**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| SID MILLER, et al., | ) | |
| *Plaintiffs*, | ) | |
| *v.* | ) | Civil Action No. 4:21-cv-595-O |
| TOM VILSACK, in his official capacity as SECRETARY OF AGRICULTURE, | ) | |
| *Defendant*. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

I.    USDA'S FARM SERVICE AGENCY AND FARM LOAN PROGRAMS .................... 3

II.    THE HISTORY OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS ........................................................................ 4

III.    CONGRESSIONAL RECOGNITION OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS AND PAST FAILURES TO REMEDY ITS LINGERING EFFECTS ............................................. 6

    A.    Congress Concludes that Its Previous Efforts Failed To Address—and Indeed Perpetuated—the Disparities Caused By the Longstanding Discrimination Against Socially Disadvantaged Farmers. .......................... 8

    B.    Congress Enacts Section 1005 To Remedy Discrimination in USDA Programs and Avoid Perpetuating Its Effects. ..................................... 11

IV.    PROCEDURAL HISTORY ................................................................................. 13

ARGUMENT ................................................................................................................ 13

I.    Plaintiffs Have Not Satisfied Any Of The Requirements For the Extraordinary Relief They Seek ..................................................................................................... 13

    A.    Plaintiffs' Legally Incorrect Conclusory Assertions Fail to Show Any Substantial Likelihood of Irreparable Harm. ................................... 14

    B.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim. .............. 17

        1.    The Government's Provision of Debt payments to SDFRs Serves Compelling Government Interests. .......................................... 19

        2.    The Government Had Strong Evidence that Remedial Action Was Necessary To Further Its Compelling Interests. ....................... 20

        3.    The Provision of Debt Relief to Minority Farmers Is Narrowly Tailored To Serve the Government's Compelling Interests. .................. 29

    C.    The Balance Of Equities And Public Interest Favor Defendant .......................... 33

II.    If The Court Concludes An Injunction Is Warranted—and It Is Not—Any Such Injunction Should Be Limited To Plaintiffs With Article III Standing. .......................... 36

CONCLUSION ............................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ........................................................................................ 17

*Am. Civil Liberties Union of Ky. V. McCreary Cty., Ky.*,
  354 F.3d 438 (6th Circ. 2003) ..................................................................... 16, 17

*Ayotte v. Planned Parenthood of Northern New Eng.*,
  546 U.S. 320 (2006) ........................................................................................ 35

*Canal Auth. Of State of Fla. V. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ........................................................................... 14

*Cantu v. United States*,
  565 F. App'x 7 (D.C. Cir. May 27, 2014) ......................................................... 23

*Cherokee Pump & Equip. Inc. v. Aurora Pump*,
  38 F.3d 246 (5th Cir. 1994) ........................................................................ 13, 14

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ........................................................................... 37

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ..................................................................... 19, 20, 29, 33

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 2003) ........................................................................... 17

*Contractors Ass'n of E. Pa., Inc. v. City of Phila.*,
  6 F.3d 990 (3d Cir. 1993) ................................................................................ 21

*Dean v. City of Shreveport*,
  438 F.3d 448 (5th Cir. 2006) ................................................................. 19, 20, 21

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................................ 16

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) ........................................................................... 14

*Fisher v. U. of Tex.*,
  136 S. Ct. 2198 (2016) ........................................................................................ 31

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ........................................................................................... 31

*Garcia v. Johanns*,
  444 F.3d 625 (D.C. Cir. 2006) ............................................................................. 4

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ........................................................................................ 36

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ..................................................................................... 18, 29

*Humana Ins. Co. v. Tenet Health Sys.*,
  No. 3:16-CV-2919-B, 2016 WL 6893629 (N.D. Tex. Nov. 21, 2016) .................... 14

*In re Black Farmer, Discrimination Litig., (Pigford II)*,
  856 F. Supp. 2d 1 (D.D.C. 2011) ............................................................... 5, 22, 23

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*,
  478 U.S. 421 (1986) ........................................................................................... 32

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ........................................................................................... 36

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................................................... 33, 34

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) .............................................................................. 17

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................... 14, 33

*Pigford v. Glickman, (Pigford I)*,
  185 F.R.D. 82 (D.D.C. 1999) .............................................................................. 23

*Rothe Dev. Corp. v. Dep't of Def.*,
  545 F.3d 1023 (Fed. Cir. 2008) .......................................................................... 21

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017) ............................................................................ 35

*Tate v. Am. Tugs, Inc.*,
    634 F.2d 869 (5th Cir. 1981) ................................................................ 15

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ............................................................................ 37

*United States v. Paradise*,
    480 U.S. 149 (1987) .......................................................... 19, 29, 31, 32

*Washington v. Trump*,
    2017 WL 4857088 (W.D. Wash Oct. 27, 2017) ................................ 15

*W. H. Scott Const. Co. v. City of Jackson, Miss.*,
    199 F.3d 206, 217 (5th Cir. 1999) ...................................................... 19

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ...................................................... 14, 17

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986) ................................................................................ 18

**Statutes**

7 USC §§ 1921 *et seq.*.......................................................................................... 3

7 USC § 1923 .......................................................................................................... 4

7 USC § 1942 .......................................................................................................... 4

7 USC § 1963 .......................................................................................................... 4

7 USC § 2279 .................................................................................................. 12, 13

7 USC § 6932 .......................................................................................................... 3

16 USC § 590h ........................................................................................................ 4

American Rescue Plan, § 1005 .......................................................... 12, 15, 36

Claims Resolution Act of 2010, Pub. L. No. 111-291 (2010) .................... 23

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14012 (2008) ................ 24

Pub. L. No. 117-2 (2021) ........................................................................... 11

## Regulations

7 CFR § 2.42 ............................................................................................ 3

7 CFR § 762.101 ..................................................................................... 4

7 CFR § 762.129 ..................................................................................... 4

7 CFR § 764.151 ..................................................................................... 4

7 CFR § 764.251 ..................................................................................... 4

7 CFR § 764.351 ..................................................................................... 4

66 FR 21617-01 (Apr. 30, 2001) ............................................................ 12

74 FR 31571 (July 2, 2009) ................................................................... 12

75 FR 27615 (May 14, 2010) ................................................................. 12

## Legislative Materials

167 Cong. Rec. H735 (daily ed. Feb. 26, 2021) ................................... *passim*

167 Cong. Rec. S.1217 (daily ed. Mar. 5, 2021) ................................. *passim*

H.R. No. 117-7 (2021) ........................................................... 11, 20, 27, 28

Hr'g on State of Black Farmers, 2021 WL 1154123 (2021) (John Boyd, Nat'l Black Farmers
   Ass'n) (March 25, 2021) ........................................................................ 25

House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill
   (Apr. 21, 2010) ................................................................................... 7

House Ag. Comm. Hr'g on USDA Oversight (July 22, 2015) ..................................... 7

Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt.,
   Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 137 (2008) ...... 7

Hr'g on the Decline of Minority Farming in the United States, Comm. on Gov't Ops., U.S. House of Reps. (1990) ........................................................................................................ 11

Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 107th Cong. (2002) (2002 Civil Rights Hr'g) ............................................................................................... 5, 6

Hr'g on State of Black Farmers, 2021 WL 1154123 (2021) (John Boyd, Nat'l Black Farmers Ass'n) (March 25, 2021) ................................................................................................ 25

Hr'g on USDA's Civil Rights Programs and Responsibilities before the House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Agric., 106th Cong. (1999) .......... 6

Hr'g to Review Availability of Credit in Rural America before the House Subcomm. on Conserv., Credit, Energy, and Research, Comm. on Ag., 110th Cong. 8 (2007) ...................... 7

Hr'g to Review the USDA's Farm Loan Programs before the Senate Comm. on Ag., Nutrition, and Forestry, 109th Cong. (2006) ................................................................................ 6, 7

Opening Stmt. of Thomas J. Vilsack before House Comm. on Ag. (Vilsack Stmt.), https://perma.cc/3LWV-4SMF ....................................................................... 19, 20, 30

Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. On Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) ..................................................................................................... 9, 26, 30

S. 278, 117th Cong. (2021) ......................................................................................... 7, 11

## Other Authorities

Civil Rights at the USDA - A Report by the Civil Rights Action Team (CRAT) (1997) (CRAT Rep.) ............................................................................................................... 5, 22

Congressional Research Service (CRS), Farm Serv. Agency Comms.: In Brief (Jan. 29, 2021), (FSA Comms.) ....................................................................................... 4

COVID-19 Racial and Ethnic Health Disparities, CDC (Dec. 10, 2020), https://perma.cc/DJ3J-22DU ....................................................................................... 27

David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012), https://perma.cc/V8TZ-C6RZ ....................................................................................... 12

D.J. Miller & Associates, report prepared for the USDA FSA (1996); USDA:
    Problems in Processing Discrim. Compls., GAO (2002)........................................................ 11

D.J. Miller, Disparity Study: Producer Participation and EEO Compl. Process Study................ 11

Equal Opportunity in Farm Progs., An Appraisal of Servs. Rendered by Agencies of the
    USDA, USCCR (1965), https://perma.cc/34HP-5V9P ............................................................ 22

Farm Service Agency Committees: In Brief (Updated Jan. 29, 2021),
    https://perma.cc/HA3L-PDPG ................................................................................................. 4

Fed'n of S. Coops/Land Assist. Fund, Ann. Rep. 4 (2020),
    https://perma.cc/94PY-HSM6 ................................................................................................. 10

GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands
    (2019), https://www.gao.gov/assets/gao-19-464.pdf ...................................................... 9, 26, 32

GAO-19-539, Agric. Lending: Info. on Credit & Outreach to [SDFRs]
    Is Limited (2019), https://perma.cc/5RD6-24VH  .......................................................... 9, 26, 32

GAO-21-399T, Fin. Servs.: Fair Lending, Access, & Retirement Sec. (2021),
    https://perma.cc/3CWQ-B959...................................................................................... 6, 27

GAO, USDA: Problems in ProcessingDiscrim. Compls. ............................................................ 11

*History and Mission*, FARM SERVICE AGENCY, https://perma.cc/B47X-MTCL............................. 4

