UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Sid Miller**, et al., | |
| Plaintiffs, | |
| v. | Case No. 4:21-cv-00595-O |
| **Tom Vilsack**, in his official capacity as Secretary of Agriculture, | |
| Defendant. | |

## REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

GENE P. HAMILTON
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

H. DUSTIN FILLMORE III
Texas Bar No. 06996010
CHARLES W. FILLMORE
Texas Bar No. 00785861
The Fillmore Law Firm, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

## TABLE OF CONTENTS

Table of contents ........................................................................................................ i

Table of authorities ................................................................................................... ii

   I.  Plaintiffs will suffer irreparable harm absent a preliminary injunction ...................... 1

     A.  Money is a finite resource and the funds for agriculture relief are being consumed ....................................................................................................... 1

     B.  Irreparable harm occurs whenever the government violates a plaintiff's constitutional right to be free from racial discrimination .................................... 5

  II.  The racial exclusions in section 1005 are not narrowly tailored to advance a compelling government interest ........................................................................... 6

     A.  The government lacks a compelling government interest to justify racial discrimination .............................................................................................. 7

     B.  The government did not narrowly tailor its program ......................................... 8

  III. The existence of a temporary restraining order in other litigation does not render a preliminary injunction unnecessary ....................................................... 10

Conclusion .............................................................................................................. 11

Certificate of service ............................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ................................................................................7

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
212 F.3d 738 (2d Cir. 2000) ...................................................................5

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
32 F. Supp. 2d 619 (W.D.N.Y. 1999)......................................................6

*California v. Azar,*
No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal.) (April 26, 2019).....................11

*California v. Texas,*
No. 19-840 (June 17, 2021) .....................................................................2

*City and County of Baltimore v. Azar,*
No. 1:19-cv-01103-RDB (ECF No. 43) (May 30, 2019)...........................11

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) .........................................................................7, 8, 9

*Faust v. Vilsack,*
No. 1:21-cv-00548-WCG, 2021 WL 2409729 (E.D. Wis. June 10, 2021)............passim

*Fisher v. Univ. of Texas at Austin,*
570 U.S. 297 (2013) ................................................................................6

*McKenzie v. City of Chicago,*
118 F.3d 552 (7th Cir. 1997) .................................................................10

*Morgan v. Fletcher,*
518 F.2d 236 (5th Cir. 1975) ...................................................................6

*Office of Personnel Management v. Richmond,*
496 U.S. 414 (1990) ................................................................................2

*Oregon v. Azar,*
No. 6:10-cv-00317 (ECF No. 142) (D. Oregon) (April 29, 2019)............11

*Seila Law LLC v. Consumer Financial Protection Bureau,*
140 S. Ct. 2183 (2020) .............................................................................3

*Small v. Hudson,*
322 F. Supp. 519 (M.D. Fla. 1970) ..........................................................6

*Texas v. United States,*
945 F.3d 355 (5th Cir. 2019) ...................................................................2

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ...........................................................................10

*Vitolo v. Guzman*,
   No. 21-5517, 2021 WL 2172181 (6th Cir. May 27, 2021) ......................................1, 6

*Washington v. Azar*,
   No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash.) (April 25, 2019) ......................11

*White v. Carlucci*,
   862 F.2d 1209 (5th Cir. 1989) ...................................................................................6

*Zepeda v. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983) ...................................................................................10

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 7 ..........................................................................................1

## Other Authorities

Douglas G. Baird and Thomas H. Jackson, *Corporate Reorganizations and
   the Treatment of Diverse Ownership Interests: A Comment on Adequate
   Protection of Secured Creditors in Bankruptcy*, 51 U. Chi. L. Rev. 97
   (1984) ...................................................................................................................3

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
   131 Harv. L. Rev. 417 (2017)...................................................................................11

Khristopher J. Brooks, *Coronavirus Relief Funding Includes $5 Billion for
   Farmers of Color*, CBS NEWS (May 15, 2021)..................................................4

Laura Reiley, *Relief Bill is Most Significant Legislation for Black Farmers Since
   Civil Rights Act, Experts Say*, Wash. Post (March 8, 2021) ............................4

Jeanine Santucci, *How $1.9 Trillion COVID-19 Relief Bill Aims to Help Black
   and Socially Disadvantaged Farmers*, USA TODAY (May 14, 2021)................................4

11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed., update
   2021) .................................................................................................................5

The government is distributing federal money according to racially discriminatory criteria. That is odious and patently unconstitutional, and the government's 40-page effort to justify this racialist practice does nothing to rebut the plaintiffs' constitutional objections or the need for a preliminary injunction.

