IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **SID MILLER, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:21-cv-0595-O** |
| | § | |
| **TOM VILSACK,** *in his official capacity as* | § | |
| *Secretary of Agriculture*, | § | |
| | § | |
| **Defendant.** | § | |

## <u>ORDER</u>

Before the Court are Plaintiffs' Motion for Class Certification (ECF Nos. 12–13), filed June 2, 2021; the Government's Response (ECF No. 28), filed June 11, 2021; Plaintiffs' Reply (ECF No. 41), filed June 18, 2021; Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 17–18), filed June 2, 2021; the Government's Response (ECF No. 27), filed June 11, 2021; and Plaintiffs' Reply (ECF No. 42), filed June 18, 2021. Plaintiffs seek a preliminary injunction to enjoin the Department of Agriculture from providing loan forgiveness to farmers and ranchers on the basis of race or ethnicity. *See* Inj. Mot., ECF No. 18. Having considered the briefing, relevant facts, and applicable law, and for the reasons set forth below, the Court **GRANTS** both motions.

## I.   BACKGROUND

Plaintiffs are Texas farmers and ranchers seeking to enjoin the United States Department of Agriculture from administering a recently enacted loan-forgiveness program under section 1005 of the American Rescue Plan Act of 2021 (ARPA). That Act appropriated funds to the USDA and required the Secretary to "provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021," to pay off qualifying Farm Service Agency (FSA) loans. ARPA, Pub. L. No. 117-2, § 1005 (2021). To be

eligible under the program, an applicant must be a "socially disadvantaged farmer or rancher" as defined in section 2501(a) of the Food, Agriculture Conservation, and Trade Act of 1990 (codified at 7 U.S.C. § 2279(a)). *See id.* That statute provides that a "'socially disadvantaged farmer or rancher' means a farmer or rancher who is a member of a socially disadvantaged group." 7 U.S.C. § 2279(a)(5). It defines "socially disadvantaged group" as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." *Id.* § 2279(a)(6). In announcing a Notice of Funds Availability, the USDA stated that those groups include but are not limited to "American Indians or Alaskan Natives," "Asians," "Blacks or African Americans," "Native Hawaiians or other Pacific Islanders," and "Hispanics or Latinos." Notice of Funds Availability, 86 Fed. Reg. 28,330 (May 26, 2021).

Plaintiffs held qualifying FSA loans on January 1, 2021 but are white, making them ineligible for the funds under the Act. *See* Inj. Mot. 1–2, ECF No. 18-4; 1–2, ECF No. 18-5; 1–2, ECF No. 18-6; 1–2, ECF No. 18-7. On April 26, 2021, Plaintiffs filed a class action to enjoin the program as a violation of equal protection under the United States Constitution and a violation of Title VI of the Civil Rights Act of 1964. *See* Compl. 6, ECF No. 1. In the alternative, Plaintiffs argue in Claims Two and Three, that, as a matter of statutory interpretation, "socially disadvantaged group" must be construed to include white ethnic groups that have experienced discrimination and individuals who have any discernible trace of minority ancestry. *See id.* at 7–9. After filing their Complaint, Plaintiffs filed the present Motion for Class Certification and Motion for Preliminary Injunction on June 2, 2021. *See* Class Cert. Mot., ECF Nos. 12–13; Inj. Mot., ECF Nos. 17–18. After responses and replies, the motions are ripe for the Court's

consideration. *See* Class Cert. Resp., ECF No. 28; Inj. Resp., ECF No. 27; Class Cert. Reply, ECF No. 41; Inj. Reply, ECF No. 42.

## II.   LEGAL STANDARD

### A.  Class Certification

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)) (internal quotation marks omitted). The party seeking class certification "bear[s] the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). "The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). A district court must "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination'" of the certification issues. *Stukenberg*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2003)).

