UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Sid Miller**, **Greg Macha**, **James Meek**, **Jeff Peters**, and **Lorinda O'Shaughnessy**, on behalf of themselves and others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>**Tom Vilsack**, in his official capacity as Secretary of Agriculture,<br><br>　　　　　　　Defendant. | Case No. 4:21-cv-00595-O |

## PLAINTIFFS' SECOND AMENDED CLASS-ACTION COMPLAINT

The Supreme Court of the United States said 125 years ago that:

> [T]he constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the general government, or by the states, against any citizen because of his race. All citizens are equal before the law. The guaranties of life, liberty, and property are for all persons, within the jurisdiction of the United States, or of any state, without discrimination against any because of their race. Those guaranties, when their violation is properly presented in the regular course of proceedings, must be enforced in the courts, both of the nation and of the state, without reference to considerations based upon race.

*Gibson v. State of Mississippi*, 162 U.S. 565, 591 (1896); *see also Bolling v. Sharpe*, 347 U.S. 497 (1954) (citing *Gibson* and holding that segregation in the District of Columbia public schools violated the Due Process Clause of the Fifth Amendment).

Equal rights under law is the cornerstone of American constitutional jurisprudence: the principle that all citizens, regardless of status, wealth, race, color, religion, or creed, have the same rights and are entitled to the same standard of justice. These are the principles etched into our founding documents, fought for on our nation's

battlefields, written into the Gettysburg Address, and delivered from the steps of the Lincoln Memorial by Martin Luther King.

As a nation, we are devoted to the task of satisfying these sacred ideals and providing equal rights to citizens of all races, as the Constitution requires. Profound progress has been made, and extraordinary milestones reached, throughout our history, serving as an inspiration to humanity and the nations of the world. Yet, today, the Department of Agriculture lurches America dangerously backward, reversing the clock on American progress, and violating our most sacred and revered principles by actively and invidiously discriminating against American citizens solely based upon their race. This is illegal, it is unconstitutional, it is wrong, and it must stop.

Indeed, the United States Department of Agriculture administers numerous statutes that provide government aid to "socially disadvantaged farmers and ranchers." The Department of Agriculture interprets this phrase to include African Americans, Hispanics, Native Americans, Alaskan natives, Asian-Americans, and Pacific Islanders. But white farmers and ranchers are not included within the definition of "socially disadvantaged farmers and ranchers," making them ineligible for aid under these federal programs.

These racial exclusions are patently unconstitutional, and the Court should permanently enjoin their enforcement. Doing so will promote equal rights under the law for all American citizens and promote efforts to stop racial discrimination, because "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (Roberts, C.J., concurring).

American citizens today represent a beautiful, complex, and increasingly interwoven fabric of racial backgrounds. Government action that tears at that fabric and divides its pieces—rather than reinforcing that fabric's unifying and binding ties—disrupts our common progress towards becoming a more perfect union.

## JURISDICTION AND VENUE

1.   The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.   Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.   Plaintiff Sid Miller is a farmer and rancher who resides in Erath County, Texas. He also serves as Agriculture Commissioner for the State of Texas. Mr. Miller is suing in his capacity as a private citizen, and not on behalf of the State of Texas or the Texas Department of Agriculture.

4.   Plaintiff Greg Macha is a white rancher who resides in Wallis, Texas.

5.   Plaintiff James Meek is a white farmer and rancher who resides in Alvord, Texas.

6.   Plaintiff Jeff Peters is a white farmer and rancher who resides in Arlington, Texas.

7.   Plaintiff Lorinda O'Shaughnessy is a white farmer and rancher who resides in Placedo, Texas.

8.   Defendant Tom Vilsack is the U.S. Secretary of Agriculture. Secretary Vilsack is sued in his official capacity.

## STATEMENT OF FACTS

9.   Section 1005 of the American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. (2021), provides aid to farmers and ranchers who have been harmed by the COVID-19 pandemic—including loan forgiveness up to *120 percent* of the value of the loan—but only if they qualify as a "socially disadvantaged farmer or rancher." *See* Exhibit 1.

10.   Federal law defines "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group." 7 U.S.C. § 2279(a)(5). "Socially disadvantaged group," in turn, is defined as:

> a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

7 U.S.C. § 2279(a)(6).

11.   On May 21, 2021, the United States Department of Agriculture, through the Farm Service Agency (FSA), issued a press release announcing a Notice of Funds Availability (NOFA), in which it would start making loan payments for eligible borrowers with qualifying direct farm loans, pursuant to section 1005 of the American Rescue Plan Act. *See* U.S. Department of Agriculture, *Press Release, In Historic Move, USDA to Begin Loan Payments to Socially Disadvantaged Borrowers under American Rescue Plan Act Section 1005*, *available at* https://bit.ly/3fAxAuB (last visited May 27, 2021) (attached as Exhibit 3). The Department of Agriculture published this notice in the Federal Register on May 26, 2021. *See* Notice of Funds Availability, 86 Fed. Reg. 28,329 (May 26, 2021) (attached as Exhibit 4).

12.   The notice defines, for the purposes of eligibility for loan forgiveness, "socially disadvantaged farmer or rancher" as:

> [A] farmer or rancher who is a member of a socially disadvantaged group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities, as defined by section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)).

*Id.* at 28,330. The notice goes on to state that this includes "American Indians or Alaskan Natives," "Asians," "Blacks or African Americans," "Native Hawaiians or other Pacific Islanders," and "Hispanics or Latinos." *Id.*[1]

13.   Plaintiff Sid Miller is a farmer and rancher. His ancestry is overwhelmingly white, and primarily Scotch-Irish. As is the case with many Americans, his ancestry is not limited to just one racial or ethnic group. Mr. Miller also has approximately 2% black ancestry.

14.   Plaintiff Greg Macha is a white rancher who resides in Wallis, Texas. He has a farm loan administered by the Farm Service Agency and a farm loan guaranteed by the Farm Service Agency.

15.   Plaintiff James Meek is a white farmer and rancher who resides in Alvord, Texas. He has a farm loan administered by the Farm Service Agency and a farm loan guaranteed by the Farm Service Agency.

16.   Plaintiff Jeff Peters is a white farmer and rancher who resides in Arlington, Texas. He has a farm loan administered by the Farm Service Agency and a farm loan guaranteed by the Farm Service Agency.

17.   Plaintiff Lorinda O'Shaughnessy is a white farmer and rancher who resides in Placedo, Texas. She has a farm loan administered by the Farm Service Agency and a farm loan guaranteed by the Farm Service Agency.

---

1.  The Department of Agriculture defines the term similarly, with minor variations, in various regulations applicable to other USDA programs. *See, e.g.*, U.S. Department of Agriculture, *Farming Opportunities Training and Outreach Grant Program*, https://www.usda.gov/sites/default/files/documents/2501_FactSheet.pdf (last visited on September 21, 2021) (attached as Exhibit 2); 7 C.F.R. § 7.3 (applicable to the selection and functions of Farm Service Agency state and county committees); 7 C.F.R. § 718.2 (applicable to farm marketing quotas, acreage allotments, and production adjustment); 7 C.F.R. § 760.107(b)(1) (applicable to certain Supplemental Agricultural Disaster Assistance Programs); 7 C.F.R. § 636.3 (applicable to the Wildlife Habitat Incentive Program); 7 C.F.R. § 1410.2(b) (applicable to the Conservation Reserve Program); 7 C.F.R. § 1430.402 (applicable to the Dairy Margin Coverage Program).

18.   The statute described above, as currently interpreted and implemented by the Department of Agriculture, excludes the plaintiffs from the benefits of a program for "socially disadvantaged farmers and ranchers" on account of their race.

19.   The plaintiffs sue on behalf of all farmers and ranchers in the United States who are excluded from the benefits of this program for "socially disadvantaged farmers and ranchers" because of their race or ethnicity.

**Claim 1:    The Department of Agriculture's Racial Exclusions Violate The Constitution and Title VI**

20.   The Constitution prohibits the federal government from discriminating on account of race or ethnicity. *See Bolling v. Sharpe*, 347 U.S. 497 (1954).

21.   Title VI of the Civil Rights Act of 1964 likewise prohibits discrimination on the grounds of race, color, or national origin in any program that receives federal funds. *See* 42 U.S.C. § 2000d.

22.   The Department of Agriculture is violating the Constitution and Title VI by discriminating on the grounds of race, color, and national origin in administering its program.

23.   The Court should declare unconstitutional the statute contained at section 1005 of ARPA limiting the benefits of a federal program to "socially disadvantaged farmers and ranchers."

24.   The Court should further declare that the Department is violating the Constitution and Title VI by excluding individuals and entities from the benefit of that federal program on the grounds of race, color, and national origin, and by discriminating against individuals and entities on this basis, and it should permanently enjoin Secretary Vilsack and his successors from implementing any racial exclusions or discriminatory racial preferences in the Department's programs.

## CLASS-ACTION ALLEGATIONS

25.   The plaintiffs bring this class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

26.   The plaintiffs seek to represent a class of all farmers and ranchers in the United States who are currently excluded from the Department's interpretation of "socially disadvantaged farmer or rancher" in section 1005.

27.   Plaintiffs Greg Macha, James Meek, Jeff Peters, and Lorinda O'Shaughnessy seek to represent a second and more narrow class of all farmers and ranchers in the United States who are encountering, or who will encounter, racial discrimination from the United States Department of Agriculture on account of section 1005 of the American Rescue Plan Act.

28.   The number of individuals in these classes makes joinder of the individual class members impractical.

29.   There are questions of law common to the classes, including whether the Constitution or Title VI allows the Department to exclude farmers and ranchers from the benefits of a federal program on account of their race.

30.   The plaintiffs' claims are typical of other members of the classes. Each of them wishes to stop the Department of Agriculture from excluding them from the benefits of a federal program on account of their race.

31.   The plaintiffs adequately represents the interests of the classes, and they have no interests antagonistic to the classes.

32.   A class action is appropriate under Rule 23(b)(2) because the defendants are acting on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

## DEMAND FOR RELIEF

33.   The plaintiffs respectfully requests that the court:

a.      certify a class of all farmers and ranchers in the United States who are currently excluded from the Department's interpretation of "socially disadvantaged farmer or rancher" in section 1005;

b.      certify an additional class of all farmers and ranchers in the United States who are encountering, or who will encounter, racial discrimination from the United States Department of Agriculture on account of section 1005 of the American Rescue Plan Act;

c.      award the declaratory relief described in paragraphs 23 and 24;

d.      permanently enjoin Secretary Vilsack and his successors from implementing any racial exclusions or discriminatory racial preferences in Department of Agriculture programs;

e.      award costs and attorneys' fees under 42 U.S.C. § 1988;

f.      award all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

GENE P. HAMILTON
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

H. DUSTIN FILLMORE III
Texas Bar No. 06996010
CHARLES W. FILLMORE
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
201 Main Street, Suite 801
Fort Worth, Texas 76102
(817) 332-2351 (phone)

(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: September 21, 2021

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on September 21, 2021, I served this document through CM/ECF

upon:

Emily Sue Newton
Senior Trial Counsel
Michael F. Knapp
Kyla M. Snow
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 305-8356 (phone)
(202) 616-8460 (fax)
emily.s.newton@usdoj.gov
michael.f.knapp@usdoj.gov
kyla.snow@usdoj.gov

*Counsel for Defendants*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Plaintiffs and
the Proposed Classes*

H. R. 1319

# One Hundred Seventeenth Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Sunday,*
*the third day of January, two thousand and twenty-one*

# An Act

To provide for reconciliation pursuant to title II of S. Con. Res. 5.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "American Rescue Plan Act of 2021".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.

TITLE I—COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

Subtitle A—Agriculture

Sec. 1001. Food supply chain and agriculture pandemic response.
Sec. 1002. Emergency rural development grants for rural health care.
Sec. 1003. Pandemic program administration funds.
Sec. 1004. Funding for the USDA Office of Inspector General for oversight of COVID–19-related programs.
Sec. 1005. Farm loan assistance for socially disadvantaged farmers and ranchers.
Sec. 1006. USDA assistance and support for socially disadvantaged farmers, ranchers, forest land owners and operators, and groups.
Sec. 1007. Use of the Commodity Credit Corporation for commodities and associated expenses.

Subtitle B—Nutrition

Sec. 1101. Supplemental nutrition assistance program.
Sec. 1102. Additional assistance for SNAP online purchasing and technology improvements.
Sec. 1103. Additional funding for nutrition assistance programs.
Sec. 1104. Commodity supplemental food program.
Sec. 1105. Improvements to WIC benefits.
Sec. 1106. WIC program modernization.
Sec. 1107. Meals and supplements reimbursements for individuals who have not attained the age of 25.
Sec. 1108. Pandemic EBT program.

TITLE II—COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

Subtitle A—Education Matters

PART 1—DEPARTMENT OF EDUCATION

Sec. 2001. Elementary and Secondary School Emergency Relief Fund.
Sec. 2002. Emergency assistance to non-public schools.
Sec. 2003. Higher Education Emergency Relief Fund.
Sec. 2004. Maintenance of effort and maintenance of equity.
Sec. 2005. Outlying areas.
Sec. 2006. Gallaudet University.
Sec. 2007. Student aid administration.
Sec. 2008. Howard University.

H. R. 1319—2

Sec. 2009. National Technical Institute for the Deaf.
Sec. 2010. Institute of Education Sciences.
Sec. 2011. Program administration.
Sec. 2012. Office of Inspector General.
Sec. 2013. Modification of revenue requirements for proprietary institutions of higher education.
Sec. 2014. Funding for the Individuals with Disabilities Education Act.

PART 2—MISCELLANEOUS

Sec. 2021. National Endowment for the Arts.
Sec. 2022. National Endowment for the Humanities.
Sec. 2023. Institute of Museum and Library Services.

Subtitle B—Labor Matters

Sec. 2101. Funding for Department of Labor worker protection activities.

Subtitle C—Human Services and Community Supports

Sec. 2201. Child Care and Development Block Grant Program.
Sec. 2202. Child Care Stabilization.
Sec. 2203. Head Start.
Sec. 2204. Programs for survivors.
Sec. 2205. Child abuse prevention and treatment.
Sec. 2206. Corporation for National and Community Service and the National Service Trust.

Subtitle D—Public Health

Sec. 2301. Funding for COVID–19 vaccine activities at the Centers for Disease Control and Prevention.
Sec. 2302. Funding for vaccine confidence activities.
Sec. 2303. Funding for supply chain for COVID–19 vaccines, therapeutics, and medical supplies.
Sec. 2304. Funding for COVID–19 vaccine, therapeutic, and device activities at the Food and Drug Administration.
Sec. 2305. Reduced cost-sharing.

Subtitle E—Testing

Sec. 2401. Funding for COVID–19 testing, contact tracing, and mitigation activities.
Sec. 2402. Funding for SARS–CoV–2 genomic sequencing and surveillance.
Sec. 2403. Funding for global health.
Sec. 2404. Funding for data modernization and forecasting center.

Subtitle F—Public Health Workforce

Sec. 2501. Funding for public health workforce.
Sec. 2502. Funding for Medical Reserve Corps.

Subtitle G—Public Health Investments

Sec. 2601. Funding for community health centers and community care.
Sec. 2602. Funding for National Health Service Corps.
Sec. 2603. Funding for Nurse Corps.
Sec. 2604. Funding for teaching health centers that operate graduate medical education.
Sec. 2605. Funding for family planning.

Subtitle H—Mental Health and Substance Use Disorder

Sec. 2701. Funding for block grants for community mental health services.
Sec. 2702. Funding for block grants for prevention and treatment of substance abuse.
Sec. 2703. Funding for mental health and substance use disorder training for health care professionals, paraprofessionals, and public safety officers.
Sec. 2704. Funding for education and awareness campaign encouraging healthy work conditions and use of mental health and substance use disorder services by health care professionals.
Sec. 2705. Funding for grants for health care providers to promote mental health among their health professional workforce.
Sec. 2706. Funding for community-based funding for local substance use disorder services.
Sec. 2707. Funding for community-based funding for local behavioral health needs.
Sec. 2708. Funding for the National Child Traumatic Stress Network.
Sec. 2709. Funding for Project AWARE.

H. R. 1319—3

Sec. 2710. Funding for youth suicide prevention.
Sec. 2711. Funding for behavioral health workforce education and training.
Sec. 2712. Funding for pediatric mental health care access.
Sec. 2713. Funding for expansion grants for certified community behavioral health clinics.

Subtitle I—Exchange Grant Program

Sec. 2801. Establishing a grant program for Exchange modernization.

Subtitle J—Continued Assistance to Rail Workers

Sec. 2901. Additional enhanced benefits under the Railroad Unemployment Insurance Act.
Sec. 2902. Extended unemployment benefits under the Railroad Unemployment Insurance Act.
Sec. 2903. Extension of waiver of the 7-day waiting period for benefits under the Railroad Unemployment Insurance Act.
Sec. 2904. Railroad Retirement Board and Office of the Inspector General funding.

Subtitle K—Ratepayer Protection

Sec. 2911. Funding for LIHEAP.
Sec. 2912. Funding for water assistance program.

Subtitle L—Assistance for Older Americans, Grandfamilies, and Kinship Families

Sec. 2921. Supporting older americans and their families.
Sec. 2922. National Technical Assistance Center on Grandfamilies and Kinship Families.

TITLE III—COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

Subtitle A—Defense Production Act of 1950

Sec. 3101. COVID–19 emergency medical supplies enhancement.

Subtitle B—Housing Provisions

Sec. 3201. Emergency rental assistance.
Sec. 3202. Emergency housing vouchers.
Sec. 3203. Emergency assistance for rural housing.
Sec. 3204. Housing counseling.
Sec. 3205. Homelessness assistance and supportive services program.
Sec. 3206. Homeowner Assistance Fund.
Sec. 3207. Relief measures for section 502 and 504 direct loan borrowers.
Sec. 3208. Fair housing activities.

Subtitle C—Small Business (SSBCI)

Sec. 3301. State Small Business Credit Initiative.

Subtitle D—Public Transportation

Sec. 3401. Federal Transit Administration grants.

TITLE IV—COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

Sec. 4001. Emergency Federal Employee Leave Fund.
Sec. 4002. Funding for the Government Accountability Office.
Sec. 4003. Pandemic Response Accountability Committee funding availability.
Sec. 4004. Funding for the White House.
Sec. 4005. Federal Emergency Management Agency appropriation.
Sec. 4006. Funeral assistance.
Sec. 4007. Emergency food and shelter program funding.
Sec. 4008. Humanitarian relief.
Sec. 4009. Cybersecurity and Infrastructure Security Agency.
Sec. 4010. Appropriation for the United States Digital Service.
Sec. 4011. Appropriation for the Technology Modernization Fund.
Sec. 4012. Appropriation for the Federal Citizen Services Fund.
Sec. 4013. AFG and SAFER program funding.
Sec. 4014. Emergency management performance grant funding.
Sec. 4015. Extension of reimbursement authority for Federal contractors.
Sec. 4016. Eligibility for workers' compensation benefits for Federal employees diagnosed with COVID–19.

TITLE V—COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

Sec. 5001. Modifications to paycheck protection program.

H. R. 1319—4

Sec. 5002. Targeted EIDL advance.
Sec. 5003. Support for restaurants.
Sec. 5004. Community navigator pilot program.
Sec. 5005. Shuttered venue operators.
Sec. 5006. Direct appropriations.

TITLE VI—COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

Sec. 6001. Economic adjustment assistance.
Sec. 6002. Funding for pollution and disparate impacts of the COVID–19 pandemic.
Sec. 6003. United States Fish and Wildlife Service.

TITLE VII—COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

Subtitle A—Transportation and Infrastructure

Sec. 7101. Grants to the National Railroad Passenger Corporation.
Sec. 7102. Relief for airports.
Sec. 7103. Emergency FAA Employee Leave Fund.
Sec. 7104. Emergency TSA Employee Leave Fund.

Subtitle B—Aviation Manufacturing Jobs Protection

Sec. 7201. Definitions.
Sec. 7202. Payroll support program.

Subtitle C—Airlines

Sec. 7301. Air Transportation Payroll Support Program Extension.

Subtitle D—Consumer Protection and Commerce Oversight

Sec. 7401. Funding for consumer product safety fund to protect consumers from po-
          tentially dangerous products related to COVID–19.
Sec. 7402. Funding for E-Rate support for emergency educational connections and
          devices.
Sec. 7403. Funding for Department of Commerce Inspector General.
Sec. 7404. Federal Trade Commission funding for COVID–19 related work.

Subtitle E—Science and Technology

Sec. 7501. National Institute of Standards and Technology.
Sec. 7502. National Science Foundation.

Subtitle F—Corporation for Public Broadcasting

Sec. 7601. Support for the Corporation for Public Broadcasting.

TITLE VIII—COMMITTEE ON VETERANS' AFFAIRS

Sec. 8001. Funding for claims and appeals processing.
Sec. 8002. Funding availability for medical care and health needs.
Sec. 8003. Funding for supply chain modernization.
Sec. 8004. Funding for State homes.
Sec. 8005. Funding for the Department of Veterans Affairs Office of Inspector Gen-
          eral.
Sec. 8006. Covid–19 veteran rapid retraining assistance program.
Sec. 8007. Prohibition on copayments and cost sharing for veterans during emer-
          gency relating to COVID–19.
Sec. 8008. Emergency Department of Veterans Affairs Employee Leave Fund.

TITLE IX—COMMITTEE ON FINANCE

Subtitle A—Crisis Support for Unemployed Workers

PART 1—EXTENSION OF CARES ACT UNEMPLOYMENT PROVISIONS

Sec. 9011. Extension of Pandemic Unemployment Assistance.
Sec. 9012. Extension of emergency unemployment relief for governmental entities
          and nonprofit organizations.
Sec. 9013. Extension of Federal Pandemic Unemployment Compensation.
Sec. 9014. Extension of full Federal funding of the first week of compensable reg-
          ular unemployment for States with no waiting week.
Sec. 9015. Extension of emergency State staffing flexibility.
Sec. 9016. Extension of pandemic emergency unemployment compensation.
Sec. 9017. Extension of temporary financing of short-time compensation payments
          in States with programs in law.
Sec. 9018. Extension of temporary financing of short-time compensation agree-
          ments for States without programs in law.

H. R. 1319—5

PART 2—EXTENSION OF FFCRA UNEMPLOYMENT PROVISIONS

Sec. 9021. Extension of temporary assistance for States with advances.
Sec. 9022. Extension of full Federal funding of extended unemployment compensation.

PART 3—DEPARTMENT OF LABOR FUNDING FOR TIMELY, ACCURATE, AND EQUITABLE PAYMENT

Sec. 9031. Funding for administration.
Sec. 9032. Funding for fraud prevention, equitable access, and timely payment to eligible workers.

PART 4—OTHER PROVISIONS

Sec. 9041. Extension of limitation on excess business losses of noncorporate taxpayers.
Sec. 9042. Suspension of tax on portion of unemployment compensation.

Subtitle B—Emergency Assistance to Families Through Home Visiting Programs

Sec. 9101. Emergency assistance to families through home visiting programs.

Subtitle C—Emergency Assistance to Children and Families

Sec. 9201. Pandemic Emergency Assistance.

Subtitle D—Elder Justice and Support Guarantee

Sec. 9301. Additional funding for aging and disability services programs.

Subtitle E—Support to Skilled Nursing Facilities in Response to COVID–19

Sec. 9401. Providing for infection control support to skilled nursing facilities through contracts with quality improvement organizations.
Sec. 9402. Funding for strike teams for resident and employee safety in skilled nursing facilities.

Subtitle F—Preserving Health Benefits for Workers

Sec. 9501. Preserving health benefits for workers.

Subtitle G—Promoting Economic Security

PART 1—2021 RECOVERY REBATES TO INDIVIDUALS

Sec. 9601. 2021 recovery rebates to individuals.

PART 2—CHILD TAX CREDIT

Sec. 9611. Child tax credit improvements for 2021.
Sec. 9612. Application of child tax credit in possessions.

PART 3—EARNED INCOME TAX CREDIT

Sec. 9621. Strengthening the earned income tax credit for individuals with no qualifying children.
Sec. 9622. Taxpayer eligible for childless earned income credit in case of qualifying children who fail to meet certain identification requirements.
Sec. 9623. Credit allowed in case of certain separated spouses.
Sec. 9624. Modification of disqualified investment income test.
Sec. 9625. Application of earned income tax credit in possessions of the United States.
Sec. 9626. Temporary special rule for determining earned income for purposes of earned income tax credit.

PART 4—DEPENDENT CARE ASSISTANCE

Sec. 9631. Refundability and enhancement of child and dependent care tax credit.
Sec. 9632. Increase in exclusion for employer-provided dependent care assistance.

PART 5—CREDITS FOR PAID SICK AND FAMILY LEAVE

Sec. 9641. Payroll credits.
Sec. 9642. Credit for sick leave for certain self-employed individuals.
Sec. 9643. Credit for family leave for certain self-employed individuals.

PART 6—EMPLOYEE RETENTION CREDIT

Sec. 9651. Extension of employee retention credit.

PART 7—PREMIUM TAX CREDIT

Sec. 9661. Improving affordability by expanding premium assistance for consumers.

H. R. 1319—6

Sec. 9662. Temporary modification of limitations on reconciliation of tax credits for coverage under a qualified health plan with advance payments of such credit.
Sec. 9663. Application of premium tax credit in case of individuals receiving unemployment compensation during 2021.

PART 8—MISCELLANEOUS PROVISIONS

Sec. 9671. Repeal of election to allocate interest, etc. on worldwide basis.
Sec. 9672. Tax treatment of targeted EIDL advances.
Sec. 9673. Tax treatment of restaurant revitalization grants.
Sec. 9674. Modification of exceptions for reporting of third party network transactions.
Sec. 9675. Modification of treatment of student loan forgiveness.

Subtitle H—Pensions

Sec. 9701. Temporary delay of designation of multiemployer plans as in endangered, critical, or critical and declining status.
Sec. 9702. Temporary extension of the funding improvement and rehabilitation periods for multiemployer pension plans in critical and endangered status for 2020 or 2021.
Sec. 9703. Adjustments to funding standard account rules.
Sec. 9704. Special financial assistance program for financially troubled multiemployer plans.
Sec. 9705. Extended amortization for single employer plans.
Sec. 9706. Extension of pension funding stabilization percentages for single employer plans.
Sec. 9707. Modification of special rules for minimum funding standards for community newspaper plans.
Sec. 9708. Expansion of limitation on excessive employee remuneration.

Subtitle I—Child Care for Workers

Sec. 9801. Child care assistance.

Subtitle J—Medicaid

Sec. 9811. Mandatory coverage of COVID–19 vaccines and administration and treatment under Medicaid.
Sec. 9812. Modifications to certain coverage under Medicaid for pregnant and postpartum women.
Sec. 9813. State option to provide qualifying community-based mobile crisis intervention services.
Sec. 9814. Temporary increase in FMAP for medical assistance under State Medicaid plans which begin to expend amounts for certain mandatory individuals.
Sec. 9815. Extension of 100 percent Federal medical assistance percentage to Urban Indian Health Organizations and Native Hawaiian Health Care Systems.
Sec. 9816. Sunset of limit on maximum rebate amount for single source drugs and innovator multiple source drugs.
Sec. 9817. Additional support for Medicaid home and community-based services during the COVID–19 emergency.
Sec. 9818. Funding for State strike teams for resident and employee safety in nursing facilities.
Sec. 9819. Special rule for the period of a declared public health emergency related to coronavirus.

Subtitle K—Children's Health Insurance Program

Sec. 9821. Mandatory coverage of COVID–19 vaccines and administration and treatment under CHIP.
Sec. 9822. Modifications to certain coverage under CHIP for pregnant and postpartum women.

Subtitle L—Medicare

Sec. 9831. Floor on the Medicare area wage index for hospitals in all-urban States.
Sec. 9832. Secretarial authority to temporarily waive or modify application of certain Medicare requirements with respect to ambulance services furnished during certain emergency periods.
Sec. 9833. Funding for Office of Inspector General.

Subtitle M—Coronavirus State and Local Fiscal Recovery Funds

Sec. 9901. Coronavirus State and Local Fiscal Recovery Funds.

Subtitle N—Other Provisions

Sec. 9911. Funding for providers relating to COVID–19.
Sec. 9912. Extension of customs user fees.

TITLE X—COMMITTEE ON FOREIGN RELATIONS

Sec. 10001. Department of State operations.
Sec. 10002. United States Agency for International Development operations.
Sec. 10003. Global response.
Sec. 10004. Humanitarian response.
Sec. 10005. Multilateral assistance.

TITLE XI—COMMITTEE ON INDIAN AFFAIRS

Sec. 11001. Indian Health Service.
Sec. 11002. Bureau of Indian Affairs.
Sec. 11003. Housing assistance and supportive services programs for Native Americans.
Sec. 11004. COVID–19 response resources for the preservation and maintenance of Native American languages.
Sec. 11005. Bureau of Indian Education.
Sec. 11006. American Indian, Native Hawaiian, and Alaska Native education.

# TITLE I—COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

## Subtitle A—Agriculture

**SEC. 1001. FOOD SUPPLY CHAIN AND AGRICULTURE PANDEMIC RESPONSE.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $4,000,000,000, to remain available until expended, to carry out this section.

(b) USE OF FUNDS.—The Secretary of Agriculture shall use the amounts made available pursuant to subsection (a)—

(1) to purchase food and agricultural commodities;

(2) to purchase and distribute agricultural commodities (including fresh produce, dairy, seafood, eggs, and meat) to individuals in need, including through delivery to nonprofit organizations and through restaurants and other food related entities, as determined by the Secretary, that may receive, store, process, and distribute food items;

(3) to make grants and loans for small or midsized food processors or distributors, seafood processing facilities and processing vessels, farmers markets, producers, or other organizations to respond to COVID–19, including for measures to protect workers against COVID–19; and

(4) to make loans and grants and provide other assistance to maintain and improve food and agricultural supply chain resiliency.

(c) ANIMAL HEALTH.—

(1) COVID–19 ANIMAL SURVEILLANCE.—The Secretary of Agriculture shall conduct monitoring and surveillance of susceptible animals for incidence of SARS–CoV–2.

(2) FUNDING.—Out of the amounts made available under subsection (a), the Secretary shall use $300,000,000 to carry out this subsection.

H. R. 1319—8

(d) OVERTIME FEES.—

(1) SMALL ESTABLISHMENT; VERY SMALL ESTABLISHMENT DEFINITIONS.—The terms "small establishment" and "very small establishment" have the meaning given those terms in the final rule entitled "Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP) Systems" published in the Federal Register on July 25, 1996 (61 Fed. Reg. 38806).

(2) OVERTIME INSPECTION COST REDUCTION.—Notwithstanding section 10703 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 2219a), the Act of June 5, 1948 (21 U.S.C. 695), section 25 of the Poultry Products Inspection Act (21 U.S.C. 468), and section 24 of the Egg Products Inspection Act (21 U.S.C. 1053), and any regulations promulgated by the Department of Agriculture implementing such provisions of law and subject to the availability of funds under paragraph (3), the Secretary of Agriculture shall reduce the amount of overtime inspection costs borne by federally-inspected small establishments and very small establishments engaged in meat, poultry, or egg products processing and subject to the requirements of the Federal Meat Inspection Act (21 U.S.C. 601 et seq.), the Poultry Products Inspection Act (21 U.S.C. 451 et seq.), or the Egg Products Inspection Act (21 U.S.C. 1031 et seq.), for inspection activities carried out during the period of fiscal years 2021 through 2030.

(3) FUNDING.—Out of the amounts made available under subsection (a), the Secretary shall use $100,000,000 to carry out this subsection.

## SEC. 1002. EMERGENCY RURAL DEVELOPMENT GRANTS FOR RURAL HEALTH CARE.

(a) GRANTS.—The Secretary of Agriculture (in this section referred to as the "Secretary") shall use the funds made available by this section to establish an emergency pilot program for rural development not later than 150 days after the date of enactment of this Act to provide grants to eligible applicants (as defined in section 3570.61(a) of title 7, Code of Federal Regulations) to be awarded by the Secretary based on rural development needs related to the COVID–19 pandemic.

(b) USES.—An eligible applicant to whom a grant is awarded under this section may use the grant funds for costs, including those incurred prior to the issuance of the grant, as determined by the Secretary, of facilities which primarily serve rural areas (as defined in section 343(a)(13)(C) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1991(a)(13)(C)), which are located in a rural area, the median household income of the population to be served by which is less than the greater of the poverty line or the applicable percentage (determined under section 3570.63(b) of title 7, Code of Federal Regulations) of the State nonmetropolitan median household income, and for which the performance of any construction work completed with grant funds shall meet the condition set forth in section 9003(f) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 8103(f), to—

(1) increase capacity for vaccine distribution;

(2) provide medical supplies to increase medical surge capacity;

H. R. 1319—9

(3) reimburse for revenue lost during the COVID–19 pandemic, including revenue losses incurred prior to the awarding of the grant;

(4) increase telehealth capabilities, including underlying health care information systems;

(5) construct temporary or permanent structures to provide health care services, including vaccine administration or testing;

(6) support staffing needs for vaccine administration or testing; and

(7) engage in any other efforts to support rural development determined to be critical to address the COVID–19 pandemic, including nutritional assistance to vulnerable individuals, as approved by the Secretary.

(c) FUNDING.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $500,000,000, to remain available until September 30, 2023, to carry out this section, of which not more than 3 percent may be used by the Secretary for administrative purposes and not more than 2 percent may be used by the Secretary for technical assistance as defined in section 306(a)(26) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1926(a)(26)).

### SEC. 1003. PANDEMIC PROGRAM ADMINISTRATION FUNDS.

In addition to amounts otherwise available, there are appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $47,500,000, to remain available until expended, for necessary administrative expenses associated with carrying out this subtitle.

### SEC. 1004. FUNDING FOR THE USDA OFFICE OF INSPECTOR GENERAL FOR OVERSIGHT OF COVID–19-RELATED PROGRAMS.

In addition to amounts otherwise made available, there is appropriated to the Office of the Inspector General of the Department of Agriculture for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $2,500,000, to remain available until September 30, 2022, for audits, investigations, and other oversight activities of projects and activities carried out with funds made available to the Department of Agriculture related to the COVID–19 pandemic.

### SEC. 1005. FARM LOAN ASSISTANCE FOR SOCIALLY DISADVANTAGED FARMERS AND RANCHERS.

(a) PAYMENTS.—

(1) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of amounts in the Treasury not otherwise appropriated, such sums as may be necessary, to remain available until expended, for the cost of loan modifications and payments under this section.

(2) PAYMENTS.—The Secretary shall provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021, to pay off the loan directly or to the socially disadvantaged farmer or rancher (or a combination of both), on each—

(A) direct farm loan made by the Secretary to the socially disadvantaged farmer or rancher; and

H. R. 1319—10

(B) farm loan guaranteed by the Secretary the borrower of which is the socially disadvantaged farmer or rancher.

(b) DEFINITIONS.—In this section:

(1) FARM LOAN.—The term "farm loan" means—

(A) a loan administered by the Farm Service Agency under subtitle A, B, or C of the Consolidated Farm and Rural Development Act (7 U.S.C. 1922 et seq.); and

(B) a Commodity Credit Corporation Farm Storage Facility Loan.

(2) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(3) SOCIALLY DISADVANTAGED FARMER OR RANCHER.—The term "socially disadvantaged farmer or rancher" has the meaning given the term in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)).

**SEC. 1006. USDA ASSISTANCE AND SUPPORT FOR SOCIALLY DISADVANTAGED FARMERS, RANCHERS, FOREST LAND OWNERS AND OPERATORS, AND GROUPS.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,010,000,000, to remain available until expended, to carry out this section.

(b) ASSISTANCE.—The Secretary of Agriculture shall use the amounts made available pursuant to subsection (a) for purposes described in this subsection by—

(1) using not less than 5 percent of the total amount of funding provided under subsection (a) to provide outreach, mediation, financial training, capacity building training, cooperative development training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition to socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups;

(2) using not less than 5 percent of the total amount of funding provided under subsection (a) to provide grants and loans to improve land access for socially disadvantaged farmers, ranchers, or forest landowners, including issues related to heirs' property in a manner as determined by the Secretary;

(3) using not less than 0.5 percent of the total amount of funding provided under subsection (a) to fund the activities of one or more equity commissions that will address racial equity issues within the Department of Agriculture and its programs;

(4) using not less than 5 percent of the total amount of funding provided under subsection (a) to support and supplement agricultural research, education, and extension, as well as scholarships and programs that provide internships and pathways to Federal employment, by—

(A) using not less than 1 percent of the total amount of funding provided under subsection (a) at colleges or universities eligible to receive funds under the Act of August 30, 1890 (commonly known as the "Second Morrill Act") (7 U.S.C. 321 et seq.), including Tuskegee University;

(B) using not less than 1 percent of the total amount of funding provided under subsection (a) at 1994 Institutions (as defined in section 532 of the Equity in Educational Land-Grant Status Act of 1994 (7 U.S.C. 301 note; Public Law 103–382));

(C) using not less than 1 percent of the total amount of funding provided under subsection (a) at Alaska Native serving institutions and Native Hawaiian serving institutions eligible to receive grants under subsections (a) and (b), respectively, of section 1419B of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3156);

(D) using not less than 1 percent of the total amount of funding provided under subsection (a) at Hispanic-serving institutions eligible to receive grants under section 1455 of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3241); and

(E) using not less than 1 percent of the total amount of funding provided under subsection (a) at the insular area institutions of higher education located in the territories of the United States, as referred to in section 1489 of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3361); and

(5) using not less than 5 percent of the total amount of funding provided under subsection (a) to provide financial assistance to socially disadvantaged farmers, ranchers, or forest landowners that are former farm loan borrowers that suffered related adverse actions or past discrimination or bias in Department of Agriculture programs, as determined by the Secretary.

(c) DEFINITIONS.—In this section:

(1) NONINDUSTRIAL PRIVATE FOREST LAND.—The term "nonindustrial private forest land" has the meaning given the term in section 1201(a)(18) of the Food Security Act of 1985 (16 U.S.C. 3801(a)(18)).

(2) SOCIALLY DISADVANTAGED FARMER, RANCHER, OR FOREST LANDOWNER.—The term "socially disadvantaged farmer, rancher, or forest landowner" means a farmer, rancher, or owner or operator of nonindustrial private forest land who is a member of a socially disadvantaged group.

(3) SOCIALLY DISADVANTAGED GROUP.—The term "socially disadvantaged group" has the meaning given the term in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)).

## SEC. 1007. USE OF THE COMMODITY CREDIT CORPORATION FOR COMMODITIES AND ASSOCIATED EXPENSES.

In addition to amounts otherwise made available, there are appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $800,000,000, to remain available until September 30, 2022, to use the Commodity Credit Corporation to acquire and make available commodities under section 406(b) of the Food for Peace Act (7 U.S.C. 1736(b)) and for expenses under such section.

H. R. 1319—12

# Subtitle B—Nutrition

**SEC. 1101. SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM.**

(a) VALUE OF BENEFITS.—Section 702(a) of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) is amended by striking "June 30, 2021" and inserting "September 30, 2021".

(b) SNAP ADMINISTRATIVE EXPENSES.—In addition to amounts otherwise available, there is hereby appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $1,150,000,000, to remain available until September 30, 2023, with amounts to be obligated for each of fiscal years 2021, 2022, and 2023, for the costs of State administrative expenses associated with carrying out this section and administering the supplemental nutrition assistance program established under the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.), of which—

(1) $15,000,000 shall be for necessary expenses of the Secretary of Agriculture (in this section referred to as the "Secretary") for management and oversight of the program; and

(2) $1,135,000,000 shall be for the Secretary to make grants to each State agency for each of fiscal years 2021 through 2023 as follows:

(A) 75 percent of the amounts available shall be allocated to States based on the share of each State of households that participate in the supplemental nutrition assistance program as reported to the Department of Agriculture for the most recent 12-month period for which data are available, adjusted by the Secretary (as of the date of the enactment of this Act) for participation in disaster programs under section 5(h) of the Food and Nutrition Act of 2008 (7 U.S.C. 2014(h)); and

(B) 25 percent of the amounts available shall be allocated to States based on the increase in the number of households that participate in the supplemental nutrition assistance program as reported to the Department of Agriculture over the most recent 12-month period for which data are available, adjusted by the Secretary (as of the date of the enactment of this Act) for participation in disaster programs under section 5(h) of the Food and Nutrition Act of 2008 (7 U.S.C. 2014(h)).

**SEC. 1102. ADDITIONAL ASSISTANCE FOR SNAP ONLINE PURCHASING AND TECHNOLOGY IMPROVEMENTS.**

(a) FUNDING.—In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $25,000,000 to remain available through September 30, 2026, to carry out this section.

(b) USE OF FUNDS.—The Secretary of Agriculture may use the amounts made available pursuant to subsection (a)—

(1) to make technological improvements to improve online purchasing in the supplemental nutrition assistance program established under the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.);

(2) to modernize electronic benefit transfer technology;

(3) to support the mobile technologies demonstration projects and the use of mobile technologies authorized under

section 7(h)(14) of the Food and Nutrition Act of 2008 (7 U.S.C. 2016(h)(14)); and

(4) to provide technical assistance to educate retailers on the process and technical requirements for the online acceptance of the supplemental nutrition assistance program benefits, for mobile payments, and for electronic benefit transfer modernization initiatives.

**SEC. 1103. ADDITIONAL FUNDING FOR NUTRITION ASSISTANCE PROGRAMS.**

Section 704 of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) is amended—

(1) by striking "In addition" and inserting the following: "(a) COVID–19 RESPONSE FUNDING.—In addition"; and

(2) by adding at the end the following—

"(b) ADDITIONAL FUNDING.—In addition to any other funds made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,000,000,000 to remain available until September 30, 2027, for the Secretary of Agriculture to provide grants to the Commonwealth of Northern Mariana Islands, Puerto Rico, and American Samoa for nutrition assistance, of which $30,000,000 shall be available to provide grants to the Commonwealth of Northern Mariana Islands for such assistance.".

**SEC. 1104. COMMODITY SUPPLEMENTAL FOOD PROGRAM.**

In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $37,000,000, to remain available until September 30, 2022, for activities authorized by section 4(a) of the Agriculture and Consumer Protection Act of 1973 (7 U.S.C. 612c note).

**SEC. 1105. IMPROVEMENTS TO WIC BENEFITS.**

(a) DEFINITIONS.—In this section:

(1) APPLICABLE PERIOD.—The term "applicable period" means a period—

(A) beginning after the date of enactment of this Act, as selected by a State agency; and

(B) ending not later than the earlier of—

(i) 4 months after the date described in subparagraph (A); or

(ii) September 30, 2021.

(2) CASH-VALUE VOUCHER.—The term "cash-value voucher" has the meaning given the term in section 246.2 of title 7, Code of Federal Regulations (as in effect on the date of enactment of this Act).

(3) PROGRAM.—The term "program" means the special supplemental nutrition program for women, infants, and children established by section 17 of the Child Nutrition Act of 1966 (42 U.S.C. 1786).

(4) QUALIFIED FOOD PACKAGE.—The term "qualified food package" means each of the following food packages (as defined in section 246.10(e) of title 7, Code of Federal Regulations (as in effect on the date of the enactment of this Act)):

(A) Food package III–Participants with qualifying conditions.

(B) Food Package IV–Children 1 through 4 years.

H. R. 1319—14

(C) Food Package V–Pregnant and partially (mostly) breastfeeding women.

(D) Food Package VI–Postpartum women.

(E) Food Package VII–Fully breastfeeding.

(5) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(6) STATE AGENCY.—The term "State agency" has the meaning given the term in section 17(b) of the Child Nutrition Act of 1966 (42 U.S.C. 1786(b)).

(b) AUTHORITY TO INCREASE AMOUNT OF CASH-VALUE VOUCHER.—During the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to the Coronavirus Disease 2019 (COVID–19), and in response to challenges relating to that public health emergency, the Secretary may, in carrying out the program, increase the amount of a cash-value voucher under a qualified food package to an amount that is less than or equal to $35.

(c) APPLICATION OF INCREASED AMOUNT OF CASH-VALUE VOUCHER TO STATE AGENCIES.—

(1) NOTIFICATION.—An increase to the amount of a cash-value voucher under subsection (b) shall apply to any State agency that notifies the Secretary of—

(A) the intent to use that increased amount, without further application; and

(B) the applicable period selected by the State agency during which that increased amount shall apply.

(2) USE OF INCREASED AMOUNT.—A State agency that makes a notification to the Secretary under paragraph (1) shall use the increased amount described in that paragraph—

(A) during the applicable period described in that notification; and

(B) only during a single applicable period.

(d) SUNSET.—The authority of the Secretary under subsection (b), and the authority of a State agency to increase the amount of a cash-value voucher under subsection (c), shall terminate on September 30, 2021.

(e) FUNDING.—In addition to amounts otherwise made available, there is appropriated to the Secretary, out of funds in the Treasury not otherwise appropriated, $490,000,000 to carry out this section, to remain available until September 30, 2022.

## SEC. 1106. WIC PROGRAM MODERNIZATION.

In addition to amounts otherwise available, there are appropriated to the Secretary of Agriculture, out of amounts in the Treasury not otherwise appropriated, $390,000,000 for fiscal year 2021, to remain available until September 30, 2024, to carry out outreach, innovation, and program modernization efforts, including appropriate waivers and flexibility, to increase participation in and redemption of benefits under programs established under section 17 of the Child Nutrition Act of 1966 (7 U.S.C. 1431), except that such waivers may not relate to the content of the WIC Food Packages (as defined in section 246.10(e) of title 7, Code of Federal Regulations (as in effect on the date of enactment of this Act)), or the nondiscrimination requirements under section 246.8 of title 7, Code of Federal Regulations (as in effect on the date of enactment of this Act).

**SEC. 1107. MEALS AND SUPPLEMENTS REIMBURSEMENTS FOR INDIVIDUALS WHO HAVE NOT ATTAINED THE AGE OF 25.**

(a) PROGRAM FOR AT-RISK SCHOOL CHILDREN.—Beginning on the date of enactment of this section, notwithstanding paragraph (1)(A) of section 17(r) of the Richard B. Russell National School Lunch Act (42 U.S.C. 1766(r)), during the COVID–19 public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), the Secretary shall reimburse institutions that are emergency shelters under such section 17(r) (42 U.S.C. 1766(r)) for meals and supplements served to individuals who, at the time of such service—

(1) have not attained the age of 25; and

(2) are receiving assistance, including non-residential assistance, from such emergency shelter.

(b) PARTICIPATION BY EMERGENCY SHELTERS.—Beginning on the date of enactment of this section, notwithstanding paragraph (5)(A) of section 17(t) of the Richard B. Russell National School Lunch Act (42 U.S.C. 1766(t)), during the COVID–19 public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), the Secretary shall reimburse emergency shelters under such section 17(t) (42 U.S.C. 1766(t)) for meals and supplements served to individuals who, at the time of such service have not attained the age of 25.

(c) DEFINITIONS.—In this section:

(1) EMERGENCY SHELTER.—The term "emergency shelter" has the meaning given the term under section 17(t)(1) of the Richard B. Russell National School Lunch Act (42 U.S.C. 1766(t)(1)).

(2) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

**SEC. 1108. PANDEMIC EBT PROGRAM.**

Section 1101 of the Families First Coronavirus Response Act (7 U.S.C. 2011 note; Public Law 116–127) is amended—

(1) in subsection (a)—

(A) by striking "During fiscal years 2020 and 2021" and inserting "In any school year in which there is a public health emergency designation"; and

(B) by inserting "or in a covered summer period following a school session" after "in session";

(2) in subsection (g), by striking "During fiscal year 2020, the" and inserting "The";

(3) in subsection (h)(1)—

(A) by inserting "either" after "at least 1 child enrolled in such a covered child care facility and"; and

(B) by inserting "or a Department of Agriculture grant-funded nutrition assistance program in the Commonwealth of the Northern Mariana Islands, Puerto Rico, or American Samoa" before "shall be eligible to receive assistance";

(4) by redesignating subsections (i) and (j) as subsections (j) and (k), respectively;

(5) by inserting after subsection (h) the following:

"(i) EMERGENCIES DURING SUMMER.—The Secretary of Agriculture may permit a State agency to extend a State agency plan approved under subsection (b) for not more than 90 days for the purpose of operating the plan during a covered summer period, during which time schools participating in the school lunch program

H. R. 1319—16

under the Richard B. Russell National School Lunch Act or the school breakfast program under section 4 of the Child Nutrition Act of 1966 (42 U.S.C. 1773 ) and covered child care facilities shall be deemed closed for purposes of this section.";

(6) in subsection (j) (as so redesignated)—

(A) by redesignating paragraphs (2) through (6) as paragraphs (3) through (7), respectively;

(B) by inserting after paragraph (1) the following:

"(2) COVERED SUMMER PERIOD.—The term 'covered summer period' means a summer period that follows a school year during which there was a public health emergency designation."; and

(C) in paragraph (5) (as so redesignated), by striking "or another coronavirus with pandemic potential"; and

(7) in subsection (k) (as so redesignated), by inserting "Federal agencies," before "State agencies".

# TITLE II—COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

## Subtitle A—Education Matters

### PART 1—DEPARTMENT OF EDUCATION

**SEC. 2001. ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND.**

(a) IN GENERAL.—In addition to amounts otherwise available through the Education Stabilization Fund, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $122,774,800,000, to remain available through September 30, 2023, to carry out this section.

(b) GRANTS.—From funds provided under subsection (a), the Secretary shall—

(1) use $800,000,000 for the purposes of identifying homeless children and youth and providing homeless children and youth with—

(A) wrap-around services in light of the challenges of COVID–19; and

(B) assistance needed to enable homeless children and youth to attend school and participate fully in school activities; and

(2) from the remaining amounts, make grants to each State educational agency in accordance with this section.

(c) ALLOCATIONS TO STATES.—The amount of each grant under subsection (b) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the Elementary and Secondary Education Act of 1965 in the most recent fiscal year.

(d) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—

(1) IN GENERAL.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local

H. R. 1319—17

educational agencies and charter schools that are local edu-
cational agencies received under part A of title I of the
Elementary and Secondary Education Act of 1965 in the most
recent fiscal year.

(2) AVAILABILITY OF FUNDS.—Each State shall make alloca-
tions under paragraph (1) to local educational agencies in an
expedited and timely manner and, to the extent practicable,
not later than 60 days after the receipt of such funds.

(e) USES OF FUNDS.—A local educational agency that receives
funds under this section—

(1) shall reserve not less than 20 percent of such funds
to address learning loss through the implementation of evi-
dence-based interventions, such as summer learning or summer
enrichment, extended day, comprehensive afterschool programs,
or extended school year programs, and ensure that such inter-
ventions respond to students' academic, social, and emotional
needs and address the disproportionate impact of the
coronavirus on the student subgroups described in section
1111(b)(2)(B)(xi) of the Elementary and Secondary Education
Act of 1965 (20 U.S.C. 6311(b)(2)(B)(xi)), students experiencing
homelessness, and children and youth in foster care; and

(2) shall use the remaining funds for any of the following:
(A) Any activity authorized by the Elementary and
Secondary Education Act of 1965.
(B) Any activity authorized by the Individuals with
Disabilities Education Act.
(C) Any activity authorized by the Adult Education
and Family Literacy Act.
(D) Any activity authorized by the Carl D. Perkins
Career and Technical Education Act of 2006.
(E) Coordination of preparedness and response efforts
of local educational agencies with State, local, Tribal, and
territorial public health departments, and other relevant
agencies, to improve coordinated responses among such
entities to prevent, prepare for, and respond to coronavirus.
(F) Activities to address the unique needs of low-income
children or students, children with disabilities, English
learners, racial and ethnic minorities, students experi-
encing homelessness, and foster care youth, including how
outreach and service delivery will meet the needs of each
population.
(G) Developing and implementing procedures and sys-
tems to improve the preparedness and response efforts
of local educational agencies.
(H) Training and professional development for staff
of the local educational agency on sanitation and mini-
mizing the spread of infectious diseases.
(I) Purchasing supplies to sanitize and clean the facili-
ties of a local educational agency, including buildings oper-
ated by such agency.
(J) Planning for, coordinating, and implementing activi-
ties during long-term closures, including providing meals
to eligible students, providing technology for online
learning to all students, providing guidance for carrying
out requirements under the Individuals with Disabilities
Education Act and ensuring other educational services can

H. R. 1319—18

continue to be provided consistent with all Federal, State, and local requirements.

(K) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and children with disabilities, which may include assistive technology or adaptive equipment.

(L) Providing mental health services and supports, including through the implementation of evidence-based full-service community schools.

(M) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, children with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(N) Addressing learning loss among students, including low-income students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and children and youth in foster care, of the local educational agency, including by—

(i) administering and using high-quality assessments that are valid and reliable, to accurately assess students' academic progress and assist educators in meeting students' academic needs, including through differentiating instruction;

(ii) implementing evidence-based activities to meet the comprehensive needs of students;

(iii) providing information and assistance to parents and families on how they can effectively support students, including in a distance learning environment; and

(iv) tracking student attendance and improving student engagement in distance education.

(O) School facility repairs and improvements to enable operation of schools to reduce risk of virus transmission and exposure to environmental health hazards, and to support student health needs.

(P) Inspection, testing, maintenance, repair, replacement, and upgrade projects to improve the indoor air quality in school facilities, including mechanical and non-mechanical heating, ventilation, and air conditioning systems, filtering, purification and other air cleaning, fans, control systems, and window and door repair and replacement.

(Q) Developing strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff.

H. R. 1319—19

(R) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(f) STATE FUNDING.—With funds not otherwise allocated under subsection (d), a State—

(1) shall reserve not less than 5 percent of the total amount of grant funds awarded to the State under this section to carry out, directly or through grants or contracts, activities to address learning loss by supporting the implementation of evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs, or extended school year programs, and ensure that such interventions respond to students' academic, social, and emotional needs and address the disproportionate impact of the coronavirus on the student subgroups described in section 1111(b)(2)(B)(xi) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(b)(2)(B)(xi)), students experiencing homelessness, and children and youth in foster care, including by providing additional support to local educational agencies to fully address such impacts;

(2) shall reserve not less than 1 percent of the total amount of grant funds awarded to the State under this section to carry out, directly or through grants or contracts, the implementation of evidence-based summer enrichment programs, and ensure such programs respond to students' academic, social, and emotional needs and address the disproportionate impact of the coronavirus on the student populations described in section 1111(b)(2)(B)(xi) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(b)(2)(B)(xi)), students experiencing homelessness, and children and youth in foster care;

(3) shall reserve not less than 1 percent of the total amount of grant funds awarded to the State under this section to carry out, directly or through grants or contracts, the implementation of evidence-based comprehensive afterschool programs, and ensure such programs respond to students' academic, social, and emotional needs and address the disproportionate impact of the coronavirus on the student populations described in section 1111(b)(2)(B)(xi) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(b)(2)(B)(xi)), students experiencing homelessness, and children and youth in foster care; and

(4) may reserve not more than one-half of 1 percent of the total amount of grant funds awarded to the State under this section for administrative costs and the remainder for emergency needs as determined by the State educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(g) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (c).

(h) DEFINITIONS.—In this section—

(1) the terms "child", "children with disabilities", "distance education", "elementary school", "English learner", "evidence-

H. R. 1319—20

based", "secondary school", "local educational agency", "parent", "Secretary", "State educational agency", and "technology" have the meanings given those terms in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801);

(2) the term "full-service community school" has the meaning given that term in section 4622(2) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7272(2)); and

(3) the term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

(i) SAFE RETURN TO IN-PERSON INSTRUCTION.—

(1) IN GENERAL.—A local educational agency receiving funds under this section shall develop and make publicly available on the local educational agency's website, not later than 30 days after receiving the allocation of funds described in paragraph (d)(1), a plan for the safe return to in-person instruction and continuity of services.

(2) COMMENT PERIOD.—Before making the plan described in paragraph (1) publicly available, the local educational agency shall seek public comment on the plan and take such comments into account in the development of the plan.

(3) PREVIOUS PLANS.—If a local educational agency has developed a plan for the safe return to in-person instruction before the date of enactment of this Act that meets the requirements described in paragraphs (1) and (2), such plan shall be deemed to satisfy the requirements under this subsection.

## SEC. 2002. EMERGENCY ASSISTANCE TO NON-PUBLIC SCHOOLS.

(a) IN GENERAL.—In addition to amounts otherwise available through the Emergency Assistance to Non-Public Schools Program, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $2,750,000,000, to remain available through September 30, 2023, for making allocations to Governors under the Emergency Assistance to Non-Public Schools Program to provide services or assistance to non-public schools that enroll a significant percentage of low-income students and are most impacted by the qualifying emergency.

(b) LIMITATIONS.—Funds provided under subsection (a) shall not be used to provide reimbursements to any non-public school.

## SEC. 2003. HIGHER EDUCATION EMERGENCY RELIEF FUND.

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $39,584,570,000, to remain available through September 30, 2023, for making allocations to institutions of higher education in accordance with the same terms and conditions of section 314 of the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (division M of Public Law 116–260), except that—

(1) subsection (a)(1) of such section 314 shall be applied by substituting "91 percent" for "89 percent";

(2) subsection (a)(2) of such section 314 shall be applied—

(A) in the matter preceding subparagraph (A), by substituting "under the heading 'Higher Education' in the Department of Education Appropriations Act, 2020" for "in the Further Consolidated Appropriations Act, 2020 (Public Law 116–94)"; and

H. R. 1319—21

(B) in subparagraph (B), by substituting "under the heading 'Higher Education' in the Department of Education Appropriations Act, 2020" for "in the Further Consolidated Appropriations Act, 2020 (Public Law 116–94)";

(3) an institution that receives an allocation apportioned in accordance with clause (iii) of subsection (a)(2)(A) of such section 314 that has a total endowment size of less than $1,000,000 (including an institution that does not have an endowment) shall be treated by the Secretary as having a total endowment size of $1,000,000 for the purposes of such clause (iii);

(4) subsection (a)(4) of such section 314 shall be applied by substituting "1 percent" for "3 percent";

(5) except as provided in paragraphs (7) and (9) of subsection (d) of such section 314, an institution shall use a portion of funds received under this section to—

(A) implement evidence-based practices to monitor and suppress coronavirus in accordance with public health guidelines; and

(B) conduct direct outreach to financial aid applicants about the opportunity to receive a financial aid adjustment due to the recent unemployment of a family member or independent student, or other circumstances, described in section 479A of the Higher Education Act of 1965 (20 U.S.C. 1087tt);

(6) the following shall not apply to funds provided or received in accordance with this section—

(A) subsection (b) of such section 314;

(B) paragraph (2) of subsection (c) of such section 314;

(C) paragraphs (1), (2), (4), (5), (6), and (8) of subsection (d) of such section 314;

(D) subsections (e) and (f) of such section 314; and

(E) section 316 of the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (division M of Public Law 116–260); and

(7) an institution that receives an allocation under this section apportioned in accordance with subparagraphs (A) through (D) of subsection (a)(1) of such section 314 shall use not less than 50 percent of such allocation to provide emergency financial aid grants to students in accordance with subsection (c)(3) of such section 314.

## SEC. 2004. MAINTENANCE OF EFFORT AND MAINTENANCE OF EQUITY.

(a) STATE MAINTENANCE OF EFFORT.—

(1) IN GENERAL.—As a condition of receiving funds under section 2001, a State shall maintain support for elementary and secondary education, and for higher education (which shall include State funding to institutions of higher education and State need-based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students), in each of fiscal years 2022 and 2023 at least at the proportional levels of such State's support for elementary and secondary education and for higher education relative to such State's overall spending, averaged over fiscal years 2017, 2018, and 2019.

(2) WAIVER.—For the purpose of relieving fiscal burdens incurred by States in preventing, preparing for, and responding

H. R. 1319—22

to the coronavirus, the Secretary of Education may waive any maintenance of effort requirements associated with the Education Stabilization Fund.

(b) STATE MAINTENANCE OF EQUITY.—

(1) HIGH-NEED LOCAL EDUCATIONAL AGENCIES.—As a condition of receiving funds under section 2001, a State educational agency shall not, in fiscal year 2022 or 2023, reduce State funding (as calculated on a per-pupil basis) for any high-need local educational agency in the State by an amount that exceeds the overall per-pupil reduction in State funds, if any, across all local educational agencies in such State in such fiscal year.

(2) HIGHEST POVERTY LOCAL EDUCATIONAL AGENCIES.—Notwithstanding paragraph (1), as a condition of receiving funds under section 2001, a State educational agency shall not, in fiscal year 2022 or 2023, reduce State funding (as calculated on a per-pupil basis) for any highest poverty local educational agency below the level of funding (as calculated on a per-pupil basis) provided to each such local educational agency in fiscal year 2019.

(c) LOCAL EDUCATIONAL AGENCY MAINTENANCE OF EQUITY FOR HIGH-POVERTY SCHOOLS.—

(1) IN GENERAL.—As a condition of receiving funds under section 2001, a local educational agency shall not, in fiscal year 2022 or 2023—

(A) reduce per-pupil funding (from combined State and local funding) for any high-poverty school served by such local educational agency by an amount that exceeds—

(i) the total reduction in local educational agency funding (from combined State and local funding) for all schools served by the local educational agency in such fiscal year (if any); divided by

(ii) the number of children enrolled in all schools served by the local educational agency in such fiscal year; or

(B) reduce per-pupil, full-time equivalent staff in any high-poverty school by an amount that exceeds—

(i) the total reduction in full-time equivalent staff in all schools served by such local educational agency in such fiscal year (if any); divided by

(ii) the number of children enrolled in all schools served by the local educational agency in such fiscal year.

(2) EXCEPTION.—Paragraph (1) shall not apply to a local educational agency in fiscal year 2022 or 2023 that meets at least 1 of the following criteria in such fiscal year:

(A) Such local educational agency has a total enrollment of less than 1,000 students.

(B) Such local educational agency operates a single school.

(C) Such local educational agency serves all students within each grade span with a single school.

(D) Such local educational agency demonstrates an exceptional or uncontrollable circumstance, such as unpredictable changes in student enrollment or a precipitous decline in the financial resources of such agency, as determined by the Secretary of Education.

(d) DEFINITIONS.—In this section:

H. R. 1319—23

(1) ELEMENTARY EDUCATION; SECONDARY EDUCATION.—The terms "elementary education" and "secondary education" have the meaning given such terms under State law.

(2) HIGHEST POVERTY LOCAL EDUCATIONAL AGENCY.—The term "highest poverty local educational agency" means a local educational agency that is among the group of local educational agencies in the State that—

(A) in rank order, have the highest percentages of economically disadvantaged students in the State, on the basis of the most recent satisfactory data available from the Department of Commerce (or, for local educational agencies for which no such data are available, such other data as the Secretary of Education determines are satisfactory); and

(B) collectively serve not less than 20 percent of the State's total enrollment of students served by all local educational agencies in the State.

(3) HIGH-NEED LOCAL EDUCATIONAL AGENCY.—The term "high-need local educational agency" means a local educational agency that is among the group of local educational agencies in the State that—

(A) in rank order, have the highest percentages of economically disadvantaged students in the State, on the basis of the most recent satisfactory data available from the Department of Commerce (or, for local educational agencies for which no such data are available, such other data as the Secretary of Education determines are satisfactory); and

(B) collectively serve not less than 50 percent of the State's total enrollment of students served by all local educational agencies in the State.

(4) HIGH-POVERTY SCHOOL.—

(A) IN GENERAL.—The term "high-poverty school" means, with respect to a school served by a local educational agency, a school that is in the highest quartile of schools served by such local educational agency based on the percentage of economically disadvantaged students served, as determined by the State in accordance with subparagraph (B).

(B) DETERMINATION.—In making the determination under subparagraph (A), a State shall select a measure of poverty established for the purposes of this paragraph by the Secretary of Education and apply such measure consistently to all schools in the State.

(5) OVERALL PER-PUPIL REDUCTION IN STATE FUNDS.—The term "overall per-pupil reduction in State funds" means, with respect to a fiscal year—

(A) the amount of any reduction in the total amount of State funds provided to all local educational agencies in the State in such fiscal year compared to the total amount of such funds provided to all local educational agencies in the State in the previous fiscal year; divided by

(B) the aggregate number of children enrolled in all schools served by all local educational agencies in the State in the fiscal year for which the determination is being made.

(6) STATE.—The term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**SEC. 2005. OUTLYING AREAS.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $850,000,000, to remain available through September 30, 2023, for the Secretary of Education to allocate awards to the outlying areas on the basis of their respective needs, as determined by the Secretary, to be allocated not more than 30 calendar days after the date of enactment of this Act.

**SEC. 2006. GALLAUDET UNIVERSITY.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $19,250,000, to remain available through September 30, 2023, for the Kendall Demonstration Elementary School, the Model Secondary School for the Deaf, and Gallaudet University to prevent, prepare for, and respond to coronavirus, including to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, and payroll) and to provide financial aid grants to students, which may be used for any component of the student's cost of attendance.

**SEC. 2007. STUDENT AID ADMINISTRATION.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $91,130,000, to remain available through September 30, 2023, for Student Aid Administration within the Department of Education to prevent, prepare for, and respond to coronavirus including direct outreach to students and borrowers about financial aid, economic impact payments, means-tested benefits, unemployment assistance, and tax benefits, for which the students and borrowers may be eligible.

**SEC. 2008. HOWARD UNIVERSITY.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $35,000,000, to remain available through September 30, 2023, for Howard University to prevent, prepare for, and respond to coronavirus, including to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, and payroll) and to provide financial aid grants to students, which may be used for any component of the student's cost of attendance.

**SEC. 2009. NATIONAL TECHNICAL INSTITUTE FOR THE DEAF.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated,

$19,250,000, to remain available through September 30, 2023, for the National Technical Institute for the Deaf to prevent, prepare for, and respond to coronavirus, including to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff training, and payroll) and to provide financial aid grants to students, which may be used for any component of the student's cost of attendance.

**SEC. 2010. INSTITUTE OF EDUCATION SCIENCES.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available through September 30, 2023, for the Institute of Education Sciences to carry out research related to addressing learning loss caused by the coronavirus among the student subgroups described in section 1111(b)(2)(B)(xi) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(b)(2)(B)(xi)) and students experiencing homelessness and children and youth in foster care, and to disseminate such findings to State educational agencies and local educational agencies and other appropriate entities.

**SEC. 2011. PROGRAM ADMINISTRATION.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $15,000,000, to remain available through September 30, 2024, for Program Administration within the Department of Education to prevent, prepare for, and respond to coronavirus, and for salaries and expenses necessary to implement this part.

**SEC. 2012. OFFICE OF INSPECTOR GENERAL.**

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $5,000,000, to remain available until expended, for the Office of Inspector General of the Department of Education, for salaries and expenses necessary for oversight, investigations, and audits of programs, grants, and projects funded under this part carried out by the Office of Inspector General.

**SEC. 2013. MODIFICATION OF REVENUE REQUIREMENTS FOR PROPRIETARY INSTITUTIONS OF HIGHER EDUCATION.**

(a) IN GENERAL.—Section 487(a)(24) of the Higher Education Act of 1965 (20 U.S.C. 1094(a)(24)) is amended by striking "funds provided under this title" and inserting "Federal funds that are disbursed or delivered to or on behalf of a student to be used to attend such institution (referred to in this paragraph and subsection (d) as 'Federal education assistance funds')".

(b) IMPLEMENTATION OF NON-FEDERAL REVENUE REQUIREMENT.—Section 487(d) of the Higher Education Act of 1965 (20 U.S.C. 1094(d)) is amended—

(1) in the subsection heading, by striking "Non-title IV" and inserting "Non-Federal"; and

(2) in paragraph (1)(C), by striking "funds for a program under this title" and inserting "Federal education assistance funds".

H. R. 1319—26

(c) EFFECTIVE DATE.—The amendments made under this section shall—

(1) be subject to the master calendar requirements under section 482 of the Higher Education Act of 1965 (20 U.S.C. 1089) and the public involvement and negotiated rulemaking requirements under section 492 of the Higher Education Act of 1965 (20 U.S.C. 1098a), except that such negotiated rulemaking shall commence not earlier than October 1, 2021; and

(2) apply to institutional fiscal years beginning on or after January 1, 2023.

**SEC. 2014. FUNDING FOR THE INDIVIDUALS WITH DISABILITIES EDU-CATION ACT.**

(a) AMOUNTS FOR IDEA.—There is appropriated to the Secretary of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

(1) $2,580,000,000 for grants to States under part B of the Individuals with Disabilities Education Act;

(2) $200,000,000 for preschool grants under section 619 of the Individuals with Disabilities Education Act; and

(3) $250,000,000 for programs for infants and toddlers with disabilities under part C of the Individuals with Disabilities Education Act.

(b) GENERAL PROVISIONS.—Any amount appropriated under subsection (a) is in addition to other amounts appropriated or made available for the applicable purpose.

# PART 2—MISCELLANEOUS

**SEC. 2021. NATIONAL ENDOWMENT FOR THE ARTS.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $135,000,000, to remain available until expended, under the National Foundation on the Arts and the Humanities Act of 1965, as follows:

(1) Forty percent shall be for grants, and relevant administrative expenses, to State arts agencies and regional arts organizations that support programming and general operating expenses to cover up to 100 percent of the costs of the programs which the grants support, to prevent, prepare for, respond to, and recover from the coronavirus.

(2) Sixty percent shall be for direct grants, and relevant administrative expenses, that support organizations' programming and general operating expenses to cover up to 100 percent of the costs of the programs which the grants support, to prevent, prepare for, respond to, and recover from the coronavirus.

**SEC. 2022. NATIONAL ENDOWMENT FOR THE HUMANITIES.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $135,000,000, to remain available until expended, under the National Foundation on the Arts and the Humanities Act of 1965, as follows:

(1) Forty percent shall be for grants, and relevant administrative expenses, to State humanities councils that support humanities organizations' programming and general operating expenses to cover up to 100 percent of the costs of the programs

H. R. 1319—27

which the grants support, to prevent, prepare for, respond to, and recover from the coronavirus.

(2) Sixty percent shall be for direct grants, and relevant administrative expenses, that support humanities organizations' programming and general operating expenses to cover up to 100 percent of the costs of the programs which the grants support, to prevent, prepare for, respond to, and recover from the coronavirus.

**SEC. 2023. INSTITUTE OF MUSEUM AND LIBRARY SERVICES.**

In addition to amounts otherwise available, there is appropriated to the Institute of Museum and Library Services for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $200,000,000, to remain available until expended, for necessary expenses to carry out museum and library services. The Director of the Institute of Museum and Library Services shall award not less than 89 percent of such funds to State library administrative agencies by applying the formula in section 221(b) of the Museum and Library Services Act, except that—

(1) section 221(b)(3)(A) of such Act shall be applied by substituting "$2,000,000" for "$680,000" and by substituting "$200,000" for "$60,000"; and

(2) section 221(b)(3)(C) and subsections (b) and (c) of section 223 of such Act shall not apply to funds provided under this section.

# Subtitle B—Labor Matters

**SEC. 2101. FUNDING FOR DEPARTMENT OF LABOR WORKER PROTECTION ACTIVITIES.**

(a) APPROPRIATION.—In addition to amounts otherwise made available, out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Secretary of Labor for fiscal year 2021, $200,000,000, to remain available until September 30, 2023, for the Wage and Hour Division, the Office of Workers' Compensation Programs, the Office of the Solicitor, the Mine Safety and Health Administration, and the Occupational Safety and Health Administration to carry out COVID–19 related worker protection activities, and for the Office of Inspector General for oversight of the Secretary's activities to prevent, prepare for, and respond to COVID–19.

(b) ALLOCATION OF AMOUNTS.—Amounts appropriated under subsection (a) shall be allocated as follows:

(1) Not less than $100,000,000 shall be for the Occupational Safety and Health Administration, of which $10,000,000 shall be for Susan Harwood training grants and not less than $5,000,000 shall be for enforcement activities related to COVID–19 at high risk workplaces including health care, meat and poultry processing facilities, agricultural workplaces and correctional facilities.

(2) $12,500,000 shall be for the Office of Inspector General.

H. R. 1319—28

# Subtitle C—Human Services and Community Supports

### SEC. 2201. CHILD CARE AND DEVELOPMENT BLOCK GRANT PROGRAM.

(a) CHILD CARE AND DEVELOPMENT BLOCK GRANT FUNDING.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $14,990,000,000, to remain available through September 30, 2021, to carry out the program authorized under section 658C of the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858a) without regard to requirements in sections 658E(c)(3)(E) or 658G of such Act (42 U.S.C. 9858c(c)(3)(E), 9858e). Payments made to States, territories, Indian Tribes, and Tribal organizations from funds made available under this subsection shall be obligated in fiscal year 2021 or the succeeding 2 fiscal years. States, territories, Indian Tribes, and Tribal organizations are authorized to use such funds to provide child care assistance to health care sector employees, emergency responders, sanitation workers, and other workers deemed essential during the response to coronavirus by public officials, without regard to the income eligibility requirements of section 658P(4) of the Child Care and Development Block Grant Act (42 U.S.C. 9858n(4)).

(b) ADMINISTRATIVE COSTS.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $35,000,000, to remain available through September 30, 2025, for the costs of providing technical assistance and conducting research and for the administrative costs to carry out this section and section 2202 of this subtitle.

(c) SUPPLEMENT NOT SUPPLANT.—Amounts made available to carry out this section shall be used to supplement and not supplant other Federal, State, and local public funds expended to provide child care services for eligible individuals.

### SEC. 2202. CHILD CARE STABILIZATION.

(a) DEFINITIONS.—In this section:

(1) COVID–19 PUBLIC HEALTH EMERGENCY.—The term "COVID–19 public health emergency" means the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19, including any renewal of the declaration.

(2) ELIGIBLE CHILD CARE PROVIDER.—The term "eligible child care provider" means—

(A) an eligible child care provider as defined in section 658P of the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858n); or

(B) a child care provider that is licensed, regulated, or registered in the State, territory, or Indian Tribe on the date of enactment of this Act and meets applicable State and local health and safety requirements.

(b) CHILD CARE STABILIZATION FUNDING.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $23,975,000,000, to remain available through September

H. R. 1319—29

30, 2021, for grants under this section in accordance with the Child Care and Development Block Grant Act of 1990.

(c) GRANTS.—From the amounts appropriated to carry out this section and under the authority of section 658O of the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858m) and this section, the Secretary shall award to each lead agency a child care stabilization grant, without regard to the requirements in subparagraphs (C) and (E) of section 658E(c)(3), and in section 658G, of the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858c(c)(3), 9858e). Such grant shall be allotted in accordance with section 658O of the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858m).

(d) STATE RESERVATIONS AND SUBGRANTS.—

(1) RESERVATION.—A lead agency for a State that receives a child care stabilization grant pursuant to subsection (c) shall reserve not more than 10 percent of such grant funds to administer subgrants, provide technical assistance and support for applying for and accessing the subgrant opportunity, publicize the availability of the subgrants, carry out activities to increase the supply of child care, and provide technical assistance to help child care providers implement policies as described in paragraph (2)(D)(i).

(2) SUBGRANTS TO QUALIFIED CHILD CARE PROVIDERS.—

(A) IN GENERAL.—The lead agency shall use the remainder of the grant funds awarded pursuant to subsection (c) to make subgrants to qualified child care providers described in subparagraph (B), regardless of such a provider's previous receipt of other Federal assistance, to support the stability of the child care sector during and after the COVID–19 public health emergency.

(B) QUALIFIED CHILD CARE PROVIDER.—To be qualified to receive a subgrant under this paragraph, a provider shall be an eligible child care provider that on the date of submission of an application for the subgrant, was either—

(i) open and available to provide child care services; or

(ii) closed due to public health, financial hardship, or other reasons relating to the COVID–19 public health emergency.

(C) SUBGRANT AMOUNT.—The amount of such a subgrant to a qualified child care provider shall be based on the provider's stated current operating expenses, including costs associated with providing or preparing to provide child care services during the COVID–19 public health emergency, and to the extent practicable, cover sufficient operating expenses to ensure continuous operations for the intended period of the subgrant.

(D) APPLICATION.—The lead agency shall—

(i) make available on the lead agency's website an application for qualified child care providers that includes certifications that, for the duration of the subgrant—

(I) the provider applying will, when open and available to provide child care services, implement policies in line with guidance from the corresponding State, Tribal, and local authorities, and

H. R. 1319—30

in accordance with State, Tribal, and local orders, and, to the greatest extent possible, implement policies in line with guidance from the Centers for Disease Control and Prevention;

(II) for each employee, the provider will pay not less than the full compensation, including any benefits, that was provided to the employee as of the date of submission of the application for the subgrant (referred to in this subclause as "full compensation"), and will not take any action that reduces the weekly amount of the employee's compensation below the weekly amount of full compensation, or that reduces the employee's rate of compensation below the rate of full compensation, including the involuntary furloughing of any employee employed on the date of submission of the application for the subgrant; and

(III) the provider will provide relief from co-payments and tuition payments for the families enrolled in the provider's program, to the extent possible, and prioritize such relief for families struggling to make either type of payment; and

(ii) accept and process applications submitted under this subparagraph on a rolling basis, and provide subgrant funds in advance of provider expenditures, except as provided in subsection (e)(2).

(E) OBLIGATION.—The lead agency shall notify the Secretary if it is unable to obligate at least 50 percent of the funds received pursuant to subsection (c) that are available for subgrants described in this paragraph within 9 months of the date of enactment of this Act.

(e) USES OF FUNDS.—

(1) IN GENERAL.—A qualified child care provider that receives funds through such a subgrant shall use the funds for at least one of the following:

(A) Personnel costs, including payroll and salaries or similar compensation for an employee (including any sole proprietor or independent contractor), employee benefits, premium pay, or costs for employee recruitment and retention.

(B) Rent (including rent under a lease agreement) or payment on any mortgage obligation, utilities, facility maintenance or improvements, or insurance.

(C) Personal protective equipment, cleaning and sanitization supplies and services, or training and professional development related to health and safety practices.

(D) Purchases of or updates to equipment and supplies to respond to the COVID–19 public health emergency.

(E) Goods and services necessary to maintain or resume child care services.

(F) Mental health supports for children and employees.

(2) REIMBURSEMENT.—The qualified child care provider may use the subgrant funds to reimburse the provider for sums obligated or expended before the date of enactment of this Act for the cost of a good or service described in paragraph (1) to respond to the COVID–19 public health emergency.

H. R. 1319—31

(f) SUPPLEMENT NOT SUPPLANT.—Amounts made available to carry out this section shall be used to supplement and not supplant other Federal, State, and local public funds expended to provide child care services for eligible individuals.

**SEC. 2203. HEAD START.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $1,000,000,000, to remain available through September 30, 2022, to carry out the Head Start Act, including for Federal administrative expenses. After reserving funds for Federal administrative expenses, the Secretary shall allocate all remaining amounts to Head Start agencies for one-time grants, and shall allocate to each Head Start agency an amount that bears the same ratio to the portion available for allocations as the number of enrolled children served by the Head Start agency bears to the number of enrolled children served by all Head Start agencies.

**SEC. 2204. PROGRAMS FOR SURVIVORS.**

(a) IN GENERAL.—Section 303 of the Family Violence Prevention and Services Act (42 U.S.C. 10403) is amended by adding at the end the following:

"(d) ADDITIONAL FUNDING.—For the purposes of carrying out this title, in addition to amounts otherwise made available for such purposes, there are appropriated, out of any amounts in the Treasury not otherwise appropriated, for fiscal year 2021, to remain available until expended except as otherwise provided in this subsection, each of the following:

"(1) $180,000,000 to carry out sections 301 through 312, to be allocated in the manner described in subsection (a)(2), except that—

"(A) a reference in subsection (a)(2) to an amount appropriated under subsection (a)(1) shall be considered to be a reference to an amount appropriated under this paragraph;

"(B) the matching requirement in section 306(c)(4) and condition in section 308(d)(3) shall not apply; and

"(C) each reference in section 305(e) to 'the end of the following fiscal year' shall be considered to be a reference to 'the end of fiscal year 2025'; and

"(D) funds made available to a State in a grant under section 306(a) and obligated in a timely manner shall be available for expenditure, by the State or a recipient of funds from the grant, through the end of fiscal year 2025;

"(2) $18,000,000 to carry out section 309.

"(3) $2,000,000 to carry out section 313, of which $1,000,000 shall be allocated to support Indian communities.".

(b) COVID–19 PUBLIC HEALTH EMERGENCY DEFINED.—In this section, the term "COVID–19 public health emergency" means the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19, including any renewal of the declaration.

(c) GRANTS TO SUPPORT CULTURALLY SPECIFIC POPULATIONS.—

(1) IN GENERAL.—In addition to amounts otherwise made available, there is appropriated, out of any amounts in the Treasury not otherwise appropriated, to the Secretary of Health

H. R. 1319—32

and Human Services (in this section referred to as the "Secretary"), $49,500,000 for fiscal year 2021, to be available until expended, to carry out this subsection (excluding Federal administrative costs, for which funds are appropriated under subsection (e)).

(2) USE OF FUNDS.—From amounts appropriated under paragraph (1), the Secretary acting through the Director of the Family Violence Prevention and Services Program, shall—

(A) support culturally specific community-based organizations to provide culturally specific activities for survivors of sexual assault and domestic violence, to address emergent needs resulting from the COVID–19 public health emergency and other public health concerns; and

(B) support culturally specific community-based organizations that provide culturally specific activities to promote strategic partnership development and collaboration in responding to the impact of COVID–19 and other public health concerns on survivors of sexual assault and domestic violence.

(d) GRANTS TO SUPPORT SURVIVORS OF SEXUAL ASSAULT.—

(1) IN GENERAL.—In addition to amounts otherwise made available, there is appropriated, out of any amounts in the Treasury not otherwise appropriated, to the Secretary, $198,000,000 for fiscal year 2021, to be available until expended, to carry out this subsection (excluding Federal administrative costs, for which funds are appropriated under subsection (e)).

(2) USE OF FUNDS.—From amounts appropriated under paragraph (1), the Secretary acting through the Director of the Family Violence Prevention and Services Program, shall assist rape crisis centers in transitioning to virtual services and meeting the emergency needs of survivors.

(e) ADMINISTRATIVE COSTS.—In addition to amounts otherwise made available, there is appropriated to the Secretary, out of any amounts in the Treasury not otherwise appropriated, $2,500,000 for fiscal year 2021, to remain available until expended, for the Federal administrative costs of carrying out subsections (c) and (d).

**SEC. 2205. CHILD ABUSE PREVENTION AND TREATMENT.**

In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, the following amounts, to remain available through September 30, 2023:

(1) $250,000,000 for carrying out the program authorized under section 201 of the Child Abuse Prevention and Treatment Act (42 U.S.C. 5116), which shall be allocated without regard to section 204(4) of such Act (42 U.S.C. 5116d(4)) and shall be allotted to States in accordance with section 203 of such Act (42 U.S.C. 5116b), except that—

(A) in subsection (b)(1)(A) of such section 203, "70 percent" shall be deemed to be "100 percent"; and

(B) subsections (b)(1)(B) and (c) of such section 203 shall not apply; and

H. R. 1319—33

(2) $100,000,000 for carrying out the State grant program authorized under section 106 of the Child Abuse Prevention and Treatment Act (42 U.S.C. 5106a), which shall be allocated without regard to section 112(a)(2) of such Act (42 U.S.C. 5106h(a)(2)).

## SEC. 2206. CORPORATION FOR NATIONAL AND COMMUNITY SERVICE AND THE NATIONAL SERVICE TRUST.

(a) CORPORATION FOR NATIONAL AND COMMUNITY SERVICE.— In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, to the Corporation for National and Community Service, $852,000,000, to remain available through September 30, 2024, to carry out subsection (b), except that amounts to carry out subsection (b)(7) shall remain available until September 30, 2026.

(b) ALLOCATION OF AMOUNTS.—Amounts provided by subsection (a) shall be allocated as follows:

(1) AMERICORPS STATE AND NATIONAL.—$620,000,000 shall be used—

(A) to increase the living allowances of participants in national service programs; and

(B) to make funding adjustments to existing (as of the date of enactment of this Act) awards and award new and additional awards to entities to support programs described in paragraphs (1)(B), (2)(B), (3)(B), (4)(B), and (5)(B) of subsection (a), and subsection (b)(2), of section 122 of the National and Community Service Act of 1990 (42 U.S.C. 12572), whether or not the entities are already grant recipients under such provisions on the date of enactment of this Act, and notwithstanding section 122(a)(1)(B)(vi) of the National and Community Service Act of 1990 (42 U.S.C. 12572(a)(1)(B)(vi)), by—

(i) prioritizing entities serving communities disproportionately impacted by COVID–19 and utilizing culturally competent and multilingual strategies in the provision of services; and

(ii) taking into account the diversity of communities and participants served by such entities, including racial, ethnic, socioeconomic, linguistic, or geographic diversity.

(2) STATE COMMISSIONS.—$20,000,000 shall be used to make adjustments to existing (as of the date of enactment of this Act) awards and new and additional awards, including awards to State Commissions on National and Community Service, under section 126(a) of the National and Community Service Act of 1990 (42 U.S.C. 12576(a)).

(3) VOLUNTEER GENERATION FUND.—$20,000,000 shall be used for expenses authorized under section 501(a)(4)(F) of the National and Community Service Act of 1990 (42 U.S.C. 12681(a)(4)(F)), which, notwithstanding section 198P(d)(1)(B) of that Act (42 U.S.C. 12653p(d)(1)(B)), shall be for grants awarded by the Corporation for National and Community Service on a competitive basis.

(4) AMERICORPS VISTA.—$80,000,000 shall be used for the purposes described in section 101 of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4951), including to increase

H. R. 1319—34

the living allowances of volunteers, described in section 105(b) of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4955(b)).

(5) NATIONAL SENIOR SERVICE CORPS.—$30,000,000 shall be used for the purposes described in section 200 of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 5000).

(6) ADMINISTRATIVE COSTS.—$73,000,000 shall be used for the Corporation for National and Community Service for administrative expenses to carry out programs and activities funded by subsection (a).

(7) OFFICE OF INSPECTOR GENERAL.—$9,000,000 shall be used for the Office of Inspector General of the Corporation for National and Community Service for salaries and expenses necessary for oversight and audit of programs and activities funded by subsection (a).

(c) NATIONAL SERVICE TRUST.—In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $148,000,000, to remain available until expended, for administration of the National Service Trust, and for payment to the Trust for the provision of educational awards pursuant to section 145(a)(1)(A) of the National and Community Service Act of 1990 (42 U.S.C. 12601(a)(1)(A)).

# Subtitle D—Public Health

### SEC. 2301. FUNDING FOR COVID–19 VACCINE ACTIVITIES AT THE CENTERS FOR DISEASE CONTROL AND PREVENTION.

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $7,500,000,000, to remain available until expended, to carry out activities to plan, prepare for, promote, distribute, administer, monitor, and track COVID–19 vaccines.

(b) USE OF FUNDS.—The Secretary, acting through the Director of the Centers for Disease Control and Prevention, and in consultation with other agencies, as applicable, shall, in conducting activities referred to in subsection (a)—

(1) conduct activities to enhance, expand, and improve nationwide COVID–19 vaccine distribution and administration, including activities related to distribution of ancillary medical products and supplies related to vaccines; and

(2) provide technical assistance, guidance, and support to, and award grants or cooperative agreements to, State, local, Tribal, and territorial public health departments for enhancement of COVID–19 vaccine distribution and administration capabilities, including—

(A) the distribution and administration of vaccines licensed under section 351 of the Public Health Service Act (42 U.S.C. 262) or authorized under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3) and ancillary medical products and supplies related to vaccines;

H. R. 1319—35

(B) the establishment and expansion, including staffing support, of community vaccination centers, particularly in underserved areas;

(C) the deployment of mobile vaccination units, particularly in underserved areas;

(D) information technology, standards-based data, and reporting enhancements, including improvements necessary to support standards-based sharing of data related to vaccine distribution and vaccinations and systems that enhance vaccine safety, effectiveness, and uptake, particularly among underserved populations;

(E) facilities enhancements;

(F) communication with the public regarding when, where, and how to receive COVID–19 vaccines; and

(G) transportation of individuals to facilitate vaccinations, including at community vaccination centers and mobile vaccination units, particularly for underserved populations.

(c) SUPPLEMENTAL FUNDING FOR STATE VACCINATION GRANTS.—

(1) DEFINITIONS.—In this subsection:

(A) BASE FORMULA.—The term "base formula" means the allocation formula that applied to the Public Health Emergency Preparedness cooperative agreement in fiscal year 2020.

(B) ALTERNATIVE ALLOCATION.—The term "alternative allocation" means an allocation to each State, territory, or locality calculated using the percentage derived from the allocation received by such State, territory, or locality of the aggregate amount of fiscal year 2020 Public Health Emergency Preparedness cooperative agreement awards under section 319C–1 of the Public Health Service Act (42 U.S.C. 247d–3a).

(2) SUPPLEMENTAL FUNDING.—

(A) IN GENERAL.—Not later than 21 days after the date of enactment of this Act, the Secretary shall, out of amounts described in subsection (a), provide supplemental funding to any State, locality, or territory that received less of the amounts that were appropriated under title III of division M of Public Law 116–260 for vaccination grants to be issued by the Centers for Disease Control and Prevention than such State, locality, or territory would have received had such amounts been allocated using the alternative allocation.

(B) AMOUNT.—The amount of supplemental funding provided under this subsection shall be equal to the difference between—

(i) the amount the State, locality, or territory received, or would receive, under the base formula; and

(ii) the amount the State, locality, or territory would receive under the alternative allocation.

**SEC. 2302. FUNDING FOR VACCINE CONFIDENCE ACTIVITIES.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,000,000,000, to remain available until expended, to carry out activities, acting

H. R. 1319—36

through the Director of the Centers for Disease Control and Prevention—

(1) to strengthen vaccine confidence in the United States, including its territories and possessions;

(2) to provide further information and education with respect to vaccines licensed under section 351 of the Public Health Service Act (42 U.S.C. 262) or authorized under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3); and

(3) to improve rates of vaccination throughout the United States, including its territories and possessions, including through activities described in section 313 of the Public Health Service Act, as amended by section 311 of division BB of the Consolidated Appropriations Act, 2021 (Public Law 116–260).

**SEC. 2303. FUNDING FOR SUPPLY CHAIN FOR COVID–19 VACCINES, THERAPEUTICS, AND MEDICAL SUPPLIES.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $6,050,000,000, to remain available until expended, for necessary expenses with respect to research, development, manufacturing, production, and the purchase of vaccines, therapeutics, and ancillary medical products and supplies to prevent, prepare, or respond to—

(1) SARS–CoV–2 or any viral variant mutating therefrom with pandemic potential; and

(2) COVID–19 or any disease with potential for creating a pandemic.

**SEC. 2304. FUNDING FOR COVID–19 VACCINE, THERAPEUTIC, AND DEVICE ACTIVITIES AT THE FOOD AND DRUG ADMINISTRATION.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $500,000,000, to remain available until expended, to be used for the evaluation of the continued performance, safety, and effectiveness, including with respect to emerging COVID–19 variants, of vaccines, therapeutics, and diagnostics approved, cleared, licensed, or authorized for use for the treatment, prevention, or diagnosis of COVID–19; facilitation of advanced continuous manufacturing activities related to production of vaccines and related materials; facilitation and conduct of inspections related to the manufacturing of vaccines, therapeutics, and devices delayed or cancelled for reasons related to COVID–19; review of devices authorized for use for the treatment, prevention, or diagnosis of COVID–19; and oversight of the supply chain and mitigation of shortages of vaccines, therapeutics, and devices approved, cleared, licensed, or authorized for use for the treatment, prevention, or diagnosis of COVID–19 by the Food and Drug Administration.

**SEC. 2305. REDUCED COST-SHARING.**

(a) IN GENERAL.—Section 1402 of the Patient Protection and Affordable Care Act is amended by redesignating subsection (f) as subsection (g) and by inserting after subsection (e) the following new subsection:

"(f) SPECIAL RULE FOR INDIVIDUALS WHO RECEIVE UNEMPLOYMENT COMPENSATION DURING 2021.—For purposes of this section,

H. R. 1319—37

in the case of an individual who has received, or has been approved to receive, unemployment compensation for any week beginning during 2021, for the plan year in which such week begins—

"(1) such individual shall be treated as meeting the requirements of subsection (b)(2), and

"(2) for purposes of subsections (c) and (d), there shall not be taken into account any household income of the individual in excess of 133 percent of the poverty line for a family of the size involved.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to plan years beginning after December 31, 2020.

## Subtitle E—Testing

**SEC. 2401. FUNDING FOR COVID–19 TESTING, CONTACT TRACING, AND MITIGATION ACTIVITIES.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $47,800,000,000, to remain available until expended, to carry out activities to detect, diagnose, trace, and monitor SARS–CoV–2 and COVID–19 infections and related strategies to mitigate the spread of COVID–19.

(b) USE OF FUNDS.—From amounts appropriated by subsection (a), the Secretary shall—

(1) implement a national, evidence-based strategy for testing, contact tracing, surveillance, and mitigation with respect to SARS–CoV–2 and COVID–19, including through activities authorized under section 319(a) of the Public Health Service Act;

(2) provide technical assistance, guidance, and support, and award grants or cooperative agreements to State, local, and territorial public health departments for activities to detect, diagnose, trace, and monitor SARS–CoV–2 and COVID–19 infections and related strategies and activities to mitigate the spread of COVID–19;

(3) support the development, manufacturing, procurement, distribution, and administration of tests to detect or diagnose SARS–CoV–2 and COVID–19, including through—

(A) support for the development, manufacture, procurement, and distribution of supplies necessary for administering tests, such as personal protective equipment; and

(B) support for the acquisition, construction, alteration, or renovation of non-federally owned facilities for the production of diagnostics and ancillary medical products and supplies where the Secretary determines that such an investment is necessary to ensure the production of sufficient amounts of such supplies;

(4) establish and expand Federal, State, local, and territorial testing and contact tracing capabilities, including—

(A) through investments in laboratory capacity, such as—

(i) academic and research laboratories, or other laboratories that could be used for processing of COVID–19 testing;

H. R. 1319—38

(ii) community-based testing sites and community-based organizations; or
(iii) mobile health units, particularly in medically underserved areas; and
(B) with respect to quarantine and isolation of contacts;
(5) enhance information technology, data modernization, and reporting, including improvements necessary to support sharing of data related to public health capabilities;
(6) award grants to, or enter into cooperative agreements or contracts with, State, local, and territorial public health departments to establish, expand, and sustain a public health workforce; and
(7) to cover administrative and program support costs necessary to conduct activities related to subparagraph (a).

### SEC. 2402. FUNDING FOR SARS-COV-2 GENOMIC SEQUENCING AND SURVEILLANCE.

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021 out of any money in the Treasury not otherwise appropriated, $1,750,000,000, to remain available until expended, to strengthen and expand activities and workforce related to genomic sequencing, analytics, and disease surveillance.

(b) USE OF FUNDS.—From amounts appropriated by subsection (a), the Secretary, acting through the Director of the Centers for Disease Control and Prevention, shall—
(1) conduct, expand, and improve activities to sequence genomes, identify mutations, and survey the circulation and transmission of viruses and other organisms, including strains of SARS–CoV–2;
(2) award grants or cooperative agreements to State, local, Tribal, or territorial public health departments or public health laboratories—
(A) to increase their capacity to sequence genomes of circulating strains of viruses and other organisms, including SARS–CoV–2;
(B) to identify mutations in viruses and other organisms, including SARS–CoV–2;
(C) to use genomic sequencing to identify outbreaks and clusters of diseases or infections, including COVID–19; and
(D) to develop effective disease response strategies based on genomic sequencing and surveillance data;
(3) enhance and expand the informatics capabilities of the public health workforce; and
(4) award grants for the construction, alteration, or renovation of facilities to improve genomic sequencing and surveillance capabilities at the State and local level.

### SEC. 2403. FUNDING FOR GLOBAL HEALTH.

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $750,000,000, to remain available until expended, for activities to be conducted acting through the Director of the Centers for Disease Control and Prevention to combat SARS–CoV–2, COVID–19, and other emerging infectious disease threats globally, including efforts related to global health security, global disease detection and response, global health

H. R. 1319—39

protection, global immunization, and global coordination on public health.

**SEC. 2404. FUNDING FOR DATA MODERNIZATION AND FORECASTING CENTER.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $500,000,000, to remain available until expended, for activities to be conducted acting through the Director of the Centers for Disease Control and Prevention to support public health data surveillance and analytics infrastructure modernization initiatives at the Centers for Disease Control and Prevention, and establish, expand, and maintain efforts to modernize the United States disease warning system to forecast and track hotspots for COVID–19, its variants, and emerging biological threats, including academic and workforce support for analytics and informatics infrastructure and data collection systems.

## Subtitle F—Public Health Workforce

**SEC. 2501. FUNDING FOR PUBLIC HEALTH WORKFORCE.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $7,660,000,000, to remain available until expended, to carry out activities related to establishing, expanding, and sustaining a public health workforce, including by making awards to State, local, and territorial public health departments.

(b) USE OF FUNDS FOR PUBLIC HEALTH DEPARTMENTS.— Amounts made available to an awardee pursuant to subsection (a) shall be used for the following:

(1) Costs, including wages and benefits, related to the recruiting, hiring, and training of individuals—

(A) to serve as case investigators, contact tracers, social support specialists, community health workers, public health nurses, disease intervention specialists, epidemiologists, program managers, laboratory personnel, informaticians, communication and policy experts, and any other positions as may be required to prevent, prepare for, and respond to COVID–19; and

(B) who are employed by—

(i) the State, territorial, or local public health department involved; or

(ii) a nonprofit private or public organization with demonstrated expertise in implementing public health programs and established relationships with such State, territorial, or local public health departments, particularly in medically underserved areas.

(2) Personal protective equipment, data management and other technology, or other necessary supplies.

(3) Administrative costs and activities necessary for awardees to implement activities funded under this section.

(4) Subawards from recipients of awards under subsection (a) to local health departments for the purposes of the activities funded under this section.

H. R. 1319—40

**SEC. 2502. FUNDING FOR MEDICAL RESERVE CORPS.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until expended, for carrying out section 2813 of the Public Health Service Act (42 U.S.C. 300hh–15).

# Subtitle G—Public Health Investments

**SEC. 2601. FUNDING FOR COMMUNITY HEALTH CENTERS AND COMMUNITY CARE.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $7,600,000,000, to remain available until expended, for necessary expenses for awarding grants and cooperative agreements under section 330 of the Public Health Service Act (42 U.S.C. 254b) to be awarded without regard to the time limitation in subsection (e)(3) and subsections (e)(6)(A)(iii), (e)(6)(B)(iii), and (r)(2)(B) of such section 330, and for necessary expenses for awarding grants to Federally qualified health centers, as described in section 1861(aa)(4)(B) of the Social Security Act (42 U.S.C. 1395x(aa)(4)(B)), and for awarding grants or contracts to Papa Ola Lokahi and to qualified entities under sections 4 and 6 of the Native Hawaiian Health Care Improvement Act (42 U.S.C. 11703, 11705). Of the total amount appropriated by the preceding sentence, not less than $20,000,000 shall be for grants or contracts to Papa Ola Lokahi and to qualified entities under sections 4 and 6 of the Native Hawaiian Health Care Improvement Act (42 U.S.C. 11703, 11705).

(b) USE OF FUNDS.—Amounts made available to an awardee pursuant to subsection (a) shall be used—

(1) to plan, prepare for, promote, distribute, administer, and track COVID–19 vaccines, and to carry out other vaccine-related activities;

(2) to detect, diagnose, trace, and monitor COVID–19 infections and related activities necessary to mitigate the spread of COVID–19, including activities related to, and equipment or supplies purchased for, testing, contact tracing, surveillance, mitigation, and treatment of COVID–19;

(3) to purchase equipment and supplies to conduct mobile testing or vaccinations for COVID–19, to purchase and maintain mobile vehicles and equipment to conduct such testing or vaccinations, and to hire and train laboratory personnel and other staff to conduct such mobile testing or vaccinations, particularly in medically underserved areas;

(4) to establish, expand, and sustain the health care workforce to prevent, prepare for, and respond to COVID–19, and to carry out other health workforce-related activities;

(5) to modify, enhance, and expand health care services and infrastructure; and

(6) to conduct community outreach and education activities related to COVID–19.

(c) PAST EXPENDITURES.—An awardee may use amounts awarded pursuant to subsection (a) to cover the costs of the awardee carrying out any of the activities described in subsection (b) during

H. R. 1319—41

the period beginning on the date of the declaration of a public health emergency by the Secretary under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19 and ending on the date of such award.

**SEC. 2602. FUNDING FOR NATIONAL HEALTH SERVICE CORPS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $800,000,000, to remain available until expended, for carrying out sections 338A, 338B, and 338I of the Public Health Service Act (42 U.S.C. 254l, 254l–1, 254q–1) with respect to the health workforce.

(b) STATE LOAN REPAYMENT PROGRAMS.—

(1) IN GENERAL.—Of the amount made available pursuant to subsection (a), $100,000,000 shall be made available for providing primary health services through grants to States under section 338I(a) of the Public Health Service Act (42 U.S.C. 254q–1(a)).

(2) CONDITIONS.—With respect to grants described in paragraph (1) using funds made available under such paragraph:

(A) Section 338I(b) of the Public Health Service Act (42 U.S.C. 254q–1(b)) shall not apply.

(B) Notwithstanding section 338I(d)(2) of the Public Health Service Act (42 U.S.C. 254q–1(d)(2)), not more than 10 percent of an award to a State from such amounts, may be used by the State for costs of administering the State loan repayment program.

**SEC. 2603. FUNDING FOR NURSE CORPS.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $200,000,000, to remain available until expended, for carrying out section 846 of the Public Health Service Act (42 U.S.C. 297n).

**SEC. 2604. FUNDING FOR TEACHING HEALTH CENTERS THAT OPERATE GRADUATE MEDICAL EDUCATION.**

(a) IN GENERAL.—In addition to amounts otherwise available, and notwithstanding the capped amount referenced in sections 340H(b)(2) and 340H(d)(2) of the Public Health Service Act (42 U.S.C. 256h(b)(2) and (d)(2)), there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $330,000,000, to remain available until September 30, 2023, for the program of payments to teaching health centers that operate graduate medical education under section 340H of the Public Health Service Act (42 U.S.C. 256h) and for teaching health center development grants authorized under section 749A of the Public Health Service Act (42 U.S.C. 293l–1).

(b) USE OF FUNDS.—Amounts made available pursuant to subsection (a) shall be used for the following activities:

(1) For making payments to establish new approved graduate medical residency training programs pursuant to section 340H(a)(1)(C) of the Public Health Service Act (42 U.S.C. 256h(a)(1)(C)).

(2) To provide an increase to the per resident amount described in section 340H(a)(2) of the Public Health Service Act (42 U.S.C. 256h(a)(2)) of $10,000.

H. R. 1319—42

(3) For making payments under section 340H(a)(1)(A) of the Public Health Service Act (42 U.S.C. 256h(a)(1)(A))) to qualified teaching health centers for maintenance of filled positions at existing approved graduate medical residency training programs.

(4) For making payments under section 340H(a)(1)(B) of the Public Health Service Act (42 U.S.C. 256h(a)(1)(B)) for the expansion of existing approved graduate medical residency training programs.

(5) For making awards under section 749A of the Public Health Service Act (42 U.S.C. 293l–1) to teaching health centers for the purpose of establishing new accredited or expanded primary care residency programs.

(6) To cover administrative costs and activities necessary for qualified teaching health centers receiving payments under section 340H of the Public Health Service Act (42 U.S.C. 256h) to carry out activities under such section.

**SEC. 2605. FUNDING FOR FAMILY PLANNING.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $50,000,000, to remain available until expended, for necessary expenses for making grants and contracts under section 1001 of the Public Health Service Act (42 U.S.C. 300).

# Subtitle H—Mental Health and Substance Use Disorder

**SEC. 2701. FUNDING FOR BLOCK GRANTS FOR COMMUNITY MENTAL HEALTH SERVICES.**

In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,500,000,000, to remain available until expended, for carrying out subpart I of part B of title XIX of the Public Health Service Act (42 U.S.C. 300x et seq.), subpart III of part B of title XIX of such Act (42 U.S.C. 300x–51 et seq.), and section 505(c) of such Act (42 U.S.C. 290aa–4(c)) with respect to mental health. Notwithstanding section 1952 of the Public Health Service Act (42 U.S.C. 300x–62), any amount awarded to a State out of amounts appropriated by this section shall be expended by the State by September 30, 2025.

**SEC. 2702. FUNDING FOR BLOCK GRANTS FOR PREVENTION AND TREATMENT OF SUBSTANCE ABUSE.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,500,000,000, to remain available until expended, for carrying out subpart II of part B of title XIX of the Public Health Service Act (42 U.S.C. 300x–21 et seq.), subpart III of part B of title XIX of such Act (42 U.S.C. 300x–51 et seq.), section 505(d) of such Act (42 U.S.C. 290aa–4(d)) with respect to substance abuse, and section 515(d) of such Act (42 U.S.C. 290bb–21(d)). Notwithstanding section 1952

H. R. 1319—43

of the Public Health Service Act (42 U.S.C. 300x–62), any amount awarded to a State out of amounts appropriated by this section shall be expended by the State by September 30, 2025.

**SEC. 2703. FUNDING FOR MENTAL HEALTH AND SUBSTANCE USE DIS-ORDER TRAINING FOR HEALTH CARE PROFESSIONALS, PARAPROFESSIONALS, AND PUBLIC SAFETY OFFICERS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $80,000,000, to remain available until expended, for the purpose described in subsection (b).

(b) USE OF FUNDING.—The Secretary, acting through the Administrator of the Health Resources and Services Administration, shall, taking into consideration the needs of rural and medically underserved communities, use amounts appropriated by subsection (a) to award grants or contracts to health professions schools, academic health centers, State or local governments, Indian Tribes and Tribal organizations, or other appropriate public or private nonprofit entities (or consortia of entities, including entities promoting multidisciplinary approaches), to plan, develop, operate, or participate in health professions and nursing training activities for health care students, residents, professionals, paraprofessionals, trainees, and public safety officers, and employers of such individuals, in evidence-informed strategies for reducing and addressing suicide, burnout, mental health conditions, and substance use disorders among health care professionals.

**SEC. 2704. FUNDING FOR EDUCATION AND AWARENESS CAMPAIGN ENCOURAGING HEALTHY WORK CONDITIONS AND USE OF MENTAL HEALTH AND SUBSTANCE USE DISORDER SERV-ICES BY HEALTH CARE PROFESSIONALS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until expended, for the purpose described in subsection (b).

(b) USE OF FUNDS.—The Secretary, acting through the Director of the Centers for Disease Control and Prevention and in consultation with the medical professional community, shall use amounts appropriated by subsection (a) to carry out a national evidence-based education and awareness campaign directed at health care professionals and first responders (such as emergency medical service providers), and employers of such professionals and first responders. Such awareness campaign shall—

(1) encourage primary prevention of mental health conditions and substance use disorders and secondary and tertiary prevention by encouraging health care professionals to seek support and treatment for their own mental health and substance use concerns; and

(2) help such professionals to identify risk factors in themselves and others and respond to such risks.

**SEC. 2705. FUNDING FOR GRANTS FOR HEALTH CARE PROVIDERS TO PROMOTE MENTAL HEALTH AMONG THEIR HEALTH PROFESSIONAL WORKFORCE.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out

H. R. 1319—44

of any money in the Treasury not otherwise appropriated, $40,000,000, to remain available until expended, for the purpose described in subsection (b).

(b) USE OF FUNDS.—The Secretary, acting through the Administrator of the Health Resources and Services Administration, shall, taking into consideration the needs of rural and medically underserved communities, use amounts appropriated by subsection (a) to award grants or contracts to entities providing health care, including health care providers associations and Federally qualified health centers, to establish, enhance, or expand evidence-informed programs or protocols to promote mental health among their providers, other personnel, and members.

**SEC. 2706. FUNDING FOR COMMUNITY-BASED FUNDING FOR LOCAL SUBSTANCE USE DISORDER SERVICES.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $30,000,000, to remain available until expended, to carry out the purpose described in subsection (b).

(b) USE OF FUNDS.—

(1) IN GENERAL.—The Secretary, acting through the Assistant Secretary for Mental Health and Substance Use and in consultation with the Director of the Centers for Disease Control and Prevention, shall award grants to support States; local, Tribal, and territorial governments; Tribal organizations; nonprofit community-based organizations; and primary and behavioral health organizations to support community-based overdose prevention programs, syringe services programs, and other harm reduction services.

(2) USE OF GRANT FUNDS.—Grant funds awarded under this section to eligible entities shall be used for preventing and controlling the spread of infectious diseases and the consequences of such diseases for individuals with substance use disorder, distributing opioid overdose reversal medication to individuals at risk of overdose, connecting individuals at risk for, or with, a substance use disorder to overdose education, counseling, and health education, and encouraging such individuals to take steps to reduce the negative personal and public health impacts of substance use or misuse.

**SEC. 2707. FUNDING FOR COMMUNITY-BASED FUNDING FOR LOCAL BEHAVIORAL HEALTH NEEDS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $50,000,000, to remain available until expended, to carry out the purpose described in subsection (b).

(b) USE OF FUNDS.—

(1) IN GENERAL.—The Secretary, acting through the Assistant Secretary for Mental Health and Substance Use, shall award grants to State, local, Tribal, and territorial governments, Tribal organizations, nonprofit community-based entities, and primary care and behavioral health organizations to address increased community behavioral health needs worsened by the COVID–19 public health emergency.

(2) USE OF GRANT FUNDS.—Grant funds awarded under this section to eligible entities shall be used for promoting

care coordination among local entities; training the mental and behavioral health workforce, relevant stakeholders, and community members; expanding evidence-based integrated models of care; addressing surge capacity for mental and behavioral health needs; providing mental and behavioral health services to individuals with mental health needs (including co-occurring substance use disorders) as delivered by behavioral and mental health professionals utilizing telehealth services; and supporting, enhancing, or expanding mental and behavioral health preventive and crisis intervention services.

**SEC. 2708. FUNDING FOR THE NATIONAL CHILD TRAUMATIC STRESS NETWORK.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000, to remain available until expended, for carrying out section 582 of the Public Health Service Act (42 U.S.C. 290hh–1) with respect to addressing the problem of high-risk or medically underserved persons who experience violence-related stress.

**SEC. 2709. FUNDING FOR PROJECT AWARE.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $30,000,000, to remain available until expended, for carrying out section 520A of the Public Health Service Act (42 U.S.C. 290bb–32) with respect to advancing wellness and resiliency in education.

**SEC. 2710. FUNDING FOR YOUTH SUICIDE PREVENTION.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until expended, for carrying out sections 520E and 520E–2 of the Public Health Service Act (42 U.S.C. 290bb–36, 290bb–36b).

**SEC. 2711. FUNDING FOR BEHAVIORAL HEALTH WORKFORCE EDUCATION AND TRAINING.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until expended, for carrying out section 756 of the Public Health Service Act (42 U.S.C. 294e–1).

**SEC. 2712. FUNDING FOR PEDIATRIC MENTAL HEALTH CARE ACCESS.**

In addition to amounts otherwise available, there is appropriated to the Secretary for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $80,000,000, to remain available until expended, for carrying out section 330M of the Public Health Service Act (42 U.S.C. 254c–19).

**SEC. 2713. FUNDING FOR EXPANSION GRANTS FOR CERTIFIED COMMUNITY BEHAVIORAL HEALTH CLINICS.**

In addition to amounts otherwise available, there is appropriated to the Secretary, acting through the Assistant Secretary for Mental Health and Substance Use, for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $420,000,000, to remain available until expended, for grants to

H. R. 1319—46

communities and community organizations that meet the criteria for Certified Community Behavioral Health Clinics pursuant to section 223(a) of the Protecting Access to Medicare Act of 2014 (42 U.S.C. 1396a note).

## Subtitle I—Exchange Grant Program

### SEC. 2801. ESTABLISHING A GRANT PROGRAM FOR EXCHANGE MODERNIZATION.

(a) IN GENERAL.—Out of funds appropriated under subsection (b), the Secretary of Health and Human Services (in this subtitle referred to as the "Secretary") shall award grants to each American Health Benefits Exchange established under section 1311(b) of the Patient Protection and Affordable Care Act (42 U.S.C. 18031(b)) (other than an Exchange established by the Secretary under section 1321(c) of such Act (42 U.S.C. 18041(c))) that submits to the Secretary an application at such time and in such manner, and containing such information, as specified by the Secretary, for purposes of enabling such Exchange to modernize or update any system, program, or technology utilized by such Exchange to ensure such Exchange is compliant with all applicable requirements.

(b) FUNDING.—In addition to amounts otherwise available, there is appropriated, for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until September 30, 2022, for carrying out this section.

## Subtitle J—Continued Assistance to Rail Workers

### SEC. 2901. ADDITIONAL ENHANCED BENEFITS UNDER THE RAILROAD UNEMPLOYMENT INSURANCE ACT.

(a) IN GENERAL.—Section 2(a)(5)(A) of the Railroad Unemployment Insurance Act (45 U.S.C. 352(a)(5)(A)) is amended—

(1) in the first sentence—

(A) by striking "March 14, 2021" and inserting "September 6, 2021";

(B) by striking "or July 1, 2020" and inserting "July 1, 2020, or July 1, 2021"; and

(2) in the fourth sentence, by striking "March 14, 2021" and inserting "September 6, 2021".

(b) CLARIFICATION ON AUTHORITY TO USE FUNDS.—Funds appropriated under subparagraph (B) of section 2(a)(5) of the Railroad Unemployment Insurance Act (45 U.S.C. 352(a)(5)) shall be available to cover the cost of recovery benefits provided under such section 2(a)(5) by reason of the amendments made by subsection (a) as well as to cover the cost of such benefits provided under such section 2(a)(5) as in effect on the day before the date of enactment of this Act.

### SEC. 2902. EXTENDED UNEMPLOYMENT BENEFITS UNDER THE RAILROAD UNEMPLOYMENT INSURANCE ACT.

(a) IN GENERAL.—Section 2(c)(2)(D) of the Railroad Unemployment Insurance Act (45 U.S.C. 352(c)(2)(D)) is amended—

(1) in clause (i)—

H. R. 1319—47

(A) in subclause (I), by striking "185 days" and inserting "330 days";

(B) in subclause (II),

(i) by striking "19 consecutive 14-day periods" and inserting "33 consecutive 14-day periods"; and

(ii) by striking "6 consecutive 14-day periods" and inserting "20 consecutive 14-day periods";

(2) in clause (ii)—

(A) by striking "120 days of unemployment" and inserting "265 days of unemployment";

(B) by striking "12 consecutive 14-day periods" and inserting "27 consecutive 14-day periods"; and

(C) by striking "6 consecutive 14-day periods" and inserting "20 consecutive 14-day periods";

(3) in clause (iii)—

(A) by striking "June 30, 2021" and inserting "June 30, 2022"; and

(B) by striking "the provisions of clauses (i) and (ii) shall not apply to any employee whose extended benefit period under subparagraph (B) begins after March 14, 2021, and shall not apply to any employee with respect to any registration period beginning after April 5, 2021." and inserting "the provisions of clauses (i) and (ii) shall not apply to any employee with respect to any registration period beginning after September 6, 2021."; and

(4) in clause (v), by adding at the end the following: "In addition to the amount appropriated by the preceding two sentences, out of any funds in the Treasury not otherwise appropriated, there is appropriated $2,000,000 to cover the cost of additional extended unemployment benefits provided under this subparagraph, to remain available until expended.".

(b) CLARIFICATION ON AUTHORITY TO USE FUNDS.—Funds appropriated under the first, second, or third sentence of clause (v) of section 2(c)(2)(D) of the Railroad Unemployment Insurance Act shall be available to cover the cost of additional extended unemployment benefits provided under such section 2(c)(2)(D) by reason of the amendments made by subsection (a) as well as to cover the cost of such benefits provided under such section 2(c)(2)(D) as in effect on the day before the date of enactment of this Act.

**SEC. 2903. EXTENSION OF WAIVER OF THE 7-DAY WAITING PERIOD FOR BENEFITS UNDER THE RAILROAD UNEMPLOYMENT INSURANCE ACT.**

(a) IN GENERAL.—Section 2112(a) of the CARES Act (15 U.S.C. 9030(a)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

(b) CLARIFICATION ON AUTHORITY TO USE FUNDS.—Funds appropriated under section 2112(c) of the CARES Act (15 U.S.C. 9030(c)) shall be available to cover the cost of additional benefits payable due to section 2112(a) of such Act by reason of the amendments made by subsection (a) as well as to cover the cost of such benefits payable due to such section 2112(a) as in effect on the day before the date of enactment of this Act.

H. R. 1319—48

**SEC. 2904. RAILROAD RETIREMENT BOARD AND OFFICE OF THE INSPECTOR GENERAL FUNDING.**

In addition to amounts otherwise made available, there are appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

    (1) $27,975,000, to remain available until expended, for the Railroad Retirement Board, to prevent, prepare for, and respond to coronavirus, of which—

        (A) $6,800,000 shall be for additional hiring and overtime bonuses as needed to administer the Railroad Unemployment Insurance Act; and

        (B) $21,175,000 shall be to supplement, not supplant, existing resources devoted to operations and improvements for the Information Technology Investment Initiatives of the Railroad Retirement Board; and

    (2) $500,000, to remain available until expended, for the Railroad Retirement Board Office of Inspector General for audit, investigatory and review activities.

# Subtitle K—Ratepayer Protection

**SEC. 2911. FUNDING FOR LIHEAP.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $4,500,000,000, to remain available through September 30, 2022, for additional funding to provide payments under section 2602(b) of the Low-Income Home Energy Assistance Act of 1981 (42 U.S.C. 8621(b)), except that—

    (1) $2,250,000,000 of such amounts shall be allocated as though the total appropriation for such payments for fiscal year 2021 was less than $1,975,000,000; and

    (2) section 2607(b)(2)(B) of such Act (42 U.S.C. 8626(b)(2)(B)) shall not apply to funds appropriated under this section for fiscal year 2021.

**SEC. 2912. FUNDING FOR WATER ASSISTANCE PROGRAM.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this section referred to as the "Secretary") for fiscal year 2021, out of any amounts in the Treasury not otherwise appropriated, $500,000,000, to remain available until expended, for grants to States and Indian Tribes to assist low-income households, particularly those with the lowest incomes, that pay a high proportion of household income for drinking water and wastewater services, by providing funds to owners or operators of public water systems or treatment works to reduce arrearages of and rates charged to such households for such services.

(b) ALLOTMENT.—The Secretary shall—

    (1) allot amounts appropriated in this section to a State or Indian Tribe based on—

        (A) the percentage of households in the State, or under the jurisdiction of the Indian Tribe, with income equal or less than 150 percent of the Federal poverty line; and

        (B) the percentage of households in the State, or under the jurisdiction of the Indian Tribe, that spend more than 30 percent of monthly income on housing; and

(2) reserve up to 3 percent of the amount appropriated in this section for Indian Tribes and tribal organizations.

(c) DEFINITION.—In this section, the term "State" means each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, Guam, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

# Subtitle L—Assistance for Older Americans, Grandfamilies, and Kinship Families

### SEC. 2921. SUPPORTING OLDER AMERICANS AND THEIR FAMILIES.

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,434,000,000, to remain available until expended, to carry out the Older Americans Act of 1965.

(b) ALLOCATION OF AMOUNTS.—Amounts made available by subsection (a) shall be available as follows:

(1) $750,000,000 shall be available to carry out part C of title III of such Act.

(2) $25,000,000 shall be available to carry out title VI of such Act, including part C of such title.

(3) $460,000,000 shall be available to carry out part B of title III of such Act, including for—

(A) supportive services of the types made available for fiscal year 2020;

(B) efforts related to COVID–19 vaccination outreach, including education, communication, transportation, and other activities to facilitate vaccination of older individuals; and

(C) prevention and mitigation activities related to COVID–19 focused on addressing extended social isolation among older individuals, including activities for investments in technological equipment and solutions or other strategies aimed at alleviating negative health effects of social isolation due to long-term stay-at-home recommendations for older individuals for the duration of the COVID–19 public health emergency.

(4) $44,000,000 shall be available to carry out part D of title III of such Act.

(5) $145,000,000 shall be available to carry out part E of title III of such Act.

(6) $10,000,000 shall be available to carry out the long-term care ombudsman program under title VII of such Act.

### SEC. 2922. NATIONAL TECHNICAL ASSISTANCE CENTER ON GRANDFAMILIES AND KINSHIP FAMILIES.

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000, to remain available through September 30, 2025, for the Secretary, acting through the Administrator of the Administration for Community Living, to establish,

H. R. 1319—50

directly or through grants or contracts, a National Technical Assistance Center on Grandfamilies and Kinship Families (in this section referred to as the "Center") to provide training, technical assistance, and resources for government programs, nonprofit and other community-based organizations, and Indian Tribes, Tribal organizations, and urban Indian organizations, that serve grandfamilies and kinship families to support the health and well-being of members of grandfamilies and kinship families, including caregivers, children, and their parents. The Center shall focus primarily on serving grandfamilies and kinship families in which the primary caregiver is an adult age 55 or older, or the child has one or more disabilities.

(b) ACTIVITIES OF THE CENTER.—The Center shall—

(1) engage experts to stimulate the development of new and identify existing evidence-based, evidence-informed, and exemplary practices or programs related to health promotion (including mental health and substance use disorder treatment), education, nutrition, housing, financial needs, legal issues, disability self-determination, caregiver support, and other issues to help serve caregivers, children, and their parents in grandfamilies and kinship families;

(2) encourage and support the implementation of the evidence-based, evidence-informed, and exemplary practices or programs identified under paragraph (1) to support grandfamilies and kinship families and to promote coordination of services for grandfamilies and kinship families across systems that support them;

(3) facilitate learning across States, territories, Indian Tribes, Tribal organizations, and urban Indian organizations for providing technical assistance, resources, and training related to issues described in paragraph (1) to individuals and entities across systems that directly work with grandfamilies and kinship families;

(4) help government programs, nonprofit and other community-based organizations, and Indian Tribes, Tribal organizations, and urban Indian organizations, serving grandfamilies and kinship families, to plan and coordinate responses to assist grandfamilies and kinship families during national, State, Tribal, territorial, and local emergencies and disasters; and

(5) assist government programs, and nonprofit and other community-based organizations, in promoting equity and implementing culturally and linguistically appropriate approaches as the programs and organizations serve grandfamilies and kinship families.

# TITLE III—COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

## Subtitle A—Defense Production Act of 1950

**SEC. 3101. COVID–19 EMERGENCY MEDICAL SUPPLIES ENHANCEMENT.**

(a) SUPPORTING ENHANCED USE OF THE DEFENSE PRODUCTION ACT OF 1950.—In addition to funds otherwise available, there is appropriated, for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000,000, to remain available

H. R. 1319—51

until September 30, 2025, to carry out titles I, III, and VII of such Act in accordance with subsection (b).

(b) MEDICAL SUPPLIES AND EQUIPMENT.—

(1) TESTING, PPE, VACCINES, AND OTHER MATERIALS.—Except as provided in paragraph (2), amounts appropriated in subsection (a) shall be used for the purchase, production (including the construction, repair, and retrofitting of government-owned or private facilities as necessary), or distribution of medical supplies and equipment (including durable medical equipment) related to combating the COVID–19 pandemic, including—

(A) in vitro diagnostic products for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19, and the reagents and other materials necessary for producing, conducting, or administering such products, and the machinery, equipment, laboratory capacity, or other technology necessary to produce such products;

(B) face masks and personal protective equipment, including face shields, nitrile gloves, N–95 filtering facepiece respirators, and any other masks or equipment (including durable medical equipment) needed to respond to the COVID–19 pandemic, and the materials, machinery, additional manufacturing lines or facilities, or other technology necessary to produce such equipment; and

(C) drugs, devices, and biological products that are approved, cleared, licensed, or authorized for use in treating or preventing COVID–19 and symptoms related to COVID–19, and any materials, manufacturing machinery, additional manufacturing or fill-finish lines or facilities, technology, or equipment (including durable medical equipment) necessary to produce or use such drugs, biological products, or devices (including syringes, vials, or other supplies or equipment related to delivery, distribution, or administration).

(2) RESPONDING TO PUBLIC HEALTH EMERGENCIES.—After September 30, 2022, amounts appropriated in subsection (a) may be used for any activity authorized by paragraph (1), or any other activity necessary to meet critical public health needs of the United States, with respect to any pathogen that the President has determined has the potential for creating a public health emergency.

# Subtitle B—Housing Provisions

**SEC. 3201. EMERGENCY RENTAL ASSISTANCE.**

(a) FUNDING.—

(1) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of the Treasury for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $21,550,000,000, to remain available until September 30, 2027, for making payments to eligible grantees under this section—

(2) RESERVATION OF FUNDS.—Of the amount appropriated under paragraph (1), the Secretary shall reserve—

(A) $305,000,000 for making payments under this section to the Commonwealth of Puerto Rico, the United States

H. R. 1319—52

Virgin Islands, Guam, the Commonwealth of the Northern
Mariana Islands, and American Samoa;

(B) $30,000,000 for costs of the Secretary for the
administration of emergency rental assistance programs
and technical assistance to recipients of any grants made
by the Secretary to provide financial and other assistance
to renters;

(C) $3,000,000 for administrative expenses of the
Inspector General relating to oversight of funds provided
in this section; and

(D) $2,500,000,000 for payments to high-need grantees
as provided in this section.

(b) ALLOCATION OF FUNDS TO ELIGIBLE GRANTEES.—

(1) ALLOCATION FOR STATES AND UNITS OF LOCAL GOVERN-
MENT.—

(A) IN GENERAL.—The amount appropriated under
paragraph (1) of subsection (a) that remains after the
application of paragraph (2) of such subsection shall be
allocated to eligible grantees described in subparagraphs
(A) and (B) of subsection (f)(1) in the same manner as
the amount appropriated under section 501 of subtitle A
of title V of division N of the Consolidated Appropriations
Act, 2021 (Public Law 116–260) is allocated to States and
units of local government under subsection (b)(1) of such
section, except that section 501(b) of such subtitle A shall
be applied—

(i) without regard to clause (i) of paragraph (1)(A);

(ii) by deeming the amount appropriated under
paragraph (1) of subsection (a) of this Act that remains
after the application of paragraph (2) of such subsection
to be the amount deemed to apply for purposes of
applying clause (ii) of section 501(b)(1)(A) of such sub-
title A;

(iii) by substituting "$152,000,000" for
"$200,000,000" each place such term appears;

(iv) in subclause (I) of such section 501(b)(1)(A)(v),
by substituting "under section 3201 of the American
Rescue Plan Act of 2021" for "under section 501 of
subtitle A of title V of division N of the Consolidated
Appropriations Act, 2021"; and

(v) in subclause (II) of such section 501(b)(1)(A)(v),
by substituting "local government elects to receive
funds from the Secretary under section 3201 of the
American Rescue Plan Act of 2021 and will use the
funds in a manner consistent with such section" for
"local government elects to receive funds from the Sec-
retary under section 501 of subtitle A of title V of
division N of the Consolidated Appropriations Act, 2021
and will use the funds in a manner consistent with
such section".

(B) PRO RATA ADJUSTMENT.—The Secretary shall make
pro rata adjustments in the amounts of the allocations
determined under subparagraph (A) of this paragraph for
entities described in such subparagraph as necessary to
ensure that the total amount of allocations made pursuant
to such subparagraph does not exceed the remainder appro-
priated amount described in such subparagraph.

H. R. 1319—53

(2) ALLOCATIONS FOR TERRITORIES.—The amount reserved under subsection (a)(2)(A) shall be allocated to eligible grantees described in subsection (f)(1)(C) in the same manner as the amount appropriated under section 501(a)(2)(A) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) is allocated under section 501(b)(3) of such subtitle A to eligible grantees described under subparagraph (C) of such section 501(b)(3), except that section 501(b)(3) of such subtitle A shall be applied—

(A) in subparagraph (A), by inserting "of section 3201 of the American Rescue Plan Act of 2021" after "the amount reserved under subsection (a)(2)(A)"; and

(B) in clause (i) of subparagraph (B), by substituting "the amount equal to 0.3 percent of the amount appropriated under subsection (a)(1)" with "the amount equal to 0.3 percent of the amount appropriated under subsection (a)(1) of section 3201 of the American Rescue Plan Act of 2021".

(3) HIGH-NEED GRANTEES.—The Secretary shall allocate funds reserved under subsection (a)(2)(D) to eligible grantees with a high need for assistance under this section, with the number of very low-income renter households paying more than 50 percent of income on rent or living in substandard or overcrowded conditions, rental market costs, and change in employment since February 2020 used as the factors for allocating funds.

(c) PAYMENT SCHEDULE.—

(1) IN GENERAL.—The Secretary shall pay all eligible grantees not less than 40 percent of each such eligible grantee's total allocation provided under subsection (b) within 60 days of enactment of this Act.

(2) SUBSEQUENT PAYMENTS.—The Secretary shall pay to eligible grantees additional amounts in tranches up to the full amount of each such eligible grantee's total allocation in accordance with a procedure established by the Secretary, provided that any such procedure established by the Secretary shall require that an eligible grantee must have obligated not less than 75 percent of the funds already disbursed by the Secretary pursuant to this section prior to disbursement of additional amounts.

(d) USE OF FUNDS.—

(1) IN GENERAL.—An eligible grantee shall only use the funds provided from payments made under this section as follows:

(A) FINANCIAL ASSISTANCE.—

(i) IN GENERAL.—Subject to clause (ii) of this subparagraph, funds received by an eligible grantee from payments made under this section shall be used to provide financial assistance to eligible households, not to exceed 18 months, including the payment of—

(I) rent;

(II) rental arrears;

(III) utilities and home energy costs;

(IV) utilities and home energy costs arrears; and

(V) other expenses related to housing, as defined by the Secretary.

H. R. 1319—54

(ii) LIMITATION.—The aggregate amount of financial assistance an eligible household may receive under this section, when combined with financial assistance provided under section 501 of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260), shall not exceed 18 months.

(B) HOUSING STABILITY SERVICES.—Not more than 10 percent of funds received by an eligible grantee from payments made under this section may be used to provide case management and other services intended to help keep households stably housed.

(C) ADMINISTRATIVE COSTS.—Not more than 15 percent of the total amount paid to an eligible grantee under this section may be used for administrative costs attributable to providing financial assistance, housing stability services, and other affordable rental housing and eviction prevention activities, including for data collection and reporting requirements related to such funds.

(D) OTHER AFFORDABLE RENTAL HOUSING AND EVICTION PREVENTION ACTIVITIES.—An eligible grantee may use any funds from payments made under this section that are unobligated on October 1, 2022, for purposes in addition to those specified in this paragraph, provided that—

(i) such other purposes are affordable rental housing and eviction prevention purposes, as defined by the Secretary, serving very low-income families (as such term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b))); and

(ii) prior to obligating any funds for such purposes, the eligible grantee has obligated not less than 75 percent of the total funds allocated to such eligible grantee in accordance with this section.

(2) DISTRIBUTION OF ASSISTANCE.—Amounts appropriated under subsection (a)(1) of this section shall be subject to the same terms and conditions that apply under paragraph (4) of section 501(c) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) to amounts appropriated under subsection (a)(1) of such section 501.

(e) REALLOCATION OF FUNDS.—

(1) IN GENERAL.—Beginning March 31, 2022, the Secretary shall reallocate funds allocated to eligible grantees in accordance with subsection (b) but not yet paid in accordance with subsection (c)(2) according to a procedure established by the Secretary.

(2) ELIGIBILITY FOR REALLOCATED FUNDS.—The Secretary shall require an eligible grantee to have obligated 50 percent of the total amount of funds allocated to such eligible grantee under subsection (b) to be eligible to receive funds reallocated under paragraph (1) of this subsection.

(3) PAYMENT OF REALLOCATED FUNDS BY THE SECRETARY.—The Secretary shall pay to each eligible grantee eligible for a payment of reallocated funds described in paragraph (2) of this subsection the amount allocated to such eligible grantee in accordance with the procedure established by the Secretary in accordance with paragraph (1) of this subsection.

(4) Use of reallocated funds.—Eligible grantees may use any funds received in accordance with this subsection only for purposes specified in paragraph (1) of subsection (d).

(f) Definitions.—In this section:

(1) Eligible grantee.—The term "eligible grantee" means any of the following:

(A) The 50 States of the United States and the District of Columbia.

(B) A unit of local government (as defined in paragraph (5)).

(C) The Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa.

(2) Eligible household.—The term "eligible household" means a household of 1 or more individuals who are obligated to pay rent on a residential dwelling and with respect to which the eligible grantee involved determines that—

(A) 1 or more individuals within the household has—

(i) qualified for unemployment benefits; or

(ii) experienced a reduction in household income, incurred significant costs, or experienced other financial hardship during or due, directly or indirectly, to the coronavirus pandemic;

(B) 1 or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability; and

(C) the household is a low-income family (as such term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b)).

(3) Inspector general.—The term "Inspector General" means the Inspector General of the Department of the Treasury.

(4) Secretary.—The term "Secretary" means the Secretary of the Treasury.

(5) Unit of local government.—The term "unit of local government" has the meaning given such term in section 501 of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260).

(g) Availability.—Funds provided to an eligible grantee under a payment made under this section shall remain available through September 30, 2025.

(h) Extension of Availability Under Program for Existing Funding.—Paragraph (1) of section 501(e) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) is amended by striking "December 31, 2021" and inserting "September 30, 2022".

**SEC. 3202. EMERGENCY HOUSING VOUCHERS.**

(a) Appropriation.—In addition to amounts otherwise available, there is appropriated to the Secretary of Housing and Urban Development (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $5,000,000,000, to remain available until September 30, 2030, for—

(1) incremental emergency vouchers under subsection (b);

(2) renewals of the vouchers under subsection (b);

H. R. 1319—56

(3) fees for the costs of administering vouchers under subsection (b) and other eligible expenses defined by notice to prevent, prepare, and respond to coronavirus to facilitate the leasing of the emergency vouchers, such as security deposit assistance and other costs related to retention and support of participating owners; and

(4) adjustments in the calendar year 2021 section 8 renewal funding allocation, including mainstream vouchers, for public housing agencies that experience a significant increase in voucher per-unit costs due to extraordinary circumstances or that, despite taking reasonable cost savings measures, would otherwise be required to terminate rental assistance for families as a result of insufficient funding.

(b) EMERGENCY VOUCHERS.—

(1) IN GENERAL.—The Secretary shall provide emergency rental assistance vouchers under subsection (a), which shall be tenant-based rental assistance under section 8(o) of the United States Housing Act of 1937 (42 U.S.C. 1437f(o)).

(2) QUALIFYING INDIVIDUALS OR FAMILIES DEFINED.—For the purposes of this section, qualifying individuals or families are those who are—

(A) homeless (as such term is defined in section 103(a) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302(a));

(B) at risk of homelessness (as such term is defined in section 401(1) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(1)));

(C) fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, or human trafficking, as defined by the Secretary; or

(D) recently homeless, as determined by the Secretary, and for whom providing rental assistance will prevent the family's homelessness or having high risk of housing instability.

(3) ALLOCATION.—The Secretary shall notify public housing agencies of the number of emergency vouchers provided under this section to be allocated to the agency not later than 60 days after the date of the enactment of this Act, in accordance with a formula that includes public housing agency capacity and ensures geographic diversity, including with respect to rural areas, among public housing agencies administering the Housing Choice Voucher program.

(4) TERMS AND CONDITIONS.—

(A) ELECTION TO ADMINISTER.—The Secretary shall establish a procedure for public housing agencies to accept or decline the emergency vouchers allocated to the agency in accordance with the formula under subparagraph (3).

(B) FAILURE TO USE VOUCHERS PROMPTLY.—If a public housing agency fails to lease its authorized vouchers under subsection (b) on behalf of eligible families within a reasonable period of time, the Secretary may revoke and redistribute any unleased vouchers and associated funds, including administrative fees and costs referred to in subsection (a)(3), to other public housing agencies according to the formula under paragraph (3).

(5) WAIVERS AND ALTERNATIVE REQUIREMENTS.—The Secretary may waive or specify alternative requirements for any

H. R. 1319—57

provision of the United States Housing Act of 1937 (42 U.S.C. 1437 et seq.) or regulation applicable to such statute other than requirements related to fair housing, nondiscrimination, labor standards, and the environment, upon a finding that the waiver or alternative requirement is necessary to expedite or facilitate the use of amounts made available in this section.

(6) TERMINATION OF VOUCHERS UPON TURNOVER.—After September 30, 2023, a public housing agency may not reissue any vouchers made available under this section when assistance for the family assisted ends.

(c) TECHNICAL ASSISTANCE AND OTHER COSTS.—The Secretary may use not more $20,000,000 of the amounts made available under this section for the costs to the Secretary of administering and overseeing the implementation of this section and the Housing Choice Voucher program generally, including information technology, financial reporting, and other costs. Of the amounts set aside under this subsection, the Secretary may use not more than $10,000,000, without competition, to make new awards or increase prior awards to existing technical assistance providers to provide an immediate increase in capacity building and technical assistance to public housing agencies.

(d) IMPLEMENTATION.—The Secretary may implement the provisions of this section by notice.

**SEC. 3203. EMERGENCY ASSISTANCE FOR RURAL HOUSING.**

In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2022, to provide grants under section 521(a)(2) of the Housing Act of 1949 or agreements entered into in lieu of debt forgiveness or payments for eligible households as authorized by section 502(c)(5)(D) of the Housing Act of 1949, for temporary adjustment of income losses for residents of housing financed or assisted under section 514, 515, or 516 of the Housing Act of 1949 who have experienced income loss but are not currently receiving Federal rental assistance.

**SEC. 3204. HOUSING COUNSELING.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Neighborhood Reinvestment Corporation (in this section referred to as the "Corporation") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2025, for grants to housing counseling intermediaries approved by the Department of Housing and Urban Development, State housing finance agencies, and NeighborWorks organizations for providing housing counseling services, as authorized under the Neighborhood Reinvestment Corporation Act (42 U.S.C. 8101–8107) and consistent with the discretion set forth in section 606(a)(5) of such Act (42 U.S.C. 8105(a)(5)) to design and administer grant programs. Of the grant funds made available under this subsection, not less than 40 percent shall be provided to counseling organizations that—

(1) target housing counseling services to minority and low-income populations facing housing instability; or

(2) provide housing counseling services in neighborhoods having high concentrations of minority and low-income populations.

H. R. 1319—58

(b) LIMITATION.—The aggregate amount provided to NeighborWorks organizations under this section shall not exceed 15 percent of the total of grant funds made available by subsection (a).

(c) ADMINISTRATION AND OVERSIGHT.—The Corporation may retain a portion of the amounts provided under this section, in a proportion consistent with its standard rate for program administration in order to cover its expenses related to program administration and oversight.

(d) HOUSING COUNSELING SERVICES DEFINED.— For the purposes of this section, the term "housing counseling services" means—

(1) housing counseling provided directly to households facing housing instability, such as eviction, default, foreclosure, loss of income, or homelessness;

(2) education, outreach, training, technology upgrades, and other program related support; and

(3) operational oversight funding for grantees and sub-grantees that receive funds under this section.

## SEC. 3205. HOMELESSNESS ASSISTANCE AND SUPPORTIVE SERVICES PROGRAM.

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Housing and Urban Development (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $5,000,000,000, to remain available until September 30, 2025, except that amounts authorized under subsection (d)(3) shall remain available until September 30, 2029, for assistance under title II of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12721 et seq.) for the following activities to primarily benefit qualifying individuals or families:

(1) Tenant-based rental assistance.

(2) The development and support of affordable housing pursuant to section 212(a) of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12742(a)) ("the Act" herein).

(3) Supportive services to qualifying individuals or families not already receiving such supportive services, including—

(A) activities listed in section 401(29) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(29));

(B) housing counseling; and

(C) homeless prevention services.

(4) The acquisition and development of non-congregate shelter units, all or a portion of which may—

(A) be converted to permanent affordable housing;

(B) be used as emergency shelter under subtitle B of title IV of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11371–11378);

(C) be converted to permanent housing under subtitle C of title IV of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11381–11389); or

(D) remain as non-congregate shelter units.

(b) QUALIFYING INDIVIDUALS OR FAMILIES DEFINED.—For the purposes of this section, qualifying individuals or families are those who are—

(1) homeless, as defined in section 103(a) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302(a));

H. R. 1319—59

(2) at-risk of homelessness, as defined in section 401(1) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(1));

(3) fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, or human trafficking, as defined by the Secretary;

(4) in other populations where providing supportive services or assistance under section 212(a) of the Act (42 U.S.C. 12742(a)) would prevent the family's homelessness or would serve those with the greatest risk of housing instability; or

(5) veterans and families that include a veteran family member that meet one of the preceding criteria.

(c) TERMS AND CONDITIONS.—

(1) FUNDING RESTRICTIONS.—The cost limits in section 212(e) (42 U.S.C. 12742(e)), the commitment requirements in section 218(g) (42 U.S.C. 12748(g)), the matching requirements in section 220 (42 U.S.C. 12750), and the set-aside for housing developed, sponsored, or owned by community housing development organizations required in section 231 of the Act (42 U.S.C. 12771) shall not apply for amounts made available in this section.

(2) ADMINISTRATIVE COSTS.— Notwithstanding sections 212(c) and (d)(1) of the Act (42 U.S.C. 12742(c) and (d)(1)), of the funds made available in this section for carrying out activities authorized in this section, a grantee may use up to fifteen percent of its allocation for administrative and planning costs.

(3) OPERATING EXPENSES.—Notwithstanding sections 212(a) and (g) of the Act (42 U.S.C. 12742(a) and (g)), a grantee may use up to an additional five percent of its allocation for the payment of operating expenses of community housing development organizations and nonprofit organizations carrying out activities authorized under this section, but only if—

(A) such funds are used to develop the capacity of the community housing development organization or nonprofit organization in the jurisdiction or insular area to carry out activities authorized under this section; and

(B) the community housing development organization or nonprofit organization complies with the limitation on assistance in section 234(b) of the Act (42 U.S.C. 12774(b)).

(4) CONTRACTING.—A grantee, when contracting with service providers engaged directly in the provision of services under paragraph (a)(3), shall, to the extent practicable, enter into contracts in amounts that cover the actual total program costs and administrative overhead to provide the services contracted.

(d) ALLOCATION.—

(1) FORMULA ASSISTANCE.—Except as provided in paragraphs (2) and (3), the Secretary shall allocate amounts made available under this section pursuant to section 217 of the Act (42 U.S.C. 12747) to grantees that received allocations pursuant to that same formula in fiscal year 2021, and shall make such allocations within 30 days of enactment of this Act.

(2) TECHNICAL ASSISTANCE.—Up to $25,000,000 of the amounts made available under this section shall be used, without competition, to make new awards or increase prior awards

H. R. 1319—60

to existing technical assistance providers to provide an imme-
diate increase in capacity building and technical assistance
available to any grantees implementing activities or projects
consistent with this section.

(3) OTHER COSTS.—Up to $50,000,000 of the amounts made
available under this section shall be used for the administrative
costs to oversee and administer implementation of this section
and the HOME program generally, including information tech-
nology, financial reporting, and other costs.

(4) WAIVERS OR ALTERNATIVE REQUIREMENTS.—The Sec-
retary may waive or specify alternative requirements for any
provision of the Cranston-Gonzalez National Affordable
Housing Act (42 U.S.C. 12701 et seq.) and titles I and IV
of the McKinney-Vento Homelessness Act (42 U.S.C. 11301
et seq., 11360 et seq.) or regulation for the administration
of the amounts made available under this section other than
requirements related to fair housing, nondiscrimination, labor
standards, and the environment, upon a finding that the waiver
or alternative requirement is necessary to expedite or facilitate
the use of amounts made available under this section.

**SEC. 3206. HOMEOWNER ASSISTANCE FUND.**

(a) APPROPRIATION.—In addition to amounts otherwise avail-
able, there is appropriated to the Secretary of the Treasury for
the Homeowner Assistance Fund established under subsection (c)
for fiscal year 2021, out of any money in the Treasury not otherwise
appropriated, $9,961,000,000, to remain available until September
30, 2025, for qualified expenses that meet the purposes specified
under subsection (c) and expenses described in subsection (d)(1).

(b) DEFINITIONS.—In this section:

(1) CONFORMING LOAN LIMIT.—The term "conforming loan
limit" means the applicable limitation governing the maximum
original principal obligation of a mortgage secured by a single-
family residence, a mortgage secured by a 2-family residence,
a mortgage secured by a 3-family residence, or a mortgage
secured by a 4-family residence, as determined and adjusted
annually under section 302(b)(2) of the Federal National Mort-
gage Association Charter Act (12 U.S.C. 1717(b)(2)) and section
305(a)(2) of the Federal Home Loan Mortgage Corporation Act
(12 U.S.C. 1454(a)(2)).

(2) DWELLING.—The term "dwelling" means any building,
structure, or portion thereof which is occupied as, or designed
or intended for occupancy as, a residence by one or more individ-
uals.

(3) ELIGIBLE ENTITY.—The term "eligible entity" means—

(A) a State; or

(B) any entity eligible for payment under subsection
(f).

(4) MORTGAGE.—The term "mortgage" means any credit
transaction—

(A) that is secured by a mortgage, deed of trust, or
other consensual security interest on a principal residence
of a borrower that is (i) a 1- to 4-unit dwelling, or (ii)
residential real property that includes a 1- to 4-unit
dwelling; and

H. R. 1319—61

(B) the unpaid principal balance of which was, at the time of origination, not more than the conforming loan limit.

(5) FUND.—The term "Fund" means the Homeowner Assistance Fund established under subsection (c).

(6) SECRETARY.—The term "Secretary" means the Secretary of the Treasury.

(7) STATE.—The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

(c) ESTABLISHMENT OF FUND.—

(1) ESTABLISHMENT; QUALIFIED EXPENSES.—There is established in the Department of the Treasury a Homeowner Assistance Fund to mitigate financial hardships associated with the coronavirus pandemic by providing such funds as are appropriated by subsection (a) to eligible entities for the purpose of preventing homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship after January 21, 2020, through qualified expenses related to mortgages and housing, which include—

(A) mortgage payment assistance;

(B) financial assistance to allow a homeowner to reinstate a mortgage or to pay other housing related costs related to a period of forbearance, delinquency, or default;

(C) principal reduction;

(D) facilitating interest rate reductions;

(E) payment assistance for—

(i) utilities, including electric, gas, home energy, and water;

(ii) internet service, including broadband internet access service, as defined in section 8.1(b) of title 47, Code of Federal Regulations (or any successor regulation);

(iii) homeowner's insurance, flood insurance, and mortgage insurance; and

(iv) homeowner's association, condominium association fees, or common charges;

(F) reimbursement of funds expended by a State, local government, or designated entity under subsection (f) during the period beginning on January 21, 2020, and ending on the date that the first funds are disbursed by the eligible entity under the Homeowner Assistance Fund, for the purpose of providing housing or utility payment assistance to homeowners or otherwise providing funds to prevent foreclosure or post-foreclosure eviction of a homeowner or prevent mortgage delinquency or loss of housing or utilities as a response to the coronavirus disease (COVID) pandemic; and

(G) any other assistance to promote housing stability for homeowners, including preventing mortgage delinquency, default, foreclosure, post-foreclosure eviction of a homeowner, or the loss of utility or home energy services, as determined by the Secretary.

H. R. 1319—62

(2) TARGETING.—Not less than 60 percent of amounts made to each eligible entity allocated amounts under subsection (d) or (f) shall be used for qualified expenses that assist homeowners having incomes equal to or less than 100 percent of the area median income for their household size or equal to or less than 100 percent of the median income for the United States, as determined by the Secretary of Housing and Urban Development, whichever is greater. The eligible entity shall prioritize remaining funds to socially disadvantaged individuals.

(d) ALLOCATION OF FUNDS.—

(1) ADMINISTRATION.—Of any amounts made available under this section, the Secretary shall reserve—

(A) to the Department of the Treasury, an amount not to exceed $40,000,000 to administer and oversee the Fund, and to provide technical assistance to eligible entities for the creation and implementation of State and tribal programs to administer assistance from the Fund; and

(B) to the Inspector General of the Department of the Treasury, an amount to not exceed $2,600,000 for oversight of the program under this section.

(2) FOR STATES.—After the application of paragraphs (1), (4), and (5) of this subsection and subject to paragraph (3) of this subsection, the Secretary shall allocate the remaining funds available within the Homeowner Assistance Fund to each State of the United States, the District of Columbia, and the Commonwealth of Puerto Rico based on homeowner need, for such State relative to all States of the United States, the District of Columbia, and the Commonwealth of Puerto Rico, as of the date of the enactment of this Act, which is determined by reference to—

(A) the average number of unemployed individuals measured over a period of time not fewer than 3 months and not more than 12 months; and

(B) the total number of mortgagors with—

(i) mortgage payments that are more than 30 days past due; or

(ii) mortgages in foreclosure.

(3) SMALL STATE MINIMUM.—

(A) IN GENERAL.—Each State of the United States, the District of Columbia, and the Commonwealth of Puerto Rico shall receive no less than $50,000,000 for the purposes established in (c).

(B) PRO RATA ADJUSTMENTS.—The Secretary shall adjust on a pro rata basis the amount of the payments for each State of the United States, the District of Columbia, and the Commonwealth of Puerto Rico determined under this subsection without regard to this subparagraph to the extent necessary to comply with the requirements of subparagraph (A).

(4) TERRITORY SET-ASIDE.—Notwithstanding any other provision of this section, of the amounts appropriated under subsection (a), the Secretary shall reserve $30,000,000 to be disbursed to Guam, American Samoa, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands based on each such territory's share of the combined total population of all such territories, as determined by the

H. R. 1319—63

Secretary. For the purposes of this paragraph, population shall be determined based on the most recent year for which data are available from the United States Census Bureau.

(5) TRIBAL SET-ASIDE.—The Secretary shall allocate funds to any eligible entity designated under subsection (f) pursuant to the requirements of that subsection.

(e) DISTRIBUTION OF FUNDS TO STATES.—

(1) IN GENERAL.—The Secretary shall make payments, beginning not later than 45 days after enactment of this Act, from amounts allocated under subsection (d) to eligible entities that have notified the Secretary that they request to receive payment from the Fund and that the eligible entity will use such payments in compliance with this section.

(2) REALLOCATION.—If a State does not request allocated funds by the 45th day after the date of enactment of this Act, such State shall not be eligible for a payment from the Secretary pursuant to this section, and the Secretary shall, by the 180th day after the date of enactment of this Act, reallocate any funds that were not requested by such State among the States that have requested funds by the 45th day after the date of enactment of this Act. For any such reallocation of funds, the Secretary shall adhere to the requirements of subsection (d), except for paragraph (1), to the greatest extent possible, provided that the Secretary shall also take into consideration in determining such reallocation a State's remaining need and a State's record of using payments from the Fund to serve homeowners at disproportionate risk of mortgage default, foreclosure, or displacement, including homeowners having incomes equal to or less than 100 percent of the area median income for their household size or 100 percent of the median income for the United States, as determined by the Secretary of Housing and Urban Development, whichever is greater, and minority homeowners.

(f) TRIBAL SET-ASIDE.—

(1) SET-ASIDE.—Notwithstanding any other provision of this section, of the amounts appropriated under subsection (a), the Secretary shall use 5 percent to make payments to entities that are eligible for payments under clauses (i) and (ii) of section 501(b)(2)(A) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) for the purposes described in subsection (c).

(2) ALLOCATION AND PAYMENT.—The Secretary shall allocate the funds set aside under paragraph (1) using the allocation formulas described in clauses (i) and (ii) of section 501(b)(2)(A) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260), and shall make payments of such amounts beginning no later than 45 days after enactment of this Act to entities eligible for payment under clauses (i) and (ii) of section 501(b)(2)(A) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) that notify the Secretary that they request to receive payments allocated from the Fund by the Secretary for purposes described under subsection (c) and will use such payments in compliance with this section.

(3) ADJUSTMENT.—Allocations provided under this subsection may be further adjusted as provided by section

H. R. 1319—64

501(b)(2)(B) of subtitle A of title V of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260).

**SEC. 3207. RELIEF MEASURES FOR SECTION 502 AND 504 DIRECT LOAN BORROWERS.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $39,000,000, to remain available until September 30, 2021, for direct loans made under sections 502 and 504 of the Housing Act of 1949 (42 U.S.C. 1472, 1474).

(b) ADMINISTRATIVE EXPENSES.—The Secretary may use not more than 3 percent of the amounts appropriated under this section for administrative purposes.

**SEC. 3208. FAIR HOUSING ACTIVITIES.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Housing and Urban Development (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until September 30, 2023, for the Fair Housing Initiatives Program under section 561 of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a) to ensure fair housing organizations have additional resources to address fair housing inquiries, complaints, investigations, education and outreach activities, and costs of delivering or adapting services, during or relating to the coronavirus pandemic.

(b) ADMINISTRATIVE EXPENSES.—The Secretary may use not more than 3 percent of the amounts appropriated under this section for administrative purposes.

# Subtitle C—Small Business (SSBCI)

**SEC. 3301. STATE SMALL BUSINESS CREDIT INITIATIVE.**

(a) STATE SMALL BUSINESS CREDIT INITIATIVE.—

(1) IN GENERAL.—The State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5701 et seq.) is amended—

(A) in section 3003—

(i) in subsection (b)—

(I) by amending paragraph (1) to read as follows:

"(1) IN GENERAL.—Not later than 30 days after the date of enactment of subsection (d), the Secretary shall allocate Federal funds to participating States so that each State is eligible to receive an amount equal to what the State would receive under the 2021 allocation, as determined under paragraph (2).";

(II) in paragraph (2)—

(aa) by striking "2009" each place such term appears and inserting "2021";

(bb) by striking "2008" each place such term appears and inserting "2020";

(cc) in subparagraph (A), by striking "The Secretary" and inserting "With respect to States other than Tribal governments, the Secretary";

H. R. 1319—65

(dd) in subparagraph (C)(i), by striking "2007" and inserting "2019"; and

(ee) by adding at the end the following:

"(C) SEPARATE ALLOCATION FOR TRIBAL GOVERN-MENTS.—

"(i) IN GENERAL.—With respect to States that are Tribal governments, the Secretary shall determine the 2021 allocation by allocating $500,000,000 among the Tribal governments in the proportion the Secretary determines appropriate, including with consideration to available employment and economic data regarding each such Tribal government.

"(ii) NOTICE OF INTENT; TIMING OF ALLOCATION.— With respect to allocations to States that are Tribal governments, the Secretary may—

"(I) require Tribal governments that individually or jointly wish to participate in the Program to file a notice of intent with the Secretary not later than 30 days after the date of enactment of subsection (d); and

"(II) notwithstanding paragraph (1), allocate Federal funds to participating Tribal governments not later than 60 days after the date of enactment of subsection (d).

"(D) EMPLOYMENT DATA.—If the Secretary determines that employment data with respect to a State is unavailable from the Bureau of Labor Statistics of the Department of Labor, the Secretary shall consider such other economic and employment data that is otherwise available for purposes of determining the employment data of such State."; and

(III) by striking paragraph (3); and

(ii) in subsection (c)—

(I) in paragraph (1)(A)(iii), by inserting before the period the following: "that have delivered loans or investments to eligible businesses"; and

(II) by amending paragraph (4) to read as follows:

"(4) TERMINATION OF AVAILABILITY OF AMOUNTS NOT TRANS-FERRED.—

"(A) IN GENERAL.—Any portion of a participating State's allocated amount that has not been transferred to the State under this section may be deemed by the Secretary to be no longer allocated to the State and no longer available to the State and shall be returned to the general fund of the Treasury or reallocated as described under subparagraph (B), if—

"(i) the second ⅓ of a State's allocated amount has not been transferred to the State before the end of the end of the 3-year period beginning on the date that the Secretary approves the State for participation; or

"(ii) the last ⅓ of a State's allocated amount has not been transferred to the State before the end of the end of the 6-year period beginning on the date that the Secretary approves the State for participation.

H. R. 1319—66

"(B) REALLOCATION.—Any amount deemed by the Secretary to be no longer allocated to a State and no longer available to such State under subparagraph (A) may be reallocated by the Secretary to other participating States. In making such a reallocation, the Secretary shall not take into account the minimum allocation requirements under subsection (b)(2)(B) or the specific allocation for Tribal governments described under subsection (b)(2)(C).";

(B) in section 3004(d), by striking "date of enactment of this Act" each place it appears and inserting "date of the enactment of section 3003(d)";

(C) in section 3005(b), by striking "date of enactment of this Act" each place it appears and inserting "date of the enactment of section 3003(d)";

(D) in section 3006(b)(4), by striking "date of enactment of this Act" and inserting "date of the enactment of section 3003(d)";

(E) in section 3007(b), by striking "March 31, 2011" and inserting "March 31, 2022";

(F) in section 3009, by striking "date of enactment of this Act" each place it appears and inserting "date of the enactment of section 3003(d)"; and

(G) in section 3011(b), by striking "date of the enactment of this Act" each place it appears and inserting "date of the enactment of section 3003(d)".

(2) APPROPRIATION.—

(A) IN GENERAL.—In addition to amounts otherwise available, there is hereby appropriated to the Secretary of the Treasury for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000,000, to remain available until expended, to provide support to small businesses responding to and recovering from the economic effects of the COVID–19 pandemic, ensure business enterprises owned and controlled by socially and economically disadvantaged individuals have access to credit and investments, provide technical assistance to help small businesses applying for various support programs, and to pay reasonable costs of administering such Initiative.

(B) RESCISSION.—With respect to amounts appropriated under subparagraph (A)—

(i) the Secretary of the Treasury shall complete all disbursements and remaining obligations before September 30, 2030; and

(ii) any amounts that remain unexpended (whether obligated or unobligated) on September 30, 2030, shall be rescinded and deposited into the general fund of the Treasury.

(b) ADDITIONAL ALLOCATIONS TO SUPPORT BUSINESS ENTERPRISES OWNED AND CONTROLLED BY SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUALS.—Section 3003 of the State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5702) is amended by adding at the end the following:

"(d) ADDITIONAL ALLOCATIONS TO SUPPORT BUSINESS ENTERPRISES OWNED AND CONTROLLED BY SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUALS.—Of the amounts appropriated for fiscal year 2021 to carry out the Program, the Secretary shall—

"(1) allocate $1,500,000,000 to States from funds allocated under this section and, by regulation or other guidance, prescribe Program requirements that the funds be expended for business enterprises owned and controlled by socially and economically disadvantaged individuals; and

"(2) allocate such amounts to States based on the needs of business enterprises owned and controlled by socially and economically disadvantaged individuals, as determined by the Secretary, in each State, and not subject to the allocation formula described under subsection (b).

"(e) INCENTIVE ALLOCATIONS TO SUPPORT BUSINESS ENTERPRISES OWNED AND CONTROLLED BY SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUALS.—Of the amounts appropriated for fiscal year 2021 to carry out the Program, the Secretary shall set aside $1,000,000,000 for an incentive program under which the Secretary shall increase the second ⅓ and last ⅓ allocations for States that demonstrate robust support, as determined by the Secretary, for business concerns owned and controlled by socially and economically disadvantaged individuals in the deployment of prior allocation amounts.".

(c) ADDITIONAL ALLOCATIONS TO SUPPORT VERY SMALL BUSINESSES.—Section 3003 of the State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5702), as amended by subsection (b), is further amended by adding at the end the following:

"(f) ADDITIONAL ALLOCATIONS TO SUPPORT VERY SMALL BUSINESSES.—

"(1) IN GENERAL.—Of the amounts appropriated to carry out the Program, the Secretary shall allocate not less than $500,000,000 to States from funds allocated under this section to be expended for very small businesses.

"(2) VERY SMALL BUSINESS DEFINED.—In this subsection, the term 'very small business'—

"(A) means a business with fewer than 10 employees; and

"(B) may include independent contractors and sole proprietors.".

(d) TECHNICAL ASSISTANCE.—Section 3009 of the State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5708) is amended by adding at the end the following:

"(e) TECHNICAL ASSISTANCE.—Of the amounts appropriated for fiscal year 2021 to carry out the Program, $500,000,000 may be used by the Secretary to—

"(1) provide funds to States to carry out a technical assistance plan under which a State will provide legal, accounting, and financial advisory services, either directly or contracted with legal, accounting, and financial advisory firms, with priority given to business enterprises owned and controlled by socially and economically disadvantaged individuals, to very small businesses and business enterprises owned and controlled by socially and economically disadvantaged individuals applying for—

"(A) State programs under the Program; and

"(B) other State or Federal programs that support small businesses;

"(2) transfer amounts to the Minority Business Development Agency, so that the Agency may use such amounts in a manner the Agency determines appropriate, including

H. R. 1319—68

through contracting with third parties, to provide technical assistance to business enterprises owned and controlled by socially and economically disadvantaged individuals applying to—

"(A) State programs under the Program; and

"(B) other State or Federal programs that support small businesses; and

"(3) contract with legal, accounting, and financial advisory firms (with priority given to business enterprises owned and controlled by socially and economically disadvantaged individuals), to provide technical assistance to business enterprises owned and controlled by socially and economically disadvantaged individuals applying to—

"(A) State programs under the Program; and

"(B) other State or Federal programs that support small businesses.".

(e) INCLUSION OF TRIBAL GOVERNMENTS.—Section 3002(10) of the State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5701(10)) is amended—

(1) in subparagraph (C), by striking "and" at the end;

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(E) a Tribal government, or a group of Tribal governments that jointly apply for an allocation.".

(f) DEFINITIONS.—Section 3002 of the State Small Business Credit Initiative Act of 2010 (12 U.S.C. 5701) is amended by adding at the end the following:

"(15) BUSINESS ENTERPRISE OWNED AND CONTROLLED BY SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUALS.—The term 'business enterprise owned and controlled by socially and economically disadvantaged individuals' means a business that—

"(A) if privately owned, 51 percent is owned by one or more socially and economically disadvantaged individuals;

"(B) if publicly owned, 51 percent of the stock is owned by one or more socially and economically disadvantaged individuals; and

"(C) in the case of a mutual institution, a majority of the Board of Directors, account holders, and the community which the institution services is predominantly comprised of socially and economically disadvantaged individuals.

"(16) COMMUNITY DEVELOPMENT FINANCIAL INSTITUTION.—The term 'community development financial institution' has the meaning given that term under section 103 of the Riegle Community Development and Regulatory Improvement Act of 1994.

"(17) MINORITY DEPOSITORY INSTITUTION.—The term 'minority depository institution' has the meaning given that term under section 308(b) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

"(18) SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUAL.—The term 'socially and economically disadvantaged individual' means an individual who is a socially disadvantaged individual or an economically disadvantaged individual, as such

H. R. 1319—69

terms are defined, respectively, under section 8 of the Small Business Act (15 U.S.C. 637) and the regulations thereunder.

"(19) TRIBAL GOVERNMENT.—The term 'Tribal government' means the recognized governing body of any Indian or Alaska Native tribe, band, nation, pueblo, village, community, component band, or component reservation, individually identified (including parenthetically) in the list published most recently as of the date of enactment of this paragraph pursuant to section 104 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).".

(g) RULE OF APPLICATION.—The amendments made by this section shall apply with respect to funds appropriated under this section and funds appropriated on and after the date of enactment of this section.

# Subtitle D—Public Transportation

**SEC. 3401. FEDERAL TRANSIT ADMINISTRATION GRANTS.**

(a) FEDERAL TRANSIT ADMINISTRATION APPROPRIATION.—

(1) IN GENERAL.—In addition to amounts otherwise made available, there are appropriated for fiscal year 2021, out of any funds in the Treasury not otherwise appropriated, $30,461,355,534, to remain available until September 30, 2024, that shall—

(A) be for grants to eligible recipients under sections 5307, 5309, 5310, and 5311 of title 49, United States Code, to prevent, prepare for, and respond to coronavirus; and

(B) not be subject to any prior restriction on the total amount of funds available for implementation or execution of programs authorized under sections 5307, 5310, or 5311 of such title.

(2) AVAILABILITY OF FUNDS FOR OPERATING EXPENSES.—

(A) IN GENERAL.—Notwithstanding subsection (a)(1) or (b) of section 5307 and section 5310(b)(2)(A) of title 49, United States Code, funds provided under this section, other than subsection (b)(4), shall be available for the operating expenses of transit agencies to prevent, prepare for, and respond to the coronavirus public health emergency, including, beginning on January 20, 2020—

(i) reimbursement for payroll of public transportation (including payroll and expenses of private providers of public transportation);

(ii) operating costs to maintain service due to lost revenue due as a result of the coronavirus public health emergency, including the purchase of personal protective equipment; and

(iii) paying the administrative leave of operations or contractor personnel due to reductions in service.

(B) USE OF FUNDS.—Funds described in subparagraph (A) shall be—

(i) available for immediate obligation, notwithstanding the requirement for such expenses to be included in a transportation improvement program, long-range transportation plan, statewide transportation plan, or statewide transportation improvement

H. R. 1319—70

program under sections 5303 and 5304 of title 49, United States Code;

(ii) directed to payroll and operations of public transportation (including payroll and expenses of private providers of public transportation), unless the recipient certifies to the Administrator of the Federal Transit Administration that the recipient has not furloughed any employees;

(iii) used to provide a Federal share of the costs for any grant made under this section of 100 percent.

(b) ALLOCATION OF FUNDS.—

(1) URBANIZED AREA FORMULA GRANTS.—

(A) IN GENERAL.—Of the amounts made available under subsection (a), $26,086,580,227 shall be for grants to recipients and subrecipients under section 5307 of title 49, United States Code, and shall be administered as if such funds were provided under section 5307 of such title.

(B) ALLOCATION.—Amounts made available under subparagraph (A) shall be apportioned to urbanized areas based on data contained in the National Transit Database such that—

(i) each urbanized area shall receive an apportionment of an amount that, when combined with amounts that were otherwise made available to such urbanized area for similar activities to prevent, prepare for, and respond to coronavirus, is equal to 132 percent of the urbanized area's 2018 operating costs; and

(ii) for funds remaining after the apportionment described in clause (i), such funds shall be apportioned such that each urbanized area that did not receive an apportionment under clause (i) shall receive an apportionment equal to 25 percent of the urbanized area's 2018 operating costs.

(2) FORMULA GRANTS FOR THE ENHANCED MOBILITY OF SENIORS AND INDIVIDUALS WITH DISABILITIES.—

(A) IN GENERAL.—Of the amounts made available under subsection (a), $50,000,000 shall be for grants to recipients or subrecipients eligible under section 5310 of title 49, United States Code, and shall be apportioned in accordance with such section.

(B) ALLOCATION RATIO.—Amounts made available under subparagraph (A) shall be allocated in the same ratio as funds were provided under section 5310 of title 49, United States Code, for fiscal year 2020.

(3) FORMULA GRANTS FOR RURAL AREAS.—

(A) IN GENERAL.—Of the amounts made available under subsection (a), $317,214,013 shall be for grants to recipients or subrecipients eligible under section 5311 of title 49, United States Code, and shall be administered as if the funds were provided under section 5311 of such title, and shall be apportioned in accordance with such section, except as described in paragraph (B).

(B) ALLOCATION RATIO.—Amounts made available under subparagraph (A) to States, as defined in section 5302 of title 49, United States Code, shall be allocated to such States based on data contained in the National Transit Database, such that—

H. R. 1319—71

(i) any State that received an amount for similar activities to prevent, prepare for, and respond to coronavirus that is equal to or greater than 150 percent of the combined 2018 rural operating costs of the recipients and subrecipients in such State shall receive an amount equal to 5 percent of such State's 2018 rural operating costs;

(ii) any State that does not receive an allocation under clause (i) that received an amount for similar activities to prevent, prepare for, and respond to coronavirus that is equal to or greater than 140 percent of the combined 2018 rural operating costs of the recipients and subrecipients in that State shall receive an amount equal to 10 percent of such State's 2018 rural operating costs; and

(iii) any State that does not receive an allocation under clauses (i) or (ii) shall receive an amount equal to 20 percent of such State's 2018 rural operating costs.

(4) CAPITAL INVESTMENTS.—

(A) IN GENERAL.—Of the amounts made available under subsection (a)—

(i) $1,425,000,000 shall be for grants administered under subsections (d) and (e) of section 5309 of title 49, United States Code; and

(ii) $250,000,000 shall be for grants administered under subsection (h) of section 5309 of title 49, United States Code.

(B) FUNDING DISTRIBUTION.—

(i) IN GENERAL.—Of the amounts made available in subparagraph (A)(i), $1,250,000,000 shall be provided to each recipient for all projects with existing full funding grant agreements that received allocations for fiscal year 2019 or 2020, except that recipients with projects open for revenue service are not eligible to receive a grant under this subparagraph. Funds shall be provided proportionally based on the non-capital investment grant share of the amount allocated.

(ii) ALLOCATION.—Of the amounts made available in subparagraph (A)(i), $175,000,000 shall be provided to each recipient for all projects with existing full funding grant agreements that received an allocation only prior to fiscal year 2019, except that projects open for revenue service are not eligible to receive a grant under this subparagraph and no project may receive more than 40 percent of the amounts provided under this clause. The Administrator of the Federal Transit Administration shall proportionally distribute funds in excess of such percent to recipients for which the percent of funds does not exceed 40 percent. Funds shall be provided proportionally based on the non-capital investment grant share of the amount allocated.

(iii) ELIGIBLE RECIPIENTS.—For amounts made available in subparagraph (A)(ii), eligible recipients shall be any recipient of an allocation under subsection (h) of section 5309 of title 49, United States Code,

H. R. 1319—72

or an applicant in the project development phase described in paragraph (2) of such subsection.

(iv) AMOUNT.—Amounts distributed under clauses (i), (ii), and (iii) of subparagraph (A) shall be provided notwithstanding the limitation of any calculation of the maximum amount of Federal financial assistance for the project under subsection (k)(2)(C)(ii) or (h)(7) of section 5309 of title 49, United States Code.

(5) SECTION 5311(F) SERVICES.—

(A) IN GENERAL.—Of the amounts made available under subsection (a) and in addition to the amounts made available under paragraph (3), $100,000,000 shall be available for grants to recipients for bus operators that partner with recipients or subrecipients of funds under section 5311(f) of title 49, United States Code.

(B) ALLOCATION RATIO.—Notwithstanding paragraph (3), the Administrator of the Federal Transit Administration shall allocate amounts under subparagraph (A) in the same ratio as funds were provided under section 5311 of title 49, United States Code, for fiscal year 2020.

(C) EXCEPTION.—If a State or territory does not have bus providers eligible under section 5311(f) of title 49, United States Code, funds under this paragraph may be used by such State or territory for any expense eligible under section 5311 of title 49, United States Code.

(6) PLANNING.—

(A) IN GENERAL.—Of the amounts made available under subsection (a), $25,000,000 shall be for grants to recipients eligible under section 5307 of title 49, United States Code, for the planning of public transportation associated with the restoration of services as the coronavirus public health emergency concludes and shall be available in accordance with such section.

(B) AVAILABILITY OF FUNDS FOR ROUTE PLANNING.— Amounts made available under subparagraph (A) shall be available for route planning designed to—

(i) increase ridership and reduce travel times, while maintaining or expanding the total level of vehicle revenue miles of service provided in the planning period; or

(ii) make service adjustments to increase the quality or frequency of service provided to low-income riders and disadvantaged neighborhoods or communities.

(C) LIMITATION.—Amounts made available under subparagraph (A) shall not be used for route planning related to transitioning public transportation service provided as of the date of receipt of funds to a transportation network company or other third-party contract provider, unless the existing provider of public transportation service is a third-party contract provider.

(7) RECIPIENTS AND SUBRECIPIENTS REQUIRING ADDITIONAL ASSISTANCE.—

(A) IN GENERAL.—Of the amounts made available under subsection (a), $2,207,561,294 shall be for grants to eligible recipients or subrecipients of funds under sections 5307 or 5311 of title 49, United States Code, that,

H. R. 1319—73

as a result of COVID–19, require additional assistance for costs related to operations, personnel, cleaning, and sanitization combating the spread of pathogens on transit systems, and debt service payments incurred to maintain operations and avoid layoffs and furloughs.

(B) ADMINISTRATION.—Funds made available under subparagraph (A) shall, after allocation, be administered as if provided under paragraph (1) or (3), as applicable.

(C) APPLICATION REQUIREMENTS.—

(i) IN GENERAL.—The Administrator of the Federal Transit Administration may not allocate funds to an eligible recipient or subrecipient of funds under chapter 53 of title 49, United States Code, unless the recipient provides to the Administrator—

(I) estimates of financial need;

(II) data on reductions in farebox or other sources of local revenue for sustained operations;

(III) a spending plan for such funds; and

(IV) demonstration of expenditure of greater than 90 percent of funds available to the applicant from funds made available for similar activities in fiscal year 2020.

(ii) DEADLINES.—The Administrator of the Federal Transit Administration shall—

(I) not later than 180 days after the date of enactment of this Act, issue a Notice of Funding Opportunity for assistance under this paragraph; and

(II) not later than 120 days after the application deadline established in the Notice of Funding Opportunity under subclause (I), make awards under this paragraph to selected applicants.

(iii) EVALUATION.—

(I) IN GENERAL.—Applications for assistance under this paragraph shall be evaluated by the Administrator of the Federal Transit Administration based on the level of financial need demonstrated by an eligible recipient or subrecipient, including projections of future financial need to maintain service as a percentage of the 2018 operating costs that has not been replaced by the funds made available to the eligible recipient or subrecipient under paragraphs (1) through (5) of this subsection when combined with the amounts allocated to such eligible recipient or subrecipient from funds previously made available for the operating expenses of transit agencies related to the response to the COVID–19 public health emergency.

(II) RESTRICTION.—Amounts made available under this paragraph shall only be available for operating expenses.

(iv) STATE APPLICANTS.—A State may apply for assistance under this paragraph on behalf of an eligible recipient or subrecipient or a group of eligible recipients or subrecipients.

(D) UNOBLIGATED FUNDS.—If amounts made available under this paragraph remain unobligated on September

30, 2023, such amounts shall be available for any purpose eligible under sections 5307 or 5311 of title 49, United States Code.

# TITLE IV—COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

**SEC. 4001. EMERGENCY FEDERAL EMPLOYEE LEAVE FUND.**

(a) ESTABLISHMENT; APPROPRIATION.—There is established in the Treasury the Emergency Federal Employee Leave Fund (in this section referred to as the "Fund"), to be administered by the Director of the Office of Personnel Management, for the purposes set forth in subsection (b). In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $570,000,000, which shall be deposited into the Fund and remain available through September 30, 2022. The Fund is available for reasonable expenses incurred by the Office of Personnel Management in administering this section.

(b) PURPOSE.—Amounts in the Fund shall be available for reimbursement to an agency for the use of paid leave under this section by any employee of the agency who is unable to work because the employee—

(1) is subject to a Federal, State, or local quarantine or isolation order related to COVID–19;

(2) has been advised by a health care provider to self-quarantine due to concerns related to COVID–19;

(3) is caring for an individual who is subject to such an order or has been so advised;

(4) is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(5) is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, if the school of such son or daughter requires or makes optional a virtual learning instruction model or requires or makes optional a hybrid of in-person and virtual learning instruction models, or the child care provider of such son or daughter is unavailable, due to COVID–19 precautions;

(6) is experiencing any other substantially similar condition;

(7) is caring for a family member with a mental or physical disability or who is 55 years of age or older and incapable of self-care, without regard to whether another individual other than the employee is available to care for such family member, if the place of care for such family member is closed or the direct care provider is unavailable due to COVID–19; or

(8) is obtaining immunization related to COVID–19 or is recovering from any injury, disability, illness, or condition related to such immunization.

(c) LIMITATIONS.—

(1) PERIOD OF AVAILABILITY.—Paid leave under this section may only be provided to and used by an employee during the period beginning on the date of enactment of this Act and ending on September 30, 2021.

H. R. 1319—75

(2) TOTAL HOURS; AMOUNT.—Paid leave under this section—

(A) shall be provided to an employee in an amount not to exceed 600 hours of paid leave for each full-time employee, and in the case of a part-time employee, employee on an uncommon tour of duty, or employee with a seasonal work schedule, in an amount not to exceed the proportional equivalent of 600 hours to the extent amounts in the Fund remain available for reimbursement;

(B) shall be paid at the same hourly rate as other leave payments; and

(C) may not be provided to an employee if the leave would result in payments greater than $2,800 in aggregate for any biweekly pay period for a full-time employee, or a proportionally equivalent biweekly limit for a part-time employee.

(3) RELATIONSHIP TO OTHER LEAVE.—Paid leave under this section—

(A) is in addition to any other leave provided to an employee; and

(B) may not be used by an employee concurrently with any other paid leave.

(4) CALCULATION OF RETIREMENT BENEFIT.—Any paid leave provided to an employee under this section shall reduce the total service used to calculate any Federal civilian retirement benefit.

(d) EMPLOYEE DEFINED.—In this section, the term "employee" means—

(1) an individual in the executive branch for whom annual and sick leave is provided under subchapter I of chapter 63 of title 5, United States Code;

(2) an individual employed by the United States Postal Service;

(3) an individual employed by the Postal Regulatory Commission; and

(4) an employee of the Public Defender Service for the District of Columbia and the District of Columbia Courts.

**SEC. 4002. FUNDING FOR THE GOVERNMENT ACCOUNTABILITY OFFICE.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $77,000,000, to remain available until September 30, 2025, for necessary expenses of the Government Accountability Office to prevent, prepare for, and respond to Coronavirus and to support oversight of the Coronavirus response and of funds provided in this Act or any other Act pertaining to the Coronavirus pandemic.

**SEC. 4003. PANDEMIC RESPONSE ACCOUNTABILITY COMMITTEE FUNDING AVAILABILITY.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $40,000,000, to remain available until September 30, 2025, for the Pandemic Response Accountability Committee to support oversight of the Coronavirus response and of funds provided in this Act or any other Act pertaining to the Coronavirus pandemic.

H. R. 1319—76

**SEC. 4004. FUNDING FOR THE WHITE HOUSE.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $12,800,000, to remain available until September 30, 2021, for necessary expenses for the White House, to prevent, prepare for, and respond to coronavirus.

**SEC. 4005. FEDERAL EMERGENCY MANAGEMENT AGENCY APPROPRIATION.**

In addition to amounts otherwise available, there is appropriated to the Federal Emergency Management Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $50,000,000,000, to remain available until September 30, 2025, to carry out the purposes of the Disaster Relief Fund for costs associated with major disaster declarations.

**SEC. 4006. FUNERAL ASSISTANCE.**

(a) IN GENERAL.—For the emergency declaration issued by the President on March 13, 2020, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191(b)), and for any subsequent major disaster declaration that supersedes such emergency declaration, the President shall provide financial assistance to an individual or household to meet disaster-related funeral expenses under section 408(e)(1) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5174(e)(1)), for which the Federal cost share shall be 100 percent.

(b) USE OF FUNDS.—Funds appropriated under section 4005 may be used to carry out subsection (a) of this section.

**SEC. 4007. EMERGENCY FOOD AND SHELTER PROGRAM FUNDING.**

In addition to amounts otherwise made available, there is appropriated to the Federal Emergency Management Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $400,000,000, to remain available until September 30, 2025, for the emergency food and shelter program.

**SEC. 4008. HUMANITARIAN RELIEF.**

In addition to amounts otherwise made available, there is appropriated to the Federal Emergency Management Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $110,000,000, to remain available until September 30, 2025, for the emergency food and shelter program for the purposes of providing humanitarian relief to families and individuals encountered by the Department of Homeland Security.

**SEC. 4009. CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY.**

In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $650,000,000, to remain available until September 30, 2023, for the Cybersecurity and Infrastructure Security Agency for cybersecurity risk mitigation.

**SEC. 4010. APPROPRIATION FOR THE UNITED STATES DIGITAL SERVICE.**

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury

H. R. 1319—77

not otherwise appropriated, $200,000,000, to remain available until September 30, 2024, for the United States Digital Service.

**SEC. 4011. APPROPRIATION FOR THE TECHNOLOGY MODERNIZATION FUND.**

In addition to amounts otherwise appropriated, there is appropriated to the General Services Administration for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,000,000,000, to remain available until September 30, 2025, to carry out the purposes of the Technology Modernization Fund.

**SEC. 4012. APPROPRIATION FOR THE FEDERAL CITIZEN SERVICES FUND.**

In addition to amounts otherwise available, there is appropriated to the General Services Administration for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $150,000,000, to remain available until September 30, 2024, to carry out the purposes of the Federal Citizen Services Fund.

**SEC. 4013. AFG AND SAFER PROGRAM FUNDING.**

In addition to amounts otherwise made available, there is appropriated to the Federal Emergency Management Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $300,000,000, to remain available until September 30, 2025, of which $100,000,000 shall be for assistance to firefighter grants and $200,000,000 shall be for staffing for adequate fire and emergency response grants.

**SEC. 4014. EMERGENCY MANAGEMENT PERFORMANCE GRANT FUNDING.**

In addition to amounts otherwise made available, there is appropriated to the Federal Emergency Management Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2025, for emergency management performance grants.

**SEC. 4015. EXTENSION OF REIMBURSEMENT AUTHORITY FOR FEDERAL CONTRACTORS.**

Section 3610 of the CARES Act (Public Law 116–136; 134 Stat. 414) is amended by striking "September 30, 2020" and inserting "September 30, 2021".

**SEC. 4016. ELIGIBILITY FOR WORKERS' COMPENSATION BENEFITS FOR FEDERAL EMPLOYEES DIAGNOSED WITH COVID–19.**

(a) IN GENERAL.—Subject to subsection (c), a covered employee shall, with respect to any claim made by or on behalf of the covered employee for benefits under subchapter I of chapter 81 of title 5, United States Code, be deemed to have an injury proximately caused by exposure to the novel coronavirus arising out of the nature of the covered employee's employment. Such covered employee, or a beneficiary of such an employee, shall be entitled to such benefits for such claim, including disability compensation, medical services, and survivor benefits.

(b) DEFINITIONS.—In this section:

(1) COVERED EMPLOYEE.—

(A) IN GENERAL.—The term "covered employee" means an individual—

(i) who is an employee under section 8101(1) of title 5, United States Code, employed in the Federal

service at anytime during the period beginning on January 27, 2020, and ending on January 27, 2023;

(ii) who is diagnosed with COVID–19 during such period; and

(iii) who, during a covered exposure period prior to such diagnosis, carries out duties that—

(I) require contact with patients, members of the public, or co-workers; or

(II) include a risk of exposure to the novel coronavirus.

(B) TELEWORKING EXCEPTION.—The term "covered employee" does not include any employee otherwise covered by subparagraph (A) who is exclusively teleworking during a covered exposure period, regardless of whether such employment is full time or part time.

(2) COVERED EXPOSURE PERIOD.—The term "covered exposure period" means, with respect to a diagnosis of COVID–19, the period beginning on a date to be determined by the Secretary of Labor.

(3) NOVEL CORONAVIRUS.—The term "novel coronavirus" means SARS–CoV–2 or another coronavirus declared to be a pandemic by public health authorities.

(c) LIMITATION.—

(1) DETERMINATIONS MADE ON OR BEFORE THE DATE OF ENACTMENT.—This section shall not apply with respect to a covered employee who is determined to be entitled to benefits under subchapter I of chapter 81 of title 5, United States Code, for a claim described in subsection (a) if such determination is made on or before the date of enactment of this Act.

(2) LIMITATION ON DURATION OF BENEFITS.—No funds are authorized to be appropriated to pay, and no benefits may be paid for, claims approved on the basis of subsection (a) after September 30, 2030. No administrative costs related to any such claim may be paid after such date.

(d) EMPLOYEES' COMPENSATION FUND.—

(1) IN GENERAL.—The costs of benefits for claims approved on the basis of subsection (a) shall not be included in the annual statement of the cost of benefits and other payments of an agency or instrumentality under section 8147(b) of title 5, United States Code.

(2) FAIR SHARE PROVISION.—Costs of administration for claims described in paragraph (1)—

(A) may be paid from the Employees' Compensation Fund; and

(B) shall not be subject to the fair share provision in section 8147(c) of title 5, United States Code.

# TITLE V—COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

**SEC. 5001. MODIFICATIONS TO PAYCHECK PROTECTION PROGRAM.**

(a) ELIGIBILITY OF CERTAIN NONPROFIT ENTITIES FOR COVERED LOANS UNDER THE PAYCHECK PROTECTION PROGRAM.—

(1) IN GENERAL.—Section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)), as amended by the Economic Aid

to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended—

 (A) in subparagraph (A)—

  (i) in clause (xv), by striking "and" at the end;

  (ii) in clause (xvi), by striking the period at the end and inserting "; and"; and

  (iii) by adding at the end the following:

 "(xvii) the term 'additional covered nonprofit entity'—

  "(I) means an organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19), and exempt from tax under section 501(a) of such Code; and

  "(II) does not include any entity that, if the entity were a business concern, would be described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in paragraph (a) or (k) of such section."; and

 (B) in subparagraph (D)—

  (i) in clause (iii), by adding at the end the following:

  "(III) ELIGIBILITY OF CERTAIN ORGANIZATIONS.—Subject to the provisions in this subparagraph, during the covered period—

   "(aa) a nonprofit organization shall be eligible to receive a covered loan if the nonprofit organization employs not more than 500 employees per physical location of the organization; and

   "(bb) an additional covered nonprofit entity and an organization that, but for subclauses (I)(dd) and (II)(dd) of clause (vii), would be eligible for a covered loan under clause (vii) shall be eligible to receive a covered loan if the entity or organization employs not more than 300 employees per physical location of the entity or organization."; and

  (ii) by adding at the end the following:

 "(ix) ELIGIBILITY OF ADDITIONAL COVERED NONPROFIT ENTITIES.—An additional covered nonprofit entity shall be eligible to receive a covered loan if—

  "(I) the additional covered nonprofit entity does not receive more than 15 percent of its receipts from lobbying activities;

  "(II) the lobbying activities of the additional covered nonprofit entity do not comprise more than 15 percent of the total activities of the organization;

  "(III) the cost of the lobbying activities of the additional covered nonprofit entity did not exceed $1,000,000 during the most recent tax year of the additional covered nonprofit entity that ended prior to February 15, 2020; and

H. R. 1319—80

"(IV) the additional covered nonprofit entity employs not more than 300 employees.".

(2) ELIGIBILITY FOR SECOND DRAW LOANS.—Paragraph (37)(A)(i) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended by inserting "'additional covered nonprofit entity'," after "the terms".

(b) ELIGIBILITY OF INTERNET PUBLISHING ORGANIZATIONS FOR COVERED LOANS UNDER THE PAYCHECK PROTECTION PROGRAM.—

(1) IN GENERAL.—Section 7(a)(36)(D) of the Small Business Act (15 U.S.C. 636(a)(36)(D)), as amended by subsection (a), is further amended—

(A) in clause (iii), by adding at the end the following:

"(IV) ELIGIBILITY OF INTERNET PUBLISHING ORGANIZATIONS.—A business concern or other organization that was not eligible to receive a covered loan the day before the date of enactment of this subclause, is assigned a North American Industry Classification System code of 519130, certifies in good faith as an Internet-only news publisher or Internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information shall be eligible to receive a covered loan for the continued provision of news, information, content, or emergency information if—

"(aa) the business concern or organization employs not more than 500 employees, or the size standard established by the Administrator for that North American Industry Classification code, per physical location of the business concern or organization; and

"(bb) the business concern or organization makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the business concern or organization that supports local or regional news.";

(B) in clause (iv)—

(i) in subclause (III), by striking "and" at the end;

(ii) in subclause (IV)(bb), by striking the period at the end and inserting "; and"; and

(iii) by adding at the end the following:

"(V) any business concern or other organization that was not eligible to receive a covered loan the day before the date of enactment of this subclause, is assigned a North American Industry Classification System code of 519130, certifies in good faith as an Internet-only news publisher or Internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information, if the business concern or organization—

"(aa) employs not more than 500 employees, or the size standard established by the Administrator for that North American

H. R. 1319—81

Industry Classification code, per physical location of the business concern or organization; and

"(bb) is majority owned or controlled by a business concern or organization that is assigned a North American Industry Classification System code of 519130.";

(C) in clause (v), by striking "clause (iii)(II), (iv)(IV), or (vii)" and inserting "subclause (II), (III), or (IV) of clause (iii), subclause (IV) or (V) of clause (iv), clause (vii), or clause (ix)"; and

(D) in clause (viii)(II)—

(i) by striking "business concern made eligible by clause (iii)(II) or clause (iv)(IV) of this subparagraph" and inserting "business concern made eligible by subclause (II) or (IV) of clause (iii) or subclause (IV) or (V) of clause (iv) of this subparagraph"; and

(ii) by inserting "or organization" after "business concern" each place it appears.

(2) ELIGIBILITY FOR SECOND DRAW LOANS.—Section 7(a)(37)(A)(iv)(II) of the Small Business Act, as amended by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended by striking "clause (iii)(II), (iv)(IV), or (vii)" and inserting "subclause (II), (III), or (IV) of clause (iii), subclause (IV) or (V) of clause (iv), clause (vii), or clause (ix)".

(c) COORDINATION WITH CONTINUATION COVERAGE PREMIUM ASSISTANCE.—

(1) PAYCHECK PROTECTION PROGRAM.—Section 7A(a)(12) of the Small Business Act (as redesignated, transferred, and amended by section 304(b) of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Public Law 116–260)) is amended—

(A) by striking "CARES Act or" and inserting "CARES Act,"; and

(B) by inserting before the period at the end the following: ", or premiums taken into account in determining the credit allowed under section 6432 of the Internal Revenue Code of 1986".

(2) PAYCHECK PROTECTION PROGRAM SECOND DRAW.—Section 7(a)(37)(J)(iii)(I) of the Small Business Act, as amended by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended—

(A) by striking "or" at the end of item (aa);

(B) by striking the period at the end of item (bb) and inserting "; or"; and

(C) by adding at the end the following new item:

"(cc) premiums taken into account in determining the credit allowed under section 6432 of the Internal Revenue Code of 1986.".

(3) APPLICABILITY.—The amendments made by this subsection shall apply only with respect to applications for forgiveness of covered loans made under paragraphs (36) or (37) of section 7(a) of the Small Business Act, as amended by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260),

H. R. 1319—82

that are received on or after the date of the enactment of
this Act.

(d) COMMITMENT AUTHORITY AND APPROPRIATIONS.—

(1) COMMITMENT AUTHORITY.—Section 1102(b)(1) of the
CARES Act (Public Law 116–136) is amended by striking
"$806,450,000,000" and inserting "$813,700,000,000".

(2) DIRECT APPROPRIATIONS.—In addition to amounts other-
wise available, there is appropriated to the Administrator of
the Small Business Administration for fiscal year 2021, out
of any money in the Treasury not otherwise appropriated,
$7,250,000,000, to remain available until expended, for carrying
out this section.

## SEC. 5002. TARGETED EIDL ADVANCE.

(a) DEFINITIONS.—In this section—

(1) the term "Administrator" means the Administrator of
the Small Business Administration; and

(2) the terms "covered entity" and "economic loss" have
the meanings given the terms in section 331(a) of the Economic
Aid to Hard-Hit Small Businesses, Nonprofits, and Venues
Act (title III of division N of Public Law 116–260).

(b) APPROPRIATIONS.—In addition to amounts otherwise avail-
able, there is appropriated to the Administrator for fiscal year
2021, out of any money in the Treasury not otherwise appropriated,
$15,000,000,000—

(1) to remain available until expended; and

(2) of which, the Administrator shall use—

(A) $10,000,000,000 to make payments to covered enti-
ties that have not received the full amounts to which
the covered entities are entitled under section 331 of the
Economic Aid to Hard-Hit Small Businesses, Nonprofits,
and Venues Act (title III of division N of Public Law 116–
260); and

(B) $5,000,000,000 to make payments under section
1110(e) of the CARES Act (15 U.S.C. 9009(e)), each of
which shall be—

(i) made to a covered entity that—

(I) has suffered an economic loss of greater
than 50 percent; and

(II) employs not more than 10 employees;

(ii) in an amount that is $5,000; and

(iii) with respect to the covered entity to which
the payment is made, in addition to any payment
made to the covered entity under section 1110(e) of
the CARES Act (15 U.S.C. 9009(e)) or section 331
of the Economic Aid to Hard-Hit Small Businesses,
Nonprofits, and Venues Act (title III of division N
of Public Law 116–260).

## SEC. 5003. SUPPORT FOR RESTAURANTS.

(a) DEFINITIONS.—In this section:

(1) ADMINISTRATOR.—The term "Administrator" means the
Administrator of the Small Business Administration.

(2) AFFILIATED BUSINESS.—The term "affiliated business"
means a business in which an eligible entity has an equity
or right to profit distributions of not less than 50 percent,
or in which an eligible entity has the contractual authority
to control the direction of the business, provided that such

H. R. 1319—83

affiliation shall be determined as of any arrangements or agreements in existence as of March 13, 2020.

(3) COVERED PERIOD.—The term "covered period" means the period—

(A) beginning on February 15, 2020; and

(B) ending on December 31, 2021, or a date to be determined by the Administrator that is not later than 2 years after the date of enactment of this section.

(4) ELIGIBLE ENTITY.—The term "eligible entity"—

(A) means a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom, licensed facility or premise of a beverage alcohol producer where the public may taste, sample, or purchase products, or other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink;

(B) includes an entity described in subparagraph (A) that is located in an airport terminal or that is a Tribally-owned concern; and

(C) does not include—

(i) an entity described in subparagraph (A) that—

(I) is a State or local government-operated business;

(II) as of March 13, 2020, owns or operates (together with any affiliated business) more than 20 locations, regardless of whether those locations do business under the same or multiple names; or

(III) has a pending application for or has received a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260); or

(ii) a publicly-traded company.

(5) EXCHANGE; ISSUER; SECURITY.—The terms "exchange", "issuer", and "security" have the meanings given those terms in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

(6) FUND.—The term "Fund" means the Restaurant Revitalization Fund established under subsection (b).

(7) PANDEMIC-RELATED REVENUE LOSS.—The term "pandemic-related revenue loss" means, with respect to an eligible entity—

(A) except as provided in subparagraphs (B), (C), and (D), the gross receipts, as established using such verification documentation as the Administrator may require, of the eligible entity during 2020 subtracted from the gross receipts of the eligible entity in 2019, if such sum is greater than zero;

(B) if the eligible entity was not in operation for the entirety of 2019—

(i) the difference between—

(I) the product obtained by multiplying the average monthly gross receipts of the eligible entity in 2019 by 12; and

H. R. 1319—84

           (II) the product obtained by multiplying the average monthly gross receipts of the eligible entity in 2020 by 12; or

        (ii) an amount based on a formula determined by the Administrator;

    (C) if the eligible entity opened during the period beginning on January 1, 2020, and ending on the day before the date of enactment of this section—

        (i) the expenses described in subsection (c)(5)(A) that were incurred by the eligible entity minus any gross receipts received; or

        (ii) an amount based on a formula determined by the Administrator; or

    (D) if the eligible entity has not yet opened as of the date of application for a grant under subsection (c), but has incurred expenses described in subsection (c)(5)(A) as of the date of enactment of this section—

        (i) the amount of those expenses; or

        (ii) an amount based on a formula determined by the Administrator.

For purposes of this paragraph, the pandemic-related revenue losses for an eligible entity shall be reduced by any amounts received from a covered loan made under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)) in 2020 or 2021.

    (8) PAYROLL COSTS.—The term "payroll costs" has the meaning given the term in section 7(a)(36)(A) of the Small Business Act (15 U.S.C. 636(a)(36)(A)), except that such term shall not include—

        (A) qualified wages (as defined in subsection (c)(3) of section 2301 of the CARES Act) taken into account in determining the credit allowed under such section 2301; or

        (B) premiums taken into account in determining the credit allowed under section 6432 of the Internal Revenue Code of 1986.

    (9) PUBLICLY-TRADED COMPANY.—The term "publicly-traded company" means an entity that is majority owned or controlled by an entity that is an issuer, the securities of which are listed on a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f).

    (10) TRIBALLY-OWNED CONCERN.—The term "Tribally-owned concern" has the meaning given the term in section 124.3 of title 13, Code of Federal Regulations, or any successor regulation.

(b) RESTAURANT REVITALIZATION FUND.—

    (1) IN GENERAL.—There is established in the Treasury of the United States a fund to be known as the Restaurant Revitalization Fund.

    (2) APPROPRIATIONS.—

        (A) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended.

        (B) DISTRIBUTION.—

H. R. 1319—85

(i) IN GENERAL.—Of the amounts made available under subparagraph (A)—

(I) $5,000,000,000 shall be available to eligible entities with gross receipts during 2019 of not more than $500,000; and

(II) $23,600,000,000 shall be available to the Administrator to award grants under subsection (c) in an equitable manner to eligible entities of different sizes based on annual gross receipts.

(ii) ADJUSTMENTS.—The Administrator may make adjustments as necessary to the distribution of funds under clause (i)(II) based on demand and the relative local costs in the markets in which eligible entities operate.

(C) GRANTS AFTER INITIAL PERIOD.—Notwithstanding subparagraph (B), on and after the date that is 60 days after the date of enactment of this section, or another period of time determined by the Administrator, the Administrator may make grants using amounts appropriated under subparagraph (A) to any eligible entity regardless of the annual gross receipts of the eligible entity.

(3) USE OF FUNDS.—The Administrator shall use amounts in the Fund to make grants described in subsection (c).

(c) RESTAURANT REVITALIZATION GRANTS.—

(1) IN GENERAL.—Except as provided in subsection (b) and paragraph (3), the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator.

(2) APPLICATION.—

(A) CERTIFICATION.—An eligible entity applying for a grant under this subsection shall make a good faith certification that—

(i) the uncertainty of current economic conditions makes necessary the grant request to support the ongoing operations of the eligible entity; and

(ii) the eligible entity has not applied for or received a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260).

(B) BUSINESS IDENTIFIERS.—In accepting applications for grants under this subsection, the Administrator shall prioritize the ability of each applicant to use their existing business identifiers over requiring other forms of registration or identification that may not be common to their industry and imposing additional burdens on applicants.

(3) PRIORITY IN AWARDING GRANTS.—

(A) IN GENERAL.—During the initial 21-day period in which the Administrator awards grants under this subsection, the Administrator shall prioritize awarding grants to eligible entities that are small business concerns owned and controlled by women (as defined in section 3(n) of the Small Business Act (15 U.S.C. 632(n))), small business concerns owned and controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))), or socially and economically disadvantaged small business concerns (as defined in section 8(a)(4)(A) of the Small Business Act

H. R. 1319—86

(15 U.S.C. 637(a)(4)(A))). The Administrator may take such steps as necessary to ensure that eligible entities described in this subparagraph have access to grant funding under this section after the end of such 21-day period.

(B) CERTIFICATION.—For purposes of establishing priority under subparagraph (A), an applicant shall submit a self-certification of eligibility for priority with the grant application.

(4) GRANT AMOUNT.—

(A) AGGREGATE MAXIMUM AMOUNT.—The aggregate amount of grants made to an eligible entity and any affiliated businesses of the eligible entity under this subsection—

(i) shall not exceed $10,000,000; and

(ii) shall be limited to $5,000,000 per physical location of the eligible entity.

(B) DETERMINATION OF GRANT AMOUNT.—

(i) IN GENERAL.—Except as provided in this paragraph, the amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity.

(ii) RETURN TO TREASURY.—Any amount of a grant made under this subsection to an eligible entity based on estimated receipts that is greater than the actual gross receipts of the eligible entity in 2020 shall be returned to the Treasury.

(5) USE OF FUNDS.—During the covered period, an eligible entity that receives a grant under this subsection may use the grant funds for the following expenses incurred as a direct result of, or during, the COVID–19 pandemic:

(A) Payroll costs.

(B) Payments of principal or interest on any mortgage obligation (which shall not include any prepayment of principal on a mortgage obligation).

(C) Rent payments, including rent under a lease agreement (which shall not include any prepayment of rent).

(D) Utilities.

(E) Maintenance expenses, including—

(i) construction to accommodate outdoor seating; and

(ii) walls, floors, deck surfaces, furniture, fixtures, and equipment.

(F) Supplies, including protective equipment and cleaning materials.

(G) Food and beverage expenses that are within the scope of the normal business practice of the eligible entity before the covered period.

(H) Covered supplier costs, as defined in section 7A(a) of the Small Business Act (as redesignated, transferred, and amended by section 304(b) of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Public Law 116–260)).

(I) Operational expenses.

(J) Paid sick leave.

(K) Any other expenses that the Administrator determines to be essential to maintaining the eligible entity.

H. R. 1319—87

(6) RETURNING FUNDS.—If an eligible entity that receives a grant under this subsection fails to use all grant funds or permanently ceases operations on or before the last day of the covered period, the eligible entity shall return to the Treasury any funds that the eligible entity did not use for the allowable expenses under paragraph (5).

**SEC. 5004. COMMUNITY NAVIGATOR PILOT PROGRAM.**

(a) DEFINITIONS.—In this section:

(1) ADMINISTRATION.—The term "Administration" means the Small Business Administration.

(2) ADMINISTRATOR.—The term "Administrator" means the Administrator of the Small Business Administration.

(3) COMMUNITY NAVIGATOR SERVICES.—The term "community navigator services" means the outreach, education, and technical assistance provided by community navigators that target eligible businesses to increase awareness of, and participation in, programs of the Small Business Administration.

(4) COMMUNITY NAVIGATOR.—The term "community navigator" means a community organization, community financial institution as defined in section 7(a)(36)(A) of the Small Business Act (15 U.S.C. 636(a)(36)(A)), or other private nonprofit organization engaged in the delivery of community navigator services.

(5) ELIGIBLE BUSINESS.—The term "eligible business" means any small business concern, with priority for small business concerns owned and controlled by women (as defined in section 3(n) of the Small Business Act (15 U.S.C. 632(n))), small business concerns owned and controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))), and socially and economically disadvantaged small business concerns (as defined in section 8(a)(4)(A) of the Small Business Act (15 U.S.C. 637(a)(4)(A))).

(6) PRIVATE NONPROFIT ORGANIZATION.—The term "private nonprofit organization" means an entity that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code.

(7) RESOURCE PARTNER.—The term "resource partner" means—

(A) a small business development center (as defined in section 3 of the Small Business Act (15 U.S.C. 632));

(B) a women's business center (as described in section 29 of the Small Business Act (15 U.S.C. 656)); and

(C) a chapter of the Service Corps of Retired Executives (as defined in section 8(b)(1)(B) of the Act (15 U.S.C. 637(b)(1)(B))).

(8) SMALL BUSINESS CONCERN.—The term "small business concern" has the meaning given under section 3 of the Small Business Act (15 U.S.C. 632).

(9) STATE.—The term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, and Guam, or an agency, instrumentality, or fiscal agent thereof.

(10) UNIT OF GENERAL LOCAL GOVERNMENT.—The term "unit of general local government" means a county, city, town, village, or other general purpose political subdivision of a State.

H. R. 1319—88

(b) COMMUNITY NAVIGATOR PILOT PROGRAM.—

(1) IN GENERAL.—The Administrator of the Small Business Administration shall establish a Community Navigator pilot program to make grants to, or enter into contracts or cooperative agreements with, private nonprofit organizations, resource partners, States, Tribes, and units of local government to ensure the delivery of free community navigator services to current or prospective owners of eligible businesses in order to improve access to assistance programs and resources made available because of the COVID–19 pandemic by Federal, State, Tribal, and local entities.

(2) APPROPRIATIONS.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2022, for carrying out this subsection.

(c) OUTREACH AND EDUCATION.—

(1) PROMOTION.—The Administrator shall develop and implement a program to promote community navigator services to current or prospective owners of eligible businesses.

(2) CALL CENTER.—The Administrator shall establish a telephone hotline to offer information about Federal programs to assist eligible businesses and offer referral services to resource partners, community navigators, potential lenders, and other persons that the Administrator determines appropriate for current or prospective owners of eligible businesses.

(3) OUTREACH.—The Administrator shall—

(A) conduct outreach and education, in the 10 most commonly spoken languages in the United States, to current or prospective owners of eligible businesses on community navigator services and other Federal programs to assist eligible businesses;

(B) improve the website of the Administration to describe such community navigator services and other Federal programs; and

(C) implement an education campaign by advertising in media targeted to current or prospective owners of eligible businesses.

(4) APPROPRIATIONS.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $75,000,000, to remain available until September 30, 2022, for carrying out this subsection.

(d) SUNSET.—The authority of the Administrator to make grants under this section shall terminate on December 31, 2025.

**SEC. 5005. SHUTTERED VENUE OPERATORS.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,250,000,000, to remain available until expended, to carry out section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), of which $500,000 shall be used to provide technical assistance to help applicants access the System for Award Management (or any successor thereto) or to assist applicants with an alternative grant application system.

H. R. 1319—89

(b) REDUCTION OF SHUTTERED VENUES ASSISTANCE FOR NEW PPP RECIPIENTS.—Section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended—

(1) in subsection (a)(1)(A)(vi)—

(A) by striking subclause (III);

(B) by redesignating subclause (IV) as subclause (III); and

(C) in subclause (III), as so redesignated, by striking "subclauses (I), (II), and (III)" and inserting "subclauses (I) and (II)"; and

(2) in subsection (c)(1)—

(A) in subparagraph (A), in the matter preceding clause (i), by striking "A grant" and inserting "Subject to subparagraphs (B) and (C), a grant"; and

(B) by adding at the end the following:

"(C) REDUCTION FOR RECIPIENTS OF NEW PPP LOANS.—

"(i) IN GENERAL.—The otherwise applicable amount of a grant under subsection (b)(2) to an eligible person or entity shall be reduced by the total amount of loans guaranteed under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)) that are received on or after December 27, 2020 by the eligible person or entity.

"(ii) APPLICATION TO GOVERNMENTAL ENTITIES.— For purposes of applying clause (i) to an eligible person or entity owned by a State or a political subdivision of a State, the relevant entity—

"(I) shall be the eligible person or entity; and

"(II) shall not include entities of the State or political subdivision other than the eligible person or entity.".

## SEC. 5006. DIRECT APPROPRIATIONS.

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, to remain available until expended—

(1) $840,000,000 for administrative expenses, including to prevent, prepare for, and respond to the COVID–19 pandemic, domestically or internationally, including administrative expenses related to paragraphs (36) and (37) of section 7(a) of the Small Business Act, section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), section 5002 of this title, and section 5003 of this title; and

(2) $460,000,000 to carry out the disaster loan program authorized by section 7(b) of the Small Business Act (15 U.S.C. 636(b)), of which $70,000,000 shall be for the cost of direct loans authorized by such section and $390,000,000 shall be for administrative expenses to carry out such program.

(b) INSPECTOR GENERAL.—In addition to amounts otherwise available, there is appropriated to the Inspector General of the Small Business Administration for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $25,000,000, to remain available until expended, for necessary expenses of the Office of Inspector General.

H. R. 1319—90

# TITLE VI—COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

**SEC. 6001. ECONOMIC ADJUSTMENT ASSISTANCE.**

(a) ECONOMIC DEVELOPMENT ADMINISTRATION APPROPRIA-TION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $3,000,000,000, to remain available until September 30, 2022, to the Department of Commerce for economic adjustment assistance as authorized by sections 209 and 703 of the Public Works and Economic Development Act of 1965 (42 U.S.C. 3149 and 3233) to prevent, prepare for, and respond to coronavirus and for necessary expenses for responding to economic injury as a result of coronavirus.

(b) Of the funds provided by this section, up to 2 percent shall be used for Federal costs to administer such assistance utilizing temporary Federal personnel as may be necessary consistent with the requirements applicable to such administrative funding in fiscal year 2020 to prevent, prepare for, and respond to coronavirus and which shall remain available until September 30, 2027.

(c) Of the funds provided by this section, 25 percent shall be for assistance to States and communities that have suffered economic injury as a result of job and gross domestic product losses in the travel, tourism, or outdoor recreation sectors.

**SEC. 6002. FUNDING FOR POLLUTION AND DISPARATE IMPACTS OF THE COVID–19 PANDEMIC.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Environmental Protection Agency for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until expended, to address health outcome disparities from pollution and the COVID–19 pandemic, of which—

(1) $50,000,000, shall be for grants, contracts, and other agency activities that identify and address disproportionate environmental or public health harms and risks in minority populations or low-income populations under—

(A) section 103(b) of the Clean Air Act (42 U.S.C. 7403(b));

(B) section 1442 of the Safe Drinking Water Act (42 U.S.C. 300j–1);

(C) section 104(k)(7)(A) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9604(k)(7)(A)); and

(D) sections 791 through 797 of the Energy Policy Act of 2005 (42 U.S.C. 16131 through 16137); and

(2) $50,000,000 shall be for grants and activities authorized under subsections (a) through (c) of section 103 of the Clean Air Act (42 U.S.C. 7403) and grants and activities authorized under section 105 of such Act (42 U.S.C. 7405).

(b) ADMINISTRATION OF FUNDS.—

(1) Of the funds made available pursuant to subsection (a)(1), the Administrator shall reserve 2 percent for administrative costs necessary to carry out activities funded pursuant to such subsection.

(2) Of the funds made available pursuant to subsection (a)(2), the Administrator shall reserve 5 percent for activities funded pursuant to such subsection other than grants.

**SEC. 6003. UNITED STATES FISH AND WILDLIFE SERVICE.**

(a) INSPECTION, INTERDICTION, AND RESEARCH RELATED TO CERTAIN SPECIES AND COVID–19.—In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $95,000,000 to remain available until expended, to carry out the provisions of the Fish and Wildlife Act of 1956 (16 U.S.C. 742a et seq.) and the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) through direct expenditure, contracts, and grants, of which—

(1) $20,000,000 shall be for wildlife inspections, interdictions, investigations, and related activities, and for efforts to address wildlife trafficking;

(2) $30,000,000 shall be for the care of captive species listed under the Endangered Species Act of 1973, for the care of rescued and confiscated wildlife, and for the care of Federal trust species in facilities experiencing lost revenues due to COVID–19; and

(3) $45,000,000 shall be for research and extension activities to strengthen early detection, rapid response, and science-based management to address wildlife disease outbreaks before they become pandemics and strengthen capacity for wildlife health monitoring to enhance early detection of diseases that have capacity to jump the species barrier and pose a risk in the United States, including the development of a national wildlife disease database.

(b) LACEY ACT PROVISIONS.—In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000, to remain available until expended, to carry out the provisions of section 42(a) of title 18, United States Code, and the Lacey Act Amendments of 1981 (16 U.S.C. 3371–3378).

# TITLE VII—COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

## Subtitle A—Transportation and Infrastructure

**SEC. 7101. GRANTS TO THE NATIONAL RAILROAD PASSENGER CORPORATION.**

(a) NORTHEAST CORRIDOR APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $970,388,160, to remain available until September 30, 2024, for grants as authorized under section 11101(a) of the FAST Act (Public Law 114–94) to prevent, prepare for, and respond to coronavirus.

(b) NATIONAL NETWORK APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $729,611,840, to remain available until September 30, 2024, for

H. R. 1319—92

grants as authorized under section 11101(b) of the FAST Act (Public Law 114–94) to prevent, prepare for, and respond to coronavirus.

(c) LONG-DISTANCE SERVICE RESTORATION AND EMPLOYEE RECALLS.—Not less than $165,926,000 of the aggregate amounts made available under subsections (a) and (b) shall be for use by the National Railroad Passenger Corporation to—

(1) restore, not later than 90 days after the date of enactment of this Act, the frequency of rail service on long-distance routes (as defined in section 24102 of title 49, United States Code) that the National Railroad Passenger Corporation reduced the frequency of on or after July 1, 2020, and continue to operate such service at such frequency; and

(2) recall and manage employees furloughed on or after October 1, 2020, as a result of efforts to prevent, prepare for, and respond to coronavirus.

(d) USE OF FUNDS IN LIEU OF CAPITAL PAYMENTS.—Not less than $109,805,000 of the aggregate amounts made available under subsections (a) and (b)—

(1) shall be for use by the National Railroad Passenger Corporation in lieu of capital payments from States and commuter rail passenger transportation providers that are subject to the cost allocation policy under section 24905(c) of title 49, United States Code; and

(2) notwithstanding sections 24319(g) and 24905(c)(1)(A)(i) of title 49, United States Code, such amounts do not constitute cross-subsidization of commuter rail passenger transportation.

(e) USE OF FUNDS FOR STATE PAYMENTS FOR STATE-SUPPORTED ROUTES.—

(1) IN GENERAL.—Of the amounts made available under subsection (b), $174,850,000 shall be for use by the National Railroad Passenger Corporation to offset amounts required to be paid by States for covered State-supported routes.

(2) FUNDING SHARE.—The share of funding provided under paragraph (1) with respect to a covered State-supported route shall be distributed as follows:

(A) Each covered State-supported route shall receive 7 percent of the costs allocated to the route in fiscal year 2019 under the cost allocation methodology adopted pursuant to section 209 of the Passenger Rail Investment and Improvement Act of 2008 (Public Law 110–432).

(B) Any remaining amounts after the distribution described in subparagraph (A) shall be apportioned to each covered State-supported route in proportion to the passenger revenue of such route and other revenue allocated to such route in fiscal year 2019 divided by the total passenger revenue and other revenue allocated to all covered State-supported routes in fiscal year 2019.

(3) COVERED STATE-SUPPORTED ROUTE DEFINED.—In this subsection, the term "covered State-supported route" means a State-supported route, as such term is defined in section 24102 of title 49, United States Code, but does not include a State-supported route for which service was terminated on or before February 1, 2020.

(f) USE OF FUNDS FOR DEBT REPAYMENT OR PREPAYMENT.—Not more than $100,885,000 of the aggregate amounts made available under subsections (a) and (b) shall be—

H. R. 1319—93

(1) for the repayment or prepayment of debt incurred by the National Railroad Passenger Corporation under financing arrangements entered into prior to the date of enactment of this Act; and

(2) to pay required reserves, costs, and fees related to such debt, including for loans from the Department of Transportation and loans that would otherwise have been paid from National Railroad Passenger Corporation revenues.

(g) PROJECT MANAGEMENT OVERSIGHT.—Not more than $2,000,000 of the aggregate amounts made available under subsections (a) and (b) shall be for activities authorized under section 11101(c) of the FAST Act (Public Law 114–94).

## SEC. 7102. RELIEF FOR AIRPORTS.

(a) IN GENERAL.—

(1) IN GENERAL.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any funds in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, for assistance to sponsors of airports, as such terms are defined in section 47102 of title 49, United States Code, to be made available to prevent, prepare for, and respond to coronavirus.

(2) REQUIREMENTS AND LIMITATIONS.—Amounts made available under this section—

(A) may not be used for any purpose not directly related to the airport; and

(B) may not be provided to any airport that was allocated in excess of 4 years of operating funds to prevent, prepare for, and respond to coronavirus in fiscal year 2020.

(b) ALLOCATIONS.—The following terms shall apply to the amounts made available under this section:

(1) OPERATING EXPENSES AND DEBT SERVICE PAYMENTS.—

(A) IN GENERAL.—Not more than $6,492,000,000 shall be made available for primary airports, as such term is defined in section 47102 of title 49, United States Code, and certain cargo airports, for costs related to operations, personnel, cleaning, sanitization, janitorial services, combating the spread of pathogens at the airport, and debt service payments.

(B) DISTRIBUTION.— Amounts made available under this paragraph—

(i) shall not be subject to the reduced apportionments under section 47114(f) of title 49, United States Code;

(ii) shall first be apportioned as set forth in sections 47114(c)(1)(A), 47114(c)(1)(C)(i), 47114(c)(1)(C)(ii), 47114(c)(2)(A), 47114(c)(2)(B), and 47114(c)(2)(E) of title 49, United States Code; and

(iii) shall not be subject to a maximum apportionment limit set forth in section 47114(c)(1)(B) of title 49, United States Code.

(C) REMAINING AMOUNTS.—Any amount remaining after distribution under subparagraph (B) shall be distributed to the sponsor of each primary airport (as such term is defined in section 47102 of title 49, United States Code) based on each such primary airport's passenger enplanements compared to the total passenger

H. R. 1319—94

enplanements of all such primary airports in calendar year 2019.

(2) FEDERAL SHARE FOR DEVELOPMENT PROJECTS.—

(A) IN GENERAL.—Not more than $608,000,000 allocated under subsection (a)(1) shall be available to pay a Federal share of 100 percent of the costs for any grant awarded in fiscal year 2021, or in fiscal year 2020 with less than a 100-percent Federal share, for an airport development project (as such term is defined in section 47102 of title 49).

(B) REMAINING AMOUNTS.—Any amount remaining under this paragraph shall be distributed as described in paragraph (1)(C).

(3) NONPRIMARY AIRPORTS.—

(A) IN GENERAL.—Not more than $100,000,000 shall be made available for general aviation and commercial service airports that are not primary airports (as such terms are defined in section 47102 of title 49, United States Code) for costs related to operations, personnel, cleaning, sanitization, janitorial services, combating the spread of pathogens at the airport, and debt service payments.

(B) DISTRIBUTION.—Amounts made available under this paragraph shall be apportioned to each non-primary airport based on the categories published in the most current National Plan of Integrated Airport Systems, reflecting the percentage of the aggregate published eligible development costs for each such category, and then dividing the allocated funds evenly among the eligible airports in each category, rounding up to the nearest thousand dollars.

(C) REMAINING AMOUNTS.—Any amount remaining under this paragraph shall be distributed as described in paragraph (1)(C).

(4) AIRPORT CONCESSIONS.—

(A) IN GENERAL.—Not more than $800,000,000 shall be made available for sponsors of primary airports to provide relief from rent and minimum annual guarantees to airport concessions, of which at least $640,000,000 shall be available to provide relief to eligible small airport concessions and of which at least $160,000,000 shall be available to provide relief to eligible large airport concessions located at primary airports.

(B) DISTRIBUTION.—The amounts made available for each set-aside in this paragraph shall be distributed to the sponsor of each primary airport (as such term is defined in section 47102 of title 49, United States Code) based on each such primary airport's passenger enplanements compared to the total passenger enplanements of all such primary airports in calendar year 2019.

(C) CONDITIONS.—As a condition of approving a grant under this paragraph—

(i) the sponsor shall provide such relief from the date of enactment of this Act until the sponsor has provided relief equaling the total grant amount, to the extent practicable and to the extent permissible under State laws, local laws, and applicable trust indentures; and

H. R. 1319—95

(ii) for each set-aside, the sponsor shall provide relief from rent and minimum annual guarantee obligations to each eligible airport concession in an amount that reflects each eligible airport concession's proportional share of the total amount of the rent and minimum annual guarantees of those eligible airport concessions at such airport.

(c) ADMINISTRATION.—

(1) ADMINISTRATIVE EXPENSES.—The Administrator of the Federal Aviation Administration may retain up to 0.1 percent of the funds provided under this section to fund the award of, and oversight by the Administrator of, grants made under this section.

(2) WORKFORCE RETENTION REQUIREMENTS.—

(A) REQUIRED RETENTION.—As a condition for receiving funds provided under this section, an airport shall continue to employ, through September 30, 2021, at least 90 percent of the number of individuals employed (after making adjustments for retirements or voluntary employee separations) by the airport as of March 27, 2020.

(B) WAIVER OF RETENTION REQUIREMENT.—The Secretary shall waive the workforce retention requirement if the Secretary determines that—

(i) the airport is experiencing economic hardship as a direct result of the requirement; or

(ii) the requirement reduces aviation safety or security.

(C) EXCEPTION.—The workforce retention requirement shall not apply to nonhub airports or nonprimary airports receiving funds under this section.

(D) NONCOMPLIANCE.—Any financial assistance provided under this section to an airport that fails to comply with the workforce retention requirement described in subparagraph (A), and does not otherwise qualify for a waiver or exception under this paragraph, shall be subject to clawback by the Secretary.

(d) DEFINITIONS.—In this section:

(1) ELIGIBLE LARGE AIRPORT CONCESSION.—The term "eligible large airport concession" means a concession (as defined in section 23.3 of title 49, Code of Federal Regulations), that is in-terminal and has maximum gross receipts, averaged over the previous three fiscal years, of more than $56,420,000.

(2) ELIGIBLE SMALL AIRPORT CONCESSION.—The term "eligible small airport concession" means a concession (as defined in section 23.3 of title 49, Code of Federal Regulations), that is in-terminal and—

(A) a small business with maximum gross receipts, averaged over the previous 3 fiscal years, of less than $56,420,000; or

(B) is a joint venture (as defined in section 23.3 of title 49, Code of Federal Regulations).

**SEC. 7103. EMERGENCY FAA EMPLOYEE LEAVE FUND.**

(a) ESTABLISHMENT; APPROPRIATION.—There is established in the Federal Aviation Administration the Emergency FAA Employee Leave Fund (in this section referred to as the "Fund"), to be

Case 4:21-cv-00595-O   Document 87   Filed 09/22/21   Page 106 of 261   PageID 2068

H. R. 1319—96

administered by the Administrator of the Federal Aviation Administration, for the purposes set forth in subsection (b). In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $9,000,000, which shall be deposited into the Fund and remain available through September 30, 2022.

(b) PURPOSE.—Amounts in the Fund shall be available to the Administrator for the use of paid leave under this section by any employee of the Administration who is unable to work because the employee—

(1) is subject to a Federal, State, or local quarantine or isolation order related to COVID–19;

(2) has been advised by a health care provider to self-quarantine due to concerns related to COVID–19;

(3) is caring for an individual who is subject to such an order or has been so advised;

(4) is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(5) is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, if the school of such son or daughter requires or makes optional a virtual learning instruction model or requires or makes optional a hybrid of in-person and virtual learning instruction models, or the child care provider of such son or daughter is unavailable, due to COVID–19 precautions;

(6) is experiencing any other substantially similar condition;

(7) is caring for a family member with a mental or physical disability or who is 55 years of age or older and incapable of self-care, without regard to whether another individual other than the employee is available to care for such family member, if the place of care for such family member is closed or the direct care provider is unavailable due to COVID–19; or

(8) is obtaining immunization related to COVID–19 or is recovering from any injury, disability, illness, or condition related to such immunization.

(c) LIMITATIONS.—

(1) PERIOD OF AVAILABILITY.—Paid leave under this section may only be provided to and used by an employee of the Administration during the period beginning on the date of enactment of this section and ending on September 30, 2021.

(2) TOTAL HOURS; AMOUNT.—Paid leave under this section—

(A) shall be provided to an employee of the Administration in an amount not to exceed 600 hours of paid leave for each full-time employee, and in the case of a part-time employee, employee on an uncommon tour of duty, or employee with a seasonal work schedule, in an amount not to exceed the proportional equivalent of 600 hours to the extent amounts in the Fund remain available for reimbursement;

(B) shall be paid at the same hourly rate as other leave payments; and

(C) may not be provided to an employee if the leave would result in payments greater than $2,800 in aggregate for any biweekly pay period for a full-time employee, or a proportionally equivalent biweekly limit for a part-time employee.

H. R. 1319—97

(3) RELATIONSHIP TO OTHER LEAVE.—Paid leave under this section—

(A) is in addition to any other leave provided to an employee of the Administration; and

(B) may not be used by an employee of the Administration concurrently with any other paid leave.

(4) CALCULATION OF RETIREMENT BENEFIT.—Any paid leave provided to an employee of the Administration under this section shall reduce the total service used to calculate any Federal civilian retirement benefit.

**SEC. 7104. EMERGENCY TSA EMPLOYEE LEAVE FUND.**

(a) ESTABLISHMENT; APPROPRIATION.—There is established in the Transportation Security Administration (in this section referred to as the "Administration") the Emergency TSA Employee Leave Fund (in this section referred to as the "Fund"), to be administered by the Administrator of the Administration, for the purposes set forth in subsection (b). In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $13,000,000, which shall be deposited into the Fund and remain available through September 30, 2022.

(b) PURPOSE.—Amounts in the Fund shall be available to the Administration for the use of paid leave under this section by any employee of the Administration who is unable to work because the employee—

(1) is subject to a Federal, State, or local quarantine or isolation order related to COVID–19;

(2) has been advised by a health care provider to self-quarantine due to concerns related to COVID–19;

(3) is caring for an individual who is subject to such an order or has been so advised;

(4) is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(5) is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, if the school of such son or daughter requires or makes optional a virtual learning instruction model or requires or makes optional a hybrid of in-person and virtual learning instruction models, or the child care provider of such son or daughter is unavailable, due to COVID–19 precautions;

(6) is experiencing any other substantially similar condition;

(7) is caring for a family member with a mental or physical disability or who is 55 years of age or older and incapable of self-care, without regard to whether another individual other than the employee is available to care for such family member, if the place of care for such family member is closed or the direct care provider is unavailable due to COVID–19; or

(8) is obtaining immunization related to COVID–19 or is recovering from any injury, disability, illness, or condition related to such immunization.

(c) LIMITATIONS.—

(1) PERIOD OF AVAILABILITY.—Paid leave under this section may only be provided to and used by an employee of the Administration during the period beginning on the date of enactment of this section and ending on September 30, 2021.

H. R. 1319—98

(2) TOTAL HOURS; AMOUNT.—Paid leave under this section—

(A) shall be provided to an employee of the Administration in an amount not to exceed 600 hours of paid leave for each full-time employee, and in the case of a part-time employee, employee on an uncommon tour of duty, or employee with a seasonal work schedule, in an amount not to exceed the proportional equivalent of 600 hours to the extent amounts in the Fund remain available for reimbursement;

(B) shall be paid at the same hourly rate as other leave payments; and

(C) may not be provided to an employee if the leave would result in payments greater than $2,800 in aggregate for any biweekly pay period for a full-time employee, or a proportionally equivalent biweekly limit for a part-time employee.

(3) RELATIONSHIP TO OTHER LEAVE.—Paid leave under this section—

(A) is in addition to any other leave provided to an employee of the Administration; and

(B) may not be used by an employee of the Administration concurrently with any other paid leave.

(4) CALCULATION OF RETIREMENT BENEFIT.—Any paid leave provided to an employee of the Administration under this section shall reduce the total service used to calculate any Federal civilian retirement benefit.

# Subtitle B—Aviation Manufacturing Jobs Protection

**SEC. 7201. DEFINITIONS.**

In this subtitle:

(1) ELIGIBLE EMPLOYEE GROUP.—The term "eligible employee group" means the portion of an employer's United States workforce that—

(A) does not exceed 25 percent of the employer's total United States workforce as of April 1, 2020; and

(B) contains only employees with a total compensation level of $200,000 or less per year; and

(C) is engaged in aviation manufacturing activities and services, or maintenance, repair, and overhaul activities and services.

(2) AVIATION MANUFACTURING COMPANY.—The term "aviation manufacturing company" means a corporation, firm, or other business entity—

(A) that—

(i) actively manufactures an aircraft, aircraft engine, propeller, or a component, part, or systems of an aircraft or aircraft engine under a Federal Aviation Administration production approval;

(ii) holds a certificate issued under part 145 of title 14, Code of Federal Regulations, for maintenance, repair, and overhaul of aircraft, aircraft engines, components, or propellers; or

(iii) operates a process certified to SAE AS9100 related to the design, development, or provision of an

H. R. 1319—99

aviation product or service, including a part, component, or assembly;

(B) which—

(i) is established, created, or organized in the United States or under the laws of the United States; and

(ii) has significant operations in, and a majority of its employees engaged in aviation manufacturing activities and services, or maintenance, repair, and overhaul activities and services based in the United States;

(C) which has involuntarily furloughed or laid off at least 10 percent of its workforce in 2020 as compared to 2019 or has experienced at least a 15 percent decline in 2020 revenues as compared to 2019;

(D) that, as supported by sworn financial statements or other appropriate data, has identified the eligible employee group and the amount of total compensation level for the eligible employee group;

(E) that agrees to provide private contributions and maintain the total compensation level for the eligible employee group for the duration of an agreement under this subtitle;

(F) that agrees to provide immediate notice and justification to the Secretary of involuntary furloughs or layoffs exceeding 10 percent of the workforce that is not included in an eligible employee group for the duration of an agreement and receipt of public contributions under this subtitle;

(G) that has not conducted involuntary furloughs or reduced pay rates or benefits for the eligible employee group, subject to the employer's right to discipline or terminate an employee in accordance with employer policy, between the date of application and the date on which such a corporation, firm, or other business entity enters into an agreement with the Secretary under this subtitle; and

(H) that—

(i) in the case of a corporation, firm, or other business entity including any parent company or subsidiary of such a corporation, firm, or other business entity, that holds any type or production certificate or similar authorization issued under section 44704 of title 49, United States Code, with respect to a transport-category airplane covered under part 25 of title 14, Code of Federal Regulations, certificated with a passenger seating capacity of 50 or more, agrees to refrain from conducting involuntary layoffs or furloughs, or reducing pay rates and benefits, for the eligible employee group, subject to the employer's right to discipline or terminate an employee in accordance with employer policy from the date of agreement until September 30, 2021, or the duration of the agreement and receipt of public contributions under this subtitle, whichever period ends later; or

(ii) in the case of corporation, firm, or other business entity not specified under subparagraph (i), agrees

H. R. 1319—100

to refrain from conducting involuntary layoffs or fur-
loughs, or reducing pay rates and benefits, for the
eligible employee group, subject to the employer's right
to discipline or terminate an employee in accordance
with employer policy for the duration of the agreement
and receipt of public contributions under this subtitle.

(3) EMPLOYEE.—The term "employee" has the meaning
given that term in section 3 of the Fair Labor Standards
Act of 1938 (29 U.S.C. 203).

(4) EMPLOYER.—The term "employer" means an aviation
manufacturing company that is an employer (as defined in
section 3 of the Fair Labor Standards Act of 1938 (29 U.S.C.
203)).

(5) PRIVATE CONTRIBUTION.—The term "private contribu-
tion" means the contribution funded by the employer under
this subtitle to maintain 50 percent of the eligible employee
group's total compensation level, and combined with the public
contribution, is sufficient to maintain the total compensation
level for the eligible employee group as of April 1, 2020.

(6) PUBLIC CONTRIBUTION.—The term "public contribution"
means the contribution funded by the Federal Government
under this subtitle to provide 50 percent of the eligible
employees group's total compensation level, and combined with
the private contribution, is sufficient to maintain the total
compensation level for those in the eligible employee group
as of April 1, 2020.

(7) SECRETARY.—The term "Secretary" means the Secretary
of Transportation.

(8) TOTAL COMPENSATION LEVEL.—The term "total com-
pensation level" means the level of total base compensation
and benefits being provided to an eligible employee group
employee, excluding overtime and premium pay, and excluding
any Federal, State, or local payroll taxes paid, as of April
1, 2020.

**SEC. 7202. PAYROLL SUPPORT PROGRAM.**

(a) IN GENERAL.—The Secretary shall establish a payroll sup-
port program and enter into agreements with employers who meet
the eligibility criteria specified in subsection (b) and are not ineli-
gible under subsection (c), to provide public contributions to supple-
ment compensation of an eligible employee group. There is appro-
priated for fiscal year 2021, out of amounts in the Treasury not
otherwise appropriated, $3,000,000,000, to remain available until
September 30, 2023, for the Secretary to carry out the payroll
support program authorized under the preceding sentence for which
1 percent of the funds may be used for implementation costs and
administrative expenses.

(b) ELIGIBILITY.—The Secretary shall enter into an agreement
and provide public contributions, for a term no longer than 6
months, solely with an employer that agrees to use the funds
received under an agreement exclusively for the continuation of
employee wages, salaries, and benefits, to maintain the total com-
pensation level for the eligible employee group as of April 1, 2020
for the duration of the agreement, and to facilitate the retention,
rehire, or recall of employees of the employer, except that such
funds may not be used for back pay of returning rehired or recalled
employees.

H. R. 1319—101

(c) INELIGIBILITY.—The Secretary may not enter into any agreement under this section with an employer who was allowed a credit under section 2301 of the CARES Act (26 U.S.C. 3111 note) for the immediately preceding calendar quarter ending before such agreement is entered into, who received financial assistance under section 4113 of the CARES Act (15 U.S.C. 9073), or who is currently expending financial assistance under the paycheck protection program established under section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)), as of the date the employer submits an application under the payroll support program established under subsection (a).

(d) REDUCTIONS.—To address any shortfall in assistance that would otherwise be provided under this subtitle, the Secretary shall reduce, on a pro rata basis, the financial assistance provided under this subtitle.

(e) AGREEMENT DEADLINE.—No agreement may be entered into by the Secretary under the payroll support program established under subsection (a) after the last day of the 6 month period that begins on the effective date of the first agreement entered into under such program.

# Subtitle C—Airlines

**SEC. 7301. AIR TRANSPORTATION PAYROLL SUPPORT PROGRAM EXTENSION.**

(a) DEFINITIONS.—The definitions in section 40102(a) of title 49, United States Code, shall apply with respect to terms used in this section, except that—

(1) the term "catering functions" means preparation, assembly, or both, of food, beverages, provisions and related supplies for delivery, and the delivery of such items, directly to aircraft or to a location on or near airport property for subsequent delivery to aircraft;

(2) the term "contractor" means—

(A) a person that performs, under contract with a passenger air carrier conducting operations under part 121 of title 14, Code of Federal Regulations—

(i) catering functions; or

(ii) functions on the property of an airport that are directly related to the air transportation of persons, property, or mail, including the loading and unloading of property on aircraft, assistance to passengers under part 382 of title 14, Code of Federal Regulations, security, airport ticketing and check-in functions, ground-handling of aircraft, or aircraft cleaning and sanitization functions and waste removal; or

(B) a subcontractor that performs such functions;

(3) the term "employee" means an individual, other than a corporate officer, who is employed by an air carrier or a contractor;

(4) the term "eligible air carrier" means an air carrier that—

(A) received financial assistance pursuant section 402(a)(1) of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260);

(B) provides air transportation as of March 31, 2021;

H. R. 1319—102

(C) has not conducted involuntary furloughs or reduced pay rates or benefits between March 31, 2021, and the date on which the air carrier makes a certification to the Secretary pursuant to subparagraph (D); and

(D) certifies to the Secretary that such air carrier will—

(i) refrain from conducting involuntary furloughs or reducing pay rates or benefits until September 30, 2021, or the date on which assistance provided under this section is exhausted, whichever is later;

(ii) refrain from purchasing an equity security of the air carrier or the parent company of the air carrier that is listed on a national securities exchange through September 30, 2022;

(iii) refrain from paying dividends, or making other capital distributions, with respect to common stock (or equivalent interest) of such air carrier through September 30, 2022;

(iv) during the 2-year period beginning April 1, 2021, and ending April 1, 2023, refrain from paying—

(I) any officer or employee of the air carrier whose total compensation exceeded $425,000 in calendar year 2019 (other than an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to the date of enactment of this Act)—

(aa) total compensation that exceeds, during any 12 consecutive months of such 2-year period, the total compensation received by the officer or employee from the air carrier in calendar year 2019; or

(bb) severance pay or other benefits upon termination of employment with the air carrier which exceeds twice the maximum total compensation received by the officer or employee from the air carrier in calendar year 2019; and

(II) any officer or employee of the air carrier whose total compensation exceeded $3,000,000 in calendar year 2019 during any 12 consecutive months of such period total compensation in excess of the sum of—

(aa) $3,000,000; and

(bb) 50 percent of the excess over $3,000,000 of the total compensation received by the officer or employee from the air carrier in calendar year 2019.

(5) the term "eligible contractor" means a contractor that—

(A) received financial assistance pursuant to section 402(a)(2) of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260);

(B) performs one or more of the functions described under paragraph (2) as of March 31, 2021;

(C) has not conducted involuntary furloughs or reduced pay rates or benefits between March 31, 2021, and the date on which the contractor makes a certification to the Secretary pursuant to subparagraph (D); and

(D) certifies to the Secretary that such contractor will—

H. R. 1319—103

(i) refrain from conducting involuntary furloughs or reducing pay rates or benefits until September 30, 2021, or the date on which assistance provided under this section is exhausted, whichever is later;

(ii) refrain from purchasing an equity security of the contractor or the parent company of the contractor that is listed on a national securities exchange through September 30, 2022;

(iii) refrain from paying dividends, or making other capital distributions, with respect to common stock (or equivalent interest) of the contractor through September 30, 2022;

(iv) during the 2-year period beginning April 1, 2021, and ending April 1, 2023, refrain from paying—

(I) any officer or employee of the contractor whose total compensation exceeded $425,000 in calendar year 2019 (other than an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to the date of enactment of this Act)—

(aa) total compensation that exceeds, during any 12 consecutive months of such 2-year period, the total compensation received by the officer or employee from the contractor in calendar year 2019; or

(bb) severance pay or other benefits upon termination of employment with the contractor which exceeds twice the maximum total compensation received by the officer or employee from the contractor in calendar year 2019; and

(II) any officer or employee of the contractor whose total compensation exceeded $3,000,000 in calendar year 2019 during any 12 consecutive months of such period total compensation in excess of the sum of—

(aa) $3,000,000; and

(bb) 50 percent of the excess over $3,000,000 of the total compensation received by the officer or employee from the contractor in calendar year 2019.

(6) the term "Secretary" means the Secretary of the Treasury.

(b) PAYROLL SUPPORT GRANTS.—

(1) IN GENERAL.—The Secretary shall make available to eligible air carriers and eligible contractors, financial assistance exclusively for the continuation of payment of employee wages, salaries, and benefits to—

(A) eligible air carriers, in an aggregate amount of $14,000,000,000; and

(B) eligible contractors, in an aggregate amount of $1,000,000,000.

(2) APPORTIONMENTS.—

(A) IN GENERAL.—The Secretary shall apportion funds to eligible air carriers and eligible contractors in accordance with the requirements of this section not later than April 15, 2021.

H. R. 1319—104

(B) ELIGIBLE AIR CARRIERS.—The Secretary shall apportion funds made available under paragraph (1)(A) to each eligible air carrier in the ratio that—

(i) the amount received by the air carrier pursuant to section 403(a) of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260) bears to

(ii) $15,000,000,000.

(C) ELIGIBLE CONTRACTORS.—The Secretary shall apportion, to each eligible contractor, an amount equal to the total amount such contractor received pursuant to section 403(a) of division N of the Consolidated Appropriations Act, 2021 (Public Law 116–260).

(3) IN GENERAL.—

(A) FORMS; TERMS AND CONDITIONS.—The Secretary shall provide financial assistance to an eligible air carrier or eligible contractor under this section in the same form and on the same terms and conditions as determined by pursuant to section 403(b)(1)(A) of subtitle A of title IV of division N of the Consolidated Appropriations Act, 2021 (Pub. L. No. 116–260).

(B) PROCEDURES.—The Secretary shall publish streamlined and expedited procedures not later than 5 days after the date of enactment of this section for eligible air carriers and eligible contractors to submit requests for financial assistance under this section.

(C) DEADLINE FOR IMMEDIATE PAYROLL ASSISTANCE.—Not later than 10 days after the date of enactment of this section, the Secretary shall make initial payments to air carriers and contractors that submit requests for financial assistance approved by the Secretary.

(4) TAXPAYER PROTECTION.—The Secretary shall receive financial instruments issued by recipients of financial assistance under this section in the same form and amount, and under the same terms and conditions, as determined by the Secretary under section 408 of subtitle A of title IV of division N of the Consolidated Appropriations Act, 2021 (Pub. L. No. 116–260).

(5) ADMINISTRATIVE EXPENSES.—Of the amounts made available under paragraph (1)(A), $10,000,000 shall be made available to the Secretary for costs and administrative expenses associated with providing financial assistance under this section.

(c) FUNDING.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $15,000,000,000, to remain available until expended, to carry out this section.

H. R. 1319—105

# Subtitle D—Consumer Protection and Commerce Oversight

### SEC. 7401. FUNDING FOR CONSUMER PRODUCT SAFETY FUND TO PROTECT CONSUMERS FROM POTENTIALLY DANGEROUS PRODUCTS RELATED TO COVID–19.

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Consumer Product Safety Commission for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $50,000,000, to remain available until September 30, 2026, for the purposes described in subsection (b).

(b) PURPOSES.—The funds made available in subsection (a) shall only be used for purposes of the Consumer Product Safety Commission to—

(1) carry out the requirements in title XX of division FF of the Consolidated Appropriations Act, 2021 (Public Law 116–260);

(2) enhance targeting, surveillance, and screening of consumer products, particularly COVID–19 products, entering the United States at ports of entry, including ports of entry for de minimis shipments;

(3) enhance monitoring of internet websites for the offering for sale of new and used violative consumer products, particularly COVID–19 products, and coordination with retail and resale websites to improve identification and elimination of listings of such products;

(4) increase awareness and communication particularly of COVID–19 product related risks and other consumer product safety information; and

(5) improve the Commission's data collection and analysis system especially with a focus on consumer product safety risks resulting from the COVID–19 pandemic to socially disadvantaged individuals and other vulnerable populations.

(c) DEFINITIONS.—In this section—

(1) the term "Commission" means the Consumer Product Safety Commission;

(2) the term "violative consumer products" means consumer products in violation of an applicable consumer product safety standard under the Consumer Product Safety Act (15 U.S.C. 2051 et seq.) or any similar rule, regulation, standard, or ban under any other Act enforced by the Commission;

(3) the term "COVID–19 emergency period" means the period during which a public health emergency declared pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d) with respect to the 2019 novel coronavirus (COVID–19), including under any renewal of such declaration, is in effect; and

(4) the term "COVID–19 products" means consumer products, as defined by section 3(a)(5) of the Consumer Product Safety Act (15 U.S.C. 2052(a)(5)), whose risks have been significantly affected by COVID–19 or whose sales have materially increased during the COVID–19 emergency period as a result of the COVID–19 pandemic.

H. R. 1319—106

### SEC. 7402. FUNDING FOR E-RATE SUPPORT FOR EMERGENCY EDU-CATIONAL CONNECTIONS AND DEVICES.

(a) REGULATIONS REQUIRED.—Not later than 60 days after the date of the enactment of this Act, the Commission shall promulgate regulations providing for the provision, from amounts made available from the Emergency Connectivity Fund, of support under paragraphs (1)(B) and (2) of section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)) to an eligible school or library, for the purchase during a COVID–19 emergency period of eligible equipment or advanced telecommunications and information services (or both), for use by—

(1) in the case of a school, students and staff of the school at locations that include locations other than the school; and

(2) in the case of a library, patrons of the library at locations that include locations other than the library.

(b) SUPPORT AMOUNT.—In providing support under the covered regulations, the Commission shall reimburse 100 percent of the costs associated with the eligible equipment, advanced telecommunications and information services, or eligible equipment and advanced telecommunications and information services, except that any reimbursement of a school or library for the costs associated with any eligible equipment may not exceed an amount that the Commission determines, with respect to the request by the school or library for the reimbursement, is reasonable.

(c) EMERGENCY CONNECTIVITY FUND.—

(1) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "Emergency Connectivity Fund".

(2) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Emergency Connectivity Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

(A) $7,171,000,000, to remain available until September 30, 2030, for—

(i) the provision of support under the covered regulations; and

(ii) the Commission to adopt, and the Commission and the Universal Service Administrative Company to administer, the covered regulations; and

(B) $1,000,000, to remain available until September 30, 2030, for the Inspector General of the Commission to conduct oversight of support provided under the covered regulations.

(3) LIMITATION.—Not more than 2 percent of the amount made available under paragraph (2)(A) may be used for the purposes described in clause (ii) of such paragraph.

(4) RELATIONSHIP TO UNIVERSAL SERVICE CONTRIBUTIONS.—Support provided under the covered regulations shall be provided from amounts made available from the Emergency Connectivity Fund and not from contributions under section 254(d) of the Communications Act of 1934 (47 U.S.C. 254(d)).

(d) DEFINITIONS.—In this section:

(1) ADVANCED TELECOMMUNICATIONS AND INFORMATION SERVICES.—The term "advanced telecommunications and information services" means advanced telecommunications and information services, as such term is used in section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)).

H. R. 1319—107

(2) COMMISSION.—The term "Commission" means the Federal Communications Commission.

(3) CONNECTED DEVICE.—The term "connected device" means a laptop computer, tablet computer, or similar end-user device that is capable of connecting to advanced telecommunications and information services.

(4) COVERED REGULATIONS.—The term "covered regulations" means the regulations promulgated under subsection (a).

(5) COVID–19 EMERGENCY PERIOD.—The term "COVID–19 emergency period" means a period that—

(A) begins on the date of a determination by the Secretary of Health and Human Services pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists as a result of COVID–19; and

(B) ends on the June 30 that first occurs after the date that is 1 year after the date on which such determination (including any renewal thereof) terminates.

(6) ELIGIBLE EQUIPMENT.—The term "eligible equipment" means the following:

(A) Wi-Fi hotspots.

(B) Modems.

(C) Routers.

(D) Devices that combine a modem and router.

(E) Connected devices.

(7) ELIGIBLE SCHOOL OR LIBRARY.—The term "eligible school or library" means an elementary school, secondary school, or library (including a Tribal elementary school, Tribal secondary school, or Tribal library) eligible for support under paragraphs (1)(B) and (2) of section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)).

(8) EMERGENCY CONNECTIVITY FUND.—The term "Emergency Connectivity Fund" means the fund established under subsection (c)(1).

(9) LIBRARY.—The term "library" includes a library consortium.

(10) WI-FI.—The term "Wi-Fi" means a wireless networking protocol based on Institute of Electrical and Electronics Engineers standard 802.11 (or any successor standard).

(11) WI-FI HOTSPOT.—The term "Wi-Fi hotspot" means a device that is capable of—

(A) receiving advanced telecommunications and information services; and

(B) sharing such services with a connected device through the use of Wi-Fi.

## SEC. 7403. FUNDING FOR DEPARTMENT OF COMMERCE INSPECTOR GENERAL.

In addition to amounts otherwise available, there is appropriated to the Office of the Inspector General of the Department of Commerce for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $3,000,000, to remain available until September 30, 2022, for oversight of activities supported with funds appropriated to the Department of Commerce to prevent, prepare for, and respond to COVID–19.

H. R. 1319—108

**SEC. 7404. FEDERAL TRADE COMMISSION FUNDING FOR COVID–19 RELATED WORK.**

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Federal Trade Commission for fiscal year 2021, $30,400,000, to remain available until September 30, 2026, for the purposes described in subsection (b).

(b) PURPOSES.—From the amount appropriated under subsection (a), the Federal Trade Commission shall use—

(1) $4,400,000 to process and monitor consumer complaints received into the Consumer Sentinel Network, including increased complaints received regarding unfair or deceptive acts or practices related to COVID–19;

(2) $2,000,000 for consumer-related education, including in connection with unfair or deceptive acts or practices related to COVID–19; and

(3) $24,000,000 to fund full-time employees of the Federal Trade Commission to address unfair or deceptive acts or practices, including those related to COVID–19.

# Subtitle E—Science and Technology

**SEC. 7501. NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY.**

In addition to amounts otherwise made available, there are appropriated to the National Institute of Standards and Technology for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $150,000,000, to remain available until September 30, 2022, to fund awards for research, development, and testbeds to prevent, prepare for, and respond to coronavirus. None of the funds provided by this section shall be subject to cost share requirements.

**SEC. 7502. NATIONAL SCIENCE FOUNDATION.**

In addition to amounts otherwise made available, there are appropriated to the National Science Foundation for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $600,000,000, to remain available until September 30, 2022, to fund or extend new and existing research grants, cooperative agreements, scholarships, fellowships, and apprenticeships, and related administrative expenses to prevent, prepare for, and respond to coronavirus.

# Subtitle F—Corporation for Public Broadcasting

**SEC. 7601. SUPPORT FOR THE CORPORATION FOR PUBLIC BROADCASTING.**

In addition to amounts otherwise made available, there is appropriated to the Corporation for Public Broadcasting for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $175,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, including for fiscal stabilization grants to public telecommunications entities, as defined in section 397 of the Communications Act of 1934 (47 U.S.C. 397), with no deduction for administrative or other costs of the Corporation, to maintain programming and services and

H. R. 1319—109

preserve small and rural stations threatened by declines in non-Federal revenues.

# TITLE VIII—COMMITTEE ON VETERANS' AFFAIRS

**SEC. 8001. FUNDING FOR CLAIMS AND APPEALS PROCESSING.**

In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $272,000,000, to remain available until September 30, 2023, pursuant to sections 308, 310, 7101 through 7113, 7701, and 7703 of title 38, United States Code.

**SEC. 8002. FUNDING AVAILABILITY FOR MEDICAL CARE AND HEALTH NEEDS.**

In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $14,482,000,000, to remain available until September 30, 2023, for allocation under chapters 17, 20, 73, and 81 of title 38, United States Code, of which not more than $4,000,000,000 shall be available pursuant to section 1703 of title 38, United States Code for health care furnished through the Veterans Community Care program in sections 1703(c)(1) and 1703(c)(5) of such title.

**SEC. 8003. FUNDING FOR SUPPLY CHAIN MODERNIZATION.**

In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2022, for the supply chain modernization initiative under sections 308, 310, and 7301(b) of title 38, United States Code.

**SEC. 8004. FUNDING FOR STATE HOMES.**

In addition to amounts otherwise made available, there are appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

(1) $500,000,000, to remain available until expended, for allocation under sections 8131 through 8137 of title 38, United States Code; and

(2) $250,000,000, to remain available until September 30, 2022, for a one-time only obligation and expenditure to existing State extended care facilities for veterans in proportion to each State's share of the total resident capacity in such facilities as of the date of enactment of this Act where such capacity includes only veterans on whose behalf the Department pays a per diem payment pursuant to section 1741 or 1745 of title 38, United States Code.

**SEC. 8005. FUNDING FOR THE DEPARTMENT OF VETERANS AFFAIRS OFFICE OF INSPECTOR GENERAL.**

In addition to amounts otherwise made available, there is appropriated to the Office of Inspector General of the Department of Veterans Affairs for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000, to remain available until expended, for audits, investigations, and other oversight

H. R. 1319—110

of projects and activities carried out with funds made available to the Department of Veterans Affairs.

**SEC. 8006. COVID–19 VETERAN RAPID RETRAINING ASSISTANCE PROGRAM.**

(a) IN GENERAL.—The Secretary of Veterans Affairs shall carry out a program under which the Secretary shall provide up to 12 months of retraining assistance to an eligible veteran for the pursuit of a covered program of education. Such retraining assistance shall be in addition to any other entitlement to educational assistance or benefits for which a veteran is, or has been, eligible.

(b) ELIGIBLE VETERANS.—

(1) IN GENERAL.—In this section, the term "eligible veteran" means a veteran who—

(A) as of the date of the receipt by the Department of Veterans Affairs of an application for assistance under this section, is at least 22 years of age but not more than 66 years of age;

(B) as of such date, is unemployed by reason of the covered public health emergency, as certified by the veteran;

(C) as of such date, is not eligible to receive educational assistance under chapter 30, 31, 32, 33, or 35 of title 38, United States Code, or chapter 1606 of title 10, United States Code;

(D) is not enrolled in any Federal or State jobs program;

(E) is not in receipt of compensation for a service-connected disability rated totally disabling by reason of unemployability; and

(F) will not be in receipt of unemployment compensation (as defined in section 85(b) of the Internal Revenue Code of 1986), including any cash benefit received pursuant to subtitle A of title II of division A of the CARES Act (Public Law 116–136), as of the first day on which the veteran would receive a housing stipend payment under this section.

(2) TREATMENT OF VETERANS WHO TRANSFER ENTITLEMENT.—For purposes of paragraph (1)(C), a veteran who has transferred all of the veteran's entitlement to educational assistance under section 3319 of title 38, United States Code, shall be considered to be a veteran who is not eligible to receive educational assistance under chapter 33 of such title.

(3) FAILURE TO COMPLETE.—A veteran who receives retraining assistance under this section to pursue a program of education and who fails to complete the program of education shall not be eligible to receive additional assistance under this section.

(c) COVERED PROGRAMS OF EDUCATION.—

(1) IN GENERAL.—For purposes of this section, a covered program of education is a program of education (as such term is defined in section 3452(b) of title 38, United States Code) for training, pursued on a full-time or part-time basis—

(A) that—

(i) is approved under chapter 36 of such title;

(ii) does not lead to a bachelors or graduate degree; and

H. R. 1319—111

(iii) is designed to provide training for a high-demand occupation, as determined under paragraph (3); or

(B) that is a high technology program of education offered by a qualified provider, under the meaning given such terms in section 116 of the Harry W. Colmery Veterans Educational Assistance Act of 2017 (Public Law 115–48; 38 U.S.C. 3001 note).

(2) ACCREDITED PROGRAMS.—In the case of an accredited program of education, the program of education shall not be considered a covered program of education under this section if the program has received a show cause order from the accreditor of the program during the five-year period preceding the date of the enactment of this Act.

(3) DETERMINATION OF HIGH-DEMAND OCCUPATIONS.—In carrying out this section, the Secretary shall use the list of high-demand occupations compiled by the Commissioner of Labor Statistics.

(4) FULL-TIME DEFINED.—For purposes of this subsection, the term "full-time" has the meaning given such term under section 3688 of title 38, United States Code.

(d) AMOUNT OF ASSISTANCE.—

(1) RETRAINING ASSISTANCE.—The Secretary of Veterans Affairs shall provide to an eligible veteran pursuing a covered program of education under the retraining assistance program under this section an amount equal to the amount of educational assistance payable under section 3313(c)(1)(A) of title 38, United States Code, for each month the veteran pursues the covered program of education. Such amount shall be payable directly to the educational institution offering the covered program of education pursued by the veteran as follows:

(A) 50 percent of the total amount payable shall be paid when the eligible veteran begins the program of education.

(B) 25 percent of the total amount payable shall be paid when the eligible veteran completes the program of education.

(C) 25 percent of the total amount payable shall be paid when the eligible veteran finds employment in a field related to the program of education.

(2) FAILURE TO COMPLETE.—

(A) PRO-RATED PAYMENTS.—In the case of a veteran who pursues a covered program of education under the retraining assistance program under this section, but who does not complete the program of education, the Secretary shall pay to the educational institution offering such program of education a pro-rated amount based on the number of months the veteran pursued the program of education in accordance with this paragraph.

(B) PAYMENT OTHERWISE DUE UPON COMPLETION OF PROGRAM.—The Secretary shall pay to the educational institution a pro-rated amount under paragraph (1)(B) when the veteran provides notice to the educational institution that the veteran no longer intends to pursue the program of education.

(C) NONRECOVERY FROM VETERAN.—In the case of a veteran referred to in subparagraph (A), the educational

H. R. 1319—112

institution may not seek payment from the veteran for any amount that would have been payable under paragraph (1)(B) had the veteran completed the program of education.

(D) PAYMENT DUE UPON EMPLOYMENT.—

(i) VETERANS WHO FIND EMPLOYMENT.—In the case of a veteran referred to in subparagraph (A) who finds employment in a field related to the program of education during the 180-day period beginning on the date on which the veteran withdraws from the program of education, the Secretary shall pay to the educational institution a pro-rated amount under paragraph (1)(C) when the veteran finds such employment.

(ii) VETERANS WHO DO NOT FIND EMPLOYMENT.— In the case of a veteran referred to in subparagraph (A) who does not find employment in a field related to the program of education during the 180-day period beginning on the date on which the veteran withdraws from the program of education—

(I) the Secretary shall not make a payment to the educational institution under paragraph (1)(C); and

(II) the educational institution may not seek payment from the veteran for any amount that would have been payable under paragraph (1)(C) had the veteran found employment during such 180-day period.

(3) HOUSING STIPEND.—For each month that an eligible veteran pursues a covered program of education under the retraining assistance program under this section, the Secretary shall pay to the veteran a monthly housing stipend in an amount equal to—

(A) in the case of a covered program of education leading to a degree, or a covered program of education not leading to a degree, at an institution of higher learning (as that term is defined in section 3452(f) of title 38, United States Code) pursued on more than a half-time basis, the amount specified under subsection (c)(1)(B) of section 3313 of title 38, United States Code;

(B) in the case of a covered program of education other than a program of education leading to a degree at an institution other than an institution of higher learning pursued on more than a half-time basis, the amount specified under subsection (g)(3)(A)(ii) of such section; or

(C) in the case of a covered program of education pursued on less than a half-time basis, or a covered program of education pursued solely through distance learning on more than a half-time basis, the amount specified under subsection (c)(1)(B)(iii) of such section.

(4) FAILURE TO FIND EMPLOYMENT.—The Secretary shall not make a payment under paragraph (1)(C) with respect to an eligible veteran who completes or fails to complete a program of education under the retraining assistance program under this section if the veteran fails to find employment in a field related to the program of education within the 180-period beginning on the date on which the veteran withdraws from or completes the program.

H. R. 1319—113

(e) NO TRANSFERABILITY.—Retraining assistance provided under this section may not be transferred to another individual.

(f) LIMITATION.—Not more than 17,250 eligible veterans may receive retraining assistance under this section.

(g) TERMINATION.—No retraining assistance may be paid under this section after the date that is 21 months after the date of the enactment of this Act.

(h) FUNDING.—In addition to amounts otherwise available there is appropriated to the Department of Veterans Affairs for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $386,000,000, to remain available until expended, to carry out this section.

**SEC. 8007. PROHIBITION ON COPAYMENTS AND COST SHARING FOR VETERANS DURING EMERGENCY RELATING TO COVID–19.**

(a) IN GENERAL.—The Secretary of Veterans Affairs—

(1) shall provide for any copayment or other cost sharing with respect to health care under the laws administered by the Secretary received by a veteran during the period specified in subsection (b); and

(2) shall reimburse any veteran who paid a copayment or other cost sharing for health care under the laws administered by the Secretary received by a veteran during such period the amount paid by the veteran.

(b) PERIOD SPECIFIED.—The period specified in this subsection is the period beginning on April 6, 2020, and ending on September 30, 2021.

(c) FUNDING.—In addition to amounts otherwise available, there is appropriated to the Secretary of Veterans Affairs for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $1,000,000,000, to remain available until expended, to carry out this section, except for health care furnished pursuant to section 1703(c)(2)–(c)(4) of title 38, United States Code.

**SEC. 8008. EMERGENCY DEPARTMENT OF VETERANS AFFAIRS EMPLOYEE LEAVE FUND.**

(a) ESTABLISHMENT; APPROPRIATION.—There is established in the Treasury the Emergency Department of Veterans Affairs Employee Leave Fund (in this section referred to as the "Fund"), to be administered by the Secretary of Veterans Affairs, for the purposes set forth in subsection (b). In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $80,000,000, which shall be deposited into the Fund and remain available through September 20, 2022.

(b) PURPOSE.—Amounts in the Fund shall be available for payment to the Department of Veterans Affairs for the use of paid leave by any covered employee who is unable to work because the employee—

(1) is subject to a Federal, State, or local quarantine or isolation order related to COVID–19;

(2) has been advised by a health care provider to self-quarantine due to concerns related to COVID–19;

(3) is caring for an individual who is subject to such an order or has been so advised;

(4) is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

H. R. 1319—114

(5) is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, if the school of such son or daughter requires or makes optional a virtual learning instruction model or requires or makes optional a hybrid of in-person and virtual learning instruction models, or the child care provider of such son or daughter is unavailable, due to COVID–19 precautions;

(6) is experiencing any other substantially similar condition;

(7) is caring for a family member with a mental or physical disability or who is 55 years of age or older and incapable of self-care, without regard to whether another individual other than the employee is available to care for such family member, if the place of care for such family member is closed or the direct care provider is unavailable due to COVID–19; or

(8) is obtaining immunization related to COVID–19 or to recover from any injury, disability, illness, or condition related to such immunization.

(c) LIMITATIONS.—

(1) PERIOD OF AVAILABILITY.—Paid leave under this section may only be provided to and used by a covered employee during the period beginning on the date of enactment of this Act and ending on September 30, 2021.

(2) TOTAL HOURS; AMOUNT.—Paid leave under this section—

(A) shall be provided to a covered employee in an amount not to exceed 600 hours of paid leave for each full-time employee, and in the case of a part-time employee, employee on an uncommon tour of duty, or employee with a seasonal work schedule, in an amount not to exceed the proportional equivalent of 600 hours to the extent amounts in the Fund remain available for reimbursement;

(B) shall be paid at the same hourly rate as other leave payments; and

(C) may not be provided to a covered employee if the leave would result in payments greater than $2,800 in aggregate for any biweekly pay period for a full-time employee, or a proportionally equivalent biweekly limit for a part-time employee.

(3) RELATIONSHIP TO OTHER LEAVE.—Paid leave under this section—

(A) is in addition to any other leave provided to a covered employee; and

(B) may not be used by a covered employee concurrently with any other paid leave.

(4) CALCULATION OF RETIREMENT BENEFIT.—Any paid leave provided to a covered employee under this section shall reduce the total service used to calculate any Federal civilian retirement benefit.

(d) COVERED EMPLOYEE DEFINED.—In this section, the term "covered employee" means an employee of the Department of Veterans Affairs appointed under chapter 74 of title 38, United States Code.

# TITLE IX—COMMITTEE ON FINANCE

## Subtitle A—Crisis Support for Unemployed Workers

### PART 1—EXTENSION OF CARES ACT UNEMPLOYMENT PROVISIONS

**SEC. 9011. EXTENSION OF PANDEMIC UNEMPLOYMENT ASSISTANCE.**

(a) IN GENERAL.—Section 2102(c) of the CARES Act (15 U.S.C. 9021(c)) is amended—

(1) in paragraph (1)—

(A) by striking "paragraphs (2) and (3)" and inserting "paragraph (2)"; and

(B) in subparagraph (A)(ii), by striking "March 14, 2021" and inserting "September 6, 2021"; and

(2) by striking paragraph (3) and redesignating paragraph (4) as paragraph (3).

(b) INCREASE IN NUMBER OF WEEKS.—Section 2102(c)(2) of such Act (15 U.S.C. 9021(c)(2)) is amended—

(1) by striking "50 weeks" and inserting "79 weeks"; and

(2) by striking "50-week period" and inserting "79-week period".

(c) HOLD HARMLESS FOR PROPER ADMINISTRATION.—In the case of an individual who is eligible to receive pandemic unemployment assistance under section 2102 of the CARES Act (15 U.S.C. 9021) as of the day before the date of enactment of this Act and on the date of enactment of this Act becomes eligible for pandemic emergency unemployment compensation under section 2107 of the CARES Act (15 U.S.C. 9025) by reason of the amendments made by section 9016(b) of this title, any payment of pandemic unemployment assistance under such section 2102 made after the date of enactment of this Act to such individual during an appropriate period of time, as determined by the Secretary of Labor, that should have been made under such section 2107 shall not be considered to be an overpayment of assistance under such section 2102, except that an individual may not receive payment for assistance under section 2102 and a payment for assistance under section 2107 for the same week of unemployment.

(d) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply as if included in the enactment of the CARES Act (Public Law 116–136), except that no amount shall be payable by virtue of such amendments with respect to any week of unemployment ending on or before March 14, 2021.

**SEC. 9012. EXTENSION OF EMERGENCY UNEMPLOYMENT RELIEF FOR GOVERNMENTAL ENTITIES AND NONPROFIT ORGANIZATIONS.**

(a) IN GENERAL.—Section 903(i)(1)(D) of the Social Security Act (42 U.S.C. 1103(i)(1)(D)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

(b) INCREASE IN REIMBURSEMENT RATE.—Section 903(i)(1)(B) of such Act (42 U.S.C. 1103(i)(1)(B)) is amended—

H. R. 1319—116

(1) in the first sentence, by inserting "and except as otherwise provided in this subparagraph" after "as determined by the Secretary of Labor"; and

(2) by inserting after the first sentence the following: "With respect to the amounts of such compensation paid for weeks of unemployment beginning after March 31, 2021, and ending on or before September 6, 2021, the preceding sentence shall be applied by substituting '75 percent' for 'one-half'.".

**SEC. 9013. EXTENSION OF FEDERAL PANDEMIC UNEMPLOYMENT COMPENSATION.**

(a) In General.—Section 2104(e)(2) of the CARES Act (15 U.S.C. 9023(e)(2)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

(b) Amount.—Section 2104(b)(3)(A)(ii) of such Act (15 U.S.C. 9023(b)(3)(A)(ii)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

**SEC. 9014. EXTENSION OF FULL FEDERAL FUNDING OF THE FIRST WEEK OF COMPENSABLE REGULAR UNEMPLOYMENT FOR STATES WITH NO WAITING WEEK.**

(a) In General.—Section 2105(e)(2) of the CARES Act (15 U.S.C. 9024(e)(2)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

(b) Full Reimbursement.—Paragraph (3) of section 2105(c) of such Act (15 U.S.C. 9024(c)) is repealed and such section shall be applied to weeks of unemployment to which an agreement under section 2105 of such Act applies as if such paragraph had not been enacted. In implementing the preceding sentence, a State may, if necessary, reenter the agreement with the Secretary under section 2105 of such Act, and retroactively pay for the first week of regular compensation without a waiting week consistent with State law (including a waiver of State law) and receive full reimbursement for weeks of unemployment that ended after December 31, 2020.

**SEC. 9015. EXTENSION OF EMERGENCY STATE STAFFING FLEXIBILITY.**

If a State modifies its unemployment compensation law and policies, subject to the succeeding sentence, with respect to personnel standards on a merit basis on an emergency temporary basis as needed to respond to the spread of COVID–19, such modifications shall be disregarded for the purposes of applying section 303 of the Social Security Act and section 3304 of the Internal Revenue Code of 1986 to such State law. Such modifications shall only apply through September 6, 2021, and shall be limited to engaging of temporary staff, rehiring of retirees or former employees on a non-competitive basis, and other temporary actions to quickly process applications and claims.

**SEC. 9016. EXTENSION OF PANDEMIC EMERGENCY UNEMPLOYMENT COMPENSATION.**

(a) In General.—Section 2107(g) of the CARES Act (15 U.S.C. 9025(g)) is amended to read as follows:

"(g) Applicability.—An agreement entered into under this section shall apply to weeks of unemployment—

"(1) beginning after the date on which such agreement is entered into; and

"(2) ending on or before September 6, 2021.".

(b) INCREASE IN NUMBER OF WEEKS.—Section 2107(b)(2) of such Act (15 U.S.C. 9025(b)(2)) is amended by striking "24" and inserting "53".

(c) COORDINATION OF PANDEMIC EMERGENCY UNEMPLOYMENT COMPENSATION WITH EXTENDED COMPENSATION.—Section 2107(a)(5)(B) of such Act (15 U.S.C. 9025(a)(5)(B)) is amended by inserting "or for the week that includes the date of enactment of the American Rescue Plan Act of 2021 (without regard to the amendments made by subsections (a) and (b) of section 9016 of such Act)" after "2020)".

(d) SPECIAL RULE FOR EXTENDED COMPENSATION.—Section 2107(a)(8) of such Act (15 U.S.C. 9025(a)(8)) is amended by striking "April 12, 2021" and inserting "September 6, 2021".

(e) EFFECTIVE DATE.—The amendments made by this section shall apply as if included in the enactment of the CARES Act (Public Law 116–136), except that no amount shall be payable by virtue of such amendments with respect to any week of unemployment ending on or before March 14, 2021.

### SEC. 9017. EXTENSION OF TEMPORARY FINANCING OF SHORT-TIME COMPENSATION PAYMENTS IN STATES WITH PROGRAMS IN LAW.

Section 2108(b)(2) of the CARES Act (15 U.S.C. 9026(b)(2)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

### SEC. 9018. EXTENSION OF TEMPORARY FINANCING OF SHORT-TIME COMPENSATION AGREEMENTS FOR STATES WITHOUT PROGRAMS IN LAW.

Section 2109(d)(2) of the CARES Act (15 U.S.C. 9027(d)(2)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

# PART 2—EXTENSION OF FFCRA UNEMPLOYMENT PROVISIONS

### SEC. 9021. EXTENSION OF TEMPORARY ASSISTANCE FOR STATES WITH ADVANCES.

Section 1202(b)(10)(A) of the Social Security Act (42 U.S.C. 1322(b)(10)(A)) is amended by striking "March 14, 2021" and inserting "September 6, 2021".

### SEC. 9022. EXTENSION OF FULL FEDERAL FUNDING OF EXTENDED UNEMPLOYMENT COMPENSATION.

(a) IN GENERAL.—Section 4105 of the Families First Coronavirus Response Act (26 U.S.C. 3304 note) is amended by striking "March 14, 2021" each place it appears and inserting "September 6, 2021".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply as if included in the enactment of the Families First Coronavirus Response Act (Public Law 116–127).

H. R. 1319—118

## PART 3—DEPARTMENT OF LABOR FUNDING FOR TIMELY, ACCURATE, AND EQUITABLE PAYMENT

**SEC. 9031. FUNDING FOR ADMINISTRATION.**

In addition to amounts otherwise available, there is appropriated to the Employment and Training Administration of the Department of Labor for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $8,000,000, to remain available until expended, for necessary expenses to carry out Federal activities relating to the administration of unemployment compensation programs.

**SEC. 9032. FUNDING FOR FRAUD PREVENTION, EQUITABLE ACCESS, AND TIMELY PAYMENT TO ELIGIBLE WORKERS.**

Subtitle A of title II of division A of the CARES Act (Public Law 116–136) is amended by adding at the end the following:

**"SEC. 2118. FUNDING FOR FRAUD PREVENTION, EQUITABLE ACCESS, AND TIMELY PAYMENT TO ELIGIBLE WORKERS.**

"(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Secretary of Labor for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $2,000,000,000, to remain available until expended, to detect and prevent fraud, promote equitable access, and ensure the timely payment of benefits with respect to unemployment compensation programs, including programs extended under subtitle A of title IX of the American Rescue Plan Act of 2021.

"(b) USE OF FUNDS.—Amounts made available under subsection (a) may be used—

"(1) for Federal administrative costs related to the purposes described in subsection (a);

"(2) for systemwide infrastructure investment and development related to such purposes; and

"(3) to make grants to States or territories administering unemployment compensation programs described in subsection (a) (including territories administering the Pandemic Unemployment Assistance program under section 2102) for such purposes, including the establishment of procedures or the building of infrastructure to verify or validate identity, implement Federal guidance regarding fraud detection and prevention, and accelerate claims processing or process claims backlogs due to the pandemic.

"(c) RESTRICTIONS ON GRANTS TO STATES AND TERRITORIES.— As a condition of receiving a grant under subsection (b)(3), the Secretary may require that a State or territory receiving such a grant shall—

"(1) use such program integrity tools as the Secretary may specify; and

"(2) as directed by the Secretary, conduct user accessibility testing on any new system developed by the Secretary pursuant to subsection (b)(2).".

H. R. 1319—119

## PART 4—OTHER PROVISIONS

### SEC. 9041. EXTENSION OF LIMITATION ON EXCESS BUSINESS LOSSES OF NONCORPORATE TAXPAYERS.

(a) IN GENERAL.—Section 461(l)(1) of the Internal Revenue Code of 1986 is amended by striking "January 1, 2026" each place it appears and inserting "January 1, 2027".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2025.

### SEC. 9042. SUSPENSION OF TAX ON PORTION OF UNEMPLOYMENT COMPENSATION.

(a) IN GENERAL.—Section 85 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(c) SPECIAL RULE FOR 2020.—

"(1) IN GENERAL.—In the case of any taxable year beginning in 2020, if the adjusted gross income of the taxpayer for such taxable year is less than $150,000, the gross income of such taxpayer shall not include so much of the unemployment compensation received by such taxpayer (or, in the case of a joint return, received by each spouse) as does not exceed $10,200.

"(2) APPLICATION.—For purposes of paragraph (1), the adjusted gross income of the taxpayer shall be determined—

"(A) after application of sections 86, 135, 137, 219, 221, 222, and 469, and

"(B) without regard to this section.".

(b) CONFORMING AMENDMENTS.—

(1) Section 74(d)(2)(B) of the Internal Revenue Code of 1986 is amended by inserting "85(c)," before "86".

(2) Section 86(b)(2)(A) of such Code is amended by inserting "85(c)," before "135".

(3) Section 135(c)(4)(A) of such Code is amended by inserting "85(c)," before "137".

(4) Section 137(b)(3)(A) of such Code is amended by inserting "85(c)" before "221".

(5) Section 219(g)(3)(A)(ii) of such Code is amended by inserting "85(c)," before "135".

(6) Section 221(b)(2)(C)(i) of such Code is amended by inserting "85(c)" before "911".

(7) Section 222(b)(2)(C)(i) of such Code, as in effect before date of enactment of the Taxpayer Certainty and Disaster Tax Relief Act of 2020, is amended by inserting "85(c)" before "911".

(8) Section 469(i)(3)(E)(ii) of such Code is amended by striking "135 and 137" and inserting "85(c), 135, and 137".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2019.

# Subtitle B—Emergency Assistance to Families Through Home Visiting Programs

**SEC. 9101. EMERGENCY ASSISTANCE TO FAMILIES THROUGH HOME VISITING PROGRAMS.**

Effective 1 day after the date of enactment of this Act, title V of the Social Security Act (42 U.S.C. 701–713) is amended by inserting after section 511 the following:

**"SEC. 511A. EMERGENCY ASSISTANCE TO FAMILIES THROUGH HOME VISITING PROGRAMS.**

"(a) SUPPLEMENTAL APPROPRIATION.—In addition to amounts otherwise appropriated, out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated to the Secretary $150,000,000, to remain available through September 30, 2022, to enable eligible entities to conduct programs in accordance with section 511 and subsection (c) of this section.

"(b) ELIGIBILITY FOR FUNDS.—To be eligible to receive funds made available by subsection (a) of this section, an entity shall—

"(1) as of the date of the enactment of this section, be conducting a program under section 511;

"(2) ensure the modification of grants, contracts, and other agreements, as applicable, executed under section 511 under which the program is conducted as are necessary to provide that, during the period that begins with the date of the enactment of this section and ends with the end of the 2nd succeeding fiscal year after the funds are awarded, the entity shall—

"(A) not reduce funding for, or staffing levels of, the program on account of reduced enrollment in the program; and

"(B) when using funds to provide emergency supplies to eligible families receiving grant services under section 511, ensure coordination with local diaper banks to the extent practicable; and

"(3) reaffirm that, in conducting the program, the entity will focus on priority populations (as defined in section 511(d)(4)).

"(c) USES OF FUNDS.—An entity to which funds are provided under this section shall use the funds—

"(1) to serve families with home visits or with virtual visits, that may be conducted by the use of electronic information and telecommunications technologies, in a service delivery model described in section 511(d)(3)(A);

"(2) to pay hazard pay or other additional staff costs associated with providing home visits or administration for programs funded under section 511;

"(3) to train home visitors employed by the entity in conducting a virtual home visit and in emergency preparedness and response planning for families served, and may include training on how to safely conduct intimate partner violence screenings, and training on safety and planning for families served to support the family outcome improvements listed in section 511(d)(2)(B);

"(4) for the acquisition by families served by programs under section 511 of such technological means as are needed to conduct and support a virtual home visit;

H. R. 1319—121

"(5) to provide emergency supplies (such as diapers and diapering supplies including diaper wipes and diaper cream, necessary to ensure that a child using a diaper is properly cleaned and protected from diaper rash, formula, food, water, hand soap and hand sanitizer) to an eligible family (as defined in section 511(k)(2));

"(6) to coordinate with and provide reimbursement for supplies to diaper banks when using such entities to provide emergency supplies specified in paragraph (5); or

"(7) to provide prepaid grocery cards to an eligible family (as defined in section 511(k)(2)) participating in the maternal, infant, and early childhood home visiting program under section 511 for the purpose of enabling the family to meet the emergency needs of the family.".

# Subtitle C—Emergency Assistance to Children and Families

SEC. 9201. PANDEMIC EMERGENCY ASSISTANCE.

Section 403 of the Social Security Act (42 U.S.C. 603) is amended by adding at the end the following:

"(c) PANDEMIC EMERGENCY ASSISTANCE.—

"(1) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury of the United States not otherwise appropriated, $1,000,000,000, to remain available until expended, to carry out this subsection.

"(2) RESERVATION OF FUNDS FOR TECHNICAL ASSISTANCE.—Of the amount specified in paragraph (1), the Secretary shall reserve $2,000,000 for administrative expenses and the provision of technical assistance to States and Indian tribes with respect to the use of funds provided under this subsection.

"(3) ALLOTMENTS.—

"(A) 50 STATES AND THE DISTRICT OF COLUMBIA.—

"(i) TOTAL AMOUNT TO BE ALLOTTED.—The Secretary shall allot a total of 92.5 percent of the amount specified in paragraph (1) that is not reserved under paragraph (2) among the States that are not a territory and that are operating a program funded under this part, in accordance with clause (ii) of this subparagraph.

"(ii) ALLOTMENT FORMULA.—The Secretary shall allot to each such State the sum of the following percentages of the total amount described in clause (i):

"(I) 50 percent, multiplied by—

"(aa) the population of children in the State, determined on the basis of the most recent population estimates as determined by the Bureau of the Census; divided by

"(bb) the total population of children in the States that are not territories, as so determined; plus

"(II) 50 percent, multiplied by—

"(aa) the total amount expended by the State for basic assistance, non-recurrent short

H. R. 1319—122

term benefits, and emergency assistance in fiscal year 2019, as reported by the State under section 411; divided by

"(bb) the total amount expended by the States that are not territories for basic assistance, non-recurrent short term benefits, and emergency assistance in fiscal year 2019, as so reported by the States.

"(B) TERRITORIES AND INDIAN TRIBES.—The Secretary shall allot among the territories and Indian tribes otherwise eligible for a grant under this part such portions of 7.5 percent of the amount specified in paragraph (1) that are not reserved under paragraph (2) as the Secretary deems appropriate based on the needs of the territory or Indian tribe involved.

"(C) EXPENDITURE COMMITMENT REQUIREMENT.—To receive the full amount of funding payable under this subsection, a State or Indian tribe shall inform the Secretary as to whether it intends to use all of its allotment under this paragraph and provide that information—

"(i) in the case of a State that is not a territory, within 45 days after the date of the enactment of this subsection; or

"(ii) in the case of a territory or an Indian tribe, within 90 days after such date of enactment.

"(4) GRANTS.—

"(A) IN GENERAL.—The Secretary shall provide funds to each State and Indian tribe to which an amount is allotted under paragraph (3), from the amount so allotted.

"(B) TREATMENT OF UNUSED FUNDS.—

"(i) REALLOTMENT.—The Secretary shall reallot in accordance with paragraph (3) all funds provided to any State or Indian tribe under this subsection that are unused, among the other States and Indian tribes eligible for funds under this subsection. For purposes of paragraph (3), the Secretary shall treat the funds as if included in the amount specified in paragraph (1).

"(ii) PROVISION.—The Secretary shall provide funds to each such other State or Indian tribe in an amount equal to the amount so reallotted.

"(5) RECIPIENT OF FUNDS PROVIDED FOR TERRITORIES.—In the case of a territory not operating a program funded under this part, the Secretary shall provide the funds required to be provided to the territory under this subsection, to the agency that administers the bulk of local human services programs in the territory.

"(6) USE OF FUNDS.—

"(A) IN GENERAL.—A State or Indian tribe to which funds are provided under this subsection may use the funds only for non-recurrent short term benefits, whether in the form of cash or in other forms.

"(B) LIMITATION ON USE FOR ADMINISTRATIVE EXPENSES.—A State to which funds are provided under this subsection shall not expend more than 15 percent of the funds for administrative purposes.

"(C) NONSUPPLANTATION.—Funds provided under this subsection shall be used to supplement and not supplant other Federal, State, or tribal funds for services and activities that promote the purposes of this part.

"(D) EXPENDITURE DEADLINE.—

"(i) IN GENERAL.—Except as provided in clause (ii), a State or Indian tribe to which funds are provided under this subsection shall expend the funds not later than the end of fiscal year 2022.

"(ii) EXCEPTION FOR REALLOTTED FUNDS.—A State or Indian tribe to which funds are provided under paragraph (4)(B) shall expend the funds within 12 months after receipt.

"(7) SUSPENSION OF TERRITORY SPENDING CAP.—Section 1108 shall not apply with respect to any funds provided under this subsection.

"(8) DEFINITIONS.—In this subsection:

"(A) APPLICABLE PERIOD.—The term 'applicable period' means the period that begins with April 1, 2021, and ends with September 30, 2022.

"(B) NON-RECURRENT SHORT TERM BENEFITS.—The term 'non-recurrent short term benefits' has the meaning given the term in OMB approved Form ACF–196R, published on July 31, 2014.

"(C) STATE.—The term 'State' means the 50 States of the United States, the District of Columbia, and the territories.

"(D) TERRITORY.—The term 'territory' means the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.".

# Subtitle D—Elder Justice and Support Guarantee

### SEC. 9301. ADDITIONAL FUNDING FOR AGING AND DISABILITY SERVICES PROGRAMS.

Subtitle A of title XX of the Social Security Act (42 U.S.C. 1397–1397h) is amended by adding at the end the following:

### "SEC. 2010. ADDITIONAL FUNDING FOR AGING AND DISABILITY SERVICES PROGRAMS.

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $276,000,000, to remain available until expended, to carry out the programs described in subtitle B.

"(b) USE OF FUNDS.—Of the amounts made available by subsection (a)—

"(1) $88,000,000 shall be made available to carry out the programs described in subtitle B in fiscal year 2021, of which not less than an amount equal to $100,0000,000 minus the amount previously provided in fiscal year 2021 to carry out section 2042(b) shall be made available to carry out such section; and

"(2) $188,000,000 shall be made available to carry out the programs described in subtitle B in fiscal year 2022, of which not less than $100,000,000 shall be for activities described in section 2042(b).".

# Subtitle E—Support to Skilled Nursing Facilities in Response to COVID–19

### SEC. 9401. PROVIDING FOR INFECTION CONTROL SUPPORT TO SKILLED NURSING FACILITIES THROUGH CONTRACTS WITH QUALITY IMPROVEMENT ORGANIZATIONS.

Section 1862(g) of the Social Security Act (42 U.S.C. 1395y(g)) is amended—

(1) by striking "The Secretary" and inserting "(1) The Secretary"; and

(2) by adding at the end the following new paragraph:

"(2) In addition to any funds otherwise available, there are appropriated to the Secretary, out of any monies in the Treasury not otherwise obligated, $200,000,000, to remain available until expended, for purposes of requiring multiple organizations described in paragraph (1) to provide to skilled nursing facilities (as defined in section 1819(a)), infection control and vaccination uptake support relating to the prevention or mitigation of COVID–19, as determined appropriate by the Secretary.".

### SEC. 9402. FUNDING FOR STRIKE TEAMS FOR RESIDENT AND EMPLOYEE SAFETY IN SKILLED NURSING FACILITIES.

Section 1819 of the Social Security Act (42 U.S.C. 1395i–3) is amended by adding at the end the following new subsection:

"(k) FUNDING FOR STRIKE TEAMS.—In addition to amounts otherwise available, there is appropriated to the Secretary, out of any monies in the Treasury not otherwise appropriated, $250,000,000, to remain available until expended, for purposes of allocating such amount among the States (including the District of Columbia and each territory of the United States) for such a State to establish and implement a strike team that will be deployed to a skilled nursing facility in the State with diagnosed or suspected cases of COVID–19 among residents or staff for the purposes of assisting with clinical care, infection control, or staffing during the emergency period described in section 1135(g)(1)(B) and the 1-year period immediately following the end of such emergency period.".

# Subtitle F—Preserving Health Benefits for Workers

### SEC. 9501. PRESERVING HEALTH BENEFITS FOR WORKERS.

(a) PREMIUM ASSISTANCE FOR COBRA CONTINUATION COVERAGE FOR INDIVIDUALS AND THEIR FAMILIES.—

(1) PROVISION OF PREMIUM ASSISTANCE.—

(A) REDUCTION OF PREMIUMS PAYABLE.—In the case of any premium for a period of coverage during the period beginning on the first day of the first month beginning after the date of the enactment of this Act, and ending

H. R. 1319—125

on September 30, 2021, for COBRA continuation coverage with respect to any assistance eligible individual described in paragraph (3), such individual shall be treated for purposes of any COBRA continuation provision as having paid in full the amount of such premium.

(B) PLAN ENROLLMENT OPTION.—

(i) IN GENERAL.—Solely for purposes of this subsection, the COBRA continuation provisions shall be applied such that any assistance eligible individual who is enrolled in a group health plan offered by a plan sponsor may, not later than 90 days after the date of notice of the plan enrollment option described in this subparagraph, elect to enroll in coverage under a plan offered by such plan sponsor that is different than coverage under the plan in which such individual was enrolled at the time, in the case of any assistance eligible individual described in paragraph (3), the qualifying event specified in section 603(2) of the Employee Retirement Income Security Act of 1974, section 4980B(f)(3)(B) of the Internal Revenue Code of 1986, or section 2203(2) of the Public Health Service Act, except for the voluntary termination of such individual's employment by such individual, occurred, and such coverage shall be treated as COBRA continuation coverage for purposes of the applicable COBRA continuation coverage provision.

(ii) REQUIREMENTS.—Any assistance eligible individual may elect to enroll in different coverage as described in clause (i) only if—

(I) the employer involved has made a determination that such employer will permit such assistance eligible individual to enroll in different coverage as provided under this subparagraph;

(II) the premium for such different coverage does not exceed the premium for coverage in which such individual was enrolled at the time such qualifying event occurred;

(III) the different coverage in which the individual elects to enroll is coverage that is also offered to similarly situated active employees of the employer at the time at which such election is made; and

(IV) the different coverage in which the individual elects to enroll is not—

(aa) coverage that provides only excepted benefits as defined in section 9832(c) of the Internal Revenue Code of 1986, section 733(c) of the Employee Retirement Income Security Act of 1974, and section 2791(c) of the Public Health Service Act;

(bb) a qualified small employer health reimbursement arrangement (as defined in section 9831(d)(2) of the Internal Revenue Code of 1986); or

(cc) a flexible spending arrangement (as defined in section 106(c)(2) of the Internal Revenue Code of 1986).

H. R. 1319—126

(2) LIMITATION OF PERIOD OF PREMIUM ASSISTANCE.—

(A) ELIGIBILITY FOR ADDITIONAL COVERAGE.—Paragraph (1)(A) shall not apply with respect to any assistance eligible individual described in paragraph (3) for months of coverage beginning on or after the earlier of—

(i) the first date that such individual is eligible for coverage under any other group health plan (other than coverage consisting of only excepted benefits (as defined in section 9832(c) of the Internal Revenue Code of 1986, section 733(c) of the Employee Retirement Income Security Act of 1974, and section 2791(c) of the Public Health Service Act), coverage under a flexible spending arrangement (as defined in section 106(c)(2) of the Internal Revenue Code of 1986), coverage under a qualified small employer health reimbursement arrangement (as defined in section 9831(d)(2) of the Internal Revenue Code of 1986)), or eligible for benefits under the Medicare program under title XVIII of the Social Security Act; or

(ii) the earlier of—

(I) the date following the expiration of the maximum period of continuation coverage required under the applicable COBRA continuation coverage provision; or

(II) the date following the expiration of the period of continuation coverage allowed under paragraph (4)(B)(ii).

(B) NOTIFICATION REQUIREMENT.—Any assistance eligible individual shall notify the group health plan with respect to which paragraph (1)(A) applies if such paragraph ceases to apply by reason of clause (i) of subparagraph (A) (as applicable). Such notice shall be provided to the group health plan in such time and manner as may be specified by the Secretary of Labor.

(3) ASSISTANCE ELIGIBLE INDIVIDUAL.—For purposes of this section, the term "assistance eligible individual" means, with respect to a period of coverage during the period beginning on the first day of the first month beginning after the date of the enactment of this Act, and ending on September 30, 2021, any individual that is a qualified beneficiary who—

(A) is eligible for COBRA continuation coverage by reason of a qualifying event specified in section 603(2) of the Employee Retirement Income Security Act of 1974, section 4980B(f)(3)(B) of the Internal Revenue Code of 1986, or section 2203(2) of the Public Health Service Act, except for the voluntary termination of such individual's employment by such individual; and

(B) elects such coverage.

(4) EXTENSION OF ELECTION PERIOD AND EFFECT ON COVERAGE.—

(A) IN GENERAL.—For purposes of applying section 605(a) of the Employee Retirement Income Security Act of 1974, section 4980B(f)(5)(A) of the Internal Revenue Code of 1986, and section 2205(a) of the Public Health Service Act, in the case of—

(i) an individual who does not have an election of COBRA continuation coverage in effect on the first

H. R. 1319—127

day of the first month beginning after the date of the enactment of this Act but who would be an assistance eligible individual described in paragraph (3) if such election were so in effect; or

(ii) an individual who elected COBRA continuation coverage and discontinued from such coverage before the first day of the first month beginning after the date of the enactment of this Act,

such individual may elect the COBRA continuation coverage under the COBRA continuation coverage provisions containing such provisions during the period beginning on the first day of the first month beginning after the date of the enactment of this Act and ending 60 days after the date on which the notification required under paragraph (5)(C) is provided to such individual.

(B) COMMENCEMENT OF COBRA CONTINUATION COVERAGE.—Any COBRA continuation coverage elected by a qualified beneficiary during an extended election period under subparagraph (A)—

(i) shall commence (including for purposes of applying the treatment of premium payments under paragraph (1)(A) and any cost-sharing requirements for items and services under a group health plan) with the first period of coverage beginning on or after the first day of the first month beginning after the date of the enactment of this Act, and

(ii) shall not extend beyond the period of COBRA continuation coverage that would have been required under the applicable COBRA continuation coverage provision if the coverage had been elected as required under such provision or had not been discontinued.

(5) NOTICES TO INDIVIDUALS.—

(A) GENERAL NOTICE.—

(i) IN GENERAL.—In the case of notices provided under section 606(a)(4) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1166(4)), section 4980B(f)(6)(D) of the Internal Revenue Code of 1986, or section 2206(4) of the Public Health Service Act (42 U.S.C. 300bb–6(4)), with respect to individuals who, during the period described in paragraph (3), become entitled to elect COBRA continuation coverage, the requirements of such provisions shall not be treated as met unless such notices include an additional written notification to the recipient in clear and understandable language of—

(I) the availability of premium assistance with respect to such coverage under this subsection; and

(II) the option to enroll in different coverage if the employer permits assistance eligible individuals described in paragraph (3) to elect enrollment in different coverage (as described in paragraph (1)(B)).

(ii) ALTERNATIVE NOTICE.—In the case of COBRA continuation coverage to which the notice provision under such sections does not apply, the Secretary of Labor, in consultation with the Secretary of the

H. R. 1319—128

Treasury and the Secretary of Health and Human Services, shall, in consultation with administrators of the group health plans (or other entities) that provide or administer the COBRA continuation coverage involved, provide rules requiring the provision of such notice.

(iii) FORM.—The requirement of the additional notification under this subparagraph may be met by amendment of existing notice forms or by inclusion of a separate document with the notice otherwise required.

(B) SPECIFIC REQUIREMENTS.—Each additional notification under subparagraph (A) shall include—

(i) the forms necessary for establishing eligibility for premium assistance under this subsection;

(ii) the name, address, and telephone number necessary to contact the plan administrator and any other person maintaining relevant information in connection with such premium assistance;

(iii) a description of the extended election period provided for in paragraph (4)(A);

(iv) a description of the obligation of the qualified beneficiary under paragraph (2)(B) and the penalty provided under section 6720C of the Internal Revenue Code of 1986 for failure to carry out the obligation;

(v) a description, displayed in a prominent manner, of the qualified beneficiary's right to a subsidized premium and any conditions on entitlement to the subsidized premium; and

(vi) a description of the option of the qualified beneficiary to enroll in different coverage if the employer permits such beneficiary to elect to enroll in such different coverage under paragraph (1)(B).

(C) NOTICE IN CONNECTION WITH EXTENDED ELECTION PERIODS.—In the case of any assistance eligible individual described in paragraph (3) (or any individual described in paragraph (4)(A)) who became entitled to elect COBRA continuation coverage before the first day of the first month beginning after the date of the enactment of this Act, the administrator of the applicable group health plan (or other entity) shall provide (within 60 days after such first day of such first month) for the additional notification required to be provided under subparagraph (A) and failure to provide such notice shall be treated as a failure to meet the notice requirements under the applicable COBRA continuation provision.

(D) MODEL NOTICES.—Not later than 30 days after the date of enactment of this Act, with respect to any assistance eligible individual described in paragraph (3), the Secretary of Labor, in consultation with the Secretary of the Treasury and the Secretary of Health and Human Services, shall prescribe models for the additional notification required under this paragraph.

(6) NOTICE OF EXPIRATION OF PERIOD OF PREMIUM ASSISTANCE.—

H. R. 1319—129

(A) IN GENERAL.—With respect to any assistance eligible individual, subject to subparagraph (B), the requirements of section 606(a)(4) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1166(4)), section 4980B(f)(6)(D) of the Internal Revenue Code of 1986, or section 2206(4) of the Public Health Service Act (42 U.S.C. 300bb–6(4)), shall not be treated as met unless the plan administrator of the individual, during the period specified under subparagraph (C), provides to such individual a written notice in clear and understandable language—

(i) that the premium assistance for such individual will expire soon and the prominent identification of the date of such expiration; and

(ii) that such individual may be eligible for coverage without any premium assistance through—

(I) COBRA continuation coverage; or

(II) coverage under a group health plan.

(B) EXCEPTION.—The requirement for the group health plan administrator to provide the written notice under subparagraph (A) shall be waived if the premium assistance for such individual expires pursuant to clause (i) of paragraph (2)(A).

(C) PERIOD SPECIFIED.—For purposes of subparagraph (A), the period specified in this subparagraph is, with respect to the date of expiration of premium assistance for any assistance eligible individual pursuant to a limitation requiring a notice under this paragraph, the period beginning on the day that is 45 days before the date of such expiration and ending on the day that is 15 days before the date of such expiration.

(D) MODEL NOTICES.—Not later than 45 days after the date of enactment of this Act, with respect to any assistance eligible individual, the Secretary of Labor, in consultation with the Secretary of the Treasury and the Secretary of Health and Human Services, shall prescribe models for the notification required under this paragraph.

(7) REGULATIONS.—The Secretary of the Treasury and the Secretary of Labor may jointly prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this subsection, including the prevention of fraud and abuse under this subsection, except that the Secretary of Labor and the Secretary of Health and Human Services may prescribe such regulations (including interim final regulations) or other guidance as may be necessary or appropriate to carry out the provisions of paragraphs (5), (6), and (8).

(8) OUTREACH.—

(A) IN GENERAL.—The Secretary of Labor, in consultation with the Secretary of the Treasury and the Secretary of Health and Human Services, shall provide outreach consisting of public education and enrollment assistance relating to premium assistance provided under this subsection. Such outreach shall target employers, group health plan administrators, public assistance programs, States, insurers, and other entities as determined appropriate by such Secretaries. Such outreach shall include an initial focus on those individuals electing continuation coverage

H. R. 1319—130

who are referred to in paragraph (5)(C). Information on such premium assistance, including enrollment, shall also be made available on websites of the Departments of Labor, Treasury, and Health and Human Services.

(B) ENROLLMENT UNDER MEDICARE.—The Secretary of Health and Human Services shall provide outreach consisting of public education. Such outreach shall target individuals who lose health insurance coverage. Such outreach shall include information regarding enrollment for Medicare benefits for purposes of preventing mistaken delays of such enrollment by such individuals, including lifetime penalties for failure of timely enrollment.

(9) DEFINITIONS.—For purposes of this section:

(A) ADMINISTRATOR.—The term "administrator" has the meaning given such term in section 3(16)(A) of the Employee Retirement Income Security Act of 1974, and includes a COBRA administrator.

(B) COBRA CONTINUATION COVERAGE.—The term "COBRA continuation coverage" means continuation coverage provided pursuant to part 6 of subtitle B of title I of the Employee Retirement Income Security Act of 1974 (other than under section 609), title XXII of the Public Health Service Act, or section 4980B of the Internal Revenue Code of 1986 (other than subsection (f)(1) of such section insofar as it relates to pediatric vaccines), or under a State program that provides comparable continuation coverage. Such term does not include coverage under a health flexible spending arrangement under a cafeteria plan within the meaning of section 125 of the Internal Revenue Code of 1986.

(C) COBRA CONTINUATION PROVISION.—The term "COBRA continuation provision" means the provisions of law described in subparagraph (B).

(D) COVERED EMPLOYEE.—The term "covered employee" has the meaning given such term in section 607(2) of the Employee Retirement Income Security Act of 1974.

(E) QUALIFIED BENEFICIARY.—The term "qualified beneficiary" has the meaning given such term in section 607(3) of the Employee Retirement Income Security Act of 1974.

(F) GROUP HEALTH PLAN.—The term "group health plan" has the meaning given such term in section 607(1) of the Employee Retirement Income Security Act of 1974.

(G) STATE.—The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

(H) PERIOD OF COVERAGE.—Any reference in this subsection to a period of coverage shall be treated as a reference to a monthly or shorter period of coverage with respect to which premiums are charged with respect to such coverage.

(I) PLAN SPONSOR.—The term "plan sponsor" has the meaning given such term in section 3(16)(B) of the Employee Retirement Income Security Act of 1974.

H. R. 1319—131

(J) PREMIUM.—The term "premium" includes, with respect to COBRA continuation coverage, any administrative fee.

(10) IMPLEMENTATION FUNDING.—In addition to amounts otherwise made available, out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Secretary of Labor for fiscal year 2021, $10,000,000, to remain available until expended, for the Employee Benefits Security Administration to carry out the provisions of this subtitle.

(b) COBRA PREMIUM ASSISTANCE.—

(1) ALLOWANCE OF CREDIT.—

(A) IN GENERAL.—Subchapter B of chapter 65 of the Internal Revenue Code of 1986 is amended by adding at the end the following new section:

**"SEC. 6432. CONTINUATION COVERAGE PREMIUM ASSISTANCE.**

"(a) IN GENERAL.—The person to whom premiums are payable for continuation coverage under section 9501(a)(1) of the American Rescue Plan Act of 2021 shall be allowed as a credit against the tax imposed by section 3111(b), or so much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b), for each calendar quarter an amount equal to the premiums not paid by assistance eligible individuals for such coverage by reason of such section 9501(a)(1) with respect to such calendar quarter.

"(b) PERSON TO WHOM PREMIUMS ARE PAYABLE.—For purposes of subsection (a), except as otherwise provided by the Secretary, the person to whom premiums are payable under such continuation coverage shall be treated as being—

"(1) in the case of any group health plan which is a multiemployer plan (as defined in section 3(37) of the Employee Retirement Income Security Act of 1974), the plan,

"(2) in the case of any group health plan not described in paragraph (1)—

"(A) which is subject to the COBRA continuation provisions contained in—

"(i) the Internal Revenue Code of 1986,

"(ii) the Employee Retirement Income Security Act of 1974, or

"(iii) the Public Health Service Act, or

"(B) under which some or all of the coverage is not provided by insurance,

the employer maintaining the plan, and

"(3) in the case of any group health plan not described in paragraph (1) or (2), the insurer providing the coverage under the group health plan.

"(c) LIMITATIONS AND REFUNDABILITY.—

"(1) CREDIT LIMITED TO CERTAIN EMPLOYMENT TAXES.—The credit allowed by subsection (a) with respect to any calendar quarter shall not exceed the tax imposed by section 3111(b), or so much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b), for such calendar quarter (reduced by any credits allowed against such taxes under sections 3131, 3132, and 3134) on the wages paid with respect to the employment of all employees of the employer.

"(2) REFUNDABILITY OF EXCESS CREDIT.—

H. R. 1319—132

"(A) CREDIT IS REFUNDABLE.—If the amount of the credit under subsection (a) exceeds the limitation of paragraph (1) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b).

"(B) CREDIT MAY BE ADVANCED.—In anticipation of the credit, including the refundable portion under subparagraph (A), the credit may be advanced, according to forms and instructions provided by the Secretary, up to an amount calculated under subsection (a) through the end of the most recent payroll period in the quarter.

"(C) TREATMENT OF DEPOSITS.—The Secretary shall waive any penalty under section 6656 for any failure to make a deposit of the tax imposed by section 3111(b), or so much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b), if the Secretary determines that such failure was due to the anticipation of the credit allowed under this section.

"(D) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, any amounts due to an employer under this paragraph shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

"(3) OVERSTATEMENTS.—Any overstatement of the credit to which a person is entitled under this section (and any amount paid by the Secretary as a result of such overstatement) shall be treated as an underpayment by such person of the taxes described in paragraph (1) and may be assessed and collected by the Secretary in the same manner as such taxes.

"(d) GOVERNMENTAL ENTITIES.—For purposes of this section, the term 'person' includes the government of any State or political subdivision thereof, any Indian tribal government (as defined in section 139E(c)(1)), any agency or instrumentality of any of the foregoing, and any agency or instrumentality of the Government of the United States that is described in section 501(c)(1) and exempt from taxation under section 501(a).

"(e) DENIAL OF DOUBLE BENEFIT.—For purposes of chapter 1, the gross income of any person allowed a credit under this section shall be increased for the taxable year which includes the last day of any calendar quarter with respect to which such credit is allowed by the amount of such credit. No credit shall be allowed under this section with respect to any amount which is taken into account as qualified wages under section 2301 of the CARES Act or section 3134 of this title or as qualified health plan expenses under section 7001(d) or 7003(d) of the Families First Coronavirus Response Act or section 3131 or 3132 of this title.

"(f) EXTENSION OF LIMITATION ON ASSESSMENT.—Notwithstanding section 6501, the limitation on the time period for the assessment of any amount attributable to a credit claimed under this section shall not expire before the date that is 5 years after the later of—

"(1) the date on which the original return which includes the calendar quarter with respect to which such credit is determined is filed, or

"(2) the date on which such return is treated as filed under section 6501(b)(2).

H. R. 1319—133

"(g) REGULATIONS.—The Secretary shall issue such regulations, or other guidance, forms, instructions, and publications, as may be necessary or appropriate to carry out this section, including—

"(1) the requirement to report information or the establishment of other methods for verifying the correct amounts of reimbursements under this section,

"(2) the application of this section to group health plans that are multiemployer plans (as defined in section 3(37) of the Employee Retirement Income Security Act of 1974),

"(3) to allow the advance payment of the credit determined under subsection (a), subject to the limitations provided in this section, based on such information as the Secretary shall require,

"(4) to provide for the reconciliation of such advance payment with the amount of the credit at the time of filing the return of tax for the applicable quarter or taxable year, and

"(5) allowing the credit to third party payors (including professional employer organizations, certified professional employer organizations, or agents under section 3504).".

(B) CLERICAL AMENDMENT.—The table of sections for subchapter B of chapter 65 of the Internal Revenue Code of 1986 is amended by adding at the end the following new item:

"Sec. 6432. Continuation coverage premium assistance.".

(C) EFFECTIVE DATE.—The amendments made by this paragraph shall apply to premiums to which subsection (a)(1)(A) applies and wages paid on or after April 1, 2021.

(D) SPECIAL RULE IN CASE OF EMPLOYEE PAYMENT THAT IS NOT REQUIRED UNDER THIS SECTION.—

(i) IN GENERAL.—In the case of an assistance eligible individual who pays, with respect any period of coverage to which subsection (a)(1)(A) applies, any amount of the premium for such coverage that the individual would have (but for this Act) been required to pay, the person to whom such payment is payable shall reimburse such individual for the amount of such premium paid.

(ii) CREDIT OF REIMBURSEMENT.—A person to which clause (i) applies shall be allowed a credit in the manner provided under section 6432 of the Internal Revenue Code of 1986 for any payment made to the employee under such clause.

(iii) PAYMENT OF CREDITS.—Any person to which clause (i) applies shall make the payment required under such clause to the individual not later than 60 days after the date on which such individual made the premium payment.

(2) PENALTY FOR FAILURE TO NOTIFY HEALTH PLAN OF CESSATION OF ELIGIBILITY FOR PREMIUM ASSISTANCE.—

(A) IN GENERAL.—Part I of subchapter B of chapter 68 of the Internal Revenue Code of 1986 is amended by adding at the end the following new section:

H. R. 1319—134

**"SEC. 6720C. PENALTY FOR FAILURE TO NOTIFY HEALTH PLAN OF CESSATION OF ELIGIBILITY FOR CONTINUATION COVERAGE PREMIUM ASSISTANCE.**

"(a) IN GENERAL.—Except in the case of a failure described in subsection (b) or (c), any person required to notify a group health plan under section 9501(a)(2)(B) of the American Rescue Plan Act of 2021 who fails to make such a notification at such time and in such manner as the Secretary of Labor may require shall pay a penalty of $250 for each such failure.

"(b) INTENTIONAL FAILURE.—In the case of any such failure that is fraudulent, such person shall pay a penalty equal to the greater of—

"(1) $250, or

"(2) 110 percent of the premium assistance provided under section 9501(a)(1)(A) of the American Rescue Plan Act of 2021 after termination of eligibility under such section.

"(c) REASONABLE CAUSE EXCEPTION.—No penalty shall be imposed under this section with respect to any failure if it is shown that such failure is due to reasonable cause and not to willful neglect.".

(B) CLERICAL AMENDMENT.—The table of sections of part I of subchapter B of chapter 68 of such Code is amended by adding at the end the following new item:

"Sec. 6720C. Penalty for failure to notify health plan of cessation of eligibility for continuation coverage premium assistance.".

(3) COORDINATION WITH HCTC.—

(A) IN GENERAL.—Section 35(g)(9) of the Internal Revenue Code of 1986 is amended to read as follows:

"(9) CONTINUATION COVERAGE PREMIUM ASSISTANCE.—In the case of an assistance eligible individual who receives premium assistance for continuation coverage under section 9501(a)(1) of the American Rescue Plan Act of 2021 for any month during the taxable year, such individual shall not be treated as an eligible individual, a certified individual, or a qualifying family member for purposes of this section or section 7527 with respect to such month.".

(B) EFFECTIVE DATE.—The amendment made by subparagraph (A) shall apply to taxable years ending after the date of the enactment of this Act.

(4) EXCLUSION OF CONTINUATION COVERAGE PREMIUM ASSISTANCE FROM GROSS INCOME.—

(A) IN GENERAL.—Part III of subchapter B of chapter 1 of the Internal Revenue Code of 1986 is amended by inserting after section 139H the following new section:

**"SEC. 139I. CONTINUATION COVERAGE PREMIUM ASSISTANCE.**

"In the case of an assistance eligible individual (as defined in subsection (a)(3) of section 9501 of the American Rescue Plan Act of 2021), gross income does not include any premium assistance provided under subsection (a)(1) of such section.".

(B) CLERICAL AMENDMENT.—The table of sections for part III of subchapter B of chapter 1 of such Code is amended by inserting after the item relating to section 139H the following new item:

"Sec. 139I. Continuation coverage premium assistance.".

H. R. 1319—135

(C) EFFECTIVE DATE.—The amendments made by this paragraph shall apply to taxable years ending after the date of the enactment of this Act.

## Subtitle G—Promoting Economic Security

### PART 1—2021 RECOVERY REBATES TO INDIVIDUALS

**SEC. 9601. 2021 RECOVERY REBATES TO INDIVIDUALS.**

(a) IN GENERAL.—Subchapter B of chapter 65 of the Internal Revenue Code of 1986 is amended by inserting after section 6428A the following new section:

**"SEC. 6428B. 2021 RECOVERY REBATES TO INDIVIDUALS.**

"(a) IN GENERAL.—In the case of an eligible individual, there shall be allowed as a credit against the tax imposed by subtitle A for the first taxable year beginning in 2021 an amount equal to the 2021 rebate amount determined for such taxable year.

"(b) 2021 REBATE AMOUNT.—For purposes of this section, the term '2021 rebate amount' means, with respect to any taxpayer for any taxable year, the sum of—

"(1) $1,400 ($2,800 in the case of a joint return), plus

"(2) $1,400 multiplied by the number of dependents of the taxpayer for such taxable year.

"(c) ELIGIBLE INDIVIDUAL.—For purposes of this section, the term 'eligible individual' means any individual other than—

"(1) any nonresident alien individual,

"(2) any individual who is a dependent of another taxpayer for a taxable year beginning in the calendar year in which the individual's taxable year begins, and

"(3) an estate or trust.

"(d) LIMITATION BASED ON ADJUSTED GROSS INCOME.—

"(1) IN GENERAL.—The amount of the credit allowed by subsection (a) (determined without regard to this subsection and subsection (f)) shall be reduced (but not below zero) by the amount which bears the same ratio to such credit (as so determined) as—

"(A) the excess of—

"(i) the taxpayer's adjusted gross income for such taxable year, over

"(ii) $75,000, bears to

"(B) $5,000.

"(2) SPECIAL RULES.—

"(A) JOINT RETURN OR SURVIVING SPOUSE.—In the case of a joint return or a surviving spouse (as defined in section 2(a)), paragraph (1) shall be applied by substituting '$150,000' for '$75,000' and '$10,000' for '$5,000'.

"(B) HEAD OF HOUSEHOLD.—In the case of a head of household (as defined in section 2(b)), paragraph (1) shall be applied by substituting '$112,500' for '$75,000' and '$7,500' for '$5,000'.

"(e) DEFINITIONS AND SPECIAL RULES.—

"(1) DEPENDENT DEFINED.—For purposes of this section, the term 'dependent' has the meaning given such term by section 152.

"(2) IDENTIFICATION NUMBER REQUIREMENT.—

"(A) IN GENERAL.—In the case of a return other than a joint return, the $1,400 amount in subsection (b)(1) shall be treated as being zero unless the taxpayer includes the valid identification number of the taxpayer on the return of tax for the taxable year.

"(B) JOINT RETURNS.—In the case of a joint return, the $2,800 amount in subsection (b)(1) shall be treated as being—

"(i) $1,400 if the valid identification number of only 1 spouse is included on the return of tax for the taxable year, and

"(ii) zero if the valid identification number of neither spouse is so included.

"(C) DEPENDENTS.—A dependent shall not be taken into account under subsection (b)(2) unless the valid identification number of such dependent is included on the return of tax for the taxable year.

"(D) VALID IDENTIFICATION NUMBER.—

"(i) IN GENERAL.—For purposes of this paragraph, the term 'valid identification number' means a social security number issued to an individual by the Social Security Administration on or before the due date for filing the return for the taxable year.

"(ii) ADOPTION TAXPAYER IDENTIFICATION NUMBER.—For purposes of subparagraph (C), in the case of a dependent who is adopted or placed for adoption, the term 'valid identification number' shall include the adoption taxpayer identification number of such dependent.

"(E) SPECIAL RULE FOR MEMBERS OF THE ARMED FORCES.—Subparagraph (B) shall not apply in the case where at least 1 spouse was a member of the Armed Forces of the United States at any time during the taxable year and the valid identification number of at least 1 spouse is included on the return of tax for the taxable year.

"(F) COORDINATION WITH CERTAIN ADVANCE PAYMENTS.—In the case of any payment determined pursuant to subsection (g)(6), a valid identification number shall be treated for purposes of this paragraph as included on the taxpayer's return of tax if such valid identification number is available to the Secretary as described in such subsection.

"(G) MATHEMATICAL OR CLERICAL ERROR AUTHORITY.—Any omission of a correct valid identification number required under this paragraph shall be treated as a mathematical or clerical error for purposes of applying section 6213(g)(2) to such omission.

"(3) CREDIT TREATED AS REFUNDABLE.—The credit allowed by subsection (a) shall be treated as allowed by subpart C of part IV of subchapter A of chapter 1.

"(f) COORDINATION WITH ADVANCE REFUNDS OF CREDIT.—

"(1) REDUCTION OF REFUNDABLE CREDIT.—The amount of the credit which would (but for this paragraph) be allowable under subsection (a) shall be reduced (but not below zero) by the aggregate refunds and credits made or allowed to the

H. R. 1319—137

taxpayer (or, except as otherwise provided by the Secretary, any dependent of the taxpayer) under subsection (g). Any failure to so reduce the credit shall be treated as arising out of a mathematical or clerical error and assessed according to section 6213(b)(1).

"(2) JOINT RETURNS.—Except as otherwise provided by the Secretary, in the case of a refund or credit made or allowed under subsection (g) with respect to a joint return, half of such refund or credit shall be treated as having been made or allowed to each individual filing such return.

"(g) ADVANCE REFUNDS AND CREDITS.—

"(1) IN GENERAL.—Subject to paragraphs (5) and (6), each individual who was an eligible individual for such individual's first taxable year beginning in 2019 shall be treated as having made a payment against the tax imposed by chapter 1 for such taxable year in an amount equal to the advance refund amount for such taxable year.

"(2) ADVANCE REFUND AMOUNT.—

"(A) IN GENERAL.—For purposes of paragraph (1), the advance refund amount is the amount that would have been allowed as a credit under this section for such taxable year if this section (other than subsection (f) and this subsection) had applied to such taxable year.

"(B) TREATMENT OF DECEASED INDIVIDUALS.—For purposes of determining the advance refund amount with respect to such taxable year—

"(i) any individual who was deceased before January 1, 2021, shall be treated for purposes of applying subsection (e)(2) in the same manner as if the valid identification number of such person was not included on the return of tax for such taxable year (except that subparagraph (E) thereof shall not apply),

"(ii) notwithstanding clause (i), in the case of a joint return with respect to which only 1 spouse is deceased before January 1, 2021, such deceased spouse was a member of the Armed Forces of the United States at any time during the taxable year, and the valid identification number of such deceased spouse is included on the return of tax for the taxable year, the valid identification number of 1 (and only 1) spouse shall be treated as included on the return of tax for the taxable year for purposes of applying subsection (e)(2)(B) with respect to such joint return, and

"(iii) no amount shall be determined under subsection (e)(2) with respect to any dependent of the taxpayer if the taxpayer (both spouses in the case of a joint return) was deceased before January 1, 2021.

"(3) TIMING AND MANNER OF PAYMENTS.—The Secretary shall, subject to the provisions of this title and consistent with rules similar to the rules of subparagraphs (B) and (C) of section 6428A(f)(3), refund or credit any overpayment attributable to this subsection as rapidly as possible, consistent with a rapid effort to make payments attributable to such overpayments electronically if appropriate. No refund or credit shall be made or allowed under this subsection after December 31, 2021.

H. R. 1319—138

"(4) NO INTEREST.—No interest shall be allowed on any overpayment attributable to this subsection.

"(5) APPLICATION TO INDIVIDUALS WHO HAVE FILED A RETURN OF TAX FOR 2020.—

"(A) APPLICATION TO 2020 RETURNS FILED AT TIME OF INITIAL DETERMINATION.—If, at the time of any determination made pursuant to paragraph (3), the individual referred to in paragraph (1) has filed a return of tax for the individual's first taxable year beginning in 2020, paragraph (1) shall be applied with respect to such individual by substituting '2020' for '2019'.

"(B) ADDITIONAL PAYMENT.—

"(i) IN GENERAL.—In the case of any individual who files, before the additional payment determination date, a return of tax for such individual's first taxable year beginning in 2020, the Secretary shall make a payment (in addition to any payment made under paragraph (1)) to such individual equal to the excess (if any) of—

"(I) the amount which would be determined under paragraph (1) (after the application of subparagraph (A)) by applying paragraph (1) as of the additional payment determination date, over

"(II) the amount of any payment made with respect to such individual under paragraph (1).

"(ii) ADDITIONAL PAYMENT DETERMINATION DATE.—The term 'additional payment determination date' means the earlier of—

"(I) the date which is 90 days after the 2020 calendar year filing deadline, or

"(II) September 1, 2021.

"(iii) 2020 CALENDAR YEAR FILING DEADLINE.—The term '2020 calendar year filing deadline' means the date specified in section 6072(a) with respect to returns for calendar year 2020. Such date shall be determined after taking into account any period disregarded under section 7508A if such disregard applies to substantially all returns for calendar year 2020 to which section 6072(a) applies.

"(6) APPLICATION TO CERTAIN INDIVIDUALS WHO HAVE NOT FILED A RETURN OF TAX FOR 2019 OR 2020 AT TIME OF DETERMINATION.—In the case of any individual who, at the time of any determination made pursuant to paragraph (3), has filed a tax return for neither the year described in paragraph (1) nor for the year described in paragraph (5)(A), the Secretary shall, consistent with rules similar to the rules of section 6428A(f)(5)(H)(i), apply paragraph (1) on the basis of information available to the Secretary and shall, on the basis of such information, determine the advance refund amount with respect to such individual without regard to subsection (d) unless the Secretary has reason to know that such amount would otherwise be reduced by reason of such subsection.

"(7) SPECIAL RULE RELATED TO TIME OF FILING RETURN.—Solely for purposes of this subsection, a return of tax shall not be treated as filed until such return has been processed by the Internal Revenue Service.

H. R. 1319—139

"(8) RESTRICTION ON USE OF CERTAIN PREVIOUSLY ISSUED PREPAID DEBIT CARDS.—Payments made by the Secretary to individuals under this section shall not be in the form of an increase in the balance of any previously issued prepaid debit card if, as of the time of the issuance of such card, such card was issued solely for purposes of making payments under section 6428 or 6428A.

"(h) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the purposes of this section, including—

"(1) regulations or other guidance providing taxpayers the opportunity to provide the Secretary information sufficient to allow the Secretary to make payments to such taxpayers under subsection (g) (including the determination of the amount of such payment) if such information is not otherwise available to the Secretary, and

"(2) regulations or other guidance to ensure to the maximum extent administratively practicable that, in determining the amount of any credit under subsection (a) and any credit or refund under subsection (g), an individual is not taken into account more than once, including by different taxpayers and including by reason of a change in joint return status or dependent status between the taxable year for which an advance refund amount is determined and the taxable year for which a credit under subsection (a) is determined.

"(i) OUTREACH.—The Secretary shall carry out a robust and comprehensive outreach program to ensure that all taxpayers described in subsection (h)(1) learn of their eligibility for the advance refunds and credits under subsection (g); are advised of the opportunity to receive such advance refunds and credits as provided under subsection (h)(1); and are provided assistance in applying for such advance refunds and credits.".

(b) TREATMENT OF CERTAIN POSSESSIONS.—

(1) PAYMENTS TO POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—The Secretary of the Treasury shall pay to each possession of the United States which has a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the amendments made by this section. Such amounts shall be determined by the Secretary of the Treasury based on information provided by the government of the respective possession.

(2) PAYMENTS TO OTHER POSSESSIONS.—The Secretary of the Treasury shall pay to each possession of the United States which does not have a mirror code tax system amounts estimated by the Secretary of the Treasury as being equal to the aggregate benefits (if any) that would have been provided to residents of such possession by reason of the amendments made by this section if a mirror code tax system had been in effect in such possession. The preceding sentence shall not apply unless the respective possession has a plan, which has been approved by the Secretary of the Treasury, under which such possession will promptly distribute such payments to its residents.

(3) INCLUSION OF ADMINISTRATIVE EXPENSES.—The Secretary of the Treasury shall pay to each possession of the United States to which the Secretary makes a payment under paragraph (1) or (2) an amount equal to the lesser of—

H. R. 1319—140

(A) the increase (if any) of the administrative expenses of such possession—

(i) in the case of a possession described in paragraph (1), by reason of the amendments made by this section, and

(ii) in the case of a possession described in paragraph (2), by reason of carrying out the plan described in such paragraph, or

(B) $500,000 ($10,000,000 in the case of Puerto Rico). The amount described in subparagraph (A) shall be determined by the Secretary of the Treasury based on information provided by the government of the respective possession.

(4) COORDINATION WITH CREDIT ALLOWED AGAINST UNITED STATES INCOME TAXES.—No credit shall be allowed against United States income taxes under section 6428B of the Internal Revenue Code of 1986 (as added by this section), nor shall any credit or refund be made or allowed under subsection (g) of such section, to any person—

(A) to whom a credit is allowed against taxes imposed by the possession by reason of the amendments made by this section, or

(B) who is eligible for a payment under a plan described in paragraph (2).

(5) MIRROR CODE TAX SYSTEM.—For purposes of this subsection, the term "mirror code tax system" means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

(6) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this subsection shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(c) ADMINISTRATIVE PROVISIONS.—

(1) DEFINITION OF DEFICIENCY.—Section 6211(b)(4)(A) of the Internal Revenue Code of 1986 is amended by striking "6428, and 6428A" and inserting "6428, 6428A, and 6428B".

(2) EXCEPTION FROM REDUCTION OR OFFSET.—Any refund payable by reason of section 6428B(g) of the Internal Revenue Code of 1986 (as added by this section), or any such refund payable by reason of subsection (b) of this section, shall not be—

(A) subject to reduction or offset pursuant to subsection (c), (d), (e), or (f) of section 6402 of the Internal Revenue Code of 1986 or any similar authority permitting offset, or

(B) reduced or offset by other assessed Federal taxes that would otherwise be subject to levy or collection.

(3) CONFORMING AMENDMENTS.—

(A) Paragraph (2) of section 1324(b) of title 31, United States Code, is amended by inserting "6428B," after "6428A,".

(B) The table of sections for subchapter B of chapter 65 of the Internal Revenue Code of 1986 is amended by

H. R. 1319—141

inserting after the item relating to section 6428A the fol-
lowing new item:

"Sec. 6428B.  2021 recovery rebates to individuals.".

(d) APPROPRIATIONS.—Immediately upon the enactment of this
Act, in addition to amounts otherwise available, there are appro-
priated for fiscal year 2021, out of any money in the Treasury
not otherwise appropriated:

(1) $1,464,500,000 to remain available until September 30,
2023 for necessary expenses for the Internal Revenue Service
for the administration of the advance payments, the provision
of taxpayer assistance, and the furtherance of integrated, mod-
ernized, and secure Internal Revenue Service systems, of which
up to $20,000,000 is available for premium pay for services
related to the development of information technology as deter-
mined by the Commissioner of the Internal Revenue occurring
between January 1, 2020 and December 31, 2022, and all
of which shall supplement and not supplant any other appro-
priations that may be available for this purpose.

(2) $7,000,000 to remain available until September 30,
2022, for necessary expenses for the Bureau of the Fiscal
Service to carry out this section (and the amendments made
by this section), which shall supplement and not supplant any
other appropriations that may be available for this purpose,
and

(3) $8,000,000 to remain available until September 30,
2023, for the Treasury Inspector General for Tax Administra-
tion for the purposes of overseeing activities related to the
administration of this section (and the amendments made by
this section), which shall supplement and not supplant any
other appropriations that may be available for this purpose.

## PART 2—CHILD TAX CREDIT

### SEC. 9611. CHILD TAX CREDIT IMPROVEMENTS FOR 2021.

(a) IN GENERAL.—Section 24 of the Internal Revenue Code
of 1986 is amended by adding at the end the following new sub-
section:

"(i) SPECIAL RULES FOR 2021.—In the case of any taxable year
beginning after December 31, 2020, and before January 1, 2022—

"(1) REFUNDABLE CREDIT.—If the taxpayer (in the case
of a joint return, either spouse) has a principal place of abode
in the United States (determined as provided in section 32)
for more than one-half of the taxable year or is a bona fide
resident of Puerto Rico (within the meaning of section 937(a))
for such taxable year—

"(A) subsection (d) shall not apply, and

"(B) so much of the credit determined under subsection
(a) (after application of subparagraph (A)) as does not
exceed the amount of such credit which would be so deter-
mined without regard to subsection (h)(4) shall be allowed
under subpart C (and not allowed under this subpart).

"(2) 17-YEAR-OLDS ELIGIBLE FOR TREATMENT AS QUALIFYING
CHILDREN.—This section shall be applied—

"(A) by substituting 'age 18' for 'age 17' in subsection
(c)(1), and

H. R. 1319—142

"(B) by substituting 'described in subsection (c) (determined after the application of subsection (i)(2)(A))' for 'described in subsection (c)' in subsection (h)(4)(A).

"(3) CREDIT AMOUNT.—Subsection (h)(2) shall not apply and subsection (a) shall be applied by substituting '$3,000 ($3,600 in the case of a qualifying child who has not attained age 6 as of the close of the calendar year in which the taxable year of the taxpayer begins)' for '$1,000'.

"(4) REDUCTION OF INCREASED CREDIT AMOUNT BASED ON MODIFIED ADJUSTED GROSS INCOME.—

"(A) IN GENERAL.—The amount of the credit allowable under subsection (a) (determined without regard to subsection (b)) shall be reduced by $50 for each $1,000 (or fraction thereof) by which the taxpayer's modified adjusted gross income (as defined in subsection (b)) exceeds the applicable threshold amount.

"(B) APPLICABLE THRESHOLD AMOUNT.—For purposes of this paragraph, the term 'applicable threshold amount' means—

"(i) $150,000, in the case of a joint return or surviving spouse (as defined in section 2(a)) ,

"(ii) $112,500, in the case of a head of household (as defined in section 2(b)), and

"(iii) $75,000, in any other case.

"(C) LIMITATION ON REDUCTION.—

"(i) IN GENERAL.—The amount of the reduction under subparagraph (A) shall not exceed the lesser of—

"(I) the applicable credit increase amount, or

"(II) 5 percent of the applicable phaseout threshold range.

"(ii) APPLICABLE CREDIT INCREASE AMOUNT.—For purposes of this subparagraph, the term 'applicable credit increase amount' means the excess (if any) of—

"(I) the amount of the credit allowable under this section for the taxable year determined without regard to this paragraph and subsection (b), over

"(II) the amount of such credit as so determined and without regard to paragraph (3).

"(iii) APPLICABLE PHASEOUT THRESHOLD RANGE.—For purposes of this subparagraph, the term 'applicable phaseout threshold range' means the excess of—

"(I) the threshold amount applicable to the taxpayer under subsection (b) (determined after the application of subsection (h)(3)), over

"(II) the applicable threshold amount applicable to the taxpayer under this paragraph.

"(D) COORDINATION WITH LIMITATION ON OVERALL CREDIT.—Subsection (b) shall be applied by substituting 'the credit allowable under subsection (a) (determined after the application of subsection (i)(4)(A)' for 'the credit allowable under subsection (a)'.".

(b) ADVANCE PAYMENT OF CREDIT.—

(1) IN GENERAL.—Chapter 77 of such Code is amended by inserting after section 7527 the following new section:

H. R. 1319—143

"SEC. 7527A. ADVANCE PAYMENT OF CHILD TAX CREDIT.

"(a) IN GENERAL.—The Secretary shall establish a program for making periodic payments to taxpayers which, in the aggregate during any calendar year, equal the annual advance amount determined with respect to such taxpayer for such calendar year. Except as provided in subsection (b)(3)(B), the periodic payments made to any taxpayer for any calendar year shall be in equal amounts.

"(b) ANNUAL ADVANCE AMOUNT.—For purposes of this section—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, the term 'annual advance amount' means, with respect to any taxpayer for any calendar year, the amount (if any) which is estimated by the Secretary as being equal to 50 percent of the amount which would be treated as allowed under subpart C of part IV of subchapter A of chapter 1 by reason of section 24(i)(1) for the taxpayer's taxable year beginning in such calendar year if—

"(A) the status of the taxpayer as a taxpayer described in section 24(i)(1) is determined with respect to the reference taxable year,

"(B) the taxpayer's modified adjusted gross income for such taxable year is equal to the taxpayer's modified adjusted gross income for the reference taxable year,

"(C) the only children of such taxpayer for such taxable year are qualifying children properly claimed on the taxpayer's return of tax for the reference taxable year, and

"(D) the ages of such children (and the status of such children as qualifying children) are determined for such taxable year by taking into account the passage of time since the reference taxable year.

"(2) REFERENCE TAXABLE YEAR.—Except as provided in paragraph (3)(A), the term 'reference taxable year' means, with respect to any taxpayer for any calendar year, the taxpayer's taxable year beginning in the preceding calendar year or, in the case of taxpayer who did not file a return of tax for such taxable year, the taxpayer's taxable year beginning in the second preceding calendar year.

"(3) MODIFICATIONS DURING CALENDAR YEAR.—

"(A) IN GENERAL.—The Secretary may modify, during any calendar year, the annual advance amount with respect to any taxpayer for such calendar year to take into account—

"(i) a return of tax filed by such taxpayer during such calendar year (and the taxable year to which such return relates may be taken into account as the reference taxable year), and

"(ii) any other information provided by the taxpayer to the Secretary which allows the Secretary to determine payments under subsection (a) which, in the aggregate during any taxable year of the taxpayer, more closely total the Secretary's estimate of the amount treated as allowed under subpart C of part IV of subchapter A of chapter 1 by reason of section 24(i)(1) for such taxable year of such taxpayer.

"(B) ADJUSTMENT TO REFLECT EXCESS OR DEFICIT IN PRIOR PAYMENTS.—In the case of any modification of the annual advance amount under subparagraph (A), the Secretary may adjust the amount of any periodic payment

H. R. 1319—144

made after the date of such modification to properly take into account the amount by which any periodic payment made before such date was greater than or less than the amount that such payment would have been on the basis of the annual advance amount as so modified.

"(4) DETERMINATION OF STATUS.—If information contained in the taxpayer's return of tax for the reference taxable year does not establish the status of the taxpayer as being described in section 24(i)(1), the Secretary shall, for purposes of paragraph (1)(A), determine such status based on information known to the Secretary.

"(5) TREATMENT OF CERTAIN DEATHS.—A child shall not be taken into account in determining the annual advance amount under paragraph (1) if the death of such child is known to the Secretary as of the beginning of the calendar year for which the estimate under such paragraph is made.

"(c) ON-LINE INFORMATION PORTAL.—The Secretary shall establish an on-line portal which allows taxpayers to—

"(1) elect not to receive payments under this section, and

"(2) provide information to the Secretary which would be relevant to a modification under subsection (b)(3)(B) of the annual advance amount, including information regarding—

"(A) a change in the number of the taxpayer's qualifying children, including by reason of the birth of a child,

"(B) a change in the taxpayer's marital status,

"(C) a significant change in the taxpayer's income, and

"(D) any other factor which the Secretary may provide.

"(d) NOTICE OF PAYMENTS.—Not later than January 31 of the calendar year following any calendar year during which the Secretary makes one or more payments to any taxpayer under this section, the Secretary shall provide such taxpayer with a written notice which includes the taxpayer's taxpayer identity (as defined in section 6103(b)(6)), the aggregate amount of such payments made to such taxpayer during such calendar year, and such other information as the Secretary determines appropriate.

"(e) ADMINISTRATIVE PROVISIONS.—

"(1) APPLICATION OF ELECTRONIC FUNDS PAYMENT REQUIREMENT.—The payments made by the Secretary under subsection (a) shall be made by electronic funds transfer to the same extent and in the same manner as if such payments were Federal payments not made under this title.

"(2) APPLICATION OF CERTAIN RULES.—Rules similar to the rules of subparagraphs (B) and (C) of section 6428A(f)(3) shall apply for purposes of this section.

"(3) EXCEPTION FROM REDUCTION OR OFFSET.—Any payment made to any individual under this section shall not be—

"(A) subject to reduction or offset pursuant to subsection (c), (d), (e), or (f) of section 6402 or any similar authority permitting offset, or

"(B) reduced or offset by other assessed Federal taxes that would otherwise be subject to levy or collection.

"(4) APPLICATION OF ADVANCE PAYMENTS IN THE POSSESSIONS OF THE UNITED STATES.—

"(A) IN GENERAL.—The advance payment amount determined under this section shall be determined—

H. R. 1319—145

"(i) by applying section 24(i)(1) without regard to the phrase 'or is a bona fide resident of Puerto Rico (within the meaning of section 937(a))', and

"(ii) without regard to section 24(k)(3)(C)(ii)(I).

"(B) MIRROR CODE POSSESSIONS.—In the case of any possession of the United States with a mirror code tax system (as defined in section 24(k)), this section shall not be treated as part of the income tax laws of the United States for purposes of determining the income tax law of such possession unless such possession elects to have this section be so treated.

"(C) ADMINISTRATIVE EXPENSES OF ADVANCE PAYMENTS.—

"(i) MIRROR CODE POSSESSIONS.—In the case of any possession described in subparagraph (B) which makes the election described in such subparagraph, the amount otherwise paid by the Secretary to such possession under section 24(k)(1)(A) with respect to taxable years beginning in 2021 shall be increased by $300,000 if such possession has a plan, which has been approved by the Secretary, for making advance payments consistent with such election.

"(ii) AMERICAN SAMOA.—The amount otherwise paid by the Secretary to American Samoa under subparagraph (A) of section 24(k)(3) with respect to taxable years beginning in 2021 shall be increased by $300,000 if the plan described in subparagraph (B) of such section includes a program, which has been approved by the Secretary, for making advance payments under rules similar to the rules of this section.

"(iii) TIMING OF PAYMENT.—The Secretary may pay, upon the request of the possession of the United States to which the payment is to be made, the amount of the increase determined under clause (i) or (ii) immediately upon approval of the plan referred to in such clause, respectively.

"(f) APPLICATION.—No payments shall be made under the program established under subsection (a) with respect to—

"(1) any period before July 1, 2021, or

"(2) any period after December 31, 2021.

"(g) REGULATIONS.—The Secretary shall issue such regulations or other guidance as the Secretary determines necessary or appropriate to carry out the purposes of this section and subsections (i)(1) and (j) of section 24, including regulations or other guidance which provides for the application of such provisions where the filing status of the taxpayer for a taxable year is different from the status used for determining the annual advance amount.".

(2) RECONCILIATION OF CREDIT AND ADVANCE CREDIT.—Section 24 of such Code, as amended by the preceding provision of this Act, is amended by adding at the end the following new subsection:

"(j) RECONCILIATION OF CREDIT AND ADVANCE CREDIT.—

"(1) IN GENERAL.—The amount of the credit allowed under this section to any taxpayer for any taxable year shall be reduced (but not below zero) by the aggregate amount of payments made under section 7527A to such taxpayer during such

H. R. 1319—146

taxable year. Any failure to so reduce the credit shall be treated as arising out of a mathematical or clerical error and assessed according to section 6213(b)(1).

"(2) EXCESS ADVANCE PAYMENTS.—

"(A) IN GENERAL.—If the aggregate amount of payments under section 7527A to the taxpayer during the taxable year exceeds the amount of the credit allowed under this section to such taxpayer for such taxable year (determined without regard to paragraph (1)), the tax imposed by this chapter for such taxable year shall be increased by the amount of such excess. Any failure to so increase the tax shall be treated as arising out of a mathematical or clerical error and assessed according to section 6213(b)(1).

"(B) SAFE HARBOR BASED ON MODIFIED ADJUSTED GROSS INCOME.—

"(i) IN GENERAL.—In the case of a taxpayer whose modified adjusted gross income (as defined in subsection (b)) for the taxable year does not exceed 200 percent of the applicable income threshold, the amount of the increase determined under subparagraph (A) with respect to such taxpayer for such taxable year shall be reduced (but not below zero) by the safe harbor amount.

"(ii) PHASE OUT OF SAFE HARBOR AMOUNT.—In the case of a taxpayer whose modified adjusted gross income (as defined in subsection (b)) for the taxable year exceeds the applicable income threshold, the safe harbor amount otherwise in effect under clause (i) shall be reduced by the amount which bears the same ratio to such amount as such excess bears to the applicable income threshold.

"(iii) APPLICABLE INCOME THRESHOLD.—For purposes of this subparagraph, the term 'applicable income threshold' means—

"(I) $60,000 in the case of a joint return or surviving spouse (as defined in section 2(a)),

"(II) $50,000 in the case of a head of household, and

"(III) $40,000 in any other case.

"(iv) SAFE HARBOR AMOUNT.—For purposes of this subparagraph, the term 'safe harbor amount' means, with respect to any taxable year, the product of—

"(I) $2,000, multiplied by

"(II) the excess (if any) of the number of qualified children taken into account in determining the annual advance amount with respect to the taxpayer under section 7527A with respect to months beginning in such taxable year, over the number of qualified children taken into account in determining the credit allowed under this section for such taxable year.".

(3) COORDINATION WITH WAGE WITHHOLDING.—Section 3402(f)(1)(C) of such Code is amended by striking "section 24(a)" and inserting "section 24 (determined after application of subsection (j) thereof)".

(4) CONFORMING AMENDMENTS.—

H. R. 1319—147

(A) Section 26(b)(2) of such Code is amended by striking "and" at the end of subparagraph (X), by striking the period at the end of subparagraph (Y) and inserting ", and", and by adding at the end the following new subparagraph:

"(Z) section 24(j)(2) (relating to excess advance payments).".

(B) Section 6211(b)(4)(A) of such Code, as amended by the preceding provisions of this subtitle, is amended—

(i) by striking "24(d)" and inserting "24 by reason of subsections (d) and (i)(1) thereof", and

(ii) by striking "and 6428B" and inserting "6428B, and 7527A".

(C) Paragraph (2) of section 1324(b) of title 31, United States Code, is amended—

(i) by inserting "24," before "25A", and

(ii) by striking " or 6431" and inserting "6431, or 7527A".

(D) The table of sections for chapter 77 of the Internal Revenue Code of 1986 is amended by inserting after the item relating to section 7527 the following new item:

"Sec. 7527A. Advance payment of child tax credit.".

(5) APPROPRIATIONS TO CARRY OUT ADVANCE PAYMENTS.— Immediately upon the enactment of this Act, in addition to amounts otherwise available, there are appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated:

(A) $397,200,000 to remain available until September 30, 2022, for necessary expenses for the Internal Revenue Service to carry out this section (and the amendments made by this section), which shall supplement and not supplant any other appropriations that may be available for this purpose, and

(B) $16,200,000 to remain available until September 30, 2022, for necessary expenses for the Bureau of the Fiscal Service to carry out this section (and the amendments made by this section), which shall supplement and not supplant any other appropriations that may be available for this purpose.

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

(2) ESTABLISHMENT OF ADVANCE PAYMENT PROGRAM.—The Secretary of the Treasury (or the Secretary's designee) shall establish the program described in section 7527A of the Internal Revenue Code of 1986 as soon as practicable after the date of the enactment of this Act, except that the Secretary shall ensure that the timing of the establishment of such program does not interfere with carrying out section 6428B(g) as rapidly as possible.

**SEC. 9612. APPLICATION OF CHILD TAX CREDIT IN POSSESSIONS.**

(a) IN GENERAL.—Section 24 of the Internal Revenue Code of 1986, as amended by the preceding provisions of this Act, is amended by adding at the end the following new subsection:

"(k) APPLICATION OF CREDIT IN POSSESSIONS.—

H. R. 1319—148

"(1) MIRROR CODE POSSESSIONS.—

"(A) IN GENERAL.—The Secretary shall pay to each possession of the United States with a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the application of this section (determined without regard to this subsection) with respect to taxable years beginning after 2020. Such amounts shall be determined by the Secretary based on information provided by the government of the respective possession.

"(B) COORDINATION WITH CREDIT ALLOWED AGAINST UNITED STATES INCOME TAXES.—No credit shall be allowed under this section for any taxable year to any individual to whom a credit is allowable against taxes imposed by a possession of the United States with a mirror code tax system by reason of the application of this section in such possession for such taxable year.

"(C) MIRROR CODE TAX SYSTEM.—For purposes of this paragraph, the term 'mirror code tax system' means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

"(2) PUERTO RICO.—

"(A) APPLICATION TO TAXABLE YEARS IN 2021.—

"(i) For application of refundable credit to residents of Puerto Rico, see subsection (i)(1).

"(ii) For nonapplication of advance payment to residents of Puerto Rico, see section 7527A(e)(4)(A).

"(B) APPLICATION TO TAXABLE YEARS AFTER 2021.—In the case of any bona fide resident of Puerto Rico (within the meaning of section 937(a)) for any taxable year beginning after December 31, 2021—

"(i) the credit determined under this section shall be allowable to such resident, and

"(ii) subsection (d)(1)(B)(ii) shall be applied without regard to the phrase 'in the case of a taxpayer with 3 or more qualifying children'.

"(3) AMERICAN SAMOA.—

"(A) IN GENERAL.—The Secretary shall pay to American Samoa amounts estimated by the Secretary as being equal to the aggregate benefits that would have been provided to residents of American Samoa by reason of the application of this section for taxable years beginning after 2020 if the provisions of this section had been in effect in American Samoa (applied as if American Samoa were the United States and without regard to the application of this section to bona fide residents of Puerto Rico under subsection (i)(1)).

"(B) DISTRIBUTION REQUIREMENT.—Subparagraph (A) shall not apply unless American Samoa has a plan, which has been approved by the Secretary, under which American Samoa will promptly distribute such payments to its residents.

"(C) COORDINATION WITH CREDIT ALLOWED AGAINST UNITED STATES INCOME TAXES.—

H. R. 1319—149

"(i) IN GENERAL.—In the case of a taxable year with respect to which a plan is approved under subparagraph (B), this section (other than this subsection) shall not apply to any individual eligible for a distribution under such plan.

"(ii) APPLICATION OF SECTION IN EVENT OF ABSENCE OF APPROVED PLAN.—In the case of a taxable year with respect to which a plan is not approved under subparagraph (B)—

"(I) if such taxable year begins in 2021, subsection (i)(1) shall be applied by substituting 'bona fide resident of Puerto Rico or American Samoa' for 'bona fide resident of Puerto Rico', and

"(II) if such taxable year begins after December 31, 2021, rules similar to the rules of paragraph (2)(B) shall apply with respect to bona fide residents of American Samoa (within the meaning of section 937(a)).

"(4) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this subsection shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

## PART 3—EARNED INCOME TAX CREDIT

**SEC. 9621. STRENGTHENING THE EARNED INCOME TAX CREDIT FOR INDIVIDUALS WITH NO QUALIFYING CHILDREN.**

(a) SPECIAL RULES FOR 2021.—Section 32 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(n) SPECIAL RULES FOR INDIVIDUALS WITHOUT QUALIFYING CHILDREN.—In the case of any taxable year beginning after December 31, 2020, and before January 1, 2022—

"(1) DECREASE IN MINIMUM AGE FOR CREDIT.—

"(A) IN GENERAL.—Subsection (c)(1)(A)(ii)(II) shall be applied by substituting 'the applicable minimum age' for 'age 25'.

"(B) APPLICABLE MINIMUM AGE.—For purposes of this paragraph, the term 'applicable minimum age' means—

"(i) except as otherwise provided in this subparagraph, age 19,

"(ii) in the case of a specified student (other than a qualified former foster youth or a qualified homeless youth), age 24, and

"(iii) in the case of a qualified former foster youth or a qualified homeless youth, age 18.

"(C) SPECIFIED STUDENT.—For purposes of this paragraph, the term 'specified student' means, with respect to any taxable year, an individual who is an eligible student (as defined in section 25A(b)(3)) during at least 5 calendar months during the taxable year.

"(D) QUALIFIED FORMER FOSTER YOUTH.—For purposes of this paragraph, the term 'qualified former foster youth' means an individual who—

"(i) on or after the date that such individual attained age 14, was in foster care provided under the supervision or administration of an entity administering (or eligible to administer) a plan under part B or part E of title IV of the Social Security Act (without regard to whether Federal assistance was provided with respect to such child under such part E), and

"(ii) provides (in such manner as the Secretary may provide) consent for entities which administer a plan under part B or part E of title IV of the Social Security Act to disclose to the Secretary information related to the status of such individual as a qualified former foster youth.

"(E) QUALIFIED HOMELESS YOUTH.—For purposes of this paragraph, the term 'qualified homeless youth' means, with respect to any taxable year, an individual who certifies, in a manner as provided by the Secretary, that such individual is either an unaccompanied youth who is a homeless child or youth, or is unaccompanied, at risk of homelessness, and self-supporting.

"(2) ELIMINATION OF MAXIMUM AGE FOR CREDIT.—Subsection (c)(1)(A)(ii)(II) shall be applied without regard to the phrase 'but not attained age 65'.

"(3) INCREASE IN CREDIT AND PHASEOUT PERCENTAGES.—The table contained in subsection (b)(1) shall be applied by substituting '15.3' for '7.65' each place it appears therein.

"(4) INCREASE IN EARNED INCOME AND PHASEOUT AMOUNTS.—

"(A) IN GENERAL.—The table contained in subsection (b)(2)(A) shall be applied—

"(i) by substituting '$9,820' for '$4,220', and

"(ii) by substituting '$11,610' for '$5,280'.

"(B) COORDINATION WITH INFLATION ADJUSTMENT.—Subsection (j) shall not apply to any dollar amount specified in this paragraph.".

(b) INFORMATION RETURN MATCHING.—As soon as practicable, the Secretary of the Treasury (or the Secretary's delegate) shall develop and implement procedures to use information returns under section 6050S (relating to returns relating to higher education tuition and related expenses) to check the status of individuals as specified students for purposes of section 32(n)(1)(B)(ii) of the Internal Revenue Code of 1986 (as added by this section).

(c) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2020.

**SEC. 9622. TAXPAYER ELIGIBLE FOR CHILDLESS EARNED INCOME CREDIT IN CASE OF QUALIFYING CHILDREN WHO FAIL TO MEET CERTAIN IDENTIFICATION REQUIREMENTS.**

(a) IN GENERAL.—Section 32(c)(1) of the Internal Revenue Code of 1986 is amended by striking subparagraph (F).

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2020.

**SEC. 9623. CREDIT ALLOWED IN CASE OF CERTAIN SEPARATED SPOUSES.**

(a) IN GENERAL.—Section 32(d) of the Internal Revenue Code of 1986 is amended—

H. R. 1319—151

(1) by striking "MARRIED INDIVIDUALS.—In the case of" and inserting the following: "MARRIED INDIVIDUALS.—

"(1) IN GENERAL.—In the case of", and

(2) by adding at the end the following new paragraph:

"(2) DETERMINATION OF MARITAL STATUS.—For purposes of this section—

"(A) IN GENERAL.—Except as provided in subparagraph (B), marital status shall be determined under section 7703(a).

"(B) SPECIAL RULE FOR SEPARATED SPOUSE.—An individual shall not be treated as married if such individual—

"(i) is married (as determined under section 7703(a)) and does not file a joint return for the taxable year,

"(ii) resides with a qualifying child of the individual for more than one-half of such taxable year, and

"(iii)(I) during the last 6 months of such taxable year, does not have the same principal place of abode as the individual's spouse, or

"(II) has a decree, instrument, or agreement (other than a decree of divorce) described in section 121(d)(3)(C) with respect to the individual's spouse and is not a member of the same household with the individual's spouse by the end of the taxable year.".

(b) CONFORMING AMENDMENTS.—

(1) Section 32(c)(1)(A) of such Code is amended by striking the last sentence.

(2) Section 32(c)(1)(E)(ii) of such Code is amended by striking "(within the meaning of section 7703)".

(3) Section 32(d)(1) of such Code, as amended by subsection (a), is amended by striking "(within the meaning of section 7703)".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

## SEC. 9624. MODIFICATION OF DISQUALIFIED INVESTMENT INCOME TEST.

(a) IN GENERAL.—Section 32(i) of the Internal Revenue Code of 1986 is amended by striking "$2,200" and inserting "$10,000".

(b) INFLATION ADJUSTMENT.—Section 32(j)(1) of such Code is amended—

(1) in the matter preceding subparagraph (A), by inserting "(2021 in the case of the dollar amount in subsection (i)(1))" after "2015",

(2) in subparagraph (B)(i)—

(A) by striking "subsections (b)(2)(A) and (i)(1)" and inserting "subsection (b)(2)(A)", and

(B) by striking "and" at the end,

(3) by striking the period at the end of subparagraph (B)(ii) and inserting ", and", and

(4) by inserting after subparagraph (B)(ii) the following new clause:

"(iii) in the case of the $10,000 amount in subsection (i)(1), 'calendar year 2020' for 'calendar year 2016'.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

H. R. 1319—152

**SEC. 9625. APPLICATION OF EARNED INCOME TAX CREDIT IN POSSESSIONS OF THE UNITED STATES.**

(a) IN GENERAL.—Chapter 77 of the Internal Revenue Code of 1986 is amended by adding at the end the following new section:

**"SEC. 7530. APPLICATION OF EARNED INCOME TAX CREDIT TO POSSESSIONS OF THE UNITED STATES.**

"(a) PUERTO RICO.—

"(1) IN GENERAL.—With respect to calendar year 2021 and each calendar year thereafter, the Secretary shall, except as otherwise provided in this subsection, make payments to Puerto Rico equal to—

"(A) the specified matching amount for such calendar year, plus

"(B) in the case of calendar years 2021 through 2025, the lesser of—

"(i) the expenditures made by Puerto Rico during such calendar year for education efforts with respect to individual taxpayers and tax return preparers relating to the earned income tax credit, or

"(ii) $1,000,000.

"(2) REQUIREMENT TO REFORM EARNED INCOME TAX CREDIT.—The Secretary shall not make any payments under paragraph (1) with respect to any calendar year unless Puerto Rico has in effect an earned income tax credit for taxable years beginning in or with such calendar year which (relative to the earned income tax credit which was in effect for taxable years beginning in or with calendar year 2019) increases the percentage of earned income which is allowed as a credit for each group of individuals with respect to which such percentage is separately stated or determined in a manner designed to substantially increase workforce participation.

"(3) SPECIFIED MATCHING AMOUNT.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'specified matching amount' means, with respect to any calendar year, the lesser of—

"(i) the excess (if any) of—

"(I) the cost to Puerto Rico of the earned income tax credit for taxable years beginning in or with such calendar year, over

"(II) the base amount for such calendar year, or

"(ii) the product of 3, multiplied by the base amount for such calendar year.

"(B) BASE AMOUNT.—

"(i) BASE AMOUNT FOR 2021.—In the case of calendar year 2021, the term 'base amount' means the greater of—

"(I) the cost to Puerto Rico of the earned income tax credit for taxable years beginning in or with calendar year 2019 (rounded to the nearest multiple of $1,000,000), or

"(II) $200,000,000.

"(ii) INFLATION ADJUSTMENT.—In the case of any calendar year after 2021, the term 'base amount' means

H. R. 1319—153

the dollar amount determined under clause (i) increased by an amount equal to—

"(I) such dollar amount, multiplied by—

"(II) the cost-of-living adjustment determined under section 1(f)(3) for such calendar year, determined by substituting 'calendar year 2020' for 'calendar year 2016' in subparagraph (A)(ii) thereof. Any amount determined under this clause shall be rounded to the nearest multiple of $1,000,000.

"(4) RULES RELATED TO PAYMENTS.—

"(A) TIMING OF PAYMENTS.—The Secretary shall make payments under paragraph (1) for any calendar year—

"(i) after receipt of such information as the Secretary may require to determine such payments, and

"(ii) except as provided in clause (i), within a reasonable period of time before the due date for individual income tax returns (as determined under the laws of Puerto Rico) for taxable years which began on the first day of such calendar year.

"(B) INFORMATION.—The Secretary may require the reporting of such information as the Secretary may require to carry out this subsection.

"(C) DETERMINATION OF COST OF EARNED INCOME TAX CREDIT.—For purposes of this subsection, the cost to Puerto Rico of the earned income tax credit shall be determined by the Secretary on the basis of the laws of Puerto Rico and shall include reductions in revenues received by Puerto Rico by reason of such credit and refunds attributable to such credit, but shall not include any administrative costs with respect to such credit.

"(b) POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—

"(1) IN GENERAL.—With respect to calendar year 2021 and each calendar year thereafter, the Secretary shall, except as otherwise provided in this subsection, make payments to the Virgin Islands, Guam, and the Commonwealth of the Northern Mariana Islands equal to—

"(A) the cost to such possession of the earned income tax credit for taxable years beginning in or with such calendar year, plus

"(B) in the case of calendar years 2021 through 2025, the lesser of—

"(i) the expenditures made by such possession during such calendar year for education efforts with respect to individual taxpayers and tax return preparers relating to such earned income tax credit, or

"(ii) $50,000.

"(2) APPLICATION OF CERTAIN RULES.—Rules similar to the rules of subparagraphs (A), (B), and (C) of subsection (a)(4) shall apply for purposes of this subsection.

"(c) AMERICAN SAMOA.—

"(1) IN GENERAL.—With respect to calendar year 2021 and each calendar year thereafter, the Secretary shall, except as otherwise provided in this subsection, make payments to American Samoa equal to—

"(A) the lesser of—

H. R. 1319—154

"(i) the cost to American Samoa of the earned income tax credit for taxable years beginning in or with such calendar year, or

"(ii) $16,000,000, plus

"(B) in the case of calendar years 2021 through 2025, the lesser of—

"(i) the expenditures made by American Samoa during such calendar year for education efforts with respect to individual taxpayers and tax return preparers relating to such earned income tax credit, or

"(ii) $50,000.

"(2) REQUIREMENT TO ENACT AND MAINTAIN AN EARNED INCOME TAX CREDIT.—The Secretary shall not make any payments under paragraph (1) with respect to any calendar year unless American Samoa has in effect an earned income tax credit for taxable years beginning in or with such calendar year which allows a refundable tax credit to individuals on the basis of the taxpayer's earned income which is designed to substantially increase workforce participation.

"(3) INFLATION ADJUSTMENT.—In the case of any calendar year after 2021, the $16,000,000 amount in paragraph (1)(A)(ii) shall be increased by an amount equal to—

"(A) such dollar amount, multiplied by—

"(B) the cost-of-living adjustment determined under section 1(f)(3) for such calendar year, determined by substituting 'calendar year 2020' for 'calendar year 2016' in subparagraph (A)(ii) thereof.

Any increase determined under this clause shall be rounded to the nearest multiple of $100,000.

"(4) APPLICATION OF CERTAIN RULES.—Rules similar to the rules of subparagraphs (A), (B), and (C) of subsection (a)(4) shall apply for purposes of this subsection.

"(d) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this section shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter 77 of the Internal Revenue Code of 1986 is amended by adding at the end the following new item:

"Sec. 7530. Application of earned income tax credit to possessions of the United States.".

**SEC. 9626. TEMPORARY SPECIAL RULE FOR DETERMINING EARNED INCOME FOR PURPOSES OF EARNED INCOME TAX CREDIT.**

(a) IN GENERAL.—If the earned income of the taxpayer for the taxpayer's first taxable year beginning in 2021 is less than the earned income of the taxpayer for the taxpayer's first taxable year beginning in 2019, the credit allowed under section 32 of the Internal Revenue Code of 1986 may, at the election of the taxpayer, be determined by substituting—

(1) such earned income for the taxpayer's first taxable year beginning in 2019, for

(2) such earned income for the taxpayer's first taxable year beginning in 2021.

(b) EARNED INCOME.—

H. R. 1319—155

(1) IN GENERAL.—For purposes of this section, the term "earned income" has the meaning given such term under section 32(c) of the Internal Revenue Code of 1986.

(2) APPLICATION TO JOINT RETURNS.—For purposes of subsection (a), in the case of a joint return, the earned income of the taxpayer for the first taxable year beginning in 2019 shall be the sum of the earned income of each spouse for such taxable year.

(c) SPECIAL RULES.—

(1) ERRORS TREATED AS MATHEMATICAL ERRORS.—For purposes of section 6213 of the Internal Revenue Code of 1986, an incorrect use on a return of earned income pursuant to subsection (a) shall be treated as a mathematical or clerical error.

(2) NO EFFECT ON DETERMINATION OF GROSS INCOME, ETC.—Except as otherwise provided in this subsection, the Internal Revenue Code of 1986 shall be applied without regard to any substitution under subsection (a).

(d) TREATMENT OF CERTAIN POSSESSIONS.—

(1) PAYMENTS TO POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—The Secretary of the Treasury shall pay to each possession of the United States which has a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the application of the provisions of this section (other than this subsection) with respect to section 32 of the Internal Revenue Code of 1986. Such amounts shall be determined by the Secretary of the Treasury based on information provided by the government of the respective possession.

(2) PAYMENTS TO OTHER POSSESSIONS.—The Secretary of the Treasury shall pay to each possession of the United States which does not have a mirror code tax system amounts estimated by the Secretary of the Treasury as being equal to the aggregate benefits (if any) that would have been provided to residents of such possession by reason of the provisions of this section (other than this subsection) with respect to section 32 of the Internal Revenue Code of 1986 if a mirror code tax system had been in effect in such possession. The preceding sentence shall not apply unless the respective possession has a plan, which has been approved by the Secretary of the Treasury, under which such possession will promptly distribute such payments to its residents.

(3) MIRROR CODE TAX SYSTEM.—For purposes of this section, the term "mirror code tax system" means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

(4) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this section shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

## PART 4—DEPENDENT CARE ASSISTANCE

**SEC. 9631. REFUNDABILITY AND ENHANCEMENT OF CHILD AND DEPENDENT CARE TAX CREDIT.**

(a) IN GENERAL.—Section 21 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(g) SPECIAL RULES FOR 2021.—In the case of any taxable year beginning after December 31, 2020, and before January 1, 2022—

"(1) CREDIT MADE REFUNDABLE.—If the taxpayer (in the case of a joint return, either spouse) has a principal place of abode in the United States (determined as provided in section 32) for more than one-half of the taxable year, the credit allowed under subsection (a) shall be treated as a credit allowed under subpart C (and not allowed under this subpart).

"(2) INCREASE IN DOLLAR LIMIT ON AMOUNT CREDITABLE.—Subsection (c) shall be applied—

"(A) by substituting '$8,000' for '$3,000' in paragraph (1) thereof, and

"(B) by substituting '$16,000' for '$6,000' in paragraph (2) thereof.

"(3) INCREASE IN APPLICABLE PERCENTAGE.—Subsection (a)(2) shall be applied—

"(A) by substituting '50 percent' for '35 percent', and

"(B) by substituting '$125,000' for '$15,000'.

"(4) APPLICATION OF PHASEOUT TO HIGH INCOME INDIVIDUALS.—

"(A) IN GENERAL.—Subsection (a)(2) shall be applied by substituting 'the phaseout percentage' for '20 percent'.

"(B) PHASEOUT PERCENTAGE.—The term 'phaseout percentage' means 20 percent reduced (but not below zero) by 1 percentage point for each $2,000 (or fraction thereof) by which the taxpayer's adjusted gross income for the taxable year exceeds $400,000.".

(b) APPLICATION OF CREDIT IN POSSESSIONS.—Section 21 of such Code, as amended by subsection (a), is amended by adding at the end the following new subsection:

"(h) APPLICATION OF CREDIT IN POSSESSIONS.—

"(1) PAYMENT TO POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—The Secretary shall pay to each possession of the United States with a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the application of this section (determined without regard to this subsection) with respect to taxable years beginning in or with 2021. Such amounts shall be determined by the Secretary based on information provided by the government of the respective possession.

"(2) PAYMENTS TO OTHER POSSESSIONS.—The Secretary shall pay to each possession of the United States which does not have a mirror code tax system amounts estimated by the Secretary as being equal to the aggregate benefits that would have been provided to residents of such possession by reason of this section with respect to taxable years beginning in or with 2021 if a mirror code tax system had been in effect in such possession. The preceding sentence shall not apply unless the respective possession has a plan, which has been

H. R. 1319—157

approved by the Secretary, under which such possession will promptly distribute such payments to its residents.

"(3) COORDINATION WITH CREDIT ALLOWED AGAINST UNITED STATES INCOME TAXES.—In the case of any taxable year beginning in or with 2021, no credit shall be allowed under this section to any individual—

"(A) to whom a credit is allowable against taxes imposed by a possession with a mirror code tax system by reason of this section, or

"(B) who is eligible for a payment under a plan described in paragraph (2).

"(4) MIRROR CODE TAX SYSTEM.—For purposes of this subsection, the term 'mirror code tax system' means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

"(5) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this subsection shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.".

(c) CONFORMING AMENDMENTS.—

(1) Section 6211(b)(4)(A) of such Code, as amended by the preceding provisions of this Act, is amended by inserting "21 by reason of subsection (g) thereof," before "24".

(2) Section 1324(b)(2) of title 31, United States Code (as amended by the preceding provisions of this title), is amended by inserting "21," before "24".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

## SEC. 9632. INCREASE IN EXCLUSION FOR EMPLOYER-PROVIDED DEPENDENT CARE ASSISTANCE.

(a) IN GENERAL.—Section 129(a)(2) of the Internal Revenue Code of 1986 is amended by adding at the end the following new subparagraph:

"(D) SPECIAL RULE FOR 2021.—In the case of any taxable year beginning after December 31, 2020, and before January 1, 2022, subparagraph (A) shall be applied by substituting '$10,500 (half such dollar amount)' for '$5,000 ($2,500)'.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2020.

(c) RETROACTIVE PLAN AMENDMENTS.—A plan that otherwise satisfies all applicable requirements of sections 125 and 129 of the Internal Revenue Code of 1986 (including any rules or regulations thereunder) shall not fail to be treated as a cafeteria plan or dependent care assistance program merely because such plan is amended pursuant to a provision under this section and such amendment is retroactive, if—

(1) such amendment is adopted no later than the last day of the plan year in which the amendment is effective, and

(2) the plan is operated consistent with the terms of such amendment during the period beginning on the effective date

H. R. 1319—158

of the amendment and ending on the date the amendment is adopted.

# PART 5—CREDITS FOR PAID SICK AND FAMILY LEAVE

**SEC. 9641. PAYROLL CREDITS.**

(a) IN GENERAL.—Chapter 21 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subchapter:

## "Subchapter D—Credits

"Sec. 3131. Credit for paid sick leave.
"Sec. 3132. Payroll credit for paid family leave.
"Sec. 3133. Special rule related to tax on employers.

**"SEC. 3131. CREDIT FOR PAID SICK LEAVE.**

"(a) IN GENERAL.—In the case of an employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 100 percent of the qualified sick leave wages paid by such employer with respect to such calendar quarter.

"(b) LIMITATIONS AND REFUNDABILITY.—

"(1) WAGES TAKEN INTO ACCOUNT.—The amount of qualified sick leave wages taken into account under subsection (a), plus any increases under subsection (e), with respect to any individual shall not exceed $200 ($511 in the case of any day any portion of which is paid sick time described in paragraph (1), (2), or (3) of section 5102(a) of the Emergency Paid Sick Leave Act, applied with the modification described in subsection (c)(2)(A)(i)) for any day (or portion thereof) for which the individual is paid qualified sick leave wages.

"(2) OVERALL LIMITATION ON NUMBER OF DAYS TAKEN INTO ACCOUNT.—The aggregate number of days taken into account under paragraph (1) for any calendar quarter shall not exceed the excess (if any) of—

"(A) 10, over

"(B) the aggregate number of days so taken into account during preceding calendar quarters in such calendar year (other than the first quarter of calendar year 2021).

"(3) CREDIT LIMITED TO CERTAIN EMPLOYMENT TAXES.—The credit allowed by subsection (a) with respect to any calendar quarter shall not exceed the applicable employment taxes for such calendar quarter on the wages paid with respect to the employment of all employees of the employer.

"(4) REFUNDABILITY OF EXCESS CREDIT.—

"(A) CREDIT IS REFUNDABLE.—If the amount of the credit under subsection (a) exceeds the limitation of paragraph (3) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b).

"(B) ADVANCING CREDIT.—In anticipation of the credit, including the refundable portion under subparagraph (A), the credit shall be advanced, according to forms and instructions provided by the Secretary, up to an amount

H. R. 1319—159

calculated under subsection (a), subject to the limits under paragraph (1) and (2), all calculated through the end of the most recent payroll period in the quarter.

"(c) QUALIFIED SICK LEAVE WAGES.—For purposes of this section—

"(1) IN GENERAL.—The term 'qualified sick leave wages' means wages paid by an employer which would be required to be paid by reason of the Emergency Paid Sick Leave Act as if such Act applied after March 31, 2021.

"(2) RULES OF APPLICATION.—For purposes of determining whether wages are qualified sick leave wages under paragraph (1)—

"(A) IN GENERAL.—The Emergency Paid Sick Leave Act shall be applied—

"(i) by inserting ', the employee is seeking or awaiting the results of a diagnostic test for, or a medical diagnosis of, COVID–19 and such employee has been exposed to COVID–19 or the employee's employer has requested such test or diagnosis, or the employee is obtaining immunization related to COVID–19 or recovering from any injury, disability, illness, or condition related to such immunization' after 'medical diagnosis' in section 5102(a)(3) thereof, and

"(ii) by applying section 5102(b)(1) of such Act separately with respect to each calendar year after 2020 (and, in the case of calendar year 2021, without regard to the first quarter thereof).

"(B) LEAVE MUST MEET REQUIREMENTS.—If an employer fails to comply with any requirement of such Act (determined without regard to section 5109 thereof) with respect to paid sick time (as defined in section 5110 of such Act), amounts paid by such employer with respect to such paid sick time shall not be taken into account as qualified sick leave wages. For purposes of the preceding sentence, an employer which takes an action described in section 5104 of such Act shall be treated as failing to meet a requirement of such Act.

"(d) ALLOWANCE OF CREDIT FOR CERTAIN HEALTH PLAN EXPENSES.—

"(1) IN GENERAL.—The amount of the credit allowed under subsection (a) shall be increased by so much of the employer's qualified health plan expenses as are properly allocable to the qualified sick leave wages for which such credit is so allowed.

"(2) QUALIFIED HEALTH PLAN EXPENSES.—For purposes of this subsection, the term 'qualified health plan expenses' means amounts paid or incurred by the employer to provide and maintain a group health plan (as defined in section 5000(b)(1)), but only to the extent that such amounts are excluded from the gross income of employees by reason of section 106(a).

"(3) ALLOCATION RULES.—For purposes of this section, qualified health plan expenses shall be allocated to qualified sick leave wages in such manner as the Secretary may prescribe. Except as otherwise provided by the Secretary, such allocation shall be treated as properly made if made on the basis of being pro rata among covered employees and pro rata

H. R. 1319—160

on the basis of periods of coverage (relative to the time periods of leave to which such wages relate).

"(e) ALLOWANCE OF CREDIT FOR AMOUNTS PAID UNDER CERTAIN COLLECTIVELY BARGAINED AGREEMENTS.—

"(1) IN GENERAL.—The amount of the credit allowed under subsection (a) shall be increased by the sum of—

"(A) so much of the employer's collectively bargained defined benefit pension plan contributions as are properly allocable to the qualified sick leave wages for which such credit is so allowed, plus

"(B) so much of the employer's collectively bargained apprenticeship program contributions as are properly allocable to the qualified sick leave wages for which such credit is so allowed.

"(2) COLLECTIVELY BARGAINED DEFINED BENEFIT PENSION PLAN CONTRIBUTIONS.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'collectively bargained defined benefit pension plan contributions' means, with respect to any calendar quarter, contributions which—

"(i) are paid or incurred by an employer during the calendar quarter on behalf of its employees to a defined benefit plan (as defined in section 414(j)), which meets the requirements of section 401(a),

"(ii) are made based on a pension contribution rate, and

"(iii) are required to be made pursuant to the terms of a collective bargaining agreement in effect with respect to such calendar quarter.

"(B) PENSION CONTRIBUTION RATE.—The term 'pension contribution rate' means the contribution rate that the employer is obligated to pay on behalf of its employees under the terms of a collective bargaining agreement for benefits under a defined benefit plan under such agreement, as such rate is applied to contribution base units (as defined by section 4001(a)(11) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1301(a)(11)).

"(C) ALLOCATION RULES.—The amount of collectively bargained defined benefit pension plan contributions allocated to qualified sick leave wages for any calendar quarter shall be the product of—

"(i) the pension contribution rate (expressed as an hourly rate), and

"(ii) the number of hours for which qualified sick leave wages were provided to employees covered under the collective bargaining agreement described in subparagraph (A)(iii) during the calendar quarter.

"(3) COLLECTIVELY BARGAINED APPRENTICESHIP PROGRAM CONTRIBUTIONS.—For purposes of this section—

"(A) IN GENERAL.—The term 'collectively bargained apprenticeship program contributions' means, with respect to any calendar quarter, contributions which—

"(i) are paid or incurred by an employer on behalf of its employees with respect to the calendar quarter to a registered apprenticeship program,

"(ii) are made based on an apprenticeship program contribution rate, and

"(iii) are required to be made pursuant to the terms of a collective bargaining agreement that is in effect with respect to such calendar quarter.

"(B) REGISTERED APPRENTICESHIP PROGRAM.—The term 'registered apprenticeship program' means an apprenticeship registered under the Act of August 16, 1937 (commonly known as the 'National Apprenticeship Act'; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.) that meets the standards of subpart A of part 29 and part 30 of title 29, Code of Federal Regulations.

"(C) APPRENTICESHIP PROGRAM CONTRIBUTION RATE.— The term 'apprenticeship program contribution rate' means the contribution rate that the employer is obligated to pay on behalf of its employees under the terms of a collective bargaining agreement for benefits under a registered apprenticeship program under such agreement, as such rate is applied to contribution base units (as defined by section 4001(a)(11) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1301(a)(11)).

"(D) ALLOCATION RULES.—The amount of collectively bargained apprenticeship program contributions allocated to qualified sick leave wages for any calendar quarter shall be the product of—

"(i) the apprenticeship program contribution rate (expressed as an hourly rate), and

"(ii) the number of hours for which qualified sick leave wages were provided to employees covered under the collective bargaining agreement described in subparagraph (A)(iii) during the calendar quarter.

"(f) DEFINITIONS AND SPECIAL RULES.—

"(1) APPLICABLE EMPLOYMENT TAXES.—For purposes of this section, the term 'applicable employment taxes' means the following:

"(A) The taxes imposed under section 3111(b).

"(B) So much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b).

"(2) WAGES.—For purposes of this section, the term 'wages' means wages (as defined in section 3121(a), determined without regard to paragraphs (1) through (22) of section 3121(b)) and compensation (as defined in section 3231(e), determined without regard to the sentence in paragraph (1) thereof which begins 'Such term does not include remuneration').

"(3) DENIAL OF DOUBLE BENEFIT.—For purposes of chapter 1, the gross income of the employer, for the taxable year which includes the last day of any calendar quarter with respect to which a credit is allowed under this section, shall be increased by the amount of such credit. Any wages taken into account in determining the credit allowed under this section shall not be taken into account for purposes of determining the credit allowed under sections 45A, 45P, 45S, 51, 3132, and 3134. In the case of any credit allowed under section 2301 of the CARES Act or section 41 with respect to wages taken into account under this section, the credit allowed under this section shall be reduced by the portion of the credit allowed under such section 2301 or section 41 which is attributable to such wages.

"(4) ELECTION TO NOT TAKE CERTAIN WAGES INTO ACCOUNT.—This section shall not apply to so much of the qualified sick leave wages paid by an eligible employer as such employer elects (at such time and in such manner as the Secretary may prescribe) to not take into account for purposes of this section.

"(5) CERTAIN GOVERNMENTAL EMPLOYERS.—No credit shall be allowed under this section to the Government of the United States or to any agency or instrumentality thereof. The preceding sentence shall not apply to any organization described in section 501(c)(1) and exempt from tax under section 501(a).

"(6) EXTENSION OF LIMITATION ON ASSESSMENT.—Notwithstanding section 6501, the limitation on the time period for the assessment of any amount attributable to a credit claimed under this section shall not expire before the date that is 5 years after the later of—

"(A) the date on which the original return which includes the calendar quarter with respect to which such credit is determined is filed, or

"(B) the date on which such return is treated as filed under section 6501(b)(2).

"(7) COORDINATION WITH CERTAIN PROGRAMS.—

"(A) IN GENERAL.—This section shall not apply to so much of the qualified sick leave wages paid by an eligible employer as are taken into account as payroll costs in connection with—

"(i) a covered loan under section 7(a)(37) or 7A of the Small Business Act,

"(ii) a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, or

"(iii) a restaurant revitalization grant under section 5003 of the American Rescue Plan Act of 2021.

"(B) APPLICATION WHERE PPP LOANS NOT FORGIVEN.— The Secretary shall issue guidance providing that payroll costs paid during the covered period shall not fail to be treated as qualified sick leave wages under this section by reason of subparagraph (A)(i) to the extent that—

"(i) a covered loan of the taxpayer under section 7(a)(37) of the Small Business Act is not forgiven by reason of a decision under section 7(a)(37)(J) of such Act, or

"(ii) a covered loan of the taxpayer under section 7A of the Small Business Act is not forgiven by reason of a decision under section 7A(g) of such Act.

Terms used in the preceding sentence which are also used in section 7A(g) or 7(a)(37)(J) of the Small Business Act shall, when applied in connection with either such section, have the same meaning as when used in such section, respectively.

"(g) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary to carry out the purposes of this section, including—

"(1) regulations or other guidance to prevent the avoidance of the purposes of the limitations under this section,

"(2) regulations or other guidance to minimize compliance and record-keeping burdens under this section,

H. R. 1319—163

"(3) regulations or other guidance providing for waiver of penalties for failure to deposit amounts in anticipation of the allowance of the credit allowed under this section,

"(4) regulations or other guidance for recapturing the benefit of credits determined under this section in cases where there is a subsequent adjustment to the credit determined under subsection (a),

"(5) regulations or other guidance to ensure that the wages taken into account under this section conform with the paid sick time required to be provided under the Emergency Paid Sick Leave Act,

"(6) regulations or other guidance to permit the advancement of the credit determined under subsection (a), and

"(7) regulations or other guidance with respect to the allocation, reporting, and substantiation of collectively bargained defined benefit pension plan contributions and collectively bargained apprenticeship program contributions.

"(h) APPLICATION OF SECTION.—This section shall apply only to wages paid with respect to the period beginning on April 1, 2021, and ending on September 30, 2021.

"(i) TREATMENT OF DEPOSITS.—The Secretary shall waive any penalty under section 6656 for any failure to make a deposit of applicable employment taxes if the Secretary determines that such failure was due to the anticipation of the credit allowed under this section.

"(j) NON-DISCRIMINATION REQUIREMENT.—No credit shall be allowed under this section to any employer for any calendar quarter if such employer, with respect to the availability of the provision of qualified sick leave wages to which this section otherwise applies for such calendar quarter, discriminates in favor of highly compensated employees (within the meaning of section 414(q)), full-time employees, or employees on the basis of employment tenure with such employer.

**"SEC. 3132. PAYROLL CREDIT FOR PAID FAMILY LEAVE.**

"(a) IN GENERAL.—In the case of an employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 100 percent of the qualified family leave wages paid by such employer with respect to such calendar quarter.

"(b) LIMITATIONS AND REFUNDABILITY.—

"(1) WAGES TAKEN INTO ACCOUNT.—The amount of qualified family leave wages taken into account under subsection (a), plus any increases under subsection (e), with respect to any individual shall not exceed—

"(A) for any day (or portion thereof) for which the individual is paid qualified family leave wages, $200, and

"(B) in the aggregate with respect to all calendar quarters, $12,000.

"(2) CREDIT LIMITED TO CERTAIN EMPLOYMENT TAXES.—The credit allowed by subsection (a) with respect to any calendar quarter shall not exceed the applicable employment taxes for such calendar quarter (reduced by any credits allowed under section 3131) on the wages paid with respect to the employment of all employees of the employer.

"(3) REFUNDABILITY OF EXCESS CREDIT.—

H. R. 1319—164

"(A) CREDIT IS REFUNDABLE.—If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b).

"(B) ADVANCING CREDIT.—In anticipation of the credit, including the refundable portion under subparagraph (A), the credit shall be advanced, according to forms and instructions provided by the Secretary, up to an amount calculated under subsection (a), subject to the limits under paragraph (1) and (2), all calculated through the end of the most recent payroll period in the quarter.

"(c) QUALIFIED FAMILY LEAVE WAGES.—

"(1) IN GENERAL.—For purposes of this section, the term 'qualified family leave wages' means wages paid by an employer which would be required to be paid by reason of the Emergency Family and Medical Leave Expansion Act (including the amendments made by such Act) as if such Act (and amendments made by such Act) applied after March 31, 2021.

"(2) RULES OF APPLICATION.—

"(A) IN GENERAL.—For purposes of determining whether wages are qualified family leave wages under paragraph (1)—

"(i) section 110(a)(2)(A) of the Family and Medical Leave Act of 1993 shall be applied by inserting 'or any reason for leave described in section 5102(a) of the Families First Coronavirus Response Act, or the employee is seeking or awaiting the results of a diagnostic test for, or a medical diagnosis of, COVID–19 and such employee has been exposed to COVID–19 or the employee's employer has requested such test or diagnosis, or the employee is obtaining immunization related to COVID–19 or recovering from any injury, disability, illness, or condition related to such immunization' after 'public health emergency', and

"(ii) section 110(b) of such Act shall be applied—

"(I) without regard to paragraph (1) thereof,

"(II) by striking 'after taking leave after such section for 10 days' in paragraph (2)(A) thereof, and

"(III) by substituting '$12,000' for '$10,000' in paragraph (2)(B)(ii) thereof.

"(B) LEAVE MUST MEET REQUIREMENTS.—For purposes of determining whether wages would be required to be paid under paragraph (1), if an employer fails to comply with any requirement of the Family and Medical Leave Act of 1993 or the Emergency Family and Medical Leave Expansion Act (determined without regard to any time limitation under section 102(a)(1)(F) of the Family and Medical Leave Act of 1994) with respect to any leave provided for a qualifying need related to a public health emergency (as defined in section 110 of such Act, applied as described in subparagraph (A)(i)), amounts paid by such employer with respect to such leave shall not be taken into account as qualified family leave wages. For purposes of the preceding sentence, an employer which takes an action described in section 105 of the Family and Medical

H. R. 1319—165

Leave Act of 1993 shall be treated as failing to meet a requirement of such Act.

"(d) ALLOWANCE OF CREDIT FOR CERTAIN HEALTH PLAN EXPENSES.—

"(1) IN GENERAL.—The amount of the credit allowed under subsection (a) shall be increased by so much of the employer's qualified health plan expenses as are properly allocable to the qualified family leave wages for which such credit is so allowed.

"(2) QUALIFIED HEALTH PLAN EXPENSES.—For purposes of this subsection, the term 'qualified health plan expenses' means amounts paid or incurred by the employer to provide and maintain a group health plan (as defined in section 5000(b)(1)), but only to the extent that such amounts are excluded from the gross income of employees by reason of section 106(a).

"(3) ALLOCATION RULES.—For purposes of this section, qualified health plan expenses shall be allocated to qualified family leave wages in such manner as the Secretary may prescribe. Except as otherwise provided by the Secretary, such allocation shall be treated as properly made if made on the basis of being pro rata among covered employees and pro rata on the basis of periods of coverage (relative to the time periods of leave to which such wages relate).

"(e) ALLOWANCE OF CREDIT FOR AMOUNTS PAID UNDER CERTAIN COLLECTIVELY BARGAINED AGREEMENTS.—

"(1) IN GENERAL.—The amount of the credit allowed under subsection (a) shall be increased by so much of the sum of—

"(A) so much of the employer's collectively bargained defined benefit pension plan contributions as are properly allocable to the qualified family leave wages for which such credit is so allowed, plus

"(B) so much of the employer's collectively bargained apprenticeship program contributions as are properly allocable to the qualified family leave wages for which such credit is so allowed.

"(2) COLLECTIVELY BARGAINED DEFINED BENEFIT PENSION PLAN CONTRIBUTIONS.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'collectively bargained defined benefit pension plan contributions' has the meaning given such term under section 3131(e)(2).

"(B) ALLOCATION RULES.—The amount of collectively bargained defined benefit pension plan contributions allocated to qualified family leave wages for any calendar quarter shall be the product of—

"(i) the pension contribution rate (as defined in section 3131(e)(2)), expressed as an hourly rate, and

"(ii) the number of hours for which qualified family leave wages were provided to employees covered under the collective bargaining agreement described in section 3131(e)(2)(A)(iii) during the calendar quarter.

"(3) COLLECTIVELY BARGAINED APPRENTICESHIP PROGRAM CONTRIBUTIONS.—For purposes of this section—

"(A) IN GENERAL.—The term 'collectively bargained apprenticeship program contributions' has the meaning given such term under section 3131(e)(3).

H. R. 1319—166

"(B) ALLOCATION RULES.—For purposes of this section, the amount of collectively bargained apprenticeship program contributions allocated to qualified family leave wages for any calendar quarter shall be the product of—

"(i) the apprenticeship contribution rate (as defined in section 3131(e)(3)), expressed as an hourly rate, and

"(ii) the number of hours for which qualified family leave wages were provided to employees covered under the collective bargaining agreement described in section 3131(e)(3)(A)(iii) during the calendar quarter.

"(f) DEFINITIONS AND SPECIAL RULES.—

"(1) APPLICABLE EMPLOYMENT TAXES.—For purposes of this section, the term 'applicable employment taxes' means the following:

"(A) The taxes imposed under section 3111(b).

"(B) So much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b).

"(2) WAGES.—For purposes of this section, the term 'wages' means wages (as defined in section 3121(a), determined without regard to paragraphs (1) through (22) of section 3121(b)) and compensation (as defined in section 3231(e), determined without regard to the sentence in paragraph (1) thereof which begins 'Such term does not include remuneration').

"(3) DENIAL OF DOUBLE BENEFIT.—For purposes of chapter 1, the gross income of the employer, for the taxable year which includes the last day of any calendar quarter with respect to which a credit is allowed under this section, shall be increased by the amount of such credit. Any wages taken into account in determining the credit allowed under this section shall not be taken into account for purposes of determining the credit allowed under sections 45A, 45P, 45S, 51, 3131, and 3134. In the case of any credit allowed under section 2301 of the CARES Act or section 41 with respect to wages taken into account under this section, the credit allowed under this section shall be reduced by the portion of the credit allowed under such section 2301 or section 41 which is attributable to such wages.

"(4) ELECTION TO NOT TAKE CERTAIN WAGES INTO ACCOUNT.—This section shall not apply to so much of the qualified family leave wages paid by an eligible employer as such employer elects (at such time and in such manner as the Secretary may prescribe) to not take into account for purposes of this section.

"(5) CERTAIN GOVERNMENTAL EMPLOYERS.—No credit shall be allowed under this section to the Government of the United States or to any agency or instrumentality thereof. The preceding sentence shall not apply to any organization described in section 501(c)(1) and exempt from tax under section 501(a).

"(6) EXTENSION OF LIMITATION ON ASSESSMENT.—Notwithstanding section 6501, the limitation on the time period for the assessment of any amount attributable to a credit claimed under this section shall not expire before the date that is 5 years after the later of—

H. R. 1319—167

"(A) the date on which the original return which includes the calendar quarter with respect to which such credit is determined is filed, or

"(B) the date on which such return is treated as filed under section 6501(b)(2).

"(7) COORDINATION WITH CERTAIN PROGRAMS.—

"(A) IN GENERAL.—This section shall not apply to so much of the qualified family leave wages paid by an eligible employer as are taken into account as payroll costs in connection with—

"(i) a covered loan under section 7(a)(37) or 7A of the Small Business Act,

"(ii) a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, or

"(iii) a restaurant revitalization grant under section 5003 of the American Rescue Plan Act of 2021.

"(B) APPLICATION WHERE PPP LOANS NOT FORGIVEN.— The Secretary shall issue guidance providing that payroll costs paid during the covered period shall not fail to be treated as qualified family leave wages under this section by reason of subparagraph (A)(i) to the extent that—

"(i) a covered loan of the taxpayer under section 7(a)(37) of the Small Business Act is not forgiven by reason of a decision under section 7(a)(37)(J) of such Act, or

"(ii) a covered loan of the taxpayer under section 7A of the Small Business Act is not forgiven by reason of a decision under section 7A(g) of such Act.

Terms used in the preceding sentence which are also used in section 7A(g) or 7(a)(37)(J) of the Small Business Act shall, when applied in connection with either such section, have the same meaning as when used in such section, respectively.

"(g) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary to carry out the purposes of this section, including—

"(1) regulations or other guidance to prevent the avoidance of the purposes of the limitations under this section,

"(2) regulations or other guidance to minimize compliance and record-keeping burdens under this section,

"(3) regulations or other guidance providing for waiver of penalties for failure to deposit amounts in anticipation of the allowance of the credit allowed under this section,

"(4) regulations or other guidance for recapturing the benefit of credits determined under this section in cases where there is a subsequent adjustment to the credit determined under subsection (a),

"(5) regulations or other guidance to ensure that the wages taken into account under this section conform with the paid leave required to be provided under the Emergency Family and Medical Leave Expansion Act (including the amendments made by such Act),

"(6) regulations or other guidance to permit the advancement of the credit determined under subsection (a), and

"(7) regulations or other guidance with respect to the allocation, reporting, and substantiation of collectively bargained

H. R. 1319—168

defined benefit pension plan contributions and collectively bargained apprenticeship program contributions.

"(h) APPLICATION OF SECTION.—This section shall apply only to wages paid with respect to the period beginning on April 1, 2021, and ending on September 30, 2021.

"(i) TREATMENT OF DEPOSITS.—The Secretary shall waive any penalty under section 6656 for any failure to make a deposit of applicable employment taxes if the Secretary determines that such failure was due to the anticipation of the credit allowed under this section.

"(j) NON-DISCRIMINATION REQUIREMENT.—No credit shall be allowed under this section to any employer for any calendar quarter if such employer, with respect to the availability of the provision of qualified family leave wages to which this section otherwise applies for such calendar quarter, discriminates in favor of highly compensated employees (within the meaning of section 414(q)), full-time employees, or employees on the basis of employment tenure with such employer.

**"SEC. 3133. SPECIAL RULE RELATED TO TAX ON EMPLOYERS.**

"(a) IN GENERAL.—The credit allowed by section 3131 and the credit allowed by section 3132 shall each be increased by the amount of the taxes imposed by subsections (a) and (b) of section 3111 and section 3221(a) on qualified sick leave wages, or qualified family leave wages, for which credit is allowed under such section 3131 or 3132 (respectively).

"(b) DENIAL OF DOUBLE BENEFIT.—For denial of double benefit with respect to the credit increase under subsection (a), see sections 3131(f)(3) and 3132(f)(3).".

(b) REFUNDS.—Paragraph (2) of section 1324(b) of title 31, United States Code, is amended by inserting "3131, 3132," before "6428".

(c) CLERICAL AMENDMENT.—The table of subchapters for chapter 21 of the Internal Revenue Code of 1986 is amended by adding at the end the following new item:

"SUBCHAPTER D—CREDITS".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to amounts paid with respect to calendar quarters beginning after March 31, 2021.

**SEC. 9642. CREDIT FOR SICK LEAVE FOR CERTAIN SELF-EMPLOYED INDIVIDUALS.**

(a) IN GENERAL.—In the case of an eligible self-employed individual, there shall be allowed as a credit against the tax imposed by chapter 1 of the Internal Revenue Code of 1986 for any taxable year an amount equal to the qualified sick leave equivalent amount with respect to the individual.

(b) ELIGIBLE SELF-EMPLOYED INDIVIDUAL.—For purposes of this section—

(1) IN GENERAL.—The term "eligible self-employed individual" means an individual who—

(A) regularly carries on any trade or business within the meaning of section 1402 of the Internal Revenue Code of 1986, and

(B) would be entitled to receive paid leave during the taxable year pursuant to the Emergency Paid Sick Leave Act if—

H. R. 1319—169

(i) the individual were an employee of an employer (other than himself or herself), and

(ii) such Act applied after March 31, 2021.

(2) RULES OF APPLICATION.—For purposes of paragraph (1)(B), in determining whether an individual would be entitled to receive paid leave under the Emergency Paid Sick Leave Act, such Act shall be applied—

(A) by inserting ", the employee is seeking or awaiting the results of a diagnostic test for, or a medical diagnosis of, COVID–19 and such employee has been exposed to COVID–19 or is unable to work pending the results of such test or diagnosis, or the employee is obtaining immunization related to COVID–19 or recovering from any injury, disability, illness, or condition related to such immunization" after "medical diagnosis" in section 5102(a)(3) of such Act, and

(B) by applying section 5102(b)(1) of such Act separately with respect to each taxable year.

(c) QUALIFIED SICK LEAVE EQUIVALENT AMOUNT.—For purposes of this section—

(1) IN GENERAL.—The term "qualified sick leave equivalent amount" means, with respect to any eligible self-employed individual, an amount equal to—

(A) the number of days during the taxable year (but not more than 10) that the individual is unable to perform services in any trade or business referred to in section 1402 of the Internal Revenue Code of 1986 for a reason with respect to which such individual would be entitled to receive sick leave as described in subsection (b), multiplied by

(B) the lesser of—

(i) $200 ($511 in the case of any day of paid sick time described in paragraph (1), (2), or (3) of section 5102(a) of the Emergency Paid Sick Leave Act, applied with the modification described in subsection (b)(2)(A)) of this section, or

(ii) 67 percent (100 percent in the case of any day of paid sick time described in paragraph (1), (2), or (3) of section 5102(a) of the Emergency Paid Sick Leave Act) of the average daily self-employment income of the individual for the taxable year.

(2) AVERAGE DAILY SELF-EMPLOYMENT INCOME.—For purposes of this subsection, the term "average daily self-employment income" means an amount equal to—

(A) the net earnings from self-employment of the individual for the taxable year, divided by

(B) 260.

(3) ELECTION TO USE PRIOR YEAR NET EARNINGS FROM SELF-EMPLOYMENT INCOME.—In the case of an individual who elects (at such time and in such manner as the Secretary may provide) the application of this paragraph, paragraph (2)(A) shall be applied by substituting "the prior taxable year" for "the taxable year".

(4) ELECTION TO NOT TAKE DAYS INTO ACCOUNT.—Any day shall not be taken into account under paragraph (1)(A) if the eligible self-employed individual elects (at such time and in

H. R. 1319—170

such manner as the Secretary may prescribe) to not take such day into account for purposes of such paragraph.

(d) CREDIT REFUNDABLE.—

(1) IN GENERAL.—The credit determined under this section shall be treated as a credit allowed to the taxpayer under subpart C of part IV of subchapter A of chapter 1 of such Code.

(2) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, any refund due from the credit determined under this section shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(e) SPECIAL RULES.—

(1) DOCUMENTATION.—No credit shall be allowed under this section unless the individual maintains such documentation as the Secretary may prescribe to establish such individual as an eligible self-employed individual.

(2) DENIAL OF DOUBLE BENEFIT.—In the case of an individual who receives wages (as defined in section 3121(a) of the Internal Revenue Code of 1986) or compensation (as defined in section 3231(e) of such Code) paid by an employer which are required to be paid by reason of the Emergency Paid Sick Leave Act, the qualified sick leave equivalent amount otherwise determined under subsection (c) of this section shall be reduced (but not below zero) to the extent that the sum of the amount described in such subsection and in section 3131(b)(1) of such Code exceeds $2,000 ($5,110 in the case of any day any portion of which is paid sick time described in paragraph (1), (2), or (3) of section 5102(a) of the Emergency Paid Sick Leave Act).

(f) APPLICATION OF SECTION.—Only days occurring during the period beginning on April 1, 2021, and ending on September 30, 2021, may be taken into account under subsection (c)(1)(A).

(g) APPLICATION OF CREDIT IN CERTAIN POSSESSIONS.—

(1) PAYMENTS TO POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—The Secretary shall pay to each possession of the United States which has a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the application of the provisions of this section. Such amounts shall be determined by the Secretary based on information provided by the government of the respective possession.

(2) PAYMENTS TO OTHER POSSESSIONS.—The Secretary shall pay to each possession of the United States which does not have a mirror code tax system amounts estimated by the Secretary as being equal to the aggregate benefits (if any) that would have been provided to residents of such possession by reason of the provisions of this section if a mirror code tax system had been in effect in such possession. The preceding sentence shall not apply unless the respective possession has a plan, which has been approved by the Secretary, under which such possession will promptly distribute such payments to its residents.

(3) MIRROR CODE TAX SYSTEM.—For purposes of this section, the term "mirror code tax system" means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents

H. R. 1319—171

of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

(4) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this subsection shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(h) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary to carry out the purposes of this section, including—

(1) regulations or other guidance to effectuate the purposes of this section, and

(2) regulations or other guidance to minimize compliance and record-keeping burdens under this section.

**SEC. 9643. CREDIT FOR FAMILY LEAVE FOR CERTAIN SELF-EMPLOYED INDIVIDUALS.**

(a) IN GENERAL.—In the case of an eligible self-employed individual, there shall be allowed as a credit against the tax imposed by chapter 1 of the Internal Revenue Code of 1986 for any taxable year an amount equal to 100 percent of the qualified family leave equivalent amount with respect to the individual.

(b) ELIGIBLE SELF-EMPLOYED INDIVIDUAL.—For purposes of this section—

(1) IN GENERAL.—The term "eligible self-employed individual" means an individual who—

(A) regularly carries on any trade or business within the meaning of section 1402 of the Internal Revenue Code of 1986, and

(B) would be entitled to receive paid leave during the taxable year pursuant to the Emergency Family and Medical Leave Expansion Act if—

(i) the individual were an employee of an employer (other than himself or herself),

(ii) section 102(a)(1)(F) of the Family and Medical Leave Act of 1993 applied after March 31, 2021.

(2) RULES OF APPLICATION.—For purposes of paragraph (1)(B), in determining whether an individual would be entitled to receive paid leave under the Emergency Family and Medical Leave Act—

(A) section 110(a)(2)(A) of the Family and Medical Leave Act of 1993 shall be applied by inserting "or any reason for leave described in section 5102(a) of the Families First Coronavirus Response Act, or the employee is seeking or awaiting the results of a diagnostic test for, or a medical diagnosis of, COVID–19 and such employee has been exposed to COVID–19 or is unable to work pending the results of such test or diagnosis, or the employee is obtaining immunization related to COVID–19 or recovering from any injury, disability, illness, or condition related to such immunization" after "public health emergency", and

(B) section 110(b) of such Act shall be applied—

(i) without regard to paragraph (1) thereof, and

(ii) by striking "after taking leave after such section for 10 days" in paragraph (2)(A) thereof.

H. R. 1319—172

(c) QUALIFIED FAMILY LEAVE EQUIVALENT AMOUNT.—For purposes of this section—

(1) IN GENERAL.—The term "qualified family leave equivalent amount" means, with respect to any eligible self-employed individual, an amount equal to the product of—

(A) the number of days (not to exceed 60) during the taxable year that the individual is unable to perform services in any trade or business referred to in section 1402 of the Internal Revenue Code of 1986 for a reason with respect to which such individual would be entitled to receive paid leave as described in subsection (b) of this section, multiplied by

(B) the lesser of—

(i) 67 percent of the average daily self-employment income of the individual for the taxable year, or

(ii) $200.

(2) AVERAGE DAILY SELF-EMPLOYMENT INCOME.—For purposes of this subsection, the term "average daily self-employment income" means an amount equal to—

(A) the net earnings from self-employment income of the individual for the taxable year, divided by

(B) 260.

(3) ELECTION TO USE PRIOR YEAR NET EARNINGS FROM SELF-EMPLOYMENT INCOME.—In the case of an individual who elects (at such time and in such manner as the Secretary may provide) the application of this paragraph, paragraph (2)(A) shall be applied by substituting "the prior taxable year" for "the taxable year".

(4) COORDINATION WITH CREDIT FOR SICK LEAVE.—Any day taken into account in determining the qualified sick leave equivalent amount with respect to any eligible-self employed individual under section 9642 shall not be take into account in determining the qualified family leave equivalent amount with respect to such individual under this section.

(d) CREDIT REFUNDABLE.—

(1) IN GENERAL.—The credit determined under this section shall be treated as a credit allowed to the taxpayer under subpart C of part IV of subchapter A of chapter 1 of such Code.

(2) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, any refund due from the credit determined under this section shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(e) SPECIAL RULES.—

(1) DOCUMENTATION.—No credit shall be allowed under this section unless the individual maintains such documentation as the Secretary may prescribe to establish such individual as an eligible self-employed individual.

(2) DENIAL OF DOUBLE BENEFIT.—In the case of an individual who receives wages (as defined in section 3121(a) of the Internal Revenue Code of 1986) or compensation (as defined in section 3231(e) of such Code) paid by an employer which are required to be paid by reason of the Emergency Family and Medical Leave Expansion Act, the qualified family leave equivalent amount otherwise described in subsection (c) of this section shall be reduced (but not below zero) to the extent

H. R. 1319—173

that the sum of the amount described in such subsection and in section 3132(b)(1) of such Code exceeds $12,000.

(3) REFERENCES TO EMERGENCY FAMILY AND MEDICAL LEAVE EXPANSION ACT.—Any reference in this section to the Emergency Family and Medical Leave Expansion Act shall be treated as including a reference to the amendments made by such Act.

(f) APPLICATION OF SECTION.—Only days occurring during the period beginning on April 1, 2021 and ending on September 30, 2021, may be taken into account under subsection (c)(1)(A).

(g) APPLICATION OF CREDIT IN CERTAIN POSSESSIONS.—

(1) PAYMENTS TO POSSESSIONS WITH MIRROR CODE TAX SYSTEMS.—The Secretary shall pay to each possession of the United States which has a mirror code tax system amounts equal to the loss (if any) to that possession by reason of the application of the provisions of this section. Such amounts shall be determined by the Secretary based on information provided by the government of the respective possession.

(2) PAYMENTS TO OTHER POSSESSIONS.—The Secretary shall pay to each possession of the United States which does not have a mirror code tax system amounts estimated by the Secretary as being equal to the aggregate benefits (if any) that would have been provided to residents of such possession by reason of the provisions of this section if a mirror code tax system had been in effect in such possession. The preceding sentence shall not apply unless the respective possession has a plan, which has been approved by the Secretary, under which such possession will promptly distribute such payments to its residents.

(3) MIRROR CODE TAX SYSTEM.—For purposes of this section, the term "mirror code tax system" means, with respect to any possession of the United States, the income tax system of such possession if the income tax liability of the residents of such possession under such system is determined by reference to the income tax laws of the United States as if such possession were the United States.

(4) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, the payments under this subsection shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(h) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary to carry out the purposes of this section, including—

(1) regulations or other guidance to prevent the avoidance of the purposes of this section, and

(2) regulations or other guidance to minimize compliance and record-keeping burdens under this section.

## PART 6—EMPLOYEE RETENTION CREDIT

### SEC. 9651. EXTENSION OF EMPLOYEE RETENTION CREDIT.

(a) IN GENERAL.—Subchapter D of chapter 21 of subtitle C of the Internal Revenue Code of 1986, as added by section 9641, is amended by adding at the end the following:

H. R. 1319—174

**"SEC. 3134. EMPLOYEE RETENTION CREDIT FOR EMPLOYERS SUBJECT TO CLOSURE DUE TO COVID–19.**

"(a) IN GENERAL.—In the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter.

"(b) LIMITATIONS AND REFUNDABILITY.—

"(1) IN GENERAL.—

"(A) WAGES TAKEN INTO ACCOUNT.—The amount of qualified wages with respect to any employee which may be taken into account under subsection (a) by the eligible employer for any calendar quarter shall not exceed $10,000.

"(B) RECOVERY STARTUP BUSINESSES.—In the case of an eligible employer which is a recovery startup business (as defined in subsection (c)(5)), the amount of the credit allowed under subsection (a) (after application of subparagraph (A)) for any calendar quarter shall not exceed $50,000.

"(2) CREDIT LIMITED TO EMPLOYMENT TAXES.—The credit allowed by subsection (a) with respect to any calendar quarter shall not exceed the applicable employment taxes (reduced by any credits allowed under sections 3131 and 3132) on the wages paid with respect to the employment of all the employees of the eligible employer for such calendar quarter.

"(3) REFUNDABILITY OF EXCESS CREDIT.—If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b).

"(c) DEFINITIONS.—For purposes of this section—

"(1) APPLICABLE EMPLOYMENT TAXES.—The term 'applicable employment taxes' means the following:

"(A) The taxes imposed under section 3111(b).

"(B) So much of the taxes imposed under section 3221(a) as are attributable to the rate in effect under section 3111(b).

"(2) ELIGIBLE EMPLOYER.—

"(A) IN GENERAL.—The term 'eligible employer' means any employer—

"(i) which was carrying on a trade or business during the calendar quarter for which the credit is determined under subsection (a), and

"(ii) with respect to any calendar quarter, for which—

"(I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19),

"(II) the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019, or

H. R. 1319—175

"(III) the employer is a recovery startup business (as defined in paragraph (5)).

With respect to any employer for any calendar quarter, if such employer was not in existence as of the beginning of the same calendar quarter in calendar year 2019, clause (ii)(II) shall be applied by substituting '2020' for '2019'.

"(B) ELECTION TO USE ALTERNATIVE QUARTER.—At the election of the employer—

"(i) subparagraph (A)(ii)(II) shall be applied—

"(I) by substituting 'for the immediately preceding calendar quarter' for 'for such calendar quarter', and

"(II) by substituting 'the corresponding calendar quarter in calendar year 2019' for 'the same calendar quarter in calendar year 2019', and

"(ii) the last sentence of subparagraph (A) shall be applied by substituting 'the corresponding calendar quarter in calendar year 2019' for 'the same calendar quarter in calendar year 2019'.

An election under this subparagraph shall be made at such time and in such manner as the Secretary shall prescribe.

"(C) TAX-EXEMPT ORGANIZATIONS.—In the case of an organization which is described in section 501(c) and exempt from tax under section 501(a)—

"(i) clauses (i) and (ii)(I) of subparagraph (A) shall apply to all operations of such organization, and

"(ii) any reference in this section to gross receipts shall be treated as a reference to gross receipts within the meaning of section 6033.

"(3) QUALIFIED WAGES.—

"(A) IN GENERAL.—The term 'qualified wages' means—

"(i) in the case of an eligible employer for which the average number of full-time employees (within the meaning of section 4980H) employed by such eligible employer during 2019 was greater than 500, wages paid by such eligible employer with respect to which an employee is not providing services due to circumstances described in subclause (I) or (II) of paragraph (2)(A)(ii), or

"(ii) in the case of an eligible employer for which the average number of full-time employees (within the meaning of section 4980H) employed by such eligible employer during 2019 was not greater than 500—

"(I) with respect to an eligible employer described in subclause (I) of paragraph (2)(A)(ii), wages paid by such eligible employer with respect to an employee during any period described in such clause, or

"(II) with respect to an eligible employer described in subclause (II) of such paragraph, wages paid by such eligible employer with respect to an employee during such quarter.

"(B) SPECIAL RULE FOR EMPLOYERS NOT IN EXISTENCE IN 2019.—In the case of any employer that was not in

H. R. 1319—176

existence in 2019, subparagraph (A) shall be applied by substituting '2020' for '2019' each place it appears.

"(C) SEVERELY FINANCIALLY DISTRESSED EMPLOYERS.—

"(i) IN GENERAL.—Notwithstanding subparagraph (A)(i), in the case of a severely financially distressed employer, the term 'qualified wages' means wages paid by such employer with respect to an employee during any calendar quarter.

"(ii) DEFINITION.—The term 'severely financially distressed employer' means an eligible employer as defined in paragraph (2), determined by substituting 'less than 10 percent' for 'less than 80 percent' in subparagraph (A)(ii)(II) thereof.

"(D) EXCEPTION.—The term 'qualified wages' shall not include any wages taken into account under sections 41, 45A, 45P, 45S, 51, 1396, 3131, and 3132.

"(4) WAGES.—

"(A) IN GENERAL.—The term 'wages' means wages (as defined in section 3121(a)) and compensation (as defined in section 3231(e)). For purposes of the preceding sentence, in the case of any organization or entity described in subsection (f)(2), wages as defined in section 3121(a) shall be determined without regard to paragraphs (5), (6), (7), (10), and (13) of section 3121(b) (except with respect to services performed in a penal institution by an inmate thereof).

"(B) ALLOWANCE FOR CERTAIN HEALTH PLAN EXPENSES.—

"(i) IN GENERAL.—Such term shall include amounts paid by the eligible employer to provide and maintain a group health plan (as defined in section 5000(b)(1)), but only to the extent that such amounts are excluded from the gross income of employees by reason of section 106(a).

"(ii) ALLOCATION RULES.—For purposes of this section, amounts treated as wages under clause (i) shall be treated as paid with respect to any employee (and with respect to any period) to the extent that such amounts are properly allocable to such employee (and to such period) in such manner as the Secretary may prescribe. Except as otherwise provided by the Secretary, such allocation shall be treated as properly made if made on the basis of being pro rata among periods of coverage.

"(5) RECOVERY STARTUP BUSINESS.—The term 'recovery startup business' means any employer—

"(A) which began carrying on any trade or business after February 15, 2020,

"(B) for which the average annual gross receipts of such employer (as determined under rules similar to the rules under section 448(c)(3)) for the 3-taxable-year period ending with the taxable year which precedes the calendar quarter for which the credit is determined under subsection (a) does not exceed $1,000,000, and

"(C) which, with respect to such calendar quarter, is not described in subclause (I) or (II) of paragraph (2)(A)(ii).

H. R. 1319—177

"(6) OTHER TERMS.—Any term used in this section which is also used in this chapter or chapter 22 shall have the same meaning as when used in such chapter.

"(d) AGGREGATION RULE.—All persons treated as a single employer under subsection (a) or (b) of section 52, or subsection (m) or (o) of section 414, shall be treated as one employer for purposes of this section.

"(e) CERTAIN RULES TO APPLY.—For purposes of this section, rules similar to the rules of sections 51(i)(1) and 280C(a) shall apply.

"(f) CERTAIN GOVERNMENTAL EMPLOYERS.—

"(1) IN GENERAL.—This credit shall not apply to the Government of the United States, the government of any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing.

"(2) EXCEPTION.—Paragraph (1) shall not apply to—

"(A) any organization described in section 501(c)(1) and exempt from tax under section 501(a), or

"(B) any entity described in paragraph (1) if—

"(i) such entity is a college or university, or

"(ii) the principal purpose or function of such entity is providing medical or hospital care.

In the case of any entity described in subparagraph (B), such entity shall be treated as satisfying the requirements of subsection (c)(2)(A)(i).

"(g) ELECTION TO NOT TAKE CERTAIN WAGES INTO ACCOUNT.—This section shall not apply to so much of the qualified wages paid by an eligible employer as such employer elects (at such time and in such manner as the Secretary may prescribe) to not take into account for purposes of this section.

"(h) COORDINATION WITH CERTAIN PROGRAMS.—

"(1) IN GENERAL.—This section shall not apply to so much of the qualified wages paid by an eligible employer as are taken into account as payroll costs in connection with—

"(A) a covered loan under section 7(a)(37) or 7A of the Small Business Act,

"(B) a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, or

"(C) a restaurant revitalization grant under section 5003 of the American Rescue Plan Act of 2021.

"(2) APPLICATION WHERE PPP LOANS NOT FORGIVEN.—The Secretary shall issue guidance providing that payroll costs paid during the covered period shall not fail to be treated as qualified wages under this section by reason of paragraph (1) to the extent that—

"(A) a covered loan of the taxpayer under section 7(a)(37) of the Small Business Act is not forgiven by reason of a decision under section 7(a)(37)(J) of such Act, or

"(B) a covered loan of the taxpayer under section 7A of the Small Business Act is not forgiven by reason of a decision under section 7A(g) of such Act.

Terms used in the preceding sentence which are also used in section 7A(g) or 7(a)(37)(J) of the Small Business Act shall, when applied in connection with either such section, have the same meaning as when used in such section, respectively.

H. R. 1319—178

"(i) THIRD PARTY PAYORS.—Any credit allowed under this section shall be treated as a credit described in section 3511(d)(2).

"(j) ADVANCE PAYMENTS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), no advance payment of the credit under subsection (a) shall be allowed.

"(2) ADVANCE PAYMENTS TO SMALL EMPLOYERS.—

"(A) IN GENERAL.—Under rules provided by the Secretary, an eligible employer for which the average number of full-time employees (within the meaning of section 4980H) employed by such eligible employer during 2019 was not greater than 500 may elect for any calendar quarter to receive an advance payment of the credit under subsection (a) for such quarter in an amount not to exceed 70 percent of the average quarterly wages paid by the employer in calendar year 2019.

"(B) SPECIAL RULE FOR SEASONAL EMPLOYERS.—In the case of any employer who employs seasonal workers (as defined in section 45R(d)(5)(B)), the employer may elect to apply subparagraph (A) by substituting 'the wages for the calendar quarter in 2019 which corresponds to the calendar quarter to which the election relates' for 'the average quarterly wages paid by the employer in calendar year 2019'.

"(C) SPECIAL RULE FOR EMPLOYERS NOT IN EXISTENCE IN 2019.—In the case of any employer that was not in existence in 2019, subparagraphs (A) and (B) shall each be applied by substituting '2020' for '2019' each place it appears.

"(3) RECONCILIATION OF CREDIT WITH ADVANCE PAYMENTS.—

"(A) IN GENERAL.—The amount of credit which would (but for this subsection) be allowed under this section shall be reduced (but not below zero) by the aggregate payment allowed to the taxpayer under paragraph (2). Any failure to so reduce the credit shall be treated as arising out of a mathematical or clerical error and assessed according to section 6213(b)(1).

"(B) EXCESS ADVANCE PAYMENTS.—If the advance payments to a taxpayer under paragraph (2) for a calendar quarter exceed the credit allowed by this section (determined without regard to subparagraph (A)), the tax imposed under section 3111(b) or so much of the tax imposed under section 3221(a) as is attributable to the rate in effect under section 3111(b) (whichever is applicable) for the calendar quarter shall be increased by the amount of such excess.

"(k) TREATMENT OF DEPOSITS.—The Secretary shall waive any penalty under section 6656 for any failure to make a deposit of any applicable employment taxes if the Secretary determines that such failure was due to the reasonable anticipation of the credit allowed under this section.

"(l) EXTENSION OF LIMITATION ON ASSESSMENT.—Notwithstanding section 6501, the limitation on the time period for the assessment of any amount attributable to a credit claimed under this section shall not expire before the date that is 5 years after the later of—

H. R. 1319—179

"(1) the date on which the original return which includes the calendar quarter with respect to which such credit is determined is filed, or

"(2) the date on which such return is treated as filed under section 6501(b)(2).

"(m) REGULATIONS AND GUIDANCE.—The Secretary shall issue such forms, instructions, regulations, and other guidance as are necessary—

"(1) to allow the advance payment of the credit under subsection (a) as provided in subsection (j)(2), subject to the limitations provided in this section, based on such information as the Secretary shall require,

"(2) with respect to the application of the credit under subsection (a) to third party payors (including professional employer organizations, certified professional employer organizations, or agents under section 3504), including regulations or guidance allowing such payors to submit documentation necessary to substantiate the eligible employer status of employers that use such payors, and

"(3) to prevent the avoidance of the purposes of the limitations under this section, including through the leaseback of employees.

Any forms, instructions, regulations, or other guidance described in paragraph (2) shall require the customer to be responsible for the accounting of the credit and for any liability for improperly claimed credits and shall require the certified professional employer organization or other third party payor to accurately report such tax credits based on the information provided by the customer.

"(n) APPLICATION.—This section shall only apply to wages paid after June 30, 2021, and before January 1, 2022.".

(b) REFUNDS.—Paragraph (2) of section 1324(b) of title 31, United States Code, is amended by inserting "3134," before "6428".

(c) CLERICAL AMENDMENT.—The table of sections for subchapter D of chapter 21 of subtitle C of the Internal Revenue Code of 1986 is amended by adding at the end the following:

"Sec. 3134. Employee retention credit for employers subject to closure due to COVID–19.".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to calendar quarters beginning after June 30, 2021.

## PART 7—PREMIUM TAX CREDIT

### SEC. 9661. IMPROVING AFFORDABILITY BY EXPANDING PREMIUM ASSISTANCE FOR CONSUMERS.

(a) IN GENERAL.—Section 36B(b)(3)(A) of the Internal Revenue Code of 1986 is amended by adding at the end the following new clause:

"(iii) TEMPORARY PERCENTAGES FOR 2021 AND 2022.—In the case of a taxable year beginning in 2021 or 2022—

"(I) clause (ii) shall not apply for purposes of adjusting premium percentages under this subparagraph, and

"(II) the following table shall be applied in lieu of the table contained in clause (i):

H. R. 1319—180

| "In the case of household income (expressed as a percent of poverty line) within the following income tier: | The initial premium percentage is— | The final premium percentage is— |
|---|---|---|
| Up to 150.0 percent ................... | 0.0 | 0.0 |
| 150.0 percent up to 200.0 percent ......................................... | 0.0 | 2.0 |
| 200.0 percent up to 250.0 percent ......................................... | 2.0 | 4.0 |
| 250.0 percent up to 300.0 percent ......................................... | 4.0 | 6.0 |
| 300.0 percent up to 400.0 percent ......................................... | 6.0 | 8.5 |
| 400.0 percent and higher ........... | 8.5 | 8.5". |

(b) CONFORMING AMENDMENT.—Section 36B(c)(1) of the Internal Revenue Code of 1986 is amended by adding at the end the following new subparagraph:

"(E) TEMPORARY RULE FOR 2021 AND 2022.—In the case of a taxable year beginning in 2021 or 2022, subparagraph (A) shall be applied without regard to 'but does not exceed 400 percent'.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

**SEC. 9662. TEMPORARY MODIFICATION OF LIMITATIONS ON RECONCILIATION OF TAX CREDITS FOR COVERAGE UNDER A QUALIFIED HEALTH PLAN WITH ADVANCE PAYMENTS OF SUCH CREDIT.**

(a) IN GENERAL.—Section 36B(f)(2)(B) of the Internal Revenue Code of 1986 is amended by adding at the end the following new clause:

"(iii) TEMPORARY MODIFICATION OF LIMITATION ON INCREASE.—In the case of any taxable year beginning in 2020, for any taxpayer who files for such taxable year an income tax return reconciling any advance payment of the credit under this section, the Secretary shall treat subparagraph (A) as not applying.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2019.

**SEC. 9663. APPLICATION OF PREMIUM TAX CREDIT IN CASE OF INDIVIDUALS RECEIVING UNEMPLOYMENT COMPENSATION DURING 2021.**

(a) IN GENERAL.—Section 36B of the Internal Revenue Code of 1986 is amended by redesignating subsection (g) as subsection (h) and by inserting after subsection (f) the following new subsection:

"(g) SPECIAL RULE FOR INDIVIDUALS WHO RECEIVE UNEMPLOYMENT COMPENSATION DURING 2021.—

"(1) IN GENERAL.—For purposes of this section, in the case of a taxpayer who has received, or has been approved to receive, unemployment compensation for any week beginning during 2021, for the taxable year in which such week begins—

"(A) such taxpayer shall be treated as an applicable taxpayer, and

"(B) there shall not be taken into account any household income of the taxpayer in excess of 133 percent of the poverty line for a family of the size involved.

"(2) UNEMPLOYMENT COMPENSATION.—For purposes of this subsection, the term 'unemployment compensation' has the meaning given such term in section 85(b).

"(3) EVIDENCE OF UNEMPLOYMENT COMPENSATION.—For purposes of this subsection, a taxpayer shall not be treated as having received (or been approved to receive) unemployment compensation for any week unless such taxpayer provides self-attestation of, and such documentation as the Secretary shall prescribe which demonstrates, such receipt or approval.

"(4) CLARIFICATION OF RULES REMAINING APPLICABLE.—

"(A) JOINT RETURN REQUIREMENT.—Paragraph (1)(A) shall not affect the application of subsection (c)(1)(C).

"(B) HOUSEHOLD INCOME AND AFFORDABILITY.—Paragraph (1)(B) shall not apply to any determination of household income for purposes of paragraph (2)(C)(i)(II) or (4)(C)(ii) of subsection (c)".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 2020.

# PART 8—MISCELLANEOUS PROVISIONS

## SEC. 9671. REPEAL OF ELECTION TO ALLOCATE INTEREST, ETC. ON WORLDWIDE BASIS.

(a) IN GENERAL.—Section 864 of the Internal Revenue Code of 1986 is amended by striking subsection (f).

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2020.

## SEC. 9672. TAX TREATMENT OF TARGETED EIDL ADVANCES.

For purposes of the Internal Revenue Code of 1986—

(1) amounts received from the Administrator of the Small Business Administration in the form of a targeted EIDL advance under section 331 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260) shall not be included in the gross income of the person that receives such amounts,

(2) no deduction shall be denied, no tax attribute shall be reduced, and no basis increase shall be denied, by reason of the exclusion from gross income provided by paragraph (1), and

(3) in the case of a partnership or S corporation that receives such amounts—

(A) any amount excluded from income by reason of paragraph (1) shall be treated as tax exempt income for purposes of sections 705 and 1366 of the Internal Revenue Code of 1986, and

(B) the Secretary of the Treasury (or the Secretary's delegate) shall prescribe rules for determining a partner's distributive share of any amount described in subparagraph (A) for purposes of section 705 of the Internal Revenue Code of 1986.

## SEC. 9673. TAX TREATMENT OF RESTAURANT REVITALIZATION GRANTS.

For purposes of the Internal Revenue Code of 1986—

H. R. 1319—182

(1) amounts received from the Administrator of the Small Business Administration in the form of a restaurant revitalization grant under section 5003 shall not be included in the gross income of the person that receives such amounts,

(2) no deduction shall be denied, no tax attribute shall be reduced, and no basis increase shall be denied, by reason of the exclusion from gross income provided by paragraph (1), and

(3) in the case of a partnership or S corporation that receives such amounts—

(A) except as otherwise provided by the Secretary of the Treasury (or the Secretary's delegate), any amount excluded from income by reason of paragraph (1) shall be treated as tax exempt income for purposes of sections 705 and 1366 of the Internal Revenue Code of 1986, and

(B) the Secretary of the Treasury (or the Secretary's delegate) shall prescribe rules for determining a partner's distributive share of any amount described in subparagraph (A) for purposes of section 705 of the Internal Revenue Code of 1986.

**SEC. 9674. MODIFICATION OF EXCEPTIONS FOR REPORTING OF THIRD PARTY NETWORK TRANSACTIONS.**

(a) IN GENERAL.—Section 6050W(e) of the Internal Revenue Code of 1986 is amended to read as follows:

"(e) DE MINIMIS EXCEPTION FOR THIRD PARTY SETTLEMENT ORGANIZATIONS.—A third party settlement organization shall not be required to report any information under subsection (a) with respect to third party network transactions of any participating payee if the amount which would otherwise be reported under subsection (a)(2) with respect to such transactions does not exceed $600.".

(b) CLARIFICATION THAT REPORTING IS NOT REQUIRED ON TRANSACTIONS WHICH ARE NOT FOR GOODS OR SERVICES.—Section 6050W(c)(3) of such Code is amended by inserting "described in subsection (d)(3)(A)(iii)" after "any transaction".

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment made by subsection (a) shall apply to returns for calendar years beginning after December 31, 2021.

(2) CLARIFICATION.—The amendment made by subsection (b) shall apply to transactions after the date of the enactment of this Act.

**SEC. 9675. MODIFICATION OF TREATMENT OF STUDENT LOAN FORGIVENESS.**

(a) IN GENERAL.—Section 108(f) of the Internal Revenue Code of 1986 is amended by striking paragraph (5) and inserting the following:

"(5) SPECIAL RULE FOR DISCHARGES IN 2021 THROUGH 2025.— Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) after December 31, 2020, and before January 1, 2026, of—

"(A) any loan provided expressly for postsecondary educational expenses, regardless of whether provided through the educational institution or directly to the borrower, if such loan was made, insured, or guaranteed by—

"(i) the United States, or an instrumentality or agency thereof,

"(ii) a State, territory, or possession of the United States, or the District of Columbia, or any political subdivision thereof, or

"(iii) an eligible educational institution (as defined in section 25A),

"(B) any private education loan (as defined in section 140(a)(7) of the Truth in Lending Act),

"(C) any loan made by any educational organization described in section 170(b)(1)(A)(ii) if such loan is made—

"(i) pursuant to an agreement with any entity described in subparagraph (A) or any private education lender (as defined in section 140(a) of the Truth in Lending Act) under which the funds from which the loan was made were provided to such educational organization, or

"(ii) pursuant to a program of such educational organization which is designed to encourage its students to serve in occupations with unmet needs or in areas with unmet needs and under which the services provided by the students (or former students) are for or under the direction of a governmental unit or an organization described in section 501(c)(3) and exempt from tax under section 501(a), or

"(D) any loan made by an educational organization described in section 170(b)(1)(A)(ii) or by an organization exempt from tax under section 501(a) to refinance a loan to an individual to assist the individual in attending any such educational organization but only if the refinancing loan is pursuant to a program of the refinancing organization which is designed as described in subparagraph (C)(ii). The preceding sentence shall not apply to the discharge of a loan made by an organization described in subparagraph (C) or made by a private education lender (as defined in section 140(a)(7) of the Truth in Lending Act) if the discharge is on account of services performed for either such organization or for such private education lender.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to discharges of loans after December 31, 2020.

# Subtitle H—Pensions

## SEC. 9701. TEMPORARY DELAY OF DESIGNATION OF MULTIEMPLOYER PLANS AS IN ENDANGERED, CRITICAL, OR CRITICAL AND DECLINING STATUS.

(a) IN GENERAL.—Notwithstanding the actuarial certification under section 305(b)(3) of the Employee Retirement Income Security Act of 1974 and section 432(b)(3) of the Internal Revenue Code of 1986, if a plan sponsor of a multiemployer plan elects the application of this section, then, for purposes of section 305 of such Act and section 432 of such Code—

(1) the status of the plan for its first plan year beginning during the period beginning on March 1, 2020, and ending on February 28, 2021, or the next succeeding plan year (as designated by the plan sponsor in such election), shall be the

H. R. 1319—184

same as the status of such plan under such sections for the plan year preceding such designated plan year, and

(2) in the case of a plan which was in endangered or critical status for the plan year preceding the designated plan year described in paragraph (1), the plan shall not be required to update its plan or schedules under section 305(c)(6) of such Act and section 432(c)(6) of such Code, or section 305(e)(3)(B) of such Act and section 432(e)(3)(B) of such Code, whichever is applicable, until the plan year following the designated plan year described in paragraph (1).

(b) EXCEPTION FOR PLANS BECOMING CRITICAL DURING ELECTION.—If—

(1) an election was made under subsection (a) with respect to a multiemployer plan, and

(2) such plan has, without regard to such election, been certified by the plan actuary under section 305(b)(3) of the Employee Retirement Income Security Act of 1974 and section 432(b)(3) of the Internal Revenue Code of 1986 to be in critical status for the designated plan year described in subsection (a)(1), then such plan shall be treated as a plan in critical status for such plan year for purposes of applying section 4971(g)(1)(A) of such Code, section 302(b)(3) of such Act (without regard to the second sentence thereof), and section 412(b)(3) of such Code (without regard to the second sentence thereof).

(c) ELECTION AND NOTICE.—

(1) ELECTION.—An election under subsection (a)—

(A) shall be made at such time and in such manner as the Secretary of the Treasury or the Secretary's delegate may prescribe and, once made, may be revoked only with the consent of the Secretary, and

(B) if made—

(i) before the date the annual certification is submitted to the Secretary or the Secretary's delegate under section 305(b)(3) of such Act and section 432(b)(3) of such Code, shall be included with such annual certification, and

(ii) after such date, shall be submitted to the Secretary or the Secretary's delegate not later than 30 days after the date of the election.

(2) NOTICE TO PARTICIPANTS.—

(A) IN GENERAL.—Notwithstanding section 305(b)(3)(D) of the Employee Retirement Income Security Act of 1974 and section 432(b)(3)(D) of the Internal Revenue Code of 1986, if, by reason of an election made under subsection (a), the plan is in neither endangered nor critical status—

(i) the plan sponsor of a multiemployer plan shall not be required to provide notice under such sections, and

(ii) the plan sponsor shall provide to the participants and beneficiaries, the bargaining parties, the Pension Benefit Guaranty Corporation, and the Secretary of Labor a notice of the election under subsection (a) and such other information as the Secretary of the Treasury (in consultation with the Secretary of Labor) may require—

(I) if the election is made before the date the annual certification is submitted to the Secretary

H. R. 1319—185

or the Secretary's delegate under section 305(b)(3) of such Act and section 432(b)(3) of such Code, not later than 30 days after the date of the certification, and

(II) if the election is made after such date, not later than 30 days after the date of the election.

(B) NOTICE OF ENDANGERED STATUS.—Notwithstanding section 305(b)(3)(D) of such Act and section 432(b)(3)(D) of such Code, if the plan is certified to be in critical status for any plan year but is in endangered status by reason of an election made under subsection (a), the notice provided under such sections shall be the notice which would have been provided if the plan had been certified to be in endangered status.

**SEC. 9702. TEMPORARY EXTENSION OF THE FUNDING IMPROVEMENT AND REHABILITATION PERIODS FOR MULTIEMPLOYER PENSION PLANS IN CRITICAL AND ENDANGERED STATUS FOR 2020 OR 2021.**

(a) IN GENERAL.—If the plan sponsor of a multiemployer plan which is in endangered or critical status for a plan year beginning in 2020 or 2021 (determined after application of section 9701) elects the application of this section, then, for purposes of section 305 of the Employee Retirement Income Security Act of 1974 and section 432 of the Internal Revenue Code of 1986, the plan's funding improvement period or rehabilitation period, whichever is applicable, shall be extended by 5 years.

(b) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

(1) ELECTION.—An election under this section shall be made at such time, and in such manner and form, as (in consultation with the Secretary of Labor) the Secretary of the Treasury or the Secretary's delegate may prescribe.

(2) DEFINITIONS.—Any term which is used in this section which is also used in section 305 of the Employee Retirement Income Security Act of 1974 and section 432 of the Internal Revenue Code of 1986 shall have the same meaning as when used in such sections.

(c) EFFECTIVE DATE.—This section shall apply to plan years beginning after December 31, 2019.

**SEC. 9703. ADJUSTMENTS TO FUNDING STANDARD ACCOUNT RULES.**

(a) ADJUSTMENTS.—

(1) AMENDMENT TO EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—Section 304(b)(8) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1084(b)) is amended by adding at the end the following new subparagraph:

"(F) RELIEF FOR 2020 AND 2021.—A multiemployer plan with respect to which the solvency test under subparagraph (C) is met as of February 29, 2020, may elect to apply this paragraph (without regard to whether such plan previously elected the application of this paragraph)—

"(i) by substituting 'February 29, 2020' for 'August 31, 2008' each place it appears in subparagraphs (A)(i), (B)(i)(I), and (B)(i)(II),

"(ii) by inserting 'and other losses related to the virus SARS–CoV–2 or coronavirus disease 2019 (COVID–19) (including experience losses related to

H. R. 1319—186

reductions in contributions, reductions in employment, and deviations from anticipated retirement rates, as determined by the plan sponsor)' after 'net investment losses' in subparagraph (A)(i), and

"(iii) by substituting 'this subparagraph or subparagraph (A)' for 'this subparagraph and subparagraph (A) both' in subparagraph (B)(iii).

The preceding sentence shall not apply to a plan to which special financial assistance is granted under section 4262. For purposes of the application of this subparagraph, the Secretary of the Treasury shall rely on the plan sponsor's calculations of plan losses unless such calculations are clearly erroneous.".

(2) AMENDMENT TO INTERNAL REVENUE CODE OF 1986.— Section 431(b)(8) of the Internal Revenue Code of 1986 is amended by adding at the end the following new subparagraph:

"(F) RELIEF FOR 2020 AND 2021.—A multiemployer plan with respect to which the solvency test under subparagraph (C) is met as of February 29, 2020, may elect to apply this paragraph (without regard to whether such plan previously elected the application of this paragraph)—

"(i) by substituting 'February 29, 2020' for 'August 31, 2008' each place it appears in subparagraphs (A)(i), (B)(i)(I), and (B)(i)(II),

"(ii) by inserting 'and other losses related to the virus SARS–CoV–2 or coronavirus disease 2019 (COVID–19) (including experience losses related to reductions in contributions, reductions in employment, and deviations from anticipated retirement rates, as determined by the plan sponsor)' after 'net investment losses' in subparagraph (A)(i), and

"(iii) by substituting 'this subparagraph or subparagraph (A)' for 'this subparagraph and subparagraph (A) both' in subparagraph (B)(iii).

The preceding sentence shall not apply to a plan to which special financial assistance is granted under section 4262 of the Employee Retirement Income Security Act of 1974. For purposes of the application of this subparagraph, the Secretary shall rely on the plan sponsor's calculations of plan losses unless such calculations are clearly erroneous.".

(b) EFFECTIVE DATES.—

(1) IN GENERAL.—The amendments made by this section shall take effect as of the first day of the first plan year ending on or after February 29, 2020, except that any election a plan makes pursuant to this section that affects the plan's funding standard account for the first plan year beginning after February 29, 2020, shall be disregarded for purposes of applying the provisions of section 305 of the Employee Retirement Income Security Act of 1974 and section 432 of the Internal Revenue Code of 1986 to such plan year.

(2) RESTRICTIONS ON BENEFIT INCREASES.—Notwithstanding paragraph (1), the restrictions on plan amendments increasing benefits in sections 304(b)(8)(D) of such Act and 431(b)(8)(D) of such Code, as applied by the amendments made by this section, shall take effect on the date of enactment of this Act.

H. R. 1319—187

### SEC. 9704. SPECIAL FINANCIAL ASSISTANCE PROGRAM FOR FINAN-CIALLY TROUBLED MULTIEMPLOYER PLANS.

(a) APPROPRIATION.—Section 4005 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1305) is amended by adding at the end the following:

"(i)(1) An eighth fund shall be established for special financial assistance to multiemployer pension plans, as provided under section 4262, and to pay for necessary administrative and operating expenses of the corporation relating to such assistance.

"(2) There is appropriated from the general fund such amounts as are necessary for the costs of providing financial assistance under section 4262 and necessary administrative and operating expenses of the corporation. The eighth fund established under this subsection shall be credited with amounts from time to time as the Secretary of the Treasury, in conjunction with the Director of the Pension Benefit Guaranty Corporation, determines appropriate, from the general fund of the Treasury, but in no case shall such transfers occur after September 30, 2030.".

(b) FINANCIAL ASSISTANCE AUTHORITY.—The Employee Retirement Income Security Act of 1974 is amended by inserting after section 4261 of such Act (29 U.S.C. 1431) the following:

### "SEC. 4262. SPECIAL FINANCIAL ASSISTANCE BY THE CORPORATION.

"(a) SPECIAL FINANCIAL ASSISTANCE.—

"(1) IN GENERAL.—The corporation shall provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance.

"(2) INAPPLICABILITY OF CERTAIN REPAYMENT OBLIGATION.—A plan receiving special financial assistance pursuant to this section shall not be subject to repayment obligations with respect to such special financial assistance.

"(b) ELIGIBLE MULTIEMPLOYER PLANS.—

"(1) IN GENERAL.—For purposes of this section, a multiemployer plan is an eligible multiemployer plan if—

"(A) the plan is in critical and declining status (within the meaning of section 305(b)(6)) in any plan year beginning in 2020 through 2022;

"(B) a suspension of benefits has been approved with respect to the plan under section 305(e)(9) as of the date of the enactment of this section;

"(C) in any plan year beginning in 2020 through 2022, the plan is certified by the plan actuary to be in critical status (within the meaning of section 305(b)(2)), has a modified funded percentage of less than 40 percent, and has a ratio of active to inactive participants which is less than 2 to 3; or

"(D) the plan became insolvent for purposes of section 418E of the Internal Revenue Code of 1986 after December 16, 2014, and has remained so insolvent and has not been terminated as of the date of enactment of this section.

"(2) MODIFIED FUNDED PERCENTAGE.—For purposes of paragraph (1)(C), the term 'modified funded percentage' means the percentage equal to a fraction the numerator of which is current value of plan assets (as defined in section 3(26) of such Act) and the denominator of which is current liabilities (as defined

H. R. 1319—188

in section 431(c)(6)(D) of such Code and section 304(c)(6)(D) of such Act).

"(c) APPLICATIONS FOR SPECIAL FINANCIAL ASSISTANCE.—Within 120 days of the date of enactment of this section, the corporation shall issue regulations or guidance setting forth requirements for special financial assistance applications under this section. In such regulations or guidance, the corporation shall—

"(1) limit the materials required for a special financial assistance application to the minimum necessary to make a determination on the application;

"(2) specify effective dates for transfers of special financial assistance following approval of an application, based on the effective date of the supporting actuarial analysis and the date on which the application is submitted; and

"(3) provide for an alternate application for special financial assistance under this section, which may be used by a plan that has been approved for a partition under section 4233 before the date of enactment of this section.

"(d) TEMPORARY PRIORITY CONSIDERATION OF APPLICATIONS.—

"(1) IN GENERAL.—The corporation may specify in regulations or guidance under subsection (c) that, during a period no longer than the first 2 years following the date of enactment of this section, applications may not be filed by an eligible multiemployer plan unless—

"(A) the eligible multiemployer plan is insolvent or is likely to become insolvent within 5 years of the date of enactment of this section;

"(B) the corporation projects the eligible multiemployer plan to have a present value of financial assistance payments under section 4261 that exceeds $1,000,000,000 if the special financial assistance is not ordered;

"(C) the eligible multiemployer plan has implemented benefit suspensions under section 305(e)(9) as of the date of the enactment of this section; or

"(D) the corporation determines it appropriate based on other similar circumstances.

"(e) ACTUARIAL ASSUMPTIONS.—

"(1) ELIGIBILITY.—For purposes of determining eligibility for special financial assistance, the corporation shall accept assumptions incorporated in a multiemployer plan's determination that it is in critical status or critical and declining status (within the meaning of section 305(b)) for certifications of plan status completed before January 1, 2021, unless such assumptions are clearly erroneous. For certifications of plan status completed after December 31, 2020, a plan shall determine whether it is in critical or critical and declining status for purposes of eligibility for special financial assistance by using the assumptions that the plan used in its most recently completed certification of plan status before January 1, 2021, unless such assumptions (excluding the plan's interest rate) are unreasonable.

"(2) AMOUNT OF FINANCIAL ASSISTANCE.—In determining the amount of special financial assistance in its application, an eligible multiemployer plan shall—

"(A) use the interest rate used by the plan in its most recently completed certification of plan status before

H. R. 1319—189

January 1, 2021, provided that such interest rate may not exceed the interest rate limit; and

"(B) for other assumptions, use the assumptions that the plan used in its most recently completed certification of plan status before January 1, 2021, unless such assumptions are unreasonable.

"(3) INTEREST RATE LIMIT.—The interest rate limit for purposes of this subsection is the rate specified in section 303(h)(2)(C)(iii) (disregarding modifications made under clause (iv) of such section) for the month in which the application for special financial assistance is filed by the eligible multiemployer plan or the 3 preceding months, with such specified rate increased by 200 basis points.

"(4) CHANGES IN ASSUMPTIONS.—If a plan determines that use of one or more prior assumptions is unreasonable, the plan may propose in its application to change such assumptions, provided that the plan discloses such changes in its application and describes why such assumptions are no longer reasonable. The corporation shall accept such changed assumptions unless it determines the changes are unreasonable, individually or in the aggregate. The plan may not propose a change to the interest rate otherwise required under this subsection for eligibility or financial assistance amount.

"(f) APPLICATION DEADLINE.—Any application by a plan for special financial assistance under this section shall be submitted to the corporation (and, in the case of a plan to which section 432(k)(1)(D) of the Internal Revenue Code of 1986 applies, to the Secretary of the Treasury) no later than December 31, 2025, and any revised application for special financial assistance shall be submitted no later than December 31, 2026.

"(g) DETERMINATIONS ON APPLICATIONS.—A plan's application for special financial assistance under this section that is timely filed in accordance with the regulations or guidance issued under subsection (c) shall be deemed approved unless the corporation notifies the plan within 120 days of the filing of the application that the application is incomplete, any proposed change or assumption is unreasonable, or the plan is not eligible under this section. Such notice shall specify the reasons the plan is ineligible for special financial assistance, any proposed change or assumption is unreasonable, or information is needed to complete the application. If a plan is denied assistance under this subsection, the plan may submit a revised application under this section. Any revised application for special financial assistance submitted by a plan shall be deemed approved unless the corporation notifies the plan within 120 days of the filing of the revised application that the application is incomplete, any proposed change or assumption is unreasonable, or the plan is not eligible under this section. Special financial assistance issued by the corporation shall be effective on a date determined by the corporation, but no later than 1 year after a plan's special financial assistance application is approved by the corporation or deemed approved. The corporation shall not pay any special financial assistance after September 30, 2030.

"(h) MANNER OF PAYMENT.—The payment made by the corporation to an eligible multiemployer plan under this section shall be made as a single, lump sum payment.

"(i) AMOUNT AND MANNER OF SPECIAL FINANCIAL ASSISTANCE.—

H. R. 1319—190

"(1) IN GENERAL.—Special financial assistance under this section shall be a transfer of funds in the amount necessary as demonstrated by the plan sponsor on the application for such special financial assistance, in accordance with the requirements described in subsection (j). Special financial assistance shall be paid to such plan as soon as practicable upon approval of the application by the corporation.

"(2) NO CAP.—Special financial assistance granted by the corporation under this section shall not be capped by the guarantee under 4022A.

"(j) DETERMINATION OF AMOUNT OF SPECIAL FINANCIAL ASSISTANCE.—

"(1) IN GENERAL.—The amount of financial assistance provided to a multiemployer plan eligible for financial assistance under this section shall be such amount required for the plan to pay all benefits due during the period beginning on the date of payment of the special financial assistance payment under this section and ending on the last day of the plan year ending in 2051, with no reduction in a participant's or beneficiary's accrued benefit as of the date of enactment of this section, except to the extent of a reduction in accordance with section 305(e)(8) adopted prior to the plan's application for special financial assistance under this section, and taking into account the reinstatement of benefits required under subsection (k).

"(2) PROJECTIONS.—The funding projections for purposes of this section shall be performed on a deterministic basis.

"(k) REINSTATEMENT OF SUSPENDED BENEFITS.—The Secretary, in coordination with the Secretary of the Treasury, shall ensure that an eligible multiemployer plan that receives special financial assistance under this section—

"(1) reinstates any benefits that were suspended under section 305(e)(9) or section 4245(a) in accordance with guidance issued by the Secretary of the Treasury pursuant to section 432(k)(1)(B) of the Internal Revenue Code of 1986, effective as of the first month in which the effective date for the special financial assistance occurs, for participants and beneficiaries as of such month; and

"(2) provides payments equal to the amount of benefits previously suspended under section 305(e)(9) or 4245(a) to any participants or beneficiaries in pay status as of the effective date of the special financial assistance, payable, as determined by the eligible multiemployer plan—

"(A) as a lump sum within 3 months of such effective date; or

"(B) in equal monthly installments over a period of 5 years, commencing within 3 months of such effective date, with no adjustment for interest.

"(l) RESTRICTIONS ON THE USE OF SPECIAL FINANCIAL ASSISTANCE.—Special financial assistance received under this section and any earnings thereon may be used by an eligible multiemployer plan to make benefit payments and pay plan expenses. Special financial assistance and any earnings on such assistance shall be segregated from other plan assets. Special financial assistance shall be invested by plans in investment-grade bonds or other investments as permitted by the corporation.

H. R. 1319—191

"(m) CONDITIONS ON PLANS RECEIVING SPECIAL FINANCIAL ASSISTANCE.—

"(1) IN GENERAL.—The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to increases in future accrual rates and any retroactive benefit improvements, allocation of plan assets, reductions in employer contribution rates, diversion of contributions to, and allocation of expenses to, other benefit plans, and withdrawal liability.

"(2) LIMITATION.—The corporation shall not impose conditions on an eligible multiemployer plan as a condition of, or following receipt of, special financial assistance under this section relating to—

"(A) any prospective reduction in plan benefits (including benefits that may be adjusted pursuant to section 305(e)(8));

"(B) plan governance, including selection of, removal of, and terms of contracts with, trustees, actuaries, investment managers, and other service providers; or

"(C) any funding rules relating to the plan receiving special financial assistance under this section.

"(3) PAYMENT OF PREMIUMS.—An eligible multiemployer plan receiving special financial assistance under this section shall continue to pay all premiums due under section 4007 for participants and beneficiaries in the plan.

"(4) ASSISTANCE NOT CONSIDERED FOR CERTAIN PURPOSES.—An eligible multiemployer plan that receives special financial assistance shall be deemed to be in critical status within the meaning of section 305(b)(2) until the last plan year ending in 2051.

"(5) INSOLVENT PLANS.—An eligible multiemployer plan receiving special financial assistance under this section that subsequently becomes insolvent will be subject to the current rules and guarantee for insolvent plans.

"(6) INELIGIBILITY FOR OTHER ASSISTANCE.—An eligible multiemployer plan that receives special financial assistance under this section is not eligible to apply for a new suspension of benefits under section 305(e)(9)(G).

"(n) COORDINATION WITH SECRETARY OF THE TREASURY.—In prescribing the application process for eligible multiemployer plans to receive special financial assistance under this section and reviewing applications of such plans, the corporation shall coordinate with the Secretary of the Treasury in the following manner:

"(1) In the case of a plan which has suspended benefits under section 305(e)(9)—

"(A) in determining whether to approve the application, the corporation shall consult with the Secretary of the Treasury regarding the plan's proposed method of reinstating benefits, as described in the plan's application and in accordance with guidance issued by the Secretary of the Treasury, and

"(B) the corporation shall consult with the Secretary of the Treasury regarding the amount of special financial assistance needed based on the projected funded status of the plan as of the last day of the plan year ending in 2051, whether the plan proposes to repay benefits over

H. R. 1319—192

5 years or as a lump sum, as required by subsection (k)(2), and any other relevant factors, as determined by the corporation in consultation with the Secretary of the Treasury, to ensure the amount of assistance is sufficient to meet such requirement and is sufficient to pay benefits as required in subsection (j)(1).

"(2) In the case of any plan which proposes in its application to change the assumptions used, as provided in subsection (e)(4), the corporation shall consult with the Secretary of the Treasury regarding such proposed change in assumptions.

"(3) If the corporation specifies in regulations or guidance that temporary priority consideration is available for plans which are insolvent within the meaning of section 418E of the Internal Revenue Code of 1986 or likely to become so insolvent or for plans which have suspended benefits under section 305(e)(9), or that availability is otherwise based on the funded status of the plan under section 305, as permitted by subsection (d), the corporation shall consult with the Secretary of the Treasury regarding any granting of priority consideration to such plans.".

(c) PREMIUM RATE INCREASE.—Section 4006(a)(3) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1306(a)(3)) is amended—

(1) in subparagraph (A)—

(A) in clause (vi)—

(i) by inserting ", and before January 1, 2031" after "December 31, 2014,"; and

(ii) by striking "or" at the end;

(B) in clause (vii)—

(i) by moving the margin 2 ems to the left; and

(ii) in subclause (II), by striking the period and inserting ", or"; and

(C) by adding at the end the following:

"(viii) in the case of a multiemployer plan, for plan years beginning after December 31, 2030, $52 for each individual who is a participant in such plan during the applicable plan year."; and

(2) by adding at the end the following:

"(N) For each plan year beginning in a calendar year after 2031, there shall be substituted for the dollar amount specified in clause (viii) of subparagraph (A) an amount equal to the greater of—

"(i) the product derived by multiplying such dollar amount by the ratio of—

"(I) the national average wage index (as defined in section 209(k)(1) of the Social Security Act) for the first of the 2 calendar years preceding the calendar year in which such plan year begins, to

"(II) the national average wage index (as so defined) for 2029; and

"(ii) such dollar amount for plan years beginning in the preceding calendar year.

If the amount determined under this subparagraph is not a multiple of $1, such product shall be rounded to the nearest multiple of $1.".

(d) AMENDMENTS TO INTERNAL REVENUE CODE OF 1986.—

H. R. 1319—193

(1) IN GENERAL.—Section 432(a) of the Internal Revenue Code of 1986 is amended—

(A) by striking "and" at the end of paragraph (2)(B),

(B) by striking the period at the end of paragraph (3)(B) and inserting ", and", and

(C) by adding at the end the following new paragraph:

"(4) if the plan is an eligible multiemployer plan which is applying for or receiving special financial assistance under section 4262 of the Employee Retirement Income Security Act of 1974, the requirements of subsection (k) shall apply to the plan.".

(2) PLANS RECEIVING SPECIAL FINANCIAL ASSISTANCE TO BE IN CRITICAL STATUS.—Section 432(b) of the Internal Revenue Code of 1986 is amended by adding at the end the following new paragraph:

"(7) PLANS RECEIVING SPECIAL FINANCIAL ASSISTANCE.—If an eligible multiemployer plan receiving special financial assistance under section 4262 of the Employee Retirement Income Security Act of 1974 meets the requirements of subsection (k)(2), notwithstanding the preceding paragraphs of this subsection, the plan shall be deemed to be in critical status for plan years beginning with the plan year in which the effective date for such assistance occurs and ending with the last plan year ending in 2051.".

(3) RULES RELATING TO ELIGIBLE MULTIEMPLOYER PLANS.—Section 432 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(k) RULES RELATING TO ELIGIBLE MULTIEMPLOYER PLANS.—

"(1) PLANS APPLYING FOR SPECIAL FINANCIAL ASSISTANCE.—In the case of an eligible multiemployer plan which applies for special financial assistance under section 4262 of such Act—

"(A) IN GENERAL.—Such application shall be submitted in accordance with the requirements of such section, including any guidance issued thereunder by the Pension Benefit Guaranty Corporation.

"(B) REINSTATEMENT OF SUSPENDED BENEFITS.—In the case of a plan for which a suspension of benefits has been approved under subsection (e)(9), the application shall describe the manner in which suspended benefits will be reinstated in accordance with paragraph (2)(A) and guidance issued by the Secretary if the plan receives special financial assistance.

"(C) AMOUNT OF FINANCIAL ASSISTANCE.—

"(i) IN GENERAL.—In determining the amount of special financial assistance to be specified in its application, an eligible multiemployer plan shall—

"(I) use the interest rate used by the plan in its most recently completed certification of plan status before January 1, 2021, provided that such interest rate does not exceed the interest rate limit, and

"(II) for other assumptions, use the assumptions that the plan used in its most recently completed certification of plan status before January 1, 2021, unless such assumptions are unreasonable.

H. R. 1319—194

"(ii) INTEREST RATE LIMIT.—For purposes of clause (i), the interest rate limit is the rate specified in section 430(h)(2)(C)(iii) (disregarding modifications made under clause (iv) of such section) for the month in which the application for special financial assistance is filed by the eligible multiemployer plan or the 3 preceding months, with such specified rate increased by 200 basis points.

"(iii) CHANGES IN ASSUMPTIONS.—If a plan determines that use of one or more prior assumptions is unreasonable, the plan may propose in its application to change such assumptions, provided that the plan discloses such changes in its application and describes why such assumptions are no longer reasonable. The plan may not propose a change to the interest rate otherwise required under this subsection for eligibility or financial assistance amount.

"(D) PLANS APPLYING FOR PRIORITY CONSIDERATION.—In the case of a plan applying for special financial assistance under rules providing for temporary priority consideration, as provided in paragraph (4)(C), such plan's application shall be submitted to the Secretary in addition to the Pension Benefit Guaranty Corporation.

"(2) PLANS RECEIVING SPECIAL FINANCIAL ASSISTANCE.—In the case of an eligible multiemployer plan receiving special financial assistance under section 4262 of the Employee Retirement Income Security Act of 1974—

"(A) REINSTATEMENT OF SUSPENDED BENEFITS.—The plan shall—

"(i) reinstate any benefits that were suspended under subsection (e)(9) or section 4245(a) of the Employee Retirement Income Security Act of 1974, effective as of the first month in which the effective date for the special financial assistance occurs, for participants and beneficiaries as of such month, and

"(ii) provide payments equal to the amount of benefits previously suspended to any participants or beneficiaries in pay status as of the effective date of the special financial assistance, payable, as determined by the plan—

"(I) as a lump sum within 3 months of such effective date; or

"(II) in equal monthly installments over a period of 5 years, commencing within 3 months of such effective date, with no adjustment for interest.

"(B) RESTRICTIONS ON THE USE OF SPECIAL FINANCIAL ASSISTANCE.—Special financial assistance received by the plan may be used to make benefit payments and pay plan expenses. Such assistance shall be segregated from other plan assets, and shall be invested by the plan in investment-grade bonds or other investments as permitted by regulations or other guidance issued by the Pension Benefit Guaranty Corporation.

"(C) CONDITIONS ON PLANS RECEIVING SPECIAL FINANCIAL ASSISTANCE.—

H. R. 1319—195

"(i) IN GENERAL.—The Pension Benefit Guaranty Corporation, in consultation with the Secretary, may impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan receiving special financial assistance relating to increases in future accrual rates and any retroactive benefit improvements, allocation of plan assets, reductions in employer contribution rates, diversion of contributions and allocation of expenses to other benefit plans, and withdrawal liability.

"(ii) LIMITATION.—The Pension Benefit Guaranty Corporation shall not impose conditions on an eligible multiemployer plan as a condition of, or following receipt of, special financial assistance relating to—

"(I) any prospective reduction in plan benefits (including benefits that may be adjusted pursuant to subsection (e)(8)),

"(II) plan governance, including selection of, removal of, and terms of contracts with, trustees, actuaries, investment managers, and other service providers, or

"(III) any funding rules relating to the plan.

"(D) ASSISTANCE DISREGARDED FOR CERTAIN PURPOSES.—

"(i) FUNDING STANDARDS.—Special financial assistance received by the plan shall not be taken into account for determining contributions required under section 431.

"(ii) INSOLVENT PLANS.—If the plan becomes insolvent within the meaning of section 418E after receiving special financial assistance, the plan shall be subject to all rules applicable to insolvent plans.

"(E) INELIGIBILITY FOR SUSPENSION OF BENEFITS.—The plan shall not be eligible to apply for a new suspension of benefits under subsection (e)(9)(G).

"(3) ELIGIBLE MULTIEMPLOYER PLAN.—

"(A) IN GENERAL.—For purposes of this section, a multiemployer plan is an eligible multiemployer plan if—

"(i) the plan is in critical and declining status in any plan year beginning in 2020 through 2022,

"(ii) a suspension of benefits has been approved with respect to the plan under subsection (e)(9) as of the date of the enactment of this subsection;

"(iii) in any plan year beginning in 2020 through 2022, the plan is certified by the plan actuary to be in critical status, has a modified funded percentage of less than 40 percent, and has a ratio of active to inactive participants which is less than 2 to 3, or

"(iv) the plan became insolvent within the meaning of section 418E after December 16, 2014, and has remained so insolvent and has not been terminated as of the date of enactment of this subsection.

"(B) MODIFIED FUNDED PERCENTAGE.—For purposes of subparagraph (A)(iii), the term 'modified funded percentage' means the percentage equal to a fraction the numerator of which is current value of plan assets (as defined in

H. R. 1319—196

section 3(26) of the Employee Retirement Income Security Act of 1974) and the denominator of which is current liabilities (as defined in section 431(c)(6)(D)).

"(4) COORDINATION WITH PENSION BENEFIT GUARANTY CORPORATION.—In prescribing the application process for eligible multiemployer plans to receive special financial assistance under section 4262 of the Employee Retirement Income Security Act of 1974 and reviewing applications of such plans, the Pension Benefit Guaranty Corporation shall coordinate with the Secretary in the following manner:

"(A) In the case of a plan which has suspended benefits under subsection (e)(9)—

"(i) in determining whether to approve the application, such corporation shall consult with the Secretary regarding the plan's proposed method of reinstating benefits, as described in the plan's application and in accordance with guidance issued by the Secretary, and

"(ii) such corporation shall consult with the Secretary regarding the amount of special financial assistance needed based on the projected funded status of the plan as of the last day of the plan year ending in 2051, whether the plan proposes to repay benefits over 5 years or as a lump sum, as required by paragraph (2)(A)(ii), and any other relevant factors, as determined by such corporation in consultation with the Secretary, to ensure the amount of assistance is sufficient to meet such requirement and is sufficient to pay benefits as required in section 4262(j)(1) of such Act.

"(B) In the case of any plan which proposes in its application to change the assumptions used, as provided in paragraph (1)(C)(iii), such corporation shall consult with the Secretary regarding such proposed change in assumptions.

"(C) If such corporation specifies in regulations or guidance that temporary priority consideration is available for plans which are insolvent within the meaning of section 418E or likely to become so insolvent or for plans which have suspended benefits under subsection (e)(9), or that availability is otherwise based on the funded status of the plan under this section, as permitted by section 4262(d) of such Act, such corporation shall consult with the Secretary regarding any granting of priority consideration to such plans.".

**SEC. 9705. EXTENDED AMORTIZATION FOR SINGLE EMPLOYER PLANS.**

(a) 15-YEAR AMORTIZATION UNDER THE INTERNAL REVENUE CODE OF 1986.—Section 430(c) of the Internal Revenue Code of 1986 is amended by adding at the end the following new paragraph:

"(8) 15-YEAR AMORTIZATION.—With respect to plan years beginning after December 31, 2021 (or, at the election of the plan sponsor, plan years beginning after December 31, 2018, December 31, 2019, or December 31, 2020)—

"(A) the shortfall amortization bases for all plan years preceding the first plan year beginning after December 31, 2021 (or after whichever earlier date is elected pursuant

H. R. 1319—197

to this paragraph), and all shortfall amortization installments determined with respect to such bases, shall be reduced to zero, and

"(B) subparagraphs (A) and (B) of paragraph (2) shall each be applied by substituting '15-plan-year period' for '7-plan-year period'.".

(b) 15-YEAR AMORTIZATION UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—Section 303(c) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1083(c)) is amended by adding at the end the following new paragraph:

"(8) 15-YEAR AMORTIZATION.—With respect to plan years beginning after December 31, 2021 (or, at the election of the plan sponsor, plan years beginning after December 31, 2018, December 31, 2019, or December 31, 2020)—

"(A) the shortfall amortization bases for all plan years preceding the first plan year beginning after December 31, 2021 (or after whichever earlier date is elected pursuant to this paragraph), and all shortfall amortization installments determined with respect to such bases, shall be reduced to zero, and

"(B) subparagraphs (A) and (B) of paragraph (2) shall each be applied by substituting '15-plan-year period' for '7-plan-year period'.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to plan years beginning after December 31, 2018.

SEC. 9706. EXTENSION OF PENSION FUNDING STABILIZATION PERCENTAGES FOR SINGLE EMPLOYER PLANS.

(a) AMENDMENT TO INTERNAL REVENUE CODE OF 1986.—

(1) IN GENERAL.—The table contained in subclause (II) of section 430(h)(2)(C)(iv) of the Internal Revenue Code of 1986 is amended to read as follows:

| "If the calendar year is: | The applicable minimum percentage is: | The applicable maximum percentage is: |
|---|---|---|
| Any year in the period starting in 2012 and ending in 2019 ............................ | 90% | 110% |
| Any year in the period starting in 2020 and ending in 2025 ............................ | 95% | 105% |
| 2026 ...................................................... | 90% | 110% |
| 2027 ...................................................... | 85% | 115% |
| 2028 ...................................................... | 80% | 120% |
| 2029 ...................................................... | 75% | 125% |
| After 2029 ............................................. | 70% | 130%.". |

(2) FLOOR ON 25-YEAR AVERAGES.—Subclause (I) of section 430(h)(2)(C)(iv) of such Code is amended by adding at the end the following: "Notwithstanding anything in this subclause, if the average of the first, second, or third segment rate for any 25-year period is less than 5 percent, such average shall be deemed to be 5 percent.".

(b) AMENDMENTS TO EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—

(1) IN GENERAL.—The table contained in subclause (II) of section 303(h)(2)(C)(iv) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1083(h)(2)(C)(iv)(II)) is amended to read as follows:

| "If the calendar year is: | The applicable minimum percentage is: | The applicable maximum percentage is: |
| --- | --- | --- |
| Any year in the period starting in 2012 and ending in 2019 ............................. | 90% | 110% |
| Any year in the period starting in 2020 and ending in 2025 ............................. | 95% | 105% |
| 2026 ....................................................... | 90% | 110% |
| 2027 ....................................................... | 85% | 115% |
| 2028 ....................................................... | 80% | 120% |
| 2029 ....................................................... | 75% | 125% |
| After 2029 ............................................... | 70% | 130%.". |

(2) FLOOR ON 25-YEAR AVERAGES.—Subclause (I) of section 303(h)(2)(C)(iv) of such Act (29 U.S.C. 1083(h)(2)(C)(iv)(I)) is amended by adding at the end the following: "Notwithstanding anything in this subclause, if the average of the first, second, or third segment rate for any 25-year period is less than 5 percent, such average shall be deemed to be 5 percent.".

(3) CONFORMING AMENDMENTS.—

(A) IN GENERAL.—Section 101(f)(2)(D) of such Act (29 U.S.C. 1021(f)(2)(D)) is amended—

(i) in clause (i) by striking "and the Bipartisan Budget Act of 2015" both places it appears and inserting ", the Bipartisan Budget Act of 2015, and the American Rescue Plan Act of 2021", and

(ii) in clause (ii) by striking "2023" and inserting "2029".

(B) STATEMENTS.—The Secretary of Labor shall modify the statements required under subclauses (I) and (II) of section 101(f)(2)(D)(i) of such Act to conform to the amendments made by this section.

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply with respect to plan years beginning after December 31, 2019.

(2) ELECTION NOT TO APPLY.—A plan sponsor may elect not to have the amendments made by this section apply to any plan year beginning before January 1, 2022, either (as specified in the election)—

(A) for all purposes for which such amendments apply, or

(B) solely for purposes of determining the adjusted funding target attainment percentage under sections 436 of the Internal Revenue Code of 1986 and 206(g) of the

H. R. 1319—199

Employee Retirement Income Security Act of 1974 for such plan year.

A plan shall not be treated as failing to meet the requirements of sections 204(g) of such Act and 411(d)(6) of such Code solely by reason of an election under this paragraph.

## SEC. 9707. MODIFICATION OF SPECIAL RULES FOR MINIMUM FUNDING STANDARDS FOR COMMUNITY NEWSPAPER PLANS.

(a) AMENDMENT TO INTERNAL REVENUE CODE OF 1986.—Subsection (m) of section 430 of the Internal Revenue Code of 1986 is amended to read as follows:

"(m) SPECIAL RULES FOR COMMUNITY NEWSPAPER PLANS.—

"(1) IN GENERAL.—An eligible newspaper plan sponsor of a plan under which no participant has had the participant's accrued benefit increased (whether because of service or compensation) after April 2, 2019, may elect to have the alternative standards described in paragraph (4) apply to such plan.

"(2) ELIGIBLE NEWSPAPER PLAN SPONSOR.—The term 'eligible newspaper plan sponsor' means the plan sponsor of—

"(A) any community newspaper plan, or

"(B) any other plan sponsored, as of April 2, 2019, by a member of the same controlled group of a plan sponsor of a community newspaper plan if such member is in the trade or business of publishing 1 or more newspapers.

"(3) ELECTION.—An election under paragraph (1) shall be made at such time and in such manner as prescribed by the Secretary. Such election, once made with respect to a plan year, shall apply to all subsequent plan years unless revoked with the consent of the Secretary.

"(4) ALTERNATIVE MINIMUM FUNDING STANDARDS.—The alternative standards described in this paragraph are the following:

"(A) INTEREST RATES.—

"(i) IN GENERAL.—Notwithstanding subsection (h)(2)(C) and except as provided in clause (ii), the first, second, and third segment rates in effect for any month for purposes of this section shall be 8 percent.

"(ii) NEW BENEFIT ACCRUALS.—Notwithstanding subsection (h)(2), for purposes of determining the funding target and normal cost of a plan for any plan year, the present value of any benefits accrued or earned under the plan for a plan year with respect to which an election under paragraph (1) is in effect shall be determined on the basis of the United States Treasury obligation yield curve for the day that is the valuation date of such plan for such plan year.

"(iii) UNITED STATES TREASURY OBLIGATION YIELD CURVE.—For purposes of this subsection, the term 'United States Treasury obligation yield curve' means, with respect to any day, a yield curve which shall be prescribed by the Secretary for such day on interest-bearing obligations of the United States.

"(B) SHORTFALL AMORTIZATION BASE.—

"(i) PREVIOUS SHORTFALL AMORTIZATION BASES.—The shortfall amortization bases determined under subsection (c)(3) for all plan years preceding the first plan year to which the election under paragraph (1)

H. R. 1319—200

applies (and all shortfall amortization installments determined with respect to such bases) shall be reduced to zero under rules similar to the rules of subsection (c)(6).

"(ii) NEW SHORTFALL AMORTIZATION BASE.—Notwithstanding subsection (c)(3), the shortfall amortization base for the first plan year to which the election under paragraph (1) applies shall be the funding shortfall of such plan for such plan year (determined using the interest rates as modified under subparagraph (A)).

"(C) DETERMINATION OF SHORTFALL AMORTIZATION INSTALLMENTS.—

"(i) 30-YEAR PERIOD.—Subparagraphs (A) and (B) of subsection (c)(2) shall be applied by substituting '30-plan-year' for '7-plan-year' each place it appears.

"(ii) NO SPECIAL ELECTION.—The election under subparagraph (D) of subsection (c)(2) shall not apply to any plan year to which the election under paragraph (1) applies.

"(D) EXEMPTION FROM AT-RISK TREATMENT.—Subsection (i) shall not apply.

"(5) COMMUNITY NEWSPAPER PLAN.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'community newspaper plan' means any plan to which this section applies maintained as of December 31, 2018, by an employer which—

"(i) maintains the plan on behalf of participants and beneficiaries with respect to employment in the trade or business of publishing 1 or more newspapers which were published by the employer at any time during the 11-year period ending on December 20, 2019,

"(ii)(I) is not a company the stock of which is publicly traded (on a stock exchange or in an over-the-counter market), and is not controlled, directly or indirectly, by such a company, or

"(II) is controlled, directly or indirectly, during the entire 30-year period ending on December 20, 2019, by individuals who are members of the same family, and does not publish or distribute a daily newspaper that is carrier-distributed in printed form in more than 5 States, and

"(iii) is controlled, directly or indirectly—

"(I) by 1 or more persons residing primarily in a State in which the community newspaper has been published on newsprint or carrier-distributed,

"(II) during the entire 30-year period ending on December 20, 2019, by individuals who are members of the same family,

"(III) by 1 or more trusts, the sole trustees of which are persons described in subclause (I) or (II), or

"(IV) by a combination of persons described in subclause (I), (II), or (III).

H. R. 1319—201

"(B) NEWSPAPER.—The term 'newspaper' does not include any newspaper (determined without regard to this subparagraph) to which any of the following apply:

"(i) Is not in general circulation.

"(ii) Is published (on newsprint or electronically) less frequently than 3 times per week.

"(iii) Has not ever been regularly published on newsprint.

"(iv) Does not have a bona fide list of paid subscribers.

"(C) CONTROL.—A person shall be treated as controlled by another person if such other person possesses, directly or indirectly, the power to direct or cause the direction and management of such person (including the power to elect a majority of the members of the board of directors of such person) through the ownership of voting securities.

"(6) CONTROLLED GROUP.—For purposes of this subsection, the term 'controlled group' means all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 as of December 20, 2019.".

(b) AMENDMENT TO EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—Subsection (m) of section 303 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1083(m)) is amended to read as follows:

"(m) SPECIAL RULES FOR COMMUNITY NEWSPAPER PLANS.—

"(1) IN GENERAL.—An eligible newspaper plan sponsor of a plan under which no participant has had the participant's accrued benefit increased (whether because of service or compensation) after April 2, 2019, may elect to have the alternative standards described in paragraph (4) apply to such plan.

"(2) ELIGIBLE NEWSPAPER PLAN SPONSOR.—The term 'eligible newspaper plan sponsor' means the plan sponsor of—

"(A) any community newspaper plan, or

"(B) any other plan sponsored, as of April 2, 2019, by a member of the same controlled group of a plan sponsor of a community newspaper plan if such member is in the trade or business of publishing 1 or more newspapers.

"(3) ELECTION.—An election under paragraph (1) shall be made at such time and in such manner as prescribed by the Secretary of the Treasury. Such election, once made with respect to a plan year, shall apply to all subsequent plan years unless revoked with the consent of the Secretary of the Treasury.

"(4) ALTERNATIVE MINIMUM FUNDING STANDARDS.—The alternative standards described in this paragraph are the following:

"(A) INTEREST RATES.—

"(i) IN GENERAL.—Notwithstanding subsection (h)(2)(C) and except as provided in clause (ii), the first, second, and third segment rates in effect for any month for purposes of this section shall be 8 percent.

"(ii) NEW BENEFIT ACCRUALS.—Notwithstanding subsection (h)(2), for purposes of determining the funding target and normal cost of a plan for any plan year, the present value of any benefits accrued or earned under the plan for a plan year with respect to which an election under paragraph (1) is in effect

H. R. 1319—202

shall be determined on the basis of the United States Treasury obligation yield curve for the day that is the valuation date of such plan for such plan year.

"(iii) UNITED STATES TREASURY OBLIGATION YIELD CURVE.—For purposes of this subsection, the term 'United States Treasury obligation yield curve' means, with respect to any day, a yield curve which shall be prescribed by the Secretary of the Treasury for such day on interest-bearing obligations of the United States.

"(B) SHORTFALL AMORTIZATION BASE.—

"(i) PREVIOUS SHORTFALL AMORTIZATION BASES.— The shortfall amortization bases determined under subsection (c)(3) for all plan years preceding the first plan year to which the election under paragraph (1) applies (and all shortfall amortization installments determined with respect to such bases) shall be reduced to zero under rules similar to the rules of subsection (c)(6).

"(ii) NEW SHORTFALL AMORTIZATION BASE.—Notwithstanding subsection (c)(3), the shortfall amortization base for the first plan year to which the election under paragraph (1) applies shall be the funding shortfall of such plan for such plan year (determined using the interest rates as modified under subparagraph (A)).

"(C) DETERMINATION OF SHORTFALL AMORTIZATION INSTALLMENTS.—

"(i) 30-YEAR PERIOD.—Subparagraphs (A) and (B) of subsection (c)(2) shall be applied by substituting '30-plan-year' for '7-plan-year' each place it appears.

"(ii) NO SPECIAL ELECTION.—The election under subparagraph (D) of subsection (c)(2) shall not apply to any plan year to which the election under paragraph (1) applies.

"(D) EXEMPTION FROM AT-RISK TREATMENT.—Subsection (i) shall not apply.

"(5) COMMUNITY NEWSPAPER PLAN.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'community newspaper plan' means a plan to which this section applies maintained as of December 31, 2018, by an employer which—

"(i) maintains the plan on behalf of participants and beneficiaries with respect to employment in the trade or business of publishing 1 or more newspapers which were published by the employer at any time during the 11-year period ending on December 20, 2019,

"(ii)(I) is not a company the stock of which is publicly traded (on a stock exchange or in an over-the-counter market), and is not controlled, directly or indirectly, by such a company, or

"(II) is controlled, directly, or indirectly, during the entire 30-year period ending on December 20, 2019, by individuals who are members of the same family, and does not publish or distribute a daily newspaper that is carrier-distributed in printed form in more than 5 States, and

H. R. 1319—203

"(iii) is controlled, directly, or indirectly—

"(I) by 1 or more persons residing primarily in a State in which the community newspaper has been published on newsprint or carrier-distributed,

"(II) during the entire 30-year period ending on December 20, 2019, by individuals who are members of the same family,

"(III) by 1 or more trusts, the sole trustees of which are persons described in subclause (I) or (II), or

"(IV) by a combination of persons described in subclause (I), (II), or (III).

"(B) NEWSPAPER.—The term 'newspaper' does not include any newspaper (determined without regard to this subparagraph) to which any of the following apply:

"(i) Is not in general circulation.

"(ii) Is published (on newsprint or electronically) less frequently than 3 times per week.

"(iii) Has not ever been regularly published on newsprint.

"(iv) Does not have a bona fide list of paid subscribers.

"(C) CONTROL.—A person shall be treated as controlled by another person if such other person possesses, directly or indirectly, the power to direct or cause the direction and management of such person (including the power to elect a majority of the members of the board of directors of such person) through the ownership of voting securities.

"(6) CONTROLLED GROUP.—For purposes of this subsection, the term 'controlled group' means all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 as of December 20, 2019.

"(7) EFFECT ON PREMIUM RATE CALCULATION.—In the case of a plan for which an election is made to apply the alternative standards described in paragraph (3), the additional premium under section 4006(a)(3)(E) shall be determined as if such election had not been made.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to plan years ending after December 31, 2017.

**SEC. 9708. EXPANSION OF LIMITATION ON EXCESSIVE EMPLOYEE REMUNERATION.**

Paragraph (3) of section 162(m) of the Internal Revenue Code of 1986 is amended—

(1) by redesignating subparagraph (C) as subparagraph (D),

(2) by striking "or" at the end of subparagraph (B),

(3) by inserting after subparagraph (B) the following new subparagraph:

"(C) in the case of taxable years beginning after December 31, 2026, such employee is among the 5 highest compensated employees for the taxable year other than any individual described in subparagraph (A) or (B), or", and

H. R. 1319—204

(4) by striking "employee" in subparagraph (D), as so redesignated, and inserting "employee described in subparagraph (A) or (B)".

# Subtitle I—Child Care for Workers

**SEC. 9801. CHILD CARE ASSISTANCE.**

(a) APPROPRIATION.—

(1) IN GENERAL.—Section 418(a)(3) of the Social Security Act (42 U.S.C. 618(a)(3)) is amended to read as follows:

"(3) APPROPRIATION.—For grants under this section, there are appropriated $3,550,000,000 for each fiscal year, of which—

"(A) $3,375,000,000 shall be available for grants to States;

"(B) $100,000,000 shall be available for grants to Indian tribes and tribal organizations; and

"(C) $75,000,000 shall be available for grants to territories.".

(2) CONFORMING AMENDMENT.—Section 418(a)(2)(A) of such Act (42 U.S.C. 618(a)(2)(A)) is amended by striking "paragraph (3), and remaining after the reservation described in paragraph (4) and" and inserting "paragraph (3)(A),".

(b) MODIFICATION OF STATE MATCH REQUIREMENT FOR FUNDING INCREASES IN FISCAL YEARS 2021 AND 2022.—With respect to the amounts made available by section 418(a)(3) of the Social Security Act for each of fiscal years 2021 and 2022, section 418(a)(2)(C) of such Act shall be applied and administered with respect to any State that is entitled to receive the entire amount that would be allotted to the State under section 418(a)(2)(B) of such Act for the fiscal year in the manner authorized for fiscal year 2020, as if the Federal medical assistance percentage for the State for the fiscal year were 100 percent.

(c) FUNDING FOR THE TERRITORIES.—Section 418(a)(4) of such Act (42 U.S.C. 618(a)(4)) is amended to read as follows:

"(4) TERRITORIES.—

"(A) GRANTS.—The Secretary shall use the amounts made available by paragraph (3)(C) to make grants to the territories under this paragraph.

"(B) ALLOTMENTS.—The amount described in subparagraph (A) shall be allotted among the territories in proportion to their respective needs.

"(C) REDISTRIBUTION.—The 1st sentence of clause (i) and clause (ii) of paragraph (2)(D) shall apply with respect to the amounts allotted to the territories under this paragraph, except that the 2nd sentence of paragraph (2)(D) shall not apply and the amounts allotted to the territories that are available for redistribution for a fiscal year shall be redistributed to each territory that applies for the additional amounts, to the extent that the Secretary determines that the territory will be able to use the additional amounts to provide child care assistance, in an amount that bears the same ratio to the amount so available for redistribution as the amount allotted to the territory for the fiscal year bears to the total amount allotted to all the territories receiving redistributed funds under this paragraph for the fiscal year.

H. R. 1319—205

"(D) INAPPLICABILITY OF PAYMENT LIMITATION.— Section 1108(a) shall not apply with respect to any amount paid under this paragraph.

"(E) TERRITORY.—In this paragraph, the term 'territory' means the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.".

# Subtitle J—Medicaid

### SEC. 9811. MANDATORY COVERAGE OF COVID–19 VACCINES AND ADMINISTRATION AND TREATMENT UNDER MEDICAID.

(a) COVERAGE.—

(1) IN GENERAL.—Section 1905(a)(4) of the Social Security Act (42 U.S.C. 1396d(a)(4)) is amended by striking the semicolon at the end and inserting "; and (E) during the period beginning on the date of the enactment of the American Rescue Plan Act of 2021 and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), a COVID–19 vaccine and administration of the vaccine; and (F) during the period beginning on the date of the enactment of the American Rescue Plan Act of 2021 and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, without regard to the requirements of section 1902(a)(10)(B) (relating to comparability), in the case of an individual who is diagnosed with or presumed to have COVID–19, during the period such individual has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State plan (or waiver of such plan);".

(2) MAKING COVID–19 VACCINE AVAILABLE TO ADDITIONAL ELIGIBILITY GROUPS AND TREATMENT AVAILABLE TO CERTAIN UNINSURED.—Section 1902(a)(10) of such Act (42 U.S.C. 1396a(a)(10)) is amended in the matter following subparagraph (G)—

(A) by striking "and to other conditions which may complicate pregnancy, (VIII)" and inserting ", medical assistance for services related to other conditions which may complicate pregnancy, and medical assistance for vaccines described in section 1905(a)(4)(E) and the administration of such vaccines during the period described in such section, (VIII)";

(B) by inserting "and medical assistance for vaccines described in section 1905(a)(4)(E) and the administration of such vaccines during the period described in such section" after "(described in subsection (z)(2))";

(C) by inserting "and medical assistance for vaccines described in section 1905(a)(4)(E) and the administration of such vaccines during the period described in such section" after "described in subsection (k)(1)";

(D) by inserting "and medical assistance for vaccines described in section 1905(a)(4)(E) and the administration

of such vaccines during the period described in such section" after "family planning setting";

(E) by striking "and any visit described in section 1916(a)(2)(G) that is furnished during any such portion" and inserting ", any service described in section 1916(a)(2)(G) that is furnished during any such portion, any vaccine described in section 1905(a)(4)(E) (and the administration of such vaccine) that is furnished during any such portion, and testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, in the case of an individual who is diagnosed with or presumed to have COVID–19, during the period such individual has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State plan (or waiver of such plan)"; and

(F) by striking the semicolon at the end and inserting ", and (XIX) medical assistance shall be made available during the period described in section 1905(a)(4)(E) for vaccines described in such section and the administration of such vaccines, for any individual who is eligible for and receiving medical assistance under the State plan or under a waiver of such plan (other than an individual who is eligible for medical assistance consisting only of payment of premiums pursuant to subparagraph (E) or (F) or section 1933), notwithstanding any provision of this title or waiver under section 1115 impacting such individual's eligibility for medical assistance under such plan or waiver to coverage for a limited type of benefits and services that would not otherwise include coverage of a COVID–19 vaccine and its administration;".

(3) PROHIBITION OF COST SHARING.—

(A) IN GENERAL.—Subsections (a)(2) and (b)(2) of section 1916 of the Social Security Act (42 U.S.C. 1396o) are each amended—

(i) in subparagraph (F), by striking "or" at the end;

(ii) in subparagraph (G), by striking "; and"; and

(iii) by adding at the end the following subparagraphs:

"(H) during the period beginning on the date of the enactment of this subparagraph and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), a COVID–19 vaccine and the administration of such vaccine (for any individual eligible for medical assistance for such vaccine (and administration)); or

"(I) during the period beginning on the date of the enactment of this subparagraph and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, in the case of an individual who is diagnosed with or presumed to have COVID–19, during the period during which such individual

H. R. 1319—207

has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State plan (or waiver of such plan); and".

(B) APPLICATION TO ALTERNATIVE COST SHARING.—Section 1916A(b)(3)(B) of the Social Security Act (42 U.S.C. 1396o–1(b)(3)(B)) is amended—

(i) in clause (xi), by striking "any visit" and inserting "any service"; and

(ii) by adding at the end the following clauses:

"(xii) During the period beginning on the date of the enactment of this clause and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), a COVID–19 vaccine and the administration of such vaccine (for any individual eligible for medical assistance for such vaccine (and administration)).

"(xiii) During the period beginning on the date of the enactment of this clause and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, in the case of an individual who is diagnosed with or presumed to have COVID–19, during the period during which such individual has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State plan (or waiver of such plan).".

(4) INCLUSION IN THE MEDICAID DRUG REBATE PROGRAM OF COVERED OUTPATIENT DRUGS USED FOR COVID–19 TREATMENT.—

(A) IN GENERAL.—The requirements of section 1927 of the Social Security Act (42 U.S.C. 1396r–8) shall apply to any drug or biological product to which subparagraph (F) of section 1905(a)(4) of such Act, as added by paragraph (1), applies or to which the subclause (XVIII) in the matter following subparagraph (G) of section 1902(a)(10) of such Act, as added by paragraph (2), applies that is—

(i) furnished as medical assistance in accordance with section 1902(a)(10)(A) of such Act and such subparagraph (F) or subclause (XVIII) and section 1902(a)(10)(A) of such Act, as applicable, for the treatment, or prevention, of COVID–19, as described in such subparagraph or subclause, respectively; and

(ii) a covered outpatient drug (as defined in section 1927(k) of such Act, except that, in applying paragraph (2)(A) of such section to a drug to which such subparagraph (F) or such subclause (XVIII) applies, such drug shall be deemed a prescribed drug for purposes of section 1905(a)(12) of such Act).

(B) CONFORMING AMENDMENT.—Section 1927(d)(7) of the Social Security Act (42 U.S.C. 1396r–8(d)(7)) is

H. R. 1319—208

amended by adding at the end the following new subparagraph:

"(E) Drugs and biological products to which section 1905(a)(4)(F) and subclause (XVIII) in the matter following subparagraph (G) of section 1902(a)(10) apply that are furnished as medical assistance in accordance with such section or clause, respectively, for the treatment or prevention, of COVID–19, as described in such subparagraph or subclause, respectively, and section 1902(a)(10)(A).".

(5) ALTERNATIVE BENEFIT PLANS.—Section 1937(b) of the Social Security Act (42 U.S.C. 1396u–7(b)) is amended by adding at the end the following new paragraph:

"(8) COVID–19 VACCINES, TESTING, AND TREATMENT.—Notwithstanding the previous provisions of this section, a State may not provide for medical assistance through enrollment of an individual with benchmark coverage or benchmark-equivalent coverage under this section unless, during the period beginning on the date of the enactment of the American Rescue Plan Act of 2021 and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), such coverage includes (and does not impose any deduction, cost sharing, or similar charge for)—

"(A) COVID–19 vaccines and administration of the vaccines; and

"(B) testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, in the case of such an individual who is diagnosed with or presumed to have COVID–19, during the period such individual has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State plan (or waiver of such plan).".

(b) TEMPORARY INCREASE IN FEDERAL PAYMENTS FOR COVERAGE AND ADMINISTRATION OF COVID–19 VACCINES.—Section 1905 of the Social Security Act (42 U.S.C. 1396d) is amended—

(1) in subsection (b), by striking "and (ff)" and inserting "(ff), and (hh)";

(2) in subsection (ff), in the matter preceding paragraph (1), by inserting ", subject to subsection (hh)" after "or (z)(2)" and

(3) by adding at the end the following new subsection:

"(hh) TEMPORARY INCREASED FMAP FOR MEDICAL ASSISTANCE FOR COVERAGE AND ADMINISTRATION OF COVID–19 VACCINES.—

"(1) IN GENERAL.—Notwithstanding any other provision of this title, during the period described in paragraph (2), the Federal medical assistance percentage for a State, with respect to amounts expended by the State for medical assistance for a vaccine described in subsection (a)(4)(E) (and the administration of such a vaccine), shall be equal to 100 percent.

"(2) PERIOD DESCRIBED.—The period described in this paragraph is the period that—

"(A) begins on the first day of the first quarter beginning after the date of the enactment of this subsection; and

H. R. 1319—209

"(B) ends on the last day of the first quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B).

"(3) EXCLUSION OF EXPENDITURES FROM TERRITORIAL CAPS.—Any payment made to a territory for expenditures for medical assistance under subsection (a)(4)(E) that are subject to the Federal medical assistance percentage specified under paragraph (1) shall not be taken into account for purposes of applying payment limits under subsections (f) and (g) of section 1108.".

## SEC. 9812. MODIFICATIONS TO CERTAIN COVERAGE UNDER MEDICAID FOR PREGNANT AND POSTPARTUM WOMEN.

(a) STATE OPTION.—Section 1902(e) of the Social Security Act (42 U.S.C. 1396a(e)) is amended by adding at the end the following new paragraph:

"(16) EXTENDING CERTAIN COVERAGE FOR PREGNANT AND POSTPARTUM WOMEN.—

"(A) IN GENERAL.—At the option of the State, the State plan (or waiver of such State plan) may provide, that an individual who, while pregnant, is eligible for and has received medical assistance under the State plan approved under this title (or a waiver of such plan) (including during a period of retroactive eligibility under subsection (a)(34)) shall, in addition to remaining eligible under paragraph (5) for all pregnancy-related and postpartum medical assistance available under the State plan (or waiver) through the last day of the month in which the 60-day period (beginning on the last day of her pregnancy) ends, remain eligible under the State plan (or waiver) for medical assistance for the period beginning on the first day occurring after the end of such 60-day period and ending on the last day of the month in which the 12-month period (beginning on the last day of her pregnancy) ends.

"(B) FULL BENEFITS DURING PREGNANCY AND THROUGHOUT THE 12-MONTH POSTPARTUM PERIOD.—The medical assistance provided for a pregnant or postpartum individual by a State making an election under this paragraph, without regard to the basis on which the individual is eligible for medical assistance under the State plan (or waiver), shall—

"(i) include all items and services covered under the State plan (or waiver) that are not less in amount, duration, or scope, or are determined by the Secretary to be substantially equivalent, to the medical assistance available for an individual described in subsection (a)(10)(A)(i); and

"(ii) be provided for the individual while pregnant and through the 12-month period that begins on the last day of the individual's pregnancy and ends on the last day of the month in which such 12-month period ends.

"(C) COVERAGE UNDER CHIP.—A State making an election under this paragraph that covers under title XXI child health assistance for targeted low-income children who are pregnant or targeted low-income pregnant women, as

H. R. 1319—210

applicable, shall also make the election under section 2107(e)(1)(J) of such title.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to State elections made under paragraph (16) of section 1902(e) of the Social Security Act (42 U.S.C. 1396a(e)), as added by subsection (a), during the 5-year period beginning on the 1st day of the 1st fiscal year quarter that begins one year after the date of the enactment of this Act.

**SEC. 9813. STATE OPTION TO PROVIDE QUALIFYING COMMUNITY-BASED MOBILE CRISIS INTERVENTION SERVICES.**

Title XIX of the Social Security Act is amended by adding after section 1946 (42 U.S.C. 1396w–5) the following new section:

**"SEC. 1947. STATE OPTION TO PROVIDE QUALIFYING COMMUNITY-BASED MOBILE CRISIS INTERVENTION SERVICES.**

"(a) IN GENERAL.—Notwithstanding section 1902(a)(1) (relating to Statewideness), section 1902(a)(10)(B) (relating to comparability), section 1902(a)(23)(A) (relating to freedom of choice of providers), or section 1902(a)(27) (relating to provider agreements), a State may, during the 5-year period beginning on the first day of the first fiscal year quarter that begins on or after the date that is 1 year after the date of the enactment of this section, provide medical assistance for qualifying community-based mobile crisis intervention services.

"(b) QUALIFYING COMMUNITY-BASED MOBILE CRISIS INTERVENTION SERVICES DEFINED.—For purposes of this section, the term 'qualifying community-based mobile crisis intervention services' means, with respect to a State, items and services for which medical assistance is available under the State plan under this title or a waiver of such plan, that are—

"(1) furnished to an individual otherwise eligible for medical assistance under the State plan (or waiver of such plan) who is—

"(A) outside of a hospital or other facility setting; and
"(B) experiencing a mental health or substance use disorder crisis;

"(2) furnished by a multidisciplinary mobile crisis team—

"(A) that includes at least 1 behavioral health care professional who is capable of conducting an assessment of the individual, in accordance with the professional's permitted scope of practice under State law, and other professionals or paraprofessionals with appropriate expertise in behavioral health or mental health crisis response, including nurses, social workers, peer support specialists, and others, as designated by the State through a State plan amendment (or waiver of such plan);

"(B) whose members are trained in trauma-informed care, de-escalation strategies, and harm reduction;

"(C) that is able to respond in a timely manner and, where appropriate, provide—

"(i) screening and assessment;
"(ii) stabilization and de-escalation; and
"(iii) coordination with, and referrals to, health, social, and other services and supports as needed, and health services as needed;

"(D) that maintains relationships with relevant community partners, including medical and behavioral

H. R. 1319—211

health providers, primary care providers, community health centers, crisis respite centers, and managed care organizations (if applicable); and

"(E) that maintains the privacy and confidentiality of patient information consistent with Federal and State requirements; and

"(3) available 24 hours per day, every day of the year.

"(c) PAYMENTS.—Notwithstanding section 1905(b) or 1905(ff) and subject to subsections (y) and (z) of section 1905, during each of the first 12 fiscal quarters occurring during the period described in subsection (a) that a State meets the requirements described in subsection (d), the Federal medical assistance percentage applicable to amounts expended by the State for medical assistance for qualifying community-based mobile crisis intervention services furnished during such quarter shall be equal to 85 percent. In no case shall the application of the previous sentence result in the Federal medical assistance percentage applicable to amounts expended by a State for medical assistance for such qualifying community-based mobile crisis intervention services furnished during a quarter being less than the Federal medical assistance percentage that would apply to such amounts expended by the State for such services furnished during such quarter without application of the previous sentence.

"(d) REQUIREMENTS.—The requirements described in this subsection are the following:

"(1) The State demonstrates, to the satisfaction of the Secretary that it will be able to support the provision of qualifying community-based mobile crisis intervention services that meet the conditions specified in subsection (b).

"(2) The State provides assurances satisfactory to the Secretary that—

"(A) any additional Federal funds received by the State for qualifying community-based mobile crisis intervention services provided under this section that are attributable to the increased Federal medical assistance percentage under subsection (c) will be used to supplement, and not supplant, the level of State funds expended for such services for the fiscal year preceding the first fiscal quarter occurring during the period described in subsection (a);

"(B) if the State made qualifying community-based mobile crisis intervention services available in a region of the State in such fiscal year, the State will continue to make such services available in such region under this section during each month occurring during the period described in subsection (a) for which the Federal medical assistance percentage under subsection (c) is applicable with respect to the State.

"(e) FUNDING FOR STATE PLANNING GRANTS.—There is appropriated, out of any funds in the Treasury not otherwise appropriated, $15,000,000 to the Secretary for purposes of implementing, administering, and making planning grants to States as soon as practicable for purposes of developing a State plan amendment or section 1115, 1915(b), or 1915(c) waiver request (or an amendment to such a waiver) to provide qualifying community-based mobile crisis intervention services under this section, to remain available until expended.".

H. R. 1319—212

**SEC. 9814. TEMPORARY INCREASE IN FMAP FOR MEDICAL ASSISTANCE UNDER STATE MEDICAID PLANS WHICH BEGIN TO EXPEND AMOUNTS FOR CERTAIN MANDATORY INDIVIDUALS.**

Section 1905 of the Social Security Act (42 U.S.C. 1396d), as amended by section 9811 of this subtitle, is further amended—

(1) in subsection (b), in the first sentence, by striking "and (hh)" and inserting "(hh), and (ii)";

(2) in subsection (ff), by striking "subject to subsection (hh)" and inserting "subject to subsections (hh) and (ii)"; and

(3) by adding at the end the following new subsection:

"(ii) TEMPORARY INCREASE IN FMAP FOR MEDICAL ASSISTANCE UNDER STATE MEDICAID PLANS WHICH BEGIN TO EXPEND AMOUNTS FOR CERTAIN MANDATORY INDIVIDUALS.—

"(1) IN GENERAL.—For each quarter occurring during the 8-quarter period beginning with the first calendar quarter during which a qualifying State (as defined in paragraph (3)) expends amounts for all individuals described in section 1902(a)(10)(A)(i)(VIII) under the State plan (or waiver of such plan), the Federal medical assistance percentage determined under subsection (b) for such State shall, after application of any increase, if applicable, under section 6008 of the Families First Coronavirus Response Act, be increased by 5 percentage points, except for any quarter (and each subsequent quarter) during such period during which the State ceases to provide medical assistance to any such individual under the State plan (or waiver of such plan).

"(2) SPECIAL APPLICATION RULES.—Any increase described in paragraph (1) (or payment made for expenditures on medical assistance that are subject to such increase)—

"(A) shall not apply with respect to disproportionate share hospital payments described in section 1923;

"(B) shall not be taken into account in calculating the enhanced FMAP of a State under section 2105;

"(C) shall not be taken into account for purposes of part A, D, or E of title IV; and

"(D) shall not be taken into account for purposes of applying payment limits under subsections (f) and (g) of section 1108.

"(3) DEFINITION.—For purposes of this subsection, the term 'qualifying State' means a State which has not expended amounts for all individuals described in section 1902(a)(10)(A)(i)(VIII) before the date of the enactment of this subsection.".

**SEC. 9815. EXTENSION OF 100 PERCENT FEDERAL MEDICAL ASSISTANCE PERCENTAGE TO URBAN INDIAN HEALTH ORGANIZATIONS AND NATIVE HAWAIIAN HEALTH CARE SYSTEMS.**

Section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b)) is amended by inserting after "(as defined in section 4 of the Indian Health Care Improvement Act)" the following: "; for the 8 fiscal year quarters beginning with the first fiscal year quarter beginning after the date of the enactment of the American Rescue Plan Act of 2021, the Federal medical assistance percentage shall also be 100 per centum with respect to amounts expended as medical assistance for services which are received through an Urban

H. R. 1319—213

Indian organization (as defined in paragraph (29) of section 4 of the Indian Health Care Improvement Act) that has a grant or contract with the Indian Health Service under title V of such Act; and, for such 8 fiscal year quarters, the Federal medical assistance percentage shall also be 100 per centum with respect to amounts expended as medical assistance for services which are received through a Native Hawaiian Health Center (as defined in section 12(4) of the Native Hawaiian Health Care Improvement Act) or a qualified entity (as defined in section 6(b) of such Act) that has a grant or contract with the Papa Ola Lokahi under section 8 of such Act".

**SEC. 9816. SUNSET OF LIMIT ON MAXIMUM REBATE AMOUNT FOR SINGLE SOURCE DRUGS AND INNOVATOR MULTIPLE SOURCE DRUGS.**

Section 1927(c)(2)(D) of the Social Security Act (42 U.S.C. 1396r–8(c)(2)(D)) is amended by inserting after "December 31, 2009," the following: "and before January 1, 2024,".

**SEC. 9817. ADDITIONAL SUPPORT FOR MEDICAID HOME AND COMMUNITY-BASED SERVICES DURING THE COVID–19 EMERGENCY.**

(a) INCREASED FMAP.—

(1) IN GENERAL.—Notwithstanding section 1905(b) of the Social Security Act (42 U.S.C. 1396d(b)) or section 1905(ff), in the case of a State that meets the HCBS program requirements under subsection (b), the Federal medical assistance percentage determined for the State under section 1905(b) of such Act (or, if applicable, under section 1905(ff)) and, if applicable, increased under subsection (y), (z), (aa), or (ii) of section 1905 of such Act (42 U.S.C. 1396d), section 1915(k) of such Act (42 U.S.C. 1396n(k)), or section 6008(a) of the Families First Coronavirus Response Act (Public Law 116–127), shall be increased by 10 percentage points with respect to expenditures of the State under the State Medicaid program for home and community-based services (as defined in paragraph (2)(B)) that are provided during the HCBS program improvement period (as defined in paragraph (2)(A)). In no case may the application of the previous sentence result in the Federal medical assistance percentage determined for a State being more than 95 percent with respect to such expenditures. Any payment made to Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, or American Samoa for expenditures on medical assistance that are subject to the Federal medical assistance percentage increase specified under the first sentence of this paragraph shall not be taken into account for purposes of applying payment limits under subsections (f) and (g) of section 1108 of the Social Security Act (42 U.S.C. 1308).

(2) DEFINITIONS.—In this section:

(A) HCBS PROGRAM IMPROVEMENT PERIOD.—The term "HCBS program improvement period" means, with respect to a State, the period—

(i) beginning on April 1, 2021; and

(ii) ending on March 31, 2022.

(B) HOME AND COMMUNITY-BASED SERVICES.—The term "home and community-based services" means any of the following:

H. R. 1319—214

(i) Home health care services authorized under paragraph (7) of section 1905(a) of the Social Security Act (42 U.S.C. 1396d(a)).

(ii) Personal care services authorized under paragraph (24) of such section.

(iii) PACE services authorized under paragraph (26) of such section.

(iv) Home and community-based services authorized under subsections (b), (c), (i), (j), and (k) of section 1915 of such Act (42 U.S.C. 1396n), such services authorized under a waiver under section 1115 of such Act (42 U.S.C. 1315), and such services through coverage authorized under section 1937 of such Act (42 U.S.C. 1396u–7).

(v) Case management services authorized under section 1905(a)(19) of the Social Security Act (42 U.S.C. 1396d(a)(19)) and section 1915(g) of such Act (42 U.S.C. 1396n(g)).

(vi) Rehabilitative services, including those related to behavioral health, described in section 1905(a)(13) of such Act (42 U.S.C. 1396d(a)(13)).

(vii) Such other services specified by the Secretary of Health and Human Services.

(C) ELIGIBLE INDIVIDUAL.—The term "eligible individual" means an individual who is eligible for and enrolled for medical assistance under a State Medicaid program and includes an individual who becomes eligible for medical assistance under a State Medicaid program when removed from a waiting list.

(D) MEDICAID PROGRAM.—The term "Medicaid program" means, with respect to a State, the State program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.) (including any waiver or demonstration under such title or under section 1115 of such Act (42 U.S.C. 1315) relating to such title).

(E) STATE.—The term "State" has the meaning given such term for purposes of title XIX of the Social Security Act (42 U.S.C. 1396 et seq.).

(b) STATE REQUIREMENTS FOR FMAP INCREASE.—As conditions for receipt of the increase under subsection (a) to the Federal medical assistance percentage determined for a State, the State shall meet each of the following requirements (referred to in subsection (a) as the HCBS program requirements):

(1) SUPPLEMENT, NOT SUPPLANT.—The State shall use the Federal funds attributable to the increase under subsection (a) to supplement, and not supplant, the level of State funds expended for home and community-based services for eligible individuals through programs in effect as of April 1, 2021.

(2) REQUIRED IMPLEMENTATION OF CERTAIN ACTIVITIES.— The State shall implement, or supplement the implementation of, one or more activities to enhance, expand, or strengthen home and community-based services under the State Medicaid program.

H. R. 1319—215

**SEC. 9818. FUNDING FOR STATE STRIKE TEAMS FOR RESIDENT AND EMPLOYEE SAFETY IN NURSING FACILITIES.**

Section 1919 of the Social Security Act (42 U.S.C. 1396r) is amended by adding at the end the following new subsection:

"(k) FUNDING FOR STATE STRIKE TEAMS.—In addition to amounts otherwise available, there is appropriated to the Secretary, out of any monies in the Treasury not otherwise appropriated, $250,000,000, to remain available until expended, for purposes of allocating such amount among the States (including the District of Columbia and each territory of the United States) for such a State to establish and implement a strike team that will be deployed to a nursing facility in the State with diagnosed or suspected cases of COVID–19 among residents or staff for the purposes of assisting with clinical care, infection control, or staffing during the emergency period described in section 1135(g)(1)(B) and the 1-year period immediately following the end of such emergency period.".

**SEC. 9819. SPECIAL RULE FOR THE PERIOD OF A DECLARED PUBLIC HEALTH EMERGENCY RELATED TO CORONAVIRUS.**

(a) IN GENERAL.—Section 1923(f)(3) of the Social Security Act (42 U.S.C. 1396r–4(f)(3)) is amended—

(1) in subparagraph (A), by striking "subparagraph (E)" and inserting "subparagraphs (E) and (F)" ; and

(2) by adding at the end the following new subparagraph:

"(F) ALLOTMENTS DURING THE CORONAVIRUS TEMPORARY MEDICAID FMAP INCREASE.—

"(i) IN GENERAL.—Notwithstanding any other provision of this subsection, for any fiscal year for which the Federal medical assistance percentage applicable to expenditures under this section is increased pursuant to section 6008 of the Families First Coronavirus Response Act, the Secretary shall recalculate the annual DSH allotment, including the DSH allotment specified under paragraph (6)(A)(vi), to ensure that the total DSH payments (including both Federal and State shares) that a State may make related to a fiscal year is equal to the total DSH payments that the State could have made for such fiscal year without such increase to the Federal medical assistance percentage.

"(ii) NO APPLICATION TO ALLOTMENTS BEGINNING AFTER COVID–19 EMERGENCY PERIOD.—The DSH allotment for any State for the first fiscal year beginning after the end of the emergency period described in section 1135(g)(1)(B) or any succeeding fiscal year shall be determined under this paragraph without regard to the DSH allotments determined under clause (i).".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect and apply as if included in the enactment of the Families First Coronavirus Response Act (Public Law 116–127).

# Subtitle K—Children's Health Insurance Program

## SEC. 9821. MANDATORY COVERAGE OF COVID–19 VACCINES AND ADMINISTRATION AND TREATMENT UNDER CHIP.

(a) COVERAGE.—

(1) IN GENERAL.—Section 2103(c) of the Social Security Act (42 U.S.C. 1397cc(c)) is amended by adding at the end the following paragraph:

"(11) REQUIRED COVERAGE OF COVID–19 VACCINES AND TREATMENT.—Regardless of the type of coverage elected by a State under subsection (a), the child health assistance provided for a targeted low-income child, and, in the case of a State that elects to provide pregnancy-related assistance pursuant to section 2112, the pregnancy-related assistance provided for a targeted low-income pregnant woman (as such terms are defined for purposes of such section), shall include coverage, during the period beginning on the date of the enactment of this paragraph and ending on the last day of the first calendar quarter that begins one year after the last day of the emergency period described in section 1135(g)(1)(B), of—

"(A) a COVID–19 vaccine (and the administration of the vaccine); and

"(B) testing and treatments for COVID–19, including specialized equipment and therapies (including preventive therapies), and, in the case of an individual who is diagnosed with or presumed to have COVID–19, during the period during which such individual has (or is presumed to have) COVID–19, the treatment of a condition that may seriously complicate the treatment of COVID–19, if otherwise covered under the State child health plan (or waiver of such plan).".

(2) PROHIBITION OF COST SHARING.—Section 2103(e)(2) of the Social Security Act (42 U.S.C. 1397cc(e)(2)), as amended by section 6004(b)(3) of the Families First Coronavirus Response Act, is amended—

(A) in the paragraph header, by inserting "A COVID–19 VACCINE, COVID–19 TREATMENT," before "OR PREGNANCY-RELATED ASSISTANCE"; and

(B) by striking "visits described in section 1916(a)(2)(G), or" and inserting "services described in section 1916(a)(2)(G), vaccines described in section 1916(a)(2)(H) administered during the period described in such section (and the administration of such vaccines), testing or treatments described in section 1916(a)(2)(I) furnished during the period described in such section, or".

(b) TEMPORARY INCREASE IN FEDERAL PAYMENTS FOR COVERAGE AND ADMINISTRATION OF COVID–19 VACCINES.—Section 2105(c) of the Social Security Act (42 U.S.C. 1397ee(c)) is amended by adding at the end the following new paragraph:

"(12) TEMPORARY ENHANCED PAYMENT FOR COVERAGE AND ADMINISTRATION OF COVID–19 VACCINES.—During the period described in section 1905(hh)(2), notwithstanding subsection (b), the enhanced FMAP for a State, with respect to payments under subsection (a) for expenditures under the State child health plan (or a waiver of such plan) for a vaccine described

H. R. 1319—217

in section 1905(a)(4)(E) (and the administration of such a vaccine), shall be equal to 100 percent.".

(c) ADJUSTMENT OF CHIP ALLOTMENTS.—Section 2104(m) of the Social Security Act (42 U.S.C. 1397dd(m)) is amended—

(1) in paragraph (2)(B), in the matter preceding clause (i), by striking "paragraphs (5) and (7)" and inserting "paragraphs (5), (7), and (12)"; and

(2) by adding at the end the following new paragraph:

"(12) ADJUSTING ALLOTMENTS TO ACCOUNT FOR INCREASED FEDERAL PAYMENTS FOR COVERAGE AND ADMINISTRATION OF COVID–19 VACCINES.—If a State, commonwealth, or territory receives payment for a fiscal year (beginning with fiscal year 2021) under subsection (a) of section 2105 for expenditures that are subject to the enhanced FMAP specified under subsection (c)(12) of such section, the amount of the allotment determined for the State, commonwealth, or territory under this subsection—

"(A) for such fiscal year shall be increased by the projected expenditures for such year by the State, commonwealth, or territory under the State child health plan (or a waiver of such plan) for vaccines described in section 1905(a)(4)(E) (and the administration of such vaccines); and

"(B) once actual expenditures are available in the subsequent fiscal year, the fiscal year allotment that was adjusted by the amount described in subparagraph (A) shall be adjusted on the basis of the difference between—

"(i) such projected amount of expenditures described in subparagraph (A) for such fiscal year described in such subparagraph by the State, commonwealth, or territory; and

"(ii) the actual amount of expenditures for such fiscal year described in subparagraph (A) by the State, commonwealth, or territory under the State child health plan (or waiver of such plan) for vaccines described in section 1905(a)(4)(E) (and the administration of such vaccines).".

## SEC. 9822. MODIFICATIONS TO CERTAIN COVERAGE UNDER CHIP FOR PREGNANT AND POSTPARTUM WOMEN.

(a) MODIFICATIONS TO COVERAGE.—

(1) IN GENERAL.—Section 2107(e)(1) of the Social Security Act (42 U.S.C. 1397gg(e)(1)) is amended—

(A) by redesignating subparagraphs (J) through (S) as subparagraphs (K) through (T), respectively; and

(B) by inserting after subparagraph (I) the following new subparagraph:

"(J) Paragraphs (5) and (16) of section 1902(e) (relating to the State option to provide medical assistance consisting of full benefits during pregnancy and throughout the 12-month postpartum period under title XIX), if the State provides child health assistance for targeted low-income children who are pregnant or to targeted low-income pregnant women and the State has elected to apply such paragraph (16) with respect to pregnant women under title XIX, the provision of assistance under the State child health plan or waiver for targeted low-income children

H. R. 1319—218

or targeted low-income pregnant women during pregnancy and the 12-month postpartum period shall be required and not at the option of the State and shall include coverage of all items or services provided to a targeted low-income child or targeted low-income pregnant woman (as applicable) under the State child health plan or waiver).''.

(2) OPTIONAL COVERAGE OF TARGETED LOW-INCOME PREGNANT WOMEN.—Section 2112(d)(2)(A) of the Social Security Act (42 U.S.C. 1397ll(d)(2)(A)) is amended by inserting after ''60-day period'' the following: '', or, in the case that subparagraph (A) of section 1902(e)(16) applies to the State child health plan (or waiver of such plan), pursuant to section 2107(e)(1), the 12-month period,''.

(b) EFFECTIVE DATE.—The amendments made by subsection (a), shall apply with respect to State elections made under paragraph (16) of section 1902(e) of the Social Security Act (42 U.S.C. 1396a(e)), as added by section 9812(a) of subtitle J of this title, during the 5-year period beginning on the 1st day of the 1st fiscal year quarter that begins one year after the date of the enactment of this Act.

# Subtitle L—Medicare

### SEC. 9831. FLOOR ON THE MEDICARE AREA WAGE INDEX FOR HOSPITALS IN ALL-URBAN STATES.

(a) IN GENERAL.—Section 1886(d)(3)(E) of the Social Security Act (42 U.S.C. 1395ww(d)(3)(E)) is amended—

(1) in clause (i), in the first sentence, by striking ''or (iii)'' and inserting '', (iii), or (iv)''; and

(2) by adding at the end the following new clause:

''(iv) FLOOR ON AREA WAGE INDEX FOR HOSPITALS IN ALL-URBAN STATES.—

''(I) IN GENERAL.—For discharges occurring on or after October 1, 2021, the area wage index applicable under this subparagraph to any hospital in an all-urban State (as defined in subclause (IV)) may not be less than the minimum area wage index for the fiscal year for hospitals in that State, as established under subclause (II).

''(II) MINIMUM AREA WAGE INDEX.—For purposes of subclause (I), the Secretary shall establish a minimum area wage index for a fiscal year for hospitals in each all-urban State using the methodology described in section 412.64(h)(4)(vi) of title 42, Code of Federal Regulations, as in effect for fiscal year 2018.

''(III) WAIVING BUDGET NEUTRALITY.—Pursuant to the fifth sentence of clause (i), this clause shall not be applied in a budget neutral manner.

''(IV) ALL-URBAN STATE DEFINED.—In this clause, the term 'all-urban State' means a State in which there are no rural areas (as defined in paragraph (2)(D)) or a State in which there are no hospitals classified as rural under this section.''.

H. R. 1319—219

(b) WAIVING BUDGET NEUTRALITY.—Section 1886(d)(3)(E)(i) of the Social Security Act (42 U.S.C. 1395ww(d)(3)(E)(i)) is amended, in the fifth sentence—

(1) by striking "and the amendments" and inserting ", the amendments"; and

(2) by inserting ", and the amendments made by section 9831(a) of the American Rescue Plan Act of 2021" after "Care Act".

**SEC. 9832. SECRETARIAL AUTHORITY TO TEMPORARILY WAIVE OR MODIFY APPLICATION OF CERTAIN MEDICARE REQUIREMENTS WITH RESPECT TO AMBULANCE SERVICES FURNISHED DURING CERTAIN EMERGENCY PERIODS.**

(a) WAIVER AUTHORITY.—Section 1135(b) of the Social Security Act (42 U.S.C. 1320b–5(b)) is amended—

(1) in the first sentence—

(A) in paragraph (7), by striking "and" at the end;

(B) in paragraph (8), by striking the period at the end and inserting "; and"; and

(C) by inserting after paragraph (8) the following new paragraph:

"(9) any requirement under section 1861(s)(7) or section 1834(l) that an ambulance service include the transport of an individual to the extent necessary to allow payment for ground ambulance services furnished in response to a 911 call (or the equivalent in areas without a 911 call system) in cases in which an individual would have been transported to a destination permitted under Medicare regulations (as described in section 410.40 to title 42, Code of Federal Regulations (or successor regulations)) but such transport did not occur as a result of community-wide emergency medical service (EMS) protocols due to the public health emergency described in subsection (g)(1)(B)."; and

(2) in the flush matter at the end, by adding at the end the following: "Ground ambulance services for which payment is made pursuant to paragraph (9) shall be paid at the base rate that would have been paid under the fee schedule established under 1834(l) (excluding any mileage payment) if the individual had been so transported and, with respect to ambulance services furnished by a critical access hospital or an entity described in paragraph (8) of such section, at the amount that otherwise would be paid under such paragraph.".

(b) EMERGENCY PERIOD EXCEPTION.—Section 1135(g)(1)(B) of the Social Security Act (42 U.S.C. 1320b–5(g)(1)(B)) is amended, in the matter preceding clause (i), by striking "subsection (b)(8)" and inserting "paragraphs (8) and (9) of subsection (b)".

**SEC. 9833. FUNDING FOR OFFICE OF INSPECTOR GENERAL.**

In addition to amounts otherwise available, there is appropriated to the inspector general of the Department of Health and Human Services for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $5,000,000, to remain available until expended, for oversight of activities supported with funds appropriated to the Department of Health and Human Services to prevent, prepare for, and respond to coronavirus 2019 or COVID–19, domestically or internationally.

H. R. 1319—220

# Subtitle M—Coronavirus State and Local Fiscal Recovery Funds

**SEC. 9901. CORONAVIRUS STATE AND LOCAL FISCAL RECOVERY FUNDS.**

(a) IN GENERAL.—Title VI of the Social Security Act (42 U.S.C. 801 et seq.) is amended by adding at the end the following:

**"SEC. 602. CORONAVIRUS STATE FISCAL RECOVERY FUND.**

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

"(1) $219,800,000,000, to remain available through December 31, 2024, for making payments under this section to States, territories, and Tribal governments to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID–19); and

"(2) $50,000,000, to remain available until expended, for the costs of the Secretary for administration of the funds established under this title.

"(b) AUTHORITY TO MAKE PAYMENTS.—

"(1) PAYMENTS TO TERRITORIES.—

"(A) IN GENERAL.—The Secretary shall reserve $4,500,000,000 of the amount appropriated under subsection (a)(1) to make payments to the territories.

"(B) ALLOCATION.—Of the amount reserved under subparagraph (A)—

"(i) 50 percent of such amount shall be allocated by the Secretary equally to each territory; and

"(ii) 50 percent of such amount shall be allocated by the Secretary as an additional amount to each territory in an amount which bears the same proportion to ½ of the total amount reserved under subparagraph (A) as the population of the territory bears to the total population of all such territories.

"(C) PAYMENT.—The Secretary shall pay each territory the total of the amounts allocated for the territory under subparagraph (B) in accordance with paragraph (6).

"(2) PAYMENTS TO TRIBAL GOVERNMENTS.—

"(A) IN GENERAL.—The Secretary shall reserve $20,000,000,000 of the amount appropriated under subsection (a)(1) to make payments to Tribal governments.

"(B) ALLOCATION.—Of the amount reserved under subparagraph (A)—

"(i) $1,000,000,000 shall be allocated by the Secretary equally among each of the Tribal governments; and

"(ii) $19,000,000,000 shall be allocated by the Secretary to the Tribal governments in a manner determined by the Secretary.

"(C) PAYMENT.— The Secretary shall pay each Tribal government the total of the amounts allocated for the Tribal government under subparagraph (B) in accordance with paragraph (6).

"(3) PAYMENTS TO EACH OF THE 50 STATES AND THE DISTRICT OF COLUMBIA.—

"(A) IN GENERAL.—The Secretary shall reserve $195,300,000,000 of the amount appropriated under subsection (a)(1) to make payments to each of the 50 States and the District of Columbia.

"(B) ALLOCATIONS.—Of the amount reserved under subparagraph (A)—

"(i) $25,500,000,000 of such amount shall be allocated by the Secretary equally among each of the 50 States and the District of Columbia;

"(ii) an amount equal to $1,250,000,000 less the amount allocated for the District of Columbia pursuant to section 601(c)(6) shall be allocated by the Secretary as an additional amount to the District of Columbia; and

"(iii) an amount equal to the remainder of the amount reserved under subparagraph (A) after the application of clauses (i) and (ii) of this subparagraph shall be allocated by the Secretary as an additional amount to each of the 50 States and the District of Columbia in an amount which bears the same proportion to such remainder as the average estimated number of seasonally-adjusted unemployed individuals (as measured by the Bureau of Labor Statistics Local Area Unemployment Statistics program) in the State or District of Columbia over the 3-month period ending with December 2020 bears to the average estimated number of seasonally-adjusted unemployed individuals in all of the 50 States and the District of Columbia over the same period.

"(C) PAYMENT.—

"(i) IN GENERAL.—Subject to clause (ii), the Secretary shall pay each of the 50 States and the District of Columbia, from the amount reserved under subparagraph (A), the total of the amounts allocated for the State and District of Columbia under subparagraph (B) in accordance with paragraph (6).

"(ii) MINIMUM PAYMENT REQUIREMENT.—

"(I) IN GENERAL.—The sum of—

"(aa) the total amounts allocated for 1 of the 50 States or the District of Columbia under subparagraph (B) (as determined without regard to this clause); and

"(bb) the amounts allocated under section 603 to the State (for distribution by the State to nonentitlement units of local government in the State) and to metropolitan cities and counties in the State;

shall not be less than the amount allocated to the State or District of Columbia for fiscal year 2020 under section 601, including any amount paid directly to a unit of local government in the State under such section.

"(II) PRO RATA ADJUSTMENT.—The Secretary shall adjust on a pro rata basis the amount of the allocations for each of the 50 States and the District of Columbia determined under subparagraph (B)(iii) (without regard to this clause) to

H. R. 1319—222

the extent necessary to comply with the requirement of subclause (I).

"(4) PRO RATA ADJUSTMENT AUTHORITY.—The amounts otherwise determined for allocation and payment under paragraphs (1), (2), and (3) may be adjusted by the Secretary on a pro rata basis to the extent necessary to ensure that all available funds are allocated to States, territories, and Tribal governments in accordance with the requirements specified in each such paragraph (as applicable).

"(5) POPULATION DATA.—For purposes of determining allocations for a territory under this section, the population of the territory shall be determined based on the most recent data available from the Bureau of the Census.

"(6) TIMING.—

"(A) STATES AND TERRITORIES.—

"(i) IN GENERAL.—To the extent practicable, subject to clause (ii), with respect to each State and territory allocated a payment under this subsection, the Secretary shall make the payment required for the State or territory not later than 60 days after the date on which the certification required under subsection (d)(1) is provided to the Secretary.

"(ii) AUTHORITY TO SPLIT PAYMENT.—

"(I) IN GENERAL.—The Secretary shall have the authority to withhold payment of up to 50 percent of the amount allocated to each State and territory (other than payment of the amount allocated under paragraph (3)(B)(ii) to the District of Columbia) for a period of up to 12 months from the date on which the State or territory provides the certification required under subsection (d)(1). The Secretary shall exercise such authority with respect to a State or territory based on the unemployment rate in the State or territory as of such date.

"(II) PAYMENT OF WITHHELD AMOUNT.—Before paying to a State or territory the remainder of an amount allocated to the State or territory (subject to subclause (III)) that has been withheld by the Secretary under subclause (I), the Secretary shall require the State or territory to submit a second certification under subsection (d)(1), in addition to such other information as the Secretary may require.

"(III) RECOVERY OF AMOUNTS SUBJECT TO RECOUPMENT.—If a State or territory is required under subsection (e) to repay funds for failing to comply with subsection (c), the Secretary may reduce the amount otherwise payable to the State or territory under subclause (II) by the amount that the State or territory would otherwise be required to repay under such subsection (e).

"(B) TRIBAL GOVERNMENTS.—To the extent practicable, with respect to each Tribal government for which an amount is allocated under this subsection, the Secretary shall make the payment required for the Tribal government

H. R. 1319—223

not later than 60 days after the date of enactment of this section.

"(C) INITIAL PAYMENT TO DISTRICT OF COLUMBIA.—The Secretary shall pay the amount allocated under paragraph (3)(B)(ii) to the District of Columbia not later than 15 days after the date of enactment of this section.

"(c) REQUIREMENTS.—

"(1) USE OF FUNDS.—Subject to paragraph (2), and except as provided in paragraph (3), a State, territory, or Tribal government shall only use the funds provided under a payment made under this section, or transferred pursuant to section 603(c)(4), to cover costs incurred by the State, territory, or Tribal government, by December 31, 2024—

"(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

"(B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

"(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

"(D) to make necessary investments in water, sewer, or broadband infrastructure.

"(2) FURTHER RESTRICTION ON USE OF FUNDS.—

"(A) IN GENERAL.—A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

"(B) PENSION FUNDS.—No State or territory may use funds made available under this section for deposit into any pension fund.

"(3) TRANSFER AUTHORITY.—A State, territory, or Tribal government receiving a payment from funds made available under this section may transfer funds to a private nonprofit organization (as that term is defined in paragraph (17) of section 401 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(17)), a Tribal organization (as that term is defined in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304)), a public benefit corporation involved in the transportation of passengers or cargo, or a special-purpose unit of State or local government.

"(d) CERTIFICATIONS AND REPORTS.—

"(1) IN GENERAL.—In order for a State or territory to receive a payment under this section, or a transfer of funds under section 603(c)(4), the State or territory shall provide the Secretary with a certification, signed by an authorized officer of such State or territory, that such State or territory requires the payment or transfer to carry out the activities specified in subsection (c) of this section and will use any payment under this section, or transfer of funds under section 603(c)(4), in compliance with subsection (c) of this section.

"(2) REPORTING.—Any State, territory, or Tribal government receiving a payment under this section shall provide to the Secretary periodic reports providing a detailed accounting of—

"(A) the uses of funds by such State, territory, or Tribal government, including, in the case of a State or a territory, all modifications to the State's or territory's tax revenue sources during the covered period; and

"(B) such other information as the Secretary may require for the administration of this section.

"(e) RECOUPMENT.—Any State, territory, or Tribal government that has failed to comply with subsection (c) shall be required to repay to the Secretary an amount equal to the amount of funds used in violation of such subsection, provided that, in the case of a violation of subsection (c)(2)(A), the amount the State or territory shall be required to repay shall be lesser of—

"(1) the amount of the applicable reduction to net tax revenue attributable to such violation; and

"(2) the amount of funds received by such State or territory pursuant to a payment made under this section or a transfer made under section 603(c)(4).

"(f) REGULATIONS.—The Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section.

"(g) DEFINITIONS.—In this section:

"(1) COVERED PERIOD.—The term 'covered period' means, with respect to a State, territory, or Tribal government, the period that—

"(A) begins on March 3, 2021; and

"(B) ends on the last day of the fiscal year of such State, territory, or Tribal government in which all funds received by the State, territory, or Tribal government from a payment made under this section or a transfer made under section 603(c)(4) have been expended or returned to, or recovered by, the Secretary.

"(2) ELIGIBLE WORKERS.—The term 'eligible workers' means those workers needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as each Governor of a State or territory, or each Tribal government, may designate as critical to protect the health and well-being of the residents of their State, territory, or Tribal government.

"(3) PREMIUM PAY.—The term 'premium pay' means an amount of up to $13 per hour that is paid to an eligible worker, in addition to wages or remuneration the eligible worker otherwise receives, for all work performed by the eligible worker during the COVID–19 public health emergency. Such

H. R. 1319—225

amount may not exceed $25,000 with respect to any single eligible worker.

"(4) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.

"(5) STATE.—The term 'State' means each of the 50 States and the District of Columbia.

"(6) TERRITORY.—The term 'territory' means the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa.

"(7) TRIBAL GOVERNMENT.—The term 'Tribal Government' means the recognized governing body of any Indian or Alaska Native tribe, band, nation, pueblo, village, community, component band, or component reservation, individually identified (including parenthetically) in the list published most recently as of the date of enactment of this Act pursuant to section 104 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

## "SEC. 603. CORONAVIRUS LOCAL FISCAL RECOVERY FUND.

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $130,200,000,000, to remain available through December 31, 2024, for making payments under this section to metropolitan cities, nonentitlement units of local government, and counties to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID–19).

"(b) AUTHORITY TO MAKE PAYMENTS.—

"(1) METROPOLITAN CITIES.—

"(A) IN GENERAL.—Of the amount appropriated under subsection (a), the Secretary shall reserve $45,570,000,000 to make payments to metropolitan cities.

"(B) ALLOCATION AND PAYMENT.—From the amount reserved under subparagraph (A), the Secretary shall allocate and, in accordance with paragraph (7), pay to each metropolitan city an amount determined for the metropolitan city consistent with the formula under section 106(b) of the Housing and Community Development Act of 1974 (42 U.S.C. 5306(b)), except that, in applying such formula, the Secretary shall substitute 'all metropolitan cities' for 'all metropolitan areas' each place it appears.

"(2) NONENTITLEMENT UNITS OF LOCAL GOVERNMENT.—

"(A) IN GENERAL.—Of the amount appropriated under subsection (a), the Secretary shall reserve $19,530,000,000 to make payments to States for distribution by the State to nonentitlement units of local government in the State.

"(B) ALLOCATION AND PAYMENT.—From the amount reserved under subparagraph (A), the Secretary shall allocate and, in accordance with paragraph (7), pay to each State an amount which bears the same proportion to such reserved amount as the total population of all areas that are non-metropolitan cities in the State bears to the total population of all areas that are non-metropolitan cities in all such States.

"(C) DISTRIBUTION TO NONENTITLEMENT UNITS OF LOCAL GOVERNMENT.—

H. R. 1319—226

"(i) IN GENERAL.—Not later than 30 days after a State receives a payment under subparagraph (B), the State shall distribute to each nonentitlement unit of local government in the State an amount that bears the same proportion to the amount of such payment as the population of the nonentitlement unit of local government bears to the total population of all the nonentitlement units of local government in the State, subject to clause (iii).

"(ii) DISTRIBUTION OF FUNDS.—

"(I) EXTENSION FOR DISTRIBUTION.—If an authorized officer of a State required to make distributions under clause (i) certifies in writing to the Secretary before the end of the 30-day distribution period described in such clause that it would constitute an excessive administrative burden for the State to meet the terms of such clause with respect to 1 or more such distributions, the authorized officer may request, and the Secretary shall grant, an extension of such period of not more than 30 days to allow the State to make such distributions in accordance with clause (i).

"(II) ADDITIONAL EXTENSIONS.—

"(aa) IN GENERAL.—If a State has been granted an extension to the distribution period under subclause (I) but is unable to make all the distributions required under clause (i) before the end of such period as extended, an authorized officer of the State may request an additional extension of the distribution period of not more than 30 days. The Secretary may grant a request for an additional extension of such period only if—

"(AA) the authorized officer making such request provides a written plan to the Secretary specifying, for each distribution for which an additional extension is requested, when the State expects to make such distribution and the actions the State has taken and will take in order to make all such distributions before the end of the distribution period (as extended under subclause (I) and this subclause); and

"(BB) the Secretary determines that such plan is reasonably designed to distribute all such funds to nonentitlement units of local government by the end of the distribution period (as so extended).

"(bb) FURTHER ADDITIONAL EXTENSIONS.— If a State granted an additional extension of the distribution period under item (aa) requires any further additional extensions of such period, the request only may be made and granted subject to the requirements specified in item (aa).

"(iii) CAPPED AMOUNT.—The total amount distributed to a nonentitlement unit of local government

H. R. 1319—227

under this paragraph may not exceed the amount equal to 75 percent of the most recent budget for the non-entitlement unit of local government as of January 27, 2020.

"(iv) RETURN OF EXCESS AMOUNTS.—Any amounts not distributed to a nonentitlement unit of local government as a result of the application of clause (iii) shall be returned to the Secretary.

"(D) PENALTY FOR NONCOMPLIANCE.—If, by the end of the 120-day period that begins on the date a State receives a payment from the amount allocated under subparagraph (B) or, if later, the last day of the distribution period for the State (as extended with respect to the State under subparagraph (C)(ii)), such State has failed to make all the distributions from such payment in accordance with the terms of subparagraph (C) (including any extensions of the distribution period granted in accordance with such subparagraph), an amount equal to the amount of such payment that remains undistributed as of such date shall be booked as a debt of such State owed to the Federal Government, shall be paid back from the State's allocation provided under section 602(b)(3)(B)(iii), and shall be deposited into the general fund of the Treasury.

"(3) COUNTIES.—

"(A) AMOUNT.—From the amount appropriated under subsection (a), the Secretary shall reserve and allocate $65,100,000,000 of such amount to make payments directly to counties in an amount which bears the same proportion to the total amount reserved under this paragraph as the population of each such county bears to the total population of all such entities and shall pay such allocated amounts to such counties in accordance with paragraph (7).

"(B) SPECIAL RULES.—

"(i) URBAN COUNTIES.—No county that is an 'urban county' as defined in section 102 of the Housing and Community Development Act of 1974 (42 U.S.C. 5302)) shall receive less than the amount the county would otherwise receive if the amount paid under this paragraph were allocated to metropolitan cities and urban counties under section 106(b) of the Housing and Community Development Act of 1974 (42 U.S.C. 5306(b)).

"(ii) COUNTIES THAT ARE NOT UNITS OF GENERAL LOCAL GOVERNMENT.—In the case of an amount to be paid to a county that is not a unit of general local government, the amount shall instead be paid to the State in which such county is located, and such State shall distribute such amount to each unit of general local government within such county in an amount that bears the same proportion to the amount to be paid to such county as the population of such units of general local government bears to the total population of such county.

"(iii) DISTRICT OF COLUMBIA.—For purposes of this paragraph, the District of Columbia shall be considered to consist of a single county that is a unit of general local government.

H. R. 1319—228

"(4) CONSOLIDATED GOVERNMENTS.—A unit of general local government that has formed a consolidated government, or that is geographically contained (in full or in part) within the boundaries of another unit of general local government may receive a distribution under each of paragraphs (1), (2), and (3), as applicable, based on the respective formulas specified in such paragraphs.

"(5) PRO RATA ADJUSTMENT AUTHORITY.—The amounts otherwise determined for allocation and payment under paragraphs (1), (2), and (3) may be adjusted by the Secretary on a pro rata basis to the extent necessary to ensure that all available funds are distributed to metropolitan cities, counties, and States in accordance with the requirements specified in each paragraph (as applicable) and the certification requirement specified in subsection (d).

"(6) POPULATION.—For purposes of determining allocations under this section, the population of an entity shall be determined based on the most recent data are available from the Bureau of the Census or, if not available, from such other data as a State determines appropriate.

"(7) TIMING.—

"(A) FIRST TRANCHE AMOUNT.—To the extent practicable, with respect to each metropolitan city for which an amount is allocated under paragraph (1), each State for which an amount is allocated under paragraph (2) for distribution to nonentitlement units of local government, and each county for which an amount is allocated under paragraph (3), the Secretary shall pay from such allocation the First Tranche Amount for such city, State, or county not later than 60 days after the date of enactment of this section.

"(B) SECOND TRANCHE AMOUNT.—The Secretary shall pay to each metropolitan city for which an amount is allocated under paragraph (1), each State for which an amount is allocated under paragraph (2) for distribution to nonentitlement units of local government, and each county for which an amount is allocated under paragraph (3), the Second Tranche Amount for such city, State, or county not earlier than 12 months after the date on which the First Tranche Amount is paid to the city, State, or county.

"(c) REQUIREMENTS.—

"(1) USE OF FUNDS.—Subject to paragraph (2), and except as provided in paragraphs (3) and (4), a metropolitan city, nonentitlement unit of local government, or county shall only use the funds provided under a payment made under this section to cover costs incurred by the metropolitan city, nonentitlement unit of local government, or county, by December 31, 2024—

"(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

H. R. 1319—229

"(B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the metropolitan city, nonentitlement unit of local government, or county that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

"(C) for the provision of government services to the extent of the reduction in revenue of such metropolitan city, nonentitlement unit of local government, or county due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the metropolitan city, nonentitlement unit of local government, or county prior to the emergency; or

"(D) to make necessary investments in water, sewer, or broadband infrastructure.

"(2) PENSION FUNDS.—No metropolitan city, nonentitlement unit of local government, or county may use funds made available under this section for deposit into any pension fund.

"(3) TRANSFER AUTHORITY.—A metropolitan city, nonentitlement unit of local government, or county receiving a payment from funds made available under this section may transfer funds to a private nonprofit organization (as that term is defined in paragraph (17) of section 401 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(17)), a public benefit corporation involved in the transportation of passengers or cargo, or a special-purpose unit of State or local government.

"(4) TRANSFERS TO STATES.—Notwithstanding paragraph (1), a metropolitan city, nonentitlement unit of local government, or county receiving a payment from funds made available under this section may transfer such funds to the State in which such entity is located.

"(d) REPORTING.—Any metropolitan city, nonentitlement unit of local government, or county receiving funds provided under a payment made under this section shall provide to the Secretary periodic reports providing a detailed accounting of the uses of such funds by such metropolitan city, nonentitlement unit of local government, or county and including such other information as the Secretary may require for the administration of this section.

"(e) RECOUPMENT.—Any metropolitan city, nonentitlement unit of local government, or county that has failed to comply with subsection (c) shall be required to repay to the Secretary an amount equal to the amount of funds used in violation of such subsection.

"(f) REGULATIONS.—The Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section.

"(g) DEFINITIONS.—In this section:

"(1) COUNTY.—The term 'county' means a county, parish, or other equivalent county division (as defined by the Bureau of the Census).

"(2) ELIGIBLE WORKERS.—The term 'eligible workers' means those workers needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as each chief executive officer of a metropolitan city, nonentitlement unit of local government, or county may designate as critical to protect the health and well-being of the residents

H. R. 1319—230

of their metropolitan city, nonentitlement unit of local government, or county.

"(3) First tranche amount.—The term 'First Tranche Amount' means, with respect to each metropolitan city for which an amount is allocated under subsection (b)(1), each State for which an amount is allocated under subsection (b)(2) for distribution to nonentitlement units of local government, and each county for which an amount is allocated under subsection (b)(3), 50 percent of the amount so allocated to such metropolitan city, State, or county (as applicable).

"(4) Metropolitan city.—The term 'metropolitan city' has the meaning given that term in section 102(a)(4) of the Housing and Community Development Act of 1974 (42 U.S.C. 5302(a)(4)) and includes cities that relinquish or defer their status as a metropolitan city for purposes of receiving allocations under section 106 of such Act (42 U.S.C. 5306) for fiscal year 2021.

"(5) Nonentitlement unit of local government.—The term 'nonentitlement unit of local government' means a 'city', as that term is defined in section 102(a)(5) of the Housing and Community Development Act of 1974 (42 U.S.C. 5302(a)(5))), that is not a metropolitan city.

"(6) Premium pay.—The term 'premium pay' has the meaning given such term in section 602(g).

"(7) Second tranche amount.—The term 'Second Tranche Amount' means, with respect to each metropolitan city for which an amount is allocated under subsection (b)(1), each State for which an amount is allocated under subsection (b)(2) for distribution to nonentitlement units of local government, and each county for which an amount is allocated under subsection (b)3, an amount not to exceed 50 percent of the amount so allocated to such metropolitan city, State, or county (as applicable).

"(8) Secretary.—The term 'Secretary' means the Secretary of the Treasury.

"(9) State.—The term 'State' means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa.

"(10) Unit of general local government.—The term 'unit of general local government' has the meaning given that term in section 102(a)(1) of the Housing and Community Development Act of 1974 (42 U.S.C. 5302(a)(1)).

**"SEC. 604. CORONAVIRUS CAPITAL PROJECTS FUND.**

"(a) Appropriation.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $10,000,000,000, to remain available until expended, for making payments to States, territories, and Tribal governments to carry out critical capital projects directly enabling work, education, and health monitoring, including remote options, in response to the public health emergency with respect to the Coronavirus Disease (COVID–19).

"(b) Payments.—

"(1) Minimum amounts.—From the amount appropriated under subsection (a)—

"(A) the Secretary shall pay $100,000,000 to each State;

H. R. 1319—231

"(B) the Secretary shall pay $100,000,000 of such amount in equal shares to the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau; and

"(C) the Secretary shall pay $100,000,000 of such amount in equal shares to Tribal governments and the State of Hawaii (in addition to the amount paid to the State of Hawaii under subparagraph (A)), of which—

"(i) not less than $50,000 shall be paid to each Tribal government; and

"(ii) not less than $50,000, and not more than $200,000, shall be paid to the State of Hawaii for the exclusive use of the Department of Hawaiian Home Lands and the Native Hawaiian Education Programs to assist Native Hawaiians in accordance with this section.

"(2) REMAINING AMOUNTS.—

"(A) IN GENERAL.—From the amount of the appropriation under subsection (a) that remains after the application of paragraph (1), the Secretary shall make payments to States based on population such that—

"(i) 50 percent of such amount shall be allocated among the States based on the proportion that the population of each State bears to the population of all States;

"(ii) 25 percent of such amount shall be allocated among the States based on the proportion that the number of individuals living in rural areas in each State bears to the number of individuals living in rural areas in all States; and

"(iii) 25 percent of such amount shall be allocated among the States based on the proportion that the number of individuals with a household income that is below 150 percent of the poverty line applicable to a family of the size involved in each State bears to the number of such individuals in all States.

"(B) DATA.—In determining the allocations to be made to each State under subparagraph (A), the Secretary of the Treasury shall use the most recent data available from the Bureau of the Census.

"(c) TIMING.—The Secretary shall establish a process of applying for grants to access funding made available under section (b) not later than 60 days after enactment of this section.

"(d) DEFINITIONS.—In this section:

"(1) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.

"(2) STATE.—The term 'State' means each of the 50 States, the District of Columbia, and Puerto Rico.

"(3) TRIBAL GOVERNMENT.—The term 'Tribal government' has the meaning given such term in section 602(g).

**"SEC. 605. LOCAL ASSISTANCE AND TRIBAL CONSISTENCY FUND.**

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $2,000,000,000 to

H. R. 1319—232

remain available until September 30, 2023, with amounts to be obligated for each of fiscal years 2022 and 2023 in accordance with subsection (b), for making payments under this section to eligible revenue sharing counties and eligible Tribal governments.

"(b) AUTHORITY TO MAKE PAYMENTS.—

"(1) PAYMENTS TO ELIGIBLE REVENUE SHARING COUNTIES.— For each of fiscal years 2022 and 2023, the Secretary shall reserve $750,000,000 of the total amount appropriated under subsection (a) to allocate and pay to each eligible revenue sharing county in amounts that are determined by the Secretary taking into account economic conditions of each eligible revenue sharing county, using measurements of poverty rates, household income, land values, and unemployment rates as well as other economic indicators, over the 20-year period ending with September 30, 2021.

"(2) PAYMENTS TO ELIGIBLE TRIBAL GOVERNMENTS.—For each of fiscal years 2022 and 2023, the Secretary shall reserve $250,000,000 of the total amount appropriated under subsection (a) to allocate and pay to eligible Tribal governments in amounts that are determined by the Secretary taking into account economic conditions of each eligible Tribe.

"(c) USE OF PAYMENTS.—An eligible revenue sharing county or an eligible Tribal government may use funds provided under a payment made under this section for any governmental purpose other than a lobbying activity.

"(d) REPORTING REQUIREMENT.—Any eligible revenue sharing county receiving a payment under this section shall provide to the Secretary periodic reports providing a detailed accounting of the uses of fund by such eligible revenue sharing county and such other information as the Secretary may require for the administration of this section.

"(e) RECOUPMENT.—Any eligible revenue sharing county that has failed to submit a report required under subsection (d) or failed to comply with subsection (c), shall be required to repay to the Secretary an amount equal to—

"(1) in the case of a failure to comply with subsection (c), the amount of funds used in violation of such subsection; and

"(2) in the case of a failure to submit a report required under subsection (d), such amount as the Secretary determines appropriate, but not to exceed 5 percent of the amount paid to the eligible revenue sharing county under this section for all fiscal years.

"(f) DEFINITIONS.—In this section:

"(1) ELIGIBLE REVENUE SHARING COUNTY.—The term 'eligible revenue sharing county' means—

"(A) a county, parish, or borough—

"(i) that is independent of any other unit of local government; and

"(ii) that, as determined by the Secretary, is the principal provider of government services for the area within its jurisdiction; and

"(iii) for which, as determined by the Secretary, there is a negative revenue impact due to implementation of a Federal program or changes to such program; and

H. R. 1319—233

"(B) the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the United States Virgin Islands.

"(2) ELIGIBLE TRIBAL GOVERNMENT.—The term 'eligible Tribal government' means the recognized governing body of an eligible Tribe.

"(3) ELIGIBLE TRIBE.—The term 'eligible Tribe' means any Indian or Alaska Native tribe, band, nation, pueblo, village, community, component band, or component reservation, individually identified (including parenthetically) in the list published most recently as of the date of enactment of this section pursuant to section 104 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

"(4) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.".

(b) CONFORMING AMENDMENT.—The heading for title VI of the Social Security Act (42 U.S.C. 801 et seq.) is amended by striking "**FUND**" and inserting ", **FISCAL RECOVERY, AND CRITICAL CAPITAL PROJECTS FUNDS**".

## Subtitle N—Other Provisions

**SEC. 9911. FUNDING FOR PROVIDERS RELATING TO COVID–19.**

Part A of title XI of the Social Security Act (42 U.S.C. 1301 et seq.) is amended by adding at the end the following:

**"SEC. 1150C. FUNDING FOR PROVIDERS RELATING TO COVID–19.**

"(a) FUNDING.—In addition to amounts otherwise available, there is appropriated to the Secretary, for fiscal year 2021, out of any monies in the Treasury not otherwise appropriated, $8,500,000,000 for purposes of making payments to eligible health care providers for health care related expenses and lost revenues that are attributable to COVID–19. Amounts appropriated under the preceding sentence shall remain available until expended.

"(b) APPLICATION REQUIREMENT.—To be eligible for a payment under this section, an eligible health care provider shall submit to the Secretary an application in such form and manner as the Secretary shall prescribe. Such application shall contain the following:

"(1) A statement justifying the need of the provider for the payment, including documentation of the health care related expenses attributable to COVID–19 and lost revenues attributable to COVID–19.

"(2) The tax identification number of the provider.

"(3) Such assurances as the Secretary determines appropriate that the eligible health care provider will maintain and make available such documentation and submit such reports (at such time, in such form, and containing such information as the Secretary shall prescribe) as the Secretary determines is necessary to ensure compliance with any conditions imposed by the Secretary under this section.

"(4) Any other information determined appropriate by the Secretary.

"(c) LIMITATION.—Payments made to an eligible health care provider under this section may not be used to reimburse any expense or loss that—

"(1) has been reimbursed from another source; or

H. R. 1319—234

"(2) another source is obligated to reimburse.

"(d) APPLICATION OF REQUIREMENTS, RULES, AND PROCE-
DURES.—The Secretary shall apply any requirements, rules, or
procedures as the Secretary deems appropriate for the efficient
execution of this section.

"(e) DEFINITIONS.—In this section:

"(1) ELIGIBLE HEALTH CARE PROVIDER.—The term 'eligible
health care provider' means—

"(A) a provider of services (as defined in section
1861(u)) or a supplier (as defined in section 1861(d)) that—

"(i) is enrolled in the Medicare program under
title XVIII under section 1866(j) (including temporarily
enrolled during the emergency period described in sec-
tion 1135(g)(1)(B) for such period);

"(ii) provides diagnoses, testing, or care for individ-
uals with possible or actual cases of COVID–19; and

"(iii) is a rural provider or supplier; or

"(B) a provider or supplier that—

"(i) is enrolled with a State Medicaid plan under
title XIX (or a waiver of such plan) in accordance
with subsections (a)(77) and (kk) of section 1902
(including enrolled pursuant to section 1902(a)(78) or
section 1932(d)(6)) or enrolled with a State child health
plan under title XXI (or a waiver of such plan) in
accordance with subparagraph (G) of section 2107(e)(1)
(including enrolled pursuant to subparagraph (D) or
(Q) of such section);

"(ii) provides diagnoses, testing, or care for individ-
uals with possible or actual cases of COVID–19; and

"(iii) is a rural provider or supplier.

"(2) HEALTH CARE RELATED EXPENSES ATTRIBUTABLE TO
COVID–19.—The term 'health care related expenses attributable
to COVID–19' means health care related expenses to prevent,
prepare for, and respond to COVID–19, including the building
or construction of a temporary structure, the leasing of a prop-
erty, the purchase of medical supplies and equipment, including
personal protective equipment and testing supplies, providing
for increased workforce and training (including maintaining
staff, obtaining additional staff, or both), the operation of an
emergency operation center, retrofitting a facility, providing
for surge capacity, and other expenses determined appropriate
by the Secretary.

"(3) LOST REVENUE ATTRIBUTABLE TO COVID–19.—The term
'lost revenue attributable to COVID–19' has the meaning given
that term in the Frequently Asked Questions guidance released
by the Department of Health and Human Services in June
2020, including the difference between such provider's budgeted
and actual revenue if such budget had been established and
approved prior to March 27, 2020.

"(4) PAYMENT.— The term 'payment' includes, as deter-
mined appropriate by the Secretary, a pre-payment, a prospec-
tive payment, a retrospective payment, or a payment through
a grant or other mechanism.

"(5) RURAL PROVIDER OR SUPPLIER.—The term 'rural pro-
vider or supplier' means—

"(A) a—

H. R. 1319—235

"(i) provider or supplier located in a rural area (as defined in section 1886(d)(2)(D)); or

"(ii) provider treated as located in a rural area pursuant to section 1886(d)(8)(E);

"(B) a provider or supplier located in any other area that serves rural patients (as defined by the Secretary), which may include, but is not required to include, a metropolitan statistical area with a population of less than 500,000 (determined based on the most recently available data);

"(C) a rural health clinic (as defined in section 1861(aa)(2));

"(D) a provider or supplier that furnishes home health, hospice, or long-term services and supports in an individual's home located in a rural area (as defined in section 1886(d)(2)(D)); or

"(E) any other rural provider or supplier (as defined by the Secretary).".

SEC. 9912. EXTENSION OF CUSTOMS USER FEES.

(a) IN GENERAL.—Section 13031(j)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(j)(3)) is amended—

(1) in subparagraph (A), by striking "October 21, 2029" and inserting "September 30, 2030"; and

(2) in subparagraph (B)(i), by striking "October 21, 2029" and inserting "September 30, 2030".

(b) RATE FOR MERCHANDISE PROCESSING FEES.—Section 503 of the United States-Korea Free Trade Agreement Implementation Act (Public Law 112–41; 19 U.S.C. 3805 note) is amended by striking "October 21, 2029" and inserting "September 30, 2030".

# TITLE X—COMMITTEE ON FOREIGN RELATIONS

SEC. 10001. DEPARTMENT OF STATE OPERATIONS.

In addition to amounts otherwise available, there is authorized and appropriated to the Secretary of State for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $204,000,000, to remain available until September 30, 2022, for necessary expenses of the Department of State to carry out the authorities, functions, duties, and responsibilities in the conduct of the foreign affairs of the United States, to prevent, prepare for, and respond to coronavirus domestically or internationally, which shall include maintaining Department of State operations.

SEC. 10002. UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT OPERATIONS.

In addition to amounts otherwise available, there is authorized and appropriated to the Administrator of the United States Agency for International Development for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $41,000,000, to remain available until September 30, 2022, to carry out the provisions of section 667 of the Foreign Assistance Act of 1961 (22 U.S.C. 2427) for necessary expenses of the United States Agency for International Development to prevent, prepare for, and respond to

H. R. 1319—236

coronavirus domestically or internationally, and for other operations and maintenance requirements related to coronavirus.

### SEC. 10003. GLOBAL RESPONSE.

(a) IN GENERAL.—In addition to amounts otherwise available, there is authorized and appropriated to the Secretary of State for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $8,675,000,000, to remain available until September 30, 2022, for necessary expenses to carry out the provisions of section 531 of chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346) as health programs to prevent, prepare for, and respond to coronavirus, which shall include recovery from the impacts of such virus and shall be allocated as follows—

(1) $905,000,000 to be made available to the United States Agency for International Development for global health activities to prevent, prepare for, and respond to coronavirus, which shall include a contribution to a multilateral vaccine development partnership to support epidemic preparedness;

(2) $3,750,000,000 to be made available to the Department of State to support programs for the prevention, treatment, and control of HIV/AIDS in order to prevent, prepare for, and respond to coronavirus, including to mitigate the impact on such programs from coronavirus and support recovery from the impacts of the coronavirus, of which not less than $3,500,000,000 shall be for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria;

(3) $3,090,000,000 to be made available to the United States Agency for International Development to prevent, prepare for, and respond to coronavirus, which shall include support for international disaster relief, rehabilitation, and reconstruction, for health activities, and to meet emergency food security needs; and

(4) $930,000,000 to be made available to prevent, prepare for, and respond to coronavirus, which shall include activities to address economic and stabilization requirements resulting from such virus.

(b) WAIVER OF LIMITATION.—Any contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria made pursuant to subsection (a)(2) shall be made available notwithstanding section 202(d)(4)(A)(i) of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (22 U.S.C. 7622(d)(4)(A)(i)), and such contribution shall not be considered a contribution for the purpose of applying such section 202(d)(4)(A)(i).

### SEC. 10004. HUMANITARIAN RESPONSE.

(a) IN GENERAL.—In addition to amounts otherwise available, there is authorized and appropriated to the Secretary of State for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $500,000,000, to remain available until September 30, 2022, to carry out the provisions of section 2(a) and (b) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601(a) and (b)) to prevent, prepare for, and respond to coronavirus.

(b) USE OF FUNDS.—Funds appropriated pursuant to this section shall not be made available for the costs of resettling refugees in the United States.

H. R. 1319—237

**SEC. 10005. MULTILATERAL ASSISTANCE.**

In addition to amounts otherwise available, there is authorized and appropriated to the Secretary of State for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $580,000,000, to remain available until September 30, 2022, to carry out the provisions of section 301(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2221(a)) to prevent, prepare for, and respond to coronavirus, which shall include support for the priorities and objectives of the United Nations Global Humanitarian Response Plan COVID–19 through voluntary contributions to international organizations and programs administered by such organizations.

# TITLE XI—COMMITTEE ON INDIAN AFFAIRS

**SEC. 11001. INDIAN HEALTH SERVICE.**

(a) In addition to amounts otherwise available, there is appropriated to the Secretary of Health and Human Services (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $6,094,000,000, to remain available until expended, of which—

(1) $5,484,000,000 shall be for carrying out the Act of August 5, 1954 (42 U.S.C. 2001 et seq.) (commonly referred to as the Transfer Act), the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.), the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.), and titles II and III of the Public Health Service Act (42 U.S.C. 201 et seq. and 241 et seq.) with respect to the Indian Health Service, of which—

(A) $2,000,000,000 shall be for lost reimbursements, in accordance with section 207 of the Indian Health Care Improvement Act (25 U.S.C. 1621f);

(B) $500,000,000 shall be for the provision of additional health care services, services provided through the Purchased/Referred Care program, and other related activities;

(C) $140,000,000 shall be for information technology, telehealth infrastructure, and the Indian Health Service electronic health records system;

(D) $84,000,000 shall be for maintaining operations of the Urban Indian health program, which shall be in addition to other amounts made available under this subsection for Urban Indian organizations (as defined in section 4 of the Indian Health Care Improvement Act (25 U.S.C. 1603));

(E) $600,000,000 shall be for necessary expenses to plan, prepare for, promote, distribute, administer, and track COVID–19 vaccines, for the purposes described in subparagraphs (F) and (G), and for other vaccine-related activities;

(F) $1,500,000,000 shall be for necessary expenses to detect, diagnose, trace, and monitor COVID–19 infections, activities necessary to mitigate the spread of COVID–19, supplies necessary for such activities, for the purposes described in subparagraphs (E) and (G), and for other related activities;

H. R. 1319—238

(G) $240,000,000 shall be for necessary expenses to establish, expand, and sustain a public health workforce to prevent, prepare for, and respond to COVID–19, other public health workforce-related activities, for the purposes described in subparagraphs (E) and (F), and for other related activities; and

(H) $420,000,000 shall be for necessary expenses related to mental health and substance use prevention and treatment services, for the purposes described in subparagraph (C) and paragraph (2) as related to mental health and substance use prevention and treatment services, and for other related activities;

(2) $600,000,000 shall be for the lease, purchase, construction, alteration, renovation, or equipping of health facilities to respond to COVID–19, and for maintenance and improvement projects necessary to respond to COVID–19 under section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a), the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.), the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.), and titles II and III of the Public Health Service Act (42 U.S.C. 202 et seq.) with respect to the Indian Health Service; and

(3) $10,000,000 shall be for carrying out section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a) for expenses relating to potable water delivery.

(b) Funds appropriated by subsection (a) shall be made available to restore amounts, either directly or through reimbursement, for obligations for the purposes specified in this section that were incurred to prevent, prepare for, and respond to COVID–19 during the period beginning on the date on which the public health emergency was declared by the Secretary on January 31, 2020, pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d) with respect to COVID–19 and ending on the date of the enactment of this Act.

(c) Funds made available under subsection (a) to Tribes and Tribal organizations under the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.) shall be available on a one-time basis. Such non-recurring funds shall not be part of the amount required by section 106 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5325), and such funds shall only be used for the purposes identified in this section.

**SEC. 11002. BUREAU OF INDIAN AFFAIRS.**

(a) IN GENERAL.—In addition to amounts otherwise made available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $900,000,000 to remain available until expended, pursuant to the Snyder Act (25 U.S.C. 13), of which—

(1) $100,000,000 shall be for Tribal housing improvement;

(2) $772,500,000 shall be for Tribal government services, public safety and justice, social services, child welfare assistance, and for other related expenses;

(3) $7,500,000 shall be for related Federal administrative costs and oversight; and

(4) $20,000,000 shall be to provide and deliver potable water.

H. R. 1319—239

(b) EXCLUSIONS FROM CALCULATION.—Funds appropriated under subsection (a) shall be excluded from the calculation of funds received by those Tribal governments that participate in the "Small and Needy'" program.

(c) ONE-TIME BASIS FUNDS.—Funds made available under subsection (a) to Tribes and Tribal organizations under the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.) shall be available on a one-time basis. Such non-recurring funds shall not be part of the amount required by section 106 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5325), and such funds shall only be used for the purposes identified in this section.

## SEC. 11003. HOUSING ASSISTANCE AND SUPPORTIVE SERVICES PROGRAMS FOR NATIVE AMERICANS.

(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Secretary of Housing and Urban Development (in this section referred to as the "Secretary") for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $750,000,000, to remain available until September 30, 2025, to prevent, prepare for, and respond to coronavirus, for activities and assistance authorized under title I of the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA) (25 U.S.C. 4111 et seq.), under title VIII of NAHASDA (25 U.S.C. 4221 et seq.), and under section 106(a)(1) of the Housing and Community Development Act of 1974 with respect to Indian tribes (42 U.S.C. 5306(a)(1)), which shall be made available as follows:

(1) HOUSING BLOCK GRANTS.—$455,000,000 shall be available for the Native American Housing Block Grants and Native Hawaiian Housing Block Grant programs, as authorized under titles I and VIII of NAHASDA, subject to the following terms and conditions:

(A) FORMULA.—Of the amounts made available under this paragraph, $450,000,000 shall be for grants under title I of NAHASDA and shall be distributed according to the same funding formula used in fiscal year 2021.

(B) NATIVE HAWAIIANS.—Of the amounts made available under this paragraph, $5,000,000 shall be for grants under title VIII of NAHASDA.

(C) USE.—Amounts made available under this paragraph shall be used by recipients to prevent, prepare for, and respond to coronavirus, including to maintain normal operations and fund eligible affordable housing activities under NAHASDA during the period that the program is impacted by coronavirus. In addition, amounts made available under subparagraph (B) may be used to provide rental assistance to eligible Native Hawaiian families both on and off the Hawaiian Home Lands.

(D) TIMING OF OBLIGATIONS.—Amounts made available under this paragraph shall be used, as necessary, to cover or reimburse allowable costs to prevent, prepare for, and respond to coronavirus that are incurred by a recipient, including for costs incurred after January 21, 2020.

(E) WAIVERS OR ALTERNATIVE REQUIREMENTS.—The Secretary may waive or specify alternative requirements for any provision of NAHASDA (25 U.S.C. 4101 et seq.)

H. R. 1319—240

or regulation applicable to the Native American Housing Block Grants or Native Hawaiian Housing Block Grant program other than requirements related to fair housing, nondiscrimination, labor standards, and the environment, upon a finding that the waiver or alternative requirement is necessary to expedite or facilitate the use of amounts made available under this paragraph.

(F) UNOBLIGATED AMOUNTS.—Amounts made available under this paragraph which are not accepted, are voluntarily returned, or otherwise recaptured for any reason shall be used to fund grants under paragraph (2).

(2) INDIAN COMMUNITY DEVELOPMENT BLOCK GRANTS.—$280,000,000 shall be available for grants under title I of the Housing and Community Development Act of 1974, subject to the following terms and conditions:

(A) USE.—Amounts made available under this paragraph shall be used for emergencies that constitute imminent threats to health and safety and are designed to prevent, prepare for, and respond to coronavirus.

(B) PLANNING.—Not to exceed 20 percent of any grant made with funds made available under this paragraph shall be expended for planning and management development and administration.

(C) TIMING OF OBLIGATIONS.—Amounts made available under this paragraph shall be used, as necessary, to cover or reimburse allowable costs to prevent, prepare for, and respond to coronavirus incurred by a recipient, including for costs incurred after January 21, 2020.

(D) INAPPLICABILITY OF PUBLIC SERVICES CAP.—Indian tribes may use up to 100 percent of any grant from amounts made available under this paragraph for public services activities to prevent, prepare for, and respond to coronavirus.

(E) WAIVERS OR ALTERNATIVE REQUIREMENTS.—The Secretary may waive or specify alternative requirements for any provision of title I of the Housing and Community Development Act of 1974 (42 U.S.C. 5301 et seq.) or regulation applicable to the Indian Community Development Block Grant program other than requirements related to fair housing, nondiscrimination, labor standards, and the environment, upon a finding that the waiver or alternative requirement is necessary to expedite or facilitate the use of amounts made available under this paragraph.

(3) TECHNICAL ASSISTANCE.—$10,000,000 shall be used to make new awards or increase prior awards to existing technical assistance providers to provide an immediate increase in training and technical assistance to Indian tribes, Indian housing authorities, tribally designated housing entities, and recipients under title VIII of NAHASDA for activities under this section.

(4) OTHER COSTS.—$5,000,000 shall be used for the administrative costs to oversee and administer the implementation of this section, and pay for associated information technology, financial reporting, and other costs.

H. R. 1319—241

### SEC. 11004. COVID–19 RESPONSE RESOURCES FOR THE PRESERVATION AND MAINTENANCE OF NATIVE AMERICAN LANGUAGES.

(a) Section 816 of the Native American Programs Act of 1974 (42 U.S.C. 2992d) is amended by adding at the end the following:

"(f) In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $20,000,000 to remain available until expended, to carry out section 803C(g) of this Act.".

(b) Section 803C of the Native American Programs Act of 1974 (42 U.S.C. 2991b–3) is amended by adding at the end the following:

"(g) EMERGENCY GRANTS FOR NATIVE AMERICAN LANGUAGE PRESERVATION AND MAINTENANCE.—Not later than 180 days after the effective date of this subsection, the Secretary shall award grants to entities eligible to receive assistance under subsection (a)(1) to ensure the survival and continuing vitality of Native American languages during and after the public health emergency declared by the Secretary pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d) with respect to the COVID–19 pandemic.".

### SEC. 11005. BUREAU OF INDIAN EDUCATION.

In addition to amounts otherwise available, there is appropriated to the Bureau of Indian Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $850,000,000, to remain available until expended, to be allocated by the Director of the Bureau of Indian Education not more than 45 calendar days after the date of enactment of this Act, for programs or activities operated or funded by the Bureau of Indian Education, for Bureau-funded schools (as defined in section 1141(3) of the Education Amendments of 1978 (25 U.S.C. 2021(3)), and for Tribal Colleges or Universities (as defined in section 316(b)(3) of the Higher Education Act of 1965 (20 U.S.C. 1059c(b)(3))).

### SEC. 11006. AMERICAN INDIAN, NATIVE HAWAIIAN, AND ALASKA NATIVE EDUCATION.

In addition to amounts otherwise available, there is appropriated to the Department of Education for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $190,000,000, to remain available until expended, for awards, which shall be determined by the Secretary of Education not more than 180 calendar days after the date of enactment of this Act, of which—

(1) $20,000,000 shall be for awards for Tribal education agencies for activities authorized under section 6121(c) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7441(c));

(2) $85,000,000 shall be for awards to entities eligible to receive grants under section 6205(a)(1) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7515(a)(1)) for activities authorized under section 6205(a)(3) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7515(a)(3)); and

(3) $85,000,000 shall be for awards to entities eligible to receive grants under section 6304(a)(1) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7544(a)(1)) for activities authorized under section 6304(a)(2–3) of the

H. R. 1319—242

Elementary and Secondary Education Act of 1965 (20 U.S.C. 7544(a)(2–3)) and other related activities.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*



OFFICE OF PARTNERSHIPS AND PUBLIC ENGAGEMENT

**Farming Opportunities Training and Outreach Grant Program**

USDA

## What is the FOTO Grants Program?

The new Farming Opportunities Training and Outreach (FOTO) program was established in the Agricultural Act of 2018 to encourage and assist socially disadvantaged and veteran farmers and ranchers (SDVFRs) and beginning farmers and ranchers (BFRs) in the ownership and operation of farms and ranches through education and training; and promote equitable participation in the agricultural programs of USDA.

FOTO is the combination of the Beginning Farmer and Rancher Development Program (BFRDP) and the Outreach and Assistance to Socially Disadvantaged and Veteran Farmers and Ranchers Program (2501 Program). USDA's National Institute of Food and Agriculture (NIFA) administers BFRDP and USDA's Office of Partnerships and Public Engagement (OPPE) manages the 2501 Program.

FOTO provides mandatory funding of $30 million for fiscal year (FY) 2020 and increases funding annually up to $50 million by FY2023. Annual funding will be split equally between BFRDP and the 2501 Program.

For more information on the BFRDP, visit:
https://nifa.usda.gov/funding-opportunity/beginning-farmer-and-rancher-development-program-bfrdp

## What groups are defined as socially disadvantaged under the 2501 Program?

A socially disadvantaged group is defined as: A farmer or rancher who is a member of one or more of the following groups whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities:
- African Americans
- American Indians
- Alaskan Natives
- Asians
- Hispanics
- Pacific Islanders

## What is the definition of a veteran under the 2501 Program?

A veteran farmer or rancher (VFR) is a person who served in the United States Army, Navy, Marine Corps, Air Force, and Coast Guard, including the reserve components thereof, and who was discharged or released therefrom under conditions other than dishonorable and who also meets the definition of beginning farmer or rancher. The VFR must: a) not have operated a farm or ranch; or b) not have operated a farm or ranch for more than 10 consecutive years. For a legal entity or joint operation to be considered a VFR entity, all members must meet the definition of VFR.

## What are the priority areas for the 2501 Program?
- Assist socially disadvantaged or veteran farmers and ranchers in owning and operating successful farms and ranches;
- Improve participation among socially disadvantaged or veteran farmers and ranchers in USDA programs;
- Build relationships between current and prospective farmers and ranchers who are socially disadvantaged or veterans and USDA's local, state, regional, and National offices;
- Introduce agriculture-related information to socially disadvantaged or veteran farmers and ranchers through innovative training and technical assistance techniques; and
- Introduce agricultural education targeting youth and beginning socially disadvantaged and veteran farmers and ranchers in rural and persistent poverty communities.

## Who is eligible to receive a 2501 Program grant?
- Community-Based & Non-Profit Organizations
- Tribal Governments & Colleges
- Higher Education Institutions with Agricultural Programs (such as 1890s, 1994s and Hispanic-Serving Institutions)
- Alaskan Native Cooperative Colleges

Organizations must have documented experience in working with socially disadvantaged or veteran farmers and ranchers for at least three (3) years to qualify for the 2501 Program.

## For more information:

**Visit our website**
https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-ranchers

**Visit Grants.gov**
https://grants.gov

**Email or call us**
2501grants@usda.gov or (202) 720-6350


**U.S. DEPARTMENT OF AGRICULTURE**

# In Historic Move, USDA to Begin Loan Payments to Socially Disadvantaged Borrowers under American Rescue Plan Act Section 1005

**Press Release**
Release No. 0109.21

**Contact:** USDA Press
**Email:** press@usda.gov

**WASHINGTON, May 21, 2021** — The U.S. Department of Agriculture Farm Service Agency (FSA) today published the first notice of funding availability (NOFA) (PDF, 242 KB) announcing loan payments for eligible borrowers with qualifying direct farm loans under the American Rescue Plan Act Section 1005. The official NOFA will be published in the Federal Register early next week and USDA expects payments to begin in early June and continue on a rolling basis. A subsequent notice addressing guaranteed loan balances and direct loans that no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset, will be published within 120 days.

"The American Rescue Plan has made it possible for USDA to deliver historic debt relief to socially disadvantaged farmers and ranchers beginning in June," said Agriculture Secretary Tom Vilsack. "USDA is recommitting itself to gaining the trust and confidence of America's farmers and ranchers using a new set of tools provided in the American Rescue Plan to increase opportunity, advance equity and address systemic discrimination in USDA programs."

Section 1005 of the American Rescue Plan Act of 2021 (ARPA) provides funding and authorization for USDA FSA to pay up to 120 percent of direct and guaranteed loan outstanding balances as of January 1, 2021, for socially disadvantaged farmers and ranchers as defined in Section 2501(a) of the Food, Agriculture Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). Section 2501(a) defines a socially disadvantaged farmer or rancher as a farmer or rancher who is a member of a socially disadvantaged group, which is further defined as a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. Qualifying loans as part of today's announcement are certain direct loans under the Farm Loan Programs (FLP) and Farm Storage Facility Loan Program (FSFL).

For much of the history of the USDA, socially disadvantaged farmers and ranchers have faced discrimination—sometimes overt and sometimes through deeply embedded rules and policies—that have prevented them from achieving as much as their counterparts who do not face these documented acts of discrimination. Over the past 30 years, several major civil rights lawsuits have compensated farmers for specific acts of discrimination—including Pigford I and Pigford II, Keepseagle, and the Garcia cases. However, those settlements and other related actions did not address the systemic and cumulative impacts of discrimination over a number of decades that the American Rescue Plan now begins to address.

Sections 1005 and 1006 of ARPA provide USDA with new tools to address longstanding inequities for socially disadvantaged borrowers. Section 1006 of ARPA provides additional funding to begin long-term racial equity work within USDA, including to address heirs property claims and to stand up an Equity Commission to identify barriers to access USDA programming.

To learn more about the loan payments to socially disadvantaged farmers and ranchers, visit www.farmers.gov/americanrescueplan.

USDA touches the lives of all Americans each day in so many positive ways. In the Biden-Harris Administration, USDA is transforming America's food system with a greater focus on more resilient local and regional food production, fairer markets for all producers, ensuring access to safe, healthy and nutritious food in all communities, building new markets and streams of income for farmers and producers using climate smart food and forestry practices, making historic investments in infrastructure and clean energy

capabilities in rural America, and committing to equity across the Department by removing systemic barriers and building a workforce more representative of America. To learn more, visit www.usda.gov.

#

USDA is an equal opportunity provider, employer, and lender.

# Notices

**Federal Register**

Vol. 86, No. 100

Wednesday, May 26, 2021

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2021–0005]**

### Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan Payment (ARPA)

**AGENCY:** Farm Service Agency, Department of Agriculture (USDA).

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this first notice announcing the availability of funds for eligible borrowers with direct loans under the Farm Loan Programs (FLP) and Farm Storage Facility Loan Program (FSFL) as authorized by section 1005 of the American Rescue Plan Act of 2021 (ARPA). A subsequent notice addressing guaranteed loans and remaining loan balances eligible under section 1005 will be published within 120 days of publication of this NOFA. FSA will pay 120 percent of direct loan balances outstanding as of January 1, 2021, for socially disadvantaged farmers and ranchers as that term is defined by section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990.

**DATES:**

*Funding availability:* Implementation will begin May 26, 2021

*Comment Date:* We will consider comments on the Paperwork Reduction Act that we receive by: July 26, 2021.

**ADDRESSES:** We invite you to submit comments on the information collection request. You may submit comments by any of the following methods, although FSA prefers that you submit comments electronically through the Federal eRulemaking Portal:

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov* and search for Docket ID FSA–2021–0005. Follow the online instructions for submitting comments.

• *Mail:* Bruce Mair, Direct Loan Servicing Branch Chief, Farm Loan Programs, Farm Service Agency, USDA, 1400 Independence Ave. SW, Stop 0523, Washington, DC 20250. In your comment, specify the docket ID FSA– 2021–0005.

All comments received, including those received by mail, will be posted without change and publicly available on *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Bruce Mair; telephone: (202) 720–1645; or by email: *bruce.mair@usda.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

Section 1005 of the American Rescue Plan Act of 2021 (ARPA) provides funding and authorization for FSA to pay up to 120 percent of direct and guaranteed loan outstanding balances as of January 1, 2021, for certain loans of socially disadvantaged farmers and ranchers as that term is defined in section 2501(a) of the Food, Agriculture Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). See ARPA section 1005(b)(3). Section 2501(a) defines a socially disadvantaged farmer or rancher as someone who is a member of a socially disadvantaged group, which is further defined as a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. See 7 U.S.C. 2279(a)(5)–(6). Through this notice, FSA is announcing the immediate implementation of section 1005 of ARPA for eligible direct loan FLP and FSFL borrowers who are socially disadvantaged farmers or ranchers, as defined by section 2501(a).

A separate NOFA will be issued specifying the timeframes and requirements for guaranteed loans and direct loans that no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset. All eligible direct loan borrowers are included in this initial announcement except those who no longer have collateral or an active farming operation. These borrowers often have more complicated cases and may not have the same opportunities to invest in their farming operation to manage tax liabilities. FSA expects these cases to account for approximately 5 percent of eligible direct loan borrowers. Procedures for

payments to these borrowers will be addressed in a subsequent NOFA, which will also include eligible guaranteed loan borrowers. For eligible direct loan borrowers who also have guaranteed loans, their guaranteed loans will be handled through the subsequent NOFA.

## Definitions

The following definitions apply to this Notice:

*Adjustment* is a form of debt settlement that reduces the financial obligation to FSA, conditioned upon the completion of payment of a specified amount at a future time. An adjustment is not a final settlement until all payments have been made under the agreement.

*Bankruptcy estate* is a legal entity created upon the filing of any case under Title 11 of the United States Code, 11 U.S.C. 101–1532, consisting of the legal and equitable interests in property of a debtor.

*CONACT* means the Consolidated Farm and Rural Development Act, as amended (7 U.S.C. 1921–2009cc–18).

*Cooperative* means an entity that has farming as its purpose, whose members have agreed to share the profits of the farming enterprise and is recognized as a farm cooperative by the laws of the state in which the entity will operate a farm.

*Corporation* means a private domestic corporation created and organized under the laws of the state in which it will operate a farm.

*Direct Loan* means a loan funded and serviced by FSA as the lender.

*Eligible direct loan* means a debt that had an outstanding balance on January 1, 2021, and is any of the following:

• FLP direct loan issued under subtitles A, B, or C of the CONACT, including Conservation loans, Emergency loans, Farm Ownership loans (including Down Payment loans), Grazing loans, Irrigation and Drainage loans, Operating loans (including Youth loans and Microloans), and Soil and Water loans;

• FLP direct non-program loan and Softwood Timber Loans where the original loan was issued under the CONACT; or

• FSFL loan.

*Eligible recipient* means an individual or entity that is:

• A borrower or co-borrower on FSA eligible direct loans on January 1, 2021;

all eligible direct loan borrowers are included in this initial announcement except those who no longer have collateral or an active farming operation and whose loan has been previously referred to the Department of Treasury for debt collection for offset; and

• A member of a socially disadvantaged group as reflected on FSA records at the time a payment is made. For entities and married couples, at least one individual personally liable as a borrower or co-borrower for the debt must be a member of a socially disadvantaged group; or

• An estate of a deceased eligible recipient.

*Entity* means a corporation, partnership, joint operation, cooperative, limited liability company, or trust.

*Estate* is a legal entity created as a result of a person's death and consists of the property of the deceased. The estate pays any debts owed by the deceased and distributes the balance of the estate's assets to the beneficiaries of the estate.

*FLP* means Farm Loan Programs, the FSA programs to make, guarantee, and service loans to family farmers authorized under the CONACT and implemented through the FSA regulations in 7 CFR parts 700–774.

*FSFL* means Farm Storage Facility Loans, the FSA program to make and service loans for farm storage facilities authorized by the CCC Charter Act (15 U.S.C. 714–714p) and the Food, Conservation and Energy Act of 2008 (7 U.S.C. 7971 and 8789) and implemented through the FSA regulations in 7 CFR part 1436.

*Guaranteed loan* means a loan made pursuant to subtitles A, B, or C of the CONACT and serviced by a lender for which FSA has entered into a Lender's Agreement and for which FSA has issued a loan guarantee. This term also includes guaranteed lines of credit.

*Joint operation* means an operation run by individuals who have agreed to operate a farm or farms together as an entity, sharing equally or unequally land, labor, equipment, expenses, or income, or some combination of these items. The real and personal property is owned separately or jointly by the individuals.

*Limited Liability Company* means a business structure combining the pass-through taxation of a partnership or sole proprietorship with the limited liability of a corporation organized pursuant to the laws of the state in which it will operate a farm.

*Offer notice* means the letter sent to eligible borrowers that will notify them of the payment amount, obtain direct deposit payment information and verifying eligible and ineligible loans.

*Partnership* means an entity consisting of two or more individuals who have agreed to operate a farm as one business unit. The entity must be recognized as a partnership by the laws of the State in which the partnership will operate a farm. It also must be authorized to own both real and personal property and to incur debt in its own name.

*Primary borrower* means the borrower who was designated as the operator of the farm or ranch when the loan was closed. For formal entities, the primary borrower is the entity while members are co-borrowers. For informal joint operations, at the time of application the applicants designate the individual identified as the primary borrower.

*Recapture* is the amount that FSA or lenders are entitled to recover from a direct or guaranteed loan borrower in consideration for FSA or the lender writing down a portion of their direct or guaranteed loan debt when the loan was secured by real estate and the real estate increased in value. Recapture also includes the act of collecting shared appreciation.

*Socially Disadvantaged Farmer or Rancher* means a farmer or rancher who is a member of a socially disadvantaged group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities, as defined by section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). Members of socially disadvantaged groups include, but are not limited to:

• American Indians or Alaskan Natives;

• Asians;

• Blacks or African Americans;

• Native Hawaiians or other Pacific Islanders; and

• Hispanics or Latinos.

The Secretary of Agriculture will determine on a case-by-case basis whether additional groups qualify under this definition in response to a written request with supporting explanation.

*Sole Proprietor* means a business owned and operated by an individual with no legal distinction between the owner and the business.

*Trust* means an entity that under applicable state law meets the criteria of being a trust of any kind but does not meet the criteria of being a farm cooperative, private domestic corporation, partnership, or joint operation.

**Determining Amount of Payments**

ARPA section 1005 permits the Secretary of Agriculture to provide payments to a lender directly to pay off an eligible loan, to an eligible recipient, or a combination of both. Payments for eligible direct loans will be equal to 120 percent of the outstanding indebtedness owed on eligible direct loans as of January 1, 2021. Undisbursed balances of eligible direct loans will not count toward the outstanding indebtedness owing as of January 1, 2021.

In order to determine the amount of the payment, FSA will make adjustments for eligible recipients with the following types of cases:

• Where FSA has entered into an adjustment agreement with the borrower, the adjustment agreement will be reversed and the payment to the eligible borrower will be calculated on the full debt as of January 1, 2021, rather than on the lesser amount owing on the adjustment agreement.

• Shared Appreciation Agreement: the recapture amount will be waived.

**Initial Notification Process**

Eligible recipients do not need to take any action until receipt of a payment offer from FSA. However, eligible recipients may, if necessary, update their demographic information in FSA records by contacting their Local FSA Service Center. Within 45 days of the publication of this NOFA, FSA anticipates sending an offer notice to eligible recipients with eligible direct loans. The offer notice will explain:

• Eligibility based on the current information on record;

• FSA's calculation of payments, including proposed distribution of payments;

• Remaining balances on loans that are not included as eligible direct loans (if any) (for example, Economic Emergency loans or loans disbursed after January 1, 2021);

• Any eligible loans that will be addressed through a subsequent NOFA (that is, guaranteed FLP loans and direct loans that no longer have collateral and have been previously referred to the Department of Treasury for debt collection for offset); and

• That borrowers should be aware of potential implications of receipt of direct payments during bankruptcy.

The offer notice will be sent to the primary borrower and eligible recipient(s) and will provide three options:

(1) Accept the offer and conditions;

(2) Schedule a meeting to discuss with FSA before making a decision (for example to discuss the loan calculation, if an error is identified); or

(3) Decline the offer.

Only the eligible recipient(s) must sign the document either accepting or declining to initiate the payments.

The eligible recipient(s) must certify the information in the offer notice. Acceptance of the offer indicates concurrence with the payment calculations and the indicated distribution of funds, and verification as eligible recipient(s).

If an offer has not been formally accepted or declined after 30 days, FSA will send a reminder letter and make a phone call or send an email if that contact information is on file. If a response to accept or decline an offer is not received after 60 days from the date of the initial offer, FSA will provide a second reminder notification to those borrowers that a payment will not be processed unless contacted by the eligible recipient. Should FSA establish a final deadline, it will be publicly announced and a final notification will be provided to borrowers at least 30 days in advance of the deadline.

**Distributing Payments**

FSA will distribute payments as follows:

(1) The amount to pay off the eligible direct loan(s) will be directly applied to such loans by FSA; and

(2) The additional 20 percent will be paid in accordance with the offer notice.

Any payment will be issued electronically as stated in the offer notice. FSA will credit payments as of January 1, 2021, and ensure payments made on accounts after January 1, 2021, are reversed and refunded to customers that have accepted the payment. Refunds will occur at the time the direct loan payoff is being completed. If the loan was paid in full after January 1, 2021, the ARPA payment will be calculated based on the balance outstanding as of January 1, 2021.

Both the payment to FSA to payoff outstanding loans and the additional 20 percent to the borrower will be reported to the Internal Revenue Service (IRS) as income using form IRS–1099 G, in accordance with applicable requirements. Borrowers should consult with a tax professional to discuss any tax implications. ARPA is subject to appeal rights pursuant to 7 CFR parts 11 and 780.

USDA will work with non-governmental organizations (NGO) funded through FSA Cooperative Agreements to provide technical assistance. Technical assistance by USDA and its cooperators will be provided to borrowers free of charge. Borrowers are not required or expected to pay any fees to access these ARPA benefits.

The USDA makes no representation whether any payment directly to a borrower in a pending bankruptcy case constitutes property of the bankruptcy estate. Borrowers should consult bankruptcy professionals or counsel to discuss the impact of bankruptcy on any payments received under ARPA.

**Paperwork Reduction Act Requirements**

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35), FSA is requesting comments from interested individuals and organizations on the information collection request associated with ARPA. After the 60-day period ends, the information collection request will be submitted to the Office of Management and Budget (OMB) for a 3-year approval to cover ARPA information collection.

To start the ARPA information collection approval, prior to publishing this document, FSA received emergency approval from OMB for 6 months. The emergency approval covers ARPA information collection activities.

*Title:* American Rescue Plan Act of 2021 Section 1005 Loan Payment (ARPA),

*OMB Control Number:* 0560–New.

*Type of Request:* New Collection.

*Abstract:* This information collection is required to support all ARPA information collection requests to provide payments to the eligible borrowers under section 1005 of ARPA. FSA will provide the loan information, the calculation of payments, and other required information to the borrower to review and to sign the offer to indicate acceptance or rejection of the offer.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

Public reporting burden for this information collection is estimated to include the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collections of information.

*Type of Respondents:* FLP direct and FSFL borrowers.

*Estimated Annual Number or Respondents:* 24,000.

*Estimated Number of Responses per Respondent:* 1.

*Estimated Total Annual Responses:* 24,000.

*Estimated Average Time per Response:* 15 minutes.

*Estimated Total Annual Burden on Respondents:* 6,000 hours.

FSA is requesting comments on all aspects of this information collection to help us to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this document, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ARPA includes provisions for paying up to 120 percent of direct and guaranteed loan balances as of January 1, 2021, for FSA borrowers who belong to socially disadvantaged groups as defined in section 2501(a) of the Food, Agriculture Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). The limited discretionary aspects of ARPA do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA Categorical Exclusions specified in 7 CFR 799.31(b)(1)(xiii) (partial or complete release of loan collateral) and 799.31(b)(1)(xvii) (restructuring of loans and writing down of debt).

No Extraordinary Circumstances (§ 799.33) exist. As such, the implementation of ARPA and the participation in ARPA do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or

environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Catalog of Federal Domestic Assistance, to which this document applies is 10.136.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877–8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2021–11155 Filed 5–24–21; 8:45 am]
**BILLING CODE 3410–05–P**

---

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Meetings of the Kansas Advisory Committee

**AGENCY:** Commission on Civil Rights.
**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Kansas Advisory Committee (Committee) will hold a meeting via the web platform Webex on, June 10, 2021 at 12:00 p.m. Central Time. The purpose of the meeting is for the committee to discuss voting rights topics of concern in the state.

**DATES:** The meetings will be held on: *https://civilrights.webex.com/civilrights/j.php?MTID=mbfc50dadd21bfd4a04a9f0961cb64a81*.

- Thursday, June 10, 2021, at 12:00 p.m. Central Time, 800–360–9505 USA Toll Free, Access code: 199 818 6105.

**FOR FURTHER INFORMATION CONTACT:** David Barreras, Designated Federal Officer, at *dbarreras@usccr.gov* or (202) 499–4066.

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion through the above call-in number. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to David Barreras at *dbarreras@usccr.gov*.

Records generated from this meeting may be inspected and reproduced at the Regional Programs Unit Office, as they become available, both before and after

the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Kansas Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov*, or may contact the Regional Programs Unit at the above email or street address.

**Agenda**

I. Welcome & Roll Call
II. Chair's Comments
III. Committee Discussion
IV. Next Steps
V. Public Comment
VI. Adjournment

Dated: May 21, 2021.

**David Mussatt,**
*Supervisory Chief, Regional Programs Unit.*
[FR Doc. 2021–11143 Filed 5–25–21; 8:45 am]
**BILLING CODE P**

---

## DEPARTMENT OF COMMERCE

**Census Bureau**

**Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; Business and Professional Classification Report**

The Department of Commerce will submit the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995, on or after the date of publication of this notice. We invite the general public and other Federal agencies to comment on proposed, and continuing information collections, which helps us assess the impact of our information collection requirements and minimize the public's reporting burden. Public comments were previously requested via the **Federal Register** on March 8, 2021 during a 60-day comment period. This notice allows for an additional 30 days for public comments.

*Agency:* U.S. Census Bureau.
*Title:* Business and Professional Classification Report.
*OMB Control Number:* 0607–0189.
*Form Number(s):* SQ–CLASS.
*Type of Request:* Regular submission, Request for an Extension, without Change, of a Currently Approved Collection.
*Number of Respondents:* 58,000.
*Average Hours per Response:* 13 minutes.
*Burden Hours:* 12,567.
*Needs and Uses:* The U.S. Census Bureau requests continued clearance of