UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Sid Miller**, et al., <br><br> Plaintiffs, <br><br> v. <br><br> **Tom Vilsack**, in his official capacity as Secretary of Agriculture, <br><br> Defendant. | Case No. 4:21-cv-00595-O |

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of contents..........................................................................................................i

Table of authorities.....................................................................................................ii

Undisputed facts .........................................................................................................1

Argument....................................................................................................................4

    I.  Racial classifications are subject to strict scrutiny ........................................4

    II.  The Department cannot meet its burden of proving that its racial classifications are "narrowly tailored" to advance a "compelling governmental interest" ................................................................................5

        A.  The government lacks a compelling interest to justify racial discrimination ..........................................................................................6

        B.  The government did not narrowly tailor these supposedly remedial racial preferences ....................................................................................9

Conclusion................................................................................................................13

Certificate of service ................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) .............................. 5, 6, 7

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ............................................................ 1, 4

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................... 7

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ........................... passim

*Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) ................................ 9, 13

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .............................................................. 9

*Johnson v. California*, 543 U.S. 499 (2005) .......................................................... 5

*Palmore v. Sidoti*, 466 U.S. 429 (1984) ................................................................. 4

*Parents Involved in Community Schools v. Seattle School District No. 1*,
  551 U.S. 701 (2007) ............................................................................................ 7

*Personnel Administrator of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ............................................................................................ 5

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) ................................. 6, 9, 10, 11

*Washington v. Davis*, 426 U.S. 229 (1976) ....................................................... 4, 7

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) .................................................... 7

**Statutes**

7 U.S.C. § 2279(a)(5) ........................................................................................ 1, 3

7 U.S.C. § 2279(a)(6) ........................................................................................... 1

Section 1005 of the American Rescue Plan Act of 2021 instructs the Secretary of Agriculture to provide loan forgiveness to farmers and ranchers—but only if they qualify as a "socially disadvantaged farmer or rancher." And the Department interprets the phrase "socially disadvantaged farmer and rancher" in a manner that includes racial minorities but excludes whites. These racial classifications are unconstitutional under *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), and the plaintiffs are entitled to judgment and a permanent injunction against their continued enforcement.

## UNDISPUTED FACTS

Section 1005 of the American Rescue Plan Act of 2021, Pub. L 117-2 (2021), provides aid to farmers and ranchers—including loan forgiveness up to *120 percent* of the value of the loan as of January 1, 2021—but only if they qualify as a "socially disadvantaged farmer or rancher." *See* Exhibit 1.

Federal law defines "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group." 7 U.S.C. § 2279(a)(5). "Socially disadvantaged group," in turn, is defined as:

> a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

7 U.S.C. § 2279(a)(6).

On May 21, 2021, the United States Department of Agriculture, through the Farm Service Agency (FSA), issued a press release announcing a Notice of Funds Availability (NOFA), in which it would start making loan payments for eligible borrowers with qualifying direct farm loans, pursuant to section 1005 of the American Rescue Plan Act. *See* U.S. Department of Agriculture, *Press Release, In Historic Move, USDA to Begin Loan Payments to Socially Disadvantaged Borrowers under American Rescue Plan Act Section 1005*, *available at* https://bit.ly/3fAxAuB (last visited May

27, 2021) (attached as Exhibit 3). The Department of Agriculture published this notice in the Federal Register on May 26, 2021. *See* Notice of Funds Availability, 86 Fed. Reg. 28,329 (May 26, 2021) (attached as Exhibit 4).

The notice defines, for the purposes of eligibility for loan forgiveness, "socially disadvantaged farmer or rancher" as:

> [A] farmer or rancher who is a member of a socially disadvantaged group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities, as defined by section 2501(a) of the Foot, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)).

*Id*. at 28,330. The notice goes on to state that this includes "American Indians or Alaskan Natives," "Asians," "Blacks or African Americans," "Native Hawaiians or other Pacific Islanders," and "Hispanics or Latinos." *Id*.

