# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| SID MILLER, on behalf of himself and others similarly situated, et al., | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 4:21-cv-00595-O |
| TOM VILSACK**,** in his official capacity as SECRETARY OF AGRICULTURE, | |
| *Defendant,* | |
| FEDERATION OF SOUTHERN COOPERATIVES/LAND ASSISTANCE FUND; NATIONAL BLACK FARMERS ASSOCIATION (NBFA); and ASSOCIATION OF AMERICAN INDIAN FARMERS (AAIF), | |
| *Intervenor-Defendants.* | |

## THE NATIONAL BLACK FARMERS ASSOCIATION'S AND THE ASSOCIATION OF AMERICAN INDIAN FARMERS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

I.    **Background and Introduction.** ..................................................................... 1

II.   **Argument.** .......................................................................................................... 4

   A.  *When a law is unconstitutionally discriminatory, the remedy is dictated by the legislature's objective; the Court may sometimes conclude Congress would want a law expanded rather than stricken, but nullification is more appropriate here.* ........... 4

   B.  *Congress would have wanted Section 1005 stricken.* ........................................ 8

     i. *Congress passed Section 1005 to undo the burdens USDA imposed on socially disadvantaged farmers and ranchers as compared to their peers.* .................................. 8

    ii. *Expanding the law would only worsen socially disadvantaged farmers' and ranchers' disadvantages.* ............................................................ 10

III.   **Conclusion.** ................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Black United Fund of N.J., Inc. v. Kean*,
   763 F.2d 156 (3d Cir. 1985)................................................................................6

*Bowsher v. Merck & Co.*,
   460 U.S. 824 (1983)........................................................................................9

*Califano v. Goldfarb*,
   430 U.S. 199 (1977)........................................................................................6

*Califano v. Westcott*,
   443 U.S. 76 (1979)..........................................................................................5

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*,
   6 F.3d 990 (3d Cir. 1993)................................................................................2

*Dickerson v. Bailey*,
   336 F.3d 388 (5th Cir. 2003) .......................................................................5, 7

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
   122 F.3d 895 (11th Cir. 1997) ........................................................................2

*Ensley Branch, NAACP v. Seibels*,
   31 F.3d 1548 (11th Cir. 1994) ........................................................................2

*Eubanks v. Wilkinson*,
   937 F.2d 1118 (6th Cir. 1991) .......................................................................6

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)........................................................................................6

*Heckler v. Mathews*,
   465 U.S. 728 (1984)..................................................................................4, 5, 6

*In re Black Farmers Discrimination Litig.*,
   856 F. Supp. 2d 1 (D.D.C. 2011)..................................................................11

*Kossman Cont., Co. v. City of Houston*,
   2016 WL 11473826 (S.D. Tex. Feb. 17, 2016) .............................................2

*Levin v. Com. Energy, Inc.*,
   560 U.S. 413 (2010)........................................................................................5

*Majeske v. City of Chicago*,
   218 F.3d 816 (7th Cir. 2000) .........................................................................2

*N. Haven Bd. Of Educ. v. Bell*,
   456 U.S. 512 (1982)........................................................................................9

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
   615 F.3d 412 (5th Cir. 2010) .........................................................................13

*Quiban v. Veterans Admin.*,
   928 F.2d 1154 (D.C. Cir. 1991) ......................................................................6

*Rogers v. Bellei*,
   401 U.S. 815 (1971) ........................................................................................7

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017) ..........................................................................4, 5, 6, 7

*Tex. Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) ..........................................................................7

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ........................................................................................6

*United States v. Booker*,
   543 U.S. 220 (2005).........................................................................................5

*United States v. Paradise*,
   480 U.S. 149 (1987) ........................................................................................3

*Villegas-Sarabia v. Sessions*,
   874 F.3d 871 (5th Cir. 2017) .......................................................................4, 5

*W.H. Scott Const. Co. v. City of Jackson*,
   199 F.3d 206 (5th Cir. 1999) ..........................................................................2

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015).........................................................................................3

*Wynn v. Vilsack*,
   545 F. Supp. 3d 1271 (M.D. Fla. 2021)..........................................................4

**STATUTES**

Pub. L. No. 117-2, § 1005, 135 Stat. 4 (2021)................................................................2

