**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| SID MILLER, on behalf of himself and others similarly situated, et al., | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 4:21-cv-00595-O |
| TOM VILSACK**,** in his official capacity as SECRETARY OF AGRICULTURE, | |
| *Defendant,* | |
| FEDERATION OF SOUTHERN COOPERATIVES/LAND ASSISTANCE FUND; NATIONAL BLACK FARMERS ASSOCIATION (NBFA); and ASSOCIATION OF AMERICAN INDIAN FARMERS (AAIF), | |
| *Intervenor-Defendants.* | |

**APPENDIX TO BRIEF IN SUPPORT OF**
**THE NATIONAL BLACK FARMERS ASSOCIATION'S AND**
**THE ASSOCIATION OF AMERICAN INDIAN FARMERS'**
**MOTION FOR SUMMARY JUDGMENT**

**Description**                                                    **Pages**

*A Hearing to Review the State of Black Farmers in the U.S. Before the H. Comm. on Agric.*, 117th Cong. (2021) (excerpts) .......................................................App. 1-13

Emma Lietz Bilecky, *Assessing the Impacts of USDA Civil Rights Settlements: Pigford in Advocacy & Context* (2019)...........................................................App. 14-55

H.R. Rep. No. 117-7 (2021) (excerpts).......................................................................App. 56-70

Justice for Black Farmers Act of 2021, S. 300, 117th Cong. (2021).........................App. 71-149

Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. (2021)....App. 150-64

167 Cong. Rec. S1217 (daily ed. Mar. 5, 2021) (excerpts) ........................................App. 165-73

Expert Report of Dr. Adrienne M. Petty, submitted by Intervenor-Defendant the Federation of Southern Cooperatives/Land Assistance Fund........................App. 174-220

USDA Nat'l Agric. Stat. Serv., *2017 Census of Agriculture Highlights: Farms and Farmland* (2019)................................................................................................App. 221-22

Adewale A. Maye, Econ. Pol'y Inst., *The Myth of Race-Neutral Policy* (2022)........App. 223-30

Dated: July 18, 2022                    Respectfully submitted,

                                      PUBLIC JUSTICE, P.C.
                                      <u>/s/ David Muraskin</u>
                                      David Muraskin*
                                      Jessica Culpepper*
                                      1620 L Street NW, Suite 630
                                      Washington, D.C. 20036
                                      (202) 797-8600
                                      dmuraskin@publicjustice.net
                                      jculpepper@publicjustice.net

                                      HENDLER FLORES LAW, PLLC
                                      Scott M. Hendler
                                      Texas Bar No. 09445500
                                      901 S. MoPac Expy, Bldg. 1, Suite #300
                                      Austin, TX 78746
                                      Telephone: (512) 439-3200
                                      Facsimile: (512) 439-3201
                                      shendler@hendlerlaw.com

                                      *Counsel for the National Black Farmers
                                      *Association and the Association of American
                                      *Indian Farmers*

                                      * Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed via the court's CM/ECF system on July 18, 2022, which will serve all counsel of record.

Dated: July 18, 2022

Respectfully submitted,

PUBLIC JUSTICE, P.C.
/s/ David Muraskin
David Muraskin*
1620 L Street NW, Suite 630
Washington, D.C. 20036
(202) 797-8600
dmuraskin@publicjustice.net

* Admitted *Pro Hac Vice*

# A HEARING TO REVIEW THE STATE OF BLACK FARMERS IN THE U.S.

===============================================

# HEARING

BEFORE THE

## COMMITTEE ON AGRICULTURE
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

————

MARCH 25, 2021

————

### Serial No. 117–3



Printed for the use of the Committee on Agriculture
*agriculture.house.gov*

A HEARING TO REVIEW THE STATE OF BLACK FARMERS IN THE U.S.

# A HEARING TO REVIEW THE STATE OF BLACK FARMERS IN THE U.S.

# HEARING

### BEFORE THE

## COMMITTEE ON AGRICULTURE
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED SEVENTEENTH CONGRESS

#### FIRST SESSION

MARCH 25, 2021

## Serial No. 117–3



Printed for the use of the Committee on Agriculture
*agriculture.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

46–332 PDF          WASHINGTON : 2021

## COMMITTEE ON AGRICULTURE

DAVID SCOTT, Georgia, *Chairman*

JIM COSTA, California
JAMES P. McGOVERN, Massachusetts
FILEMON VELA, Texas
ALMA S. ADAMS, North Carolina, *Vice Chair*
ABIGAIL DAVIS SPANBERGER, Virginia
JAHANA HAYES, Connecticut
ANTONIO DELGADO, New York
BOBBY L. RUSH, Illinois
CHELLIE PINGREE, Maine
GREGORIO KILILI CAMACHO SABLAN, Northern Mariana Islands
ANN M. KUSTER, New Hampshire
CHERI BUSTOS, Illinois
SEAN PATRICK MALONEY, New York
STACEY E. PLASKETT, Virgin Islands
TOM O'HALLERAN, Arizona
SALUD O. CARBAJAL, California
RO KHANNA, California
AL LAWSON, JR., Florida
J. LUIS CORREA, California
ANGIE CRAIG, Minnesota
JOSH HARDER, California
CYNTHIA AXNE, Iowa
KIM SCHRIER, Washington
JIMMY PANETTA, California
ANN KIRKPATRICK, Arizona
SANFORD D. BISHOP, JR., Georgia

GLENN THOMPSON, Pennsylvania, *Ranking Minority Member*
AUSTIN SCOTT, Georgia
ERIC A. "RICK" CRAWFORD, Arkansas
SCOTT DESJARLAIS, Tennessee
VICKY HARTZLER, Missouri
DOUG LAMALFA, California
RODNEY DAVIS, Illinois
RICK W. ALLEN, Georgia
DAVID ROUZER, North Carolina
TRENT KELLY, Mississippi
DON BACON, Nebraska
DUSTY JOHNSON, South Dakota
JAMES R. BAIRD, Indiana
JIM HAGEDORN, Minnesota
CHRIS JACOBS, New York
TROY BALDERSON, Ohio
MICHAEL CLOUD, Texas
TRACEY MANN, Kansas
RANDY FEENSTRA, Iowa
MARY E. MILLER, Illinois
BARRY MOORE, Alabama
KAT CAMMACK, Florida
MICHELLE FISCHBACH, Minnesota

———

ANNE SIMMONS, *Staff Director*
PARISH BRADEN, *Minority Staff Director*

(II)

App. 4

# CONTENTS

|  | Page |
|---|---|
| Adams, Hon. Alma S., a Representative in Congress from North Carolina, submitted memorandum | 324 |
| Carbajal, Hon. Salud O., a Representative in Congress from California, submitted case | 350 |
| Costa, Hon. Jim, a Representative in Congress from California, prepared statement | 7 |
| Submitted article | 302 |
| Submitted hearing | 305 |
| Submitted report | 318 |
| Submitted statements on behalf of: |  |
| Scott, Jr., Will, Owner, Scott Family Farms, Founder, African American Farmers of California | 322 |
| Asian Business Institute & Resource Center | 323 |
| Kirkpatrick, Hon. Ann, a Representative in Congress from Arizona, submitted report | 375 |
| Rush, Hon. Bobby L., a Representative in Congress from Illinois, submitted book | 348 |
| Scott, Hon. David, a Representative in Congress from Georgia, opening statement | 1 |
| Prepared statement | 4 |
| Submitted letters on behalf of: |  |
| Bunch, James, President/Chief Executive Officer, Bunchology LLC | 159 |
| Davis, Webster E., Senior Policy Advisor, Family Farm Action | 160 |
| Jones, Collis, Vice President, U.S. Policy & Strategy, Deere & Company | 163 |
| Simpson, Duane, Vice President, North America Government & Industry Affairs, Bayer Crop Science | 164 |
| Submitted presentation on behalf of Bernice Atchison, farmer from Chilton County, AL and *Pigford* historian | 166 |
| Submitted statements on behalf of: |  |
| Khanna, Navina, Executive Director, HEAL (Health, Environment, Agriculture, Labor) Food Alliance | 204 |
| Jordan, Tanya Ward, President, Coalition For Change, Inc. (C4C) | 207 |
| Rural Coalition/Coalición Rural | 208 |
| Thompson, Hon. Glenn, a Representative in Congress from Pennsylvania, opening statement | 5 |

WITNESSES

| Vilsack, Hon. Thomas "Tom" J., Secretary, U.S. Department of Agriculture, Washington, D.C. | 10 |
|---|---|
| Prepared statement | 11 |
| Submitted questions | 394 |
| Boyd, Jr., John W., Founder and President, National Black Farmers Association, Baskerville, VA | 13 |
| Prepared statement | 15 |
| Submitted questions | 402 |
| Blanding, Cornelius, Executive Director, Federation of Southern Cooperatives/Land Assistance Fund, East Point, GA | 93 |
| Prepared statement | 95 |
| Haynie III, Philip J., Chairman, National Black Growers Council, Burgess, VA | 98 |
| Prepared statement | 99 |
| Rowe, Sedrick, Owner/Operator, Rowe Organic Farms LLC, Albany, GA | 101 |
| Prepared statement | 102 |

(III)

IV

Page

Rowe, Sedrick, Owner/Operator, Rowe Organic Farms LLC, Albany, GA—
Continued
   Submitted questions ........................................................................................ 403
Sherrod, Shirley, Executive Director, Southwest Georgia Project for Commu-
nity Education, Inc., Albany, GA .......................................................... 103
   Prepared statement ........................................................................................ 105
   Submitted question ........................................................................................ 403
Cotton, Arnetta, Co-Owner and Program Facilitator, Kingdom Community
Development Services, Wagoner, OK; accompanied by Earrak Cotton,
Owner, Cattle For The Kingdom ......................................................... 106
   Prepared statement ........................................................................................ 108

# A HEARING TO REVIEW THE STATE OF BLACK FARMERS IN THE U.S.

––––––––––

## THURSDAY, MARCH 25, 2021

House of Representatives,
Committee on Agriculture,
*Washington, D.C.*

The Committee met, pursuant to call, at 12:00 p.m., via Webex, Hon. David Scott of Georgia [Chairman of the Committee] presiding.

Members present: Representatives David Scott of Georgia, Costa, McGovern, Adams, Spanberger, Hayes, Delgado, Rush, Pingree, Sablan, Kuster, Bustos, Maloney, Plaskett, O'Halleran, Carbajal, Khanna, Lawson, Correa, Craig, Harder, Axne, Schrier, Panetta, Kirkpatrick, Bishop, Thompson, Austin Scott of Georgia, DesJarlais, Hartzler, LaMalfa, Davis, Allen, Rouzer, Bacon, Johnson, Baird, Hagedorn, Balderson, Cloud, Mann, Feenstra, Miller, Moore, and Fischbach.

Staff present: Lyron Blum-Evitts, Carlton Bridgeforth, Ross Hettervig, Chu-Yuan Hwang, Anne Simmons, Ashley Smith, Parish Braden, Caleb Crosswhite, Josh Maxwell, Jennifer Tiller, Erin Wilson, John Konya, and Dana Sandman.

## OPENING STATEMENT OF HON. DAVID SCOTT, A REPRESENTATIVE IN CONGRESS FROM GEORGIA

The CHAIRMAN. This hearing of the Committee on Agriculture entitled, *A Hearing to Review the State of Black Farmers in the U.S.,* will now come to order.

Welcome, and I want to thank everyone for joining us for today's hearing. After brief opening remarks, Members will receive testimony from the witnesses today, and then the hearing will be open to our Members' questions. Members will be recognized in the order of seniority, alternating between Majority and Minority Members, and in the order of arrival for those Members who have joined us after the hearing was called to order. When you are recognized, you will be asked to please unmute your microphone, and you will have 5 minutes to ask your questions and make your statements. If you are not speaking, please, I ask that you remain muted in order to minimize the background noise so we can hear what our witnesses and our Members are saying. In order to get to all of your questions, the timer will stay consistently visible on your screen, and your Chairman is going to be very strict. Five minutes, the hammer is coming down. We want everybody to participate in this extraordinary event.

And ladies and gentlemen, my opening statement.

(1)

\*                                        \*                                        \*

*           *           *

13

I am here today to say that racism and discrimination have no place at the Department of Agriculture. I will not tolerate it, and I am committed to rooting it out and establishing a relationship with producers that is built on a commitment to equity, trust and customer service. One of the most important steps I took in my previous tenure as Agriculture Secretary was to use authority granted under the 2002 Farm Bill to appoint voting members to over 385 Farm Service Agency County Committees, addressing a longstanding inequity due to the under-representation of socially disadvantaged farmers and ranchers. We must ensure these important appointments continue and that these individuals have privileges equal to the elected members.

I was pleased when the socially disadvantaged farmer provisions in the American Rescue Plan began to come together. I'm grateful to you, Mr. Chairman, for your leadership, alongside Chairman Bishop, and of course Senators Booker, Warnock, and Chairwoman Stabenow.

From the beginning, these provisions recognized that on top of the economic pain caused by the pandemic's impact on the economy and agriculture, socially disadvantaged farmers are also dealing with a disproportionate share of COVID infection rates, hospitalizations, death and economic hurt.

The law provides funding to address longstanding racial equity issues within the Department and across agriculture. It provides debt relief for socially disadvantaged farmers and ranchers to respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt.

The new law also provides approximately $1 billion in additional funding for assistance and support to socially disadvantaged producers and groups. USDA is in the process of standing up a Racial Equity Commission to identify and address barriers across USDA. The law also directs USDA to invest in programs to facilitate land access, strengthen outreach and education, business development, and more. USDA is now engaged in a process of outreach and seeking feedback directly from socially disadvantaged producers as we implement the law. This will be a collaborative, inclusive process.

Before I close, I want to say that all of us here should want successful farmers. We should want more farmers. We should want farmers who can pass their land down to the next generation—who are role models including for young people of color to take up farming and ranching. We should want farming to be associated with equity and opportunity and entrepreneurship—not racism and barriers and intimidation. We should want farmers of color to have equal opportunity to contribute to the diverse fabric of American agriculture. We should make clear that prosperous farmers of color means a prosperous agricultural sector and a prosperous America. And we should do everything we can to make that possible. You have my commitment that I will do just that.

Thank you for your time today.

The CHAIRMAN. Thank you, Mr. Secretary. Thank you very much for your very good testimony that we have just heard.

Now, I want to recognize for 5 minutes our next panelist, Mr. Boyd. You are now recognized to begin.

Mr. Boyd, you may be muted.

## STATEMENT OF JOHN W. BOYD, JR., FOUNDER AND PRESIDENT, NATIONAL BLACK FARMERS ASSOCIATION, BASKERVILLE, VA

Mr. BOYD. There we go. I am sorry. Okay.

Mr. Chairman, thank you very much. First, glad to give honor to God, first and foremost, and I would like to thank you, the Ranking Member Thompson, Congressman Thompson, the other congressperson from North Carolina, the Vice Chair, Alma Adams. I have spent some time visiting with most Members of the Agriculture Committee to talk to them about the plight of the Black farmers this week, so I would like to thank all of the Members who took time to visit with me personally to talk about the plight of the Black farmers.

It is an honor to be here today to talk to you and this Committee. This is a hearing, Mr. Chairman, that I personally have been advo-

14

cating for, for over 30 years. When I first began to advocate and press the issue on Capitol Hill, we could never even get a full Committee Agriculture hearing. The people who are watching here, this is a very, very historic hearing and nature. Where the only hearing we could get at that time was with the Congressional Black Caucus in 1997 where all of the Members participated and listened to the plight of Black farmers. On behalf of every enslaved Black man in this country, on behalf of every sharecropper in this country, on behalf of every Black farmer who tilled the soil, past and present, we thank you and this Committee for finally hearing our cries.

I am a fourth-generation farmer, and I was trained to farm by my grandfather, Thomas Boyd, and also my other grandfather, Lee Robinson, a sharecropper, and my father, John Boyd, Sr., who is probably watching this hearing today. I have a long, rich history of farming along the Roanoke River in Mecklenburg County, Virginia, where my great-grandfather, Andrew Boyd, was a slave. We bring a lot of history and wealth and pride and wisdom to this Committee today as we reach out to talk to you.

Currently today, I raise corn, wheat, and soybeans, but I was trained as a tobacco, cotton, and peanut farmer. Many of those things were bought out under the government buyouts, and I, too, switched over to those types of commodities.

Today, as you know, Mr. Chairman, in your comments, we are less than one percent of the nation's farmers, and we are facing extinction. At the turn of the century, we were over one million Black farm families strong, tilling 20 million acres of land in this country. Today, we are down to 4½ million acres of land in this country, and less than 50,000 Black farmers in this country. We got to this place partly by the United States Department of Agriculture and its discrimination, and I can attest that discrimination was alive and well at the Department of Agriculture, and we need to resolve the backlog of complaints that exist there. We need to improve program delivery at local offices around the country where those farmers, even today when they walk into the office and inquire about the Farmers of Color Act that recently passed, and we are getting a snobby and disrespected type of tone from the local offices, that they don't know anything about it and don't know how it is going to move forward. That was the same type of information that got us here in the first place, Mr. Chairman. This Committee worked hard to get that measure passed and we need to—I'm urging the Secretary today—and I heard his comments—to move swiftly and implement the bill so that the farmers can get the debt relief, and also the $29 billion that was doled out in the Trump Administration, less than 0.01 percent went to Black farmers, 0.01 percent out of the $29 billion went to Black farmers, Mr. Chairman.

We can do better than that, and it was due to the act of discrimination by using the same policies by rolling this information out through the county offices, and is failing because Black farmers don't trust the United States Department of Agriculture. We have to find a better way to do that, and that is why we named it, Mr. Chairman, the Last Plantation, and rightfully so.

And today, we need to move in a more cohesive way. This isn't a Republican issue. It is not a Democratic issue. It has happened on the hands of all Presidents, and I have met with Sonny Perdue,

15

and it was the worst meeting in history for me as a leader where he said Black farmers had to get big or get out. He didn't need any tokens or people who didn't want to work on these committees. That is the type of discrimination that Black farmers are facing, and—it looks like I am running out of my time, but I can talk to you, Mr. Chairman, about this all day long.

I am looking forward to getting all of the questions and input from this Committee, and again, thank you for having this very, very important hearing.

[The prepared statement of Mr. Boyd follows:]

PREPARED STATEMENT OF JOHN W. BOYD, JR., FOUNDER AND PRESIDENT, NATIONAL
BLACK FARMERS ASSOCIATION, BASKERVILLE, VA

Dear Honorable Chairman David Scott, Vice Chair Alma Adams, and Congressman Glenn "GT" Thompson, Ranking Member. Thank you for the invitation. It is truly an honor to address your Committee hearing, *A Hearing to Review the State of Black Farmers in the U.S.*

I am John Boyd, Founder and President of the National Black Farmers Association (NBFA). The National Black Farmers Association seeks justice in terms of the distribution of wealth, opportunities, and privileges within the United States "U.S." and U.S. territories.

The National Black Farmers Association (NBFA) is a nonprofit 501(c)[(3)] organization with farm training sites across the United States in rural and urban areas. NBFA is a community-based organization with a national constituency of over 116,000 members predominately in 42 states. Our membership consists of full-time farmers, part-time farmers, land and timber owners and many concerned citizens. To date, the organization continues to work diligently to improve the quality of life in rural communities through improved agricultural outreach, technical assistance, access to credit for small farmers, family farm business development, food distribution, rural economic development and environmental protection with a Memorandum of Understanding (MOU) with United States Department of Agriculture (USDA), U.S. Forest Service and Environmental Protection Agency.

As a national civil rights figure representing Black Farmers, I have met with President Barack Obama, President Bill Clinton, President George W. Bush and President Jimmy Carter. I have led dozens of training sessions and community meetings across the nation, Africa and Haiti serving as a social justice advocate for women, Native American and Hispanic farmers in their pursuit for fair access to USDA programs and services. As a result, I am highly regarded in the farm community as someone "who cares" and has access to critical information about programs for Black and other minority, youth, veteran, women and limited resource farmers with a proven ability to deliver high-quality technical advice and solutions. The latest example of my personal commitment and corporate resolve to ensure civil, economic, environmental and social justice and fiscal responsibility for NBFA members and other small-scale farmers is the NBFA call to action "ReClaiming, ReGaining, and ReGenerating Our Family Farms".

The NBFA has been providing sustainable agriculture workshops and conferences for over 30 years due to the ongoing injustices faced by Black and other minority farmers. The NBFA provides all educational outreach training initiatives, direct technical assistance and conferences free of charge to attendees and open invitation for all to attend in accordance with the MOU between USDA, EPA, U.S. Forest Service. SC Commission for Minority Affairs and the NBFA.

I am a fourth-generation farmer, maintaining about 1,300 acres in Southside, Virginia, where I grow soybeans, wheat, corn and raise beef cattle.

The long history of discrimination by the United States Department of Agriculture (USDA) is not in dispute.

Scholars, commissions, the courts, and even the Department itself have confirmed that USDA systematically denied loans, subsidies and other benefits to Black farmers that were routinely provided to white farmers.

16

- In 1965, the U.S. Commission on Civil Rights *found*[1] that discrimination in farm programs had contributed to a decline in Black ownership of farmland.
- In 1968, the U.S. Commission on Civil Rights *found*[2] that Black farmers faced discrimination when seeking farm loans and other forms of assistance.
- In 1970, the U.S. Commission on Civil Rights *found*[3] discrimination in the administration of USDA programs.
- 1982, the U.S. Commission on Civil Rights *documented*[4] discrimination complaints at USDA county offices.
- In 1995, the [General Accounting] Office *found*[5] USDA county committees had few people of color.
- In 1996, a study for USDA's Farm Services Agency *found*[6] farmers were not getting an equitable share of farm payments and loans.
- In 1997, USDA's Inspector General *documented*[7] a "climate of disorder" among USDA civil rights staff.
- In 1997, the Civil Rights Action Team created by USDA *documented*[8] stories of discrimination against farmers of color.
- In 1998, the USDA's Commission on Small Farms *cites*[9] discrimination as a cause of the decline of Black farmers.
- In 1999, a Federal court *found*[10] USDA discriminated against Black farmers by denying or delaying loans.
- In 2001, the U.S. Commission on Civil rights *found*[11] Black farmers waited four times longer than white farmers to receive farm loans.
- In 2008, the Government Accountability Office *reported*[12] that USDA had still not resolved many discrimination complaints.

But discrimination is not something that I read about in a report or a court transcript. I have attached to my testimony the reports by the Commission on Civil Rights, the Department of Agriculture, and the Government Accountability Office as well as written testimony I have presented to Congress over the years as the NBFA President that document this history of discrimination, differential treatment, and breach of trust by USDA. They also detail the struggle the NBFA has encountered at the USDA to end racial discrimination and achieve justice for Black Farmers as the NBFA was a named plaintiff in *In Re Black Farmers Discrimination* and has filed objections and sought legal remedies to protect Black Farmers in America.

In 1983, I was introduced to the USDA Farmers Home Administration (now known as Farm Service Agency) by an elderly Black farmer who was fighting off foreclosure. Once I purchased the farm with a farm ownership loan, the lien was recorded in the local county courthouse. That was the being of my relationship or lack thereof that brings me before you today to discuss the "State of Black Farmers". I experienced racial discrimination personally when I sought farm operating loans from the Department. I was called "boy." I was spit on. My loan applications on numerous occasions were torn up and thrown in the trash while I watched. Upon investigation by the USDA Office of Civil Rights, several applications were found unprocessed in my USDA file. In my county office, Black farmers were only seen

---

[1] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1965_USCCR-Report.pdf.*
[2] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1968_USCCR-Report.pdf.*
[3] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/cr12en2.pdf.*
[4] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1990_House-Report.pdf.*
[5] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1995_Minorities-and-Women-on-Farm-Committees.pdf.*
[6] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1996_DJ-Miller-Report.pdf.*
[7] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997_IG-Report.pdf.*
[8] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-crat-report.pdf.*
[9] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1998-NCSF-Report.pdf.*
[10] *https://acresofancestry.org/wp-content/uploads/2021/01/April-1999-Court-Opinion-Approving-Consent-Decree-.pdf.*
[11] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2001_USCCR-Report.pdf.*
[12] *https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2008_GAO-Report.pdf.*

17

on Wednesday—or what came to be known as "Black Wednesday." When Black farmers received USDA loans they were assigned "supervised" bank accounts which required white loan officers to co-sign every transaction.

As a result of differential treatment and discrimination against Black farmers like myself, the number of Black farmers has fallen dramatically—from more than 900,000 in 1920 to less than 50,000 today.

Unfortunately, the effects of discrimination by the Department can be felt decades after reaching historic settlement agreements. I reached a settlement agreement with USDA in 1997 which provided complete debt relief. In 2019, I was informed that USDA had breached the settlement agreement and over $600,000 in USDA liens remained against my farm according to a title search. I filed a complaint against USDA for Breach of Agreement and Retaliation because the amounts recorded in the liens were erroneous and the prepared Certificates of Satisfaction to release the liens had been prepared but never executed or filed as they remained unsigned by the local county FSA official in my USDA file. It wasn't until I secured and paid for the services of an attorney to file these Certificates that my farm was no longer in jeopardy of [land loss] at the hands of the USDA. This wasn't the 1st time USDA officials had failed to act upon my behalf and I am here today because I want to openly address why the NBFA has continued to call for accountability and transparency at the Department in 2021. Too many Black Farmers continue to request our assistance to address program complaints and civil rights violations.

Discrimination continues to be reflected and reinforced by current USDA programs.

While Black farmers receive about $60 million in annual commodity subsidies, white farmers annually receive about $10 *billion* in commodity subsidies.

While an eligible Black farmer receives, on average, $7,755 in commodity subsidies, an eligible white farmer receives, on average, $17,206 in commodity subsidies.

Like commodity subsidies, *ad hoc* disaster payments also overwhelmingly flow to white farmers.

Experts found that 99% of the Market Facilitation Payments made to offset the effects of President Trump's trade war went to white farmers. Experts also found that 97% of Coronavirus Food Assistance Payments made to address the [COVID]–19 pandemic went to white farmers.

The disparity in the crop insurance program—which requires a farmer-paid premium many Black farmers cannot afford—may be even greater, but Congress will not lift the veil of secrecy that hides who receives crop insurance subsidies.

As you know, arm income support payments are tied to production or revenue. The largest 10% of subsidy recipients collect more than half of all subsidies. Virtually all of these farmers are white.

The result of decades of discrimination is that Black farms are smaller, and our revenues are smaller than those of our white neighbors. Therefore, eligible Black farmers receive less support from USDA and fall further and further behind. What's more, a disproportionate share of Black farmers produce farm products that are not even eligible for traditional subsidies.

Rather than right these historic wrongs, government programs have largely perpetuated systemic racism.

In response to discrimination by the Department, I joined with other farmers to sue USDA, which resulted in the *Pigford* and *In Re: Black Farmers Discrimination* settlements. By acknowledging the long history of discrimination, the Black Farmer settlements were an important first step. But they failed to provide farmers the debt relief Black farmers needed.

During the Trump Trade war, it was unacceptable that foreign owned corporations benefited at an alarming rate while tax-paying American farmers such as myself received min[u]scule amounts of the relief designated with stated purpose to help American Farmers. Economic fairness was at stake in that matter but failed to provide much needed relief for the disruption to our farms.

On June 19, 2019, I testified before the U.S. Financial Services Committee. I stated, "Unless there is a set aside amount for support of small-scale farmers in the proposed $16 Billion Bailout, we will be treated as invisible and insignificant participants in the process. Policy decisions regarding farmers will continue to disproportionately reward foreign-owned corporations and exclude already disadvantaged farmers in our category. Justice would be served in the current crisis by a vote for bipartisan legislation from this Committee to set aside $5 Billion to help

18

address the needs of Black and other small-scale farmers. Fair treatment is all we are asking. Just justice."[13]

By providing debt relief to Black farmers and other farmers of color, the American Rescue Plan Act begins to fulfil the promises of the Black Farmers lawsuits and, more importantly, gives new life to Black farmers facing foreclosure. But there is still much more to be done to right these historic wrongs and to ensure that Black farmers remain part of the fabric of American agriculture.

To support Black farmers, we must reform our subsidy and crop insurance programs to level the playing field between white farmers and Black farmers. We must make these programs more transparent, so Black farmers can see whether promised reforms are actually working. We must expand access to land and credit so that Black farmers can expand our operations. And we must improve outreach and technical assistance to Black farmers who have been treated as second-class citizens by the Department for too long.

Thank you, Chairman Scott, for holding this historic hearing.

APPENDIX

**Editor's note:** the documents listed were submitted by the witness as an *Appendix.* They are listed here in the order that they were submitted. Due to its size the *Appendix* is retained in Committee file, and the individual documents are available online at the hyperlinks noted. **Note:** items marked with (†) denote that in addition to the excerpt the full report is retained in Committee file.

1. USDA RBS Research, Report 194: *Black Farmers in America, 1865–2000 The Pursuit of Independent Farming and the Role of Cooperatives* (*https://www.rd.usda.gov/files/RR194.pdf*)[14]

2. USDA NASS, 1964 Census of Agriculture, *Vol. 2, Part 8, Color, Race, and Tenure of Farm Operator* (*http://lib-usda-05.serverfarm.cornell.edu/usda/AgCensusImages/1964/02/08/1964-02-08.pdf*), Table 4. Number of Negro and Other Nonwhite Farm Operators, by Regions and States: 1900 to 1964, p. 761†

3. USDA NASS, 1964 Census of Agriculture, *Vol. 2, Part 8, Color, Race, and Tenure of Farm Operator* (*http://lib-usda-05.serverfarm.cornell.edu/usda/AgCensusImages/1964/02/08/1964-02-08.pdf*), Table 3. Number of Farms by Color and by Tenure of Operator, and Land in Farms by Tenure and Operator, by Regions and States: 1880 to 1964, p. 756†

4. U.S. Commission on Civil Rights, 1965, *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture. A Report of the United States Commission on Civil Rights, 1965* (*http://files.eric.ed.gov/fulltext/ED068206.pdf*)

5. U.S. Commission on Civil Rights, 1965, *Civil Rights Under Federal Programs: An Analysis of Title VI of The Civil Rights Act of 1964* (*https://hdl.handle.net/2027/mdp.39015019789091*)[15]

6. U.S. Commission on Civil Rights, 1970, *Federal Civil Rights Enforcement Effort: A Report of The United States Commission on Civil Rights 1970* (*https://www2.law.umaryland.edu/marshall/usccr/documents/cr12en2.pdf*), pp. I–III, 48–49†

7. USDA, January 1981, *A Time to Choose: Summary Report on the Structure of Agriculture* (*https://archive.org/details/timetochoosesumm00unit/page/n1/mode/2up*)

8. U.S. Commission on Civil Rights, February 1982, *The Decline of Black Farming in America* (*https://files.eric.ed.gov/fulltext/ED222604.pdf*)

9. USDA, Economic Research Service, July 1986, Rural Development Research Report Number 59, *Black Farmers and Their Farms* (*https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1982_USDA-History.pdf*)

---

[13]*https://docs.house.gov/meetings/BA/BA10/20190619/109679/HHRG-116-BA10-Wstate-BoydJ-20190619-U1.pdf* (video testimony: *https://youtu.be/Ibm-zA4wQII*)
[14]**Note:** contained further on in the Appendix as an excerpt from this report, p. 24 (Appendix Table 3—Farm operators in the U.S. by race, 1900 to 1997).
[15]**Note:** this document is available at a variety of university sites; however, in all extant instances they are using the "Digitized by Google" copy.

*                                        *                                        *

Assessing the Impacts of USDA Civil Rights Settlements: *Pigford* in Advocacy and Context

by

Emma Lietz Bilecky

Dr. Erika Weinthal, Adviser

April 26, 2019

Master's project submitted in partial fulfillment of the requirements for the Master of Environmental Management degree in the Nicholas School of the Environment of Duke University

**Contents**

I.    Introduction
          A.  Research Questions
          B.  Methods

II.   Background
     A.  The Power of Land: Resistance, Agency and Black Agrarianism

            A.  Who Owns U.S. Farmland?
                    i.      Figures
                    ii.     Black Land Loss in the 20th Century
                    iii.    Documenting Discrimination
                    iv.     The Rise of Black Farmers?
            B.  The *Pigford* Cases

III.  Interview Analysis and Results
          A.  Assessing *Pigford*
          B.  Cultural Transformation at USDA
          C.  Common Themes
          D.  Policy Recommendations

IV.   Discussion

V.    Implications

Bibliography

## I.        Introduction

In 1999, a class of African-American farmers and landowners led by North Carolinian Timothy Pigford sued the United States Department of Agriculture under the Equal Credit Opportunity Act, alleging Farm Service Agency (FSA) officers had discriminated against them in loan-making during a period in which USDA's Office of Civil rights failed to process discrimination complaints. Such patterns of discrimination were connected to significant losses of black-owned farmland throughout the 20th century.[1] While *Pigford* has been cited as the largest and most successful civil rights case in recent decades, many experienced the settlements as a disappointment.[2] In 2010, a second historic agreement known as *Pigford II* provided another avenue for farmers excluded from the initial class to bring complaints, allocating an additional 1.25 billion dollars for settlement payments. Alongside *Pigford II*, USDA Secretary Tom Vilsack ushered in "a new era of civil rights,"[3] refining loan and benefit programs intended to serve minority and disadvantaged farmers and reforming USDA leadership at many levels.

Almost a decade after *Pigford II*, African American farmers continue to lose land and experience discrimination in agriculture. Drawing from policy and historical research and nine semi-structured interviews with key stakeholders including advocates, farmers, community organizers, legal experts and academics, this project investigates the effectiveness and lasting impacts of the *Pigford* settlements. I find that remedies to correct USDA's discriminatory history failed to extricate structural racism within the department, which continues to uphold policies and practices favoring large, predominately white farmers. Such policies have shaped American landscapes and reproduce inequality in U.S. agriculture, which has consolidated farmland—and with it both power and wealth—into the hands of fewer, larger, whiter farmers.

This paper reviews literature on histories of land ownership and land loss in the U.S. and its connection to civil rights. I discuss current demographic data on U.S. land ownership and consider methodological issues with its collection which have supported claims of civil rights

---

[1] A 1997 Civil Rights Action Team Report found "minority and limited resource customers believe USDA has not acted in good faith on the complaints. Appeals are too often delayed and for too long. Favorable decisions are too often reversed." Civil Rights Action Team, "Civil Rights at the United States Department of Agriculture" (Washington, D.C.: United States Department of Agriculture, 1997), 30-31.

[2] See Mark A. Bunbury Jr., "Recent Development: 'Forty Acres and a Mule' … Not Quite Yet: Section 14012 Of the Food, Conservation, and Energy Act Of 2008 Fails Black Farmers," 87 N.C.L. Rev. (2009): 1230-1251; Kindaka Jamal Sanders, "Re-Assembling Osiris: Rule 23, the Black Farmers Case, and Reparations," 118 Penn St. L. Rev. (2013): 339-373.

[3] See Tom Vilsack, "The People's Department: A New Era for Civil Rights at USDA," Medium, updated August 2, 2016, https://medium.com/usda-results/https-medium-com-usda-results-chapter-8-b57f91b64d49.

improvements. I find USDA's purported transformation is troubled by narratives of persistent discrimination deduced from interviews conveying lived experience. I discuss persistent land loss, the history of discrimination at USDA, and the wider context of the *Pigford* cases as factors which continue to inhibit 'cultural transformation' in agriculture.

Analyzing major themes from nine original interviews, I find analysis of the *Pigford* settlements and civil rights reform at USDA is mixed. I discuss failures internal to the settlement process and forms of structural discrimination which continue to disadvantage farmers of color, effecting mistrust and erasure.  Using Minkoff-Zern's framework of "state legibility,"[4] I argue that farmers of color remain largely invisible to USDA when the department is governed by the interests of farmers of a privileged class (e.g. large, midwestern commodity farmers[5]). Though USDA's attempted reforms and reparations have led to positive changes, I argue that United States agricultural policy retains biases which frustrate institutional reform.[6] USDA must reconsider its own history, biases and mission in light of the experience of African American and minority farmers in order to approach equity, justice and cultural transformation.

## A.  Research Questions

This study seeks to assess the effectiveness and lasting impacts of the *Pigford* settlements and gauge any improvements in the situation of African American farmers in the Southeast since *Pigford I* and *II.* Additionally, it seeks to determine whether the "new era of civil rights" claimed by Secretary Vilsack[7] had noticeable impacts in the lives of African American farmers or their access to USDA services. It also aims to identify policy recommendations that could improve relations between black farmers and USDA.

The literature assessing *Pigford* is mixed. Many have cited it as the most successful civil rights litigation in recent decades,[8] an exemplary reparations case, and a "significant first step" in

---

[4] Laura-Anne Minkoff-Zern and Sean Sloat, "A New Era of Civil Rights? Latino Immigrant Farmers and Exclusion at the United States Department of Agriculture," *Agriculture and Human Values* 34 no. 3 (2017): 631–43.
[5] Deborah Dixon and Holly Hapke argue that American agriculture possesses a legislative bias for midwestern forms of agriculture. Deborah P. Dixon and Holly M. Hapke, "Cultivating Discourse: The Social Construction of Agricultural Legislation," *Annals of the Association of American Geographers* 93 no. 1 (2003), 143.
[6] See Garrett Graddy-Lovelace, "The Coloniality of U.S. Agricultural Policy: Articulating Agrarian (in)Justice," *The Journal of Peasant Studies* 44, no. 1 (2017): 78–99.
[7] See Vilsack, "The People's Department."
[8] Stephen Carpenter, "The USDA Discrimination Cases: Pigford, In Re Black Farmers, Keepseagle, Garcia, and Love," 17 Drake J. Agric. L. (2012): 1-35.

correcting past mistakes and improving conditions for black farmers.[9] Others have argued that *Pigford* fell short – that settlement payments were inadequate to appropriately redress actual harms suffered by class members, or that the class itself too exclusive,[10] covering only the period the period between 1981-1996,[11] when significant discrimination existed prior.[12]

If settlements were largely inadequate to compensate for the costs of discrimination or assist farmers in regaining land lost, did the settlement process reform the culture of USDA to curtail ongoing discrimination or improve access to land, credit or assistance programs? The number of active advocacy organizations still working on behalf of black farmers indicates the persistence of problems facing farmers of color in the U.S. neither *Pigford* nor steps taken in its aftermath adequately solved.

### B.  Methods

This study involves nine semi-structured, qualitative interviews with expert stakeholders including land loss advocates, scholars, legal experts and former USDA employees in addition to analysis of *Pigford's* political and historical context. Seven advocacy organizations focused on black land loss prevention in the Southeast region were contacted,[13] and a total of six representatives from three organizations agreed to an interview.[14] In addition, an attorney specializing in land loss prevention and food systems advocacy, a legal scholar conducting

---

[9] Phil Fraas "The Pigford Settlement: Grading its Success and Measuring its Impact," Federation of Southern Cooperatives (2013), accessed March 16, 2019, db04/0836770.0002/8366441.1 wp14.

[10] Bunbury, "Forty Acres and a Mule."; Monica M. Clark, "So Near, Yet so Far: The Past, Present, and Future of the Complaints Process within the USDA," 32 S.U. L. Rev. (2005): 139-194.; Minkoff-Zern, "A New Era of Civil Rights?"; Shakara S. Tyler and Eddie A. Moore, "Plight of Black Farmers in the Context of USDA Farm Loan Programs: A Research Agenda for the Future," *Professional Agricultural Workers Journal* 1 no. 1 (2013): 1-11. Notably, the text of the initial settlement acknowledged arguments that the class definition was too narrow.

[11] Pigford v. Glickman, 185 F.R.D. 82 (1999), at 89. In 1983, the USDA Office of Civil Rights (OCR) was effectively dismantled when a number of employees were dismissed, including 14 program investigators. When these 14 program investigators were rehired in 1997 and early 1998, the OCR was considered functional again. Congress extended the Statute of Limitations for the Equal Credit Opportunity Act from 1981-1996, two years prior to these two employment events. Interview participant #8, personal communication, April 29, 2019.; See Pigford v. Glickman, 185 F.R.D. 82 (1999), at 100.

[12] For a history of discrimination within USDA, see Pete Daniel, *Dispossession: Discrimination against African American Farmers in the Age of Civil Rights* (Chapel Hill: University of North Carolina Press, 2013).

[13] The Black Farmers and Agriculturalists Association, Black Family Land Trust, the Federation of Southern Cooperatives, Land Loss Prevention Project, Black Belt Justice Center, the Southwest Georgia Project, and the Center for Land and Community Security at Tuskegee University.

[14] These included representatives from the Black Farmers and Agriculturalists Association, the Land Loss Prevention Project, and the Black Family Land Trust.

policy and qualitative research on USDA discrimination, and three former USDA employees[15] participated in interviews. This study relies on data from nine interviews involving ten participants in total.[16] Interviews were conducted in person and over the phone, lasting from 30 minutes to two hours, with most lasting between 40 minutes and one hour. Seven of ten participants elected to remain anonymous and are noted accordingly.

Prior to conducting interviews, participants were provided the following list of questions:

- In what ways have the *Pigford* settlements impacted black farm owners, landowners, and rural communities in the Southeastern U.S.?
- Did *Pigford I* and *Pigford II* adequately compensate farmers who experienced discrimination by the USDA and/or suffered land loss? Why or why not?
- In your experience, what made the settlements effective or ineffective?
- What have been the lasting effects of the settlements?
- What broader impacts have the *Pigford* settlements had for farmers of color in the United States, their farm operations, and access to land?
- What do you think the USDA should do or should have done post-*Pigford* to better support black farm owners and operators?
- In what ways have different understandings of agricultural land's history and use been reflected in the settlement processes?

These questions were either asked directly or addressed organically within guided conversations. Eight of nine interviews were recorded, transcribed, and analyzed for common themes.

## II.     Background

### B.  The Power of Land: Resistance, Agency and Black Agrarianism

Numerous studies throughout the past several decades have drawn attention to the precipitous decline in black-owned and operated farmland in the United States. These losses have been concentrated in the Southeastern U.S., where the country's highest number of African American farm owners and operators have historically resided. The demographic characteristics

---

[15] These included a former Undersecretary of Natural Resources and the Environment under secretary Tom Vilsack, a former USDA cooperative extension agent, and a representative from the USDA Office of Civil Rights.
[16] One interview involved two participants. Responses were attributed individually. Two of ten participants were also active farmers at the time of the Pigford settlements. One was a successful claimant.

of Southern agriculture are attributable to a confluence of economic and policy processes, including global capitalist and westward expansion fueled by plantation agriculture and the enslaved labor it exploited and concentrated.[17] Emancipation and Reconstruction transformed Southern agriculture and patterns of land ownership, but nonetheless kept exploitative power relations intact. Legacies of forced labor found new expression in sharecropping agreements, through which white landowners continued to economically exploit black labor on leased land while trapping black agriculturalists in poverty and debt.[18]

For many black farmers and agricultural workers of color, farmland ownership signifies more than a material asset or a source of income: it is a guarantee of economic and political power and a means of self-determination, self-sufficiency and resilience. Sociologist and agricultural historian Jess Gilbert describes the importance of landownership:

> Landownership is important because it is a form of wealth, not just income. As such, it can provide a spur to economic development and broader investment, including the education of children. In the Black Belt of the rural South, where most African-American farms are located, land is still key to cultural and political power as well. From the visions of Thomas Jefferson and Abraham Lincoln, to Booker T. Washington and George Washington Carver, through populists and progressives of yesterday and today, widespread property ownership has promised fuller citizenship and a more egalitarian distribution of wealth and power.[19]

Property ownership also determines individuals' power to shape, influence and benefit from public amenities, social services and education systems. It determines not only who has voice in the policy processes, but who benefits from public investment and who is vulnerable to dispossession or relocation. The benefits of landownership are not merely economic, but essential for cultural preservation, self-reliance and resistance. Socioeconomic well-being, civic participation, optimism,[20] participation in Civil Rights movements, the maintenance of

---

[17] See, for example, Sven Beckert, *Empire of Cotton: A Global History* (New York: Vintage Books, 2014), which chronicles the role of the cotton industry in the proliferation of plantation-style agricultural expansion, slave labor and soil degradation across the United States.

[18] See Equal Justice Initiative, "History of Racial Injustice: Sharecropping," accessed April 14, 2019, https://eji.org/history-racial-injustice-sharecropping.

[19] Jess Gilbert, Gwen Sharp, and M. Sindy Fezin, "The Loss and Persistence of Black Owned Farms and Farmland: A Review of the Research Literature and Its Implications," *Southern Rural Sociology* 18 no. 20 (2002), 6.

[20] Lester Salamon compares farmers who became landowners through New Deal programs with tenant farmers and found both increased civic participation and optimism for the future as characteristics differentiating the former.

agricultural knowledge traditions and resistance to white supremacy are all associated with access to and ownership of land.[21]

Black agrarian traditions recognize the importance of landownership, as land has enabled participation in civil rights movements, voting rights and political resistance to racial terrorism in the Jim Crow South. If power comes from land, a community without a land base is vulnerable. Indeed, Fannie Lou Hamer's conviction that "in order for any people or nation to survive, land is necessary"[22] was the motivating ethos of her Freedom Farm Cooperative in the Mississippi Delta, which at its height provided over 600 acres of farmland for poor, black farmers connected to Student Nonviolent Coordinating Committee efforts to build rural economic and political resilience.[23] Monica White argues that land has always been central to generating collective agency in African American communities: from the cultivation of slave gardens and the preservation of African crops in U.S. agriculture, to historically black 1890 land grant institutions, to the cooperative movement of the 20th century to contemporary urban agrarian movements pursuing public health and community development aims.[24]

African agricultural practices were highly influential in the development of Southern agriculture.[25] Those who lived in slavery were skilled farmers who sustained the inhabitants of the Americas while also employing strategies of resistance and capacity building through sharing

Lester M. Salamon, *Land and Minority Enterprise: The Crisis and the Opportunity* (Durham, NC: Duke University Institute of Policy Sciences and Public Affairs, June 30, 1976).

[21] See Dānia C. Davy, Savonala Horne, Tracy Lloyd McCurty, and Edward "Jerry" Pennick, "Resistance," *Land Justice: Reimagining Land, Food and the Commons in the United States*, ed. Justine M. Williams and Eric Holt-Giménez (Oakland, CA: Food First Books, 2017).; Jess Gilbert, Gwen Sharp, and M. Sindy Fezin, "The Loss and Persistence of Black Owned Farms and Farmland: A Review of the Research Literature and its Implications," *Southern Rural Sociology* (2002), 6.

[22] Monica White, *Freedom Farmers: Agricultural Resistance and the Black Freedom Movement* (Chapel Hill, NC: University of North Carolina Press, 2108), 3.

[23] Shorlette Ammons, "Shining a Light in Dark Places: Raising Up the Work of Southern Women of Color in the Food System: A Policy Brief" (New York: Center for Social Inclusion, 2014), 11.

[24] Importantly, White's work moves beyond a narrative of oppression and exploitation to recover "another narrative of the relationship between labor, land use and the black farmers whose contributions were intrinsic to the development of the agricultural sector in the United States of America." Her work centers on the work of Fannie Lou Hamer's Freedom Farm Cooperative, the North Bolivar County Farmers Cooperative, the Federation of Southern Cooperatives and the Detroit Black Food Security Network, among others. White, *Freedom Farmers,* 3.

[25] "Enslaved Africans drew deeply upon the agricultural expertise and the crops of their own heritage, while adopting the knowledge systems and plants bequeathed to them by the Amerindians…In addition to human cargo, slave ships carried African food stables, seed root vegetables, other produce, and livestock…Researchers identify the introduction of African yams, arrowroot, bananas, various types of beans, cowpeas, eddo, guinea squash, hibiscus, lablab beans, millet, okra, pearl millet, pigeon peas, plantains, purslane, rice, sesame, sorghum, sweet potatoes, tamarind, taro and watermelon to the Americas and the Caribbean through the middle passage." White, 12.

9

knowledge and even smuggling seeds.[26] West African rice cultivation techniques, for example, influenced rice-growing in the Carolinas,[27] and African food traditions drove the development of Southern cuisine.[28] Even before the industrial plantation economy's proliferation, black farmers "were among the first agricultural trailblazers in British North America."[29]

bell hooks reflects on the foundational importance of land within the black community. Even when forced to work rented or sharecropped land, she writes, "it was the earth itself that protected exploited black folks from dehumanization"[30] in ways not possible after the Great Migration to urban centers.[31] For hooks, the earth witnesses to a natural egalitarianism and a power that exceeds human oppression which can overcome dehumanizing forces.[32] Furthermore, hooks connects the exploitation of land and people: "When we are forgetful and participate in the destruction and exploitation of the dark earth, we collude with the domination of the earth's dark people, both here and globally."[33] Living in harmony with land, then, is a kid of "meaningful resistance" to the forces of "corrupt capitalism and hedonistic consumerism" which "work daily to strip [poor people] of their ties with nature."[34]

Throughout the 20th century, land ownership remained fundamentally important within black communities, and declining landownership produced anxiety despite historically complex

---

[26] White, 12.

[27] Waymon R. Hinson and Edward Robinson, "'We Didn't Get Nothing:' The Plight of Black Farmers," *Journal of African American Studies* 12, no. 3 (September 2008), 285.

[28] See Michael W. Twitty, *The Cooking Gene: A Journey Through African American Culinary History in the Old South* (New York: HarperCollins, 2018).

[29] Hinson and Robinson cite the story of Anthony Johnson, a black landowner (and slaveowner) who held a 250-acre tobacco estate in colonial Virginia in the 17th century. Hinson and Robinson, "We Didn't Get Nothing," 284.

[30] bell hooks, *Belonging: A Culture of Place* (New York: Routledge, 2009), 118.

[31] "The fundamental understanding that white folks were not gods (for if they were they could shape nature) helped imbue black folks with an oppositional sensibility. When black people migrated to urban cities, this humanizing connection with nature was severed; racism and white supremacy came to be seen as all powerful, the ultimate factors informing our fate." hooks, 118.; Graddy-Lovelace narrates the Great Migration as a story of loss, resistance and discrimination, noting that "90 percent of African-Americans lived in the rural south in the 1910s, but just a decade later, less than half did. Those who remained used their considerable agricultural expertise and experience to farm their own lands. Yet federal farm policy systematically undermined their endeavors." Graddy-Lovelace, "The Coloniality of U.S. Agricultural Policy, 84.

[32] "Humankind, no matter how powerful, cannot take away the rights of the earth. Ultimately, nature rules. That is the great democratic gift earth offers us – that sweet death to which we all inevitably go – into that final communion. No race, no class, no gender, nothing can keep us from dying into that death where we are made one. To tend the earth is always then to tend our destiny, our freedom and our hope." hooks, *Belonging*, 117.

[33] hooks offers an invocation to return to the land: "Reclaiming our history, our relationship to nature, to farming in America, and proclaiming the humanizing restorative of living in harmony with nature so that earth can be our witness is meaningful resistance." hooks, 118.

[34] hooks, 119.

relationships with Southern agricultural land.[35] Today, after a century characterized by significant demographic shifts in and across the Southeast, black-owned land remains important for rural and urban growers and people of color activists alike.[36] Underlying these movements is a belief in land's connection to autonomy, self-determination, political and economic power.

While the importance of landownership is the context of this report, the loss of land within the black community and the role of discrimination are its subjects. While many consider demographic shifts and the consolidation of white-owned farmland a result of the Green Revolution, agricultural mechanization, specialization, rural disinvestment and urban development, the transformation of United States farmland also owes itself also to a racialized policy history.[37] This report explores ways in which agricultural policy and structural discrimination have affected shifts in farmland ownership.

### C.  Who Owns U.S. Farmland?

Agricultural land access and distribution is a growing area of concern for policymakers, environmental advocates, and farmers alike. Land access is a major problem for young and beginning farmers.[38] Barriers to affordable, arable land coupled with predictions of large-scale

---

[35] A 1972 report published with the Federation of Southern Cooperatives worried about the black community "becoming a community without a land base," as "the possession of intangible wealth [does not] provide one with the same sense of participation in the national patrimony as does the ownership of real estate, a consideration which may be of some significance for a group which already has numerous reasons to feel itself to be a less-than-full participant in the American scheme." Robert S. Browne, "Only Six Million Acres: The Decline of Black-Owned Land in the Rural South" (New York: Black Economic Research Center, 1973), 3.
[36] Brian Barth, "Black Land Matters," Modern Farmer, accessed February 14, 2019, https://modernfarmer.com/2018/08/black-land-matters/.; See also Leah Penniman, *Farming While Black: Soul Fire Farm's Practical Guide to Liberation on the Land* (White River Junction, Vermont: Chelsea Green Publishing, 2018).
[37] See Nathan Rosenberg and Bryce Stucki, "The Butz Stops Here: Why the Food Movement Needs to Rethink Agricultural History," 13 *J. Food L. & Policy* 12 (2017), 14.
[38] A 2011 report by the National Young Farmers Coalition found that 68% of farmers surveyed indicated land access to be a significant challenge. Lindsey Lusher Shute et al., "Building a Future with Farmers: Challenges Faced by Young, American Farmers and a National Strategy to Help Them Succeed" (New York: National Young Farmers' Coalition, November 2011), 20.

landownership transfer[39] have contributed much renewed attention to the interactions between landownership, equity and sustainability in agriculture.[40]

While many USDA and Farm Bill programs addressing land access target socially disadvantaged farmers, land access issues have been especially pronounced for farmers of color and exacerbated by decades of discriminatory treatment.[41]

### i. Figures

According to the most recent United States Census data, 74% of the United States population is white, and 26% of the U.S. population are people of color.[42] Yet 97% of farm landowners are white, and 96% of farm owner-operators are white.[43] People of color farmers are more likely to be farm tenants or farm laborers: 13.6% of farm tenants are people of color, and 62% of farm laborers are people of color.[44]

The 2012 Census of Agriculture reported black farm operators owned or partially owned under 2.5 million acres of farmland.[45] White operators, by contrast, own over 500 million acres

---

[39] "The average American farmer…is white, male, and 58 years old." Olivia Paschal, "A Boost for Young, Diverse Farmers," The Atlantic, updated December 16, 2018, https://www.theatlantic.com/politics/archive/2018/12/farm-bill-funds-programs-new-and-diverse-farmers/578260/. According to the 2012 Census of Agriculture, 19.4% of farms in the Unites States have principal operators over the age of 65, who control 23.8% of the nation's farmland. 47.3% of farmland is operated by a principal operator 55 or older, while farm operators under 35 control only 3.3%. USDA National Agricultural Statistics Service, "Table 69: Summary by Age and Primary Occupation of Principal Operator," 2012, accessed February 13, 2019, https://www.nass.usda.gov/Publications/AgCensus/2012/Full_Report/Volume_1,_Chapter_1_U.S./st99_1_069_069.pdf. In October 2017, the National Sustainable Agriculture Coalition predicted 100 million acres of farmland would change hands within the subsequent five years. National Sustainable Agriculture Coalition, "An Agenda for the 2018 Farm Bill" (Washington, DC: October 2017), 7.

[40] Notably, the 2018 Farm Bill responded to land access concerns, establishing permanent funding for the Beginning Farmer and Rancher Development Program to fund technical training, business planning and farmland access and the 2501 Program providing outreach and assistance to farmers of color and indigenous farmers. Additionally, it improved credit access and farmland affordability through new easement programs which protect farm real estate from being sold to non-farmers and institutional investors. Andrew Bahrenburg, Holly Rippon-Butler, and Erin Foster West, "A Farm Bill for the Future," National Young Farmers Coalition, updated December 12, 2018, https://www.youngfarmers.org/2018/12/farmbillforthefuture/.

[41] Discrimination in loan making and unfair loan terms impacts farmers' credit and leads to burdensome farm debts, for instance. Landowners of color are also particularly vulnerable to land loss due to heir's property law, forced partition sales, and intergenerational land loss.

[42] Megan Horst and Amy Marion. "Racial, Ethnic and Gender Inequities in Farmland Ownership and Farming in the U.S.," *Agriculture and Human Values* 36, no. 1 (March 2019), 7.

[43] Data on farm landowners are for non-operating landowners. Only 2.9% of non-operating landowners are people of color and 3.9% of farm owner-operators are people of color. Horst and Marion, 7.

[44] Horst and Marion, 7.

[45] The census reported 2,447,543 acres of farmland in 30,293 farms were owned or partially owned by black farm operators. 22,505 farms with black operators were fully owned, and 7,782 farms with black operators were partially

of farmland across the country. Black-owned and operated farms have historically been concentrated in the Southeastern U.S. In 1997, 15 Southern states contained 97% of all black farms.[46]

### ii.  Black Land Loss in the 20th Century

Despite the federal government's failure to deliver on its post-Civil War promise of 40 acres of land for formerly enslaved persons,[47] by 1910, African American farmers had acquired 16 million acres of farmland.[48] In 1920, the number of black farm operators peaked close to a million, at which point African American farmers constituted 14% of farmers in the U.S.[49] By 1997, this number had decreased to 18,451, just 1% of the national population.[50] Between 1920 and 1997, farms operated by African Americans decreased by 98%, compared with a 65.8% decline for white farmers.[51]

The population of farmers has decreased dramatically in the 20th century for all farmers regardless of race,[52] attributable in part to economic trends including farmland consolidation and acreage expansion.[53] However, the *rates* at which black and white farm operators have lost land vary significantly.[54] There is widespread agreement that the loss of black farmers and black-

owned. Black operators rented or leased a total of 1,197,746 acres of farmland in 10,860 farms. White operators owned or partially owned 511,967,676 acres of farmland in 1,884,955 farms and rented or leased 342,883,215 acres of farmland in 642,120 farms. "Table 60. Selected Farm Characteristics by Race of Principal Operator: 2012 and 2007," USDA National Agricultural Statistics Service, accessed April 14, 2019, https://www.nass.usda.gov/Publications/AgCensus/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_060_060.pdf.

[46] Spencer D. Wood and Jess Gilbert, "Returning African American Farmers to the Land: Recent Trends and a Policy Rationale," *The Review of Black Political Economy* 27, no. 4 (March 2000): 44.

[47] Special Field Orders No. 15, Headquarters Military Division of the Mississippi, January 16, 1865, Orders & Circulars, Series 44, Adjutant General's Office, Record Group 94, National Archives.

[48] Tyler and Moore, "Plight of Black Farmers," 1.

[49] The 1920 census reported 925,710 African American farm operators. Wood and Gilbert, "Returning African American Farmers to the Land," 45.

[50] Wood and Gilbert, 45.

[51] Wood and Gilbert, 45.

[52] Graddy-Lovelace, "The Coloniality of U.S. Agricultural Policy," 84.

[53] Such consolidation, however, was not inevitable nor racially neutral. Nathan Rosenberg highlights how New Deal-era policies including crop subsidies and the creation of the Agricultural Adjustment Administration played an important role in the loss of black-owned small-scale farms. Rosenberg and Stucki, "The Butz Stops Here," 14. See also Pete Daniel, *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures Since 1880* (Champaign, IL: University of Illinois Press; 1985), 170.

[54] Rosenberg and Stucki note that between 1930 and 1950, while the number of farmers declined 14 percent, black farmers declined by 37 percent. Rosenberg and Stucki, "The Butz Stops Here," 14. Wood and Gilbert conclude that by any metric, black land loss has been more severe throughout the past century than for white landowners. Wood and Gilbert, "Returning African American Farmers to the Land," 45.

owned farmland cannot be explained by economic trends alone, but have been influenced heavily by histories of racism and discrimination in agricultural programs.[55] Inequality in agricultural lending and assistance remains a problem. Farmers of color receive only one percent of crop subsidies and 0.2 percent of conservation dollars distributed by USDA.[56]

Land loss is not reducible to individual acts of racism and discrimination alone, but also connected also to historical trends, policies and evaluation mechanisms which favor large farmers. While Alec Hickmott argues that historically, economic modernization policies excluded rural Southern, black communities from benefitting from American agriculture's organizational shifts,[57] institutional practices and incentive structures favoring larger farmers were still driving inequality at the end of the 20th century.

> Field employees' performance ratings are often based on measurement systems that favor large, wealthy landowners. County loan officers are rewarded based on the total number of acres served by program dollars, for having low default rates, and for dispensing all the funds allocated to them—a performance management system that rewards service to large, financially sound producers while working against small and minority farmers. USDA's policy statements support the idea of helping low-income and socially disadvantaged farmers. However, its management practices include performance measurement systems that actually do the opposite.[58]

Coupled with nonapparent disciplinary action to punish civil rights violations[59] and a dearth of incentives and resources for civil rights improvements,[60] policies disfavoring minority farmers continued to shape agricultural landscapes and ownership inequality.

---

[55] In particular, the Farm Home Administration (FmHA) and Farm Services Agency (FHA) county offices subjected black farmers to more processing delays, lost paperwork, loans denials and supervised loans than their white counterparts. Civil Rights Action Team, "Civil Rights at the United States Department of Agriculture," 15. Hinson and Robinson explain the impact of tax laws, credit access, partition sales, foreclosures and eminent domain in precipitous declines in black-owned land. Hinson and Robinson, "We Didn't Get Nothing," 289.

[56] In 2007, 1% of crop subsidy payments went to farmers of color, while 99% went to white farmers. In 2002, white farmers received $1.4 billion in direct payments for conservation, while farmers of color received less 0.2% that amount. Robert Zabawa, Tasha M. Hargrove, Ntam Baharanyi and Richard A. Levins, *Shut Out: How US Farm Programs Fail Minority Farmers* (Boston, MA: Oxfam America, 2007), 5. 90% of USDA crop subsidies go to rice, cotton, corn, wheat and soybeans growers, markets that have historically excluded black farmers. Center for Social Inclusion, "Regaining Ground: Cultivating Community Assets and Preserving Black Land" (New York: 2011): 11-12.

[57] Alec Fazackerley Hickmott, "Black Land, Black Capital: Rural Development in the Shadows of the Sunbelt South, 1969–1976," *The Journal of African American History* 101 no. 4 (September 1, 2016): 508-509.

[58] Civil Rights Action Team, "Civil Rights at the United States Department of Agriculture," 8.

[59] "Civil Rights at the United States Department of Agriculture," 9.

[60] "Civil Rights at the United States Department of Agriculture," 11-12.

### iii. Documenting Discrimination

A number of studies commissioned by Congress and the USDA have extensively documented discrimination in farm programs. In 1965, a report assessing the Farmers Home Administration (FmHA), Soil Conservation Service and Agricultural Stabilization and Conservation Service assistance programs found that low-cost credit programs intended to address the problem of farm tenancy benefitted white sharecroppers but not African Americans[61] due to white-dominated committees[62] and funding disparities,[63] and found "USDA had been a catalyst in the decline of minority farming."[64]  In 1982, the U.S. Commission on Civil Rights called attention to low numbers of African American FmHA committee members[65] and found that "longstanding discrimination in USDA programs and a lack of effective procedures for ensuring civil rights enforcement contributed to a decline in farms operated by African-American farmers."[66] In 1997, a Civil Rights Action Team report found farmers of color still perceived USDA employees and programs with pronounced mistrust[67] due to experiences of exclusion among other significant problems, such as services disfavoring limited-resource farmers.[68] Even

---

[61] United States Commission on Civil Rights, "Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture" (Washington, D.C.: 1965), 58.

[62] "In counties where Negroes [sic] constitute a majority of low-income farmers, the absence of Negroes [sic] from the committee structure has seriously handicapped the development of full participation by Negroes in the new and growing agricultural economy." "Equal Opportunity in Farm Programs," 62.

[63] "Equal Opportunity in Farm Programs," 70. The report concluded, "it should be a matter of national concern that the gap between Negro [sic] and white rural residents in the South has decreased during the very period when the programs of the Department were helping thousands of rural white families to achieve substantial gains in income, housing and education." "Equal Opportunity in Farm Programs," 100.

[64] "Equal Opportunity in Farm Programs," 41.

[65] "Between 1979 and 1980, the number of black committee members fell 39.8% nationwide." The report recommended efforts be taken to improve representation. United States Commission on Civil Rights, "The Decline of Black Farming in America: A Report of the United States Commission on Civil Rights" (Washington, D.C.: February 1982), 188.

[66] Stephen Carpenter, "The USDA Discrimination Cases: Pigford, In Re Black Farmers, Keepseagle, Garcia, and Love," 17 *Drake J. Agric. L.* (2012), 8.

[67] Farmers in this report believed USDA participated in a "conspiracy to strip black farmers of their land."  Civil Rights Action Team, "Civil Rights and the United States Department of Agriculture," 6.

[68] "Some problems of inequitable delivery of services stem from program rules and legislation that—intentionally or not—have the effect of disqualifying limited resource customers from USDA programs. Eligibility requirements limit the participation of limited-resource customers while complicated forms and program regulations discourage participation." "Civil Rights and the United States Department of Agriculture," 31.

so, a 2011 report found that many USDA employees still did not recognize the problem of inequitable program delivery.[69]

After decades of evidence of repeated patterns of discrimination in farm program administration, the department has been slow, if unable to correct the structural problems such evidence exposes. Though USDA claims as its title "the People's Department,"[70] its services have been shown to favor white farmers and landowners, and efforts to address the problem have not yet comprehensively corrected it.

### iv. The Rise of Black Farmers?

While recent census data continues to depict significant disparity in farmland controlled by black versus white farmers, the 2012 Census of Agriculture does report increases in acreage and number of farms both owned and leased by black farmers.[71] This data, along with increases in the reported number of black farmers, has allowed some to claim that situations for black farmers have improved since Secretary Vilsack's "new era of civil rights."[72] In 2014, the USDA reported a 12% increase in black farm operators and a 9% increase in black principal operators.[73] Does such evidence indicate that the situation for black farmers is improving?

Scholars have expressed criticism with census data collection processes, analysis and reporting, highlighting methodological problems and inconsistencies which have both under-

---

[69] Jackson Lewis LLP, "United States Department of Agriculture Independent Assessment of the Delivery of Technical and Financial Assistance: 'Civil Rights Assessment Report'" (New York: March 2011), viii. Based on interviews with 30 community organizations, the report recommended better diversity and inclusion program implementation, internal publication of USDA discrimination accusations and penalties, reframing "outreach" models, and the publication of corrective action plans. "Civil Rights Assessment Report," xii. The report found persistent barriers to equitable delivery of Rural Development, Natural Resources Conservation Program, and FSA programs including lack of knowledge of rural development programs, eligibility requirements and assistance, staff representation, and insufficient outreach, geographic barriers, and subjective decision-making processes which allowed discrimination at local levels. "Civil Rights Assessment Report," xxii.

[70] United States Department of Agriculture, "About the U.S. Department of Agriculture: What We Do," accessed March 26, 2019, https://www.usda.gov/our-agency/about-usda.

[71] Increases are from 2007 census data. This data also shows decreases in each of these categories for white farmers between the 2007 and 2012 census years. United States Department of Agriculture National Agricultural Statistics Service, "Black Farmers: Up 12% since 2007; most live in Southern States: 2012 Census of Agriculture Highlights," updated September 2014, https://www.nass.usda.gov/Publications/Highlights/2014/Highlights_Black_Farmers.pdf.

[72] See *Yes! Magazine*'s article on USDA's improved allyship with black farmers, which claimed, "the number of Black farmers in the United States is suddenly growing again…up about 15% from 10 years earlier" and that "policy changes at USDA seem to be driving the recovery." Sylvia A. Harvey, "For Decades, the USDA Was Black Farmers' Worst Enemy. Here's How It Became an Ally," accessed February 19, 2019, https://www.yesmagazine.org/people-power/the-resurgence-of-black-farmers-20160708.

[73] Harvey.

counted and artificially inflated the number of black farms and farmers in Census of Agriculture data.[74]  Trendlines may be more attributable to increased accuracy in data collection, as historically, census data has struggled to paint a comprehensive or accurate picture of African American farmland ownership.[75]

### C. The *Pigford* Cases

In August 1997, two suits brought against the USDA by black farmers under the Equal Credit Opportunity Act – *Pigford v. Glickman* and *Brewington v. Glickman* – alleged racial discrimination by local county committees administering USDA farm loans and assistance.[76] These farmers, and many others throughout prior decades, claimed to have experienced discrimination leading to foreclosure and financial ruin. This was due to loan denials, but also to delayed or supervised loans and debt restructuring.[77] The class of farmers included in the *Pigford* settlements, though not representative of the total number who experienced discrimination by USDA, sought compensation for USDA's failure to address program discrimination complaints between 1983 and 1998, a period during which the USDA Office of Civil Rights division was dysfunctional, resulting in a backlog of unprocessed program complaints.[78]

When a class action and settlement decree was approved by Judge Paul L. Friedman in 1999, it opened up two tracks for financial relief. Track A required a lower burden of proof and

---

[74] When the USDA National Agricultural Statistics Service (NASS) replaced the United States Census Bureau in 1997 as the agency responsible for performing the agricultural census, land tenure data became more accurate as NASS made an effort to include more minority farmers. Gilbert, Sharp, and Fezin, "The Loss and Persistence of Black Owned Farms and Farmland," 4; Jess Gilbert, Spencer D. Wood, and Gwen Sharp, "Who Owns the Land: Agricultural Land Ownership by Race/Ethnicity," *Rural America* 17 no. 4 (2002), 58.

[75] A study in Delta County, Mississippi found that 27% of farmers were excluded from the 1997 census when only farmers who earned more than $1,000 in agricultural sales per year were included. Since farms operated by people of color tend to be smaller, such definitional changes influence their representation in the U.S. census more significantly. Wood and Gilbert, "Returning African American Farmers to the Land," 56-58. Nathan Rosenberg discusses the significance of zero-sales farmers and farmers earning less than 1,000 dollars in annual agricultural sales in Census of Agriculture data and the policies it generates. Women, minorities, and beginning farmers are disproportionately likely to be zero-sales operators, but zero-sales farms have not been included in publicly available U.S. census data as a sales category. While such farms play a significant role in the U.S. agricultural landscape, USDA programs have historically targeted high-visibility farmers who participate in commercial agricultural markets. Nathan A. Rosenberg, "Farmers Who Don't Farm: The Curious Rise of the Zero-Sales Farmer," *Journal of Agriculture, Food Systems, and Community Development* (October 2017): 1-9.

[76] Tadlock Cowan and Jody Feder, "The *Pigford* Cases: USDA Settlement of Discrimination Suits by Black Farmers" (Washington, D.C.: Congressional Research Service, May 29, 2013), 1.

[77] Cowan and Feder, 1.

[78] Cowan and Feder, 2.

allowed claimants up to $50,000 in cash and debt relief. Track B required a higher burden of proof and enabled farmers higher levels of compensation based on proven harm. Ultimately, 15,645 of 22,721 (69%) of eligible class members had adjudications approved through the Track A process. 104 farmers (52%) prevailed using Track B, totaling $1.06 billion in cash relief, tax payments, and debt relief.[79]

A decade after *Pigford I,* a second settlement process known as *Pigford II*[80] addressed the large number of denied or disqualified claimants, late claims, notification failures and issues with representation in the first settlement process.[81] $100 million in mandatory spending for late claimants was made available through a 2008 Farm Bill provision, and an additional $1.25 billion required congressional approval.[82] Like *Pigford I, Pigford II* contained two settlement tracks and issued a moratorium on farm foreclosures for farmers with open claims.[83] As of April 2016, 33,346 claims had been made and 18,310 approved. $1.09 billion had been paid to claimants in direct payments, debt relief, or on behalf of claimants to the Internal Revenue Service in tax payments.[84]

The *Pigford* cases, and *Pigford II* in particular, ignited significant political controversy. Representative Steve King (R-IA) strongly opposed *Pigford II,*[85] calling it both a fraud and reparations for slavery in disguise.[86] Mainstream and right-wing media outlets alike reported critically on the large sum of money allocated to settling claims made on questionable grounds[87]

---

[79] Cowan and Feder, 7.

[80] After multiple separate lawsuits were filed, claims were consolidated in a single case: *re Black Farmers Discrimination Litigation*, commonly known as *Pigford II*. Cowan and Feder, 7.

[81] Cowan and Feder, 5.

[82] After multiple failed attempts, the Claims Resolution Act of 2010 (H.R. 4783) passed the Senate and was signed by President Obama in December 2010 as the Food, Conservation and Energy Act § 14012. Cowan and Feder, 5.; Bunbury, "Forty Acres and a Mule," 1238.

[83] Cowan and Feder, "The *Pigford* Cases," 9.

[84] "In re Black Farmers Ombudsman," accessed April 3, 2019, http://inreblackfarmersombudsman.com/

[85] Steve King, "King Offers Amendment to Protect Taxpayers from Billion Dollar Pigford Fraud," Congressman Steve King, Representing the 4th District of Iowa, updated November 30, 2010, https://steveking.house.gov/media-center/press-releases/king-offers-amendment-to-protect-taxpayers-from-billion-dollar-pigford.

[86] See "Probe Pigford Fraud," Investor's Business Daily, updated July 21, 2011, http://bit.ly/1cxeBrc.

[87] Sharon LaFraniere, "U.S. Opens Spigot After Farmers Claim Discrimination," The New York Times, updated October 19, 2018, https://www.nytimes.com/2013/04/26/us/farm-loan-bias-claims-often-unsupported-cost-us-millions.html.; Lee Stranahan, "New Obama 'Pigford' Farmers Settlements Designed for Fraud," Breitbart, updated September 25, 2012, https://www.breitbart.com/politics/2012/09/25/new-obama-farmers-settlements-designed-for-fraud/.

and considered the disparity between numbers of claimants and black farmers reported by the census indicative of fraud.[88]

## III.   Interview Analysis and Results

Literature review and historical research reveals mixed analysis of the *Pigford* settlements and their aftermath.  Some cite *Pigford* as the most successful civil rights litigation in recent decades[89] and a "significant first step" in correcting an egregious history of civil rights violations.[90] Many attest to concerted efforts USDA has taken in response to *Pigford* to address discrimination internally within the Department.[91] However, many severely criticize the settlements[92]  and point to persistent problems with discrimination. Such problems were elucidated in nine semi-structured interviews discussing firsthand and lived experiences with the settlements.

In the following pages, I present results from interview data in four categories. First, I discuss participants' assessment of the *Pigford* cases. Then, I address participants' reaction to purported cultural change within UDSA since the *Pigford* settlements. Third, I present common themes which characterized nine original interviews. I conclude by highlighting policy recommendations offered by respondents.

### A.  Assessing *Pigford*

Pointing to a variety of factors, all participants interviewed for this study acknowledged that the *Pigford* settlements themselves were not adequate to resolve problems African American

---

[88] The New York Times reported that for 16 zip codes in Alabama, Arkansas, Mississippi and North Carolina, the number of claimants exceeded the total number of farm operators of any race. LaFraniere, "U.S. Opens Spigot." Amidst the controversy, Andrew Breitbart released video footage accusing USDA Rural Development director and *Pigford* leader Shirley Sherrod of reverse racism, after which Secretary Vilsack fired her. Vilsack later obtained the full video transcript, exonerated Sherrod, and offered her a new position in USDA. Sherrod declined. Graddy-Lovelace, "The Coloniality of U.S. Agricultural Policy," 85.
[89] Carpenter, "The USDA Discrimination Cases."
[90] Fraas, "The Pigford Settlement."
[91] For example, Horst and Marion cite the creation of the USDA Office of Advocacy and Outreach, a number of Socially Disadvantaged Farmer and Rancher and microloan programs, increased minority representation on FSA boards and efforts to engage people of color in land use planning and resource distribution. Horst and Marion, "Racial, Ethnic, and Gender Inequities in Farmland Ownership," 5.
[92] *Pigford* has been criticized for excluding too many potential claimants, requiring burdensome paperwork or information about similarly situated white farmers to which claimants lacked access. Bunbury, "Forty Acres and a Mule."

farmers have faced and continue to confront. Participants connected the failures of Pigford to persistent land loss, delays in funding distribution, undelivered promises of the settlement agreement and improper communication of the settlement's terms.

When asked whether the *Pigford* settlements adequately compensated farmers who experienced discrimination, most participants agreed: "not at all."[93] One described *Pigford* as a "slap in the face" and a "joke."[94] Participants testified to *Pigford's* minimal impact in improving the situation of black farmers. According to one source who continues to work with black farmers in the Southeast through legal advocacy, *Pigford* had no impact on farm viability, and most claimants wish they would not have filed.[95] This sentiment was repeated frequently and by other legal advocates. One claimed, "the people who were happiest—did best under *Pigford*— were those who opted out, and had administrative lawsuits decided rather than the *Pigford* process."[96] This participant claimed *Pigford* "essentially failed black rural communities."[97] When asked about *Pigford's* long-term impacts, this participant responded: "If you ask me overall has the black community, black farmer and black landownership improved as a result of *Pigford*? I would say no."[98]

Multiple participants mentioned the persistent problems of discrimination and land loss after *Pigford*. Land loss was still acknowledged as a significant problem, and participants cited current examples of discrimination leading to land loss via the same discriminatory practices that gave rise to *Pigford*.[99] One participant, who had conducted thirty qualitative interviews evaluating the impacts of the *Pigford* settlements after working with farmers at USDA, claimed that despite reported increases in the number of black farmers nationally, "almost all significant

---

[93] Interview participant #1, interview by Emma Lietz Bilecky, January 4, 2019.
[94] Interview participant #1.
[95] Interview participant #1.
[96] Interview participant #9, interview by Emma Lietz Bilecky, March 13, 2019, Charlotte, NC.
[97] Interview participant #9.
[98] Interview participant #9.
[99] One interviewee cited a North Carolina case of land loss involving a *Pigford* claimant as recently as 2018. Interview participant #1. Another cited a recent case concerning the use of supervised loans for black farmers in Louisiana (a vehicle FSA agents used historically to discriminate against black farmers). Interview Participant #9. A supervised loan required black farmers to seek approval for all purchases made with loan money from county agents, requiring significant time and effort exerted by farmers and allowing intentional delays for funding approval, forcing black farmers to miss important planting windows, etc. Recent foreclosures on black farmers in North and South Carolina were also cited. Interview participant #9.

farmers have lost land since *Pigford*."[100] "*Pigford* did not help farmers hold onto their land," this participant claimed, "They lost land."[101]

While one participant claimed that many farmers who filed discrimination complaints decades ago still have not received financial compensation owed them,[102] others cited the modesty of compensation compared to material harms suffered[103] and the long period of time elapsed since those harms as other reasons for *Pigford's* inadequacy. Many farmers eligible to participate in the class (those who had brought complaints to the Office of Civil Rights between 1981 and 1996) were either deceased or had lost land by the time payments were distributed.[104] One farmer recounted his own family's story: "My parents who had fought for over 20 years to prove the discrimination…and died, never having received the settlement that the government had agreed to. And they both passed in 2001, and we finally settled with the government in 2011, and we ended up paying them."[105] This participant further reflected: "These farmers had died, they were in nursing homes, they had had strokes…what is 50,000 dollars going to do?"[106]

---

[100] "Significant," in this case, connoted large and profitable. This participant described how census data reporting increases in the number of black farmers includes black farmers who farm small acreages but derive little to no benefit from farm-related income, thus remaining a marginal part of the agricultural economy. Recalling personal interview data, this participant claimed: "Of the 30 people we interviewed only one of the 30 have increased their landholdings since *Pigford*. Some of them have lost 90% of it." Interview participant #8, interview by Emma Lietz Bilecky, February 27, 2019.

[101] Interview Participant #8.

[102] Interview participant #1.

[103] This shortcoming was also noted in the original opinion, which read, "putting a monetary value on the damage done to someone who has experienced discrimination at the hands of the government obviously is no easy matter, and it is probable that no amount of money can fully compensate class members for past acts of discrimination. It is quite clear, as the objectors point out, that $50,000 is not full compensation in most cases." Pigford 185 F.R.D., at 108. One participant shared that for many farmers, 50,000 dollars was not adequate even to cover penalties or interest incurred on debt from USDA loans. What farmers really wanted was not 50,000 dollars, but debt relief, this participant claimed. Interview participant #8. Another participant, describing the reaction of communities engaged in land loss prevention, stated, "the compensation that the A and B tracks provided just wasn't adequate, and they were still having problems accessing USDA programs, operating loans and acquiring…farm property to engage in farming." Omari Wilson, Senior Staff Attorney, Land Loss Prevention Project, interview by Emma Lietz Bilecky, February 21, 2019, Durham, NC. Others reflected on the magnitude of land loss: "There are things that you cannot go back and undo." Robert Bonnie, former Under Secretary for Natural Resources and Environment, USDA, interview by Emma Lietz Bilecky, February 12, 2019, Durham, NC.

[104] "The folk who got the 50,000 dollars were the people who had already been put out of farming. There were very few, I doubt if there were ten farmers who were still farming who actually received the 50,000 dollars." Interview Participant #2, interview by Emma Lietz Bilecky, January 11, 2019, Tillery, NC. Another participant highlighted the problem of the division of settlement payments between heirs after farmers had died. Interview Participant #1.

[105] Interview Participant #2.

[106] Interview Participant #2.

In addition to the modestly of payments, many participants mentioned problems with their distribution which led to worse financial situations for farmers after the settlement. The issue of taxation on settlement income was frequently cited. Though the settlement terms provided an additional 25% of the settlement amount for farmers to be paid to the Internal Revenue Service,[107] participants expressed that the issue of taxation on settlement awards nonetheless led to foreclosures and financial hardship, either because state taxes were not covered[108] or, when claimants received debt relief, it was taxed as income.[109] These problems were attributed in part to poor communication with claimants in *Pigford I*.[110] The issue of exacerbated debts was purportedly corrected in *Pigford II*.[111]

Participants cited a number of administrative problems with the settlements. While many farmers expected to receive debt relief through the Track A and B settlement processes,[112] such relief was not widely administered.[113] Though foreclosures in connection to debt on properties incurred by USDA loans should have stopped during claims processes,[114] one participant testified that foreclosures on farmers with open discrimination complaints were still taking place during Vilsack's tenure.[115] Another participant claimed that farmers did not receive the priority services or technical assistance also promised by *Pigford*.[116] One participant explained that in

---

[107] *Pigford v. Glickman* 185 F.R.D. 82 (1999), at 96.

[108] *Pigford v. Glickman*, at 109.

[109] Additionally, many farmers no longer had their settlement payment by the time taxes were owed. Interview Participant #8.

[110] "What happened was…They didn't get the debt write off…Even though the government paid the taxes on the 50,000, the farmers were not aware they had to claim…the 12,000 dollars…so basically, instead of saying you got 50,000 dollars you actually had to claim 62,000 because of the 12,000 that was paid to the IRS." Interview Participant #2.

[111] "So, a number of farmers got into deeper debt because they had to pay taxes on the money that they weren't prepared to take pay taxes on, the settlement money, that was corrected and *Pigford II*." Interview Participant #5 (land loss prevention advocate), interview by Emma Lietz Bilecky, February 20, 2019.

[112] One participant connected this expectation to precedents set by other civil rights cases and corrective measures which involved debt relief. Interview Participant #8

[113] While the initial Pigford settlement estimated that the average claimant would have 100,000 dollars in debt from USDA, two sources acknowledged that very few claimants actually received debt relief (376 in *Pigford I* and *II*). Nathan Rosenberg, interview by Emma Lietz Bilecky, February 1, 2019, and Interview Participant #8. Another participant claimed, "although some [farmers] may have gotten their debt write down our liquidated, majority of them still are carrying humongous debts even post Pigford to this day." This participant blamed such debt on a "third - wave foreclosure crisis within the African American farm community…" Interview Participant #9.

[114] *Pigford v. Glickman* 185 F.R.D. 82 (1999), at 97.

[115] Bonnie, interview.

[116] Interview Participant #8

*Pigford II* especially, settlements did not reach the right people (i.e. legitimate farmers):[117] "I don't know who got paid but I know that a lot of active black farmers did not get paid, and still haven't been paid, and are still wrestling with their debt, and are still losing their farms. So, the promise of *Pigford* to those communities has done more damage than good."[118]

Participants referenced criteria that made people ineligible to participate in the settlement as another problem.[119] In some interviews, participants attributed failures of the settlement process to the case's legal representation.[120] While some administrative and procedural failures were corrected in *Pigford II*, which expanded the class to more claimants,[121] criticisms of *Pigford* focused also on lasting structural and systemic issues. One participant acknowledged a persistent lack of support from USDA for black farmers.

> There was no concerted effort to help rural black towns, for example, develop grants…no technical assistance to help them apply for grants and—from the USDA to assist them in reestablishing the footprint of farmers in their community, nor for the infrastructure…So I just feel that for those who lost land, there's not been any recovery…[122]

Assistance programs created or implemented after *Pigford* for historically disadvantaged farmers were also seen as flawed or inadequate. One participant explained the way policy design meant to correct issues of exclusion following *Pigford* actually impeded redress.

> There was no [injunctive] relief to hold USDA accountable to the assist farmers in getting preference to farmland, or even their…descendants…The children who grew up on the

---

[117]This participant found that many active farmers didn't get paid, and yet payments in *Pigford I* and *II* were administered to more individuals than there were black farmers according to the census. "And it may have reached folks whose granddaddy farms, but it's hard to say that, 33,000 plus the [7,000] that didn't get approved…I'll say, money went to someone who's not farming. That's clear."  Interview Participant #8.

[118] Interview Participant #8.

[119] Interview 7, Participant A, interview by Emma Lietz Bilecky, February 22, 2019.
 Another participant testified to the problem of ineligibility from his own experience: "I filed as a litigant in *Pigford* and I was successful because I had records, I had documents, I had dates, I had the whole thing. They told me I was not a farmer."[119] Interview Participant #2.

[120] Particularly in *Pigford* I. One participant called Pigford a "lawyer's lawsuit," referencing the lack of input farmers had in *Pigford I*. Interview 2. Another claimed the class council did not properly consult the appropriate interest groups. "There were some farm interest groups that had - but they were not at the table doing the implementation, it was primarily lawyers. And they…did not put emphasis on debt relief program benefits." Interview Participant #8.

[121] Note, however, that such expansion had administrative issues of its own, did not reach the right farmers, and administered very little debt relief. Rosenberg, interview, and Interview Participant #8.

[122] Interview Participant #9.

farms who are now adults…could not qualify for new and beginning farmer loans because they were not farming for 10 or more years…And so while we did get relief, in terms of monetary relief, going to a lot of farmers, the failure of all of this was that it did not assist farmers to re-enter into agriculture themselves as continuing farmers or their descendants as new and beginning farmers.[123]

Some participants spoke to the positive impacts *Pigford* settlements, though they acknowledged their limitations. One participant affirmed that in the Track B settlement process, "people who were severely damaged, many of them were made whole."[124] One participant shared a story of a farmer regaining his land because of *Pigford*.[125] Another participant spoke of non-financial outcomes, including "a glaring exposure, of the inequities in USDA up to that point" that "puts folks on notice that you can't continue to get away with this kind of discriminatory behavior, that there's somebody watching."[126] Conversely, one participant acknowledged a difficulty accompanying the case's public prominence: "To some extent, it may be negative, in that some folks feel that having paid $2 billion dollars they've taken care of the problem"[127] when there is still work to be done.

Overall, participants' assessments of the *Pigford* settlements highlighted procedural and administrative failures,[128] poor communication, the inadequacy of settlement payments, and insufficient measures to address persistent structural discrimination. Criticism targeted both poor execution owing to bureaucratic and procedural failures, but also a number of problems the case did not address.  In their evaluation of the cases, participants described the settlement process not merely as inadequate compared to harms suffered, but as contributing to further land loss. One participant actually blamed the settlements for having "stripped farmers of land."[129] When asked if the situation for African American farmers improved following *Pigford*, seven of ten participants gave negative assessments. Many connected the *Pigford* proceedings to persistent land loss after the settlement, explaining how income taxes and failure to deliver on promises or

---

[123] Interview Participant #9.
[124] Interview Participant #5.
[125] Interview 7, Participant A. Though this outcome was rare, according to other interviews.
[126] Interview Participant #5. Notably, this was one of *Pigford's* intended outcomes, though its success is debated. *Pigford v. Glickman* 185 F.R.D. 82 (1999), at 111.
[127] Interview Participant #8.
[128] Including delays in funding distribution, unclear communication of the settlement's terms, failure to deliver on the settlement's promises, and problems with distribution, even after *Pigford II*. Interview Participants #1 and #2.
[129] Interview Participant #1. This was due in part to taxation and in part under-administered debt forgiveness farmers expected. Interview Participant #8 and Rosenberg, interview.

adequately communicate terms of the agreement led to more land loss.[130] In interviews, participants expressed that *Pigford* "negatively impacted black farm owners and landowners,"[131] "failed black rural communities,"[132] and provided a perception that problems were solved when it in fact, they continued.[133]

### B. Cultural Transformation at USDA

Interviews also assessed whether participants witnessed positive changes within USDA since the *Pigford* settlements, and more specifically, whether Secretary Vilsack's efforts to achieve cultural transformation and civil rights reform had noticeable impacts for black farmers and advocates who work with USDA. Each interview asked questions to determine whether participants perceived cultural change at USDA after *Pigford*, if the situation for black farmers who work with USDA improved after *Pigford* and if participants believed USDA could reform in the future.

In general, assessment of cultural change resulting from and following *Pigford* was negative or the process what considered slow. Three participants pointed to a lack of civil rights enforcement and accountability allowing the continuation of problems *Pigford* sought to correct.[134] Participants expressed discontent that officers accused of discrimination did not lose their jobs. One mentioned that many officials who had discrimination complaints filed against them in *Pigford* still hold positions at FSA county offices and have not been reprimanded.[135] Another explained,

> USDA has a history of paying settlements with discriminatory practices against people, but nobody ever loses their job. So, you…pay out this money, but the people who are in many cases doing or participating in discriminatory practice aren't removed from that position. So, you know, it's likely to happen again. [136]

---

[130] Interview Participants #1 and #2.
[131] Rosenberg, interview.
[132] Interview Participant #9.
[133] Interview Participant #2.
[134] Interview Participant #1, #2, and Rosenberg, interview.
[135] Interview Participant #1.
[136] Interview Participant #5. This issue was also mentioned in Interview 7, Participant A.

Efforts to improve accountability were seen as weak and ineffective. Describing efforts to improve accountability within local FSA offices, one participant recounted,

> They could have told these Southern white boys, "you cannot do that." The language is 'you may,' it is not you *will*, you *may* write off, you may write down. And then the local boys decide who's going to get written off, who's going to get write down and so, it doesn't work. And when people complain, you ought to investigate and rectify, which they never did.[137]

Socially disadvantaged farmer and rancher programs, meant to improve minority land access, were also seen as insufficiently monitored and in need of improved accountability.[138]

> The policy's a lot better than the implementation and the department is not done a good job at following up with implementation. Once in a while, Congress will hold a hearing and point out that they're not doing it. Once in a while the [Government Accountability Office] will do something. The [Inspector General] does very little…in terms…of holding the Department accountable…But I would say the answer would be no, in my opinion, the department itself has not [improved] services as a result of *Pigford*…They have responded to some extent to the Farm Bills that have directed that they do it….Those who got settlements should have received - since the agreement states they would receive increased services - they didn't get it.[139]

Some acknowledged the importance of Vilsack's cultural transformation efforts.[140] Yet another participant relayed criticism of USDA cultural transformation programming for failing to improve accountability and instead compounding problems of discrimination: "All the [cultural transformation] training did was teach people how to discriminate…in a more subtle way, without getting in trouble."[141] This was connected to a perceived pattern of civil rights reform at USDA, which hid discrimination more than it addressed it: "the Civil Rights Department at the

---

[137] Interview Participant #2.
[138] This was qualified by an acknowledgement of improvements regarding documentation within the past five years, for instance, requirements for receipt of service for all inquiries and interactions between farmers and FSA offices. Interview Participant #9. Improved documentation measures, including electronic documentation, was also cited in Interview 7, participant A.
[139] Interview Participant #9. Interview Participant #8 also compared Farm Bill measures to address equity with USDA initiatives, showing preference for the former.
[140] Bonnie, interview.
[141] Rosenberg, interview.

USDA from the very beginning was there to cover up discrimination rather than address it, and this culture has stayed with the agency for the past 50 years."[142]

Two of ten participants cited the persistent lack of programs and policies designed to help black farmers as reasons stifling cultural change. One participant claimed no more help was given to black farmers after *Pigford* than before *Pigford*.[143] A participant who worked closely with the USDA Office of Civil Rights attested: "No, I haven't seen any progress as a result of Pigford," citing poor implementation of provisions designed to improve transparency and accountability.[144] Another cited the minimal increases in the share of loans distributed to black farmers as evidence of little progress.[145]

While cultural transformation initiatives following *Pigford* sought to improve minority representation within USDA[146] and FSA county offices, many participants viewed such efforts as minimally successful. Though one former USDA employee confirmed that the administration closely monitored hiring practices after *Pigford*,[147] others doubted the impacts of such efforts. In some cases, 'representation' was seen as more symbolic than effective. Two participants explained that representation does not necessarily guarantee voice or decision-making power on majority white committees,[148] expressing a need for additional measures to ensure decision-making power and influence are distributed.

Three participants gave qualified responses when assessing USDA's cultural transformation. One acknowledged positive steps to address civil rights as well as a more acute awareness of discrimination within the Department of Agriculture at large, but also a need for continued improvements and regained trust.[149] Two acknowledged that some progress had been made, citing heightened exposure of USDA's history of discrimination and ongoing surveillance

---

[142] Rosenberg, interview.
[143] Interview Participant #2.
[144] This participant mentioned service tracking for socially disadvantaged farmers since the 2002 Farm Bill as a positive improvement but did not credit the Department for its implementation. Interview Participant #8.
[145] Rosenberg, interview.
[146] Bonnie, interview.
[147] Bonnie, interview.
[148] Interview Participant #2.; "They tried to do things like trying to put one black on the committee. Whatever. But that does matter if it's a committee of three or four, the votes will be 3 to 1 and the results will be the same."[148] Interview Participant #8.
[149] "Is there still a distrust from the outside? Absolutely, and it's going to be these for quite some time;" "I worked with USDA for eight years, great place, there are great people there. There's more work to be done." Bonnie, interview.

of USDA practices as positive outcomes, but expressed that such changes did not necessarily guarantee civil rights reform.[150] One provided a searing criticism, explaining that improved information and exposure failed to effect substantial change in representation or institutional culture.

> Everyone knew that USDA were discriminating against black farmers, it was completely clear on the record, courts…had judged that they discriminated against black farmers. USDA did absolutely nothing…They didn't move the people that were – the loan officers that were…discriminating. They didn't hire black people to work with…black farmers…The share of FSA employees that were black actually went down during the…Vilsack administration…There was no concerted effort to increase the amount of loans or even address the discrimination… They took absolutely zero disciplinary actions as a result of discrimination against black farmers.[151]

In addition to enforcement and accountability failures, the challenge of cultural transformation was connected to USDA's institutional culture and biases. Participants spoke to a persistent culture of farming which favors larger, white farmers.[152]

> I think one of the things that USDA could do is to recognize that many of the black farmers are small farmers and many of USDA's programs are geared towards large, corporate farmers. And they will argue with you that they're not, but in the practical application of it, they are, so they need to address that.[153]

One researcher traced this systemic discrimination in agricultural policy to the New Deal, describing how policies to support small farmers did not survive due to racism against smaller, black farmers in the 1950s and 60s South.[154] This legacy has had lasting effects on the Department of Agriculture, influencing which farmers and programs continue to receive federal priority today. Some traced the problem of discrimination in loan assistance to the mechanization of the agricultural industry and its lasting impacts. One recounted that prior to agricultural mechanization, when loans were not universally required, farmers were more autonomous and discrimination less impactful.

---

[150] Interview Participants #1, #5, and Wilson, interview.
[151] Rosenberg, interview.
[152] Rosenberg, interview, and Interview Participant #5.
[153] Interview Participant #5.
[154] Rosenberg, interview.

Before you had equipment…you could farm as much land as you had kids. But when they got mechanized, you needed loans to buy equipment and…the system was segregated to the extent that the Department - decisions were made by white committees, out in the counties, and they took care of themselves, their family and friends, blacks happen not to be one of the above, and we didn't get anything.[155]

The need for loans and agricultural assistance was connected to the high entry costs of farming, which were seen as persistent barriers to land access.[156] Another perceived, institutionalized  barrier to land access for black farmers included burdensome paperwork requirements for loans and documentation many small, limited resource farmers are unable produce.[157] "And this is something that's a problem with USDA, across the board. They require so much paperwork. And it…becomes challenging because there's so much. I think they need to figure out different ways to streamline things."[158] Additionally, one wondered whether disenchantment functions to discourage new complaints:

In North Carolina, we have seen a dip in discrimination complaints being filed. But that's not to say that discrimination is not happening. It's just that people are disenchanted with filing complaints… And it could be because they don't feel like the Office of Civil Rights is doing what they need to do to assist the farmers. So, there's still systemic-wide issues with the Office of Civil Rights and their inability, it seems, to manage caseload and investigate. And I don't know if that's a function…of being under-resourced, or a lack of will, right?[159]

Participants acknowledged paperwork requirements for participation in USDA programs as well as biases which favor large farmers within USDA as persistent structural barriers to USDA's cultural change. One former USDA employee spoke to the administrative costs of conservation programs making participation easier and more viable for larger farmers and landowners.[160] Some advocates saw recent minority participation in USDA programs as more

---

[155] Interview Participant #8.
[156] Interview Participants #2, #5, and #8 all cited the high entry costs of farming as a related problem.
[157] Interview 7, Participant A also cited burdensome paperwork requirements as making claimants in *Pigford* ineligible.
[158] Interview 7, Participant A.
[159] Interview Participant #9.
[160] Larger farmers benefit more from conservation payments due to higher acreages, and USDA's transaction costs are lower when working with fewer, larger landowners. Bonnie, interview.

accidental than intentional and only minimally effective in helping black farmers succeed.[161] Socially disadvantaged farmer programs, sometimes attributed to a changing culture at USDA, were seen as too broad, too little prioritized, and too underfunded to substantially assist black farmers.[162]

One participant claimed progress toward cultural transformation was slow due to the Department's failure to take civil rights seriously.[163] This participant noted the issue of oversight, claiming that the department was not currently including civil rights performance in evaluating its employees.[164] Farmers' perceptions of the culture of USDA still prevents their participation in USDA loan and assistance programs. One participant who works closely with farmers of color to provide technical assistance and loan access shared that many farmers "will go to other places to get loans, they do it out of pocket, they work with the land grant institution, but they will not go to USDA. And just, you know, it's at the point, I don't even try anymore."[165] Four participants were explicitly negative in their assessment of USDA's discriminatory history and culture.[166] Multiple participants acknowledged that farmers still perceive USDA as a "good old boys club,"[167] or "the last plantation."[168] Five cited some positive changes in the culture of USDA while still acknowledging the need for further improvements.[169]

When asked if USDA can change in the future, participants expressed varying degrees of optimism. Some said no,[170] while others cited the prevalence of persistent structural racism.[171]

---

[161] "You can't pursue an outcome you're not intentionally driving towards. So, it's almost as if whether or not the farmer maintains their land access, or their land tenure, utilizing these programs is almost a happenstance, when - but it's touted, as if this is the purpose of it." Interview 7, Participant B (land loss prevention advocate), interview with Emma Lietz Bilecky, February 22, 2019.

[162] One participant mentioned the problem of heightened competition for scarce funding and assistance. According to this source, programs could to better to specifically target black farmers: "But because the program bandwidth…has been extended to a large degree away from like direct technical assistance to socially disadvantaged farmers. And because it has increased its reach, I believe that you will not see that many grants going to historic organizations that have been doing this work." Interview Participant #9.

[163] Interview Participant #8.

[164] Interview Participant #8.

[165] Interview Participant #5.

[166] Interview Participants #1, #2, #8 and Rosenberg, interview.

[167] Interview Participants #2, #5.

[168] Rosenberg and Bonnie, interviews.

[169] Interview Participant #9, Interview 7, Participant A, Bonnie and Wilson, interviews.

[170] Interview Participant #2.

[171] Interview 7, Participant 1.

Others believed USDA could change with time,[172] serious effort,[173] or with the right strategy, leadership and political will.[174] Multiple participants attested to the importance of dedicated leadership due to the massive and disparate nature of the department[175] and expressed doubt that change would happen under the current administration or without the right administrative leadership.[176] All participants spoke to the persistent difficulty of civil rights reform and cultural change within USDA.

### C. Common Themes

Three themes characterized all interviews: mistrust, disrespect, and the difficulty of cultural change. Mistrust has sustained despite USDA efforts to support farmers who experienced discrimination. It became clear throughout interviews that this case is about more than the period the case addressed: it represents a history of unfair treatment of farmers of color. Regaining this trust is no simple task.

Experiences of discrimination are connected to painful perceptions of disrespect also. Black farmers have been marginalized in U.S. agriculture, and their contributions have not been sufficiently acknowledged. *Pigford* was not only a "slap in the face,"[177] it was one instance in a long series of such offenses. One participant recounted with pain his experience being perceived as an illegitimate farmer when filing as a class member in *Pigford I*.[178] Black farmers have been made invisible in U.S. agriculture for many of the reasons cited above: exclusion from policy and programs, preference given to larger, white farmers and failures to substantially assist farmers whose material realities are determined by histories of mistreatment, discrimination and exclusion. In addition, participants spoke to the negative depiction of black farmers in the national media following *Pigford II*. Right-wing and mainstream media outlets, including the New York Times, accused claimants of fraud.[179] Claimants were seen as "money grubbers" and

---

[172] Bonnie and Wilson, interviews.
[173] Rosenberg, Wilson, and Bonnie, interviews.
[174] Bonnie, interview.
[175] Bonnie, interview.
[176] Interview Participant #8 and Rosenberg, interview.
[177] Interview Participant #1.
[178] "I had records, I had documents, I had dates, I had the whole thing. They told me I was not a farmer." Interview Participant #2.
[179] Rosenberg, interview.

illegitimate recipients of the repayment *Pigford* provided.[180] Such a portrayal compounded the disrespect black farmers already felt, exacerbated by census data reporting which in some ways erased black farmers and their stories of land loss.[181]

Finally, cultural change is exceedingly difficult, and so far, unaccomplished. Participants expressed both that change takes time, but also that problems are deeply embedded. After a history of repeated failures and unkept promises, some advocates attested to farmers' persistent unwillingness to participate in USDA programs.[182] Another farmer communicated that efforts to enroll black farmers in conservation programs failed to consider the cultural importance of farming traditions.[183] Respondents expressed cultural change would require more than merely creating new programs to help black farmers achieve economic viability, but also consulting and responding to communities to respect their stories, meet their needs and regain trust.

### D.  Policy Recommendations

Respondents offered a number of policy recommendations for improving accountability, achieving programmatic reform, and elevating the priority of civil rights to improve relations between black farmers and USDA. When asked what USDA can do to better, most acknowledged a need for accountability and enforcement, including punishing those who discriminated or firing those who had discrimination claims filed against them.[184] Others pointed to a need for increased oversight to ensure that provisions and services to help minority farmers such as loan application assistance and modified criteria for loan applications were properly implemented.[185] One suggested monitoring the share of loans actually distributed to black farmers,[186] and another that USDA work to "measure what matters" for farmers on the ground,

---

[180] Interview Participant #1.
[181] Interview Participant #8 spoke to the discrepancy between farmers who failed to receive compensation and farmers counted in the census, noting that *Pigford's* reportedly successful claimants may have been non-farmers. As discussed earlier, underrepresentation in census data has been a significant problem for the visibility, equitable treatment and support of black farmers. The way census data has been interpreted in popular commentary contributes to patterns of delegitimization and erasure as it optimistically claims improvements farmers may not perceive. See Rosenberg, "Farmers Who Don't Farm."
[182] In her work with black farmers, one advocate aims to improve perceptions both of black farmers and USDA assistance programs, highlighting the contributions of black farmers and taxpayers to help them understand that they, too, deserve government benefits. Interview Participant #5.
[183] Interview Participant #2.
[184] Interview Participants #1, #2, and Rosenberg, interview.
[185] Interview Participant #1, and Bonnie, interview.
[186] Rosenberg, interview.

considering not only individual farmers' needs but the systems and local economies which support them.[187] Finally, participants cited the need for further investigation.[188] One suggested the Department of Justice perform an independent investigation and audit FSA.[189]

Other recommendations targeted programmatic reform. Some pointed to the need for increased assistance, such as increases in cost share for conservation programs, community outreach, improved technical assistance programs[190] and financial competency workshops for farmers.[191] Others suggested making programs more user-friendly and better tailored to small farmers.

> But we've got to make the programs more user-friendly. We've got to make people who work with USDA understand that everybody is not from the same cultural background and/or experience, you know, and, and do some sort of programmatic design that will allow small farmers to take a risk to change a crop to buy new equipment... When a tractor can cost $400,000, and you're a subsistence farmer, meaning that, you know, you make enough to breakeven every year, how are going to afford to buy a new tractor that costs more than your house?[192]

One suggested that the government actually make land available to farmers to buy or rent,[193] and another that USDA consider how it can replace income streams lost with land.[194] While some merely suggested USDA follow through on promises made and better implement programs designed to support black farmers, for instance, by tracking services provided to socially disadvantaged farmers, others suggested USDA creatively consider how to support to rural towns and community groups it has not traditionally supported.[195] Treating programs which support small and minority farmers as vital to the national agricultural economy and not merely as handouts was also suggested.[196]

---

[187] Interview 7, Participant B.
[188] Interview Participant #1, and Rosenberg, interview.
[189] Interview Participant #1.
[190] Interview Participant #5.
[191] Interview Participant #9.
[192] Interview Participant #5.
[193] Rosenberg, interview.
[194] Interview Participant #9.
[195] Interview Participant #9.
[196] "Main Street is important for big business. We need small businesses to keep the economy going. We need the small farms to keep the agricultural economy going. And we've got to come to terms with that. And we've got to create some – and I'm not talking about handout programs or anything like that – but we've got to make the programs more user-friendly." Interview Participant #5.

Overall, participants recommended continuing to prioritize civil rights at the department and promoting people committed to cultural transformation,[197] though they recognized sustaining buy-in and a vision of transformation remains a challenge as administrations change. Advocates highlighted the need for better listening, representation of affected communities within the department[198] as well as new and creative leadership.[199]

## IV.    Discussion

Disappointment expressed over the *Pigford* settlement process was not surprising in light of extensive literature and commentary on the issue. In some ways, the settlement agreement anticipated such disappointments. The text of the initial *Pigford* case itself acknowledges the limits of financial compensation offered. *Pigford* could not wholly correct discrimination at USDA—that was too big a task, according to Judge Friedman.[200] What it *did* intend was for the billions of dollars paid to black farmers to "serve as a reminder to the Department of Agriculture that its actions are unacceptable" and "deter it from engaging in the same conduct in the future."[201]

In some ways, *Pigford II* corrected some of the procedural and administrative errors participants cited in interviews. Even still, mistrust persists. As many problems continued even after 2010, however, indicates that they cannot be resolved by, as one respondent put it, simply "[throwing] all that money at it."[202] Such problems are deeply embedded. A symbolic settlement agreement serving as a "reminder" of a discriminatory history is indeed important, but it is no guarantee of structural change. Problems are reproduced not only by racist individuals, but also by institutional culture. If USDA neglects to transform its leadership but also fails to consider the ways in which its criteria of evaluation, programming, funding allocations, measures of success, and the kinds of policy solutions it imagines contribute to root problems, it may fail to adequately address them.

---

[197] Bonnie, interview.
[198] Wilson, interview.
[199] Interview Participant #9.
[200] "The court cannot guarantee class members that they will never experience discrimination at the hands of USDA again, and the consent decree does not purport to make such a guarantee." *Pigford v. Glickman* 185 F.R.D. 82 (1999), at 111.
[201] *Pigford v. Glickman*, at 112.
[202] Interview Participant #8.

Addressing discrimination and approaching institutional reform are complex goals which require more than merely identifying and extricating racist actors. If the *Pigford* settlements are to be understood as appropriate compensation for institutional racism against black farmers in U.S. agriculture, they must be coupled with a wider movement initiating institutional reform at USDA. Attention must be paid, then, not only to compensatory, redistributive, or reparative metrics, but also to cultural mores, patterns of behavior, values expressed by institutional representatives, perceptions of change held by advocates and community-based organizations and USDA client (farmer) attitudes. Policy analysis assessing structural change must consider not only individual behaviors and funding distribution, though these, too, are important, but also legal contexts,[203] geographic environments and institutional biases in evaluating the authenticity and permanence of cultural change.

George Lipsitz's conception of *racialized space* is helpful to this analysis, as it describes the ways in which land ownership and distribution are not only a consequence of discrimination, but actually reproduce inequalities. Though Lipstiz discusses how segregated housing, land use policy, and tax codes which preserve intergenerational wealth within white families function to racialize urban and suburban landscapes in the United States by creating communities from which racial biases and identities emerge,[204] his analysis can be applied to agricultural landscapes as well. "Largely because of racialized space," he writes, "whiteness in this society is not so much a color as a condition."[205] Considering racialized processes of farmland ownership and agricultural wealth, we might consider a circular process through which rural agricultural land, too, becomes racialized.[206] Agricultural land controlled by white Americans has shaped the

---

[203] For instance, the problem of heir's property law in the Southeastern U.S.

[204] "People of different races do not inhabit different places by choice. Housing and lending discrimination, the design of school district boundaries, zoning regulations, policing strategies, the location of highways and transit systems, and a host of tax subsidies do disastrous work by making places synonymous with races." George Lipsitz, *How Racism Takes Place* (Philadelphia, PA: Temple University Press, 2011), 6.

[205] Lipsitz, 3.

[206] Graddy-Lovelace argues that "racialization was used to justify extreme violence and oppression in the name of agricultural expansion and productivity. Driving these entrenched hegemonies have been the epistemic devaluations of indigenous, African diaspora, women-led and immigrant agrarian knowledges, which were capitalized upon while being formally disregarded and demeaned. Subjectivities of inferiority were leveraged against other subjected communities in colonialist 'divide and conquer' strategies. The expansionist project of removing' native people was underwritten by U.S. agricultural agendas and policies of wheat and livestock…U.S. agricultural policy has remained neocolonialist in subtle and overt ways. It festers in unjust work conditions all along the food chain. These injustices depend on and deepen constructed hierarchizations of ethnicity, gender, language and nationality/citizenship."  Graddy-Lovelace, "The Coloniality of U.S. Agricultural Policy," 82.

U.S. economy from its founding, and plantation-style agricultural systems played a key role in the United States' rise to global economic power.[207] Agricultural land has likewise served as a development tool pushing a kind of providential imagination westward with a particular class of white American farmers.[208] As agricultural production became increasingly mechanized, agricultural "improvement" efforts tended to support white-owned farms and value certain forms of agricultural education over others.[209] If agricultural institutions like USDA arise from and respond to an agricultural landscape shaped by values which have historically privileged white-owned farms and farmers, they may also reinforce them. The failure and relative weaknesses of policies designed to assist African American farmers,[210] then, are not accidental realities, but the consequences of institutional biases. Overt acts and hidden acts of racism which have driven land loss and shaped Southern agricultural landscapes in particular are not the primary cause of such biases; they are its result and defense.

In a parallel analysis of USDA discrimination against Latino immigrant farmers in the U.S., Laura-Anne Minkoff-Zern and Sean Sloat question the legitimacy of the USDA's "new era of civil rights." Citing James Scott's *Seeing Like a State,* they argue some forms of agrarian knowledge and practice are *illegible* to the state, as they "do not replicate state-sanctioned or dominant forms of farming."[211] Marginalized forms of agricultural practice, they claim, are then deemed unworthy of funding.[212] For Minkoff-Zern and Sloat, efforts to address institutionalized racism do not adequately acknowledge significant schisms of cultural misunderstanding,

---

[207] See Edward E. Baptist, *The Half Has Never Been Told: Slavery and the Making of American Capitalism* (New York: Basic Books, 2014).

[208] See Jedediah Purdy, *After Nature: A Politics for the Anthropocene* (Harvard University Press, 2015), 129-133.; Horst and Marion note how the Homestead Acts redistributed land taken from Native Americans and low or no cost to U.S. citizens (thereby excluding indentured servants, recent immigrants, and slaves). The legislation ultimately reallocated 20% of U.S. (246 million acres) to nearly 2 million households between, mostly white, between 1863-1939. Horst and Marion, "Racial, Ethnic, and Gender Inequities in Farmland Ownership," 7.

[209] Levi Van Sant discusses the way agricultural "improvement" projects promoted by the federal government and agricultural societies possessed a racialized bias for white-owned farms and were used as a tool of dispossession. See Levi Van Sant, "'Into the Hands of Negroes: Reproducing Plantation Geographies in the Carolina Lowcountry," *Geoforum* 77 (2016): 196-205.

[210] C.f. Thirteen African American Resettlement Communities were established by Franklin Delano Roosevelt's New Deal Resettlement Administration, creating pathways to landownership for many farmers of color in the South, for instance in Tillery, North Carolina. Jess Gilbert and Spencer Wood, "The New Deal State and Local African-Americans Remake Civil Society in the Rural South, 1935-2004," presented at the Rural Sociological Society Annual Meeting (Sacramento, CA: August 2004).

[211] Particularly those interpreted as "unscientific." Minkoff-Zern and Sloat, "A New Era of Civil Rights?," 632.

[212] Minkoff-Zern and Sloat, 633.

misrepresentation and historic erasure through which federal government policy persistently fails to comprehend and thus properly address and support the experience of minority farmers.[213]

With the framework of legibility in mind, I return to a critical analysis of the *Pigford* cases and their lasting impacts as experienced by black farmers and landowners and those who have worked closely with them. When asked to evaluate *Pigford* and identify changes still required to approach justice for black farmers, interview participants identified misinformation, lack of accountability, bureaucracy, and insufficient financial assistance as characteristics of the settlement process. But participants also expressed mistrust of USDA, anger over sustained and ill-addressed injustices, deep disappointment over continuing land loss, and noted persistent structural barriers to cultural transformation.

Persistent discrimination in agriculture, I argue, owes itself not only to a lack of accountability or program design, but to USDA's perception of its own mission and purpose, determined by the farmers with whom it engages. Perhaps equity ought to begin with attention to and respect for farmers who have made vital contributions to the U.S. agricultural economy yet repeatedly have been rendered invisible by and excluded from it. If the problems the *Pigford* cases and their aftermath make clear relationships of distrust through repeated acts of marginalization, solutions are not only about compensation, though compensation and correcting mistakes are vital to justice efforts. It is through such efforts, moreover, that USDA must demonstrate its commitment to change. But as many participants noted, black farmers must also be shown respect, recognized, and valued within agricultural economies, even if their operations have historically resisted or been excluded from agriculture's dominant trends. Perhaps justice requires a reexamination of these agricultural economies themselves, the histories that have shaped them, and the lives and communities they have shaped in turn.

## V.    Implications

Equity is an important component of a sustainable and just agricultural economy. As one participant in this study put it, "the more people who have a stake in our agricultural system, the

---

[213] Citing the state's inability to legitimate accusations of discrimination in subsequent class action suits against the USDA, and the larger number of USDA programs tailored to large grain farmers, they argue that "government expectations of modernization largely function as gatekeepers to agricultural development and growth, despite individual and structural efforts to create inclusivity." Minkoff-Zern and Sloat, 636.

more people will be concerned with its results."[214] In thinking about the future of agriculture, we must consider who has the power to shape it, which agricultural practices, communities and forms of knowledge are valued within it, and the danger of erasure.

Some participants expressed hope that the Department of Agriculture could undergo authentic cultural transformation, though so far this transformation has been only partial. USDA's cultural transformation is at best, slow, and at worst, too disparate and misdirected to produce the kind of results for which it hopes. The success of reform, I argue, requires attention not only to individual instances of discrimination, but also to the many ways in which discrimination is institutionalized, not only by workplace culture and representation but also in the way policies continue to privilege some farmers and not others.

It is clear there is much work still to be done in USDA's process of cultural transformation. To reform its institutional culture, USDA must demonstrate that it is *for* farmers of color and committed not only to making reparations, but also to enabling their full participation in agricultural economies and valuing their contributions, while continuing to work to understand the injustices it has perpetrated in so many different but interlocking ways. Policy and institutional culture shaped over decades of discrimination *lasts*. Changing structurally embedded problems is not simple, and many strategies will be required, including devoting renewed attention to USDA's mission, values and purpose while following the lead of farmers, visionaries and advocates who stand up for those historically excluded from U.S. agriculture.

---

[214] Rosenberg, interview.

## Bibliography

Ammons, Shorlette. "Shining a Light in Dark Places: Raising Up the Work of Southern Women of Color in the Food System: A Policy Brief." New York: Center for Social Inclusion, 2014.

Bahrenburg, Andrew, Holly Rippon-Butler, and Erin Foster West. "A Farm Bill for the Future." National Young Farmers Coalition. Updated December 12, 2018, https://www.youngfarmers.org/2018/12/farmbillforthefuture/.

Baptist, Edward E. *The Half Has Never Been Told: Slavery and the Making of American Capitalism.* New York: Basic Books, 2014.

Barth, Brian. "Black Land Matters." Modern Farmer. Accessed February 14, 2019, https://modernfarmer.com/2018/08/black-land-matters/.

Beckert, Sven. *Empire of Cotton: A Global History.* New York: Vintage Books, 2014.

Browne, Robert S. "Only Six Million Acres: The Decline of Black-Owned Land in the Rural South." New York: Black Economic Research Center, 1973.

Bunbury, Mark A. Jr. "Recent Development: 'Forty Acres and a Mule'…Not Quite Yet: Section 14012 Of the Food, Conservation, and Energy Act Of 2008 Fails Black Farmers," 87 N.C.L. Rev. (2009): 1230-1251.

Carpenter, Stephen. "The USDA Discrimination Cases: Pigford, In Re Black Farmers, Keepseagle, Garcia, And Love." 17 Drake J. Agric. L. (2012): 1-35.

Center for Social Inclusion. "Regaining Ground: Cultivating Community Assets and Preserving Black Land." New York: 2011.

Civil Rights Action Team. "Civil Rights at the United States Department of Agriculture." Washington, D.C.: United States Department of Agriculture, 1997.

Clark, Monica M. "So Near, Yet so Far: The Past, Present, and Future of the Complaints Process within the USDA." 32 S.U. L. Rev. (2005): 139-194.

Cowan, Tadlock and Jody Feder. "The *Pigford* Cases: USDA Settlement of Discrimination Suits by Black Farmers." (Washington, D.C.: Congressional Research Service, May 29, 2013).

Daniel, Pete. *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures Since 1880.* (Champaign, IL: University of Illinois Press: 1985).

Daniel, Pete. *Dispossession: Discrimination against African American Farmers in the Age of Civil Rights.* Chapel Hill: University of North Carolina Press, 2013.

Davy, Dãnia C., Savonala Horne, Tracy Lloyd McCurty, and Edward "Jerry" Pennick. "Resistance." *Land Justice: Reimagining Land, Food and the Commons in the United States*. Edited by Justine M. Williams and Eric Holt-Giménez. Oakland, CA: Food First Books, 2017.

Dixon, Deborah P. and Holly M. Hapke. "Cultivating Discourse: The Social Construction of Agricultural Legislation." *Annals of the Association of American Geographers* 93 no. 1 (2003): 142-164.

Equal Justice Initiative. "History of Racial Injustice: Sharecropping." Accessed April 14, 2019, https://eji.org/history-racial-injustice-sharecropping.

Fraas, Phil. "The Pigford Settlement: Grading its Success and Measuring its Impact." Federation of Southern Cooperatives (2013). Accessed March 16, 2019. db04/0836770.0002/8366441.1 wp14.

Gilbert, Jess and Spencer Wood, "The New Deal State and Local African-Americans Remake Civil Society in the Rural South, 1935-2004." Presented at the Rural Sociological Society Annual Meeting. Sacramento, CA: August 2004.

Gilbert, Jess, Gwen Sharp, and M. Sindy Fezin. "The Loss and Persistence of Black Owned Farms and Farmland: A Review of the Research Literature and Its Implications." *Southern Rural Sociology* 18 no. 20 (2002): 1-30.

Gilbert, Jess, Spencer D. Wood, and Gwen Sharp, "Who Owns the Land: Agricultural Land Ownership by Race/Ethnicity." *Rural America* 17 no. 4 (2002): 55-63.

Graddy-Lovelace, Garrett. "The Coloniality of U.S. Agricultural Policy: Articulating Agrarian (in)Justice." *The Journal of Peasant Studies* 44, no. 1 (January 2, 2017): 78–99.

Harvey, Sylvia A. "For Decades, the USDA Was Black Farmers' Worst Enemy. Here's How It Became an Ally." Accessed February 19, 2019, https://www.yesmagazine.org/people-power/the-resurgence-of-black-farmers-20160708.

Hickmott, Alec Fazackerley. "Black Land, Black Capital: Rural Development in the Shadows of the Sunbelt South, 1969–1976." *The Journal of African American History* 101 no. 4 (September 1, 2016): 504–34.

Hinson, Waymon R. and Edward Robinson. "'We Didn't Get Nothing:' The Plight of Black Farmers." *Journal of African American Studies* 12, no. 3 (September 2008).

hooks, bell. *Belonging: A Culture of Place.* New York: Routledge, 2009.

Horst, Megan and Amy Marion. "Racial, Ethnic and Gender Inequities in Farmland Ownership and Farming in the U.S." *Agriculture and Human Values* 36, no. 1 (March 2019): 1-16.

"In re Black Farmers Ombudsman." Accessed April 3, 2019,
http://inreblackfarmersombudsman.com/cgi-sys/suspendedpage.cgi.

Jackson Lewis LLP. "United States Department of Agriculture Independent Assessment of the
Delivery of Technical and Financial Assistance: 'Civil Rights Assessment Report.'" New
York: March 2011.

King, Steve. "King Offers Amendment to Protect Taxpayers from Billion Dollar Pigford Fraud."
updated November 30, 2010, https://steveking.house.gov/media-center/press-
releases/king-offers-amendment-to-protect-taxpayers-from-billion-dollar-pigford.

LaFraniere, Sharon. "U.S. Opens Spigot After Farmers Claim Discrimination." The New York
Times. Updated October 19, 2018, https://www.nytimes.com/2013/04/26/us/farm-loan-
bias-claims-often-unsupported-cost-us-millions.html.

Minkoff-Zern, Laura-Anne and Sean Sloat. "A New Era of Civil Rights? Latino Immigrant
Farmers and Exclusion at the United States Department of Agriculture." *Agriculture and
Human Values* 34 no. 3 (2017): 631–43.

National Sustainable Agriculture Coalition. "An Agenda for the 2018 Farm Bill." Washington,
DC: October 2017.

Paschal, Olivia. "A Boost for Young, Diverse Farmers." The Atlantic. Updated December 16,
2018, https://www.theatlantic.com/politics/archive/2018/12/farm-bill-funds-programs-
new-and-diverse-farmers/578260/.

Penniman, Leah. *Farming While Black: Soul Fire Farm's Practical Guide to Liberation on the
Land.* White River Junction, Vermont: Chelsea Green Publishing, 2018.

*Pigford v. Glickman*. 185 F.R.D. 82 (1999).

"Probe Pigford Fraud." Investor's Business Daily. Updated July 21, 2011. http://bit.ly/1cxeBrc.

Rosenberg, Nathan A. "Farmers Who Don't Farm: The Curious Rise of the Zero-Sales Farmer."
*Journal of Agriculture, Food Systems, and Community Development* (October 2017): 1-9.

Rosenberg, Nathan and Bryce Stucki. "The Butz Stops Here: Why the Food Movement Needs to
Rethink Agricultural History." 13 J. Food L. & Policy 12 (2017): 12-25.

Salamon, Lester M. *Land and Minority Enterprise: The Crisis and the Opportunity*. Durham,
NC: Duke University Institute of Policy Sciences and Public Affairs, June 30, 1976.

Sanders, Kindaka Jamal. "Re-Assembling Osiris: Rule 23, the Black Farmers Case, and
Reparations." 118 Penn St. L. Rev. (2013): 339-373.

Shute, Lindsey Lusher et al. "Building a Future with Farmers: Challenges Faced by Young, American Farmers and a National Strategy to Help Them Succeed." New York: National Young Farmers' Coalition, November 2011.

Special Field Orders No. 15. Headquarters Military Division of the Mississippi. January 16, 1865. Orders & Circulars. Series 44. Adjutant General's Office. Record Group 94. National Archives.

Stranahan, Lee. "New Obama 'Pigford' Farmers Settlements Designed for Fraud." Breitbart. Updated September 25, 2012, https://www.breitbart.com/politics/2012/09/25/new-obama-farmers-settlements-designed-for-fraud/.

Twitty, Michael W. *The Cooking Gene: A Journey Through African American Culinary History in the Old South*. New York: HarperCollins, 2018.

Tyler, Shakara S. and Eddie A. Moore. "Plight of Black Farmers in the Context of USDA Farm Loan Programs: A Research Agenda for the Future." *Professional Agricultural Workers Journal* 1 no. 1 (2013): 1-11.

United States Commission on Civil Rights. "Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture." Washington, D.C.: 1965.

United States Commission on Civil Rights. "The Decline of Black Farming in America: A Report of the United States Commission on Civil Rights." Washington, D.C.: February 1982.

United States Department of Agriculture National Agricultural Statistics Service. "Table 69: Summary by Age and Primary Occupation of Principal Operator." 2012. Accessed February 13, 2019. https://www.nass.usda.gov/Publications/AgCensus/2012/Full_Report/Volume_1,_Chapter_1_U.S./st99_1_069_069.pdf.

United States Department of Agriculture National Agricultural Statistics Service. "Black Farmers: Up 12% since 2007; most live in Southern States: 2012 Census of Agriculture Highlights." Updated September 2014, https://www.nass.usda.gov/Publications/Highlights/2014/Highlights_Black_Farmers.pdf.

United States Department of Agriculture National Agricultural Statistics Service. "Table 60. Selected Farm Characteristics by Race of Principal Operator: 2012 and 2007." Accessed April 14, 2019, https://www.nass.usda.gov/Publications/AgCensus/2012/Full_Report/Volume_1,_Chapter_1_US/st99_1_060_060.pdf.

United States Department of Agriculture. "About the U.S. Department of Agriculture: What We Do." Accessed March 26, 2019, https://www.usda.gov/our-agency/about-usda.

Van Sant, Levi. "'Into the Hands of Negroes: Reproducing Plantation Geographies in the Carolina Lowcountry." *Geoforum* 77 (2016): 196-205.

Vilsack, Tom. "The People's Department: A New Era for Civil Rights at USDA." Medium. Updated August 2, 2016. https://medium.com/usda-results/https-medium-com-usda-results-chapter-8-b57f91b64d49.

White, Monica. *Freedom Farmers: Agricultural Resistance and the Black Freedom Movement*. Chapel Hill, NC: University of North Carolina Press, 2108.

Wood, Spencer D. and Jess Gilbert. "Returning African American Farmers to the Land: Recent Trends and a Policy Rationale." *The Review of Black Political Economy* 27, no. 4 (March 2000): 43-64.

Zabawa, Robert, Tasha M. Hargrove, Ntam Baharanyi, and Richard A. Levins. *Shut Out: How US Farm Programs Fail Minority Farmers*. Boston, MA: Oxfam America, 2007.

**Union Calendar No. 1**

| 117TH CONGRESS<br>*1st Session* } | HOUSE OF REPRESENTATIVES | { REPORT<br>117–7 |
|---|---|---|

# AMERICAN RESCUE PLAN ACT OF 2021

R E P O R T

OF THE

## COMMITTEE ON THE BUDGET
## HOUSE OF REPRESENTATIVES

TO ACCOMPANY

## H.R. 1319

together with

MINORITY VIEWS



FEBRUARY 24, 2021.—Committed to the Committee of the Whole House
on the State of the Union and ordered to be printed

# AMERICAN RESCUE PLAN ACT OF 2021

**Union Calendar No. 1**

| 117TH CONGRESS<br>*1st Session* } | HOUSE OF REPRESENTATIVES | { REPORT<br>117–7 |
|---|---|---|

# AMERICAN RESCUE PLAN ACT OF 2021

———

## R E P O R T

OF THE

## COMMITTEE ON THE BUDGET
## HOUSE OF REPRESENTATIVES

TO ACCOMPANY

## H.R. 1319

together with

MINORITY VIEWS



FEBRUARY 24, 2021.—Committed to the Committee of the Whole House
on the State of the Union and ordered to be printed

———

U.S. GOVERNMENT PUBLISHING OFFICE
43–504                    WASHINGTON : 2021

## COMMITTEE ON THE BUDGET

JOHN A. YARMUTH, Kentucky, *Chairman*

HAKEEM S. JEFFRIES, New York
BRIAN HIGGINS, New York
BRENDAN F. BOYLE, Pennsylvania,
  *Vice Chairman*
LLOYD DOGGETT, Texas
DAVID E. PRICE, North Carolina
JANICE D. SCHAKOWSKY, Illinois
DANIEL T. KILDEE, Michigan
JOSEPH D. MORELLE, New York
STEVEN HORSFORD, Nevada
BARBARA LEE, California
JUDY CHU, California
STACEY E. PLASKETT, Virgin Islands
JENNIFER WEXTON, Virginia
ROBERT C. "BOBBY" SCOTT, Virginia
SHEILA JACKSON LEE, Texas
JIM COOPER, Tennessee
ALBIO SIRES, New Jersey
SCOTT H. PETERS, California
SETH MOULTON, Massachusetts
PRAMILA JAYAPAL, Washington

JASON SMITH, Missouri,
  *Ranking Member*
TRENT KELLY, Mississippi
TOM McCLINTOCK, California
GLENN GROTHMAN, Wisconsin
LLOYD SMUCKER, Pennsylvania
CHRIS JACOBS, New York
MICHAEL BURGESS, Texas
BUDDY CARTER, Georgia
BEN CLINE, Virginia
LAUREN BOEBERT, Colorado
BYRON DONALDS, Florida
RANDY FEENSTRA, Iowa
BOB GOOD, Virginia
ASHLEY HINSON, Iowa
JAY OBERNOLTE, California

PROFESSIONAL STAFF

ELLEN BALIS, *Staff Director*
MARK ROMAN, *Minority Staff Director*

(II)

# C O N T E N T S

_____

| | Page |
|---|---|
| Introduction by the Committee on the Budget | 2 |
| Title I—Committee on Agriculture | 7 |
| Title II—Committee on Education and Labor | 47 |
| Title III—Committee on Energy and Commerce | 130 |
| Title IV—Committee on Financial Services | 360 |
| Title V—Committee on Oversight and Reform | 400 |
| Title VI—Committee on Small Business | 456 |
| Title VII—Committee on Transportation and Infrastructure | 486 |
| Title VIII—Committee on Veterans' Affairs | 532 |
| Title IX—Committee on Ways and Means | 561 |
| Committee on the Budget: | |
|     Votes of the Committee on the Budget | 899 |
|     Other House Report Requirements | 915 |
|     Views of Committee Members | 920 |
| American Rescue Plan Act of 2021 (legislative text) | 925 |

# Union Calendar No. 1

| 117TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>117–7 |
| --- | --- | --- |

## AMERICAN RESCUE PLAN ACT OF 2021

---

FEBRUARY 24, 2021.—Committed to the Committee of the Whole House on the State of the union and ordered to be printed

---

Mr. YARMUTH, from the Committee on the Budget,
submitted the following

## R E P O R T

together with

## MINORITY VIEWS

[To accompany H.R. 1319]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Budget, to whom reconciliation recommendations were submitted pursuant to title II of S. Con. Res. 5, the concurrent resolution on the budget for fiscal year 2021, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

\*                                    \*                                    \*

*                                    *                                    *

12

TITLE I—COMMITTEE ON AGRICULTURE

inspectors at small and very small Federally inspected meat and poultry facilities. These funds will support resiliency and capacity in the domestic meat and poultry supply chains.

Emergency Grants for Rural Health Care

As stated earlier, rural communities may have less access to health care providers and infrastructure, and some rural communities are also impacted by persistent poverty and hunger. Even with Federal assistance earlier investments to combat COVID-19, rural communities have been hit hard by COVID-19 as the pandemic has spread across the country, with the USDA Economic Research Service noting that "non-metro death rates from COVID-19 surpassed metro rates starting in late August". Accordingly, the Committee provides the Department funds for emergency grants to entities eligible under the USDA Community Facilities Grant Program to maintain and increase health care and nutritional assistance capacity related to COVID-19.

Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups

The USDA spends billions of dollars annually to provide crucial support to American agricultural producers. Black farmers and other agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups. Despite multiple lawsuits, numerous government reports, and the limited programs created by Congress since the 1980s attempting to address the disproportionately low rates of agricultural spending on socially disadvantaged groups, USDA farm loan and payment programs continue to disproportionately benefit farmers who are not racial or ethnic minorities. Consequently, the Committee has agreed to achieve its directed spending target by using a tailored approach to increase spending to address these longstanding inequities.

For this purpose, the Committee provides funds for payment or modification of existing Department of Agriculture Farm Service Agency loans and Commodity Credit Corporation Farm Storage Facility Loans held by socially disadvantaged farmers or ranchers. The Committee also ensures that these payments do not affect the eligibility of farmers or ranchers for future farm loans.

For the same purpose, the Committee provides $1.01 billion for assistance to socially disadvantaged farmers, ranchers, forest landowners, and groups who have historically faced discrimination on the basis of race or ethnicity by USDA. These funds will support outreach, financial training, cooperative development and capacity building, and other technical assistance to socially disadvantaged groups. These funds will also support the development of agricultural legal centers and agricultural credit institutions to serve socially disadvantaged groups, including other financing institutions funded by the Farm Credit System.  These funds will support pilot projects to provide technical and financial assistance to socially disadvantaged groups focused on land acquisition, financial planning, technical assistance, and access to credit. The funds will also support grants and loans to improve land access, including heirs' property issues, and aid former

23

13

TITLE I—COMMITTEE ON AGRICULTURE

farm loan borrowers that suffered adverse actions or past discrimination or bias. These funds will support the activities of equity commissions.  These funds will also support research, education, and extension activities at minority serving institutions, including scholarships, internships, and pathways to Federal employment for students; eligible institutions include 1890 Land-Grant Institutions, 1994 Tribal Land-Grant Colleges and Universities, Alaska Native/Native Hawaiian Serving Institutions, Hispanic-Serving Institutions, and Insular Area Institutions.

Food Assistance

To ease food and agricultural supply chain disruptions and address increased hunger due to COVID-19, the Committee provides an additional $800 million in necessary funds to facilitate delivery of U.S. commodities abroad via Title II grants of the Food for Peace Act, most recently reauthorized in the Agriculture Improvement Act of 2018 (P.L. 115-334).

Domestic Hunger and Nutrition

As stated earlier in this report, the crisis of hunger in this country has been exacerbated by the ongoing pandemic. News story after news story has highlighted the impact of this in communities across the country.

Subtitle B of the Committee Print is intended to reduce this real threat of hunger to American families. The Committee extends for 3 additional months, through September 30, 2021, the requirement that the value of SNAP benefits be calculated using 115 percent of the June 2020 value of the thrifty food plan. This temporary increase to SNAP benefits is necessary because of the significant increase in food insecurity and rise in food prices during the COVID-19 pandemic. The Committee provides additional funds to states to administer the program, as caseloads are expected to remain high through the fiscal year due to the economic indicators. The Committee also provides funds to the Nutrition Assistance Programs for Puerto Rico, American Samoa, and the Commonwealth of the Northern Mariana Islands. In order to achieve greater equity in the distribution of Federal resources to the underserved, minority community in the Commonwealth of the Northern Mariana Islands, the Committee encourages the Secretary of Agriculture to collaborate with leadership of the Northern Mariana Islands to better meet the nutrition and anti-hunger needs of communities across the islands.

The Committee also provides funds to support improvements for online purchases using SNAP, modernize the electronic benefit transfer system, and support mobile payment technologies. And, the Committee provides additional funding for the Commodity Supplemental Food Program to ensure sufficient inventory of food and to provide flexibility for increased caseload of low-income seniors for this critical program.

Program Administration and Oversight

24

*                                        *                                        *

\*                                        \*                                        \*

30



**Congressional Budget Office**
Cost Estimate

February 13, 2021

| At a Glance | | | |
|---|---|---|---|
| **Reconciliation Recommendations of the House Committee on Agriculture**<br>As ordered reported on February 10, 2021 | | | |
| By Fiscal Year, Millions of Dollars | 2021 | 2021-2030 | 2021-2031 |
| Direct Spending (Outlays) | 13,018 | 16,072 | 16,072 |
| Revenues | 0 | 0 | 0 |
| Increase or Decrease (-)<br>in the Deficit | 13,018 | 16,072 | 16,072 |

| | | Mandate Effects | |
|---|---|---|---|
| Statutory pay-as-you-go procedures apply? | Yes | | |
| Increases on-budget deficits in any year after 2030? | No | Contains intergovernmental mandate? | No |
| | | Contains private-sector mandate? | No |

CBO has not reviewed the legislation for effects on spending subject to appropriation.

**The bill would**
- Appropriate funds to address the effects of COVID-19, the disease caused by coronavirus, on the food supply chain, including the purchase and distribution of agricultural commodities to people in need
- Appropriate funds to aid in vaccine administration and expand health care capacity in rural areas
- Provide debt relief to socially disadvantaged farmers and ranchers
- Fund new programs to increase the participation of socially disadvantaged groups in agriculture
- Extend the period for increased benefits under the Supplemental Nutrition Assistance Program (SNAP)
- Provide funds for SNAP and other nutrition programs

**Estimated budgetary effects would mainly stem from**
- Debt relief for socially disadvantaged farmers and ranchers
- Purchase and distribution of agricultural commodities
- Support for the food supply chain
- New programs to support socially disadvantaged groups in agriculture
- Extended higher funding for SNAP
- Increased spending from additional funding provided for nutrition programs

**Areas of uncertainty include**
- Estimating the cost of debt relief for socially disadvantaged farmers and ranchers
- Estimating the cost of extending the period for increased SNAP benefits

**Detailed estimate begins on the next page.**

See also *CBO's Cost Estimates Explained*, www.cbo.gov/publication/54437;
*How CBO Prepares Cost Estimates*, www.cbo.gov/publication/53519; and *Glossary*, www.cbo.gov/publication/42904.

App. 65

31

 CBO Cost Estimate                Reconciliation Recommendations of the House Committee on Agriculture
                                                                                                      Page 2

## Bill Summary

S. Con. Res. 5, the Concurrent Resolution on the Budget for Fiscal Year 2021, instructed several committees of the House of Representatives to recommend legislative changes that would increase deficits up to a specified amount over the 2021-2030 period. As part of this reconciliation process, the House Committee on Agriculture approved legislation on February 10, 2021, with a number of provisions that would increase deficits.

Subtitle A would appropriate an estimated $10.4 billion for measures intended to strengthen the food supply chain, purchase and distribute agricultural commodities, increase health care capacity in lower-income rural areas and other efforts to address the pandemic. Also included are provisions that would provide debt relief for socially disadvantaged farmers and ranchers and establish new programs to support socially disadvantaged groups in agriculture.

Subtitle B would extend increased SNAP benefits through September 30, 2021, and provides administrative and technology support for SNAP, as well as increased funding to other nutrition programs.

## Estimated Federal Cost

The estimated budgetary effects of the Reconciliation Recommendations of the House Committee on Agriculture are shown in Table 1. The costs of the legislation fall within budget functions 150 (international affairs), 350 (agriculture), 450 (community and regional development), 550 (health), and 600 (income security).

## Basis of Estimate

For this estimate, CBO assumes that the Reconciliation Recommendations of the House Committee on Agriculture will be enacted by the end of March 2021. CBO estimates that enacting the legislation would increase direct spending by $16.1 billion over the 2021-2030 period.

As required by the Federal Credit Reform Act of 1990 (FCRA), CBO estimates most costs of USDA loan programs on a net-present-value basis. A present value is a single number that expresses a flow of current and future payments in terms of an equivalent lump sum received or paid at a specific time. Under credit reform, the present value of all loan-related cash flows is calculated by discounting those expected cash flows to the year of disbursement, using the rates for comparable maturities on Treasury securities. (For example, the cash flow for a one-year loan is discounted using the rate for a one-year, zero-coupon Treasury note.) As required by FCRA, changes to the estimated costs of outstanding direct loans are shown in the year of enactment. CBO's estimated cost of $4 billion to pay off certain USDA loans represents the net-present-value of the change in cash flows resulting from the loan

42

App. 66

32

CBO Cost Estimate                    Reconciliation Recommendations of the House Committee on Agriculture
                                                                                                     Page 3

forgiveness. That $4 billion comprises the cost of the loan forgiveness and an additional cash payment to those borrowers equal to 20 percent of their outstanding indebtedness, as directed in the legislation.

**Direct Spending**

Subtitle A of the legislation would provide funds to USDA and other agencies to respond to the pandemic by appropriating:

- $3.7 billion to purchase and distribute agricultural products to persons in need; to provide loans and grants for small- and mid-sized food processors and distributors, including seafood processors, farmers markets, producers, or other organizations to improve supply chain resiliency; to reduce fees charged to small and very small meat, poultry, and egg processing facilities for overtime inspection costs; and to compensate producers for losses in crop year 2020 due to natural disasters, including high winds or derechos;

- $300 million for monitoring animals like mink and domesticated cats that are susceptible to the viral strain that causes COVID-19 in humans;

- $500 million to make grants to hospitals and clinics located in rural communities to provide testing and vaccination services related to COVID-19, increase health care capacity, and engage in other efforts critical to addressing the pandemic;

- $50 million for USDA administrative expenses and oversight of COVID-19-related programs;

- An estimated $4 billion to pay off farm ownership, operating, emergency, and farm storage facility loans for farmers and ranchers who are members of socially disadvantaged groups, and to provide, as directed by the legislation, an additional cash payment equal to 20 percent of  the outstanding indebtedness of those producers;

- $1.01 billion to develop programs that provide assistance to socially disadvantaged farmers, ranchers, forest land owners and operators, and to provide additional funding for institutions of higher education dedicated to supporting socially disadvantaged groups; and

- $800 million in additional funding for donations of U.S. food assistance to meet emergency and nonemergency food needs around the world, including support for food security goals.

In total, enacting those provisions would cost $10.3 billion over the 2021-2030 period, CBO estimates.

The Consolidated Appropriations Act, 2021, increased SNAP benefits through June 2021. Subtitle B would extend the period for those increased SNAP benefits through September 30, 2021, at an estimated cost of $3.54 billion. It also would provide:

43

33

 CBO Cost Estimate                Reconciliation Recommendations of the House Committee on Agriculture
Page 4

- $1.15 billion for SNAP state administrative expenses;

- $25 million for SNAP online purchasing and technology improvements;

- $1 billion for nutrition assistance programs in the Commonwealth of the Northern Mariana Islands, Puerto Rico, and American Samoa; and

- $37 million for the Commodity Supplemental Food Program.

In total, enacting those provisions would cost $5.8 billion over the 2021-2030 period, CBO estimates.

**Uncertainty**
Uncertainty in the estimate of the cost of debt relief for socially disadvantaged farmers and ranchers arises from incomplete data on the actual indebtedness of those producers. If the number of affected producers and the net-present-value of future interest on the loans is higher or lower than our estimate, then the cost of loan forgiveness and the additional payment would increase or decrease accordingly.

Additionally, the cost of extending increased SNAP benefits depends on the level of participation in that program and the average benefits for participants. Uncertainty in the estimate arises around both of those factors. For example, if SNAP participation is higher or lower than CBO forecasts, costs for extending increased benefits would be higher or lower.

**Pay-As-You-Go Considerations:**
The Statutory Pay-As-You-Go Act of 2010 establishes budget-reporting and enforcement procedures for legislation affecting direct spending or revenues. The net changes in outlays that are subject to those pay-as-you-go procedures are shown in Table 1.

**Increases On-Budget Deficits in any Year after 2030:** None.

**Mandates:** None.

34

 CBO Cost Estimate          Reconciliation Recommendations of the House Committee on Agriculture
Page 5

**Estimate Prepared By**

Federal Costs:

  Tiffany Arthur for agriculture
  Susan Yeh Beyer for nutrition programs
  Jennifer Gray for SNAP and nutrition programs
  Etaf Khan for international development
  Erik O'Donoghue for agriculture
  Jon Sperl for rural development
  Ellen Werble for food safety

Mandates: Lilia Ledezma

**Estimate Reviewed By**

Sheila Dacey
Chief, Income Security and Education Cost Estimates Unit

Susan Willie
Chief, Natural and Physical Resources Cost Estimates Unit

H. Samuel Papenfuss
Deputy Director of Budget Analysis

Theresa Gullo
Director of Budget Analysis

45

35

**Table 1.**
**Estimated Budgetary Effects of Reconciliation Recommendations of the House Committee on Agriculture**

| | By Fiscal Year, Millions of Dollars | | | | | | | | | | | 2021-2030 | 2021-2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | | |
| | **Increases in Direct Spending** | | | | | | | | | | | | |
| **Sec. 1001 - Food Supply Chain and Agriculture Pandemic Response** | | | | | | | | | | | | | |
| Budget Authority | 4,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,000 | 4,000 |
| Estimated Outlays | 3,774 | 108 | 55 | 42 | 3 | 3 | 3 | 4 | 4 | 4 | 0 | 4,000 | 4,000 |
| **Sec. 1002 - Emergency Grants for Rural Healthcare** | | | | | | | | | | | | | |
| Budget Authority | 500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 500 |
| Estimated Outlays | 200 | 150 | 100 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 500 |
| **Sec. 1003 - Pandemic Program Administration Funds** | | | | | | | | | | | | | |
| Budget Authority | 47 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 | 47 |
| Estimated Outlays | 41 | 4 | 1 | * | * | * | * | * | * | * | 0 | 47 | 47 |
| **Sec. 1004 - Office of the Inspector General** | | | | | | | | | | | | | |
| Budget Authority | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| Estimated Outlays | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| **Sec. 1005 - Farm Loan Assistance for Socially Disadvantaged Farmers and Ranchers** | | | | | | | | | | | | | |
| Estimated Budget Authority | 4,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,000 | 4,000 |
| Estimated Outlays | 4,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,000 | 4,000 |
| **Sec. 1006 - Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups** | | | | | | | | | | | | | |
| Budget Authority | 1,010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,010 | 1,010 |
| Estimated Outlays | 475 | 296 | 64 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 0 | 1,010 | 1,010 |
| **Sec. 1007 - Food for Peace Title II Grants** | | | | | | | | | | | | | |
| Budget Authority | 800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800 | 800 |
| Estimated Outlays | 128 | 440 | 120 | 48 | 16 | 8 | 0 | 0 | 0 | 0 | 0 | 760 | 760 |
| **Sec. 1011 - SNAP Value of Benefits** | | | | | | | | | | | | | |
| Estimated Budget Authority | 3,540 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,540 | 3,540 |
| Estimated Outlays | 3,540 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,540 | 3,540 |
| **SNAP Administrative Expenses** | | | | | | | | | | | | | |
| Budget Authority | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,150 | 1,150 |
| Estimated Outlays | 345 | 460 | 345 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,150 | 1,150 |
| **Sec. 1012 - Additional Assistance for SNAP Online Purchasing and Technology Improvements** | | | | | | | | | | | | | |
| Budget Authority | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 25 |
| Estimated Outlays | 3 | 11 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 25 |
| **Sec. 1013 - Additional Funding for Nutrition Assistance Programs** | | | | | | | | | | | | | |
| Budget Authority | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 1,000 |
| Estimated Outlays | 500 | 500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 1,000 |
| **Sec. 1014 - Commodity Supplemental Food Program** | | | | | | | | | | | | | |
| Budget Authority | 37 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 37 |
| Estimated Outlays | 11 | 22 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 37 |
| **Total Direct Spending** | | | | | | | | | | | | | |
| Estimated Budget Authority | 16,112 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16,112 | 16,112 |
| Estimated Outlays | 13,018 | 1,993 | 700 | 165 | 44 | 36 | 28 | 29 | 29 | 29 | 0 | 16,072 | 16,072 |

Components may not sum to totals because of rounding; SNAP = Supplemental Nutrition Assistance Program; * = between -$500,000 and $500,000.

46

\*                                              \*                                              \*

II

117TH CONGRESS
1ST SESSION
# S. 300

To address the history of discrimination against Black farmers and ranchers, to require reforms within the Department of Agriculture to prevent future discrimination, and for other purposes.

————————————

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 8, 2021

Mr. BOOKER (for himself, Ms. WARREN, Mrs. GILLIBRAND, Ms. SMITH, Mr. WARNOCK, and Mr. LEAHY) introduced the following bill; which was read twice and referred to the Committee on Agriculture, Nutrition, and Forestry

————————————

# A BILL

To address the history of discrimination against Black farmers and ranchers, to require reforms within the Department of Agriculture to prevent future discrimination, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5 ''Justice for Black Farmers Act of 2021''.

6    (b) TABLE OF CONTENTS.—The table of contents for

7 this Act is as follows:

2

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE I—DEPARTMENT OF AGRICULTURE CIVIL RIGHTS
REFORMS

Sec. 101. Definitions.
Sec. 102. Independent Civil Rights Oversight Board.
Sec. 103. Equity Commission.
Sec. 104. Office of the Assistant Secretary for Civil Rights reforms.
Sec. 105. Data collection and reporting.

TITLE II—BLACK FARMER LAND GRANTS

Sec. 201. Definitions.
Sec. 202. Establishment of the Under Secretary of Agriculture for Equitable
          Land Access and the Equitable Land Access Service.
Sec. 203. Provision of land grants.
Sec. 204. Identification of land.
Sec. 205. Restrictions on conveyed land.
Sec. 206. Eligibility for assistance.
Sec. 207. Completion of farmer training program and succession planning.
Sec. 208. Grants for qualified entities.
Sec. 209. Farm Conservation Corps.
Sec. 210. Annual report to Congress.

TITLE III—FUNDING FOR HISTORICALLY BLACK COLLEGES AND
UNIVERSITIES

Sec. 301. Funding for historically Black colleges and universities.
Sec. 302. USDA/1890 National Scholars Program.

TITLE IV—LAND RETENTION AND CREDIT ASSISTANCE

Sec. 401. Protections for land ownership.
Sec. 402. Access to credit for socially disadvantaged farmers and ranchers.
Sec. 403. Additional credit assistance.
Sec. 404. Foreclosure moratorium.

TITLE V—AGRICULTURAL SYSTEM REFORMS

Subtitle A—Amendments to Packers and Stockyards Act, 1921

Sec. 501. Definitions.
Sec. 502. Unlawful practices.
Sec. 503. Spot market purchases of livestock by packers.
Sec. 504. Investigation of live poultry dealers.
Sec. 505. Award of attorney fees.
Sec. 506. Technical amendments.

Subtitle B—Local Agriculture Market Program

Sec. 511. Local Agriculture Market Program.

Subtitle C—Conservation and Renewable Energy Programs

Sec. 521. Conservation technical assistance.
Sec. 522. Conservation Stewardship Program.

3

Sec. 523. Rural Energy for America Program.
Sec. 524. Conservation and renewable energy programs priority.

**SEC. 2. DEFINITIONS.**

In this Act:

(1) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(2) SOCIALLY DISADVANTAGED FARMER OR RANCHER.—The term "socially disadvantaged farmer or rancher" means a farmer or rancher who is a member of a socially disadvantaged group.

(3) SOCIALLY DISADVANTAGED GROUP.—The term "socially disadvantaged group" means a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

# TITLE I—DEPARTMENT OF AGRICULTURE CIVIL RIGHTS REFORMS

**SEC. 101. DEFINITIONS.**

In this title:

(1) ASSISTANT SECRETARY.—The term "Assistant Secretary" means the Assistant Secretary of Agriculture for Civil Rights.

(2) BOARD.—The term "Board" means the Department of Agriculture Civil Rights Oversight Board established by section 102(a).

1     (3) COMMISSION.—The term "Commission"

2 means the Equity Commission established by section

3 103(a)(1).

4     (4) OFFICE.—The term "Office" means the Of-

5 fice of the Assistant Secretary.

**6 SEC. 102. INDEPENDENT CIVIL RIGHTS OVERSIGHT BOARD.**

7     (a) IN GENERAL.—There is established in the De-

8 partment of Agriculture an independent board, to be

9 known as the "Department of Agriculture Civil Rights

10 Oversight Board"—

11     (1) to oversee the Office; and

12     (2) to protect the rights of individuals who seek

13 to file, or do file, a discrimination complaint with the

14 Office.

15     (b) DUTIES.—The Board shall—

16     (1)(A) conduct a de novo review with fact find-

17 ing power, including notice and opportunity for a

18 hearing, of any appeal of a decision made by the Of-

19 fice, including any appeal of a dismissal of a com-

20 plaint; and

21     (B) issue a written decision within 180 days of

22 receipt of an appeal or dismissal described in sub-

23 paragraph (A);

24     (2) investigate reports of discrimination within

25 the Department of Agriculture, make findings of

1    fact and conclusions of law in accordance with the

2    findings, and recommend to the Secretary appro-

3    priate actions relative to specific findings;

4        (3) recommend improvements to Department of

5    Agriculture policies and procedures to address pat-

6    terns and practices of discrimination and to prevent

7    further discrimination;

8        (4) conduct regular reviews to assess the com-

9    pliance of the Office with civil rights, fair employ-

10   ment, and pay equity laws and policies applicable to

11   the Office;

12       (5) provide oversight over Farm Service Agency

13   county committees;

14       (6)(A) assess the progress made by the pro-

15   grams and policies established under this Act and

16   the amendments made by this Act; and

17       (B) submit recommendations for improvements

18   to those programs or policies to the Secretary; and

19       (7)(A) prepare an annual report on the status

20   of socially disadvantaged farmers and ranchers and

21   the treatment of socially disadvantaged farmers and

22   ranchers by the Department of Agriculture;

23       (B) make each report prepared under subpara-

24   graph (A) publicly available; and

6

1    (C) submit each report prepared under sub-
2    paragraph (A) to the Attorney General.

3    (c) AUTHORIZATION OF APPROPRIATIONS.—There
4 are authorized to be appropriated for each of fiscal years
5 2021 through 2030 such sums as are necessary to carry
6 out this section.

**7    SEC. 103. EQUITY COMMISSION.**

8    (a) ESTABLISHMENT.—

9        (1) IN GENERAL.—There is established in the
10    Department of Agriculture the Equity Commission,
11    the purposes of which are—

12            (A) to study historical and continuing dis-
13        crimination by the Department of Agriculture
14        against Black farmers and ranchers that is fos-
15        tered or perpetuated by the laws, policies, or
16        practices of the Department of Agriculture; and

17            (B) to recommend actions to end the sys-
18        tematic disparities in treatment of Black farm-
19        ers and ranchers, particularly by the Depart-
20        ment of Agriculture.

21        (2) MEMBERSHIP.—

22            (A) COMPOSITION.—The Commission shall
23        be composed of 9 members, to be appointed by
24        the Secretary, of whom—

•S 300 IS

1          (i) 3 shall be Black farmers or ranch-
2     ers with not less than 10 years of experi-
3     ence in farming or ranching;

4          (ii) 3 shall be employees or board
5     members of nonprofit organizations that
6     have not less than 7 years of experience
7     providing meaningful agricultural, business
8     assistance, legal assistance, or advocacy
9     services to Black farmers or ranchers; and

10          (iii) 3 shall be faculty or staff from
11     1890 Institutions (as defined in section 2
12     of the Agricultural Research, Extension,
13     and Education Reform Act of 1998 (7
14     U.S.C. 7601)) or the University of the Dis-
15     trict of Columbia.

16     (B) DATE.—The appointments of the
17 members of the Commission shall be made not
18 later than 90 days after the date of enactment
19 of this Act.

20 (3) PERIOD OF APPOINTMENT; VACANCIES.—

21     (A) IN GENERAL.—A member of the Com-
22 mission shall be appointed for the life of the
23 Commission.

24     (B) VACANCIES.—A vacancy in the Com-
25 mission—

1        (i) shall not affect the powers of the

2     Commission; and

3        (ii) shall be filled in the same manner

4     as the original appointment.

5   (4) MEETINGS.—

6        (A) INITIAL MEETING.—Not later than 30

7     days after the date on which all members of the

8     Commission have been appointed, the Commis-

9     sion shall hold the first meeting of the Commis-

10    sion.

11       (B) FREQUENCY.—The Commission shall

12    meet at the call of the Chairperson.

13       (C) QUORUM.—A majority of the members

14    of the Commission shall constitute a quorum,

15    but a lesser number of members may hold hear-

16    ings.

17   (5) CHAIRPERSON AND VICE CHAIRPERSON.—

18   The Commission shall select a Chairperson and Vice

19   Chairperson from among the members of the Com-

20   mission.

21   (b) DUTIES OF THE COMMISSION.—

22   (1) STUDY.—The Commission shall study dis-

23   crimination against Black farmers and ranchers by

24   the Department of Agriculture, including by con-

25   ducting investigations of—

9

1          (A) the prevalence of discrimination
2     against Black farmers and ranchers in Depart-
3     ment of Agriculture agencies and programs, in-
4     cluding Farm Service Agency county commit-
5     tees; and

6          (B) the status of claimants who filed for
7     relief under the settlement agreement and con-
8     sent decree in Pigford v. Glickman, 185 F.R.D.
9     82 (D.D.C. 1999) or the settlement agreement
10    in In re Black Farmers Discrimination Litiga-
11    tion, Misc. No. 08–mc–0511 (PLF), with a par-
12    ticular focus on the status of claimants who did
13    not receive payments.

14    (2)   RECOMMENDATIONS.—The   Commission
15    shall develop recommendations for—

16         (A) ending the systematic disparities in
17    treatment of Black farmers and ranchers, par-
18    ticularly by the Department of Agriculture;

19         (B) improving the structure of Farm Serv-
20    ice Agency county committees to better serve
21    socially disadvantaged farmers and ranchers,
22    including, if necessary, recommending the elimi-
23    nation and replacement of those committees;
24    and

1          (C) addressing any mishandling of pay-
2     ments identified through studying the matters
3     under paragraph (1)(B).
4          (3) OUTREACH.—In studying the matters under
5     paragraph (1) and developing recommendations
6     under paragraph (2), the Commission shall—
7          (A) consult with the Socially Disadvan-
8     taged Farmers and Ranchers Policy Research
9     Center; and
10          (B) hold town hall meetings with socially
11     disadvantaged farmers and ranchers, research-
12     ers, and civil rights advocates.
13          (4) REPORT.—Not later than 2 years after the
14     date of enactment of this Act, the Commission shall
15     make publicly available a detailed report that de-
16     scribes—
17          (A) the findings of the study under para-
18     graph (1); and
19          (B) the recommendations developed under
20     paragraph (2).
21     (c) POWERS OF COMMISSION.—
22          (1) HEARINGS.—The Commission shall hold
23     open, televised, and public hearings, during which
24     the Commission may sit and act at such times and
25     places, take such testimony, and receive such evi-

1    dence as the Commission considers advisable to

2    carry out this section.

3        (2) INFORMATION FROM FEDERAL AGENCIES.—

4           (A) IN GENERAL.—The Commission may

5          secure directly from a Federal department or

6          agency such information as the Commission

7          considers necessary to carry out this section.

8           (B) FURNISHING INFORMATION.—On re-

9          quest of the Chairperson of the Commission,

10         the head of the department or agency shall fur-

11         nish the information to the Commission.

12        (3) POSTAL SERVICES.—The Commission may

13    use the United States mails in the same manner and

14    under the same conditions as other departments and

15    agencies of the Federal Government.

16        (4) GIFTS.—The Commission may accept, use,

17    and dispose of gifts or donations of services or prop-

18    erty.

19    (d) COMMISSION PERSONNEL MATTERS.—

20        (1) COMPENSATION OF MEMBERS.—A member

21    of the Commission who is not an officer or employee

22    of the Federal Government shall be compensated at

23    a rate equal to the daily equivalent of the annual

24    rate of basic pay prescribed for level IV of the Exec-

25    utive Schedule under section 5315 of title 5, United

12

1    States Code, for each day (including travel time)
2    during which the member is engaged in the perform-
3    ance of the duties of the Commission.

4        (2) TRAVEL EXPENSES.—A member of the
5    Commission shall be allowed travel expenses, includ-
6    ing per diem in lieu of subsistence, at rates author-
7    ized for employees of agencies under subchapter I of
8    chapter 57 of title 5, United States Code, while
9    away from their homes or regular places of business
10   in the performance of services for the Commission.

11       (3) STAFF.—

12           (A) IN GENERAL.—The Chairperson of the
13       Commission may, without regard to the civil
14       service laws (including regulations), appoint
15       and terminate an executive director and such
16       other additional personnel as may be necessary
17       to enable the Commission to perform its duties,
18       except that the employment of an executive di-
19       rector shall be subject to confirmation by the
20       Commission.

21           (B) COMPENSATION.—The Chairperson of
22       the Commission may fix the compensation of
23       the executive director and other personnel with-
24       out regard to chapter 51 and subchapter III of
25       chapter 53 of title 5, United States Code, relat-

1          ing to classification of positions and General
2          Schedule pay rates, except that the rate of pay
3          for the executive director and other personnel
4          may not exceed the rate payable for level V of
5          the Executive Schedule under section 5316 of
6          that title.

7          (4) DETAIL OF GOVERNMENT EMPLOYEES.—A
8      Federal Government employee may be detailed to
9      the Commission without reimbursement, and such
10     detail shall be without interruption or loss of civil
11     service status or privilege.

12         (5) PROCUREMENT OF TEMPORARY AND INTER-
13     MITTENT SERVICES.—The Chairperson of the Com-
14     mission may procure temporary and intermittent
15     services under section 3109(b) of title 5, United
16     States Code, at rates for individuals that do not ex-
17     ceed the daily equivalent of the annual rate of basic
18     pay prescribed for level V of the Executive Schedule
19     under section 5316 of that title.

20     (e) TERMINATION OF COMMISSION.—The Commis-
21 sion shall terminate on the date that is 30 days after the
22 date on which the Commission makes publicly available
23 the report under subsection (b)(4).

24     (f) AUTHORIZATION OF APPROPRIATIONS.—There
25 are authorized to be appropriated for each of fiscal years

14

1  2021 through 2030 such sums as are necessary to carry

2  out this section.

3  **SEC. 104. OFFICE OF THE ASSISTANT SECRETARY FOR**

4               **CIVIL RIGHTS REFORMS.**

5       (a) OMBUDSMAN.—The Secretary shall establish in

6  the Department of Agriculture a position of Civil Rights

7  Ombudsman—

8               (1) to assist individuals in navigating Office

9       programs; and

10              (2) to provide recommendations to the Sec-

11      retary for grants provided under subsection (g).

12      (b) DEADLINE FOR DECISIONS.—Not later than 180

13  days after the date on which the Office receives a civil

14  rights complaint, the Assistant Secretary shall make a

15  final decision of the Assistant Secretary regarding the

16  merit of the complaint and the appropriate disposition of

17  the matter.

18      (c) APPEALS TO BOARD.—

19              (1) IN GENERAL.—A person that receives an

20      adverse decision or dismissal by the Office on a civil

21      rights complaint filed by the person may appeal the

22      decision or dismissal to the Board for a final deci-

23      sion.

24              (2) DEADLINE.—An appeal under paragraph

25      (1) shall be filed not later than 1 year after the date

•S 300 IS

1    of the adverse decision or dismissal described in that

2    paragraph.

3        (3) EFFECT OF BOARD DECISION.—A decision

4    of the Board on an appeal filed under paragraph

5    (1), or a dismissal of such an appeal for lack of ju-

6    risdiction, shall constitute exhaustion of administra-

7    tive remedies and be reviewable in Federal court.

8    (d) MORATORIUM ON FORECLOSURES.—The Sec-

9  retary shall not take any action on a foreclosure pro-

10  ceeding against any farmer or rancher during any period

11  that a civil rights complaint filed by the farmer or rancher

12  with the Office is outstanding, including an appeal to the

13  Board under subsection (c)(1).

14  (e) REPORTS.—The Assistant Secretary shall—

15        (1) publish on the website of the Office and

16    submit to the Board a report of each civil rights

17    complaint filed with the Office and the results of

18    each such complaint; and

19        (2) include in each report described in para-

20    graph (1) a description of the race, ethnicity, gen-

21    der, and geographic region of the complainant.

22  (f) PROHIBITION ON INTERFERENCE BY THE OFFICE

23  OF THE GENERAL COUNSEL.—The Office of General

24  Counsel of the Department of Agriculture shall not have

25  any involvement with the investigation, adjudication, or

1   resolution of any civil rights complaint brought against the

2   Secretary.

3   (g) GRANTS.—

4       (1) IN GENERAL.—The Secretary, based on rec-

5       ommendations from the Civil Rights Ombudsman,

6       shall provide grants to community-based organiza-

7       tions and advocates with a history of working with

8       socially disadvantaged farmers and ranchers to pro-

9       vide technical assistance to farmers and ranchers

10      seeking to file a civil rights complaint with the Of-

11      fice.

12      (2) FUNDING.—There is authorized to be ap-

13      propriated, and there is appropriated, out of

14      amounts in the Treasury not otherwise appropriated,

15      $50,000,000 for each of fiscal years 2021 through

16      2030 to carry out this subsection.

17  (h) DIRECT REPORTING TO THE SECRETARY OF AG-

18  RICULTURE.—Section 218(c) of the Department of Agri-

19  culture Reorganization Act of 1994 (7 U.S.C. 6918(c)) is

20  amended—

21      (1) in the subsection heading, by striking "DU-

22      TIES OF";

23      (2) by redesignating paragraphs (1) through

24      (3) as subparagraphs (A) through (C), respectively,

25      and indenting appropriately;

1     (3) in the matter preceding subparagraph (A)

2     (as so redesignated), by striking ''The Secretary''

3     and inserting the following:

4     ''(1) DUTIES.—The Secretary''; and

5     (4) by adding at the end the following:

6     ''(2) DIRECT REPORTING TO THE SEC-

7     RETARY.—If the Secretary establishes the position

8     of Assistant Secretary for Civil Rights under sub-

9     section (a)(3), the Assistant Secretary for Civil

10    Rights shall report directly to the Secretary.''.

11    (i) AUTHORIZATION OF APPROPRIATIONS.—In addi-

12   tion to amounts made available under subsection (g)(2),

13   there are authorized to be appropriated for each of fiscal

14   years 2021 through 2030 such sums as are necessary to

15   carry out this section and the amendments made by this

16   section.

17   **SEC. 105. DATA COLLECTION AND REPORTING.**

18    (a) IN GENERAL.—The Secretary shall make publicly

19   available annual reports describing data on the recipients

20   of Department of Agriculture assistance, including assist-

21   ance from farm subsidy programs, and the amounts of the

22   assistance, delineated by the race, ethnicity, and gender

23   of the recipients.

24    (b) ERS RESEARCH OF SOCIALLY DISADVANTAGED

25   FARMERS AND RANCHERS.—The Secretary, acting

1 through the Administrator of the Economic Research
2 Service, shall conduct research on the status of socially
3 disadvantaged farmers and ranchers, including—

4     (1) the share of land ownership of those socially
5     disadvantaged farmers and ranchers as compared to
6     all farmers and ranchers, delineated by the race,
7     ethnicity, and gender of the landowners;

8     (2) the share of the amount of assistance those
9     socially disadvantaged farmers and ranchers receive
10     from the Department of Agriculture as compared to
11     all farmers and ranchers, delineated by the race,
12     ethnicity, and gender of the recipients;

13     (3) the share, status, and receipt of Farm Cred-
14     it System loans by socially disadvantaged farmers
15     and ranchers as compared to all farmers and ranch-
16     ers, delineated by the race, ethnicity, and gender of
17     the recipients; and

18     (4) an assessment of the reasons for disparities
19     in land ownership, assistance from the Department
20     of Agriculture, and Farm Credit System loans for
21     socially disadvantaged farmers and ranchers com-
22     pared to all farmers and ranchers.

23 (c) ERS RESEARCH OF FARMWORKERS.—The Sec-
24 retary, acting through the Administrator of the Economic

1 Research Service, shall conduct research on the demo-
2 graphics and status of farmworkers, including—

3     (1) the races, ethnicities, ages, localities, wages
4   and benefits, and working conditions of farm-
5   workers;

6     (2) the economic contributions of farmworkers
7   to the United States economy; and

8     (3) satisfaction of farmworkers with their em-
9   ployment.

10 (d) CENSUS OF AGRICULTURE.—The Secretary, act-
11 ing through the Administrator of the National Agricul-
12 tural Statistics Service, shall—

13     (1) investigate historical changes in reporting
14   methodology and misreporting of Black farmers and
15   ranchers in the census of agriculture;

16     (2) develop procedures to ensure that census of
17   agriculture surveys accurately capture the status of
18   socially disadvantaged farmers and ranchers engaged
19   in urban agriculture; and

20     (3) conduct, concurrently with each census of
21   agriculture, a review to assess—

22         (A) the outreach and methodologies used
23       in conducting the census of agriculture; and

1          (B) how such outreach and methodologies

2              have affected the counting of socially disadvan-

3              taged farmers and ranchers.

4      (e) CORPORATE OWNERSHIP OF FARMLAND.—The

5  Secretary shall annually conduct, and annually make pub-

6  licly available reports describing, in-depth research and

7  analysis of corporate (domestic and foreign) land invest-

8  ment and ownership in the United States, with specific

9  attention given to the impact of corporate land investment

10  and ownership on—

11          (1) land consolidation trends in the United

12      States;

13          (2) challenges and opportunities for new and

14      beginning farmers and ranchers accessing land for

15      farming or ranching;

16          (3) challenges and opportunities for members of

17      socially disadvantaged groups accessing land for

18      farming or ranching; and

19          (4) crop selection and production trends.

20      (f) FUNDING.—There is authorized to be appro-

21  priated, and there is appropriated, out of amounts in the

22  Treasury not otherwise appropriated, $10,000,000 for

23  each of fiscal years 2021 through 2030 to carry out this

24  section.

21

# TITLE II—BLACK FARMER LAND GRANTS

**SEC. 201. DEFINITIONS.**

In this title:

(1) ANIMAL FEEDING OPERATION.—The term ''animal feeding operation'' means a lot or facility at which—

    (A) for not less than a total of 45 days in any 12-month period, animals (other than aquatic animals) are—

        (i) stabled or confined; and

        (ii) fed or maintained; and

    (B) crops, vegetation, forage growth, or postharvest residues are not sustained in the normal growing season over any portion of the lot or facility.

(2) ELIGIBLE BLACK INDIVIDUAL.—The term ''eligible Black individual'' means a person who—

    (A) was born in the United States;

    (B) is at least 21 years of age;

    (C) has previously identified as Black or African American; and

    (D) has at least 1 parent of African ancestry.

1   (3) FARMER TRAINING.—The term "farmer
2   training" means a program that—

3       (A) provides eligible Black individuals and
4       other enrollees with the basic skills to operate
5       a farm or ranch profitably with a primary focus
6       on regenerating the soil, ecosystem, and local
7       community;

8       (B) provides a course of study that is
9       equivalent to not less than 30 academic credit
10      hours of study, which may be provided as direct
11      in-field instruction;

12      (C) is approved by the Undersecretary of
13      the Equitable Land Access Service as an au-
14      thorized program to meet the farmer training
15      program requirement under section 207(a) for
16      recipients of land grants under section
17      203(a)(2);

18      (D) focuses training on low-capital-inten-
19      sive techniques and technologies; and

20      (E) includes a robust study of local and re-
21      gional food systems and the market opportuni-
22      ties those systems present.

23  (4) QUALIFIED ENTITY.—The term "qualified
24  entity" means—

25      (A) an organization—

23

1        (i)(I) described in section 501(c)(3) of

2        the Internal Revenue Code of 1986 and ex-

3        empt from taxation under 501(a) of that

4        Code; or

5            (II) that has a fiscal sponsor that is

6        an organization described in subclause (I);

7            (ii) that has not less than 3 years of

8        experience providing meaningful agricul-

9        tural, business assistance, legal assistance,

10       or advocacy services to Black farmers or

11       ranchers; and

12           (iii) at least 50 percent of the mem-

13       bers of the board of directors of which are

14       Black; and

15       (B) an 1890 Institution (as defined in sec-

16       tion 2 of the Agricultural Research, Extension,

17       and Education Reform Act of 1998 (7 U.S.C.

18       7601)), including the University of the District

19       of Columbia.

20   (5) SECRETARY.—The term "Secretary" means

21   the Secretary, acting through the Under Secretary

22   of Agriculture for Equitable Land Access.

24

1  SEC. 202. ESTABLISHMENT OF THE UNDER SECRETARY OF

2           AGRICULTURE FOR EQUITABLE LAND AC-

3           CESS AND THE EQUITABLE LAND ACCESS

4           SERVICE.

5      (a) ESTABLISHMENT.—The Department of Agri-

6  culture Reorganization Act of 1994 (7 U.S.C. 6901 et

7  seq.) is amended by adding at the end the following:

## "Subtitle L—Equitable Land Access

9  "SEC. 297. UNDER SECRETARY OF AGRICULTURE FOR EQUI-

10          TABLE LAND ACCESS.

11     "(a) IN GENERAL.—The Secretary shall establish in

12 the Department the position of Under Secretary of Agri-

13 culture for Equitable Land Access.

14     "(b) CONFIRMATION REQUIRED.—The Under Sec-

15 retary of Agriculture for Equitable Land Access shall be

16 appointed by the President, by and with the advice and

17 consent of the Senate.

18     "(c) FUNCTIONS.—The Secretary shall delegate to

19 the Under Secretary of Agriculture for Equitable Land

20 Access the functions of the Department carried out

21 through the Equitable Land Access Service.

22 "SEC. 297A. EQUITABLE LAND ACCESS SERVICE.

23     "(a) ESTABLISHMENT.—There is established in the

24 Department the Equitable Land Access Service.

25

1    "(b) UNDER SECRETARY.—The Equitable Land Ac-
2  cess Service shall be headed by the Under Secretary of
3  Agriculture for Equitable Land Access.

4    "(c) FUNCTIONS.—The Secretary shall carry out
5  through the Equitable Land Access Service title II of the
6  Justice for Black Farmers Act of 2021.".

7    (b) TECHNICAL AND CONFORMING AMENDMENTS.—

8        (1) Subtitle A of the Department of Agriculture
9      Reorganization Act of 1994 is amended by redesig-
10      nating section 225 (7 U.S.C. 6925) as section 224A.

11        (2) Section 296(b) of the Department of Agri-
12      culture Reorganization Act of 1994 (7 U.S.C.
13      7014(b)) is amended by adding at the end the fol-
14      lowing:

15        "(11) The authority of the Secretary to carry
16      out the amendments made to this Act by the Justice
17      for Black Farmers Act of 2021.".

18        (3) Section 5314 of title 5, United States Code,
19      is amended by inserting after the item relating to
20      the Under Secretary of Agriculture for Marketing
21      and Regulatory Programs the following:

22        "Under Secretary of Agriculture for Equitable
23      Land Access.".

24  SEC. 203. PROVISION OF LAND GRANTS.

25    (a) IN GENERAL.—The Secretary shall—

1       (1) purchase from willing sellers, at a price not

2   greater than fair market value, available agricultural

3   land in the United States; and

4       (2) subject to section 205, convey grants of that

5   land to eligible Black individuals at no cost to the

6   eligible Black individuals.

7   (b) REQUIREMENT.—To the maximum extent prac-

8   ticable, if sufficient applications are submitted by eligible

9   Black individuals, the Secretary shall convey not less than

10  20,000 land grants to eligible Black individuals under sub-

11  section (a)(2) for each of fiscal years 2021 through 2030.

12  (c) MAXIMUM ACREAGE.—A land grant to an eligible

13  Black individual under subsection (a)(2) shall be not more

14  than 160 acres.

15  (d) APPLICATIONS.—

16      (1) IN GENERAL.—An eligible Black individual

17  seeking a land grant under subsection (a)(2) shall

18  submit to the Secretary an application at such time,

19  in such manner, and containing such information as

20  the Secretary may require, including a legal descrip-

21  tion of the land identified under section 204 of

22  which the eligible Black individual is seeking the

23  grant.

24      (2) QUALIFIED ENTITIES.—

1              (A) IN GENERAL.—A qualified entity that

2           receives a grant under section 208 may submit

3           to the Secretary an application under para-

4           graph (1) on behalf of 1 or more eligible Black

5           individuals seeking a land grant under sub-

6           section (a)(2).

7              (B) APPLICATIONS TO SUBDIVIDE AND

8           CONVEY.—If applicable, an application sub-

9           mitted under subparagraph (A) shall include a

10          proposal for how the land will be subdivided

11          and conveyed separately to eligible Black indi-

12          viduals as described in section 204(b).

13   (e) PRIORITY.—The Secretary shall give priority to

14 applications submitted under subsection (c) for land

15 grants to—

16          (1) eligible Black individuals who are currently

17       farmers or ranchers;

18          (2) eligible Black individuals with a family his-

19       tory of land dispossession;

20          (3) eligible Black individuals with experience in

21       agriculture, including experience obtained through

22       participation in the Farm Conservation Corps estab-

23       lished under section 209; and

24          (4) eligible Black individuals who are veterans.

1     (f) FUNDING.—There is authorized to be appro-
2 priated, and there is appropriated, out of amounts in the
3 Treasury not otherwise appropriated, $8,000,000,000 for
4 each of fiscal years 2021 through 2030 to carry out this
5 section.

**SEC. 204. IDENTIFICATION OF LAND.**

7     (a) IN GENERAL.—The Secretary shall refer an eligi-
8 ble Black individual seeking a land grant under section
9 203 to a qualified entity that receives a grant under sec-
10 tion 208 to assist the eligible Black individual in identi-
11 fying available agricultural land in the United States that
12 is suitable for purchase by the Secretary and conveyance
13 to the eligible Black individual under section 203.

14     (b) SUBDIVISIONS.—In carrying out subsection (a),
15 a qualified entity may assist eligible Black individuals in
16 identifying land described in that subsection that is suit-
17 able to be subdivided and conveyed separately to multiple
18 eligible Black individuals under section 203.

**SEC. 205. RESTRICTIONS ON CONVEYED LAND.**

20     (a) IN GENERAL.—Before conveying a land grant
21 under section 203(a)(2), the Secretary shall attach to the
22 land an easement requiring that the land be—

23         (1) restricted in perpetuity for agricultural use,
24         but with an allowance for constructing or improving

1    and maintaining 1 primary residence and housing

2    for farmworkers on the land; and

3         (2) subject in perpetuity to the conservation re-

4    quirements that—

5              (A) an animal feeding operation may not

6         be operated on the land, with the exception that

7         an animal feeding operation with fewer than

8         299 animal units may be operated during times

9         of the year that outdoor access is not possible

10        due to weather conditions; and

11             (B) the land shall be subject to applicable

12        highly erodible land and wetland conservation

13        requirements in effect on the date of enactment

14        of this Act under subtitles B and C of title XII

15        of the Food Security Act of 1985 (16 U.S.C.

16        3811 et seq.).

17   (b) RIGHT OF REENTRY.—

18        (1) IN GENERAL.—A deed conveying a land

19   grant under section 203(a)(2) shall include a right

20   of reentry for the Secretary if the Secretary—

21             (A) determines, after giving notice and a

22        reasonable opportunity for a hearing, that a re-

23        quirement described in subsection (a) of an

24        easement attached to that land has been vio-

25        lated; and

1           (B) determines that the violation has not

2           been remedied within 60 days after the date of

3           the determination under subparagraph (A).

4       (2) EXPIRATION.—The right of reentry de-

5   scribed in paragraph (1) shall expire on the date

6   that is 5 years after the date of conveyance.

7   (c) RIGHT OF FIRST REFUSAL.—

8       (1) IN GENERAL.—Beginning on the day after

9   the expiration date described in subsection (b)(2)—

10          (A) the recipient of the land grant may sell

11          the land; but

12          (B) the Secretary shall have a right of first

13          refusal to purchase the land at the appraised

14          value of the land.

15      (2) DELEGATION.—The Secretary may, on a

16  case-by-case basis, delegate the right of first refusal

17  under paragraph (1)(B) to a qualified entity that re-

18  quests the delegation.

19  (d) REQUIREMENT.—If the Secretary purchases land

20  under subsection (c)(1)(B), the Secretary shall convey the

21  land to another eligible Black individual under section

22  203(a)(2).

23  **SEC. 206. ELIGIBILITY FOR ASSISTANCE.**

24      (a) FARM OPERATING LOANS.—

31

1     (1) ELIGIBLE BLACK INDIVIDUALS.—Beginning
2     on the date of conveyance of a land grant under sec-
3     tion 203(a)(2), the eligible Black individual that re-
4     ceives the land grant shall be eligible for a direct op-
5     erating loan under subtitle B of the Consolidated
6     Farm and Rural Development Act (7 U.S.C. 1941
7     et seq.), notwithstanding any borrower eligibility re-
8     quirements under subparagraph (B) or (D) of sec-
9     tion 311(a)(1) of that Act (7 U.S.C. 1941(a)(1)) for
10    such a loan.

11    (2) SOCIALLY DISADVANTAGED FARMERS AND
12    RANCHERS.—During the 5-year period beginning on
13    the date of enactment of this Act, any socially dis-
14    advantaged farmer or rancher shall be eligible for a
15    direct operating loan under subtitle B of the Con-
16    solidated Farm and Rural Development Act (7
17    U.S.C. 1941 et seq.), notwithstanding any borrower
18    eligibility requirements under subparagraph (B) or
19    (D) of section 311(a)(1) of that Act (7 U.S.C.
20    1941(a)(1)) for such a loan.

21    (3) INTEREST AND DEFERMENT.—In the case
22    of an operating loan under paragraph (1) or (2)—
23       (A) the interest rate shall be zero percent
24       for the first 7 years of the term of the loan; and

1    (B) the Secretary of Agriculture shall defer

2        payments for the first 24 months.

3    (b) SINGLE FAMILY HOME MORTGAGES.—Beginning

4 on the date of conveyance of a land grant under section

5 203(a)(2), the eligible Black individual that receives the

6 land grant shall be eligible for a direct loan under section

7 502 of the Housing Act of 1949 (42 U.S.C. 1472), not-

8 withstanding any borrower eligibility requirements for

9 such a loan, for the construction or improvement of a sin-

10 gle family home on the conveyed land.

11    (c) FUNDING.—There are authorized to be appro-

12 priated such sums as are necessary to carry out this sec-

13 tion for each of fiscal years 2021 through 2030.

**14 SEC. 207. COMPLETION OF FARMER TRAINING PROGRAM**

**15            AND SUCCESSION PLANNING.**

16    (a) REQUIRED TRAINING.—As a condition on the re-

17 ceipt of a land grant under section 203(a)(2), any recipi-

18 ent who does not have at least 2 years of prior experience

19 in agriculture shall be required to complete, at no cost,

20 a farmer training program established pursuant to section

21 208(a)(4).

22    (b) OPTIONAL TRAINING.—Any eligible Black indi-

23 vidual who has at least 2 years of prior experience in agri-

24 culture, and any socially disadvantaged farmer or rancher,

1  may complete, at no cost, a farmer training program es-
2  tablished pursuant to section 208(a)(4).

3  (c) SUCCESSION PLANNING.—As a condition on the
4  receipt of a land grant under section 203(a)(2), each re-
5  cipient shall collaborate with a qualified entity to develop
6  a succession plan.

**SEC. 208. GRANTS FOR QUALIFIED ENTITIES.**

8  (a) IN GENERAL.—The Secretary shall establish a
9  program to provide grants to qualified entities to use as
10  operating amounts—

11      (1) to support eligible Black individuals in iden-
12      tifying land under section 204, including developing
13      proposals for how land may be subdivided as de-
14      scribed in subsection (b) of that section;

15      (2) to support eligible Black individuals in ac-
16      quiring that land through a land grant under section
17      203(a)(2), including by submitting applications on
18      behalf of eligible Black individuals under section
19      203(d)(2);

20      (3) to support eligible Black individuals in
21      starting up farm operations on that land;

22      (4) to provide eligible Black individuals and so-
23      cially disadvantaged farmers and ranchers with
24      farmer training; and

34

1      (5) to provide other assistance, including legal

2    advocacy, succession planning, and support for the

3    development of farmer cooperatives, to eligible Black

4    individuals and other Black farmers and ranchers.

5    (b) FUNDING.—There is authorized to be appro-

6  priated, and there is appropriated, out of amounts in the

7  Treasury not otherwise appropriated, $1,000,000,000 for

8  each of fiscal years 2021 through 2030 to carry out this

9  section.

10  **SEC. 209. FARM CONSERVATION CORPS.**

11    (a) IN GENERAL.—The Secretary shall establish a ci-

12  vilian conservation corps, to be known as the ''Farm Con-

13  servation Corps'' to provide young adults ages 18 to 29

14  from socially disadvantaged groups with the academic, vo-

15  cational, and social skills necessary to pursue long-term,

16  productive careers in farming and ranching.

17    (b) REQUIREMENT.—To the maximum extent prac-

18  ticable, the Secretary shall enroll not fewer than 20,000

19  young adults in the Farm Conservation Corps pursuant

20  to subsection (a) in each of fiscal years 2021 through

21  2030.

22    (c) FARMWORKER SERVICES.—Members of the Farm

23  Conservation Corps shall serve as on-farm apprentices, at

24  no cost, to—

35

1    (1) socially disadvantaged farmers and ranch-
2    ers, the annual gross farm income of whom is less
3    than $250,000;

4    (2) beginning farmers and ranchers, the annual
5    gross farm income of whom is less than $250,000;
6    and

7    (3) farmers and ranchers operating certified or-
8    ganic farms (as defined in section 2103 of the Or-
9    ganic Foods Production Act of 1990 (7 U.S.C.
10   6502)), the annual gross farm income of whom is
11   less than $250,000.

12   (d) DURATION OF PARTICIPATION.—An individual
13   shall serve in the Farm Conservation Corps for not more
14   than 2 years.

15   (e) HOUSING AND CARE.—The Secretary shall pro-
16   vide to each member of the Farm Conservation Corps, for
17   the duration of the participation—

18   (1) housing, subsistence, clothing, medical at-
19   tention (including hospitalization), and transpor-
20   tation; or

21   (2) a cash allowance sufficient for the applica-
22   ble locality to cover costs described in paragraph (1).

23   (f) COMPENSATION.—Members of the Farm Con-
24   servation Corps shall be paid for their services as a farm-
25   worker at a rate consistent with the minimum wage appli-

1 cable to a nonimmigrant described in section
2 101(a)(15)(H)(ii) of the Immigration and Nationality Act
3 (8 U.S.C. 1101(a)(15)(H)(ii)) for services as a farm-
4 worker in the applicable locality.

5 (g) FUNDING.—There is authorized to be appro-
6 priated, and there is appropriated, out of amounts in the
7 Treasury not otherwise appropriated, $1,000,000,000 for
8 each of fiscal years 2021 through 2030 to carry out this
9 section.

**10 SEC. 210. ANNUAL REPORT TO CONGRESS.**

11 The Secretary shall submit to Congress and make
12 publicly available annual reports describing data on land
13 grants under this title, including—

14 (1) the number of land grants;

15 (2) the recipients of land grants;

16 (3) the total number of acres of land granted;

17 (4) the number of acres of land granted by
18 county; and

19 (5) the types of new farming or ranching oper-
20 ations established on the granted land.

# TITLE III—FUNDING FOR HISTORICALLY BLACK COLLEGES AND UNIVERSITIES

### SEC. 301. FUNDING FOR HISTORICALLY BLACK COLLEGES AND UNIVERSITIES.

(a) IN GENERAL.—There is authorized to be appropriated, and there is appropriated, out of amounts in the Treasury not otherwise appropriated, $500,000,000 for fiscal year 2021 and each of the succeeding 9 fiscal years for the Secretary of Education to provide funding to part B institutions (as defined in section 322 of the Higher Education Act of 1965 (20 U.S.C. 1061)).

(b) USE OF FUNDING.—The funding provided by subsection (a) shall be used by part B institutions described in that subsection—

    (1)(A) to commence new courses of study and expand existing courses of study focused on careers in agriculture, agriculture-related fields, or other related disciplines; and

    (B) to recruit students for those courses of study; and

    (2) to commence research to further the study of—

        (A) regenerative agricultural practices; and

1        (B) market opportunities for socially dis-
2            advantaged farmers and ranchers.

3 **SEC. 302. USDA/1890 NATIONAL SCHOLARS PROGRAM.**

4        The National Agricultural Research, Extension, and
5 Teaching Policy Act of 1977 is amended by inserting after
6 section 1446 (7 U.S.C. 3222a) the following:

7 **"SEC. 1446A. USDA/1890 NATIONAL SCHOLARS PROGRAM.**

8        "(a) DEFINITION OF PROGRAM.—In this section, the
9 term 'program' means the USDA/1890 National Scholars
10 Program established by the Secretary.

11        "(b) AUTHORIZATION.—The Secretary shall continue
12 to carry out the program.

13        "(c) FUNDING.—There is authorized to be appro-
14 priated, and there is appropriated, out of amounts in the
15 Treasury not otherwise appropriated, $20,000,000 for
16 each fiscal year to carry out the program.".

# TITLE IV—LAND RETENTION
# AND CREDIT ASSISTANCE

19 **SEC. 401. PROTECTIONS FOR LAND OWNERSHIP.**

20        (a) RELENDING PROGRAM TO RESOLVE OWNERSHIP
21 AND SUCCESSION ON FARMLAND.—Section 310I(g) of the
22 Consolidated Farm and Rural Development Act (7 U.S.C.
23 1936c(g)) is amended by striking "through 2023" and in-
24 serting "and 2020 and $50,000,000 for each of fiscal
25 years 2021 through 2023".

1  (b) REPORTS ON LAND ACCESS AND FARMLAND

2 OWNERSHIP DATA COLLECTION.—Section 12607(c) of

3 the Agriculture Improvement Act of 2018 (7 U.S.C.

4 2204i(c)) is amended by striking "through 2023" and in-

5 serting "and 2020 and $10,000,000 for each of fiscal

6 years 2021 through 2023".

7  (c) FAMILY FARMER INCOME.—Section 101(18)(A)

8 of title 11, United States Code, is amended, in the matter

9 preceding clause (i), by striking "50 percent" and insert-

10 ing "30 percent".

11 **SEC. 402. ACCESS TO CREDIT FOR SOCIALLY DISADVAN-**

12 **TAGED FARMERS AND RANCHERS.**

13  (a) NATIONAL SOCIALLY DISADVANTAGED FARMER

14 AND RANCHER BANK.—

15   (1) DEFINITIONS.—In this subsection—

16    (A) the term "Bank" means the National

17   Socially Disadvantaged Farmer and Rancher

18   Bank established under paragraph (2);

19    (B) the term "community development fi-

20   nancial institution" has the meaning given the

21   term in section 103 of the Community Develop-

22   ment Banking and Financial Institutions Act of

23   1994 (12 U.S.C. 4702); and

24    (C) the term "eligible entity" means—

1          (i)  a  credit  union,  mutual  savings

2          bank,  or  mutual  savings  and  loan  associa-

3          tion—

4                (I) that—

5                      (aa) is operated on a cooper-

6                      ative, not-for-profit basis; and

7                      (bb)  provides  financial  serv-

8                      ices  or  facilities  for  the  benefit

9                      of—

10                            (AA)  the  members  of

11                            the entity; or

12                            (BB)  voting  stock-

13                            holders who are the ultimate

14                            recipients  of  those  financial

15                            services or facilities; and

16                (II)  not  less  than  60  percent  of

17                the  members  or  voting  stockholders  of

18                which   are   socially   disadvantaged

19                farmers or ranchers; or

20          (ii)  a  not-for-profit  community  devel-

21          opment  financial  institution,  if  not  less

22          than 75 percent of the total dollar value of

23          the loans made by the institution consist of

24          loans made to socially disadvantaged farm-

25          ers or ranchers.

1     (2) ESTABLISHMENT OF BANK.—

2         (A) IN GENERAL.—Congress hereby cre-

3     ates and charters a bank to be known as the

4     National Socially Disadvantaged Farmer and

5     Rancher Bank, the sole mission of which shall

6     be to provide financing and other assistance in

7     accordance with the requirements of this sub-

8     section.

9         (B) BOARD OF DIRECTORS.—

10         (i) IN GENERAL.—The Bank shall be

11     governed by a Board of Directors—

12         (I) which shall consist of 13

13     members; and

14         (II) each member of which shall

15     be appointed by the President, by and

16     with the advice and consent of the

17     Senate.

18         (ii) TERM.—Each member of the

19     Board of Directors of the Bank shall serve

20     for a term of 3 years.

21     (3) LENDING AUTHORITY.—

22         (A) IN GENERAL.—The Bank may make

23     loans and loan guarantees to eligible entities.

24         (B) TERMS.—With respect to a loan made

25     by the Bank to an eligible entity—

1          (i) the term of the loan shall be 30
2     years;
3          (ii) the interest rate with respect to
4     the loan shall be the interest rate on 30-
5     year Treasury bonds, as of the date on
6     which the loan is made; and
7          (iii) before the end of the term de-
8     scribed in clause (i), the eligible entity—
9          (I) shall not be required to make
10         any principal payments with respect
11         to the loan; and
12         (II) shall make interest payments
13         with respect to the loan.
14   (C) CONDITION OF FINANCING FOR CER-
15   TAIN ELIGIBLE ENTITIES.—With respect to a
16   loan or loan guarantee made under this para-
17   graph to an eligible entity described in para-
18   graph (1)(C)(ii), the Bank, as a condition of
19   the financing, shall require the eligible entity to
20   ensure that, for the full term of the loan or loan
21   guarantee made by the Bank, not less than 75
22   percent of the total dollar value of the loans
23   made by the eligible entity consist of loans
24   made to socially disadvantaged farmers or
25   ranchers.

43

1     (4) GRANT PROGRAM.—

2         (A) IN GENERAL.—The Bank shall estab-

3         lish a program through which the Bank may

4         make a grant to assist—

5             (i) an entity in becoming an eligible

6             entity; or

7             (ii) an eligible entity with the com-

8             mencement or expansion of operations of

9             the eligible entity, including with respect to

10             outreach, education, and training activities.

11         (B) GRANT AMOUNT.—The amount of a

12         grant made under the program established

13         under subparagraph (A) shall be not more than

14         $3,000,000.

15         (C) FIRST AWARD.—The first grant made

16         by the Bank under the program established

17         under subparagraph (A) shall be to an entity,

18         not less than 60 percent of the members or

19         stockholders of which are Black farmers or

20         ranchers.

21     (5) TECHNICAL ASSISTANCE.—The Bank shall

22     establish a program to provide technical assistance

23     to eligible entities, including assistance in obtain-

24     ing—

1    (A) approval from the National Credit
2    Union Administration Board under section 104
3    of the Federal Credit Union Act (12 U.S.C.
4    1754); and

5    (B) certification from the Community De-
6    velopment Financial Institutions Fund estab-
7    lished under section 104(a) of the Community
8    Development Banking and Financial Institu-
9    tions Act of 1994 (12 U.S.C. 4701 et seq.).

10   (6) FUNDING.—

11   (A) IN GENERAL.—There are appropriated
12   to the Bank, out of any amounts in the Treas-
13   ury not otherwise appropriated, $1,000,000,000
14   to carry out this subsection—

15        (i) which shall remain available until
16        expended; and

17        (ii) of which—

18             (I) not less than $50,000,000
19             shall be used to make grants under
20             the program established under para-
21             graph (4); and

22             (II) not less than $50,000,000
23             shall be used to provide technical as-
24             sistance under paragraph (5).

25   (B) EMERGENCY DESIGNATION.—

1          (i) IN GENERAL.—The amounts pro-
2    vided under this paragraph are designated
3    as an emergency requirement pursuant to
4    section 4(g) of the Statutory Pay-As-You-
5    Go Act of 2010 (2 U.S.C. 933(g)).

6          (ii) DESIGNATION IN SENATE.—In the
7    Senate, this subsection is designated as an
8    emergency requirement pursuant to section
9    4112(a) of H. Con. Res. 71 (115th Con-
10    gress), the concurrent resolution on the
11    budget for fiscal year 2018.

12    (b) CFPB AUTHORITY TO INVESTIGATE CLAIMS OF
13 DISCRIMINATION BY FARM CREDIT SYSTEM INSTITU-
14 TIONS.—Section 5.31 of the Farm Credit Act of 1971 (12
15 U.S.C. 2267) is amended—

16    (1) in the first sentence, by striking ''The
17    Farm'' and inserting the following:

18    ''(a) IN GENERAL.—Except as provided in subsection
19 (b), the Farm''; and

20    (2) by adding at the end the following:

21    ''(b) BUREAU OF CONSUMER FINANCIAL PROTEC-
22 TION.—The Bureau of Consumer Financial Protection
23 shall have enforcement authority over institutions and in-
24 stitution-affiliated parties with respect to claims of dis-
25 crimination.''.

1    (c) ESTABLISHMENT OF FUNDING GOALS.—The Sec-

2  retary shall establish goals for the funding of programs

3  to address racial disparities in the recipients of assistance

4  provided by the Department of Agriculture, including the

5  programs under section 2501 of the Food, Agriculture,

6  Conservation, and Trade Act of 1990 (7 U.S.C. 2279),

7  to ensure that those programs directly support socially dis-

8  advantaged farmers and ranchers.

9    (d) PUBLIC AWARENESS CAMPAIGNS.—

10    (1) IN GENERAL.—The Secretary shall—

11      (A) conduct public awareness campaigns

12      for socially disadvantaged farmers and ranchers

13      relating to programs available for socially dis-

14      advantaged farmers and ranchers through the

15      Department of Agriculture; and

16      (B) use 50 percent of the amount made

17      available under paragraph (2) to provide fund-

18      ing for community organizations with history of

19      working with socially disadvantaged farmers

20      and ranchers to conduct community-based out-

21      reach.

22    (2) AUTHORIZATION OF APPROPRIATIONS.—

23  There is authorized to be appropriated to carry out

24  this subsection $50,000,000.

1  SEC. 403. ADDITIONAL CREDIT ASSISTANCE.

2  (a) REFINANCING OF DEBT WITH FARM LOANS.—

3      (1) PURPOSES OF FARM OWNERSHIP LOANS.—

4  Section 303(a)(1) of the Consolidated Farm and

5  Rural Development Act (7 U.S.C. 1923(a)(1)) is

6  amended by striking subparagraph (E) and inserting

7  the following:

8          "(E) refinancing indebtedness.".

9      (2) PURPOSES OF OPERATING LOANS.—Section

10  312(a) of the Consolidated Farm and Rural Devel-

11  opment Act (7 U.S.C. 1942(a)) is amended by strik-

12  ing paragraph (9) and inserting the following:

13          "(9) refinancing the indebtedness of a borrower;

14  or".

15  (b) REMOVAL OF ELIGIBILITY RESTRICTION BASED

16  ON PREVIOUS DEBT WRITE-DOWN OR OTHER LOSS.—

17  Section 373 of the Consolidated Farm and Rural Develop-

18  ment Act (7 U.S.C. 2008h) is amended—

19          (1) in subsection (b)—

20              (A) in paragraph (1), in the matter pre-

21          ceding subparagraph (A), by inserting "and

22          subsection (d)" after "paragraph (2)"; and

23              (B) in paragraph (2)(A)—

24                  (i) by striking clause (i);

25                  (ii) in clause (ii), by striking "chap-

26              ters 11, 12, or 13 of Title 11 of the" and

48

1        inserting "chapter 11, 12, or 13 of title

2        11,"; and

3             (iii) by redesignating clauses (ii) and

4             (iii) as clauses (i) and (ii), respectively;

5             and

6        (2) by adding at the end the following:

7    "(d) PROHIBITION ON ELIGIBILITY RESTRICTION

8 BASED ON DEBT WRITE-DOWN OR OTHER LOSS.—The

9 Secretary shall not restrict the eligibility of a borrower for

10 a farm ownership or operating loan under subtitle A or

11 B based on a previous debt write-down or other loss to

12 the Secretary.".

13    (c) AUTHORIZATION FOR LOANS.—Section 346(b)(1)

14 of the Consolidated Farm and Rural Development Act (7

15 U.S.C. 1994(b)(1)) is amended—

16        (1) in the matter preceding subparagraph (A),

17        by striking "$10,000,000,000 for each of fiscal

18        years 2019 through 2023" and inserting

19        "$20,000,000,000 for each of fiscal years 2021

20        through 2023"; and

21        (2) by striking subparagraphs (A) and (B) and

22        inserting the following:

23             "(A) $10,000,000,000 shall be for farm

24             ownership loans under subtitle A; and

1        "(B) $10,000,000,000 shall be for oper-
2     ating loans under subtitle B.".

3    (d) LOAN FORGIVENESS FOR SETTLEMENTS APPLI-
4 CANTS IN PIGFORD I.—

5        (1) DEFINITION OF COVERED BORROWER.—In
6     this subsection, the term "covered borrower" means
7     a Black farmer or rancher that—

8            (A) submitted a claim under the settlement
9         agreement and consent decree in Pigford v.
10        Glickman, 185 F.R.D. 82 (D.D.C. 1999); and

11            (B) as of the date of enactment of this
12        Act, has indebtedness on a loan made or guar-
13        anteed by the Secretary.

14        (2) LOAN FORGIVENESS.—The Secretary
15     shall—

16            (A) forgive the indebtedness of a covered
17        borrower on a loan made by the Secretary; and

18            (B) require a lender of a loan guaranteed
19        by the Secretary for a covered borrower to for-
20        give the indebtedness of that covered borrower
21        on that loan.

22        (3) REIMBURSEMENT FOR PAYMENTS AND
23     OTHER FUNDS SEIZED.—The Secretary shall provide
24     to a covered borrower a payment equal to the
25     amount, if any, of payments of tax refunds, pay-

50

1     ments under the old-age, survivors, and disability in-

2     surance benefits program established under title II

3     of the Social Security Act (42 U.S.C. 401 et seq.),

4     and any other funds of the covered borrower that

5     were seized after the date of the settlement agree-

6     ment and consent decree described in paragraph

7     (1)(A) in partial or full satisfaction of debt that, if

8     the payments or other funds had not been seized,

9     would have been forgiven under this subsection.

10     (4) FARMER GRANTS.—The Secretary shall pro-

11     vide to a covered borrower a grant equal to 30 per-

12     cent of the amount of the debt forgiven with respect

13     to the covered borrower under this subsection.

14     (e) FARM SERVICE AGENCY LOAN ELIGIBILITY FOR

15 HEIRS WITH UNDIVIDED PROPERTY OWNERSHIP INTER-

16 ESTS.—Subtitle D of the Consolidated Farm and Rural

17 Development Act is amended by inserting after section

18 331F (7 U.S.C. 1981f) the following:

19 **"SEC. 331G. ELIGIBILITY OF TENANTS IN COMMON FOR**

20         **LOANS.**

21     "Notwithstanding any other provision of law, a ten-

22 ant in common shall be eligible for a direct or guaranteed

23 farm ownership loan under subtitle A, a direct or guaran-

24 teed operating loan under subtitle B, or a direct or guar-

1 anteed emergency loan under subtitle C if the tenant in

2 common submits to the Secretary an agreement—

3     "(1) entered into by each person that owns a

4     property interest in or to the applicable property;

5     and

6     "(2) that includes—

7         "(A) clear identification of—

8            "(i) the owners of the property, as of

9            the date on which the agreement is sub-

10            mitted; and

11            "(ii) the percentages of ownership of

12            each owner described in clause (i);

13         "(B) identification of the property and a

14         description of the proposed use of the property;

15         "(C) a process for payment of expenses

16         and application and disbursement of any pro-

17         ceeds or profits among the owners of the prop-

18         erty;

19         "(D) appointment of a lead responsible

20         person for farm management;

21         "(E) a dispute resolution process; and

22         "(F) a buy-out provision that allows an

23         heir of the property to sell the property interest

24         of the heir in and to the property.".

52

1  **SEC. 404. FORECLOSURE MORATORIUM.**

2  Effective during the period beginning on the date of

3  enactment of this Act and ending on the date that is 1

4  year after the date on which the public health emergency

5  declared by the Secretary of Health and Human Services

6  under section 319 of the Public Health Service Act (42

7  U.S.C. 247d) on January 31, 2020, with respect to

8  COVID–19 (or any successor declaration) is lifted, there

9  shall be a moratorium on the Department of Agriculture

10  instituting or completing any foreclosure action on a loan

11  secured by a first or subordinate lien on real property that

12  includes a residence and farmland.

13  # TITLE V—AGRICULTURAL
14  # SYSTEM REFORMS
15  ## Subtitle A—Amendments to
16  ## Packers and Stockyards Act, 1921

17  **SEC. 501. DEFINITIONS.**

18  Section 2(a) of the Packers and Stockyards Act,

19  1921 (7 U.S.C. 182(a)) is amended—

20  (1) in paragraph (8), by striking "for slaugh-

21  ter" and all that follows through "of such poultry"

22  and inserting "under a poultry growing arrange-

23  ment, regardless of whether the poultry is owned by

24  that person or another person";

25  (2) in paragraph (9), by striking "and cares for

26  live poultry for delivery, in accord with another's in-

53

1    structions, for slaughter'' and inserting ''or cares for

2    live poultry in accordance with the instructions of

3    another person'';

4        (3) in each of paragraphs (1) through (9), by

5    striking the semicolon at the end and inserting a pe-

6    riod;

7        (4) in paragraph (10)—

8            (A) by striking ''for the purpose of either

9        slaughtering it or selling it for slaughter by an-

10       other''; and

11           (B) by striking ''; and'' at the end and in-

12       serting a period; and

13       (5) by adding at the end the following:

14   ''(15) FORMULA PRICE.—

15           ''(A) IN GENERAL.—The term 'formula

16       price' means any price term that establishes a

17       base from which a purchase price is calculated

18       on the basis of a price that will not be deter-

19       mined or reported until a date that is after the

20       date on which the forward price is established.

21           ''(B) EXCLUSION.—The term 'formula

22       price' does not include—

23               ''(i) any price term that establishes a

24           base from which a purchase price is cal-

54

1  culated on the basis of a futures market

2  price; or

3    "(ii) any adjustment to the base for

4    quality, grade, or other factors relating to

5    the value of livestock or livestock products

6    that are readily verifiable market factors

7    and are outside the control of the packer.

8   "(16) FORWARD CONTRACT.—The term 'for-

9 ward contract' means an oral or written contract for

10 the purchase of livestock that provides for the deliv-

11 ery of the livestock to a packer at a date that is

12 more than 7 days after the date on which the con-

13 tract is entered into, without regard to whether the

14 contract is for—

15    "(A) a specified lot of livestock; or

16    "(B) a specified number of livestock over a

17    certain period of time.".

18 **SEC. 502. UNLAWFUL PRACTICES.**

19 (a) IN GENERAL.—Section 202 of the Packers and

20 Stockyards Act, 1921 (7 U.S.C. 192) is amended—

21   (1) by redesignating subsections (a) through (f)

22  and (g) as paragraphs (1) through (6) and (10), re-

23  spectively, and indenting appropriately;

24   (2) by striking the section designation and all

25  that follows through "It shall be" in the matter pre-

55

1    ceding paragraph (1) (as so redesignated) and in-

2    serting the following:

3    **"SEC. 202. UNLAWFUL ACTS.**

4        "(a) IN GENERAL.—It shall be";

5        (3) in subsection (a)—

6            (A) in the matter preceding paragraph (1)

7            (as so redesignated), by striking "to:" and in-

8            serting "to do any of the following:";

9            (B) in each of paragraphs (1) through (6)

10           (as so redesignated), by striking "; or" each

11           place it appears and inserting a period;

12           (C) in paragraph (6) (as so redesig-

13           nated)—

14                (i) by striking "(1)" and inserting

15                "(A)";

16                (ii) by striking "(2)" and inserting

17                "(B)"; and

18                (iii) by striking "(3)" and inserting

19                "(C)";

20           (D) by inserting after paragraph (6) the

21           following:

22        "(7) Use, in effectuating any sale of livestock,

23    a forward contract that—

24        "(A) does not contain a firm base price

25        that may be equated to a fixed dollar amount

1   on the date on which the forward contract is

2   entered into;

3   &ldquo;(B) is not offered for bid in an open, pub-

4   lic manner under which—

5   &ldquo;(i) buyers and sellers have the oppor-

6   tunity to participate in the bid;

7   &ldquo;(ii) more than 1 blind bid is solic-

8   ited; and

9   &ldquo;(iii) buyers and sellers may witness

10   bids that are made and accepted;

11   &ldquo;(C) is based on a formula price; or

12   &ldquo;(D) provides for the sale of livestock in a

13   quantity in excess of—

14   &ldquo;(i) in the case of cattle, 40 cattle;

15   &ldquo;(ii) in the case of swine, 30 swine;

16   and

17   &ldquo;(iii) in the case of another type of

18   livestock, a comparable quantity of that

19   type of livestock, as determined by the Sec-

20   retary.

21   &ldquo;(8) Own or feed livestock directly, through a

22   subsidiary, or through an arrangement that gives a

23   packer operational, managerial, or supervisory con-

24   trol over the livestock, or over the farming operation

25   that produces the livestock, to such an extent that

1    the producer of the livestock is not materially par-

2    ticipating in the management of the operation with

3    respect to the production of the livestock, except

4    that this paragraph shall not apply to—

5            ''(A) an arrangement entered into not

6            more than 7 business days before slaughter of

7            the livestock by a packer, a person acting

8            through the packer, or a person that directly or

9            indirectly controls, or is controlled by or under

10          common control with, the packer;

11          ''(B) a cooperative or entity owned by a co-

12          operative, if a majority of the ownership inter-

13          est in the cooperative is held by active coopera-

14          tive members that—

15               ''(i) own, feed, or control the livestock;

16               and

17               ''(ii) provide the livestock to the coop-

18               erative for slaughter;

19          ''(C) a packer that is not required to re-

20          port to the Secretary on each reporting day (as

21          defined in section 212 of the Agricultural Mar-

22          keting Act of 1946 (7 U.S.C. 1635a)) informa-

23          tion on the price and quantity of livestock pur-

24          chased by the packer; or

1     "(D) a packer that owns only 1 livestock

2    processing plant.

3     "(9) Take any action that adversely affects or

4    is likely to adversely affect competition, regardless of

5    whether there is a business justification for the ac-

6    tion."; and

7     (E) in paragraph (10) (as so redesig-

8    nated), by striking "subdivision (a), (b), (c),

9    (d), or (e)" and inserting "paragraphs (1)

10    through (9)"; and

11    (4) by adding at the end the following:

12 "(b) UNFAIR, DISCRIMINATORY, AND DECEPTIVE

13 PRACTICES AND DEVICES.—Acts by a packer, swine con-

14 tractor, or live poultry dealer that violate subsection (a)(1)

15 include the following:

16    "(1) Refusal to provide, on the request of a

17    livestock producer, swine production contract grow-

18    er, or poultry grower with which the packer, swine

19    contractor, or live poultry dealer has a marketing or

20    delivery contract, the relevant statistical information

21    and data used to determine the compensation paid

22    to the livestock producer, swine production contract

23    grower, or poultry grower, as applicable, under the

24    contract, including—

1          ''(A) feed conversion rates by house, lot, or

2      pen;

3              ''(B) feed analysis;

4              ''(C) breeder history;

5              ''(D) quality grade;

6              ''(E) yield grade; and

7              ''(F)  delivery  volume  for  any  certified

8          branding program (such as programs for angus

9          beef or certified grassfed or Berkshire pork).

10         ''(2) Conduct or action that limits or attempts

11     to limit by contract the legal rights and remedies of

12     a   livestock   producer,   swine   production   contract

13     grower, or poultry grower, including the right—

14             ''(A) to a trial by jury, unless the livestock

15         producer, swine production contract grower, or

16         poultry  grower,  as  applicable,  is  voluntarily

17         bound by an arbitration provision in a contract;

18             ''(B) to pursue all damages available under

19         applicable law; and

20             ''(C) to seek an award of attorneys' fees,

21         if available under applicable law.

22         ''(3) Termination of a poultry growing arrange-

23     ment  or  swine  production  contract  with  no  basis

24     other than an allegation that the poultry grower or

60

1    swine production contract grower failed to comply

2    with an applicable law, rule, or regulation.

3          "(4) A representation, omission, or practice

4    that is likely to mislead a livestock producer, swine

5    production contract grower, or poultry grower re-

6    garding a material condition or term in a contract

7    or business transaction.

8    "(c) UNDUE OR UNREASONABLE PREFERENCES, AD-

9    VANTAGES, PREJUDICES, AND DISADVANTAGES.—

10        "(1) IN GENERAL.—Acts by a packer, swine

11    contractor, or live poultry dealer that violate sub-

12    section (a)(2) include the following:

13          "(A) A retaliatory action (including coer-

14        cion or intimidation) or the threat of retaliatory

15        action—

16              "(i) in connection with the execution,

17            termination, extension, or renewal of a

18            contract or agreement with a livestock pro-

19            ducer, swine production contract grower,

20            or poultry grower aimed to discourage the

21            exercise of the rights of the livestock pro-

22            ducer, swine production contract grower,

23            or poultry grower under this Act or any

24            other law; and

1    "(ii) in response to lawful communica-

2    tion (including as described in paragraph

3    (2)), association, or assertion of rights by

4    a livestock producer, swine production con-

5    tract grower, or poultry grower.

6   "(B) Use of the tournament system for

7 poultry as described in paragraph (3).

8  "(2) LAWFUL COMMUNICATION DESCRIBED.—A

9 lawful communication referred to in paragraph

10 (1)(A)(ii) includes—

11   "(A) a communication with officials of a

12 Federal agency or Members of Congress;

13   "(B) any lawful disclosure that dem-

14 onstrates a reasonable belief of a violation of

15 this Act or any other law; and

16   "(C) any other communication that assists

17 in carrying out the purposes of this Act.

18  "(3) USE OF TOURNAMENT SYSTEM FOR POUL-

19 TRY.—

20   "(A) IN GENERAL.—Subject to subpara-

21 graph (B), a live poultry dealer shall be in vio-

22 lation of subsection (a)(2) if the live poultry

23 dealer determines the formula for calculating

24 the pay of a poultry grower in a tournament

25 group by comparing the performance of the

1    birds of other poultry growers in the group
2    using factors outside the control of the poultry
3    grower and within the control of the live poultry
4    dealer.

5        "(B) EXCEPTION.—Under subparagraph
6    (A), a live poultry dealer shall not be found in
7    violation of subsection (a)(2) if the live poultry
8    dealer demonstrates through clear and con-
9    vincing evidence that the inputs and services
10    described in subparagraph (C) that were used
11    in the comparative evaluation were substantially
12    the same in quality, quantity, and timing, as
13    applicable, for all poultry growers in the tour-
14    nament group.

15        "(C) INPUTS AND SERVICES DESCRIBED.—
16    The inputs and services referred to in subpara-
17    graph (B) include, with respect to poultry grow-
18    ers in the same tournament group—

19            "(i) the quantity, breed, sex, and age
20        of chicks delivered to each poultry grower;

21            "(ii) the breed and age of the breeder
22        flock from which chicks are drawn for each
23        poultry grower;

1                                                              "(iii) the quality, type (such as starter

2                     feed), and quantity of feed delivered to

3                     each poultry grower;

4                                   "(iv) the quality of and access to

5                     medications for the birds of each poultry

6                     grower;

7                                   "(v) the number of birds in a flock de-

8                     livered to each poultry grower;

9                                 "(vi) the timing of the pick-up of

10                     birds for processing (including the age of

11                     the birds and the number of days that the

12                     birds are in the care of the poultry grower)

13                     for each poultry grower;

14                                 "(vii) the death loss of birds during

15                     pick-up, transport, and time spent at the

16                     processing plant for each poultry grower;

17                               "(viii) condemnations of parts of birds

18                     due to actions in processing for each poul-

19                     try grower;

20                               "(ix) condemnations of whole birds

21                     due to the fault of the poultry grower;

22                             "(x) the death loss of birds due to the

23                     fault of the poultry grower;

64

1          "(xi) the stated reasons for the cause

2              of the death losses and condemnations de-

3              scribed in clauses (vii) through (x);

4          "(xii) the type and classification of

5              each poultry grower; and

6          "(xiii) any other input or service that

7              may have an impact on feed conversion to

8              weight gain efficiency or the life span of

9              the birds of each poultry grower.

10     "(d) HARM TO COMPETITION NOT REQUIRED.—In

11 determining whether an act, device, or conduct is a viola-

12 tion under paragraph (1) or (2) of subsection (a), a find-

13 ing that the act, device, or conduct adversely affected or

14 is likely to adversely affect competition is not required.".

15     (b) EFFECTIVE DATE.—

16         (1) IN GENERAL.—Subject to paragraph (2),

17     paragraph (8) of section 202(a) of the Packers and

18     Stockyards Act, 1921 (7 U.S.C. 192) (as designated

19     by subsection (a)(2)) shall take effect on the date of

20     enactment of this Act.

21         (2) TRANSITION RULES.—In the case of a pack-

22     er that, on the date of enactment of this Act, owns,

23     feeds, or controls livestock intended for slaughter in

24     violation of paragraph (8) of section 202(a) of the

25     Packers and Stockyards Act, 1921 (7 U.S.C. 192)

1   (as designated by subsection (a)(2)), that paragraph

2   shall take effect—

3       (A) in the case of a packer of swine, begin-

4       ning on the date that is 18 months after the

5       date of enactment of this Act; and

6       (B) in the case of a packer of any other

7       type of livestock, beginning not later than 180

8       days after the date of enactment of this Act, as

9       determined by the Secretary.

10  **SEC. 503. SPOT MARKET PURCHASES OF LIVESTOCK BY**

11  **PACKERS.**

12      The Packers and Stockyards Act, 1921, is amended

13  by inserting after section 202 (7 U.S.C. 192) the fol-

14  lowing:

15  **"SEC. 202A. SPOT MARKET PURCHASES OF LIVESTOCK BY**

16  **PACKERS.**

17      "(a) DEFINITIONS.—In this section:

18          "(1) COVERED PACKER.—

19              "(A) IN GENERAL.—The term 'covered

20              packer' means a packer that is required under

21              subtitle B of the Agricultural Marketing Act of

22              1946 (7 U.S.C. 1635 et seq.) to report to the

23              Secretary each reporting day information on the

24              price and quantity of livestock purchased by the

25              packer.

1           "(B) EXCLUSION.—The term 'covered

2         packer' does not include a packer that owns

3         only 1 livestock processing plant.

4         "(2) NONAFFILIATED PRODUCER.—The term

5     'nonaffiliated producer' means a producer of live-

6     stock—

7           "(A) that sells livestock to a packer;

8           "(B) that has less than 1 percent equity

9         interest in the packer;

10          "(C) that has no officers, directors, em-

11        ployees, or owners that are officers, directors,

12        employees, or owners of the packer;

13          "(D) that has no fiduciary responsibility to

14        the packer; and

15          "(E) in which the packer has no equity in-

16        terest.

17     "(3) SPOT MARKET SALE.—

18          "(A) IN GENERAL.—The term 'spot mar-

19        ket sale' means a purchase and sale of livestock

20        by a packer from a producer—

21             "(i) under an agreement that specifies

22           a firm base price that may be equated with

23           a fixed dollar amount on the date the

24           agreement is entered into;

67

1            "(ii) under which the livestock are

2            slaughtered not more than 7 days after the

3            date on which the agreement is entered

4            into; and

5            "(iii) under circumstances in which a

6            reasonable competitive bidding opportunity

7            exists on the date on which the agreement

8            is entered into.

9       "(B) REASONABLE COMPETITIVE BIDDING

10      OPPORTUNITY.—For the purposes of subpara-

11      graph (A)(iii), a reasonable competitive bidding

12      opportunity shall be considered to exist if—

13            "(i) no written or oral agreement pre-

14            cludes the producer from soliciting or re-

15            ceiving bids from other packers; and

16            "(ii) no circumstance, custom, or

17            practice exists that—

18                  "(I) establishes the existence of

19                  an implied contract (as determined in

20                  accordance with the Uniform Com-

21                  mercial Code); and

22                  "(II) precludes the producer from

23                  soliciting or receiving bids from other

24                  packers.

1     "(b) GENERAL RULE.—Of the quantity of livestock

2 that is slaughtered by a covered packer during each re-

3 porting day in each plant, the covered packer shall slaugh-

4 ter not less than the applicable percentage specified in

5 subsection (c) of the quantity through spot market sales

6 from nonaffiliated producers.

7     "(c) APPLICABLE PERCENTAGES.—

8         "(1) IN GENERAL.—Except as provided in para-

9         graph (2), the applicable percentage shall be 50 per-

10         cent.

11         "(2) EXCEPTIONS.—In the case of a covered

12         packer that reported to the Secretary in the 2018

13         annual report that more than 60 percent of the live-

14         stock of the covered packer were committed procure-

15         ment livestock, the applicable percentage shall be the

16         greater of—

17             "(A) the difference between the percentage

18             of committed procurement so reported and 100

19             percent; and

20             "(B)(i) during calendar year 2021, 20 per-

21             cent;

22             "(ii) during each of calendar years 2022

23             and 2023, 30 percent; and

24             "(iii) during calendar year 2024 and each

25             calendar year thereafter, 50 percent.

69

1    ''(d) NONPREEMPTION.—This section does not pre-
2 empt any requirement of a State or political subdivision
3 of a State that requires a covered packer to purchase on
4 the spot market a greater percentage of the livestock pur-
5 chased by the covered packer than is required under this
6 section.''.

**SEC. 504. INVESTIGATION OF LIVE POULTRY DEALERS.**

8    (a) ADMINISTRATIVE ENFORCEMENT AUTHORITY
9 OVER LIVE POULTRY DEALERS.—Sections 203, 204, and
10 205 of the Packers and Stockyards Act, 1921 (7 U.S.C.
11 193, 194, 195) are amended by inserting '', live poultry
12 dealer,'' after ''packer'' each place it appears.

13    (b) AUTHORITY TO REQUEST TEMPORARY INJUNC-
14 TION OR RESTRAINING ORDER.—Section 408(a) of the
15 Packers and Stockyards Act, 1921 (7 U.S.C. 228a(a)) is
16 amended by inserting ''or poultry care'' after ''on account
17 of poultry''.

18    (c) VIOLATIONS BY LIVE POULTRY DEALERS.—Sec-
19 tion 411 of the Packers and Stockyards Act, 1921 (7
20 U.S.C. 228b–2) is amended—

21        (1) in subsection (a), in the first sentence, by
22        striking ''any provision of section 207 or section 410
23        of''; and

1  (2) in subsection (b), in the first sentence, by

2  striking "any provisions of section 207 or section

3  410" and inserting "any provision".

4 **SEC. 505. AWARD OF ATTORNEY FEES.**

5  Section 204 of the Packers and Stockyards Act, 1921

6 (7 U.S.C. 194) is amended by adding at the end the fol-

7 lowing:

8  "(i) ATTORNEY'S FEE.—The court shall award a rea-

9 sonable attorney's fee as part of the costs to a prevailing

10 plaintiff in a civil action under this section.".

11 **SEC. 506. TECHNICAL AMENDMENTS.**

12  (a) Section 203 of the Packers and Stockyards Act,

13 1921 (7 U.S.C. 193) is amended—

14  (1) in subsection (a), in the first sentence—

15   (A) by striking "he shall cause" and in-

16   serting "the Secretary shall cause"; and

17   (B) by striking "his charges" and inserting

18   "the charges";

19  (2) in subsection (b), in the first sentence, by

20  striking "he shall make a report in writing in which

21  he shall state his findings" and inserting "the Sec-

22  retary shall make a report in writing in which the

23  Secretary shall state the findings of the Secretary";

24  and

1  (3) in subsection (c), by striking "he" and in-
2  serting "the Secretary".

3  (b) Section 204 of the Packers and Stockyards Act,
4  1921 (7 U.S.C. 194) is amended—

5  (1) in subsection (a), by striking "he has his"
6  and inserting "the packer, live poultry dealer, or
7  swine contractor has the";

8  (2) in subsection (c), by striking "his officers,
9  directors, agents, and employees" and inserting "the
10  officers, directors, agents, and employees of the
11  packer, live poultry dealer, or swine packer";

12  (3) in subsection (f), in the second sentence—

13  (A) by striking "his findings" and insert-
14  ing "the findings of the Secretary"; and

15  (B) by striking "he" and inserting "the
16  Secretary"; and

17  (4) in subsection (g), by striking "his officers,
18  directors, agents, and employees" and inserting "the
19  officers, directors, agents, and employees of the
20  packer, live poultry dealer, or swine packer".

# Subtitle B—Local Agriculture Market Program

21
22

**SEC. 511. LOCAL AGRICULTURE MARKET PROGRAM.**

23

24  Section 210A(i)(1) of the Agricultural Marketing Act
25  of 1946 (7 U.S.C. 1627c(i)(1)) is amended by striking

1  "fiscal year 2019 and" and inserting "each of fiscal years

2  2019 and 2020, and $500,000,000 for".

# Subtitle C—Conservation and Renewable Energy Programs

**SEC. 521. CONSERVATION TECHNICAL ASSISTANCE.**

6  Section 6 of the Soil Conservation and Domestic Al-

7  lotment Act (16 U.S.C. 590f) is amended—

8  (1) by striking the section designation and

9  heading and all that follows through "There is" in

10  subsection (a) and inserting the following:

11  **"SEC. 6. FUNDING; CONSERVATION TECHNICAL ASSIST-**

12  **ANCE FUND.**

13  "(a) FUNDING.—

14  "(1) MANDATORY FUNDING.—Of the funds of

15  the Commodity Credit Corporation, the Secretary of

16  Agriculture shall use to carry out this Act

17  $2,100,000,000 for each fiscal year.

18  "(2) AUTHORIZATION OF APPROPRIATIONS.—

19  There are"; and

20  (2) in the undesignated matter following para-

21  graph (2) (as so designated) of subsection (a), by

22  striking "Appropriations" and inserting the fol-

23  lowing:

24  "(3) AVAILABILITY OF APPROPRIATIONS FOR

25  NURSERY STOCK.—Appropriations".

1    **SEC. 522. CONSERVATION STEWARDSHIP PROGRAM.**

2    (a) SUPPLEMENTAL PAYMENTS FOR CLIMATE STEW-

3    ARDSHIP PRACTICES.—Section 1240L(d) of the Food Se-

4    curity Act of 1985 (16 U.S.C. 3839aa–24(d)) is amend-

5    ed—

6        (1) in the subsection heading, by striking "RO-

7        TATIONS AND ADVANCED GRAZING MANAGEMENT"

8        and inserting "ROTATIONS, ADVANCED GRAZING

9        MANAGEMENT, AND CLIMATE STEWARDSHIP PRAC-

10       TICES";

11       (2) in paragraph (1)—

12           (A) by redesignating subparagraphs (B)

13           and (C) as subparagraphs (C) and (D), respec-

14           tively; and

15           (B) by inserting after subparagraph (A)

16           the following:

17               "(B) CLIMATE STEWARDSHIP PRACTICE.—

18           The term 'climate stewardship practice' means

19           any of the following practices:

20                   "(i) Alley cropping.

21                   "(ii) Biochar incorporation.

22                   "(iii) Conservation cover.

23                   "(iv) Conservation crop rotation.

24                   "(v) Contour buffer strips.

25                   "(vi) Contour farming.

26                   "(vii) Cover crops.

74

1          ''(viii) Critical area planting.

2          ''(ix) Cross wind trap strips.

3          ''(x) Field borders.

4          ''(xi) Filter strips.

5          ''(xii) Forage and biomass planting,

6     including the use of native prairie seed

7     mixtures.

8          ''(xiii) Forest stand improvements.

9          ''(xiv) Grassed waterways.

10         ''(xv) Hedgerow planting.

11         ''(xvi) Herbaceous wind barriers.

12         ''(xvii) Multistory cropping.

13         ''(xviii) Nutrient management, includ-

14    ing nitrogen stewardship activities.

15         ''(xix) Prescribed grazing.

16         ''(xx) Range planting.

17         ''(xxi) Residue and tillage manage-

18    ment with no till.

19         ''(xxii) Residue and tillage manage-

20    ment with reduced till.

21         ''(xxiii) Riparian forest buffers.

22         ''(xxiv) Riparian herbaceous buffers.

23         ''(xxv) Silvopasture establishment.

24         ''(xxvi) Stripcropping.

1    "(xxvii) Tree and shrub establish-
2    ment, including planting for a high rate of
3    carbon sequestration.

4        "(xxviii) Upland wildlife habitat.

5        "(xxix) Vegetative barriers.

6        "(xxx) Wetland restoration.

7        "(xxxi) Windbreak renovation.

8        "(xxxii) Windbreaks and shelterbelts.

9        "(xxxiii) Woody residue treatment.

10       "(xxxiv) Any other vegetative or man-
11   agement conservation activity that signifi-
12   cantly—

13           "(I) reduces greenhouse gas
14       emissions;

15           "(II) increases carbon sequestra-
16       tion; or

17           "(III) enhances resilience to in-
18       creased weather volatility.";

19   (3) in paragraph (2)—

20       (A) in subparagraph (A), by striking "or"
21   at the end;

22       (B) in subparagraph (B), by striking the
23   period at the end and inserting "; or"; and

24       (C) by adding at the end the following:

1            ''(C) conservation activities relating to cli-

2            mate stewardship practices.''; and

3       (4) in paragraph (3), by striking ''rotations or

4 advanced grazing management'' and inserting ''rota-

5 tions, advanced grazing management, or conserva-

6 tion activities relating to climate stewardship prac-

7 tices''.

8       (b) PAYMENT LIMITATIONS.—Section 1240L(f) of

9 the Food Security Act of 1985 (16 U.S.C. 3839aa–24(f))

10 is amended by striking ''fiscal years 2019 through 2023''

11 and inserting ''the period of fiscal years 2019 through

12 2023, the period of fiscal years 2024 through 2028, or

13 the period of fiscal years 2029 through 2033''.

14       (c) FUNDING.—Section 1241 of the Food Security

15 Act of 1985 (16 U.S.C. 3841) is amended—

16       (1) in subsection (a)—

17            (A) in the matter preceding paragraph (1),

18            by striking ''2023'' and inserting ''2030''; and

19            (B) in paragraph (3)(B)—

20                 (i) in clause (iii), by striking

21                 ''$750,000,000'' and inserting

22                 ''$2,750,000,000'';

23                 (ii) in clause (iv)—

24                     (I) by striking ''$800,000,000''

25                    and inserting ''$2,800,000,000''; and

1           (II) by striking "and" at the end;

2       (iii) in clause (v)—

3           (I) by striking "$1,000,000,000"

4       and inserting "$3,000,000,000"; and

5           (II) by striking the period at the

6       end and inserting "; and"; and

7       (iv) by adding at the end the fol-

8   lowing:

9           "(vi) $3,000,000,000 for each of fiscal

10      years 2024 through 2030.";

11      (2) in subsection (b), by striking "2023" and

12  inserting "2030"; and

13      (3) by adding at the end the following:

14  "(k) FUNDING FOR CLIMATE STEWARDSHIP PRAC-

15  TICES.—Of the funds made available under subsection

16  (a)(3)(B), the Secretary shall set aside $2,000,000,000 for

17  each of fiscal years 2021 through 2030 to be used exclu-

18  sively to enroll in the conservation stewardship program

19  contracts comprised predominantly of conservation activi-

20  ties relating to climate stewardship practices (as defined

21  in section 1240L(d)(1)) or bundles of practices comprised

22  predominantly of conservation activities relating to climate

23  stewardship practices (as so defined).".

1    **SEC. 523. RURAL ENERGY FOR AMERICA PROGRAM.**

2    Section 9007 of the Farm Security and Rural Invest-

3    ment Act of 2002 (7 U.S.C. 8107) is amended—

4         (1) in subsection (c)(3)(A), by striking "25"

5    and inserting "40"; and

6         (2) in subsection (f)(1)—

7              (A) in subparagraph (D), by striking

8         "and" at the end;

9              (B) in subparagraph (E), by striking "for

10        fiscal" and all that follows through the period

11        at the end and inserting "for each of fiscal

12        years 2014 through 2020; and"; and

13             (C) by adding at the end the following:

14        "(F) $500,000,000 for fiscal year 2021

15        and each fiscal year thereafter.".

16   **SEC. 524. CONSERVATION AND RENEWABLE ENERGY PRO-**

17             **GRAMS PRIORITY.**

18   Each socially disadvantaged farmer or rancher, in-

19   cluding each eligible Black individual that receives a land

20   grant under section 203(a)(2), shall be given priority—

21        (1) for conservation technical assistance under

22        the Soil Conservation and Domestic Allotment Act

23        (16 U.S.C. 590a et seq.);

24        (2) under the conservation stewardship program

25        under subchapter B of that chapter (16 U.S.C.

26        3839aa–21 et seq.); and

79

1        (3) under the Rural Energy for America Pro-

2        gram established under section 9007 of the Farm

3        Security and Rural Investment Act of 2002 (7

4        U.S.C. 8107).

○

II

117TH CONGRESS
1ST SESSION

# S. 278

To require the Secretary of Agriculture to provide assistance for socially disadvantaged farmers and ranchers and socially disadvantaged groups, and for other purposes.

————————

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 8, 2021

Mr. WARNOCK (for himself, Mr. BOOKER, Mr. LUJÁN, Ms. STABENOW, Mr. LEAHY, and Ms. KLOBUCHAR) introduced the following bill; which was read twice and referred to the Committee on Agriculture, Nutrition, and Forestry

————————

# A BILL

To require the Secretary of Agriculture to provide assistance for socially disadvantaged farmers and ranchers and socially disadvantaged groups, and for other purposes.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4   This Act may be cited as the "Emergency Relief for

5   Farmers of Color Act of 2021".

6   **SEC. 2. FINDINGS.**

7   Congress finds that—

1          (1) various factors have contributed to the loss

2     of Black farmers, Indigenous farmers, and farmers

3     of color in the United States, including—

4          (A) mass and systemic loss of farmland

5          owned and operated by minority farmers;

6          (B) institutional civil rights violations by

7          the Federal Government;

8          (C) difficulties accessing debt and credit

9          capital; and

10          (D) other legal challenges that make it dif-

11          ficult for minority farmers and farmworkers to

12          participate in the United States farm economy;

13     (2) a 2019 Government Accountability Office

14     report found that socially disadvantaged farmers and

15     ranchers have more difficulty getting loans and cred-

16     it from the Department of Agriculture, which can

17     help beginning farmers break into the business and

18     help existing farmers continue running their oper-

19     ations;

20          (3) the finding described in paragraph (2) high-

21     lights the systemic racism that has hindered farmers

22     of color for generations and continues as of the date

23     of enactment of this Act;

24          (4) beginning in 1830, Native American re-

25     moval was a federally sanctioned practice, the im-

3

1    pact of which still detrimentally impacts Native

2    American farmers today, including—

3          (A) the moving of tens of thousands of

4          original inhabitants from traditional land;

5          (B) the disruption of land ownership and

6          tenure; and

7          (C) the reorientation of traditional farm

8          production techniques;

9    (5) according to the Census of Agriculture—

10         (A) approximately 80 percent of land was

11         lost by Black farmers from 1910 to 2007;

12         (B) in 1910, 14 percent of United States

13         farmers were Black; and

14         (C) in 2012, less than 2 percent of United

15         States farmers were Black;

16    (6) heirs' property refers to land that is infor-

17    mally passed down from generation to generation

18    without a legally designated owner;

19    (7) due to lack of access to the legal system

20    during Reconstruction and distrust of the legal sys-

21    tem during the Jim Crow era, many Black families

22    have relied on heirs' property to keep land in their

23    families, which has resulted in title issues now hin-

24    dering many Black families from obtaining credit;

4

1      (8) Hispanic farmers were unlawfully discrimi-

2   nated against by the Department of Agriculture with

3   respect to credit and loan transaction and farm dis-

4   aster benefits;

5      (9) there are various laws, regulations, and

6   questionable practices that have led to and are asso-

7   ciated with land owned by Black farmers, Indige-

8   nous farmers, and farmers of color being acquired

9   by developers, contrary to the will of the farmers

10   and land workers;

11      (10) numerous reports over 60 years have

12   shown a consistent pattern of discrimination at the

13   Department of Agriculture against Black farmers,

14   Indigenous farmers, and farmers of color;

15      (11) in 1965, the United States Commission on

16   Civil Rights found evidence of discrimination in pro-

17   gram delivery and the treatment of employees of

18   color at the Department of Agriculture;

19      (12) in the 1970s, the Department of Agri-

20   culture deliberately forced Black farmers, Indigenous

21   farmers, and farmers of color off their land through

22   corrupt loan and financing practices;

23      (13) a 1982 report of the United States Com-

24   mission on Civil Rights concluded that racial dis-

25   crimination was continuing within the Department

5

1    of Agriculture, and, despite lawsuits and court or-
2    ders, the discrimination continued in carrying out
3    the farm loan programs in the headquarters and the
4    network of field offices of the Department of Agri-
5    culture; and

6        (14) a 2008 Government Accountability Office
7    report stated there were ''significant deficiencies'' in
8    addressing civil rights issues by the Department of
9    Agriculture and recommended new measures to ad-
10   dress the backlog of civil rights issues at the Depart-
11   ment of Agriculture.

**12   SEC. 3. DEFINITIONS.**

13   In this Act:

14       (1) FARM LOAN.—The term ''farm loan'' means
15   a loan administered by the Farm Service Agency
16   under subtitle A, B, or C of the Consolidated Farm
17   and Rural Development Act (7 U.S.C. 1922 et seq.).

18       (2) QUALIFIED NONPROFIT ORGANIZATION.—
19   The term ''qualified nonprofit organization'' means
20   an organization—

21           (A) that is a nonprofit;

22           (B) that has not less than 3 years of expe-
23       rience providing meaningful agricultural, busi-
24       ness assistance, legal assistance, or advocacy

6

1        services to socially disadvantaged farmers or

2        ranchers; and

3           (C) at least 50 percent of the members of

4        the board of directors of which are members of

5        a socially disadvantaged group.

6        (3) SECRETARY.—The term "Secretary" means

7  the Secretary of Agriculture.

8        (4) SOCIALLY DISADVANTAGED FARMER OR

9  RANCHER.—The term "socially disadvantaged farm-

10  er or rancher" has the meaning given the term in

11  section 2501(a) of the Food, Agriculture, Conserva-

12  tion, and Trade Act of 1990 (7 U.S.C. 2279(a)).

13        (5) SOCIALLY DISADVANTAGED GROUP.—The

14  term "socially disadvantaged group" has the mean-

15  ing given the term in section 2501(a) of the Food,

16  Agriculture, Conservation, and Trade Act of 1990 (7

17  U.S.C. 2279(a)).

18  **SEC. 4. DEBT FORGIVENESS ON FARM SERVICE AGENCY**

19         **LOANS.**

20  (a) PURPOSE.—The purpose of this section is to ad-

21  dress the historical discrimination against socially dis-

22  advantaged farmers and ranchers and address issues re-

23  lating to the Coronavirus Disease 2019 (COVID–19)—

24        (1) in farm loan programs; and

25        (2) across the Department of Agriculture.

•S 278 IS

7

1    (b) DEBT FORGIVENESS.—

2        (1) DIRECT LOANS.—The Secretary shall for-

3    give the obligation of each socially disadvantaged

4    farmer or rancher who is a borrower of a farm loan

5    made by the Secretary to repay the principal and in-

6    terest outstanding as of the date of enactment of

7    this Act on the farm loan.

8        (2) GUARANTEED LOANS.—The Secretary shall

9    pay to each lender of farm loans guaranteed by the

10    Secretary an amount equal to the principal and in-

11    terest outstanding as of the date of enactment of

12    this Act on all farm loans held by the lender, the

13    borrowers of which are socially disadvantaged farm-

14    ers and ranchers, such that the borrowers shall be

15    relieved of the obligation to repay the principal and

16    interest due on those guaranteed farm loans.

17        (3) APPLICATIONS.—

18            (A)  CIRCUMSTANCES  WHEN  NOT  RE-

19        QUIRED.—The  Secretary  shall  not  require  a

20        borrower of a farm loan for which debt forgive-

21        ness  may  be  provided  under  paragraph  (1)  or

22        (2)  who  has  self-identified  as  a  socially  dis-

23        advantaged  farmer  or  rancher  under  a  farm

24        loan existing as of the date of enactment of this

1         Act to submit an application for debt forgive-

2         ness under paragraph (1) or (2).

3             (B) OPPORTUNITY TO SUBMIT.—The Sec-

4         retary shall provide to each socially disadvan-

5         taged farmer or rancher who is a borrower of

6         a farm loan for which debt forgiveness may be

7         provided under paragraph (1) or (2) and who

8         has not self-identified as a socially disadvan-

9         taged farmer or rancher under a farm loan ex-

10         isting as of the date of enactment of this Act

11         an opportunity to submit to the Secretary an

12         application for debt forgiveness under para-

13         graph (1) or (2).

14       (4) PROHIBITION ON FUTURE ELIGIBILITY RE-

15     STRICTION.—The Secretary shall not restrict the eli-

16     gibility of a borrower for a future farm loan based

17     on the receipt of loan forgiveness under this section.

18   (c) FUNDING.—There is appropriated to the Sec-

19 retary, out of amounts in the Treasury not otherwise ap-

20 propriated, to carry out this section $4,000,000,000 for

21 the period of fiscal years 2021 through 2025.

22 **SEC. 5. ADDITIONAL ASSISTANCE FOR SOCIALLY DIS-**

23               **ADVANTAGED FARMERS AND RANCHERS AND**

24               **SOCIALLY DISADVANTAGED GROUPS.**

25   (a) EQUITY COMMISSION.—

1         (1) IN GENERAL.—The Secretary shall establish

2 an equity commission composed of—

3         (A) officers of the Department of Agri-

4 culture;

5         (B) individuals with an interest in the ac-

6 tivities of the Department of Agriculture;

7         (C) socially disadvantaged farmers or

8 ranchers with not less than 10 years of experi-

9 ence in farming or ranching;

10         (D) individuals with expertise in civil

11 rights; and

12         (E) employees or board members of quali-

13 fied nonprofit organizations.

14 (2) DUTIES.—The equity commission estab-

15 lished under paragraph (1) shall—

16         (A) examine past discrimination by the De-

17 partment of Agriculture;

18         (B) examine and evaluate discrimination

19 occurring in programs administered by the De-

20 partment of Agriculture; and

21         (C) provide recommendations to the Sec-

22 retary to address and mitigate future discrimi-

23 nation by the Department of Agriculture, in-

24 cluding—

25             (i) budgetary recommendations; and

1          (ii) recommendations for improving

2              the structure of Farm Service Agency

3              county committees to better serve socially

4              disadvantaged farmers and ranchers.

5      (b) NATIONAL CENTER FOR MINORITY FARMER AG-

6  RICULTURAL LAW RESEARCH AND INFORMATION.—

7      (1) ESTABLISHMENT.—The Secretary shall

8  make a competitive grant to a school of law, or a

9  legal research entity, in the United States to estab-

10  lish the National Center for Minority Farmer Agri-

11  cultural Law Research and Information (referred to

12  in this subsection as the ''Center'').

13      (2) ACTIVITIES.—The Center shall—

14          (A) conduct international, Federal, State,

15              and local legal research on the legal issues of

16              minority farmers and farmworkers relating to

17              farmland, credit, land ownership, and related

18              food and agricultural issues;

19          (B) provide information, community legal

20              education, policy research, and guidance on

21              legal issues relating to minority farmers and

22              farmworkers to—

23              (i) practicing attorneys, including at-

24                  torneys providing pro bono assistance, rep-

25                  resenting minority farmers and farm-

1               workers, including advice and brief serv-

2               ices;

3                     (ii) minority farmers and individuals

4               assisting minority farmers on legal issues;

5                     (iii) food, agriculture, farmworker,

6               and farm organizations;

7                     (iv) local, State, and Federal agencies;

8                     (v) members of Congress; and

9                     (vi) other persons who are assisting

10               minority farmers and farmworkers in ad-

11               dressing the legal issues described in sub-

12               paragraph (A); and

13             (C) coordinate a national network of attor-

14         neys—

15                     (i) providing legal assistance to minor-

16               ity farmers and farmworkers; or

17                     (ii) working on issues relevant to mi-

18               nority farmers and farmworkers.

19         (3) AVAILABILITY.—

20            (A) CENTER.—The Center shall make

21         available to the National Agricultural Library

22         the research, community legal education, policy

23         research, guidance, advice, and information of

24         the Center.

1          (B) NATIONAL AGRICULTURAL LIBRARY.—
2      The National Agricultural Library shall make
3      available to the public the research, community
4      legal education, policy research, guidance, ad-
5      vice, and information provided by the Center
6      under subparagraph (A).

7      (4) COLLABORATION.—The Center shall col-
8   laborate with—

9          (A) the National Agricultural Library; and
10         (B) the National Center for Agricultural
11     Law Research and Information.

12   (c) GRANTS AND LOANS TO RESOLVE OWNERSHIP
13 AND SUCCESSION ON FARMLAND.—The Secretary shall
14 make—

15     (1) grants to resolve property issues relating to
16   ownership and succession on farmland; and

17     (2) loans under section 310I of the Consoli-
18   dated Farm and Rural Development Act (7 U.S.C.
19   1936c).

20   (d) COOPERATIVES SERVING SOCIALLY DISADVAN-
21 TAGED GROUPS.—The Secretary shall provide financial
22 assistance to cooperative development centers, individual
23 cooperatives, or groups of cooperatives—

24     (1) that serve socially disadvantaged groups;
25   and

1       (2) a majority of the boards of directors or
2    other governing boards of which are composed of in-
3    dividuals who are members of socially disadvantaged
4    groups.

5    (e) PILOT PROJECTS.—The Secretary may establish
6 pilot projects to provide technical and financial assistance
7 to socially disadvantaged farmers and ranchers, including
8 projects that focus on land acquisition, financial planning,
9 technical assistance, and credit.

10    (f) HISTORICAL DISCRIMINATION.—The Secretary
11 may provide financial assistance to socially disadvantaged
12 farmers or ranchers that—

13       (1) are former farm loan borrowers of the De-
14    partment of Agriculture; and

15       (2) have suffered adverse actions or past dis-
16    crimination or bias relating to the farm loan, as de-
17    termined by the Secretary.

18    (g) FINANCIAL INSTITUTIONS.—The Secretary may
19 support the development of agricultural credit financial in-
20 stitutions that are designed to serve and finance socially
21 disadvantaged groups, including Farm Credit System in-
22 stitutions chartered under the Farm Credit Act of 1971
23 (12 U.S.C. 2001 et seq.).

24    (h) FINANCIAL AND TECHNICAL ASSISTANCE.—The
25 Secretary shall provide financial assistance, outreach, me-

14

1 diation, financial training, capacity building training, co-

2 operative development training and support, and other

3 technical assistance to qualified nonprofit organizations

4 that provide services to socially disadvantaged farmers and

5 ranchers.

6    (i) 1890 LAND-GRANT INSTITUTIONS AND CERTAIN

7 OTHER INSTITUTIONS.—The Secretary shall support and

8 supplement research, education, and extension activities

9 at—

10        (1) colleges or universities eligible to receive

11      funds under the Act of August 30, 1890 (commonly

12      known as the ''Second Morrill Act'') (26 Stat. 417,

13      chapter 841; 7 U.S.C. 321 et seq.), including

14      Tuskegee University;

15        (2) 1994 Institutions (as defined in section 532

16      of the Equity in Education Land-Grant Status Act

17      of 1994 (7 U.S.C. 301 note; Public Law 103–382));

18        (3) Alaska Native serving institutions and Na-

19      tive Hawaiian serving institutions eligible to receive

20      grants under subsections (a) and (b), respectively, of

21      section 1419B of the National Agricultural Re-

22      search, Extension, and Teaching Policy Act of 1977

23      (7 U.S.C. 3156);

24        (4) Hispanic-serving institutions eligible to re-

25      ceive grants under section 1455 of the National Ag-

1 ricultural Research, Extension, and Teaching Policy

2 Act of 1977 (7 U.S.C. 3241); and

3     (5) eligible institutions (as defined in section

4 1489 of the National Agricultural Research, Exten-

5 sion, and Teaching Policy Act of 1977 (7 U.S.C.

6 3361)).

7 (j) GRANTS FOR SCHOLARSHIPS.—The Secretary

8 shall provide grants to—

9     (1) colleges or universities eligible to receive

10 funds under the Act of August 30, 1890 (commonly

11 known as the "Second Morrill Act") (26 Stat. 417,

12 chapter 841; 7 U.S.C. 321 et seq.), including

13 Tuskegee University, for student scholarships; and

14     (2) land-grant colleges and universities (as de-

15 fined in section 1404 of the National Agricultural

16 Research, Extension, and Teaching Policy Act of

17 1977 (7 U.S.C. 3103)) for scholarships for students

18 or prospective students who are—

19         (A) members of Indian Tribes; and

20         (B) pursuing an agricultural field of study.

21 (k) FUNDING.—There is appropriated to the Sec-

22 retary, out of amounts in the Treasury not otherwise ap-

23 propriated, to carry out this section $1,000,000,000 for

24 fiscal year 2021, to remain available until expended.

○



# Congressional Record

**United States**
**of America**

PROCEEDINGS AND DEBATES OF THE *117th* CONGRESS, FIRST SESSION

| | | |
|---|---|---|
| *Vol. 167* | WASHINGTON, FRIDAY, MARCH 5, 2021 | *No. 42* |

# House of Representatives

The House was not in session today. Its next meeting will be held on Monday, March 8, 2021, at 12 p.m.

# Senate

## FRIDAY, MARCH 5, 2021

The Senate met at 9 a.m. and was called to order by the Honorable TINA SMITH, a Senator from the State of Minnesota.

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Eternal God, who rules the raging of the sea, use our lawmakers to bring stability to our Nation through wise and knowledgeable leadership. Remind them to be quick to listen, slow to speak, and slow to anger. Give them the wisdom to understand that moral rot within a nation can topple its government.

Lord, inspire our Senators to pursue justice, to love mercy, and to work with humility. Help them also to remember that You rescue the blameless from harm.

And, Lord, give a special blessing to Your faithful servants who worked through the night.

We pray in Your faithful Name. Amen.

### PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. LEAHY).

The bill clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, March 5, 2021.*
*To the Senate:*
Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable TINA SMITH, a Senator from the State of Minnesota, to perform the duties of the Chair.

PATRICK J. LEAHY,
*President pro tempore.*

Ms. SMITH thereupon assumed the Chair as Acting President pro tempore.

### RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

### THANKING SENATE STAFF

Mr. SCHUMER. Madam President, first and foremost, I want to thank everyone—everyone on the floor staff who worked late into the night and into the wee hours of the morning to finish reading the Senate amendment to the American Rescue Plan.

The folks who sit up here on the dais come to work every day with a very serious job to do, helping the Senate come to life and fulfill its purpose under the Constitution. I am sure you all didn't expect that part of your job this week would entail standing on your feet and reading dense legislation for more than 10 hours straight.

I can't imagine that is anyone's idea of a good time, but, as usual, our staff took their additional duties in stride and carried them out with professionalism and grace, finishing around 3 in the morning, and you are all right back on your posts this morning.

Thank you, thank you, thank you for your service, your dedication. You are the unsung heroes of this place.

To all of the critical workers, not just those here on the dais—the clerks, the stenographers, the Capitol Police officers, the floor staff—to all of you: Thank you, thank you, thank you for your efforts yesterday and every day.

And as for our friend from Wisconsin, I hope he enjoyed his Thursday evening.

### AMERICAN RESCUE PLAN ACT OF 2021

Mr. SCHUMER. Madam President, a year ago this week, Congress began work on what would become the CARES Act, the opening salvo in a yearlong battle against what, at the time, was a strange and new disease. I don't think anyone could have anticipated a year hence we would have lost more than 10 million jobs and over half a million citizens.

Even as the vaccine makes its way across the country, and hope shimmers on the horizon, millions of Americans

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

\*                                        \*                                        \*

*                                *                                *

Mr. CASSIDY. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alaska (Mr. SULLIVAN).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 50, as follows:

[Rollcall Vote No. 84 Leg.]

YEAS—49

| | | |
|---|---|---|
| Barrasso | Graham | Portman |
| Blackburn | Grassley | Risch |
| Blunt | Hagerty | Romney |
| Boozman | Hawley | Rounds |
| Braun | Hoeven | Rubio |
| Burr | Hyde-Smith | Sasse |
| Capito | Inhofe | Scott (FL) |
| Cassidy | Johnson | Scott (SC) |
| Collins | Kennedy | Shelby |
| Cornyn | Lankford | Thune |
| Cotton | Lee | Tillis |
| Cramer | Lummis | Toomey |
| Crapo | Marshall | Tuberville |
| Cruz | McConnell | Wicker |
| Daines | Murkowski | Young |
| Ernst | Paul | |
| Fischer | | |

NAYS—50

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Reed |
| Bennet | Hirono | Rosen |
| Blumenthal | Kaine | Sanders |
| Booker | Kelly | Schatz |
| Brown | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Cardin | Leahy | Sinema |
| Carper | Luján | Smith |
| Casey | Manchin | Stabenow |
| Coons | Markey | Tester |
| Cortez Masto | Menendez | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Feinstein | Murray | Warren |
| Gillibrand | Ossoff | Whitehouse |
| Hassan | Padilla | Wyden |
| Heinrich | Peters | |

NOT VOTING—1

Sullivan

The amendment (No. 1161) was rejected.

The PRESIDING OFFICER. The Senator from Iowa.

MOTION TO COMMIT WITH INSTRUCTIONS

Mr. GRASSLEY. Mr. President, I have a motion to commit at the desk, and I ask that it be reported.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Iowa [Mr. GRASSLEY] moves to commit the bill, H.R. 1319, to the Committee on Finance with instructions to report the same back to the Senate in 3 days, not counting any day on which the Senate is not in session, with changes that—(1) are within the jurisdiction of such subcommittee; and (2) include reforms to protect taxpayers from perpetually subsidizing private sector pension plans by ensuring the long-term solvency of the multiemployer pension system.

The motion is as follows:

MOTION TO COMMIT WITH INSTRUCTIONS

Mr. Grassley moves to commit the bill, H.R. 1319, to the Committee on Finance with instructions to report the same back to the Senate in 3 days, not counting any day on which the Senate is not in session, with changes that—

(1) are within the jurisdiction of such committee; and

(2) include reforms to protect taxpayers from perpetually subsidizing private sector pension plans by ensuring the long-term solvency of the multiemployer pension system.

Mr. GRASSLEY. I ask unanimous consent that there be 2 minutes of debate, equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GRASSLEY. Mr. President, this bill includes an $86 billion no-strings bailout of multiemployer pension plans. It does not belong in the current package. It has nothing to do with COVID. The bailout is not coupled with any reforms. Consequently, there won't be any long-term sustainability. It is just a blank check with no measures to hold plans accountable.

Senator Alexander and I spent the last Congress working on a responsible proposal to rescue and reform failing multiemployer pension plans. Without reforms included, the precedent will be that taxpayers, not the PPGC, will be the ultimate guarantors of private employer pensions. In that case, the burden on the taxpayers will not be for the $86 billion. It will be endless as to how much the taxpayers are going to have to pay.

Please vote in favor of my motion to commit to consider the reforms necessary to protect the taxpayers and ensure the long-term sustainability of the multiemployer pension system.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. BROWN. Mr. President, every time banks need help and every time large corporate interests need help, this body rises to the occasion, but when it is a bunch of workers or a bunch of small businesses, we are going to turn our backs? Unions, chambers of commerce, and small businesses—pretty much everyone—agree we need to get this done.

I have listened for years to my colleagues' speeches extolling the value of hard work and the virtues of small businesses. This is your chance, my friends, to live up to your own words and help these workers.

In collective bargaining, they negotiate at the bargaining table. They gave up money today to put money in pensions for the future. If you support working Americans, vote no on this motion. Let's pass a solution which actually honors the dignity of work.

Mr. GRASSLEY. Mr. President, do I have any time remaining?

The PRESIDING OFFICER. The Senator's time has expired.

VOTE ON MOTION TO COMMIT

The question is on agreeing to the motion.

Mr. GRASSLEY. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alaska (Mr. SULLIVAN).

The PRESIDING OFFICER (Mr. HEINRICH). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 50, as follows:

[Rollcall Vote No. 85 Leg.]

YEAS—49

| | | |
|---|---|---|
| Barrasso | Graham | Portman |
| Blackburn | Grassley | Risch |
| Blunt | Hagerty | Romney |
| Boozman | Hawley | Rounds |
| Braun | Hoeven | Rubio |
| Burr | Hyde-Smith | Sasse |
| Capito | Inhofe | Scott (FL) |
| Cassidy | Johnson | Scott (SC) |
| Collins | Kennedy | Shelby |
| Cornyn | Lankford | Thune |
| Cotton | Lee | Tillis |
| Cramer | Lummis | Toomey |
| Crapo | Marshall | Tuberville |
| Cruz | McConnell | Wicker |
| Daines | Moran | Young |
| Ernst | Murkowski | |
| Fischer | Paul | |

NAYS—50

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Reed |
| Bennet | Hirono | Rosen |
| Blumenthal | Kaine | Sanders |
| Booker | Kelly | Schatz |
| Brown | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Cardin | Leahy | Sinema |
| Carper | Luján | Smith |
| Casey | Manchin | Stabenow |
| Coons | Markey | Tester |
| Cortez Masto | Menendez | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Feinstein | Murray | Warren |
| Gillibrand | Ossoff | Whitehouse |
| Hassan | Padilla | Wyden |
| Heinrich | Peters | |

NOT VOTING—1

Sullivan

The motion was rejected.

The PRESIDING OFFICER. The Senator from Pennsylvania.

AMENDMENT NO. 1010 TO AMENDMENT NO. 891

Mr. TOOMEY. Mr. President, I call up my amendment No. 1010, and I ask that it be reported by number.

The PRESIDING OFFICER. The clerk will report the amendment by number.

The bill clerk read as follows:

The Senator from Pennsylvania [Mr. TOOMEY] proposes an amendment numbered 1010 to amendment No. 891.

The amendment is as follows:

(Purpose: To strike a provision providing payments to farmers for purposes unrelated to COVID–19)

Strike section 1005.

ADDITIONAL COSPONSOR

The PRESIDING OFFICER. Mr. President, I ask unanimous consent for 2 minutes of debate, equally divided, and that Senator DAINES be added as a cosponsor.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. TOOMEY. Mr. President, my amendment would simply strike the section that provides "such sums as may be necessary to make payments of 120 percent of outstanding debts to socially disadvantaged farmers and ranchers."

There are only two requirements to get this money. One is to have a USDA

farm loan, and there are billions of dollars' worth out there, and the other is, you must be a member of a favored racial or ethnic group, including African American, Hispanic, Asian Americans, and some others. There is no income test. There is no asset test. It doesn't matter whether you are rich or poor. You don't have to have experienced any harm of any kind whatsoever, including from COVID. You just have to be the right race.

The senior Senator from Michigan called this provision "an important piece of reparations." This bill is supposed to be about COVID relief and helping the people who are adversely affected by the economics of the lockdown. Instead, we are handing out money based exclusively on race. This is unconstitutional. It is outrageous. My amendment strikes the provision, and I urge its adoption.

The PRESIDING OFFICER. The Senator from Georgia.

Mr. WARNOCK. Mr. President, contrary to the suggestion from my colleague from Pennsylvania, this provision has everything to do with COVID-19 relief.

The thing about this terrible pandemic is that it has both illuminated and exacerbated longstanding disparities rooted in our racial past, and for too long, farmers of color have been left to fend for themselves, not getting the support they deserve from the USDA, making it even more difficult for them to recover from this pandemic.

We have an opportunity here to lift all of our rural communities by aiming the aid where it is needed given our historic past, which is very much present. So I urge all of my colleagues to oppose this amendment that strips these communities that have been forgotten by our government of the relief that they so desperately deserve. It will have an adverse effect on the very relief that we are trying to provide to all rural communities.

The PRESIDING OFFICER. All time has expired.

VOTE ON AMENDMENT NO. 1010

The question is on agreeing to the amendment.

Mr. TOOMEY. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alaska (Mr. SULLIVAN).

The PRESIDING OFFICER. Are there any other Senators in the Chamber wishing to vote?

The result was announced—yeas 49, nays 50, as follows:

[Rollcall Vote No. 86 Legs]

YEAS—49

| | | |
|---|---|---|
| Barrasso | Blunt | Braun |
| Blackburn | Boozman | Burr |
| Capito | Hoeven | Romney |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Inhofe | Rubio |
| Cornyn | Johnson | Sasse |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Shelby |
| Cruz | Lummis | Thune |
| Daines | Marshall | Tillis |
| Ernst | McConnell | Toomey |
| Fischer | Moran | Tuberville |
| Graham | Murkowski | Wicker |
| Grassley | Paul | Young |
| Hagerty | Portman | |
| Hawley | Risch | |

NAYS—50

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Reed |
| Bennet | Hirono | Rosen |
| Blumenthal | Kaine | Sanders |
| Booker | Kelly | Schatz |
| Brown | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Cardin | Leahy | Sinema |
| Carper | Luján | Smith |
| Casey | Manchin | Stabenow |
| Coons | Markey | Tester |
| Cortez Masto | Menendez | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Feinstein | Murray | Warren |
| Gillibrand | Ossoff | Whitehouse |
| Hassan | Padilla | Wyden |
| Heinrich | Peters | |

NOT VOTING—1

Sullivan

The amendment (No. 1010) was rejected.

The PRESIDING OFFICER. The Senator from Nebraska.

AMENDMENT NO. 944 TO AMENDMENT NO. 891

(Purpose: To distribute funds for public transportation urbanized area formula grants through the existing formulas)

Mrs. FISCHER. Mr. President, I call up my amendment No. 944 and ask that it be reported by number.

The PRESIDING OFFICER. The clerk will report the amendment by number.

The senior assistant legislative clerk read as follows:

The Senator from Nebraska [Mrs. FISCHER] proposes an amendment numbered 944 to amendment No. 891.

(The amendment is printed in the RECORD of March 4, 2021, under "Text of Amendments.")

Mrs. FISCHER. Mr. President, I ask unanimous consent for 2 minutes of debate equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. FISCHER. Mr. President, my amendment would fix the proposed new formula that benefits New York at the expense of other States. The bill provides $30 billion for transit on top of the nearly $40 billion Congress already gave transit in the CARES Act and the December COVID bill.

I oppose the extreme funding, but my amendment at least fixes one troubling detail. The bill directs $26 billion in transit to urbanized areas but gives 30 percent of that to New York City, nearly double of what it would receive under the normal formula. By voting for this bill, my colleagues from States like Arizona, Georgia, and West Virginia would lose out on transit money to New York.

The bill also has $2.2 billion for FTA to allocate based on another new formula that just happens to reward the largest urban transit systems. My amendment would reinstate the regular formula. It will ensure transit money is at least distributed fairly instead of benefiting one or two cities, and I urge my colleagues to support it.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. BROWN. Mr. President, I oppose the amendment. Don't believe the false argument that most of the funding goes to New York. In New Jersey, they get the same treatment as everyone else.

The alternative formula offered by the amendment is indefensible. One small city would get 2,400 times their annual transit budget.

And think about the workers. Think about the drivers and the clerks who put themselves dealing with the public every single day and the anxiety coming home at night about potentially having COVID. The way we treat essential workers is crucial in this bill. If you care about workers and if you care about the dignity of work, vote no on this amendment.

Mrs. FISCHER. Mr. President, do I have time?

The PRESIDING OFFICER. The Senator's time has expired.

Mrs. FISCHER. Could I ask unanimous consent for 15 more seconds, please?

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. FISCHER. New York would receive 30 percent more under this new formula compared to the 18 percent they have now. For example, Reno, NV, would lose $2 million, and other cities like that lose as well under this new formula.

Mr. BROWN. Mr. President, may I ask unanimous consent for 15 seconds also?

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BROWN. Thank you. The transit formula in the American Rescue Plan Act is the exact same formula developed with Republicans, some of that coming out of the Banking, Housing, and Urban Affairs Committee for the relief bill we passed in December. This formula uses data and not politics to allocate funds.

VOTE ON AMENDMENT NO. 944

The PRESIDING OFFICER. The question is on agreeing to the amendment.

Mr. CORNYN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alaska (Mr. SULLIVAN).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 50, as follows:

\*        \*        \*

\*                                            \*                                            \*

Parliamentarian advised were extraneous. It makes a series of perfecting changes on behalf of reconciled committees while preserving the will that the Senate has worked over this long day.

I call up my amendment No. 1398 and ask that it be reported by number.

The PRESIDENT pro tempore. The clerk will report.

The legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER], proposes an amendment numbered 1398 to amendment No. 891.

(The amendment is printed in today's RECORD under "Text of Amendments.")

Mr. SCHUMER. Mr. President, I ask unanimous consent for 2 minutes of debate, equally divided.

The PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Ohio.

Mr. PORTMAN. Mr. President, this amendment comes after about 24 hours of discussion here as a surprise because we are just looking at it for the first time.

But there are two things that are very disturbing about it. One is it completely distorts workers' compensation for Federal employees, which has substantially increased costs to taxpayers, of course. It also sets a terrible precedent in terms of how workers' comp works.

Workers' comp, of course, is for people who are injured on the job, and you have to show you have been injured on the job. That is how it works. It is a basic principle for workers' comp.

In this case, this amendment changes the rules to require compensation for COVID–19 lost wages no matter how risky the Federal employees' behavior might have been outside of the workplace. In other words, no questions asked. If you are a Federal worker and you get COVID–19, you get this.

That is not the way workers' comp works. So this is a big change in workforce policy and establishes, again, a dangerous new precedent in workers' comp policy, generally.

It also creates a wrong incentive—think about it—for the employee and for the employer. So we oppose this.

For Federal workers, the statute is very explicit. It says: Federal workers' compensation "for the disability or death . . . resulting from personal injury sustained while in the performance of . . . duty."

Second—I ask unanimous consent for an additional 30 seconds.

The PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. PORTMAN. Second, we are just finding out there is another $10 billion added through this amendment to State and local governments. I don't know if everybody was listening when Senator ROMNEY gave his explanation during his amendment of what is happening with regard to our States, but a lot of our States don't need the money. Some do and some don't. And there is no requirements here that if you have got a surplus or if you otherwise don't

have COVID–19 expenses that you don't get the money, and yet we are adding another $10 billion to that pot through this one amendment. So, of course, we object to this amendment, and there may be other stuff in there too. I hope everybody gets a chance to look at it because we have not had a chance to do so yet.

But I hope we do not create the wrong incentives. I hope we do not create this situation where we are substantially increasing costs to the taxpayer through changes in workers' comp and adding another $10 billion to a category where it has been shown, in many cases, not to be needed.

The PRESIDENT pro tempore. The Senator's time has expired.

The Senator from Vermont.

Mr. SANDERS. Mr. President, I rise in support of the technical amendment and in very strong support of the overall bill, the American Rescue Plan.

Let's be clear. This bill that we are completing now is the most significant piece of legislation that benefits working people in the modern history of this country. Not only are we going to go forward to crush this pandemic, to rebuild our economy, and to get our kids back to school safely, we are going to do something even more important. We are going to help restore faith in the U.S. Government among the people of our country. The people are hurting, and today we responded.

The PRESIDENT pro tempore. All time has expired.

The question is on agreeing to the amendment.

The amendment (No. 1398) was agreed to.

VOTE ON AMENDMENT NO. 891, AS AMENDED

The PRESIDENT pro tempore. The question is on agreeing to amendment No. 891, as amended.

The amendment (No. 891), as amended, was agreed to.

The amendments were ordered to be engrossed and the bill to be read a third time.

The bill was read the third time.

Ms. STABENOW. Mr. President, I rise today in support of provisions in this bill that support socially disadvantaged farmers and ranchers.

One-fifth of all rural America—10.5 million people—are people of color. For Black, Native American, Hispanic and Latinx, and Asian American farm families, their experience in the agricultural economy is markedly different than their White counterparts. This has been particularly true when it comes to the interactions between farmers of color and the U.S. Department of Agriculture. This history of longstanding systemic discrimination against farmers of color is well documented. Congress has long recognized this discrimination against farmers of color by USDA and, through various mechanisms, has sought to remedy and alleviate systemic barriers that prevented socially disadvantaged farmers and ranchers from fully participating in the American farm economy. How-

ever, those efforts have fallen short, and Congress is now providing additional assistance.

Various factors have contributed to the historic loss of farmland owned and operated by farmers of color. According to the Economic Research Service, a century ago, Black farmers owned more than 15 million acres of agricultural land and operated almost 1 million farms. A century later, data from the 2017 Census of Agriculture indicated that Black farmers own fewer than 2.9 million acres, less than a fifth of what they owned in 1920. A Tufts University analysis estimated the value of that lost farmland at more than $120 billion in lost opportunities. According to a 2019 article in the Atlantic, "The Great Land Robbery," in the recovery from the Great Depression, the New Deal Farm Security Administration at the U.S. Department of Agriculture denied loans to poor Black farmers that were available to their White neighbors.

In 1830, the Indian Removal Act formalized Native American removal as a federally sanctioned practice, removing tens of thousands of original inhabitants from their traditional lands within existing State borders to land west of the Mississippi River. The removal disrupted land ownership and tenure and reoriented traditional farm production techniques. The Homestead Act, enacted in 1862, allowed settlers to claim 160 acres of surveyed government land. Records in the National Archive show that land had been inhabited by Native Americans, but Native Americans were not eligible to participate in the program.

The California Alien Land Laws of 1913 and 1920 denied Asian immigrants the opportunity to purchase farmland or enter into long-term lease contracts until a 1952 court decision held the law to be unconstitutional. During World War II, tens of thousands of first and second generation Japanese American families were forced off their farms and into internment camps. For perspective, an estimated half of Japanese Americans living in California at the time were involved in agriculture according to a February 12, 2021, article in "Civil Eats."

Hispanic farmers have faced a particularly difficult time with discrimination at the U.S. Department of Agriculture because demographic information about Hispanic farmers wasn't even collected separately by the Census of Agriculture until 1974. According to USDA, the Census of Agriculture started collecting demographic information about minority farmers in 1900 and published the first record of minority farmers in 1920 but neglected to include Hispanic farmers. This lack of historical documentation has resulted in many Hispanic farmers being left out of critical farm programs and has made it difficult to resolve issues of discrimination and civil rights. A 2001 article in the Natural Resources Journal entitled "Livestock Racism and Traditional

Culture in Northern New Mexico'' noted additional struggles Hispanic farmers and ranchers have had with grazing issues and Federal land management, including USDA programs.

American institutions both public and private have thoroughly documented this discrimination. Numerous reports issued since the Civil Rights Era in the 1960s have shown a consistent pattern of discrimination, in particular by USDA, against Black, Indigenous, and other farmers of color. Much of the following history was laid out by House Agriculture Committee Chairman DAVID SCOTT during his floor statement in support of the American Rescue Plan provisions on February 26, 2021.

A 1965 report by the United States Commission on Civil Rights found that Federal, state, and local officials discriminated against Black farmers in agricultural programs and that this discrimination actively contributed to the decline in the Black ownership of farmland.

In 1968, a follow up report from the United States Commission on Civil Rights found that Black farmers continued to face discrimination when seeking farm loans and other forms of assistance.

In 1970, the United States Commission on Civil Rights again found that discrimination continued in USDA program administration. The 1970 report indicated that prior to 1968, no Black farmer had ever been elected to any former Agricultural Stabilization and Conservation Service committee at the county level in the South. In 1970, two out of more than 4,100 committee members in the South were Black farmers, even though there were 58 counties in the South, where Black farmers comprised a majority of the farm operator population. It is hard to view as coincidence then that half a million Black-owned farms in the U.S. failed between 1950 and 1975.

In 1982, the United States Commission on Civil Rights issued another report on the rapid decline of Black-operated farms. The report noted that between 1970 and 1980, the Black farm population declined 65 percent, compared to a 22 percent decline in the white farm population. The report also documented numerous discrimination complaints filed against USDA field offices regarding the administration of farm loan programs and noted that for many of these complaints, USDA's Office of Equal Opportunity investigated and found equal opportunity violations at those field offices. The report concluded that racial discrimination was continuing within the USDA, at USDA headquarters, and in the network of field offices that implement USDA programs. Instead of responding to recommendations of the report, President Ronald Reagan and Agriculture Secretary John Block closed the Office in 1983, and it would remain closed for another 13 years until reopened under President Bill Clinton and Secretary Dan Glickman in 1996.

A 1995 U.S. Government Accountability Office (GAO) report found that socially disadvantaged producers were significantly underrepresented on the county and community committees of the former Agricultural Stabilization and Conservation Service. Specifically, the report found that while minority producers accounted for nearly 5 percent of the producers eligible to vote for committee members, minority producers only represented 2.1 percent of county committee members in the United States.

In 1997, the USDA formed a Civil Rights Action Team to hold nationwide listening sessions to hear from socially disadvantaged and minority farmers. A report published after the listening sessions documented Black, Hispanic, Asian-American, and American Indian farmers who told stories of USDA hurting minority farmers more than helping them. Minority farmers described how their discrimination complaints were caught in the backlog of appeals or if successfully appealed, were given findings of discrimination that were not enforced. The report acknowledged that discrimination in USDA program delivery continued to exist to a large degree unabated.

Also in 1997, the USDA Office of the Inspector General (OIG) issued a report to the USDA Secretary that noted "a climate of disorder within the civil rights staff at the Farm Service Agency.'' It was difficult for the OIG to even determine the number and status of civil rights complaints at the agency and department because of that climate.

A 1998 OIG report noted the OIG had issued 44 recent recommendations to USDA to improve its civil rights complaints and improve relations with minority farmers and stated that several of those recommendations had yet to be implemented.

In 1998, the USDA National Commission on Small Farms further described and documented the longstanding discrimination of USDA towards socially disadvantaged producers. And, it observed that "discrimination has been a contributing factor in the decline of Black farmers over the last several decades.'' The Commission's report also notes the "history of under-allocation of resources to institutions that have served minority farmers,'' the "disgraceful'' "failure to elect minority farmers to positions on Farm Service Agency County Committees,'' and more.

During the period between 1997 and 2000, Black farmers, Native American farmers, and Hispanic farmers filed lawsuits alleging USDA discriminated against them on the basis of race in processing their farm program applications and that USDA failed to investigate their complaints of discrimination.

In 2001, a report by the U.S. Commission on Civil Rights documented the continued discriminatory lending practices against minority farmers. The Commission found that Black farmers waited four times longer than white farmers for USDA farm loans. The Commission recommended that USDA resolve the backlog of civil rights complaints and document and alleviate discriminatory lending practices. However, USDA continued to struggle with resolving its backlog of civil rights complaints.

In a 2005 audit the OIG stated in a report, "it took 12 days longer to complete minority applications, delinquencies were higher for minority borrowers than non-minority borrowers, and minority borrowers were reluctant to enter into Farm Service Agency offices to apply for loans.''

In 2008, GAO reported that USDA's difficulties in resolving discrimination complaints persisted and that the USDA had not achieved its goal of preventing future backlogs of discrimination complaints.

The 2010 Jackson Lewis report provided over 200 recommendations to USDA on civil rights issues, including recommendations related to civil rights issues in USDA's farm lending program and minority farmer access to other USDA programs.

Recent studies and reports continue to document the challenges and barriers faced by farmers of color due to race or ethnic discrimination or the legacy of such discrimination. A September 20, 2017, study in the Agriculture and Human Values journal described the challenges faced by Latinx farmers due to failure of agricultural agencies to engage in appropriate outreach or account for language barriers.

Most recently in 2019, a GAO report observed that despite specific preference, socially disadvantaged farmers and ranchers had proportionately fewer Farm Service Agency direct and guaranteed loans than non-socially disadvantaged farmers and ranchers. This report found that farmers and ranchers of color continued to face more difficulties in obtaining farm loans and highlighted the historic, systemic discrimination against such farmers.

The record of discriminatory conduct at USDA, as well as the library of studies and reports chronicling that discrimination is indeed long and details many of the barriers between farmers of color and the Department that prevent these farm families from accessing the same programs and experiencing the same success as their White counterparts.

To address long and well-documented history of systemic discrimination, successive Congresses have worked in a bicameral and bipartisan manner over the years to authorize and oversee implementation of programs at USDA.

During the agriculture credit crisis in the 1980s, Congress addressed this well-documented systemic discrimination at USDA and began to target assistance at the U.S. Department of Agriculture to "socially disadvantaged farmers or ranchers,'' a farmer or rancher who has been subjected to racial or ethnic prejudice because of their identity as a member of a socially disadvantaged group without regard to their individual qualities. Congress provided support that targeted and prioritizes USDA resources to ensure farmers of color have the same opportunities as White farmers. Today, this support has grown to include a broad range of set-asides, special programs, and incentives for socially disadvantaged farmers.

In 1987, Congress passed the Agricultural Credit Act of 1987. Section 617 of this bill required the USDA to establish annual target participation rates, on a countywide basis, that would ensure that members of socially disadvantaged groups receive direct or guaranteed farm ownership loans. Congress amended this requirement in 1996 to ensure that USDA's implementation was consistent with the holding of the Supreme Court in Adarand Constructors, Inc. v. Federico Pena, Secretary of Transportation, 515 U.S. 200 (1995), which held that race-based actions by the government is within constitutional constraints when it is necessary to further a compelling interest such as the "unhappy persistence of both the practice and lingering effects of racial discrimination against minority groups.''

In the 1990 farm bill, Congress took additional steps to recognize socially disadvantaged farmers and ranchers and created a landmark new program, the 2501 Socially Disadvantaged Farmer and Rancher Outreach program,

which is designed specifically to improve outreach and technical assistance to farmers of color.

In section 741 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999 (7 U.S.C. 2279 note), Congress took the extraordinary step of suspending the application of the then-2-year statute of limitations regarding Equal Credit Opportunity Claims. This allowed claimants in discrimination suits against USDA, including Black farmers in Pigford v. Glickman and Native American farmers in Keepseagle v. Veneman, to cite at times decades-old instances of discrimination to qualify for payments under the respective settlements.

In the 2002 farm bill, Congress created the Office of the Assistant Secretary for Civil Rights, with statutory authority to ensure compliance of all civil rights laws and incorporation of civil rights activities into the strategic planning of the U.S. Department of Agriculture.

A sense of Congress in the 2008 farm bill stated that claims and class actions brought against USDA by socially disadvantaged farmers or ranchers, including Native American, Hispanic, and female farmers or ranchers, on racial, ethnic, or gender discrimination in farm program participation should be quickly and fairly resolved. Congress reacted to USDA's discriminatory history and provided $100 million to help settle the Pigford discrimination claims and established a moratorium on acceleration and foreclosure proceedings by USDA against any farmer or rancher who filed a discrimination claim. To further support Pigford, Congress provided an additional $1.15 billion in funding in the Claims Resolution Act of 2010 to settle the additional claims in the Pigford II class action lawsuit.

The 2014 farm bill created a permanent Office of Tribal Relations under the Secretary of Agriculture.

Because of the continuing and systemic nature of these concerns, the 2018 farm bill permanently funded the section 2501 Socially Disadvantaged Farmer and Rancher Outreach Program and provided new support to address longstanding heirs property and farmland ownership issues. Additionally, because Congress recognized that discrimination is both pervasive and ongoing, the 2018 farm bill also required the production of several reports by GAO on how both latent and overt discrimination manifest in agriculture programs, including a report specifically on bias-related to loan credit issues for farmers of color within the socially disadvantaged designation to inform Congress for future legislation. As important as Congress's actions have been, the remedies are still not enough as there is still ongoing and pervasive discrimination leaving socially disadvantaged farmers significantly behind.

Settlements resulting from the Pigford and Keepseagle lawsuits, along with Garcia v. Vilsack that focused on discrimination against Hispanic and Latinx farmers, have not provided the relief necessary for these farmers of color to participate fully in the American agricultural economy. For example, the Los Angeles Times reported in 2012 that payments made to Black farmers under the Pigford settlements were significantly eroded by State taxes, as well as tax debt related to forgiven USDA farm loans. In Keepseagle only a very small percentage of potential claimants even applied. This was largely due to the older age of many potential claimants and because they were difficult to contact. Claims adjudication simply was not effective and did not adequately remedy the discrimination.

Specifically in the area of farm lending, as recently as 2 years ago, two GAO reports showed that socially disadvantaged farmers and ranchers have more difficulty getting loans and credit from USDA. These loans can help beginning farmers break into the business and help existing farmers continue running their operations. One of the GAO reports focused on the specific barriers of Tribal farmers accessing credit and the other GAO report highlights the systemic discrimination that has hindered farmers of color for generations continue today.

Similarly, a 2019 report from the National Young Farmers Coalition on the structural challenges facing farmers in California shows that while White respondents reported that they had no gaps in access to resources like business entity choice, credit lending, land access and lease development, marketing, policy advocacy, and regulatory navigation; non-White respondents reported significantly impaired access to those same resources, and Native American respondents reported receiving none of the listed resources.

The Farm Bill Law Enterprise reported that 99.4 percent of USDA's Market Facilitation Program payments went to White farmers. Similarly, the Environmental Working Group reported that nonminority farmers received nearly 97 percent of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program in 2020.

The diminished relationships between socially disadvantaged farmers and USDA as a result of both latent barriers and historic discrimination limits access of socially disadvantaged farmers to USDA's program, making it more difficult or impossible for socially disadvantaged farmers to participate in USDA programs. The statistics continue to bear this out: 73 percent of Black farmers, when surveyed by the Federation of Southern Cooperatives/Land Assistance Fund, an association of Black farmers and landowners, were not even aware of the agricultural aid provisions of the coronavirus rescue programs at USDA.

Congress recognizes the longstanding systemic discrimination against farmers of color by USDA. Despite multiple congressional efforts to address this discrimination, these efforts, taken mostly on a case-by-case basis, have still not remedied the discrimination. Congress is now continuing to address this longstanding, widespread, and well-documented discrimination against socially disadvantaged farmers and ranchers, including systemic barriers preventing socially disadvantaged farmers and ranchers from fully participating in the American farm economy, in recognition that our mostly case-by-case efforts thus far have not done enough. Because of discrimination in USDA's programs, particularly loan programs, at USDA, socially disadvantaged farmers and ranchers are less likely to have the same access to adequate loan servicing and face other barriers in USDA programs, as their White counterparts. As a result, their loans are more likely to be in default or in a precarious situation.

Sections 1005 and 1006 of the American Rescue Plan contain narrowly tailored provisions to address the discrimination in credit and other programs at USDA, the effects of which have been magnified by the pandemic, as well as programmatic changes to support socially disadvantaged farmers and ranchers. The sections provide funding for payments on existing USDA direct and guaranteed loans held by socially disadvantaged farmers and ranchers. In addition, this legislation is providing tools and funding for programs and systemic reforms at USDA to undo the systemic racism that has prevented socially disadvantaged farmers and ranchers from getting access to critical agricultural credit.

The public recognition of longstanding discrimination against socially disadvantaged farmers and ranchers and the accompanying broad support for this work along the food and agriculture supply chain is overwhelming and represents every corner of American food and farming. More than 600 farm, food, and rural organizations, businesses, equity advocates, and legal scholars have sent letters, documents and issued statements of support. Notably, each of these letters includes both acknowledgment that these ongoing barriers exist, and a great many cite staggering examples of the disadvantages many farmers of color experience, as well as why the provisions contained in sections 1005 and 1006 of the American Rescue Plan are an appropriate remedy for these important producers.

While earlier versions of this legislation included specific references to the longstanding discrimination within the Department of Agriculture, as noted in Chairman Scott's February 26, 2021, statement for the record, the manager's amendment in the House Rules Committee was purely to ensure that these sections would meet the requirements of section 313 of the Congressional Budget Act of 1974 for consideration in the U.S. Senate. Congress includes these measures to address the

longstanding and widespread systemic discrimination within the USDA, particularly within the loan programs, against socially disadvantaged farmers and ranchers.

Mr. BOOKER. Mr. President, I rise today to speak in support of sections 1005 and 1006 of the American Rescue Plan Act.

These sections provide loan forgiveness and other critical assistance to Black farmers and to other farmers who are members of racial or ethnic groups that have for many decades suffered discrimination by the U.S. Department of Agriculture.

According to USDA data, in 1920 in the United States there were nearly 1 million Black farmers, and they represented nearly 15 percent of all farmers in our country. Today, as a direct result of a brutal legacy of discrimination by a Federal agency, there are less than 50,000 Black farmers left and they represent less than 2 percent of all farmers in our country.

It is estimated that during the past century, Black farmers have lost between 15 and 20 million acres of land and the hundreds of billions of dollars of generational wealth that land represented.

The cause of the loss of so much Black-owned farmland and the loss of so many Black farmers is not a mystery. Federal court decisions, the U.S. Commission on Civil Rights, and the USDA itself have all told us that a primary cause of that loss was long standing, pervasive discrimination by the USDA.

In his opinion in Pigford v. Glickman, Federal District Court Judge Paul Friedman stated clearly that USDA and their county commissioners discriminated against Black farmers when they denied, delayed, or otherwise frustrated the applications of those Black farmers for farm loans and other credit and benefit programs and that USDA and the county commissioners bear much of the responsibility for the dramatic decline in Black farms and Black-owned farmland.

Judge Friedman wrote his decision in 1999, but the systemic discrimination by USDA against Black farmers and other farmers of color by USDA was well documented beginning many decades earlier.

A 1965 report by the U.S. Commission on Civil Rights found that Federal, State, and local officials discriminated against Black farmers in agricultural programs and that this discrimination actively contributed to the decline in the Black ownership of farmland.

In 1968, a follow-up report from the U.S. Commission on Civil Rights found that Black farmers continued to face discrimination when seeking farm loans and other forms of assistance.

In 1970, the U.S. Commission on Civil Rights again found that discrimination continued in USDA program administration. The 1970 report stated that only 2 out of more than 4,100 USDA county committee members in the South were Black farmers, even though there were 58 counties in the South where Black farmers comprised a majority of the farm operator population.

In 1982, the U.S. Commission on Civil Rights issued another report entitled "The Decline of Black Farming in America" which found that the prevailing practice at the USDA was to follow local patterns of racial segregation and discrimination when providing assistance and that longstanding discrimination in USDA programs contributed to the decline in farms operated by African-American farmers.

In 1997, the USDA formed a Civil Rights Action Team to hold nationwide listening sessions to hear from socially disadvantaged and minority farmers. A report published after the listening sessions documented Black, Hispanic, Asian-American, and indigenous farmers who told story after story of USDA hurting minority farmers more than helping them. This 1997 report acknowledged that discrimination in USDA program delivery continued to exist to a large degree unabated and recommended 92 changes to address racial bias at the USDA.

In 1998, the USDA National Commission on Small Farms further described and documented the longstanding discrimination of USDA towards socially disadvantaged farmers. USDA stated that "discrimination has been a contributing factor in the decline of Black farmers over the last several decades." The Commission's report also notes the "history of under-allocation of resources to institutions that have served minority farmers."

During the period between 1997 and 2000, Black farmers, Native American farmers, and Latino/Latina farmers filed lawsuits alleging USDA discriminated against them on the basis of race in processing their farm program applications and that USDA failed to investigate their complaints of discrimination. But settlements resulting from these lawsuits did not provide the relief necessary for these farmers of color to participate fully in the American agricultural economy.

On March 2, 2021, a group of full-time professors who work in agricultural, food law, and related subjects wrote in a letter to Majority Leader SCHUMER and Minority Leader McCONNELL that these court settlements were severely flawed because of the adversarial nature of the settlement process and because they attempted to define the problem in terms of discrete incidents of individualized discrimination without correcting the systemic problems that led to that discrimination. These professors noted that while some farmers received a payment, many remained indebted to the USDA, and the system itself remained broken.

Mr. President, I would ask unanimous consent to have this letter printed in the RECORD following my remarks.

In 2001, we then have a report by the U.S. Commission on Civil Rights documenting the continued discriminatory lending practices against minority farmers. The Commission found that Black farmers waited four times longer than White farmers for USDA farm loans. The Commission recommended that USDA resolve the backlog of civil rights complaints and document and alleviate discriminatory lending practices.

However, USDA continued to struggle with resolving its backlog of civil rights complaints. In 2008, the Government Accountability Office, or GAO, reported that USDA's difficulties in resolving discrimination complaints persisted and that the USDA had not achieved its goal of preventing future backlogs of discrimination complaints.

In 2019, a GAO report observed that socially disadvantaged farmers and ranchers had proportionately less agricultural credit than non-socially disadvantaged farmers and ranchers. This report found that farmers and ranchers of color continued to face more difficulties in obtaining farm loans and highlighted the historic, systemic discrimination against such farmers.

So now let's look at where we are today.

USDA spends billions of dollars each year to provide much needed support to American farmers. The Market Facilitation Program and Coronavirus Food Assistance Program are recent USDA programs designed to bolster the farm economy. In both programs the majority of funds went to nonminority farmers.

For example, the Environmental Working Group reported that non-minority farmers received nearly 97 percent of the $9.2 billion provided by the USDA's Coronavirus Food Assistance Program. Additionally, the Farm Bill Law Enterprise reported that 99 percent of market facilitation payments went to nonminority farmers.

Just last week the USDA stated "there is a lot more that needs to be done and accomplished at USDA to make programming equitable and to root out decades of systemic discrimination that disproportionately affects Black, Hispanic, Indigenous and other farmers of color."

Early this week Secretary of Agriculture Tom Vilsack recognized the residual harm that decades of discrimination have caused to farmers of color when he stated: "Here's the challenge: We're not only dealing with the specific issues of discrimination, but we're dealing with the cumulative effect of that discrimination over a period of time."

And what is the cumulative effect of that discrimination over time? The cumulative effect of all the past systemic racism and discrimination is that Black farmers and other farmers of color were in a far more precarious financial situation before the COVID–19 pandemic hit us, and so many of them have simply not been able to weather the storm.

Approximately 13 percent of borrowers with FSA direct loans are currently delinquent on their loans and could lose their farms to foreclosure. But for Black farmers, 35 percent of those with FSA direct loans are in default and could soon lose their farms. And it is not only Black farmers—approximately 24 percent of the FSA direct loans to Hispanic, Asian-American, and Indigenous farmers are currently in default. What this means is that we are facing yet another wave of foreclosures and potential land loss by farmers of color. But the debt forgiveness and other assistance in the bill we are considering today can prevent this and can begin to turn the page on this shameful history of discrimination by the Federal Government.

I want to close by giving you one specific example of the discrimination I have been talking about.

Eddie and Dorothy Wise were residents of Whitakers, NC. A retired Green Beret, Mr. Wise's dream was to own a pig farm, and so in 1991, Mr. Wise purchased land and started to raise swine. But then came the discriminatory actions by USDA: failure to handle his loan applications in a timely manner, denial of loan applications, change of interest rates and escalation of monthly notes, and other misdeeds.

In 1997, a loan for improvements to the property was approved, but the receipt of the funds was delayed for 7 months, and his 400 pigs froze to death, destroying his operation. Later, he discovered that his original plan had been approved at the State level but that his loan officer never told him.

In the early morning hours of January 20, 2016, at least 14 Federal marshals descended with guns drawn on Eddie's farm and forcibly escorted him and his wife, who was still in bed and suffering from a debilitating medical condition, out of their home and off their property. Forcibly evicted from their home and their land and forced to live in a cheap motel, Dorothy Wise died shortly thereafter. The 106-acre farm was sold to an adjacent White farmer for the miniscule price of $260,000, and Eddie Wise had lost the one thing that he had always wanted—to own a pig farm.

This story is just one example of the discrimination that literally destroyed the lives of hundreds of thousands of Black farmers and their families over the last century.

Today we have the opportunity to take a step towards justice for those families.

I urge all of my colleagues to support sections 1005 and 1006 of the bill before the Senate today.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

MARCH 2, 2021.
Re Support for Socially Disadvantaged Farmers.

Hon. CHARLES SCHUMER,
*Senate Majority Leader,*
*U.S. Senate, Washington, DC.*
Hon. MITCH McCONNELL,
*Senate Minority Leader*
*U.S. Senate, Washington, DC.*
Hon. NANCY PELOSI,
*House Majority Leader,*
*House of Representatives, Washington, DC.*
Hon. KEVIN McCARTHY,
*House Minority Leader,*
*House of Representatives, Washington, DC.*

DEAR LEADER SCHUMER, MINORITY LEADER McCONNELL, SPEAKER PELOSI, AND MINORITY LEADER McCARTHY: We write in support of efforts to level the playing field for socially disadvantaged American farmers as set forth in §§1005 and 1006 of the House-passed American Rescue Plan. If enacted, these sections will help to correct past injustices and create new opportunities to build the diverse, resilient food system that we all want and need.

American agriculture's history began with slavery and the forced removal of tribes from their land. It continued with myriad abuses, including Jim Crow laws, the prohibition of minority land ownership, property laws that facilitated Black land loss, and deceptive practices to entice Hmong farmers to incur huge debts to build chicken houses. Each of these predatory practices were instituted or allowed by U.S. law. At every turn, government policies have either intentionally or inadvertently served to advantage white farmers, creating the category of farmers recognized by Congress and the USDA for decades as "socially disadvantaged."

Cultural traditions in farming in America, long romanticized in disregard of their discriminatory consequences, have further contributed to inequities. Farming is built on relationships: handshake contracts, neighbors helping neighbors, conversations at the local coffee shop. These relationships work well if you are a member of the group; if you are not, they serve as a persistent barrier to success. According to the 2017 Census of Agriculture, of the 3.4 million farmers in the United States, 3.2 million, 95.4% are white. Only approximately 1.7% are American Indian or Alaskan Native; 1.3% are Black; and .6% are Asian. For most of these farmers, their farms are smaller, their sales are smaller, and each year they fall further behind.

The USDA should have served as the equalizer, supporting all farmers and assisting those in need. But most often it has not. It has instead reflected and perpetuated institutional racism since its inception. The problems experienced by the farmers it has disadvantaged have been repeatedly documented in government reports and investigations and in writings by scholars, journalists, and others. While some tell of the decades-long pattern of discrimination, recent reports, including a GAO Report released just last week, confirm that the barriers still exist today, expressly affirming that socially disadvantaged farmers still have less access to credit than other agricultural businesses. Fair Lending, Access and Retirement Security, Government Accountability Office (2021) (finding racial and income disparities in access to financial services, availability of credit, and the ability to accumulate wealth).

Congressionally enacted farm programs have perpetuated and exacerbated the problem by distorting the farm economy. Federal farm programs reward the largest farms the most, providing staggering sums of money to large landowners who produce the program-favored crops. Not only are the vast majority of these large landowners white, the program-favored crops are not those most often produced by socially disadvantaged farmers. These government payments distort credit, land, input costs, and markets by favoring white farmers to the disadvantage of others, most of whom are small or beginning farmers.

The cumulative effect of decades of unequal treatment by the USDA coupled with farm programs that favor large landowners continues to negatively impact the economic condition of beginning farmers and small fanning operations, creating an extra burden for socially disadvantaged farmers. Today, disadvantaged farmers generally have less access to credit than white farmers, less accumulated wealth, and smaller farming operations.

Congress and the USDA acknowledged this racial discrimination and attempted to resolve it through the settlement of two landmark lawsuits—Pigford and Keepseagle. But this approach was severely flawed. These settlements attempted to define the problem in terms of discret incidents of individualized discrimination without correcting the systemic problems that led to that discrimination. The adversarial nature of the settlement process served to further divide. While some farmers received a payment, many remained indebted to the government, and the system itself remained broken. Providing debt relief to disadvantaged farmers, will help to correct the longstanding past injustice, wiping the slate clean for USDA to start over. Reforming the system will provide the necessary financial and educational infrastructure to finally give these farmers an opportunity to compete on an even playing field.

We depend on our food system, and farming is at the heart of that system. Natural disasters and the COVID pandemic have revealed significant systemic problems, and climate change has and will produce additional challenges. We need strong regional food systems to build the resilience that is necessary for our very survival. We need diversity reflected in that network. We bemoan the aging of our nation's farmers and the high barriers to entry for beginning and would-be beginning farmers. The vast majority of American farmers are white men over the age of 50. We need to open farming to its full potential by offering new opportunities for diverse farmers, thus benefiting from their help in creating a resilient regional food system that is always able to meet our food security needs.

We are all full-time professors who work in agricultural, food law, and related subjects. The opinions expressed in this letter are our own personal views and do not represent the position or policies of the Universities with which we are affiliated.

Sincerely,

Susan A. Schneider, William H. Enfield Professor of Law, Director, LL.M. Program in Agricultural & Food Law, University of Arkansas School of Law; Nicole Civita, Sustainable Food Systems Specialization Lead, Graduate Faculty, Masters of the Environment Program, University of Colorado; Josh Galperin, Visiting Associate Professor of Law, University of Pittsburgh School of Law; Neil D. Hamilton, Emeritus Professor of Law, Drake University Law School; Christopher R. Kelley, Associate Professor of Law, University of Arkansas School of Law; Stacy Leeds, Foundation Professor of Law and Leadership, Sandra Day O'Connor College of Law, Arizona State University; Emily M. Broad Leib, Clinical Professor of Law, Director, Food Law and Policy

Clinic, Harvard Law School; Thomas W. Mitchell, Professor of Law, Co-Director, Program in Real Estate and Community Development Law, Texas A&M University School of Law; Michelle B. Nowlin, Clinical Professor of Law, Co-Director, Environmental Law and Policy Clinic, Duke University School of Law; Michael T. Roberts, Executive Director, Resnick Center for Food Law and Policy, Professor from Practice, University of California, Los Angeles; Anthony B. Schutz, Associate Professor of Law, Associate Dean for Faculty, Director, Rural Law Opportunities Program, University of Nebraska College of Law; Jessica A. Shoemaker, Professor of Law, University of Nebraska College of Law; Jennifer Zwagerman, Assistant Professor of Law, Director of the Agricultural Law Center, Drake University Law School.

ATTACHMENT

EXAMPLES OF GOVERNMENT AND RELATED REPORTS DOCUMENTING USDA DISCRIMINATION

Equal Opportunity in Farm Programs, An Appraisal of Services Rendered by Agencies of the USDA, U.S. Commission on Civil Rights (1965) (finding discrimination in the administration of federal farm programs, contributing to the decline in Black ownership of farmland);

Civil Rights Under Federal Programs: An Analysis of Title IV of the Civil Rights Act of 1964, U.S. Commission on Civil Rights (1968) (finding discrimination in the administration of federal farm programs and in the information services provided by Agricultural Extension);

Federal Civil Rights Enforcement Effort, U.S. Commission on Civil Rights (1970) (finding discrimination in the administration of federal farm programs);

The Decline of Black Farming in America, U.S. Commission on Civil Rights (1982) (documenting discrimination complaints at USDA field offices, the lack of institutional support provided to Black farmers, and legal structures geared to benefit large farming operations);

Hearing on the Decline of Minority Farming in the United States, Committee on Government Operations, U.S. House of Representatives (1990) (documenting evidence of discrimination in USDA programs);

Minorities and Women on Farm Committees, Govt Accountability Office (1995) (reporting on the lack of representation of minority farmers within the USDA committee system);

D.J. Miller Disparity Study: Producer Participation and EEO Complaint Process Study), D.J. Miller & Associates report prepared for the USDA Farm Services Agency (1996) (finding inequities throughout the federal farm programs, with minority farmers not receiving an equitable share of farm payments and loans and serious problems with the USDA EEO Complaint Process);

Report for the Secretary on Civil Rights Issues, USDA's Inspector General (1997) (reporting that a ''staffing problems, obsolete procedures, and little direction from management have resulted in a climate of disorder'');

Civil Rights at the United States Department of Agriculture—A Report by the Civil Rights Action Team, Report of the USDA Civil Rights Action Team (1997) (documenting widespread discrimination throughout the USDA network of offices);

A Time to Act: A Report of the USDA National Commission on Small Farms, USDA Nat'l Commission on Small Farms (1998) (reporting on the ''structural bias toward greater concentration of assets and wealth'' and on the importance of developing policies to

support and encourage small farms; noting that ''Black, Hispanic Native American, Asian, women, and other minorities have contributed immensely to our Nation's food production and their contributions should be recognized and rewarded.'');

USDA: Problems in Processing Discrimination Complaints, U.S. Govt Accountability Office (2000) (reporting on the continuation of ''longstanding problems'' in the USDA's discrimination complaint process);

Racial and Ethnic Tensions in American Communities: Poverty, Inequality, and Discrimination, Vol. VII: The Mississippi Delta Report, U.S. Commission on Civil Rights (2001) (finding evidence that Black farmers have unequal access to technical support and financial assistance, with a wait that is four times longer than white farmers to receive farm loans);

USDA: Recommendations and Options to Address Management Deficiencies in the Office of the Assistant Secretary for Civil Rights, Government Accountability Office (2008) (reporting that the USDA's ''difficulties in resolving discrimination complaints persist,'' that its data on minority farmer participation is ''unreliable,'' and that its ''strategic planning does not address key steps needed to ensure USDA provides fair and equitable services'');

Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers is Limited, Government Accountability Office (2019) (addressing USDA survey data that shows that ''socially disadvantaged farmers'' receive a disproportionately small share of farm loans and noting lack of reliable data on program services to this community; acknowledging concerns of ongoing discrimination);

Indian Issues: Agricultural Credit Needs and Barriers to Lending on Tribal Lands, Government Accountability Office (2019) (reporting on the structural barriers to lending to tribal members, including the difficulty in using tribal land as security, long delays in federal paperwork, lender hesitancy, lack of credit history);

Fair Lending, Access and Retirement Security, Government Accountability Office (2021) (finding racial and income disparities in access to financial services, availability of credit, and the ability to accumulate wealth; specifically finding that ''women and minority farmers and ranchers, including tribal members, had less access to credit than other agricultural businesses'').

Mrs. BLACKBURN. Mr. President, to most people back home in Tennessee, ''business as usual'' here in Washington means a combination of partisan bickering and reckless spending, usually after someone up high decides not to let a crisis go to waste. They are used to watching this all play out on TV, then looking at the receipt and seeing a billion dollars' worth of earmarks and pork barrel spending they didn't order.

Right now, Democrats are doing their best to spin the scandal their absurd $1.9 trillion bailout bill has caused as ''business as usual'' but Tennesseans aren't stupid. They know the spin is a lie because over the past year they have seen what ''business as usual'' looks like when it comes to passing COVID relief funding.

Since last March, the Senate has passed five separate relief laws with overwhelming bipartisan support, 96–1, 90–8, 96–0, 100–0, and 92–6.

But what happened with last month's vote on the budget resolution? Why did

it end in a tiebreaker? For the same reason the House passed their version of the bill we are considering today in the dead of night. No amount of good PR could ever make the American people forget that this little exercise the Democrats are leading us through has almost nothing to do with providing emergency COVID relief.

Nine percent. That is how much of this package Democrats want to dedicate to a national vaccination program, expanded testing, and public health jobs. They slapped a ''COVID RELIEF'' label on one of the largest transfers of wealth ever proposed in the history of the U.S. Congress and tried to sneak it through reconciliation before anyone caught on.

This bill is so far over the line that my friends across the aisle have spent the past week fighting over the very provisions House Democrats and the White House used to pitch it. The bill is fatally flawed, right down to the formula it employs to allocate State funding. The previous, bipartisan relief packages used population to determine this. It very straightforward. But this time, Democrats ran the numbers and decided they could benefit by making unemployment rate the deciding factor. And, wouldn't you know it, this new system disproportionately benefits poorly mannaged blue States at the expense of well-managed red ones. New Jersey, New York, and California, whose destructive shutdowns led to high unemployment rates, will walk away with a combined gain of almost $9 billion. Tennessee, on the other hand, is still one of the best fiscally managed States in the country. We will lose $164 million for doing the right thing. Alabama will lose almost $900 million. Both Florida and Georgia will lose over $1.2 billion each.

If this body mandates a transfer of wealth based solely on Democrats' desire to clean up their prepandemic mistakes, we will scare off investment and hamper innovation in every State long after we are able to fully reopen. This isn't a hypothetical—leaders on the State level know what is coming. Last week, 22 Governors, including Tennessee Governor Bill Lee, released a joint statement pointing out the foolish premise driving the new formula. I would like to associate myself with what they said: ''A state's ability to keep businesses open and people employed should not be a penalizing factor when distributing funds.''

If this happens, small towns and mom-and-pop shops will suffer. Those budding tech hubs you hear so much about will suffer. The unemployed people my colleagues on the left are using as leverage against their political rivals will suffer.

So I would ask my colleagues whether fulfilling campaign promises is worth what it will cost the families and small business owners stuck holding the bill. And to the Democratic Senators representing States losing out, I would say that we will be happy

*          *          *

Adrienne M. Petty, Ph.D.
Associate Professor, The College of William & Mary
250 James Blair Drive
Williamsburg, VA 23185
ampetty@wm.edu

May 31, 2022

Nisha Kashyap
Mark Rosenbaum
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA  90005

RE: *Miller v. Vilsack*

This is an FRCP Rule 26(a) report regarding the effort to defend the USDA's loan forgiveness program in the above referenced matter. The data I considered in preparing this report is included in the citations and a list of materials reviewed that appears at the end of the report. The report responds to the question of whether there is evidence of past and present discrimination by the USDA against black farmers.

**Methodology**

The report relies on my analysis of peer-reviewed historical and legal scholarship on American agriculture, government reports regarding discrimination within the USDA, the Census of Agriculture, newspaper and magazine sources, interviews with black farmers arranged by the Federation of Southern Cooperatives/Land Assistance Fund, and my own past research in the archival records of past and present USDA agencies. I also draw upon analyses by scholars who have sought out information that the government has not made public. I listened to interviews with farmers and corroborated their accounts with the patterns of discrimination found in government reports and academic studies.

**Overview**

Farms owned or operated by black farmers would be extinct by the 21st Century, the United States Commission on Civil Rights concluded in a 1982 study that cited 57,271 farms existing then.[1] Black farmers, in fact, have survived now into the third decade of the 21st century. Today, they account for 1.3 percent of U.S. farms—45,000 out of 2,240,976, and down from a peak of 14 percent in 1920.[2] U.S. farms overall shrunk dramatically in numbers – from 6.5 million in 1920 to 2.2 million in 2017 due to the efforts of the USDA, private corporations, and land-grant universities to promote capital-intensive farming. Heavier reliance on farm machinery and agricultural chemicals reduced the demand for farmers in agricultural production. The loss of black-operated farms, however, outpaced white-operated farms inordinately. The result is a 97 percent decline in the number of Black-owned farms in the United States.  Although there has been growth in the number of black farmers since 2002, today's black farmers remain imperiled.[3]

The United States Department of Agriculture (USDA)—established in 1862 and called "The People's Department" by President Abraham Lincoln—has been a, if not *the*, primary locus of discrimination.[4] The USDA acknowledges its blame as part of its newly-authorized responsibility under the American Rescue Plan Act (ARPA) of 2021. Section 1005 of the ARPA directs the USDA to address "systemic discrimination in USDA farm programs" that helped foster a category of "socially disadvantaged farmers and ranchers." African Americans were

---

[1] United States Commission on Civil Rights, *The Decline of Black Farming in America* (Washington: U.S. Civil Rights Commission, 1982), 1.
[2] "Number of Farm Operators in the United States, with Per Cent Distribution, by Race, 1900 to 1920," 1920 Census of Agriculture, 293; Jess Gilbert, "Returning African American Farmers to the Land: Recent Trends and A Policy Rationale," *The Review of Black Political Economy,* March 22, 2000.
[3] 2002, 2007, 2012, and 2012 Census of Agriculture.
[4] Tom Vilsack, "Secretary's Column: 'The Peoples' Department: 150 Years of USDA," U.S. Department of Agriculture blog, February 21, 2017, https://www.usda.gov/media/blog/2012/05/11/secretarys-column-peoples-department-150-years-usda, accessed May 24, 2022.

foremost among those farmers who were prevented from "achieving as much as their counterparts who do not face these documented acts of discrimination."[5] The plan earmarked $4 billion in debt relief for African American, Native American, Latino, Alaskan Native, Asian American, and Pacific Islander farmers. In *Miller v. Vilsack*, which alleges that this debt relief plan violates the U.S. Constitution, a court has enjoined implementation of Section 1005, suspending in limbo the livelihood of tens of thousands of black farmers. The irony is that extinction could be a fallout of the USDA's effort to address its history of discrimination, which is substantiated empirically and anecdotally over generations up to today.

---

[5] "American Rescue Plan Debt Payments," U.S. Department of Agriculture, Farmers.gov, https://www.farmers.gov/loans/american-rescue-plan, accessed May 26, 2022.

**Executive Summary**

This report establishes the United States Department of Agriculture's (USDA) history of discrimination against black farmers, the long-term impact of this past discrimination, and its current discrimination against black farmers. During its first fifty years in existence, the USDA discriminated against black farmers by acquiescing in segregated educational facilities for them and allocating fewer financial and physical resources for black land grant institutions and black agents of the Cooperative Extension Service. The USDA essentially reinforced the place to which society consigned African Americans, relegating them to roles as laborers in the southern agricultural economy.[6]

Several significant turning points in the history of the USDA and American agriculture contributed to new forms of racial discrimination that persist today. First, the New Deal era witnessed the remarkable expansion of the federal government's role in farmers' lives. The Roosevelt administration worked to bring about the recovery of agriculture from the Great Depression by paying farmers to limit their production of crops and livestock in order to raise prices. It also expanded the USDA's system of agricultural credit. To administer these programs, the USDA created a decentralized system that placed control of farm programs in the hands of elected local farmers. Yet these committees have been far from democratic. In the Jim Crow South, local control typically meant that the wealthiest or most politically connected members of communities served on committees and routinely discriminated against black farmers. To this day, the USDA continues to place enormous responsibility in the hands of county committees.[7]

---

[6] Mark Schultz and I have evaluated these matters closely in Adrienne Petty and Mark Schultz, "African-American Farmers and the USDA: 150 Years of Discrimination," *Agricultural History* 87, no. 3 (Summer 2013), 331. This section on the USDA's history of discrimination draws upon our article, some primary evidence, and the analyses of other historians.
[7] Joshua Ulan Galperin, "The Life of Administrative Democracy," *The Georgetown Law Review* 108, no. 5 (May 2020), 1221, 1240.

Second, during the 1950s, the USDA doubled down on its longstanding goal of modern scientific agriculture that relied on new chemicals and farm machinery, and that eliminated small farms in the name of efficiency. Farms had to grow bigger or go under. Black farmers, who still made up 21 percent of the total southern farm population in 1950, were excluded from the USDA's vision of modern agriculture.[8] A sizable number of sharecroppers and small farm owners lost a foothold on the land. Still fighting for their civil rights at the very moment that this transformation was underway, the discrimination against black farmers placed them at a disadvantage and then they were denied loans because of the economically precarious position into which the USDA had already placed them.

The USDA has continued to fall short of giving all farmers fair opportunities to produce food and fiber for the nation. Instead, it has prioritized larger farmers over smaller ones, which has a discriminatory impact on black farmers, whose farms remain the smallest and least remunerative in American agriculture. Throughout the 1970s, 1980s, and 1990s, a string of reports by the U.S. Commission on Civil Rights and other federal agencies have provided evidence that the USDA discriminated against black farmers, but the USDA did not act to end this discrimination.

In 1999, the *Pigford v. Glickman* decision proved that the USDA had discriminated against black farmers in the administration of its farm programs. Yet in the 23 years since this decision, the USDA has yet to make the changes that would root out racial discrimination and USDA employees also have yet to commit themselves to an effective and efficient way of investigating and resolving civil rights complaints.

---

[8] U.S. Bureau of the Census, *Census of Agriculture, 1959* (Washington: Department of Commerce, 1960).

My report concludes that, regardless of which political party has been in power, the USDA has discriminated against black farmers in the past and continues to discriminate against them today. Section 1005 of the American Rescue Plan is attempting to remediate this past and present discrimination by extending loan forgiveness to black farmers.

## I.     History of Discrimination

### A.  The Founding of the USDA at the Dawn of Emancipation

The history of racial discrimination in American farm policy stretches back to the establishment of the United States Department of Agriculture (USDA) in 1862. The main goal of the new department during its first seventy years was to improve agricultural production by promoting science, technology, and the education of farmers. Although there had been widespread interest in establishing an agency that would promote agricultural production for decades, it was not until the Civil War that the Union was able to put forward legislation to create it. Southern politicians had blocked legislation calling for the founding of such a government office for decades. With the southern representatives' opposition no longer a factor, Congress was able to establish the USDA. [9]

Newly emancipated from slavery, black people faced an uphill battle to make a living in agriculture. The USDA's establishment roughly coincided with the Emancipation Proclamation, which freed all enslaved people in states under rebellion. Despite freedpeople's agricultural experience, aspiration for land, and deep involvement in American farming, the USDA was complicit with former slaveowners in seeking to discipline freedpeople into accepting a role as

---

[9] Sarah T. Phillips, "What Next? The USDA at One Hundred and One Hundred Fifty Years Old," *Agricultural History* 87, no. 3 (Summer 2013), 318; Adrienne Petty and Mark Schultz, "African-American Farmers and the USDA: 150 Years of Discrimination," *Agricultural History* 87, no. 3 (Summer 2013), 331.

paid workers on the land of former slaveowners. Despite the failure of the government to confiscate the land of former Confederates and redistribute it among freedpeople, a surprising number of them managed to buy their own land. Yet most black people worked as sharecroppers on someone else's land. Whether they worked their own or someone else's land, all black farm people shared a common experience with the USDA. They were taken for granted as the major labor force of southern agriculture but did not gain fair and equal access to agricultural education and other resources.

Moreover, the South, where most black farmers lived and worked, faced challenges following the Civil War because of the legacies of slavery and plantation agriculture. The South had represented one of the largest and wealthiest plantation regions in the world. Antebellum southern agriculture had rested on the labor of slaves, the extensive use of land, and the ability to continually expand to fertile western land. In the non-plantation regions of the antebellum South, white farm families owning small farms produced mostly subsistence crops for their own use and had minimal participation in agricultural markets. Everything changed after the Civil War. Because the federal government failed to enact land reform, black people entered freedom as farmers without land. They were forced to enter into uneven, exploitative labor relations with former slaveowners, becoming sharecroppers and tenant farmers. The region experienced steady economic and disorder and devastation, and its poorest residents, especially the freedpeople, bore the worst consequences of this transformation.

Early USDA initiatives helped the South tackle its level of underdevelopment compared with the rest of the nation through the 1862 Morill Act, which facilitated and funded the establishment of land grant universities. The Morrill Land Grant Act gave land to states for the establishment of agricultural and mechanical colleges to cooperate with the newly established

USDA. For black farmers, however, the Morill Act started a cycle of separate and unequal treatment. From the outset, African Americans' access to education at these institutions varied from state to state. Land grant universities in most of the southern and border states did not admit black students. In 1890, the Second Morrill Act provided additional funds for the 1862 land-grant universities on the condition that they either admit black students or provide racially segregated land grant institutions. Several southern states either founded separate land-grant schools for black students or gave land-grant status to schools already in existence. Throughout their history, these all-black colleges have received less support from southern states than the 1862 institutions.[10] For example, in 1950, Alabama Polytechnic Institute, the predecessor institution to Auburn University, received $2,287,361 in federal, state, and local funding while the African American land grant school, Alabama Agricultural and Mechanical College, received only $84,417.[11] Black people in Alabama composed 32 percent of the population and were proportionately more involved in agriculture than were white Alabamians. Yet they received only 3.5 percent of the total of $2,371,778 that the government allocated for the education of Alabamians.

### B.  Hardening of Discriminatory Practices at the Dawn of Jim Crow

The USDA's neglect of freedpeople grew even more pronounced at the dawn of the Jim Crow era, when southern politicians rewrote voting laws and state constitutions to monopolize political power on the state and local level and enacted segregation ordinances—all in the name of white supremacy. The federal government acquiesced in southern states' anti-democratic and

---

[10] Under both Morrill Acts, states are supposed to match federal funds on a dollar-to-dollar basis. States have consistently failed to meet this matching requirement for 1890 schools. See John Michael Lee Jr. and Samaad Wes Keys, "Land-Grant But Unequal: State One-to-One Match Funding for 1890 Land Grant Institutions," APLU Office of Access and Success publication no. 3000-PB1 (Washington: Association of Public and Land-Grant Universities, 2013), 62.

[11] Pete Daniel, *Lost Revolutions: The South in the 1950s* (Chapel Hill: University of North Carolina Press, 2000), 45.

racially discriminatory approach to black citizens, designing USDA programs throughout the late nineteenth and most of the twentieth century that mirrored the separate and unequal approach evident in all facets of southern life. As noted above, the USDA condoned separate and underfunded land-grant colleges for black students. The pattern of discrimination continued when the Smith-Lever Act empowered the USDA to establish the Cooperative Extension Service in 1914, which offered adult education on the latest agricultural techniques to farm families, organized 4-H clubs that introduced rural youth to more modern approaches to farming, and established home demonstration clubs for rural women. The founding of the Extension Service coincided with the Woodrow Wilson administration's segregation of the civil service, so the agency enacted its programs on a segregated and unequal basis. It hired Negro farm agents and home demonstration agents on a separate basis, paid them less, hired fewer of them, and equipped them with fewer resources to conduct their outreach work.[12]

It is a testament to Black farm peoples' determination and fierce resistance to Jim Crow that they managed to make the most of the unequal and inadequate resources provided under the USDA. Within Black rural communities, agricultural experts gradually gained more and more opportunities to work as agricultural extension agents and home demonstration agents, among the few professional positions available to college-educated African Americans. The crucial assistance provided by the Cooperative Extension service shows that Black farm communities have been able to thrive when provided with even inadequate resources.

### C.  Legacy of Discrimination in New Deal programs

---

[12] Eric Steven Yellin, *Racism in the Nation's Service: Government Workers and the Color Line in Woodrow Wilson's America* (Chapel Hill: The University of North Carolina Press, 2013), 112-131. Debra A. Reid, *Reaping a Greater Harvest: African Americans, the Extension Service, and Rural Reform in Jim Crow Texas* (College Station: Texas A&M University Press, 2007); Allen W. Jones, "The South's First Black Farm Agents," *Agricultural History* 50 (Oct. 1976): 636–44; Carmen V. Harris, "'A Ray of Hope for Liberation': Blacks in the South Carolina Extension Service, 1915–1970" (PhD diss., Michigan State University, 2002).

The New Deal greatly expanded the purview of the USDA and offers important historical context for understanding the long-term effects of past racial discrimination and persistence of racial discrimination in the present. While the Roosevelt administration created farm programs to address the economic impact of the Great Depression for all American farmers, the needs of the rural South were especially pressing. The economic collapse of the 1930s only intensified longstanding problems of chronic poverty, pervasive racism, and a stagnant economy, with low prices for farm commodities caused by overproduction of commodities grown in the South, especially cotton and tobacco.

The New Deal greatly expanded the USDA's budget, power, and reach and, unfortunately, presented new opportunities for racial discrimination through three agencies in particular, the Agricultural Adjustment Administration, the Federal Cooperative Extension Service, and the Farm Security Administration. The first farm program of the New Deal, the Agricultural Adjustment Act, set out to tackle overproduction and raise farm incomes by paying farmers to limit the amount of land on which they would plant certain crops or limit their production of livestock. This program increased the power of the USDA, making it the only established federal department to have responsibility for a significant New Deal program and giving the USDA a significant regulatory role for the first time.[13]

The USDA, with the support of powerful southern representatives in Congress, organized the AAA in such a way that the program relied on local control so that the program would not challenge or interfere with the landowning and merchant elite's dominance of the rural South.[14] At first, agents of the Agricultural Extension Service informed farmers about the AAA and

---

[13] Phillips, 318; Galperin, "The Life of Administrative Democracy," 1221.
[14] Ira Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America (New York: W.W. Norton, 2006), 40.

signed them up. For a variety of reasons, the Roosevelt administration developed a decentralized plan that gave power to elected local committees to oversee the program. The way it worked was that administrators at the USDA's Washington headquarters figured out a commodity's national allotment and then gave a share to each state where the crop was produced. Then, each county was apportioned an allotment (the amount of a crop that could be grown) to be divided among individual farms based on their past production. AAA county committees determined these acreage allotments, administered the subsidies farmers received for limiting their production, and supervised farmers to make sure they planted no more than what they were allotted. Across the country, these elected county committees were made up of all white and often larger, more financially secure male farm owners. In the Jim Crow South, putting the local landowning elite in charge of administering the AAA meant giving them yet another tool for controlling the movement and prospects of workers and enriching themselves and members of their class at the expense of sharecroppers, tenant farmers, and small farm owners. As the main agricultural workforce and the smallest farm owners in the South, African Americans felt the brunt of this local elite control.[15]

To avoid threatening the power of landlords over sharecroppers, AAA administrators in Washington, D.C. acquiesced in giving sharecropper and tenant farmers' share of crop subsidy payments to their landlords, who often pocketed the funds rather than distributing them as the law required. In addition, the AAA contributed to the displacement of sharecroppers and tenant farmers, most of whom were black, because acreage reduction cut down on the need of these

---

[15] Pete Daniel, *Lost Revolutions*, 41.

landless agricultural producers. The number of nonwhite tenants and sharecroppers in the southern states declined from 698,839 in 1930 to 508,638 in 1940.[16]

Another discriminatory impact of the AAA was the new requirement, beginning in 1934, that made participation in the crop-control program mandatory. This program penalized black landowning farmers and some white landowning families as well, most of whom had already cut their small acreages of tobacco or cotton during the 1920s, when extension agents were urging them to limit production of cash crops in favor of producing more food and feed for their sustenance and that of their farm animals.[17]

Yet another consequence of the AAA was to make it more difficult for landless farmers and those not already participating in AAA programs to become independent landowners. This was true for all farmers but had a particularly prohibitive impact on black farmers. Two USDA studies confirm that commodity price supports raised the price of farmland by as much as 20 percent. "The commodity programs are tied to specific lands, which capitalizes the future value of the programs into the value of the land," one study shows.[18]

The Resettlement Administration and, later, the Farm Security Administration were the Roosevelt administration's most ambitious programs to wrestle with the problem of chronic rural poverty in the South. The goal of both programs was to help tenant farmers and sharecroppers become independent farmers and establish cooperatives.[19] Despite its promise and commitment to addressing the poverty of black and white rural southerners, the agency faced political

---

[16] Pete Daniel, *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures since 1880* (Urbana and Chicago: University of Illinois Press, 1985)*,* 101-104.
[17] Adrienne Monteith Petty, *Standing Their Ground: Small Farmers in North Carolina Since the Civil War* (New York: Oxford University Press, 2013), 104-105.
[18] Bruce J. Reynolds, *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives* (Washington: United States Department of Agriculture, Rural Business-Cooperative Service, RBS Research Report 194, 2003), 9.
[19] Reynolds, *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives*, 9.

backlash and ultimately set a precedent for some of the racially discriminatory practices that continue to characterize the USDA's dealings with black farmers today. The FSA attempted to lift tenants and sharecroppers to the status of independent farm owners by offering them farm purchase loans and resettling families in farming communities. By 1941, this agency had helped 1.5 million farm families nationwide. However, it limited its assistance to farmers it considered the surest bets for success. This criterion excluded all but a comparative handful of black farmers. Another factor limiting the success of the FSA was hostility from southern white politicians, who saw the program as a threat to their political power and to the social order of the southern labor system.[20]

Through the Federal Emergency Relief Administration (FERA) and the FSA, the New Deal also greatly expanded the USDA's involvement in giving farmers access to agricultural credit. FERA attempted to improve the economic prospects of destitute sharecroppers, tenant farmers, and small farm owners by providing them access to production credit and living credit, and closely supervising their farming. In the South, sharecroppers, tenant farmers, and small farm owners had relied on advances of seed, feed, and other supplies from supply merchants, who often charged usurious interest rates. Thus, New Deal programs had the potential to provide black farmers alternate forms of credit that would reduce their dependence on landlords and merchants.

The FSA's supervised credit programs provide important context for understanding the ongoing problem of racial discrimination in the USDA. To address not only poverty but also soil erosion and other environmental problems, the FSA required farm families to work with a government agent to make farm and home plans. The goal was to expose farm families to

---

[20] Charles Kenneth Roberts, "Client Failures and Supervised Credit in the Farm Security Administration," *Agricultural History* 87, no. 3 (Summer 2013), 370.

USDA-approved farming methods. Yet, over time, the practice of requiring oversight over loans emerged as a tool of racial discrimination that continued into the 1980s and 1990s. While supervised loans were a condition for many black farmers to obtain credit, white farmers faced no such condition.[21]

### D.  Displacement and Dispossession during the 1950s and 1960s

With technological revolutions in the production of cotton and other commodities, the 1950s represented a pivotal decade of displacement and dispossession for family farmers throughout the United States and especially in the South. Again, black farmers bore the brunt of the upheaval. During the 1950s, 67,000 African American farmers and 413,000 white landowning families were displaced from farming.[22] As large white landowners used USDA farm subsidies to invest in tractors and the mechanical cotton harvester, which International Harvester began manufacturing in 1947, black sharecroppers lost their livelihoods and left the countryside for southern towns and cities, and the urban North, Midwest, and West. Black farm owners faced competition from more prosperous white farm owners whose acquisition of planting, cultivating, and harvesting machinery enabled them to expand their farming operations while employing fewer laborers. While some officials within the USDA insisted that the agency should step in to ease the plight of farm families, others admonished farmers to "get big or get out."[23]

The discrimination against black farmers increased after the 1954 *Brown v. Board of Education* decision. Farmers who joined the National Association for the Advancement of

---

[21] Tadlock Cowan and Jody Feder, *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers* (Washington: Congressional Research Service, May 29, 2013), 1.
[22] Daniel, *Lost Revolutions,* 46.
[23] Pete Daniel, *Lost Revolutions: The South in the 1950s* (Chapel Hill: University of North Carolina Press for the Smithsonian National Museum of American History, 2000), 48-51.

Colored People or participated in the civil rights movement in any way were frozen out of loans or had their acreage allotments drastically reduced.[24] Overall, the civil rights era presents a huge paradox when it comes to understanding the history of the USDA's treatment of black farmers. Discrimination against black farmers at the hands of the USDA grew more severe at the very moment that one would assume their prospects would have improved. The United States Commission on Civil Rights detailed the racism and inequality that characterized USDA programs in its 1965 report *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture.*[25] The report found that the USDA's Farmers Home Administration (FmHA) subjected black farmers to variable treatment in farm loans. In selected southern counties, white borrowers received significantly larger loan sizes than black borrowers on comparably-sized farms. It also revealed that "not a single Negro had been elected to a county committee in the South."[26] Two years later, the Georgia State Advisory Committee to the U.S. Commission on Civil Rights published a study arguing that the USDA's pattern of denying Black people equal opportunity and equal treatment "begins in childhood when they are excluded from 4-H Club work and continues in later life when they are excluded from programs of the Extension service and from services of specialists in FmHA and the Agricultural and Stabilization Conservation Service."[27]

As Julian Bond, then an activist with the Student Nonviolent Coordinating Committee, observed during a 1967 speech, black people's "condition has worsened as their civil rights have increased. For every lunch counter seat won and black vote recorded, a farm, a home or a job has

---

[24] Pete Daniel, *Dispossession,* 17-18.
[25] U.S. Commission on Civil Rights, *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture* (Washington: Government Printing Office, 1965).
[26] U.S. Commission on Civil Rights, *Equal Opportunity in Farm Programs,* 57-82, 91.
[27] Georgia State Advisory Committee to the United States Commission on Civil Rights, *Equal Opportunity in Federally Assisted Agricultural Programs in Georgia,* (Washington: Government Printing Office, 1967), 2.

been lost or erased."[28] While civil rights laws ended segregation in public accommodations and a turn to equal opportunity, black farmers were displaced and dispossessed. The USDA promoted scientific and technological advancements in agricultural production but excluded most black farmers from this transition to capital-intensive agriculture by denying them access to loans and information.[29]

### E.  Heightened discrimination in the Post-Civil Rights Era

The discrimination continued into the 1970s and 1980s, with important parallels to some of the discrimination black farmers report experiencing in the present. In 1982, the United States Commission on Civil Rights detailed the way that discriminatory practices within the USDA kept black farmers from gaining access to credit. The USDA had not made any effort to set up enforcement mechanisms to ensure that it was not violating black farmers' civil rights. Instead, the USDA consistently perpetuated local patterns of segregation and racist proscription that endured even after major civil rights legislation had outlawed such practices.[30] Rather than address the problems cited in the 1982 report, the government shut down the USDA Office of Civil Rights Enforcement and Adjudication in 1983.[31] In 1990, after a series of hearings on civil rights violations at the USDA, Congress produced a report that concluded that the USDA had "been a catalyst in the decline of minority farming."[32] The graphs below illustrate the rise and fall in the number of farms owned by African Americans and the amount of land they gained and lost between 1870 and 1992.[33]

---

[28] Julian Bond, "Speech—'Great Days Ahead' concerning the plight of black farmers, ca. 1967," Box 1, folder 7, The Papers of Julian Bond, 1897-2006, Special Collections, The University of Virginia Library.
[29] Pete Daniel, *Dispossession*, 2.
[30] U.S. Commission on Civil Rights, *The Decline of Black Farming in America* (Washington: U.S. Commission on Civil Rights, 1982), 8-11.
[31] Cassandra Jones Havard, "African American Farmers and Fair Lending: Racializing Rural Economic Space," *Stanford Law and Policy Review* (Spring 2001), 4. The Office of Civil Rights was established in 1971.
[32] H.R. Rep. No. 101-984 (1990).
[33] Both graphs were created by Mark Schultz.





Source: Census of Agriculture, Selected years, Washington, DC: Bureau of the Census

In November 1996, Grant Buntrock, administrator of the Farm Service Agency, the successor agency to the FmHA, conceded publicly that the agency still discriminated against Black farmers in its lending. A month later, North Carolina farmer Timothy Pigford and 300 other Black farmers marched in protest in front of the White House. Dan Glickman, the Secretary of Agriculture during the Clinton Administration, set up a dozen "listening sessions" to allow black farmers nationwide to share their decades of discriminatory mistreatment by the USDA.

In 1997, the USDA issued yet another report titled "Civil Rights at the United States Department of Agriculture: A Report by the Civil Rights Action Team."[34] It was the latest in a string of reports since 1965 in which the federal government itself detailed government-sponsored discrimination targeting black farmers.[35] The report contained an example from Mississippi that exemplifies the enduring problem of discrimination during the 1990s. It took local USDA employees an average of 84 days to process loan applications for white farmers but an average of 222 days to process the same applications for black farmers. The consequence of

---

[34] Civil Rights Action Team, U.S. Department of Agriculture, *Civil Rights at the United States Department of Agriculture* (Washington: U.S. Department of Agriculture, 1997).
[35] Lloyd Wright, "Racial Equity in Agricultural and Rural Development Report: Preventing the Decline of Black Farmers and Black Rural Landownership," August 29, 2008, Revised November 20, 2010, W.K. Kellogg Foundation, 27.

such delays was the loss of annual farm income for many farmers because of the importance of calibrating planting to the weather and the marketing season.[36] It demonstrated that racism was endemic to the USDA. One farmer in Mississippi reported that the USDA treated black farmers and small farmers "worse than I would treat a dog."[37]

The discriminatory tactics took a variety of forms, from dismissive treatment to threats of violence. Testifying before Congress, Arnetta Cotton recalled the way USDA employees in an FmHA office treated her and her husband, beginning farmers who visited the office for information: "We thought we would be welcomed with open arms. Instead, when we stepped into our county FmHA office in 1984, the secretary looked up and continued working without ever acknowledging our presence. 'Ma'am, is this the FmHA,' we asked. 'Yes,' she answered, never moving from her desk." Nearly a decade later, in southeastern Virginia, a white FSA officer flaunted a loaded handgun at Philip J. Haynie III, who, at the time, was a college student and aspiring farmer and his father, an established black farmer. After telling the younger Haynie to focus on getting a good job after college rather than becoming a farmer, he humiliated both men by asking the son if he knew how much debt his father was in.[38] In addition to subjecting black farmers to dismissive or hostile treatment in county offices, USDA administrators refused to give black farmers loan applications and outright denied loan requests and emergency relief payments. Meanwhile black farmers saw their white neighbors getting the loans and payments they needed. Other tactics that effectively made it impossible for black farmers to farm included giving them a loan for seed but not for fertilizer and pesticides. As had been the case since the

---

[36] Wright, 28.
[37] Civil Rights Action Team, *Civil Rights at the United States Department of Agriculture*, 4.
[38] "Prepared Statement of Philip J. Haynie III, Chairman, National Black Growers Council, Burgess, VA," in *A Hearing to Review the State of Black Farmers in the U.S.: Hearing Before the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, First Session, March 25, 2021,* Serial No. 117-3, 100.

App. 191

New Deal, the typically all-white county elite effectively controlled local USDA administrators and programs. Meaningful loans went to wealthy white farmers, not to more modest black family farmers. Black farmers still report experiencing delays in loan approvals today. The net impact of these discriminatory USDA practices was to make it impossible for them to make a living from year to year, let alone to pass down their land and the vocation they love to their children and grandchildren.

The *Pigford v. Glickman* suit charged the USDA with discriminating against black farmers and failing to properly investigate and resolve discrimination complaints.[39] Focusing on the years between 1982 and 1996, the complaint alleged that the USDA had denied black farmers access to federal farm operating loans, disaster payments, and other financial support that the agency is obligated to provide to low-income farmers.[40] The suit was against Secretary of Agriculture Dan Glickman, and it called for an end to farm foreclosures and restitution for financial ruin they claimed was brought on by discrimination.

In 1999, Judge Lawrence J. Friedman ruled that the USDA had systematically discriminated against black farmers by denying them government loans. Friedman argued that "the United States Department of Agriculture and the county commissioners to whom it has delegated so much power bear much of the responsibility for this dramatic decline" of African American farmers.[41] The court mandated that the USDA compensate African American farmers for lost income. It laid out a five-year consent decree with two tracks that established a mechanism for members of the class to obtain relief. Track A gave farmers a payout of $50,000.

---

[39] *Pigford, v. Glickman,* Civil Action No. 97-1978 (PLF).
[40] Valerie Grim, "Between Forty Acres and a Class Action Suit: Black Farmers, Civil Rights, and Protest against the US Department of Agriculture, 1997–2010," in Reid and Bennett, *Beyond Forty Acres and a Mule,* 271–96.
[41] *Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C. 1999)

Under the consent decree, an eligible recipient was an African American who (1) owned or leased or attempted to own or lease farmland between January 1, 1981, and December 31, 1996, (2) applied to USDA for farm credit or program benefits and believes that he or she was discriminated against by the USDA on the basis of race, and (3) made a complaint against the USDA on or before July 1, 1997.[42] Track B gave farmers the option of going through arbitration with a higher burden of proof but with the possibility of a higher award.

In 2004, the Environmental Working Group issues report finding that USDA and DOJ have spent millions of dollars to block settlements, even though both departments had endorsed and affirmed the 1997 Civil Rights Commission report that provided extensive evidence of discrimination and accepted the *Pigford* judgment. In an effort to rectify the situation, the Obama administration announced a $1.25 billion deal with black farmers. As Barack Obama noted, the goal of the payments was to bring "these long-ignored claims of African-American farmers to a rightful conclusion."[43] This new payout was intended for people who were denied earlier payments because they had missed deadlines for filing.[44]

## II.   Discrimination Persists Today Despite the *Pigford* Decision

The *Pigford* decision offered the USDA a moment to end discrimination against black farmers once and for all. Despite the landmark nature of the ruling, it did not require the USDA to hold anyone accountable for discriminatory actions or improve and expedite the investigation of civil rights complaints. Nor did it make any structural changes to the decentralized way it

---

[42] *Pigford, v. Glickman,* Civil Action No. 97-1978 (PLF).

[43] Clement Tan, "Obama administration reaches deal for black farmers," *Los Angeles Times,* February 19, 2010, https://www.latimes.com/archives/la-xpm-2010-feb-19-la-na-black-farmers19-2010feb19-story.html, accessed May 25, 2022.

[44] The Associated Press, "Deal Nearer for Farmers in Bias Case," *The New York Times,* February 18, 2010, http://www.nytimes.com/2010/02/19/business/19farm.html?emc=eta1, accessed May 25, 2022.

administers its loan programs.[45] Without any legal mandate to eliminate discrimination, the USDA has continued administrative practices that perpetuate discrimination. Moreover, this ongoing discrimination transcends political party and presidential administration.

Despite the USDA's demonstrable lack of transparency highlighted during the *Pigford* case, the agency continues to be cavalier in its responsibility to readily provide vital data about its dealings with black farmers and other socially disadvantaged farmers. Journalists have had to file Freedom of Information Act requests and representatives have had to ask USDA officials for answers regarding the treatment of black farmers during hearings. Some of the information the agency does report is faulty. By admission of its own employees, "USDA has struggled maintaining data integrity." This revelation appeared in a 2016 report to the Equal Employment Opportunity Commission that three writers obtained through a Freedom of Information Act request.[46] The work of investigative journalists, Congressional testimony, scholarly articles, and recent interviews with clients of the Federation of Southern Cooperatives/Land Assistance Fund reveal that the USDA's discriminatory practices and policies endure.

**1)  The 2018 Market Facilitation Plan and the 2020 CARES Act had a discriminatory impact on black farmers**

Based on a Freedom of Information Act request, Nathan Rosenberg and Bryce Wilson Stucki found that of the $8 billion in aid to farmers affected by the Chinese government's

---

[45] Since Pigford, experts have called for changes that would address discrimination in the USDA. See "Prepared Statement of Cassandra Jones Havard," *African-American Farmers Benefit Relief Act of 2007, and the Pigford Claims Remedy Act of 2007, Hearing before the Subcommittee on the Constitution, Civil Rights, and Civil Liberties of the Committee on the Judiciary, House of Representatives,* One Hundred Tenth Congress, First Session, on H.R. 558 and H.R. 899, June 21, 2007, Serial No. 110-46; "Statement of Shirley Sherrod, Executive Director, Southwest Georgia Project for Community Education, Inc. Albany, GA," *Hearing to Review the State of Black Farmers in the U.S.,* 104.

[46] Kathryn Joyce, Nathan Rosenberg, and Bryce Stucki, "The 'Machine That Eats Up Black Farmland,'" *Mother Jones,* May-June 2021, https://www.motherjones.com/food/2021/04/the-machine-that-eats-up-black-farmland/, accessed May 29, 2022.

retaliatory tariffs on farm commodities, 99.8 percent of the funds went to white farmers. According to the article, "In Mississippi, for example, where 38 percent of the population is black and 14 percent of farms have a black principal operator, according to the 2017 Census of Agriculture, only 1.4 percent of the $200 million distributed to farmers through the MFP went to black operators."[47]

The 2020 Coronavirus Aid, Relief, and Economic Security Act (CARES Act) offers another recent example of discriminatory USDA programs. Under the CARES Act, the Office of the Secretary of the Department of Agriculture received $9.5 billion, approximately 19% of the total food and agriculture provisions, to provide financial support to farmers and ranchers experiencing financial pressure and loss of profit caused by the COVID-19 pandemic. However, black farmers and other socially disadvantaged farmers forced to compete with white farmers who have decades of privileged access to farm loans and subsidies, received only 0.1 percent of COVID-19 relief from the CARES Act. Of the roughly $26 billion under the Coronavirus Food Assistance Program, $20.8 million went to Black farmers. According to Secretary of Agriculture Tom Vilsack, "The top 10 percent of farmers in the United States received 60 percent of the value of the covid payments. And the bottom 10 percent received 0.26 percent."[48]

2) **Black and other socially disadvantaged producers receive fewer loans**

A Government Accountability Office (GAO) report in 2019 found that socially disadvantaged producers received proportionately fewer FSA direct and guaranteed loans than

---

[47] Nathan Rosenberg & Bryce Wilson Stucki, "USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers," *The Counter,* July 29, 2019, https://thecounter.org/usda-trump-trade-war-bailout-white-farmers-race/, accessed May 30, 2022, https://thecounter.org/usda-trump-trade-war-bailout-white-farmers-race/
[48] Laura Reiley, "Agriculture Secretary Tom Vilsack says only 0.1 percent of Trump administration's covid farm relief went to Black farmers," *The Washington Post,* March 25, 2021, https://www.washingtonpost.com/business/2021/03/25/vilsack-interview-usda-rescue-plan/

other farmers.[49] This discrimination against black and other socially disadvantaged farmers represents a dereliction of the USDA's mandate to expand credit access to farmers for whom commercial loans are not as obtainable.

3) **Between 2006 and 2016, the USDA was more than six times as likely to foreclose on black farmers than on any other group of farmers**

Through a Freedom of Information Act request, Nathan Rosenberg and Bryce Wilson Stucki discovered that black farmers made up 13 percent of farmers on whom the USDA foreclosed although they made up less than 3 percent of USDA's direct-loan recipients. Speaking on the condition of anonymity, a USDA employee reported being aware of at least one farmer who faced foreclosure from the USDA even though it was the agency's discriminatory dealings that put him in a tight financial spot. When asked about the high rate of foreclosures on black farmers, Joe Leonard, former assistant secretary of civil rights, blamed the victim, arguing that the problem was black farmers' lack of "financial literacy."[50]

4) **The USDA's approach of prioritizing the interests of corporate, industrialized farming over smaller farmers has a disproportionately negative impact on black farmers**

Speaking to dairy farmers in Wisconsin, former secretary of agriculture Sonny Perdue argued in 2019 that, "in America, the big get bigger and the small go out. I don't think in America we, for any small business, have a guaranteed income or guaranteed profitability." He is the latest in a long line of agriculture secretaries of both parties who, since the 1950s, have

---

[49] U.S. Government Accountability Office, "Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited," https://www.gao.gov/products/gao-19-539
[50] Nathan Rosenberg and Bryce Wilson Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers," *The Counter,* October 26, 2019, https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/

advanced this orientation toward industrialized farming, even if few have stated it as frankly as Perdue did. Perdue delivered these comments to dairy farmers in Wisconsin, which lost 551 dairy farms in 2019, 638 in 2018, and 465 in 2017.[51] Such an agribusiness-oriented approach harms black farmers even more than it harms the predominantly white, small- and medium-scale dairy farmers of Wisconsin. More than 95% of farmers in the United States are white while only 1.4% are black, according to the USDA's 2017 Census of Agriculture. Farms operated by African Americans account for 0.5% of the U.S. total, and black farmers own about 0.3% of all farmland in the United States.[52] Overall, wealth and income are more unequally distributed among American farmers than in society as a whole. The largest farms in the United States, which make up two percent of all farms and rely on hired labor, average $2.5 million in gross cash farm income annually and produce more than half of all farm production in the country.[53] By contrast, 57 percent of black-operated farms had sales and government payments of less than $5,000 per year.[54]

Encouraging small, sustainable farming among black farmers and other socially disadvantaged farmers and reducing the orientation toward larger farm operations could help tackle the problem of climate change, stemming the increase in greenhouse gas emissions from farming. Supporting small farms also could meet the public's increased demand for local food production.[55]

---

[51] Todd Richmond, "Trump ag secretary in Wisconsin: No guarantee small farms will survive," *Fox 11 News,* October 1, 2019, https://fox11online.com/news/state/us-agriculture-secretary-to-address-wisconsin-town-hall, accessed May 19, 2022.
[52] 2017 Census of Agriculture
[53] Stephen Carpenter, "Family Farm Advocacy and Rebellious Lawyering," *Clinical Law Review* 24 (October 2017), 82.
[54] "Black Producers," 2017 Census of Agriculture Highlights, https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf, accessed May 20, 2022.
[55] Carolyn Dimitri and Anne Effland, "From farming to food systems: the evolution of US Agricultural production and policy into the 21st century," *Renewable Agriculture and Food Systems* (2018), 10-12.

**5)  The decentralized administration of USDA programs leaves open the opportunity for discrimination**

The USDA continues to rely on a county committee structure, first implemented during the New Deal era, to administer its farm loan program and other programs on the local level. Today, the agency relies on more than 7,700 committee members who sit on more than 2,200 committees across the nation and wield a considerable amount of power. According to the USDA, these three- to five-person committees make decisions regarding price support loans and payments, verify farmers' acreage, oversee conservation programs, decide which farmers receive incentive, indemnity, and disaster payments, and how much, and verify farmers' eligibility for payment.[56] Part of their charge is to "ensure fair and equitable administration of FSA farm programs in their counties and are accountable to the Secretary of Agriculture."[57] Yet the 1997 Civil Rights Action Team report argued that USDA leadership in Washington, D.C. lacked the ability, capacity, and will to manage thousands of local committees, which were more beholden to their local electors than to USDA federal bureaucrats.[58] The report recommended that Congress establish more centralized control over county committees and take away the committees' authority to determine who was eligible for loans. Cassandra Jones Havard, a legal scholar, echoed both the 1965 *Equal Opportunity in Farm Programs* report and the 1997 report in calling for reform of the county committee system, arguing that it "gives elected farmers both critical discretion regarding loan eligibility and an opportunity for self-aggrandizement."[59] And, of course, Friedman singled out the committees as a driving force of discrimination when he

---

[56] "Farm Service Agency: County Committee (COC) Frequently Asked Questions for Stakeholders," https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/NewsRoom/County-Committee-Elections/pdf/2019%20County%20Committee%20Elections.pdf
[57] "Farm Service Agency: County Committee (COC) Frequently Asked Questions for Stakeholders"
[58] Civil Rights Action Team, U.S. Department of Agriculture, *Civil Rights at the United States Department of Agriculture* (Washington: U.S. Department of Agriculture, 1997), 18-20
[59] Havard, "African-American Farmers and Fair Lending," 1.

issued the *Pigford* decision. Other criticisms of the county committee system include the committee members' varying levels of administrative expertise, the interest of some farmers in serving because they are ideologically opposed to farm programs, and the problem that some farmers are either "unaware or only vaguely aware that the committee system even exists; even when they are aware of the committees, they tend to underestimate committee authority."[60] There have been a few reforms to the system. The Farm Security and Rural Investment Act of 2002 gave the Secretary of Agriculture the option of appointing one additional social disadvantaged member to county committees to achieve greater fairness.[61] There also were provisions to increase access and provide more transparency about the elections.[62]

Yet criticism of the county committees continues among scholars and farm advocates. In a 2020 article, Joshua Ulan Galperin, a legal scholar, argues that these county committees are unconstitutional because they are not subject to the system of checks and balances. Committee members are not subject to Congressional and Presidential power over administrators and the President does not have the ability to remove committee members from their positions if they abuse their positions.[63] Despite the concerns raised about county committees, the USDA resisted call for meaningful change.

**6) OASCR still fails to investigate complaints in a thorough and timely manner**

For more than 20 years, various federal agencies have documented the USDA's failure to investigate and resolve civil rights complaints. The Government Accountability Office (GAO) alone issued at least 10 reports between 1999 and 2009. In a 2008 report, the GAO argued that

---

[60] Galperin, "The Life of Administrative Democracy," 1249
[61] Carol Canada, "Farm Service Agency Committees: In Brief," Congressional Research Service, January 29, 2021, https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pdf
[62] Galperin, "The Life of Administrative Democracy," 1251. Galperin notes that there was opposition to the nonelected minority. See Galperin, "The Life of Administrative Democracy," 1252.
[63] Galperin, "The Life of Administrative Democracy," 1255-1256.

the USDA's civil rights division failed to improve accountability in the department. It found that the USDA was uncooperative when it came to investigations of discrimination and neglected its responsibility of prohibiting discrimination in its programs and workplace. As the report noted, "At a basic level, the credibility of USDA's efforts has been and continues to be undermined by ASCR's faulty reporting of data on discrimination complaints."[64] The USDA's failure to process and resolve discrimination complaints often negatively impacted the livelihood of the farmers involved.

Most recently, in a 2021 report, the USDA Office of Inspector General (OIG) found the same problems as the 2008 report had noted. It found that the Office of the Assistant Secretary for Civil Rights failed to process civil rights complaints in a timely and thorough manner. Processing times steadily increased between 2017 and 2019, from 571 days in 2017 to 799 days in 2019, many more days than the 180-day departmental guidance. More than 85 percent of complaints between 2017 and 2019 took longer than 180 days to process.[65] During a February 2022 congressional hearing to review the 2021 OIG report, Phyllis Fong, Inspector General for the USDA Office of Inspector General, said "We have identified these same themes 14 years ago in testimony to Congress, and civil rights and outreach activities have been a management challenge on our list of key challenges facing the Department for 20 years now," she said. "The problems remain, and I think if we look at the course of the program over the years, at times

---

[64] United States Government Accountability Office, "U.S. Department of Agriculture: Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention," Testimony before the Subcommittee on Government Management, Organization, and Procurement, Committee on Oversight and Government Reform, House of Representatives, May 14, 2008, 107.

[65] Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," Audit Report 60601-0001-21, September 2021, 6, 10.

there's progress and then at other times, due to change in priorities or change in focus, other priorities take precedence."[66]

In addition to lengthy processing times, the 2021 OIG report found that OASCR did not take care to adequately document their reviews to ensure accuracy and fairness. In half of the cases sampled, there was inadequate documentation. According to the report, "Considering USDA's long history of discrimination complaints, it is critical that OASCR adequately support its determinations."[67]

Another concern the report raises is the tendency in OASCR is to speed through complaints rather than review them thoroughly. The complaints process is so flawed that many complaints with merit go unaddressed. During the February 2022 hearing with the OIG, Rep. Jahana Hayes noted that USDA/OASCR employees themselves have called attention this problem: "There have been troubling reports about the failure to adequately investigate discrimination complaints. In fact, several OASCR employees have alleged that there is a focus on closing complaints to meet processing timeframes, rather than investigating and assessing the substance of complaints," she said.[68] As a result, there has been a pattern of the OASCR rejecting or closing all but a few cases, even when some employees report that many cases have merit.[69] A recent report by Harvard Law School's Food Law and Policy Clinic showed that the complaint process itself is often discriminatory, penalizing farmers who filed grievances by taking a long time and sometimes foreclosing on farmers before their complaints have been reviewed (before a temporary moratorium on this practice went into effect). The report

---

[66] "Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints," Hearing before the Subcommittee on Nutrition, Oversight, and Department Operations of the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, Second Session, February 15, 2022, Serial No. 117-30, 20.
[67] Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," 26.
[68] "Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints," 21.
[69] Rosenberg and Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers."

recommended several changes to rectify the USDA's long history of mishandling discrimination complaints, including fast-tracking certain complaints, improving and expediting the process overall, and reporting statistics and the substance of complaints with transparency, both to the complainants and to the public.[70]

7) **FSA agents give farmers costly and misleading information and retaliate when they complain.**

The experience of Arthur Eaton offers an example of the FSA's administrative neglect and the willingness of its agents to misuse their positions to retaliate against farmers who complain about discrimination. Eaton is a 59-year-old farmer from Mount Olive, Mississippi, who has been growing a variety of fruits and vegetables on contract and for sale at farmers' markets for 12 years. Over the years, Eaton has invested in several changes that would allow him to expand his business and centralize the distribution of his produce.

In 2017, Eaton entered into a contract with Capital Produce in Baton Rouge, Louisiana, to produce cayenne peppers. He planted 15-20 acres of peppers, which represented a $10,000 investment. Unbeknownst to him at the time, a farmer half a mile from him treated the cotton growing on his farm with Dicamba, an herbicide. The spray drifted down to Eaton's growing acreage of peppers and "took my plants out."

Because of this crop failure, Mr. Eaton had to figure out a way to generate income to compensate for this loss and to continue paying off an FSA loan. He went to his local branch of Community Bank to try to get a guaranteed loan so that he could invest in greenhouses and honor his contract with Capital Produce. He completed the application and had to contact the

---

[70] Harvard Law School Food Law and Policy Clinic, "Supporting Civil Rights at USDA: Opportunities to Reform the USDA Office of the Assistant Secretary for Civil Rights," April 2021, https://chlpi.org/wp-content/uploads/2013/12/FLPC_OASCR-Issue-Brief.pdf

FSA. Instead of working with the office in Hattiesburg, he was directed to Dave Blakely, an FSA loan officer. Working with Blakely gave Eaton pause because of an earlier experience with him. Back in 2004, when Eaton was first looking to purchase his farm, he had visited the FSA office and asked Blakely about getting a direct loan of $200,000 to purchase the property. Blakely informed him that the FSA only offered guaranteed loans for farm ownership, not direct loans. However, after doing his own research, Eaton discovered that the FSA *did* offer direct loans for farm ownership. He called Blakely, revealed what he'd learned, and told him that he was returning to the office to pick up an application. "When I got there," Eaton recalled, "he wouldn't talk to me. He stayed in his office and had [a woman who works in the office] give me near a book of paperwork to fill out." Eaton filed a grievance about the misleading and demeaning treatment he received from Blakely. His loan finally went through in April 2005.

Despite his misgivings and mistrust of Blakely, Eaton had no choice but to work with him on obtaining the loan he needed to recover from the loss of his pepper crop. He waited for the bank to submit the paperwork to Blakely. As he waited, he got in touch with Blakely to find out if he should apply for loan servicing.[71] Blakely told him this would not be necessary. "Two weeks passed, and they didn't do it, so they've got me in a bind," Mr. Eaton described. He sold some apartments and made an FSA payment in 2019 because Blakely had assured him that making a payment would reset the clock and provide him more time to pay off his debt. He also purchased a trailer in which he planned to raise oyster mushrooms under contract. "I wouldn't have done that had I known I couldn't trust the FSA," he explained. He got a call from Blakely, who later brought him a letter saying that the payment he made had not reset the clock and that

---

[71] Interview with Arthur Eaton by Dānia Davy et. al., May 20, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.

the payment was due. Blakely said that his boss and Jackson and administrators in Washington had confirmed that his payment would not reset the clock.

Eaton didn't panic. He stayed busy and kept the faith that he would be able to make his payment from the sale of tomatoes to Capital Produce, which contracted with him for 1,500 to 2,500 pounds of tomatoes a week. But then COVID-19 hit, and Louisiana shut down. "I'm stuck with tons of tomatoes and mushrooms that I don't really have a market for," he remembered.

Shortly afterward, he received a letter from the FSA that they were foreclosing on him—right at the beginning of the pandemic. The FSA was preparing to do an inventory of his farm and to start pulling his equipment. He pleaded with them to at least let him hold onto his greenhouse and his homestead, but they said they were going to auction everything off. A fortuitous phone call from a woman who runs one of the farmer's markets where he sold produce helped Eaton halt the auction. She was just checking to see how he was faring because of COVID. After hearing about Eaton's ordeal, she suggested that he call a lawyer who'd bought produce from him in the past. The lawyer suggested that Eaton file bankruptcy to block the FSA from being able to foreclose on him.

For now, Eaton has managed to hold onto his farm and work toward paying off his debt. In addition to obtaining and license and beginning to grow hemp marijuana, he is currently applying for a license to grow medical marijuana in his greenhouse. Yet his ordeal with the FSA highlights the reality that the USDA is six times more likely to foreclose on a black farmer than a white one.[72] Discrimination in the administration of government assistance prevents Eaton and other black farmers from overcoming historical and ongoing roadblocks to farming.

---

[72] Rosenberg and Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers."

8) **Some black farmers are dealing with the combined impact of the COVID-19 pandemic and recent discrimination**

Julian Marcus, an established Georgia poultry farmer, suffered a devastating blow in 2017 when a storm destroyed two of his four poultry houses. Compounding the loss of these two houses was the fact that an FSA loan officer demanded that he pay off his FSA loan immediately with the insurance money that he received from the loss of the poultry houses. If he did not pay, the loan officer said, the USDA would foreclose on him. The officer argued that the USDA was the primary lien holder on the insurance policy, so Marcus should have turned the check over to the USDA. Marcus ended up paying off the loan, a farm ownership loan, for $219,642.10. This was just the latest example of issues he had with the same loan officer, and he suspects that the officer's insistence that he pay the loan off was in retaliation for a discrimination complaint Marcus filed over a delay in processing a farm purchase loan, which cost Marcus an opportunity to expand to eight poultry houses. When asked how COVID impacted his business, Marcus was clear. "If I had been able to rebuild after the storm, I would have been able to avert the adverse impact of COVID. I assume something different transpired with white farmers because several farms were decimated, and they were able to rebuild their farms." His problems with the FSA stunted his plans for expansion. "Initially, I wanted to do 4 to 6 to 8 [poultry houses]," Marcus said. "Now, I just want to get back to four. Black farmers are not able to acquire any land to expand. "The only farmers that are acquiring more land and building more chicken houses are white farmers."[73]

9) **An FSA loan officer threatened to arrest a young black farmer**

---

[73] Interview with Julian Marcus, by Dānia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives-Land Assistance Fund.

Hosea Henry, a 41-year-old black farmer from Georgia, has not farmed on his own since 2010. This is not by choice. In 2007, he had obtained an FSA loan to buy land. He raised row crops for two years and then decided to purchase cattle. He got a loan to buy 55-head of cattle, but he initially only bought 30. Everything was going well at first. Clark Gordon, the loan supervisor, who is black, encouraged him to purchase 25 more cows. To keep down costs, Henry opted to buy cattle that were low in weight. The supervisor told him that his cows were looking good. However, another person passing by his farm apparently disagreed. "Someone called in on me and said I wasn't taking care of my cows," Henry recalled. The loan officer demanded that he liquidate his cows. "He was very nasty with me that day," Henry recalled. "He threatened to arrest me if I didn't sign the paper to liquidate my cows." The loan officer, a white man, refused to listen to Gordon when he tried to explain that Henry was taking good care of the cattle. "He [the white loan officer] made Clark stop talking that day in the office," Henry said. "Clark was trying to tell him it wasn't that bad." While Henry had paid $35,000 for the cattle, he ended up selling them for less than $15,000. Today, he remains $120,000 in debt to the FSA. "I feel like because I was a young black farmer, they just railroaded me," Henry said. "I still to this day haven't bounced back from that."[74]

10) **The FSA continues to subject black farmers to dismissive treatment and to deny them equal service**

Angela Calvin's experience two years ago in Hale County, Alabama, sounds eerily reminiscent of the dismissive, discriminatory treatment that farmers experienced at the hands of the Farmers Home Administration during the 1950s and 1960s, and that Arnetta Cotton and her husband experience during the 1980s. In 2020, Calvin and her husband visited the USDA office

---

[74] Interview with Hosea Henry by Dãnia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives-Land Assistance Fund.

in the county after purchasing a 44-acre farm in Greensboro. As first-time farmers, they wanted to find out information and programs that might help them get established. Instead of the "customer-driven" service that the FSA promises that producers will receive at county offices, a staff person at the office curtly told them "We don't have any grant money available."[75] Calvin recalled that she and her husband just looked at each other and tried to maintain their composure. They felt "belittled" as they left the office. The staff person had treated them "like we were in there for a handout."[76] Receiving courteous, attentive, and informative service in FSA offices is crucial for black farmers because they tend to live in communities with unstable and unreliable internet connections because of the well-known lack of broadband in rural communities, and the inability to afford high-speed access. While the 2017 Census of Agriculture reports that 62 percent of black-operated farms have internet access, it is not clear whether this access is high-speed.[77] A 2021 report found that more than 1 in 3 rural black southerners lack internet access in their homes, and one in four lack the option to subscribe to high-speed broadband.[78]

**Conclusion**

The *Pigford* decision was not the turning point that it could have been. The USDA has not taken deep and lasting steps to combat discrimination in the administration and thrust of its programs. It continues to vest administration of its loan programs in county committees despite the *Pigford* case establishing the discriminatory impact of these committees. It continues to

---

[75] "History and Mission," U.S. Department of Agriculture Farm Service Agency website, https://www.fsa.usda.gov/about-fsa/history-and-mission/index; Interview with Angela Calvin by Eric Hilton et. al., May 25, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.
[76] Interview with Angela Calvin.
[77] "Black Producers," 2017 Census of Agriculture.
[78] Dominique Harrison, "Affordability & Availability: Expanding Broadband in the Black Rural South," Joint Center of Political and Economic Studies, October 2021, 2-7, https://jointcenter.org/wp-content/uploads/2021/10/Affordability-Availability-Expanding-Broadband-in-the-Black-Rural-South.pdf, accessed May 29, 2022. The study notes that expanded broadband is a necessity for black farmers to gain access to government funding and to operate "precision agricultural equipment."

mishandle its responsibility to investigate accusations of discrimination in a serious and timely manner. And it continues to enrich large white-controlled corporate farming at the expense of black farmers. Perhaps the most damaging consequence of discrimination continuing unabated at the USDA is that black farmers' deep distrust of the agency, which they dubbed the "last plantation," has continued. Speaking before Congress in 2020, Shirley Sherrod, a former USDA official and long-time farm advocate, recalled her grandfather's skepticism about the USDA:

> What that [ongoing discrimination] has done is in addition to farmers trying and being denied, they don't feel there is a place for them to go. We have to go back and try to help farmers understand that this agency is there for them, because so many of them think that is not the case. Many of them think like one of my grandfathers, when he had the opportunity to try to apply for money, he said I have never borrowed money from Farmers Home Administration, because it is just a way to take a Black farmer's land. That has proven to be true.[79]

---

[79] *Hearing to Review the State of Black Farmers in the U.S.,* 128.

**Qualifications**

I am an associate professor of history at the College of William & Mary. I earned an

undergraduate degree from Northwestern University's Medill School of Journalism, and my

master's and doctorate in History from Columbia University. Before joining the faculty of the

College of William & Mary in 2017, I was a faculty member at the City College of New York

for a decade. In addition, I have held adjunct and visiting positions at Swarthmore College in

Pennsylvania, Rutgers University-Newark in New Jersey, and Shaw University in North

Carolina. I also worked as a reporter at the *Roanoke Times* in Roanoke, Virginia.

My research has focused on the history of farmers in the American South since the Civil

War. My doctoral dissertation and first book, *Standing Their Ground: Small Farmers in North

Carolina Since the Civil War* (2013) analyzed small farm owners' efforts to hold onto their land

and livelihood in the face of successive and overlapping changes in farming and USDA policy.

The book won the H.L. Mitchell Award from the Southern Historical Association and the

Theodore Saloutos Award from the Agricultural History Society. Along with historian Mark

Schultz, I was awarded a collaborative research grant from the National Endowment for the

Humanities in 2011 to lead undergraduate and graduate students in conducting oral history

interviews with African American farm owners and their descendants. Most of the interviews

took place between 2011 and 2013 and are archived in the University of North Carolina—Chapel

Hill's Southern Oral History Collection. Schultz and I are currently completing a book on the

history of African American farm owners that draws upon these interviews and extensive

archival research.

I have a national reputation as an expert on U.S. agricultural history, having served as

president of the Agricultural History Society and having spoken at an opening symposium for the

Smithsonian National Museum of African American History and Culture. My twenty-five years of researching southern agriculture, specifically the plight of small farmers, qualifies me to comment on the discriminatory history of farm policy and discrimination in the implementation of contemporary USDA programs. I have not testified as an expert by trial or by deposition in the past four years. I have included my list of publications in the previous 10 years below as part of my Curriculum Vita.

**Compensation**

My rate of compensation is $100 per hour for document preparation and consultation. My compensation is not contingent on or affected by the substance of my opinions or the outcome of this litigation.

I could and would competently testify to the above if called and sworn as a witness under oath and penalty of perjury under the laws of the United States of America.
Executed May 31, 2022 in James City County, Commonwealth of Virginia.

*Adrienne M. Petty*

**Materials Reviewed**

**Congressional Hearings**

African-American Farmers Benefit Relief Act of 2007, and the Pigford Claims Remedy Act of
2007, Hearing before the Subcommittee on the Constitution, Civil Rights, and Civil
Liberties of the Committee on the Judiciary, House of Representatives, One Hundred
Tenth Congress, First Session, on H.R. 558 and H.R. 899, June 21, 2007, Serial No. 110-
46

A Hearing to Review the State of Black Farmers in the U.S. Hearing Before the Committee on
Agriculture, House of Representatives, One Hundred Seventeenth Congress, First
Session, March 25, 2021, Serial No. 117-3, 100.

Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights
Complaints," Hearing before the Subcommittee on Nutrition, Oversight, and Department
Operations of the Committee on Agriculture, House of Representatives, One Hundred
Seventeenth Congress, Second Session, February 15, 2022, Serial No. 117-30

**Cases**

*Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C. 1999)

**Interviews**

Interview with Angela Calvin by Eric Hilton et. al., May 25, 2022, recording in possession of the
Federation of Southern Cooperatives-Land Assistance Fund.

Interview with Arthur Eaton by Dānia Davy et. al., May 20, 2022, recording in possession of the
Federation of Southern Cooperatives/Land Assistance Fund.

Interview with Hosea Henry by Dānia Davy et. al., May 27, 2022, recording in possession of the
Federation of Southern Cooperatives/Land Assistance Fund.

Interview with Julian Marcus, by Dānia Davy et. al., May 27, 2022, recording in possession of
the Federation of Southern Cooperatives/Land Assistance Fund.

**Government Reports**

Census of Agriculture, select years

"Civil Rights at USDA: A Backgrounder on Efforts by the Obama Administration,"
https://www.law.umich.edu/facultyhome/margoschlanger/Documents/Publications/Office

s_of_Goodness/USDA%20Civil%20Rights%20at%20USDA%20A%20Backgrounder%2 0on%20Efforts%20by%20the%20Obama%20Administration.pdf

Georgia State Advisory Committee to the United States Commission on Civil Rights, *Equal Opportunity in Federally Assisted Agricultural Programs in Georgia.* Washington: Government Printing Office, 1967.

Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," Audit Report 60601-0001-21, September 2021.

Reynolds, Bruce J. *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives.* Washington: United States Department of Agriculture, Rural Business-Cooperative Service, RBS Research Report 194, 2003.

U.S. Commission on Civil Rights, *The Decline of Black Farming in America*. Washington: U.S. Commission on Civil Rights, 1982.

United States Commission on Civil Rights, *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture.* Washington: Government Printing Office, 1965.

U.S. Government Accountability Office, "Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited," https://www.gao.gov/products/gao-19-539

United States Government Accountability Office, *Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention* (Washington: Government Accountability Office, 2008).


**Books and Articles**

Asare-Baah, Lucy, Robert Zabawa, and Henry J. Findlay. "Participation in Selected USDA Programs by Socially Disadvantaged Farmers." *Journal of Rural Social Sciences* 33, no. 1 (2018): 32-55.

Canada, Carol. "Farm Service Agency Committees: In Brief," Congressional Research Service, January 29, 2021, https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pd

Carpenter, Stephen. "Family Farm Advocacy and Rebellious Lawyering." *Clinical Law Review* 24 (October 2017): 79-134.

Cowan, Tadlock and Jody Feder. *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers.* Washington: Congressional Research Service, May 29, 2013.

Daniel, Pete. *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures since 1880.* Urbana and Chicago: University of Illinois Press, 1985.

Daniel, Pete. *Dispossession: Discrimination Against African American Farmers in the Age of Civil Rights.* Chapel Hill: University of North Carolina Press, 2013.

Daniel, Pete.  "Farmland Blues: The Legacy of USDA Discrimination," *Southern Spaces,* October 20, 2015

Daniel, Pete. *Lost Revolutions: The South in the 1950s.* Chapel Hill: University of North Carolina Press for the Smithsonian National Museum of American History, 2000.

Dimitri, Carolyn and Anne Effland. "From farming to food systems: the evolution of US Agricultural production and policy into the 21st century." *Renewable Agriculture and Food Systems* (2018): 391-406.

Galperin, Joshua Ulan. "The Life of Administrative Democracy." *The Georgetown Law Review* 108, no. 5 (May 2020): 1214-1256.

Gilbert, Jess. "Returning African American Farmers to the Land: Recent Trends and A Policy Rationale." *The Review of Black Political Economy,* March 22, 2000.

Grim, Valerie. "Between Forty Acres and a Class Action Suit: Black Farmers, Civil Rights, and Protest against the US Department of Agriculture, 1997–2010." In Debra A. Reid and Evan P. Bennett, *Beyond Forty Acres and a Mule.* Gainesville: University Press of Florida, 2014.

Harris, Carmen V. "'A Ray of Hope for Liberation': Blacks in the South Carolina Extension Service, 1915–1970" (PhD diss., Michigan State University, 2002).

Harrison, Dominique. "Affordability & Availability: Expanding Broadband in the Black Rural South." Joint Center of Political and Economic Studies, October 2021. https://jointcenter.org/wp-content/uploads/2021/10/Affordability-Availability-Expanding-Broadband-in-the-Black-Rural-South.pdf

Harvard Law School Food Law and Policy Clinic, "Supporting Civil Rights at USDA: Opportunities to Reform the USDA Office of the Assistant Secretary for Civil Rights," April 2021, https://chlpi.org/wp-content/uploads/2013/12/FLPC_OASCR-Issue-Brief.pdf

Havard, Cassandra Jones. "African American Farmers and Fair Lending: Racializing Rural Economic Space." *Stanford Law and Policy Review* (Spring 2001): 333-360.

Hayes, Jared. "USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers." Environmental Working Group, February 18, 2021. www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers

Healy, Jack. "'You Can Feel the Tension': A Windfall for Minority Farmers Divides Rural America." *New York Times*, May 22, 2021. www.nytimes.com/2021/05/22/us/black-farmers.html?searchResultPosition=1.

Jones, Allen W. "The South's First Black Farm Agents." *Agricultural History* 50 (Oct. 1976): 636–44.

Kathryn Joyce, Nathan Rosenberg, and Bryce Stucki, "The 'Machine That Eats Up Black Farmland,'" *Mother Jones,* May-June 2021, https://www.motherjones.com/food/2021/04/the-machine-that-eats-up-black-farmland/

Katznelson, Ira. *When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America.* New York: W.W. Norton, 2006.

Lee Jr., John Michael and Samaad Wes Keys. "Land-Grant But Unequal: State One-to-One Match Funding for 1890 Land Grant Institutions," APLU Office of Access and Success publication no. 3000-PB1. Washington: Association of Public and Land-Grant Universities, 2013.

Moore, Mark. "Sen. Scott Defends Racism Remarks, Says US Can't Replace 'Bigotry with Bigotry.'" *New York Post*, May 2, 2021. nypost.com/2021/05/02/sen-tim-scott-says-us-cant-replace-bigotry-with-bigotry/.

Petty, Adrienne Monteith. *Standing Their Ground: Small Farmers in North Carolina Since the Civil War.* New York: Oxford University Press, 2013.

Petty, Adrienne and Mark Schultz. "African-American Farmers and the USDA: 150 Years of Discrimination." *Agricultural History* 87, no. 3 (Summer 2013): 314-367.

Petty, Adrienne and Mark Schultz. "Breaking New Ground: African American Landowners and the Pursuit of the American Dream," in Orville Vernon Burton and Peter Eisenstadt, eds. *Lincoln's Unfinished Work: The New Birth of Freedom from Generation to Generation.* Baton Rouge: Louisiana State University Press, 2022.

Phillips, Sarah T. "What Next? The USDA at One Hundred and One Hundred Fifty Years Old." *Agricultural History* 87, no. 3 (Summer 2013), 315-322.

Reid, Debra A. *Reaping a Greater Harvest: African Americans, the Extension Service, and Rural Reform in Jim Crow Texas.* College Station: Texas A&M University Press, 2007.

RFD TV, "Tx Ag Commissioner Miller on Why He Filed a Lawsuit against the USDA," RFD TV.com, April 28, 2021, www.rfdtv.com/story/43777597/tx-ag-commissioner-miller-on-why-he-filed-a-lawsuit-against-the-usda

Richmond, Todd, "Trump ag secretary in Wisconsin: No guarantee small farms will survive," *Fox 11 News,* October 1, 2019, https://fox11online.com/news/state/us-agriculture-secretary-to-address-wisconsin-town-hall, accessed May 19, 2022.

Roberts, Charles Kenneth. "Client Failures and Supervised Credit in the Farm Security Administration." *Agricultural History* 87, no. 3 (Summer 2013): 368-390.

Roberts, Charles Kenneth. *The Farm Security Administration and Rural Rehabilitation in the South.* Knoxville: University of Tennessee Press, 2015.

Rosenberg, Nathan and Bryce Wilson Stucki. "How USDA distorted data to conceal decades of discrimination against Black farmers," *The Counter,* October 26, 2019, https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/

Rosenberg, Nathan and Bryce Wilson Stucki. "USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers," *The Counter,* July 29, 2019

*Timothy Pigford, et. al., v. Dan Glickman,* Secretary, United States Department of Agriculture, US District Court for the District of Columbia, Civil Action No. 97-1978 (PLF).

Tyler, Shakara S. and Eddie A. Moore, "Plight of Black Farmers in the Context of USDA Farm Programs: A Research Agenda for the Future." *Professional Agricultural Workers Journal* 1, no. 1 (2013).

Wright, Lloyd. "Racial Equity in Agricultural and Rural Development Report: Preventing the Decline of Black Farmers and Black Rural Landownership," August 29, 2008, Revised November 20, 2010, W.K. Kellogg Foundation.

Yellin, Eric S. *Racism in the Nation's Service: Government Workers and the Color Line in Woodrow Wilson's America.* Chapel Hill: The University of North Carolina Press, 2013.

*ADRIENNE MONTEITH PETTY*
ampetty@wm.edu

EXPERIENCE

| | |
|---|---|
| 2017- | Associate Professor, History, College of William & Mary |
| 2014-2017 | Associate Professor, History, The City College of New York |
| 2006-2014 | Assistant Professor, History, The City College of New York |
| 2010- | Co-director, Breaking New Ground: An Oral History of African American Farm Owners |
| 2005-2006 | Visiting Assistant Professor, History and Black Studies, Swarthmore College |

EDUCATION

Columbia University, Ph.D. in History, with distinction, May 2004

Northwestern University, B.S. in Journalism, June 1993

FELLOWSHIPS AND GRANTS

| | |
|---|---|
| 2021 | HistoryMakers Faculty Innovations in Pedagogy and Teaching Fellowship |
| 2016 | National Park Service Civil Rights Commemorative Initiative Grant for a special study for the Jimmy Carter National Historic Site |
| 2011 | Schomburg Scholar-in-Residence |
| 2010-2014 | NEH Collaborative Research Grant, with Mark Schultz |

AWARDS

| | |
|---|---|
| 2021 | William & Mary Arts & Sciences Excellence in Teaching Award |
| 2014 | H.L. Mitchell Award, Southern Historical Association |
| 2014 | Theodore Saloutos Memorial Award, Agricultural History Society |

PUBLICATIONS, PEER-REVIEWED

*Standing Their Ground: Small Farmers in North Carolina Since the Civil War,* Oxford University Press, 2013.

"African American Landowners and the Pursuit of the American Dream," with Mark Schultz, in Orville Vernon Burton and Peter Eisenstadt, eds., *Lincoln's Unfinished Work: The New Birth of Freedom from Generation to Generation,* Louisiana State University Press, 2022.

"The Honey Pond and the Flapjack Tree: The USDA at Two World Fairs, 1933-1940," *Agricultural History,* forthcoming.

"The Town and Country Roots of Modjeska Monteith Simkins' Activism," *Agricultural History* 93, no. 3 (Summer 2019): 452-476.

"In a Class by Itself: Slavery and the Emergence of Capitalist Social Relations During Reconstruction," online forum, *Journal of the Civil War Era,* March 2017. http://journalofthecivilwarera.org/forum-the-future-of-reconstruction-studies/in-a-class-by-itself-slavery/

"Revolutionary Times Revisited: Students' Interpretations of the City College of New York Student Protest and Takeover of 1969," with William C. Gibbons and Sydney C. Van Nort, *The History Teacher* 47, no. 4 (August 2014): 511-528.

"Reflections on One Hundred and Fifty Years of the United States Department of Agriculture," With Sarah R. Phillips, Dale Potts, Mark Schultz, Sam Stalcup, and Anne Effland, *Agricultural History* 87, no. 3 (Summer 2013): 332-343.

"The Jim Crow Section in Agricultural History," in Debra A. Reid and Evan P. Bennett, eds., *Beyond Forty Acres and a Mule: African American Landowning Families Since Reconstruction,* (Gainesville: University Press of Florida, 2012), 21-35.

"Guess Who's Coming to Interview," *Agricultural History* 84, no. 3 (Summer 2010): 298-306.

"I'll Take My Farm: The GI Bill, Agriculture and Veterans in North Carolina," *Journal of Peasant Studies* 35, no. 4 (October 2008): 742-769.


PUBLIC HISTORY WORK

Published *"Instilling Wisdom, Building Character': A Study of Segregation, Politics, and Public Education in Sumter County, Georgia, 1930s-1970s"* with D. Jason Berggren, December 2021, under cooperative agreement with the Organization of American Historians and The National Park Service (not peer-reviewed)

2017-2021 Consultant, Modjeska Monteith Simkins House, Columbia, SC
Consulted as a historian and family member with researchers at Historic Columbia to create new exhibits at the former home of Simkins, a civil rights activist and my great aunt

BOOK REVIEWS

William L. Andrews, *Slavery and Class in the American South* in *The Journal of the Civil War Era* 10, no. 4 (December 2020): 561-563.

"Family Ties, Color Lines, and Fault Lines: Oral Histories of Land Ownership and Dispossession," *Reviews in American History* 47, no. 3 (September 2019): 436-444.

Angela Stuesse, *Scratching Out a Living: Latinos, Race, and Work in the Deep South,* in *Labor: Studies in Working Class History of Americas 15*, no. 2 (May 2018): 142-144

Louis A. Ferleger and John D. Metz, *Cultivating Success in the South: Farm Households in the Postbellum Era,* in *Agricultural History* 90, no. 3 (Summer 2016): 412-413

Drew A. Swanson, *A Golden Weed: Tobacco and Environment in the Piedmont South,* in *American Historical Review* 121, no. 1 (February 2016): 241-242.

INVITED PRESENTATIONS

2022    Speaker, "Environmental Justice: Black Farmers, Green Planet, North Carolina Museum of History, Raleigh, NC

2020    Contributor, Piedmont Biocapitalism Project, Duke University, Durham, NC

2018    Speaker, "Beyond Famous Firsts: Black History Month, Populism and the American Protest Tradition," University of Georgia, Athens, GA

2017    Speaker, "Fighting to Hold onto the Promised Land: Oral Histories of Farming, Resistance and Civil Rights," Haverford College, Haverford, PA

2016    Panelist, "Labor and Engagement with American Capitalism." The Future of the African American Past Conference, in honor of the opening of the National Museum of African American History and Culture, Washington, DC

2016    Panelist, Historians' Roundtable at the Jimmy Carter National Historic Site, Plains, GA

2015    Speaker, "The Legacy of the Civil War," at St. Paul's Church National Historic Site, Mount Vernon, NY

2015    Panelist, "Farming and Foodways," North Carolina in Dialogue: Our Past, Present and Future, Western Carolina University, Cullowhee, NC

2015    Keynote Speaker at Dean Hopper New Scholars Conference, Drew University, Madison, NJ

2014    "Faith, Family, Farm and Future." Talk at St. Mary's Episcopal Church, Washington, DC

2013 "Did Lincoln Free the Slaves?" Talk at University of North Carolina-Wilmington, Wilmington, NC

PROFESSIONAL Presentations

2021 "The Honey Pond and the Flapjack Tree: The USDA at Two World Fairs, 1933-1940." Presidential Address for the Agricultural History Society, presented virtually

2019 "The Negro's New Jerusalem": The African Methodist Episcopal Church and the Gospel of Landownership," Paper presented at the Association for the Study of the Worldwide African Diaspora annual meeting, Williamsburg, VA

2019 "From City to Country: Black Urbanites and the Quest for Land in South Carolina," Paper presented at the Association for the Study of African American Life and History annual meeting, North Charleston, SC

2018 "The Southern Homestead Act and the Struggle Over Wage Labor," Paper presented at the 2018 Southern Labor Studies Association annual meeting, Athens, GA

2017 "The Politics of Collective Landownership During Reconstruction," Paper presented at the American Historical Association annual meeting, Denver, CO

2016 "Teaching Social Justice: An Oral History of Anti-Gentrification in Harlem," Paper presented at the Oral History Association annual meeting, Long Beach, CA

2014 "Roundtable: American Land Reform: Reconsidering Land Ownership in the African American Experience," Paper presented at the American Historical Association annual meeting, Washington, DC

2013 "What Do You Want With My Husband? Talking to the Opposite Sex and Other Challenges of Oral History." Paper presented at the annual meeting of the Oral History Association, Oklahoma City, OK

2010 "Myth, Romance and Tobacco." Paper presented at the annual meeting of the Agricultural History Society, Winter Park, FL

2009 "Guess Who's Coming to Interview." Paper presented at the Annual Meeting of the Organization of American Historians, Seattle, WA

SERVICE TO THE PROFESSION

President, Agricultural History Society, 2020-2021

Co-chair, Program Committee, Southern Historical Association Annual Meeting, 2020-2021

Chair, Article Prize Committee, Oral History Association, 2022-2024

Chair, Book Prize Committee, Oral History Association, 2017-2019

Member, Executive Committee, Agricultural History Society, 2017-present

Member, Fletcher Green and Charles Ramsdell award committee, Southern Historical Association, 2018-2019

Chair, Jack Temple Kirby Award Committee, Southern Historical Association, 2015-2016

Member, Program Committee for the 2016 Annual Meeting of the Oral History Association

Chair, Local Arrangements Committee, Annual Meeting of the Agricultural History Society, 2015-2016

Member, Program Committee for the 2015 Annual Meeting of the Southern Historical Association

Examiner, Swarthmore College Honors Program in History, 2014

Member and Chair, Organization of American Historians Committee on the Status of African American, Latino/a, Asian American, and Native American (ALANA), and Huggins-Quarles Award Committee, 2008-2011



**2017 CENSUS OF AGRICULTURE**
*Highlights*

# Farms and Farmland

*Farms and farmland continue to decline as average farm size increases*

ACH17-3/August 2019

*In the five years between 2012, when the last Census of Agriculture was conducted, and 2017, the number of farms in the United States and the amount of land in farms continued their gradual decline and average farm size continued to increase. The amount and direction of change varied by state and by county but farmland continued to be most heavily concentrated in the center of the country.*



**2,042,220**
farms



**900.2 million**
acres



**441 acres**
average farm size

## Farms and Land

In 2017, the United States had just over 2 million farms, down 3.2 percent from 2012. These farms accounted for 900.2 million acres of land in farms, or 40 percent of all U.S. land. This was a decline of 14.3 million acres (1.6 percent) from the 2012 level.

During the same time, the average farm size increased 1.6 percent, from 434 acres in 2012 to 441 acres in 2017.

Between 2012 and 2017, only the smallest farms (less than 10 acres in size) and the largest farms (2,000 acres or larger) increased in number. All categories of farms between the smallest and largest decreased in number.

**Farms and Farmland, 2012 and 2017**

|  | 2012 | 2017 | % change |
|---|---|---|---|
| Number of farms | 2,109,303 | 2,042,220 | -3.2 |
| Land in farms (acres) | 914,527,657 | 900,217,576 | -1.6 |
| Average farm size (acres) | 434 | 441 | +1.6 |

**Twenty-year Trends, 1997–2017**

*Between 1997 and 2017, the number of U.S. farms declined 8 percent and the amount of farmland declined 6 percent.*



No. of farms (millions): 2.22, 2.13, 2.2, 2.11, 2.04

Land in farms (million acres): 955, 938, 922, 915, 900

1997   2002   2007   2012   2017

**Farmland as Percent of Land Area by County, 2017**



< 10
10 - 29
30 - 49
50 - 69
70 - 89
90 +

U.S. = 40

*Two out of five acres of land in the United States are farmland. But the distribution of that land varies. In many counties from North Dakota down through Texas, more than 70 percent of land is used for agriculture.*

### What is a "Farm"?

Since 1974, the Census of Agriculture has defined a farm as any place from which $1,000 or more of agricultural products were produced and sold, or normally would have been sold, during the census year.



**United States Department of Agriculture**
National Agricultural Statistics Service

**www.nass.usda.gov/AgCensus**

App. 221

## U.S. Farms by Location

Counties in Kentucky, Tennessee, and eastern Texas have high farm densities. With nearly a quarter million farms, Texas has more than twice as many farms as the next state.

California, Pennsylvania, and Minnesota had the largest declines in farm numbers. Nevada, Rhode Island, North Dakota, and Pennsylvania had the largest percentage declines.

**Number of Farms, 2017**



1 dot = 200 farms

U.S. = 2,042,220

| Top States | no. of farms |
|---|---|
| Texas | 248,416 |
| Missouri | 95,320 |
| Iowa | 86,104 |
| Oklahoma | 78,531 |
| Ohio | 77,805 |
| Kentucky | 75,966 |
| Illinois | 72,651 |
| California | 70,521 |
| Tennessee | 69,983 |
| Minnesota | 68,822 |

## Farms and Land by Size of Farm



*In 2017, the largest 4 percent of U.S. farms (2,000 or more acres) controlled 58 percent of all farmland, while 13 percent of farms (1 to 9 acres in size) controlled 0.14 percent of farmland.*

*In 1997, the largest farms controlled 50 percent of all farmland.*

## Farm Specialization[a]

Three fourths of farmland is used by farms specializing in two commodity categories: oilseed and grain production (30 percent) and cattle and dairy production (44 percent).

| | % of farmland | % of farms |
|---|---|---|
| Oilseeds and grains | 30 | 16 |
| Specialty crops (fruits, vegetables, nursery) | 3 | 9 |
| Other crops | 13 | 22 |
| Cattle and dairy | 44 | 34 |
| Hogs and pigs | 1 | 1 |
| Poultry and eggs | 1 | 2 |
| Sheep and goats | 2 | 5 |
| Other animals | 6 | 11 |

# 692,625

**The number of farms specializing in cattle and dairy production in 2017.**

[a] *Refers to the North American Industry Classification System (NAICS). More than half of a farm's sales come from the commodity.*

## Land Use

Nine out ten acres of agricultural land in 2017 were either permanent pasture or cropland. Woodland accounted for 8 percent of farmland, and the remaining 3 percent includes land in farmsteads, buildings, livestock facilities, etc. Midwestern states have large amounts of cropland; most permanent pasture is in the western states.

| | acres (mil) | % of total |
|---|---|---|
| Permanent pasture | 401 | 45 |
| Cropland | 396 | 44 |
| *Harvested* | 320 | 36 |
| Woodland | 73 | 8 |
| Other | 30 | 3 |
| Total | 900 | 100 |

## Land Ownership

A farm may be operated by *full owners* (own all the land they farm), *part owners* (rent some farmland but own some as well), or *tenants* (rent all the land they farm). In 2017, farms operated by part owners accounted for just under one fourth of all farms but 56 percent of all farmland. These farms were larger than others in both acres operated and agriculture sales.

| | % of farms | % of farmland | Average size acres | Average size dollars |
|---|---|---|---|---|
| Full owners | 69 | 34 | 220 | 100,738 |
| Part owners | 24 | 56 | 1,020 | 418,884 |
| Tenants | 7 | 10 | 620 | 285,606 |

# 40

**The percent of U.S. farmland rented from others.**

## About the Census

The Census of Agriculture, conducted once every five years, is a complete count of U.S. farms and ranches and the people who operate them. Results from the 2017 and earlier censuses are available at national, state, and county levels.

See the searchable database Quick Stats, the new Census Data Query Tool, downloadable PDF reports, maps, and a variety of topic-specific products.

**www.nass.usda.gov/AgCensus**

*Source: USDA NASS, 2017 Census of Agriculture.*

*USDA is an equal opportunity provider, employer, and lender.*

**Economic
Policy
Institute**

# The myth of race-neutral policy

By Adewale A. Maye • June 15, 2022

**Summary:** Race-neutral policies are harmful for achieving true racial equity and justice. We must acknowledge and tackle the barriers posed by systemic racism with race-conscious policies that target the intersection of race, class, and gender. Following are key reasons *why* we need to combat the harms of race-neutral policy with race-conscious policies to build a racially just economy and *how* those policies should be structured:

- The persistent and in some cases widening gaps between economic outcomes for Black and white Americans are largely due to structural racism; racism that is entrenched within the very fabric of our customs, laws, systems, and institutions.

- Race-neutral policies—such as equal protection civil rights laws—fail to reverse the gaps and barriers that exist because of structural racism.

- Only race-conscious policies—policies that may disproportionately help communities of color—can dismantle the structural barriers to prosperity, safety, and equity for Black Americans.

- Equitable policymaking must not only be race conscious but also target the intersection of race and class—particularly regarding criminal justice policy and combatting mass incarceration.

- Race-neutral policy such as the drive to eliminate affirmative action threatens racial equity in the states.

- The acute gaps between the economic well-being of Black women and white men demonstrate the need for race-conscious policies that target the intersection of race and gender.

# Introduction: Racial disparities persist despite civil rights laws

Over 50 years ago, the civil rights era ushered in numerous transformative policies that sought to give people of color equal access to various social and democratic institutions free from explicit discrimination based on race. This includes voting, education, employment, and much more. Although the civil rights legislation and the anti-discriminatory laws that followed had put an end to legally sanctioned discrimination and segregation, it continued, and racial economic disparities not only persisted, but many grew worse over time (Jones, Schmitt, and Wilson 2018; Kuhn, Schularick, and Steins 2019). The persistent and in some cases widening gaps between economic outcomes for Black and white Americans are largely due to structural racism; racism that is entrenched within the very fabric of our customs, systems, and institutions—even as rules and laws that once denied rights and opportunities to people of color have been repealed (Solomon, Maxwell, and Castro 2019).

# Race-neutral policies neglect reality and history

The premise that civil rights laws can eradicate racism within institutions founded on the doctrine of racism is not only a common fallacy, but harmful in achieving true racial equity and justice. It leads to the myth of race-neutral policy—the notion that if all groups are seen as equal under the law all will share equitably in social and economic benefits. This notion dismisses centuries of racist policies that have created and reinforced structural barriers to prosperity, safety, and equity for these groups.

For example, while the Fair Housing Act—Title VIII of the Civil Rights Act of 1968—outlaws housing discrimination based on race, color, religion, national origin, sex, disability, or familial status,[1] it "has never fully delivered on its promise to promote and further integration" (Adams 2018). As just one example of the gap between the promises of the act and the reality, decades later African Americans still face disparately low rates of homeownership, as shown in **Figure A**.

As of 2021, the homeownership rate for Black people is approximately 45%—nearly 30 percentage points lower than the white U.S. homeownership rate of approximately 74% (U.S. Census Bureau 2022). While there are many factors that may play a role in the low Black homeownership rate, one key factor is the racist history of redlining—the practice in which lenders deny mortgage loans or other services to communities of color. Despite the intention of prohibiting discrimination by outlawing redlining (and other practices, such as real estate agents steering Black buyers away from white neighborhoods), the Fair Housing Act only mitigated the harm inflicted on communities of color by outlawing future racist policies. The act did not tackle the residential patterns—such as the segregation into neighborhoods with lower price appreciation and less investment—that resulted from the

Figure A

## Black homeownership rate still lags nearly 30 percentage points behind white homeownership rate

Homeownership rates by race and ethnicity, 1994–2021



**Notes:** AAPI refers to Asian Americans and Pacific Islanders. Race/ethnicity categories are mutually exclusive (i.e., white non-Hispanic, Black non-Hispanic, AAPI non-Hispanic, and Hispanic any race). "Other" includes AAPI in years in which AAPI data are not available.

**Source:** Economic Policy Institute analysis of Current Population Survey Housing Vacancy Survey.

**Economic Policy Institute**

past policies (Rothstein 2017).

Consequently, disparities in wealth and numerous other indicators connected to homeownership and residential patterns continue to grow while the economy leaves communities of color further behind. These race-neutral policies neglect the reality and history of race and the role it has played in stripping communities of color from opportunity.

Policies that may disproportionately help communities of color are critical to building a more racially just society and economy because historically communities of color have been socially, economically, and politically disempowered. Our country isn't race-neutral despite efforts to push race-neutral policy. Without targeted policies to address the structural barriers in access and equity, lawmakers will struggle to advance restorative policies that can truly combat racial disparities.

# Policy must target the intersection of race and class

A crucial component to equitable policymaking is using the intersection of race and class as a policy target. Throughout U.S. political history, there have been a plethora of policy

initiatives that were designed to lift only members of a disadvantaged socioeconomic group without acknowledging the racial component, thus failing to address long-standing inequity—or vice versa. Criminal justice reform policies have been prime examples of legislation that fails to address both race and class while also reifying the inequities present at the intersection of race, class, gender, and criminality (Hankivsky and Cormier 2011).

For most of the 20th century, the criminal justice system has magnified and reinforced the growing racial divide in America. Over the last 40 years, the incarcerated population has increased by 500%, with 2 million people in prison and jail today (The Sentencing Project 2021). The steep increase in the prison population can be largely attributed to many of the policies passed in the 1970s—including the war on drugs legislation—and maintained over the subsequent decades that disproportionately hurt Black and brown people and established what we know today as mass incarceration (Taifa 2021).

Currently, within state prisons alone, Black people are incarcerated at nearly five times the rate of white Americans and hold a state average incarceration rate of 1,240 per 100,000 residents (Nellis 2021). Clearly the link between race and mass incarceration is evident. However, research suggests that while racial discrimination is explicit within the criminal justice system, the class composition of each racial group is strongly correlated with the big overall gap in Black and white incarceration rates (Lewis 2018). In reviewing rates of incarceration by race and income quintiles, the analysis indicates that 42% of observed incarcerated Black men were in the lowest class group versus just 15% of white men (Lewis 2018). This analysis indicates that these disparities are largely due to a racialized class system. For policymakers to craft meaningful criminal justice reform, legislation must address the systemic racial legacy of mass incarceration *and* the root causes of race and class divide through economic empowerment.

Policies must embrace both race and class as policy targets to achieve race-conscious efforts and policy solutions. Advancing race-conscious policies is critical to restoring equity and dismantling structural injustice for people of color.

# Race-neutral policy threatens racial equity in the states

Race-conscious policies are just as important on state and local levels as on a federal level. For years, states have been the battleground on whether to advance race-neutral and race-conscious policies. Recent debates over race-neutral policy have concerned affirmative action in higher education. Affirmative action is a set of policies and practices within government or an organization that seeks to boost participation of underrepresented groups (based on their race, gender, sexuality, or nationality) in specific areas such as college admissions or managerial ranks. Affirmative action decision-making in employment and education is a useful way to implement race-conscious practices that address inequities springing from historical barriers for marginalized people. However, over the past several years, affirmative action has been under attack in the higher

education space as some believe race shouldn't be a factor for admission into a school or program.

Within the past few years, Harvard University has been under legal attack to ban affirmative action in its admission process despite the literature available indicating that schools that rely on race-neutral policies and abandon affirmative action decision-making are less accessible and less diverse to underrepresented students of color (Burgess 2020). Beyond higher education school boards, state and local policymakers and voters have also been apprehensive about enforcing race-conscious decision-making in schools. For example, voters in California recently rejected a ballot measure that would have restored the state's affirmative action policy, suggesting broad public unease with race-conscious decision-making (Cineas 2020).

In systems and institutions like higher education with a history of long-entrenched racial segregation and discrimination, race-conscious policies are pivotal in enhancing the representativeness, diversity, and educational outcomes of people of color. State and local policymakers play a large role in advancing these policies and ensuring equitable and comprehensive pathways for people of color to fully participate in historically inaccessible institutions.

# Policies must also look at the intersection of race and gender

Across measures of income, wealth, employment, and health, Black women face some of the most acute disparities with white men. For example, on an average hourly basis, Black women are paid just 66 cents on the dollar relative to non-Hispanic white men with the same level of education and age (Wilson and Kassa 2020). These disparities are especially problematic given that, with an increasing share of women also being the sole breadwinners for their households, Black women carry a significant amount of the economic cost (Glynn 2019). Black women are also more likely to face occupational segregation that limits their access to higher-paying jobs (Wilson, Miller, and Kassa 2021). Despite these specific barriers, Black women also endure the costs of caregiving, child care, and student loan debt, which also constrain women's prosperity.

Due to the combination of many of these factors, Black women constitute one of the most vulnerable groups in our economy and society. Policies to protect and uplift women may not always address the intersectional needs of Black women nor combat the structural racist and patriarchal impediments they face. Intersectionality and disaggregation within race-conscious policies is integral in identifying and addressing the barriers that exist within subpopulations of racial groups including gender. We need disaggregated race data to truly aid in identifying the inequities, documenting the harm, and advancing equitable and comprehensive policies to address the inequities.

# Conclusion

After centuries of systemic exclusion of Black Americans from full participation in our society and economy, targeted, intersectional, race-conscious policies to ensure full participation are long overdue. Without these policies, laws will only mitigate—but not dismantle—the barriers that racist and discriminatory laws and policies have reinforced. The inclusion of race, class, and disaggregated gender disparities as policy targets are critical in advancing race-conscious policies on both federal and state levels. The true myth of race-neutral policy is the unwillingness to acknowledge or address the racist history within our country, our economy, and our society as well as the long-standing effects that systemic racism has on communities of color.

# Additional reading and resources

Readers interested in delving deeper into the issues touched on in this chapter are encouraged to explore the following resources suggested by the author.

### Articles & Reports

Gale, William G. 2021. *Reflections on What Makes a Policy Racist.* Tax Policy Center, November 2021.

Jones, Tiffany, and Andrew Howard Nichols. 2020. *Hard Truths: Why Only Race-Conscious Policies Can Fix Racism in Higher Education.* The Education Trust, January 2020.

Schlesinger, Traci. 2011. "The Failure of Race Neutral Policies: How Mandatory Terms and Sentencing Enhancements Contribute to Mass Racialized Incarceration." *Crime & Delinquency* 57, no. 1: 56–81.

Sawhill, Isabell V., and Richard V. Reeves. 2016. "The Case for 'Race-Conscious' Policies." *Social Mobility Memos* (Brookings blog), February 4, 2016.

Wingfield, Adia Harvey. 2017. "The Failure of Race-Blind Economic Policy." *The Atlantic*, February 16, 2017.

### Book

Satio, Leland T. 2009. *The Politics of Exclusion: The Failure of Race-Neutral*

*Policies in Urban America*. Stanford, Calif.: Stanford University Press.

## Video

Race & Reconciliation Initiative at Texas Christian University. 2021. "Race Neutral Policies as Barriers to Reconciliation." YouTube video, 59:21. Published March 22, 2021.

## Podcast

Hanauer, Nick, and Jessyn Farrell. 2021. "There's No Such Thing as Race-Neutral Policy (with Valerie Wilson)." *Pitchfork Economics* (podcast), April 20, 2021, 24 min.

## Subject matter experts

**William A. Darity Jr.** • Duke University

**Daria Roithmayr** • University of Southern California

**Valerie Wilson** • Economic Policy Institute

# Endnote

1. In addition to discriminatory home sales practices such as redlining, the act outlaws discriminatory practices in a range of rental and housing-financing activities. See National Fair Housing Alliance 2021.

# References

Adams, Michelle. 2018. "The Unfulfilled Promise of the Fair Housing Act." *The New Yorker*, April 11, 2018.

Burgess, Tiffani. 2020. "Race-Conscious Policies—Including Affirmative Action—Are Necessary for Addressing Racial Inequity." American Civil Liberties Union, December 1, 2020.

Cineas, Fabiola. 2020. "Affirmative Action Just Lost in California—Again." *Vox Media*, November 4, 2020.

Glynn, Sarah Jane. 2019. *Breadwinning Mothers Continue to be the U.S. Norm*. Center for American Progress, May 2019.

Hankivsky, Olena, and Renee Cormier. 2011. "Intersectionality and Public Policy: Some Lessons from Existing Models." *Political Research Quarterly* 64, no. 1 (2011): 217–29. http://www.jstor.org/stable/41058335.

Jones, Janelle, John Schmitt, and Valerie Wilson. 2018. *50 Years After the Kerner Commission: African Americans Are Better Off in Many Ways but Are Still Disadvantaged by Racial Inequality*. Economic Policy Institute, February 2018.

Kuhn, Moritz, Mortiz Schularick, and Ulrike I. Steins. 2019. *Income and Wealth Inequality in America*. Centre of Economic Policy Research, December 2019.

Lewis, Nathan. 2018. *Mass Incarceration: New Jim Crow, Class War, or Both?* People's Policy Project, January 2018.

National Fair Housing Alliance. 2021. "Fair Housing Act" (web page). Last updated July 16, 2021.

Nellis, Ashley. 2021. *The Color of Justice: Racial and Ethnic Disparity in State Prisons*. The Sentencing Project, October 2021.

Rothstein, Richard. 2017. *The Color of Law: A Forgotten History of How Our Government Segregated America*. New York: Liveright.

Solomon, Danyelle, Conor Maxwell, and Abril Castro. 2019. *Systematic Inequality and Economic Opportunity*. Center for American Progress. August 2019.

Taifa, Nkechi. 2021. "Race, Mass Incarceration, and the Disastrous War on Drugs." Brennan Center for Justice, May 10, 2021.

The Sentencing Project. 2021. "Criminal Justice Facts" (web page). Last updated June 3, 2021.

U.S. Census Bureau, Current Population Survey/Housing Vacancy Survey. Various years. Public data series accessed through the Housing Vacancies and Homeownership (CPS/HVS) data tables. Accessed January-February 2022.

Wilson, Valerie, Ethan Miller, and Melat Kassa. 2021. "Racial Representation in Professional Occupations: By the Numbers." Economic Policy Institute, June 2021.

Wilson, Valerie, and Melat Kassa. 2020. "Black Women Workers Are Essential During the Crisis and for the Recovery but Still Are Greatly Underpaid." *Working Economics Blog* (Economic Policy Institute), August 12, 2020.