# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

SID MILLER et al., on behalf of themselves
and others similarly situated,
            *Plaintiffs,*

v.                                                      Civil Action No. 4:21-cv-00595-O

TOM VILSACK, in his official capacity as
Secretary of Agriculture,
            *Defendant*

            and

FEDERATION OF SOUTHERN
COOPERATIVES/LAND ASSISTANCE
FUND; NATIONAL BLACK FARMERS
ASSOCIATION (NBFA); ASSOCIATION OF
AMERICAN INDIAN FARMERS (AAIF),
            *Intervenor-Defendants.*

---

## BRIEF IN SUPPORT OF
## DEFENDANT FEDERATION OF SOUTHERN COOPERATIVES/LAND
## ASSISTANCE FUND'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND AND UNDISPUTED FACTS .............................................................. 2

    I.    Historical and Ongoing Discrimination Against Socially Disadvantaged Farmers and Ranchers ............................................................................................................... 2

    II.    Section 1005 of the American Rescue Plan Act ........................................................ 5

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT AND AUTHORITIES ................................................................................ 9

    I.    Plaintiffs lack Article III standing ............................................................................. 9

        A.    Plaintiffs lack standing to challenge the constitutionality of Section 1005. ... 10

        B.    Plaintiffs lack standing to challenge the USDA's interpretation of Section 1005 ................................................................................................................... 11

            1.    Plaintiffs lacked standing at the relevant time. ................................... 12

            2.    Plaintiffs cannot show that they are, or imminently will be, injured by any USDA action. .............................................................................. 13

        C.    Plaintiffs lack standing to seek the broad injunctive relief they request ......... 14

    II.    Plaintiffs have not exhausted their administrative remedies ...................................... 15

    III.    Section 1005 is not unconstitutional. ....................................................................... 17

        A.    Section 1005 survives under rational-basis review, which is the proper standard to apply. .............................................................................................. 18

        B.    Even if strict scrutiny applies, Section 1005 satisfies it ................................... 20

            1.    Section 1005 advances a compelling government interest. ................. 21

            2.    Section 1005 is narrowly tailored. ....................................................... 29

    IV.    To the Extent the Court Finds that the NOFA Constitutes an Impermissible Racial Classification, the Court Should Not Enjoin Section 1005 ......................................... 37

CONCLUSION ................................................................................................................. 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Peña,*
515 U.S. 200 (1995).................................................................................20, 36, 37

*Adarand Constructors, Inc. v. Slater,*
228 F.3d 1147 (10th Cir. 2000) ....................................................................31

*Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, LLC,*
620 F.3d 558 (5th Cir. 2010) ........................................................................8

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................................9

*Broadfield v. Garland,*
2022 U.S. Dist. LEXIS 92938, 2022 WL 1651460 (N.D. Tex. 2022)....................16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)......................................................................................9

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985)......................................................................................19

*Dean v. City of Shreveport,*
438 F.3d 448 (5th Cir. 2006) .......................................................... *passim*

*Dynalantic Corp. v. U.S. Dep't of Defense,*
885 F. Supp. 2d 237 (D.D.C. 2012).............................................................27, 31

*Fisher v. Univ. of Tex. at Austin,*
570 U.S. 297 (2013)......................................................................................30

*FM Props. Operating Co. v. City of Austin,*
93 F.3d 167 (5th Cir. 1996) ..........................................................................19

*Geduldig v. Aiello,*
417 U.S. 484 (1974)......................................................................................20

*Grutter v. Bollinger,*
539 US 306 (2003)........................................................................................20

*Hockerson-Halberstadt,Inc. v. New Balance Ath. Shoe Inc.,*
No. 08-4131, 2009 U.S. Dist. LEXIS 141599, 2009 WL 10679734 (E.D. La.
2009) ..............................................................................................................12

*Lalla v. City of New Orleans*,
　　1999 WL 138900 (E.D. La. Mar. 12, 1999) ................................................................27

*Lamie v. U.S. Trustee*,
　　540 U.S. 526 (2004)................................................................................................11

*Local 28 of Sheet Metal Workers' Intern. Ass'n v. EEOC*,
　　478 U.S. 421 (1986) (plurality opinion) ...........................................................21, 26

*Lujan v. Defs. of Wildlife*,
　　504 U.S. 555 (1992)...........................................................................................10, 15

*McCarthy v. Madigan*,
　　503 U.S. 140 (1992)................................................................................................15

*Parisi v. Davidson*,
　　405 U.S. 34 (1972)..................................................................................................16

*Pollack v. U.S. Dep't of Justice*,
　　577 F.3d 736 (7th Cir. 2009) ..................................................................................13

*Romer v. Evans*,
　　517 U.S. 620 (1996)................................................................................................18

*Rutherford v. City of Cleveland*,
　　179 Fed. Appx. 366 (6th Cir. 2006)........................................................................31

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
　　402 F.3d 1198 (Fed. Cir. 2005)...............................................................................13

*Shaw v. Hunt*,
　　517 U.S. 899 (1996)................................................................................................20

*Sheetmetal Workers' Int'l Ass'n*, 478 U.S. 421, 445 (1986)........................................26

*Spokeo, Inc. v. Robins*,
　　578 U.S. 330 (2016)................................................................................9, 10, 11, 14

*Tecat v. Gonzales*,
　　188 F. App'x 308 (5th Cir. 2006) ...........................................................................19

*TransUnion LLC v. Ramirez*,
　　141 S. Ct. 2190 (2021)...................................................................................9, 10, 15

*Turner Broad. Sys., Inc. v. F.C.C.*,
　　520 U.S. 180 (1997)...........................................................................................30, 31

*United States v. Paradise*,
　　480 U.S. 149 (1987)....................................................................................... *passim*

*W.H. Scott Const. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999) .....................................21

*W. States Paving Co. v. Wash. State Dep't of Transp.*,
    407 F.3d 983 (9th Cir. 2005) ..........................................................................18, 37

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*,
    945 F.3d 206 (2019)........................................................................................18

*Walker v. City of Mesquite*,
    169 F. 3d 973 (5th Cir. 1999) .........................................................................30

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015)........................................................................................20

*Woodford v. Ngo*,
    548 US 81 (2006)...........................................................................................16

*Wygant. v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986).......................................................................................35

*Wynn v. Vilsack*,
    545 F. Supp. 3d 1271 (M.D. Fla. 2021)...........................................................27

**Statutes**

7 U.S.C 2279(a) ...........................................................................................7, 10, 12, 13

Am. Rescue Plan Act of 2021, Pub. L. No. 117-2, § 1005(a)(2), 135 Stat. 4....................... *passim*

Pub. L. No. 117-2, § 1005(a)(2)......................................................................................10, 32

**Other Authorities**

167 Cong. Rec. H762 (daily ed. Feb. 26, 2021),
    https://www.govinfo.gov/content/pkg/CREC-2021-02-26/pdf/CREC-2021-02-
    26-pt1-PgH762-3.pdf (last visited July 5, 2022) ......................................6, 24, 30, 33

167 Cong. Rec. S1219 (daily ed. March 5, 2021),
    https://www.congress.gov/117/crec/2021/03/05/167/42/CREC-2021-03-05-
    pt1-PgS1219-2.pdf (last visited July 5, 2022) ......................................6, 33, 34, 36

86 Fed. Reg. 28,329, (May 26, 2021) ................................................................... *passim*

David E. Bernstein, The Modern American Law of Race, 94 S. Cal. L. Rev. 171,
    180–81 (2021)..............................................................................................14

Environmental Working Group, Timeline: Black Farmers and the USDA, 1920 to
    Present, https://www.ewg.org/research/timeline-black-farmers-and-usda-
    1920-present/ (last accessed July 5, 2022).........................................................3, 22

Fed. R. Civ. P. 56(a) .................................................................................................9

*Garcia v. Vilsack: A Policy and Legal Analysis of a USDA Discrimination Case*,
    3-4 (2013), *available at* http://nationalaglawcenter.org/wp-
    content/uploads/assets/crs/R40988.pdf..............................................................2, 22

H.R. Rep. No. 117-7 (2021), https://www.congress.gov/117/crpt/hrpt7/CRPT-
    117hrpt7.pdf...............................................................................................5, 6, 7, 30

*Improved Race and Ethnicity Measures Reveal U.S. Population is Much More
    Multiracial*, U.S. Census Bureau (Aug. 12, 2021),
    https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-
    measures-reveal-united-states-population-much-more-multiracial.html................14

Jonathan Coppess, The History and Development of USDA Farm Loan Programs,
    Part 3: 1946 to 1961, Mar. 25, 2021,
    https://farmdocdaily.illinois.edu/2021/03/the-history-and-development-of-
    usda-farm-loanprograms-part-3-1946-to-1961.html............................................2, 3

Notice of Funds Availability on May 26 ...................................................................12

Order on PI & Class Cert, ECF No. 60.......................................................................8

U.S. Dep't Agriculture, American Rescue Plan Debt Payments,
    https://www.farmers.gov/loans/american-rescue-plan#e-loan (last accessed
    July 18, 2022)....................................................................................................16

U.S. Dept. of Agriculture, *Debt Payment Timeline*,
    https://www.farmers.gov/loans/american-rescue-plan#e-loan ..............................32

USDA, Civil Rights Action Team, Civil Rights at the United States Department
    of Agriculture (1997), *available at*
    https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-
    crat-report.pdf?_ga=2.237323136.16040426.1658120354-
    281206423.1658120354.......................................................................................3, 4

USDA, Independent Assessment of the Delivery of Technical and Financial
    Assistance, xxv, 66, Mar. 31, 2011,
    https://www.coalition4change.org/USDA%20jackson.pdf ......................................5

USDA, Agency History, https://www.fsa.usda.gov/about-fsa/history-
    andmission/agency-history/index (last accessed July 5, 2022).................................2

# INTRODUCTION

In the wake of the COVID-19 pandemic, Congress passed the American Rescue Plan Act ("ARPA")—a comprehensive economic relief bill focused particularly on assisting the most vulnerable communities across the United States. Among the most vulnerable communities, Congress found, are socially disadvantaged farmers and ranchers who, due in whole or in large part to discrimination by the U.S. Department of Agriculture ("USDA") itself, are at a disproportionately higher risk of foreclosure and financial ruin. Congress enacted Section 1005 of ARPA to combat this risk and remedy the disastrous effects of past, continuing, and present discrimination by providing debt relief to "socially disadvantaged" farmers and ranchers, which the statute specifically defines as those who belong to "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."