J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Envir'l
    Working Group (EWG) (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD......................... 10, 32

Jackson Lewis LLP, "Civil Rights Assessment" Final Report
    (Mar. 31, 2011)  (JL Report,) https://perma.cc/8X6Q-GZ5V .................................. 6, 24, 25, 32

L. Minkoff-Zern & S. Sloat, *A New Era of Civil Rights?Latino Immigrant Farmers and
    Exclusion at the [USDA]*, AG. & HUMAN VALUES (2017)................................................. 25, 26

M. Gordon, "Revolution is Based on Land:  Wealth Denied via Black Farmland Ownership
    Loss" (Dec. 17, 2018) (M.A. thesis, Tufts University), https://perma.cc/YJ9U-KC7E) .......... 8

N. Rosenberg, *USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White
    Farmers*, Farm Bill Law Enterprise, https://perma.cc/T7SY-TZQM ...................................... 10

Nat'l Young Farmers Coal., Cal. Young Farmers Rep. (Apr. 2019),
    https://perma.cc/PEY5-Z253 ................................................................................ 9

Notice of Funds Availability (NOFA), https://perma.cc/A35E-UANV ............................... 12, 31

U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in
    America* (1982) (1982 Rep.), https://perma.cc/CFE9-ANJ3 ...................................... 5, 6, 21, 22

*USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE .................. 10

 USDA, Civil Rights at the [USDA] (Feb. 1997), https://perma.cc/5DNF-PFJY ......................... 5

USDA, Fact Sheet: [USDA] Agricultural Provision in H.R. 1319, the American Rescue Plan
    (Mar. 10, 2021), https://perma.cc/R69N-AL5K ........................................................ 31

USDA OIG, *Rep. for the Secretary on Civil Rights Issues – Phase I*, (1997),
    https://perma.cc/NK6B-W2CL ............................................................................. 22

USDA: Recommendations and Options to Address Mgmt. Deficiencies in the Off. of the
    Assistant Secretary for Civil Rights, GAO (2008) , https://perma.cc/YW73-83WE ............... 11

USDA, *Who Owns the Land? Agricultural Land Ownership by Race/Ethnicity, Rural America*
    (2002), https://perma.cc/FG7J-YJEQ ..................................................................... 8

## INTRODUCTION

In the midst of a global pandemic, Congress enacted Section 1005 of the American Rescue Plan Act (ARPA) to alleviate the debt of certain socially disadvantaged farmers at a time of acute need. Congress did so based on strong evidence that socially disadvantaged farmers had been subject to decades of discrimination in U.S. Department of Agriculture (USDA) programs, such that when COVID-19 hit, they sat on the brink of foreclosure at higher rates than other farmers. Congress also relied on reporting that, despite those farmers' urgent need for relief, the vast majority of recent agricultural subsidies and pandemic relief did not reach socially disadvantaged farmers. Plaintiffs, five farmers who do not allege that they have been subject to USDA discrimination or left out of prior funding, ask the Court to preliminarily enjoin USDA's implementation of Section 1005, arguing that it is unconstitutional for Congress to provide such targeted assistance. Plaintiffs' six-page motion—which is based on incorrect theories of irreparable harm and contains virtually no legal analysis—falls far short of satisfying the demanding standard for showing entitlement to such an extraordinary form of relief.

First and foremost, Plaintiffs fail to show a substantial likelihood that they would suffer irreparable harm unless a preliminary injunction is issued that would further delay the provision of debt relief to minority farmers under Section 1005.[1] Their arguments on this point are legally and factually erroneous. Plaintiffs argue that an injunction is necessary to prevent distribution of

---

[1] On June 10, 2021, the U.S. District Court for the Eastern District of Wisconsin granted a request for a temporary restraining order (TRO) enjoining Defendants from administering any loan payments under "Section 1005 until the Court rules on Plaintiffs' motion for preliminary injunction." *See* Order, *Faust v. Vilsack*, No. 21-548 (June 10, 2021), ECF Nos. 21, 22. Consistent with the Order, USDA is not issuing any loan payments under Section 1005 until the Court rules on the plaintiffs' preliminary injunction motion in that case, on which briefing is set to conclude by June 21, 2021. Given that the relief Plaintiffs seek in this motion—to halt the provision of debt relief to minority farmers under Section 1005—has been granted temporarily by another court, Defendant focuses the arguments herein on whether Plaintiffs have satisfied the requirements for a further injunction after the TRO in *Faust* expires.

all Section 1005 funds before they have an opportunity to prove that they, too, are entitled to that relief. But Congress did not provide a finite sum for debt relief; rather, it expressly appropriated "such sums as may be necessary, to remain available until expended," to pay off certain direct or guaranteed USDA farm loans held by eligible socially disadvantaged farmers. Thus, even if this Court were later to conclude that there were some legal defect (constitutional or otherwise) in the criteria employed by USDA to determine eligibility for debt relief, the Court could fashion an appropriate remedy at that juncture, without any risk of appropriated funds being depleted in the meantime. Because Plaintiffs provide no irreparable-harm allegations that are founded in law or fact, they fail to satisfy this necessary condition for obtaining preliminary relief. The Court should deny Plaintiffs' motion on this basis alone.

Plaintiffs fare no better on the remaining preliminary injunction factors. As to the merits of their constitutional claim, Plaintiffs simply assert that Congress provided debt relief to minority farmers without any justification. They are wrong. Congress concluded that paying off minority farmers' qualifying USDA loans was necessary to further its interests in remedying well-documented, long-standing racial discrimination in USDA loan programs and to ensure that its pandemic relief efforts did not perpetuate the effects of that discrimination. The Supreme Court has recognized that the Government can use race-conscious measures to further exactly those types of compelling interests. Plaintiffs' contention that the Government has no compelling interest in curing societal discrimination generally misses the mark. Congress authorized debt relief to remedy discrimination specific to USDA loan programs, the effects of which placed minority farmers in a particularly precarious position even before the pandemic hit—all the more so a year into it. And it provided for these one-time, emergency debt payments after reviewing reporting that its prior race-neutral forms of agricultural funding and relief immediately preceding and

during the pandemic largely failed to reach minority farmers—thereby perpetuating the effect of discrimination against them.  Congress has compelling interests in remedying those harms, and Plaintiffs cannot show otherwise.

On the final preliminary injunction factors, Plaintiffs utterly fail to show the balance of harms and public interest weigh in their favor.  As stated, Plaintiffs do not show any irreparable harm absent a preliminary injunction at all—much less one that outweighs the substantial harm to the public if the Court grants Plaintiffs' request and grants an injunction that would further delay payments to minority farmers upon the expiration of the TRO in *Faust*.  Congress reasonably determined that minority farmers were in need of timely debt relief after decades of USDA discrimination and in the midst of a pandemic that disproportionately affected them.  The conclusory and unsupported allegations of harm raised by these five Plaintiffs—at least one of whom does not even have a qualifying loan for purposes of Section 1005—should not be permitted to override Congress's determination and further delay the distribution of payments to their fellow Americans in need.  Plaintiffs' motion should be denied.

## BACKGROUND

## I.   USDA'S FARM SERVICE AGENCY AND FARM LOAN PROGRAMS

USDA's Farm Service Agency (FSA) administers a variety of farm credit and benefit programs.  *See* Consol. Farm and Rural Dev. Act, 7 USC §§ 1921, *et seq.*; 7 CFR § 2.42(a)(28). Like its predecessor the Farmers Home Administration (FmHA), FSA makes credit available to farmers who cannot obtain it from commercial institutions, 7 USC § 6932(b), including by making loans directly to farmers, *see id.*, and guaranteeing loans of commercial lenders up to 95%, 7 CFR § 762.129, thereby expanding opportunities for farmers and ranchers, *id.* § 762.101.[2]  These loans

---

[2] For ease of reference, Defendants use "farmers" to include "farmers and ranchers."

may assist farmers with buying or improving farm property, *id.* § 764.151 ("farm ownership" loans), provide credit and management assistance to help farmers run their farms, *id.* § 764.251 ("operating" loans), or help farmers resume operations after a disaster, *id.* § 764.351 ("emergency" loans). *See* 7 USC §§ 1923, 1942, 1963.

Local committees have been key to the administration of USDA loan programs, *see* 16 USC § 590h(b)(5), though their structure and role in those programs have changed, *see* Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.).[3] In 2002 and 2008, Congress adopted measures to ensure minority representation on local committees. *Id* at 2-3. And though county committees used to work with individuals to complete loan applications, make decisions about borrower eligibility and status, and determine loan amounts, *Garcia v. Johanns*, 444 F.3d 625, 628–29 (D.C. Cir. 2006), today they are uninvolved in the loan approval process, *see* FSA Comms. 3. Now, they generally advise USDA loan officers on regional issues, conduct outreach to farmers, provide education and training, and ensure Socially Disadvantaged Farmers and Ranchers (SDFRs)[4] are fairly represented. *See id.*

## II. THE HISTORY OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS

Although USDA aims to serve all farmers equitably,[5] decades of evidence shows that not all USDA stakeholders have benefitted equally from its services—particularly its farm loan services. *See infra* Argument (Arg.) II.B. In fact, the evidence indicates just the opposite: that throughout USDA's history and up to present day, minority farmers have been "hurt" more than helped due to discrimination in USDA's farm loan programs. Civil Rights at the [USDA]—A

---

[3] *Available at* https://perma.cc/HA3L-PDPG.

[4] As explained below, USDA defines SDFRs to include certain racial and ethnics minorities; herein, Defendants refer to SDFRs and minority farmers interchangeably.

[5] *History and Mission*, FARM SERVICE AGENCY, https://perma.cc/B47X-MTCL.

Report by the Civil Rights Action Team (CRAT) 6 (1997) (CRAT Rep.)[6]; *see also* Arg. II.B.