## I.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

The government denies the existence of irreparable harm, but encountering unconstitutional racial discrimination at the hands of government officials is irreparable harm *per se*. *See Vitolo v. Guzman*, No. 21-5517, 2021 WL 2172181, at *3 (6th Cir. May 27, 2021); *Faust v. Vilsack*, No. 1:21-cv-00548-WCG, 2021 WL 2409729, at *4 (E.D. Wis. June 10, 2021). If the Court determines that the plaintiffs are likely to succeed on the merits of their constitutional objections, then a finding of irreparable harm automatically follows. None of the government's arguments do anything to change this inescapable fact.

### A.   Money Is A Finite Resource And The Funds For Agriculture Relief Are Being Consumed

The government suggests that the money appropriated for the loan-forgiveness program is unlimited. *See* Def.'s Br. (ECF No. 27) at 15. It therefore insists that the plaintiffs will not suffer "irreparable harm" if the government continues to administer its racially discriminatory loan-forgiveness program, because it claims that the plaintiffs will be able to obtain loan forgiveness after final judgment if the courts pronounce the racial exclusions unconstitutional. *See id*. There are many problems with this argument.

First. The government assumes that it can redress the alleged constitutional violations by ignoring the racial restrictions in section 1005 and awarding loan forgiveness to *every* farmer and rancher regardless of race. But the Appropriations Clause does not allow the defendants to spend money from the Treasury except by "Appropriations made by Law,"[1] and the appropriation of money in section 1005 is limited by its terms to loan forgiveness for

---

1.   U.S. Const. art. I, § 9, cl. 7.

"socially disadvantaged farmers or ranchers." It is unconstitutional for the defendants to spend money appropriated by section 1005 on loan forgiveness for anyone who falls outside the category of "socially disadvantaged farmer or rancher"—even in response to a judicial pronouncement that declares section 1005's racial exclusions unconstitutional. And it is unconstitutional for this Court to order a remedy that compels the defendants to spend money from the Treasury in violation of an explicit congressional limitation on appropriated funds. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 425 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."). Unless and until Congress acts to appropriate money for farmers or ranchers who fall outside the category of "socially disadvantaged farmer or rancher," the funds appropriated by section 1005 may be spent *only* on loan forgiveness for "socially disadvantaged farmers or ranchers"—or on no one at all.

It is of course possible that Congress might choose to enact new legislation that appropriates money for farmers and ranchers of all races in response to an adverse ruling from this Court, but that it entirely speculative and does nothing to defeat the plaintiffs' showing of irreparable harm. And the government does not even contend that this will happen. Instead, the government assumes that it can spend money in violation of the Appropriations Clause in response to a court ruling that disapproves the racial exclusions in section 1005. But the text of section 1005 will remain on the books no matter how this Court rules on the constitutional issues—and it will continue to limit the defendants' ability to spend money from the Treasury. *See Texas v. United States*, 945 F.3d 355, 396 (5th Cir. 2019) ("The federal courts have no authority to erase a duly enacted law from the statute books, [but can only] decline to enforce a statute in a particular case or controversy." (citation and internal quotation marks omitted)), vacated on other grounds in *California v. Texas*, No. 19-840 (June 17, 2021); *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2220

(2020) (Thomas, J., concurring in part and dissenting in part) ("The Federal Judiciary does not have the power to excise, erase, alter, or otherwise strike down a statute.").