Federal Rule of Civil Procedure 23 governs whether a proposed class falls within this limited exception. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).  Rule 23(a)'s four threshold requirements are

(1)     the class is so numerous that joinder of all members is impracticable;
(2)     there are questions of law or fact common to the class;
(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four threshold conditions are "commonly known as numerosity, commonality, typicality, and adequacy of representation." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (citing Fed. R. Civ. P. 23(a)) (additional citation and internal quotation marks omitted). Additionally, the Fifth Circuit has articulated an "ascertainability" doctrine implicit in Rule 23. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."). "To maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam) (citations omitted).

Rule 23(b)(2) applies where the four threshold requirements are met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This requirement is satisfied "when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

### B.  Preliminary Injunction

To prevail on an application for a preliminary injunction, the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *See Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

To qualify for a preliminary injunction, the movant must clearly carry the burden of persuasion with respect to all four requirements. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *See Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction. *See* Fed. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal*, 489 F.2d at 572). A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). Even when a movant satisfies each of the four *Canal* factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light*, 760 F.2d at 621.

III.   **ANALYSIS**

   **A.  Class Certification**

Plaintiffs move to certify two classes under Federal Rule of Civil Procedure 23(b)(2):

| Class | Class Representatives |
|---|---|

| 1 | All farmers and ranchers in the United States who are encountering, or who will encounter, racial discrimination from the United States Department of Agriculture on account of section 1005 of the American Rescue Plan Act | Plaintiffs Greg Macha, James Meek, Jeff Peters, and Lorinda O'Shaughnessy |
|---|---|---|
| 2 | All farmers and ranchers in the United States who are currently excluded from the definition of 'socially disadvantaged farmer or rancher,' as defined in 7 U.S.C. § 2279(a)(5)–(6) and as interpreted by the Department of Agriculture | All named Plaintiffs |

### 1. Rule 23(a)

#### i. Numerosity

Plaintiffs argue that the number of white farmers and ranchers facing discrimination from the USDA on account of their race or ethnicity easily exceeds the numerosity threshold, as evidenced by 2017 census data showing some 239,351 white farmers and ranchers in Texas and 1,963,286 nationwide. *See* Class Cert. Mot. 5, ECF No. 13. Plaintiffs also point to the same data to show that there are an estimated 21,000 holders of qualifying FSA loans nationwide who do not qualify as "socially disadvantaged." *See id.* The Government does not contest the numerosity of the proposed classes. *See* Class Cert. Resp., ECF No. 28.

Courts have regularly certified classes far fewer in number than the tens of thousands of potential plaintiffs here. *See, e.g.*, *Mullen*, 186 F.3d at 625 ("[T]he size of the class in this case—100 to 150 members—is within the range that generally satisfies the numerosity requirement."). The actual number of class members is not necessarily "the determinative question, for '(t)he proper focus (under Rule 23(a)(1)) is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.'" *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (quoting *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). "[A] number of facts other than the actual or

estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman*, 651 F.2d at 1038 (citing *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113 (1981)).

Here, Plaintiffs' unchallenged evidence demonstrates classes of plaintiffs sufficiently large and for whom joinder would be impracticable, if not impossible, due to size, geographic dispersion across the nation, and the inclusion of future members. Accordingly, the Court finds that Plaintiffs have satisfied the numerosity requirement for certification of both proposed classes.

### ii.   Commonality

Plaintiffs "seek to litigate a question of law common to all members of each of the two classes: does the United State Department of Agriculture violate the Constitution and Title VI of the Civil Rights Act of 1964 by limiting eligibility for government benefits to 'socially disadvantaged farmers or ranchers'?" Class Cert Mot. 6, ECF No. 13. Plaintiffs further contend that "[t]his question affects all class members because each of them is subject to discrimination on account of their race, as each of them is excluded from the definition of 'socially disadvantaged farmers or ranchers' because they are white." *Id.* The Government disagrees, arguing that there is no common legal question between the different claims Plaintiffs bring. *See* Class Cert. Mot. 13, ECF No. 28. With regard to the second class, the Government indicates that, because there are multiple programs for "socially disadvantaged farmers or ranchers," and the use of race in a benefit program must be narrowly tailored, no commonality can exist for the class members who are not included in that definition, as it necessitates individualized considerations for each of those programs. *See id.* at 15.