The Department has also issued a "fact sheet" explaining its interpretation of "socially disadvantaged farmer or rancher":

> A socially disadvantaged group is defined as: A farmer or rancher who is a member of one or more of the following groups whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities:
>
> - African Americans
> - American Indians
> - Alaskan Natives
> - Asians
> - Hispanics
> - Pacific Islanders

U.S. Department of Agriculture, *Farming Opportunities Training and Outreach Grant Program*, https://bit.ly/3I4ICmI (last visited on April 26, 2021) (attached as Exhibit 2).

The Department's website goes on to explain that its grants are available to "any Socially Disadvantaged producer who has a qualifying loan." It explains, again, that

this "includes producers who are one or more of the following: Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian, or Pacific Islander." American Rescue Plan Debt Payments, U.S. Department of Agriculture, available at https://bit.ly/3pVowFu (last visited March 11, 2022) (attached as Exhibit 5).

The plaintiffs in this case are farmers and ranchers who held qualifying FSA loans on January 1, 2021. If not for their racial or ethnic backgrounds, they would all otherwise be entitled to benefit from this program.

Plaintiff Greg Macha is a white rancher who resides in Wallis, Texas. Declaration of Greg Macha ¶¶ 3–4 (attached as Exhibit 6). Plaintiff Macha held a qualifying loan on January 1, 2021. *Id.* ¶ 5. Plaintiff James Meek is a white farmer and rancher who resides in Alvord, Texas. Declaration of James Meek ¶¶ 3–4 (attached as Exhibit 7). Plaintiff Meek held a qualifying loan on January 1, 2021. *Id.* ¶ 5. Plaintiff Jeff Peters is a white farmer and rancher who resides in Arlington, Texas. Declaration of Jeff Peters ¶¶ 3–4 (attached as Exhibit 8). Plaintiff Peters held a qualifying loan on January 1, 2021. *Id.* ¶ 5. Plaintiff Lorinda O'Shaughnessy is a white rancher who resides in Placedo, Texas. Declaration of Lorinda O'Shaughnessy ¶¶ 3–4 (attached as Exhibit 9). Plaintiff O'Shaughnessy held a qualifying loan on January 1, 2021. *Id.* ¶ 5.

Plaintiffs Macha, Meek, Peters, and O'Shaughnessy represent two classes. The first class consists of "all farmers and ranchers in the United States who are encountering, or who will encounter, racial discrimination from the United States Department of Agriculture on account of section 1005 of the American Rescue Plan Act." The second class includes "all farmers and ranchers in the United States who are currently excluded from the definition of 'socially disadvantaged farmer or rancher,' as defined in 7 U.S.C. § 2279(a)(5)–(6) and as interpreted by the Department of Agriculture." The Court certified these classes in its order of July 1, 2021 (ECF No. 60).

# ARGUMENT

The plaintiffs are entitled to judgment as a matter of law on the undisputed facts of this case. The Supreme Court has repeatedly held that racial classifications are subject to strict scrutiny, and it is undisputed that the Department of Agriculture is using racial preferences to administer section 1005's loan-forgiveness program. The burden therefore falls on the government to justify its racial classifications by invoking a compelling governmental interest, and to show that its racial classifications are narrowly tailored to advance that compelling governmental interest.

The government has attempted to meet its burden with an expert report from Alicia M. Robb, which describes past episodes of discrimination within the Department of Agriculture's loan program. But even if one were to assume that a desire to remedy these past discriminatory acts qualifies as a "compelling" interest, the blanket loan-forgiveness regime in section 1005—which extends to every minority farmer or rancher regardless of whether they (or members of their race) experienced past discrimination from the Department—is too blunt of a tool to qualify as narrow tailoring. And in all events, Dr. Robb's report provides no evidence (or insufficient evidence) of *intentional* racial discrimination against each of the racial-minority groups that is receiving preference under the Department's interpretation of section 1005. That falls well short of what is needed to justify a regime of remedial racial preferences.

## I. Racial Classifications Are Subject To Strict Scrutiny

Racial classifications are antithetical to the Constitution, as the Supreme Court has repeatedly recognized. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (footnote omitted) ("A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race."); *see also Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (requiring the federal

government to comply with the constitutional prohibition on racial discrimination on the same terms as the states). *All* government-imposed racial classifications are "presumptively invalid"[1] and "inherently suspect,"[2] and they will not be tolerated unless the government proves that a racial classification is "narrowly tailored" and "furthers compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation and internal quotation marks omitted); *see also Adarand*, 515 U.S. at 230. The standard for the means-ends fit is demanding—the government policy "must be narrowly tailored to further" that compelling government interest. *Id.* at 235. "[M]ore than good motives should be required when government seeks to allocate its resources by way of an explicit racial classification system." *Id.* at 226 (citation and internal quotation marks omitted).