**OTHER AUTHORITIES**

*A Hearing to Review the State of Black Farmers in the U.S. Before the H. Comm. on Agric.*, 117th Cong. (2021) ..................................................................................................1, 15

Emma Lietz Bilecky, *Assessing the Impacts of USDA Civil Rights Settlements:* Pigford *in Advocacy & Context* (2019)............................................................................................1, 2

167 Cong. Rec. S1217 (daily ed. Mar. 5, 2021) ......................................................9, 10

Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. (2021).......................9

H.R. Rep. No. 117-7 (2021)..................................................................................8, 9, 14

Justice for Black Farmers Act of 2021, S. 300, 117th Cong. (2021).............................................9

Adewale A. Maye, Econ. Pol'y Inst., *The Myth of Race-Neutral Policy* (2022)....................15, 16

USDA Nat'l Agric. Stat. Serv., *2017 Census of Agriculture Highlights: Farms and Farmland* (2019)..........................................................................................................14, 15

## I.   Background and Introduction.

Intervenors NBFA and AAIF detailed for this Court and Congress how USDA's farm loan programs are infected with discrimination. *E.g.*, NBFA & AAIF Amicus Br. 5-6, ECF No. 177 (citing *A Hearing to Review the State of Black Farmers in the U.S. Before the H. Comm. on Agric.*, 117th Cong. 13-18 (2021), App. at 8-13 (Statement of Dr. John Boyd, President and Founder, NBFA)). Dr. Boyd—an African American—testified in this case that when he first sought USDA loans in the 1980s, USDA officials subjected him to "racial slurs" and limited his access to their offices, encumbering his ability to build his farm. Boyd Decl., ECF No. 29-1 ¶ 9. NBFA member Ivan Isidore Williams—also an African American—testified that between 2000 and 2021 he sought assistance to upgrade his farm and USDA told him he was ineligible, when "white farmers in [his] area ha[d] routinely" accessed those funds and thereby farm more efficiently. Williams Decl., ECF No. 29-3 ¶ 8.

NBFA and AAIF further documented that race-neutral programs have proven unable to counteract the disparities USDA created. USDA's discrimination against socially disadvantaged farmers and ranchers results in disparities in farm operations, such as farmers of color having smaller scales of production. Def.'s Br. Supp. Mot. Summ. J., ECF No. 168, at 8. Thus, when programs are designed to be purportedly race-neutral, such as linking benefits to production, socially disadvantaged farmers and ranchers are deprived. *E.g.*, *id.*; *see also* NBFA & AAIF Amicus Br., ECF No. 177, at 16. The racism still ingrained in USDA also distorts how it administers purportedly neutral programs, so the benefits USDA distributes do not reach all farmers and ranchers. In fact, legal settlements meant to remedy instances of racial bias have been so poorly administered by the government that NBFA and AAIF continue to receive inquiries from potentially qualifying individuals, who missed their chance to recover as they are only now

learning of the opportunity. *E.g.*, ECF No. 177, at 17-18 (citing Emma Lietz Bilecky, *Assessing the Impacts of USDA Civil Rights Settlements:* Pigford *in Advocacy & Context* 21 (2019) (Master's Project, Duke University), App. at 34 (describing problems with settlement's administration)).

To correct the financial instability USDA created among farmers and ranchers subjected to the agency's discrimination, and thereby level the playing field in the agriculture industry, Congress passed Section 1005 of the American Rescue Plan Act. It requires USDA to forgive certain loans to "socially disadvantaged farmers and ranchers." Pub. L. No. 117-2, § 1005, 135 Stat. 4, 12-13 (2021). Plaintiffs challenge this law as violating equal protection, as applied to the Federal government under the Due Process Clause of the Fifth Amendment. Third Am. Compl., ECF No. 135, ¶¶ 20-23. Defendant conceded for purposes of this litigation that Section 1005 is a race-based statute subject to strict scrutiny. *E.g.*, ECF No. 168, at 5.