The race-neutral statute is now being challenged by plaintiffs who elected to make no attempt to show why they are entitled to benefits under the statute, even though the USDA has provided a number of administrative options for them to do so. Plaintiffs also challenge the USDA's administration of the debt relief program, which undoubtedly employs race-conscious classifications—but only to the extent necessary to further the government's compelling interest remedying the effects of the USDA's own racial discrimination, which is well documented and undisputed. Plaintiffs lack standing to bring their claim, have failed to exhaust administrative remedies, and have failed to show that either the statute itself or USDA's implementation of the statute is unconstitutional. There are no material facts in dispute. The Court should enter judgment in favor of the Secretary and intervening parties on the sole claim asserted in the Third Amended Complaint.

## BACKGROUND AND UNDISPUTED FACTS

I.      **Historical and Ongoing Discrimination Against Socially Disadvantaged Farmers and Ranchers**

Over the past century and continuing to the present day, USDA lending programs have blatantly and systematically discriminated against members of various racial, ethnic, and socioeconomic groups—including Black farmers and ranchers who are members of Intervenor-Defendant Federation of Southern Cooperatives/Land Assistance Fund (the "Federation"). This discrimination has never ceased.

The Farm Service Agency ("FSA"), a part of USDA, was created in 1933 to address the fall of crop prices after the Great Depression and provide loans to family-sized farms that were unable to obtain credit from commercial banks or other lenders. *History of USDA's Farm Service Agency*. USDA, Agency History, https://www.fsa.usda.gov/about-fsa/history-andmission/agency-history/index (last accessed July 5, 2022); *Garcia v. Vilsack: A Policy and Legal Analysis of a USDA Discrimination Case*, 3-4 (2013), *available at* http://nationalaglawcenter.org/wp-content/uploads/assets/crs/R40988.pdf.

Between 1937 and 1961, four congressionally mandated changes to USDA loan programs had a disproportionately adverse and devastating impact on Black farmers. *See* Jonathan Coppess, The History and Development of USDA Farm Loan Programs, Part 3: 1946 to 1961, Mar. 25, 2021, https://farmdocdaily.illinois.edu/2021/03/the-history-and-development-of-usda-farm-loanprograms-part-3-1946-to-1961.html. The Acts of 1937, 1946, 1956, and 1961 revised eligibility for USDA loans from farm tenants, laborers, and sharecroppers to family-farm owner-operators with a farm background and either farming training or experience who were unable to get credit elsewhere. *Id*. The revisions made it easier for FSA county committees—which exercise "vast discretion," are "ab[le] to impact the loan making decision," and consist almost entirely of

White men—to deny loans to farmers, sharecroppers, and laborers in Black, Indigenous, and people of color ("BIPOC") communities. *Id.*; *see also* the Federation's Appendix in Support of Its Motion for Summary Judgment ("App.") at 207, 211 (Gooding Decl. ¶¶ 13, 36); 189–90 (Eaton Decl. ¶ 15–16); ECF No. 93-2, at 9 (Blanding Decl. ¶ 9). As a result, the number of Black farmers in the United States decreased by a staggering 90.6% between 1920 and 1969. *See* Coppess, *supra* (citing census data that showed 925,708 Black farm operators in 1920, versus 88,393 in 1969).

Since 1965, the federal government has confirmed USDA's pattern of discrimination against Black farmers in the distribution of loans and conservation payments. *See* Environmental Working Group, Timeline: Black Farmers and the USDA, 1920 to Present, https://www.ewg.org/research/timeline-black-farmers-and-usda-1920-present/ (last accessed July 5, 2022). In 1997, the USDA created the Civil Rights Action Team ("CRAT"). USDA, Civil Rights Action Team, Civil Rights at the United States Department of Agriculture (1997), *available at* https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-crat-report.pdf?_ga=2.237323136.16040426.1658120354-281206423.1658120354. In a report issued that year, CRAT found that Black farmers were still experiencing the same discrimination documented in reports dating back to 1965. *Id.* at 2, 14. The report found:

> The minority or limited-resource farmer tries to apply for a farm operating loan through the FSA county office well in advance of planting season. The FSA County office might claim to have no applications available and ask the farmer to return later. Upon returning, the farmer might receive an application without any assistance in completing it, then be asked repeatedly to correct mistakes or complete oversights in the loan application. Often those requests for correcting the application could be stretched for months . . . By the time processing is completed, even when the loan is approved, planting season has already passed and . . . the farmer's profit is then reduced. If the farmer's promised FSA loan finally does arrive, it may have been arbitrarily reduced . . . . [I]n some cases, the FSA loan never arrives . . . .

*Id.* at 15–16.

In 1999, the U.S. District Court for the District of Columbia approved a settlement agreement and consent decree in *Pigford v. Glickman*, a class-action discrimination suit brought by Black farmers against USDA. 185 F.R.D. 82 (Dist. D.C. 1999). The plaintiffs there alleged that the agency had discriminated against Black farmers on the basis of race and failed to investigate or properly respond to complaints of such discrimination from 1983 to 1997. Under the terms of the consent decree, the USDA was "obligated to pay billions of dollars to African American farmers who have suffered discrimination." *Id.* at 111. But, as the court noted in an unfortunately prescient observation, the settlement agreement and consent decree did not "guarantee class members that they will never experience discrimination at the hands of the USDA again." *Id.*

In the twenty-three years since the *Pigford* decision, Black and other socially disadvantaged farmers across the country have continued to experience discriminatory conduct at the hands of the USDA and FSA, including lack of outreach, lack of assistance, mistreatment, misinformation, lack of communication, arbitrary denials, unreasonable requests, delays in application processing, delays in application approval, and delays in loan disbursements. *See id.;* App. at 29–35 (Petty Report at 29–35); *see also, e.g.*, App. at 163–68 (Bernal Decl. ¶¶ 7–12, 24–33, 39–43), 189–94 (Eaton Decl. ¶ 9–49), 208–11 (Gooding Decl. ¶ 16–26); *and* ECF No. 93-2, at 003 (Batten Decl. ¶¶ 9–12), 013–15 (Cannon Decl. ¶¶ 4–13), 019 (Hall Decl. ¶¶ 6–9), 023-24 (Smith Decl. ¶¶ 7–8), 027 (Wilson Decl. ¶¶ 22–25).[1]  Although USDA has made some limited efforts toward improving its discriminatory track record, it has yet to make the necessary changes

---

[1]   These Declarations represent only a small subset of Black farmers across the United States who continue to face current discrimination, while suffering from the effects of historical discrimination. These are not isolated incidents—they are part of a nation-wide pattern of discrimination. *See* App. at 177–78 (Blanding Decl. ¶¶ 20–23).

to root out racial discrimination and has yet to commit its employees to an effective and efficient process for investigating and resolving complaints of discrimination. App. at 5 (Petty Report at 5).

Past USDA reforms have largely failed because the decentralized structure makes large-scale intra-agency reforms nearly impossible. Changes in the USDA's methods of investigating and resolving civil rights complaints have been insufficient to remedy past discrimination because, as of 2011, "most FSA employees [believe] that inequitable treatment of [famers] and [potential farmers] is, at worst, a series of isolated and independent incidents," despite significant data to the contrary. USDA, Independent Assessment of the Delivery of Technical and Financial Assistance, xxv, 66, Mar. 31, 2011, https://www.coalition4change.org/USDA%20jackson.pdf.[2]

As a result of the USDA's inability to remedy its own discriminatory practices, Black farmers are grossly and disproportionately burdened by substantial debt and the risk of losing their farms. Today, Black farmers account for 1.3% of U.S. farms—down from a peak of 14% in 1920. App. at 2 (Petty Report at 2). Racial discrimination in USDA/FSA lending programs is a key culprit for this steep drop in the percentage of U.S. farms owned by Black farmers, and decline in Black-operated farms has substantially outpaced the decline in White-operated farms. *Id.*

## II.     Section 1005 of the American Rescue Plan Act

Congress enacted the American Rescue Plan Act (ARPA) as a means of combatting the disastrous effects that the COVID-19 pandemic has inflicted on American families and businesses. *See* H.R. Rep. No. 117-7, at 2 (2021), https://www.congress.gov/117/crpt/hrpt7/CRPT-117hrpt7.pdf. In doing so, Congress found that the country's "most vulnerable communities" have

---

[2]     In 2011, the firm Jackson Lewis LLP was commissioned by Secretary Vilsack to assess the "effectiveness" of USDA agencies "in reaching America's diverse population in a nondiscriminatory manner." Jackson Lewis Rep. i. After a thorough 18-month investigation and analysis, Jackson Lewis issued a 569-page report setting forth its findings and 234 recommendations.

been "forced to bear the brunt of" the pandemic and resultant economic crisis "as underlying health and economic inequities grow worse." *Id.* One of those vulnerable communities, Congress found, is "Black farmers and other agricultural producers belonging to racial or ethnic minority groups" that "have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups." *Id.* at 12.