Minority farmers have long experienced inequities in FSA's administration of farm loans, including with respect to loan approval rates, amounts, and terms. *See* U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America* 84-85(1982) (1982 Rep.)[7] (discussing complaints of loan amounts being reduced or repayment schedules "accelerated without explanation"); *see also* CRAT Rep. 16 (discussing complaints of loans being "arbitrarily reduced" or not arriving as promised); Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Subcomm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th Cong. 23, 16-21, 33-35 (2002) (2002 Civil Rights Hr'g) (discussing disparities in loan processing times and approval rates for Hispanic farmers and discrimination complaints by "black, American Indian, [and] Hispanic" farmers). These experiences are recounted in numerous reports and the many administrative civil rights complaints filed by minority farmers. *See* Arg. II.B. But those complaints have failed to remedy individual experiences of discrimination in FSA's loan programs: too often they languished in a growing backlog or went unanswered altogether. *See id.*

These problems spawned a series of lawsuits against USDA by groups of minority farmers.[8] From 1997 and over the next decade, African-American, Native American, Hispanic, and female farmers alleged that USDA systematically discriminated against them in the administration of farm loans and other benefits and failed to investigate discrimination complaints. *See In re Black Farmer, Discrimination Litig., (Pigford II)*, 856 F. Supp. 2d 1, 8 (D.D.C. 2011); Arg. II.B. Although USDA settled the lawsuits and has paid more than $2.4 billion to claimants,

---

[6] *Available at* https://perma.cc/5DNF-PFJY.
[7] *Available at* https://perma.cc/CFE9-ANJ3.
[8] *Pigford v. Glickman* ("*Pigford I*"), No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation* ("*Pigford II*"), No. 08-mc-0511 (D.D.C.).

*see* Arg. II.B., State taxes eroded recoveries, debt relief was incomplete, and reports before Congress have shown that the settlements did not cure the problems faced by minority farmers. *See* 167 Cong. Rec. S1264 (Mar. 5, 2021) (Stabenow).

Even after the lawsuits, investigations revealed that Socially Disadvantaged Groups ("SDGs") continued to experience discrimination with respect to the requirements, availability, and timing of FSA loans. *See* Arg. II.B (discussing Jackson Lewis LLP, "Civil Rights Assessment" (Mar. 31, 2011) (JL Report)).[9] Just this year, the Government Accountability Office (GAO) noted that "[c]oncerns about discrimination in credit markets … have long existed" and that, as a result, minority farmers continue to "ha[ve] less access to credit." GAO-21-399T, Fin. Servs.: Fair Lending, Access, and Retirement Sec. 1 (2021).[10] As these and other reports have documented, discrimination in USDA's loan programs has contributed to a dramatic loss of minority-owned farmland. *See* Arg. II.B; *see, e.g.*, 1982 Rep. 176 (reporting that from 1920 to 1992, the number of all minority-owned farms fell from 925,000 to around 60,000).

## III. CONGRESSIONAL RECOGNITION OF DISCRIMINATION AGAINST SOCIALLY DISADVANTAGED FARMERS IN USDA PROGRAMS AND PAST FAILURES TO REMEDY ITS LINGERING EFFECTS

The history of discrimination against minority farmers in USDA programs has not gone unnoticed by Congress. For decades, Congress has heard testimony and acknowledged such discrimination during numerous hearings to understand and remedy its ongoing effects.[11] And in

---

[9] *Available at* https://perma.cc/8X6Q-GZ5V.

[10] *Available at* https://perma.cc/3CWQ-B959.

[11] *See, e.g.,* Hr'g on USDA's Civil Rights Progs. and Responsibilities before The House Subcomm. on Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 106th Cong. 37 (1999) (Goodlatte) (recognizing that "[c]ivil rights at the [USDA] has long been a problem"); 2002 Civil Rights Hr'g 16, 18, 26 (hearing testimony about the disparities in loan processing times and approval rates for Hispanic farmers; underrepresentation of minorities in USDA; and continuing delays in the resolution of civil rights complaints); Hr'g to Review the USDA's Farm Loan Progs. before the Senate Comm. on Ag., Nutrition, and Forestry, 109th Cong. 800 (2006) (Karen Krub, Farmers' Legal Action Group, Inc.) ("[T]here is still no meaningful process for investigation and

passing Section 1005, Congress did so again.

The predecessor to Section 1005 included findings highlighting the pattern of discrimination in USDA programs and its consequences for minority farmers. *See* S.278, "Emergency Relief for Farmers of Color Act of 2021," (intr'd Feb. 8, 2021). The bill noted that over the last century, Black farmers dwindled from 14 to two percent of all farmers and lost about 80% of their land. *Id.* § 2, ¶ 5(A)-(C). The findings attributed the losses to minority farmers to various "civil rights violations by the Federal Government," *id.* ¶ 1(B), including persistent discrimination at USDA, *id.* ¶¶ 2-15.

Floor statements leading to the passage of § 1005 echoed those findings. As Chairman of the House Agriculture Committee, David Scott, put it, "[t]he systemic discrimination against … farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy." 167 Cong. Rec. H765 (Feb. 26, 2021). He recounted "this history and the continuing challenges for these farmers" by summarizing over a dozen reports between 1965 and 2019, which showed how discrimination against them manifested at all levels of USDA—from lacking representation on county committees, to receiving disproportionately fewer farm loans, to being denied an adequate process for resolving civil rights complaints. *Id.* H765-66. Senator Cory Booker cited some of the same

---

resolution of allegations of discrimination [against] FSA decision-makers."); Hr'g to Review Availability of Credit in Rural America before the House Subcomm. on Conserv., Credit, Energy, and Research, Comm. on Ag., 110th Cong. 8 (2007); Hr'g on Mgmt. of Civil Rights at the USDA before the House Subcomm. on Gov't Mgmt., Org., and Procurement, Comm. on Oversight and Gov't Reform, 110th Cong. 137 (2008) (hearing testimony about, and recognizing, the continued problem of USDA discrimination against minority farmers, including the inability of Native American and Hispanic farmers to receive loans; underrepresentation of minorities on county committees; and delayed processing of civil rights complaints, including allegations that complaints were shredded and not processed, all despite creation in 2002 of the Assistant Secretary of Civil Rights); House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015).

evidence in attributing the massive loss of Black-owned farmland, and economic disadvantages of other minority farmers, to the "brutal legacy of discrimination by [USDA]."  *Id.* S1265; *see also id.* S1262 (Stabenow) (citing studies estimating losses "at more than $120 billion in lost opportunities").[12]

A.  **Congress Concludes that Its Previous Efforts Failed To Address—and Indeed Perpetuated—the Disparities Caused By the Longstanding Discrimination Against Socially Disadvantaged Farmers.**

At the same time, Congress acknowledged that its previous efforts to remedy the lingering effects of discrimination against minority farmers in USDA programs "ha[d] fallen short."  *Id.* S1262 (Stabenow).  As Senator Stabenow explained, Congress began targeting USDA assistance to SDFRs during the agriculture credit crisis in the 1980s, created a program to provide outreach and technical assistance to SDFRs in 1990 (the "2501 Program"), and permanently funded the 2501 Program in 2018.  *See id.* S1263-64.  In response to the lawsuits brought by groups of farmers against USDA, *supra* Background ("BG") II, Congress suspended statutes of limitations for Equal Credit Opportunity Claims in 1998, and in 2010, it provided $1.25 billion to ensure that those claimant groups received payments under their respective settlements.  *See id.* S1264.  In 2002, Congress created the Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws.  *See id.*  And in 2014, it created a permanent Office of Tribal Relations under the Secretary of Agriculture.  *See id.*

Despite these efforts, Congress found that minority farmers continued to suffer the effects of discrimination in USDA programs.  Two GAO reports mandated by Congress in 2018 illuminated the extent of the problem.  *See* GAO-19-539, Ag'l Lending: Info. on Credit & Outreach

---

[12] M. Gordon, "Revolution is Based on Land:  Wealth Denied via Black Farmland Ownership Loss" (Dec. 17, 2018) (Tufts University), https://perma.cc/YJ9U-KC7E; USDA, *Who Owns the Land? Agricultural Land Ownership by Race/Ethnicity, Rural Amer.* at 55-57 (2002), https://perma.cc/FG7J-YJEQ.

to [SDFRs] Is Limited 2 (2019)[13]; GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019).[14]  Those reports revealed that SDFRs still had "more difficulty getting loans and credit from USDA … [that] can help beginning farmers break into the business and help existing farmers continue running their operations," S1264 (Stabenow) (citing Nat'l Young Farmers Coal., Cal. Young Farmers Rep. 32 (Apr. 2019)).[15]

Congress also found that, due to the lingering effects of the longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID–19 pandemic hit"—and a year into the pandemic, some "ha[d] simply not been able to weather the storm." *Id.* S1265-66 (Booker).  For instance, Congress observed that a disproportionate number of Black, Hispanic, Asian-American, and Indigenous farmers were in default on their direct loans, putting farmers of color at risk of "facing yet another wave of foreclosures and potential land loss." *Id.* (citing statistics showing that 13% of borrowers with FSA direct loans were currently delinquent and that this number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers); *see also id.* at S1264 (Stabenow) (explaining that SDFRs are more likely to have loans in default because they "are less likely to have the same access to adequate loan servicing … as their White counterparts" due to discrimination in USDA loan programs); Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. On Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) (Adams) (citing reports that Black farmers were subject to 13% of USDA foreclosures despite being less than 3 percent of direct loan recipients).