Second. The plaintiffs will *still* suffer irreparable harm even if they could somehow obtain a payment equal to 120 percent of their "outstanding indebtedness" at the conclusion of court proceedings. The wait itself inflicts irreparable injury because the plaintiffs are unable to obtain immediate loan forgiveness on account of their race, while minority farmers and ranchers can obtain loan forgiveness without delay. And the plaintiffs will not be compensated for their wait time because sovereign immunity prevents them from recovering interest from the federal government, and their "outstanding indebtedness" will shrink between now and the end of court proceedings if they continue making monthly payments. A payment of money one year from now is worth significantly less than immediate payment of the same nominal amount,[2] and there is no mechanism to compensate the plaintiffs for any erosion in the value of the ultimate payout that they receive.

Third. The premise of the government's argument—that the funds available for loan forgiveness under section 1005 are infinite—is dubious and has already been rejected by a federal district court considering a similar challenge to the constitutionality of section 1005's racial exclusions. *See Faust v. Vilsack*, No. 1:21-cv-00548-WCG, 2021 WL 2409729, at *4 (E.D. Wis. June 10, 2021). The government appears to be relying on the open-ended wording of the statute, which provides for "such sums as may be necessary" to pay for the program. But the government never explains how this actually works. In practice, money comes in discrete lump sums. Congress appropriated an initial pot of money as part of the American Rescue Plan Act. It is not hard to find multiple news sources reporting on the allocations for agriculture and for the farm programs challenged here.[3] $10.4 billion was designated for

---

2.  *See, e.g.*, Douglas G. Baird and Thomas H. Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy*, 51 U. Chi. L. Rev. 97, 123–25 (1984).

3.  *See, e.g.*, *What's in the American Rescue Plan Act of 2021 for Agriculture?*, Farm Bureau (March 8, 2021), https://www.fb.org/market-intel/whats-in-the-american-rescue-

agriculture and food supply sectors.[4] Of that, "approximately half would go to disadvantaged farmers"[5]— $5 billion was earmarked to "go to socially disadvantaged farmers of color."[6] About four billion dollars would go toward the loan forgiveness ("covering up to 120% of outstanding debt"), while another $1 billion was "for outreach, training, education, technical assistance and grants."[7] There is a pot of money there right now and it is being spent. Future appropriations are possible but not guaranteed, and a court cannot order Congress to pass a bill if this money runs out. And as the pandemic conditions pass, it is anyone's guess whether additional ARPA funds will continue to be allocated.

In the Wisconsin litigation, the district court found that there was a real possibility that the money Congress had already designated would be used and leave none for future appropriation:

> Defendants have already started to forgive loans, and the 8,580 farmers and ranchers who were sent offer letters represent approximately 49% of the loans that will be forgiven under the program. The entire $3.8 billion that has been allocated to the program may be depleted before briefing and consideration of the motion for a preliminary injunction. Plaintiffs' injuries are also irreparable in light of Defendants' sovereign immunity and Plaintiffs' inability to seek damages.

---

plan-act-of-2021-for-agriculture (last accessed June 18, 2021); Khristopher J. Brooks, *Coronavirus Relief Funding Includes $5 Billion for Farmers of Color*, CBS NEWS (May 15, 2021), https://www.cbsnews.com/news/black-farmers-covid-relief-stimuus-bill-american-rescue-plan (last accessed June 18, 2021).

4.  *Id.*

5.  *See* Laura Reiley, *Relief Bill is Most Significant Legislation for Black Farmers Since Civil Rights Act, Experts Say*, Wash. Post (March 8, 2021), https://www.washingtonpost.com/business/2021/03/08/reparations-black-farmers-stimulus (last accessed June 18, 2021).

6.  *See* Jeanine Santucci, *How $1.9 Trillion COVID-19 Relief Bill Aims to Help Black and Socially Disadvantaged Farmers*, USA TODAY (May 14, 2021), https://www.usatoday.com/story/news/politics/2021/03/13/how-covid-relief-bill-aims-to-help-socially-disadvantaged-farmers/4637103001 (last accessed June 18, 2021).

7.  *See id.*

*Faust v. Vilsack*, No. 1:21-cv-00548-WCG, 2021 WL 2409729, at *4 (E.D. Wis. June 10, 2021). And once the funds are used, there is no way to get them back. The federal court in the Wisconsin litigation recognized this point: "Plaintiffs' injuries are . . . irreparable in light of Defendants' sovereign immunity and Plaintiffs' inability to seek damages." *Faust*, 2021 WL 2409729, at *4.