"In order to satisfy commonality under *Wal-Mart*, a proposed class must prove that the claims of every class member 'depend upon a common contention . . . that is capable of classwide resolution.'" *Stukenberg*, 675 F.3d at 838 (quoting *Wal-Mart*, 564 U.S. at 350). This occurs where "the contention is 'of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Stukenberg*, 675 F.3d at 838 (quoting *Wal-Mart*, 564 U.S. at 350). Put plainly, "Rule 23(a)(2) requires that all of the class member[s'] claims depend on a common issue of law or fact whose resolution 'will *resolve* an issue that *is central to the validity* of each one of the [class member's] claims in one stroke.'" *Stukenberg*, 675 F.3d at 840 (quoting *Wal-Mart*, 564 U.S. at 350). And a court's "obligation to perform a 'rigorous analysis'" of the commonality prong may "entail some overlap with the merits of the plaintiff's underlying claim." *Stukenberg*, 675 F.3d at 840 (quoting *Wal-Mart*, 564 U.S. at 350).

The Court concludes that the proposed classes satisfy the commonality requirement. The complained-of discrimination by the USDA constitutes more than a common grievance with a particular legal provision, deemed insufficient for commonality by the Supreme Court in *Wal-Mart*. *See* 564 U.S. at 350 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." (citation and internal quotation marks omitted)). Answering Plaintiffs' substantive legal question will provide a common answer for all class members regarding a common issue of law: the availability of USDA program benefits to them absent racial and ethnic discrimination. *See DeOtte v. Azar*, 332 F.R.D. 188, 198 (N.D. Tex. March 30, 2019) (distinguishing its facts from *Stukenberg*, in which plaintiffs asserted "various harms, the risk of experiencing those harms, and the violation of constitutional rights in various ways"

(internal quotation marks omitted)). Resolution of the alleged conflict between, on the one hand, programs for "socially disadvantaged farmers or ranchers" and, on the other, Constitutional equal protection provides a common answer to a narrow question of law based in a specific alleged injury "in one stroke." *Wal-Mart*, 564 U.S. at 350. Accordingly, Plaintiffs have satisfied the commonality requirement for certification of both classes.

### iii.    Typicality

Plaintiffs argue that, not only are their claims typical, they are precisely the same as those of all members of the proposed classes. *See* Class Cert. Mot. 7, ECF No. 13. The Government focuses on Plaintiffs' alternative Claims Two and Three and alleges that proceeding on a class basis will not be economical, as there will be a need to litigate each member's unique inclusion in a disadvantaged group or an individual assessment of each government program that benefits "socially disadvantaged farmers or ranchers." *See* Class Cert. Resp. 16–18, ECF No. 28.

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* "[T]he test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625 (citations omitted). "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."

*James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting 5 James Wm. Moore et al.,

*Moore's Federal Practice* P 23.24[4] (3d ed. 2000)).

For similar reasons supporting commonality, the Court rejects the Government's arguments on typicality. First, Plaintiffs only seek classwide relief on Claim One and pleaded Claim Two and Three in the alternative. *See* Compl., ECF No. 1. Second, any fact-specific inquiries regarding a putative class member's challenge does not prevent certification of the class itself because, to the extent they are even necessary, these individualized membership or government program assessments can be made after class certification. *See, e.g.*, *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (requiring only that the plaintiff demonstrate "that the class is adequately defined" and "provide sufficient objective criteria from which to identify class members" (citation and internal quotation marks omitted)). Denying certification on this basis would be especially improper in cases like these, where the proposed classes seek only injunctive and declaratory relief regarding enforcement of a statute, and the usual complications of class certification and phased litigation of suits for money damages do not apply. *See, e.g.*, *Rice v. City of Philadelphia*, 66 F.R.D. 17, 19 (E.D. Pa. 1974) ("[T]he precise definition of the [Rule 23(b)(2)] class is relatively unimportant. If relief is granted to the plaintiff class, the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance."); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 431 n.28 (5th Cir. 1998) (citing Hebert B. Newberg & Alba Conte, *Newberg On Class Actions* § 4.41, at 4-51 to 52 (3d ed. 1992) and noting differing approaches to certification and litigation of individual trials for damages). Accordingly, Plaintiffs' claim is typical for both proposed classes.