## II. THE DEPARTMENT CANNOT MEET ITS BURDEN OF PROVING THAT ITS RACIAL CLASSIFICATIONS ARE "NARROWLY TAILORED" TO ADVANCE A "COMPELLING GOVERNMENTAL INTEREST"

There is no justification for the racial preferences in section 1005 that satisfies the "strict scrutiny" standard. The COVID-19 pandemic has affected farmers, ranchers, and people from all walks of life. It has done so without regard to anyone's race. And even if there were some unique vulnerabilities to infection among certain racial groups, that would have no effect on the economic misfortunes that befall a person's farm or ranch. It is a blatant violation of equal protection to condition government assistance on an individual's race.

The government is not allowed to "prioritize" racial minorities to compensate for past discriminatory actions that have occurred in society generally. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989). *Croson* emphatically rejected the idea that generalized claims of past discrimination can justify a present-day racial preference

---

1. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979).
2. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223 (1995) (citation and internal quotation marks omitted).

in the distribution of government largesse. *See id*. at 499–506; *see also Adarand*, 515 U.S. 200 (extending *Croson*'s holding to the federal government). And although the government's expert claims that the Department of Agriculture's discriminatory program is justified by historical discrimination and statistical disparities, neither of these is enough to justify racial discrimination. And even if it were, the government's programs are not narrowly tailored to address the problem. "This is a very demanding standard, which few programs will survive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

### A. The Government Lacks a Compelling Interest to Justify Racial Discrimination

"Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). A "generalized assertion" of past discrimination across an "entire industry" is not sufficient to justify discrimination in the present. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). Instead, there must be evidence of *intentional* discrimination, which is more than just a statistical disparity. *Croson*, 488 U.S. at 503.

The government has claimed in previous briefing that its discriminatory racial classifications are justified by historical discrimination and statistical disparities affecting minority farmers and ranchers. The government has also provided an expert report that develops these claims in more detail. The government's expert explains that minority farmers and ranchers encountered discrimination in Department of Agriculture loan programs for many years. It also reports the continued existence of disparities between minority and non-minority farms. For purposes of this summary-judgment motion, we assume (without conceding) that the report and other expert materials are factually correct. Whether the government's facts—taken as true, for purposes of

summary judgment—can in fact amount to a compelling government interest is a question of law, suitable for determination on a summary-judgment motion.

Yet neither the history as presented nor the statistics are enough to justify racial discrimination. The Supreme Court has of course recognized that the government has a "compelling" interest in remedying specific racial discrimination—and specifically, intentional discrimination. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 503 (1989); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007) (explaining that "remedying the effects of past intentional discrimination" can be a compelling government interest); *Washington v. Davis*, 426 U.S. 229, 240–41 (1976) (holding that the Equal Protection Clause prohibits only purposeful discrimination, not racial disparity).[3] And the history of discrimination recounted by defendant's expert is troubling and tragic. But generalized assertions and statistical disparities are the principal types of evidence that the government offers. There is statistical data documenting declines of black farms. *See, e.g.*, Expert Report at 40–74. There are also reports documenting failures and shortcomings in the USDA's complaint process in the 1960s. See *id.* at 18–22. There were investigations from 1997 and 2011 suggesting that the USDA neglected its civil-rights complaints and had significant differences in access based on race. *Id.* at 29–36. There was litigation alleging discrimination in the USDA's administration of aid programs. *Id.* at 24–29. More recent reports suggested discrimination in lending to Native Americans and obstacles (including language barriers) for Latino farmers. The government goes on to cite additional studies and Congressional hearings. *See, e.g.*, *id.* at 36–37.