Nonetheless, "[a]necdotal evidence" like that NBFA and AAIF provided to Congress and this Court, "especially if buttressed by relevant statistical evidence" of discrimination that Defendant and Intervenor the Federation of Southern Cooperatives ("the Federation") has and will produce, establishes that such a race-based solution is warranted. *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 907 (11th Cir. 1997) (quoting *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1565 (11th Cir. 1994)); *see also Majeske v. City of Chicago*, 218 F.3d 816, 822 (7th Cir. 2000); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003 (3d Cir. 1993); *Kossman Cont., Co. v. City of Houston*, 2016 WL 11473826, at *21 (S.D. Tex. Feb. 17, 2016). "[C]ombating racial discrimination is a compelling government interest," and anecdotes and statistics are sufficient to prove discrimination exists and a race-conscious law is needed to counteract the race-based ill. *W.H. Scott Const. Co. v. City of Jackson*, 199 F.3d 206, 217-18 (5th Cir. 1999). Anecdotes and data can also establish that a law is properly

tailored, particularly if a program is a one-time emergency benefit rather than an ongoing preference—and thus current experiences are especially relevant. Indeed, in analyzing tailoring, the Court must consider "the efficacy of alternative remedies," *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion), and the conditions on the ground, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449-50 (2015) (considering the realities of campaign fundraising). The government can correct what this record shows is a "pressing concern[]" stemming from discrimination, even if it does "not address all aspects of a problem in one fell swoop." *Williams-Yulee*, 575 U.S. at 449. NBFA and AAIF therefore detailed to this Court how race-neutral programs repeatedly failed to address the financial disparity suffered by their members, necessitating Congress's approach in Section 1005. *See* ECF No. 177, at 15-17.

To avoid burdening the Court, NBFA and AAIF do not further repeat those arguments here but incorporate them by reference. *See*, *e.g.*, ECF No. 168; ECF No. 177. The arguments in Defendant's and the Federation's summary judgment briefs and NBFA and AAIF's amicus brief demonstrate that Plaintiffs' challenge should fail. Section 1005 is justified under the Constitution. It should be allowed to take effect and provide loan forgiveness to socially disadvantaged farmers and ranchers.

NBFA and AAIF submit this brief to demonstrate that should this Court disagree, both Plaintiffs and Defendant err regarding the proper remedy. Both Plaintiffs and Defendant claim that if Section 1005 is unconstitutional, the Court should expand the benefits it authorizes, ordering the government to forgive the qualifying loans of *all* farmers and ranchers, regardless of the history of discrimination. ECF No. 168, at 35; Pls.' Third Am. Compl. ECF No. 135, ¶ 32(d) (Plaintiffs requesting the Court issue an injunction preventing "any racial exclusions"). The government explains that this would turn a $4 billion program into a $40 billion one. ECF No. 168, at 37. Put

another way, Plaintiffs and Defendant ask the Court to rewrite a law meant to correct the biased distribution of government resources, so that the law gives out the money in a biased ratio. They ask the Court to reinforce existing disparities. As a result, Plaintiffs' and Defendant's remedy will further drive socially disadvantaged farmers and ranchers from agriculture. It would allow newly enriched farmers and ranchers who (due to USDA's discrimination) are better situated than their socially disadvantaged peers to either increase their competitive advantages or buy out socially disadvantaged farms. Congress passed Section 1005 to level the agriculture industry. Plaintiffs' and Defendant's remedy would effectuate the exact opposite. Thus, the proposed remedy is unlawful.

To be clear, the outcome here should be for socially disadvantaged farmers and ranchers to receive the benefits Congress directed and thereby begin to undo the "discrimination that permeates USDA programs" and has shaped our agricultural system. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1278-79 (M.D. Fla. 2021) (addressing Section 1005). However, if the Court will not allow that to occur, at the least it should not build on and worsen USDA's discriminatory legacy. Unfortunately, if the Court holds Section 1005 unconstitutional, this means the only available remedy is to declare Section 1005 null and void. *Villegas-Sarabia v. Sessions*, 874 F.3d 871, 883 (5th Cir. 2017).

## II.   Argument.

### A. *When a law is unconstitutionally discriminatory, the remedy is dictated by the legislature's objective; the Court may sometimes conclude Congress would want a law expanded rather than stricken, but nullification is more appropriate here.*

"'When the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.'" *Sessions v. Morales-Santana*, 137

S. Ct. 1678, 1698 (2017) (cleaned up) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)); *see also* ECF No. 168, at 35 (Defendant relying on same standard). That is, when an "equal protection infirmity" is established, there are two possible remedies: "a court may either declare the statute a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." *Morales-Santana*, 137 S. Ct. at 1698 (cleaned up) (quoting *Califano v. Westcott*, 443 U.S. 76, 89 (1979)). The court can strike down the law or expand the eligible groups so the law complies with equal protection. However, those are the "only two [] options." *Villegas-Sarabia*, 874 F.3d at 883.