During its deliberations, Congress considered evidence of historical and ongoing discrimination against socially disadvantaged farmers and ranchers by USDA officials. *See* 167 Cong. Rec. H762, H765–66 (daily ed. Feb. 26, 2021), https://www.govinfo.gov/content/pkg/CREC-2021-02-26/pdf/CREC-2021-02-26-pt1-PgH762-3.pdf (last visited July 5, 2022) (discussing evidence); 167 Cong. Rec. S1219, S1262–67 (daily ed. March 5, 2021), https://www.congress.gov/117/crec/2021/03/05/167/42/CREC-2021-03-05-pt1-PgS1219-2.pdf (last visited July 5, 2022) (same). The evidence illustrated how the USDA has systematically prevented farmers of color from participating in farm-loan and other financial-benefits programs, and how this discrimination has contributed to a sustained and substantial decrease in farmland owned by farmers of color over time. *See, e.g.*, *id.* at S1262–67. In addition to evidence of historical discrimination, Congress also considered post-*Pigford* reports showing that, as recent as 2019, farmers of color continued to face discrimination from the USDA and difficulty in obtaining farms loans and other financial benefits. *Id.* at S1265–66. Various reports showed Congress that non-White farmers struggle to obtain credit and are at a significant financial disadvantage relative to White farmers. *Id.* Congress also considered current statistics showing that a disproportionately high number of farmers of color are in default and on the brink of losing their farms, as well as other ill effects of the USDA's discrimination, including lack of trust in the

USDA in Black and other communities of color and the compounding discrepancies in resource allocation between White and non-White farmers. *Id.* at 1262–67.[3]

Congress considered the significant inadequacies of *Pigford* and other remedial efforts, ultimately concluding that past remedial measures had "fallen short" and that assistance was necessary to prevent a "wave of foreclosures." *Id.* at S1262–66. In particular, it found that "[a]s important as Congress's actions have been, the remedies are still not enough as ***there is still ongoing and pervasive discrimination*** leaving socially disadvantaged farmers significantly behind." *Id.* (emphasis added). In short, Congress determined that "[d]espite multiple congressional efforts to address this discrimination, these efforts, taken mostly on a case-by-case basis, have still not remedied the discrimination." *Id.* Remedial efforts were urgently needed, it concluded, because the economic crisis caused by the COVID-19 pandemic disproportionately affected BIPOC communities and threatened to push many more socially disadvantaged farmers and ranchers out of business. *Id.*

After reviewing the evidence, Congress enacted Section 1005 of the ARPA, which authorizes the Secretary of the USDA to "provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021." Am. Rescue Plan Act of 2021, Pub. L. No. 117-2, § 1005(a)(2), 135 Stat. 4. The statute adopts the definition of "socially disadvantaged farmer or rancher" ("SDFR") set forth in 7 U.S.C 2279(a), which defines an SDFR as a farmer or rancher who belongs to a "socially disadvantaged group," i.e., "a group whose members have been subjected to racial or ethnic prejudice because of

---

[3]The Secretary's expert, Dr. Alicia Robb, testified that she was unaware of efforts by the USDA to investigate or remediate various complaints of discrimination, documented reports of distrust of USDA lending programs among socially disadvantaged communities, and other indicia of discrimination by the USDA. *See* App. at 120–21, 125 (Robb Dep. Tr. at 82:5–86:17, 103:13–104:9).

their identity as members of a group without regard to their individual qualities." USDA interprets the term "SDFR" as "includ[ing], but . . . not limited to: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos." Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan Payment (ARPA), 86 Fed. Reg. 28,329, 28,330 (May 26, 2021) ("NOFA"). Consistent with this non-exclusive enumeration, the USDA has declared that it will, upon written request, "determine on a case-by-case basis whether additional groups qualify" as "socially disadvantaged groups." *Id.*

The benefits offered by Section 1005 serve as a crucial lifeline for farmers whose debts threaten the survival of their farms. Without the promised loan forgiveness, many farmers will lose their farms to foreclosure and bankruptcy. After learning that they were eligible for assistance through Section 1005, many farmers made significant investment plans and purchases in reliance on the debt relief that they were told they could expect. They will face severe, life-changing disadvantage—if not outright ruin—if the relief does not come through. *See, e.g.*, ECF No. 93-2, at 004 (Batten Decl. ¶ 19), 014–16 (Cannon Decl. ¶¶ 15–18), 020 (Hall Decl. ¶¶ 13–19), 023–24 (Smith Decl. ¶¶ 5–9); 028 (Wilson Decl. ¶¶ 33–35).

Plaintiffs challenge the constitutionality of Section 1005 and seek an injunction prohibiting USDA from "implementing any racial exclusions or discriminatory racial preferences" under Section 1005. 3d Am. Compl. ¶¶ 20–23, 32, ECF No. 135. On July 1, 2021, upon a record lacking any evidence of ongoing discrimination, this Court entered a preliminary injunction prohibiting USDA from disbursing any Section 1005 funds. Order on PI & Class Cert, ECF No. 60.

## LEGAL STANDARD

"Where, as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Am. Int'l Specialty*

*Lines Ins. Co. v. Rentech Steel, LLC*, 620 F.3d 558, 562 (5th Cir. 2010). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

ARGUMENT AND AUTHORITIES

## I.   Plaintiffs lack Article III standing.

As a threshold issue, Plaintiffs' claims should be dismissed because Plaintiffs have not carried their burden of establishing that they have standing to assert their claims. Article III "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'  For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case— in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citations omitted). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures . . . that federal courts exercise 'their proper function in a limited and separated government.'" *Id.* (citations omitted). "Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches." *Id.*

The Supreme Court has established that the "irreducible constitutional minimum of standing" requires a plaintiff to have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To establish injury in fact, plaintiffs must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural

9

or hypothetical." *Id.* at 339. For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* To be concrete, an injury "must actually exist"; it must be "'real,' and not 'abstract.'" *Id.* at 340 (citation omitted). In short, "[t]o demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *TransUnion*, 141 S. Ct. at 2203 (citing A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of demonstrating that they have standing. *TransUnion*, 141 S. Ct. at 2207. Standing "is not dispensed in gross"; rather, Plaintiffs must demonstrate standing for each claim they assert and for each form of relief that they seek. *Id.* at 2208. Plaintiffs must demonstrate standing "with the manner and degree of evidence required" at each successive stage of litigation. *Id.* At the summary judgment stage, a plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to actually prove standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have failed to do so here.

A.   <u>Plaintiffs lack standing to challenge the constitutionality of Section 1005.</u>

Plaintiffs lack standing to challenge the constitutionality of Section 1005 because they cannot demonstrate an injury in fact. Section 1005 authorizes the FSA to pay up to 120 percent of "the outstanding indebtedness of each socially disadvantaged farmer and rancher." Pub. L. No. 117-2, § 1005(a)(2). As noted above, a "socially disadvantaged farmer or rancher" is defined as a farmer or rancher who is a member of a socially disadvantaged group, i.e., "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6). Neither Section 1005 nor Section 2279, which it incorporates by reference, refers to ***any*** particular racial or ethnic group and neither limits eligibility for debt relief to non-White farmers and ranchers.

10

Plaintiffs, who self-identify as "white" (3d Am. Compl. ¶¶ 4–7, 13–17, 20–23), have asserted that they are "farmers and ranchers who held qualifying FSA loans on January 1, 2021." Pls.' Br. At 6, ECF No. 170; *see also* 3d Am. Compl. ¶¶ 13–17.[4] Plaintiffs claim that they are "exclude[d] from the benefits" of Section 1005 "on account of their race." 3d Am. Compl. ¶ 18.

But Plaintiffs have not shown (or attempted to show) that they are ineligible for debt relief under the terms of the statute, which is indisputably race-neutral on its face.[5] Plaintiffs offer no evidence that the statutory definition of "socially disadvantaged farmer or rancher" necessarily excludes them simply because they are White.

Given the absence of any evidence that Plaintiffs are necessarily excluded from the race-neutral statutory definition of a "socially disadvantaged farmer or rancher," Plaintiffs have failed to demonstrate that Section 1005 has injured or is likely to injure them "in a personal and individual way," as is required for an injury to be particularized. *Spokeo*, 578 U.S. at 338–39. Lacking any evidence that they have been denied or are likely to be denied debt relief as a result of the statutory definition of a "socially disadvantaged farmer or rancher," Plaintiffs also have failed to demonstrate that they have been or likely will be actually injured by Section 1005, as is required for an injury to be concrete. *Id.* at 340. Because Plaintiffs have not shown—and cannot show—that Section 1005 has caused or will cause them to suffer a particularized, concrete injury, their challenge to Section 1005 must be dismissed for lack of standing.

B.    <u>Plaintiffs lack standing to challenge the USDA's interpretation of Section 1005.</u>

---

[4]    Notably, the operative complaint does not allege that lead plaintiff Sid Miller has a qualifying FSA loan. *See generally* ECF No. 135. Mr. Miller lacks standing for that reason alone.

[5]    It is axiomatic that "when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms," at least when, as here, the result "is not absurd." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

Given that Section 1005 is race-neutral on its face, Plaintiffs' complaint must be directed not at the statute itself but at its "interpret[ation] and implement[ation] by the Department of Agriculture." 3d Am. Compl. ¶ 18. Plaintiffs, however, lack standing to challenge the interpretation set forth in USDA's Notice of Funds Availability.

### 1.   *Plaintiffs lacked standing at the relevant time.*

"[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed.*" *Davis*, 554 U.S. at 734 (emphasis added). Plaintiffs did not have standing to challenge the agency's interpretation at that point.