Moreover, lawmakers cited reporting that the overwhelming majority of recent agricultural

---

[13] *Available at* https://perma.cc/5RD6-24VH.
[14] *Available at* https://www.gao.gov/assets/gao-19-464.pdf.
[15] *Available at* https://perma.cc/PEY5-Z253.

subsidies and pandemic relief prior to ARPA went to non-minority farmers, despite minority farmers occupying a more vulnerable financial position than their white counterparts. Specifically, the reporting indicated that nearly the entirety of USDA's Market Facilitation Program (MFP) payments, *see* S1264-65; *see also id.* H766,[16] and almost all of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP), went to non-minority farmers, *see id.* S1264-65; H766.[17] This disproportionate allocation of funding, Congress again found, was partly due to the lingering effects of discrimination in USDA programs. Senator Stabenow explained that "[t]he diminished relationships between [SDFRs] and USDA as a result of both latent barriers and historic discrimination limit[ed]" SDFRs' access to, and participation in, USDA programs, such that "73 percent of Black farmers … were not even aware of the agricultural aid provisions of the[se] coronavirus rescue programs." *Id.* S1264.[18] Additionally, a letter introduced into the record from 13 full-time professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem" of discrimination, by preferring certain crops (those produced by white farmers) and "reward[ing] the largest farms the most" (those owned by white farmers). *Id.* All of this, the academics concluded, had "distort[ed]

---

[16] Citing N. Rosenberg, *USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers*, Farm Bill Law Enterprise, https://perma.cc/T7SY-TZQM. In 2018 and 2019, FSA was authorized to distribute up to $25.1 billion through the MFP to assist producers directly affected by retaliatory tariffs by China. The MFP is reportedly the single largest subsidy to farmers and, according to the Farm Bill Law Enterprise, it "has almost exclusively benefitted white men and their families." *Id.*

[17] Citing J. Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Envir'l Working Group (EWG) (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD. CFAP was created in 2020 pursuant to the Coronavirus Aid, Relief, and Economic Security ("CARES Act") to assist producers who faced market disruptions due to COVID-19. It consisted of $16 billion in direct support to producers and $3 billion to buy agricultural products and re-distribute them to Americans in need. *See USDA Announces [CFAP]*, USDA (Apr. 17, 2021), https://perma.cc/B7N9-PTRE.

[18] Citing Fed'n of S. Coops/Land Assist. Fund, Ann. Rep. 4 (2020), https://perma.cc/94PY-HSM6.

credit, land, input costs, and markets" to the disadvantage of minority farmers.  *Id.*[19]

### B.  Congress Enacts Section 1005 To Remedy Discrimination in USDA Programs and Avoid Perpetuating Its Effects.

On March 10, 2021, Congress passed ARPA, which provides widespread pandemic relief to the American people, including farmers.  *See* Pub. L. No. 117-2 (2021).  ARPA "takes a multipronged approach to tackle the public health and economic crises resulting from the COVID-19 pandemic."  H.R. Rep. No. 117-7, 3 (2021).  The House Report accompanying the bill shows that Congress was focused on the "most vulnerable communities … forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities grow worse."  *Id.* at 2.  Among those communities were minority farmers who had "received a disproportionately small share of the farm loans and payments administered by USDA as a result of … longstanding and widespread discrimination."  *Id.* at 23.

As part of ARPA, Congress passed Section 1005, which was designed to "provide targeted and tailored support for … farmers," CR H765 (Scott), who "have for many decades suffered discrimination by [USDA]," *id.* S1265 (Booker), and who had not benefited from prior pandemic relief efforts, *see id.* H1273 (Rep. Neal) (explaining Black farmers were not targeted by other Covid-19 legislation); *see also id.* S1264-65 ("Congress includes these measures to address the longstanding and widespread systemic discrimination within the USDA, particularly within the loan programs, against [SDFRs].") (Stabenow); S.278, Sec. 4, ¶ (a)(1)-(2) (stating that its purpose was "to address the historical discrimination against [SDFRs] and … issues relating to … COVID–

---

[19] In addition to most of the reports cited herein, the letter also attached and summarized the following sources documenting USDA discrimination:  Hr'g on the Decline of Minority Farming in the United States, Comm. on Gov't Ops., U.S. House of Reps. (1990); D.J. Miller Disparity Study: Producer Participation and EEO Compl. Process Study), D.J. Miller & Associates report prepared for the USDA FSA (1996); USDA: Problems in Processing Discrim. Compls., GAO (2002); USDA: Recomms. and Options to Address Mgmt. Deficiencies in the Off. of the Assistant Secretary for Civil Rights, GAO (2008), https://perma.cc/YW73-83WE.  *See* S1266-67.

19 … in the farm loan programs[] and across the [USDA]").

Section 1005 provides funds to pay up to 120 percent of certain direct or guaranteed USDA farm loans held by a "socially disadvantaged farmer or rancher" and outstanding as of January 1, 2021.[20]  *See* ARPA § 1005.  For purposes of Section 1005, Congress gave the term "socially disadvantaged farmer or rancher" the same meaning as in Section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990, codified at 7 USC § 2279(a).  *See id.* ARPA § 1005(b)(3).  That provision defines a "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group," 7 USC § 2279(a)(5), which is further defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities," *id.* § 2279(a)(6).

USDA has long interpreted "socially disadvantaged group[s]" to include the following five groups: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Hispanics or Latinos; and Native Hawaiians or other Pacific Islanders.  *See* 66 FR 21617-01 (Apr. 30, 2001) (interpreting 7 USC § 2279 to include those groups for purposes of Outreach and Assistance for SDFRs Program); 74 FR 31567 (July 2, 2009) (same for Risk Management Purchase Waiver); 75 FR 27165 (May 14, 2010) (same for Conservation Reserve Program).  USDA confirmed in a Notice of Funds Availability (NOFA) that SDGs would continue to "include, but are not limited to," those same five groups, while others could be considered for inclusion on a case-by-case basis by the Secretary in response to a written request.  *See* NOFA.[21]

## IV.    PROCEDURAL HISTORY

On April 26, 2021, Plaintiff Sid Miller, on behalf of himself and others similarly situated,

---

[20] Congress provided 20% over and above outstanding loan balances because State taxes eroded previous settlement payments to minority farmers.  *See* S1264 (Stabenow); David Zucchino, *Sowing Hope, Harvesting Bitterness*, LA Times (Mar. 23, 2012), https://perma.cc/V8TZ-C6RZ.

[21] *Available at* https://perma.cc/A35E-UANV.

filed a putative class action challenging the USDA's implementation of Section 1005.  Compl., ECF No. 1.  On June 2, Plaintiff filed an Amended Complaint adding four additional Plaintiffs. Am. Compl., ECF No. 11.  All Plaintiffs are farmers who self-identify as white, *id.* ¶¶ 19-23; Plaintiff Miller alleges that he "also has approximately 2% black ancestry," *id.* ¶ 19.

With the exception of Mr. Miller, all Plaintiffs allege that they hold FSA direct and guaranteed loans.  *Id.* ¶¶ 19-23.  They claim that USDA's interpretation of "socially disadvantaged farmers and ranchers" for purposes of Sections 1005 and 1006 of ARPA, and across all other USDA programs in which USDA has interpreted the term as used in 7 U.S.C. § 2279(a), violates equal protection principles under the Constitution and violates Title VI.  *See generally* Am. Compl.

Also on June 2, Plaintiffs moved for class certification, ECF No. 13, and a preliminary injunction, ECF No. 18 (PI Mot.).  The motion for a preliminary injunction addresses only Plaintiffs' challenge to Section 1005 and not the broader challenge to all USDA interpretations of "socially disadvantaged farmer or rancher" in § 2279(a), their Title VI allegations, or any other allegations in their Amended Complaint.  *See generally* PI Mot.  In their motion, Plaintiffs ask the Court to enjoin the Secretary from providing Section 1005 debt relief to farmers or ranchers based on their race or ethnicity.  *Id.* at 1.

**ARGUMENT**

I.    **Plaintiffs Have Not Satisfied Any Of The Requirements For the Extraordinary Relief They Seek.**

"A preliminary injunction is an extraordinary remedy.  It should only be granted if the movant has clearly carried the burden of persuasion on all four . . . prerequisites." *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994).  "This is a 'difficult' and 'stringent' standard for the movant to meet." *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-CV-

2919-B, 2016 WL 6893629, at *11 (N.D. Tex. Nov. 21, 2016) (citations omitted).[22]  "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Cherokee Pump*, 38 F.3d at 249.  A plaintiff bears the burden of establishing the following four elements: "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Auth. Of State of Fla. V. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  These last two factors merge when claims are brought against the government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs fail to carry their burden here.[23]

## A. Plaintiffs' Legally Incorrect Conclusory Assertions Fail to Show Any Substantial Likelihood of Irreparable Harm.

"Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).  Thus, even where a plaintiff carries his or her burden on all other factors—and these Plaintiffs cannot— preliminary relief is inappropriate unless the plaintiff faces irreparable harm. *See id.* at 1211-13; *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("When the movant fails to prove that, absent the injunction, irreparable injury will result, … the preliminary injunction should be denied."); *Humana*, 2016 WL 6893629, at *12 ("Because an indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable

---

[22] Hereinafter, all internal alterations, citations, omissions, quotations, and subsequent history are omitted unless otherwise indicated.

[23] In their motion, Plaintiffs seek only to preliminarily enjoin USDA's implementation of Section 1005 and do not assert that any other claims raised in their Amended Complaint warrant early injunctive relief.  Defendant thus addresses only Section 1005 in its Response and does not waive any arguments opposing any other claims raised in Plaintiffs' Amended Complaint.

injury, only in rare instances is the issuance of a mandatory preliminary injunction proper." (quoting *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981)).  Plaintiffs' two-paragraph argument fails to clearly establish a substantial threat of irreparable injury that would justify this rare form of relief, and their motion should be denied for that reason alone.[24]

Plaintiffs are vague about the nature of the harm they believe a preliminary injunction will prevent.  At the outset, they seem to rest on the mistaken belief that, without an injunction now, all funds allocated by Section 1005 may be exhausted while the case is ongoing and preclude Plaintiffs from receiving any should they demonstrate they are in fact entitled to debt payments. They say that, absent an injunction, "the entirety of funds Congress … appropriated under section 1005 will be unavailable to them" and there will be no way "to 'claw back' this money once" dispensed.  PI Mot. at 4.  But there is no risk that Section 1005 funds will run dry before this case is resolved through the normal course of litigation.  Congress appropriated "such sums as may be necessary, to remain available until expended," for payments to qualifying loans under Section 1005.  ARPA § 1005.  So if Plaintiffs contend that they are entitled to payments because they are "socially disadvantaged farmers or ranchers" within the meaning of the Act, then an immediate injunction is wholly unnecessary to protect any claim of entitlement to those funds.[25]  If, on the

---

[24] Here, where another court has entered a nationwide TRO enjoining USDA from issuing loan payments to minority farmers under Section 1005, Plaintiffs plainly cannot show that they will suffer "imminent" harm so as to warrant further injunctive relief.  *Pars Equality Ctr. v. Trump*, No. 17-cv-0255-TSC (D.D.C.) (March 2, 2018), ECF No. 143 (staying request for preliminary relief because another nationwide injunction "calls into question whether the harms Plaintiffs allege are actually imminent or certain—a prerequisite for a preliminary injunction"); *Washington v. Trump*, 2017 WL 4857088, at *6 (W.D. Wash Oct. 27, 2017) ("[T]he Hawaii federal district court's injunction already provides Plaintiff States with virtually all the relief they seek in their TRO motion.").  And in any event, Plaintiffs have not satisfied any of the requirements for a preliminary injunction that would further delay payments to minority farmers upon expiration of the TRO.