### B. Irreparable Harm Occurs Whenever The Government Violates A Plaintiff's Constitutional Right To Be Free From Racial Discrimination

The government denies that racial discrimination at the hands of government constitutes irreparable harm *per se*, and it insists that particular, individualized facts be introduced to "prove" the existence of irreparable harm in these situations. The district court in Wisconsin found the government's approach astonishing: "Defendants make the extraordinary argument that racial discrimination inflicts no harm at all." *Faust*, 2021 WL 2409729 at *4. But even if one takes a more generous reading of the defendant's position, it still comes up short.

The defendants observe that the denial of First Amendment rights has been recognized as a *per se* irreparable harm, and they suggest that this is the *only* situation where a constitutional violation will automatically qualify as irreparable harm. The defendants are mistaken: "[T]o the extent that defendants suggest that only alleged First Amendment violations give rise to constitutional claims for which monetary compensation would be insufficient, this is clearly incorrect." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744–45 (2d Cir. 2000). It is true that First Amendment violations have been the most *common* context for finding irreparable harm from constitutional violations, but they are just examples of a broader principle: "When an alleged deprivation of a constitutional right is involved, *such as* the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed., update 2021) (emphasis added).

A constitutional violation does not automatically become irreparable harm if it can be remedied with damages—as, for example, in a denial of employment.[8] "Although there is some authority from other circuits that an alleged constitutional violation does not necessarily give rise to irreparable injury in every case, . . . those cases involved situations in which the actual harm was of an economic nature and could thus be remedied by damages." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 32 F. Supp. 2d 619, 625–26 (W.D.N.Y. 1999), vacated on other grounds, 212 F.3d 738 (2d Cir. 2000). *See also Small v. Hudson*, 322 F. Supp. 519, 529 (M.D. Fla. 1970) ("Racial discrimination is per se irreparable harm to the minority group."), citing *Brown v. Board of Education*, 347 U.S. 483, 493–95 (1954). Here, there is no possibility of getting damages due to sovereign immunity. *See Faust*, 2021 WL 2409729 at *4. With damages unavailable, the plaintiffs are threatened with irreparable harm.

## II. THE RACIAL EXCLUSIONS IN SECTION 1005 ARE NOT NARROWLY TAILORED TO ADVANCE A COMPELLING GOVERNMENT INTEREST

"'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people,' and therefore 'are contrary to our traditions and hence constitutionally suspect.'" *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 309 (2013) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000), and *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). The government claims that its discriminatory program is justified by historical discrimination and statistical disparities. Neither of these is enough to justify racial discrimination. And even if it were, the government's programs are not narrowly tailored to address the problem. "This is a very demanding standard, which few programs will survive." *Vitolo v. Guzman*, No. 21-5517, 2021 WL 2172181, at *4 (6th Cir. May 27, 2021).

---

8. That is precisely the situation in the case relied upon by the Government for the proposition that particularized, fact-specific arguments are required. *See White v. Carlucci*, 862 F.2d 1209, 1213 (5th Cir. 1989). Similarly, the other case cited by the government, *Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975), is also about employment.

A. **The Government Lacks a Compelling Government Interest to Justify Racial Discrimination**

"Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). A "generalized assertion" of past discrimination across an "entire industry" is not sufficient to justify discrimination in the present. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). Instead, there must be evidence of *intentional* discrimination, which is more than just a statistical disparity. *J.A. Croson Co.*, 488 U.S. at 503.

But generalized assertions and statistical disparities are the only kinds of evidence that the government provides here. There is tragic statistical data documenting the decline of black farms. Def's. Br. (ECF No. 27) at 21. There are reports documenting failures and shortcomings in the USDA's complaint process in the 1960s. *See id.* at 21–22. There were investigations from 1997 and 2011 suggesting that the USDA neglected its civil rights complaints, *id.* at 22, and had significant differences in access based on race, *id.* at 24. There was litigation alleging discrimination in the USDA's administration of aid programs. *Id.* at 23. More recent reports suggested discrimination in lending to Native Americans, *id.* at 26, and obstacles (including language barriers) for Latino farmers, *id.* at 25. The government goes on to cite additional studies and congressional hearings.