### iv.   Adequacy of Representation

For the final Rule 23(a) factor, Plaintiffs argue that there are no conflicts of interest among the class members with respect to Claim One, the only claim on which Plaintiffs seek classwide relief. *See* Class Cert. Mot. 7–8, ECF No. 13. They contend "[a] classwide injunction will serve only to protect the class members' constitutional rights, as well as rights guaranteed under the Civil Rights Act of 1964[,]" conceding that classwide relief would not be appropriate for Claims Two and Three. *Id.*; *see* Class Cert. Reply 8, ECF No. 41. In response, the Government claims that, in seeking to prohibit the use of the socially-disadvantaged definition in USDA programs, Plaintiffs have a conflict in seeking to represent members who cannot opt out from any judgment that will necessarily bind the entire Rule 23(b)(2) class. *See* Class Cert. Resp. 18, ECF No. 28.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Adequacy encompasses three separate but related inquiries (1) 'the zeal and competence of the representative[s'] counsel'; (2) 'the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees'; and (3) the risk of 'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (citing *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)). "[The] requirements [of commonality and typicality] . . . tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Falcon*, 457 U.S. at 158 n.13. Throughout litigation, the court "must continue carefully to scrutinize the adequacy of representation and withdraw certification if such representation is not furnished." *Grigsby v. N. Miss. Med. Center, Inc.*, 586 F.2d 457, 462 (5th Cir. 1978).

Here, Plaintiffs have carried their burden to show that they will adequately represent the interests of class members similarly situated in zealously pursuing the requested relief. All indications are that Plaintiffs are willing and able to control the litigation and to protect the interests of absent class members. *See Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). Given the Court's conclusion as to the commonality and typicality prongs, *supra*, and because the Government has not shown any conflicts of interest, issues with competency of counsel, or other issues suggesting inadequacy of Plaintiffs' representation as to Claim One, the Court finds that Plaintiffs will adequately represent members of the proposed classes in pursuit of that claim.

### v.  Ascertainability

Plaintiffs argue that both proposed classes are ascertainable under Fifth Circuit law. *See* Class Cert. Reply 10, ECF No. 41. They contend that nothing is imprecise or vague about the proposed classes, as a potential plaintiff is either "encountering racial discrimination on account of section 1005, or he isn't" and is "either included with the definition of 'socially disadvantaged farmer or rancher,' or he's not." *Id.* The Government argues that both proposed classes are imprecise. *See* Class Cert. Resp. 21–22, ECF No. 28. For the first class, the Government submits that it is unclear whether it would include, for example, individuals who fall within the definition of a socially disadvantaged farmer or rancher but claim discrimination based on other factors, such as accessibility to program services. *See id.* As for the second class, the Government argues that it "is not limited to those who have suffered any injury as a result of the fact that they do not fall within the definition of a 'socially disadvantaged farmer or rancher.'" *Id.* at 22.

While not a requirement of Rule 23, courts only certify classes ascertainable under objective criteria. *DeBremaecker*, 433 F.2d at 734 (citations omitted).[1] "There can be no class action if the proposed class is amorphous or imprecise." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.5 (5th Cir. 2007). "[T]he court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) (citations omitted). The Fifth Circuit has upheld the ascertainability of a class even when a definition necessitates individualized membership assessments that might *follow* litigation, so long as the class definition is sufficiently clear. *See, e.g.*, *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999).

The Court finds that the proposed classes are ascertainable. The ascertainability inquiry is significantly relaxed for Rule 23(b)(2) certifications like this one. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 n.6 (5th Cir. 2004). Contrary to the Government's argument, "district courts do not err by failing to ascertain at the Rule 23 stage whether the class members include persons and entities who have suffered 'no injury at all.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014). Plaintiffs here only seek classwide relief on their claim that section 1005 violates equal protection and Title VI, and the proposed definitions are sufficiently clear to identify class members at some stage of the proceeding for that claim. *See Frey*, 602 F. App'x at 168. As such,

---

[1] Ascertainability may not be applicable in the Rule 23(b)(2) context. *See, e.g.*, *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3rd Cir. 2015) ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The advisory committee's notes for Rule 23(b)(2) assure us that ascertainability is inappropriate in the (b)(2) context."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability [of class members] is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)."). However, the Fifth Circuit has yet to endorse this view shared by other circuit courts. The Court need not decide whether it applies here, because the class is ascertainable.

both proposed classes are ascertainable. Accordingly, the Court concludes that Plaintiffs have satisfied the elements for class certification under Rule 23(a) and need only address whether the elements of Rule 23(b) are satisfied.