---

3. The Constitution guarantees equal protection against state interference under the Equal Protection Clause of the Fourteenth Amendment and against federal interference via the Due Process Clause of the Fifth Amendment—which is interpreted identically with the Fourteenth Amendment's Equal Protection Clause. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217–18 (1995); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

But the expert report falls short of demonstrating the type of "compelling" interest that the government needs to uphold its remedial racial preferences. The expert report describes some scattered instances of direct and apparently intentional discrimination (drawing all inferences in the defendants' favor). For example, it notes various allegations of hostility toward minority farmers on the part of USDA employees. *See, e.g.*, Expert Report at 24–29. But the expert report then couples that scattered evidence with statistics indicating disparities in access and loan grants, wealth, and debt levels. In other words, it has a small handful of documented instances (at most) of intentional discrimination at various points in the last several decades—and it relies on those to do all of the work of showing intentional wrongdoing on the part of the much larger number of disparate-impact cases embodied in the statistics. *See, e.g.*, Expert Report at 84, 103. This combination of anecdote and statistics does not demonstrate that the existing disparities are the product of *intentional* discrimination. For that, all we have is speculation based on the largely anecdotal evidence of direct and purposeful discrimination. Yet only to the extent that the discrimination is intentional does the government have a compelling remedial interest. Without intentional discrimination, all the government has are generalized assertions of disparities across an entire field. A "generalized assertion" of past discrimination across an "entire industry" is not sufficient justify discrimination in the present. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). It is the *intentional* discrimination, the Supreme Court has made clear, which moves the matter into the realm of a compelling government interest—a statistical disparity, without more, cannot do that. *See Croson*, 488 U.S. at 503.

The government also attempts to create a compelling interest by playing with the level of generality at which government programs are considered. The government's previous briefing and its expert report all rest on the assumption that so long as there was some discrimination somewhere in USDA programs, then that would justify a

remedial racial classification in *this* program. But there is no evidence of intentional discrimination in the USDA's administration of COVID-19 relief programs. All that the government has in the present are some statistical disparities. "Aside from a summary of statistical disparities, the defendants have no evidence of intentional discrimination by the USDA in the implementation of the recent agriculture subsidies and pandemic relief efforts." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 476 (E.D. Wis. 2021). There may well be plenty of other instances of discrimination by the USDA—but the USDA has not shown a connection between any of historical discrimination and the COVID-19 relief program. "An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way." *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021). The government lacks a compelling interest that could justify its discriminating on the basis of race today.

### B. The Government Did Not Narrowly Tailor These Supposedly Remedial Racial Preferences

Even if the government had evidence a compelling remedial interest, its efforts to justify racial discrimination run aground on the issue of tailoring. Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *see also Croson*, 488 U.S. at 507. "[A] court must not uphold a race-conscious policy unless it is 'satisfied that no workable race-neutral alternative' would achieve the compelling interest." *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021), quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

The government has utterly failed to consider race-neutral alternatives, and there is no suggestion that the government thought about race-neutral alternatives to addressing the racial disparities at issue here—which is the racial disparity in accessing COVID-19 relief funds. The government instead muddies the waters by talking about

the years that USDA spent trying various programs to remedy various aspects of discrimination and differential treatment or outcomes. For example, in 2002, Congress created an Assistant Secretary of Civil Rights at USDA to address the problems with the USDA's civil-rights complaint processes. It sought to improve minority representation on county committees handling loan programs in an effort to address disparities in access to USDA loans. The government thinks that the fact that disparities remain shows that race-neutral ways of addressing the problem have failed. But it's conflating all the problems into a single, generalized issue of disparate racial access to USDA programs. It's back to a problem of specificity, running afoul in the process of the Supreme Court's requirements for a compelling government interest. On the other hand, when the government is sufficiently specific in describing the problems, then it becomes obvious that its attempt to use the ARPA agriculture preferences as a solution is not narrowly tailored.

Race-neutral alternatives are not hard to imagine. If the problem is that minority-owned farms struggled to obtain credit during the pandemic, then "government could grant priority consideration to all business owners who were unable to obtain needed capital or credit during the pandemic." *Vitolo v. Guzman*, 999 F.3d 353, 363 (6th Cir. 2021). Or if the problem is that prior programs providing grants or funding disproportionately failed to reach minority farms, then "[t]he government could simply grant priority consideration to all small business owners who have not yet received coronavirus relief funds." *Id*.