"The choice between these outcomes is governed by the legislature's intent[.]" *Morales-Santana*, 137 S. Ct. at 1699. A court must determine "what the legislature would have willed had it been apprised of the constitutional infirmity." *Id.* (quoting *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 427 (2010)); *see also* ECF No. 168, at 35 (Defendant relying on same standard).

In making that determination, the court looks to "the Act's language, history, and basic purposes." *United States v. Booker*, 543 U.S. 220, 248 (2005) (striking down an unconstitutional provision to remedy constitutional infirmity). Consistent with the last consideration, where, as here, a statute impacts competition, the Fifth Circuit has also considered the impacts of the remedy on the "marketplace." *Dickerson v. Bailey*, 336 F.3d 388, 408 (5th Cir. 2003).

In its original summary judgment brief, Defendant suggested its proposed remedy gets special deference because expanding the program was "ordinarily" the result in prior cases, ECF No. 168, at 35; but this ignores more recent authority, and the Congressional intent underlying Section 1005 that unquestionably governs here. Recent Supreme Court precedent explains that when, as in this case, "the discriminatory exception consists of *favorable* treatment for a discrete

group … striking the discriminatory exception" is the right course. *Morales-Santana*, 137 S. Ct. at 1699 (emphasis in original). This is because the touchstone in selecting a remedy is what would best effectuate the legislature's goal. As "the potential for 'disruption of the statutory scheme' is large" if a court were to provide benefits to those Congress purposefully excluded from a program, there is reason to assume the legislature would have preferred the benefit removed entirely. *Id.* at 1700 (quoting *Heckler*, 465 U.S. at 739 n.5). The outcome of the prior cases is irrelevant. Each law must be evaluated based on Congress's objectives. And with laws like Section 1005, there are reasons to doubt extension is appropriate.

Indeed, far from establishing a presumption in favor of extension, Defendant's cases authorized extension solely because the evidence produced regarding that law supported that outcome. *Califano v. Goldfarb*, 430 U.S. 199, 216 (1977) (Defendant's authority, extending benefits because "there was simply no indication of an intention to create [the] differential treatment" present in the statute); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-38 (1973) (Defendant's authority, extending benefits as that was the only "rational" way to address Congress's concerns in passing the statute); *Frontiero v. Richardson*, 411 U.S. 677, 689, 691 n.25 (1973) (Defendant's authority, similar).

Consistent with this, the D.C. Circuit has held any extension of benefits must be based on the particular legislative objectives, not any generalized presumption. *Quiban v. Veterans Admin.*, 928 F.2d 1154, 1163 (D.C. Cir. 1991). Likewise, the Sixth Circuit explained that the ability to extend benefits should be treated as "[a] narrow exception to the rule that a court will not redraft a statute to create constitutionality" and is only allowed where it is "more consistent with Congressional intent than nullification." *Eubanks v. Wilkinson*, 937 F.2d 1118, 1123 (6th Cir. 1991); *see also Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir. 1985) (similar).

It follows, therefore, that in *Morales-Santana*, when the Supreme Court held unlawful a shorter residency requirement to acquire citizenship for children born to unwed citizen mothers as opposed to unwed citizen fathers, it "extend[ed] the general rule of longer-physical presence" to both groups. 137 S. Ct. at 1699. Congress "recogni[zed] . . . 'the importance of'" a specific predicate for the benefit, and the Court could not award the same benefits to those not having the predicate without acting as a legislature rather than a judiciary. *Id.* at 1700 (quoting *Rogers v. Bellei*, 401 U.S. 815, 834 (1971)).

Like in *Morales-Santana*, the Fifth Circuit has recognized that while courts should avoid remedies that "equaliz[e] *burdens*," this does not authorize courts to "extend[] *benefits*" that were meant for a particular class. *Dickerson*, 336 F.3d at 407. Rewriting a law to provide greater benefits to all, instead of the isolated group on which the legislature focused, risks courts "assum[ing] the mantle of super legislature." *Id.* at 408. Rather than usurp the legislature's power, where a remedy would greatly expand a statute's reach, courts "should enforce the constitutional right only by nullifying, or enjoining the enforcement of, the offending statutes." *Id.* at 409 (emphasis removed); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 417 (5th Cir. 2020) (Ho, J., concurring) (explaining where the legislature has created an "exception" from standard practices that provides for greater flexibility, the proper relief is the "leveling down" injunction that eliminates the benefits).