Plaintiffs initiated this action on April 26, one month *before* the USDA published its Notice of Funds Availability on May 26. *Compare* Original Compl., ECF 1 (filed Apr. 26, 2021), *with* NOFA, 86 Fed. Reg. 28,329 (May 26, 2021). When Plaintiffs filed suit, the only definition of "socially disadvantaged farmer or rancher" for purposes of Section 1005 was the race-neutral definition set forth at 7 U.S.C. § 2279(a)(6).[6] Thus, at the moment crucial to the question of standing, Plaintiffs could not have suffered an injury traceable to USDA's interpretation of the term, which had yet to be announced. Therefore, when Plaintiffs filed suit, they did not have standing to challenge USDA's as-of-then non-existent regulatory definition.

That Plaintiffs subsequently filed amended complaints that reference the agency's later-adopted interpretation does not cure this fatal defect. "[T]he Fifth Circuit has held that if a plaintiff does not have initial standing, he/she similarly does not have standing to amend the complaint." *Hockerson-Halberstadt, Inc. v. New Balance Ath. Shoe Inc.*, No. 08-4131, 2009 U.S. Dist. LEXIS 141599, at *4 n.4, 2009 WL 10679734, at *2 n.4 (E.D. La. 2009) (citing *Fed. Recovery Servs.,*

---

[6] The only racial classifications referenced in Plaintiffs' original complaint are from a USDA webpage related to a "Farming Opportunities Training and Outreach Grant Program." Original Compl. ¶ 8, ECF No. 1. As of the date of this filing, that webpage is no longer available at the link in Plaintiffs' complaint.

*Inc. v. U.S.A.*, 72 F.3d 447, 452–53 (5th Cir. 1996)); *see also Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 742 n.2 (7th Cir. 2009) ("[A] plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards."). Because Plaintiffs lacked standing when they filed suit and standing "is assessed at the time of the original complaint, even if the complaint is later amended," *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005), Plaintiffs' challenge to USDA's definition of "socially disadvantaged farmer or rancher" must be dismissed for lack of standing.

> 2. *Plaintiffs cannot show that they are, or imminently will be, injured by any USDA action.*

Indeed, because they have not—and cannot—show any injury traceable to it, Plaintiffs would not have standing even if the agency's definition of "socially disadvantaged farmer or rancher" had been in effect when they filed their original complaint.

Under USDA's interpretation, "members of socially disadvantaged groups ***include, but are not limited to***" various enumerated racial and ethnic groups. NOFA, 86 Fed. Reg. 28,329, 28,330 (emphasis added). Underscoring the open-ended nature of the agency's interpretation, the Notice of Funds Availability expressly declares that USDA "will determine on a case-by-case basis whether additional groups qualify under this definition in response to a written request with supporting explanation." *Id.* Plaintiffs present no evidence of having requested that USDA expand the administratively enumerated list of "socially disadvantaged groups." Nor do they present any evidence that USDA would deny such a request had one been made. Apparently in recognition of this fact, Plaintiffs did not seek any discovery as to USDA practices in this regard.  Thus, although Plaintiffs claim to represent "[a]ll farmers and ranchers in the United States who are currently excluded from the definition of 'socially disadvantaged farmer or rancher,' as defined in 7 U.S.C. § 2279(a)(5)–(6) and as interpreted by the Department of Agriculture" (July 1, 2021 Order (ECF

60), at 6), they have not shown that they or anyone else are necessarily excluded from USDA's "definition of 'socially disadvantaged farmer or rancher.'" July 1, 2021 Order on Class Certification, at 6 (quoting 7 U.S.C. § § 2279(a)(5)–(6)).[7]

Lacking any evidence that they have been or will be denied debt relief "on account of their race" under USDA's non-exclusive interpretation of "socially disadvantaged farmer or rancher," Plaintiffs cannot show that they have or ever will suffer particularized, concrete harm. Plaintiffs therefore lack standing to challenge USDA's interpretation. *See Spokeo*, 578 U.S. at 338.

C.    Plaintiffs lack standing to seek the broad injunctive relief they request.

Regardless, Plaintiffs have not demonstrated standing to obtain the relief they seek. In their operative complaint, Plaintiffs seek a permanent injunction barring Secretary Vilsack and his successors "from implementing any racial exclusions or discriminatory racial preferences in the Department's programs." 3d Am. Compl. at 6, ECF. No. 135. To seek forward-looking injunctive

---

[7]Even ignoring USDA's open-ended interpretation of "socially disadvantaged farmer or rancher," Plaintiffs have offered no evidence that, but for their race, they would be entitled to debt relief as "socially disadvantaged" farmers. USDA already recognizes Blacks and Hispanics as socially disadvantaged. NOFA, 86 Fed. Reg. at 28,330. Plaintiff Miller states that he "has approximately 2% black ancestry." 3d Am. Compl. ¶ 13 (ECF 135). While that might not qualify him as Black within USDA's understanding, he has presented no evidence to that effect. More fundamentally, Plaintiffs have presented—and can present—no evidence that Whites are categorically excluded from USDA's understanding of "Hispanic." Plaintiffs ignore the fact that "[m]embers of the disparate groups that fall into the 'Hispanic' or 'Latino' category often self-identify as white." David E. Bernstein, The Modern American Law of Race, 94 S. Cal. L. Rev. 171, 180–81 (2021). In the 2020 census, 12.6 million individuals of Hispanic or Latino origin identified themselves as "White alone." *Improved Race and Ethnicity Measures Reveal U.S. Population is Much More Multiracial*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html. Similarly, a 2021 Pew Research Center study reports that "more than half of Hispanics" surveyed—"58%"—"identified their race as White." Pew Research Center, Majority of Latinos Say Skin Color Impacts Opportunity American and Shapes Daily Life, at 41 (Nov. 4, 2021). Given these undisputed—and indisputable—facts, Plaintiffs cannot show that they are categorically ineligible, "on account of their race," for debt relief under Section 1005 "as currently interpreted and implemented by the Department of Agriculture." *Id*.

relief to prevent future harm, Plaintiffs must demonstrate that the risk of harm is "sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210; *see also Lujan*, 504 U.S. at 564 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.") (internal quotation omitted).

Plaintiffs' requested relief purports to encompass all of USDA's programming. Yet there is no evidence in the record regarding matters outside of Section 1005. Plaintiffs present no evidence that Congress or the USDA will institute future debt relief that would categorically exclude White farmers and ranchers. Absent such evidence, Plaintiffs have not shown an imminent and substantial risk of future harm from such hypothetical programs and thus have not established standing to obtain the broad injunction they seek against unspecified "racial exclusions or discriminatory racial preferences in the Department's programs." *See* 3d Am. Compl. ¶ 23, ECF 136.

## II.   Plaintiffs have not exhausted their administrative remedies.

Plaintiffs' lack of Article III standing aside, the Court must dismiss Plaintiffs' complaint because they failed to exhaust their administrative remedies prior to filing suit, or at any time since filing. The Supreme Court "long has acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts." *McCarthy v. Madigan,* 503 U.S. 140, 144–45 (1992) ("The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decision-making."). "Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Id.* at 145.

Exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," and it discourages "disregard of [the

15

agency's] procedures." *Woodford v. Ngo*, 548 US 81, 89 (2006); *see also Parisi v. Davidson,* 405 U.S. 34, 37 (1972) ("The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."). Exhaustion also "promotes judicial efficiency and conserves scarce judicial resources, allows the agency time to develop the necessary factual background and apply its specific expertise, and discourages the deliberate flouting of the administrative process." *Broadfield v. Garland*, 2022 U.S. Dist. LEXIS 92938, at *6-7, 2022 WL 1651460 at *6-7 (N.D. Tex. 2022) (citing *McKart v. United States*, 395 U.S. 185, 193-95 (1969)).

As explained above, the Notice of Funds Availability states that the "socially disadvantaged groups" entitled to debt relief include but are "not limited" to certain enumerated racial and ethnic groups and expressly states that additional groups will be considered upon "written request." NOFA, 86 Fed. Reg. at 28,330. And as also explained above, Plaintiffs filed this lawsuit challenging Section 1005 (which does not enumerate any racial or ethnic categories) *before* the Notice was even issued and before any person, including Plaintiffs, would have learned whether the USDA had determined that he or she was eligible for loan forgiveness. A USDA website with information about the program explains that eligible borrowers would receive a letter explaining the loan-relief offer and that "[i]f an eligible Direct Loan borrower has not received a letter" he or she should "contact your local FSA service center." U.S. Dep't Agriculture, American Rescue Plan Debt Payments, https://www.farmers.gov/loans/american-rescue-plan#e-loan (last accessed July 18, 2022). And, under the heading "USDA Non-Discrimination Policy," the Notice of Funds Availability provides a process for submitting program discrimination complaints. There

is no allegation or evidence that any Plaintiff (or class member) availed themselves of any of these administrative options before filing their lawsuit.

Simply put, Plaintiffs jumped the gun. Presumably they assumed they would be excluded from debt relief even though the statutory language does not identify any racial or ethnic categories, and the USDA had not yet applied the statute or explained how it would do so at the time they filed suit. Or perhaps they sought simply to seek to enjoin a statute they disagreed with philosophically. Either way, there is no allegation or evidence anywhere in the record that any Plaintiffs or class members have submitted a written request explaining why they should be considered as a member of a socially disadvantaged group; contacted their local FSA service center to enquire why they did not receive a letter; or file a discrimination complaint directly with the USDA. This lawsuit thus intrudes upon the USDA's sphere of authority without giving the agency the opportunity to consider any errors it may have made in applying the statute, and it wastes judicial resources by litigating the matter even before any Plaintiff had been denied Section 1005 debt relief—let alone taken any of the many actions offered by the USDA to remedy such denial. Thus, even if the Court could determine the Plaintiffs have standing, it should still dismiss the complaint without prejudice to refiling if Plaintiffs later believe it still necessary to sue after exhausting their administrative remedies.