[25] Plaintiffs make a passing reference to their inability to obtain damages against the Government because of sovereign immunity, but Plaintiffs have not made a claim for past harm for which

other hand, Plaintiffs concede that they are ineligible to receive loan payments under Section 1005 because they are not "socially disadvantaged farmer[s] or rancher[s]," but complain that this form of targeted assistance is unconstitutional, then a preliminary injunction to further delay distribution of needed funds to *others* who do fit within the definition still will not remedy any harm to Plaintiffs. Thus, whether they claim to be eligible recipients of the funds or not, no preliminary injunction is necessary to prevent depleting Section 1005 funds. They fail to show irreparable harm on this basis.

Plaintiffs' only other argument in support of irreparable harm is likewise unsubstantiated. Relying on one line plucked from an out-of-circuit case, they contend that an alleged constitutional violation constitutes irreparable harm without more. PI Mot. at 5. But the caselaw does not stand for that all-encompassing proposition, which would relieve every plaintiff raising a constitutional claim of their heavy burden to make the irreparable harm showing necessary to warrant emergency relief. The sole Sixth Circuit case Plaintiffs cite—*Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003)—simply applies the Supreme Court's conclusion elsewhere that a likelihood of success on the merits of a First Amendment claim is sufficient to show irreparable injury. *See id.* (discussing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the Sixth Circuit has explained, "when a party seeks a preliminary injunction on the basis of the potential violation *of the First Amendment*, the likelihood of success on the merits often will be the determinative factor." *Id.* (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 2003)) (emphasis added). Yet Plaintiffs cite no case at all—much less a Fifth Circuit case—

---

damages would be available. They seek injunctive and declaratory relief related to the Government's allocation of funds. Am. Compl. ¶ 48; PI Mot. at 1. Any irreparable-harm principles that might apply in a damages cases—and Plaintiff has not specified what those are—thus have no relevance here.

extending that principle outside the First Amendment context and to equal protection claims. And there is good reason to reject Plaintiffs' novel theory that irreparable harm is assumed in every equal protection case: that standard would lower the bar for every plaintiff, of every race and gender, seeking to preliminarily enjoin the Government merely on the basis of equal protection allegations, thereby crippling the ability of federal agencies to operate effectively.

Plaintiffs' theory, moreover, conflicts with Fifth Circuit precedent underscoring the "fact-specific" nature of the irreparable harm inquiry, which eschews reliance on the nature of a claim alone, as Plaintiffs do here. *White*, 862 F.2d at 1213 (rejecting "the untenable assertion that the nature of [the] claim" alleged may "eliminate … the need [to] make any fact-specific argument as to how [the movant] will be irreparably harmed"). Irreparable injuries, "by their nature, depend on the circumstances surrounding each case." *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975). Plaintiffs fail to make any factual allegations of irreparable injury. Having failed to establish any irreparable harm, Plaintiffs present no basis for obtaining the drastic remedy of early injunctive relief that they seek. Their motion should be denied on for that reason alone.

## B. Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim.

Plaintiffs likewise cannot show a likelihood of success on the merits of their challenge to Section 1005's implementation. Plaintiffs contend that the Government's use of race and ethnicity in determining who is eligible for Section 1005 loan payments violates equal protection. They are wrong.

"The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). Thus, "[a]lthough all governmental uses of race are subject to strict scrutiny, not all are invalidated by it." *Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003). "When race-based

action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Id.* at 327. Ultimately, a plaintiff bears the burden of demonstrating the unconstitutionality of the Government's race-based remedial measures adopted to further a compelling interest. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986). Plaintiffs cannot do so here.

The Government's provision of debt relief to socially disadvantaged farmers through Section 1005 is supported by well-established compelling interests in remedying discrimination in agency programs and in ensuring that public funds are not allocated in a manner that perpetuates the effects of that discrimination. Leading up to ARPA's enactment, Congress considered strong evidence revealing the unfortunate, but well-documented, history of discrimination against minority farmers in USDA programs, and in particular its loan programs. Congress also considered evidence that recent gaps in agricultural and pandemic-related funding to those same minority groups further exacerbated the disadvantaged position of minority farmers as compared to their white counterparts, as a result of longstanding discrimination in USDA loan programs. With those concerns in mind, it adopted Section 1005's time-limited remedy, designed to meet the acute needs of socially disadvantaged farmers in this unique historic moment. And USDA tailored its implementation of Section 1005 loan payments to the groups that Congress observed had suffered discrimination but had been left out of prior rounds of monetary relief, while also flexibly allowing for the inclusion of other groups shown to be socially disadvantaged. The Government's use of racial classifications to relieve the debts of SDFRs is thus narrowly tailored to further the Government's compelling interests.

1. **The Government's Provision of Debt payments to SDFRs Serves Compelling Government Interests.**

The government's compelling interest in relieving debt of SDFRs is two-fold: to remedy the well-documented history of discrimination against minority farmers in USDA loan (and other) programs and prevent public funds from being allocated in a way that perpetuates the effects of discrimination. Its reliance on these interests did not break new ground. "It is well settled that the government has a compelling interest in remedying its own past discrimination." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (citing *United States v. Paradise*, 480 U.S. 149, 167 (1987)). And "[i]t is beyond dispute that any public entity ... has a compelling interest in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (O'Connor, J., plurality op.); *see also W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999) ("[A] governmental entity can enact a race-conscious program" if it "has been a passive participant in a system of racial exclusion.").

The congressional record elaborates both concerns at length. *See supra* BG III. And USDA has reiterated them. In hearings leading to Section 1005's enactment, Agriculture Secretary Vilsack told Congress that providing debt relief to minority farmers would "address longstanding racial equity issues within [USDA]" and "respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt." Opening Stmt. of Thomas J. Vilsack before House Comm. on Ag. (Vilsack Stmt.).[26] He emphasized that historic discrimination has "plague[d] the programs at the USDA, especially [] the Farm Loan Program." *Id.* At the same time, Congress and USDA expressed an interest in ensuring that current pandemic-relief funds are not allocated in a manner that perpetuates discrimination against minority farmers,

---

[26] *Available at* https://perma.cc/3LWV-4SMF.

19

as had been the case with distribution of recent funds to farmers.  *See* BG III.  Members of Congress explained that minority farmers had been largely left out of prior agricultural funding (such as the MFP) and the pandemic relief in CFAP, *see id.*, and Secretary Vilsack stressed that debt relief authorized by Section 1005 would help SDFRs "dealing with a disproportionate share of COVID infection rates, hospitalizations, death and economic hurt," Vilsack Stmt.

Plaintiffs' sole rejoinder is that the Government lacks any interest in curing "amorphous claims of past discrimination" in society writ large.  PI Mot. at 4 (citing *Croson*, 488 U.S. at 499-506).  But the Government did not invoke such an interest here.  Rather, it pointed to voluminous evidence that USDA itself—and particularly FSA, through its farm loan programs—had discriminated against minority farmers for decades.   Congress had a compelling interest in remedying that historic discrimination and its lingering effects, made acute by a pandemic that disproportionately affected minority farmers and exacerbated by those farmers' lack of access to recent USDA funds.  H.R. Rep. 117-7, 23 (stating that Section 1005 takes a "tailored approach" "to address[ing] … longstanding inequities" in USDA programs and congressional funding).

### 2. The Government Had Strong Evidence that Remedial Action Was Necessary To Further Its Compelling Interests.

The Government's compelling interests were supported by strong evidence that remedial action was necessary to address long-standing discrimination in USDA programs and its lingering effects.  The Government need not make a "formal finding of discrimination prior to the use of a race-conscious remedy," but it must have a "strong basis in evidence for the conclusion that remedial action was necessary."  *Dean*, 438 F.3d at 455.  Although "[t]he Supreme Court has offered little guidance as to how much evidence of past discrimination is required," "gross statistical disparities" may in some cases "constitute prima facie proof of a pattern or practice of discrimination, *id.*, and the combination of anecdotal and statistical evidence is potent,"

*Contractors Ass'n of E. Pa., Inc. v. City of Phila.*, 6 F.3d 990, 1003 (3d Cir. 1993); *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1046 (Fed. Cir. 2008) ("[B]oth statistical and anecdotal evidence are appropriate in the strict scrutiny calculus[.]").Here, the decades of investigations, testimony, and reports on which Congress relied when it enacted Section 1005 provide a strong basis in evidence to support its conclusion that targeted debt relief was necessary to address the lingering effects of historic discrimination against minority farmers in USDA programs, and to prevent the allocation of pandemic relief from perpetuating that same discrimination and placing minority farmers at a further disadvantage.

a. *The Government's Persuasive Evidence of Longstanding Discrimination Against SDFRs in USDA Programs.*  As set forth below, in enacting Section 1005, Congress relied on a vast body of statistical and anecdotal evidence recounting discrimination against SDFRs in USDA programs.

Initial reports by USCCR in 1965 and 1982 shed light on the specific inequities in USDA's farm loan programs, which "actively contributed to the [alarming] decline in the Black ownership of farmland."  1982 Rep. 176.  USCCR reported that between 1970 and 1980, Black-operated farms had declined "57 percent—a rate of loss 2 1/2 times that for white-operated farms"—and that "almost 94 percent of the farms operated by blacks ha[d] been lost since 1920."  *Id.*  FSA (through its predecessor FmHA) was largely to blame.  1982 Rep. 176-79.