But there is no evidence of *intentional* discrimination in the USDA's administration of COVID-19 relief programs. All that the government has in the present are some statistical disparities. What it has in the past might be better evidence of actual discrimination by the USDA but it has not shown a connection between that historical discrimination and the COVID-19 relief program. And the fact that the socially disadvantaged farmers at issue in this case actually *received* loans from the Department of Agriculture renders any historical shortcomings completely irrelevant for the purpose of section 1005. The government lacks a compelling interest that could justify its discriminating on the basis of race today.

**B.    The Government Did Not Narrowly Tailor Its Program**

Even if the government had relevant evidence of intentional discrimination, its attempt to justify racial discrimination would run aground on the issue of tailoring. "Narrow tailoring" requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *see also J.A. Croson Co.*, 488 U.S. at 507. That government falls far short of this requirement.

First. The evidence that the government points to as "serious" consideration of race-neutral alternatives is misplaced. There is in fact no suggestion that the government thought about race-neutral alternatives to address the racial disparities at issue here—which is the racial disparity in accessing COVID-19 relief funds. The government instead muddies the waters by talking about the years that the USDA spent trying various programs to remedy various aspects of discrimination and differential treatment or outcomes. For example, in 2002, Congress created an Assistant Secretary of Civil Rights at USDA to address the problems with the USDA's civil-rights complaint processes. It sought to improve minority representation on county committees handling loan programs in an effort to address disparities in access to USDA loans. The government thinks that the fact that disparities remain an issue shows that race-neutral ways of addressing the problem have failed. But it's conflating all the problems into a single, generalized issue of disparate racial access to USDA programs. It's back to a problem of specificity, running afoul in the process of the Supreme Court's requirements for a compelling government interest. On the other hand, when the government is sufficiently specific in describing the problems, then it becomes obvious that its attempt to use the ARPA agriculture preferences as a solution is not narrowly tailored.

The government has also failed to provide anything resembling a tight fit between the ends it says it is trying to accomplish (eradicating a variety of racial disparities in farm aid) and the means it is undertaking to accomplish those ends. In other words, the government's attempting tailoring is imprecise. "[A] policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications." *Vitolo v. Guzman*, No. 21-5517, 2021

WL 2172181, at *6 (6th Cir. May 27, 2021), citing *J.A. Croson Co.*, 488 U.S. at 507–08, and *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003).

The congressional discussions cited by the defendants shows that the proponents of this race-based relief saw it as a response to "systemic discrimination," Def. Resp. Br. at 19. It was not singling out particularized instances of discrimination. It was instead a project that lumped together a range of anecdotal evidence of distinct kinds of problems and attempted to provide a single remedy through a broad program that had little to do with the specific problems identified in the past. This USDA program is a blunt instrument for dealing with the complex and varied historical problems listed in the government's brief.

For example, most of the government's evidence pertains only to black farmers. *See, e.g.*, Def.'s Br. (ECF No. 27) at 5, citing U.S. Commission on Civil Rights (USCCR), *The Decline of Black Farming in America* 84–85 (1982) (1982 Rep.); Def.'s Br. (ECF No. 27) at 10. What does this evidence have to do with the program's preferences for Asian-Americans? Another report cited by the government suggested that blacks, Hispanics, and Asians were subject to discrimination in their applications for FSA loans. Def. Resp. Br. at 24–25. What does this have to do with the preferences for American Indians or Alaskan Natives? Another report found disparities in loan processing that affected Hispanic farmers. Def. Resp. Br. at 5. Why should this inform the treatment of blacks?

Lumping together distinct groups with distinct histories is a textbook demonstration of imprecise tailoring. In *J.A. Croson Co.*, 488 U.S. at 506, the Supreme Court faulted the affirmative-action program at issue for covering Aleut or Eskimo citizens without any reason to think that they had been subjected to the same discrimination that justified the rest of the program. The USDA's program suffers from the same flaw. It tries to justify its existence by invoking an assortment of distinct pieces of evidence—historical instances of discrimination, more recent statistical disparities. But different pieces of evidence show that distinct groups suffered in different ways. And the program does not make the least effort to tailor its purportedly remedial efforts to the different groups' experiences.