### 2. Rule 23(b)

Plaintiffs move for class certification under Rule 23(b)(2). *See* Compl. 9, ECF No. 1. The Government argues that the requirements of Rule 23(b)(2) are not met because the USDA has not acted or refused to act on any request by Plaintiffs for debt relief under section 1005. *See* Class Cert. Resp. 19–20, ECF No. 28. It argues that Plaintiffs have "the opportunity to seek inclusion of those groups by submitting a written request with supporting explanation" for consideration by the Secretary on a case-by-case basis. *Id.* at 20. For this reason, any denial of benefits would necessarily vary from group to group and Plaintiff to Plaintiff. *See id.*

The Government misconstrues the requirements of Rule 23(b)(2). A class action filed pursuant to Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) does not require "common issues," only "common behavior by the defendant towards the class." *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012). "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment.

Here, the USDA acts on grounds that apply generally to the classes in administering the debt-relief program in a racially discriminatory way, as required by the statute. Plaintiffs seek an injunction stopping the USDA from providing loan forgiveness to individuals based on their race

or ethnicity. *See* Inj. Mot. 1, ECF No. 18. As required, "a single injunction or declaratory judgment" here "would provide relief to each member of the" classes. *Wal-Mart*, 564 U.S. at 360. Because granting the requested relief would apply generally to the classes as a whole, the Court finds that Rule 23(b)(2) is satisfied.

### B. Preliminary Injunction

#### 1. Substantial Likelihood of Success on the Merits

Plaintiffs contend they are substantially likely to succeed on the merits of their constitutional challenge, as prioritized compensation for minorities for past discrimination by society is foreclosed as a matter of law. *See* Inj. Mot. 3–4, ECF No. 18 (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)). The Government concedes its prioritization scheme is race-based but maintains that it is allowed to use racial classification to remedy the lingering effects of past racial discrimination against minority groups—a "well-established" compelling government interest. *See* Inj. Resp. 26–27, ECF No. 27 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)). The Government also submits that Congress narrowly tailored the law to achieve that compelling interest, considering the history of discrimination against minority farmers and specific gaps in pandemic-related funding for those racial groups. *See id.* The Court disagrees.

As other courts to consider this issue already have, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim that the Government's use of race- and ethnicity-based preferences in the administration of the loan-forgiveness program violates equal protection under the Constitution. *See Faust v. Vilsack*, No. 21-C-548, 2021 WL 2409729, at *3 (E.D. Wis. June 10, 2021); *Wynn v. Vilsack*, No. 3:21-CV-514-MMH-JRK, 2021 WL 2580678, at *12 (M.D. Fla. June 23, 2021). "Government policies that classify people by race are presumptively invalid." *Vitolo v. Guzman*, Nos. 21-5517/5528, 2021 WL 2172181, at *4 (6th Cir. May 27, 2021) (citing

U.S. Const. amend. XIV; *Adarand*, 515 U.S. at 235). It is the Government's burden to establish that its race-based distribution of taxpayer money is narrowly tailored to achieve a compelling interest. *See Adarand*, 515 U.S. at 227. To do so, it must provide a "strong basis in evidence for its conclusion that remedial action was necessary." *Croson*, 488 U.S. at 500 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986)). In an analogous case, the Sixth Circuit summarized the Government's burden as follows: (1) the policy must target a specific episode of past discrimination, not simply relying on generalized assertions of past discrimination in an industry; (2) there must be evidence of past intentional discrimination, not simply statistical disparities; and (3) the government must have participated in the past discrimination it now seeks to remedy. *Vitolo*, 2021 WL 2172181, at *4–5.