Not only has the government failed to properly analyze and consider the possibility of race-neutral alternatives, the government has also failed to provide anything resembling a tight fit between the ends it says it is trying to accomplish (eradicating a variety of racial disparities in farm aid) and the means it is undertaking to accomplish those ends. In other words, the tailoring is anything but precise. "[A] policy is not

narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications." *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021) (citing *Croson*, 488 U.S. at 507–08, and *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003)).

The congressional discussions cited by the government's expert shows that the proponents of this race-based relief saw it as a response to "systemic discrimination." It was not singling out particularized instances of discrimination. It was instead a project that lumped together evidence of distinct kinds of problems and attempted to provide a single remedy through a broad program that had little to do with those specific problems. This USDA program is a blunt instrument for dealing with the complex and varied historical problems described in the government's expert report.

For instance, most of the government's evidence is about black farmers. *See, e.g.*, Expert Report at 22–23, citing U.S. Commission on Civil Rights (USCCR), The Decline of Black Farming in America (1982) (1982 Rep.). What does this evidence have to do with the program's preference for Asian-Americans? Some reports cited by the government suggested that blacks, Hispanics, and Asians were subject to discrimination in their applications for FSA loans. *See* Expert Report at 36–37. What does this have to do with the preferences for American Indians or Alaskan Natives? Problems also varied by locale. In discussing racial disparities in participation and delays in loan approval in various FSA programs, for example, the expert noted that "the variances in regional and state statistics showed no consistent picture," even while "some states showed very wide disparities for approval rates and processing times between minorities and non-minorities." Expert Report at 30.

Lumping together distinct groups with distinct histories is a textbook example of imprecise tailoring. In *Croson*, the Supreme Court faulted the affirmative-action program for covering Aleut or Eskimo citizens without any reason to think that they had encountered the same discrimination that was invoked to justify the rest of the program. 488 U.S. at 506. The USDA's program in the present case has a similar flaw. It

justifies its existence on the basis of an assortment of distinct pieces of evidence—historical and anecdotal instances of discrimination (with regional variations at that), along with more recent statistical disparities. But different pieces of evidence show that distinct groups suffered in different ways. And yet the program does not make the slightest effort to tailor its purportedly remedial programs to the different groups' experiences.

The flat exclusion of white farmers and ranchers from an entire program is also disproportionate to the objective. One could easily imagine less extreme ways of trying to remedy historical discrimination—for instance, prioritizing outreach to minority communities that had been affected, expediting the processing and approval of applications from communities that had suffered unfair delays in the past. But given that individual applications have to be made to the Department anyway, this court could ask the government the same question that the Supreme Court asked of the affirmative-action program it disapproved in *Croson*: "Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience." *Croson*, 488 U.S. at 508. A system that has individualized applications but still treats them with broad, quota-style rules, the Court held, could not be narrowly tailored. *Id*. Likewise with the Department of Agriculture's broad-brush interpretation of "socially disadvantaged" groups as consisting of certain racial groups and not others.

One could imagine many kinds of programs to deal with the problems raised in the government's brief. If the problem is ongoing discrimination in the USDA's civil-rights complaint procedures, then it needs to address the complaint procedures. If the problem is access and approval for loans, then it needs to address that process. And so on. "The obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to

stop: it is not to direct it to intentionally discriminate against others on the basis of their race and national origin." *Faust*, 519 S. Supp. 3d at 476.

## CONCLUSION

The plaintiffs' motion for summary judgment should be granted.

Respectfully submitted.

/s/ Jonathan F. Mitchell

<table>
<tr><td>

Gene P. Hamilton
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: March 11, 2022

</td><td>

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and Certified Classes*

</td></tr>
</table>

## CERTIFICATE OF SERVICE

  I certify that on March 11, 2022, I served this document through CM/ECF upon:

MICHAEL F. KNAPP
KYLA M. SNOW
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 305-8356 (phone)
(202) 616-8460 (fax)
michael.f.knapp@usdoj.gov
kyla.snow@usdoj.gov

*Counsel for Defendants*

                /s/ Jonathan F. Mitchell
                JONATHAN F. MITCHELL
                *Counsel for Plaintiffs and*
                *the Proposed Class*