In sum, Defendant is wrong to suggest there is a thumb on the scale in favor of expanding a law rather than striking it down. If anything, where Congress created a program to aid a specific group, *e.g.*, socially disadvantaged farmers and ranchers, courts should start from the presumption that if the law is unconstitutional, it should be struck down. Regardless, in the end, legislative

intent controls. As discussed below, the only plausible conclusion in this case is that Congress would have wanted Section 1005 enjoined rather than expanded.

### B.  Congress would have wanted Section 1005 stricken.

Congress passed Section 1005 to undo the competitive disadvantages caused by USDA's discrimination. As Defendant's expert put it, "§ 1005 signals that the agency intends to help minority farmers recover from the financial effects of past discrimination" so that they can "graduate" by growing their business and no longer requiring government assistance. Cobb. Decl., ECF No. 168-1, ¶ 86.[1] To extend Section 1005's benefits to all farmers and ranchers would, by definition, undermine Congress's aim. Rather than give socially disadvantaged farmers and ranchers a special boost they both need and warrant, it would align the payouts with the existing biased distribution of resources. Thus, it would actively harm socially disadvantaged farmers and ranchers. Because their peers are better situated to take advantage of the capital and more of them would be receiving funds, non-socially disadvantaged farmers and ranchers could use the distribution to further gain market share. Accordingly, should the Court hold Section 1005 unconstitutional, it cannot expand the law. Thus, it must strike it down.

       *i.*    *Congress passed Section 1005 to undo the burdens USDA imposed on socially disadvantaged farmers and ranchers as compared to their peers.*

Section 1005 was enacted to recognize and remedy USDA's discriminatory practices that have held socially disadvantaged farmers and ranchers back, by enabling them to more fairly compete with their peers in the farm economy. The House Report on the American Rescue Plan Act, the only congressional report on the Act, explained that while governmental support is "crucial" for all "agricultural producers," "Black farmers and other agricultural producers

---

[1] Defendant submitted two declarations with its initial summary judgment brief. It has represented to the parties that it intends to rely on those same declarations in this second round of briefing.

belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination." H.R. Rep. No. 117-7, at 12 (2021), App. at 63. Indeed, "USDA farm loan and payment programs continue to disproportionately benefit farmers who are not racial or ethnic minorities." *Id.* Thus, the House endorsed Section 1005 to "develop[]" minority farmers, increase their "land acquisition," and enhance their "access to credit," among other benefits. *Id.* at 12-13, App. at 63-64. Section 1005 is an acknowledgment that USDA's discriminatory practices impede socially disadvantaged farmers' and ranchers' development as compared to others, and an infusion of capital is necessary to help them catch up.

Although the Senate did not produce a report, its legislative history is similar. Section 1005 parallels text introduced by Senators Booker and Warnock earlier in the same year Section 1005 was passed. *See* Justice for Black Farmers Act of 2021, S. 300, 117th Cong. § 403(d) (2021), App. at 119-20; Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. § 4 (2021), App. at 155-57. Thus, their understanding of Section 1005 is particularly weighty. *See, e.g.*, *Bowsher v. Merck & Co.*, 460 U.S. 824, 832 (1983) (where there is no report, the "explanation of the sponsor of the language, is an 'authoritative guide to the statute's construction'" (quoting *N. Haven Bd. Of Educ. v. Bell*, 456 U.S. 512, 527 (1982))). Senator Booker explained, "the debt forgiveness and other assistance in the bill we are considering … can begin to turn the page" on USDA's "shameful history of discrimination" that has led the Black farmer population to decline from "nearly 15 percent of all farmers in our country" to "less than 2 percent," caused "Black farmers [to] have lost between 15 and 20 million acres of land and the hundreds of billions of dollars of general wealth that land represented," and led Black, Hispanic, Asian-American and Indigenous farmers to face rates of default 2 to 3 times the national average. 167 Cong. Rec. S1217,

9

S1265-66 (daily ed. Mar. 5, 2021), App. at 171-72. Senator Warnock explained the goal of Section 1005 was to "lift all of our rural communities" by undoing "disparities rooted in our racial past" that had left "farmers of color … to fend for themselves" where others have gotten "the support they deserve from the USDA." *Id.* at S1241, App. at 167. The Senators explained USDA's racism leads to systemic inequities and Section 1005 was meant to help undo those disparities in farming.