## III.    Section 1005 is not unconstitutional.

Even assuming Plaintiffs had standing, their constitutional attack on Section 1005 still fails as a matter of law. Plaintiffs' challenge to the constitutionality of Section 1005 fails because Section 1005 is facially neutral and survives rational-basis review, and because even if strict scrutiny were applicable, Section 1005 is narrowly tailored to a compelling government interest.

A.     <u>Section 1005 survives under rational-basis review, which is the proper standard to apply.</u>

Section 1005 is subject to rational-basis review because does not discriminate on the basis of race—and it passes constitutional muster under that standard. When subject to rational-basis review, "a legislative classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 225 (2019) (quoting *Glass v. Paxton*, 900 F.3d 233, 244–45 (5th Cir. 2018), in turn quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

Section 1005 is race-neutral on its face. The statutory text does not bar any racial or ethnic group from receiving debt relief, nor does it presume that any particular racial or ethnic groups are entitled to debt relief. In fact, the statutory text does not refer to any racial or ethnic categories at all. *Cf.* Pub. L. No. 117-2, § 1005. Courts recognize that "the term 'socially . . . disadvantaged'"— i.e., the term used in Section 1005—"is race-[]neutral on its face." *See, e.g., W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 988 (9th Cir. 2005). There is, in short, no basis to conclude that Section 1005 as written is anything other than race-neutral.

To the extent that USDA has interpreted the term "socially disadvantaged farmer or rancher" to include a non-exhaustive list of racial and ethnic groups whose members are entitled to debt relief creates any constitutional infirmity—which the Federation vehemently disputes, for the reasons set forth in Part III.B, below—the problem would lie not with the statute but with the USDA's application of it. As such, this Court should rule that Section 1005 is race-neutral and thus subject to rational-basis review.

A statute survives rational basis review where the statutory "classification bear[s] a rational relationship to an independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 633

(1996). Thus, "differential treatment must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Tecat v. Gonzales*, 188 F. App'x 308, 310 (5th Cir. 2006) (quoting *FCC v. Beach Comms.*, 508 U.S. 307, 313 (1993)); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."). Although "Supreme Court jurisprudence '[has] not elaborated on the standards for determining what constitutes a 'legitimate state interest'" when engaged in rational-basis review, it has "'made clear . . . that a broad range of governmental purposes and regulations satisfy these requirements.'" *FM Props. Operating Co. v. City of Austin,* 93 F.3d 167, 175 n.9 (5th Cir. 1996) (quoting *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 834–85 (1987)). Section 1005 serves the federal government's indisputably legitimate interest in providing economic assistance where it is needed most. Direct and guaranteed USDA loans "support the economic stability of farmers and ranchers" by "provid[ing] access to credit for farmers and ranchers who are temporarily unable to obtain financing from a commercial source at reasonable rates and terms." USDA's Br., Ex. A ¶ 11, ECF No. 168-1. Section 1005 furthers those ends by removing obstacles to economic well-being from those who, as the result of USDA discrimination, have faced the greatest hardships, including the denial of credit from commercial institutions. *Id.* ¶ 13. By distinguishing farmers and ranchers who are socially disadvantaged from all other farmers and ranchers, Section 1005 simply recognizes the relationship between social disadvantage and relative economic security and ensures that debt relief flows to those who in the aggregate suffer the greatest insecurity.

Although the program established by Section 1005 may not extend debt relief to all farmers and ranchers with outstanding FSA loans, "[t]here is nothing in the Constitution . . . that requires

the State to subordinate or compromise its legitimate interests solely to create a more comprehensive social insurance program than it already has." *Geduldig v. Aiello*, 417 U.S. 484, 496 (1974). Here, the fit between Section 1005's purpose and the means by which it pursues that end clearly satisfies rational-basis review. *See Washington,* 426 U.S. at 246–48.

B.      Even if strict scrutiny applies, Section 1005 satisfies it.

Even though the debt-relief program created by Section 1005 is race-neutral, as explained above, the Secretary's use of non-exhaustive racial categories to implement it satisfies strict scrutiny because it is narrowly tailored to the compelling government interest in remedying past and present discrimination in USDA and FSA loan practices.

Racial classifications by the government are subject to strict scrutiny. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). Strict scrutiny is a *strict* but not impossible standard, and "not all" racial classifications "are invalidated by it." *Grutter v. Bollinger*, 539 US 306, 327 (2003). Race-based action does not violate the Equal Protection Clause so long as it is "narrowly tailored to further compelling governmental interests." *Id*. at 326; *accord Shaw v. Hunt*, 517 U.S. 899, 908 (1996). Moreover, the narrow-tailoring requirement does not require the "impossibility of perfect tailoring." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015).

In determining whether race-conscious remedies are constitutionally permissible, the courts look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties. *United States v. Paradise,* 480 U.S. 149, 171 (1987). These so-called *Paradise* factors have been adopted and utilized by the Fifth Circuit to determine whether a race-conscious remedy is narrowly tailored to achieve the compelling interest at issue. *See, e.g., Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006).

20

*1.     Section 1005 advances a compelling government interest.*

Section 1005 is supported by a compelling government interest in remedying the effects of past and present discrimination against socially disadvantaged farmers and ranchers. "The Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *Paradise*, 480 U.S. at 167; *see also W.H. Scott Const. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999) (concluding that "combating racial discrimination is a compelling government interest.") (citing *Croson*, 488 U.S. at 492). Race-conscious approaches to combating racial discrimination require (1) that the government have "actively discriminated" in the past or have been a "'passive participant' in a system of racial exclusion practiced by elements" of the relevant industry, and (2) that the government "'identif[y] that discrimination with the particularity required by the Fourteenth Amendment' . . . so that there is 'a strong basis in evidence for its conclusion that remedial action was necessary.'" *W.H. Scott Const.*, 199 F.3d at 217 (quoting *Croson*, 488 U.S. at 492, 500). Defendants, through expert reports, declarations, and Congressional findings demonstrate beyond any reasonable dispute that Congress had a "strong basis in evidence" to conclude that race-conscious remedial action is necessary to remedy past and present discrimination by USDA in the administration of federal loan programs.

The government has a compelling interest in "remedying its own past discrimination," *Dean*, 438 F.3d at 454 (citing *Paradise*, 480 U.S. at 167), and the Supreme Court has held that "affirmative race-conscious relief" is an appropriate remedy for past discrimination where the bad actor "has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination," both of which are true here. *Local 28 of Sheet Metal Workers' Intern. Ass'n v. EEOC*, 478 U.S. 421, 444–45 (1986) (plurality opinion). A race-conscious remedy must be justified by a showing of both "past discrimination by the governmental unit seeking to use the race-conscious remedy" and of "lingering effects of past discrimination"

that "still necessitate[] a race-conscious remedy." *Dean*, 438 F.3d at 454, 456. The Supreme Court has held that "gross statistical disparities . . . alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination." *Id.* (quoting *Croson*, 488 U.S. at 501–02) (finding statistical disparity between minority truck-drivers and relevant population probative of discriminatory exclusion).

Here, the Federation and UDSA have presented ample, undisputed evidence demonstrating that USDA's past discrimination was persistent and egregious. While "the government need not incriminate itself with a formal finding of discrimination prior to using a race-conscious remedy," *Dean*, 438 F.3d at 455, USDA has in this case presented evidence of several formal findings documenting the agency's discrimination. The pattern of discrimination against Black farmers in loans and conservation payments was first officially confirmed in 1965. *See* USDA, Civil Rights Action Team, Civil Rights at the United States Department of Agriculture (1997) at 2, *available at* https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-crat-report.pdf?_ga=2.237323136.16040426.1658120354-281206423.1658120354. Since then, USDA's persistent "discriminat[ion] against minority farmers in numerous ways in administering its loan programs," ECF No. 168-2, at 7 (Robb Rpt. at 3) has been formally documented in the U.S. Commission on Civil Rights' 1965 and 1982 reports; in the 1997 USDA Civil Rights Action Team report; in the OIG audit conducted that same year; in the *Pigford I & II*, *Keepseagle*, and *Garcia* cases; and in the 2011 Jackson Lewis report. *See* Environmental Working Group, Timeline: Black Farmers and the USDA, 1920 to Present, https://www.ewg.org/research/timeline-black-farmers-and-usda-1920-present/ (last accessed July 5, 2022); USDA's Br., Ex. B at 17, 22–38, ECF No. 168-2. USDA has also presented evidence of the myriad congressional hearings that were held to review and assess those, and other, formal findings of USDA's discrimination, including

hearings in 2002, 2006, and 2015—each of which provided Congress substantial anecdotal and statistical evidence of USDA's pervasive past discrimination against socially disadvantaged farmers and ranchers and the significant, persistent lingering effects of that discrimination. *See* USDA Br. at 13–20, ECF 168.

Moreover, the Federation and USDA have presented statistical data showing racial disparities among farmers that are highly probative of past discrimination by USDA. The statistical disparities between White farmers and farmers of color are stronger evidence of a pattern of past discrimination than the disparities raised in *Croson*, for two reasons. First, unlike in *Croson*, the statistical disparities in this case are not only "gross," but devastating. Nationwide, farm ownership by farmers who belong to the socially disadvantaged groups identified in USDA's Notice of Funds Availability fell from 14.7% in 1920 to only 4.3% in 2017. ECF No. 168-2, at 22 (Robb Rpt. at 18). Black farmers specifically fell from representing 14% of farm ownership in 1920 to 1.3% today. App. at 2, (Petty Rpt. at 2). These racial disparities are also reflected in farm acreage statistics, which are similarly jarring. As of 2017, Black farmers owned 1.6% of farms but only .4% of the acreage; Hispanics owned 3.8% of farms but only 2.9% of the acreage; and Asians owned .7% of farms but only .2% of the acreage. ECF No. 168-2, at 52 (Robb Rpt. at 48).