For instance, FmHA consistently provided inferior loans—with respect to amounts and terms—to Black farmers as compared to their white counterparts, which was consistent with its overall pattern of "follow[ing] local patterns of racial segregation and discrimination in providing assistance" to farmers.  Equal Opportunity in Farm Progs., An Appraisal of Servs. Rendered by Agencies of the USDA, USCCR (1965) (1965 Rep.) 100.[27]  Data "revealed that in terms of the size

---

[27] *Available at* https://perma.cc/34HP-5V9P.

of loans, purposes for which loans were to be used, and technical assistance, FmHA did not provide services to black farmers comparable to those provided to similarly situated whites." 1982 Rep. at 9. Moreover, USDA's civil rights complaints process—an otherwise "important tool to ensure that FmHA provide[d] equal opportunities for minority farmers," *id.* at 134—was too "ineffective" and "untimely" to provide adequate recourse, *id.* at 169. Investigation into the large number of civil rights complaints showed they were often stalled or not acted on at all. *Id.* at 166-70. The cost of this discrimination was often "the season's crop, and ultimately the[] farm[]." *Id.* at 173.

That is exactly what such discrimination cost many farmers, according to another civil rights report issued over a decade later. When a team of USDA leaders appointed by the Secretary of Agriculture—the Civil Rights Action Team ("CRAT")—reviewed USDA's civil rights problems in 1997, it heard Black, Hispanic, Asian-American, and American Indian farmers tell of unexplained delays in processing their loan applications, arbitrary reductions in farm loans by county officials, and failures to receive promised loans at all, often leaving them "without enough money to repay suppliers and any mortgage or equipment debts." *Id.* at 3, 6-7, 15-16. Many minority farmers lost "significant amounts of land and potential farm income" as a result of these practices. *Id.* at 30; *id.* at 14 (reporting that "the number of all minority farms ha[d] fallen" significantly''—"from 950,000 in 1920 to around 60,000 in 1992"); *see also* 1982 Rep. 176 (reporting similar findings). Like the USCCR, the CRAT found that USDA's civil rights complaints process was an ineffective "system without accountability," where complaints often languished for years in a growing backlog or were left unanswered altogether. *Id.* at 24-25.[28]

---

[28] *See also* USDA OIG, *Rep. for Secretary on Civil Rights Issues – Phase I*, (1997), https://perma.cc/NK6B-W2CL.

Lack of administrative recourse for discrimination led to a series of lawsuits over the next decade by African-American, Native American, Hispanic, and female farmers, alleging that USDA had systematically discriminated against them on the basis of race, ethnicity, and gender in the administration of farm loans and other benefits and routinely failed to investigate administrative complaints about such discrimination. *See Pigford II*, 856 F. Supp. 2d at 8 (describing allegations by African-American farmers that USDA had "deprived countless farmers of desperately needed credit and payments under various aid programs," causing "severe financial losses and even, in many cases, los[t] … land"); *Cantu v. United States*, 565 F. App'x 7 (D.C. Cir. May 27, 2014) (summarizing similar allegations in the other suits).

Though the cases settled, the court in *Pigford I* stressed that the claims, "though broad in scope, were no exaggeration"—it was clear by then that USDA had failed to "provide equal opportunity for all as the law requires." *Pigford II*, 856 F. Supp. 2d at 8 (quoting CRAT Rep. 6). Farmers in that case recounted not only being denied loans but also receiving them after "planting season was over, [when] the loans w[ere] virtually useless," or receiving supervised loans requiring a county supervisor's co-signature before funds could be withdrawn. *Pigford v. Glickman, (Pigford I)*, 185 F.R.D. 82, 87 (D.D.C. 1999). To receive payments under the settlements, claimants had to substantiate these claims of discrimination with some level of evidence. *Pigford II*, 856 F. Supp. 2d at 9-10 (explaining the settlement's two-track system that awarded differing amounts depending on a "substantial evidence" or "preponderance of the evidence" showing); *see also Cantu*, 565 F. App'x at 8-9 (explaining processes in other cases). In the *Pigford* litigation alone, so many African-American farmers sought relief that Congress enacted special legislation extending the statute of limitations for administrative civil rights complaints, *see* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14012 (2008), and then

appropriated $1.25 billion to fund awards to successful claimants, *see* Claims Resolution Act of 2010, Pub. L. No. 111-291 (2010).  To date, the government has paid more than $2.4 billion under settlement agreements with minority and female farmers who sufficiently substantiated their claims.  *See Pigford I*, 97-cv-1978, ECF No. 1812, at 7; *Pigford II*, 08-mc-511, ECF No. 378-1, at 4; *Keepseagle*, 99-cv-3119, ECF No. 646, at 2; *Love*, 00-cv-2502, ECF No. 248-1, at 4.

Even after these settlements, problems with discrimination in USDA programs lingered. In 2011, the firm Jackson Lewis LLP ("JL") was commissioned by Secretary Vilsack to assess the "effectiveness" of USDA agencies "in reaching America's diverse population in a non-discriminatory manner."  JL Rep. i.  After a thorough 18-month investigation and analysis, JL issued a 569-page report setting forth its findings and 234 recommendations.  *See id.* at iv, viii. The report compiled substantial anecdotal evidence, depicting "a system where the deck was always stacked, not only against access to USDA programs, but also against [customers'] ultimate success" due to their status as minorities.  *Id.* at viii.[29]  It found that the evidence "substantiated claims of denial of equal program access and continuing institutional discrimination," *id.* at viii, which resulted in "a broad and longstanding negative impact on … SDGs—including the loss of scarce or irreplaceable farm lands," *id.* at 64.[30]

Like preceding reports, the JL Report again recounted the persistent complaints that African-Americans, Hispanics, and Asians were discriminated against with respect to the

---

[29] Relatedly, JL cited substantial statistical evidence that, in the every-day operations of each USDA agency reviewed, SDGs were under-represented to their detriment, *see id.* xxiii, including with respect to the FSA specifically, *id.* at 131; *see also id.* at 69-72.  This contributed to "serious concerns as to both inequitable service delivery … and employment discrimination."  *Id.* at 63.

[30] The JL Report included women in its groups of SDGs, along with Hispanics/Latinos; Blacks/African Americans; Asians; American Indians/Alaskan Natives; and Native Hawaiians/Pacific Islanders.  *See id.* 66 n.33.  Although USDA's interpretation of SDGs, consistent with the statutory definition, includes only racial and ethnic groups, Defendants rely herein on JL Report's many findings specific to the aforementioned racial and ethnic groups.

availability, timing, and requirements for obtaining FSA loans. *See id.* at 83-87. African-American farmers, for instance, complained of their loans being "doled out in small amounts by FSA or subject to dual signature" requirements, or having other supervision requirements not imposed on white farmers. *Id.* at 85-86 ("When loans are approved for African Americans, FSA tends to 'control the purse strings' (uses supervised accounts), and the same is not true for Whites who receive loans[.]").[31] Hispanic and Asian farmers similarly reported unfair treatment and being "stereotyped as … farm workers, rather than farm owners." *Id.* at 86-87. Additionally, the report found that USDA's discrimination complaints processing resulted in "what appear[ed] to be an almost foregone conclusion: in 97%+ of the claims, there [wa]s no finding of discrimination." *Id.* at xxv. It stressed that "most FSA employees" believed "that inequitable treatment of customers and potential customers is, at worst, a series of isolated and independent incidents." *Id.* at 66. That was incorrect, according to JL—in reality, "the inequities faced by SDGs have, over time, been systemic and ingrained in every-day FSA operations." *Id.*

*b. The Government's Persuasive Evidence of Lingering Discrimination in USDA Programs.* The inequalities described in the JL Report are reflected in recent reports that "continue to document the challenges and barriers faced by farmers of color due to race or ethnic discrimination or the legacy of such discrimination." CR S1263 (Stabenow). For instance, a 2017 study focused on "the challenges faced by Latinx farmers," including the "failure of agricultural agencies to engage in appropriate outreach or account for language barriers" with respect to them. H766 (citing L. Minkoff-Zern & S. Sloat, *A New Era of Civil Rights? Latino Immigrant Farmers*

---

[31] In recent congressional testimony, Congress heard of black farmers receiving "'supervised' bank accounts which required white loan officers to co-sign every transaction." Comm. Hr'g on State of Black Farmers, 2021 WL 1154123 (2021) (John Boyd, Nat'l Black Farmers Ass'n) (March 25, 2021).

*and Exclusion at [USDA]*, AG. & HUMAN VALUES 34 (2017)) (attached as Ex. B).  The study's conclusion: "These processes have succeeded in creating agricultural racial formations, resulting in the ownership and operation of US farms remaining in primarily white hands."  Minkoff-Zern & Sloat, *A New* Era at 634.

Two additional GAO reports, generated at Congress's request, looked at the "challenges SDFRs reportedly face in obtaining agricultural credit[.]"  GAO-19-539, 2.  In the first report, GAO concluded that the "long-standing and well-documented" "allegations of unlawful discrimination against SDFRs in the management of USDA programs" were substantiated by the data and were continuing to affect SDFRs' ability to access credit.  *Id.* at 28-29.[32]  In the second report, specific to Native Americans, GAO noted that some Native American stakeholders believed "discrimination ... contribute[d] to the lack of commercial lending on tribal lands," which may also have "deter[ed] them from applying for credit" at all.  GAO-19-464, 19-20.

That same year, Congress held a hearing on civil rights compliance at USDA "to ensure the Department ... functions equally for everyone it serves and employs, regardless of race, gender, ethnicity, or any other protected class."  2019 Civil Rights Hr'g 1 (Fudge).  By that time, the "controversial history on civil rights at USDA" was "no secret."  *Id.*  Congress repeated some of the same concerns about discrimination that motivated its, and USDA's, prior efforts to revise the Department's programing, including the higher foreclosure rates for black farmland, *id.* at 9, and the faster decline of farm ownership "for black farmers than for other farmers."  *Id.* at 8.