One could imagine a great many different kinds of programs to deal with the problems raised in the government's brief. If the problem is ongoing discrimination in the USDA's civil-rights complaint procedures, then it needs to address the complaint procedures. If the problem is access and approval for loans, then it needs to address that process. And so on. "The obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to stop: it is not to direct it to intentionally discriminate against others on the basis of their race and national origin." *Faust*, 2021 WL 2409729, at *3.

## III. THE EXISTENCE OF A TEMPORARY RESTRAINING ORDER IN OTHER LITIGATION DOES NOT RENDER A PRELIMINARY INJUNCTION UNNECESSARY

The government suggests that the Court should deny a preliminary injunction because the district court in *Faust* has already issued a TRO. See Def.'s Br. (ECF No. 27) at 36. The government's stance is untenable. The TRO in *Faust* lasts only for 14 days, and the plaintiffs in *Faust* did not bring a class action and do not purport to represent the plaintiffs in this litigation. And although the district court in *Faust* issued a "nationwide injunction" despite the absence of a certified class, the practice of extending injunctive relief beyond the named plaintiffs to a lawsuit is controversial and the scope of the *Faust* injunction could very well be narrowed on appeal. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2426–48 (2018) (Thomas, J., concurring) (criticizing the practice of "nationwide injunctions"); *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (Easterbrook, J.) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs."); *Zepeda v. I.N.S.*, 753 F.2d 719, 727–28 (9th Cir. 1983) ("[An] injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs."); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417

(2017). In all events, there is nothing wrong with district courts issuing redundant prelimi-nary injunctions; this practice was commonplace during the Trump Administration,[9] and the government cites no authority that prohibits a district court from entering a preliminary injunction after a different court has issued the same preliminary relief.

As for the government's contention that relief be limited to the named plaintiffs: The plaintiffs have moved for class certification precisely to obviate any objections that might be raised to a so-called nationwide injunction. The plaintiffs respectfully ask the Court to grant the pending motion for class certification, and then award preliminary injunctive relief on a classwide basis.

## CONCLUSION

The motion for preliminary injunction should be granted.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

| | |
|---|---|
| Gene P. Hamilton | Jonathan F. Mitchell |
| Virginia Bar No. 80434 | Texas Bar No. 24075463 |
| Vice-President and General Counsel | Mitchell Law PLLC |
| America First Legal Foundation | 111 Congress Avenue, Suite 400 |
| 300 Independence Avenue SE | Austin, Texas 78701 |
| Washington, DC 20003 | (512) 686-3940 (phone) |
| (202) 964-3721 | (512) 686-3941 (fax) |
| gene.hamilton@aflegal.org | jonathan@mitchell.law |

(additional counsel listed on following page)

---

9.  *See, e.g.*, *Washington v. Azar*, No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash.) (April 25, 2019) (nationwide injunction issued against the enforcement of the Trump Admin-istration's Protect Life rule); *Oregon v. Azar*, No. 6:10-cv-00317 (ECF No. 142) (D. Oregon) (April 29, 2019) (redundant nationwide injunction issued against the enforce-ment of the Trump Administration's Protect Life rule); *California v. Azar*, No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal.) (April 26, 2019) (redundant injunction issued against the enforcement of the Trump Administration's Protect Life rule limited to the named plaintiffs); *City and County of Baltimore v. Azar*, No. 1:19-cv-01103-RDB (ECF No. 43) (May 30, 2019) (redundant injunction issued against the enforcement of the Trump Administration's Protect Life rule limited to the named plaintiffs).

H. DUSTIN FILLMORE III
Texas Bar No. 06996010
CHARLES W. FILLMORE
Texas Bar No. 00785861
The Fillmore Law Firm, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

*Counsel for Plaintiffs and*
*the Proposed Classes*

Dated: June 18, 2021

## CERTIFICATE OF SERVICE

I certify that on June 18, 2021, I served this document through CM/ECF upon:

EMILY SUE NEWTON
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 305-8356 (phone)
(202) 616-8460 (fax)
emily.s.newton@usdoj.gov

*Counsel for Defendants*

   /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs and
the Proposed Class*