Instead of demonstrating a strong basis, the Government's evidence of a compelling interest is a mixed bag. On the one hand, the Government points to cases where the USDA settled claims for past discrimination, leading Congress to enact special legislation addressing the civil rights complaints. *See* Inj. Resp. 32–33, ECF No. 27. On the other hand, the Government admits that the USDA is not currently discriminating against any socially disadvantaged farmers or ranchers. *See* Inj. Hearing Tr. Instead, it points to evidence of past intentional discrimination that, it argues, has produced lingering effects that continue to negatively affect these groups. *See id.* For example, it cites a 1982 report from the United States Commission on Civil Rights to show that the Farmers Home Administration (FmHA), the predecessor to the FSA, provided inferior loans and services to blacks as compared to whites. *See* Inj. Resp. 30, ECF No. 27. However, the same report details that the FmHA provided its loans based on credit-worthiness and did not have "jurisdiction to make loans for social purposes." *See* USCCR Rep. 19 (1982). Likewise, evidence from a 2011 investigation highlighted statistics on racial disparities in access to USDA programs

and services and racial under-representation in USDA employment. *See* JL Rep. (2011). While this investigation yielded "concerns as to both inequitable service delivery, . . . employment discrimination" and "negative impact[s]" on minority farmers and ranchers, lacking was direct evidence of causation tying these results to government discrimination. *Id.* at 64, 131; *see also Croson*, 488 U.S. at 505 ("[I]t is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate."). The same is true for evidence cited by the Government showing that a disproportionately low number of black farmers were aware of and provided funds from the USDA's Market Facilitation Program and first Coronavirus Food Assistance Program administered during the Trump administration. *See* Inj. Resp. 18–19, ECF No. 27.

All of this evidence shows disparate impact but requires an inference of intentional discrimination by the USDA or its agencies. *See Croson*, 488 U.S. at 503 (statistical disparity alone, absent a gross disparity, is insufficient to establish intentional discrimination); *Vitolo*, 2021 WL 2172181, at *4–5 ("there must be evidence of intentional discrimination in the past" at the hands of the government). Additionally, the Government puts forward no evidence of intentional discrimination by the USDA in at least the past decade. *See* Inj. Resp., ECF No. 27; Inj. Hearing Tr. To find intentional discrimination, then, requires a logical leap, as well as a leap back in time. In sum, the Government's evidence falls short of demonstrating a compelling interest, as any past discrimination is too attenuated from any present-day lingering effects to justify race-based remedial action by Congress. *See Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification").

Even if the evidence clearly established historical governmental discrimination to give rise to a compelling interest, the Government must then show that its proposed remedy in the race-exclusionary program is narrowly tailored. *See id.* In the racial classifications context, narrowly tailored means explicit use of even narrowly drawn racial classifications can be used only as a last resort. *See Croson*, 488 U.S. at 519. This requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). The Government's claim that new race-based discrimination is needed to remedy past race-based discrimination is unavailing. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 (2007) (plurality opinion) ("remedying past societal discrimination does not justify race-conscious government action"). Namely, it is founded on a faulty premise equating equal protection with equal results. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("[T]he Fourteenth Amendment guarantees equal laws, not equal results."). As it argues, past, race-neutral attempts by Congress to correct perceived discrimination were ineffective in achieving parity in number, amounts, and servicing of USDA loans by race. *See* Inj. Resp. 39, ECF No. 27. The Court is skeptical of racial "parity" arguments, as they tend to sound a lot like racial balancing, something abhorrent to the concept of equal protection. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 320 (1978). In any event, the Government's evidence does not support the conclusion that these disparities are the result of systemic discrimination justifying the use of race classifications here.