While less authoritative, other Senators' statements are consistent with those of Senators Booker and Warnock. Senator Stabenow, the Chair of the Senate Agriculture Committee, spoke in favor of Section 1005 because "[f]or Black, Native American, Hispanic and Latinx, and Asian American farm families, their experience in the agricultural economy is markedly different than their White counterparts." *Id.* at S1262, App. at 168. In particular, the government has failed to remedy USDA's "longstanding systemic discrimination" and this has led to "the historic loss of farmland owned and operated by farmers of color." *Id.* Section 1005 sought to "undo" these competitive disadvantages. *Id.* at S1264, App. at 170. Senator Toomey, who opposed the provision, described it as an attempt at "reparations." *Id.* at S1240-41, App. at 166-67.

Congress passed Section 1005 because USDA had acted unlawfully and thereby distorted the agricultural economy based on race. USDA kept socially disadvantaged farmers and ranchers from developing their businesses, either driving them from the field or undermining their ability to compete. Section 1005 sought to compensate farmers of color for the indignities and also to rebalance the marketplace discrimination produced.

  *ii.*   *Expanding the law would only worsen socially disadvantaged farmers' and ranchers' disadvantages.*

The undisputed record confirms Congress's understanding that socially disadvantaged farmers and ranchers are vulnerable compared to their white peers, who are by far the majority of

farmers and ranchers.[2] Accordingly, extending the benefits of Section 1005 to all farmers and ranchers—as Plaintiffs and Defendant request—would not impact farmers equally. At best, it would maintain the biased structures Section 1005 sought to undo. In actuality, it would further distort the agriculture system, as non-socially disadvantaged farmers are situated to receive more funds and invest them to increase their market share. Either way, that is not what Congress intended.

Indeed, the record fully supports Congress's rationale for passing Section 1005: USDA's discrimination has reduced the competitiveness of socially disadvantaged farmers and ranchers. According to Defendant's expert Dr. Robb, among the "lingering effects of past discrimination against minority farmers" are, ECF No. 168-2, at 40: (i) "minority farms are [] smaller on average, in terms of both acreage and revenue, when compared with white farms," *id.* at 55; (ii) "minority farmers tend to generate less income as compared to white farmers" when looking at products sold, *id.* at 66; and (iii) "minority farmers have lower net worth overall," *id.* at 72; *accord In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 8 (D.D.C. 2011) (stating USDA's discrimination "deprived countless farmers of desperately needed credit and payments under various aid programs, with the result that many farmers suffered severe financial losses").

Specifically regarding farm size and production, Dr. Robb states that "white farms are between 129% and 336% larger than Asian farms in the top five states where Asian principal producers are most heavily concentrated; and they are between 103% and 347% larger than Black farms in the five states where Black principal producers are most heavily concentrated." ECF No. 168-2, at 64. Moreover, with the exception of American Indians and Alaskan Natives, "minority

---

[2] Plaintiffs declined to produce expert reports to counter the reports of Defendant and the Federation, discussed below.

groups have a much smaller share of the large farms (500 acres or more) compared with their share of farms overall." *Id.* at 59. "Even in states with the highest percentage of minority farmers, minority farms tend to be smaller—and in some cases significantly smaller—on average than white farms." *Id.* at 64. Further, American Indians and Alaskan Natives only appear to be a positive outlier. Much of their land is "dedicated to pasture," not to maximizing production. *Id.* at 59-60. "[E]ven on reservations, where the majority of farm acreage belongs to American Indian farmers, white farms account for a highly disproportionate share of agricultural products sold." *Id.* at 60.

Regarding socially disadvantaged farmers' income, "[i]n terms of the market value of agricultural products sold, white farms produced the vast majority, or 97.7%, of the market value of agriculture products sold." *Id.* at 66 (emphasis removed). "The share of market value of production by all of the minority groups except Asians was less than their corresponding share of farms." *Id.* And once again, the positive outlier is an illusion. A "relatively small number of Asian farms" outperform and "thus skew the data." *Id.* at 68.