Racial disparities are also reflected in the different rates at which loan applications are approved, the different ways in which loans are serviced, and different default rates. In the late 1990s, Black farmers in Alabama and Louisiana had their FSA loans approved between 12% and 16% less often than non-minority farmers. ECF No. 168-2, at 34 (Robb Rpt. at 40) (citing 1997 Report: Civil Rights at the United States Department of Agriculture, A Report by the Civil Rights Action Team (CRAT Report), February 1997). Data covering direct loans from January 2000 to December 2020 show that the average rate at which loan applications by Black farmers were

approved was 18% lower than the rate for non-Hispanic White borrowers. App. at 50–41 (Berkman & Gibbons Rpt. ¶¶ 8–10.)  In 2002, Congress heard testimony that the USDA took 25% longer to process loan applications from Hispanic farmers as compared to loan applications from nonminority farmers. ECF No. 168-2, at 41 (Robb Rpt. at 37) (citing Hr'g on the USDA's Civil Rights Prog. for Farm Prog. Participants before House Sub-comm., Dep't Ops., Oversight, Nutrition, and Forestry, Comm. on Ag., 107th Cong. 23, at 33–35, 36 (2002)). Representative David Scott reported during ARPA considerations on the House floor in 2021 that "when [Black or other farmers of color have] receive[d] loans or payments, many of them were not provided timely or proper loan servicing options due to discrimination, which led to producers of color losing their land and operations." 167 Cong. Rec. H765 (Feb. 26, 2021). As a result, in 2021, the default rate for direct and guaranteed loans held by minority farmers is twice the rate of loans held by nonminority farmers. *See* ECF No. 168-2, at 96–97 (Robb Rpt. at 92–93).

Second, because farming is a profession that requires "minimal [formal] training" rather than "special qualifications," *Croson*, 488 U.S. at 501, the statistical disparity demonstrated here is stronger evidence of racial discrimination than the statistical evidence offered in *Croson*. *See* App. at 172 (Blanding Decl. ¶ 3). There, the majority found the data that Richmond used to justify its race-conscious quota scheme for hiring contractors defective because the city compared the racial disparities in contractor hiring against the city's entire minority population rather than assessing the disparity between White and Black hired contractors against the number of White and Black contractors in the city that were trained and qualified. *Id.* at 501–02.

Here, by contrast, measuring the statistical disparities between White and non-White farmers against the demographics of the communities in which they live is probative of racial discrimination because farming, ranching, and agricultural stewardship, as important as it they are,

do not require any special qualifications or formal credentials and are accessible to all who have both the desire and the means to cultivate the land. *See* App. at 172 (Blanding Decl. ¶ 3). Nevertheless, farmers of color are significantly underrepresented as compared to rural populations nationwide. In 2017, Blacks constituted 8% of the rural population but only 1.3% of farmers while Hispanics made up 9% of the rural population but only 3.3% of farmers. *See* ECF No. 168-2, at 52 (Robb Rpt. at 48). Non-Hispanic White farmers are, conversely, overrepresented. In 2017, Whites accounted for less than 80% of the rural population but 90% of agricultural producers. *See id.* Farmers of color are underrepresented even in states with the greatest percentage of farmers of non-White racial groups. For example, in Mississippi, the state with the largest proportional share of Black farmers in the country, Black people make up 37% of Mississippi's population but only 14% of its agricultural producers, while White people constitute only 59% of the population but 85% of agricultural producers. *See id.* at 56– 57 (Robb Rpt. at 52–53). The overrepresentation of White farmers persists in each of the five states with the largest share of Black, Hispanic, American Indian, Asian, or Native Hawaiian farmers, causing USDA's expert to conclude that "[W]hite farmers [are] dominating the farming industry[.]" *See id.* at 56 (Robb Rpt. at 52). Under *Croson*, these glaring statistical disparities are evidence of past discrimination against farmers of color.

Defendants have likewise shown that the "lingering effects" of USDA's past discrimination persist and warrant a race-conscious remedy. The compelling interest in remedying the lingering effects of past discrimination has been found to justify race-conscious remedies significantly stricter than any found in Section 1005 or USDA's interpretation thereof. For example, where the lingering effects of "pervasive, systematic, and obstinate" discriminatory conduct "permeated entry-level hiring practices and [] promotional process[es] alike," the Supreme Court found the government's interest in remedying those effects sufficiently compelling to justify a race-

25

conscious quota system. *Paradise*, 480 U.S. at 167, 170. Similarly, a plurality of the Court determined that "affirmative race-conscious relief" in the form of quotas was permissible where such relief was "necessary to dissipate lingering effects of pervasive discrimination" under Title VII. *Sheetmetal Workers' Int'l Ass'n*, 478 U.S. 421, 445 (1986).

It is undisputed that USDA's past discrimination was pervasive. For their part, Plaintiffs acknowledge that "[t]here is tragic statistical data documenting the decline of [B]lack farms," "reports documenting failures and shortcomings in the USDA's complaint process in the 1960s," and "investigations from 1997 and 2011 suggesting that the USDA neglected its civil rights complaints . . . and had significant differences in access based on race." Pls.' Reply Supp. Mot. Class Cert. at 11, ECF No. 42. And USDA's defense is rooted in claiming responsibility for pervasive and systematic practices so racially discriminatory that they resulted in the loss of "between 15 and 20 million acres of [Black] land" over "the past century" and a landscape of farms owned by persons of color that are consistently smaller and less lucrative than those of their White counterparts. USDA's Br. at 21–22, ECF No. 168.

The lingering effects of this pervasive discrimination are documented in the expert reports, official findings, and declarations submitted by USDA and the Federation. Evidence presented by USDA shows that the lingering effects of past discrimination are manifest in the gross racial disparities in farm ownership, loan access, and generational wealth; comparative difficulties accumulating wealth and the collateral necessary to access private credit; and an ongoing inability to access USDA payment programs dedicated to the kinds of large farms that socially disadvantaged farmers found unsustainable in the face of past discrimination by USDA in its loan programs. USDA's Br. at 21–22, ECF No. 168. The declarations submitted by the Federation provide additional evidence of the continuing effects of past discrimination, such as farm

foreclosures (App. at 193–94 (Eaton Decl. ¶¶ 47–51); loss of multi-generational family land, *id.* at 256 (Pressley Decl. ¶ 64); farmers from BIPOC communities deciding not to seek loan assistance due to poor treatment by FSA employees, *id.* at 206–10 (Gooding Decl. ¶¶ 2 –28); and stark disparities in equipment and overall performance among farms owned by White farmers and farmers of color, *id.* at 167 (Bernal Decl. at 39–40), 248 (Lamar Decl. ¶ 58).

While there is no clearly articulated difference in the evidentiary burden required to show a compelling interest in remedying "past" versus "present" discrimination, *Paradise*, 480 U.S. at 166, numerous cases in the Fifth Circuit and beyond have found that evidence of recent discrimination is particularly strong evidence that a "gross" racial imbalance or statistical disparity is the product of a pattern and practice of discrimination justifying remedial efforts. *See, e.g.*, *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1279 (M.D. Fla. 2021) (stating that "evidence of continued discrimination" may be "crucial" for the "Government to show that additional remedial action is warranted" and that "prior remedial measures failed to adequately remedy the harm caused by USDA's past discrimination of that the Government remains a 'passive participant' in discrimination in USDA loans and programs"); *Dynalantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237, 285 (D.D.C. 2012) (concluding that plaintiff's constitutional challenges to a governmental program to limit the issuance of certain contracts to socially and economically disadvantaged businesses were not supported given that Congress "adopted a race-conscious contracting preference . . . only after long experience showed that race-neutral alternatives were inadequate to combat the effects of racial discrimination" and that "recent evidence indicate[d] minority business developments remain[ed] hampered by the same kinds of discriminatory barriers that prompted the enactment" of the program); *Lalla v. City of New Orleans*, 1999 WL 138900, at *1, *2 (E.D. La. Mar. 12, 1999) (disparaging defendants for failing to offer "any recent anecdotal

evidence, prior judicial findings, poor testing methods, or other specific evidence of recent discrimination to support the assertion that the [New Orleans Fire Department] ha[d] recently discriminated against black applicants").

The Federation's declarations provide significant anecdotal evidence that USDA continues to discriminate against Black farmers to this day. In relevant part, the declarations demonstrate that *at least* 18 unique farmers in many different counties and states have experienced race-based discrimination in their interactions with the FSA within the last 10–15 years that is substantially similar to the methods of discrimination identified in *Pigford*. *See generally* App. at 162–69; ECF No. 93-2, at App. 001–29. The declarants report recent, first-hand experiences with discrimination in each of the five areas of past discrimination throughout the loan cycle identified by USDA's expert Dr. Robb:

(1)  outreach and education about existing loan programs and eligibility;

(2)  assistance with loan applications;

(3)  processing time for applications;

(4)  loan application approvals; and

(5)  post-disbursement loan servicing.

*Compare* ECF No. 168-2, at 6 (Robb Rpt. at 2), *with* App. at 163–68 (Bernal Decl. ¶¶ 7–12, 24–33, 39–43), 189–94 (Eaton Decl. ¶¶ 9–49), 208–09 (Gooding Decl. ¶¶ 16–26); ECF No. 93–2 at 019 (Hall Decl. ¶¶ 6–9).