---

[32] Specifically, SDFRs accounted for an estimated 17% of primary producers in USDA's 2015-2017 Agricultural Resource Management Surveys but only 13% of farms with loans and 8 percent of total outstanding farm debt.  SDFR debt represented an estimated 9% of total farm ownership debt and 7% of total farm operating debt.  Therefore, even though farm ownership debt comprised most outstanding SDFR farm debt (67%), SDFR primary producers were still less likely to have outstanding farm ownership debt than all other farmers and ranchers.  GAO-19-539, at 16.

In 2021, GAO released another report summarizing "more than a decade of [its] work" on issues related to income security and underscoring the "racial and income disparities in access to financial services and availability of credit," including among "minority farmers and ranchers." GAO-21-399T, at 1.  Drawing from previous reports and incorporating updated data, GAO concluded that minority farmers, including tribal members, "had less access to credit than other agricultural businesses."  *Id.* at 1, 2-3 (statistics illustrating that they "received a disproportionately small share of farm loans and agricultural credit").  All of this and additional evidence relied upon by Congress in passing Section 1005 was more than sufficient to justify its conclusion that there has been discrimination against minority farmers in USDA loan (and other) programs.

*c. The Government's Persuasive Evidence That Allocation of Prior USDA Funds Perpetuated the Effects of Longstanding Discrimination in USDA Programs.*  Congress also had a strong basis in evidence to conclude that, while COVID-19 was hitting minority farmers the hardest, recent agricultural funding and pandemic relief was unfortunately perpetuating historic inequalities, creating a need for targeted relief.  Numerous sources have reported the pandemic's disproportionate impact on the health and welfare of minorities in the United States.  *See, e.g.*, COVID-19 Racial and Ethnic Health Disparities, CDC (Dec. 10, 2020), https://perma.cc/DJ3J-22DU.  Congress recognized this, *see* H.R. Rep. No. 117-7, 2-3 (noting that the "most vulnerable communities" had been "forced to bear the brunt of" the pandemic and economic crisis), and found that minority farmers were in a particularly vulnerable position, *see* CR S1265 ("[F]armers of color were in a far more precarious financial situation" than their white counterparts "before the COVID-19 pandemic hit.") (Booker).  For instance, while "[a]pproximately 13 percent of borrowers with FSA direct loans [we]re currently delinquent on their loans," that number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers, meaning that

27

minority farmers were on the precipice of "yet another wave of foreclosures and potential land loss." *Id.* S1266.

Despite minority farmers having a disproportionate need for monetary relief, Congress noted that although "USDA spends billions of dollars annually to provide crucial support to American agricultural producers," "agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups." H.R. Rep. No. 117-7, 23; *see also id.* at 12 (noting that such programs "continue to disproportionately benefit farmers who are not racial or ethnic minorities"). Indeed, as discussed, Congress cited reporting that the overwhelming majority of recent agricultural funding and pandemic relief had gone to white farmers. *See* BG III.A. The academic letter introduced into the congressional record also explained that these were just the most recent examples of farm programs that "have perpetuated and exacerbated the problem" of discrimination against minority farmers by favoring large, non-minority landowners. CR S1266. Congress thus had a strong basis in evidence to conclude that its "tailored approach" in Section 1005 was necessary "to address these longstanding inequities." H.R. Rep. 117-7, 23.

*d. Plaintiffs Do Not Undermine the Government's Evidence.* Plaintiffs do not grapple with any of this evidence. They simply ignore it. The entirety of Plaintiffs' argument consists of their conclusory assertions that loan payments to minority farmers is a "blatant violation of the principles of rule of law and equal protection," and that the Government did not base its remedial action on any evidence related to "the industry in question." PI Mot. at 3-4. Those blanket assertions, devoid of any analysis, are contradicted by the congressional record outlined above. Congress considered decades of evidence of discrimination toward minority farmers in USDA

programs—and specifically in FSA loan programs—as well as evidence that recent pandemic funding and other subsidies have failed to address, but instead have perpetuated, the lingering effects of that longstanding discrimination.  Plaintiffs do not undermine this extensive evidence of discrimination specific to USDA and its loan programs.  They thus fail to rebut the Government's conclusions that race-based remedial action was necessary to further its compelling interests in remedying such discrimination and not perpetuating its effects.

### 3. The Provision of Debt Relief to Minority Farmers Is Narrowly Tailored To Serve the Government's Compelling Interests.

The targeted relief that Congress provided in Section 1005 is also narrowly tailored to further the government's compelling interests.  Narrow tailoring requires that "the means chosen to accomplish the government's asserted purpose must be specifically and narrowly framed to accomplish that purpose."  *Grutter*, 539 U.S. at 333.  To assess narrow tailoring, courts look to: "[i] the necessity for the relief and the efficacy of alternative remedies; [ii] the flexibility and duration of the relief, including the availability of waiver provisions; [iii] the relationship of the numerical goals to the relevant labor market; and [iv] the impact of the relief on the rights of third parties," *Paradise*, 480 U.S. at 171, as well as over- or under-inclusiveness, *see Croson*, 488 U.S. at 506.  All of the pertinent factors show that USDA's provision of debt relief to minority farmers is narrowly tailored.

First, the necessity for USDA's remedial action is firmly rooted in the evidence set forth above, showing longstanding discrimination against minority farmers in USDA programs.  *See* Arg. I.B.2.  That discrimination contributed to a situation where minority farmers were hit hardest by COVID-19, such that they were on the brink of foreclosure at higher rates than white farmers, and yet, got short-changed again, reportedly receiving a tiny fraction of CFAP funds less than a year after white farmers received the vast majority of the single largest U.S. agricultural subsidy.

*See* BG III.A.  Targeted relief to minority farmers was thus necessary to remedy the discriminatory effects on minority farmers, made even more acute by a pandemic that disproportionately affected them, *see* Vilsack Stmt. (explaining disproportionate impacts on SDFRs), and to ensure that, unlike prior agricultural funding and pandemic relief, public funds were not allocated in a manner that perpetuated existing inequities.

The necessity of the debt relief in Section 1005 is underscored by the inefficacy of the race-neutral alternatives that Congress used before enacting Section 1005.  As explained, Congress changed the role of county committees in USDA loan programs and enacted measures to achieve greater minority representation on those committees in 2002 and 2008, *see* BG I; and yet testimony and reporting, as recent as one month before Congress passed Section 1005, shows continuing disparities in the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers.  *See id.* III.A.  Also, in 2002, Congress created an Assistant Secretary of Civil Rights at USDA to attempt to address the agency's poor civil rights record; and yet subsequent testimony and reports showed continuing issues in processing civil rights complaints, *see* Arg. I.B.2, including "inconsistencies and missing information in [USDA] data" and a dearth of findings of wrongdoing as recently as 2019, *see* 2019 Civil Rights Hr'g (Fudge).  Congress created the 2501 Program in 1990 to increase minority farmers' awareness of, and access to, USDA resources, and permanently funded the program in 2018; and yet recent reporting indicated that minority farmers were still not aware of USDA resources, including recent pandemic relief, *see* BG III.A.  And most recently, Congress created CFAP to help farmers who had been adversely impacted by the pandemic; and yet the vast majority of the billions in CFAP funding did not reach minority farmers due to structural biases in federal farm programs.  *See id.*  Where Congress has tried for decades to use race-neutral means to remedy the effects of discrimination against minority

farmers, the relative failure of those race-neutral efforts shows the necessity for this race-conscious one.  *See Fisher v. U. of Tex.*, 136 S. Ct. 2198, 2213 (2016) (race-conscious admissions program was narrowly tailored where university failed to achieve compelling interest after trying to do so for seven years via race-neutral means).

Second, in addition to being necessary, the debt relief for minority farmers is both flexible and time-limited.  Although five minority groups are included in USDA's definition of "socially disadvantaged groups," USDA's definition is "not limited to" those groups.  NOFA, 6.  Rather, the Secretary will consider written requests on a case-by-case basis to determine whether other groups should be eligible for debt relief.  *See id.*  The debt relief under Section 1005 is also "a one-time occurrence," extended to SDFRs with qualified loans as of January 1, 2021.  USDA's implementation of Section 1005 is thus "flexib[le] in administration," *Fullilove v. Klutznick*, 448 U.S. 448, 460 (1980), and "temporary in application," *Paradise*, 480 U.S. at 178, thereby ensuring that the race-conscious measure endures no longer than necessary to serve its purposes.

Third, USDA's provision of debt relief to minority farmers does not impose an unacceptable burden on innocent third parties, namely white farmers.  Plaintiffs point to no evidence that white farmers were historically denied equal treatment by USDA.  And Plaintiffs do not address reports showing that the overwhelming and disproportionate majority of recent agricultural subsidies and pandemic relief before ARPA went to white farmers, and not minority farmers.  *See BG* III.A.  The temporary and comparatively small debt relief under Section 1005[33] to relieve the sizeable burden minority farmers have long borne does not impose an impermissible burden on white farmers, who have received the vast majority of agricultural funding.  *See BG*

---

[33] The MFP alone is a $25.1 billion program, while USDA estimates that payments under § 1005 will be roughly over $4 billion.  *See* https://perma.cc/R69N-AL5K.

III.A; *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (finding 29.3% nonwhite union membership goal to remedy past discrimination had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union").

Fourth and finally, USDA's provision of loan payments to minority farmers is neither over- nor under-inclusive. As explained, there is a large body of evidence that the minority groups included in USDA's definition of "socially disadvantaged groups" for purposes of Section 1005 have suffered from discrimination in USDA programs with nation-wide scope. USDA has defined SDGs to include those same racial and ethnic groups since at least 2001. *See* BG III.B. And reporting before and since then has recounted discrimination in federal programs against *those* SDGs, including by addressing a particular SDG, *see, e.g.,* GAO 19-464 (addressing Native Americans); *see also* JL Rep., or SDGs as a whole as defined by the USDA, *see, e.g.,* GAO 19- 539 at 1. Reporting also shows that recent agricultural funding has gone disproportionately to those who do not fall within USDA's definition of SDGs. *See* Jared Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, EWG (Feb. 18, 2021), https:// perma.cc/PVZ7-QMFD. Where particular racial and ethnic groups have suffered discrimination in USDA programs and been largely left out of relief efforts, debt relief to those particular groups to ameliorate the effects of that discrimination and unequal funding is not over-inclusive. *See, Paradise*, 480 U.S. 149. Nor is the definition underinclusive because it does not include white farmers. As noted, the evidence simply does not show that white farmers have suffered the same history of discrimination as minority farmers or failed to receive recent funding. Where Congress sought to remedy discrimination and funding inequities unique to minority farmers, Section 1005 is not under-inclusive because it does not include white farmers who generally have not suffered

the same discrimination and unequal treatment.  *See Croson*, 488 U.S. at 506 (noting that if relief program was meant "to compensate black contractors for past discrimination, one might legitimately ask why" remedial relief must be shared with those who were not shown to have been discriminated against).