As pointed out by Judge Howard considering the same issue, the loan-forgiveness program is simultaneously overinclusive and underinclusive: overinclusive in that the program provides debt relief to individuals who may never have experienced discrimination or pandemic-related hardship, and underinclusive in that it fails to provide any relief to those who have suffered such discrimination but do not hold a qualifying FSA loan. *See Wynn v. Vilsack*, 2021 WL 2580678, at

*10. The Government also wants to have it both ways in arguing that the appropriated funds are limitless, therefore Plaintiffs cannot establish irreparable harm, *see infra*, yet are limited enough that Congress was justified excluding some farmers and ranchers from the debt-relief program based on their race and ethnicity. *See* Inj. Hearing Tr. In short, the statute's check-the-box approach to the classification of applicants by race and ethnicity is far different than the "highly individualized, holistic review" of individuals in a classification system permitted as narrowly tailored in a case like *Grutter*. 539 U.S. at 337; *see also Fisher v. U. of Tex.*, 136 S. Ct. 2198, 2214 (2016). Because the Government has not demonstrated a compelling interest or a narrowly tailored remedy under strict scrutiny, the Plaintiffs have shown a substantial likelihood of success on the merits.

### 2.   Substantial Threat of Irreparable Harm

Plaintiffs contend that they "will suffer irreparable harm absent a preliminary injunction because the entirety of funds Congress appropriated under section 1005 will be unavailable to them," and "there is no mechanism to 'claw back' this money once the government dispenses it." Inj. Mot. 4, ECF No. 18. The Government responds that either Plaintiffs are eligible socially disadvantaged farmers or ranchers, in which case their claim to the appropriated funds will be unaffected by an injunction, or they are ineligible, in which case an "injunction to further delay distribution of needed funds to *others* who do fit within the definition still will not remedy any harm to Plaintiffs." Inj. Resp. 24–24, ECF No. 27.  The Government contends that, if Plaintiffs succeed on the merits of their claim, the Court could order debt relief from the program funds; therefore, any harm at this stage is reparable. *See id.* at 45–46. To show immediate and irreparable harm, Plaintiff must demonstrate he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable

where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). But "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.* An injunction is appropriate only if the anticipated injury is imminent and not speculative. *See Winter*, 555 U.S. at 22.

Here, Plaintiffs are suffering a continuing and irreparable injury based on the direct effects of the race- and ethnicity-based application process. An ongoing constitutional deprivation can be sufficient to establish irreparable harm. *See Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 470 (N.D. Tex. 2012) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable [harm] is necessary."). Aside from that, there is the risk that any Plaintiffs who do establish the right to relief on the merits will be unable to access program funding by the time they receive a judgment in their favor. The Government suggests that the appropriated funds are limitless and will last long enough for Plaintiffs to access them if and when they secure a judgment on the merits. *See* Inj. Hearing Tr. The limited nature of Congressional appropriations both in terms of time and money suggest otherwise. While the Government may at times act like it, the public fisc is not bottomless, and at any time, Congress can turn off the spigot. *See Baker v. Concord*, 916 F.2d 744, 749 (1st Cir. 1990) ("Public funding to assist the disadvantaged is, of course, not limitless.").

Second, "our constitutional structure does not permit [courts] to 'rewrite the statute that Congress has enacted.'" *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1949 (2016). Thus, contrary to the Government's argument, if Plaintiffs were to prove at the merits stage that they are ineligible under the program but that the program violates equal protection, this Court is unable to provide a remedy as part of a judgment in favor of Plaintiffs extending debt relief to them under the statute. To do so would be a violation of the Appropriations Clause and the plain

text of section 1005 of the ARPA, which explicitly limits how the appropriated funds may be spent. *See* ARPA, Pub. L. No. 117-2, § 1005 (2021) (only authorizing payments to "socially disadvantaged farmers" as defined in in section 2501(a) of the Food, Agriculture Conservation, and Trade Act of 1990). *See* U.S. Const. art. I, § 9, cl. 7; *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 ("no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."). Given the Government's sovereign immunity and Plaintiffs' inability to seek damages retrospectively, these injuries are irreparable.