"As one would expect" with this background, socially disadvantaged farmers and ranchers "have lower mean and median levels of net worth, acreage, value of production, … farm assets, and debt-to-asset ratio, as well as lower average and median household income and non-farm assets" than non-Hispanic white farmers. *Id.* at 72 (citation omitted). In the words of Defendant's other expert, William Cobb, on effectively every metric, socially disadvantaged farmers and ranchers do not have and cannot generate the same "generational wealth" as compared to farm groups that have not experienced USDA's discrimination. ECF No. 168-1 ¶ 10(d). This inhibits their ability to pay bills and maintain their operations as compared to their non-socially disadvantaged peers. *See id.* ¶ 53 (providing details).

The Federation's expert establishes recent events only increased socially disadvantaged farmers' and ranchers' vulnerability. Two programs meant to offset recent, special financial hardships faced by farmers and ranchers went disproportionally to non-socially disadvantaged ones. All but 0.2% of the 2018 Market Facilitation Plan meant to aid "farmers affected by the Chinese government's retaliatory tariffs on farm commodities … went to white farmers." Expert Report submitted by the Federation of Dr. Adrienne M. Petty, 21-22, App. at 194-95. The disparities could not be attributed to need. "In Mississippi, for example, where 38 percent of the population is black and 14 percent of farms have a black principal operator, according to the 2017 Census of Agriculture, only 1.4 percent of the $200 million distributed to farmers through the [program] went to black operators." *Id.* at 22, App. at 195.

Likewise, socially disadvantaged farmers and ranchers only received 0.1% of the $9.5 billion that went to agriculture and food producers under the 2020 Coronavirus Aid, Relief, and Economic Security Act. *Id.* "Of the roughly $26 billion under the Coronavirus Food Assistance Program, $20.8 million went to Black farmers." *Id.*; *see also* ECF No. 168-1 ¶ 59 (Defendant's expert describing these programs similarly). As Defendant put it, even without the long history of discrimination and its consequences, the distribution of recent relief creates unique "urgen[cy]" among socially disadvantaged farmers and ranchers for funds. ECF No. 168, at 17.

In light of this record, basic economics establishes that expanding Section 1005 to forgive all qualifying loans would undermine Congress's goal of raising up socially disadvantaged farmers and ranchers in relation to their white peers to enable to them to compete. *E.g.*, *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 421 (5th Cir. 2010) (relying on "[e]conomic logic" to reject an argument). Section 1005 is meant "towards leveling the playing field." ECF No. 168-2, at 5 (Defendant's expert). But one does not level by inflating both sides. While there might be

13

individual variance, by distributing funds to all, in general, the same disparities will remain. Put another way, uniformly distributing resources into a biased system merely creates the façade of action, but perpetuates the existing, systemic disadvantages.

In fact, redrafting Section 1005 to pay off all loans could be far more nefarious than simply failing to achieve Congress's goal—although the Court need go no further to reject Plaintiffs' and Defendant's proposed remedy. Plaintiffs and Defendant request a massive influx of wealth to farmers who have not had to fight against the burdens of discrimination, which can only *worsen* the existing (unlawful) disparities. As noted above, Defendant estimates that expanding the program will result in a ten-fold increase in its costs. ECF No. 168, at 37; *see also* H.R. Rep. No. 117-7, at 31-32, App. at 66-67 (estimating original expect cost of Section 1005). Because, presently, "[f]arming in the United States … is predominantly and disproportionately the occupation of whites," Plaintiffs and Defendants are thus asking $36 billion to flow almost exclusively to white farmers, whereas only $4 billion would go to socially disadvantaged farmers and ranchers. ECF No. 168-2, at 59 (Defendant's expert).

Non-socially disadvantaged farmers and ranchers could then leverage their increased resources to take advantage of their pre-existing position vis-à-vis socially disadvantaged farmers. Defendant's expert Dr. Cobb explains that if the payouts went to socially disadvantaged farmers and ranchers that would "free[] up funds for expansion," "increase equity position," and establish balance sheets that allow access to other credit. ECF No. 168-1 ¶ 85. It follows, the same would be true of the other farmers who would receive funds under a rewritten Section 1005.