These declarations are particularly probative of recent discrimination in post-disbursement loan servicing—a form of discrimination suffered by Black farmers prior to *Pigford* that is especially salient in this case. *See* ECF No. 168-2, at 6 (Robb Rpt. at 2). One Mississippi farmer testifies that he was repeatedly subjected to delays and obstacles created by a White FSA loan officer who was his primary point of contact at FSA. *See* App. at 192–93 (Eaton Decl. ¶¶ 31–45)

Mr. Eaton testifies that this loan officer—who once recounted a gratuitous childhood story for no apparent reason other than to stick his finger in Mr. Eaton's face while saying "in your face, Black boy"—refused to consider Mr. Eaton for loan consolidation, blocked Mr. Eaton's efforts to seek loan consolidation from private banks, and tried to require Mr. Eaton to add the loan officer's name to his bank account before issuing additional funding, which delayed the funding. *See* App. at 191–93 (Eaton Decl. ¶¶ 33, 36–43). When Mr. Eaton sought loan servicing, this loan officer initially tried to have Mr. Eaton sign paperwork saying he would pay back a staggering $80,000 in a single year; it was only after a different FSA employee in a different local office completed the loan servicing that Mr. Eaton finally received an affordable option. *See* App. at 195 (Eaton Decl. ¶ 60). Mr. Eaton has observed that White farmers are treated differently by his local FSA office than he is; unlike him, White farmers are able to get the funding and benefits they needed timely and with minimal difficulty. *See* App. at 191, 194 (Eaton Decl. ¶¶ 26, 52-54). The declarations submitted herewith, App. at 162–269, as well as those submitted with the Federation's Motion to Intervene, ECF No. 93-2, at App. 001–29, powerfully demonstrate that discrimination in USDA lending programs has persisted in recent years and continues to this day—not only justifying but ***demanding*** remedial action by the government.

       2.       *Section 1005 is narrowly tailored.*

          a.     Race-neutral remedies have failed to remedy USDA's discriminatory loan practices.

Even though Section 1005 is race-neutral on its face, the USDA's employment of racial criteria in administering the statutory program is appropriate because race-neutral actions have failed to achieve the government's avowed goal of remedying its discriminatory treatment of farm loan applicants.

A race-conscious remedy is justified after race-neutral remedies have been "considered and found wanting." *Walker v. City of Mesquite*, 169 F. 3d 973, 986 (5th Cir. 1999). The government does not need to consider or try every conceivable race-neutral alternative if it takes a "serious, good faith consideration of workable race-neutral alternatives" and finds that those "available, workable race-neutral alternatives do not suffice." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 313 (2013). Here, in contrast to *Walker*, there is ample evidence to conclude that are no available race-neutral alternatives to accomplish the government's goal of remedying discrimination in USDA loan programs.

Prior to Section 1005, USDA implemented numerous "race neutral" loan and financial-benefit plans. 167 Cong. Rec. H762, H765–66 (daily ed. Feb. 26, 2021). Congress found, however, that despite "race neutral" selection criteria, the benefits conferred by those plans were distributed in a racially discriminatory manner and that farmers of color received a disproportionately small share of those benefits as a result. H.R. Rep. No. 117-7, at 12 (2021). In short, Congress found that earlier, race-neutral alternatives to Section 1005 were therefore insufficient to remedy the effects of USDA discrimination. *Id.* Thus, unlike Section 8 in *Walker*, the available alternatives have not shown promise in remedying the effects governmental discrimination and the resulting disparity in farm ownership; on the contrary, they have instead exacerbated those effects. Where, as here, race-neutral alternatives are found lacking, a race-conscious remedy is an appropriate "remedy of last resort." *Walker*, 169 F.3d at 982–83.

In reviewing the constitutionality of a statute, courts must give substantial deference to the findings of Congress because the legislature is "far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997). This Court should therefore take as true Congress's factual

determination that race-neutral policies have not cured the effects of racial discrimination in USDA lending practices. At minimum, it should find that Congress "has drawn reasonable inferences based on substantial evidence." *Id.*

> b.    Section 1005 is both flexible and limited in duration.

Section 1005, on its face and as applied by USDA, is both "flexible" and "ephemeral." *Paradise*, 480 U.S. at 177–78. A governmental program is flexible if it lacks rigid racial quotas, imposes no penalties for failure to comply with program requirements, and allows persons who presumptively do not benefit from the program to overcome the presumption with sufficient evidence that he or she qualifies. *See Dynalantic Corp.*, 885 F. Supp. 2d at 285. Section 1005 satisfies each of these criteria. As explained above, Section 1005 is facially race-neutral and—even as interpreted by USDA—does not rigidly limit debt relief to a fixed set of racial or ethnic groups. *See supra* at Part III.A. Neither the statute itself nor USDA's interpretation of it imposes a racial quota or penalties for failure to meet any program requirements. Thus, Section 1005, on its face and as implemented by USDA, is flexible.

"The central theme of a duration analysis is that the shorter the lifespan of the remedy, the more likely it is narrowly tailored." *Dean*, 438 F.3d at 460. A court may also consider whether the remedy would be ongoing or a "one-time occurrence." *Paradise*, 480 U.S. at 178. Courts have found remedies intended to last as long as ten years to have a reasonably short duration because they set termination points and would not last in perpetuity. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1179 (10th Cir. 2000) (finding that ten-and-a-half years was a sufficient limit on duration); *see also Rutherford v. City of Cleveland*, 179 Fed. Appx. 366, 370 380 (6th Cir. 2006) (finding that a remedy with an automatic termination after eight years was sufficiently limited in duration for narrow-tailoring analysis).

Applying these standards, there is no doubt that Section 1005 has a limited duration. It creates a one-time debt relief program based on loan balances as of a single date—January 1, 2021. Pub. L. No. 117-2, § 1005(a)(2). Only loans made or guaranteed by USDA qualify for debt relief, and each qualified individual can have his or her loans forgiven only once under the program. *Id.* Because there are a finite number of eligible individuals and a finite number of eligible loans, the duration of the remedy is inherently limited. Indeed, the government expected the program to last only a few months:  Section 1005 was enacted in April 2021 and, according to USDA's timeline, the debt relief it promised was scheduled to be disbursed by June 2021. *See* U.S. Dept. of Agriculture, *Debt Payment Timeline*, https://www.farmers.gov/loans/american-rescue-plan#e-loan. Section 1005 does not create a new multi-year program or office; nor does it offer ongoing benefits. It provides one-time debt relief that can be administered in a period of months. Thus, the benefits that it provides are "ephemeral." *Paradise*, 480 U.S. at 177–78.  Section 1005's flexibility and limited duration weigh heavily in favor of finding the program that it creates narrowly tailored.

        c.       \The long-term goal of Section 1005 is based on statistical evidence of racial disparities.

Section 1005 seeks to close the gap between the percentage of minorities in rural areas and the percentage of Black farmers and other farmers of color in those areas, and to counteract the disparate rates at which loan applications submitted by non-White farmers and White farmers are approved. While "amorphous" claims of past discrimination are insufficient, specific statistical evidence of past discrimination can justify a present-day race-conscious remedy. *See Croson*, 488 U.S. at 501, 509. Section 1005 is not based on mere "amorphous claims." To the contrary, when Congress enacted Section 1005, it considered precisely the kinds of statistics and anecdotal evidence called for by the *Croson* Court. The statistics Congress considered demonstrate the ills that it sought to target with through Section 1005 and identify the goals that it intended to achieve

32

by enacting it. Congress considered numerous reports of past discrimination by the USDA and determined that the "cumulative effects" of the discrimination necessitated a remedy like that in Section 1005. 167 Cong. Rec. S1265.

In making this determination, Congress considered the significant decrease in Black farmers over the last century, the disparities between the racial composition of local farming populations and the communities in which they live, and the percentage of socially disadvantaged farmers who lack the generational wealth necessary to build credit and provide collateral for loans due to past discriminatory practices. *See* ECF No. 168-2, at 64–70 (Robb Rpt. at 60–66); 167 Cong. Rec. H765; 167 Cong. Rec. S1265.

These disparities are well-established, specific, and stark. In the past one hundred years, the share of Black farmers has dropped from 15% to less than 2%. 167 Cong. Rec. S1265. Socially disadvantaged farmers are underrepresented by any metric: "they are a smaller share of the farming population than they are of the general population, the population in rural areas, and in the states where the majority of minority farmers are concentrated." ECF No. 168-2, at 45 (Robb Rpt. at 51).

In addition, most farms owned by people of color are smaller—in acreage and revenue— than White-owned farms, which "is a natural consequence of past discrimination in lending practices, which hindered minority farmers seeking to expand or invest in their farms." *Id.* at 60 (Robb Rpt. at 56). Farms owned by non-Whites have a smaller share of the market and generate less net cash income than farms owned by Whites:  Black farmers have 1.6% of farms, but only 0.2% of the market value of agricultural products sold and just 0.1% of net-cash farm income. *Id.* at 84, 86 (Robb Rpt. at 80, 82). White farmers also earn nearly twice as much per acre than Black farmers, an advantage fueled by economies of scale, and access to research and technology, tax benefits, government support, and commercial lending. *Id.* at 86 (Robb Rpt. at 82).

Non-White farmers also "received government payments that were well below their share of farms," with Black farmers receiving a mere 0.6% of government payments. *Id.* at 70 (Robb Rpt. at 66). White farmers received a higher share of government payments than their shares of revenues, expenses, or net income. *Id.* 72 (Robb Rpt. at 68). This disparity in government support for White farmers continues to the present-day: only 0.2% of the $8 billion farm aid issued in response to China's retaliatory tariffs went to Black and other socially disadvantaged farmers, and only 0.1% of COVID-19 relief from the CARES Act went to them. App. at 21–22 (Petty Report at 21–22).

Perhaps unsurprisingly given these disparities, Black and other farmers of color are far more likely to be in default on their FSA loans and at risk of foreclosure: 35% of Black farmers and 24% of Hispanic, Asian-American, and Indigenous farmers with FSA direct loans are delinquent, even though only approximately 13% of all FSA direct loan borrowers are in delinquency. 167 Cong. Rec. S1266.