Plaintiffs offer nothing to contradict any of this.  In fact, they say nothing at all related to the narrow tailoring analysis, and simply rest on a single, conclusory assertion that the debt relief provided by Section 1005 does not "satisfy the 'strict scrutiny' standard."  PI Mot. at 3-4.  With that sole contention, Plaintiffs falls far short of satisfying their burden to show that the Government's remedial action here is unconstitutional, much less show that they are entitled to the drastic remedy of preliminary injunctive relief.

### C.  The Balance Of Equities And Public Interest Favor Defendant

Finally, the balance of harms overwhelmingly favors Defendant7s, as the injunction Plaintiff seeks is manifestly contrary to the public interest.  *See Nken*, 556 U.S. at 435 (pointing out that "[t]hese factors merge when the Government is the opposing party").  Congress passed Section 1005 based on its determination that timely debt relief for minority farmers was necessary to remedy the lingering effects of the well-documented history of USDA discrimination against them and to ensure that, unlike prior funding, pandemic relief actually reached them.  *See* Ex. A, § BG III.A-B.  And it did so based on evidence that minorities, and minority farmers in particular, were especially in need due to the disproportionate impact of COVID-19 on those communities and their lack of access to prior rounds of agricultural funding and pandemic relief.  *See id.*

Congress has a compelling interest in remedying prior discrimination and in ensuring that its funds are not allocated in a manner that perpetuates that discrimination.  *See id.* § Arg. I.B.1; *see also supra* Arg. I.B.  The Government and the public likewise have a strong interest in the implementation of the laws enacted by their elected representatives.  *See Maryland v. King*, 567

U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And the thousands of minority farmers, who, Congress emphasized, sat disproportionately on the brink of foreclosure when COVID-19 hit, plainly have a strong interest in receiving the debt relief to which they are entitled. *See* Declaration of William D. Cobb ¶¶ 36-40 ("Cobb Decl.") (attached as Exhibit A)[34] (explaining that minority farmers have requested a disproportionate number of disaster set-aside requests due to the impacts of COVID-19 and the adverse impacts on those farmers if debt payments were to be delayed). Indeed, as the Declaration by FSA's Deputy Administrator for Farm Loan Programs explains, 299 accounts with eligible recipients to whom USDA anticipates sending offer notices are currently in bankruptcy proceedings, *see* Cobb Decl. ¶ 37, and minority farmers are delinquent on FSA loans at higher rates—in some cases much higher rates—than white farmers, *see id.* ¶ 38. Further delaying loan payments to those farmers after the nationwide TRO in *Faust* expires, as Plaintiffs ask the Court to do, could adversely affect their ability to obtain student loans, loans from the Small Business Administration, or loans from other federal agencies. *See id.* It will delay their closings on new FSA loans. *See id.* ¶ 40. And it could result in foreclosure on their farms by non-USDA lenders, which already account for a disproportionately high number of foreclosures. *See id.* ¶ 39.

Plaintiffs ignore the reality of these harms in seeking to preliminarily enjoin implementation of Section 1005. And, as previously discussed, they show no irreparable harm to

---

[34] The Cobb Declaration was prepared for purposes of responding to the TRO motion in *Faust*, and thus discusses USDA's anticipated timeline for implementing Section 1005, including issuing payments. As stated above, *supra* n.1, USDA is complying with the TRO. Consistent with the order, USDA continues to "identify[] eligible recipients, mail[] notices, accept[] and review[] [acceptance letters], respond[] to inquiries regarding the program, and mak[e] other determinations" related to loan payments but is not issuing any payments to eligible recipients while the order is in effect. TRO Op. & Order 8, ECF No. 21, *Faust*, No. 21-cv-548.

their own interests, *supra* Arg. I.A., much less one that would outweigh these specific, potential harms to minority farmers across the country. Their fleeting reference to the unexplained "financial harms that are being inflicted" on them, PI Mot. at 5, certainly does not (as Plaintiffs assert) "tip[] the scales" on this factor "decisively in [their] favor," *id.* at 6. Even if they had alleged any facts whatsoever in support of that assertion of financial harm, such harm—which could be remedied by the unlimited appropriation in Section 1005 at the conclusion of these proceedings—does not outweigh the Government's and the public's interest in remedying prior discrimination, ensuring the equitable and timely distribution of much-needed pandemic relief, and seeing the implementation of duly enacted federal law.

Finally, Plaintiffs contend that "[i]f the Court agrees that the plaintiffs are likely to succeed on their [constitutional] claim," then a preliminary injunction is, necessarily, in the public interest. PI Mot. at 6. But the public interest weighs against any further delay of the implementation of Section 1005 even if one assumes that Plaintiffs' legal claims have merit. "When the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). "The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand." *Id.* at 1699; *see Ayotte v. Planned Parenthood of N. New Eng.,* 546 U.S. 320, 330 (2006) (explaining that "the touchstone for any decision about remedy is legislative intent"). Further delay of implementation of the program would be appropriate only if Plaintiffs could show, in addition to the other requisite showings, that Congress would prefer, as a remedy for any constitutional violation, to provide *no* immediate relief for *any* minority farmers while the program is redesigned. There is no basis for concluding that further delaying the provision of emergency

relief to those farmers would be consistent with Congress's intent in enacting Section 1005. Plaintiffs therefore fail to show that their desired injunction would constitute an appropriate remedy under binding Supreme Court precedent.

## II.    If The Court Concludes An Injunction Is Warranted—and It Is Not—Any Such Injunction Should Be Limited To Plaintiffs With Article III Standing.

As previously noted, the Eastern District of Wisconsin issued a nationwide TRO on June 10 that prohibits USDA from processing any Section 1005 payments until it rules on the plaintiffs' pending motion for preliminary injunction. *Faust v. Vilsack*, 1:21-cv-548 (E.D. Wis.), ECF No. 21. At least while that TRO remains in place, it is unnecessary for this Court to issue any injunctive relief. But should this Court determine that any form of injunctive relief is necessary at some point after the restraining order in *Faust* expires (and it should not), any such injunction should be limited to the Plaintiffs before the Court. A remedy "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and an injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Plaintiffs suggest that they seek to ensure that funds appropriated by Section 1005 remain "[]available to them" and that they do not "wind up" being "exclud[ed]" from obtaining debt relief should they be deemed entitled to it. PI Mot. at 4-5. As already explained, there is no need for an injunction to protect that interest, because Congress allocated "such sums as may be necessary, to remain available until expended," to distribute debt relief to qualified SDFR loan-holders; those funds are therefore not at risk of depletion. ARPA § 1005(a)(1); *see supra* Arg. Part I.A. Nonetheless, if the Court had any doubts about whether those funds will remain available, it could issue a limited injunction requiring the Government to set aside funds sufficient to pay off any of Plaintiffs' qualified loans pending the outcome of this litigation. That limited injunction would

ensure that Plaintiffs are not "exclud[ed]" from the debt relief they seek if they establish entitlement to receive it.  And it would be consistent with the well-established principle that courts cannot grant relief to third parties not before them.  *See* Df.'s Opp'n to Pls.' Mot. for Class Cert. Part V (filed concurrently with this brief).

In the same vein, such an injunction should extend only to the Plaintiffs in this case who can establish standing because they actually have a loan that could be paid off under ARPA if eligibility extended to them.  Plaintiff Sid Miller does not.  *See* Am. Compl. ¶ 19.  Because he has no USDA qualifying loans, and thus would not be entitled to debt relief regardless of whether he fell within the meaning of SDFR, he is not entitled to any form of injunctive relief.  *See also* Df.'s Opp'n to Pls.' Mot. for Class Cert. Part V.

Finally, a preliminary injunction extending beyond these Plaintiffs would flout Supreme Court warnings against nationwide injunctions.  *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (Nationwide relief "take[s] a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."); *see also City of Chicago v. Barr*, 961 F.3d 882, 936 (7th Cir. 2020) (Manion, J., concurring) (explaining that tailored relief "guards against a decision premised on faulty assumptions: that the parties presented the district court with the very best arguments on the merits; that no other jurisdictions' standards for injunctive relief would yield different results than in this case; … and that no trial judge sitting in the 93 other districts could possibly reach a different decision on these issues.").  Those warnings are particularly apt here where Section 1005 is being challenged in six other courts.  *Faust*, 1:21-cv-548 (E.D. Wis.); *Wynn v. Vilsack*, 3:21-cv-514

(M.D. Fla.); *Carpenter v. Vilsack*, 21-cv-103 (D. Wyo.); *Holman v. Vilsack*, 21-cv-1085 (W.D. Tenn.); *Kent v. Vilsack*, 21-cv-540 (S.D. Ill.); *McKinney v. Vilsack*, 21-cv-212 (E.D. Tex.).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:  June 11, 2021                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Acting Assistant Attorney General

                                         LESLEY FARBY
                                         Assistant Branch Director
                                         Civil Division, Federal Programs Branch

                                         */s/ Kyla M. Snow*
                                         EMILY SUE NEWTON (VA Bar No. 80745)
                                         Senior Trial Counsel
                                         KYLA M. SNOW (Ohio Bar No. 96662)
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, D.C. 20005
                                         Tel: (202) 514-3259 / Fax: (202) 616-8460
                                         kyla.snow@usdoj.gov

                                         *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2021, a copy of the foregoing was filed electronically via

the Court's ECF system, which effects service upon counsel of record.

*/s/ Kyla M. Snow*
KYLA M. SNOW (Ohio Bar No. 96662)
Trial Attorney, U.S. Department of Justice