Finally, although the Government argues that any injunctive relief is unnecessary so long as injunctions on the same issue are in place from other courts, the existence of overlapping injunctive relief from other courts does not serve to automatically eliminate irreparable harm in parallel litigation, and the Government cites no authority to suggest otherwise. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018); *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017). Additionally as it concerns the scope of relief, Plaintiffs do not seek nationwide relief here, as the Government seems to suggest. *See* Inj. Resp. 46, ECF No. 27. Plaintiffs agree on the impropriety of a universal injunction and only seek relief tailored to any classes certified under Rule 23. *See* Inj. Reply 14–15, ECF No. 42.

Accordingly, the Court concludes that Plaintiffs face a substantial threat of irreparable harm absent a preliminary injunction because Plaintiffs are experiencing race-based discrimination at the hand of government officials and will be barred from even being considered for funding from the program as a result of this discrimination.

### 3. Balance of Hardships and the Public Interest

The Court next considers whether the threatened injury to Plaintiffs outweighs any damage to the Government and the public from the proposed preliminary injunction.[2] Plaintiffs argue that a "preliminary injunction will not only alleviate the financial harms that are being inflicted the plaintiffs, but it will also eliminate the injury to their constitutional right to be free from racial discrimination at the hands of the government." Inj. Mot. 6, ECF No. 18. Plaintiffs submit that, if an injunction is granted, any harm to socially disadvantaged farmers and ranchers could only come from the Government's choice to shut off funding to everyone in lieu of awarding loan forgiveness without considering race or ethnicity. *See id.* at 5. The Government disagrees, maintaining that Congress determined that timely debt relief for minority farmers was necessary to remedy past discrimination by the USDA. *See* Inj. Resp. 42, ECF No. 27.

The Government again fails to adequately explain how the exclusion of certain races and ethnicities from consideration for loan forgiveness benefits the already eligible socially disadvantaged farmers and ranchers or the public at large. Even if it could, the inherent harm from an unlawful government-run racially discriminatory program is detrimental to the public interest. *See Bakke*, 438 U.S. 265, 289–90 ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal."). The Court finds that Plaintiffs suffer an ongoing constitutional injury from the irreversible act of government-sanctioned racial discrimination and that, on balance, this harm weighs in favor of immediate injunctive relief here.

### 4. Bond

---

[2] The Court considers the balance of hardships and public interest factors together as they overlap considerably. *See Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016).

Rule 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of security required "is a matter for the discretion of the trial court," and the Fifth Circuit has held district courts have discretion to "require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)). In determining the appropriate amount, the Court may elect to require no security at all. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011) (citing *EOG Resources, Inc. v. Beach*, 54 F. App'x 592 (5th Cir. 2002)). The Court finds no evidence that the Government will suffer any financial loss from a preliminary injunction, so there is no need for Plaintiffs to post security in this case.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs have met their burden for class certification and certifies both proposed classes.[3] Additionally, Plaintiffs have met their burden demonstrating the need for a preliminary injunction in this case. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Class Certification (ECF No. 12), **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 17), and **ENJOINS** Defendants Tom Vilsack, and the United States Department of Agriculture and their officers, agents, servants, employees, attorneys,

---

[3] Plaintiffs Greg Macha, James Meek, Jeff Peters, and Lorinda O'Shaughnessy may proceed in this case as representatives of themselves and "all farmers and ranchers in the United States who are encountering, or who will encounter, racial discrimination from the United States Department of Agriculture on account of section 1005 of the American Rescue Plan Act."

All named Plaintiffs may proceed in this case as representatives of themselves and "all farmers and ranchers in the United States who are currently excluded from the definition of 'socially disadvantaged farmer or rancher,' as defined in 7 U.S.C. § 2279(a)(5)–(6) and as interpreted by the Department of Agriculture."

designees, and subordinates, as well as any person acting in concert or participation with them from discriminating on account of race or ethnicity in administering section 1005 of the American Rescue Plan Act for any applicant who is a member of the Certified Classes. This prohibition encompasses: (a) considering or using an applicant Class Member's race or ethnicity as a criterion in determining whether that applicant will obtain loan assistance, forgiveness, or payments; and (b) considering or using any criterion that is intended to serve as a proxy for race or ethnicity in determining whether an applicant Class Member will obtain loan assistance, forgiveness, or payments.

      **SO ORDERED** this **1st day** of **July 2021**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

24