Because non-socially disadvantaged farmers start from a point of greater generational wealth, they will be more able to turn these windfalls into means to obtain ever-dwindling land—furthering their production advantages—or to buy out socially disadvantaged farmers and

ranchers. *See* USDA Nat'l Agric. Stat. Serv., *2017 Census of Agriculture Highlights: Farms and Farmland* (2019), App. at 221-22 (documenting the steady decrease in acres of farmland). Non-socially disadvantaged farmers and ranchers do not need to make the same investments into their operations and accounts as farmers of color, and thus can spend the influx more freely. Because socially disadvantaged farmers are less profitable, they will also be more likely to sell to their peers. The big will only get bigger.

Even if it did not lead to a land grab, forgiving all loans would further distort competition. Due to the history of discrimination, socially disadvantaged farmers and ranchers are operating on a shoestring, without the "economies of scale" available to those able to grow through complete access to government programs. ECF No. 168-2, at 83 (Defendant's expert). Moreover, larger farms, predominantly owned by non-socially disadvantaged farmers and ranchers already have greater access to government programs designed to "favor large farms" and "private credit." *Id.* at 88-89, 99. Thus, again, if all qualifying loans are forgiven, by and large non-socially disadvantaged farmers can immediately maximize the competitive benefits of the income, while socially disadvantaged farmers and ranchers would first need to catch up. This will widen existing divides.

Lest there be any doubt, this is precisely the experience of NBFA and AAIF with prior purportedly race-neutral programs. *E.g.*, ECF No. 177, at 16-17. As both the Federation's expert documents and Dr. Boyd explained regarding the recent agriculture relief packages, "rather than right these historic wrongs, [neutral] Government programs have largely perpetuated systemic racism." *A Hearing to Review the State of Black Farmers in the U.S. Before the H. Comm. on Agric.*, 117th Cong. 17 (2021), App. at 12 (Statement of Dr. John Boyd, President and Founder, NBFA). These anecdotes and data are underscored by the work of independent economists, as recently outlined by the Economic Policy Institute. *See generally* Adewale A. Maye, Econ. Pol'y

Inst., *The Myth of Race-Neutral Policy* (2022), App. at 223-230 ("Race-neutral policies ... fail to reverse the gaps and barriers that exist because of structural racism.").

In sum, Section 1005 responds to real disparities among farmers and ranchers. Therefore, the Court cannot carry out Congress's goal in enacting Section 1005, to empower socially disadvantaged farmers and ranchers by forgiving the loans of all farmers and ranchers. That would only build on the existing differences. Indeed, as non-socially disadvantaged farmers and ranchers would benefit from this change significantly more than their socially disadvantaged peers, the further biased distribution of wealth could drive socially disadvantaged farmers and ranchers from their land. Expanding the program is anathema to what motivated Congress to enact Section 1005.

## III.    Conclusion.

For the forgoing reasons, including those incorporated by reference, the Court should grant summary judgment for Defendant and Intervenors, holding Section 1005 constitutional. If it determines otherwise, however, it should strike down the provision. Expanding the program as Plaintiffs and Defendant request is contrary to Congress's wishes to uplift socially disadvantaged farmers and ranchers. Regrettably, the only other option is to hold the program unenforceable.


Dated: July 18, 2022                         Respectfully submitted,

                                             PUBLIC JUSTICE, P.C.
                                             /s/ David Muraskin
                                             David Muraskin*
                                             Jessica Culpepper*
                                             1620 L Street NW, Suite 630
                                             Washington, D.C. 20036
                                             (202) 797-8600
                                             dmuraskin@publicjustice.net
                                             jculpepper@publicjustice.net

                                             HENDLER FLORES LAW, PLLC
                                             Scott M. Hendler

Texas Bar No. 09445500
901 S. MoPac Expy, Bldg. 1, Suite #300
Austin, TX 78746
Telephone: (512) 439-3200
Facsimile: (512) 439-3201
shendler@hendlerlaw.com

*Counsel for the National Black Farmers
Association and the Association of American
Indian Farmers*

\* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed via the court's CM/ECF system on July 18, 2022, which will serve all counsel of record.

Dated: July 18, 2022

Respectfully submitted,

PUBLIC JUSTICE, P.C.
/s/ David Muraskin
David Muraskin*
1620 L Street NW, Suite 630
Washington, D.C. 20036
(202) 797-8600
dmuraskin@publicjustice.net

* Admitted *Pro Hac Vice*

18