These disparities are not primarily (or at all) attributable to race-neutral factors on the record here. *See* ECF No. 168-2, at 78 (Robb Rpt. at 74). In fact, the data show that "minority and non-minority farmer characteristics are actually quite similar." *Id.* Instead, the glaring, persistent disparities between minority and non-minority farms are "consistent with what one would expect given the historical discrimination against minority farmers in USDA's loan programs and the nature of agricultural credit markets." *Id.* at 82 (Robb Rpt. at 78). They are the product of discrimination which "deprived generations of minority farmers of needed credit, payments, and technical assistance," resulting in farms that are "disadvantaged in terms of acreage, revenue, net income, and other metrics vis-à-vis non-minority farmers, and are a smaller (and in the case of Black farmers, dramatically smaller) proportion of the U.S. farming population today." *Id.* at 89

(Robb Rpt. at 85). Discrimination and the disadvantages resulting from that discrimination impede the ability of farmers of color "to access the credit and collateral necessary to expand their farms, leaving them smaller and less profitable." *Id.* at 93 (Robb Rpt. at 89).

Section 1005 was fashioned to address these specific inequalities, and the ultimate goal of the remedy is to reverse such inequalities by providing farmers of color the benefits they have previously been systematically denied. ARPA is a federal, nationwide act. As such, its goal cannot be pared down to something like the "one-to-one until 25%" system approved in *Paradise*. *See* 480 U.S. 179–80. But that does not mean that there is not a numerical goal guiding this legislation. This measure is intended to bring the number of socially disadvantaged farmers back up to where it was before the decline, to create greater consistency in the percentages of socially disadvantaged farmers to their respective populations in an area, and to increase the number of socially disadvantaged farmers who can qualify for loans. The exact numbers for each of these goals will vary based on the specifics of individual states that this remedy impacts, but they are based on examination of the statistical inequalities at issue and the percentage of non-Whites in the relevant market, as contemplated by the Court in *Paradise.*

> d.     Section 1005 does not impose a burden on third parties.

Section 1005 does not impose any burden on the named plaintiffs, the certified class, or anyone else. And even if the class members were somehow "burdened" by debt relief offered to socially disadvantaged farmers and ranchers, impact on third parties is of less concern when the remedial measure "impose[s] a diffuse burden, . . . foreclosing only one of several opportunities." *Paradise*, 480 U.S. at 183; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 283 (1986). This means that a remedial measure may permissibly impose a burden on third parties so long as

that burden is not a complete barrier to all opportunities.[8] Even if White farmers are not eligible to receive aid under Section 1005—which, as discussed above, Plaintiffs have not established—Section 1005 is far from the only relief measure available. As Congress noted when deciding to pass ARPA, there have been recent, significant agricultural relief efforts that, while failing to reach non-White farmers, have provided ample aid to White farmers. 167 Cong. Rec. S1264–65. When considered in the context of the many relief measures that have (often disproportionately) benefited non-minority farmers, their purported exclusion from a single relief measure can hardly be called an "absolute bar to white advancement." *Paradise*, 480 U.S. at 182. The "unacceptable burden," historically and up to the present moment, has been placed not on the Plaintiffs and the classes they represent but on minority farmers, and Section 1005 as interpreted by USDA seeks to level the playing field.

In considering whether a program imposes a burden on third parties, it is important to keep in mind not only the elements but also the purpose of strict scrutiny. The stated reason for requiring strict scrutiny of racial classifications is "to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *Adarand*, 515 U.S. at 226. The goal of strictly scrutinizing race-conscious decision-making is to root out illegitimate purpose, racial prejudice, and racial stereotyping. *Id.* To the extent it does so at all, Section 1005 as interpreted by USDA does not classify based on prejudice against, or pernicious stereotypes of, any racial or ethnic group, but rather to remedy the real discrimination experienced by Black and other socially disadvantaged farmers victimized by USDA's past and

---

[8]For example, in *Paradise*, the Court found that the state did not impose an impermissible burden on third parties by requiring one-to-one Black and White hiring because there were still positions available for qualified White applicants, even if White applicants were unable to take every position. *See Paradise*, 480 US at 183–84.

present discrimination in the administration of its loan programs. "It is well settled that the government has a compelling interest in remedying its own past discrimination." *Dean*, 438 F.3d at 454 (citing *Paradise*, 480 U.S. at 167). The fact that Section 1005 neither burdens nor reflects racial prejudice against the Plaintiff classes (or anyone else) supports a finding that it is narrowly tailored to the compelling governmental interest of remedying actual racial prejudice experienced by Black and other socially disadvantaged farmers.

## IV.   To the Extent the Court Finds that the NOFA Constitutes an Impermissible Racial Classification, the Court Should Not Enjoin Section 1005.

For the reasons set forth above, Plaintiffs' claim fails because (1) Plaintiffs lack standing to challenge either Section 1005 itself or USDA's interpretation of it, and (2) Plaintiffs' only claim is pleaded as a facial attack on Section 1005, which is race-neutral and easily survives rational basis review. But even if the Court concludes the Plaintiffs have standing to challenge USDA's interpretation of Section 1005, and that the agency's interpretation constitutes an impermissible racial classification, the Court must limit the effect of any relief granted to Plaintiffs to the USDA's administration of the debt relief program through the Notice of Funds Availability. The Court should not, under Plaintiffs' theory, deem unconstitutional Section 1005, which makes no reference to any racial presumptions or classifications whatsoever.

As noted above, Section 1005 uses the term "socially disadvantaged," a term that courts have been deemed to be race-neutral. *See, e.g.*, *W. States Paving*, 407 F.3d at 987 (holding that the definition of "socially and economically disadvantaged individual" in the Transportation Equity Act for the 21st Century is race-neutral on its face); *cf. Adarand*, 515 U.S. at 200; (drawing a distinction between race-neutral statute and race-based rebuttable presumptions). Plaintiffs' claim is based upon the assertion that USDA has engaged in impermissible racial classification in its *administration* of Section 1005. 3d Am. Compl. ¶ 21, ECF No. 135 ("The Department of

Agriculture is violating the Constitution by discriminating on the grounds of race, color, and national origin in administering its program."); Pls.' Br. at 4, ECF No. 170 ("And the Department interprets the phrase "socially disadvantaged farmer and rancher" in a manner that includes racial minorities but excludes whites. These racial classifications are unconstitutional."). But the only "racial classifications" Plaintiffs identify are the enumeration of specific groups in the Notice of Funds Availability which was issued after Plaintiffs filed this action, and in other ancillary materials, such as a press release and USDA's website. *Id*. at 5–6.

Thus, even if the Court could conclude that a challenge to the USDA's interpretation of Section 1005 in the Notice of Funds Availability is properly before the Court, the constitutional defect—if any—is in the agency's interpretation, not in the statute. Accordingly, the Court should, at most, void that interpretation and allow USDA to issue a new interpretation that cures any perceived constitutional infirmities.

The Federation presumes, based on their prior representations, that Plaintiffs would welcome the opportunity to participate in the debt relief afforded by Section 1005. *See* Original Compl. ¶ 21, ECF No. 1 ("[The Court] should at the very least declare that the phrase "socially disadvantaged group" must be construed, as a matter of statutory interpretation, to include ethnic groups of all types that have been subjected to racial and ethnic prejudice."). To the extent the racial classifications in the Notice of Funds Availability do not pass constitutional muster, the proper remedy is directed at the Notice, not at the statute, which does not contain racial classifications.

## CONCLUSION

For all the above reasons, the Federation respectfully requests the Court to enter judgment for the Federation and dismiss Plaintiffs' claim in its entirety.

Dated: July 18, 2022                         Respectfully submitted,

*/s/ Chase J. Cooper*
Chase J. Cooper
TX Bar No. 24087342
ccooper@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
P: 214-453-6500

George C. Lombardi *(admitted pro hac vice)*
Illinois Bar No. 6187715
glombardi@winston.com
Julie A. Bauer *(admitted pro hac vice)*
Illinois Bar No. 6191271
jbauer@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
P: 312-558-5600

Kobi K. Brinson *(admitted pro hac vice)*
NC Bar No. 23827
kbrinson@winston.com
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
P: 704-350-7700

Andrew Tauber *(admitted pro hac vice)*
D.C. Bar No. 495980
atauber@winston.com
WINSTON & STRAWN LLP
1901 L St. NW
Washington, DC 20036
P: 202-282-5288

Janelle Li-A-Ping *(admitted pro hac vice)*
California Bar No. 330805
jliaping@winston.com

WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA 90071
P: 213-615-1700

/s/ Dorian L. Spence
Jon Greenbaum *(admitted pro hac vice)*
California Bar No. 166733
jgreenbaum@lawyerscommittee.org
Dorian L. Spence *(admitted pro hac vice)*
Maryland Bar No. 0912170195
dspence@lawyerscommittee.org
Anneke Dunbar-Gronke* *(admitted pro hac vice)*
Maryland Bar No. 2001060009
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
P: 202-662-8600
*Admitted in Maryland only. Practicing under the
supervision of D.C. bar members.

/s/ Mark D. Rosenbaum
Mark D. Rosenbaum *(admitted pro hac vice)*
California Bar. No. 59940
mrosenbaum@publiccounsel.org
Nisha Kashyap *(admitted pro hac vice)*
California Bar No. 301934
nkashyap@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Ave.
Los Angeles, CA 90005
P: 213-385-2977

*Counsel for The Federation of Southern
Cooperatives/Land Assistance Fund*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was filed via the court's CM/ECF system on July 18, 2022, which will serve all counsel of record.

*/s/ Chase J. Cooper*
Chase J. Cooper