# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| SID MILLER et al., on behalf of themselves and others similarly situated, *Plaintiffs,* | |
| v. | Civil Action No. 4:21-cv-00595-O |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, *Defendant* | |
| and | |
| FEDERATION OF SOUTHERN COOPERATIVES/LAND ASSISTANCE FUND; NATIONAL BLACK FARMERS ASSOCIATION (NBFA); ASSOCIATION OF AMERICAN INDIAN FARMERS (AAIF), *Intervenor-Defendants.* | |

**APPENDIX TO BRIEF IN SUPPORT OF DEFENDANT FEDERATION OF SOUTHERN COOPERATIVES/LAND ASSISTANCE FUND'S MOTION FOR SUMMARY JUDGMENT**

| Description | Pages |
|---|---|
| Expert Report of Adrienne M. Petty | 1 – 47 |
| Expert Report of Mark Berkman and Charles Gibbons | 48 – 98 |
| Alicia M. Robb Deposition Transcript | 99 – 161 |
| Declaration of Saul Bernal | 162 – 170 |
| Declaration of Cornelius Blanding | 171 – 182 |
| Declaration of Richard Burke | 183 – 187 |
| Declaration of Arthur Eaton | 188 – 197 |
| Declaration of Steve Flemons | 198 – 205 |
| Declaration of Phoebe Gooding | 206 – 213 |
| Declaration of Deborah Hendrix | 214 – 220 |
| Declaration of Hosea Henry | 221 – 224 |
| Declaration of Wilburt Howard | 225 – 229 |
| Declaration of  Jordan Rae Owens | 230 – 236 |
| Declaration of Amy Kroll | 237 – 242 |
| Declaration of Jonathan Lamar | 243 – 250 |
| Declaration of Ryan Pressley | 251 – 257 |

| Description | Pages |
|---|---|
| Declaration of Martice Scales | 258 – 262 |
| Declaration of Barbara Shipman | 263 – 269 |

Dated: July 18, 2022                    Respectfully submitted,

/s/ Chase J. Cooper
Chase J. Cooper
TX Bar No. 24087342
ccooper@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
P: 214-453-6500

George C. Lombardi *(PHV App. Forthcoming)*
Illinois Bar No. 6187715
glombardi@winston.com
Julie A. Bauer *(PHV App. Forthcoming)*
Illinois Bar No. 6191271
jbauer@winston.com
Rebecca Carter *(PHV App. Forthcoming)*
Illinois Bar No. 6335662
rcarter@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
P: 312-558-5600

Kobi K. Brinson *(PHV App. Forthcoming)*
NC Bar No. 23827
kbrinson@winston.com
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC  28202
P: 704-350-7700

Janelle Li-A-Ping *(PHV App. Forthcoming)*
California Bar No. 330805
jliaping@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA  90071
P: 213-615-1700

Jon Greenbaum *(PHV App. Forthcoming)*
California Bar No. 166733
jgreenbaum@lawyerscommittee.org
Dorian L. Spence *(PHV App. Forthcoming)*
Maryland Bar No. 0912170195
dspence@lawyerscommittee.org
Maryum Jordan *(PHV App. Forthcoming)*
California Bar No. 325447
mjordan@lawyerscommittee.org
Phylicia Hill *(PHV App. Forthcoming)*
Alabama Bar No. 5749J00X
phill@lawyerscommittee.org
Noah Baron *(PHV App. Forthcoming)*
DC Bar No. 1048319
nbaron@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
P: 202-662-8600

Mark D. Rosenbaum *(PHV App. Forthcoming)*
California Bar. No. 59940
mrosenbaum@publiccounsel.org
Nisha Kashyap *(PHV App. Forthcoming)*
California Bar No. 301934
nkashyap@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Ave.
Los Angeles, CA 90005
P: 213-385-2977

*Counsel for The Federation of Southern
Cooperatives/Land Assistance Fund*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed via the court's CM/ECF system on July 18, 2022, which will serve all counsel of record.

*/s/ Chase J. Cooper*
Chase J. Cooper

Adrienne M. Petty, Ph.D.
Associate Professor, The College of William & Mary
250 James Blair Drive
Williamsburg, VA 23185
ampetty@wm.edu

May 31, 2022

Nisha Kashyap
Mark Rosenbaum
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA  90005

RE: *Miller v. Vilsack*

This is an FRCP Rule 26(a) report regarding the effort to defend the USDA's loan forgiveness program in the above referenced matter. The data I considered in preparing this report is included in the citations and a list of materials reviewed that appears at the end of the report. The report responds to the question of whether there is evidence of past and present discrimination by the USDA against black farmers.

**Methodology**

The report relies on my analysis of peer-reviewed historical and legal scholarship on American agriculture, government reports regarding discrimination within the USDA, the Census of Agriculture, newspaper and magazine sources, interviews with black farmers arranged by the Federation of Southern Cooperatives/Land Assistance Fund, and my own past research in the archival records of past and present USDA agencies. I also draw upon analyses by scholars who have sought out information that the government has not made public. I listened to interviews with farmers and corroborated their accounts with the patterns of discrimination found in government reports and academic studies.

**Overview**

Farms owned or operated by black farmers would be extinct by the 21st Century, the United States Commission on Civil Rights concluded in a 1982 study that cited 57,271 farms existing then.[1] Black farmers, in fact, have survived now into the third decade of the 21st century. Today, they account for 1.3 percent of U.S. farms—45,000 out of 2,240,976, and down from a peak of 14 percent in 1920.[2] U.S. farms overall shrunk dramatically in numbers – from 6.5 million in 1920 to 2.2 million in 2017 due to the efforts of the USDA, private corporations, and land-grant universities to promote capital-intensive farming. Heavier reliance on farm machinery and agricultural chemicals reduced the demand for farmers in agricultural production. The loss of black-operated farms, however, outpaced white-operated farms inordinately. The result is a 97 percent decline in the number of Black-owned farms in the United States.  Although there has been growth in the number of black farmers since 2002, today's black farmers remain imperiled.[3]

The United States Department of Agriculture (USDA)—established in 1862 and called "The People's Department" by President Abraham Lincoln—has been a, if not *the*, primary locus of discrimination.[4] The USDA acknowledges its blame as part of its newly-authorized responsibility under the American Rescue Plan Act (ARPA) of 2021. Section 1005 of the ARPA directs the USDA to address "systemic discrimination in USDA farm programs" that helped foster a category of "socially disadvantaged farmers and ranchers." African Americans were

---

[1] United States Commission on Civil Rights, *The Decline of Black Farming in America* (Washington: U.S. Civil Rights Commission, 1982), 1.
[2] "Number of Farm Operators in the United States, with Per Cent Distribution, by Race, 1900 to 1920," 1920 Census of Agriculture, 293; Jess Gilbert, "Returning African American Farmers to the Land: Recent Trends and A Policy Rationale," *The Review of Black Political Economy,* March 22, 2000.
[3] 2002, 2007, 2012, and 2012 Census of Agriculture.
[4] Tom Vilsack, "Secretary's Column: 'The Peoples' Department: 150 Years of USDA," U.S. Department of Agriculture blog, February 21, 2017, https://www.usda.gov/media/blog/2012/05/11/secretarys-column-peoples-department-150-years-usda, accessed May 24, 2022.

foremost among those farmers who were prevented from "achieving as much as their counterparts who do not face these documented acts of discrimination."[5] The plan earmarked $4 billion in debt relief for African American, Native American, Latino, Alaskan Native, Asian American, and Pacific Islander farmers. In *Miller v. Vilsack*, which alleges that this debt relief plan violates the U.S. Constitution, a court has enjoined implementation of Section 1005, suspending in limbo the livelihood of tens of thousands of black farmers. The irony is that extinction could be a fallout of the USDA's effort to address its history of discrimination, which is substantiated empirically and anecdotally over generations up to today.

---

[5] "American Rescue Plan Debt Payments," U.S. Department of Agriculture, Farmers.gov, https://www.farmers.gov/loans/american-rescue-plan, accessed May 26, 2022.

**Executive Summary**

This report establishes the United States Department of Agriculture's (USDA) history of discrimination against black farmers, the long-term impact of this past discrimination, and its current discrimination against black farmers. During its first fifty years in existence, the USDA discriminated against black farmers by acquiescing in segregated educational facilities for them and allocating fewer financial and physical resources for black land grant institutions and black agents of the Cooperative Extension Service. The USDA essentially reinforced the place to which society consigned African Americans, relegating them to roles as laborers in the southern agricultural economy.[6]

Several significant turning points in the history of the USDA and American agriculture contributed to new forms of racial discrimination that persist today. First, the New Deal era witnessed the remarkable expansion of the federal government's role in farmers' lives. The Roosevelt administration worked to bring about the recovery of agriculture from the Great Depression by paying farmers to limit their production of crops and livestock in order to raise prices. It also expanded the USDA's system of agricultural credit. To administer these programs, the USDA created a decentralized system that placed control of farm programs in the hands of elected local farmers. Yet these committees have been far from democratic. In the Jim Crow South, local control typically meant that the wealthiest or most politically connected members of communities served on committees and routinely discriminated against black farmers. To this day, the USDA continues to place enormous responsibility in the hands of county committees.[7]

---

[6] Mark Schultz and I have evaluated these matters closely in Adrienne Petty and Mark Schultz, "African-American Farmers and the USDA: 150 Years of Discrimination," *Agricultural History* 87, no. 3 (Summer 2013), 331. This section on the USDA's history of discrimination draws upon our article, some primary evidence, and the analyses of other historians.
[7] Joshua Ulan Galperin, "The Life of Administrative Democracy," *The Georgetown Law Review* 108, no. 5 (May 2020), 1221, 1240.

Second, during the 1950s, the USDA doubled down on its longstanding goal of modern scientific agriculture that relied on new chemicals and farm machinery, and that eliminated small farms in the name of efficiency. Farms had to grow bigger or go under. Black farmers, who still made up 21 percent of the total southern farm population in 1950, were excluded from the USDA's vision of modern agriculture.[8] A sizable number of sharecroppers and small farm owners lost a foothold on the land. Still fighting for their civil rights at the very moment that this transformation was underway, the discrimination against black farmers placed them at a disadvantage and then they were denied loans because of the economically precarious position into which the USDA had already placed them.

The USDA has continued to fall short of giving all farmers fair opportunities to produce food and fiber for the nation. Instead, it has prioritized larger farmers over smaller ones, which has a discriminatory impact on black farmers, whose farms remain the smallest and least remunerative in American agriculture. Throughout the 1970s, 1980s, and 1990s, a string of reports by the U.S. Commission on Civil Rights and other federal agencies have provided evidence that the USDA discriminated against black farmers, but the USDA did not act to end this discrimination.

In 1999, the *Pigford v. Glickman* decision proved that the USDA had discriminated against black farmers in the administration of its farm programs. Yet in the 23 years since this decision, the USDA has yet to make the changes that would root out racial discrimination and USDA employees also have yet to commit themselves to an effective and efficient way of investigating and resolving civil rights complaints.

---

[8] U.S. Bureau of the Census, *Census of Agriculture, 1959* (Washington: Department of Commerce, 1960).

My report concludes that, regardless of which political party has been in power, the USDA has discriminated against black farmers in the past and continues to discriminate against them today. Section 1005 of the American Rescue Plan is attempting to remediate this past and present discrimination by extending loan forgiveness to black farmers.

## I.   History of Discrimination

### A.  The Founding of the USDA at the Dawn of Emancipation

The history of racial discrimination in American farm policy stretches back to the establishment of the United States Department of Agriculture (USDA) in 1862. The main goal of the new department during its first seventy years was to improve agricultural production by promoting science, technology, and the education of farmers. Although there had been widespread interest in establishing an agency that would promote agricultural production for decades, it was not until the Civil War that the Union was able to put forward legislation to create it. Southern politicians had blocked legislation calling for the founding of such a government office for decades. With the southern representatives' opposition no longer a factor, Congress was able to establish the USDA. [9]

Newly emancipated from slavery, black people faced an uphill battle to make a living in agriculture. The USDA's establishment roughly coincided with the Emancipation Proclamation, which freed all enslaved people in states under rebellion. Despite freedpeople's agricultural experience, aspiration for land, and deep involvement in American farming, the USDA was complicit with former slaveowners in seeking to discipline freedpeople into accepting a role as

---

[9] Sarah T. Phillips, "What Next? The USDA at One Hundred and One Hundred Fifty Years Old," *Agricultural History* 87, no. 3 (Summer 2013), 318; Adrienne Petty and Mark Schultz, "African-American Farmers and the USDA: 150 Years of Discrimination," *Agricultural History* 87, no. 3 (Summer 2013), 331.

paid workers on the land of former slaveowners. Despite the failure of the government to confiscate the land of former Confederates and redistribute it among freedpeople, a surprising number of them managed to buy their own land. Yet most black people worked as sharecroppers on someone else's land. Whether they worked their own or someone else's land, all black farm people shared a common experience with the USDA. They were taken for granted as the major labor force of southern agriculture but did not gain fair and equal access to agricultural education and other resources.

Moreover, the South, where most black farmers lived and worked, faced challenges following the Civil War because of the legacies of slavery and plantation agriculture. The South had represented one of the largest and wealthiest plantation regions in the world. Antebellum southern agriculture had rested on the labor of slaves, the extensive use of land, and the ability to continually expand to fertile western land. In the non-plantation regions of the antebellum South, white farm families owning small farms produced mostly subsistence crops for their own use and had minimal participation in agricultural markets. Everything changed after the Civil War. Because the federal government failed to enact land reform, black people entered freedom as farmers without land. They were forced to enter into uneven, exploitative labor relations with former slaveowners, becoming sharecroppers and tenant farmers. The region experienced steady economic and disorder and devastation, and its poorest residents, especially the freedpeople, bore the worst consequences of this transformation.

Early USDA initiatives helped the South tackle its level of underdevelopment compared with the rest of the nation through the 1862 Morrill Act, which facilitated and funded the establishment of land grant universities. The Morrill Land Grant Act gave land to states for the establishment of agricultural and mechanical colleges to cooperate with the newly established

USDA. For black farmers, however, the Morill Act started a cycle of separate and unequal treatment. From the outset, African Americans' access to education at these institutions varied from state to state. Land grant universities in most of the southern and border states did not admit black students. In 1890, the Second Morrill Act provided additional funds for the 1862 land-grant universities on the condition that they either admit black students or provide racially segregated land grant institutions. Several southern states either founded separate land-grant schools for black students or gave land-grant status to schools already in existence. Throughout their history, these all-black colleges have received less support from southern states than the 1862 institutions.[10] For example, in 1950, Alabama Polytechnic Institute, the predecessor institution to Auburn University, received $2,287,361 in federal, state, and local funding while the African American land grant school, Alabama Agricultural and Mechanical College, received only $84,417.[11] Black people in Alabama composed 32 percent of the population and were proportionately more involved in agriculture than were white Alabamians. Yet they received only 3.5 percent of the total of $2,371,778 that the government allocated for the education of Alabamians.

### B. Hardening of Discriminatory Practices at the Dawn of Jim Crow

The USDA's neglect of freedpeople grew even more pronounced at the dawn of the Jim Crow era, when southern politicians rewrote voting laws and state constitutions to monopolize political power on the state and local level and enacted segregation ordinances—all in the name of white supremacy. The federal government acquiesced in southern states' anti-democratic and

---

[10] Under both Morrill Acts, states are supposed to match federal funds on a dollar-to-dollar basis. States have consistently failed to meet this matching requirement for 1890 schools. See John Michael Lee Jr. and Samaad Wes Keys, "Land-Grant But Unequal: State One-to-One Match Funding for 1890 Land Grant Institutions," APLU Office of Access and Success publication no. 3000-PB1 (Washington: Association of Public and Land-Grant Universities, 2013), 62.

[11] Pete Daniel, *Lost Revolutions: The South in the 1950s* (Chapel Hill: University of North Carolina Press, 2000), 45.

9

racially discriminatory approach to black citizens, designing USDA programs throughout the late nineteenth and most of the twentieth century that mirrored the separate and unequal approach evident in all facets of southern life. As noted above, the USDA condoned separate and underfunded land-grant colleges for black students. The pattern of discrimination continued when the Smith-Lever Act empowered the USDA to establish the Cooperative Extension Service in 1914, which offered adult education on the latest agricultural techniques to farm families, organized 4-H clubs that introduced rural youth to more modern approaches to farming, and established home demonstration clubs for rural women. The founding of the Extension Service coincided with the Woodrow Wilson administration's segregation of the civil service, so the agency enacted its programs on a segregated and unequal basis. It hired Negro farm agents and home demonstration agents on a separate basis, paid them less, hired fewer of them, and equipped them with fewer resources to conduct their outreach work.[12]

It is a testament to Black farm peoples' determination and fierce resistance to Jim Crow that they managed to make the most of the unequal and inadequate resources provided under the USDA. Within Black rural communities, agricultural experts gradually gained more and more opportunities to work as agricultural extension agents and home demonstration agents, among the few professional positions available to college-educated African Americans. The crucial assistance provided by the Cooperative Extension service shows that Black farm communities have been able to thrive when provided with even inadequate resources.

C. **Legacy of Discrimination in New Deal programs**

---

[12] Eric Steven Yellin, *Racism in the Nation's Service: Government Workers and the Color Line in Woodrow Wilson's America* (Chapel Hill: The University of North Carolina Press, 2013), 112-131. Debra A. Reid, *Reaping a Greater Harvest: African Americans, the Extension Service, and Rural Reform in Jim Crow Texas* (College Station: Texas A&M University Press, 2007); Allen W. Jones, "The South's First Black Farm Agents," *Agricultural History* 50 (Oct. 1976): 636–44; Carmen V. Harris, "'A Ray of Hope for Liberation': Blacks in the South Carolina Extension Service, 1915–1970" (PhD diss., Michigan State University, 2002).

The New Deal greatly expanded the purview of the USDA and offers important historical context for understanding the long-term effects of past racial discrimination and persistence of racial discrimination in the present. While the Roosevelt administration created farm programs to address the economic impact of the Great Depression for all American farmers, the needs of the rural South were especially pressing. The economic collapse of the 1930s only intensified longstanding problems of chronic poverty, pervasive racism, and a stagnant economy, with low prices for farm commodities caused by overproduction of commodities grown in the South, especially cotton and tobacco.

The New Deal greatly expanded the USDA's budget, power, and reach and, unfortunately, presented new opportunities for racial discrimination through three agencies in particular, the Agricultural Adjustment Administration, the Federal Cooperative Extension Service, and the Farm Security Administration. The first farm program of the New Deal, the Agricultural Adjustment Act, set out to tackle overproduction and raise farm incomes by paying farmers to limit the amount of land on which they would plant certain crops or limit their production of livestock. This program increased the power of the USDA, making it the only established federal department to have responsibility for a significant New Deal program and giving the USDA a significant regulatory role for the first time.[13]

The USDA, with the support of powerful southern representatives in Congress, organized the AAA in such a way that the program relied on local control so that the program would not challenge or interfere with the landowning and merchant elite's dominance of the rural South.[14] At first, agents of the Agricultural Extension Service informed farmers about the AAA and

---

[13] Phillips, 318; Galperin, "The Life of Administrative Democracy," 1221.
[14] Ira Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America (New York: W.W. Norton, 2006), 40.

signed them up. For a variety of reasons, the Roosevelt administration developed a decentralized plan that gave power to elected local committees to oversee the program. The way it worked was that administrators at the USDA's Washington headquarters figured out a commodity's national allotment and then gave a share to each state where the crop was produced. Then, each county was apportioned an allotment (the amount of a crop that could be grown) to be divided among individual farms based on their past production. AAA county committees determined these acreage allotments, administered the subsidies farmers received for limiting their production, and supervised farmers to make sure they planted no more than what they were allotted. Across the country, these elected county committees were made up of all white and often larger, more financially secure male farm owners. In the Jim Crow South, putting the local landowning elite in charge of administering the AAA meant giving them yet another tool for controlling the movement and prospects of workers and enriching themselves and members of their class at the expense of sharecroppers, tenant farmers, and small farm owners. As the main agricultural workforce and the smallest farm owners in the South, African Americans felt the brunt of this local elite control.[15]

To avoid threatening the power of landlords over sharecroppers, AAA administrators in Washington, D.C. acquiesced in giving sharecropper and tenant farmers' share of crop subsidy payments to their landlords, who often pocketed the funds rather than distributing them as the law required. In addition, the AAA contributed to the displacement of sharecroppers and tenant farmers, most of whom were black, because acreage reduction cut down on the need of these

---

[15] Pete Daniel, *Lost Revolutions,* 41.

landless agricultural producers. The number of nonwhite tenants and sharecroppers in the southern states declined from 698,839 in 1930 to 508,638 in 1940.[16]

Another discriminatory impact of the AAA was the new requirement, beginning in 1934, that made participation in the crop-control program mandatory. This program penalized black landowning farmers and some white landowning families as well, most of whom had already cut their small acreages of tobacco or cotton during the 1920s, when extension agents were urging them to limit production of cash crops in favor of producing more food and feed for their sustenance and that of their farm animals.[17]

Yet another consequence of the AAA was to make it more difficult for landless farmers and those not already participating in AAA programs to become independent landowners. This was true for all farmers but had a particularly prohibitive impact on black farmers. Two USDA studies confirm that commodity price supports raised the price of farmland by as much as 20 percent. "The commodity programs are tied to specific lands, which capitalizes the future value of the programs into the value of the land," one study shows.[18]

The Resettlement Administration and, later, the Farm Security Administration were the Roosevelt administration's most ambitious programs to wrestle with the problem of chronic rural poverty in the South. The goal of both programs was to help tenant farmers and sharecroppers become independent farmers and establish cooperatives.[19] Despite its promise and commitment to addressing the poverty of black and white rural southerners, the agency faced political

---

[16] Pete Daniel, *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures since 1880* (Urbana and Chicago: University of Illinois Press, 1985)*,* 101-104.
[17] Adrienne Monteith Petty, *Standing Their Ground: Small Farmers in North Carolina Since the Civil War* (New York: Oxford University Press, 2013), 104-105.
[18] Bruce J. Reynolds, *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives* (Washington: United States Department of Agriculture, Rural Business-Cooperative Service, RBS Research Report 194, 2003), 9.
[19] Reynolds, *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives*, 9.

backlash and ultimately set a precedent for some of the racially discriminatory practices that continue to characterize the USDA's dealings with black farmers today. The FSA attempted to lift tenants and sharecroppers to the status of independent farm owners by offering them farm purchase loans and resettling families in farming communities. By 1941, this agency had helped 1.5 million farm families nationwide. However, it limited its assistance to farmers it considered the surest bets for success. This criterion excluded all but a comparative handful of black farmers. Another factor limiting the success of the FSA was hostility from southern white politicians, who saw the program as a threat to their political power and to the social order of the southern labor system.[20]

Through the Federal Emergency Relief Administration (FERA) and the FSA, the New Deal also greatly expanded the USDA's involvement in giving farmers access to agricultural credit. FERA attempted to improve the economic prospects of destitute sharecroppers, tenant farmers, and small farm owners by providing them access to production credit and living credit, and closely supervising their farming. In the South, sharecroppers, tenant farmers, and small farm owners had relied on advances of seed, feed, and other supplies from supply merchants, who often charged usurious interest rates. Thus, New Deal programs had the potential to provide black farmers alternate forms of credit that would reduce their dependence on landlords and merchants.

The FSA's supervised credit programs provide important context for understanding the ongoing problem of racial discrimination in the USDA. To address not only poverty but also soil erosion and other environmental problems, the FSA required farm families to work with a government agent to make farm and home plans. The goal was to expose farm families to

---

[20] Charles Kenneth Roberts, "Client Failures and Supervised Credit in the Farm Security Administration," *Agricultural History* 87, no. 3 (Summer 2013), 370.

USDA-approved farming methods. Yet, over time, the practice of requiring oversight over loans emerged as a tool of racial discrimination that continued into the 1980s and 1990s. While supervised loans were a condition for many black farmers to obtain credit, white farmers faced no such condition.[21]

### D.  Displacement and Dispossession during the 1950s and 1960s

With technological revolutions in the production of cotton and other commodities, the 1950s represented a pivotal decade of displacement and dispossession for family farmers throughout the United States and especially in the South. Again, black farmers bore the brunt of the upheaval. During the 1950s, 67,000 African American farmers and 413,000 white landowning families were displaced from farming.[22] As large white landowners used USDA farm subsidies to invest in tractors and the mechanical cotton harvester, which International Harvester began manufacturing in 1947, black sharecroppers lost their livelihoods and left the countryside for southern towns and cities, and the urban North, Midwest, and West. Black farm owners faced competition from more prosperous white farm owners whose acquisition of planting, cultivating, and harvesting machinery enabled them to expand their farming operations while employing fewer laborers. While some officials within the USDA insisted that the agency should step in to ease the plight of farm families, others admonished farmers to "get big or get out."[23]

The discrimination against black farmers increased after the 1954 *Brown v. Board of Education* decision. Farmers who joined the National Association for the Advancement of

---

[21] Tadlock Cowan and Jody Feder, *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers* (Washington: Congressional Research Service, May 29, 2013), 1.
[22] Daniel, *Lost Revolutions,* 46.
[23] Pete Daniel, *Lost Revolutions: The South in the 1950s* (Chapel Hill: University of North Carolina Press for the Smithsonian National Museum of American History, 2000), 48-51.

Colored People or participated in the civil rights movement in any way were frozen out of loans or had their acreage allotments drastically reduced.[24] Overall, the civil rights era presents a huge paradox when it comes to understanding the history of the USDA's treatment of black farmers. Discrimination against black farmers at the hands of the USDA grew more severe at the very moment that one would assume their prospects would have improved. The United States Commission on Civil Rights detailed the racism and inequality that characterized USDA programs in its 1965 report *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture.*[25] The report found that the USDA's Farmers Home Administration (FmHA) subjected black farmers to variable treatment in farm loans. In selected southern counties, white borrowers received significantly larger loan sizes than black borrowers on comparably-sized farms. It also revealed that "not a single Negro had been elected to a county committee in the South." [26] Two years later, the Georgia State Advisory Committee to the U.S. Commission on Civil Rights published a study arguing that the USDA's pattern of denying Black people equal opportunity and equal treatment "begins in childhood when they are excluded from 4-H Club work and continues in later life when they are excluded from programs of the Extension service and from services of specialists in FmHA and the Agricultural and Stabilization Conservation Service."[27]

As Julian Bond, then an activist with the Student Nonviolent Coordinating Committee, observed during a 1967 speech, black people's "condition has worsened as their civil rights have increased. For every lunch counter seat won and black vote recorded, a farm, a home or a job has

[24] Pete Daniel, *Dispossession,* 17-18.
[25] U.S. Commission on Civil Rights, *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture* (Washington: Government Printing Office, 1965).
[26] U.S. Commission on Civil Rights, *Equal Opportunity in Farm Programs,* 57-82, 91.
[27] Georgia State Advisory Committee to the United States Commission on Civil Rights, *Equal Opportunity in Federally Assisted Agricultural Programs in Georgia,* (Washington: Government Printing Office, 1967), 2.

been lost or erased."[28] While civil rights laws ended segregation in public accommodations and a turn to equal opportunity, black farmers were displaced and dispossessed. The USDA promoted scientific and technological advancements in agricultural production but excluded most black farmers from this transition to capital-intensive agriculture by denying them access to loans and information.[29]

### E.   Heightened discrimination in the Post-Civil Rights Era

The discrimination continued into the 1970s and 1980s, with important parallels to some of the discrimination black farmers report experiencing in the present. In 1982, the United States Commission on Civil Rights detailed the way that discriminatory practices within the USDA kept black farmers from gaining access to credit. The USDA had not made any effort to set up enforcement mechanisms to ensure that it was not violating black farmers' civil rights. Instead, the USDA consistently perpetuated local patterns of segregation and racist proscription that endured even after major civil rights legislation had outlawed such practices.[30] Rather than address the problems cited in the 1982 report, the government shut down the USDA Office of Civil Rights Enforcement and Adjudication in 1983.[31] In 1990, after a series of hearings on civil rights violations at the USDA, Congress produced a report that concluded that the USDA had "been a catalyst in the decline of minority farming."[32] The graphs below illustrate the rise and fall in the number of farms owned by African Americans and the amount of land they gained and lost between 1870 and 1992.[33]

---

[28] Julian Bond, "Speech—'Great Days Ahead' concerning the plight of black farmers, ca. 1967," Box 1, folder 7, The Papers of Julian Bond, 1897-2006, Special Collections, The University of Virginia Library.
[29] Pete Daniel, *Dispossession*, 2.
[30] U.S. Commission on Civil Rights, *The Decline of Black Farming in America* (Washington: U.S. Commission on Civil Rights, 1982), 8-11.
[31] Cassandra Jones Havard, "African American Farmers and Fair Lending: Racializing Rural Economic Space," *Stanford Law and Policy Review* (Spring 2001), 4. The Office of Civil Rights was established in 1971.
[32] H.R. Rep. No. 101-984 (1990).
[33] Both graphs were created by Mark Schultz.





Source: Census of Agriculture, Selected years, Washington, DC: Bureau of the Census

In November 1996, Grant Buntrock, administrator of the Farm Service Agency, the successor agency to the FmHA, conceded publicly that the agency still discriminated against Black farmers in its lending. A month later, North Carolina farmer Timothy Pigford and 300 other Black farmers marched in protest in front of the White House. Dan Glickman, the Secretary of Agriculture during the Clinton Administration, set up a dozen "listening sessions" to allow black farmers nationwide to share their decades of discriminatory mistreatment by the USDA.

In 1997, the USDA issued yet another report titled "Civil Rights at the United States Department of Agriculture: A Report by the Civil Rights Action Team."[34] It was the latest in a string of reports since 1965 in which the federal government itself detailed government-sponsored discrimination targeting black farmers.[35] The report contained an example from Mississippi that exemplifies the enduring problem of discrimination during the 1990s. It took local USDA employees an average of 84 days to process loan applications for white farmers but an average of 222 days to process the same applications for black farmers. The consequence of

---

[34] Civil Rights Action Team, U.S. Department of Agriculture, *Civil Rights at the United States Department of Agriculture* (Washington: U.S. Department of Agriculture, 1997).
[35] Lloyd Wright, "Racial Equity in Agricultural and Rural Development Report: Preventing the Decline of Black Farmers and Black Rural Landownership," August 29, 2008, Revised November 20, 2010, W.K. Kellogg Foundation, 27.

such delays was the loss of annual farm income for many farmers because of the importance of calibrating planting to the weather and the marketing season.[36] It demonstrated that racism was endemic to the USDA. One farmer in Mississippi reported that the USDA treated black farmers and small farmers "worse than I would treat a dog."[37]

The discriminatory tactics took a variety of forms, from dismissive treatment to threats of violence. Testifying before Congress, Arnetta Cotton recalled the way USDA employees in an FmHA office treated her and her husband, beginning farmers who visited the office for information: "We thought we would be welcomed with open arms. Instead, when we stepped into our county FmHA office in 1984, the secretary looked up and continued working without ever acknowledging our presence. 'Ma'am, is this the FmHA,' we asked. 'Yes,' she answered, never moving from her desk." Nearly a decade later, in southeastern Virginia, a white FSA officer flaunted a loaded handgun at Philip J. Haynie III, who, at the time, was a college student and aspiring farmer and his father, an established black farmer. After telling the younger Haynie to focus on getting a good job after college rather than becoming a farmer, he humiliated both men by asking the son if he knew how much debt his father was in.[38] In addition to subjecting black farmers to dismissive or hostile treatment in county offices, USDA administrators refused to give black farmers loan applications and outright denied loan requests and emergency relief payments. Meanwhile black farmers saw their white neighbors getting the loans and payments they needed. Other tactics that effectively made it impossible for black farmers to farm included giving them a loan for seed but not for fertilizer and pesticides. As had been the case since the

---

[36] Wright, 28.
[37] Civil Rights Action Team, *Civil Rights at the United States Department of Agriculture*, 4.
[38] "Prepared Statement of Philip J. Haynie III, Chairman, National Black Growers Council, Burgess, VA," in *A Hearing to Review the State of Black Farmers in the U.S.: Hearing Before the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, First Session, March 25, 2021,* Serial No. 117-3, 100.

New Deal, the typically all-white county elite effectively controlled local USDA administrators and programs. Meaningful loans went to wealthy white farmers, not to more modest black family farmers. Black farmers still report experiencing delays in loan approvals today. The net impact of these discriminatory USDA practices was to make it impossible for them to make a living from year to year, let alone to pass down their land and the vocation they love to their children and grandchildren.

The *Pigford v. Glickman* suit charged the USDA with discriminating against black farmers and failing to properly investigate and resolve discrimination complaints.[39] Focusing on the years between 1982 and 1996, the complaint alleged that the USDA had denied black farmers access to federal farm operating loans, disaster payments, and other financial support that the agency is obligated to provide to low-income farmers.[40] The suit was against Secretary of Agriculture Dan Glickman, and it called for an end to farm foreclosures and restitution for financial ruin they claimed was brought on by discrimination.

In 1999, Judge Lawrence J. Friedman ruled that the USDA had systematically discriminated against black farmers by denying them government loans. Friedman argued that "the United States Department of Agriculture and the county commissioners to whom it has delegated so much power bear much of the responsibility for this dramatic decline" of African American farmers.[41] The court mandated that the USDA compensate African American farmers for lost income. It laid out a five-year consent decree with two tracks that established a mechanism for members of the class to obtain relief. Track A gave farmers a payout of $50,000.

[39] *Pigford, v. Glickman,* Civil Action No. 97-1978 (PLF).
[40] Valerie Grim, "Between Forty Acres and a Class Action Suit: Black Farmers, Civil Rights, and Protest against the US Department of Agriculture, 1997–2010," in Reid and Bennett, *Beyond Forty Acres and a Mule,* 271–96.
[41] *Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C. 1999)

Under the consent decree, an eligible recipient was an African American who (1) owned or leased or attempted to own or lease  farmland between January 1, 1981, and December 31, 1996, (2) applied to USDA for farm credit or program benefits and believes that he or she was discriminated against by the USDA on the basis of race, and (3) made a complaint against the USDA on or before July 1, 1997.[42] Track B gave farmers the option of going through arbitration with a higher burden of proof but with the possibility of a higher award.

In 2004, the Environmental Working Group issues report finding that USDA and DOJ have spent millions of dollars to block settlements, even though both departments had endorsed and affirmed the 1997 Civil Rights Commission report that provided extensive evidence of discrimination and accepted the *Pigford* judgment. In an effort to rectify the situation, the Obama administration announced a $1.25 billion deal with black farmers. As Barack Obama noted, the goal of the payments was to bring "these long-ignored claims of African-American farmers to a rightful conclusion."[43] This new payout was intended for people who were denied earlier payments because they had missed deadlines for filing.[44]

## II.     Discrimination Persists Today Despite the *Pigford* Decision

The *Pigford* decision offered the USDA a moment to end discrimination against black farmers once and for all. Despite the landmark nature of the ruling, it did not require the USDA to hold anyone accountable for discriminatory actions or improve and expedite the investigation of civil rights complaints. Nor did it make any structural changes to the decentralized way it

---

[42] *Pigford, v. Glickman,* Civil Action No. 97-1978 (PLF).
[43] Clement Tan, "Obama administration reaches deal for black farmers," *Los Angeles Times,* February 19, 2010, https://www.latimes.com/archives/la-xpm-2010-feb-19-la-na-black-farmers19-2010feb19-story.html, accessed May 25, 2022.
[44] The Associated Press, "Deal Nearer for Farmers in Bias Case," *The New York Times,* February 18, 2010, http://www.nytimes.com/2010/02/19/business/19farm.html?emc=eta1, accessed May 25, 2022.

administers its loan programs.[45] Without any legal mandate to eliminate discrimination, the USDA has continued administrative practices that perpetuate discrimination. Moreover, this ongoing discrimination transcends political party and presidential administration.

Despite the USDA's demonstrable lack of transparency highlighted during the *Pigford* case, the agency continues to be cavalier in its responsibility to readily provide vital data about its dealings with black farmers and other socially disadvantaged farmers. Journalists have had to file Freedom of Information Act requests and representatives have had to ask USDA officials for answers regarding the treatment of black farmers during hearings. Some of the information the agency does report is faulty. By admission of its own employees, "USDA has struggled maintaining data integrity." This revelation appeared in a 2016 report to the Equal Employment Opportunity Commission that three writers obtained through a Freedom of Information Act request.[46] The work of investigative journalists, Congressional testimony, scholarly articles, and recent interviews with clients of the Federation of Southern Cooperatives/Land Assistance Fund reveal that the USDA's discriminatory practices and policies endure.

1) **The 2018 Market Facilitation Plan and the 2020 CARES Act had a discriminatory impact on black farmers**

Based on a Freedom of Information Act request, Nathan Rosenberg and Bryce Wilson Stucki found that of the $8 billion in aid to farmers affected by the Chinese government's

---

[45] Since Pigford, experts have called for changes that would address discrimination in the USDA. See "Prepared Statement of Cassandra Jones Havard," *African-American Farmers Benefit Relief Act of 2007, and the Pigford Claims Remedy Act of 2007, Hearing before the Subcommittee on the Constitution, Civil Rights, and Civil Liberties of the Committee on the Judiciary, House of Representatives,* One Hundred Tenth Congress, First Session, on H.R. 558 and H.R. 899, June 21, 2007, Serial No. 110-46; "Statement of Shirley Sherrod, Executive Director, Southwest Georgia Project for Community Education, Inc. Albany, GA," *Hearing to Review the State of Black Farmers in the U.S.,* 104.

[46] Kathryn Joyce, Nathan Rosenberg, and Bryce Stucki, "The 'Machine That Eats Up Black Farmland,'" *Mother Jones,* May-June 2021, https://www.motherjones.com/food/2021/04/the-machine-that-eats-up-black-farmland/, accessed May 29, 2022.

retaliatory tariffs on farm commodities, 99.8 percent of the funds went to white farmers. According to the article, "In Mississippi, for example, where 38 percent of the population is black and 14 percent of farms have a black principal operator, according to the 2017 Census of Agriculture, only 1.4 percent of the $200 million distributed to farmers through the MFP went to black operators."[47]

The 2020 Coronavirus Aid, Relief, and Economic Security Act (CARES Act) offers another recent example of discriminatory USDA programs. Under the CARES Act, the Office of the Secretary of the Department of Agriculture received $9.5 billion, approximately 19% of the total food and agriculture provisions, to provide financial support to farmers and ranchers experiencing financial pressure and loss of profit caused by the COVID-19 pandemic. However, black farmers and other socially disadvantaged farmers forced to compete with white farmers who have decades of privileged access to farm loans and subsidies, received only 0.1 percent of COVID-19 relief from the CARES Act. Of the roughly $26 billion under the Coronavirus Food Assistance Program, $20.8 million went to Black farmers. According to Secretary of Agriculture Tom Vilsack, "The top 10 percent of farmers in the United States received 60 percent of the value of the covid payments. And the bottom 10 percent received 0.26 percent."[48]

2) **Black and other socially disadvantaged producers receive fewer loans**

A Government Accountability Office (GAO) report in 2019 found that socially disadvantaged producers received proportionately fewer FSA direct and guaranteed loans than

---

[47] Nathan Rosenberg & Bryce Wilson Stucki, "USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers," *The Counter,* July 29, 2019, https://thecounter.org/usda-trump-trade-war-bailout-white-farmers-race/, accessed May 30, 2022, https://thecounter.org/usda-trump-trade-war-bailout-white-farmers-race/
[48] Laura Reiley, "Agriculture Secretary Tom Vilsack says only 0.1 percent of Trump administration's covid farm relief went to Black farmers," *The Washington Post,* March 25, 2021, https://www.washingtonpost.com/business/2021/03/25/vilsack-interview-usda-rescue-plan/

other farmers.[49] This discrimination against black and other socially disadvantaged farmers represents a dereliction of the USDA's mandate to expand credit access to farmers for whom commercial loans are not as obtainable.

3) **Between 2006 and 2016, the USDA was more than six times as likely to foreclose on black farmers than on any other group of farmers**

Through a Freedom of Information Act request, Nathan Rosenberg and Bryce Wilson Stucki discovered that black farmers made up 13 percent of farmers on whom the USDA foreclosed although they made up less than 3 percent of USDA's direct-loan recipients. Speaking on the condition of anonymity, a USDA employee reported being aware of at least one farmer who faced foreclosure from the USDA even though it was the agency's discriminatory dealings that put him in a tight financial spot. When asked about the high rate of foreclosures on black farmers, Joe Leonard, former assistant secretary of civil rights, blamed the victim, arguing that the problem was black farmers' lack of "financial literacy."[50]

4) **The USDA's approach of prioritizing the interests of corporate, industrialized farming over smaller farmers has a disproportionately negative impact on black farmers**

Speaking to dairy farmers in Wisconsin, former secretary of agriculture Sonny Perdue argued in 2019 that, "in America, the big get bigger and the small go out. I don't think in America we, for any small business, have a guaranteed income or guaranteed profitability." He is the latest in a long line of agriculture secretaries of both parties who, since the 1950s, have

---

[49] U.S. Government Accountability Office, "Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited," https://www.gao.gov/products/gao-19-539
[50] Nathan Rosenberg and Bryce Wilson Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers," *The Counter,* October 26, 2019, https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/

advanced this orientation toward industrialized farming, even if few have stated it as frankly as Perdue did. Perdue delivered these comments to dairy farmers in Wisconsin, which lost 551 dairy farms in 2019, 638 in 2018, and 465 in 2017.[51] Such an agribusiness-oriented approach harms black farmers even more than it harms the predominantly white, small- and medium-scale dairy farmers of Wisconsin. More than 95% of farmers in the United States are white while only 1.4% are black, according to the USDA's 2017 Census of Agriculture. Farms operated by African Americans account for 0.5% of the U.S. total, and black farmers own about 0.3% of all farmland in the United States.[52] Overall, wealth and income are more unequally distributed among American farmers than in society as a whole. The largest farms in the United States, which make up two percent of all farms and rely on hired labor, average $2.5 million in gross cash farm income annually and produce more than half of all farm production in the country.[53] By contrast, 57 percent of black-operated farms had sales and government payments of less than $5,000 per year.[54]

Encouraging small, sustainable farming among black farmers and other socially disadvantaged farmers and reducing the orientation toward larger farm operations could help tackle the problem of climate change, stemming the increase in greenhouse gas emissions from farming. Supporting small farms also could meet the public's increased demand for local food production.[55]

---

[51] Todd Richmond, "Trump ag secretary in Wisconsin: No guarantee small farms will survive," *Fox 11 News,* October 1, 2019, https://fox11online.com/news/state/us-agriculture-secretary-to-address-wisconsin-town-hall, accessed May 19, 2022.

[52] 2017 Census of Agriculture

[53] Stephen Carpenter, "Family Farm Advocacy and Rebellious Lawyering," *Clinical Law Review* 24 (October 2017), 82.

[54] "Black Producers," 2017 Census of Agriculture Highlights, https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf, accessed May 20, 2022.

[55] Carolyn Dimitri and Anne Effland, "From farming to food systems: the evolution of US Agricultural production and policy into the 21st century," *Renewable Agriculture and Food Systems* (2018), 10-12.

**5) The decentralized administration of USDA programs leaves open the opportunity for discrimination**

The USDA continues to rely on a county committee structure, first implemented during the New Deal era, to administer its farm loan program and other programs on the local level. Today, the agency relies on more than 7,700 committee members who sit on more than 2,200 committees across the nation and wield a considerable amount of power. According to the USDA, these three- to five-person committees make decisions regarding price support loans and payments, verify farmers' acreage, oversee conservation programs, decide which farmers receive incentive, indemnity, and disaster payments, and how much, and verify farmers' eligibility for payment.[56] Part of their charge is to "ensure fair and equitable administration of FSA farm programs in their counties and are accountable to the Secretary of Agriculture."[57] Yet the 1997 Civil Rights Action Team report argued that USDA leadership in Washington, D.C. lacked the ability, capacity, and will to manage thousands of local committees, which were more beholden to their local electors than to USDA federal bureaucrats.[58] The report recommended that Congress establish more centralized control over county committees and take away the committees' authority to determine who was eligible for loans. Cassandra Jones Havard, a legal scholar, echoed both the 1965 *Equal Opportunity in Farm Programs* report and the 1997 report in calling for reform of the county committee system, arguing that it "gives elected farmers both critical discretion regarding loan eligibility and an opportunity for self-aggrandizement."[59] And, of course, Friedman singled out the committees as a driving force of discrimination when he

---

[56] "Farm Service Agency: County Committee (COC) Frequently Asked Questions for Stakeholders," https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/NewsRoom/County-Committee-Elections/pdf/2019%20County%20Committee%20Elections.pdf
[57] "Farm Service Agency: County Committee (COC) Frequently Asked Questions for Stakeholders"
[58] Civil Rights Action Team, U.S. Department of Agriculture, *Civil Rights at the United States Department of Agriculture* (Washington: U.S. Department of Agriculture, 1997), 18-20
[59] Havard, "African-American Farmers and Fair Lending," 1.

issued the *Pigford* decision. Other criticisms of the county committee system include the committee members' varying levels of administrative expertise, the interest of some farmers in serving because they are ideologically opposed to farm programs, and the problem that some farmers are either "unaware or only vaguely aware that the committee system even exists; even when they are aware of the committees, they tend to underestimate committee authority."[60] There have been a few reforms to the system. The Farm Security and Rural Investment Act of 2002 gave the Secretary of Agriculture the option of appointing one additional social disadvantaged member to county committees to achieve greater fairness.[61] There also were provisions to increase access and provide more transparency about the elections.[62]

Yet criticism of the county committees continues among scholars and farm advocates. In a 2020 article, Joshua Ulan Galperin, a legal scholar, argues that these county committees are unconstitutional because they are not subject to the system of checks and balances. Committee members are not subject to Congressional and Presidential power over administrators and the President does not have the ability to remove committee members from their positions if they abuse their positions.[63] Despite the concerns raised about county committees, the USDA resisted call for meaningful change.

**6) OASCR still fails to investigate complaints in a thorough and timely manner**

For more than 20 years, various federal agencies have documented the USDA's failure to investigate and resolve civil rights complaints. The Government Accountability Office (GAO) alone issued at least 10 reports between 1999 and 2009. In a 2008 report, the GAO argued that

[60] Galperin, "The Life of Administrative Democracy," 1249
[61] Carol Canada, "Farm Service Agency Committees: In Brief," Congressional Research Service, January 29, 2021, https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pdf
[62] Galperin, "The Life of Administrative Democracy," 1251. Galperin notes that there was opposition to the nonelected minority. See Galperin, "The Life of Administrative Democracy," 1252.
[63] Galperin, "The Life of Administrative Democracy," 1255-1256.

the USDA's civil rights division failed to improve accountability in the department. It found that the USDA was uncooperative when it came to investigations of discrimination and neglected its responsibility of prohibiting discrimination in its programs and workplace. As the report noted, "At a basic level, the credibility of USDA's efforts has been and continues to be undermined by ASCR's faulty reporting of data on discrimination complaints."[64] The USDA's failure to process and resolve discrimination complaints often negatively impacted the livelihood of the farmers involved.

Most recently, in a 2021 report, the USDA Office of Inspector General (OIG) found the same problems as the 2008 report had noted. It found that the Office of the Assistant Secretary for Civil Rights failed to process civil rights complaints in a timely and thorough manner. Processing times steadily increased between 2017 and 2019, from 571 days in 2017 to 799 days in 2019, many more days than the 180-day departmental guidance. More than 85 percent of complaints between 2017 and 2019 took longer than 180 days to process.[65] During a February 2022 congressional hearing to review the 2021 OIG report, Phyllis Fong, Inspector General for the USDA Office of Inspector General, said "We have identified these same themes 14 years ago in testimony to Congress, and civil rights and outreach activities have been a management challenge on our list of key challenges facing the Department for 20 years now," she said. "The problems remain, and I think if we look at the course of the program over the years, at times

---

[64] United States Government Accountability Office, "U.S. Department of Agriculture: Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention," Testimony before the Subcommittee on Government Management, Organization, and Procurement, Committee on Oversight and Government Reform, House of Representatives, May 14, 2008, 107.
[65] Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," Audit Report 60601-0001-21, September 2021, 6, 10.

there's progress and then at other times, due to change in priorities or change in focus, other priorities take precedence."[66]

In addition to lengthy processing times, the 2021 OIG report found that OASCR did not take care to adequately document their reviews to ensure accuracy and fairness. In half of the cases sampled, there was inadequate documentation. According to the report, "Considering USDA's long history of discrimination complaints, it is critical that OASCR adequately support its determinations."[67]

Another concern the report raises is the tendency in OASCR is to speed through complaints rather than review them thoroughly. The complaints process is so flawed that many complaints with merit go unaddressed. During the February 2022 hearing with the OIG, Rep. Jahana Hayes noted that USDA/OASCR employees themselves have called attention this problem: "There have been troubling reports about the failure to adequately investigate discrimination complaints. In fact, several OASCR employees have alleged that there is a focus on closing complaints to meet processing timeframes, rather than investigating and assessing the substance of complaints," she said.[68] As a result, there has been a pattern of the OASCR rejecting or closing all but a few cases, even when some employees report that many cases have merit.[69] A recent report by Harvard Law School's Food Law and Policy Clinic showed that the complaint process itself is often discriminatory, penalizing farmers who filed grievances by taking a long time and sometimes foreclosing on farmers before their complaints have been reviewed (before a temporary moratorium on this practice went into effect). The report

---

[66] "Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints," Hearing before the Subcommittee on Nutrition, Oversight, and Department Operations of the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, Second Session, February 15, 2022, Serial No. 117-30, 20.
[67] Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," 26.
[68] "Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints," 21.
[69] Rosenberg and Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers."

recommended several changes to rectify the USDA's long history of mishandling discrimination complaints, including fast-tracking certain complaints, improving and expediting the process overall, and reporting statistics and the substance of complaints with transparency, both to the complainants and to the public.[70]

7) **FSA agents give farmers costly and misleading information and retaliate when they complain.**

The experience of Arthur Eaton offers an example of the FSA's administrative neglect and the willingness of its agents to misuse their positions to retaliate against farmers who complain about discrimination. Eaton is a 59-year-old farmer from Mount Olive, Mississippi, who has been growing a variety of fruits and vegetables on contract and for sale at farmers' markets for 12 years. Over the years, Eaton has invested in several changes that would allow him to expand his business and centralize the distribution of his produce.

In 2017, Eaton entered into a contract with Capital Produce in Baton Rouge, Louisiana, to produce cayenne peppers. He planted 15-20 acres of peppers, which represented a $10,000 investment. Unbeknownst to him at the time, a farmer half a mile from him treated the cotton growing on his farm with Dicamba, an herbicide. The spray drifted down to Eaton's growing acreage of peppers and "took my plants out."

Because of this crop failure, Mr. Eaton had to figure out a way to generate income to compensate for this loss and to continue paying off an FSA loan. He went to his local branch of Community Bank to try to get a guaranteed loan so that he could invest in greenhouses and honor his contract with Capital Produce. He completed the application and had to contact the

---

[70] Harvard Law School Food Law and Policy Clinic, "Supporting Civil Rights at USDA: Opportunities to Reform the USDA Office of the Assistant Secretary for Civil Rights," April 2021, https://chlpi.org/wp-content/uploads/2013/12/FLPC_OASCR-Issue-Brief.pdf

FSA. Instead of working with the office in Hattiesburg, he was directed to Dave Blakely, an FSA loan officer. Working with Blakely gave Eaton pause because of an earlier experience with him. Back in 2004, when Eaton was first looking to purchase his farm, he had visited the FSA office and asked Blakely about getting a direct loan of $200,000 to purchase the property. Blakely informed him that the FSA only offered guaranteed loans for farm ownership, not direct loans. However, after doing his own research, Eaton discovered that the FSA *did* offer direct loans for farm ownership. He called Blakely, revealed what he'd learned, and told him that he was returning to the office to pick up an application. "When I got there," Eaton recalled, "he wouldn't talk to me. He stayed in his office and had [a woman who works in the office] give me near a book of paperwork to fill out." Eaton filed a grievance about the misleading and demeaning treatment he received from Blakely. His loan finally went through in April 2005.

Despite his misgivings and mistrust of Blakely, Eaton had no choice but to work with him on obtaining the loan he needed to recover from the loss of his pepper crop. He waited for the bank to submit the paperwork to Blakely. As he waited, he got in touch with Blakely to find out if he should apply for loan servicing.[71] Blakely told him this would not be necessary. "Two weeks passed, and they didn't do it, so they've got me in a bind," Mr. Eaton described. He sold some apartments and made an FSA payment in 2019 because Blakely had assured him that making a payment would reset the clock and provide him more time to pay off his debt. He also purchased a trailer in which he planned to raise oyster mushrooms under contract. "I wouldn't have done that had I known I couldn't trust the FSA," he explained. He got a call from Blakely, who later brought him a letter saying that the payment he made had not reset the clock and that

---

[71] Interview with Arthur Eaton by Dānia Davy et. al., May 20, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.

the payment was due. Blakely said that his boss and Jackson and administrators in Washington had confirmed that his payment would not reset the clock.

Eaton didn't panic. He stayed busy and kept the faith that he would be able to make his payment from the sale of tomatoes to Capital Produce, which contracted with him for 1,500 to 2,500 pounds of tomatoes a week. But then COVID-19 hit, and Louisiana shut down. "I'm stuck with tons of tomatoes and mushrooms that I don't really have a market for," he remembered.

Shortly afterward, he received a letter from the FSA that they were foreclosing on him—right at the beginning of the pandemic. The FSA was preparing to do an inventory of his farm and to start pulling his equipment. He pleaded with them to at least let him hold onto his greenhouse and his homestead, but they said they were going to auction everything off. A fortuitous phone call from a woman who runs one of the farmer's markets where he sold produce helped Eaton halt the auction. She was just checking to see how he was faring because of COVID. After hearing about Eaton's ordeal, she suggested that he call a lawyer who'd bought produce from him in the past. The lawyer suggested that Eaton file bankruptcy to block the FSA from being able to foreclose on him.

For now, Eaton has managed to hold onto his farm and work toward paying off his debt. In addition to obtaining and license and beginning to grow hemp marijuana, he is currently applying for a license to grow medical marijuana in his greenhouse. Yet his ordeal with the FSA highlights the reality that the USDA is six times more likely to foreclose on a black farmer than a white one.[72] Discrimination in the administration of government assistance prevents Eaton and other black farmers from overcoming historical and ongoing roadblocks to farming.

---

[72] Rosenberg and Stucki, "How USDA distorted data to conceal decades of discrimination against Black farmers."

**8) Some black farmers are dealing with the combined impact of the COVID-19 pandemic and recent discrimination**

Julian Marcus, an established Georgia poultry farmer, suffered a devastating blow in 2017 when a storm destroyed two of his four poultry houses. Compounding the loss of these two houses was the fact that an FSA loan officer demanded that he pay off his FSA loan immediately with the insurance money that he received from the loss of the poultry houses. If he did not pay, the loan officer said, the USDA would foreclose on him. The officer argued that the USDA was the primary lien holder on the insurance policy, so Marcus should have turned the check over to the USDA. Marcus ended up paying off the loan, a farm ownership loan, for $219,642.10. This was just the latest example of issues he had with the same loan officer, and he suspects that the officer's insistence that he pay the loan off was in retaliation for a discrimination complaint Marcus filed over a delay in processing a farm purchase loan, which cost Marcus an opportunity to expand to eight poultry houses. When asked how COVID impacted his business, Marcus was clear. "If I had been able to rebuild after the storm, I would have been able to avert the adverse impact of COVID. I assume something different transpired with white farmers because several farms were decimated, and they were able to rebuild their farms." His problems with the FSA stunted his plans for expansion. "Initially, I wanted to do 4 to 6 to 8 [poultry houses]," Marcus said. "Now, I just want to get back to four. Black farmers are not able to acquire any land to expand. "The only farmers that are acquiring more land and building more chicken houses are white farmers."[73]

**9) An FSA loan officer threatened to arrest a young black farmer**

---

[73] Interview with Julian Marcus, by Dānia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives-Land Assistance Fund.

Hosea Henry, a 41-year-old black farmer from Georgia, has not farmed on his own since 2010. This is not by choice. In 2007, he had obtained an FSA loan to buy land. He raised row crops for two years and then decided to purchase cattle. He got a loan to buy 55-head of cattle, but he initially only bought 30. Everything was going well at first. Clark Gordon, the loan supervisor, who is black, encouraged him to purchase 25 more cows. To keep down costs, Henry opted to buy cattle that were low in weight. The supervisor told him that his cows were looking good. However, another person passing by his farm apparently disagreed. "Someone called in on me and said I wasn't taking care of my cows," Henry recalled. The loan officer demanded that he liquidate his cows. "He was very nasty with me that day," Henry recalled. "He threatened to arrest me if I didn't sign the paper to liquidate my cows." The loan officer, a white man, refused to listen to Gordon when he tried to explain that Henry was taking good care of the cattle. "He [the white loan officer] made Clark stop talking that day in the office," Henry said. "Clark was trying to tell him it wasn't that bad." While Henry had paid $35,000 for the cattle, he ended up selling them for less than $15,000. Today, he remains $120,000 in debt to the FSA. "I feel like because I was a young black farmer, they just railroaded me," Henry said. "I still to this day haven't bounced back from that."[74]

10) **The FSA continues to subject black farmers to dismissive treatment and to deny them equal service**

Angela Calvin's experience two years ago in Hale County, Alabama, sounds eerily reminiscent of the dismissive, discriminatory treatment that farmers experienced at the hands of the Farmers Home Administration during the 1950s and 1960s, and that Arnetta Cotton and her husband experience during the 1980s. In 2020, Calvin and her husband visited the USDA office

---

[74] Interview with Hosea Henry by Dānia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives-Land Assistance Fund.

in the county after purchasing a 44-acre farm in Greensboro. As first-time farmers, they wanted to find out information and programs that might help them get established. Instead of the "customer-driven" service that the FSA promises that producers will receive at county offices, a staff person at the office curtly told them "We don't have any grant money available."[75] Calvin recalled that she and her husband just looked at each other and tried to maintain their composure. They felt "belittled" as they left the office. The staff person had treated them "like we were in there for a handout."[76] Receiving courteous, attentive, and informative service in FSA offices is crucial for black farmers because they tend to live in communities with unstable and unreliable internet connections because of the well-known lack of broadband in rural communities, and the inability to afford high-speed access. While the 2017 Census of Agriculture reports that 62 percent of black-operated farms have internet access, it is not clear whether this access is high-speed.[77] A 2021 report found that more than 1 in 3 rural black southerners lack internet access in their homes, and one in four lack the option to subscribe to high-speed broadband.[78]

**Conclusion**

The *Pigford* decision was not the turning point that it could have been. The USDA has not taken deep and lasting steps to combat discrimination in the administration and thrust of its programs. It continues to vest administration of its loan programs in county committees despite the *Pigford* case establishing the discriminatory impact of these committees. It continues to

---

[75] "History and Mission," U.S. Department of Agriculture Farm Service Agency website, https://www.fsa.usda.gov/about-fsa/history-and-mission/index; Interview with Angela Calvin by Eric Hilton et. al., May 25, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.
[76] Interview with Angela Calvin.
[77] "Black Producers," 2017 Census of Agriculture.
[78] Dominique Harrison, "Affordability & Availability: Expanding Broadband in the Black Rural South," Joint Center of Political and Economic Studies, October 2021, 2-7, https://jointcenter.org/wp-content/uploads/2021/10/Affordability-Availability-Expanding-Broadband-in-the-Black-Rural-South.pdf, accessed May 29, 2022. The study notes that expanded broadband is a necessity for black farmers to gain access to government funding and to operate "precision agricultural equipment."

mishandle its responsibility to investigate accusations of discrimination in a serious and timely manner. And it continues to enrich large white-controlled corporate farming at the expense of black farmers. Perhaps the most damaging consequence of discrimination continuing unabated at the USDA is that black farmers' deep distrust of the agency, which they dubbed the "last plantation," has continued. Speaking before Congress in 2020, Shirley Sherrod, a former USDA official and long-time farm advocate, recalled her grandfather's skepticism about the USDA:

> What that [ongoing discrimination] has done is in addition to farmers trying and being denied, they don't feel there is a place for them to go. We have to go back and try to help farmers understand that this agency is there for them, because so many of them think that is not the case. Many of them think like one of my grandfathers, when he had the opportunity to try to apply for money, he said I have never borrowed money from Farmers Home Administration, because it is just a way to take a Black farmer's land. That has proven to be true.[79]

---

[79] *Hearing to Review the State of Black Farmers in the U.S.,* 128.

**Qualifications**

I am an associate professor of history at the College of William & Mary. I earned an undergraduate degree from Northwestern University's Medill School of Journalism, and my master's and doctorate in History from Columbia University. Before joining the faculty of the College of William & Mary in 2017, I was a faculty member at the City College of New York for a decade. In addition, I have held adjunct and visiting positions at Swarthmore College in Pennsylvania, Rutgers University-Newark in New Jersey, and Shaw University in North Carolina. I also worked as a reporter at the *Roanoke Times* in Roanoke, Virginia.

My research has focused on the history of farmers in the American South since the Civil War. My doctoral dissertation and first book, *Standing Their Ground: Small Farmers in North Carolina Since the Civil War* (2013) analyzed small farm owners' efforts to hold onto their land and livelihood in the face of successive and overlapping changes in farming and USDA policy. The book won the H.L. Mitchell Award from the Southern Historical Association and the Theodore Saloutos Award from the Agricultural History Society. Along with historian Mark Schultz, I was awarded a collaborative research grant from the National Endowment for the Humanities in 2011 to lead undergraduate and graduate students in conducting oral history interviews with African American farm owners and their descendants. Most of the interviews took place between 2011 and 2013 and are archived in the University of North Carolina—Chapel Hill's Southern Oral History Collection. Schultz and I are currently completing a book on the history of African American farm owners that draws upon these interviews and extensive archival research.

I have a national reputation as an expert on U.S. agricultural history, having served as president of the Agricultural History Society and having spoken at an opening symposium for the

Smithsonian National Museum of African American History and Culture. My twenty-five years of researching southern agriculture, specifically the plight of small farmers, qualifies me to comment on the discriminatory history of farm policy and discrimination in the implementation of contemporary USDA programs. I have not testified as an expert by trial or by deposition in the past four years. I have included my list of publications in the previous 10 years below as part of my Curriculum Vita.

**Compensation**

My rate of compensation is $100 per hour for document preparation and consultation. My compensation is not contingent on or affected by the substance of my opinions or the outcome of this litigation.

I could and would competently testify to the above if called and sworn as a witness under oath and penalty of perjury under the laws of the United States of America.
Executed May 31, 2022 in James City County, Commonwealth of Virginia.

## Materials Reviewed

**Congressional Hearings**

African-American Farmers Benefit Relief Act of 2007, and the Pigford Claims Remedy Act of 2007, Hearing before the Subcommittee on the Constitution, Civil Rights, and Civil Liberties of the Committee on the Judiciary, House of Representatives, One Hundred Tenth Congress, First Session, on H.R. 558 and H.R. 899, June 21, 2007, Serial No. 110-46

A Hearing to Review the State of Black Farmers in the U.S. Hearing Before the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, First Session, March 25, 2021, Serial No. 117-3, 100.

Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints," Hearing before the Subcommittee on Nutrition, Oversight, and Department Operations of the Committee on Agriculture, House of Representatives, One Hundred Seventeenth Congress, Second Session, February 15, 2022, Serial No. 117-30

**Cases**

*Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C. 1999)

**Interviews**

Interview with Angela Calvin by Eric Hilton et. al., May 25, 2022, recording in possession of the Federation of Southern Cooperatives-Land Assistance Fund.

Interview with Arthur Eaton by Dãnia Davy et. al., May 20, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.

Interview with Hosea Henry by Dãnia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.

Interview with Julian Marcus, by Dãnia Davy et. al., May 27, 2022, recording in possession of the Federation of Southern Cooperatives/Land Assistance Fund.

**Government Reports**

Census of Agriculture, select years

"Civil Rights at USDA: A Backgrounder on Efforts by the Obama Administration," https://www.law.umich.edu/facultyhome/margoschlanger/Documents/Publications/Office

s_of_Goodness/USDA%20Civil%20Rights%20at%20USDA%20A%20Backgrounder%20on%20Efforts%20by%20the%20Obama%20Administration.pdf

Georgia State Advisory Committee to the United States Commission on Civil Rights, *Equal Opportunity in Federally Assisted Agricultural Programs in Georgia.* Washington: Government Printing Office, 1967.

Office of the Inspector General, "USDA Oversight of Civil Rights Complaints," Audit Report 60601-0001-21, September 2021.

Reynolds, Bruce J. *Black Farmers in America, 1865-2000: The Pursuit of Independent Farming and the Role of Cooperatives.* Washington: United States Department of Agriculture, Rural Business-Cooperative Service, RBS Research Report 194, 2003.

U.S. Commission on Civil Rights, *The Decline of Black Farming in America*. Washington: U.S. Commission on Civil Rights, 1982.

United States Commission on Civil Rights, *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United Department of Agriculture.* Washington: Government Printing Office, 1965.

U.S. Government Accountability Office, "Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited," https://www.gao.gov/products/gao-19-539

United States Government Accountability Office, *Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention* (Washington: Government Accountability Office, 2008).

**Books and Articles**

Asare-Baah, Lucy, Robert Zabawa, and Henry J. Findlay. "Participation in Selected USDA Programs by Socially Disadvantaged Farmers." *Journal of Rural Social Sciences* 33, no. 1 (2018): 32-55.

Canada, Carol. "Farm Service Agency Committees: In Brief," Congressional Research Service, January 29, 2021, https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pd

Carpenter, Stephen. "Family Farm Advocacy and Rebellious Lawyering." *Clinical Law Review* 24 (October 2017): 79-134.

Cowan, Tadlock and Jody Feder. *The Pigford Cases: USDA Settlement of Discrimination Suits by Black Farmers.* Washington: Congressional Research Service, May 29, 2013.

Daniel, Pete. *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures since 1880.* Urbana and Chicago: University of Illinois Press, 1985.

Daniel, Pete. *Dispossession: Discrimination Against African American Farmers in the Age of Civil Rights.* Chapel Hill: University of North Carolina Press, 2013.

Daniel, Pete.  "Farmland Blues: The Legacy of USDA Discrimination," *Southern Spaces,* October 20, 2015

Daniel, Pete. *Lost Revolutions: The South in the 1950s.* Chapel Hill: University of North Carolina Press for the Smithsonian National Museum of American History, 2000.

Dimitri, Carolyn and Anne Effland. "From farming to food systems: the evolution of US Agricultural production and policy into the 21st century." *Renewable Agriculture and Food Systems* (2018): 391-406.

Galperin, Joshua Ulan. "The Life of Administrative Democracy." *The Georgetown Law Review* 108, no. 5 (May 2020): 1214-1256.

Gilbert, Jess. "Returning African American Farmers to the Land: Recent Trends and A Policy Rationale." *The Review of Black Political Economy,* March 22, 2000.

Grim, Valerie. "Between Forty Acres and a Class Action Suit: Black Farmers, Civil Rights, and Protest against the US Department of Agriculture, 1997–2010." In Debra A. Reid and Evan P. Bennett, *Beyond Forty Acres and a Mule.* Gainesville: University Press of Florida, 2014.

Harris, Carmen V. "'A Ray of Hope for Liberation': Blacks in the South Carolina Extension Service, 1915–1970" (PhD diss., Michigan State University, 2002).

Harrison, Dominique. "Affordability & Availability: Expanding Broadband in the Black Rural South." Joint Center of Political and Economic Studies, October 2021. https://jointcenter.org/wp-content/uploads/2021/10/Affordability-Availability-Expanding-Broadband-in-the-Black-Rural-South.pdf

Harvard Law School Food Law and Policy Clinic, "Supporting Civil Rights at USDA: Opportunities to Reform the USDA Office of the Assistant Secretary for Civil Rights," April 2021, https://chlpi.org/wp-content/uploads/2013/12/FLPC_OASCR-Issue-Brief.pdf

Havard, Cassandra Jones. "African American Farmers and Fair Lending: Racializing Rural Economic Space." *Stanford Law and Policy Review* (Spring 2001): 333-360.

Hayes, Jared. "USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers." Environmental Working Group, February 18, 2021. www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers

Healy, Jack. "'You Can Feel the Tension': A Windfall for Minority Farmers Divides Rural America." *New York Times*, May 22, 2021. www.nytimes.com/2021/05/22/us/black-farmers.html?searchResultPosition=1.

Jones, Allen W. "The South's First Black Farm Agents." *Agricultural History* 50 (Oct. 1976): 636–44.

Kathryn Joyce, Nathan Rosenberg, and Bryce Stucki, "The 'Machine That Eats Up Black Farmland,'" *Mother Jones,* May-June 2021, https://www.motherjones.com/food/2021/04/the-machine-that-eats-up-black-farmland/

Katznelson, Ira. *When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America.* New York: W.W. Norton, 2006.

Lee Jr., John Michael and Samaad Wes Keys. "Land-Grant But Unequal: State One-to-One Match Funding for 1890 Land Grant Institutions," APLU Office of Access and Success publication no. 3000-PB1. Washington: Association of Public and Land-Grant Universities, 2013.

Moore, Mark. "Sen. Scott Defends Racism Remarks, Says US Can't Replace 'Bigotry with Bigotry.'" *New York Post*, May 2, 2021. nypost.com/2021/05/02/sen-tim-scott-says-us-cant-replace-bigotry-with-bigotry/.

Petty, Adrienne Monteith. *Standing Their Ground: Small Farmers in North Carolina Since the Civil War.* New York: Oxford University Press, 2013.

Petty, Adrienne and Mark Schultz. "African-American Farmers and the USDA: 150 Years of Discrimination." *Agricultural History* 87, no. 3 (Summer 2013): 314-367.

Petty, Adrienne and Mark Schultz. "Breaking New Ground: African American Landowners and the Pursuit of the American Dream," in Orville Vernon Burton and Peter Eisenstadt, eds. *Lincoln's Unfinished Work: The New Birth of Freedom from Generation to Generation.* Baton Rouge: Louisiana State University Press, 2022.

Phillips, Sarah T. "What Next? The USDA at One Hundred and One Hundred Fifty Years Old." *Agricultural History* 87, no. 3 (Summer 2013), 315-322.

Reid, Debra A. *Reaping a Greater Harvest: African Americans, the Extension Service, and Rural Reform in Jim Crow Texas.* College Station: Texas A&M University Press, 2007.

RFD TV, "Tx Ag Commissioner Miller on Why He Filed a Lawsuit against the USDA," RFD TV.com, April 28, 2021, www.rfdtv.com/story/43777597/tx-ag-commissioner-miller-on-why-he-filed-a-lawsuit-against-the-usda

Richmond, Todd, "Trump ag secretary in Wisconsin: No guarantee small farms will survive," *Fox 11 News,* October 1, 2019, https://fox11online.com/news/state/us-agriculture-secretary-to-address-wisconsin-town-hall, accessed May 19, 2022.

Roberts, Charles Kenneth. "Client Failures and Supervised Credit in the Farm Security Administration." *Agricultural History* 87, no. 3 (Summer 2013): 368-390.

Roberts, Charles Kenneth. *The Farm Security Administration and Rural Rehabilitation in the South.* Knoxville: University of Tennessee Press, 2015.

Rosenberg, Nathan and Bryce Wilson Stucki. "How USDA distorted data to conceal decades of discrimination against Black farmers," *The Counter,* October 26, 2019, https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/

Rosenberg, Nathan and Bryce Wilson Stucki. "USDA Gave Almost 100 Percent of Trump's Trade War Bailout to White Farmers," *The Counter,* July 29, 2019


*Timothy Pigford, et. al., v. Dan Glickman,* Secretary, United States Department of Agriculture, US District Court for the District of Columbia, Civil Action No. 97-1978 (PLF).

Tyler, Shakara S. and Eddie A. Moore, "Plight of Black Farmers in the Context of USDA Farm Programs: A Research Agenda for the Future." *Professional Agricultural Workers Journal* 1, no. 1 (2013).

Wright, Lloyd. "Racial Equity in Agricultural and Rural Development Report: Preventing the Decline of Black Farmers and Black Rural Landownership," August 29, 2008, Revised November 20, 2010, W.K. Kellogg Foundation.

Yellin, Eric S. *Racism in the Nation's Service: Government Workers and the Color Line in Woodrow Wilson's America*. Chapel Hill: The University of North Carolina Press, 2013.

*ADRIENNE MONTEITH PETTY*
ampetty@wm.edu

EXPERIENCE

2017-          Associate Professor, History, College of William & Mary
2014-2017      Associate Professor, History, The City College of New York
2006-2014      Assistant Professor, History, The City College of New York
2010-          Co-director, Breaking New Ground: An Oral History of African American Farm
               Owners
2005-2006      Visiting Assistant Professor, History and Black Studies, Swarthmore College

EDUCATION

Columbia University, Ph.D. in History, with distinction, May 2004

Northwestern University, B.S. in Journalism, June 1993

FELLOWSHIPS AND GRANTS

2021          HistoryMakers Faculty Innovations in Pedagogy and Teaching Fellowship

2016          National Park Service Civil Rights Commemorative Initiative Grant
              for a special study for the Jimmy Carter National Historic Site

2011          Schomburg Scholar-in-Residence

2010-2014     NEH Collaborative Research Grant, with Mark Schultz

AWARDS
2021          William & Mary Arts & Sciences Excellence in Teaching Award

2014          H.L. Mitchell Award, Southern Historical Association

2014          Theodore Saloutos Memorial Award, Agricultural History Society

PUBLICATIONS, PEER-REVIEWED

*Standing Their Ground: Small Farmers in North Carolina Since the Civil War,* Oxford University Press, 2013.

"African American Landowners and the Pursuit of the American Dream," with Mark Schultz, in Orville Vernon Burton and Peter Eisenstadt, eds., *Lincoln's Unfinished Work: The New Birth of Freedom from Generation to Generation,* Louisiana State University Press, 2022.

"The Honey Pond and the Flapjack Tree: The USDA at Two World Fairs, 1933-1940," *Agricultural History,* forthcoming.

"The Town and Country Roots of Modjeska Monteith Simkins' Activism," *Agricultural History* 93, no. 3 (Summer 2019): 452-476.

"In a Class by Itself: Slavery and the Emergence of Capitalist Social Relations During Reconstruction," online forum, *Journal of the Civil War Era,* March 2017. http://journalofthecivilwarera.org/forum-the-future-of-reconstruction-studies/in-a-class-by-itself-slavery/

"Revolutionary Times Revisited: Students' Interpretations of the City College of New York Student Protest and Takeover of 1969," with William C. Gibbons and Sydney C. Van Nort, *The History Teacher* 47, no. 4 (August 2014): 511-528.

"Reflections on One Hundred and Fifty Years of the United States Department of Agriculture," With Sarah R. Phillips, Dale Potts, Mark Schultz, Sam Stalcup, and Anne Effland, *Agricultural History* 87, no. 3 (Summer 2013): 332-343.

"The Jim Crow Section in Agricultural History," in Debra A. Reid and Evan P. Bennett, eds., *Beyond Forty Acres and a Mule: African American Landowning Families Since Reconstruction,* (Gainesville: University Press of Florida, 2012), 21-35.

"Guess Who's Coming to Interview," *Agricultural History* 84, no. 3 (Summer 2010): 298-306.

"I'll Take My Farm: The GI Bill, Agriculture and Veterans in North Carolina," *Journal of Peasant Studies* 35, no. 4 (October 2008): 742-769.


PUBLIC HISTORY WORK
Published *"Instilling Wisdom, Building Character': A Study of Segregation, Politics, and Public Education in Sumter County, Georgia, 1930s-1970s"* with D. Jason Berggren, December 2021, under cooperative agreement with the Organization of American Historians and The National Park Service (not peer-reviewed)

2017-2021 Consultant, Modjeska Monteith Simkins House, Columbia, SC
Consulted as a historian and family member with researchers at Historic Columbia to create new exhibits at the former home of Simkins, a civil rights activist and my great aunt

BOOK REVIEWS

William L. Andrews, *Slavery and Class in the American South* in *The Journal of the Civil War Era* 10, no. 4 (December 2020): 561-563.

"Family Ties, Color Lines, and Fault Lines: Oral Histories of Land Ownership and Dispossession," *Reviews in American History* 47, no. 3 (September 2019): 436-444.

Angela Stuesse, *Scratching Out a Living: Latinos, Race, and Work in the Deep South,* in *Labor: Studies in Working Class History of Americas 15*, no. 2 (May 2018): 142-144

Louis A. Ferleger and John D. Metz, *Cultivating Success in the South: Farm Households in the Postbellum Era,* in *Agricultural History* 90, no. 3 (Summer 2016): 412-413

Drew A. Swanson, *A Golden Weed: Tobacco and Environment in the Piedmont South,* in *American Historical Review* 121, no. 1 (February 2016): 241-242.

INVITED PRESENTATIONS

2022    Speaker, "Environmental Justice: Black Farmers, Green Planet, North Carolina Museum of History, Raleigh, NC

2020    Contributor, Piedmont Biocapitalism Project, Duke University, Durham, NC

2018    Speaker, "Beyond Famous Firsts: Black History Month, Populism and the American Protest Tradition," University of Georgia, Athens, GA

2017    Speaker, "Fighting to Hold onto the Promised Land: Oral Histories of Farming, Resistance and Civil Rights," Haverford College, Haverford, PA

2016    Panelist, "Labor and Engagement with American Capitalism." The Future of the African American Past Conference, in honor of the opening of the National Museum of African American History and Culture, Washington, DC

2016    Panelist, Historians' Roundtable at the Jimmy Carter National Historic Site, Plains, GA

2015    Speaker, "The Legacy of the Civil War," at St. Paul's Church National Historic Site, Mount Vernon, NY

2015    Panelist, "Farming and Foodways," North Carolina in Dialogue: Our Past, Present and Future, Western Carolina University, Cullowhee, NC

2015    Keynote Speaker at Dean Hopper New Scholars Conference, Drew University, Madison, NJ

2014    "Faith, Family, Farm and Future." Talk at St. Mary's Episcopal Church, Washington, DC

2013   "Did Lincoln Free the Slaves?" Talk at University of North Carolina-Wilmington, Wilmington, NC

PROFESSIONAL Presentations

2021   "The Honey Pond and the Flapjack Tree: The USDA at Two World Fairs, 1933-1940." Presidential Address for the Agricultural History Society, presented virtually

2019   "The Negro's New Jerusalem": The African Methodist Episcopal Church and the Gospel of Landownership," Paper presented at the Association for the Study of the Worldwide African Diaspora annual meeting, Williamsburg, VA

2019   "From City to Country: Black Urbanites and the Quest for Land in South Carolina," Paper presented at the Association for the Study of African American Life and History annual meeting, North Charleston, SC

2018   "The Southern Homestead Act and the Struggle Over Wage Labor," Paper presented at the 2018 Southern Labor Studies Association annual meeting, Athens, GA

2017   "The Politics of Collective Landownership During Reconstruction," Paper presented at the American Historical Association annual meeting, Denver, CO

2016   "Teaching Social Justice: An Oral History of Anti-Gentrification in Harlem," Paper presented at the Oral History Association annual meeting, Long Beach, CA

2014   "Roundtable: American Land Reform: Reconsidering Land Ownership in the African American Experience," Paper presented at the American Historical Association annual meeting, Washington, DC

2013   "What Do You Want With My Husband? Talking to the Opposite Sex and Other Challenges of Oral History." Paper presented at the annual meeting of the Oral History Association, Oklahoma City, OK

2010   "Myth, Romance and Tobacco." Paper presented at the annual meeting of the Agricultural History Society, Winter Park, FL

2009   "Guess Who's Coming to Interview." Paper presented at the Annual Meeting of the Organization of American Historians, Seattle, WA

SERVICE TO THE PROFESSION

President, Agricultural History Society, 2020-2021

Co-chair, Program Committee, Southern Historical Association Annual Meeting, 2020-2021

Chair, Article Prize Committee, Oral History Association, 2022-2024

Chair, Book Prize Committee, Oral History Association, 2017-2019

Member, Executive Committee, Agricultural History Society, 2017-present

Member, Fletcher Green and Charles Ramsdell award committee, Southern Historical Association, 2018-2019

Chair, Jack Temple Kirby Award Committee, Southern Historical Association, 2015-2016

Member, Program Committee for the 2016 Annual Meeting of the Oral History Association

Chair, Local Arrangements Committee, Annual Meeting of the Agricultural History Society, 2015-2016

Member, Program Committee for the 2015 Annual Meeting of the Southern Historical Association

Examiner, Swarthmore College Honors Program in History, 2014

Member and Chair, Organization of American Historians Committee on the Status of African American, Latino/a, Asian American, and Native American (ALANA), and Huggins-Quarles Award Committee, 2008-2011

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

SID MILLER, et al.,

**Plaintiffs**

**v**

TOM VILSACK, in his official

capacity as Secretary of Agriculture,

**Defendant**

**No. 4:21-cv-00595-O**

EXPERT REPORT OF

# MARK BERKMAN

AND

# CHARLES GIBBONS

ON BEHALF OF

# FEDERATION OF SOUTHERN
# COOPERATIVES / LAND ASSISTANCE FUND

**MAY 31, 2022**

# I.    Qualifications

1.  This report has been prepared by Dr. Mark Berkman and Dr. Charles Gibbons. We are providing our expert services on a pro bono basis and are not being compensated for our study or testimony in this matter.

## I.A.    Mark Berkman

2.  I am a Principal of The Brattle Group, an economics and finance consulting firm. Brattle has over 450 employees in eleven offices across North America, Europe, and Asia. Prior to joining Brattle in 2011, I was a principal and director of Berkeley Economic Consultants and a vice president of both Charles River Associates and NERA Economic Consulting.  I have also served as a budget and policy analyst at the Congressional Budget Office and was a research assistant at the Urban Institute. I earned a BA in urban studies and economics from George Washington University, a master's degree in planning and public policy from Harvard University, and a PhD. in public policy from the University of Pennsylvania's Wharton School program in applied economics and managerial science.

3.  I have over 30 years of experience as an applied economist and have testified before federal and state courts across the United States and Canada on a range of matters for both plaintiffs and defendants. I have also testified before regulatory bodies and legislatures. My testimonies have addressed a range of topics including environmental damages, natural resource valuation, intellectual property valuation, regulatory impacts, antitrust, trade disputes, and statistical evidence of discrimination.

4.  I have published numerous articles in academic and trade journals and authored several book chapters on economics topics, especially in the areas of environment, energy, natural resources, and regulation.

5.  My curriculum vitae is provided as Appendix A to this report.  It covers my testimony experience and my publications for more than 10 years.

## I.B.    Charles Gibbons

6.  I am a Senior Associate with The Brattle Group. I specialize in applying sophisticated econometric and statistical models to legal, regulatory, and policy issues. My work has been used in a variety of litigation matters, including structural modeling of antitrust damages, estimating price premium impacts of product mislabeling, and determining the impacts of environmental contamination on outdoor recreation. I served as a consulting expert for the Consumer Financial Protection Bureau to examine regulatory filings under the Home Mortgage Disclosure Act for evidence in discriminatory mortgage lending practices. I have also examined mortgage approval decisions more broadly while supporting experts in litigation related to deficient or misrepresented lending standards. I am the co-founder and chair of Brattle's LGBTQ+ employee resource group, BProud. I received a PhD in economics and a master's degree in statistics from the University of California, Berkeley.

7.  My curriculum vitae is provided as Appendix B to this report.

## II.    Assignment and Summary of Opinions

8.  In this report, we have been asked by counsel for the Federation of Southern Cooperatives/Land Assistance Fund (the "Federation") to review data from the USDA for evidence of discrimination in lending practices. The data available to us from the direct loan program covers the period January 1, 2000 to December 31, 2020; the data from the guaranteed program covers October 1, 2018 to September 30, 2020. Dr. Berkman has previously filed two declarations in this matter, including one related to the specific data required to determine whether there has been discrimination in lending ("Berkman Data Declaration").[1]

9.  In the Berkman Data Declaration, Dr. Berkman provides two reasons why these data are insufficient to determine whether there is evidence of discrimination against minority borrowers. First, only a few factors that indicate the riskiness of a loan application were

---

[1]    Declaration of Mark P. Berkman, May 13, 2022.

provided for direct loans and no risk factors were provided for guaranteed loans. Second, 77% or more of the values for the risk factors that were included are missing.[2]

10. Despite insufficiencies in the data, we did examine these files to determine whether there is any evidence consistent with discrimination. We find that minority borrowers are less likely to be approved for a direct loan; in particular, Blacks have the lowest approval rates, which are 18% lower than the approval rates for non-Hispanic White borrowers. Because minority borrowers may have poorer creditworthiness than White borrowers (which could be evidence of discrimination arising from other contexts), it is not possible to determine whether these lower approval rates are due to discrimination in the USDA lending program. However, with additional data, it would be possible to use standard econometric techniques to assess this question.

11. To determine whether it is at least plausible that there is discrimination in the USDA's direct lending program, we reviewed the academic literature related to discrimination in business lending. We find several examples of research that does find discrimination against minority borrowers. As a result, we conclude that it is at least plausible that there has been discrimination in the USDA's lending programs, but once again assert that more data is necessary to assess this question fully.

12. We elaborate on these points in the remainder of this report.

## III.   Loan Applications from Minority Borrowers Are Rejected at Higher Rates

13. The loan application data provided by the USDA includes applications to the direct lending program and data on guaranteed loan applications. For each program, a loan can be approved, denied, or withdrawn.[3] While the first two dispositions are determined by the lender, the latter is determined by the borrower. There are myriad factors that could induce a

---

[2]   Berkman Data Declaration.

[3]   We exclude applications with unknown disposition. We also exclude loans with unknown applicant race. We do not consider ethnicity when determining whether an applicant is of multiple races. Applicants with missing ethnicity were assumed to not be Hispanic.

borrower to withdraw their application (including perceptions of unfairness in the lending process, lack of assistance from lender personnel in completing complex forms, etc.); for that reason, we consider loans that were approved or rejected separately from those that were withdrawn.[4]

14. For the direct lending program, we find that 92% of applications from non-Hispanic Whites were approved. Blacks have the lowest approval rate: 75%. Non-Hispanic Whites also have higher approval rates than Asian American and Pacific Islander ("AAPI") borrowers and White Hispanic borrowers; American Indian borrowers had nearly the same approval rate as Whites. Figure 1 below shows these rates.



FIGURE 1: DIRECT LOAN PROGRAM APPROVAL RATES BY RACE

15. For the guaranteed lending program, there are fewer applications in the data; there are only 57 applications from Black borrowers and 59 from White Hispanic borrowers, for example. Additionally, nearly all (non-withdrawn) applications are approved—the approval rate is 98%. Because of this high approval rate, we do not observe substantive differences among

---

[4] Because of the various factors that could influence withdrawal rates and with limited data on each loan's risk factors, we do not present an assessment of withdrawal rates in this report. We do note, however, that withdrawal rates for the direct lending program follow almost exactly the inverse pattern of approval rates: non-Hispanic Whites and American Indian borrowers have the lowest withdrawal rates (and highest approval rates), while Blacks have the highest withdrawal rates (and lowest approval rates). The small number of guaranteed loan applications available in the data make it difficult to reach firm conclusions, but White borrowers do have lower withdrawal rates than other borrowers.

racial groups. It is important to remember, however, that these data only span October 2018 through September 2020; a longer series may reveal different patterns in the data.

## IV.   Additional Data Are Necessary to Determine Whether Lower Approval Rates are Due To Discrimination in Lending

16. Observing lower approval rates for minority borrowers is not sufficient to conclude that there has been discrimination against those borrowers. Discrimination occurs when the outcome of a transaction is affected by characteristics of the participants that are not relevant to the transaction. In the context of business lending, racial discrimination exists if loan approval rates differ across demographic groups with equal creditworthiness. It is possible (and, indeed, typical) that minority borrowers have worse risk characteristics than White borrowers (which could be evidence of discrimination in other aspects of the minority experience). Worse risk profiles on average would provide a justification for rejecting minority borrowers at higher rates. Therefore, it is crucial to have a clear understanding of the risk profiles of borrowers.

17. Unfortunately, production by the USDA has been deficient on this point. As Dr. Berkman discusses in the Berkman Data Declaration, few risk factors were provided in the data and the values of the included factors are often missing. Without a more complete set of factors considered by the USDA when making loan approval decisions and more complete values for each factor that is provided, it is not possible to adequately assess the relationship between risk factors and approval decisions and the differences among racial groups in risk profiles. In turn, this renders it impossible to reach a conclusion as to whether minority borrowers are rejected at higher rates due to underlying differences in risk or due to discrimination.

# V.  The Academic Literature Provides Examples of Discrimination in Business Lending

18. Though differences in approval rates are not alone sufficient evidence of discrimination in lending, they are consistent with discrimination. To establish that discrimination is plausible, we reviewed the academic literature on business lending. We found several pieces of academic research that conclude with findings of discrimination against minority borrowers.

19. In the cases that we reviewed, the authors use statistical models to control for underlying risk factors. Commonly used risk factors that measure creditworthiness when modeling approval decisions for business loans include characteristics of the owner (e.g. credit score, financial wealth, experience), the firm (e.g. age, size, net worth), and the loan contract (e.g. amount, purpose, duration). These models also include various levels of additional control variables (e.g. location, industry, lender) to account for additional sources of differential risk. If differences in approval rates across groups remain after controlling for differences in creditworthiness, then it indicates that the racial disparity in credit availability is likely caused by discrimination.

20. Using this approach, articles in the academic literature have found evidence of racial discrimination in business lending. For example, Blanchflower, et.al. (2003), Cavalluzzo and Wolken (2005), Blanchard, et.al. (2008), and Fairlie, et.al. (2022) use survey data to show that minority-owned businesses are more likely than White-owned businesses to be turned down for bank loans even after controlling for differences in risk factors.[5] Additionally, there is some evidence that minority-owned businesses are less likely to apply for loans even when they have a good credit history because they anticipate being turned down.

21. Recently, there are papers exploring racial disparities in small business lending through the Paycheck Protection Program ("PPP"), which was designed to support small business jobs

---

[5]   Blanchflower, et. al., "Discrimination in the Small-Business Credit Market," *The Review of Economics and Statistics*, Vol. 85, Issue 4, (November 2003), 930-943. Cavalluzzo and Wolken, "Small Business Loan Turndowns, Personal Wealth, and Discrimination," *The Journal of Business*, Vol. 78, Issue 6, (November 2005), 2153-2178. Blanchard, et.al., "Do Lenders Discriminate Against Minority and Woman Entrepreneurs?", *Journal of Urban Economics*, Vol. 63, Issue 2, (March 2008), 467-497. Fairlie, et.al., "Black and White: Access to Capital Among Minority-Owned Start-ups," *Management Science*, Vol. 68, Issue 4, (April 2022), 2377-3174.

during the COVID-19 pandemic. Chernenko and Scharfstein (2022) finds that Black- and Hispanic-owned restaurants were less likely to receive PPP loans than similar White-owned restaurants. The disparity for Black-owned restaurants is further exacerbated by localized racial bias: restaurants located in counties where more White people express implicit or explicit biases towards Black people are less likely to receive PPP loans from banks. They are also more likely to substitute to non-bank PPP loans and to the Economics Injury Disaster Loan program, which made loans directly to small businesses without using financial intermediaries. This substitution, however, is not strong enough to eliminate racial disparities in PPP borrowing.[6] Howell, et.al. (2022) finds that Black-owned businesses are more likely to obtain PPP loans from a "fintech" lender than a traditional bank, with larger effects in places with more racial bias, likely because fintech lenders reduce human involvement in the loan origination process.[7]

22. There has been some academic research related to lending by the USDA. However, only one of these papers studies loan approval decisions.[8] As the authors acknowledge, the study is "limited in coverage to [Farm Service Agency] borrowers in Georgia who have distinct demographic attributes relative to those in the rest of the country" and "the actual size of total rejected loan applications is unknown and therefore understated given the absence of records on quick loan denials that were not entered into the FSA loan application database." Other studies of USDA lending programs focus only on approved loans and study other dimensions of lending, such as default (Dodson, 2013), loan amounts borrowed (Wu, et.al., 2011), and packaging terms (Escalante, et. al., 2018).[9] In contrast to the general business lending studies

---

[6]   Chernenko and Scharfstein, "Racial Disparities in the Paycheck Protection Program," *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3907575, (2022).

[7]   Howell, et.al., "Racial Disparities in Access to Small Business Credit: Evidence from the Paycheck Protection Program," *available at* https://www.nber.org/papers/w29364, (2022).

[8]   Escalante, et. al., "Credit Risk Assessment and Racial Minority Lending at the Farm Service Agency," *Journal of Agricultural and Applied Economics*, Vol. 38, Issue 1, (April 2006), 61-75.

[9]   Dodson, Charles B., "Racial/Ethnic Discrimination in USDA's Direct Farm Lending Programs," *available at* https:// ageconsearch.umn.edu/record/150492/?ln=en, (2013). Wu, et. al., "A Decomposition Approach to Analysing Racial and Gender Biases in Farm Service Agency's Lending Decisions," *Applied Economics*, Vol. 44, Issue 22, (June 2011), 2841-2850. Escalante, et. al., "Looking Beyond Farm Loan Approval Decisions: Loan Pricing and Nonpricing Terms for Socially Disadvantaged Farm Borrowers," *Journal of Agricultural and Applied Economics*, Vol. 50, Issue 1, (February 2018), 61-75.

that consider approval decisions, academic research related to lending by the USDA is limited.

23. Based upon this literature, we find it plausible that differences in approval rates between minority and White borrowers for direct loans from the USDA are in part due to discrimination. Without additional data on the creditworthiness of borrowers, however, it is not possible to determine whether there truly was discrimination in this lending program. We understand that the Federation is presently attempting to obtain additional loan data and we will review any such data that becomes available and supplement this report as appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 31st day of May, 2022 in San Francisco County, California.

| | |
|---|---|
| _(signature)_ | May 31, 2022 |
| Mark Berkman | Date |
| _(signature)_ | May 31, 2022 |
| Charles Gibbons | Date |

Appendix A: Curriculum Vitae of Mark Berkman

## MARK P. BERKMAN
### Principal

San Francisco, CA             +1.415.217.1000             Mark.Berkman@brattle.com

**Dr. Mark P. Berkman** is an expert in applied microeconomics.  His experience spans the areas of the environment, energy, and natural resources; environmental health and safety; labor and employment; intellectual property; antitrust; commercial litigation and damages; and public finance.  He has assisted both public and private clients and provided testimony before state and federal courts, arbitration panels, regulatory bodies, and legislatures.

His environmental work has involved the review of proposed air, water, solid waste, and worker and product safety regulations.  Dr. Berkman has quantified the costs and benefits of these regulations, as well as toxic tort and product liability claims.  In addition, he has valued natural and water resources as well as property damages associated with pollution from Superfund sites, landfills, and power plants.

His work on energy matters includes the valuation of coal resources, power plants, and transmission rights-of-way.  He has also prepared energy demand and price forecasts. He has extensive experience working with Native American tribes on energy and resource valuation matters. Dr. Berkman has also advised Alberta Agriculture and Forestry and the Trade Law Bureau, Department of Justice on trade matters involving timber and fossil fuels.

Dr. Berkman has also been involved in several Lanham Act cases where he has determined the value of consumer product characteristics. The products include food, wine, electronic devices, cosmetics, and software. Clients in a variety of industries ranging from computer chip to shoe manufacturers have sought Dr. Berkman's assistance to value patents, trade secrets, and trademarks.  He has also been called on to address questions of market power in antitrust proceedings in a variety of industries including solid waste, computer manufacturing, and medical devices.  He has testified regarding market definition and market power and participated in Hart-Scott-Rodino proceedings.

Dr. Berkman also has substantial experience in labor and discrimination litigation. He has conducted statistical analyses of alleged discrimination in hiring, promotion, pay, and contracting, and completed damage analyses regarding these allegations.  He has also conducted statistical analyses regarding mortgage lending discrimination. His clients in this area include, the Consumer Financial Protection Bureau, the Department of Justice, the State of Californian and various regional transit and economic development agencies.

Dr. Berkman's work in commercial damages and bankruptcy litigation include a recent study of the government costs imposed by the opioid epidemic on behalf of 49 state attorney generals in the Purdue bankruptcy matter. He is currently assisting the New York Attorney General's office on another opioid matter. He also estimated environmental liabilities for Pacific Gas & Electric in its 2003 bankruptcy proceeding.

Prior to joining Brattle he was a co-founder and director at Berkeley Economic Consulting and a vice president at both Charles River Associates and NERA Economic Consulting.



1

## MARK P. BERKMAN

### AREAS OF EXPERTISE

- Antitrust/Competition
- Commercial Damages
- Environmental Litigation and Regulation
- Intellectual Property
- Product Liability
- Utility Regulatory Policy and Ratemaking
- Employment and Discrimination

### EDUCATION

- University of Pennsylvania, Wharton School – Ph.D. in Public Policy Analysis – Managerial Science and Applied Economics
- Harvard University – M.A. in Planning, Policy Analysis and Administration
- George Washington University, B.A. in Economics and Urban Affairs

### EXPERIENCE

- *2011 – present, Principal, The Brattle Group*
- 2008 – 2010: Director, *Berkeley Economic Consulting*
  Responsible for managing and conducting projects in the areas of environment, energy, intellectual property, antitrust, labor, and public finance
- 2002 – 2008: Vice President, *Charles River Associates*
- 1993 – 2002: Vice President, *NERA Economic Consulting*
- 1988 – 1993: Senior Consultant, *NERA Economic Consulting*
- 1984 – 1988: Senior Analyst, *NERA Economic Consulting*
- 1983 – 1984: Economic Analyst, *NERA Economic Consulting*
- 1980 – 1983: Research Fellow, *University of Pennsylvania*
- 1977 – 1980: Associate Budget Analyst, *Congressional Budget Office*
- 1976 – 1977: Teaching Assistant, *Harvard University*
- 1975 – 1976: Research Assistant, *The Urban Institute*
- 1973 – 1975: Staff Assistant, *United States Congress, Office of Congressman Charles Vanik*

### PROFESSIONAL AFFILIATIONS

- American Economic Association
- Association of Environmental and Resource Economists



MARK P. BERKMAN

## PUBLICATIONS

- "The Accuracy of Benefits Transfer for Environmental Valuation," with Martha Rogers and Gina Waterfield," *Trends*, July/August 2018, ABA Section of Environment Energy, and Resources.

- "Response to Amory Lovins' reply comments," with Dean Murphy, *The Electricity Journal* (2017). https://doi.org/10.1016/j.tej.2017.09.013.

- "Efficiency and nuclear energy: Complements, not competitors, for a low-carbon future," with Dean Murphy, *The Electricity Journal* (2017). https://doi.org/10.1016/j.tej.2017.09.007.

- "Produced Water — Emerging Challenges, Risks, and Opportunities," with Earl Hagström, et al., *Environmental Claims Journal*, Vol. 28, No. 2 2016, pp. 122-139.

- "The Legal and Economic Implications of Hydraulic Fracturing Bans," with Earl Hagström, ed. Donna L. Drogos, in *Hydraulic Fracturing: Environmental Issues*, 181-196. Washington, DC: American Chemical Society, 2015. DOI:10.1021/bk-2015-1216.ch008.

- "Electricity – Water Nexus: Is a Crisis Imminent?" *Water Policy* 17, no. 6 (2015): 1163-1175.

- "Reply to Comment on Effect of Coal-fired Power Generation on Visibility at a Nearby National Park." *Atmospheric Environment*, 55 (2012) 297-298.

- "The Adverse Impact of Particulate Matter on Property Values," with Kyle Hubbard and Timothy Savage, *International Real Estate Review*, available online at http://www.umac.mo/fba/irer/forth/irer_forth_IR1143%20.html.

- "Effect of Coal-Fired Power Generation on Visibility in a Nearby National Park," with Jonathan Terhorst. *Atmospheric Environment*, 44 (2010) 2524-2531.

- "Estimating Toxic Tort and Environmental Damages," with Gordon Rausser in Earl Hagström, editor, *Perchlorate, A Scientific, Legal, and Economic Assessment*, Tucson, AZ, Lawyers and Judges Publishing Co., March 2006.

- "The Airline Crisis and Labor: Negotiations Will Play a Key Role," with Mark Kiefer and Robert Litan. TNR/ON, *The New Republic*, June 13, 2005, pp. 5–8.

- "What's Wrong with America's Airlines, and How Can It Be Fixed?" with Mark Kiefer and Robert Litan, TNR/ON, *The New Republic*, May 16, 2005, pp. 3–6.

- "Valuing Intellectual Property Assets for Licensing Transactions," *The Licensing Journal*, Vol. 22, No. 4, April 2002.



MARK P. BERKMAN

- "Where is the Market Failure? A Review of OSHA's Economic Analysis for Its Proposed Ergonomics Standard," with Jesse David, *Journal of Labor Research*, Vol. XXII, No. 1, winter 2001.

- "Water Subsidies in Southern California: Do They Exist and Have They Contributed to Urban Sprawl? A Comment on an Article by Steven Erie and Pascale Joassart-Marcelli," with Jesse David, *California Western Law Review*, Vol. 37, No. 1, fall 2000.

- "Complying with New Rules for Controlling Nitrogen Oxides Emissions," With Jonathan Falk and John Wile, *The Electricity Journal*, January-February 2000, pp. 40–50.

- "The Regional Costs and Benefits of Acid Rain Control," Dissertation, University of Pennsylvania, May 1991.

- "Valuing Flexibility in Utility Planning Using Dynamic Programming," with J. Falk. *EPRI Proceedings from Conference on Decision Support Methods for the Electric Power Industry*, Cambridge, Mass., May 1990.

- "Environmental Regulation Will Affect Electric Utility Fuel Consumption Patterns," *Energy*, August 1989.

- "Equal Time: Dunbar & Berkman Reply," a reply to M. Crew and P. Kleindorfer, "Landfill Tipping Fees Should Be Much Higher," *Waste Age*, February 1988, p. 134.

- "The Underpricing of Landfills," with Fred Dunbar. *Viewpoint*, summer 1987, pp. 25–33.

- "Sanitary Landfills Are Too Cheap!" with Fred Dunbar. *Waste Age*, May 1987.

- "Regional Economic Trade-offs in Sulfur Emissions Control Policy," with P. Blair. *Geographic Dimensions of Energy*, F. Calzonetti and B. Solomon, Dordrecht Holland: D. Reidel Publishing Co., 1985.

- "Regional Impacts of Federal Coal Policy," with P. Blair, *International Journal of Energy Systems*, Vol. 4, No. 2, 1984.

- "Multiregional Analysis of Federal Coal Policy," with P. Blair, *Journal of Resource Management and Technology*, Vol. 12, No. 2, April 1983.



**MARK P. BERKMAN**

## TESTIMONY AND REPORTS

### Environment, Energy, and Natural Resources

- Environmental and Economic Impacts of the Calvert Cliffs Nuclear Plant prepared for Nuclear Powers Maryland, with Dean Murphy, March 2022

- Trial Testimony in the matter RE: Venoco, LLC, Et. Al, Debtors Eugene Davis in his Capacity of the Venoco Liquidating Trust v. State of California, and California State Lands Commission, Chapter 11, Case NO. 18-50908 (JTD) in the United States Bankruptcy Court for the District of Delaware, March, 2022

- Deposition Testimony in the matter in the matter RE: Venoco, LLC, Et. Al, Debtors Eugene Davis in his Capacity of the Venoco Liquidating Trust v. State of California, and California State Lands Commission, Chapter 11, Case NO. 18-50908 (JTD) in the United States Bankruptcy Court for the District of Delaware, January, 2022

- Valuation of Santa Barbara County Air Pollution Control District Emissions Control Credits prepared for Counsel at Bracewell in the matter RE: Venoco, LLC, et. al, Debtors Eugene Davis in his Capacity of the Venoco Liquidating Trust v. State of California, and California State Lands Commission, Chapter 11, Case NO. 18-50908 (JTD) in the United States Bankruptcy Court for the District of Delaware, December 6, 2021

- Deposition Testimony of Mark Berkman on behalf of Sunnyvale and Mountain View California in the matter of San Francisco Baykeeper v. City of Sunnyvale and City of Mountain View, United States District Court, Northern District of California, San Jose Division, Civil Case Nos: 5:20-cv-00824-EJD and 5:20-cv-00826-BLF, August 30, 2021.

- Economic Analysis of Critical Habitat Designation for the Northern Spotted Owl, Response to Fish and Wildlife Service Comments, Prepared for the American Forest Resource Council, September 17, 2021.

- Expert Report of Mark Berkman on behalf of Sunnyvale and Mountain View California in the matter of San Francisco Baykeeper v. City of Sunnyvale and City of Mountain View, United States District Court, Northern District of California, San Jose Division, Civil Case Nos: 5:20-cv-00824-EJD and 5:20-cv-00826-BLF, August 2, 2021.

- Economic Analysis of Critical Habitat Designation for the Northern Spotted Owl, Prepared for the American Forest Resource Council, October 13, 2020.

- Hexachlorobenzene Discharge Variance Request Economic Analysis with David McKnight prepared for Westlake Chemical Corporation, July 8, 2020.

- Pre-filed Testimony of Dr. Mark Berkman on behalf of Colville, Inc. In the Matter of the Tariff Revision Designated as a TA17-231, Filed by North Slope Borough for an Interim and Permanent



Rate Increase for Service Area Ten Refuse Collection and Disposal, Regulatory Commission of Alaska, Docket No. U-18-085, March 6, 2019.

- Deposition Testimony of Dr. Mark Berkman on behalf of Lighthouse Resources, Inc., et al., Plaintiffs and BNSF Railway Company, Plaintiff-Intervenor, vs. Jay Inslee, et al., Defendants, and Washington Environmental Council, et al., Defendant-Intervenors, Western District of Washington at Tacoma, No. 3:18-cv-05005-RJB, January 30, 2019.

- Expert Rebuttal Report of Dr. Mark Berkman on behalf of Lighthouse Resources, Inc.; Lighthouse Products, LLC; LHR Infrastructure, LLC; LHR Coal, LLC and Millennium Bulk Terminals-Longview LLC in the matter of *Lighthouse Resources Inc., Lighthouse Products, LLC; LHR Infrastructure, LLC; LHR Coal, LLC and Millennium Bulk Terminals-Longview LLC v. Jay Inslee, in his official capacity as Governor of the State of Washington; Maia Bellon, in her official capacity as Director of the Washington Department of Ecology; and Hilary S. Franz, in her official capacity as Commissioner of Public Lands,* United States District Court, Western District of Washington at Tacoma, Case No.: 3:18-cv-05005-RJB, December 14, 2018.

- Expert Report of Dr. Mark Berkman on behalf of Lighthouse Resources, Inc.; Lighthouse Products, LLC; LHR Infrastructure, LLC; LHR Coal, LLC and Millennium Bulk Terminals-Longview LLC in the matter of *Lighthouse Resources Inc., Lighthouse Products, LLC; LHR Infrastructure, LLC; LHR Coal, LLC and Millennium Bulk Terminals-Longview LLC v. Jay Inslee, in his official capacity as Governor of the State of Washington; Maia Bellon, in her official capacity as Director of the Washington Department of Ecology; and Hilary S. Franz, in her official capacity as Commissioner of Public Lands,* United States District Court, Western District of Washington at Tacoma, Case No.: 3:18-cv-05005-RJB, December 3, 2018.

- Deposition Testimony on behalf of Ameren Missouri in the matter of United States of America, Plaintiff, and the Sierra Club, Plaintiff-Intervenor v. Ameren Missouri, Defendant, United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:11-cv-00077-RWS, July 3, 2018.

- Responsive Expert Report of Dr. Mark Berkman on behalf of Ameren Missouri in the matter of United States of America, Plaintiff, and the Sierra Club, Plaintiff-Intervenor v. Ameren Missouri, Defendant, United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:11-cv-00077-RWS, May 7, 2018.

- Rebuttal Expert Report of Mark P. Berkman on behalf of Exxon Mobil Corp. in the matter of *Louisiana Environmental Action Network and Stephanie Anthony, Plaintiffs, v. Exxon Mobil Corp. d/b/a ExxonMobil Chemical Co., Defendant*, United States District Court, Middle District of Louisiana, Case No. 3:16-cv-00144-SDD-RLB, regarding air pollution control violations, May 19, 2017. This included an application of the BEN model.

- Response to Comments by Gregory House to Kern County California Regarding Agricultural Elements of the Willow Springs Solar Project, with Stephen Hamilton on behalf of First Solar,



**MARK P. BERKMAN**

January 20, 2016.

- Deposition Testimony of Dr. Mark Berkman in the matter of The Chickasaw Nation and The Choctaw Nation v. United States Department of the Interior, *et al.*, United States District Court for the Western District of Oklahoma, No. Civ. 05-1524-W, on behalf of plaintiff's breach of trust claims, May 8, 2015.

- Deposition Testimony of Dr. Mark Berkman in the matter of Briggs, et.al vs. Freeport McMoran, *et al.*, United States District Court for the Western District of Oklahoma, Case No. 13-cv-1157-M, on behalf of plaintiffs regarding class certification, April 8, 2015.

- "Surviving the Storm," with Bay Area Council Economic Institute, March 2015.

- Declaration of Dr. Mark Berkman in the matter of Briggs, *et al.* vs. Freeport McMoran, *et al.*, United States District Court for the Western District of Oklahoma, Case No. 13-cv-1157-M, on behalf of plaintiffs regarding class certification, February 23, 2015.

- Expert Report of Mark P. Berkman, PhD on behalf of The Chickasaw Nation and The Choctaw Nation v. United States Department of the Interior, *et al.*, United States District Court for the Western District of Oklahoma, No. Civ. 05-1524-W, on behalf of plaintiff's breach of trust claims, January 15, 2015

- "Comments on the Draft Amendments to the Statewide Water Quality Control Plans to Control Trash: The Role of Polystyrene Bans," with David Sunding. Prepared for Dart Container Corporation. August 5, 2014.

- "A Learning Investment-based Analysis of the Economic Potential for Offshore Wind: The case of the United States," with Jurgen Weiss and Mark Sarro. Prepared for the Center for American Progress, the US Offshore Wind Collaborative, the Clean Energy States Alliance, and the Sierra Club. February 28, 2013.

- Expert Witness Report of Mark P. Berkman in C&A Carbone, Inc. et al v. The County of Rockland et al. New York Southern District Court 7:08-cv-06459-KMK, on behalf of plaintiff regarding the interstate nature of waste and recyclable materials, December 17, 2012.

- "Economic Analysis of SB568's Proposed Polystyrene Ban." With David Sunding. Prepared for Dart Container Corporation, August 15, 2011.

- Deposition Testimony of Mark P. Berkman on behalf of the West Bay Sanitary District in the matter of *San Francisco Baykeeper v. West Bay Sanitary District*, United States District Court for the Northern District of California, Case No. cv-09-5676-EMC, regarding water pollution damages, July 28, 2011.



- Rebuttal Expert Report of Mark P. Berkman on behalf of West Bay Sanitary District in the matter of *San Francisco Baykeeper v. West Bay Sanitary District*, United States District Court for the Northern District of California, Case No. cv-09-5676-EMC, regarding water pollution damages, June 2011.

- Rebuttal Testimony of Mark P. Berkman and David L. Sunding in the Matter of the Application of California American Water Company (U 210 W) for a Certificate of Convenience and Necessity to Construct and Operate its Coastal Water Supply Project to Resolve the Long-Term Water Supply Deficit in its Monterey District and to Recover all Present and Future Costs in Connection Therewith in Rates, Application 04009-019, on behalf of the Marina Coast Water District regarding the benefits of a regional water supply project, May 27, 2010.

- Declaration of Mark P. Berkman, PhD in Support of Real Party in Interest Potrero Hills Landfill, Inc.'s Memorandum of Points and Authorities in Opposition to Petition for Writ of Mandate, Sierra Club vs. County of Solano: Board of Supervisors of Solano County: and Does 1-10, Superior Court of the State of California, County of Solano, Case No. FCS034073, regarding the interstate nature of waste disposal, December 9, 2009.

- Direct Testimony of Mark P. Berkman and David L. Sunding in the Matter of the Application of California American Water Company (U 210 W) for a Certificate of Convenience and Necessity to Construct and Operate its Coastal Water Supply Project to Resolve the Long-Term Water Supply Deficit in its Monterey District and to Recover all Present and Future Costs in Connection Therewith in Rates, Application 04009-019, on behalf of the Marina Coast Water District regarding the benefits of a regional water supply project, June 24, 2009.

- Deposition Testimony in the matter of *Watkins & Shepard Trucking vs Soco West, Inc.*, Superior Court of the State of California for the County of Los Angeles –Central District, Case No. BC379287, on behalf of defendants regarding the influence of environmental risk on real estate price, September 9, 2008

- Deposition testimony, In Re Mt. Konocti Mutual Water Company, Inc., Official Committee of Unimproved Lot Owners vs. Mt Konocti Mutual Water Company, Case No. 90-11573, regarding water connection fee methodology on behalf of defendants, January 14, 2008.

- Declaration, In Re Mt. Konocti Mutual Water Company, Inc., Official Committee of Unimproved Lot Owners vs. Mt Konocti Mutual Water Company, Case No. 90-11573, regarding water connection fee methodology, on behalf of defendants, January 4, 2008.

- Hilmar Supplemental Environmental Project, Managing Salt in the Central Valley, submitted to the California Regional Water Quality Control Board, Central Valley Region in compliance with Order No. R5-2006-0025, with David Sunding and Yoram Rubin, November 16, 2007.

- Measures to Reduce the Economic Impacts of a Drought-Induced Water Shortage in the San Francisco Bay Area for the San Francisco Public Utilities Commission with David Sunding, Robert



Gamble, and Sean Randolph, May 3, 2007.

- Valuation of Hells Canyon Jet Boat Outfitters and the Impact of the River Flow Restrictions on behalf of Idaho Power Corp., April, 2006.

- Expert Testimony in the matter of *Quality Control Services, Inc. v. Dougherty County*, United States District Court for the Middle District of Georgia Albany Division, Case no. 1:05 CV-19 (WLS) on behalf of plaintiffs regarding the Pike Balancing test, 2006.

- Deposition Testimony in the Matter of *Corbitt* v. *American Furniture Manufacturing Inc. and W.S. Bradcock Corporation,* United States District Court, Middle District of Alabama Civil Action 2:05CV58-T, on behalf of defendants regarding product liability, November 18, 2005.

- Expert Report and Direct Testimony of Mark Berkman and David Sunding in the matter of Hilmar Cheese Company Inc., Hilmar Whey Protein Inc., California Regional Water Quality Control Board Central Valley Region, ACL Complaint No. R5-2005-0501, August 2005.

- Economic Impacts of Critical Habitat Designation for Vernal Pool Species, prepared for the U.S. Fish and Wildlife Service, U.S. Department of Interior with David Sunding, June 25, 2005.

- "Environmental liability forecasts regarding manufactured gas plant sites for Pacific Gas & Electric," September 2004. (Confidential)

- Expert Report of Mark Berkman in the matter of *BFI Waste Systems of North America, Inc. v. City and County of Denver and Waste Management of Colorado, Inc.* on behalf of the plaintiff. Filed in the United States District Court for the District of Colorado. August 30, 2004.

- Expert report in the matter of *United Haulers Association, Inc. et al. v. Oneida-Herkimer Solid Waste Management Authority, County of Oneida and County of Herkimer* before the U.S. District Court for the Northern District of New York. Performed an analysis on behalf of the plaintiffs of the solid waste flow control laws enacted by Oneida and Herkimer Counties, New York. November 15, 2002.

- "Forecast of Environmental Remediation Liability for Pacific Gas & Electric." With Gordon Rausser, October 10, 2002.

- "The Economic Impacts of Closing the Canton Mill." With Burton Griffith. Prepared for Blue Ridge Paper Products, Inc., June 1, 2001.

- "Estimates of Environmental Risk Associated with the BMI Site." Prepared for Marsh & McLennan, March 2000.

- "The Effect of CO2 Reduction Policies on the Canadian Electricity Industry and Economy." Prepared for ATCO Electric, EPCOR, New Brunswick Power, Nova Scotia Power, Ontario Power Generation, Saskatchewan Power and TransAlta Utilities, July 5, 1999.


THE **Brattle** GROUP

9

MARK P. BERKMAN

- "The Economic Impacts of Policies to Reduce Alfalfa Water Consumption." Report, prepared for Natural Resources Defense Council, October 12, 1998.

- "Market Opportunities for Environmental Remediation and Site Management" Report prepared for Pacific Corp, 1998.

- "Comments on CalFed's Draft EIS of March 1998." Prepared for Save San Francisco Bay Association, June 30, 1998.

- "Evaluation of Tax Claim Against the State of Montana." Prepared for the Fort Peck Reservation, September 18, 1997. (Confidential)

- Deposition Testimony on behalf of homeowners in Benicia, California, regarding property value diminution in *Lagrimes* v. *Southhampton et al.,* September 1997.

- Testimony before the Trade Waste Commission, City of New York on behalf of the New York City Economic Development Commission, regarding maximum rate regulation of commercial waste collection, January 21, 1997.

- "Costs and Benefits of the Proposed Enclosed Unloader at the Fresh Kills Landfill." Prepared for the New York City Law Department, December 1996.

- Deposition Testimony on behalf of Browning-Ferris Industries, in the matter of *W.J. Curry & Son v. Velsicol Chemical Co. v. Kraft et al.* regarding the allocation of Superfund remediation costs, July 12, 1996.

- "Estimating Employment Effects of Electric Price Increases in U.S. Manufacturing Industries and Assessing Such Effects in New Jersey." Prepared for Jersey Central Power & Light, June 28, 1996.

- "Estimate of Employment Effects of Electric Price Increases in U.S. Manufacturing Industries and Assessing Such Effects in Maryland." Prepared for Allegheny Power, Maryland, June 17, 1996.

- Rebuttal Testimony on behalf of Central and South West Energy, Inc. in the matter of Application No. 93-2, CSW Energy, Inc. and KVA Resources, Inc., Northwest Regional Power Facility, Before the State of Washington Energy Facility Site Evaluation Council regarding the costs and benefits of controlling residual NOx and CO emissions and CO2 emissions at a proposed natural gas-fired power plant in Washington, October 1995.

- Affidavit on behalf of the New York City Law Department, in the matter of the Application of New York City Department of Environmental Protection for Renewals of the State Pollutant

  Discharge Elimination System Permits for New York City's 14 Publicly Owned Treatment Works regarding the costs and benefits of proposed pollution control investments, August 24, 1995.



- "The Cost of Flow Control." Prepared for Browning-Ferris Industries, May 3, 1995.

- "Economic Impacts of VOC Emission Reductions Beyond the 15% Plan in the Cincinnati CMSA." Prepared for Cincinnati Gas & Electric, April 27, 1995.

- Pre-filed Rebuttal Testimony before the Montana Public Service Commission, on behalf of the Montana Power Company, Docket No. 94.8.30, regarding affiliated coal prices, January 13, 1995.

- Pre-filed Direct Testimony before the Montana Public Service Commission, on behalf of the Montana Power Company, Docket No. 94.8.30, regarding affiliated coal prices, August 22, 1994.

- "Water Quality Benefits of Floatable Reduction in the New York Bight." Expert Witness Report and Testimony on behalf of the New York City Law Department before the State of New York Department of Environmental Conservation in the Matter of the Application of The New York City Department of Environmental Protection for Renewals for the State Pollutant Discharge Elimination System (SPDES) Permits for New York City's 14 Publicly Owned Sewage Treatment Works. DEC No. 0026131, April 27, 1994.

- "Comments Regarding Water Pricing and Water Markets Under the Reclamation Reform Act of 1982," to the U.S. Bureau of Reclamation on behalf of the Natural Resources Defense Council, March 14, 1994.

- "Initial Comments of National Economic Research Associates, Inc. on Florida DSM Employment Impacts," prepared with J. Landon and P. Griffes for Florida Power & Light Company, January 1994.

- Rebuttal testimony before the Montana Public Service Commission on behalf of the Montana Power Company, Docket No. 93.6.24, regarding affiliated coal prices, October 15, 1993.

- Declaration on behalf of the Hacienda Improvement Association before the Superior Court of the State of California, Case No. BS 021186, *Hacienda La Puente Unified School District of Los Angeles County, et al.* v. *County of Sanitation District No. 2 of Los Angeles County, et al.*, regarding solid waste disposal capacity in Los Angeles, October 14, 1993.

- "A Review of Environmental Damage Studies." Prepared for Ontario Hydro, October 1993.

- Direct pre-filed testimony before the Montana Public Service Commission on behalf of the Montana Power Company, Docket No. 93.6.24, regarding affiliated coal prices, June 21, 1993.

- "Environmental Externalities Briefing Book." Prepared for Florida Power & Light Company, April 17, 1993.

- "External Costs of Electric Utility Resource Selection in Nevada." Prepared with D. Harrison, Jr., A. Nichols, and S. Bittenbender for Nevada Power Company, March 1993.



MARK P. BERKMAN

- "The Economic Impacts of AOX Reduction on the U.S. Pulp and Paper Industry." Sponsored by Georgia-Pacific Corporation, October 22, 1992.

- "Carbon Tax Impacts on Coal Production and Rail Shipments." Prepared with John Wile for Association of American Railroads, May 1992.

- "The Environmental and Social Costs Associated with Wood Roof Removal Legislation." Prepared with Clayton Environmental Consultants for Steel Roofing Manufacturers' Association, February 1992.

- "The Economic Feasibility of VOC Control Technologies for the Wood Furniture and Cabinet Industries." Prepared for the American Furniture Manufacturers Association, Business and Institutional Furniture Manufacturers Association, Kitchen Cabinet Manufacturers Association, National Paint and Coatings Association, January 1992.

- Rebuttal testimony before the Texas Public Utility Commission on behalf of Houston Lighting and Power, Docket No. 10473, regarding the treatment of environmental externalities, October 4, 1991.

- "Key Issues in Least-Cost Planning." With Kent Anderson, National Economic Research Associates, Inc. Working Paper #10, August 1991.

- "Hydroelectric Relicensing: Comparing the Value of Power and Nonpower Uses." With Mike Rosenzweig, April 1, 1991.

- Expert testimony before the District Court of the Fifth Judicial District of the State of Idaho, *State of Idaho, ex rel. R. Keith Higginson* v. *United States, State of Idaho, et al.*, Case No. 39576, on behalf of the United States, regarding water claims fees, February 4, 1991.

- "An Evaluation of State Efforts to Incorporate Environmental Externalities Into Electric Utility Planning." Prepared for Central Maine Power and the Energy Research Group, with John Wile, January 1991.

- Testimony before the Oregon Environmental Quality Commission, on behalf of the Oregon Department of Environmental Quality, regarding out-of-state waste charges, November 1, 1990.

- "Evaluation of Out-of-State Waste Surcharge Proposal." Prepared for Oregon Department of Environmental Quality, October 5, 1990.

- "Environmental Regulation Beyond the Clean Air Act Amendments: Incorporating Externalities," Prepared with John Wile for the Energy Research Group, June 26, 1990.

- "Economic Impacts of Proposed SO2 Emissions Standards on Hamilton County, Ohio." Prepared for the Hamilton County SO2 Task Force, June 1990.



- Expert testimony before the Indiana Utility Regulatory Commission on behalf of Northern Indiana Public Service Company regarding acid rain legislation and coal price forecasts, September 27, 1989.

- "Electric Utilities and the Environment in the 1990s." Prepared with Lewis Perl for the Energy Research Group, June 20, 1989.

- "The Impact of Environmental Regulation on Electric Utility Fuel Use." *NERA Energy Outlook*, Special Report, April 17, 1989.

- Affidavit for the New York City Department of Sanitation in *The Presidents' Council of Trade Waste Associations, Inc., et al.* v. *Edward I. Koch, Mayor of the City of New York, et al.*, commenting on increases in waste disposal rates and methods used to determine rates, October 27, 1988.

- Determination of Market Price for Angel Mining Inc.'s and Diversified Fuels Inc.'s Contracts With Taiwan Power Company." With Fred Dunbar and Jerry Hausman before the International Chamber of Commerce on behalf of Angel/Diversified, April 1987.

- "Economic Review of The McKinley County Coal Exchange." With Fred Dunbar, Washington, D.C.: National Coal Association, February 1987.

- "Lessons For the Interstate Gas Pipeline Industry From Railroad Deregulation." With Fred Dunbar, Washington, D.C.: The Interstate Natural Gas Association of America, 1986.

- Testimony before the Vermont Public Service Board on capacity planning and load forecasting on behalf of Central Vermont Public Service Corporation, July 12, 1985.

- "The Economics of U.K. Coal Mining." With S. Barrett, December 1984.

- "Pricing Solid Waste Disposal in New York City," November 1984.

- "Risk Analysis of the Pacific Power and Light Company PCB Handling and Disposal Program." With B. Price, October 19, 1984.

- "An Evaluation of Capacity Planning and Load Forecasting for Central Maine Power Company." With Lew Perl and John Wile, February 17, 1984.

- Expert Witness Report and Testimony before the United States District Court, District of Montana, on the coal severance taxes and the market for Western coal, on behalf of the Crow Indian Tribe, 1984.

- Co-author, "Solar Energy Technologies: Market Estimates and Federal R & D Payoff." Prepared for the Energy Research Advisory Board, sponsored by the U.S. Department of Energy, 1982.



- Co-author, "Analysis of Proposed Changes to Federal Surface Mining and Coal Leasing Policy." Final Report for the U.S. Department of Energy, October 1982.

- Co-author, "Barriers and Incentives for Fuel Cell Commercialization." Prepared for the U.S. Department of Energy, 1981.

### Environmental Health and Safety

- "Proposed Safety Standards for Clothing Storage Units, Comments on the CPSC's Preliminary Regulatory Analysis," Prepared for the American Home Furnishing Alliance, April 12, 2022.

- "A Review of the National Fire Incident Reporting System and the National Fire Protection Association's Upholstered Furniture Fire Statistics." Prepared for the Fire Prevention Alliance, August 31, 2015.

- "A Review of the Pipeline and Hazardous Materials Safety Administration's Draft Regulatory Impact Analysis. Docket No. PHMSA-2012-0082 (HM-251)." Prepared for The Railway Supply Institute, November 2014.

- Expert Report of Mark P. Berkman in the matter of *SPS Limited Partnership, LLLP et al. v. Severstal Sparrow Point, LLC et al.*, Prepared for Counsel on behalf of Arcelor Mittal USA, LLC, March 14, 2013.

- Expert Report of Mark P. Berkman in the matter of Jorge Santiago, Sr. v. Wholesale Furniture Distributors Inc., 139th District Court, Hidalgo Texas, Cause No. C-1311-07-C on behalf of defendant regarding the risks of death and injury from upholstered furniture ignited home fires, June 15, 2009.

- Expert Report of Mark P. Berkman in the matter of Price v. Price, Circuit Court of the Fifteenth Circuit in and for the County of Palm Beach Florida, Case No. 50 2007 DR1982 MBFC, regarding environmental and business risks associated with a construction and demolition landfill, December 2008.

- Expert Report of Mark P. Berkman in the matter of John Stewart Edwards v. La-Z-boy *et al.*, in the District Court 258th District, Polk County Texas, on behalf of defendant regarding the impact of fire safety regulations on upholstered furniture fires, May 16, 2008.

- "An Evaluation of the CPSC Staff Preliminary Regulatory Analysis of the Draft Upholstered Furniture Flammability Standard." on behalf of the American Home Furnishings Alliance National Home Furnishings Associations and the Upholstered Furniture Action Council, March 2, 2006.

- Deposition Testimony in the matter of Seng v. Levitz *et al.* in the Superior Court of the State of Washington, in and for Snohomish County, on behalf of the defendants regarding product liability. Oakland, California, August 27, 2003.



- "Assessing the Need for a Federal Small Open Flame / Cigarette Ignition Upholstered Furniture Flammability Standard." On behalf of the Upholstered Furniture Action Council, February 16, 2001.

- "A Review of the Federal Motor Carrier Safety Administration's Economic Analysis for its Proposed Hours of Service Standard." Prepared for the American Trucking Associations, August 3, 2000.

- "A Review of OSHA's Economic Analysis For Its Proposed Ergonomics Standard." On behalf of the National Coalition on Ergonomics, February 29, 2000.

- Testimony before the U.S. House of Representatives Committee on Education and the Workforce on behalf of the American Trucking Association regarding the costs and benefits of a proposed ergonomics standard, July 1997.

- "Benefit-Cost Analysis of OSHA's Proposed Ergonomics Standard on the Trucking Industry." On behalf of the ATA Foundation, September 1996.

- Testimony on behalf of the Inter-Industry Wood Dust Coordinating Committee, before the Occupational Safety and Health Administration, Department of Labor, Docket No. H-020, August 12, 1988.

- "The Economic Impact of OSHA's Proposed Air Contaminants Rule on the Wood Products Industries." Prepared for the Inter-Industry Wood Dust Coordinating Committee, July 25, 1988.

## Economic Impacts

- Salem and Hope Creek Nuclear Plants' Contribution to the New Jersey Economy, prepared for Exelon and Public Service Gas and Electric by Mark Berkman and Dean Murphy, November 2017.

- Mark Berkman and Jurgen Weiss, "Renewable Energy Growth Program Analysis: Economic, Jobs and Environmental Impacts for Program Years 2015 and 2016 and the Overall Program Years 2015 to 2019," prepared for the Rhode Island Office of Energy Resources and the Rhode Island Distributed Generation Board, May 12, 2017.

- Ohio Nuclear Power Plants' Contribution to the State Economy, with Dean Murphy, prepared for Nuclear Matters, and the Affiliated Construction Trades Ohio Foundation, the Mechanical Contractors Association of Northwest Ohio, the Ottawa County Improvement Corporation, the Regional Growth Partnership (Northwest Ohio), and the Team Northeast Ohio, April 2017.

- Direct Testimony of Mark P. Berkman, PhD on behalf of NorthStar Decommissioning Holdings, LLC and Entergy, *et al.*, Docket No. 8880, December 16, 2016.



MARK P. BERKMAN

- Pennsylvania Power Plants' Contribution to the State Economy, with Dean Murphy, prepared for the Pennsylvania Building and Construction Trade Council, the Pennsylvania Chamber of Business and Industry, Allegheny Conference on Community Development, and the Greater Philadelphia Chamber of Commerce, December 2016.

- "The Economic Impacts of Decommissioning Vermont Yankee: A Comparison of Two Approaches." Prepared for NorthStar and Entergy, December 16, 2016.

- Electricity Cost and Environmental Effects of Retiring the Quad Cities and Clinton Nuclear Plants with Dean Murphy prepared for Chicagoland Chamber of Commerce, Illinois Hispanic Chamber of Commerce and Illinois Retail Merchants Association, October 2016.

- "New York's Upstate Nuclear Power Plants' Contribution to the State Economy," with Dean Murphy. Prepared for the New York State IBEW Utility Labor Council, the Rochester Building and Construction Trades Council and the Central and Northern New York Building and Construction Trades Council, December 2015.

- Testimony on behalf of the New Hampshire Public Utility Commission regarding the economic impacts associated with a proposed settlement enabling the divestiture of all remaining power plants by Public Service of New Hampshire, October, 2015.

- "Analysis for the Boston 2024 Proposed Summer Olympic Plans," with Coleman Bazelon, Steve Herscovici, and Pallavi Seth. Prepared for the Commonwealth of Massachusetts Office of the Governor, President of the Senate, and Speaker of the House. August 17, 2015.

- "The Nuclear Industry's Contribution to the U.S. Economy," with Dean Murphy. Prepared for Nuclear Matters, July 2015. (Additional studies were prepared for selected states including Arizona, New York, Ohio, and Pennsylvania).

- "Distributed Generation Standard Contracts and Renewable Energy Fund: Jobs, Economic and Environmental Impact Study." With Jurgen Weiss and Stephen Lagos. Prepared for Rhode Island Office of Energy Resources and Commerce RI, April 30, 2014.

- "The Employment Impacts of Proposed Tariffs on Chinese Manufactured Photovoltaic Cells and Modules." With Lisa Cameron and Judy Chang. Prepared for the Coalition for Affordable Solar Energy, January 30, 2012.

- "Employment Impacts of the Proposed Bay Delta Conservation Plan Habitat Restoration Measures." With David Sunding. Prepared for the Delta Habitat Conservation and Conveyance Program, November 3, 2011.

- "Economic and Fiscal Impacts of the Alta Wind Energy Center." With Michelle Tran and Kyle Hubbard. Prepared for Alta Windpower Development, LLC, October 20, 2011.



- "Employment Impacts for Proposed Bay Delta Water Conveyance Tunnel Options." With David Sunding and Michelle Tran. Prepared for the Metropolitan Water District of Southern California on behalf of the Delta Habitat Conservation and Conveyance Program, September 19, 2011.

- "Economic and Fiscal Impacts of the Desert Sunlight Solar Farm." With Michelle Tran and Wesley Ahlgren. Prepared for First Solar, May 2011.

- "Economic and Fiscal Impacts of the Topaz Solar Farm." With Michelle Tran and Stephen Hamilton. Prepared for First Solar, March 2011.

- Analysis of the Economic Impacts of a Shutdown of Limestone Mining in Florida's Lake Belt District on behalf of the Miami Dade Limestone Products Association with Ann McDermott, March 21, 2007.

- "Socio-Economic Impacts of Strategies to Comply with the Clean Air Act Amendments of 1990." Prepared for The Cincinnati Gas & Electric Company Licensing and Environmental Affairs Department, May 1992.


## Commercial Litigation and Damages

- Deposition Testimony of Dr. Mark Berkman on behalf of Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation, Plaintiffs v. Countrywide Home Loans, Inc., Countrywide Wide Securities, Corp., Countrywide Financial Corp., and Bank of America Corp., Defendants, Supreme Court of the State of New York, New York County, Index No. 653979/2014, March 7, 2019.

- Expert Report of Dr. Mark Berkman In the Matter of Ambac Assurance Deposition Testimony of Dr. Mark Berkman on behalf of Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation, Plaintiffs v. Countrywide Home Loans, Inc., Countrywide Wide Securities, Corp., Countrywide Financial Corp., and Bank of America Corp., Defendants, Index No. 653979/2014, January 7, 2019.

- Expert and supplemental reports of Daniel J. McFadden on behalf of plaintiffs in the matter of *United States v. Novartis Pharmaceuticals Corp.*, United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG), August 14 and September 22, 2017. (consulting expert)

- Expert report of Daniel J. McFadden in the matter of *United States of America v. Countrywide Financial Corporation et.al.* (12CIV.1422 (JSR)), May 7, 2013 and a revised report on June 6, 2013. (consulting expert)



**MARK P. BERKMAN**

- Expert witness report of Mark P. Berkman, Ph.D., in the matter of *Neptec Optical Solutions v. Nabuo Takahashi and Nomura Jimusho (U.S.A.),* U.S. District Court for the Eastern District of Tennessee at Knoxville, reviewing and evaluating plaintiff's damages estimates and providing damages assessments on behalf of the defendant. November 10, 2003.—*Confidential.*

- Declaration of Mark P. Berkman before the American Arbitration Association Commercial Arbitration Tribunal in the matter of *Javad Ashjaee v. Topcon Positioning Systems, Inc.* on behalf of the plaintiff, Javad Ashjaee, calculating damages resulting from certain alleged practices by defendant Topcon Positioning Systems, Inc. that violate the Non-Compete, License and Permissible Activities Agreement between the parties. San Francisco, October 30, 2002.

- Deposition of Mark Berkman, in the matter of *Isuzu Motors Limited* v. *Consumers Union of United States, Inc.*, in the United States District Court, Central District of California, Case No. 97 5685 RAP (RBNx), regarding rebuttal report to plaintiff's damage estimates, July 27, 1999.

- Expert Report of Mark P. Berkman and Kenneth E. Train, in the matter of *Isuzu Motors Limited* v. *Consumers Union of United States, Inc.*, in the United States District Court, Central District of California, Case No. 97 5685 RAP (RBNx), rebuttal report to plaintiff's damage estimates, July 16, 1999.

- Supplemental Expert Report of Mark P. Berkman and Kenneth E. Train in the matter of *Suzuki Motor Corporation Japan* v. *Consumers Union of United States, Inc.*, in the United States District Court, California Central Division Case No. SACV 96-340 AHS (ANx), response to surrebuttal report to plaintiff's damage estimates, June 10, 1999.

- Declaration of Mark P. Berkman in the matter of *Walters Furniture* v. *Alameda Newspapers Inc.*, in Superior Court of California, County of Alameda, Case No. 800147-8, regarding damages resulting from overstated newspaper circulation claims, June 2, 1999.

- Deposition of Mark P. Berkman in the matter of *Suzuki Motor Corporation Japan* v. *Consumers Union of United States*, regarding damage estimates, April 9, 1999.

- Expert Report of Mark P. Berkman and Kenneth E. Train, in the matter of *Suzuki Motor Corporation Japan* v. *Consumers Union of United States, Inc.*, in the United States District Court, California Central Division Case No. SACV 96-340 AHS (ANx), rebuttal report to plaintiff's damage estimates, February 23, 1999.

- Expert Witness Report of Mark P. Berkman in the matter of *Ben Oehrlein et al.* v. *Hennepin County, Minnesota*, in the United States District Court for the District of Minnesota Fourth Division, February 6, 1998.



- Expert Testimony and Report before the United States District Court, for the District of Minnesota Fourth Division, Civil Court File No. 4-96-CIV 188, on behalf of Edward Kraemer & Sons, in the matter of *Edward Kraemer & Sons, Inc.* v. *Wybierala et al.*, regarding estimating the lost profits suffered by a landfill owner as a result of unauthorized discounts to customers, December 8, 1997.

- "Report on Damages Newark Group Industries, Inc. Recycled Fibers Division Eastern Region (Newark)," on behalf of Newark Group Industries, Inc., in the matter of *The Newark Group Industries, Inc.* v. *Joseph Merante, et al.*, Superior Court of New Jersey, Chancery Division: Essex County regarding business damage claims, November 1996.

- Expert witness report and testimony before the Rhode Island Superior Court, *Landfill & Resource Recovery, Inc.* v. *Department of Environmental Management of the State of Rhode Island, et al.* (Sup. Ct., C.A. No. 81-4091), on behalf of Landfill and Resource Recovery regarding the fair market value for a landfill site, July 3, 1989.

## Intellectual Property and Unfair Advertising

- Deposition Testimony in the matter of Teva Pharmaceuticals International  GMBH and Teva Phamaceuticals USA Inc. v. Eli Lily and Company in the United States Court for the District of Massachusestts, Civil Action No.1:18-cv-12029-ADB, January, 2022.

- Expert Reply Report of Mark P. Berkman in the matter of Teva Pharmaceuticals International GMBH and Teva Phamaceuticals USA Inc. v. Eli Lily and Company in the United States Court for the District of Massachusestts, Civil Action No.1:18-cv-12029-ADB, December 7, 2021.

- Expert Report of Mark P. Berkman in the matter of Teva Pharmaceuticals International  GMBH and Teva Pharmaceuticals USA Inc. v. Eli Lily and Company in the United States Court for the District of Massachusetts, Civil Action No.1:18-cv-12029-ADB, September 16, 2021.

- Expert testimony of Mark Berkman in the matter of Bauer Hockey LTD. v. Sport Maska INC. dba CCM Hockey, Federal Court, Case No. T-311-12, on behalf of plaintiff to estimate royalties as a measure of damages incurred of the alleged trademark infringement, December 9, 2020.

- Expert response report of Mark Berkman in the matter of Bauer Hockey LTD. v. Sport Maska INC. dba CCM Hockey, Federal Court, Case No. T-311-12, on behalf of plaintiff to estimate royalties as a measure of damages incurred of the alleged trademark infringement, June 26, 2020.

- Expert testimony of Mark Berkman in the matter of Bauer Hockey LTD. v. Sport Maska INC. dba CCM Hockey, Federal Court, Case No. T-546-12, on behalf of plaintiff to estimate reasonable royalties incurred as a consequence of the alleged infringement of Bauer's Canadian patent No. 2,214,748, February 19, 2020.

- Expert report of Mark Berkman in the matter of Bauer Hockey LTD. v. Sport Maska INC. dba CCM



Hockey, Federal Court, Case No. T-546-12, on behalf of plaintiff to estimate reasonable royalties incurred as a consequence of the alleged infringement of Bauer's Canadian patent No. 2,214,748, July 15, 2019.

- Expert report of Mark Berkman in the matter of Bauer Hockey LTD. v. Sport Maska INC. dba CCM Hockey, Federal Court, Case No. T-311-12, on behalf of plaintiff to estimate royalties as a measure of damages incurred of the alleged trademark infringement, July 2, 2019.

- Affidavit of Mark P. Berkman, prepared at the request of counsel for Ford Motor Company of Canada, Limited, in the matter of *Barry Rebuck and Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* No. CV-16-544545-00CP, regarding alleged misleading fuel economy information, April 3, 2018.

- Deposition Testimony of Dr. Mark P. Berkman in the matter of Western Sugar Cooperative et.al. vs. Archer-Daniels-Midland Company *et al.* in the United States District Court Central District of California, Case No. CV11-3473 CBM (MANx), November 19, 2014

- Expert Report of Mark P. Berkman in the matter of Western Sugar Co-operative *et.al.* v. Archer Daniels Midland et.al, United States District Court Central District of California, Case No. CV11-3473 CBM (MANx), on behalf of plaintiffs provided rebuttal to defendant's counterclaim damage estimate, September 30, 2014.

- Trial Testimony in the matter of *PQ Labs Inc. v. ZaagTech, Inc.*, in the United States District Court, Northern District of California, Case No. 12-cv-00450-cw, March 12, 2014.

- Rebuttal Report of Dr. Mark P. Berkman in the matter of *PQ Labs Inc. v. ZaagTech, Inc.*, in the United States District Court, Northern District of California, Case No. 12-cv-00450-cw, on behalf of defendants regarding alleged misappropriation of trade secrets and breach of contract, October 25, 2013.

- Deposition Testimony in the matter of PQ Labs Inc. v. ZaagTech, Inc., in the United States District Court, Northern District of California, Case No. 12-cv-00450-cw, on behalf of defendants regarding alleged misappropriation of trade secrets and breach of contract, October 4, 2013.

- Deposition Testimony in the matter of *GigOptix v. M/A COM et.al*, Superior Court of the State of California, Case No. 1-11-cv-199643, on behalf of defendants regarding damages attributed to alleged trade secret misappropriation, September 13, 2013.

- Expert Report of Mark P. Berkman, on behalf of PQ Labs, Inc., in the matter of *PQ Labs Inc. v. ZaagTech, Inc.*, in the United States District Court, Northern District of California, Case No. 12-cv-00450-cw, to calculate damages regarding alleged misappropriation of trade secrets and breach of contract, August 30, 2013.

- Deposition Testimony in the matter of *Quickie LLC v Greenberg Traurig et.al,* United States



MARK P. BERKMAN

District Court Southern District of New York, 07Civ.10331 (RMB) (DFE), on behalf of plaintiffs, April 13, 2009.

- Expert Report of Mark P. Berkman in the matter of *CAL-PAL v. California Police Youth Charities, Inc.*, United States District Court, Northern District of California, Case No. 3:08-cv-01991-PJH on behalf of plaintiffs regarding damages regarding alleged trademark infringement and violations of the Uniform Trade Secret Act, January 9, 2009.

- Expert Rebuttal Report of Mark Berkman, PhD in the matter of *Quickie LLC v Greenberg Traurig et.al,* United States District Court Southern District of New York, 07Civ.10331 (RMB) (DFE), on be-half of plaintiffs regarding patent infringement damages, October 17, 2008.

- Expert Report of Mark Berkman, PhD in the matter of *Quickie LLC v Greenberg Traurig et al.*, United States District Court Southern District of New York, 07Civ.10331 (RMB) (DFE), on behalf of plain-tiffs regarding patent infringement damages, July 21, 2008.

- Trial Testimony in the matter of *Ultra Clean Technology Systems and Service, Inc.* v. *Celerity, Inc.* before the United States District Court Northern District of California- San Francisco. June 12, 2007.

- Deposition Testimony in the matter of *Ultra Clean Technology Systems and Service, Inc.* v. *Celerity, Inc.* before the United States District Court Northern District of California- San Francisco, February 8, 2007.

- Expert Report of Mark Berkman in the matter of *Ultra Clean Technology Systems and Service, Inc.* v. *Celerity, Inc.* before the United States District Court Northern District of California- San Francisco. January 12, 2007.

- Deposition Testimony in the matter of Hank Spacone, on behalf of and a trustee for the General Unsecured Creditors' Liquidating Trust of At Home Corporation, and on behalf of and in the name of the At Home Liquidating Trust of At Home Corporation, Microsoft Corporation, Civil Action NO. C034739 (CW), September 27, 2005.

- Expert Report of Mark Berkman in the matter of Hank Spacone, on behalf of and a trustee for the General Unsecured Creditors' Liquidating Trust of At Home Corporation, and on behalf of and in the name of the At Home Liquidating Trust of At Home Corporation, Microsoft Corporation, Civil Action NO. C034739 (CW), August 19, 2005.

- Expert Report of Mark P. Berkman in the matter of *Monster Cable Products, Inc. v. Discovery Communications, Inc.* before the United States District Court for the Northern District of California—San Francisco. July 23, 2004. Rebuttal Report filed August 13, 2004. Deposition Testimony taken in San Francisco on August 18, 2004.

- Trial Testimony of Mark P. Berkman before the U.S. District Court for the District of Connecticut



in the matter of *Raytek Corporation* v. *Omega Engineering, Inc. and Newport Electronics, Inc.,* regarding false advertising and a patent infringement claim. Bridgeport, CT, June 16, 2004.

- Deposition Testimony of Mark Berkman in the matter of *Vladimir I. Makhov v. Litton Systems, Inc., et al.,* providing damages estimates on behalf of respondents with regard to an alleged breach of contract. May 27, 2004.

- Supplemental Expert Report of Mark Berkman in the matter of *Vladimir I. Makhov v. Litton Systems, Inc., et al.,* providing damages estimates on behalf of respondents with regard to an alleged breach of contract. Before the American Arbitration Association, New York City Office, May 4, 2004.

- Expert Report of Mark Berkman in the matter of *Vladimir I. Makhov v. Litton Systems, Inc., et al.,* providing damages estimates on behalf of respondents with regard to an alleged breach of contract. Before the American Arbitration Association, New York City Office, April 26, 2004.

- Supplemental Expert Report of Mark P. Berkman in the matter of *Quickie, LLC, v. Medtronic, Inc.*, U.S. District Court for the Southern District of New York, on behalf of the plaintiff, Quickie, LLC, filed March 5, 2004.

- Deposition Testimony of Mark P. Berkman in the matter of *Quickie, LLC, v. Medtronic, Inc.*, U.S. District Court for the Southern District of New York, on behalf of the plaintiff, Quickie, LLC, calculating damages for alleged patent infringement. Washington, DC, August 20, 2003.

- Rebuttal report with Timothy Savage, Ph.D. and Phillip Taylor, Ph.D., in the matter of *Tyson Foods, Inc. v. ConAgra Foods, Inc.*, U.S. District Court for the Western District of Arkansas, on behalf of the defendant, responding to opposing expert's damages calculations. August 8, 2003.

- Expert witness report with Timothy Savage, Ph.D. and Phillip Taylor, Ph.D., in the matter of *Tyson Foods, Inc. v. ConAgra Foods, Inc.*, U.S. District Court for the Western District of Arkansas, on behalf of the defendant, calculating economic damages resulting from alleged false advertising under the Lanham Act. July 30, 2003.

- Expert witness report of Mark P. Berkman before the U.S. District Court for the Southern District of New York in the matter of *Quickie, LLC, v. Medtronic, Inc.* on behalf of the plaintiff, Quickie, LLC, calculating damages for alleged patent infringement. June 18, 2003.

- Expert witness report of Mark P. Berkman before the U.S. District Court for the Northern District of California in the matter of *Molecular Probes, Inc. v. Texas Fluorescence Laboratories, Inc.* on behalf of the plaintiff, Molecular Probes, Inc., calculating damages for alleged patent infringement. San Francisco, CA, November 15, 2002.

- Deposition Testimony of Mark P. Berkman before the U.S. District Court for the District of Connecticut in the matter of *Raytek Corporation* v. *Omega Engineering, Inc. and Newport*



*Electronics, Inc.,* regarding false advertising and a patent infringement claim, July 18, 2001.

- Trial Testimony of Mark P. Berkman in *Caliper Technologies Corp.* v. *Bertram Rowland; Flehr, Hohbach, Test, Albritton & Herbert; Aclara Biosciences, Inc., and Does One Through One Hundred,* estimated damages related to the misappropriation of trade secrets for a computer chip, October 5, 2000.

- Deposition Testimony of Mark P. Berkman in *Caliper Technologies Corp.* v. *Bertram Rowland; Flehr, Hohbach, Test, Albritton & Herbert; Aclara Biosciences, Inc., and Does One Through One Hundred,* September 7, 2000.

- Expert Witness Report of Mark P. Berkman (Confidential) in *Baxter Healthcare Corporation* v. *Spectranetics, Inc.*, to determine reasonable royalties in a patent infringement suit involving medical lasers, April 25, 2000.

- Trial Testimony of Mark P. Berkman, on behalf of R.E. Service Company, Inc., in the matter of *Johnson & Johnson Associates, Inc.* v. *R.E. Service Co., Inc.*, in the United States District Court, Northern District of California, Case No. C 97-04382 CRB, regarding damages associated with an alleged patent infringement, October 21, 1998.

- Expert Report with Kent Anderson in *Canon* v. *Nu-Kote International, U.S. District Court for the Central District of California, Southern Division*, regarding damages from alleged infringement of trademark, trade dress and design patents, August, 1998.

- Deposition Testimony of Mark P. Berkman, on behalf of R.E. Service Company, Inc., in the matter of *Johnson & Johnson Associates, Inc.* v. *R.E. Service Co., Inc.*, in the United States District Court, Northern District of California, Case No. C 97-04382 CRB, to calculate damages regarding an alleged patent infringement, July 10, 1998.

- Second Supplemental Expert Report of Mark P. Berkman, on behalf of Cellnet Data Systems, Inc., in the matter of *Cellnet Data Systems, Inc. v. Itron, Inc.*, to calculate damages regarding Itron's alleged infringement of their patent on remote electric meter reading, June 30, 1998.

- Expert Witness Report of Mark P. Berkman, on behalf of R.E. Service Company, Inc., in the matter of *Johnson & Johnson Associates, Inc.* v. *R.E. Service Co., Inc.*, in the United States District Court, Northern District of California, Case No. C 97-04382 CRB, to calculate damages regarding an alleged patent infringement, June 22, 1998.

- Expert Reports of Mark P. Berkman, on behalf of Cellnet Data Systems, Inc., in the matter of *Cellnet Data Systems, Inc.* v. *Itron, Inc.,* to calculate damages regarding Itron's alleged infringement of their patent on remote electric meter reading, April 1, 1998 and May 19, 1998.

**Antitrust**



- Deposition Testimony in the matter of Sinclair Oil Corporation vs. eprime, Inc. and OneOK Energy Services Company, L.P. Docket No. 055CV 435 CVE-FHM, on behalf of Sinclair Oil. March 15, 2017.

- Expert Rebuttal Report of Mark Berkman, Ph.D. in the matter of *Sinclair Oil Corporation vs. eprime, Inc. and OneOK Energy Services Company, L.P.* Docket No. 055CV 435 CVE-FHM, on behalf of Sinclair Oil regarding allegations of price fixing in violation of the Sherman Antitrust Act. January 2017.

- Expert Report of Mark Berkman, Ph.D. in the matter of *Sinclair Oil Corporation vs. eprime, Inc. and OneOK Energy Services Company, L.P.* Docket No. 055CV 435 CVE-FHM, on behalf of Sinclair Oil regarding allegations of price fixing in violation of the Sherman Antitrust Act. April 2016.

- Expert Report of Richard J. Arnould, Ph.D. in the matter of *Miguel A. Gomez III, M.D., and Miguel A. Gomez, M.D., P.A. v. Memorial Hermann Hospital System, et al.* on behalf of Memorial Hermann Hospital System, *et al.*, regarding antitrust claims that the Defendant monopolized robotic heart surgery in the Houston metropolitan area. November 2015. (consulting expert)

- Expert Report of Mark Berkman, Ph.D. and John Simpson, Ph.D. in the matter of *Arger, et al. v. Renown Health, et al.* on behalf of St. Mary's Hospital for mediation purposes, February 2015. Confidential.

- Expert Report of Mark P. Berkman in Support for Summary Adjudication of Tesoro Refining and Marketing Company, California Public Utilities Commission, Application No. A08-09-04, regarding market power in the transport of crude oil on behalf of Tesoro, November 16, 2009.

- Deposition Testimony in the matter of Southern Waste Systems LLC and Sun Recycling v. The City of Coral Springs Florida, Waste Management Inc., of Florida and the Broward Solid Waste Disposal District, United States District Court Southern District of Florida Miami Division, Case No. 06-61448-CIV on behalf of plaintiffs, April 14, 2009.

- Expert Report of Mark P. Berkman in the matter of *Southern Waste Systems, LLC and Sun Recycling v. The City of Coral Springs Florida, Waste Management Inc. of Florida and the Broward Solid Waste Disposal District*, United States District Court Southern District of Florida Miami Division, Case No. 06-61448-CIV on behalf of plaintiffs regarding Commerce Clause violations and damages, February 2, 2009.

- Sworn Declaration of Mark P. Berkman in Support for Summary Adjudication of Tesoro Refining and Marketing Company, California Public Utilities Commission, Application No. A08-09-04, regarding market power in the transport of crude oil, December 18, 2008.

- Trial Testimony in the matter of *Groeniger & Co.* v. *Ferguson Enterprise Inc.*, Superior Court of the State of California, County of Kern, No. 253924, on behalf of defendants regarding antitrust



and anticompetitive act claims, May 16, 2007.

- Deposition Testimony in the matter of *Groeniger & Co.* v F*erguson Enterprises, Inc.*, Superior Court of the State of California, County of Kern, No. 253924, April 21, 2007.

- *Waste Services Inc.* v. *Waste Management Inc.* in the United States District Court, Middle District of Florida, Orlando Division, Case no. 6:05-CV-00320-ACC-DAB, 2006.

- In Re High Pressure Laminates Antitrust Litigation in the United States District Court for the Southern District of New York, 2004.

- Expert witness report of Mark P. Berkman before the U.S. District Court for the Northern District of California in the matter of *Molecular Probes, Inc. v. Texas Fluorescence Laboratories, Inc.* on behalf of the plaintiff, Molecular Probes, Inc., critiquing defendant's antitrust counterclaim. San Francisco, CA, December 6, 2002.

- Trial Testimony of Mark P. Berkman before the U.S. District Court for the District of Minnesota on behalf of Superior-FCR Landfill, Inc., in the matter *Superior-FCR Landfill, Inc.* v. *Wright County, Minnesota,* regarding the impact of a county-need based zoning decision on interstate commerce, June 15, 2001.

- Arbitration Testimony of Mark P. Berkman in the matter of *Raisin Bargaining Association* v. *American Raisin Packers et al.*, on behalf of the American Raisin Packers regarding the free tonnage price for raisins in 2001, April 30, 2001.

- Expert Witness Report on Damages of Mark P. Berkman in *Cardiac Pacemakers Inc., Guidant Sales Corp, and Eli Lilly Company* vs. *St. Jude Medical, Inc., Pacesetter, Inc., Ventritex, Inc. and John Does 1–10*, regarding alleged anti-competitive actions by plaintiff, February 26, 2001.

- Expert Witness Report of Mark P. Berkman in *Cardiac Pacemakers Inc., Guidant Sales Corp, and Eli Lilly Company* vs. *St. Jude Medical, Inc., Pacesetter, Inc., Ventritex, Inc. and John Does 1–10*, regarding counterclaim damages, January 18, 2001.

- Deposition Testimony of Mark P. Berkman on behalf of Superior-FCR Landfill, Inc., in the matter *Superior-FCR Landfill, Inc.* v. *Wright County, Minnesota,* regarding the effects on interstate commerce of Wright County's zoning policies, August 24, 2000.

- Expert Witness Report of Mark P. Berkman on behalf of Superior-FCR Landfill, Inc., in the matter *Superior-FCR Landfill, Inc.* v. *Wright County, Minnesota*, regarding the effects on interstate commerce of Wright County's zoning policies, April 3, 2000.

- Affidavit of Mark P. Berkman, December 29, 1999, and Supplemental Affidavit of Mark P. Berkman, January 15, 2000, prepared on behalf of Waste Management of New York in the matter of *Waste Management of New York* v. *Town of Oyster Bay et al.*, reviewing the Town of Oyster



**MARK P. BERKMAN**

Bay's contracting procedures and terms for a solid waste disposal contract.

- Rebuttal Report of Mark P. Berkman, on behalf of Randy's Sanitation, Inc., in the matter of *Randy's Sanitation, Inc.* v. *Wright County, Minnesota, Patrick Sawatzke, and Kenneth Jude*, January 21, 1999.

- Expert Witness Report of Mark P. Berkman, on behalf of Randy's Sanitation, Inc., in the matter of *Randy's Sanitation, Inc.* v. *Wright County, Minnesota, Patrick Sawatzke, and Kenneth Jude*, regarding the impacts of Wright County's flow control ordinance on interstate and intrastate trade, November 2, 1998.

- Investigation of the Proposed Merger of Waste Management, Inc. with USA Waste before the U.S. Department of Justice as required by the Hart-Scott-Rodino Act, 1998.

- Testimony before the Trade Waste Commission, City of New York on behalf of the New York City Economic Development Commission, regarding maximum rate regulation of commercial waste collection, January 21, 1997.

- *Strobe Data, Inc.* v. *Digital Equipment Corporation,* before the United States District Court, Western District of Washington, C96-947C, 1997.

- Investigation of the Proposed Acquisition of United Waste by USA Waste, before the U.S. Department of Justice as required by the Hart-Scott-Rodino Act, 1997.

- Expert Witness Report of Mark P. Berkman, on behalf of *Robinson Rubber Co. Inc., et al.* v. *Hennepin County, Minnesota*, before the United States District Court, District of Minnesota, Civil Court File No. 4-95-220, regarding the impact of Hennepin County's flow control ordinance on the demand for solid waste management services, December 30, 1996.

- Expert Witness Report of Mark P. Berkman, on behalf of Entex Information Services, in the matter of *Daniels et al.* v. *Random Access et al.*, in the United States District Court for the District of Colorado, Civil Action No. 95-Z-1785, regarding Sherman Act claims and damages, July 15, 1996.

- *Jerry Duke* v. *Browning Ferris Industries of Tennessee and Browning Ferris Industries*, Tennessee Circuit Court, 1996.

- Expert Witness Report of Mark P. Berkman in the matter of *Ben Oehrlein et al.* v. *Hennepin County, Minnesota*, in the United States District Court for the District of Minnesota Fourth Division, addresses what the market price for solid waste disposal in Hennepin County, Minnesota, would have been between 1989 and 1995 but-for a County Ordinance restricting waste to designated disposal facilities, November 1, 1995.

- Affidavit of Mark P. Berkman in Support of Class Certification, on behalf of *Robinson Rubber Co. Inc., et al.* v. *Hennepin County, Minnesota*, before the United States District Court, District of



MARK P. BERKMAN

Minnesota, Civil Court File No. 4-95-220, regarding the impact of Hennepin *County's* flow control ordinance on solid waste disposal costs on County residents and businesses, October 30, 1995.

- Declaration on behalf of *Ben Oehrlein et al.* v. *Hennepin County, Minnesota*, before the United States District Court, District of Minnesota, Civil Court File No. 4-94-63, regarding the geographic market for solid waste disposal, August 3, 1995.

- *Novadyne Computer Systems, Inc.* v. *Tandem Computers, Inc.*, before the United States District Court, Central District of California, No. 91-1941 THJ (KX), October, 1995.

- Affidavit on behalf of Kauai Publishing Company in *Hawaii Press Newspapers, Inc.* v. *Wolf Publishing et al.*, No. 88-1836-6, regarding predatory pricing claims made against Kauai Publishing, March 11, 1994.

- Investigation of the Proposed Acquisition of Attwoods, Inc. by Browning-Ferris Industries, Inc. before the U.S. Justice Department as required by the Hart Scott Rodino Act, 1994.

- "Economic Implications of *Los Angeles Times* Job Fair-Related Activities." Prepared with Richard T. Rapp, on behalf of the *Los Angeles Times*, October 27, 1992.

- Expert testimony before the U. S. District Court, District of Rhode Island, *Metals Recycling, Inc.* v. *American Waste Services, Inc., et al.*, on behalf of American Waste regarding market power and tying in solid waste disposal and transportation, July 17–21, 1992.

- *Metals Recycling, Inc.* v. *American Waste Services, Inc., and Envirco Transportation Management, Inc.*, before the U.S. District Court, District of Rhode Island, No. 91-0149B, 1992.

- Deposition testimony on behalf of Kauai Publishing Company regarding *Hawaii Press Newspapers, Inc.* v. *Wolf Publishing, et al.*, First Circuit Court, State of Hawaii, Civil Case No. 88-1836-06, regarding alleged market power and predatory pricing, October 29, 1991.

- *Hawaii Press* v. *Wolf Publishing et al.*, before the Circuit Court of the First Circuit, State of Hawaii, No. 88-1836-06, 1991.

- *High Technology Careers, a California partnership* v. *San Jose Mercury News, a California Corporation*, before the U.S. District Court, Northern District of California, San Jose Division, No. 90-20579-SW, 1991.

- *BPHC Acquisition Inc.* v. *Penthouse International, Donald J. Trump, et al.* before the Superior Court of New Jersey, 1990.

- *Zapata Gulf Marine Corporation* v. *Puerto Rico Maritime Shipping Authority, et al.* before the U.S. District Court of the Eastern District of Louisiana, 1990.

- *ETSI Pipeline Project* v. *Burlington Northern Inc., et al.*, in the United States District Court for the



**MARK P. BERKMAN**

Eastern District of Texas, Beaumont Division, No. B-84-979-CA, 1989.

- *Landmarks Holding Corporation, et al.* v. *David W. Bermant, et al.*, before the United States District Court, District of Connecticut, 1984.

- *Jefferson Disposal* v. *Parish of Jefferson, et al.*, before the United States District Court, for the Eastern District of Louisiana, 1984.

- *Scenic Trails, Inc.* v. *Greyhound Lines, Inc., et al.*, before the United States District Court, Western District of Wisconsin, 1984.

## Discrimination

- Declaration in Support of Plaintiffs' Motion for Preliminary Injunction, Jiahoa Kuang and Deron Cooke on behalf of the themselves and those similarly situated, v. United States Department of Defense, United States District Court for the Northern District of California, San Francisco Division, Case No. 3.8CB-03698, July 18, 2018.

- Report on behalf of The Consumer Financial Protection Bureau. "The Effect of Race and Ethnicity on (redacted) Mortgage Loan Origination and Pricing." Prepared with Charles Gibbons and Stephen Lagos. November 25, 2014.

- Report on behalf of The Consumer Financial Protection Bureau. "The Effect of Race and Ethnicity on (redacted) Mortgage Loan Origination and Pricing." Prepared with Charles Gibbons, Pavitra Kumar, and Stephen Lagos. July 8, 2014.

- Report on behalf of The Consumer Financial Protection Bureau. "The Effect of Race and Ethnicity on (redacted) Mortgage Loan Origination and Pricing." Prepared with Charles Gibbons, Pavitra Kumar, and Stephen Lagos. August 1, 2013.

- Presentation to the US Department of Justice, Office of Civil Rights and Housing regarding "The Effect of Race and Ethnicity on (redacted) Mortgage Loan Origination and Pricing." Prepared with Michelle Tran and Stuart Gabriel. Covered the findings a detailed statistical analysis of lending results of a major U.S. lender, June 2012.

- Deposition Testimony in the matter of Associated General Contractors of America v. California Department of Transportation, United States District Court Eastern District of California No. 2:09-cv-01622-JAM-GGH , November 2010.

- Rebuttal Report in the matter of Associated General Contractors of America v. California Department of Transportation, United States District Court Eastern District of California No. 2:09-cv-01622-JAM-GGH, October 2010.

- Expert Report in the matter of Associated General Contractors of America v. California Department of Transportation, United States District Court Eastern District of California No. 2:09-



MARK P. BERKMAN

cv-01622-JAM-GGH, Reviewed the methods employed to measure race, gender, and ethnic disparities in CalTrans contracting, September 2010.

- Measuring Minority and Woman-Owned Construction and Professional Service Firm Availability and Utilization for the San Mateo County Transit District and Peninsula Joint Powers Board, with Robert Fairlie and Mathew Johnson, April 2008.

- Measuring Minority and Woman-Owned Construction and Professional Service Firm Availability and Utilization for the Santa Clara Valley Transit Authority, with Robert Fairlie and Mathew Johnson, December 2007.

- Trial Testimony in the Matter of *Public Works Contract Cases, City of San Francisco, et al.* v. *William D. Spencer et al.* and *F.W. Spencer & Son Inc., et al.* v. *David Norman, et al.*. Judicial Council Coordination Proceeding No 4379, on behalf of defendant regarding evidence of discrimination in public contracting, November 14, 2005.

- Deposition Testimony in the Matter of *Public Works Contract Cases, City of San Francisco, et al.* v. *William D. Spencer et al.* and *F.W. Spencer & Son Inc., et al.* v. *David Norman, et al.*. Judicial Council Coordination Proceeding No 4379, October 7, 2005.

- Declaration of Mark P. Berkman PhD, in the matter of *Public Works Contract Cases, City of San Francisco, et al.* v. *William D. Spencer et al.* and *F.W. Spencer & Son Inc., et al.* v. *David Norman, et al.* Judicial Council Coordination Proceeding No 4379, June 10, 2005.

- Trial Testimony in the matter of *National Association for the Advancement of Colored People, et al. v. The State of Florida Department of Corrections, et al.*, In the United States District Court for the Middle District of Florida, Ocala Division, on behalf of the plaintiffs. Ocala, Florida, November 12–13, 2003.

- Supplemental expert report of Mark P. Berkman filed in the matter of *National Association for the Advancement of Colored People, et al. v. The State of Florida Department of Corrections, et al.*, In the United States District Court for the Middle District of Florida, Ocala Division, on behalf of the plaintiffs. October 20, 2003.

- Trial Testimony on behalf of the NAACP in the matter of *NAACP v. State of Florida Department of Corrections*, U.S. District Court, Middle District of Florida, Ocala Division regarding statistical evidence of race discrimination in the promotion, training and discipline of black corrections officers, Ocala, Florida, November 6, 2002.

- Expert Testimony on behalf of the NAACP in the matter of *NAACP v. State of Florida Department of Corrections*, U.S. District Court, Middle District of Florida, Ocala Division regarding the adequacy of available data for statistical analysis. Ocala, Florida, September 14, 2001.

- Trial Testimony of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa*



**MARK P. BERKMAN**

*et al.*, before the U.S. District Court for the Northern District of California, on behalf of Contra Costa County regarding the utilization of minority- and women-owned firms by the County, June 18, 2001.

- Deposition of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*, regarding comments on reports filed by plaintiff's experts, February 16, 2001.

- Affidavit of Mark P. Berkman in the matter of *National Association for the Advancement of Colored People, et al.* v. *State of Florida Department of Corrections, et al.*, to examine the Florida Department of Corrections data regarding the hiring and promotion of staff and analyze it for evidence of race and gender discrimination, April 4, 2001 and September 13, 2000.

- Deposition of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*, regarding the calculation of the utilization of minority- and woman-owned firms in professional services and purchasing by the County, October 17, 2000 and July 18, 2000.

- Amended Declaration of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*, to calculate the utilization of minority- and woman-owned firms in professional services and purchasing by the County, September 19, 2000 and July 14, 2000.

- "A Statistical Analysis of Fair Lending." Prepared with Anthony Yezer and Stuart Gabriel, (Confidential), January 1999.

- "The Availability of Minority and Woman-Owned Businesses for the Southern California Regional Rail Authority." Prepared at the request of the Southern California Regional Rail Authority, December 1996.

- Testimony before the California Public Utilities Commission, on behalf of The Joint Utilities Subcommittee, consisting of 12 California utilities, regarding NERA's study to estimate the availability of service disabled veteran-owned establishments within the geographic and product markets from which the California utilities purchase goods and services, October 17, 1996.

- "California Disabled Veteran Business Enterprise Availability Study." Prepared for The Joint Utilities Subcommittee, consisting of 12 California utilities, October 15, 1996.

- "An Analysis of the Utilization and Availability of Minority and Woman-Owned Businesses in the Los Angeles Metropolitan Area." Prepared with D. Evans *et al.*, March 7, 1996.

- "The Utilization of Minority and Women-Owned Business Enterprises by Member Agencies of the Regional Transit Association." Prepared with D. Evans *et al.*, May 1993.

- "The Utilization of Minority and Woman-Owned Business Enterprises by the San Francisco Redevelopment Agency." Prepared with D. Evans *et al.*, April 1993.

- "The Utilization of Minority and Woman-Owned Business Enterprises by the City of Hayward."



MARK P. BERKMAN

Prepared with D. Evans *et al.*, March 1993.

- Declaration on behalf of San Francisco Bay Area Rapid Transit District in *RGW Construction, Inc. San Francisco Bay Area Rapid Transit District, et al.*, regarding evidence of discrimination against minority contractors in the Bay Area, October 8, 1992.

- "The Utilization of Minority and Woman-Owned Business Enterprises by Alameda County." Prepared with D. Evans *et al.*, June 1992.

- "The Utilization of Minority and Woman-Owned Business Enterprises by Contra Costa County." Prepared with D. Evans *et al.*, May 1992.

## Labor and Employment

- Expert Report on behalf of L-3 Communications/ L-3 on the Matter of Tanya Rahim vs. L-3 Titan Corporation regarding damages attributed to alleged wrongful injury claim, August 22, 2012.

- Deposition Testimony on behalf of Chevron U.S.A. Inc. in the matter of *Richard O. Jacks v. Chevron U.S.A. Inc., Paul Moran and Kevin Hofer*, United States District Court for the Northern District of California San Francisco Division, Case no. C09-4523 JSW, regarding damages attributed to alleged wrongful termination, November 15, 2011.

- Expert Report on behalf of Chevron U.S.A. Inc. in the matter of *Richard O. Jacks v. Chevron U.S.A. Inc., Paul Moran and Kevin Hofer*, United States District Court for the Northern District of California San Francisco Division, Case no. C09-4523 JSW, regarding damages attributed to alleged wrongful termination, August 23, 2011.

- Deposition Testimony on behalf of the *City and County of San Francisco in the matter of City and County of San Francisco, et al. v. United States Postal Service, et al.*, United States District Court for the Northern District of California San Francisco Division No. 3:09-cv-01964-RS (EDL), regarding labor costs to provide centralized service to single occupancy hotels, July 7, 2011.

- Expert Report on behalf of the City and County of San Francisco in the matter of *City and County of San Francisco, et al. v. United States Postal Service, et al.*, United States District Court for the Northern District of California San Francisco Division No. 3:09-cv-01964-RS (EDL), regarding costs to provide centralized service to single occupancy hotels, June 2011.

- Trial Testimony in the matter of Amy Moran v. Qwest Communications *et al.*, Superior Court of the  State of California, City and County of San Francisco Case No. CGC08-480654 on behalf of plaintiff regarding damages attributable to alleged gender discrimination and sexual harassment, February 2, 2010.

- Arbitration Testimony in the Matter of *George Santana v. The New Santana Band* on behalf of the Defendant regarding damages arising from alleged wrongful termination, February 16, 2006.



- Deposition Testimony in the matter of *Carlos Torres et al.* v. *Gristedes Operating Corporation et al.*, United States Court Southern District of New York, Case No. 04 CV 3316 (PAC) (ASP), October 25, 2005.

- Expert Report of Mark Berkman in the matter of *Carlos Torres et al.* v. *Gristedes Operating Corporation et al.*, United States Court Southern District of New York, Case No. 04 CV 3316 (PAC) (ASP), regarding a wages and hours claim on behalf of defendant, October 11, 2005.

- Trial Testimony of Mark P. Berkman in the matter of *Barbara Niesendorf v. Levi Strauss & Company* on behalf of the defendant, regarding alleged wrongful termination. San Francisco, CA, June 10, 2004.

- Deposition Testimony of Mark P. Berkman in the matter of *Barbara Niesendorf v. Levi Strauss & Company* on behalf of the defendant, regarding alleged wrongful termination. San Francisco, CA, April 29, 2004.

- Deposition Testimony of Mark P. Berkman in the matter of *Michelle Hamamura v. Kelly-Moore Paint Company, Inc.* on behalf of the defendant, regarding alleged gender discrimination. San Jose, CA, February 12, 2004.

- Trial Testimony of Mark P. Berkman in the matter of *Willard E. Kopetski v. Chevron Corporation et al.,* Superior Court of the State of California in and for the County of San Francisco, on behalf of defendant Chevron Corporation, regarding alleged wrongful termination. San Francisco, CA, January 21, 2004.

- Expert Report in the matter of *Michelle Hamamura v. Kelly-Moore Paint Company, Inc.* in the United States District Court, Northern District of California, on behalf of defendant Kelly-Moore Paint Company, Inc. January 20, 2004.

- Expert witness report of Mark P. Berkman, Ph.D., filed in the matter of *Jeri Hewitt v. Amerigas Propane, Inc.*, calculating damages estimates on behalf of the defendant with regard to alleged wrongful termination. November 5, 2003.

- Trial Testimony in the matter of *Daniel Millar v. San Francisco Bay Area Rapid Transit District*, Superior Court for the State of California, for the County of Alameda, on behalf of San Francisco Bay Area Rapid Transit District, regarding alleged wrongful termination. Oakland, CA, October 8–9, 2003.

- Deposition Testimony of Mark P. Berkman in the matter of *Willard E. Kopetski v. Chevron Corporation et al.,* Superior Court of the State of California in and for the County of San Francisco, on behalf of defendant Chevron Corporation, regarding alleged wrongful termination. San Francisco, CA, August 18, 2003.

- Rebuttal Report of Dr. Mark P. Berkman in the matter of *Mark J. True v. Allstate Insurance*



*Company et al.*, United States District Court, Eastern District of California, on behalf of the defendant. Report filed July 9, 2003.

- Expert Witness Report of Dr. Mark P. Berkman in the matter of *Mark J. True v. Allstate Insurance Company et al.*, United States District Court, Eastern District of California, on behalf of the defendant, outlined proper methods for damage calculation. Report filed June 18, 2003.

- Deposition Testimony in the matter of *Daniel Millar v. San Francisco Bay Area Rapid Transit District*, Superior Court for the State of California, For the County of Alameda, on behalf of San Francisco Bay Area Rapid Transit District, regarding alleged wrongful termination. Walnut Creek, CA, April 3, 2003.

- Expert Witness Report in the matter of *Alpheus Ray Brokaw v. Qualcomm, Inc.*, U.S. District Court, Southern District of California, on behalf of Qualcomm, Inc. regarding alleged wrongful termination. Report filed January 23, 2003.

- Deposition Testimony and Trial Testimony in the matter of *Lannie Staniford v. Acordia Inc., Acordia of California Insurance Services, Robert DeValle, James Wells, Wells Fargo and Company, and DOES 1 through 20 inclusive*, in the Superior Court of the State of California, in and for the County of San Francisco, on behalf of defendant Acordia, Inc. regarding alleged wrongful termination. Deposition December 23, 2002; Trial Testimony January 13, 2003, both in San Francisco, CA.

- Deposition Testimony of Mark P. Berkman before the U.S. District Court, Southern District of California, in the matter of *Durante et al. v. Qualcomm, Inc.* on behalf of Qualcomm, Inc. regarding alleged age-based termination. San Diego, CA, December 10, 2002. Declaration filed in San Diego, CA, November 6, 2002.

- Trial Testimony of Mark P. Berkman in the matter of *Dawn Goodman* v. *City of San Jose* before the Superior Court of the State of California on behalf of the City of San Jose regarding economic damages related to alleged wrongful termination, San Jose, CA, August 16, 2001.

- Deposition of Mark P. Berkman in the matter of *Victoria Aguinaldo Boudakian* v. *Avco Financial Services, et al.* Testimony before the United States District Court for the Eastern District of California on behalf of Avco Financial Services regarding alleged gender-based pay discrimination and termination, Oakland, CA, June 19, 2001.

- "A Statistical Analysis of Coaches' Salaries at California State University, Fresno. Prepared with Michael Liu, (Confidential), March 2000.

- "The Oregon Health Plan Economic Impact Analysis for the Employer Mandate." Prepared with John Gaisford *et al.* for the Oregon Office of the Health Care Administrator, February 10, 1995.

- "The Economic Impact of Health Care Reform in Arizona." Prepared for the Arizona Affordable



Health Care Foundation, February 8, 1994.

**Tribal and Indian Affairs**

- "Relative Needs of the MHA Nation and North Dakota for Fort Berthold Oil and Gas Revenues," prepared for The Mandan, Hidatsa, and Arikara Nation, March 4, 2019.

- Expert Report of Dr. Mark Berkman on behalf of Mark Curry; American Web Loan, Inc.; AWL, Inc.; Red Stone, Inc.; Medley Opportunity Fund II LP; and Medley Capital Corporation in the matter of *George Hengle and Lula Williams, on behalf of themselves and all individuals similarly situated v. Mark Curry; American Web Loan, Inc., AWL, Inc.; Red Stone, Inc.; Medley Opportunity Fund II LP; and Medley Capital Corporation,* United States District Court for the Eastern District of Virginia, Richmond Division, Case No.: 3:18-cv-00100 REP, November 19, 2018.

- Expert Report on behalf of plaintiffs in the matter of Chickasaw Nation and Choctaw Nation v. United States Department of Interior, U.S. District Court for Western District of Oklahoma, No. CIV 05-1524-W, regarding the valuation of tribal land including timber, natural gas, and gravel assets allegedly improperly sold by the Department, April, 2015.

- An Evaluation of NAPI's Electricity Sourcing Options prepared for the Navajo Agricultural Products Industry, June, 2013.

- Testimony in the matter of Thermal Energy Company v. Bureau of Land Management, Navajo Nation, Intervenor of ILBA 2006-71, regarding the commercial quantities of coal on behalf of the Navajo Nation, January 9, 2011.

- Deposition Testimony in the matter of The Ponca Tribe of Indians of Oklahoma, *et al.* v. Continental Carbon Company *et al.* United States District Court for the Western District of Oklahoma. Case No. CIV-05-445-C, May 30, 2008.

- Expert Report of Mark P. Berkman in the matter of The Ponca Tribe of Indians of Oklahoma, *et al.* v. Continental Carbon Company *et al.* United States District Court for The Western District of Oklahoma Case No. CIV-05-445-C on behalf of plaintiff regarding property damage and unjust enrichment resulting from alleged failure to reduce particulate emissions, March 3, 2008. This included an application of the BEN model.

- Deposition testimony in the matter of Rincon San Luiseño Band of Mission Indians; and HCAL Corporation, a Nevada Corporation, vs. Dan McAllister, in his official capacity as Treasurer-Tax Collector of San Diego County, on behalf of the Rincon Tribe, May 26, 2005.

- Supplemental Expert Report in the matter of Rincon San Luiseño Band of Mission Indians; and HCAL Corporation, a Nevada Corporation, vs. Dan McAllister, in his official capacity as Treasurer-Tax Collector of San Diego County, on behalf of the Rincon Tribe, May 23, 2005.

- Expert Report of Mark Berkman, PhD, "Economic Impact of the Harrah's Rincon Casino on San



Diego County, California," in the matter of *Rincon San Luiseño Band of Mission Indians; and HCAL Corporation, a Nevada Corporation, vs. Dan McAllister, in his official capacity as Treasurer-Tax Collector of San Diego County*, on behalf of the Rincon Tribe, March 21, 2005.

- Affidavit of Mark Berkman in the matter of the *Navajo Nation v. United States of America*, on behalf of the Navajo Nation. Filed in the United States Court of Federal Claims, August 20, 2004.

- Testified before the Public Utilities Commission of the State of California on behalf of the Navajo Nation, in the matter of the Application of Southern California Edison Regarding the Future Disposition of the Mohave Generating Station, June 23, 2004.

- Prepared Superseding testimony of Mark P. Berkman, Ph.D., before the Public Utilities Commission of the State of California on behalf of the Navajo Nation, in the matter of the Application of Southern California Edison Regarding the Future Disposition of the Mohave Generating Station, May 14, 2004.

- "Preliminary Estimate of Revenues Derived by Wyoming and Fremont county from Residents and Businesses on the Wind River Reservation and Expenditures by Wyoming and Fremont County for Services to the Reservation, 1988–2002," prepared by Mark Berkman and Benjamin Arnold for the Northern Arapaho and Shoshone Business Council, November 18, 2003.

- Prepared Direct Testimony of Mark P. Berkman before the Public Utilities Commission of the State of California on behalf of the Navajo Nation in the matter of the Application of Southern California Edison Regarding the Future Disposition of the Mohave Generating Station, March 28, 2003.

- Trial Testimony of Mark P. Berkman in *Cayuga Indian Nation of New York et al.* v. *George P. Pataki et al.* to calculate pre-judgement interest and critique defendant's damage estimates in a land dispute dating back to 1795, August 15, 2000.

- Expert Witness Report of Mark P. Berkman in *Cayuga Indian Nation of New York et al.* v. *George P. Pataki et al.* to calculate pre-judgement interest and critique defendant's damage estimates in a land dispute dating back to 1795, April 28, 2000.

- Defendant's Expert Witness Report of Mark P. Berkman, prepared on behalf of the Crow Tribal Council, in the matter of *Railbox Co. et al.* v. *Crow Tribal Council* regarding the economic basis for taxation of rail cars shipped through the Crow Reservation, revised August 3, 1999.

- Affidavit of Mark P. Berkman, prepared on behalf of the Crow Tribe of Indians, in the matter of *Crow Tribe of Indians* v. *State of Montana* regarding the impact of Montana taxes on the Crow Tribe's ability to manage its coal resources, October 30, 1998.

- Expert Witness Report Disclosure of Mark P. Berkman prepared on behalf of the Crow Tribal Council, in the matter of *Railbox Co. et al.* v. *Crow Tribal Council* regarding the economic basis for taxation of rail cars shipped through the Crow Reservation, September 9, 1998.



MARK P. BERKMAN

- Testimony before the United States District Court, District of Montana, on behalf of the Crow Tribe of Indians and the United States in *Crow Tribe of Indians and the United States* v. *State of Montana, et al.*, CV-78-110 BLG-JDS, regarding unjust enrichment and damages claims made by the Crow Tribe against the State of Montana, March 31, 1994.

- Testimony before the United States District Court, District of Arizona, on behalf of the Navajo Nation in *Peabody Coal Company* v. *The Navajo Nation*, regarding the Navajo/Hopi coal tax dispute, March 17, 1994.

- Affidavit for Marathon Oil Company and the Shoshone and Northern Arapaho Tribes of the Wind River Indian Reservation in *Marathon Oil Company, Shoshone and Northern Arapaho Tribes of the Wind River Reservation* v. *State of Wyoming, et al.*, demonstrating how state and local taxes infringe on the Tribes' abilities to manage their own energy resources and to provide necessary government services on the Reservation, November 19, 1992.

- "Comments Regarding Indian Gaming Markets," prepared for the U.S. Department of Justice in the matter of *U.S.* v. *Trump*, 1992.

- Testimony before the Select Committee on Indian Affairs, United States Senate, on behalf of the Crow Indian Tribe regarding coal reserve appraisal, July 23, 1992.

- "Appraisal of the 107th Meridian Strip Coal Reserves." Prepared for the Crow Indian Tribe, July 1992.

- Testimony before Select Committee on Indian Affairs, United States Senate, "State Taxation and Indian Economic Development," May 1, 1990.

- "Preliminary Estimate of Revenues Derived by Wyoming and Fremont County from Residents and Businesses on the Wind River Reservation and Expenditures by Wyoming and Fremont County for Services to the Reservation." Prepared for the Shoshone and Arapaho Tribes, June 3, 1988.



Appendix B: : Curriculum Vitae of Charles Gibbons

## CHARLES E. GIBBONS
### Senior Associate

San Francisco, CA                    +1.415.217.1055                    Charlie.Gibbons@brattle.com

**Dr. Charles Gibbons** is a Senior Associate with The Brattle Group. Dr. Gibbons specializes in applying sophisticated econometric and statistical models to legal, regulatory, and policy issues. His work has been used in a variety of litigation matters, including structural modeling of antitrust damages, estimating price premium impacts of product mislabeling, and determining the impacts of environmental contamination on outdoor recreation. Dr. Gibbons has also conducted conjoint surveys to understand consumer preferences. His work has been used in class certification, liability determination, and damages calculations. He is the co-founder and chair of the firm's LGBTQ+ employee resource group, BProud.

Dr. Gibbons serves as a Statistics Advisor to a consumer technology company in the health and wellness space. Previously, he was a lecturer at the University of California, Berkeley where he last taught a graduate-level course in probability and statistics. His dissertation at Berkeley proposed new methods in applied econometrics and a theory of competition for online advertising auction platforms.

## EMPLOYMENT

- The Brattle Group                                           2012—Present
- Fitbod, Statistics Advisor                                   2019--Present
- University of California, Berkeley, Lecturer                 2012—2015
- University of California, Berkeley, Instructor               2011

## EDUCATION

- University of California, Berkeley, PhD In Economics         2012
- University of California, Berkeley, MA in Statistics         2012
- Cornell University, BA in Economics and Government           2006

## EXPERIENCE

### Causality Analysis

- Co-authored a report on the impact of Alberta government policies on provincial log prices as part of the *Lumber V* trade dispute

- Submitted a report to a regulatory agency discussing the scientific reliability of product sampling data supporting nutrition label claims

- Designed a conjoint survey to elicit consumers' preferences for features of an online music streaming service and used state-of-the-art models to estimate willingness-to-pay for those features as part of a royalty setting proceeding



1

- Examined a cryptocurrency market for evidence of coin price manipulation

- Provided consulting guidance on the impact of worker regulations and unionization on the business model of a firm in the gig economy

- Determined whether defective devices could be detected indirectly using historical measurements rather than directly through testing for class certification purposes

- Modeled the impact of an advertising campaign on demand for competing products in the context of a false advertising case using sales data and consumer sentiment analysis

## Estimation of Damages

- Developed structural models of the health insurance industry for estimating antitrust damages

- Estimated the impacts of the BP oil spill on recreation to the Gulf of Mexico

- Determined the damages sustained by anglers who visit sites with fish consumption advisories arising from water contamination

- Estimated property diminution due to groundwater contamination from PFAS

- Calculated the value of surface water deliveries to growers in the Klamath Basin as part of an environmental takings case on behalf of the US Department of Justice

## Mortgage-Related Litigation

- Assessed the causal relationship between defective underwriting practices and subsequent mortgage delinquencies by a major lending institution on behalf of the US Attorney's Office

- Evaluated mortgage origination and pricing records for evidence of racial discrimination practices at nationwide lending institutions for the Consumer Financial Protection Bureau

## Utilities Consulting and Litigation

- Developed sales and peak demand forecasts for CLP Hong Kong and supported them before the utility's governing agency

- Calculated the costs of delinquent accounts to a major telecommunications firm for use in class action litigation



CHARLES E. GIBBONS

## PUBLICATIONS

"Understanding the Econometric Tools of Antitrust—With No Math!" (with Michael Cragg and Loren
     Smith), 2021, *ANTITRUST Magazine,* 35(2)
        Winner of the Concurrences Antitrust Writing Awards, Economics Category
"Broken or Fixed Effects?" (with Juan Carlos Suárez Serrato and Mike Urbancic), 2018, *Journal of
     Econometric Methods*, 8(1)

### In Process

"Willingness-to-Pay to Avoid Fish Consumption Advisories: Evidence from a Repeat Cross-Section of
     New York Anglers" (with David Sunding)
"Quantile Regression for Peak Demand Forecasting" (with Ahmad Faruqui)
 "Ad Server and Firm Strategies in Contextual Advertising Auctions"
 "LATE for School: Instrumental Variables and the Returns to Education" (with Mike Urbancic)

## FILED TESTIMONY

"Proposed Safety Standards for Clothing Storage Units: Comments on the Preliminary Regulatory
Analysis" (with Mark Berkman), before the Consumer Product Safety Commission, April 2022

## ACADEMIC HONORS AND FELLOWSHIPS

National Science Foundation (IGERT) Politics, Economics, Psychology, and Public Policy Fellow
Searle Center on Law, Regulation, and Economic Growth (Northwestern University) Award
Institute for Humane Studies Fellow
University of California, Berkeley, Department of Economics Fellowship

## PRESENTATIONS

California Energy Commission Demand Analysis Working Group, September 2014. "Quantile Regression
     for Peak Demand Forecasting."
Center for Research in Regulating Industries, 2014. "The Application of Quantile Regression to
     Forecasting Peak Demand." (Eastern and Western conferences)
Government of Hong Kong, 2013. "Quantile Regression With Applications to Peak Demand
     Forecasting."
Electric Utility Forecasters' Forum, June 2012. "Housing Wealth and the Demand for Electricity:
     Prometheus Bound." (with Joe Wharton)
US Federal Trade Commission, Microeconomics Conference, November 2011. "Ad Server and Firm
     Strategies in Contextual Advertising Auctions."


THE **Brattle** GROUP

# CHARLES E. GIBBONS

Northwestern University, Searle Center Conference on Internet Search and Innovation, June 2011.
"Firm Strategy in Contextual Advertising Auctions."

## PROFESSIONAL AFFILIATIONS

Referee:     *Review of Economics and Statistics*, *International Journal of Forecasting*,
             *Industrial Relations*

Member:      American Economic Association, American Statistical Association



```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                  FORT WORTH DIVISION
 4                 _____
 5
       SID MILLER, et al.,      )
 6                              )
              Plaintiffs,       )
 7                              )
          vs.                   )No. 4:21-cv-00595-O
 8                              )
       TOM VILSACK, in his      )
 9     official capacity as     )
       Secretary of            )
10     Agriculture,             )
                                )
11             Defendant.       )
                                )
12
13
14
15        REMOTE VIDEO-RECORDED DEPOSITION
16                    OF
17          ALICIA M. ROBB, PH.D.
18          THURSDAY, JULY 7, 2022
19
20
21
22
23
24
25
```

                                        Page 1

FEDERATION MSJ APP. 99

**Page 2**

```
 1          APPEARANCES
 2
 3
    For the Intervenor:  PUBLIC COUNSEL
 4          By: Mark D. Rosenbaum, Esq.
                Nisha Kashyap, Esq.
 5          Sarah Medina Camiscoli,
            Justice Catalyst Fellow
 6          610 S. Ardmore Avenue
            Los Angeles, CA 90005
 7          (213) 385-2977
            mrosenbaum@publiccounsel.org
 8          nkashyap@publiccounsel.org
 9          WINSTON & STRAWN LLP
            By: Andrew E. Tauber, Esq.
10          1901 L. Street NW
            Washington, DC 20036
11          (202) 282-5000
            atauber@winston.com
12
            WINSTON & STRAWN LLP
13          By:  Janelle Li-A-Ping, Esq.
            333 South Grand Avenue
14          Los Angeles, CA 90071
            (213) 615-1700
15          jliaping@winston.com
    For Defendant:    Michael Knapp Esq.
16          Trial Attorney, Federal
            Programs Branch
17          U.S. Department of Justice,
            Civil Division
18          1100 L Street, NW, Room 12008
            Washington, DC 20005
19          (202) 514-2071
            michael.f.knapp@usdoj.gov
20
    Also Present:     Dennis Clayton, Videographer
21          Danny Villegas
            Tyrik LaCruise
22
23
24
25
```

**Page 3**

```
 1             INDEX
 2
 3  EXAMINATIONS:                   PAGE
 4  ALICIA M. ROBB, Ph.D.
 5    Examination By Mr. Rosenbaum         10
 6
 7             EXHIBITS
 8
 9  No.      Description          Identified
10  Exhibit 1    Dr. Robb's Expert Report      14
11  Exhibit 2    Press Release: In Major Step   105
              to Implement American Rescue
12            Plan, USDA Announces
              Membership of Newly Formed
13            Equity Commission
14  Exhibit 3    Loan Application FSA-2001      122
15
         QUESTIONS INSTRUCTED NOT TO ANSWER
16
17      PAGE      LINE
         17       22
18       21       19
         22       13
19       29       17
         36        5
20       93       13
        101       20
21      112        9
        112       16
22      113        7
23
24
25
```

**Page 4**

```
 1          PURSUANT TO WRITTEN NOTICE and the
 2  appropriate rules of civil procedure, the Remote
 3  Video-Recorded Deposition of Alicia M. Robb, Ph.D.,
 4  called for examination by the Intervenor, was taken
 5  via Zoom, commencing at 9:11 A.M. on Thursday,
 6  July 7, 2022, before Jennifer L. Smith, California
 7  CSR No. 10358, Washington CCR No. 3101, RMR, CRR,
 8  CRC, and Notary Public in and for the State of
 9  Colorado.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  Good morning.  We're
 4  going on the record at 9:11 A.M. Mountain on
 5  July 7, 2022.  Please note that this deposition is
 6  being recorded virtually.  The quality of the
 7  recording depends on the quality of the camera and
 8  Internet connection of the participants.  What is
 9  seen from the witness and heard on the screen is what
10  will be recorded.  Audio and video recording will
11  continue to take place unless all parties agree to go
12  off the record.
13          This is Media Unit Number 1 of the
14  video-recorded deposition of Dr. Alicia Robb taken by
15  counsel for the plaintiff in the matter of Sid
16  Miller, et al., versus Tom Vilsack, et al., filed in
17  the United States District Court, Northern District
18  of Texas, Fort Worth Division, Case Number
19  4:21-cv-00595-O.
20          This deposition is being conducted remotely
21  using virtual technology.  My name is Dennis Clayton,
22  representing Veritext Legal Solutions, and I am the
23  videographer.  The court reporter today is Jennifer
24  Smith from the firm Veritext Legal Solutions.
25          I am not authorized to administer an oath, I
```

2 (Pages 2 - 5)

1 am not related to any party in this action, nor am I
2 financially interested in the outcome.
3        If there are any objections to the
4 proceedings, please state them at the time of your
5 appearance.
6        Counsel and all present, including remotely,
7 will now state their appearances and affiliations,
8 beginning with the noticing attorney.
9        MR. ROSENBAUM:  Good morning.  This is Mark
10 Rosenbaum.  Actually, it's on behalf of the
11 intervenor, that the deposition that is being
12 conducted.
13        THE VIDEOGRAPHER:  Thank you, Counsel.
14        MR. ROSENBAUM:  And I'm in Los Angeles.  I'm
15 an attorney with Public Counsel.
16        Why don't I ask my co-counsel to announce
17 their presence as well.
18        Janelle?
19        MS. LI-A-PING:  Hi.  This is Janelle
20 Li-A-Ping, Counsel for the intervenor, defendant,
21 Winston & Strawn.
22        MR. ROSENBAUM:  And, Sarah?
23        MS. MEDINA CAMISCOLI:  Hi.  My name is Sarah
24 Medina Camiscoli, Justice Catalyst Fellow, with
25 Public Counsel.

Page 6

1 provided with Exhibit A to the Court's Protective
2 Order, which governs the disclosure of some material
3 in this case.
4        THE VIDEOGRAPHER:  I was not.
5        THE COURT REPORTER:  I was not either.
6        MR. KNAPP:  Okay.  So, Mark, I don't know
7 whether intend to ask questions about the material
8 subject to the protective order.
9        MR. ROSENBAUM:  I don't plan to.  If I
10 inadvertently do that, just bring it to my attention
11 right away.
12        MR. KNAPP:  Okay.  The alternative is to
13 take a quick break and have them --
14        MR. ROSENBAUM:  No.
15        MR. KNAPP:  Okay.  And then I'd like to just
16 assert that we would like to read, review, and sign
17 the transcript.
18        THE VIDEOGRAPHER:  Okay.  With that, the
19 court reporter has a brief statement, and then we'll
20 swear in the witness.
21        MR. ROSENBAUM:  Can I just inquire:  Is
22 there anyone here on behalf of plaintiffs?
23        No.  Okay.
24        THE COURT REPORTER:  All counsel
25 participating in this deposition acknowledge that I

Page 8

1        MR. ROSENBAUM:  Is there anyone else here on
2 behalf of intervenor?
3        MS. KASHYAP:  Hi.  This is Nisha Kashyap.
4 I'm an attorney with Public Counsel, also on behalf
5 of the intervenor defendant.
6        MR. ROSENBAUM:  Ms. Reporter, do you need
7 the spellings of anybody's names?
8        THE COURT REPORTER:  I will check on the
9 break and let you know.
10        MR. ROSENBAUM:  Okay.  I think that
11 completes all on behalf of the intervenor.  Thank
12 you.
13        MR. KNAPP:  This is Michael Knapp from the
14 U.S. Department of Justice on behalf of the
15 defendant.  I'd like to just verify for those --
16 well, I guess for everyone, that there is nobody else
17 in the room with them?
18        MR. ROSENBAUM:  There is nobody in the room
19 with me, and if there is anyone in the room with
20 anyone else, state that.  If you don't hear anything,
21 the means there is no one else in the room.
22        MS. LI-A-PING:  Correct.  There is nobody
23 else in the room.
24        MR. KNAPP:  And then if I could just ask the
25 court reporter and the videographer whether you were

Page 7

1 am not physically present in a deposition room with
2 the deponent and that I will be reporting this
3 deposition and providing an oath remotely.
4        You further agree that, in lieu of an oath
5 administered in person, the witness declares that her
6 testimony in this matter is given under penalty of
7 perjury.
8        All parties and counsel consent to this
9 arrangement and waive any objections to this manner
10 of reporting and manner of providing the oath.
11        Counsel, please indicate your agreement by
12 stating your name and your agreement on the record,
13 and then I will swear in the witness.
14        MR. ROSENBAUM:  Mark Rosenbaum.  I agree.
15 We agree.
16        MR. KNAPP:  Michael Knapp, I agree.
17        MS. LI-A-PING:  Janelle Li-A-Ping, I agree.
18        MS. MEDINA CAMISCOLI:  Sarah Medina
19 Camiscoli, I agree.
20        THE COURT:  And, Dr. Robb, if you could
21 please raise your right hand.
22
23        ALICIA M. ROBB, Ph.D.,
24        having been first duly sworn,
25        was examined and testified as follows:

Page 9

3 (Pages 6 - 9)

1          EXAMINATION
2 BY MR. ROSENBAUM:
3     Q.  All right.  How are you, Dr. Robb?
4     A.  Fine.  How are you?
5     Q.  I'm good.
6          Thank you for making time to be with us this
7 morning.
8          Dr. Robb, have you ever been deposed before?
9     A.  I have not.
10     Q.  Have you had an opportunity to (Zoom
11 interference) the sorts of procedures that are
12 utilized in depositions with Mr. Knapp or other
13 counsel?
14     A.  I have.
15     Q.  Good.  I'm going to briefly review those
16 procedures.  If you have any questions at all, either
17 about that, or anything over the course of the
18 deposition, please let me know.  Okay?
19     A.  Okay.
20     Q.  This is a deposition in a case involving
21 plaintiff, Sid Miller, and others, versus the
22 Department of Agriculture and the Secretary of
23 Agriculture, the Department of Agriculture.
24          I'm going to be asking you some questions
25 relating to that matter.  It is not my intent to

1 trick or deceive you.  Therefore, if you have any
2 questions about any question I ask, you want me to
3 restate a question or explain a question, please ask
4 me, and I'll be pleased to do that.
5          Do you understand that?
6     A.  I do.
7     Q.  Otherwise, I'm going to be assuming that
8 you're answering as fully and as completely as
9 possible.
10          Do you understand that?
11     A.  I do.
12     Q.  Just a few moments ago, the reporter
13 administered an oath to you.  And do you understand
14 that, even though we are in an informal setting in
15 God knows how many different places, you're
16 testifying under the same penalties of perjury as if
17 you were in a formal court.
18          Do you understand that?
19     A.  I do.
20     Q.  At the end of the deposition, after the
21 deposition is going to be -- is completed, you're
22 going to get a booklet, and that booklet is going to
23 include my questions and your answers and any
24 comments by counsel.
25          Are you aware of that?

1     A.  I am.
2     Q.  And you will have an opportunity to review
3 that booklet and make any changes you believe are
4 appropriate.
5          Do you understand that?
6     A.  Okay.
7     Q.  And I do want you to know that either myself
8 or any counsel in this case can make comments about
9 changes that you make and draw any inferences that we
10 think are appropriate, including negative inferences.
11          Do you understand that?
12     A.  I do.
13     Q.  So, again, it's important that you answer as
14 fully and as fairly as you possibly can.  Okay?
15     A.  Okay.
16     Q.  Any reason we shouldn't go forward?
17     A.  No.
18     Q.  Dr. Robb, did you bring any documents with
19 you this morning?
20     A.  I did not.
21     Q.  For purposes of this deposition, did you
22 review any documents?
23     A.  Did I do any -- did I do what?
24     Q.  Review documents?
25     A.  I reviewed my expert report.

1     Q.  Anything else?
2     A.  I briefly glanced at the expert reports that
3 you -- your two experts provided.
4     Q.  When you say "briefly," what does that mean?
5     A.  I skimmed over them briefly.  I didn't read
6 in super detailed manner.
7     Q.  I take it you've read them previously?
8     A.  When I -- when I briefly reviewed them, yes.
9     Q.  That's the first time you've looked at the
10 documents?
11     A.  Yes.  Last week is when I got them.
12     Q.  Okay.  And they were supplied to you by
13 Mr. Knapp or other counsel; is that right?
14     A.  Correct.
15     Q.  And as you currently sit here today, do you
16 plan to draft any response to those expert reports?
17     A.  Not unless asked, no.
18     Q.  And you haven't been asked to date; is that
19 right?
20     A.  I have -- I have not.
21     Q.  Have you discussed this deposition with
22 anyone else besides counsel?
23     A.  No.
24     Q.  Just so I have it right, by "counsel,"
25 you -- I mean Mr. Knapp.

4 (Pages 10 - 13)

FEDERATION MSJ APP. 102

1       Anyone else?
2       A. His co-counsel, yes. One other person.
3       Q. And do you recall her name?
4       A. Alex.
5       Q. Okay. I would like you to put --
6       Janelle, can we put the report in front of
7   Dr. Robb, please. Okay.
8       Dr. Robb, as far as I'm concerned, you are
9   welcome to look at your report when I'm going to be
10  asking you some questions.
11      Incidentally, in the report that you
12  prepared, did you make any notes in, like, the
13  margins or in the text, handwritten notes or however
14  you write things down?
15      A. No, I didn't print it out.
16      Q. Okay. All right. I'm glad to have Janelle
17  run through all of the pages. I'm not going to be
18  asking you about all of the pages.
19      But I'd like Ms. Reporter to mark this
20  document as Exhibit 1.
21      (Exhibit 1 was identified.)
22      MR. ROSENBAUM: Are we good?
23      THE COURT REPORTER: Yes. I've marked it.
24      MR. ROSENBAUM: All right. Thank you.
25  ///

Page 14

1   I spent various hours over the months, I believe, of
2   August through December.
3       Q. Got it.
4       And I take it from your testimony you
5   prepared drafts and then you submitted them to
6   counsel, and counsel gave them back to you.
7       Was that what the process was like?
8       A. Correct.
9       Q. And do you remember how many drafts you
10  prepared?
11      A. I believe there was a first draft and then a
12  second draft and then minor changes with a final
13  draft, the third draft. So this is probably the
14  fourth and final draft.
15      Q. Thank you.
16      And when you received the draft back, were
17  there comments on it placed by counsel?
18      A. What do you mean by "comments"?
19      Q. Edits, suggestions, ideas, anything about
20  the text that you had prepared.
21      MR. KNAPP: Objection to the extent that
22  this calls for the substance of those comments that
23  would be protected by attorney work product.
24      MR. ROSENBAUM: Okay. I haven't asked for
25  the substance yet.

Page 16

1   BY MR. ROSENBAUM:
2       Q. Do you recognize what has been marked as
3   Exhibit 1, Dr. Robb?
4       A. I do.
5       Q. Okay. And can you identify that for me,
6   please?
7       A. It is the expert report I wrote in the
8   matter of this case, which I submitted to the DOJ in
9   early January, I believe.
10      Q. And when did you draft the report that's
11  been marked as Exhibit 1?
12      A. When did I what?
13      Q. When did you actually draft the report?
14      A. In the fall of 2021. So the final draft was
15  finished at the end of December or the first week in
16  January.
17      Q. Okay.
18      A. But there is a date right there, and that
19  should be the last -- the last -- there should be
20  a -- possibly a date right below that?
21      Q. Yeah.
22      A. Yeah, January 7th.
23      Q. And how long did it take you to prepare the
24  report?
25      A. You know, I didn't work on it full time, but

Page 15

1   BY MR. ROSENBAUM:
2       Q. So right now I just want to know if there
3   were comments and/or edits that were on the documents
4   that you received back.
5       A. Yes.
6       Q. Okay. And true each time that you submitted
7   the draft to counsel?
8       A. Correct.
9       Q. And by "counsel," let's be specific. That's
10  Mr. Knapp?
11      A. There were two other women that were working
12  on the case earlier in the fall that are -- that I
13  haven't spoken with since the submission. Kylie, and
14  I forgot the other woman's name.
15      Q. Okay. And the -- did you ever meet with the
16  counsel whom you've just talked about, the three
17  counsel you've just identified, or any one of them in
18  person?
19      A. No.
20      Q. Okay. So this was all done virtually?
21      A. Yes.
22      Q. And can you give me just your best estimate,
23  please, as to how extensive the comments were that
24  you received?
25      MR. KNAPP: Objection. This calls for --

Page 17

5 (Pages 14 - 17)

1    MR. ROSENBAUM:  Not -- I'm not asking for
2  the substance.  I just want to know how extensive
3  they were.
4    MR. KNAPP: Objection.  Vague.  Ambiguous,
5  and I instruct the witness not to answer as to the
6  extensiveness, whatever that means, of the comments.
7    MR. ROSENBAUM:  Well, I don't think you can
8  instruct her not to answer, but we'll leave it for
9  now.
10 BY MR. ROSENBAUM:
11   Q.  Did you do -- did you incorporate -- I'm not
12 asking what the content was.
13      Did you incorporate words or sentences that
14 counsel provided to you in your report?
15   A.  Probably.
16   Q.  Okay.  Tell me about how many sentences.
17   A.  It's a 113-page document.  I -- I mean, I
18 don't recall.
19   Q.  What's your best estimate?  I don't want you
20 guessing, but your best estimate.
21   A.  Probably a total of five or six paragraphs.
22   Q.  Okay.  Let me direct your attention, please,
23 to Page 1 of your report.
24      Do you have that in front of you?  Perfect.
25      I'm going to ask you some questions

Page 18

1  regarding some of the content of your report, and I
2  want to be clear, Dr. Robb, if -- you are free to
3  read as much of your report as you'd like.  I don't
4  want to take anything out of context.
5      So I'm going to ask you about particular
6  sentences or parts of the report, and if you feel
7  it's appropriate to read the entire paragraph to
8  yourself or more of the report, feel free to do that.
9      Do you understand that?
10   A.  Yep.
11   Q.  Okay.  And directing your attention, do you
12 see the sentence in Paragraph 1 of Page 1 of Exhibit
13 1, "I was retained by counsel for defendant, the
14 Secretary of Agriculture, who leads the United States
15 Department of Agriculture (USDA) to evaluate the
16 anecdotal and statistical evidence of discrimination
17 against minority farmers in USDA's lending programs
18 and provide an opinion on whether there are any
19 lingering effects of this past discrimination that
20 disadvantage individual groups of minority farmers in
21 the present day."
22      Do you see that sentence?
23   A.  I do.
24   Q.  Incidentally, did you ever meet with the
25 Secretary of Agriculture?

Page 19

1   A.  No.
2   Q.  Or any employee or official with the
3  Department of Agriculture?
4   A.  I did not.
5   Q.  Have you ever met with anybody from the
6  Department of Agriculture in your career, as far as
7  you know?
8   A.  Yes.
9   Q.  Who?
10   A.  Staff economists, years ago.
11   Q.  "Years ago," I assume that means not
12 yesterday; right?
13   A.  Correct.
14   Q.  About how many years ago, to your best --
15   A.  Could be decades.  Over 10.  Probably more
16 like 15 or 20.
17   Q.  Okay.  But no one in between 15 or 20 and
18 today?
19   A.  Not that I recall.
20   Q.  All right.  Now, directing your attention to
21 the sentence that I read to you.  You see the phrase,
22 "this past discrimination"?
23      Do you see that?
24   A.  I see it, yes.
25   Q.  Can you tell me what you meant by the

Page 20

1  phrase "this past discrimination," please.
2   A.  Discrimination in the past.
3   Q.  Okay.  And when you say "past," what do you
4  mean by that?
5   A.  Not present day.
6   Q.  Well, do you have -- do you -- when you
7  spoke of past discrimination, were there particular
8  years that you were thinking about?
9   A.  The materials that I reviewed covered the
10 mid '60s to about 2011.
11   Q.  And when you said the materials that you
12 reviewed, were those materials provided by counsel?
13   A.  Most of them, yes.
14   Q.  Okay.  Were these materials that you
15 yourself requested?
16   A.  Were they materials that I requested?
17   Q.  Yes.
18   A.  Yes.
19   Q.  And can you tell me, please, what materials
20 you requested for purposes of preparing your report?
21    MR. KNAPP:  Object.  Calls for attorney work
22 product.  I instruct the witness not to answer about
23 communications with attorneys.
24    MR. ROSENBAUM:  I am not talking about the
25 contents, specific contents.  This is an expert, and

Page 21

6 (Pages 18 - 21)

1  I'm fully entitled to know what materials she
2  requested.
3       MR. KNAPP:  I --
4       MR. ROSENBAUM:  That's a completely
5  inappropriate objection.
6       MR. KNAPP:  I don't -- do you want to
7  discuss it further, Mark, or --
8       MR. ROSENBAUM:  No.
9       MR. KNAPP:  Okay.
10 BY MR. ROSENBAUM:
11      Q.  Go ahead.  Your counsel has made his
12 objection for the record.
13      Can you tell me what materials you've
14 requested that you did not otherwise -- that you did
15 not otherwise receive?
16      MR. KNAPP:  Same objection, and I instruct
17 the witness not to answer as to communications
18 between you and counsel.
19 BY MR. ROSENBAUM:
20      Q.  All right.  I don't want to know any
21 communication you had with counsel.  I want to know
22 materials that you looked at.
23      A.  There are a list of those materials in
24 Appendix B, I believe.
25      Q.  All right.  Were there any materials that

Page 22

1  strike that.
2       Let me direct your attention to Page 2.
3       Do you have that in front of you?  Do you
4  have that in front of you?
5       A.  Yes.
6       Q.  All right.  Do you see the sentence that
7  says, "I have been asked to review the evidence of
8  discrimination against minority farmers in USDA
9  lending programs, evaluate the data related to the
10 status of minority farmers today, and opine on
11 whether the data are consistent with the expected
12 effects of the documented history of discrimination
13 against minority farmers in USDA's lending programs."
14      Do you see that?
15      A.  I do.
16      Q.  All right.  And were you asked to do
17 anything else for purposes of review?
18      A.  No.  This was what I was asked to review.
19      Q.  Okay.  Directing your attention now to
20 Pages 2 and 3 of your report at the sentence that is
21 in the last full paragraph on Page 2 and that carries
22 over to Page 3.
23      Are you with me?
24      A.  Yes.
25      Q.  All right.  And it reads, "This

Page 24

1  you looked at that are not put -- that are not
2  specifically referenced in Exhibit B?
3       A.  No.
4       Q.  Okay.  You see the phrase in the sentence
5  that we've been discussing, where it says, "The
6  present day"?
7       A.  Yes.
8       Q.  All right.  Can you tell me what you meant
9  by "the present day"?
10      A.  Currently.
11      Q.  Currently as of the date that you prepared
12 this report?
13      A.  Correct.
14      Q.  All right.  Did you request any materials
15 post 2011?
16      MR. KNAPP:  Objection.  Calls for attorney
17 work product.  Again, communications between the
18 expert and counsel.
19      THE WITNESS:  There are several reports in
20 the Appendix B that have a publication date later
21 than 2011.
22 BY MR. ROSENBAUM:
23      Q.  Other than that, any materials past 2011?
24      A.  The data I reviewed.
25      Q.  Any reports past -- that were -- well,

Page 23

1  discrimination manifested in many ways throughout the
2  loan cycle, including disparate treatment in:  One,
3  outreach and education about existing loan programs
4  and eligibility; two, assistance with loan
5  applications; three, processing time for
6  applications; four, loan application approvals; and,
7  five, post-disbursement loan servicing.  In addition,
8  various reports indicated that minority farmers were
9  given additional requirements, such as needing a
10 joint signature of an FSA representative for
11 withdrawing funds for expenses, which were not
12 typically imposed on white farmers."
13      I'm on Page 3 now.
14      "The evidence tells a clear story:  For
15 decades USDA discriminated against minority farmers
16 in numerous ways in administering its loan programs."
17      Do you see that?
18      A.  I do.
19      Q.  To your knowledge, Dr. Robb, has the United
20 States Department of Agriculture between 2011 and
21 today ever conducted any inquiry -- specific inquiry
22 or investigation to determine the ways -- whether the
23 ways of discrimination that you've identified on
24 Pages 2 and 3 were taking place in 2012 and the
25 passage of the American Rescue Plan Act?

Page 25

7 (Pages 22 - 25)

1    A.   I would have to look at the dates of the
2  publications in Appendix B.
3    Q.   But you're not -- so you're not aware of any
4  specific inquiry or investigation of the ways of
5  discrimination that you've identified, other than in
6  the reports that you discuss in your report; is that
7  right?
8    A.   Correct.
9    Q.   All right.  Were you directed to undertake
10  any such inquiry or investigation past 2011?
11    A.   There was no specific end date I was given
12  to investigate.
13    Q.   I want to make my question clear.  I'm not
14  interested in effects of past discrimination.  I'm
15  asking you were you ever directed to conduct any
16  investigation or inquiry to determine specifically
17  whether the ways of discrimination persisted past
18  2011?
19    A.   Yes.
20    Q.   And what directions were you given?
21    A.   I was given loan applicant data and outcomes
22  from 2000 to 2020 and asked to investigate whether or
23  not there was disparate treatment.
24    Q.   And were you actually -- were you given any
25  loan applications themselves, individual loan

Page 26

1  applications?
2    A.   No.
3    Q.   Do you know if the Department of Agriculture
4  maintains loan applications?
5    A.   Am I aware if they maintain loan
6  applications?
7    Q.   Yes.
8    A.   I am not aware.
9    Q.   All right.  Either loan applications that
10  are for origination or for servicing?
11    A.   I'm not aware.
12    Q.   Did you ever make an inquiry to determine
13  whether or not USDA maintains loan applications --
14  loan applications?
15    A.   I did not.
16       MR. KNAPP:  Objection.
17       THE WITNESS:  I did not.
18  BY MR. ROSENBAUM:
19    Q.   Okay.  Could you turn to Page 4 of your
20  report.
21       THE VIDEOGRAPHER:  Counsel, pardon the
22  interruption.  Can we take a five-minute break.  My
23  computer memory is skyrocketing, and I need to reset.
24  Can we take five minutes?
25       MR. ROSENBAUM:  Yeah.

Page 27

1       THE VIDEOGRAPHER:  Going off the record.
2  The time is 9:40.
3       (Recess taken.)
4       THE VIDEOGRAPHER:  We're back on the record.
5  The time is 9:48.
6  BY MR. ROSENBAUM:
7    Q.   Okay.  Dr. Robb, other than reports and the
8  data that are referenced in your report, are you
9  aware of any other reports and data that relate to
10  racial discrimination by the United States Department
11  of Agriculture?
12    A.   There was one that was referenced in one of
13  the expert reports.  I believe the Berkman report
14  that I was not aware of.
15    Q.   Okay.  Did you -- did you -- do you know
16  what the title of that report is?
17    A.   Not off the top of my head, no.
18    Q.   Did you read the report?
19    A.   The Berkman report?  Yeah, I briefly --
20    Q.   No.  No.  My question wasn't clear.
21       What you testified to a moment ago is that
22  in the Berkman report there was reference to a report
23  that you were not previously aware of; is that right?
24    A.   Correct.
25    Q.   And did you then go and read the report that

Page 28

1  was referenced in the Berkman report?
2    A.   I did.
3    Q.   And that was the first time you became aware
4  of that report?
5    A.   Yes.
6    Q.   And do you remember the title or the
7  substance of the report in the Berkman report?
8    A.   It investigated, yeah, discrimination and
9  some -- and one of the farm lending -- I believe the
10  direct lending program.
11    Q.   Okay.  And Berkman is B-e-r-k-m-a-n?
12    A.   Correct.  I believe it was that report, not
13  that --
14    Q.   Okay.  And did you bring that report to the
15  attention of your counsel?
16    A.   I did.
17    Q.   Okay.  And what did they say to you?
18       MR. KNAPP:  Objection.  Calls for attorney
19  work product and instruct the witness not to answer.
20  BY MR. ROSENBAUM:
21    Q.   And do you recall the dates of the coverage
22  of the information that was in the report in
23  Dr. Berkman's report?
24    A.   I want to say it was in the 2000s somewhere,
25  but I don't remember if it was before 2011 or after

Page 29

8 (Pages 26 - 29)

1  2011.
2      Q.  Okay.
3      A.  But, I mean, regardless, the reports found
4  that it was not -- that -- the findings were not
5  consistent with lending discrimination.  So it
6  doesn't really necessarily help your case.  It hurts
7  it.
8      Q.  Okay.  What do you understand my case to be
9  about?
10     A.  Supporting the Section 1005 of the American
11 Rescue Plan.
12     Q.  Anything more specific than that?
13     A.  No.
14     Q.  Okay.  Have you reviewed any of the
15 documents that were filed in this case other than the
16 report by Dr. Berkman and your report?
17     A.  There was one more by a woman.  The two
18 expert reports that were filed, I briefly reviewed
19 them.
20     Q.  Okay.  And when did you -- and you're
21 referring to a report submitted by Dr. Petty,
22 P-e-t-t-y?
23     A.  Correct.
24     Q.  And did you -- when did you -- you read that
25 report?

Page 30

1      A.  I briefly reviewed both reports when I
2  received them.
3      Q.  Okay.  And when did you receive the report
4  authored by Dr. Petty?
5      A.  It was a week or two ago.
6      Q.  Okay.  And -- and you're aware that
7  Dr. Petty cited some reports and other materials in
8  her report?
9      A.  Yes.
10     Q.  And did you undertake any effort to obtain
11 those?
12     A.  I did not.
13     Q.  Okay.  And were you asked to do so?
14     A.  I was not.
15     Q.  Okay.  Directing your attention to Page 4 of
16 your report, do you have that in front of you?
17     A.  I do.
18     Q.  All right.  And I want to direct your
19 attention -- it's in the first full paragraph.  You
20 see the sentence that says, "Second, the documented
21 discrimination occurred over a long period of time
22 until at least 2010."
23         Do you see that?
24     A.  No.
25     Q.  All right.  Let me help you.

Page 31

1          In Page 4 --
2      A.  Can you scroll down?
3      Q.  Oh, okay.
4      A.  Okay.  Which sentence?
5      Q.  Yeah.  Do you see it's in the first full
6  paragraph, and it's one, two, three, four, five --
7  six lines down, three-fourth of a way through that
8  sixth line.
9      A.  Yes.
10     Q.  And, again, I want you to feel free to read
11 as much of your paragraph or anything else to -- if
12 you feel it's important for contextualizing.
13         But I'm specifically referring to the
14 sentence that says, "Second, the documented
15 discrimination occurred over a long period of time
16 until at least 2010."
17         Do you see that?
18     A.  I do.
19     Q.  And is that your sentence?
20     A.  Yes.
21     Q.  Okay.  And do you see the phrase, "At
22 least"?
23     A.  Yes.
24     Q.  Why did you use -- what do you mean when you
25 say, "At least"?

Page 32

1      A.  I was referring to the Jackson Lewis report,
2  which was published in 2011.  There was two very
3  detailed reports that I relied on, which I refer to
4  in the report, one of which was the J -- Jackson
5  Lewis report, and another one that was, I believe,
6  from 2007.
7          So when I said, "At least 2010," I was
8  referring to content from the Jackson Lewis report.
9      Q.  Okay.  And the Jackson Lewis report, Lewis
10 is L-e-w-i-s.  Am I right?
11     A.  Yes.  Yes.
12     Q.  Okay.  The Jackson Lewis report had
13 recommendations.
14         Do you recall that?
15     A.  Vaguely.
16     Q.  Okay.  Sitting here today, do you know
17 whether the recommendations were, in fact, carried
18 out by the Department of Agriculture?
19     A.  I don't specifically recall.
20     Q.  Okay.  Did you undertake any investigation
21 or inquiry to determine whether or not those
22 recommendations were, in fact, fulfilled and
23 executed?
24     A.  Not specifically, no.
25     Q.  Okay.  And sitting here today, when you use

Page 33

9 (Pages 30 - 33)

1 the phrase, "until at least 2010," do you have any
2 knowledge as to whether or not the discrimination
3 that you referred to continued past 2010?
4    A. There was one other report, I believe.  It
5 was maybe 2013 or 2017 that discussed -- discussed,
6 you know, disparate treatments.  I'd have to look at
7 the Appendix B and then -- and look at the other one,
8 but I refer to it later in the report somewhere.
9       I wrote this six months ago; so I'm sorry
10 I'm not as fresh with the details.
11    Q. You're doing fine.
12       Other than that report that is referenced in
13 your report, have you conducted any inquiry
14 investigation to determine whether or not the
15 discrimination that you identify occurred past 2010?
16    A. I did -- I did examine it, yes.
17    Q. I'm not talking about that report.  I want
18 to know whether or not you have conducted an
19 investigation independently to determine whether or
20 not discrimination -- not the lingering effects of
21 discrimination -- but discrimination continued past
22 2010?
23    A. Yes, I did.
24    Q. And other than the data you refer to that's
25 in your report, any other -- any other investigation

Page 34

1 you undertook?
2    A. No, just those data.
3    Q. Okay.  Let me direct your attention, please,
4 to -- do you know if -- strike that.
5       Do you know if the USDA maintains documents
6 that document loan denials?
7    MR. KNAPP:  Objection.  Vague.
8    MR. ROSENBAUM:  You're right.
9 BY MR. ROSENBAUM:
10    Q. I want to know whether or not the -- to your
11 knowledge, the USDA maintains loan applications for
12 which denials were issued?
13    MR. KNAPP:  Just lodge an objection that
14 this is beyond the scope of Dr. Robb's expertise.
15       You may answer, Dr. Robb.
16    THE WITNESS:  Yeah, I'm not aware of whether
17 or not they maintain loan applications that were
18 denied.
19 BY MR. ROSENBAUM:
20    Q. And maybe I asked this before, but I just
21 want to be really clear.
22       Regarding loan applications, do you know
23 whether or not the USDA maintains loan applications,
24 referring either to origination loans or loan
25 servicing?

Page 35

1    A. I'm not aware.
2    Q. Did you receive any data regarding loan
3 servicing?  Specifically referring --
4    A. No, I didn't.  No, I did not.
5    Q. Okay.  Did you request any such information
6 or data?
7    MR. KNAPP:  Objection.  Calls for attorney
8 work product.  I instruct the witness not to answer.
9 BY MR. ROSENBAUM:
10    Q. If you could -- if we could look at Page 5
11 of your report, please.  Now, maybe you've already
12 answered this too, but I want you to look, please, at
13 the sentence that says, "The materials and data I
14 reviewed provide substantial evidence of past
15 discrimination against minority farmers in USDA loan
16 programs."
17       Do you see that?
18    A. I do.
19    Q. Okay.  And when you use the phrase "past
20 discrimination," that's with respect to the dates
21 you've previously given us?
22    A. Correct.
23    Q. Okay.  Directing your attention, Doctor, to
24 Page 11 of your report.
25       Incidentally, Doctor, are you familiar with

Page 36

1 the phrase "passive participation"?
2    A. Am I familiar with the phrase "asset
3 participation"?
4    Q. No, that's a good one, though.
5       The one I'm asking about, though, is
6 passive, p-a-s-s-i-v-e, participation.
7    A. No.  Would -- no.
8    Q. Okay.  Did you conduct any inquiry or
9 investigation to determine whether or not private
10 banks discriminated against minority farmers who are
11 seeking loans?
12    A. I did not.
13    Q. Okay.  Were you directed to look at that?
14    A. No.
15    Q. Sitting here today, do you know if there are
16 private banks, during the time period that you looked
17 at, that discriminated against minority farmers?
18    A. I'm not aware of specific --
19    Q. And --
20    A. -- no.
21    Q. Okay.  And if I asked you the same question
22 from 2011 to today, are you aware of private banks or
23 lending institutions that, to your knowledge,
24 discriminate -- discriminated against private --
25 minority farmers?  Are you aware of any such

Page 37

10 (Pages 34 - 37)

1 practices?

2     A.  I'm not aware.

3     Q.  And you didn't conduct any investigation to

4 determine?

5     A.  I did not.

6     Q.  Okay.  And you weren't directed to -- you

7 weren't asked to look into that question; is that

8 right?

9     A.  I was not.

10     Q.  Okay.  Looking, Doctor, at Page 11 of your

11 report, do you see the sentence that says -- it's in

12 the first full paragraph -- "Both loan eligibility

13 and loan approval decisions are highly centralized.

14 The key decisions are made at one of hundreds of

15 county-level offices."

16         Do you see that?

17         MR. KNAPP:  Mark, I just want to clarify.  I

18 may have misheard you.  But I believe you

19 said "highly centralized," and I believe the report

20 says "highly decentralized."

21         THE WITNESS:  That's what I heard as well.

22 Yes, I see the sentence, and that it's highly

23 decentralized.

24         MR. ROSENBAUM:  Well, I promised you I

25 wasn't going to ask you any trick questions, and I

1 whether or not discrimination takes place in those

2 county-level offices post 2011?

3     A.  I don't believe so.

4     Q.  Okay.  And how about -- strike that.

5         In your report you talk about the racial and

6 ethnic composition of persons who work in those

7 offices.

8         Do I have that right?

9     A.  Yes.

10     Q.  Okay.  And do you know currently what the

11 racial and ethnic composition of persons in those

12 offices are?

13     A.  I do not.

14     Q.  Do you know if there are offices where all

15 the employees there are white?

16     A.  I do not.

17     Q.  Or where none of the offices have black

18 employees?

19     A.  I do not.

20     Q.  Or Hispanic employees?

21     A.  I do not.

22     Q.  Or Native American employees?

23     A.  I do not.

24     Q.  Or employees of color?

25     A.  I do not.

1 just did.  Let me start over.

2 BY MR. ROSENBAUM:

3     Q.  Looking -- and thank you for the correction.

4         Looking at the sentence, "Both loan

5 eligibility and loan approval decisions are highly

6 decentralized; the key decisions are made at one of

7 hundreds of county-level offices."

8         Do you see that?

9     A.  I do.

10     Q.  All right.  Help me understand, Doctor, your

11 understanding of how those county-level offices work,

12 in terms of loan applications.

13         Do you have an understanding of how they go

14 about their business?

15     A.  I have a general idea, that, yes, USDA staff

16 in these county-level offices are the main contact

17 points for these farmers, and they are the ones that

18 make the lending decisions.

19     Q.  Okay.  And do you know how many offices

20 there are in the USDA network?

21     A.  Hundreds.

22     Q.  Could be a couple thousand?

23     A.  I don't recall.

24     Q.  Okay.  And to your knowledge, has USDA ever

25 conducted any specific investigation to determine

1     Q.  And did you undertake any investigation to

2 determine that?

3     A.  I did not.

4     Q.  Do you know if USDA has ever undertaken any

5 such investigation?

6     A.  I do not.

7     Q.  And you never made any inquiry to determine

8 that; is that right?

9     A.  Correct.

10     Q.  Did it ever cross your mind that it would be

11 an interesting thing to do?

12         MR. KNAPP:  Objection.  Argumentative.

13 BY MR. ROSENBAUM:

14     Q.  Go ahead.

15     A.  There would be a lot of interesting things

16 you could do, but, you know, in the -- in the, you

17 know, constraints of time, I was tasked with

18 reviewing existing reports and audits and data

19 available.

20     Q.  Do you know if USDA has ever conducted an

21 audit to determine the racial and ethnic composition

22 of its employees in these county offices?

23     A.  Yes, I refer to at least one of them in my

24 report.

25     Q.  Correct.

1     How about post 2011?
2     A. Again, I'd have to look at Appendix B for
3  the exact publication dates, but I'm not aware.
4     Q. Okay. And in those offices, decisions are
5  made regarding recommending whether to approve loan
6  applications; is that right?
7     A. Correct.
8     Q. Okay. And in those offices -- strike that.
9        Those offices are where USDA directly
10 interfaces with farmers seeking loans; is that right?
11    A. Correct.
12    Q. Answers questions, helps -- gives out
13 information about the application forms --
14       MR. KNAPP: Objection. Compound.
15       MR. ROSENBAUM: It is compound.
16 BY MR. ROSENBAUM:
17    Q. If you want me to break it up, but I saw you
18 nodding your head; so I jumped on that possibility
19 there.
20       That's -- both of those take place in those
21 offices, so far as you know; is that right?
22    A. Correct.
23    Q. Okay. And are there -- to your knowledge,
24 are there -- do you know -- strike that.
25       Do you know what a risk factor is?

*Page 42*

1     A. No.
2        MR. KNAPP: Objection. Vague.
3        THE WITNESS: It's vague, but, no, I did not
4  receive it.
5  BY MR. ROSENBAUM:
6     Q. Do you know -- thank you.
7        Do you know if USDA maintains information on
8  each and every risk factor that is considered for
9  risk scores?
10    A. I don't.
11    Q. You don't know one way or the other?
12    A. (Witness shakes head.)
13    Q. You're shaking your head no? I don't know.
14    A. No, sorry. No, I do not know.
15    Q. Okay. I just want to help the reporter.
16       Do you know -- did you -- did you look at
17 any particular county-level office to gain an
18 understanding of what was done there?
19    A. I did not. There were a few that were
20 listed in some of the audit reports, but I did not
21 look at any specific county, no.
22    Q. Okay. Now, in your report -- tell me if I
23 have this right -- you described anecdotal evidence
24 that you concluded demonstrated that some of the
25 decision-making at county-level offices was a

*Page 44*

1     A. Yes.
2     Q. What is your understanding of what a risk
3  factor is?
4     A. Factors that have -- affect the risk of loan
5  default.
6     Q. Yeah.
7        And do you know what a risk score is?
8     A. Yes.
9     Q. And what's a risk score?
10    A. A quantitative variable that defines the
11 estimated risk of default.
12    Q. Okay. And do you know if there are risk
13 scores that are placed on loan applications at those
14 county offices?
15    A. I know the data I received had a credit risk
16 score. I am not aware of whether the county offices
17 do that or that is done at the headquarters.
18    Q. Okay. You do know, at minimum, that
19 information that goes into the determination of a
20 risk score, that information is compiled at the
21 county offices; is that right?
22    A. Yes, I would assume so.
23    Q. Okay. And did you receive data as to every
24 risk factor that is considered in compiling a risk
25 score?

*Page 43*

1  possible source of racial discrimination against
2  minority farmers; isn't that right?
3     A. Correct.
4     Q. Okay. And did you examine any anecdotal
5  evidence post 2011 regarding decision-making at
6  county-level offices as a source of racial
7  discrimination against minority farmers?
8     A. Again, I'd have to look at Appendix B and
9  the publication dates, but I don't recall any county
10 level after 2011.
11    Q. Okay. And, again, you may have answered
12 this question. I apologize if I've asked it
13 previously.
14       To your knowledge, has USDA ever examined,
15 ever investigated for anecdotal evidence as to
16 whether or not there is racial discrimination at
17 county-level offices post 2011?
18    A. Again, I believe -- at the county level.
19 I'm not aware.
20    Q. Okay. Of any such investigation; is that
21 right?
22    A. Correct.
23    Q. Okay. We talked a few moments ago about
24 loan servicing.
25       To your knowledge, those county-level

*Page 45*

12 (Pages 42 - 45)

1 offices, is that a site where loan servicing
2 applications are made?
3    A. I believe --
4       MR. KNAPP: Objection. Vague. Confusing.
5 BY MR. ROSENBAUM:
6    Q. Do you understand my question?
7       MR. KNAPP: You can answer.
8       THE WITNESS: I believe loan servicing is
9 applied for at the county level.
10 BY MR. ROSENBAUM:
11    Q. Okay. And the basis for that answer?
12    A. From the GAO and OIG reports that I list in
13 Appendix B.
14    Q. Okay. And to your knowledge, are
15 recommendations or decisions regarding loan servicing
16 made by officers at those county offices?
17    A. That is my understanding.
18    Q. Okay. And on -- can we take a look, please,
19 at Page 14 of your report.
20       Incidentally -- do you have that in front of
21 you?
22    A. Yes.
23    Q. All right. Incidentally, Doctor, do you
24 know how the officials who work out at county-level
25 offices, do you know how they're selected?

Page 46

1    A. Individually.
2    Q. Say that again.
3    A. Individually.
4    Q. Okay. And were these farmers whom you knew?
5    A. No.
6    Q. Okay. And do you know -- did they call you
7 or did you call them?
8    A. They called the Department of Justice. I
9 believe --
10    Q. Okay.
11    A. Well, let me rephrase that. No.
12       Either they called the Department of Justice
13 or someone they worked with at an entrepreneurial
14 support organization called the Department of
15 Justice, from what I am aware. I was told that they
16 reached out, and that I could call them.
17    Q. Okay. And do you know where -- did they --
18 strike that.
19       Did they -- did they have farms, so far as
20 you knew, at the time they talked to you?
21    A. Yes. At -- I'm -- again, this is, like,
22 more than six months ago. So I believe one was on a
23 farm, but I'm not sure if they were currently
24 operating because they were, you know, retired. The
25 other two were operating.

Page 48

1    A. I do not.
2    Q. Did you ever make any inquiry to find out?
3    A. I did not.
4    Q. Do you know if minority farmers have
5 attempted to get positions in those county-level
6 offices?
7    A. I am not aware.
8    Q. Incidentally, have you ever talked to a
9 minority farmer?
10    A. Yes.
11    Q. When was that?
12    A. In the fall of 2021.
13    Q. And how many minority farmers did you talk
14 to?
15    A. Three.
16    Q. And do you know the names of those three?
17    A. Not off the top of my head.
18    Q. Where did those conversations take place?
19    A. By phone.
20    Q. Okay. And so you have not met in person
21 with any minority farmer; am I right?
22    A. Correct.
23    Q. Okay. And the phone conversations, were
24 they with all three at the same time? Were they
25 individually -- help me understand.

Page 47

1    Q. Okay. And how long were each of the
2 conversations approximately?
3    A. I would say 30 to 45 minutes.
4    Q. Okay. And did you take notes of those
5 conversations?
6    A. I did.
7    Q. And do you still have those notes?
8    A. Probably.
9    Q. Did you take notes by hand, or did you use a
10 laptop?
11    A. I believe one was -- one was notes -- notes
12 on paper and two were on computer, but I'd have to go
13 back and look.
14    Q. Okay. And if you went back and looked,
15 where would you look?
16    A. On my computer and in my pile of papers in a
17 folder.
18    Q. Okay. And I'm asking you, please, and I'm
19 saying to counsel, don't delete those notes or
20 otherwise dispose of those notes. I want them.
21       Can you tell me -- let's -- let's break it
22 down.
23       Farmer Number 1 who you spoke with, so you
24 can pick any of the three, can you tell me, as you
25 best recall, the sum and substance of that

Page 49

13 (Pages 46 - 49)

1  conversation?
2     A.  Yeah, I believe it was -- the first one was
3  the wife of the Keapseagle class action suit.
4     Q.  And that's one of the lawsuits you referred
5  to in your report; is that right?
6     A.  Correct.
7     Q.  Okay.  And can you spell the name of that
8  case, please?
9     A.  Keapseagle?
10    Q.  Yes.
11    A.  K-e-a-p-s-e-a-g-l-e, Keapseagle, I believe.
12    Q.  All right.  And did you review documents
13 relating to that case?
14    A.  I did.
15    Q.  And what documents did you review?
16    A.  You know, I don't recall specifically, but
17 it would be listed in Appendix B.
18    Q.  Okay.  Sitting here today, do you recall any
19 of the documents in particular?
20    A.  I remember one was a court document, I
21 believe.
22    Q.  Okay.  I take it these -- you did not do
23 independent research to --
24    A.  No.
25    Q.  -- find court documents relating to this

Page 50

1  case; is that right?
2     A.  I did not.
3     Q.  And you didn't do independent research
4  relating to any of the cases that you referred to in
5  your report; is that right?
6     A.  I did not.
7     Q.  For example, you talk about Pigford 1 and
8  Pigford 2, P-i-g-f-o-r-d.
9        Did you review -- did you -- you looked
10 at -- strike that.
11       You looked at documents that counsel gave
12 you; is that right?
13    A.  Correct.
14    Q.  Okay.  And do you know if there are books
15 written about Pigford?
16    A.  I don't know.
17    Q.  Or articles?
18    A.  I'd have to look at Appendix B, but I think
19 there was one kind of analysis that was done by --
20 maybe the Commission of Civil Rights.  You know, I
21 don't recall, but I do remember reading an analysis
22 of it.
23    Q.  Okay.  But, again, if it's not in your
24 appendix, you're not aware of it; is that right?
25    A.  Correct.

Page 51

1     Q.  You never conducted any independent
2  investigation to see if there were other critiques or
3  analyses of what happened in that case or any of the
4  cases that you referred to; is that right?
5     A.  Correct.
6     Q.  Okay.  You -- the -- do you know what is
7  meant by the phrase "injunctive relief"?
8     A.  Probably not.
9     Q.  Okay.
10    A.  No.  Why don't you tell me.
11    Q.  Your counsel can correct me if he has a
12 different definition, but injunctive relief refers
13 generally to the fact that a Court can order a party
14 to do something, in addition to pay damages.
15       You with me?
16    A.  Okay.
17    Q.  For example, in, say, a domestic relations
18 case, a Court could order injunctive relief to one
19 member of a family unit, saying, "Stay away from the
20 other member."
21       Are you with me?
22    A.  Sure.
23    Q.  Or in a discrimination case, a Court could
24 order a party to undertake certain actions
25 specifically to address the discrimination.

Page 52

1        Are you with me?
2     A.  Yep.
3     Q.  Okay.  To your knowledge, in any of the
4  cases that you referenced, was there any injunctive
5  relief, as I've defined it?
6     A.  I'm not aware.
7     Q.  Okay.  Are you aware of any -- any provision
8  in either the cases or the -- strike that.
9        You're aware that there were settlements in
10 those cases?
11    A.  That there were settlements?
12    Q.  Yes.
13    A.  Correct.
14    Q.  Did you review the settlement documents?
15    A.  Yes.  Well, I don't know exactly if -- if
16 they were called "settlement documents," but I
17 reviewed details about the settlements.
18    Q.  And do you recall any specific provisions in
19 any of the settlements documents that you're thinking
20 about that directed the USDA to do anything other
21 than pay damages?
22    A.  Define "pay damages."
23    Q.  Set up a process by which farmers could come
24 in and say, "I've been damaged," and the USDA would
25 pay out money.

Page 53

14 (Pages 50 - 53)

1    A.  So financial payments and debt relief and
2 tax relief would all be defined as that.
3    Q.  Yeah, thank you for saying that.
4    A.  That's -- yeah, that's what I'm aware of.
5    Q.  Okay.
6    A.  I'm not aware of anything else.
7    Q.  Okay.  And did you ever make any inquiry to
8 see if there was anything outside those documents
9 regarding policies and practices specifically coming
10 from these cases?
11    A.  I did not.
12    Q.  Okay.  And besides the three farmers you
13 talked about or their spouses, did you talk to anyone
14 else associated with those cases?
15    A.  No.
16    Q.  Okay.  Now, the -- wife whom you
17 referenced to me a few moments ago, you said you had
18 about a 30- to 45-minute conversation with her?
19    A.  Yes.
20    Q.  And your understanding was that she had
21 contacted the Department of Justice?
22    A.  She --
23       MR. KNAPP:  Objection.  Misstates prior
24 testimony.
25       THE WITNESS:  Yeah, I said she or someone

Page 54

1    Q.  Why --
2    A.  So --
3    Q.  I cut you off.  I apologize.
4    A.  That's okay.
5    Q.  Why was that?
6    A.  Just to hear a personal story and get -- get
7 color, context around the -- the evidence I was
8 reading.
9    Q.  And why did you think color and context were
10 important?
11    A.  Just for my own understanding.
12    Q.  And why was that important?
13       MR. KNAPP:  Objection.  Asked and answered.
14 BY MR. ROSENBAUM:
15    Q.  Go ahead.
16    A.  I guess to familiarize myself more with
17 farming and farmers.  Most of my work is with
18 entrepreneurs, small business owners, venture
19 capital-backed startups.  Farming, you know, is a
20 business, but I just wanted to learn more.
21    Q.  Have you ever been on a farm?
22    A.  Yeah.
23    Q.  When?
24    A.  Various times over the years.
25    Q.  Have you ever been on a farm run by a

Page 56

1 she with -- associated with from a farmers' support
2 organization.  Somehow it was made -- made known that
3 she was open to a conversation.
4 BY MR. ROSENBAUM:
5    Q.  Okay.  And did you come into that
6 conversation with a set of prepared questions?
7    A.  No.
8    Q.  Okay.  Did you come into that conversation
9 with a set of notes, as to areas that you wanted to
10 inquire about or investigate?
11    A.  Yes.
12    Q.  Okay.  And were those provided to you by the
13 Department of Justice?
14    A.  No.
15    Q.  Okay.  And what did you want to investigate?
16    A.  I just wanted to listen to her story about
17 her experience with USDA and the lending programs.
18    Q.  Okay.  And stories, I take it, are important
19 to you; is that right?
20       MR. KNAPP:  Objection.  Vague.
21 BY MR. ROSENBAUM:
22    Q.  Go ahead.
23    A.  Yeah, I just wanted to hear her experience
24 firsthand rather than, you know, reading about it in
25 reports or audits, et cetera.

Page 55

1 minority farmer?
2    A.  Hmmm.  Yes.
3    Q.  How many?
4    A.  At least one.
5    Q.  When?
6    A.  Well, I guess some time in 2021.
7    Q.  Can you tell me the circumstances?
8    A.  I have a friend of mine who is -- has a farm
9 and a sanctuary called Rancho Compasión, in Marin
10 County, California, and I used to live in Marin for
11 twelve years, and she started this farm and
12 sanctuary, I don't know, five or six years ago.  So
13 I've been there several times.
14    Q.  Do you know if she ever applied for a loan
15 from USDA?
16    A.  I do not.
17    Q.  Do you know if you've ever been on a farm
18 where the owner/operator of the farm sought a loan
19 from USDA?
20    A.  I'm not aware.
21    Q.  Okay.  Are you aware that the intervenor in
22 this case has submitted declarations -- strike that.
23       Do you know what a declaration is?
24    A.  Yes.
25    Q.  Okay.  What's your understanding of what a

Page 57

15 (Pages 54 - 57)

1 declaration is.
2    A. My understanding is that it's a statement, a
3 legal -- a statement for a legal proceeding.
4    Q. Okay. And are you aware that in this case
5 declarations were submitted by intervenor of minority
6 farmers who sought loans from USDA?
7    A. No.
8    Q. You were never supplied with any such
9 declarations?
10    A. No.
11    Q. Returning to -- do you know why you weren't
12 submitted those -- why you weren't provided with
13 those declarations?
14    A. I don't.
15    Q. Okay. Let's go back to the conversation
16 with the person who you understood to be a wife of an
17 individual involved in the litigation.
18      Can you give me your best recollection of
19 the sum and substance of that conversation, please.
20    A. Well, again, it was August or September, but
21 basically I asked her about, you know, her experience
22 farming and her experience with USDA, and obviously
23 was not a great one, as she was part of the class
24 action lawsuit.
25      So I'd have to look and see if there was,

Page 58

1    Q. Okay. Do you know which county office?
2    A. There were multiple plaintiffs in that case.
3 I think there were multiple county offices. So, no,
4 I don't know specifically.
5    Q. Do you know any of those offices?
6    A. No.
7    Q. Okay. You make any inquiry or investigation
8 to determine --
9    A. No.
10    Q. -- what offices?
11      Do you know if the employees at those
12 offices remained at those offices after the
13 conclusion of the lawsuit?
14    A. I do not.
15    Q. Did you ever undertake any inquiry or
16 investigation to determine?
17    A. I did not.
18    Q. Do you know if any of those employees at any
19 of those county offices were disciplined or released,
20 fired, at the conclusion of the lawsuit?
21    A. I do not.
22    Q. Okay. Did you ever make any inquiry or
23 investigation to determine?
24    A. I did not.
25    Q. Okay. Did -- did counsel ever say to you,

Page 60

1 you know -- the specifics, if I have them. But it
2 was -- it didn't really add anything -- it was not
3 included in my report because it didn't add anything
4 to the documents that I already had from the
5 Keepseagle lawsuit.
6    Q. And when you say it was -- when you say,
7 "obviously it was not a great one," what's the basis
8 for that statement?
9    A. They had a lawsuit against USDA.
10    Q. Do you know what the allegations were in
11 that lawsuit?
12    A. That they were discriminated against by
13 USDA.
14    Q. And discriminated against based on race, as
15 far as you understood?
16    A. As far as I'm aware.
17    Q. Okay. And do you remember what the
18 specifics of that racial discrimination were?
19    A. I'm -- I think it had mostly to do with loan
20 applications and getting support and approval for
21 loan applications. I'd have to look specifically.
22    Q. Okay. And the discrimination that you
23 understood to have taken place, did that take place
24 at a county office?
25    A. I believe so.

Page 59

1 "Let's find out whether or not those officers or
2 employees at those offices were ever disciplined or
3 terminated"?
4      MR. KNAPP: I'm sorry. Could the court
5 reporter read that back. There was an audio skip,
6 and I didn't hear the question, or, Mark, you can
7 restate it.
8      MR. ROSENBAUM: We can read that back.
9      (Record read.)
10      THE WITNESS: They did not.
11 BY MR. ROSENBAUM:
12    Q. Okay. And I want to be clear, not just
13 the -- I'm talking about all the litigation, any of
14 those cases, my question is, that's what they refer
15 to.
16      Did you understand that?
17    A. I did not. But I do now, and the answer is
18 still the same.
19    Q. Okay. Thank you.
20      The -- the -- the person who spoke to you,
21 did they tell you what office they had difficulties
22 with?
23    A. They did not.
24    Q. Did you inquire?
25    A. I did not.

Page 61

16 (Pages 58 - 61)

1   Q.  Why not?
2   A.  It didn't seem relevant.
3   Q.  Why didn't it seem relevant?
4   A.  I wasn't investigating at such level of
5  detail.  I was just getting a high -- a high-level
6  view of her experiences before and after the lawsuit.
7   Q.  What do you mean "a high-level of review" --
8  strike that.
9       What do you mean "a high-level view"?
10   A.  I was just looking for broad -- we were just
11  having a conversation broadly about her experiences,
12  not --
13   Q.  You --
14   A.  -- specific, like, an exact loan application
15  or the exact county office.
16   Q.  Thank you.
17       Or the precise nature of the discrimination.
18  You were not looking for that?
19   A.  No, I think I did ask her about what kind --
20  what the discrimination -- or how she thought there
21  was disparate treatment.
22   Q.  What did she say?
23   A.  I don't recall specifically.  I would have
24  to find and check my notes.
25   Q.  Regarding the policies and practices,

Page 62

1   A.  I believe there was a specific report, I
2  believe, either the G -- GAO or the OIG that was
3  mandated by Congress that I reviewed that was, you
4  know, a more recent date, but I'd have to look at it.
5   Q.  Do you know what, if anything -- strike
6  that.
7       Other than that report, are you aware of any
8  other investigation?
9   A.  I'm not.
10   Q.  Okay.  By anyone associated with the United
11  States government, other than what is in your report?
12   A.  I'm not aware.
13   Q.  Okay.  Sitting here today, can you tell me
14  whether or not the practices that were described
15  by -- in the litigation that you were talking about
16  are taking place in county offices today?  Can you
17  definitively tell me?
18   A.  I cannot.
19   Q.  Or at the time that the American Rescue Plan
20  Act was enacted?
21   A.  I cannot.
22   Q.  Okay.  And directing your attention -- we
23  have Page 14 there; is that right?  Nice.
24       You state at Page 14 -- you see the sentence
25  that says, "As has been well documented, and as

Page 64

1  experience that she had, did you conduct any
2  investigation to determine whether or not such
3  experience happened to other minority farmers?
4   A.  Not beyond the evidence that was presented
5  and the various reports that I reviewed and audits.
6  It was --
7   Q.  And --
8   A.  -- clearly happening in various geographies.
9   Q.  Okay.  What geographies?
10   A.  Where there was specific mention, I noted
11  them in my report.
12   Q.  Okay.  And do you know -- as to those
13  practices that were clearly happening, did you
14  conduct any investigation to see if they continued to
15  happen after the litigation?
16   A.  Only by reviewing the USDA direct loan
17  applications from 20 -- 2000 to 2020 that I was
18  provided.
19   Q.  But other than that, did you specifically
20  look to see whether those practices continued?
21   A.  I did not.
22   Q.  Do you know if USDA ever did?
23   A.  I'm not aware.
24   Q.  And do you know if the Department of Justice
25  ever did?

Page 63

1  discussed more below, this created opportunities for
2  both intentional and unintentional discrimination
3  against minority farmers."
4       Do you see that sentence?
5   A.  I do.
6   Q.  Okay.  And other than the reports and data
7  that are in your report, do you know if there has
8  been any other investigation to determine whether or
9  not the intentional and unintentional discrimination
10  against minority farmers that you referred to here
11  has, in fact, taken place?
12   A.  I am not.
13   Q.  Okay.  And so far as you know, has the
14  Department of Agriculture ever investigated whether
15  the opportunities that you refer to continued to
16  exist post 2011?
17   A.  Again, one of the reports that I reference
18  below either comes from the USDA OIG or the GAO, but
19  I don't recall.
20   Q.  Other than that report?
21   A.  No.  Not --
22   Q.  Okay.
23   A.  -- that I'm aware of.
24   Q.  The report that you're referring to, do you
25  know if it made recommendations?

Page 65

17 (Pages 62 - 65)

1    A. I believe it did.
2    Q. And sitting here today, do you know whether
3  or not those recommendations were carried out?
4    A. I am not aware.
5    Q. To your knowledge, has USDA ever conducted
6  any investigation to determine whether or not those
7  recommendations were carried out?
8    A. Well, I mean -- so there's been various
9  reports dating back to the '60s that I refer to. And
10  in those reports and audits, there are investigations
11  on whether the USDA has made progress in various --
12    Q. Got it. But I'm asking you a very specific
13  question here.
14      Regarding the -- you talked to me about a
15  USDA or OIG report more recently; is that correct?
16    A. Correct.
17      MR. KNAPP: Objection. Misstates prior
18  testimony.
19  BY MR. ROSENBAUM:
20    Q. And, incidentally, do you know what "OIG"
21  stands for?
22    A. Office of Inspector General.
23    Q. And that report, that specific report, do
24  you know if it made recommendations?
25    A. I believe it did.

Page 66

1    A. Yes.
2    Q. Okay. Anything more that you can add
3  regarding your conversation with the wife whom you
4  referred to?
5      MR. KNAPP: Objection. Vague. Calls for a
6  narrative.
7      MR. ROSENBAUM: That's true.
8  BY MR. ROSENBAUM:
9    Q. Go ahead.
10    A. No, this was months and months ago. So,
11  yeah, I don't really recall much. I believe it's --
12  her name was Marilyn Keapseagle, but vague
13  recollection.
14    Q. Did you -- do you know if -- if her family
15  still owns a farm?
16    A. Yeah. So she's still on that same farm she
17  was on. What I don't know is if they're currently
18  operating. So she's on the farm. I just don't know
19  if it's an operating farm.
20    Q. Do you know if they have submitted loan
21  applications to USDA in the last ten years?
22      THE COURT REPORTER: The last how long?
23      MR. ROSENBAUM: Ten years.
24      THE WITNESS: I'm not aware.
25  ///

Page 68

1    Q. Okay. And my question specifically with
2  respect to those recommendations, do you know if USDA
3  has ever conducted any inquiry or investigation to
4  determine whether or not those recommendations were
5  carried out?
6    A. I am not aware.
7    Q. Okay.
8      MR. KNAPP: Mark, we've been going about an
9  hour since the last break, so if this is a good time.
10      MR. ROSENBAUM: Yeah, we're good. How long
11  do you want, Dr. Robb, or Mike?
12      MR. KNAPP: I think five minutes should be
13  sufficient?
14      THE VIDEOGRAPHER: Going off the record.
15  This is the end of Media Number 1. The time is
16  10:47.
17      (Recess taken.)
18      THE VIDEOGRAPHER: We are back on the
19  record. This is the beginning of Media Number 2 in
20  the deposition of Dr. Alicia Robb. The time is 10:58
21  A.M. Mountain.
22  BY MR. ROSENBAUM:
23    Q. Are you doing okay, Dr. Robb?
24    A. Yes.
25    Q. You're aware you're still under oath?

Page 67

1  BY MR. ROSENBAUM:
2    Q. Did you make any inquiry to find out?
3    A. I don't recall.
4    Q. Did you ask her if she had friends or
5  acquaintances who had made loan applications to USDA
6  in the past ten years?
7    A. I don't recall.
8    Q. You don't recall if you asked?
9    A. Correct.
10    Q. Do you recall any discussion from her, as to
11  whether anyone she knew had made loan applications to
12  USDA in the last ten years?
13    A. No, I don't recall.
14    Q. Okay. When you told me you had a set of
15  notes in terms of things you wanted to think about,
16  was one of the items on that list, "Do you know
17  anybody who has had -- made a loan application for
18  origination loan or loan servicing in the last ten
19  years?"
20    A. I believe I asked about knowing people who
21  had submitted loan applications. I don't remember
22  articulating a time frame.
23    Q. Okay. Did she -- did she identify anyone
24  that she knew would main -- strike that.
25      Did you specifically ask that question to

Page 69

18 (Pages 66 - 69)

FEDERATION MSJ APP. 116

1 her, sitting here today, do you recall?
2      MR. KNAPP: Objection. Unclear what "that
3 question" is.
4      THE WITNESS: Yeah, what question did I --
5 are you asking me?
6 BY MR. ROSENBAUM:
7      Q. Did you ask her, "Do you know anybody who
8 has made a loan servicing application or a loan
9 origination application over the past ten years?"
10      A. I believe what I asked her was if she knew
11 others who had applied for SBA -- sorry. USDA loans.
12 I do not believe I asked her for a specific time
13 frame.
14      Q. Do you recall what her answer was?
15      A. I believe it was affirmative.
16      Q. And did you ask any follow-up questions?
17      A. I would have to check.
18      Q. Sitting here today, do you recall if you
19 asked any follow-up questions?
20      A. I don't recall.
21      Q. Did you say to her, "Can you give me the
22 names of those persons, because I'd like to make
23 contact with them?"
24      A. I did not.
25      Q. Okay. Did you do any follow up after your

Page 70

1 conversation to get information about any of those
2 individuals?
3      A. I did not.
4      Q. Okay. Why was that?
5      A. It was really a question of resource, you
6 know. I'm aware that my expert report was costing
7 taxpayer dollars, and I didn't want to -- I wanted to
8 be, you know, as efficient as I could to do the task
9 that I was asked to do.
10      Q. Okay.
11      A. That didn't involve chasing down various
12 minority farmers and doing in-depth conversations. I
13 was asked to review the evidence of discrimination in
14 lending programs.
15      Q. Okay. Did -- and then you had a
16 conversation with -- with the second farmer or
17 someone associated with a farm; is that right?
18      A. Yes. I -- I had three conversations. I
19 don't remember very much at all about the second
20 person.
21      Q. How long was that conversation?
22      A. That was probably -- again, this was, like,
23 seven or eight months ago, but I would say 20 to 30
24 minutes.
25      Q. Okay. And do you recall whether that person

Page 71

1 was associated with one of the lawsuits that you
2 referenced in your report?
3      A. I do not -- I don't think he was.
4      Q. Okay.
5      A. But I don't know.
6      Q. Okay. Do you know where his farm was?
7      A. I did -- I think I did at the time. I don't
8 recall now.
9      Q. Do you know if he's currently on a farm?
10      A. He was at the time I had that conversation
11 with him.
12      Q. Did he say to you that he had applied for a
13 loan or loan servicing?
14      A. Again, I don't recall specifically loan
15 servicing, but I recall asking him about loan
16 applications.
17      Q. Okay. Did he talk about what he believed to
18 be discrimination in loan applications?
19      A. Well, he said he was denied.
20      Q. Okay. And did -- did you -- could you see
21 him? Was it a Zoom call?
22      A. It was not.
23      Q. Okay. Do you know if he was a person of
24 color?
25      A. I believe he was, but honestly, I remember

Page 72

1 so little about that one specific one. I want to say
2 he was Latino, but it -- it didn't -- it wasn't very
3 useful. So I -- yeah, I kind of filed it away and
4 mentally. I actually don't even know if I have
5 specific notes or -- on that one.
6      Q. Do you know the period -- he discussed an
7 application process; is that right?
8      A. He -- he had applied for a loan and got
9 denied, yes.
10      Q. And do you remember the date or approximate
11 date when he made that --
12      A. I don't.
13      Q. Do you know if it was within the past ten
14 years?
15      A. I don't recall.
16      Q. You can't rule it out?
17      A. I can't rule it out.
18      Q. And did you say to him, "I'd like more
19 information about what happened," beyond what he said
20 to you?
21      A. I didn't.
22      Q. Did you say to anyone, "I think we should
23 conduct further investigation to see what happened"?
24      A. I did not.
25      Q. Was it your understanding that what he was

Page 73

19 (Pages 70 - 73)

1 concerned about was what he regarded as
2 discrimination, based on the fact that he was Latino
3 or a person of color?
4      A.  No.  I -- I think he felt he was unfairly
5 denied.  I don't know if -- I don't actually even
6 remember if he was a person of color.  I think he was
7 Latino.
8      Q.  Okay.
9      A.  But this is so long ago.
10      Q.  Do you remember any details as to why he
11 thought he was unfairly denied?
12      A.  Yes, which is why I kind of forgot about it.
13 He seemed to think that USDA, as a lender of last
14 resort, guaranteed that he would get a loan, and
15 that's not how USDA works.
16           While they are known as the lender of last
17 resort, they're not going to make loans that they
18 don't think are going to be able to be paid back.
19      Q.  Did he tell you specifically what caused him
20 to believe that he was unfairly denied the
21 application other than your statement that he thought
22 they -- did he actually -- strike that.
23           Did he actually say, "They have to do every
24 loan.  They have to approve every loan"?
25      A.  His comments led me to the assumption that

Page 74

1      A.  Not -- I don't recall.
2      Q.  Okay.  And then the third conversation?
3      A.  That happened probably in November or
4 December of 2021, and either he was a native Hawaiian
5 farmer, who was on the island of Maui, and he had
6 reached out, I guess, to the Department of Justice or
7 through some farmer support organization and was
8 connected to me.
9      Q.  And did he give you any details about what
10 happened to his situation?
11      A.  He did.
12      Q.  And what did he tell you?
13      A.  Well, it was a long narrative.  We probably
14 spoke for 30 or 45 minutes, but he gave me the
15 history of native Hawaiians and how the tax system
16 really kind of decimated the native Hawaiian farming
17 population because of, you know, their use of
18 bartering for generations and hundreds of years, and
19 the tax bills ended up, you know, requiring a lot of
20 native Hawaiians to move to more urban areas to earn
21 wages so they could pay the taxes.  So it was -- he
22 was an interesting guy.  It was a long conver -- you
23 know, a longer conversation, which was just a
24 narrative of the history of his family and -- yeah,
25 so his family has been in farming, and he -- he has a

Page 76

1 he thought all loans should be -- loan applications
2 should be approved.
3      Q.  Okay.  Did he also give you details about
4 his loan application?
5      A.  Not his loan application.  I remember
6 discussing a little bit about his farm and what the
7 loan was -- the funding was for.  But, again, it was
8 a long time ago, and I don't actually recall the
9 details.
10      Q.  Did you ask him anything specifically about
11 his treatment at the county office?
12      A.  Yeah, the other thing I do remember was --
13 and, again, I don't remember the exact specifics, but
14 I do recall there was one office that was somewhat
15 closer and another one that was further away.  And I
16 do recall something about him having to go to the one
17 that was further away for some reason, and he didn't
18 understand why.  And I asked him, and he -- he didn't
19 know why he had to go to the one that was further
20 away.
21      Q.  Did you ask him about -- I'm sorry.  Go
22 ahead.
23      A.  No, that's it.
24      Q.  Did you ask him about any details about what
25 happened inside that office?

Page 75

1 farm now.
2      Q.  And do you know if he has made any
3 applications for loans from the USDA?
4      A.  Yeah.  No, he -- he did, and I think he has
5 some, because they would be eligible under 1005 for
6 debt relief.
7      Q.  And do you know whether his own application
8 was approved or denied?
9      A.  Well, he has at least one outstanding loan.
10      Q.  Do you know if he has sought loan servicing?
11      A.  I do not know.
12      Q.  Do you know if he would be eligible for loan
13 servicing?
14      A.  I don't know.
15      Q.  Did you make any inquiry to find out?
16      A.  I don't recall.
17      Q.  Do you know --
18      A.  I would have to check my notes.
19      Q.  Okay.  Did you ask him, "Do you know of
20 experiences that other native Hawaiians have had with
21 respect to seeking loans from USDA?"
22      A.  Yes.
23      Q.  And what did he tell you?
24      A.  Yeah, he said he did know others that
25 were -- I would have to look at my notes, but he

Page 77

20 (Pages 74 - 77)

1 did -- he did know others that had either some
2 relationship with USDA that had -- had applied for
3 loans.  I don't remember asking specifically about
4 loan servicing, but it was -- yeah, it -- it was
5 more -- it was more an interesting conversation just
6 about the culture and the -- the way that native
7 Hawaiians have been meant to feel like second-class
8 citizens.
9        He actually went off to the mainland and got
10 a degree and then an MBA because he wanted to feel
11 more prepared.
12    Q.  Did you ask whether or not any of the other
13 native Hawaiians, who had applied for loan approvals,
14 were denied their loans?
15    A.  No, I don't recall specifically his response
16 to loan applications and denials.  We had more of a
17 discussion of why native Hawaiian farmers don't go
18 and apply for loans.
19    Q.  All right.  I'll come to that in a moment.
20 But my -- my question was a little more specific.
21        With respect to those native Hawaiians who
22 did apply for loans, did you ask anything about
23 whether or not they had been denied?
24    A.  Yeah, I don't recall.
25    Q.  Did you ask him anything about whether they

Page 78

1 had reported to him or he believed that they had been
2 subject to discrimination by officers or employees of
3 USDA?
4    A.  You know, not -- you know, I don't recall.
5 I would need to look at my notes, but it was
6 specifically more around the feeling of less than or
7 being secondary -- you know, second-class citizens
8 and being very intimidated by both bankers in general
9 and, you know, USDA as a lender.
10    Q.  And did you ask him any of the details with
11 respect to why they felt like they were second --
12 less than second-class citizens in terms of their
13 interactions with USDA?  Did you ask him about any
14 details of that?
15    A.  Yeah, I don't recall the details, but we --
16 we did discuss that.
17    Q.  Do you recall anything about what -- what he
18 said, as to why they felt as second class when they
19 interacted with USDA?
20    A.  I think the general sense they were given
21 from lenders was that they were being looked down
22 upon.
23    Q.  They were being what?
24    A.  Looked down upon.
25    Q.  Okay.  Did you ask him for any details with

Page 79

1 respect to USDA, in that regard, being looked down
2 upon?
3    A.  I would have to check my notes.
4    Q.  Sitting here today, do you remember asking
5 that question?
6    A.  Details around how -- how they were looked
7 down upon?
8    Q.  Yeah, by USDA.
9    A.  Yeah, we discuss -- I believe we
10 discussed -- some of it was around their clothing and
11 not having, like, suits and ties and, you know, being
12 professional.  That's one detail I recall.
13    Q.  Any other details?
14    A.  There was some reference around education
15 levels.  I remember this because that was one of the
16 reasons why he went off to college and then to grad
17 school.  So that they weren't educated, and they
18 weren't professional.
19    Q.  And that they were treated as second class
20 on account of those variables?
21    A.  Correct.
22    Q.  That was his impression; right?
23    A.  Yes, that was --
24    Q.  Did you -- after your conversation with this
25 gentleman, did you undertake any investigation to

Page 80

1 determine whether or not USDA employees treated
2 native Hawaiian farmers in the loan application
3 process as second-class persons?
4    A.  I did not.
5    Q.  Do you know if USDA has ever done that?
6    A.  I do not.
7    Q.  Okay.  With respect to what you told me
8 regarding -- let me see if I have this right,
9 Dr. Robb.
10        You said to me there was also conversation
11 about some native Hawaiians not seeking loans from
12 USDA, feeling like they would not do that.
13        Do I have that right?
14    A.  Correct.
15    Q.  Okay.  Did he give you reasons as to why he
16 thought that was happening?
17    A.  Well, I think there's a level of distrust
18 that's been documented in other reports, and the
19 feeling that they're not going to get their loan
20 application approved so why apply.  So we call that
21 kind of the discouraged borrower.  So folks that need
22 credit but don't apply because they fear they'll be
23 denied.
24    Q.  Fear they'll be denied because of distrust
25 of who they are or how they'll be treated.  Do I have

Page 81

21 (Pages 78 - 81)

1 that right?  That's a factor --
2    A.  Correct.
3    Q.  -- in your --
4    A.  Correct.  They fear they'll be denied.
5    Q.  To your knowledge, has USDA ever undertaken
6 any specific investigation to explore why native
7 Hawaiians feel distrust regarding the loan
8 application process?
9    A.  Yeah.  No, I think with the CRAT report
10 from, I believe, that was '97, and then the -- the JL
11 report in 2011, and I think there were other audits
12 that the OIG undertook that did listening sessions
13 and focus groups over -- over many years that looked
14 at how and why farmers were feeling the way they
15 were.
16    Q.  And do you know if that distrust continues
17 today?
18    A.  I don't have conclusive evidence, but I feel
19 like the analysis I did with loan withdrawals and
20 loan applications are consistent with at least some
21 feeling of discouragement.
22    Q.  Okay.  To your knowledge, in 2021 did USDA
23 undertake any investigation regarding this issue of
24 distrust?
25    A.  Not that I'm aware of.

Page 82

1    Q.  Okay.  Could you turn, please, Doctor, to
2 Page 38 of your report.
3       Do you see the sentence there that
4 says, "The aforementioned lawsuits, investigations,
5 reports, and other materials contain qualitative
6 evidence including thousands of complaints by
7 minority farmers of various forms of discrimination
8 in USDA loan programs occurring as recently as 2010
9 when the JL report was compiled."
10      Do you see that?
11    A.  Yes.
12    Q.  Do you know if USDA -- strike that.
13      Jackson Lewis, that's a law firm?
14    A.  Yes.
15    Q.  And you talked about it in your report --
16    A.  Right.
17    Q.  -- at some length?
18      Okay.  Do you know if USDA has commissioned
19 any law firm post the JL report to conduct the same
20 sort of investigation that Jackson Lewis did in their
21 report?
22    A.  I'm not aware.
23    Q.  Okay.  Or any independent auditor?
24    A.  Well, again, the USDA OIG had -- had a
25 couple audits.  I don't recall the specific dates,

Page 84

1    Q.  Or 2020?
2    A.  No, not that I'm aware of.
3    Q.  Or 2019?
4    A.  Not that I'm aware of.
5    Q.  Or 2018?
6    A.  That report I'd have to look in Appendix B,
7 but that was either the OIG or the GAO, I think, was
8 2017 or 2019.  I believe they -- they did have
9 discussions with farmers.
10    Q.  And --
11    A.  I don't recall the specifics.
12    Q.  -- other than that report you're referring
13 to, are you aware of any investigation or report or
14 audit post 2011?
15    A.  I'm not.
16    Q.  And that report -- if we've talked about
17 this before, just tell me, please.
18      That report, to your knowledge, did it make
19 specific recommendations regarding this issue of
20 distrust?
21    A.  I believe so.
22    Q.  And do you know if USDA has conducted any
23 investigation to determine whether or not those
24 recommendations were carried out?
25    A.  I am not aware.

Page 83

1 but one of them might have been after that, but I'd
2 have to look.
3    Q.  Other than that?
4    A.  No, not that I'm aware of.
5    Q.  Okay.  And the thousands of complaints -- do
6 you see that?
7    A.  Yes.
8    Q.  All right.  Did you request any of those
9 complaints?
10    A.  Not beyond the descriptions of the
11 complaints that were provided in the reports.
12    Q.  Do you know if USDA maintains those
13 complaints?
14    A.  I'm not aware.
15    Q.  Okay.  Do you know if USDA maintains all
16 complaints that have been filed with the department
17 over the last ten years?
18    A.  I am not aware.
19    Q.  Or any period of that time?
20    A.  I don't know.
21    Q.  Okay.  Do you know for -- to your knowledge,
22 were -- strike that.
23      Have you seen any reports or investigations
24 as to the adequacy of USDA investigation of those
25 complaints?

Page 85

22 (Pages 82 - 85)

1     MR. KNAPP:  Objection.  Vague.
2     You can answer, Dr. Robb.
3     THE WITNESS:  Can you repeat the question?
4 BY MR. ROSENBAUM:
5     Q.  Sure.
6        Do you -- are you aware of any investigation
7 or inquiry by USDA as to the manner by which those
8 complaints are reviewed or analyzed?
9     A.  In the last ten years?
10    Q.  Yeah.
11    A.  Correct.  I am not aware.
12    Q.  Did you make any investigation inquiry to
13 determine?
14    A.  I'm assuming there has not been, because I
15 asked for any relevant materials for the case.  So
16 since I did not receive them, I assume that they
17 don't exist.
18    Q.  And you asked your lawyer -- the lawyers at
19 the Department of Justice; is that right?
20    A.  Correct.
21    Q.  And you took what they gave you?
22    A.  Correct.
23    Q.  And did you conduct any independent
24 investigation to see if there were other reports or
25 data that, in your mind, would be relevant to the

Page 86

1 lawsuit that were not supplied by the Department of
2 Justice?
3     A.  Yeah, I mean, I did a search on, you know,
4 USDA's website, GAO's website, Congress -- you know,
5 congressional testimony.  But, yeah, what you see in
6 Appendix B is what I found either myself or through
7 the Department of Justice.
8     Q.  So you looked at USDA.  You looked at GAO
9 websites.  You looked at congressional websites.
10       Any other websites that you looked at?
11    A.  Yeah, there's a couple, like, nonprofits --
12 yeah, I mean, I did a Google search as well.  So a
13 few other things came up in those searches.
14    Q.  What was the Google search that you
15 conducted?
16    A.  Probably discrimination in lending, farm
17 lending discrimination, minority farmers.  Search --
18 searches like that.
19    Q.  Well, I want you to be specific.  Tell me
20 which ones you remember, sitting here today.
21    A.  Oh, I remember doing those three.
22    Q.  Any others?
23    A.  Minority farmers, maybe racial disparities
24 in farming.
25    Q.  Anything else?

Page 87

1     A.  Those are the likely suspects.
2     Q.  Did you -- did you review everything that
3 came up on those Google searches?
4     A.  Define "everything."
5     Q.  "Everything" is everything.  Everything
6 that -- when you do a Google --
7     A.  No.  Yeah, I think with a Google search, you
8 end up with thousands of pages.  But I would review,
9 like, the top page or two of output and click through
10 if I saw anything that looked relevant.
11    Q.  And how long would you say those Google
12 searches took you?
13    A.  I don't know.  I probably spent a couple
14 days on it.
15    Q.  Okay.  And did you request from USDA any of
16 the materials that came up on the Google search?
17    A.  I don't recall specifically, but I
18 definitely -- a lot of them were things I already had
19 or were able to get.  So I don't recall any instance
20 where there was something I wanted that I couldn't
21 get.
22    Q.  And everything that you reviewed, that's in
23 your appendix?
24    A.  No, I mean, there were some that weren't
25 relevant.  So I put those in a different folder

Page 88

1 of "not used."
2     Q.  Okay.  Do you still have that folder?
3     A.  Yes.
4     Q.  And if I wanted to find that folder, where
5 would I look for it?
6     A.  On my computer.
7     Q.  Okay.  Does it have a title?
8     A.  I think it's literally something called,
9 "Not Used."
10    Q.  Do you recall asking your -- asking counsel
11 for materials that they did not initially provide
12 you?
13    A.  No.
14    Q.  Okay.  The -- do you recall materials that
15 they did not provide you that you then utilized?
16       MR. KNAPP:  Objection.  Confusing.
17       You can answer, Dr. Robb.
18       THE WITNESS:  Was there anything I used
19 that --
20 BY MR. ROSENBAUM:
21    Q.  For the purposes of your report that U.S. --
22 the Department of Justice didn't provide you.
23    A.  Yeah, I mean, I think several things on
24 Appendix B were things that I found.
25    Q.  Okay.  Do you know what they were?

Page 89

23 (Pages 86 - 89)

1    A.  There's four or five pages of documents.  So
2  not off the top of my head, no.  I think one of them
3  was the book "Dispossession."
4    Q.  Okay.  Anything else that you recall?
5    A.  No, not offhand, but I don't know.  It's
6  probably several of them.
7    Q.  Okay.
8    A.  Several of them are my journal articles and
9  articles by my colleagues.
10   Q.  Okay.  Prior to this -- this assignment, had
11  you ever done any work with respect to racial
12  discrimination by USDA?
13   A.  No.
14   Q.  Or with respect to discrimination in farm
15  loan applications, either origination or servicing?
16   A.  No.
17   Q.  Sitting here today, do you know who has --
18      MR. KNAPP:  I'm sorry.  Could the court
19  reporter read that back?  -
20      THE COURT REPORTER:  Sorry.  I was just
21  trying to unmute to ask that question.  I missed the
22  last part it.  I heard, "Sitting here today, do you
23  know who has."
24  BY MR. ROSENBAUM:
25   Q.  Who has conducted research into the issue of

Page 90

racial discrimination by USDA?
2    A.  The one article I mentioned previously that
3  was referred to in the Beckham report -- Beckman
4  report.
5       Yeah, there hasn't been a lot of research on
6  this topic, as far as research goes beyond, you know,
7  the audits and reports.
8    Q.  Okay.  But sitting here today, you're not
9  aware of any studies or investigations of USDA racial
10  discrimination other than what's in your report in
11  your appendices.
12      Do I have that right?
13      MR. KNAPP:  Objection.  Misstates prior
14  testimony.
15      THE WITNESS:  So beyond what's in my report
16  and the research paper I mentioned, there were a
17  couple references in the two expert reports that were
18  provided last week -- a week or two ago that I
19  reviewed.
20  BY MR. ROSENBAUM:
21   Q.  Do you -- any others besides those?
22   A.  Not that I'm aware of.
23   Q.  Do you know if those -- any of those
24  references appeared in the Google searches you're
25  describing?

Page 91

1    A.  They must not have, at least not in the top
2  page or two since I didn't see -- since I hadn't
3  found them.
4    Q.  Okay.  Directing your attention to Page 38.
5       Do you have that in front of you?
6    A.  Yeah, I think so.
7    Q.  All right.  Do you see the sentence, just
8  after the sentence that I read to you, and it
9  reads, "They also contain quantitative evidence
10  showing statistical disparities in outreach and
11  education about existing loan programs and
12  eligibility; assistance with loan applications;
13  processing time for applications; loan application
14  approvals; and loan servicing"?
15      Do you see that sentence?
16   A.  Uh-huh.
17   Q.  Okay.  You're saying "yes"?
18   A.  Yes.
19   Q.  All right.  And with respect to the
20  phrase "processing time for applications," did you
21  conduct any inquiry investigation to determine what
22  disparities exist in the past ten years with respect
23  to processing time for applications?
24   A.  I believe I did.
25   Q.  Well, do you recall the results?

Page 92

1    A.  Nothing consistent.
2    Q.  Say again?
3    A.  I didn't -- I would have to look.  This was
4  seven or eight months ago at this point.  I
5  believe -- I believe I did an initial analysis of the
6  days -- the processing days.  I thought there was no,
7  like, consistent story or -- you know, there was
8  no -- the data really weren't adequate to --
9    Q.  Did you require --
10   A.  -- to make it meaningful.
11   Q.  Did you request data from the Department of
12  Agriculture with respect to processing time for
13  applications over past ten years?
14      MR. KNAPP:  Objection.  Calls for attorney
15  work product.
16      MR. ROSENBAUM:  No.
17      MR. KNAPP:  And I'd instruct --
18      MR. ROSENBAUM:  There's -- do you have a
19  case that stands for that proposition?
20      MR. KNAPP:  This is the federal rules, the
21  communications between an attorney and the expert are
22  protected as attorney work product, except to the
23  extent that it falls into one of the three
24  exceptions.
25  ///

Page 93

24 (Pages 90 - 93)

1  BY MR. ROSENBAUM:
2      Q.  Go ahead.  You can answer the question.
3          MR. KNAPP:  No.  I'm sorry.  I instructed
4  the witness not to answer the question.
5  BY MR. ROSENBAUM:
6      Q.  Did you look -- strike that.
7          Tell me what data you looked at regarding
8  processing time for applications over the past ten
9  years.
10     A.  I looked at applications; withdrawals;
11 whether the loan was approved or not; if it was
12 approved, the loan amounts; and I believe the
13 processing days.
14     Q.  Do you know for a fact that you looked at
15 the processing times?
16     A.  I did.
17     Q.  Okay.  And what data did you look at for
18 that?
19     A.  Oh, it was that same file, the USDA direct
20 loan applications from 20 -- 2000 to 2020.
21     Q.  And did they -- did that actually put down
22 the amount of time that was put with respect to each
23 application?
24     A.  Correct.  It was a number of days between
25 the application and the outcome.

Page 94

1      Q.  The -- do you see where it says, "Assistance
2  with loan applications"?
3      A.  Yes.
4      Q.  Did you conduct any inquiry investigation to
5  determine whether there were disparities in
6  assistance with loan applications?
7      A.  No.
8      Q.  To your knowledge, has USDA ever done that?
9      A.  I'm not aware.
10     Q.  With respect to disparities in outreach and
11 education about existing loan programs, do you see
12 that?
13     A.  Yes.
14     Q.  Did you conduct any investigation to see if
15 there were disparities in outreach and education
16 about existing loan programs over past ten years?
17     A.  I did not.
18     Q.  Okay.  Do you know if USDA has ever done
19 that?
20     A.  I'm not aware.
21     Q.  You talked earlier in your report about
22 different requirements for minority farmers seeking
23 loan applications, as opposed to white farmers.
24         Do you recall referencing that?
25     A.  I do.

Page 95

1      Q.  Did you conduct any investigation to see
2  whether misleading or inappropriate information was
3  provided to minority farmers as opposed to white
4  farmers over the last -- over the last ten years?
5      A.  I did not.
6      Q.  Do you know if USDA has ever done that?
7      A.  I'm not aware.
8      Q.  Regarding the data that you did talk about,
9  Dr. Robb, you told me earlier you used the phrase
10 "risk factors."
11     A.  Yes.
12     Q.  Do you know how many risk factors USDA
13 considers in the loan application process?
14     A.  I do not.
15     Q.  Did you ever make any inquiry to find out
16 what is each and every risk factor that USDA
17 considers?
18     A.  I did not.
19     Q.  Do you -- do you know -- did you receive --
20 to your knowledge, did you receive data on each and
21 every risk factor that USDA considers in the loan
22 application?
23     A.  I don't know.  I doubt it.
24     Q.  And why do you doubt it?
25     A.  Because usually the credit risk score is

Page 96

1  based on an algorithm of several, if not dozens or,
2  in the case of, you know, business credit scores, I
3  think there's, you know, dozens or hundreds of
4  factors that are in there.  So I -- I was given very
5  little -- I was given the credit score.
6      Q.  You were given the raw score?
7      A.  Correct.
8      Q.  You were not given measurements for
9  individual risk factors?
10     A.  Well, I'm sure they use things like current
11 debt, assets, revenue, firm -- farm age, things like
12 that.
13     Q.  Were you given that data?
14     A.  I'm sorry.
15     Q.  Were you specifically given that data?
16     A.  Well, I was given dataset with loan
17 application and outcome data with some of -- some of
18 those records had those data -- data fields filled
19 out, filled, and some of those were missing.
20     Q.  Do you remember how many were missing?
21     A.  A lot.
22     Q.  And when you say "a lot," what do you mean
23 by that?
24     A.  Enough to make it impossible to do
25 multi-varied regressions.

Page 97

25 (Pages 94 - 97)

1    Q.  And what is necessary to do multi-varied --
2  why don't you define what a "multi-varied regression"
3  is.
4    A.  Well, ideally when you look at
5  discrimination, you want to control for things that
6  would affect a loan outcome, and risk factors are a
7  part of that.
8        So you'd want a control for firm and
9  owner -- firm and farmer characteristics that might
10  influence a loan application being approved or
11  denied.
12    Q.  To your knowledge, does USDA have a manual
13  as to how to compute risk factors?
14    A.  The credit risk factor --
15    Q.  Yes.
16    A.  -- score?
17    Q.  Yeah.
18    A.  No.
19    Q.  You -- you know for a fact there is no such
20  manual?
21    A.  No, I don't know if there is.
22    Q.  Did you ever make any inquiry or
23  investigation to find out?
24    A.  No, I just asked for how the categories were
25  defined, which seemed to be a relevant question.

Page 98

1  strike that.
2        Do you know what the Federation of Southern
3  Cooperatives is?
4    A.  I do not.
5    Q.  Have you ever made any inquiry or
6  investigation to find out?
7    A.  I did not.
8    Q.  Okay.  Do you -- do you know if there are
9  federations or organizations or associations that
10  represent minority farmers?
11    A.  I'm aware that they exist.
12    Q.  How many?
13    A.  Oh, I don't know.
14    Q.  Did you ever do a Google search to find the
15  names about any of those organizations?
16    A.  No.
17    Q.  Did you ever make any inquiry about the
18  existence of any of those organizations?
19    A.  Well, there was mention of groups in the --
20  you know, in the various reports and documents I
21  reviewed, but nothing specific, no.
22    Q.  Do you remember the names of any of those
23  groups?
24    A.  Not that I recall.
25    Q.  Do you know the numbers of farmers that

Page 100

1    Q.  Did you -- do you know if USDA publishes any
2  guidelines as to how individual risk factors are to
3  be calculated?
4    A.  Not that I'm aware of.
5    Q.  Did you specifically inquire as to whether
6  such guidelines exist?
7    A.  No.
8    Q.  Okay.  The -- I may have asked you this
9  before, and I am sorry if I did.  Just tell me.
10        But did you -- to your knowledge, has USDA
11  ever investigated or inquired over the past ten years
12  as to how risk factors are calculated at the
13  county-office level?
14    A.  No.
15    Q.  And, to your knowledge, has the USDA ever
16  conducted any audit to determine the manner by which
17  risk factors are calculated at the county-office
18  level?
19    A.  Not that I'm aware of.
20    Q.  Okay.  Did you ever make any inquiry to find
21  out?
22    A.  No.
23    Q.  Do you -- are you aware, Doctor -- I think
24  you told me you were, but I don't want to put words
25  in your mouth -- as to whether or not -- let me

Page 99

1  those groups represent?
2    A.  I do not.
3    Q.  Did you ever make any inquiry to find out?
4    A.  No.
5    Q.  Do you know whether any of those groups have
6  documented racial discrimination over the past ten
7  years?
8    A.  I'm not aware.
9    Q.  Did you ever make any inquiry to find out?
10    A.  I did not.
11    Q.  Do you know if USDA has ever conducted any
12  systematic examination or inquiry to see whether
13  those groups or organizations have documented racial
14  discrimination in USDA loan -- loan application
15  policies and practices?
16        MR. KNAPP:  Objection.  Vague as to time.
17  BY MR. ROSENBAUM:
18    Q.  Ever.
19    A.  I've not.
20    Q.  Okay.  Every make any effort to find out?
21    A.  No.
22    Q.  Did anyone from the Department of Justice
23  say, "You should talk to some of these groups because
24  they document racial discrimination"?
25        MR. KNAPP:  Objection.  Asks for attorney

Page 101

26 (Pages 98 - 101)

1 work product. I instruct the witness not to answer.
2 BY MR. ROSENBAUM:
3    Q. You didn't get any materials that talked
4 about studies or reports or anecdotal evidence that
5 any of these groups or organizations ever compiled;
6 isn't that right?
7    A. In the past ten years?
8    Q. Yes.
9    A. Correct.
10    Q. How about prior to those ten years?
11    A. Nothing beyond what's in Appendix B of my
12 report.
13    Q. With respect to what's in Appendix B of your
14 report, did -- to your knowledge, have any of those
15 groups or organizations documented the persistence of
16 discriminatory practices that they noted?
17    A. Did who document?
18    Q. Any of those groups or organizations.
19    A. Historically, sure. Not in the last ten
20 years.
21    Q. You don't know whether they did or did not?
22    A. I do not.
23    Q. Okay. And you never made inquiry to find
24 out?
25    A. I did not.

                                        Page 102

1 inquiry to find out?
2    A. Beyond what's in those reports that are post
3 2011 in my Appendix B, those were all that I had
4 considered.
5    Q. And maybe the answer is the same thing, but
6 do you know if USDA has ever conducted any inquiry
7 investigation to determine whether those policies or
8 practices have continued over the past ten years?
9    A. I'm not aware.
10    Q. Okay.
11      Let's -- are you doing okay, Doctor?
12    A. Yeah.
13    Q. All right.
14    MR. KNAPP: We have been going for an hour
15 now, Dr. Robb, so if you want to take a break.
16    THE WITNESS: I'm okay.
17 BY MR. ROSENBAUM:
18    Q. Doctor, do you know who Alice Munnell is?
19 M-u-n-n-e-l-l.
20    A. Alice Munnell?
21    Q. Yeah.
22    A. Not that I recall.
23    Q. To -- to your knowledge, have you read any
24 reports or studies or papers authored by Alice
25 Munnell?

                                        Page 104

1    Q. I may have asked you this before; so please
2 bear with me if I did.
3      To your knowledge, the sorts of practices --
4 strike that.
5      Are you aware that in 1999 a federal judge
6 found USDA guilty of discrimination, racial
7 discrimination?
8    A. Other than that -- the four lawsuits that I
9 cite in my report, I'm not aware of other legal
10 cases.
11    Q. You're not aware one way or the other?
12    A. I'm not aware.
13    Q. Are you aware that a federal judge in one or
14 more of those lawsuits did make findings of racial
15 discrimination by USDA?
16    A. Yes.
17    Q. And do you know if the practices and
18 policies -- strike that.
19      To your knowledge, has USDA ever conducted
20 any investigation or inquiry to determine whether or
21 not the policies and practices that the federal judge
22 found to be racially discrimination -- discriminatory
23 has continued over the past ten years?
24    A. Not that I'm aware.
25    Q. Okay. Did you ever make any specific

                                        Page 103

1    A. I don't believe so.
2    Q. Okay.
3      Janelle, can you help me. Can we put in
4 front of Dr. Robb the press release.
5    MS. LI-A-PING: Yes, one second.
6    MR. ROSENBAUM: Thank you.
7      All right. Ms. Reporter, let's mark this,
8 please, as Exhibit 2 to Dr. Robb's deposition. Can
9 you tell me when that's been done?
10    (Exhibit 2 was identified.)
11    THE COURT REPORTER: It's done. Thank you.
12      I don't know if you heard me that is
13 done.
14 BY MR. ROSENBAUM:
15    Q. Dr. Robb, take as much time as you like, but
16 would you please familiarize yourself with what has
17 been marked as Exhibit 2.
18    A. Can you go to the next page?
19    Q. Say it again?
20    A. I was just asking her to move the page.
21    Q. Yeah.
22    A. Next page. Next page. Okay.
23    Q. All right. Have you had a chance to review
24 this document now?
25    A. I have.

                                        Page 105

                              27 (Pages 102 - 105)

1   Q. Have you ever seen this document before?
2   A. I have not.
3   Q. Were you aware of the creation of an Equity
4  Commission by the Department of Agriculture?
5   A. I was not.
6   Q. You were never informed about that; is that
7  right?
8   A. Correct.
9   Q. Okay. Do you see the sentence there that
10 reads, "'USDA acknowledges that we have not done
11 enough to provide all farmers and ranchers an equal
12 chance of success and prosperity, and we are striving
13 to change that,' said Agriculture Secretary Tom
14 Vilsack."
15     Do you see that?
16  A. Yes.
17  Q. Did you -- did you have any conversations
18 with the Secretary about practices of USDA towards
19 minority farmers and ranchers?
20  A. I have not.
21  Q. Okay. Did you receive any information that
22 would form the basis of the acknowledgment referred
23 to in this sentence?
24  A. I have not.
25  Q. Okay. Do you see -- do you know if the

Page 106

1 equity commission has conducted any hearings?
2   A. I think it said above in the first page that
3 they met in February?
4   Q. Yeah. But other than what you've now just
5 read, were you aware of any hearings conducted by the
6 Equity Commission?
7   A. I'm not.
8   Q. Okay. You see a list of names at the end of
9 persons who were on the Equity Commission?
10  A. I saw that.
11  Q. Okay. Can we get to that, please.
12    Do you see the name Shirley Sherrod?
13    MR. KNAPP: I believe it's on the next page,
14 Counsel.
15    MR. ROSENBAUM: Oh, thank you.
16    THE WITNESS: Shirley Sherrod. Oh, yes.
17 BY MR. ROSENBAUM:
18  Q. Do you know who Shirley Sherrod is?
19  A. I do not.
20  Q. Do you know if Shirley Sherrod has made any
21 statements regarding racial discrimination by the
22 Department of Agriculture?
23  A. I am not aware.
24  Q. Do you know if Shirley Sherrod's name came
25 up in your Google searches?

Page 107

1   A. Not that I'm aware of, no.
2   Q. You can't tell me one way or the other?
3   A. I don't think I've ever seen her name before
4 today.
5   Q. Okay. You certainly don't have any
6 recollection of that --
7   A. No.
8   Q. -- name.
9     Okay. Do you know if Shirley Sherrod has
10 made any statements specifically regarding
11 discrimination by USDA?
12  A. I'm not aware.
13  Q. Okay. And weren't supplied with any
14 statements by Shirley Sherrod or suggested that you
15 get in touch with Shirley Sherrod?
16  A. I was not.
17  Q. Okay. And going back to paragraph that I
18 was reading from, there is a next sentence that
19 says -- why don't we go back there.
20  A. She's back.
21  Q. No, no, no. I'm -- oh, okay.
22    "This commission" -- I'm reading from
23 Exhibit 2.
24    "This commission will support our work to
25 build a USDA that does not ignore or leave anyone

Page 108

1 behind as we dismantle barriers that historically
2 underserved communities have faced in accessing USDA
3 programs and services."
4     Do you see that quote attributed to
5 Secretary Vilsack?
6     MR. KNAPP: Counsel, I think you misread the
7 quotation, although it may be a transcription error
8 or a speaking error. But it says "anyone" twice, and
9 I believe you omitted the second "anyone."
10    MR. ROSENBAUM: That's my second trick
11 question.
12 BY MR. ROSENBAUM:
13  Q. Why don't you read that sentence out loud,
14 Dr. Robb.
15  A. "This Commission will support our work to
16 build a USDA that does not ignore or leave behind --
17 or leave anyone behind anyone as we dismantle
18 barriers that historically underserved communities
19 have faced in accessing USDA programs and services."
20  Q. Thank you. I put an ellipses in, but I
21 appreciate the correction.
22    Do you know what barriers Secretary Vilsack
23 was referring to?
24  A. Well, I'm assuming access to capital; access
25 to programs; access to loan servicing; you know,

Page 109

28 (Pages 106 - 109)

1 materials in native languages; staff that are
2 proficient in the languages of the farmers. Those
3 would be the main ones I would assume he's referring
4 to.
5    Q. Did you receive any information regarding
6 the existence -- specific existence of the barriers
7 you just named over the last ten years?
8    A. Not specifically, no.
9    Q. Okay. Do you know -- do you know why
10 Secretary Vilsack referred to the process of
11 dismantling those barriers as opposed to just
12 barriers that have been fully dismantled?
13       MR. KNAPP: Objection. Calls for
14 speculation about what Secretary Vilsack was
15 thinking.
16       You can answer, Dr. Robb.
17       THE WITNESS: Yeah, it's an interesting
18 choice of words. I don't know what his thought
19 process was.
20 BY MR. ROSENBAUM:
21    Q. Okay. To your knowledge, has USDA publicly
22 identified the barriers in need of dismantling,
23 referenced by Secretary Vilsack?
24    A. Well, I think access to credit is -- is one
25 barrier the farmers have.

Page 110

1 access to non-data specialists employed by USDA?
2    A. No, but I didn't ask for access.
3    Q. Okay. Let me -- when you spoke with the
4 data persons, can you tell me their names?
5    A. Not offhand. This was probably between
6 September and October or November of 2021.
7    Q. Did you have specific questions of any of
8 the -- of those persons?
9    A. Yes, about the data.
10    Q. What questions did you ask?
11       MR. KNAPP: Objection. These were attorney
12 work-product-protected conversations. I instruct the
13 witness not to answer.
14 BY MR. ROSENBAUM:
15    Q. Did you express any concerns about the data?
16    A. Yes.
17    Q. What did you say?
18       MR. KNAPP: Objection. Same objection. I
19 instruct the witness not to answer.
20       MR. ROSENBAUM: I'm not asking for the
21 content. I don't agree with these.
22       MR. KNAPP: Mark, I think the question,
23 "What did you say?" is definitely asking for the
24 content.
25 ///

Page 112

1    Q. No, I'm asking a different question.
2    A. Oh, sorry. What is your question?
3    Q. But I appreciate that comment.
4       I'm saying to you -- oh, and are you saying
5 that that's been publicly identified?
6       I want to restate the question because it's
7 getting confusing. It's my fault.
8       My question is thinking about the sentence
9 that you read to me from Exhibit 2, to your
10 knowledge, has USDA publicly identified the barriers
11 in need of dismantling that Secretary Vilsack
12 referenced?
13    A. I'm not aware of.
14    Q. Was Secretary Vilsack made available to you
15 for purposes of preparing your report?
16    A. He was not.
17    Q. Or any of his staff?
18    A. Yes. We had two or three meetings with the
19 USDA staff that were involved with the data. So --
20 the data was made available to me, yes.
21    Q. Okay. Putting aside those persons, they're
22 data specialists.
23       Do I have that right?
24    A. Correct.
25    Q. Were you -- were you -- were you given

Page 111

1 BY MR. ROSENBAUM:
2    Q. Can you tell me how many questions you had?
3    A. I don't know if there was many questions as
4 much as data requests. I think, you know, I had a
5 specific question about the -- the meaning of the
6 credit risk variable. There were problems with --
7 there were inconsistencies. So I had questions about
8 that and questions about the quality of the data.
9    Q. What were the questions about the quality of
10 the data?
11       MR. KNAPP: Again, I instruct the witness
12 not to answer about the specific content of the
13 conversations.
14 BY MR. ROSENBAUM:
15    Q. What inconsistencies were you concerned
16 about?
17    A. Well, for example, the credit score. Credit
18 risk variable is supposed to have a value between one
19 and four, and there was missing variables, there were
20 values of zero, and there were values of five. So
21 that was --
22    Q. What were you -- what were you told about
23 those inconsistencies?
24    A. I believe I was told just to ignore the
25 zeros, and the fives were actually determinations

Page 113

29 (Pages 110 - 113)

1 made after the fact.  So we dropped -- I dropped
2 those.
3       So I dropped anything with non-valid values.
4    Q.  Okay.  Dr. Robb, let's return to Exhibit 1
5 and specifically Page 107.
6    A.  Page 107?
7    Q.  Correct.
8       Is that in front of you now?
9    A.  It is.
10       And that actually answers my previous
11 question about what report it was when I was trying
12 to remember the year, and if it was GAO or OIG.  So
13 it was the 2019 GAO report I was thinking about.
14    Q.  Okay.  Do you see the bullet points there?
15    A.  Yes.
16    Q.  All right.  Okay.  As -- I'm reading to you
17 from the top line.  "As mentioned earlier in the
18 report, there are a myriad of anecdotal accounts of
19 discrimination against minority farmers in USDA loan
20 programs, including allegations that USDA officials
21 did not provide the same levels of assistance to
22 minority farmers in completing their loan
23 applications, including," and one of the bullet
24 points is "minority farmers receiving USDA loans, and
25 then having their loans arbitrarily reduced."

Page 114

1 farmers"?
2    Q.  Do you see that?
3    A.  I do.
4    Q.  Did you conduct any investigation to
5 determine whether or not those practices continued
6 within the past ten years?
7    A.  I did not.
8    Q.  To your knowledge, has USDA?
9    A.  I'm not aware.
10    Q.  You see the bullet point, the first one,
11 "USDA denying minority farmers loan applications at
12 higher rates, arbitrarily, and sometimes without
13 explanation."
14       Do you see that?
15    A.  I do.
16    Q.  Did you conduct any investigation to
17 determine whether those practices continued over the
18 past ten years?
19    A.  I did.
20    Q.  And with respect to the phrase, "Sometimes
21 without explanation," did you specifically inquire as
22 to whether that practice continued?
23    A.  No.
24    Q.  To your knowledge, has USDA?
25    A.  No.  I mean, I'm not aware.

Page 116

1       Do you see that?
2    A.  Yes.
3    Q.  All right.  Did you conduct any
4 investigation to determine whether, in the past ten
5 years, minority farmers receiving USDA loans have had
6 their loans arbitrarily reduced?
7    A.  I -- I did not.
8    Q.  Do you know if USDA has ever done that?
9    A.  I'm not aware.
10    Q.  You see the bullet point underneath that,
11 "USDA not informing minority farmers of loan
12 servicing options or providing the same levels of
13 loan servicing to minority farmers"?
14    A.  I do.
15    Q.  Did you conduct any investigation to
16 determine whether that practice was continued over
17 the past ten years?
18    A.  I did not.
19    Q.  To your knowledge, has USDA?
20    A.  I'm not aware.
21    Q.  You see the bullet point, the second
22 one, "Minority farmers receiving USDA loans that were
23 smaller, on less favorable terms, arriving too late
24 to be useful for that year's operations, and/or with
25 additional requirements not imposed on white

Page 115

1    Q.  Okay.  Do you know who Phyllis Fong is,
2 F-o-n-g?
3    A.  The name sounds familiar, but, no, I don't
4 know.
5    Q.  Okay.  Do you know what the Inspector
6 General for the USDA Office of Civil Rights is?
7    A.  Yes.
8    Q.  Did you have -- I take it you're not -- you
9 don't recall any conversation you had with Phyllis
10 Fong; is that right?
11    A.  I did not have any conversations with her.
12    Q.  Did you have any conversation with anybody
13 in the USDA Office of Civil Rights regarding racial
14 discrimination against minority farmers seeking
15 origination loans or loan servicing?
16    A.  I did not.
17    Q.  Did you read any materials prepared by that
18 office in the last ten years, regarding racial
19 discriminatory practices?
20    A.  I did not.
21    Q.  Do you know if any such reports were
22 prepared?
23    A.  I'm not aware.  I think that was one of the
24 things I was looking for in the -- when my -- in my
25 search, but I did not find anything.

Page 117

30 (Pages 114 - 117)

1  Q. Okay.
2     MR. KNAPP: Mark, I wonder if we could take
3  a break at this time, or --
4     MR. ROSENBAUM: Sure.
5     MR. KNAPP: -- if you have a few more
6  questions in this line.
7     MR. ROSENBAUM: Let me just ask one or two
8  more questions.
9     MR. KNAPP: Sure.
10    MR. ROSENBAUM: And then we'll take a break.
11 BY MR. ROSENBAUM:
12 Q. Do you know what the Harvard Law School Food
13 Law & Policy Clinic is?
14 A. I've heard of them. I'm not really familiar
15 with them, no.
16 Q. Do you know if the Harvard Law School Food
17 and Law -- Food Law & Policy Clinic conducted any
18 investigation or issued any report regarding
19 discriminatory practices in the USDA complaint
20 process?
21 A. Not that I'm aware of.
22 Q. You weren't provided with any such report;
23 is that right?
24 A. I was not, that I'm aware of.
25 Q. Do you -- this is my last one, by the way.
*Page 118*

1     Do you -- are you aware of any findings by
2  USDA regarding whether the office of -- of the
3  Assistant Secretary for Civil Rights processes civil
4  rights complaints in a timely and thorough manner?
5  A. I'm aware of reports about the untimeliness
6  in processing historically. I'm not aware of
7  anything recently.
8  Q. And by "recently," do you mean within the
9  last ten years?
10 A. Correct. Unless -- the GAO report might
11 have had -- yeah, I don't recall.
12 Q. Okay.
13    Why don't we take a break here. Mike, how
14 long do you want?
15    THE VIDEOGRAPHER: Going off the record.
16 The time is 12:16. This is the end of Media
17 Number 2.
18    (Noon recess taken.)
19    THE VIDEOGRAPHER: We're back on the record.
20 This is the beginning of Media Number 3 in the
21 deposition of Dr. Alicia Robb. The time is 1:00 P.M.
22 Mountain Time.
23    MR. ROSENBAUM: Okay. Back on the record.
24 Ms. Reporter, are you doing okay?
25    THE COURT REPORTER: I am. Thank you.
*Page 119*

1 BY MR. ROSENBAUM:
2  Q. And, Dr. Robb, are you doing okay?
3  A. Yep. I'm good.
4  Q. You're aware you're still under oath?
5  A. Yep.
6  Q. You talked to me before the break about
7  processing time data; correct?
8  A. Yes.
9  Q. Can you show me where in your report,
10 please, which has been marked as Exhibit 1, you
11 discuss processing time data after 2010?
12 A. I don't.
13 Q. And where -- where did you discuss
14 processing time data prior to 2010, in your report?
15 A. Just citing some anecdotal reports of longer
16 processing times for minority farm applicants.
17 Q. And -- and --
18 A. It was within the report.
19 Q. Can you conclusively tell me that the
20 processing time disparities that you noted in terms
21 of prior to 2010 do not continue today?
22 A. Well, I remember the average processing days
23 decline for all groups, but as far as differences
24 across groups, it was, you know, mixed. So there was
25 no consistent --
*Page 120*

1  Q. So there are some groups that the processing
2  time data disparities that you -- that previously
3  existed continue today; is that correct?
4  A. I'd have to look at the data, but I didn't
5  include it because there was no clear evidence of
6  higher --
7  Q. But that's not exactly my question. My
8  question is --
9  A. Oh, sorry.
10 Q. -- with respect to some groups, can you
11 conclusively rule out that the disparities that
12 previously existed do not exist today?
13 A. No.
14 Q. Okay. Do you know which groups those are?
15 A. Not offhand.
16 Q. All right.
17 A. I'd have to look, yeah.
18 Q. Let me direct you, please, to Paragraph 40
19 of Exhibit 1, your report.
20    Can you get that in front of you, please.
21    MR. KNAPP: Do you mean Page 40?
22    MR. ROSENBAUM: I do mean Page 40.
23 BY MR. ROSENBAUM:
24 Q. Do you have that in front of -- oh, boy.
25 A. I see it.
*Page 121*

31 (Pages 118 - 121)

1   Q.  Okay.  And, again, read as much as you'd
2  like in terms of context, but I'm looking at the
3  first full paragraph.
4       "These efforts may have addressed some of
5  the underlying problems of USDA discrimination
6  against minority farmers and somewhat improved their
7  situations with respect to certain metrics.  It is
8  apparent, however, that these and other efforts,
9  including the payments made to minority farmers
10  through the various claims processes, have not fully
11  remedied the problematic effects of decades of USDA
12  discrimination.  This is evidenced by several metrics
13  that continue to show that minority farmers suffering
14  the lingering effects of past discrimination in
15  USDA's loan programs."
16       Do you see that paragraph?
17   A.  I do.
18   Q.  Could another explanation be for the metrics
19  that you referred to that discrimination has
20  continued to the current time?  Is that another
21  possible explanation?
22   A.  It's possible.
23   Q.  Okay.  Are you familiar, Doctor, with -- are
24  you familiar with the USDA loan application itself?
25   A.  Yeah, I do believe at the very beginning of

Page 122

1  this process, I did take a look at a .pdf of an
2  application.
3   Q.  Okay.
4   A.  Blank -- a blank one.
5   Q.  Okay.
6       And why don't we make Exhibit 3, FSA-2001.
7  Loan Application, FSA-2001.
8       (Exhibit 3 was identified.)
9  BY MR. ROSENBAUM:
10   Q.  Do you see that?
11   A.  I do.
12       MR. ROSENBAUM:  All right.  So could the
13  reporter please mark that as Exhibit 3.
14       THE COURT REPORTER:  So marked.
15  BY MR. ROSENBAUM:
16   Q.  Is this the form that you looked at?
17   A.  Probably.  This is a request for direct loan
18  assistance.  Maybe can you scroll down?
19   Q.  Yeah.
20   A.  To the actual loan.
21       Yes.  Okay.  Uh-huh.
22   Q.  Okay.  And as -- as we see here on
23  Exhibit 3, there are numerous blanks to be filled
24  out.
25       Do I have that right?

Page 123

1   A.  Yes.
2   Q.  And the data that you received, did the
3  dataset contain a field for every application
4  question?
5   A.  No.
6   Q.  Do you know what percentage of the data --
7  strike that.
8       With respect to the dataset you received, do
9  you know what percent of the blanks were, in fact,
10  filled out on the dataset you got?
11   A.  Can you repeat the question?
12   Q.  Sure.
13       You told me that the dataset you received
14  contains -- did not contain a field for every
15  application question.
16   A.  Correct.
17   Q.  Can you give me some sense of the numbers of
18  fields that were missing on the application -- on the
19  dataset that you received?
20   A.  That -- that are on the application?
21   Q.  Yeah.
22   A.  Well, I mean, for example, we don't have the
23  farmer name, address, email address, phone number,
24  employer.  This is an anonymized dataset that just
25  has the loan application and so forth.

Page 124

1       If you scroll down, I can look at what the
2  other stuff is that they're asking.
3       Yeah.  So, like, there was, I believe,
4  citizen -- so I believe, like, 10, 11 -- I'd have to
5  look.  But, obviously, race and gender and ethnicity
6  were on there.  I believe citizenship was on there.
7       Scroll down.
8   Q.  Why don't we scroll down to Part D.
9       Do you see that?  Part D, Doctor?
10   A.  Yes.
11   Q.  Was the data -- was the dataset you received
12  contain a field for every field that's on Part D?
13   A.  Amount requested was.  There was some -- I
14  don't remember if there was one or two variables
15  about acreage.
16       "Purpose of loan," there was a variable that
17  you know, delineated between farm ownership loan or
18  operating loan and some other various metrics, like
19  length of loan, et cetera.
20       So there was probably, I don't know, 25
21  values for that variable, which is for, you know,
22  purpose of loan.  I don't remember county on there,
23  but it could be.
24   Q.  So help me understand this.  Would --
25  looking at entries 1, 2, 3, 4-A, 4-B, 5-A, 5-B, and

Page 125

32 (Pages 122 - 125)

1 6, my question is did the datasets that you
2 received -- the dataset you received contain a field
3 for -- in every -- for one?
4     A. I don't remember. I mean, if you bring up
5 the Excel spreadsheet you got, I got the same dataset
6 you did.
7     Q. Okay. So if I look at that Excel sheet and
8 there's something missing, that means you didn't get
9 it?
10    A. So there's two kinds of missingness.
11 There's variables that are entirely not there, which
12 is one kind of missing. Like, for example, name of
13 farmer, that's not going to be there.
14        There's another missingness, which means the
15 value is sometimes missing for certain observations.
16 So amount requested is a variable that's on that
17 dataset, and I think it's pretty complete, but I'd
18 have to look. So there's different levels of
19 missingness.
20    Q. All right. In terms of 1 on Part D, was it
21 complete, as you described it?
22    A. I don't remember county.
23    Q. What about 2? Was that complete?
24 100 percent complete?
25    A. There was an acres variable on there. I
Page 126

1 processing days, everything, credit score, all of
2 them -- all the variables were missing in some
3 records in some cases.
4     Q. Okay. What about -- and that includes 6,
5 description of operation on Part D?
6     A. You know, I don't remember if there was
7 description of operation on this loan level dataset.
8 It was -- they used a different NAIC code. So NAIC
9 code, which shows what sector it is, if it's cattle
10 farming or fruit trees or chickens or dairy or
11 whatever.
12        So that kind of description was the variable
13 that was on that dataset.
14    Q. Got it.
15        But there was some missingness for that
16 entry field as well; right?
17    A. Correct.
18    Q. Okay. Did you make any attempt to get
19 100 percent completion of data for every field in
20 Part D?
21    A. For the variables that are on the dataset,
22 yes.
23    Q. And what happened when you tried to do that?
24    A. The USDA said that they weren't able to
25 provide that -- those data.
Page 128

1 don't remember two of them being on there, but there
2 might have been.
3     But, no, nothing -- nothing was completely
4 complete, meaning there was no missingness at all.
5     Q. So all the entries on Part D, all the
6 fields?
7     MR. KNAPP: Objection. Vague.
8     MR. ROSENBAUM: I'll start it over.
9     Could -- could the reporter read me back
10 Dr. Robb's last answer, please.
11     (Record read.)
12     MR. ROSENBAUM: Okay.
13     THE WITNESS: So most the variables had some
14 missingness. But there's some -- like, I don't know
15 what the difference between what 4-A is and 5-A is.
16 Does that mean they're applying for two different
17 loans here? And if so, there was -- that would be
18 two lines on this dataset, from my understanding of
19 the dataset, because each line -- each record in that
20 dataset was one loan application.
21 BY MR. ROSENBAUM:
22    Q. And when you say "some missingness," tell me
23 what you mean by that?
24    A. So all of the variables on the dataset --
25 you know, sector, acres, revenues, farmage,
Page 127

1     Q. Did they say why?
2     A. They said that there was not one source for
3 all of the data in the dataset; that they had to pull
4 data from different datasets from different computer
5 systems from different areas based on which -- what
6 the variables were and what time frame it was. And
7 so the dataset they gave me was the best that they
8 could do.
9     Q. Could you go to Part E, please.
10        And did you -- did the dataset you received
11 contain a field for every question asked in Part E?
12    A. I don't recall.
13    Q. Did you receive a -- field with complete
14 data for Question 3 on Part E?
15    A. I -- I don't recall. If you pull up the
16 dataset, I can look at the variables on there.
17    Q. What about Question 4?
18    A. I don't recall.
19    Q. Or 5, 6, or 8?
20     MR. KNAPP: Compound. Objection.
21     You can answer, Dr. Robb.
22     THE WITNESS: I believe a variable relating
23 to Number 8 was on there.
24 BY MR. ROSENBAUM:
25    Q. You're not 100 percent certain?
Page 129

33 (Pages 126 - 129)

1    A. Not -- I'm not certain.  It's been a long
2 time since I looked at those data.  Sorry.
3    Q. What about 5?
4    A. I don't recall.
5    Q. What about 6?
6    A. I don't recall.
7    Q. Did your analysis analyze data from each and
8 every field in the dataset you received?
9    A. It --
10    MR. KNAPP:  Objection.  Vague as to which
11 analysis.
12    THE WITNESS:  Good point.
13 BY MR. ROSENBAUM:
14    Q. The analysis for your report.
15    A. No, it did not.
16    Q. Why is that?
17    A. Well, the main things I look -- I used from
18 that dataset for the report were the application
19 rates, the withdrawal rates, the approved and denied
20 outcome, and the credit risk.
21    So those were the variables I used in the
22 report -- for the report.
23    Q. I think you just answered it for me.  When
24 you say "the main thing," those were, in fact, the
25 variables you used?

Page 130

1    A. Correct.
2    Q. Okay.
3    A. Well, I'm sorry.  And then I also obviously
4 used farmer, race, and ethnicity.
5    Q. Yeah.  Thank you.
6    Mike, let me just have one more consultation
7 with the team.  I don't expect this to go much
8 longer.  I just want to check some boxes with them.
9    Is that okay?
10    MR. KNAPP:  Yeah.  Ten minutes?
11    MR. ROSENBAUM:  Sure.
12    MR. KNAPP:  Okay.
13    THE VIDEOGRAPHER:  Going off the record.
14 The time is 1:19 P.M.
15    (Recess taken.)
16    THE VIDEOGRAPHER:  We're back on the record.
17 The time is 1:24 P.M.
18 BY MR. ROSENBAUM:
19    Q. All right.  Are you doing okay, Dr. Robb?
20    A. Yep.
21    Q. Dr. Robb, do you know what a data dictionary
22 is?
23    A. Do I know what a data dictionary is?
24    Q. Yeah.
25    A. Yes.

Page 131

1    Q. What is a data dictionary?
2    A. It's a list of variables in a dataset and
3 the description of what the variable is.
4    Q. Were you provided a data dictionary for
5 purposes of your work?
6    A. I was.
7    Q. Okay.  Did you utilize it?
8    A. Yes.
9    Q. Okay.  Going back to what we were talking
10 about before this last break.
11    We just went through the direct loan
12 application, FSA-2001.  Do you recall that?  We went
13 through parts of it?
14    A. The one we're looking at right now?
15    Q. Yeah.
16    A. Yes.
17    Q. Okay.  You're aware that there are other
18 loan application types -- loan application types?
19    A. I didn't hear you.  A word that --
20    Q. You're aware that there are other
21 application types that relate to the loan processing
22 that USDA does?
23    A. In terms of kinds of loans?
24    Q. Yeah.
25    A. Yes.

Page 132

1    Q. And if I ask you the same questions that we
2 just went through, would your answer be the same with
3 respect to missingness and fields?
4    A. Yes.  I was given guaranteed loan data
5 applications as well.
6    Q. And same answers that you gave me before?
7    A. Yeah, I mean, there was, you know,
8 obviously -- so -- so just to be clear, when I asked
9 for a dataset, I didn't ask for the loan
10 applications.  I asked for a dataset that had various
11 variables.
12    So I requested things like assets, receipts,
13 acreage, industry, farmer, race, gender, ethnicity,
14 state, type of collateral, credit score.  I didn't --
15 so I'm not expecting every single field from this
16 farm application loan -- farm loan application to be
17 in the dataset I requested, because I requested a set
18 of variables for each loan application.
19    Q. Okay.  And was -- was there data that you
20 did request that you did not receive?
21    A. So I asked for data from 2000 to 2020, and
22 some of the variables were not available from 2000 to
23 2009 that were available from 2010 to 2020.  So there
24 was a higher level of missingness in the data prior
25 to 2011.

Page 133

34 (Pages 130 - 133)

1    Q.  Okay.  And just -- just to clarify:  You
2  talked to me about two types of missingness.  One was
3  missing variables in the dataset, and the other was
4  missing values for the individual records.
5        Do I have that right?
6    A.  (Witness nods head.)
7    Q.  Is that a "yes"?
8    A.  Yes.
9    Q.  And the testimony that you're talking to me
10  about is that there were missing variables in the
11  dataset.
12        Do I have that right?
13    A.  There was missingness in the data.  So there
14  was missingness in the values.  So some of the
15  variables did not have values in the data.
16        The variables themselves were variables that
17  I requested.  So there was no missing variables.  The
18  ones I requested were --
19    Q.  But there are missing variables with respect
20  to the application that you and I just went through?
21    A.  Correct.
22        But they're not missing in the sense that I
23  asked for them, and they didn't provide them.  I
24  didn't ask for them.
25    Q.  Got it.  Got it.  Got it.

*Page 134*

1        THE VIDEOGRAPHER:  We're back on the record
2  at 1:45 P.M., and we're going off the video record at
3  1:45 P.M. Mountain, and this concludes today's
4  testimony given by Dr. Alicia Robb.  The total number
5  of media units used was three, and will be retained
6  by Veritext Legal Solutions.
7        Thank you, all, and please state on the line
8  for orders or spellings the reporter has.
9        THE COURT REPORTER:  And I just wanted to
10  confirm that you wanted the final transcript
11  delivered overnight?
12        MS. LI-A-PING:  Yes, can we have an
13  overnight transcript.
14        THE COURT REPORTER:  And both sides wanted
15  copies, I'm assuming?
16        MR. KNAPP:  Yes, please.
17        THE COURT REPORTER:  All right.  Thank you,
18  everyone.
19
20        (Whereupon, the foregoing deposition was
21  concluded.  Total time on the record was 3 hours, 12
22  minutes.)
23
24
25

*Page 136*

1        Okay.  Doctor, I don't have any further
2  questions.  I appreciate your time and willingness to
3  talk with us today.  Thank you.
4        MR. KNAPP:  If -- if we could take, let's
5  say, ten minutes just so I can go over my notes, and
6  then I don't anticipate having many questions.
7        THE VIDEOGRAPHER:  Going off the record.
8  The time is 1:30.
9        (Recess taken.)
10        THE VIDEOGRAPHER:  We're back on the record.
11  The time is 1:41 P.M.
12        MR. KNAPP:  I have no questions for
13  Dr. Robb.
14        MR. ROSENBAUM:  Okay.
15        MR. KNAPP:  I believe the deposition is
16  concluded.
17        THE VIDEOGRAPHER:  Okay.  Then we're off --
18        MR. ROSENBAUM:  Mike, can we just -- so
19  we're off the record for a second.
20        THE VIDEOGRAPHER:  Do we want to end the
21  deposition or just go off the record, Counsel?
22        MR. ROSENBAUM:  Let's hold it for a moment.
23        THE VIDEOGRAPHER:  Okay.  Going off the
24  record.  The time is 1:42.
25        (Recess taken.)

*Page 135*

1        I, ALICIA M. ROBB, PH.D., the deponent in the
2  above deposition, do hereby acknowledge that I have
3  read the foregoing transcript of my testimony, and
4  state under oath that it, together with any attached
5  Amendment to Deposition pages, constitutes my sworn
6  testimony.
7
8  _____ I have made changes to my deposition
9  _____ I have NOT made any changes to my deposition
10
11
                      _____
12        ALICIA M. ROBB, PH.D.
13
14
        Subscribed and sworn to before me this_____
15
        day of _____, 20_____.
16
17
18        My Commission expires: _____
19
20        _____
        Notary Public
21
22        _____
        Address
23
24
25    Job No. TX5308654

*Page 137*

35 (Pages 134 - 137)

FEDERATION MSJ APP. 133

1          REPORTER'S CERTIFICATE
2
3       I, JENNIFER L. SMITH, California CSR No.
4  10358, Washington CCR NO. 3101, RMR, CRR, CRC, and
5  Notary Public within and for the State of Colorado,
6  commissioned to administer oaths, do hereby certify
7  that previous to the commencement of the examination,
8  the witness was duly sworn by me to testify the truth
9  in relation to matters in controversy between the
10  said parties; that the said deposition was taken in
11  stenotype by me at the time and place aforesaid and
12  was thereafter reduced to typewritten form by me; and
13  that the foregoing is a true and correct transcript
14  of my stenotype notes thereof.
15      That I am not an attorney nor counsel nor in
16  any way connected with any attorney or counsel for
17  any of the parties to said action nor otherwise
18  interested in the outcome of this action.
19      My commission expires:  February 7, 2026
20
21      Jennifer L. Smith
22      JENNIFER L. SMITH
        CA CSR NO. 10358
23      WA CCR NO. 3101
        RMR, CRR, CRC,
24      and Notary Public
25      Job No. TX5308654

Page 138

1  Michael Knapp Esq.
2  michael.f.knapp@usdoj.gov
3          July 8, 2022
4  RE:   Miller, Sid, Et Al. v. Vilsack, Tom, Et Al.
5     7/7/2022, Dr. Alicia Robb (#5308654)
6     The above-referenced transcript is available for
7  review.
8       Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 140

1  RE: COST CERTIFICATE
2  DEPOSITION OF: Dr. Alicia Robb
3  5308654
4  7/7/2022
5  Cause No: 4:21-cv-00595-O
6  Miller, Sid, Et Al. v. Vilsack, Tom, Et Al.
7      Enclosed for filing, please find the
8  required certification pages and witness
9  signature pages for the deposition referenced
10  above was/was not returned.
11      Please note that $_____ is the
12  deposition officer's charges to the
13  Intervenor for preparing the original
14  deposition and any copies of exhibits.
15      Thank you for your prompt attention to this
16  matter.
17
18  Sincerely,
    Veritext Legal Solutions
19  Firm Registration No. 571
    300 Throckmorton Street, Suite 1600
20  Fort Worth, Texas  76102
    cs-tx@veritext.com
21
22
23
24
25

Page 139

**[& - 9:48]**

**&**

**&**   2:9,12 6:21
118:13,17

**0**

**00595**   1:7 5:19
139:5

**1**

**1**   3:10 5:13 14:20
14:21 15:3,11
18:23 19:12,12,13
49:23 51:7 67:15
114:4 120:10
121:19 125:25
126:20
**10**   3:5 20:15 125:4
**100**   126:24 128:19
129:25
**1005**   30:10 77:5
**101**   3:20
**10358**   4:7 138:4,22
**105**   3:11
**107**   114:5,6
**10:47**   67:16
**11**   36:24 38:10
125:4
**1100**   2:18
**112**   3:21,21
**113**   3:22 18:17
**12**   136:21
**12008**   2:18
**122**   3:14
**12:16**   119:16
**13**   3:18,20
**14**   3:10 46:19
64:23,24
**15**   20:16,17
**16**   3:21
**1600**   139:19
**17**   3:17,19

**19**   3:18
**1901**   2:10
**1999**   103:5
**1:00**   119:21
**1:19**   131:14
**1:24**   131:17
**1:30**   135:8
**1:41**   135:11
**1:42**   135:24
**1:45**   136:2,3

**2**

**2**   3:11 24:2,20,21
25:24 51:8 67:19
105:8,10,17
108:23 111:9
119:17 125:25
126:23
**20**   3:20 20:16,17
63:17 71:23 94:20
137:15
**2000**   26:22 63:17
94:20 133:21,22
**20005**   2:18
**2000s**   29:24
**2001**   3:14 123:6,7
132:12
**20036**   2:10
**2007**   33:6
**2009**   133:23
**2010**   31:22 32:16
33:7 34:1,3,15,22
84:8 120:11,14,21
133:23
**2011**   21:10 23:15
23:21,23 25:20
26:10,18 29:25
30:1 33:2 37:22
40:2 42:1 45:5,10
45:17 65:16 82:11
83:14 104:3
133:25

**2012**   25:24
**2013**   34:5
**2017**   34:5 83:8
**2018**   83:5
**2019**   83:3,8 114:13
**202**   2:11,19
**2020**   26:22 63:17
83:1 94:20 133:21
133:23
**2021**   15:14 47:12
57:6 76:4 82:22
112:6
**2022**   1:18 4:6 5:5
140:3
**2026**   138:19
**21**   3:18
**213**   2:7,14
**22**   3:17,18
**25**   125:20
**26961**   138:21
**282-5000**   2:11
**29**   3:19

**3**

**3**   3:14 24:20,22
25:13,24 119:20
123:6,8,13,23
125:25 129:14
136:21
**30**   49:3 54:18
71:23 76:14
140:17
**300**   139:19
**3101**   4:7 138:4,23
**333**   2:13
**36**   3:19
**38**   84:2 92:4
**385-2977**   2:7

**4**

**4**   27:19 31:15 32:1
125:25,25 127:15

**129:17**
**40**   121:18,21,22
**45**   49:3 54:18
76:14
**4:21**   1:7 5:19
139:5

**5**

**5**   3:19 36:10
125:25,25 127:15
129:19 130:3
**514-2071**   2:19
**5308654**   139:3
140:5
**571**   139:19

**6**

**6**   126:1 128:4
129:19 130:5
**60s**   21:10 66:9
**610**   2:6
**615-1700**   2:14

**7**

**7**   1:18 3:22 4:6 5:5
138:19
**7/7/2022**   139:4
140:5
**76102**   139:20
**7th**   15:22

**8**

**8**   129:19,23 140:3

**9**

**9**   3:21
**90005**   2:6
**90071**   2:14
**93**   3:20
**97**   82:10
**9:11**   4:5 5:4
**9:40**   28:2
**9:48**   28:5

Page 1

[a.m. - application]

| a | | | |
|---|---|---|---|
| **a.m.** 4:5 5:4 67:21 | **administered** 9:5 11:13 | **allegations** 59:10 114:20 | 130:23 |
| **able** 74:18 88:19 128:24 | **administering** 25:16 | **allotted** 140:20 | **answering** 11:8 |
| **access** 109:24,24 109:25 110:24 112:1,2 | **affect** 43:4 98:6 | **alternative** 8:12 | **answers** 11:23 42:12 114:10 133:6 |
| **accessing** 109:2,19 | **affiliations** 6:7 | **ambiguous** 18:4 | **anticipate** 135:6 |
| **account** 80:20 | **affirmative** 70:15 | **amendment** 137:5 | **anybody** 20:5 69:17 70:7 117:12 |
| **accounts** 114:18 | **aforementioned** 84:4 | **american** 3:11 25:25 30:10 40:22 64:19 | **anybody's** 7:7 |
| **accuracy** 140:9 | **aforesaid** 138:11 | **amount** 94:22 125:13 126:16 | **apologize** 45:12 56:3 |
| **acknowledge** 8:25 137:2 | **age** 97:11 | **amounts** 94:12 | **apparent** 122:8 |
| **acknowledges** 106:10 | **ago** 11:12 20:10,11 20:14 28:21 31:5 34:9 45:23 48:22 54:17 57:12 68:10 71:23 74:9 75:8 91:18 93:4 | **analyses** 52:3 | **appearance** 6:5 |
| **acknowledgment** 106:22 140:12 | | **analysis** 51:19,21 82:19 93:5 130:7 130:11,14 | **appearances** 2:1 6:7 |
| **acquaintances** 69:5 | **agree** 5:11 9:4,14 9:15,16,17,19 112:21 | **analyze** 130:7 | **appeared** 91:24 |
| **acreage** 125:15 133:13 | **agreement** 9:11,12 | **analyzed** 86:8 | **appendices** 91:11 |
| **acres** 126:25 127:25 | **agriculture** 1:10 10:22,23,23 19:14 19:15,25 20:3,6 25:20 27:3 28:11 33:18 65:14 93:12 106:4,13 107:22 | **andrew** 2:9 | **appendix** 22:24 23:20 26:2 34:7 42:2 45:8 46:13 50:17 51:18,24 83:6 87:6 88:23 89:24 102:11,13 104:3 |
| **act** 25:25 64:20 | | **anecdotal** 19:16 44:23 45:4,15 102:4 114:18 120:15 | |
| **action** 6:1 50:3 58:24 138:17,18 | **ahead** 22:11 41:14 55:22 56:15 68:9 75:22 94:2 | **angeles** 2:6,14 6:14 | **applicable** 140:8 |
| **actions** 52:24 | | **announce** 6:16 | **applicant** 26:21 |
| **actual** 123:20 | **al** 1:5 5:16,16 139:6,6 140:4,4 | **announces** 3:12 | **applicants** 120:16 |
| **add** 59:2,3 68:2 | **alex** 14:4 | **anonymized** 124:24 | **application** 3:14 25:6 42:13 62:14 69:17 70:8,9 73:7 74:21 75:4,5 77:7 81:2,20 82:8 92:13 94:23,25 96:13,22 97:17 98:10 101:14 122:24 123:2,7 124:3,15,18,20,25 127:20 130:18 132:12,18,18,21 133:16,16,18 134:20 |
| **addition** 25:7 52:14 | **algorithm** 97:1 | **answer** 3:15 12:13 18:5,8 21:22 22:17 29:19 35:15 36:8 46:7,11 61:17 70:14 86:2 89:17 94:2,4 102:1 104:5 110:16 112:13,19 113:12 127:10 129:21 133:2 | |
| **additional** 25:9 115:25 | **alice** 104:18,20,24 | | |
| **address** 52:25 124:23,23 137:22 | **alicia** 1:17 3:4 4:3 5:14 9:23 67:20 119:21 136:4 137:1,12 139:2 140:5 | | |
| **addressed** 122:4 | | | |
| **adequacy** 85:24 | | **answered** 36:12 45:11 56:13 | |
| **adequate** 93:8 | | | |
| **administer** 5:25 138:6 | | | |

Page 2

[applications - b]

**applications** 25:5 25:6 26:25 27:1,4 27:6,9,13,14 35:11 35:17,22,23 39:12 42:6 43:13 46:2 59:20,21 63:17 68:21 69:5,11,21 72:16,18 75:1 77:3 78:16 82:20 90:15 92:12,13,20 92:23 93:13 94:8 94:10,20 95:2,6,23 114:23 116:11 133:5,10
**applied** 46:9 57:14 70:11 72:12 73:8 78:2,13
**apply** 78:18,22 81:20,22
**applying** 127:16
**appreciate** 109:21 111:3 135:2
**appropriate** 4:2 12:4,10 19:7
**approval** 38:13 39:5 59:20
**approvals** 25:6 78:13 92:14
**approve** 42:5 74:24
**approved** 75:2 77:8 81:20 94:11 94:12 98:10 130:19
**approximate** 73:10
**approximately** 49:2
**arbitrarily** 114:25 115:6 116:12

**ardmore** 2:6
**areas** 55:9 76:20 129:5
**argumentative** 41:12
**arrangement** 9:9
**arriving** 115:23
**article** 91:2
**articles** 51:17 90:8 90:9
**articulating** 69:22
**aside** 111:21
**asked** 13:17,18 16:24 24:7,16,18 26:22 31:13 35:20 37:21 38:7 45:12 56:13 58:21 69:8 69:20 70:10,12,19 71:9,13 75:18 86:15,18 98:24 99:8 103:1 129:11 133:8,10,21 134:23
**asking** 10:24 14:10,18 18:1,12 26:15 37:5 49:18 66:12 70:5 72:15 78:3 80:4 89:10 89:10 105:20 111:1 112:20,23 125:2
**asks** 101:25
**assert** 8:16
**asset** 37:2
**assets** 97:11 133:12
**assignment** 90:10
**assistance** 25:4 92:12 95:1,6 114:21 123:18

**assistant** 119:3
**associated** 54:14 55:1 64:10 71:17 72:1
**associations** 100:9
**assume** 20:11 43:22 86:16 110:3
**assuming** 11:7 86:14 109:24 136:15
**assumption** 74:25
**atauber** 2:11
**attached** 137:4 140:11
**attempt** 128:18
**attempted** 47:5
**attention** 8:10 18:22 19:11 20:20 24:2,19 29:15 31:15,19 35:3 36:23 64:22 92:4 139:15
**attorney** 2:16 6:8 6:15 7:4 16:23 21:21 23:16 29:18 36:7 93:14,21,22 101:25 112:11 138:15,16 140:13
**attorneys** 21:23
**attributed** 109:4
**audio** 5:10 61:5
**audit** 41:21 44:20 83:14 99:16
**auditor** 84:23
**audits** 41:18 55:25 63:5 66:10 82:11 84:25 91:7
**august** 16:2 58:20
**authored** 31:4 104:24

**authorized** 5:25
**available** 41:19 111:14,20 133:22 133:23 140:6
**avenue** 2:6,13
**average** 120:22
**aware** 11:25 26:3 27:5,8,11 28:9,14 28:23 29:3 31:6 35:16 36:1 37:18 37:22,25 38:2 42:3 43:16 45:19 47:7 48:15 51:24 53:6,7,9 54:4,6 57:20,21 58:4 59:16 63:23 64:7 64:12 65:23 66:4 67:6,25 68:24 71:6 82:25 83:2,4 83:13,25 84:22 85:4,14,18 86:6,11 91:9,22 95:9,20 96:7 99:4,19,23 100:11 101:8 103:5,9,11,12,13 103:24 104:9 106:3 107:5,23 108:1,12 111:13 115:9,20 116:9,25 117:23 118:21,24 119:1,5,6 120:4 132:17,20

**b**

**b** 22:24 23:2,20 26:2 29:11 34:7 42:2 45:8 46:13 50:17 51:18 83:6 87:6 89:24 102:11 102:13 104:3 125:25,25

Page 3

[back - circumstances]

back   16:6,16 17:4
28:4 49:13,14
58:15 61:5,8 66:9
67:18 74:18 90:19
108:17,19,20
119:19,23 127:9
131:16 132:9
135:10 136:1
backed   56:19
bankers   79:8
banks   37:10,16,22
barrier   110:25
barriers   109:1,18
109:22 110:6,11
110:12,22 111:10
bartering   76:18
based   59:14 74:2
97:1 129:5
basically   58:21
basis   46:11 59:7
106:22
bear   103:2
beckham   91:3
beckman   91:3
beginning   6:8
67:19 119:20
122:25
behalf   6:10 7:2,4
7:11,14 8:22
believe   12:3 15:9
16:1,11 22:24
28:13 29:9,12
33:5 34:4 38:18
38:19 40:3 45:18
46:3,8 48:9,22
49:11 50:2,11,21
59:25 64:1,2 66:1
66:25 68:11 69:20
70:10,12,15 72:25
74:20 80:9 82:10
83:8,21 92:24

93:5,5 94:12
105:1 107:13
109:9 113:24
122:25 125:3,4,6
129:22 135:15
believed   72:17
79:1
berkman   28:13,19
28:22 29:1,7,11
30:16
berkman's   29:23
best   17:22 18:19
18:20 20:14 49:25
58:18 129:7
beyond   35:14 63:4
73:19 85:10 91:6
91:15 102:11
104:2
bills   76:19
bit   75:6
black   40:17
blank   123:4,4
blanks   123:23
124:9
book   90:3
booklet   11:22,22
12:3
books   51:14
borrower   81:21
boxes   131:8
boy   121:24
branch   2:16
break   7:9 8:13
27:22 42:17 49:21
67:9 104:15 118:3
118:10 119:13
120:6 132:10
brief   8:19
briefly   10:15 13:2
13:4,5,8 28:19
30:18 31:1

bring   8:10 12:18
29:14 126:4
broad   62:10
broadly   62:11
build   108:25
109:16
bullet   114:14,23
115:10,21 116:10
business   39:14
56:18,20 97:2

c

c   5:1
ca   2:6,14 138:22
calculated   99:3,12
99:17
california   4:6
57:10 138:3
call   48:6,7,16
72:21 81:20
called   4:4 48:8,12
48:14 53:16 57:9
89:8
calls   16:22 17:25
21:21 23:16 29:18
36:7 68:5 93:14
110:13
camera   5:7
camiscoli   2:5 6:23
6:24 9:18,19
capacity   1:9
capital   56:19
109:24
career   20:6
carried   33:17 66:3
66:7 67:5 83:24
carries   24:21
case   5:18 8:3
10:20 12:8 15:8
17:12 30:6,8,15
50:8,13 51:1 52:3
52:18,23 57:22

58:4 60:2 86:15
93:19 97:2
cases   51:4 52:4
53:4,8,10 54:10,14
61:14 103:10
128:3
catalyst   2:5 6:24
categories   98:24
cattle   128:9
cause   139:5
caused   74:19
ccr   4:7 138:4,23
centralized   38:13
38:19
certain   52:24
122:7 126:15
129:25 130:1
certainly   108:5
certificate   138:1
139:1
certification   139:8
certify   138:6
cetera   55:25
125:19
chance   105:23
106:12
change   106:13
changes   12:3,9
16:12 137:8,9
140:10
characteristics
98:9
charges   139:12
chasing   71:11
check   7:8 62:24
70:17 77:18 80:3
131:8
chickens   128:10
choice   110:18
circumstances
57:7

[cite - conversation]

| | | | |
|---|---|---|---|
| **cite**  103:9 | **comments**  11:24 | **compute**  98:13 | **considers**  96:13,17 |
| **cited**  31:7 | 12:8 16:17,18,22 | **computer**  27:23 | 96:21 |
| **citing**  120:15 | 17:3,23 18:6 | 49:12,16 89:6 | **consistent**  24:11 |
| **citizen**  125:4 | 74:25 | 129:4 | 30:5 82:20 93:1,7 |
| **citizens**  78:8 79:7 | **commission**  3:13 | **concerned**  14:8 | 120:25 |
| 79:12 | 51:20 106:4 107:1 | 74:1 113:15 | **constitutes**  137:5 |
| **citizenship**  125:6 | 107:6,9 108:22,24 | **concerns**  112:15 | **constraints**  41:17 |
| **civil**  2:17 4:2 | 109:15 137:18 | **concluded**  44:24 | **consultation**  131:6 |
| 51:20 117:6,13 | 138:19 | 135:16 136:21 | **contact**  39:16 |
| 119:3,3 | **commissioned** | **concludes**  136:3 | 70:23 |
| **claims**  122:10 | 84:18 138:6 | **conclusion**  60:13 | **contacted**  54:21 |
| **clarify**  38:17 | **communication** | 60:20 | **contain**  84:5 92:9 |
| 134:1 | 22:21 | **conclusive**  82:18 | 124:3,14 125:12 |
| **class**  50:3 58:23 | **communications** | **conclusively** | 126:2 129:11 |
| 78:7 79:7,12,18 | 21:23 22:17 23:17 | 120:19 121:11 | **contains**  124:14 |
| 80:19 81:3 | 93:21 | **conduct**  26:15 | **content**  18:12 19:1 |
| **clayton**  2:20 5:21 | **communities** | 37:8 38:3 63:1,14 | 33:8 112:21,24 |
| **clear**  19:2 25:14 | 109:2,18 | 73:23 84:19 86:23 | 113:12 |
| 26:13 28:20 35:21 | **compasión**  57:9 | 92:21 95:4,14 | **contents**  21:25,25 |
| 61:12 121:5 133:8 | **compiled**  43:20 | 96:1 115:3,15 | **context**  19:4 56:7 |
| **clearly**  63:8,13 | 84:9 102:5 | 116:4,16 | 56:9 122:2 |
| **click**  88:9 | **compiling**  43:24 | **conducted**  5:20 | **contextualizing** |
| **clinic**  118:13,17 | **complaint**  118:19 | 6:12 25:21 34:13 | 32:12 |
| **closer**  75:15 | **complaints**  84:6 | 34:18 39:25 41:20 | **continue**  5:11 |
| **clothing**  80:10 | 85:5,9,11,13,16,25 | 52:1 66:5 67:3 | 120:21 121:3 |
| **code**  128:8,9 | 86:8 119:4 | 83:22 87:15 90:25 | 122:13 |
| **collateral**  133:14 | **complete**  126:17 | 99:16 101:11 | **continued**  34:3,21 |
| **colleagues**  90:9 | 126:21,23,24 | 103:19 104:6 | 63:14,20 65:15 |
| **college**  80:16 | 127:4 129:13 | 107:1,5 118:17 | 103:23 104:8 |
| **color**  40:24 56:7,9 | **completed**  11:21 | **confirm**  136:10 | 115:16 116:5,17 |
| 72:24 74:3,6 | 140:17 | **confusing**  46:4 | 116:22 122:20 |
| **colorado**  4:9 138:5 | **completely**  11:8 | 89:16 111:7 | **continues**  82:16 |
| **come**  53:23 55:5,8 | 22:4 127:3 | **congress**  64:3 87:4 | **control**  98:5,8 |
| 78:19 | **completes**  7:11 | **congressional**  87:5 | **controversy**  138:9 |
| **comes**  65:18 | **completing**  114:22 | 87:9 | **conver**  76:22 |
| **coming**  54:9 | **completion**  128:19 | **connected**  76:8 | **conversation**  50:1 |
| **commencement** | **composition**  40:6 | 138:16 | 54:18 55:3,6,8 |
| 138:7 | 40:11 41:21 | **connection**  5:8 | 58:15,19 62:11 |
| **commencing**  4:5 | **compound**  42:14 | **consent**  9:8 | 68:3 71:1,16,21 |
| **comment**  111:3 | 42:15 129:20 | **considered**  43:24 | 72:10 76:2,23 |
| | | 44:8 104:4 | 78:5 80:24 81:10 |

FEDERATION MSJ APP. 139

[conversation - decisions]

117:9,12
**conversations**
47:18,23 49:2,5
71:12,18 106:17
112:12 113:13
117:11
**cooperatives**
100:3
**copies** 136:15
139:14 140:14
**correct** 7:22 13:14
16:8 17:8 20:13
23:13 26:8 28:24
29:12 30:23 36:22
41:9,25 42:7,11,22
45:3,22 47:22
50:6 51:13,25
52:5,11 53:13
66:15,16 69:9
80:21 81:14 82:2
82:4 86:11,20,22
94:24 97:7 102:9
106:8 111:24
114:7 119:10
120:7 121:3
124:16 128:17
131:1 134:21
138:13
**correction** 39:3
109:21
**cost** 139:1
**costing** 71:6
**counsel** 2:3 5:15
6:6,13,15,16,20,25
7:4 8:24 9:8,11
10:13 11:24 12:8
13:13,22,24 14:2
16:6,6,17 17:7,9
17:16,17 18:14
19:13 21:12 22:11
22:18,21 23:18

27:21 29:15 49:19
51:11 52:11 60:25
89:10 107:14
109:6 135:21
138:15,16 140:14
**county** 38:15 39:7
39:11,16 40:2
41:22 43:14,16,21
44:17,21,25 45:6,9
45:17,18,25 46:9
46:16,24 47:5
57:10 59:24 60:1
60:3,19 62:15
64:16 75:11 99:13
99:17 125:22
126:22
**couple** 39:22
84:25 87:11 88:13
91:17
**course** 10:17
**court** 1:1 5:17,23
7:8,25 8:5,19,24
9:20 11:17 14:23
50:20,25 52:13,18
52:23 61:4 68:22
90:18,20 105:11
119:25 123:14
136:9,14,17
**court's** 8:1
**coverage** 29:21
**covered** 21:9
**crat** 82:9
**crc** 4:8 138:4,23
**created** 65:1
**creation** 106:3
**credit** 43:15 81:22
96:25 97:2,5
98:14 110:24
113:6,17,17 128:1
130:20 133:14

**critiques** 52:2
**cross** 41:10
**crr** 4:7 138:4,23
**cs** 139:20 140:15
**csr** 4:7 138:3,22
**culture** 78:6
**current** 97:10
122:20
**currently** 13:15
23:10,11 40:10
48:23 68:17 72:9
**cut** 56:3
**cv** 1:7 5:19 139:5
**cycle** 25:2

**d**

**d** 2:4 5:1 51:8
125:8,9,12 126:20
127:5 128:5,20
**dairy** 128:10
**damaged** 53:24
**damages** 52:14
53:21,22
**danny** 2:21
**data** 23:24 24:9,11
26:21 28:8,9
34:24 35:2 36:2,6
36:13 41:18 43:15
43:23 65:6 86:25
93:8,11 94:7,17
96:8,20 97:13,15
97:17,18,18
111:19,20,22
112:1,4,9,15 113:4
113:8,10 120:7,11
120:14 121:2,4
124:2,6 125:11
128:19,25 129:3,4
129:14 130:2,7
131:21,23 132:1,4
133:4,19,21,24
134:13,15

**dataset** 97:16
124:3,8,10,13,19
124:24 125:11
126:2,5,17 127:18
127:19,20,24
128:7,13,21 129:3
129:7,10,16 130:8
130:18 132:2
133:9,10,17 134:3
134:11
**datasets** 126:1
129:4
**date** 13:18 15:18
15:20 23:11,20
26:11 64:4 73:10
73:11
**dates** 26:1 29:21
36:20 42:3 45:9
84:25
**dating** 66:9
**day** 19:21 21:5
23:6,9 137:15
**days** 88:14 93:6,6
94:13,24 120:22
128:1 140:17
**dc** 2:10,18
**debt** 54:1 77:6
97:11
**decades** 20:15
25:15 122:11
**deceive** 11:1
**december** 15:15
16:2 76:4
**decentralized**
38:20,23 39:6
**decimated** 76:16
**decision** 44:25
45:5
**decisions** 38:13,14
39:5,6,18 42:4
46:15

Page 6

FEDERATION MSJ APP. 140

[declaration - dismantling]

**declaration**  57:23
58:1
**declarations**  57:22
58:5,9,13
**declares**  9:5
**decline**  120:23
**default**  43:5,11
**defendant**  1:11
2:15 6:20 7:5,15
19:13
**define**  53:22 88:4
98:2
**defined**  53:5 54:2
98:25
**defines**  43:10
**definitely**  88:18
112:23
**definition**  52:12
**definitively**  64:17
**degree**  78:10
**delete**  49:19
**delineated**  125:17
**delivered**  136:11
**demonstrated**
44:24
**denials**  35:6,12
78:16
**denied**  35:18
72:19 73:9 74:5
74:11,20 77:8
78:14,23 81:23,24
82:4 98:11 130:19
**dennis**  2:20 5:21
**denying**  116:11
**department**  2:17
7:14 10:22,23
19:15 20:3,6
25:20 27:3 28:10
33:18 48:8,12,14
54:21 55:13 63:24
65:14 76:6 85:16

86:19 87:1,7
89:22 93:11
101:22 106:4
107:22
**depends**  5:7
**deponent**  9:2
137:1 140:13
**deposed**  10:8
**deposing**  140:13
**deposition**  1:15
4:3 5:5,14,20 6:11
8:25 9:1,3 10:18
10:20 11:20,21
12:21 13:21 67:20
105:8 119:21
135:15,21 136:20
137:2,5,8,9 138:10
139:2,9,12,14
**depositions**  10:12
**depth**  71:12
**described**  44:23
64:14 126:21
**describing**  91:25
**description**  3:9
128:5,7,12 132:3
**descriptions**  85:10
**detail**  62:5 80:12
**detailed**  13:6 33:3
**details**  34:10
53:17 74:10 75:3
75:9,24 76:9
79:10,14,15,25
80:6,13
**determination**
43:19
**determinations**
113:25
**determine**  25:22
26:16 27:12 33:21
34:14,19 37:9
38:4 39:25 41:2,7

41:21 60:8,16,23
63:2 65:8 66:6
67:4 81:1 83:23
86:13 92:21 95:5
99:16 103:20
104:7 115:4,16
116:5,17
**dictionary**  131:21
131:23 132:1,4
**difference**  127:15
**differences**  120:23
**different**  11:15
52:12 88:25 95:22
111:1 126:18
127:16 128:8
129:4,4,5
**difficulties**  61:21
**direct**  18:22 24:2
29:10 31:18 35:3
63:16 94:19
121:18 123:17
132:11
**directed**  26:9,15
37:13 38:6 53:20
**directing**  19:11
20:20 24:19 31:15
36:23 64:22 92:4
**directions**  26:20
**directly**  42:9
**disadvantage**
19:20
**disbursement**  25:7
**disciplined**  60:19
61:2
**disclosure**  8:2
**discouraged**  81:21
**discouragement**
82:21
**discriminate**
37:24

**discriminated**
25:15 37:10,17,24
59:12,14
**discrimination**
19:16,19 20:22
21:1,2,7 24:8,12
25:1,23 26:5,14,17
28:10 29:8 30:5
31:21 32:15 34:2
34:15,20,21,21
36:15,20 40:1
45:1,7,16 52:23,25
59:18,22 62:17,20
65:2,9 71:13
72:18 74:2 79:2
84:7 87:16,17
90:12,14 91:1,10
98:5 101:6,14,24
103:6,7,15,22
107:21 108:11
114:19 117:14
122:5,12,14,19
**discriminatory**
102:16 103:22
117:19 118:19
**discuss**  22:7 26:6
79:16 80:9 120:11
120:13
**discussed**  13:21
34:5,5 65:1 73:6
80:10
**discussing**  23:5
75:6
**discussion**  69:10
78:17
**discussions**  83:9
**dismantle**  109:1
109:17
**dismantled**  110:12
**dismantling**
110:11,22 111:11

FEDERATION MSJ APP. 141

[disparate - example]

disparate  25:2
  26:23 34:6 62:21
disparities  87:23
  92:10,22 95:5,10
  95:15 120:20
  121:2,11
dispose  49:20
dispossession  90:3
district  1:1,2 5:17
  5:17
distrust  81:17,24
  82:7,16,24 83:20
division  1:3 2:17
  5:18
doctor  36:23,25
  38:10 39:10 46:23
  84:1 99:23 104:11
  104:18 122:23
  125:9 135:1
document  14:20
  18:17 35:6 50:20
  101:24 102:17
  105:24 106:1
documented  24:12
  31:20 32:14 64:25
  81:18 101:6,13
  102:15
documents  12:18
  12:22,24 13:10
  17:3 30:15 35:5
  50:12,15,19,25
  51:11 53:14,16,19
  54:8 59:4 90:1
  100:20
doing  34:11 67:23
  71:12 87:21
  104:11 119:24
  120:2 131:19
doj  15:8
dollars  71:7

domestic  52:17
doubt  96:23,24
dozens  97:1,3
dr  3:10 5:14 9:20
  10:3,8 12:18 14:7
  14:8 15:3 19:2
  25:19 28:7 29:23
  30:16,21 31:4,7
  35:14,15 67:11,20
  67:23 81:9 86:2
  89:17 96:9 104:15
  105:4,8,15 109:14
  110:16 114:4
  119:21 120:2
  127:10 129:21
  131:19,21 135:13
  136:4 139:2 140:5
draft  13:16 15:10
  15:13,14 16:11,12
  16:13,13,14,16
  17:7
drafts  16:5,9
draw  12:9
dropped  114:1,1,3
duly  9:24 138:8

e

e  2:9 5:1,1 29:11
  30:22 33:10 37:6
  50:11,11,11
  104:19 129:9,11
  129:14
earlier  17:12
  95:21 96:9 114:17
early  15:9
earn  76:20
economists  20:10
edits  16:19 17:3
educated  80:17
education  25:3
  80:14 92:11 95:11
  95:15

effects  19:19 24:12
  26:14 34:20
  122:11,14
efficient  71:8
effort  31:10
  101:20
efforts  122:4,8
eight  71:23 93:4
either  8:5 10:16
  12:7 27:9 35:24
  48:12 53:8 64:2
  65:18 76:4 78:1
  83:7 87:6 90:15
eligibility  25:4
  38:12 39:5 92:12
eligible  77:5,12
ellipses  109:20
email  124:23
employed  112:1
employee  20:2
employees  40:15
  40:18,20,22,24
  41:22 60:11,18
  61:2 79:2 81:1
employer  124:24
enacted  64:20
enclosed  139:7
ended  76:19
entire  19:7
entirely  126:11
entitled  22:1
entrepreneurial
  48:13
entrepreneurs
  56:18
entries  125:25
  127:5
entry  128:16
equal  106:11
equity  3:13 106:3
  107:1,6,9

errata  140:11,13
  140:17
erratas  140:15
error  109:7,8
esq  2:4,4,9,13,15
  140:1
estimate  17:22
  18:19,20
estimated  43:11
et  1:5 5:16,16
  55:25 125:19
  139:6,6 140:4,4
ethnic  40:6,11
  41:21
ethnicity  125:5
  131:4 133:13
evaluate  19:15
  24:9
evidence  19:16
  24:7 25:14 36:14
  44:23 45:5,15
  56:7 63:4 71:13
  82:18 84:6 92:9
  102:4 121:5
evidenced  122:12
exact  42:3 62:14
  62:15 75:13
exactly  53:15
  121:7
examination  3:5
  4:4 10:1 101:12
  138:7
examinations  3:3
examine  34:16
  45:4
examined  9:25
  45:14
example  51:7
  52:17 113:17
  124:22 126:12

FEDERATION MSJ APP. 142

[excel - firm]

| | | | |
|---|---|---|---|
| **excel**  126:5,7 | **explain**  11:3 | 57:17,18 68:15,16 | **federation**  100:2 |
| **exceptions**  93:24 | **explanation** | 68:18,19 71:17 | **federations**  100:9 |
| **executed**  33:23 | 116:13,21 122:18 | 72:6,9 75:6 77:1 | **feel**  19:6,8 32:10 |
| **exhibit**  3:10,11,14 | 122:21 | 87:16 90:14 97:11 | 32:12 78:7,10 |
| 8:1 14:20,21 15:3 | **explore**  82:6 | 120:16 125:17 | 82:7,18 |
| 15:11 19:12 23:2 | **express**  112:15 | 133:16,16 | **feeling**  79:6 81:12 |
| 105:8,10,17 | **extensive**  17:23 | **farmage**  127:25 | 81:19 82:14,21 |
| 108:23 111:9 | 18:2 | **farmer**  47:9,21 | **fellow**  2:5 6:24 |
| 114:4 120:10 | **extensiveness**  18:6 | 49:23 57:1 71:16 | **felt**  74:4 79:11,18 |
| 121:19 123:6,8,13 | **extent**  16:21 93:23 | 76:5,7 98:9 | **field**  124:3,14 |
| 123:23 | | 124:23 126:13 | 125:12,12 126:2 |
| **exhibits**  3:7 | **f** | 131:4 133:13 | 128:16,19 129:11 |
| 139:14 | | **farmers**  19:17,20 | 129:13 130:8 |
| **exist**  65:16 86:17 | **f**  51:8 117:2 | 24:8,10,13 25:8,12 | 133:15 |
| 92:22 99:6 100:11 | **faced**  109:2,19 | 25:15 36:15 37:10 | **fields**  97:18 |
| 121:12 | **fact**  33:17,22 | 37:17,25 39:17 | 124:18 127:6 |
| **existed**  121:3,12 | 52:13 65:11 74:2 | 42:10 45:2,7 47:4 | 133:3 |
| **existence**  100:18 | 94:14 98:19 114:1 | 47:13 48:4 53:23 | **file**  94:19 |
| 110:6,6 | 124:9 130:24 | 54:12 55:1 56:17 | **filed**  5:16 30:15,18 |
| **existing**  25:3 | **factor**  42:25 43:3 | 58:6 63:3 65:3,10 | 73:3 85:16 |
| 41:18 92:11 95:11 | 43:24 44:8 82:1 | 71:12 78:17 81:2 | **filing**  139:7 |
| 95:16 | 96:16,21 98:14 | 82:14 83:9 84:7 | **filled**  97:18,19 |
| **expect**  131:7 | **factors**  43:4 96:10 | 87:17,23 95:22,23 | 123:23 124:10 |
| **expected**  24:11 | 96:12 97:4,9 98:6 | 96:3,4 100:10,25 | **final**  15:14 16:12 |
| **expecting**  133:15 | 98:13 99:2,12,17 | 106:11,19 110:2 | 16:14 136:10 |
| **expenses**  25:11 | **fails**  140:19 | 110:25 114:19,22 | **financial**  54:1 |
| **experience**  55:17 | **fairly**  12:14 | 114:24 115:5,11 | **financially**  6:2 |
| 55:23 58:21,22 | **fall**  15:14 17:12 | 115:13,22 116:1 | **find**  47:2 50:25 |
| 63:1,3 | 47:12 | 116:11 117:14 | 61:1 62:24 69:2 |
| **experiences**  62:6 | **falls**  93:23 | 122:6,9,13 | 77:15 89:4 96:15 |
| 62:11 77:20 | **familiar**  36:25 | **farming**  56:17,19 | 98:23 99:20 100:6 |
| **expert**  3:10 12:25 | 37:2 117:3 118:14 | 58:22 76:16,25 | 100:14 101:3,9,20 |
| 13:2,16 15:7 | 122:23,24 | 87:24 128:10 | 102:23 104:1 |
| 21:25 23:18 28:13 | **familiarize**  56:16 | **farms**  48:19 | 117:25 139:7 |
| 30:18 71:6 91:17 | 105:16 | **fault**  111:7 | **findings**  30:4 |
| 93:21 | **family**  52:19 68:14 | **favorable**  115:23 | 103:14 119:1 |
| **expertise**  35:14 | 76:24,25 | **fear**  81:22,24 82:4 | **fine**  10:4 34:11 |
| **experts**  13:3 | **far**  14:8 20:6 | **february**  107:3 | **finished**  15:15 |
| **expires**  137:18 | 42:21 48:19 59:15 | 138:19 | **fired**  60:20 |
| 138:19 | 59:16 65:13 91:6 | **federal**  2:16 93:20 | **firm**  5:24 84:13,19 |
| | 120:23 | 103:5,13,21 | 97:11 98:8,9 |
| | **farm**  29:9 48:23 | | |
| | 56:21,25 57:8,11 | | |

FEDERATION MSJ APP. 143

[firm - head]

139:19

**first**  9:24 13:9
  15:15 16:11 29:3
  31:19 32:5 38:12
  50:2 107:2 116:10
  122:3
**firsthand**  55:24
**five**  18:21 25:7
  27:22,24 32:6
  57:12 67:12 90:1
  113:20
**fives**  113:25
**focus**  82:13
**folder**  49:17 88:25
  89:2,4
**folks**  81:21
**follow**  70:16,19,25
**follows**  9:25
**fong**  117:1,10
**food**  118:12,16,17
**foregoing**  136:20
  137:3 138:13
**forgot**  17:14 74:12
**form**  106:22
  123:16 138:12
**formal**  11:17
**formed**  3:12
**forms**  42:13 84:7
**fort**  1:3 5:18
  139:20
**forth**  124:25
**forward**  12:16
**found**  30:3 87:6
  89:24 92:3 103:6
  103:22
**four**  25:6 32:6
  90:1 103:8 113:19
**fourth**  16:14 32:7
**frame**  69:22 70:13
  129:6

**free**  19:2,8 32:10
**fresh**  34:10
**friend**  57:8
**friends**  69:4
**front**  14:6 18:24
  24:3,4 31:16
  46:20 92:5 105:4
  114:8 121:20,24
**fruit**  128:10
**fsa**  3:14 25:10
  123:6,7 132:12
**fulfilled**  33:22
**full**  15:25 24:21
  31:19 32:5 38:12
  122:3
**fully**  11:8 12:14
  22:1 110:12
  122:10
**funding**  75:7
**funds**  25:11
**further**  9:4 22:7
  73:23 75:15,17,19
  135:1

## g

**g**  5:1 50:11 51:8
  64:2 117:2
**gain**  44:17
**gao**  46:12 64:2
  65:18 83:7 87:8
  114:12,13 119:10
**gao's**  87:4
**gender**  125:5
  133:13
**general**  39:15
  66:22 79:8,20
  117:6
**generally**  52:13
**generations**  76:18
**gentleman**  80:25
**geographies**  63:8
  63:9

**getting**  59:20 62:5
  111:7
**give**  17:22 58:18
  70:21 75:3 76:9
  81:15 124:17
**given**  9:6 25:9
  26:11,20,21,24
  36:21 79:20 97:4
  97:5,6,8,13,15,16
  111:25 133:4
  136:4
**gives**  42:12
**glad**  14:16
**glanced**  13:2
**go**  5:11 12:16
  22:11 28:25 39:13
  41:14 49:12 55:22
  56:15 58:15 68:9
  75:16,19,21 78:17
  94:2 105:18
  108:19 129:9
  131:7 135:5,21
**god**  11:15
**goes**  43:19 91:6
**going**  5:4 10:15,24
  11:7,21,22,22 14:9
  14:17 18:25 19:5
  28:1 38:25 67:8
  67:14 74:17,18
  81:19 104:14
  108:17 119:15
  126:13 131:13
  132:9 135:7,23
  136:2
**good**  5:3 6:9 10:5
  10:15 14:22 37:4
  67:9,10 120:3
  130:12
**google**  87:12,14
  88:3,6,7,11,16
  91:24 100:14

107:25
**government**  64:11
**governs**  8:2
**grad**  80:16
**grand**  2:13
**great**  58:23 59:7
**groups**  19:20
  82:13 100:19,23
  101:1,5,13,23
  102:5,15,18
  120:23,24 121:1
  121:10,14
**guaranteed**  74:14
  133:4
**guess**  7:16 56:16
  57:6 76:6
**guessing**  18:20
**guidelines**  99:2,6
**guilty**  103:6
**guy**  76:22

## h

**hand**  9:21 49:9
**handwritten**
  14:13
**happen**  63:15
**happened**  52:3
  63:3 73:19,23
  75:25 76:3,10
  128:23
**happening**  63:8,13
  81:16
**harvard**  118:12,16
**hawaiian**  76:4,16
  78:17 81:2
**hawaiians**  76:15
  76:20 77:20 78:7
  78:13,21 81:11
  82:7
**head**  28:17 42:18
  44:12,13 47:17
  90:2 134:6

Page 10

[headquarters - investigation]

**headquarters**
43:17
**hear** 7:20 55:23
56:6 61:6 132:19
**heard** 5:9 38:21
90:22 105:12
118:14
**hearings** 107:1,5
**help** 30:6 31:25
39:10 44:15 47:25
105:3 125:24
**helps** 42:12
**hi** 6:19,23 7:3
**high** 62:5,5,7,9
**higher** 116:12
121:6 133:24
**highly** 38:13,19,20
38:22 39:5
**hispanic** 40:20
**historically**
102:19 109:1,18
119:6
**history** 24:12
76:15,24
**hmmm** 57:2
**hold** 135:22
**honestly** 72:25
**hour** 67:9 104:14
**hours** 16:1 136:21
**huh** 92:16 123:21
**hundreds** 38:14
39:7,21 76:18
97:3
**hurts** 30:6

**i**

**idea** 39:15
**ideally** 98:4
**ideas** 16:19
**identified** 3:9
14:21 17:17 25:23
26:5 105:10

110:22 111:5,10
123:8
**identify** 15:5
34:15 69:23
**ignore** 108:25
109:16 113:24
**implement** 3:11
**important** 12:13
32:12 55:18 56:10
56:12
**imposed** 25:12
115:25
**impossible** 97:24
**impression** 80:22
**improved** 122:6
**inadvertently** 8:10
**inappropriate**
22:5 96:2
**incidentally** 14:11
19:24 36:25 46:20
46:23 47:8 66:20
**include** 11:23
121:5
**included** 59:3
**includes** 128:4
**including** 6:6
12:10 25:2 84:6
114:20,23 122:9
**inconsistencies**
113:7,15,23
**incorporate** 18:11
18:13
**independent** 50:23
51:3 52:1 84:23
86:23
**independently**
34:19
**index** 3:1
**indicate** 9:11
**indicated** 25:8

**individual** 19:20
26:25 58:17 97:9
99:2 134:4
**individually** 47:25
48:1,3
**individuals** 71:2
**industry** 133:13
**inferences** 12:9,10
**influence** 98:10
**informal** 11:14
**information** 29:22
36:5 42:13 43:19
43:20 44:7 71:1
73:19 96:2 106:21
110:5
**informed** 106:6
**informing** 115:11
**initial** 93:5
**initially** 89:11
**injunctive** 52:7,12
52:18 53:4
**inquire** 8:21 55:10
61:24 99:5 116:21
**inquired** 99:11
**inquiry** 25:21,21
26:4,10,16 27:12
33:21 34:13 37:8
41:7 47:2 54:7
60:7,15,22 67:3
69:2 77:15 86:7
86:12 92:21 95:4
96:15 98:22 99:20
100:5,17 101:3,9
101:12 102:23
103:20 104:1,6
**inside** 75:25
**inspector** 66:22
117:5
**instance** 88:19
**institutions** 37:23

**instruct** 18:5,8
21:22 22:16 29:19
36:8 93:17 102:1
112:12,19 113:11
**instructed** 3:15
94:3
**intend** 8:7
**intent** 10:25
**intentional** 65:2,9
**interacted** 79:19
**interactions** 79:13
**interested** 6:2
26:14 138:18
**interesting** 41:11
41:15 76:22 78:5
110:17
**interfaces** 42:10
**interference** 10:11
**internet** 5:8
**interruption** 27:22
**intervenor** 2:3 4:4
6:11,20 7:2,5,11
57:21 58:5 139:13
**intimidated** 79:8
**investigate** 26:12
26:22 55:10,15
**investigated** 29:8
45:15 65:14 99:11
**investigating** 62:4
**investigation**
25:22 26:4,10,16
33:20 34:14,19,25
37:9 38:3 39:25
41:1,5 45:20 52:2
60:7,16,23 63:2,14
64:8 65:8 66:6
67:3 73:23 80:25
82:6,23 83:13,23
84:20 85:24 86:6
86:12,24 92:21
95:4,14 96:1

[investigation - lawsuits]

98:23 100:6
103:20 104:7
115:4,15 116:4,16
118:18
**investigations**
66:10 84:4 85:23
91:9
**involve** 71:11
**involved** 58:17
111:19
**involving** 10:20
**island** 76:5
**issue** 82:23 83:19
90:25
**issued** 35:12
118:18
**items** 69:16

### j

**j** 33:4
**jackson** 33:1,4,8,9
33:12 84:13,20
**janelle** 2:13 6:18
6:19 9:17 14:6,16
105:3
**january** 15:9,16
15:22
**jennifer** 4:6 5:23
138:3,22
**jl** 82:10 84:9,19
**jliaping** 2:15
**job** 137:25 138:25
**joint** 25:10
**journal** 90:8
**judge** 103:5,13,21
**july** 1:18 4:6 5:5
140:3
**jumped** 42:18
**justice** 2:5,17 6:24
7:14 48:8,12,15
54:21 55:13 63:24
76:6 86:19 87:2,7

89:22 101:22

### k

**k** 29:11 50:11
**kashyap** 2:4 7:3,3
**keapseagle** 50:3,9
50:11 59:5 68:12
**key** 38:14 39:6
**kind** 51:19 62:19
73:3 74:12 76:16
81:21 126:12
128:12
**kinds** 126:10
132:23
**knapp** 2:15 7:13
7:13,24 8:6,12,15
9:16,16 10:12
13:13,25 16:21
17:10,25 18:4
21:21 22:3,6,9,16
23:16 27:16 29:18
35:7,13 36:7
38:17 41:12 42:14
44:2 46:4,7 54:23
55:20 56:13 61:4
66:17 67:8,12
68:5 70:2 86:1
89:16 90:18 91:13
93:14,17,20 94:3
101:16,25 104:14
107:13 109:6
110:13 112:11,18
112:22 113:11
118:2,5,9 121:21
127:7 129:20
130:10 131:10,12
135:4,12,15
136:16 140:1
**knew** 48:4,20
69:11,24 70:10
**know** 7:9 8:6
10:18 12:7 15:25

17:2 18:2 20:7
22:1,20,21 27:3
28:15 33:16 34:6
34:18 35:4,5,10,22
37:15 39:19 40:10
40:14 41:4,16,17
41:20 42:21,24,25
43:7,12,15,18 44:6
44:7,11,13,14,16
46:24,25 47:4,16
48:6,17,24 50:16
51:14,16,20 52:6
53:15 55:24 56:19
57:12,14,17,23
58:11,21 59:1,10
60:1,4,5,11,18
63:12,22,24 64:4,5
65:7,13,25 66:2,20
66:24 67:2 68:14
68:17,18,20 69:16
70:7 71:6,8 72:5,6
72:9,23 73:4,6,13
74:5 75:19 76:17
76:19,23 77:2,7,10
77:11,12,14,17,19
77:24 78:1 79:4,4
79:7,9 80:11 81:5
82:16 83:22 84:12
84:18 85:12,15,20
85:21 87:3,4
88:13 89:25 90:5
90:17,23 91:6,23
93:7 94:14 95:18
96:6,12,19,23 97:2
97:3 98:19,21
99:1 100:2,8,13,20
100:25 101:5,11
102:21 103:17
104:6,18 105:12
106:25 107:18,20
107:24 108:9

109:22,25 110:9,9
110:18 113:3,4
115:8 117:1,4,5,21
118:12,16 120:24
121:14 124:6,9
125:17,20,21
127:14,25 128:6
131:21,23 133:7
**knowing** 69:20
**knowledge** 25:19
34:2 35:11 37:23
39:24 42:23 45:14
45:25 46:14 53:3
66:5 82:5,22
83:18 85:21 95:8
96:20 98:12 99:10
99:15 102:14
103:3,19 104:23
110:21 111:10
115:19 116:8,24
**known** 55:2 74:16
**knows** 11:15
**kylie** 17:13

### l

**l** 2:10,18 4:6 33:10
50:11 104:19,19
138:3,22
**lacruise** 2:21
**languages** 110:1,2
**laptop** 49:10
**late** 115:23
**latino** 73:2 74:2,7
**law** 84:13,19
118:12,13,16,17
118:17
**lawsuit** 58:24 59:5
59:9,11 60:13,20
62:6 87:1
**lawsuits** 50:4 72:1
84:4 103:8,14

Page 12

[lawyer - marked]

**lawyer** 86:18
**lawyers** 86:18
**leads** 19:14
**learn** 56:20
**leave** 18:8 108:25
　109:16,17
**led** 74:25
**legal** 5:22,24 58:3
　58:3 103:9 136:6
　139:18 140:23
**lender** 74:13,16
　79:9
**lenders** 79:21
**lending** 19:17 24:9
　24:13 29:9,10
　30:5 37:23 39:18
　55:17 71:14 87:16
　87:17
**length** 84:17
　125:19
**level** 38:15 39:7,11
　39:16 40:2 44:17
　44:25 45:6,10,17
　45:18,25 46:9,24
　47:5 62:4,5,7,9
　81:17 99:13,18
　128:7 133:24
**levels** 80:15
　114:21 115:12
　126:18
**lewis** 33:1,5,8,9,9
　33:12 84:13,20
**li** 2:13 6:19,20
　7:22 9:17,17
　105:5 136:12
**lieu** 9:4
**line** 3:17 32:8
　114:17 118:6
　127:19 136:7
**lines** 32:7 127:18

**lingering** 19:19
　34:20 122:14
**list** 22:23 46:12
　69:16 107:8 132:2
**listed** 44:20 50:17
**listen** 55:16
**listening** 82:12
**literally** 89:8
**litigation** 58:17
　61:13 63:15 64:15
**little** 73:1 75:6
　78:20 97:5
**live** 57:10
**llp** 2:9,12
**loan** 3:14 25:2,3,4
　25:6,7,16 26:21,25
　26:25 27:4,5,9,13
　27:14 35:6,11,17
　35:22,23,24 36:2
　36:15 38:12,13
　39:4,5,12 42:5
　43:4,13 45:24
　46:1,8,15 57:14,18
　59:19,21 62:14
　63:16 68:20 69:5
　69:11,17,18,18,21
　70:8,8 72:13,13,14
　72:15,18 73:8
　74:14,24,24 75:1,4
　75:5,7 77:9,10,12
　78:4,13,16 81:2,19
　82:7,19,20 84:8
　90:15 92:11,12,13
　92:14 94:11,12,20
　95:2,6,11,16,23
　96:13,21 97:16
　98:6,10 101:14,14
　109:25 114:19,22
　115:11,13 116:11
　117:15 122:15,24
　123:7,17,20

124:25 125:16,17
　125:18,19,22
　127:20 128:7
　132:11,18,18,21
　133:4,9,16,16,18
**loans** 35:24 37:11
　42:10 58:6 70:11
　74:17 75:1 77:3
　77:21 78:3,14,18
　78:22 81:11
　114:24,25 115:5,6
　115:22 117:15
　127:17 132:23
**lodge** 35:13
**long** 15:23 31:21
　32:15 49:1 67:10
　68:22 71:21 74:9
　75:8 76:13,22
　88:11 119:14
　130:1
**longer** 76:23
　120:15 131:8
**look** 14:9 26:1
　34:6,7 36:10,12
　37:13 38:7 42:2
　44:16,21 45:8
　46:18 49:13,15
　51:18 58:25 59:21
　63:20 64:4 77:25
　79:5 83:6 85:2
　89:5 93:3 94:6,17
　98:4 121:4,17
　123:1 125:1,5
　126:7,18 129:16
　130:17
**looked** 13:9 22:22
　23:1 37:16 49:14
　51:9,11 79:21,24
　80:1,6 82:13 87:8
　87:8,9,10 88:10
　94:7,10,14 123:16

130:2
**looking** 38:10 39:3
　39:4 62:10,18
　117:24 122:2
　125:25 132:14
**los** 2:6,14 6:14
**lot** 41:15 76:19
　88:18 91:5 97:21
　97:22
**loud** 109:13

**m**

**m** 1:17 3:4 4:3
　9:23 29:11 104:19
　137:1,12
**main** 39:16 69:24
　110:3 130:17,24
**mainland** 78:9
**maintain** 27:5
　35:17
**maintains** 27:4,13
　35:5,11,23 44:7
　85:12,15
**major** 3:11
**making** 10:6 44:25
　45:5
**mandated** 64:3
**manifested** 25:1
**manner** 9:9,10
　13:6 86:7 99:16
　119:4
**manual** 98:12,20
**margins** 14:13
**marilyn** 68:12
**marin** 57:9,10
**mark** 2:4 6:9 8:6
　9:14 14:19 22:7
　38:17 61:6 67:8
　105:7 112:22
　118:2 123:13
**marked** 14:23
　15:2,11 105:17

FEDERATION MSJ APP. 147

[marked - nods]

120:10 123:14
**material**  8:2,7
**materials**  21:9,11
21:12,14,16,19
22:1,13,22,23,25
23:14,23 31:7
36:13 84:5 86:15
88:16 89:11,14
102:3 110:1
117:17
**matter**  5:15 9:6
10:25 15:8 139:16
**matters**  138:9
**maui**  76:5
**mba**  78:10
**mean**  13:4,25
16:18 18:17 21:4
30:3 32:24 62:7,9
66:8 87:3,12
88:24 89:23 97:22
116:25 119:8
121:21,22 124:22
126:4 127:16,23
133:7
**meaning**  113:5
127:4
**meaningful**  93:10
**means**  7:21 18:6
20:11 126:8,14
**meant**  20:25 23:8
52:7 78:7
**measurements**
97:8
**media**  5:13 67:15
67:19 119:16,20
136:5
**medina**  2:5 6:23
6:24 9:18,18
**meet**  17:15 19:24
**meetings**  111:18

**member**  52:19,20
**membership**  3:12
**memory**  27:23
**mentally**  73:4
**mention**  63:10
100:19
**mentioned**  91:2,16
114:17
**met**  20:5 47:20
107:3
**metrics**  122:7,12
122:18 125:18
**michael**  2:15 7:13
9:16 140:1
**michael.f.knapp**
2:19 140:2
**mid**  21:10
**mike**  67:11 119:13
131:6 135:18
**miller**  1:5 5:16
10:21 139:6 140:4
**mind**  41:10 86:25
**mine**  57:8
**minimum**  43:18
**minor**  16:12
**minority**  19:17,20
24:8,10,13 25:8,15
36:15 37:10,17,25
45:2,7 47:4,9,13
47:21 57:1 58:5
63:3 65:3,10
71:12 84:7 87:17
87:23 95:22 96:3
100:10 106:19
114:19,22,24
115:5,11,13,22
116:11 117:14
120:16 122:6,9,13
**minute**  27:22
54:18

**minutes**  27:24
49:3 67:12 71:24
76:14 131:10
135:5 136:22
**misheard**  38:18
**misleading**  96:2
**misread**  109:6
**missed**  90:21
**missing**  97:19,20
113:19 124:18
126:8,12,15 128:2
134:3,4,10,17,19
134:22
**missingness**
126:10,14,19
127:4,14,22
128:15 133:3,24
134:2,13,14
**misstates**  54:23
66:17 91:13
**mixed**  120:24
**moment**  28:21
78:19 135:22
**moments**  11:12
45:23 54:17
**money**  53:25
**months**  16:1 34:9
48:22 68:10,10
71:23 93:4
**morning**  5:3 6:9
10:7 12:19
**mountain**  5:4
67:21 119:22
136:3
**mouth**  99:25
**move**  76:20
105:20
**mrosenbaum**  2:7
**multi**  97:25 98:1,2
**multiple**  60:2,3

**munnell**  104:18,20
104:25
**myriad**  114:18

**n**

**n**  5:1 29:11 104:19
104:19 117:2
**naic**  128:8,8
**name**  5:21 6:23
9:12 14:3 17:14
50:7 68:12 107:12
107:24 108:3,8
117:3 124:23
126:12
**named**  110:7
**names**  7:7 47:16
70:22 100:15,22
107:8 112:4
**narrative**  68:6
76:13,24
**native**  40:22 76:4
76:15,16,20 77:20
78:6,13,17,21 81:2
81:11 82:6 110:1
**nature**  62:17
**necessarily**  30:6
**necessary**  98:1
**need**  7:6 27:23
79:5 81:21 110:22
111:11
**needing**  25:9
**negative**  12:10
**network**  39:20
**never**  41:7 52:1
58:8 102:23 106:6
**newly**  3:12
**nice**  64:23
**nisha**  2:4 7:3
**nkashyap**  2:8
**nodding**  42:18
**nods**  134:6

[non - operation]

**non** 112:1 114:3
**nonprofits** 87:11
**noon** 119:18
**northern** 1:2 5:17
**notary** 4:8 137:20
138:5,24
**note** 5:5 139:11
140:10
**noted** 63:10
102:16 120:20
**notes** 14:12,13
49:4,7,9,11,11,19
49:20 55:9 62:24
69:15 73:5 77:18
77:25 79:5 80:3
135:5 138:14
**notice** 4:1
**noticing** 6:8
**november** 76:3
112:6
**number** 5:13,18
49:23 67:15,19
94:24 119:17,20
124:23 129:23
136:4
**numbers** 100:25
124:17
**numerous** 25:16
123:23
**nw** 2:10,18

**o**

**o** 1:7 5:1,19 51:8
117:2 139:5
**oath** 5:25 9:3,4,10
11:13 67:25 120:4
137:4
**oaths** 138:6
**object** 21:21
**objection** 16:21
17:25 18:4 22:5
22:12,16 23:16

27:16 29:18 35:7
35:13 36:7 41:12
42:14 44:2 46:4
54:23 55:20 56:13
66:17 68:5 70:2
86:1 89:16 91:13
93:14 101:16,25
110:13 112:11,18
112:18 127:7
129:20 130:10
**objections** 6:3 9:9
**observations**
126:15
**obtain** 31:10
**obviously** 58:22
59:7 125:5 131:3
133:8
**occurred** 31:21
32:15 34:15
**occurring** 84:8
**october** 112:6
**offhand** 90:5
112:5 121:15
**office** 44:17 59:24
60:1 61:21 62:15
66:22 75:11,14,25
99:13,17 117:6,13
117:18 119:2
**officer's** 139:12
**officers** 46:16 61:1
79:2
**offices** 38:15 39:7
39:11,16,19 40:2,7
40:12,14,17 41:22
42:4,8,9,21 43:14
43:16,21 44:25
45:6,17 46:1,16,25
47:6 60:3,5,10,12
60:12,19 61:2
64:16

**official** 1:9 20:2
**officials** 46:24
114:20
**oh** 32:3 87:21
94:19 100:13
107:15,16 108:21
111:2,4 121:9,24
**oig** 46:12 64:2
65:18 66:15,20
82:12 83:7 84:24
114:12
**okay** 7:10 8:6,12
8:15,18,23 10:18
10:19 12:6,14,15
13:12 14:5,7,16
15:5,17 16:24
17:6,15,20 18:16
18:22 19:11 20:17
21:3,14 22:9 23:4
24:19 27:19 28:7
28:15 29:11,14,17
30:2,8,14,20 31:3
31:6,13,15 32:3,4
32:21 33:9,12,16
33:20,25 35:3
36:5,19,23 37:8,13
37:21 38:6,10
39:19,24 40:4,10
42:4,8,23 43:12,18
43:23 44:15,22
45:4,11,20,23
46:11,14,18 47:20
47:23 48:4,6,10,17
49:1,4,14,18 50:7
50:18,22 51:14,23
52:6,9,16 53:3,7
54:5,7,12,16 55:5
55:8,12,15,18 56:4
57:21,25 58:4,15
59:17,22 60:1,7,22
60:25 61:12,19

63:9,12 64:10,13
64:22 65:6,13,22
67:1,7,23 68:2
69:14,23 70:25
71:4,10,15,25 72:4
72:6,17,20,23 74:8
75:3 76:2 77:19
79:25 81:7,15
82:22 84:1,18,23
85:5,15,21 88:15
89:2,7,14,25 90:4
90:7,10 91:8 92:4
92:17 94:17 95:18
99:8,20 100:8
101:20 102:23
103:25 104:10,11
104:16 105:2,22
106:9,21,25 107:8
107:11 108:5,9,13
108:17,21 110:9
110:21 111:21
112:3 114:4,14,16
117:1,5 118:1
119:12,23,24
120:2 121:14
122:1,23 123:3,5
123:21,22 126:7
127:12 128:4,18
131:2,9,12,19
132:7,9,17 133:19
134:1 135:1,14,17
135:23
**omitted** 109:9
**ones** 39:17 87:20
110:3 134:18
**open** 55:3
**operating** 48:24
48:25 68:18,19
125:18
**operation** 128:5,7

[operations - point]

operations  115:24
operator  57:18
opine  24:10
opinion  19:18
opportunities  65:1
 65:15
opportunity  10:10
 12:2
opposed  95:23
 96:3 110:11
options  115:12
order  8:2,8 52:13
 52:18,24
orders  136:8
organization
 48:14 55:2 76:7
organizations
 100:9,15,18
 101:13 102:5,15
 102:18
original  139:13
origination  27:10
 35:24 69:18 70:9
 90:15 117:15
outcome  6:2 94:25
 97:17 98:6 130:20
 138:18
outcomes  26:21
output  88:9
outreach  25:3
 92:10 95:10,15
outside  54:8
outstanding  77:9
overnight  136:11
 136:13
owner  57:18 98:9
owners  56:18
ownership  125:17
owns  68:15

p

p  5:1 30:22 37:6
 50:11 51:8
p.m.  119:21
 131:14,17 135:11
 136:2,3
page  3:3,17 18:17
 18:23 19:12 24:2
 24:21,22 25:13
 27:19 31:15 32:1
 36:10,24 38:10
 46:19 64:23,24
 84:2 88:9 92:2,4
 105:18,20,22,22
 107:2,13 114:5,6
 121:21,22
pages  14:17,18
 24:20 25:24 88:8
 90:1 137:5 139:8
 139:9
paid  74:18
paper  49:12 91:16
papers  49:16
 104:24
paragraph  19:7
 19:12 24:21 31:19
 32:6,11 38:12
 108:17 121:18
 122:3,16
paragraphs  18:21
pardon  27:21
part  58:23 90:22
 98:7 125:8,9,12
 126:20 127:5
 128:5,20 129:9,11
 129:14
participants  5:8
participating  8:25
participation  37:1
 37:3,6

particular  19:5
 21:7 44:17 50:19
parties  5:11 9:8
 138:10,17
parts  19:6 132:13
party  6:1 52:13,24
passage  25:25
passive  37:1,6
pay  52:14 53:21
 53:22,25 76:21
payments  54:1
 122:9
pdf  123:1
penalties  11:16
penalty  9:6
people  69:20
percent  124:9
 126:24 128:19
 129:25
percentage  124:6
perfect  18:24
period  31:21
 32:15 37:16 73:6
 85:19
perjury  9:7 11:16
persisted  26:17
persistence  102:15
person  9:5 14:2
 17:18 47:20 58:16
 61:20 71:20,25
 72:23 74:3,6
personal  56:6
persons  40:6,11
 70:22 81:3 107:9
 111:21 112:4,8
petty  30:21 31:4,7
ph.d.  1:17 3:4 4:3
 9:23 137:1,12
phone  47:19,23
 124:23

phrase  20:21 21:1
 23:4 32:21 34:1
 36:19 37:1,2 52:7
 92:20 96:9 116:20
phyllis  117:1,9
physically  9:1
pick  49:24
pigford  51:7,8,15
pile  49:16
ping  2:13 6:19,20
 7:22 9:17,17
 105:5 136:12
place  5:11 25:24
 40:1 42:20 47:18
 59:23,23 64:16
 65:11 138:11
placed  16:17
 43:13
places  11:15
plaintiff  5:15
 10:21
plaintiffs  1:6 8:22
 60:2
plan  3:12 8:9
 13:16 25:25 30:11
 64:19
please  5:5 6:4 9:11
 9:21 10:18 11:3
 14:7 15:6 17:23
 18:22 21:1,19
 35:3 36:11,12
 46:18 49:18 50:8
 58:19 83:17 84:1
 103:1 105:8,16
 107:11 120:10
 121:18,20 123:13
 127:10 129:9
 136:7,16 139:7,11
pleased  11:4
point  93:4 115:10
 115:21 116:10

FEDERATION MSJ APP. 150

[point - questions]

130:12

**points** 39:17 114:14,24

**policies** 54:9 62:25 101:15 103:18,21 104:7

**policy** 118:13,17

**population** 76:17

**positions** 47:5

**possibility** 42:18

**possible** 11:9 45:1 122:21,22

**possibly** 12:14 15:20

**post** 23:15 25:7 40:2 42:1 45:5,17 65:16 83:14 84:19 104:2

**practice** 115:16 116:22

**practices** 38:1 54:9 62:25 63:13 63:20 64:14 101:15 102:16 103:3,17,21 104:8 106:18 116:5,17 117:19 118:19

**precise** 62:17

**prepare** 15:23

**prepared** 14:12 16:5,10,20 23:11 55:6 78:11 117:17 117:22

**preparing** 21:20 111:15 139:13

**presence** 6:17

**present** 2:20 6:6 9:1 19:21 21:5 23:6,9

**presented** 63:4

**press** 3:11 105:4

**pretty** 126:17

**previous** 114:10 138:7

**previously** 13:7 28:23 36:21 45:13 91:2 121:2,12

**print** 14:15

**prior** 54:23 66:17 90:10 91:13 102:10 120:14,21 133:24

**private** 37:9,16,22 37:24

**probably** 16:13 18:15,21 20:15 49:8 52:8 71:22 76:3,13 87:16 88:13 90:6 112:5 123:17 125:20

**problematic** 122:11

**problems** 113:6 122:5

**procedure** 4:2

**procedures** 10:11 10:16

**proceeding** 58:3

**proceedings** 6:4

**process** 16:7 53:23 73:7 81:3 82:8 96:13 110:10,19 118:20 123:1

**processes** 119:3 122:10

**processing** 25:5 92:13,20,23 93:6 93:12 94:8,13,15 119:6 120:7,11,14 120:16,20,22 121:1 128:1

132:21

**product** 16:23 21:22 23:17 29:19 36:8 93:15,22 102:1 112:12

**professional** 80:12 80:18

**proficient** 110:2

**program** 29:10

**programs** 2:16 19:17 24:9,13 25:3,16 36:16 55:17 71:14 84:8 92:11 95:11,16 109:3,19,25 114:20 122:15

**progress** 66:11

**promised** 38:24

**prompt** 139:15

**proposition** 93:19

**prosperity** 106:12

**protected** 16:23 93:22 112:12

**protective** 8:1,8

**provide** 19:18 36:14 89:11,15,22 106:11 114:21 128:25 134:23

**provided** 8:1 13:3 18:14 21:12 55:12 58:12 63:18 85:11 91:18 96:3 118:22 132:4

**providing** 9:3,10 115:12

**provision** 53:7

**provisions** 53:18

**public** 2:3 4:8 6:15 6:25 7:4 137:20 138:5,24

**publication** 23:20 42:3 45:9

**publications** 26:2

**publiccounsel.org** 2:7,8

**publicly** 110:21 111:5,10

**published** 33:2

**publishes** 99:1

**pull** 129:3,15

**purpose** 125:16,22

**purposes** 12:21 21:20 24:17 89:21 111:15 132:5

**pursuant** 4:1

**put** 14:5,6 23:1 88:25 94:21,22 99:24 105:3 109:20

**putting** 111:21

**q**

**qualitative** 84:5

**quality** 5:6,7 113:8,9

**quantitative** 43:10 92:9

**question** 11:2,3,3 26:13 28:20 37:21 38:7 45:12 46:6 61:6,14 66:13 67:1 69:25 70:3,4 71:5 78:20 80:5 86:3 90:21 94:2,4 98:25 109:11 111:1,2,6,8 112:22 113:5 114:11 121:7,8 124:4,11 124:15 126:1 129:11,14,17

**questions** 3:15 8:7 10:16,24 11:2,23

FEDERATION MSJ APP. 151

[questions - relevant]

14:10 18:25 38:25
42:12 55:6 70:16
70:19 112:7,10
113:2,3,7,8,9
118:6,8 133:1
135:2,6,12
**quick**  8:13
**quotation**  109:7
**quote**  109:4

## r

**r**  5:1 29:11 51:8
**race**  59:14 125:5
131:4 133:13
**racial**  28:10 40:5
40:11 41:21 45:1
45:6,16 59:18
87:23 90:11 91:1
91:9 101:6,13,24
103:6,14 107:21
117:13,18
**racially**  103:22
**raise**  9:21
**ranchers**  106:11
106:19
**rancho**  57:9
**rates**  116:12
130:19,19
**raw**  97:6
**reached**  48:16
76:6
**read**  8:16 13:5,7
19:3,7 20:21
28:18,25 30:24
32:10 61:5,8,9
90:19 92:8 104:23
107:5 109:13
111:9 117:17
122:1 127:9,11
137:3 140:9
**reading**  51:21
55:24 56:8 108:18

108:22 114:16
**reads**  24:25 92:9
106:10
**really**  30:6 35:21
59:2 68:11 71:5
76:16 93:8 118:14
**reason**  12:16
75:17 140:11
**reasons**  80:16
81:15
**recall**  14:3 18:18
20:19 29:21 33:14
33:19 39:23 45:9
49:25 50:16,18
51:21 53:18 62:23
65:19 68:11 69:3
69:7,8,10,13 70:1
70:14,18,20 71:25
72:8,14,15 73:15
75:8,14,16 76:1
77:16 78:15,24
79:4,15,17 80:12
83:11 84:25 88:17
88:19 89:10,14
90:4 92:25 95:24
100:24 104:22
117:9 119:11
129:12,15,18
130:4,6 132:12
**receipt**  140:18
**receipts**  133:12
**receive**  22:15 31:3
36:2 43:23 44:4
86:16 96:19,20
106:21 110:5
129:13 133:20
**received**  16:16
17:4,24 31:2
43:15 124:2,8,13
124:19 125:11
126:2,2 129:10

130:8
**receiving**  114:24
115:5,22
**recess**  28:3 67:17
119:18 131:15
135:9,25
**recognize**  15:2
**recollection**  58:18
68:13 108:6
**recommendations**
33:13,17,22 46:15
65:25 66:3,7,24
67:2,4 83:19,24
**recommending**
42:5
**record**  5:4,12 9:12
22:12 28:1,4 61:9
67:14,19 119:15
119:19,23 127:11
127:19 131:13,16
135:7,10,19,21,24
136:1,2,21
**recorded**  1:15 4:3
5:6,10,14
**recording**  5:7,10
**records**  97:18
128:3 134:4
**reduced**  114:25
115:6 138:12
**refer**  33:3 34:8,24
41:23 61:14 65:15
66:9
**reference**  28:22
65:17 80:14
**referenced**  23:2
28:8,12 29:1
34:12 53:4 54:17
72:2 110:23
111:12 139:9
140:6

**references**  91:17
91:24
**referencing**  95:24
**referred**  34:3 50:4
51:4 52:4 65:10
68:4 91:3 106:22
110:10 122:19
**referring**  30:21
32:13 33:1,8
35:24 36:3 65:24
83:12 109:23
110:3
**refers**  52:12
**regard**  80:1
**regarded**  74:1
**regarding**  19:1
35:22 36:2 42:5
45:5 46:15 54:9
62:25 66:14 68:3
81:8 82:7,23
83:19 94:7 96:8
107:21 108:10
110:5 117:13,18
118:18 119:2
**regardless**  30:3
**registration**
139:19
**regression**  98:2
**regressions**  97:25
**relate**  28:9 132:21
**related**  6:1 24:9
**relating**  10:25
50:13,25 51:4
129:22
**relation**  138:9
**relations**  52:17
**relationship**  78:2
**release**  3:11 105:4
**released**  60:19
**relevant**  62:2,3
86:15,25 88:10,25

Page 18

[relevant - right]

98:25
**relied** 33:3
**relief** 52:7,12,18
53:5 54:1,2 77:6
**remained** 60:12
**remedied** 122:11
**remember** 16:9
29:6,25 50:20
51:21 59:17 69:21
71:19 72:25 73:10
74:6,10 75:5,12,13
78:3 80:4,15
87:20,21 97:20
100:22 114:12
120:22 125:14,22
126:4,22 127:1
128:6
**remote** 1:15 4:2
**remotely** 5:20 6:6
9:3
**repeat** 86:3 124:11
**rephrase** 48:11
**report** 3:10 12:25
14:6,9,11 15:7,10
15:13,24 18:14,23
19:1,3,6,8 21:20
23:12 24:20 26:6
27:20 28:8,13,16
28:18,19,22,22,25
29:1,4,7,7,12,14
29:22,23 30:16,16
30:21,25 31:3,8,16
33:1,4,5,8,9,12
34:4,8,12,13,17,25
36:11,24 38:11,19
40:5 41:24 44:22
46:19 50:5 51:5
59:3 63:11 64:1,7
64:11 65:7,20,24
66:15,23,23 71:6
72:2 82:9,11 83:6

83:12,13,16,18
84:2,9,15,19,21
89:21 91:3,4,10,15
95:21 102:12,14
103:9 111:15
114:11,13,18
118:18,22 119:10
120:9,14,18
121:19 130:14,18
130:22,22
**reported** 79:1
**reporter** 5:23 7:6
7:8,25 8:5,19,24
11:12 14:19,23
44:15 61:5 68:22
90:19,20 105:7,11
119:24,25 123:13
123:14 127:9
136:8,9,14,17
**reporter's** 138:1
**reporting** 9:2,10
**reports** 13:2,16
23:19,25 25:8
26:6 28:7,9,13
30:3,18 31:1,7
33:3 41:18 44:20
46:12 55:25 63:5
65:6,17 66:9,10
81:18 84:5 85:11
85:23 86:24 91:7
91:17 100:20
102:4 104:2,24
117:21 119:5
120:15
**represent** 100:10
101:1
**representative**
25:10
**representing** 5:22
**request** 23:14 36:5
85:8 88:15 93:11

123:17 133:20
**requested** 21:15
21:16,20 22:2,14
125:13 126:16
133:12,17,17
134:17,18
**requests** 113:4
**require** 93:9
**required** 139:8
**requirements** 25:9
95:22 115:25
**requiring** 76:19
**rescue** 3:11 25:25
30:11 64:19
**research** 50:23
51:3 90:25 91:5,6
91:16
**reset** 27:23
**resort** 74:14,17
**resource** 71:5
**respect** 36:20 67:2
77:21 78:21 79:11
80:1 81:7 90:11
90:14 92:19,22
93:12 94:22 95:10
102:13 116:20
121:10 122:7
124:8 133:3
134:19
**response** 13:16
78:15
**restate** 11:3 61:7
111:6
**results** 92:25
**retained** 19:13
136:5
**retired** 48:24
**return** 114:4
140:13,17
**returned** 139:10

**returning** 58:11
**revenue** 97:11
**revenues** 127:25
**review** 8:16 10:15
12:2,22,24 24:7,17
24:18 50:12,15
51:9 53:14 62:7
71:13 88:2,8
105:23 140:7
**reviewed** 12:25
13:8 21:9,12
23:24 30:14,18
31:1 36:14 53:17
63:5 64:3 86:8
88:22 91:19
100:21
**reviewing** 41:18
63:16
**right** 8:11 9:21
10:3 13:13,19,24
14:16,24 15:18,20
17:2 20:12,20
22:20,25 23:8,14
24:6,16,25 26:7,9
27:9 28:23 31:18
31:25 33:10 35:8
38:8 39:10 40:8
41:8 42:6,10,21
43:21 44:23 45:2
45:21 46:23 47:21
50:5,12 51:1,5,12
51:24 52:4 55:19
64:23 71:17 73:7
78:19 80:22 81:8
81:13 82:1 84:16
85:8 86:19 91:12
92:7,19 102:6
104:13 105:7,23
106:7 111:23
114:16 115:3
117:10 118:23

Page 19

**[right - servicing]**

121:16 123:12,25
126:20 128:16
131:19 132:14
134:5,12 136:17
**rights** 51:20 117:6
117:13 119:3,4
**risk** 42:25 43:2,4,7
43:9,11,12,15,20
43:24,24 44:8,9
96:10,12,16,21,25
97:9 98:6,13,14
99:2,12,17 113:6
113:18 130:20
**rmr** 4:7 138:4,23
**robb** 1:17 3:4 4:3
5:14 9:20,23 10:3
10:8 12:18 14:7,8
15:3 19:2 25:19
28:7 35:15 67:11
67:20,23 81:9
86:2 89:17 96:9
104:15 105:4,15
109:14 110:16
114:4 119:21
120:2 129:21
131:19,21 135:13
136:4 137:1,12
139:2 140:5
**robb's** 3:10 35:14
105:8 127:10
**room** 2:18 7:17,18
7:19,21,23 9:1
**rosenbaum** 2:4
3:5 6:9,10,14,22
7:1,6,10,18 8:9,14
8:21 9:14,14 10:2
14:22,24 15:1
16:24 17:1 18:1,7
18:10 21:24 22:4
22:8,10,19 23:22
27:18,25 28:6

29:20 35:8,9,19
36:9 38:24 39:2
41:13 42:15,16
44:5 46:5,10 55:4
55:21 56:14 61:8
61:11 66:19 67:10
67:22 68:7,8,23
69:1 70:6 86:4
89:20 90:24 91:20
93:16,18 94:1,5
101:17 102:2
104:17 105:6,14
107:15,17 109:10
109:12 110:20
112:14,20 113:1
113:14 118:4,7,10
118:11 119:23
120:1 121:22,23
123:9,12,15 127:8
127:12,21 129:24
130:13 131:11,18
135:14,18,22
**rule** 73:16,17
121:11
**rules** 4:2 93:20
**run** 14:17 56:25

**s**

**s** 2:6 5:1 33:10
37:6,6 50:11
**sanctuary** 57:9,12
**sarah** 2:5 6:22,23
9:18
**saw** 42:17 88:10
107:10
**saying** 49:19 52:19
54:3 92:17 111:4
111:4
**says** 23:5 24:7
31:20 32:14 36:13
38:11,20 64:25
84:4 95:1 108:19

109:8
**sba** 70:11
**school** 80:17
118:12,16
**scope** 35:14
**score** 43:7,9,16,20
43:25 96:25 97:5
97:6 98:16 113:17
128:1 133:14
**scores** 43:13 44:9
97:2
**screen** 5:9
**scroll** 32:2 123:18
125:1,7,8
**search** 87:3,12,14
87:17 88:7,16
100:14 117:25
**searches** 87:13,18
88:3,12 91:24
107:25
**second** 16:12
31:20 32:14 71:16
71:19 78:7 79:7
79:11,12,18 80:19
81:3 105:5 109:9
109:10 115:21
135:19
**secondary** 79:7
**secretary** 1:9
10:22 19:14,25
106:13,18 109:5
109:22 110:10,14
110:23 111:11,14
119:3
**section** 30:10
**sector** 127:25
128:9
**see** 19:12,22 20:21
20:23,24 23:4
24:6,14 25:17
31:20,23 32:5,17

32:21 36:17 38:11
38:16,22 39:8
52:2 54:8 58:25
63:14,20 64:24
65:4 72:20 73:23
81:8 84:3,10 85:6
86:24 87:5 92:2,7
92:15 95:1,11,14
96:1 101:12 106:9
106:15,25 107:8
107:12 109:4
114:14 115:1,10
115:21 116:2,10
116:14 121:25
122:16 123:10,22
125:9
**seeking** 37:11
42:10 77:21 81:11
95:22 117:14
**seen** 5:9 85:23
106:1 108:3
**selected** 46:25
**sense** 79:20 124:17
134:22
**sent** 140:14
**sentence** 19:12,22
20:21 23:4 24:6
24:20 31:20 32:4
32:14,19 36:13
38:11,22 39:4
64:24 65:4 84:3
92:7,8,15 106:9,23
108:18 109:13
111:8
**sentences** 18:13,16
19:6
**september** 58:20
112:6
**services** 109:3,19
**servicing** 25:7
27:10 35:25 36:3

Veritext Legal Solutions
800-336-4000

FEDERATION MSJ APP. 154

[servicing - substance]

45:24 46:1,8,15
69:18 70:8 72:13
72:15 77:10,13
78:4 90:15 92:14
109:25 115:12,13
117:15
**sessions**  82:12
**set**  53:23 55:6,9
69:14 133:17
**setting**  11:14
**settlement**  53:14
53:16
**settlements**  53:9
53:11,17,19
**seven**  71:23 93:4
**shakes**  44:12
**shaking**  44:13
**sheet**  126:7 140:11
**sherrod**  107:12,16
107:18,20 108:9
108:14,15
**sherrod's**  107:24
**shirley**  107:12,16
107:18,20,24
108:9,14,15
**show**  120:9 122:13
**showing**  92:10
**shows**  128:9
**sid**  1:5 5:15 10:21
139:6 140:4
**sides**  136:14
**sign**  8:16 140:12
**signature**  25:10
138:21 139:9
**signed**  140:20
**sincerely**  139:18
**single**  133:15
**sit**  13:15
**site**  46:1
**sitting**  33:16,25
37:15 50:18 64:13

66:2 70:1,18 80:4
87:20 90:17,22
91:8
**situation**  76:10
**situations**  122:7
**six**  18:21 32:7 34:9
48:22 57:12
**sixth**  32:8
**skimmed**  13:5
**skip**  61:5
**skyrocketing**
27:23
**small**  56:18
**smaller**  115:23
**smith**  4:6 5:24
138:3,22
**solutions**  5:22,24
136:6 139:18
140:23
**somewhat**  75:14
122:6
**sorry**  34:9 44:14
61:4 70:11 75:21
90:18,20 94:3
97:14 99:9 111:2
121:9 130:2 131:3
**sort**  84:20
**sorts**  10:11 103:3
**sought**  57:18 58:6
77:10
**sounds**  117:3
**source**  45:1,6
129:2
**south**  2:13
**southern**  100:2
**speaking**  109:8
**specialists**  111:22
112:1
**specific**  17:9 21:25
25:21 26:4,11
30:12 37:18 39:25

44:21 53:18 62:14
63:10 64:1 66:12
66:23 70:12 73:1
73:5 78:20 82:6
83:19 84:25 87:19
100:21 103:25
110:6 112:7 113:5
113:12
**specifically**  23:2
26:16 32:13 33:19
33:24 36:3 50:16
52:25 54:9 59:21
60:4 62:23 63:19
67:1 69:25 72:14
74:19 75:10 78:3
78:15 79:6 88:17
97:15 99:5 108:10
110:8 114:5
116:21
**specifics**  59:1,18
75:13 83:11
**speculation**
110:14
**spell**  50:7
**spellings**  7:7 136:8
**spent**  16:1 88:13
**spoke**  21:7 49:23
61:20 76:14 112:3
**spoken**  17:13
**spouses**  54:13
**spreadsheet**  126:5
**staff**  20:10 39:15
110:1 111:17,19
**stands**  66:21 93:19
**start**  39:1 127:8
**started**  57:11
**startups**  56:19
**state**  4:8 6:4,7
7:20 64:24 133:14
136:7 137:4 138:5

**statement**  8:19
58:2,3 59:8 74:21
**statements**  107:21
108:10,14
**states**  1:1 5:17
19:14 25:20 28:10
64:11
**stating**  9:12
**statistical**  19:16
92:10
**status**  24:10
**stay**  52:19
**stenotype**  138:11
138:14
**step**  3:11
**stories**  55:18
**story**  25:14 55:16
56:6 93:7
**strawn**  2:9,12 6:21
**street**  2:10,18
139:19
**strike**  24:1 35:4
40:4 42:8,24
48:18 51:10 53:8
57:22 62:8 64:5
69:24 74:22 84:12
85:22 94:6 100:1
103:4,18 124:7
**striving**  106:12
**studies**  91:9 102:4
104:24
**stuff**  125:2
**subject**  8:8 79:2
**submission**  17:13
**submitted**  15:8
16:5 17:6 30:21
57:22 58:5,12
68:20 69:21
**subscribed**  137:14
**substance**  16:22
16:25 18:2 29:7

[substance - time]

| | | | |
|---|---|---|---|
| 49:25 58:19 | 135:4 | 95:16 96:4 99:11 | 59:19 60:3 62:19 |
| **substantial** 36:14 | **taken** 4:4 5:14 | 101:6 102:7,10,19 | 67:12 69:15 72:3 |
| **success** 106:12 | 28:3 59:23 65:11 | 103:23 104:8 | 72:7 73:22 74:4,6 |
| **suffering** 122:13 | 67:17 119:18 | 110:7 115:4,17 | 74:13,18 77:4 |
| **sufficient** 67:13 | 131:15 135:9,25 | 116:6,18 117:18 | 79:20 81:17 82:9 |
| **suggested** 108:14 | 138:10 | 119:9 131:10 | 82:11 83:7 88:7 |
| **suggestions** 16:19 | **takes** 40:1 | 135:5 | 89:8,23 90:2 92:6 |
| **suit** 50:3 | **talk** 40:5 47:13 | **terminated** 61:3 | 97:3 99:23 107:2 |
| **suite** 139:19 | 51:7 54:13 72:17 | **terms** 39:12 69:15 | 108:3 109:6 |
| **suits** 80:11 | 96:8 101:23 135:3 | 79:12 115:23 | 110:24 112:22 |
| **sum** 49:25 58:19 | **talked** 17:16 45:23 | 120:20 122:2 | 113:4 117:23 |
| **super** 13:6 | 47:8 48:20 54:13 | 126:20 132:23 | 126:17 130:23 |
| **supplied** 13:12 | 66:14 83:16 84:15 | **testified** 9:25 | **thinking** 21:8 |
| 58:8 87:1 108:13 | 95:21 102:3 120:6 | 28:21 | 53:19 110:15 |
| **support** 48:14 | 134:2 | **testify** 138:8 | 111:8 114:13 |
| 55:1 59:20 76:7 | **talking** 21:24 | **testifying** 11:16 | **third** 16:13 76:2 |
| 108:24 109:15 | 34:17 61:13 64:15 | **testimony** 9:6 16:4 | **thorough** 119:4 |
| **supporting** 30:10 | 132:9 134:9 | 54:24 66:18 87:5 | **thought** 62:20 |
| **supposed** 113:18 | **task** 71:8 | 91:14 134:9 136:4 | 74:11,21 75:1 |
| **sure** 48:23 52:22 | **tasked** 41:17 | 137:3,6 140:9,18 | 81:16 93:6 110:18 |
| 86:5 97:10 102:19 | **tauber** 2:9 | **texas** 1:2 5:18 | **thousand** 39:22 |
| 118:4,9 124:12 | **tax** 54:2 76:15,19 | 139:20 | **thousands** 84:6 |
| 131:11 | **taxes** 76:21 | **text** 14:13 16:20 | 85:5 88:8 |
| **suspects** 88:1 | **taxpayer** 71:7 | **thank** 6:13 7:11 | **three** 17:16 25:5 |
| **swear** 8:20 9:13 | **team** 131:7 | 10:6 14:24 16:15 | 32:6,7 47:15,16,24 |
| **sworn** 9:24 137:5 | **technology** 5:21 | 39:3 44:6 54:3 | 49:24 54:12 71:18 |
| 137:14 138:8 | **tell** 18:16 20:25 | 61:19 62:16 105:6 | 87:21 93:23 |
| **system** 76:15 | 21:19 22:13 23:8 | 105:11 107:15 | 111:18 136:5 |
| **systematic** 101:12 | 44:22 49:21,24 | 109:20 119:25 | **throckmorton** |
| **systems** 129:5 | 52:10 57:7 61:21 | 131:5 135:3 136:7 | 139:19 |
| **t** | 64:13,17 74:19 | 136:17 139:15 | **thursday** 1:18 4:5 |
| | 76:16 77:23 83:17 | **thereof** 138:14 | **ties** 80:11 |
| **t** 30:22,22 | 87:19 94:7 99:9 | **thing** 41:11 75:12 | **time** 6:4 10:6 13:9 |
| **take** 5:11 8:13 | 105:9 108:2 112:4 | 104:5 130:24 | 15:25 17:6 25:5 |
| 13:7 15:23 16:4 | 113:2 120:19 | **things** 14:14 41:15 | 28:2,5 29:3 31:21 |
| 19:4 27:22,24 | 127:22 | 69:15 87:13 88:18 | 32:15 37:16 41:17 |
| 42:20 46:18 47:18 | **tells** 25:14 | 89:23,24 97:10,11 | 47:24 48:20 57:6 |
| 49:4,9 50:22 | **ten** 68:21,23 69:6 | 98:5 117:24 | 64:19 67:9,15,20 |
| 55:18 59:23 | 69:12,18 70:9 | 130:17 133:12 | 69:22 70:12 72:7 |
| 104:15 105:15 | 73:13 85:17 86:9 | **think** 7:10 12:10 | 72:10 75:8 85:19 |
| 117:8 118:2,10 | 92:22 93:13 94:8 | 18:7 51:18 56:9 | 92:13,20,23 93:12 |
| 119:13 123:1 | | | |

FEDERATION MSJ APP. 156

[time - usda's]

94:8,22 101:16
105:15 118:3
119:16,21,22
120:7,11,14,20
121:2 122:20
129:6 130:2
131:14,17 135:2,8
135:11,24 136:21
138:11 140:19
**timeframe**  140:8
**timely**  119:4
**times**  56:24 57:13
94:15 120:16
**title**  28:16 29:6
89:7
**today**  5:23 13:15
20:18 24:10 25:21
33:16,25 37:15,22
50:18 64:13,16
66:2 70:1,18 80:4
82:17 87:20 90:17
90:22 91:8 108:4
120:21 121:3,12
135:3
**today's**  136:3
**told**  48:15 69:14
81:7 96:9 99:24
113:22,24 124:13
**tom**  1:8 5:16
106:13 139:6
140:4
**top**  28:17 47:17
88:9 90:2 92:1
114:17
**topic**  91:6
**total**  18:21 136:4
136:21
**touch**  108:15
**transcript**  8:17
136:10,13 137:3
138:13 140:6,20

**transcription**
109:7
**treated**  80:19 81:1
81:25
**treatment**  25:2
26:23 62:21 75:11
**treatments**  34:6
**trees**  128:10
**trial**  2:16
**trick**  11:1 38:25
109:10
**tried**  128:23
**true**  17:6 68:7
138:13
**truth**  138:8
**trying**  90:21
114:11
**turn**  27:19 84:1
**twelve**  57:11
**twice**  109:8
**two**  13:3 17:11
25:4 30:17 31:5
32:6 33:2 48:25
49:12 88:9 91:17
91:18 92:2 111:18
118:7 125:14
126:10 127:1,16
127:18 134:2
**tx**  139:20
**tx5308654**  137:25
138:25
**type**  133:14
**types**  132:18,18,21
134:2
**typewritten**
138:12
**typically**  25:12
**tyrik**  2:21

**u**

**u**  104:19
**u.s.**  2:17 7:14
89:21
**uh**  92:16 123:21
**unclear**  70:2
**underlying**  122:5
**underneath**
115:10
**underserved**
109:2,18
**understand**  11:5
11:10,13,18 12:5
12:11 19:9 30:8
39:10 46:6 47:25
61:16 75:18
125:24
**understanding**
39:11,13 43:2
44:18 46:17 54:20
56:11 57:25 58:2
73:25 127:18
**understood**  58:16
59:15,23
**undertake**  26:9
31:10 33:20 41:1
52:24 60:15 80:25
82:23
**undertaken**  41:4
82:5
**undertook**  35:1
82:12
**unfairly**  74:4,11
74:20
**unintentional**  65:2
65:9
**unit**  5:13 52:19
**united**  1:1 5:17
19:14 25:19 28:10
64:10

**units**  136:5
**unmute**  90:21
**untimeliness**
119:5
**urban**  76:20
**usda**  3:12 19:15
24:8 25:15 27:13
35:5,11,23 36:15
39:15,20,24 41:4
41:20 42:9 44:7
45:14 53:20,24
55:17 57:15,19
58:6,22 59:9,13
63:16,22 65:18
66:5,11,15 67:2
68:21 69:5,12
70:11 74:13,15
77:3,21 78:2 79:3
79:9,13,19 80:1,8
81:1,5,12 82:5,22
83:22 84:8,12,18
84:24 85:12,15,24
86:7 87:8 88:15
90:12 91:1,9
94:19 95:8,18
96:6,12,16,21
98:12 99:1,10,15
101:11,14 103:6
103:15,19 104:6
106:10,18 108:11
108:25 109:2,16
109:19 110:21
111:10,19 112:1
114:19,20,24
115:5,8,11,19,22
116:8,11,24 117:6
117:13 118:19
119:2 122:5,11,24
128:24 132:22
**usda's**  19:17 24:13
87:4 122:15

[usdoj.gov - worth]

| | | | |
|---|---|---|---|
| **usdoj.gov** 2:19 140:2 | 66:11 71:11 84:7 100:20 122:10 | 26:13 29:24 31:18 32:10 34:17 35:10 | **withdrawal** 130:19 |
| **use** 32:24 33:25 36:19 49:9 76:17 97:10 | 125:18 133:10 **venture** 56:18 **verify** 7:15 140:9 | 35:21 36:12 38:17 42:17 44:15 49:20 55:15 61:12 67:11 | **withdrawals** 82:19 94:10 **withdrawing** |
| **useful** 73:3 115:24 | **veritext** 5:22,24 | 71:7 73:1 87:19 | 25:11 |
| **usually** 96:25 | 136:6 139:18 | 98:5,8 99:24 | **witness** 5:9 8:20 |
| **utilize** 132:7 | 140:14,23 | 104:15 111:6 | 9:5,13 18:5 21:22 |
| **utilized** 10:12 89:15 | **veritext.com** 139:20 | 119:14 131:8 135:20 | 22:17 23:19 27:17 29:19 35:16 36:8 |
| | **veritext.com.** | **wanted** 55:9,16,23 | 38:21 44:3,12 |
| **v** | 140:15 | 56:20 69:15 71:7 | 46:8 54:25 61:10 |
| **v** 37:6 139:6 140:4 | **versus** 5:16 10:21 | 78:10 88:20 89:4 | 68:24 70:4 86:3 |
| **vague** 18:4 35:7 | **video** 1:15 4:3 | 136:9,10,14 | 89:18 91:15 94:4 |
| 44:2,3 46:4 55:20 | 5:10,14 136:2 | **washington** 2:10 | 102:1 104:16 |
| 68:5,12 86:1 | **videographer** 2:20 | 2:18 4:7 138:4 | 107:16 110:17 |
| 101:16 127:7 | 5:3,23 6:13 7:25 | **way** 32:7 44:11 | 112:13,19 113:11 |
| 130:10 | 8:4,18 27:21 28:1 | 78:6 82:14 103:11 | 127:13 129:22 |
| **vaguely** 33:15 | 28:4 67:14,18 | 108:2 118:25 | 130:12 134:6 |
| **valid** 114:3 | 119:15,19 131:13 | 138:16 | 138:8 139:8 140:8 |
| **value** 113:18 | 131:16 135:7,10 | **ways** 25:1,16,22 | 140:10,12,19 |
| 126:15 | 135:17,20,23 | 25:23 26:4,17 | **woman** 30:17 |
| **values** 113:20,20 | 136:1 | **we've** 23:5 67:8 | **woman's** 17:14 |
| 114:3 125:21 | **view** 62:6,9 | 83:16 | **women** 17:11 |
| 134:4,14,15 | **villegas** 2:21 | **website** 87:4,4 | **wonder** 118:2 |
| **variable** 43:10 | **vilsack** 1:8 5:16 | **websites** 87:9,9,10 | **word** 132:19 |
| 113:6,18 125:16 | 106:14 109:5,22 | **week** 13:11 15:15 | **words** 18:13 99:24 |
| 125:21 126:16,25 | 110:10,14,23 | 31:5 91:18,18 | 110:18 |
| 128:12 129:22 | 111:11,14 139:6 | **welcome** 14:9 | **work** 15:25 16:23 |
| 132:3 | 140:4 | **went** 49:14 78:9 | 21:21 23:17 29:19 |
| **variables** 80:20 | **virtual** 5:21 | 80:16 132:11,12 | 36:8 39:11 40:6 |
| 113:19 125:14 | **virtually** 5:6 17:20 | 133:2 134:20 | 46:24 56:17 90:11 |
| 126:11 127:13,24 | **vs** 1:7 | **white** 25:12 40:15 | 93:15,22 102:1 |
| 128:2,21 129:6,16 | | 95:23 96:3 115:25 | 108:24 109:15 |
| 130:21,25 132:2 | **w** | **wife** 50:3 54:16 | 112:12 132:5 |
| 133:11,18,22 | **w** 33:10 | 58:16 68:3 | **worked** 48:13 |
| 134:3,10,15,16,16 | **wa** 138:23 | **willingness** 135:2 | **working** 17:11 |
| 134:17,19 | **wages** 76:21 | **winston** 2:9,12 | **works** 74:15 |
| **varied** 97:25 98:1 | **waive** 9:9 | 6:21 | **worth** 1:3 5:18 |
| 98:2 | **want** 11:2 12:7 | **winston.com** 2:11 | 139:20 |
| **various** 16:1 25:8 | 17:2 18:2,19 19:2 | 2:15 | |
| 56:24 63:5,8 66:8 | 19:4 22:6,20,21 | | |

FEDERATION MSJ APP. 158

[write - zoom]

| | |
|---|---|
| **write**  14:14 | **yesterday**  20:12 |
| **written**  4:1 51:15 | **z** |
| **wrote**  15:7 34:9 | **zero**  113:20 |
| **y** | **zeros**  113:25 |
| **y**  30:22 | **zoom**  4:5 10:10 |
| **yeah**  15:21,22 | 72:21 |
| 27:25 28:19 29:8 | |
| 32:5 35:16 43:6 | |
| 50:2 54:3,4,25 | |
| 55:23 56:22 67:10 | |
| 68:11,16 70:4 | |
| 73:3 75:12 76:24 | |
| 77:4,24 78:4,24 | |
| 79:15 80:8,9 82:9 | |
| 86:10 87:3,5,11,12 | |
| 88:7 89:23 91:5 | |
| 92:6 98:17 104:12 | |
| 104:21 105:21 | |
| 107:4 110:17 | |
| 119:11 121:17 | |
| 122:25 123:19 | |
| 124:21 125:3 | |
| 131:5,10,24 | |
| 132:15,24 133:7 | |
| **year**  114:12 | |
| **year's**  115:24 | |
| **years**  20:10,11,14 | |
| 21:8 56:24 57:11 | |
| 57:12 68:21,23 | |
| 69:6,12,19 70:9 | |
| 73:14 76:18 82:13 | |
| 85:17 86:9 92:22 | |
| 93:13 94:9 95:16 | |
| 96:4 99:11 101:7 | |
| 102:7,10,20 | |
| 103:23 104:8 | |
| 110:7 115:5,17 | |
| 116:6,18 117:18 | |
| 119:9 | |
| **yep**  19:10 53:2 | |
| 120:3,5 131:20 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

SID MILLER, et al.,

     *Plaintiffs*,

     *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

     *Defendant*.

No. 4:21-cv-00595-O

## <u>DECLARATION OF SAUL BERNAL</u>

I, Saul Bernal, state that I am more than 18 years of age, and the following is based on my personal experience:

1. My wife and I are Hispanic farmers and have been farming in New Mexico for almost two years.

2. My wife and I are first-generation farmers, neither our parents nor grandparents farmed.

3. We own an alfalfa and cattle farm that is approximately 12 acres.

4. We have five direct loans from USDA: a real estate loan to buy the land for approximately $270,000, an operating loan for approximately $5,500, and three equipment loans for $50,000, $18,000, and $35,500.

5. We received very little help from USDA when we applied for the loans.

6. To apply for the loans, I checked online and found that we had a local USDA office. I called our local USDA office and they referred me to farm agency loan manager from USDA named Leah Bradfute to apply for the loans.

1

7.  The first time we went to the office, we sat in the front for a while before anyone came to talk to us, even though there was not anyone else there waiting to be seen.

8.  Ms. Bradfute has never been helpful to us. She is very short with us, and it feels like she is just trying to meet a quota to help a certain number of Hispanic farmers. It is like we are just another number, or a box to check, for her, and she is not going to do anything more than the bare minimum.

9.  You have to know exactly what to ask of Ms. Bradfute to get the information you are looking for, which is nearly impossible, especially for first-time farmers. She does not expand or elaborate, and she answers only direct questions from us. It makes it very difficult to get answers or help because you basically have to guess exactly what you need to know to ask the right questions.

10. One of my friends is a longtime farmer and was the one to guide us through the process, like how much seed and fertilizer we will need. My friend also helped us figure out how much money to apply for.

11. USDA did not help us with any of these decisions. If it were not for my friend, we would have lost our farm by now.

12. As part of the application process, Ms. Bradfute said we had to prove that we had farming background. USDA had my friend sign a letter saying that he has been working with me and mentoring me in order for me to apply.

13. USDA told us that we had to take business management classes as a condition of our loans, since we were first-generation farmers. We still have not been able to take the classes because we only recently received an email from Ms. Bradfute with the classes that we need to take – nearly two years after we took out the loans.

2

14. It also took a really long time to get a tract number for the farm from USDA. Even once we got the tract number, there was an error – it only lists my name, not my wife's name. I have emailed and called several times to get this fixed, but I never get a response from the USDA employee who I am supposed to be contacting to correct this mistake. I even asked Ms. Bradfute if that employee still works for USDA because that employee never has gotten back to me.

15. Ms. Bradfute and the vast majority of the other employees in the USDA office I work with are White.

16. We bought the farm in August 2020. We got a couple of cuts of alfalfa that year, but the field needed a lot of work, so we took out the operating loan to help pay for the seed, fertilizer, and some custom labor to prepare the field.

17. During 2020, we were impacted by rain, which caused us to lose half of our first cut. Rain impacted the second cut as well.

18. I later learned I qualified for free insurance (NAP) because I was Hispanic, but USDA never told us about that. I am not sure why USDA did not tell me that sooner, especially since we came to USDA as first-generation farmers. That insurance would have helped us recover some money for the cuts that we lost.

19. We later enrolled in the insurance, but we received an enrollment letter that had a question mark in place of the number of acres, so I am not even sure if we are covered for this year. This insurance is really important because, where we live, it does not rain often, but it is sudden when it comes, and it can ruin our alfalfa.

20. The third and fourth cut of alfalfa were impacted by COVID. Many people did not want to buy bales, so we had to go find others to buy our bales and the prices we sold for were

3

less than we expected. We ended up making much less than what we were projected to make.

21. In approximately May 2021, we received the letter about the ARPA relief. It said four of our loans were eligible for debt forgiveness.

22. A few months later we received another letter from USDA. We thought this letter was to tell us that the ARPA funds had gone through, but it was the complete opposite. This letter said that our loans were past due because we had not made payments, and that we had sixty days to respond or we were going to go into foreclosure.

23. We were under the impression we were going to receive debt relief, which we still have not received.

24. The letter that mentioned foreclosure really scared us. Being first-time farmers, it seemed really abrupt. We felt that we had been set up to fail.

25. After receiving the letter, I called Ms. Bradfute to ask what was going on. I asked her what was going on with ARPA and she said she did not know and referred me to the website.

26.  I asked her if we had any other options to avoid foreclosure, and she just basically read out loud the letter we had received and said those are your options. It made me feel kind of stupid because obviously I knew how to read and had read the letter I got it in the mail. I clearly did not need her to read the letter to me verbatim. What I was looking for was more information about my options, but she did not give me any additional information.

27. We ended up signing a restructure of our loans. I am not sure if that was the right decision or not, but we did it because the paperwork we got said that we would go into

4

foreclosure if we did not sign. We thought USDA was not moving forward with
foreclosures, but the letter suggested otherwise.

28. As part of the initial application process for our loans, USDA put a lien on everything we
own, including a house we own out of state. If we do not keep up with our payments, we
could lose everything.

29. The process of the restructure was entirely through the mail. We filled out the paperwork
and sent it back through the mail. We came into the office only to sign the paperwork.

30. As part of the restructure, USDA increased the length of the loan from 30 to 40 years.

31. When I later contacted Ms. Bradfute to get our loan balances and to ask if the balances
are available on the website, she said she did not know.

32. We later learned we could see all of our loan balances on the website, but we had to
figure out how to do that ourselves.

33. After the restructure, we owe approximately $280,000 in a real estate loan, $75,000 for
two equipment loans consolidated with an operating loan, and $35,500 for the third
equipment loan. We were not late on the third equipment loan so it did not get included in
the restructure.

34. We have applied to the National Resources Conservation Services (NRCS), which is
another department in USDA, because our irrigation ditch is dirt, so we lose a lot of water
and waste extra electricity running the well. We found out about NRCS from another
farmer friend down the street, who is White. USDA never told us that we could get a
grant to have the ditch lined.

35. NRCS also told us that there is a program to help with the soil. USDA did not tell us that
when we first applied for the loans, even though we were first-time farmers. We could

5

have used that program and avoided having to take out $5,000 in loans to work on the soil.

36. USDA never contacts us to let us know about programs that we might be eligible for or that might help us. If I was not educated and did not speak English, I would not have been able to do all the research I had to do to learn about these programs and opportunities myself.

37. The lack of communication and information from USDA is the biggest barrier to our success.

38. When we first got the loans, we were told by USDA that the farm will pay for itself soon. We did not think we would have to pay so much out of our own pockets. Instead, we have had to pay a lot of money out of pocket and the farm still is not making money. We are living out of a barn on our property because we cannot afford to make our loan payment and build a house at the same time.

39. It is very obvious who gets help from USDA and who does not. White farmers in my area have not had the same experience with USDA as my wife and I have had.

40. The farms owned by White farmers have their ditches cemented and lined and have new-looking tractors. Those farms have alfalfa that is knee-high, whereas our alfalfa barely grows. I believe that is because of the different investment in capital that the White farmers are able to make.

41. Many of the Hispanic farmers I have spoken to do not know what assistance the USDA has to offer because the USDA does not reach out to them.

42. There is another Hispanic farmer we know in our area who has a 70-acre farm which was passed down to him by his family. He has old tractors and his farm looks like crap. When

6

I asked him whether he had heard about ARPA, he said he did not know anything about it.

43. My wife and I had looked into purchasing another neighboring property to expand our farm, and even took on the third equipment loan we had to do so. But, after our experience with USDA and seeing how little help we would get from USDA to learn the business, we backed out of that purchase. We lost our earnest money deposit.

44. I do not earn enough farming for it be my primary source of income. Had it not been for my day job, we would not have enough to live on.

45. If the ARPA debt relief came through, it would allow us to expand. We want to farm. It is hard work, but we love it and we want to expand. But I do not see how that is possible right now given how little help we have received from USDA.


**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**


*Saul Bernal*                                  07/16/2022
_____                    _____
Declarant's Signature                         Date

Saul Bernal
_____
Declarant's Printed Name

7

| | |
|---|---|
| Document title: | Saul Bernal Declaration |
| Filename: | Saul Bernal Declaration.pdf |
| Document id: | 183e9821-cdd6-4edb-b24d-cdffeba6a30c |
| Document status: | Completed |

# Document Audit Trail

 CREATED AT: Jul 15, 2022 | 20:10:09 UTC+00:00

Document Created

 UPDATED AT: Jul 15, 2022 | 20:11:13 UTC+00:00

Document updated

 SENT AT: Jul 15, 2022 | 20:11:24 UTC+00:00

Sent for signature to Saul Bernal | sbernal2133@icloud.com

From IP: 2601:2c2:500:8b40:39b7:22d5:cc81:47e3

# Document Audit Trail

---

 **VIEWED AT :** Jul 16, 2022 | 15:01:21 UTC+00:00

Viewed by Saul Bernal | sbernal2133@icloud.com

From IP: 2600:1011:b102:dab5:4d92:4d02:b2c7 :1646

---

 **SIGNED AT :** Jul 16, 2022 | 15:01:51 UTC+00:00

Signed by Saul Bernal | sbernal2133@icloud.com

From IP: 2600:1011:b102:dab5:4d92:4d02:b2c7 :1646

---

 **COMPLETED AT :** Jul 16, 2022 | 15:02:01 UTC+00:00

Document Completed

---

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

SID MILLER, et al.,

       *Plaintiffs*,

     *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

       *Defendant*.

No. 4:21-cv-00595-O

## <u>DECLARATION OF CORNELIUS BLANDING</u>

I, Cornelius Blanding, submitted a declaration in support of the Federation's Motion to Intervene as Defendant on October 12, 2021, *see* App'x Mem. ISO Federation's Mot. Intervene as Def. at 9, ECF No. 93-2, and now incorporate that declaration and additionally declare as follows:

1.      I am the Executive Director of the Federation of Southern Cooperatives/Land Assistance Fund ("The Federation"). I have been in my current position since 2015. Before I became the Executive Director, I also served as Deputy Director, Director of Field Operations, Director of Marketing and International Development, and Revolving Loan Fund Manager for The Federation. I have personal knowledge of the facts set forth below, and if called upon to testify, I could and would do so competently.

2.      The Federation was created in 1967 by twenty-two cooperatively owned organizations and leaders to be a catalyst for the development of self-supporting communities as well as advocate at the local, state and national level on behalf of Black farmers and to help develop economically poor rural communities. The organization functions as a nonprofit cooperative

1

association of Black farmers, landowners, and cooperatives. The Federation is unique as an organization because it has a cooperative membership as well as a land assistance fund. The Federation has roughly 20,000 members, which include agricultural/producer, consumer, and worker cooperatives, as well as farmers, and landowners. Our membership is almost exclusively Black, and many of the farmers who are part of The Federation are multigenerational farmers. Our members are located all over the southeast United States, including in Texas, Georgia, Mississippi, Alabama, Florida, South Carolina, and Louisiana. Individual members join our membership database through an application and payment of dues.

3.      The Federation serves its members through advocacy, technical assistance, and support services. Although farming, ranching, and agricultural stewardship, as important as they are, do not require any special qualifications, credentials, or formal training, and are accessible to all who have both the desire and the means to cultivate the land, supportive services are often extremely helpful to ensure that farms are efficient and sustainable. In terms of advocacy, The Federation represents the interests of its members at the local, state, and federal level. For example, in 1980, Congress commissioned The Federation to conduct a study titled "The Impact of Heir Property on Black Land Tenure in the Southeastern Region of the United States." The study culminated in 19 recommendations submitted to the United States Department of Agriculture ("USDA") and Congress regarding USDA services, including loans.

4.      Our technical assistance is available in many forms, including providing our members with support during the USDA loan application process, conservation assistance, and legal support.

5.      If a farmer is interested in applying for a loan, we help the farmer work through the local Farm Service Agency ("FSA"). We provide education and technical support on natural resource conservation services, which entails equipping farmers, ranchers and forest landowners

2

with the knowledge and tools needed to conserve, maintain, and restore the natural resources on their land and improve the health of their operations for the future. Our legal assistance covers land tenure and retention issues.

6.     The Federation's Land Assistance Fund is an integral part of the organization and the result of a merger with the Emergency Land Fund almost forty years ago. Historically, the Land Assistance Fund provided low-cost loans to farmers and heir property landowners to resolve legal issues and save their land. Support for heir property landowners is important because these farmers have inherited their land through intestacy laws because there was no estate-planning mechanism in place.

7.     Overall, members of The Federation face great financial burdens with respect to their farms. Many Black farmers operate with heavy debt loads and the farming industry makes gaining a profit very difficult. In addition, many farms have more expenses than revenue because of increasing input costs and fluctuating market prices. To avoid potential financial ruin, Black farmers try to obtain loans through the FSA because the FSA is considered the "lender of last resort." This is significant because the FSA is supposed to extend operating, equipment and farm ownership loans to farmers when they can't get loans through a traditional bank or farm credit system. However, even though FSA is the lender of last resort, many Black farmers cannot even get an FSA loan because of racial discrimination. Black farmers report that they have experienced, witnessed or heard first-hand of FSA agents discriminating against Black farmers by, *inter alia*: refusing to acknowledge Black farmers when they walk in the door; misrepresenting and omitting information about the e kinds of assistance provided by the FSA; losing loan application forms repeatedly; refusing to provide any information or technical support with loan applications; discouraging Black farmers from applying for FSA loans altogether; redirecting Black farmers to apply for credit cards or commercial loans instead of FSA loans; asking Black farmers to fill out

3

additional forms not originally provided; requiring Black farmers to return to the FSA office multiple times unnecessarily; and failing to conduct routine site visits. Black farmers have also reported having witnessed or heard of white farmers who have not experienced any of these issues when applying for FSA loans, and often for significantly larger sums.

8.      As a result of these and other discrimination tactics, Black farmers end up paying for expenses out of pocket or rely on predatory loans/high interest loans because they cannot obtain an FSA loan. Through our members, we have received countless reports of Black farmers who have had an FSA loan application denied, even if the farmer has significant farming experience and sufficient credit history and ability to pay back an FSA loan.

9.      Even when Black farmers receive an FSA loan, the loan programs are administered in ways that exacerbate their debt. FSA will provide loans that have unfavorable terms and are difficult to pay back. For example, when Black farmers *are* approved for a loan, there is usually a delay in the disbursement of their funds. Oftentimes, the disbursement of funds is too late for Black farmers to take advantage of a full growing season. This means that they have incurred more debt because they could not use the loan to optimize their crop for that year. Further, USDA provides operation loans which are designated for the general operations of the farm. Black farmers have reported that FSA agents have unreasonably required them to justify certain expenses under their operation loan. The additional step of justifying an expense to an FSA agent can be significant, especially if a farmer needs to address an immediate need, a crop infestation for example. In such a situation, a small delay can lead to the devastation of an entire crop. Moreover, many Black farmers have experienced pressure from FSA agents to put the name of an FSA agent on the bank account holding the loan funds in order to create a "supervised account"—oversight that white farmers are rarely, if ever, subjected to.

4

10.     During the COVID-19 pandemic, we have received reports that FSA offices have informed Black farmers that they cannot visit the office despite allowing white farmers to do so. Further, many of the FSA decisionmakers are white farmers, and are in direct competition with Black farmers for loans. Because of the long history of discrimination, many Black farmers have lost their land and have been left with a high amount of debt. Some farmers have been forced to foreclose their farms.

11.     While the Federation represents Black farmers, I have additionally heard many stories of other socially disadvantaged farmers, including farmers that are Latino/Hispanic, Indigenous or Native American and/or Asian, facing similarly discriminatory treatment that has led to similarly disparate outcomes.

12.     The discrimination against Black farmers is linked to the fact that much of the decision-making for USDA loans is done by white men. Black farmers are required to deal directly with the decentralized network of FSA offices and county committees. The vast majority of the membership of county committees are white males who act as the gatekeepers for USDA loan programs and there is very little oversight from the federal government.

13.     At the beginning of the COVID-19 pandemic, we circulated a survey among our members to better assess their priorities. The number one need identified by participants is direct financial assistance for their farms. Many survey participants have debt that has increased over the past three years because of market loss and inability to obtain financing for farming operations. These troubles were only exacerbated by the pandemic. Over half of the members surveyed said that they would seek debt relief if offered.

14.     Given that debt relief is essential to farmers, The Federation provides outreach, education, and technical assistance to Black farmers to access USDA debt relief programs. Debt relief programs are critical given the USDA's longstanding, well-documented practice of race-

5

based discrimination against farmers of color. Indeed, The Federation has gathered much data on discrimination against farmers through complaints that we have received from our members. In fact, it is rare for us to encounter any Federation member who has not experienced some form of race-based bias or discrimination.

15.     One of the early attempts of addressing this discrimination was through the *Pigford* class action settlement. The *Pigford* lawsuit confirmed that USDA discriminated against Black farmers and also highlighted how many Black farmers must rely on high-interest, predatory loans because they cannot obtain an FSA loan. The cash awards through the settlement were $50,000 per farmer, which was insufficient to remedy their losses or for them to prosper. The insufficiency of the *Pigford* settlement further demonstrates the significance of debt relief under Section 1005, which would finally provide farmers a clean slate after suffering years of discrimination.

16.     Many members of The Federation received a letter from the USDA informing them of their eligibility for debt relief under Section 1005. We conservatively estimate that 150 of our members are eligible for debt relief under Section 1005. Although Section 1005 would serve as a critical lifeline for many farmers, it is important to note that under the program, although 17,000 farmers qualify, only 3,100 eligible farmers are Black. A small fraction are Black farmers because of the discriminatory practices employed by local FSA offices when they denied loans to Black farmers. This means that Section 1005 only applies to Black farmers who are in the "best case scenario" in terms of obtaining an FSA loan.

17.     That said, the Black farmers who are in this "best case scenario" as compared to other Black farmers who have been excluded from obtaining FSA loans altogether are still often in the worst-case scenario compared to other, non-socially disadvantaged farmers whose loans have been and are being serviced in a timely, supportive and forgiving fashion. Thus, socially

6

disadvantaged farmers and ranchers, which includes Black farmers, who have FSA loans but who

have been subjected to discriminatory loan servicing are entitled to relief.

18.     Since filing our Motion to Intervene, The Federation has collected fourteen

additional declarations from Black, Latino/Hispanic and Native American farmers and/or their

spouses, each of which recount harrowing stories of discriminatory treatment by the FSA largely

within the last 10 to 15 years. While the Federation only represents Black farmers, these

declarations show that socially disadvantaged farmers across certain racial and ethnic groups are

subjected to discriminatory treatment in FSA loan servicing and applications as Black farmers.

19.     Six report discrimination in the servicing of their FSA loans. Declaration of Saul

Bernal ("Saul Decl.") ¶ 24–33, 39–43; Declaration of Arthur Eaton ("Eaton Decl.") ¶¶ 44–52;

Declaration of Steve Flemons ("Flemons Decl.") ¶ 15–31, 47–50; Declaration of Henry Hosea

("Hosea Decl.") ¶¶ 10–34; Declaration of Jordan Rae Owens ("Owens Decl.") ¶¶ 11, 36–57;

Declaration of Ryan Pressley ("Pressley Decl.") ¶¶ 14–36, 54–59; *cf.* Declaration of Jonathan

Lamar ("Lamar Decl.") ¶¶ 48–54 (recounting discrimination in FSA loan servicing experienced

by Mr. Lamar's father, also Black, in 2012).

20.     The Federation's anecdotal evidence of ongoing discrimination in loan servicing is

a sample showing that such discrimination is occurring across the country, as the declarations refer

to discriminatory treatment in Oregon, Idaho, New Mexico, Georgia, Mississippi and South

Carolina. Eaton Decl. ¶ 2; Flemons Decl. ¶¶ 1, 19; Lamar Decl. ¶ 4; Owens Decl. ¶ 36; Pressley

Decl. ¶¶ 8–10.

21.     Eleven report recent discrimination in the loan application process, which typically

led to applications being incomplete, denied or withdrawn. Bernal Decl. ¶¶ 7–12; 39–43;

Declaration of Richard Burke ("Burke Decl.") ¶¶ 9–29, 50; Eaton Decl. ¶¶ 7–43; Flemons Decl.

¶¶ 22–31; Declaration of Phoebe Gooding ("Gooding Decl.") ¶ 10–27; Declaration of Deborah

7

Jones-Hendrix ("Jones-Hendrix Decl.") ¶¶ 32–45; Declaration of Amy Kroll ("Kroll Decl.") ¶¶ 5–20; Lamar Decl. ¶¶ 11–42; Owens Decl. ¶¶ 11–35; Pressley Decl. ¶¶ 37–53; Declaration of Martice Scales ("Scales Decl.") ¶¶ 7–20; Declaration of Barbara Shipman ("Shipman Decl.") ¶¶ 41–52; *cf.* Jones-Hendrix Decl. ¶¶ 14–30 (describing gender and race discrimination perpetrated by the Mississippi USDA National Resources Conservation Service ("NCRS"); Owens Decl. ¶¶ 63–66 (recounting discrimination in FSA loan application process experienced by Ms. Owens' brother in Oregon); Pressley Decl. ¶¶ 59–62 (recounting discrimination in FSA loan application process experienced by Mr. Pressley's father, also Black, in 2015); Shipman Decl. ¶¶ 14–17, 26–40 (reporting personal experience with discrimination in the Non-insured Crop Disaster Assistance Program claim payouts).

22.     These declarations thus also provide anecdotal evidence of ongoing discrimination in the loan application process across the country, as the declarations show that such discrimination has occurred in Baker County, Oregon; Rankin County, Forest County and Marion County, Mississippi; Greensboro and Dale County, Alabama; Durham, North Carolina; New Mexico; Wellington, Kansas; Georgia; South Carolina; and Madison, Wisconsin. Burke Decl. ¶ 11; Eaton Decl. ¶¶ 59–60; Flemons Decl. ¶¶ 1, 19; Gooding Decl. ¶ 2; Jones-Hendrix Decl. ¶ 6; Lamar Decl. ¶ 4; Owens Decl. ¶ 67; Pressley Decl. ¶¶ 8–10; Scales Decl. ¶ 10.

23.     These declarations from farmers of color, along with the accounts reflected earlier in this declaration, provide a representative sample of anecdotal evidence describing the discrimination farmers of color face in FSA loan applications and servicing across the country.

24.     Of particular relevance here, Black and Indigenous farmers that submitted declarations reported discrimination in the servicing of their FSA loans that has led to stress, anxiety, lost revenue, liens, default, foreclosure, loss of land and capital, and creditworthiness. *See, e.g.*, Hosea Decl. ¶¶ 31–32; Declaration of Wilburt Howard ("Howard Decl.") ¶¶ 32–34; Owens

Decl. ¶ 66; Pressley Decl. ¶¶ 58, 65. The effects of this recent discrimination would be ameliorated by the debt relief granted by Section 1005.

25.     When Section 1005 was first announced, our members were excited because the program was a great opportunity for them to get out of debt and gain financial stability. Accordingly, The Federation hosted a webinar and educational workshops providing members with information about the program. We also shared information about the program through The Federation's website, state newsletter, and regional newsletters. Outreach related to Section 1005 has taken up a lot of staff time and resources. Because we are focusing our efforts on Section 1005 and the temporary injunction against the program, The Federation has had to put aside other programs.

26.     Although some members have received information from the USDA on how much debt relief they would receive, none of The Federation's members received any money before the nationwide injunction against Section 1005 was implemented. When the injunction was first announced, many members expressed extreme disappointment and were concerned about the future of their farming operations.

27.     The injunction against Section 1005 has required follow-up work for The Federation. Our state level coordinators an outreach staff have had to shift priorities to dedicate time to membership inquiries about how the nationwide injunction will affect the future of the program. Members are frustrated by the injunction, and this has caused some tension with our outreach staff because The Federation's credibility has been impacted.

28.     If the injunction against Section 1005 becomes permanent, our members will suffer tremendously. Many Black farmers will lose their land and farming equipment to foreclosures. The number of Black farmers in the United States has dramatically decreased over the last 50 years. The number will become even smaller if Section 1005 is permanently enjoined. Debt relief

9

is a lifeline for many members of The Federation and without the program they have nowhere else to go for financial support. Additionally, many of The Federation's members have planned their farming seasons under the presumption that they will receive funds from the debt relief program. Because of the anticipated debt relief, farmers overprepared for this year's farming season by spending additional money on seeds, farming equipment and expanding their farm operations. Without the debt relief, farmers will lose their anticipated income, their ability to take care of their families, and their ability to fulfill their financial obligations. Although the USDA has indicated to The Federation that is will not move forward with foreclosures of farms, it is unclear how long the foreclosure suspension will last or what impact it will have on non-USDA loans.

29.     Getting rid of the program under Section 1005 will be a drastic loss for the Black farming community and the Black community overall. As I explained earlier in my declaration, the 3,100 Black farmers who qualify for loan forgiveness under the program are the farmers who are "better off" compared to many Black farmers who cannot even get an FSA loan. If these 3,100 farmers do not get debt relief, they will be in the same situation as many other Black farmers who must rely on predatory lenders/high interest loans or spend money out of pocket. Ending Section 1005 will eliminate the class of Black farmers who were relatively more "financially secure" and as a result, there will be an increase in Black land loss. The small number of Black farmers in the country will shrink even more.

10

I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.

_____
Declarant's Signature

7/18/2022
Date

CORNELIUS BLANDING
Declarant's Printed Name

11

FEDERATION MSJ APP. 181

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

SID MILLER, et al.,
        *Plaintiffs*,

    *v.*                           No. 4:21-cv-00595-O

TOM VILSACK, in his official capacity as
Secretary of Agriculture,
        *Defendant*.

## <u>DECLARATION OF RICHARD BURKE</u>

My name is Richard Burke. I am over the age of 18 and fully competent to make this declaration.

1.      I am a Black farmer in Alabama.

2.      I want amicus Rural Coalition to represent my interests in this lawsuit, *Miller v. Vilsack*, No. 4:21-cv-00595-O (N.D. Tex. Apr. 26, 2021).

3.      I agree this declaration may be shared with the Federation of Southern Cooperatives/Land Assistance Fund to file in support of its case before this Court.

4.      I live in Coffee County in the state of Alabama.

5.      While I will not be directly impacted by the outcome of the debt relief payments, it is important for me to share my experiences with USDA, Natural Resources Conservation Service (NRCS), and FSA, as a minority farmer who sought loan assistance and program support through the agencies before resorting to a private lender.

6.      I was treated very poorly in my local FSA offices and want to make it clear that discrimination, mistreatment, and/or discouragement to minority farmers from FSA representatives persists.

1

7.      I am a new farmer who, until recently, operated a 49-acre farm, which I took out a loan to purchase.

8.      Once I retired from the military, I decided that I would go into farming as my second career choice, if you will.

9.      I initially reached out to USDA around 2019 to get a loan and some support through the veterans' program but was making no headway with them.

10.     My first attempt to get a loan through USDA was frustrating because of the poor treatment I received and blatant dismissal.

11.     On my initial attempt, I was denied the loan without the FSA agent even asking me for any information, including an application. I was given no justification for the denial but was simply dismissed by the Ozark office in Dale County, Alabama.

12.     When I asked their reason, I was given one excuse after another. It felt as if the answer depended on who you talked to at the office. My frustration was building, and I started questioning whether I wanted to go into farming.

13.     It wasn't until I went to the Black farmers association conference and met Mrs. Barbara Shipman and started sharing my plight of trying to get any kind of assistance through my local office that I felt like I finally had some support.

14.     Mrs. Shipman started making calls on my behalf, which led to a representative from the FSA's office in Washington, D.C., reaching out to me.

15.     I shared the paperwork I was provided with Mrs. Shipman and the DC contact who then informed me I was given the wrong paperwork. The application I was provided was not the right one for what I was applying.

FEDERATION MSJ APP. 183

16.     Once the DC contact reached out to the local office, I started receiving phone calls asking me to come into the office and that they would take a look at my application.

17.      I was also informed around that time that I could ask to have my paperwork transferred to the New Brompton office because it was closer to me than the Ozark office.

18.     Once I started visiting the New Brompton office, I received more information, and they also requested information from me, which was a big change from the Ozark office.

19.     I was still denied the loan but was told that it was due to their policies, such as limited experience in farming. I was also told that I needed to apply and be denied elsewhere before applying through FSA.

20.     Although I was getting more support, the poor treatment by office staff did not change.

21.     I would be sitting in the office waiting to be served and white farmers would walk in and get preferential treatment while I was being ignored.

22.     These white farmers were people the agents knew, and the agents would have them go ahead of me, even though they came into the office after me.

23.     I would just have to sit there until the white farmers left, which happened on numerous occasions.

24.     Between trying to get start-up resources and a loan, I would have to go back and forth to the office multiple times because the agents would continuously request documents, including duplicate documents.

25.     After a while, it seemed their purpose was to frustrate me as a new farmer, and they managed to do just that.

FEDERATION MSJ APP. 184

26.     I felt like I was begging someone for their personal service, instead of them doing their jobs.

27.     I felt like I didn't want to even ask them any more questions but kept persisting as a determined retired major from the Army.

28.     I eventually decided to give up and instead apply through a bank.

29.     After receiving a bank loan, I bought a property to grow pecans.

30.     Through the NRCS program, I was approved for a well, but I had to use a company that was approved through NRCS, which was a nightmare experience.

31.     I reached out to the company and was told it would take 45 days for them to come out to the property to put in the well.

32.     Based on that timeline, I decided to go ahead and plant the pecan trees (105 trees), which I would water by hand for a month and half.

33.     Eight (8) months after planting, I was still waiting for the company to come out to the property, while still watering 105 pecan trees by hand. My timeline kept getting pushed back to accommodate larger projects.

34.     Only 8 pecan trees survived, which meant I lost that investment, as watering by hand became impossible.

35.     As a new farmer, this was very disappointing because I did everything NRCS asked but received no assistance to prevent the loss of my trees.

36.     Once I lost my trees, I decided to go into livestock to raise goats, turkeys, geese, and chickens.

4

37.     My woes did not stop there. My first year to sell my animals was during the Covid-19 pandemic, so I lost even more of my investment. I was having to spend more on input, including feed, but did not make the necessary sales to offset those expenses.

38.     I operated at a loss and have not been able to recover, forcing me to make the painful decision of closing my operation.

39.     I believe if I had promptly received NRCS support, as well as prompt service from their approved company, my outcome would be different.

40.     As I got into farming and got connected with other farmers, I realized that the treatment and the resources given to farmers are not equal.

41.     Something as simple as providing BIPOC farmers a receipt for service proved to be too difficult for FSA agents.

42.     It was only after connecting with Mrs. Shipman that I was made aware of a receipt that FSA agents should give to farmers identifying the date, time, and purpose of each appointment.

43.     I started asking for a receipt once I was made aware and only then did I receive it.

44.     BIPOC farmers, including myself, are not afforded the same respect and support as white farmers, which should not be the case from agencies that are supposed to support all farmers.

45.     For example, it is common for BIPOC farmers to not receive information about funding opportunities until funding deadlines have passed.

46.     I was not provided any information on the Covid-19 payments available to farmers, like the Coronavirus Food Assistance Program (CFAP).

47.     Ironically, I learned about CFAP from white farmers discussing them at the Co-op, but the deadline had passed by the time I heard about these monies. They were talking about the programs and confirming to each other that they received payments.

5

48.     One of the white farmers made the comment that we (minority farmers) have our own designated money, and we should "go get some of our own money."

49.     Seeing that I was new, one of the well-established Black farmers pulled me aside and said "son, you're not going to get that money. They tell you at the state that there is money allocated for minorities and women, etc., but I bet you don't get a lot of that money."

50.     He said that the state has to break down their budget and some percentage has to go to minorities, but they come up with different ways of not issuing it, and at the close of the budget cycle they roll the money over into a general fund that typically favors white farmers.

51.     In my thinking, it would only seem fair that we as minority farmers are at least provided the same information, courtesy, and support as white farmers.


**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**


*/s/Richard Burke*                                          Dated: July 14, 2022
Declarant's Signature


Richard Burke
Declarant's Printed Name

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,

       *Plaintiffs*,

     *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

       *Defendant.*

No. 4:21-cv-00595-O

---

## DECLARATION OF ARTHUR EATON

I, Arthur Eaton, state that I am more than 18 years of age, and the following is based on my personal experience:

1. I am a 59 year-old African American farmer and a member of the Federation of Southern Cooperatives/Land Assistance Fund.

2. I have been farming commercially for twelve years in Mississippi.

3. I own two adjoining properties that total 118 acres. I purchased both properties together because the couple selling the property did not want it to be split up, even though it is technically two different parcels with two different addresses.

4. I grow watermelon, peppers, cucumbers, corn, sugar cane, tomatoes, and oyster mushrooms. I grow the tomatoes and cucumbers hydroponically. I have a 1105 square foot greenhouse on the farm.

5. Farming is my primary source of income.

6. I sell at farmers' markets and farm stands, and have a contract with a produce distributor.

7. In June 2004, I started the process to purchase a property to farm. It was really hard to get funding through USDA to purchase the property.

8. I first went to the FSA office in Hattiesburg in Forrest County.

9. The FSA representative told me that FSA did not do direct loans. He said this very forcefully, as if he was trying to exert his authority over me, and say, 'why are you in here boy,' but he knew better than to say that outright.

10. Before he told me that FSA did not do direct loans, he shut his office door. I think he did this because he did not want anyone to hear the misinformation he was giving me.

11. He directed me to go to the bank and get a guaranteed loan.

12. I did not know about the loan programs because I had never worked with FSA before. I went home and did some research and learned that FSA does give direct loans.

13. I called the FSA office back and confronted them with the new information I had learned.

14. I went back to the FSA office again. The person who had originally told me that FSA did not do direct loans did not come out of his office. Instead, he had another employee give me a book of paperwork to fill out. Many of the documents I was given to complete were irrelevant.

15. FSA continued to give me the runaround. They sent me to another FSA office in Marion County, which is about a 45-minute drive from Hattiesburg, to speak with someone else who told me that USDA would not give me the loan. When I visited the office for a third time, it was filled with White men. There were about twenty-five White men in the office, all looking at me.

16. I submitted my loan application in the Marion County office. I dealt with a Marion County FSA office representative named John McTiger. Mr. McTiger is White. Mr. McTiger reviewed my application and denied it because he said it would not generate cash flow. No one explained why it would not generate cash flow.

17. I later learned that the reason my plan was not approved was because I included blueberries in my plan. Mr. McTiger did not tell me that this was the reason my plan was not approved. In fact, I never received any instructions or assistance from USDA when applying for the loan.

18. Only after I got help from Alcorn State University did I learn I had to adjust my business plan to remove blueberries.

19. Once I swapped out blueberries for watermelon in my plan, USDA approved me for the loan.

20. Even though I first started trying to apply for a loan in June 2004, I was not able to actually submit my application until February 2005. USDA then dragged out the process until April 2005, when my application was finally approved and funds were distributed to me.

21. This was too late to plant watermelons, especially since I had not yet been able to get the equipment I needed.

22. Famers need watermelon loans ideally in December, and they needed to be planted no later than May 1st to harvest by July to get the best price. The price for watermelons drops tremendously if they are not harvested before July 4.

23. Because I knew I received the funds too late to plant the watermelon, I did not accept the loan for the watermelon.

24. I only accepted the loan for the land, which was approximately $220,000, and a loan for approximately $20,000 to $30,000 for equipment, which I later paid off.

25. The timing of the loan distribution affected my ability to timely plant crops.

26. By contrast, White farmers do not have to wait for their money. They just call the FSA office and tell them what they want, and then go into the office to sign the documents.

27. I ended up having to file a discrimination complaint against USDA because of how I was treated and the misinformation I was given by USDA representatives.

28. After I filed my complaint, someone from USDA called me and assured me that my complaint would be looked at, and they would make sure I was treated fairly.

29. That did not happen. In fact, USDA would not even work with me after I filed my complaint.

30. I went to the USDA office to see how I could make my farm a success, but instead this is was how I was treated.

31. Over the years I have had multiple loans with USDA. I most often dealt with a USDA representative named David Blakely. Mr. Blakely is White.

32. The process of dealing with USDA and Mr. Blakely has been very difficult. Multiple times, I have been told a loan application was not complete. When I followed up to ask about what parts still needed to be complete, most times the documents were there, but the USDA representative would say that they had not seen them before. I have had to go back many times—sometimes fifteen to twenty times—to complete an application process.

33. Mr. Blakely is very hostile in his interactions with me. Once Mr. Blakely told me about a Black guy from my neighborhood who Mr. Blakely used to play basketball against in high school. Mr. Blakely told me that the guy had once said to Mr. Blakely, "in your face, White

boy," while they were playing. Mr. Blakeley said that, a few years later, while on the basketball court, he said "in your face, Black boy" to the same guy. Mr. Blakely reenacted this scene while he was telling me and stuck his finger in my face like he was pointing at me when he said it.

34. I do not know why he told this decades-old story to me, except to let me know that, sooner or later, Mr. Blakely would do the same thing to me.

35. Mr. Blakely also once told me that he would be on the courthouse steps auctioning off my belongings if I did not make payments on time.

36. I have taken out loans to build my greenhouse and to get a wood boiler to heat the greenhouse. Mr. Blakely never denied me for a loan, but always made the process long.

37. When I wanted more money for materials, Mr. Blakely wanted me to open an account and put his name on the account so he could sign off on my spending. I told them that I was not going to do that, and Mr. Blakely said I had to.

38. I called Mr. Blakely's boss in the Jackson office, and I told him that, if I put Mr. Blakely on the account, Mr. Blakely would have to help with the payments. Only then did they back down.

39. Since I have multiple loans, I repeatedly asked Mr. Blakely if I can get my multiple loans consolidated into one loan, so I will only have one payment. Mr. Blakely refused to do that.

40. Mr. Blakely also has prevented me from getting consolidation from other places too. There is a community bank in Hattiesburg called Bank One. I visited two branches and both branches were willing to consolidate my loans, until they met with Mr. Blakely. Then their attitude changed. Before they met with Mr. Blakely, they were communicative and sending

me information. After they met with Mr. Blakely, they stopped communicating with me and it was very difficult to get anyone on the phone.

41. Similarly, I met with representatives of another bank, Farm Credit. They were thrilled about what I was planning to do to consolidate my loans until they met with Mr. Blakely and their attitude changed too.

42. I also tried to get a guaranteed loan to get another greenhouse to grow produce for Capitol Produce and continue selling at farmers' markets.

43. I submitted my complete loan application to Mr. Blakely, who told me he would get the paperwork in. This was two weeks before the deadline, and I was told by Mr. Blakley that everything would be okay. But the paperwork never got submitted, and I never got the loan from Farm Credit.

44. By 2019, I was behind two payments on my loans. I asked Mr. Blakely if making a payment would reset the clock on my delinquency. He said it would. Based on that information, I sold some apartments I owned and made the payment.

45. That June, Mr. Blakley drove out to bring me a letter saying that USDA would not be able to reset the clock on my loan.

46. When I sold my apartments, I also used some of the money to purchase an 18-wheeler trailer to grow mushrooms in. I would not have spent money on the trailer if I knew the payment was not going to reset the clock on the loan. At that point, I had to try to find another servicer to provide me funding to consolidate all loans together and remove my debt with the USDA.

47. In December, I received a foreclosure letter from FSA.

48. I called the FSA office and left messages about the letter, but I did not receive a response timely. By the time I received a call back, the FSA representative told me they were going to start taking my property. The FSA sent someone out to take inventory of my property.

49. I asked if I could keep my greenhouse section to keep from being homeless. The FSA representative directed me to speak to the Jackson office. The Jackson FSA office told me that I could not keep my greenhouse, that it would be auctioned, and that I could not bid on it.

50. I ended up filing for bankruptcy to stop the foreclosure.

51. If I lost my farm to foreclosure, it likely would be purchased by a White farmer. When it looked like I was going to lose the farm, a White cattle rancher approached me about buying the property.

52. I have been treated poorly by FSA based on my race. I have seen how differently White farmers get treated. I have observed White farmers getting benefits, and I have White friends who are farmers who have told me about the programs that they are in.

53. It was a White farmer who first told me that FSA does in fact give direct loans for ownership, contrary to what I had been initially told by FSA. The White farmer said that he had bought land with FSA's help.

54. White farmers get loans with minimal paperwork. Some of the White farmers I am friendly with do not understand why Black farmers do not just go in and get the funding they need. I do not think they know or understand how difficult it is for Black farmers, and that we cannot get what we need for our farms without a fight.

55. A White farmer tried to sell me his ice business, and he did not understand why the loan process was taking so long, and why I did not get approved for the loan.

56. One of my high school classmates is a White woman who farms hydrphonic tomatoes. When she told Mr. Blakely she knows me, his whole attitude toward her soured. Until she mentioned she was friends with me, Mr. Blakely had been very friendly toward her.

57. FSA has never allowed me to work with the Jefferson Davis County office. Instead, I had to deal with Mr. Blakely to get what I needed.

58. The White FSA employees interact one way with White farmers, and another way with Black farmers.

59. No one at the Marion County FSA office had helped me, if anything I felt as though they were just there to discourage me and be an inconvenience to me.

60. One of the two people was a young man named Clinton at the Forest County office. I was doing a debt service, and Mr. Blakely tried to get me to sign paperwork saying I would pay back $80,000 next year. Mr. Blakely then instructed Clinton to do the debt service. Clinton completed the debt service paperwork, and I was able to afford it and make the payments. A few months later, Clinton was no longer working in that office.

61. For a brief time there was a young Black woman in the FSA office after Mr. Blakely retired. The first time I actually received emails and receipts of service from FSA was when she worked there.

62. I have never been invited to join my local FSA county committee. At one time, there was a Black farmer on the committee. He was just there as a token. He told me he had heard things about how the FSA gave loans to White farmers, but gave the Black farmers a harder time. He also told me how the county committee was working with White farmers to use funds from the NRCS to make White farmers' payments.

63. I come from a family of farmers. My great grandfather farmed, both my father and his mother were hobbyist farms, and my mother's father also farmed.

64. My father tried to apply for farm loans, but was denied by USDA. He was told that no funds were available. USDA representatives told my father they would contact him when funds were available, but never did.

65. My grandmother told me about an experience my great grandfather had when he was growing cotton in Alabama. He took his cotton to a facility to be weighed. When the White men working at the facility gave him the weight of his cotton, he questioned them because he knew his cotton weighed more than they said. One of the White workers at the cotton facility wanted to whip him. My great grandfather was given until sundown to get out of Alabama. He and his family left with what they could take, some cows and chickens. They ended up in Wiggins, Mississippi. They knew that if they did not leave, the men from the cotton facility would come with the Ku Klux Klan and drag them out of the house and probably hang them.

66. I am familiar with the *Pigford* settlement. Neither I nor my family members received funds. I do not think things have improved since *Pigford* – some of the same things are ongoing. No one from our local FSA offices has been fired or gotten in trouble for racism and discrimination.

67. COVID really hurt my business. I had a contract with Capitol Produce to sell them 2,000 pounds of hydroponic tomatoes weekly, but COVID killed their customer-based market. Capital Produce lost over half of their customers, which killed the contract. I have since decided to grow medical marijuana in the trailer I bought because I think I can do better financially than with hydroponic tomatoes.

68. Based on the letters I have received from USDA, all of my loans are eligible for debt relief through the American Rescue Plan Act.

69. Once I received the letters about the debt relief, I thought my debts were going to be forgiven, so I invested money in equipment that needed repairs and invested $20,000 to $30,000 in growing medical marijuana.

70. I have future plans for my farm, but I am hesitant to implement them because I am afraid and I do not trust FSA.

71. If I do not receive the debt relief, my business will be significantly affected. It may even send me under. I depend on loans to continue farming and building.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

_Arthur Leon Eaton_                 7-12-2022
Declarant's Signature                Date

_Arthur Leon Eaton_
Declarant's Printed Name

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| SID MILLER, et al., | |
| *Plaintiffs*, | |
| *v.* | No. 4:21-cv-00595-O |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, | |
| *Defendant*. | |

## DECLARATION OF STEVE FLEMONS

My name is Steve Flemons. I am over the age of 18 and fully competent to make this declaration.

1. I am a Black farmer in Kansas and a member of the Seminole Nation of Oklahoma.

2. I am also a member of the Kansas Black Farmers Association, and I have a substantial interest in the outcome of this litigation.

3. I want amicus Rural Coalition and amicus Kansas Black Farmers Association to represent my interests in this lawsuit, *Miller v. Vilsack*, No. 4:21-cv-00595-O (N.D. Tex. Apr. 26, 2021).

4. I agree this declaration may be shared with the Federation of Southern Cooperatives/Land Assistance Fund to file in support of its case before this Court.

5. I am a generational farmer living in Sedgwick County in the state of Kansas.

6. I have been farming for the past 10 years on a 320-acre farm owned by my in-laws, and the past 4-5 years on an additional 80-acre property I purchased relatively close (6 miles) to the original homestead.

1

7. Although I have only been closely involved over the past 10 years, the farm has been operational since 1872.

8. I currently grow wheat and soybeans and raise a small cow-calf herd. The farm has always been wheat-producing with soybeans later added to the rotation, which was dictated by the equipment we owned.

9. Raising a small herd was also "low-hanging" fruit for us, given we had the pasture and did not need to buy hay from others. Also, I have always been around cows growing up in Manhattan, Kansas.

10. I was a full-time employee with a large firm that downsized due to the pandemic, which drove me to farming full-time.

11. My salary was my primary source of income pre-pandemic. Now, I rely solely on farming, which has proven to be very challenging.

12. The pandemic not only affected my job of over 20 years, but also impacted our operational cost on the farm.

13. Farm input costs skyrocketed, while supply was disrupted, causing us to make some tough decisions on cutting back.

14. When input costs increase that significantly, you need to decide how to save money, as every dollar counts, especially for small farmers.

15. With our farm struggling financially, it was a relief to receive letters from USDA/FSA regarding our loans, Direct Farm Ownership and Direct Farm Operating Loan.

16. I signed the letters and sent them back, which my local FSA office is aware of.

17. I did not receive those payments, and I am told my loan is now due.

FEDERATION MSJ APP. 199

18. I will most likely lose everything because of the lien that was placed on my assets as collateral.

19. Around 2012-2013, I took out an operating loan with FSA, at the Sumner County office in Wellington, Kansas.

20. I would say I was kind of a novelty going into that office because there is no minority farmer within a 100-mile radius; therefore, none had been going to the local FSA office seeking loans.

21. I think the excitement of seeing me in the office wore off quickly after realizing I was serious about seeking a loan.

22. I would describe my experience as a double-edged sword. That is because I was fortunate to be assisted by a black FSA agent, I married into a well-known family in the area, and I had been employed for over 20 years with a stable, reputable company.

23. However, I was told I could only get the operating loan, off the bat, because of my long-term employment, but would also get denied every year for a combine that my farm so desperately needed.

24. While I was thankful the operating loan was approved, I was dumbfounded at the rationale of assisting with only some of the equipment and machinery needed to operate a successful farm. You can only be as good as the equipment you have.

25. Our combine was an old 1966 model that broke, and we could not find the parts to fix it. Hence, I would have to rely on a neighbor to cut my crop, which always meant I was the last one to get harvested.

FEDERATION MSJ APP. 200

26. Relying on my neighbor to cut my crop was less than ideal because they not only stole some of my crop, but I also lost an entire crop one year because it was so late when they became available.

27. I pleaded with FSA regarding a loan to purchase a combine, but was met with rude comments by agents, such as "everyone cannot come in and just be a farmer," which I understood to be a reference to me not operating a farm as long as others.

28. An agent also said to me, "That's a pretty big tractor for what you farm, don't you think?" I believe this was a reference to my small acreage compared to the large white farms in the area.

29. I think those are pretty crass comments for anyone to make, but especially an FSA employee who is supposed to be supporting all farmers, not just white farmers.

30. Fast forward to 2021, after all the years of asking for a combine from FSA to help me succeed in my livelihood, I had to take out a loan from a private lender to buy the combine.

31. I am frustrated because I personally know white counterparts who had a much quicker, easier process and were approved for their full ask.

32. I did not ask for much support from the FSA office with completing my loan application, except requesting county averages I did not know, only to be told "no" on money for equipment, without justification.

33. It is disappointing because I have heard from and of others where non-minority farmers are treated differently.

34. I do not expect a handout, but I do expect to be treated fairly, or at least equitably, or even equally, to white farmers.

4

35. USDA serves farmers, not a specific group of farmers, and should operate accordingly.

36. After seeking my first FSA loan in 2012-2013, around 2017-2018, I applied for a farm ownership loan to purchase additional farmland through the same Sumner County FSA office in Wellington, Kansas. My application was initially denied.

37. I was looking to purchase a 160-acre property that was closer to my original homestead but was told by the FSA agent to "go find a cheaper piece of property because I could not afford this one."

38. I eventually found 80 acres and was approved for the loan, but certainly not without multiple back-and-forths on documentation and a lien on all my assets, which was "out of an abundance of caution," according to this same FSA agent.

39. I had to negotiate with the realtor to reduce the price of the land because it was appraised higher than FSA would be willing to loan me.

40. I had to purchase the land without the mineral rights, just so I could get the loan.

41. I was also asked on numerous occasions to provide redundant documents.

42. Additionally, my then work supervisor said that FSA contacted him every year to verify my employment, including providing my W-2 and tax filing every year. Despite the fact that I'd had this loan for multiple years, the FSA took these measures.

43. Ironically, I am aware that white counterparts are not subject to the same treatment but instead can go into the office, flaunt their generational farming history and large acreages, and are provided loans immediately.

44. Meanwhile, I had to have a lien on everything I own, which is even greater than the loan amount required.

FEDERATION MSJ APP. 202

45. In my opinion, the biggest problem is that the local FSA offices have white "generational employees" who are making decisions based on how they were raised and deciding who gets money in that same fashion.

46. This discrimination to BIPOC farmers like myself will never stop as long as the decision-makers are white-biased individuals.

47. Besides the issues I have encountered with my loans, I have had multiple random audits on my equipment and cattle.

48. I would get a yearly random call from an auditor who would tell me to expect a piece of paper in the mail regarding an audit on my equipment and cattle.

49. When they did the appraisal on my combine, they appraised it for less than half of what it is worth and have even refused to count my cattle for an accurate number.

50. Because there is a lien on everything, when I take my grain to the elevator, the check is made out to FSA, and they get that income.

51. I am constantly under duress because I don't know what the outcome on Section 1005 debt relief will be in the courts.

52. I have received an acceleration letter while I am in limbo waiting on this decision.

53. In the meantime, I will have to go into the office to see if they will take a portion of my grain revenue to allow me to keep paying on my combine, which I am not very hopeful about.

54. I have had enough mistreatment and discouragement when going to the FSA office to the point where I am always on edge when I must go.

55. I have experienced enough rude comments, had enough short and nonchalant conversations, and even had one female agent tell me I shouldn't expect to have my debt paid off.

56. It is absurd to me that people think discrimination and mistreatment of BIPOC farmers does not currently exist. I am just one example, and I know of others.

57. It is evident even with the Covid-19 payments, where the large white farms benefitted, while small farms and minority farms were in some cases left out.

58. I think it is also important to note that discrimination comes in different forms, where some of the most blatant forms are not documented and cannot be proven because it is "your word against mine."

59. How often will a BIPOC farmer's word hold more weight than a government employee who has more power? For this very reason, I did not report any of my experiences to USDA or a third party.

60. I also hesitated to share my story for this declaration because of fear of retaliation.

61. However, if sharing my story has the potential to help me or others, I am happy to do so.

62. I am stuck waiting for relief that might never come, all while grappling with the fact that I might lose everything if it doesn't come.

63. How is that considered fair or just?

**<u>I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY</u>**

**<u>THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL</u>**

**<u>KNOWLEDGE.</u>**


*<u>/s/Steve Flemons</u>*                                          Date: <u>July 13, 2022</u>
Declarant's Signature


<u>Steve Flemons</u>
Declarant's Printed Name

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| SID MILLER, et al., | |
| *Plaintiffs*, | |
| *v.* | No. 4:21-cv-00595-O |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, | |
| *Defendant*. | |

<u>**DECLARATION OF BHOEME YOODINY**</u>

I, Phoebe Gooding, state that I am more than 18 years of age, and the following is based on my personal experience:

1.      I am a woman who identifies as Black biracial, who is currently actively engaged in farming.

2.      I am a first-generation farmer and I live in Durham, North Carolina.  I have been farming for two years.

3.      I own my farm with my husband Hector Lopez. He identifies as Latin American, Mexican and Indigenous. He has been farming for twenty years.

4.      Our farm is 1.3 acres. It has been that size since I began farming.

5.      On my farm we grow herbs and organic produce, including tomatoes and cucumbers. We're also beekeepers.

6.      We began our farm in 2020, during the COVID-19 pandemic. We created a limited liability corporation for the business and also obtained a farm number from USDA. We

then put up a deer fence and planted herbs, vegetables such as radishes, parsley, chard, kale, peas, spring collards and chickens for eggs.

7.      During the pandemic, it was difficult to obtain supplies. There was a noticeable shortage of feed and seeds which affected our farming. In addition, there were more activities in our business plan that my husband and I were planning to do in person that were made impossible given the pandemic.

8.      This was difficult because farming plays a significant role of my household's total income.

9.      I currently do not have any loans through the USDA.

10.     In 2020, we applied for one $30,000 microloan from the USDA to jumpstart our farm. I applied based on public representations made by the USDA that the agency intended to provide loans to Black and brown beginning farmers.

11.     We were dismayed by the treatment we received when applying for the microloan. Although we were not directly denied, we were heavily discouraged from applying at every step of the process.

12.     I started the process by reaching out to Jason Silver, a loan officer at the Orange County FSA office in Hillsborough, North Carolina. I first e-mailed Mr. Silver to inform him that we had started the loan application. We spoke with him on the phone multiple times, and sent Mr. Silver questions about what information was required for the capitalized FSA Microloan application. Altogether, we had approximately three phone calls and three e-mail exchanges with Mr. Silver regarding the loan we were trying to apply for.

13.     Jason Silver, upon information and belief, is a white man.

14.     During the phone conversations, in my excitement to apply for this loan and jumpstart our farm, I did inform Mr. Silver that my husband and I were Black, Indigenous and/or People of Color (BIPOC) farmers, given that I am Black, and my husband is Latin American, Mexican and Indigenous. In addition, Mr. Silver was made aware of my husband's race due to his accented English.

15.     In response to my raising our race, Mr. Silver was very neutral and did not share in my excitement. He instead informed us that our loan application would be applied to a distinct pot of money.

16.     As we developed our application, we adopted all of Mr. Silver's recommendations and included all of the additional information he suggested. We also complied with all of the directions he provided and supplied all of the documents that he asked for. However, on at least two occasions, Mr. Silver asked us for additional paperwork that he had not previously asked for, leading us to feel like we had initially filled out the application incorrectly and he was adding new requirements each time we spoke and making our application process more difficult and drawn out which ultimately lead to frustration.

17.     In our final phone conversation with Mr. Silver, he outright discouraged us from completing the loan application. During that conversation, Mr. Silver said that if we were denied, it would be harder for us to apply in the future. Mr. Silver went on to explain that he would not apply for the loan if he were in our position.

18.     Mr. Silver further explained that we would probably have to put up the home that we own on the farm as collateral for the $30,000 loan. He explained that the reason for this collateral was based on our debt-to-income ratio, and further asserted that we probably would not want to put our home up as collateral.

3

19.     At the time, based on our limited experience with farming and with the USDA, we trusted that Mr. Silver's advice was sound.

20.     I was, however, surprised to hear that a $30,000 FSA Microloan with a 1.7% interest rate would require us to put our house up as collateral.

21.     In response to this recommendation, I asked Mr. Silver about what recourse we might have. Mr. Silver then told us that, if he were us, he would "shoestring it along."

22.     We understood "shoestring it along" to mean that we would need to save our money and build our farm little by little over time.

23.     Mr. Silver advised us that we should instead apply for personal credit cards and use those credit cards to finance our farm operations. We found the recommendation that we apply for personal credit cards to finance our farm extremely disheartening. We found it very surprising that Mr. Silver would expect we could qualify for multiple personal credit cards while also asserting that we might not qualify for the USDA microloan, especially given that FSA is supposed to be a lender of last resort.

24.     My husband felt like Mr. Silver was treating us like children by discouraging us from applying for a loan that we desperately needed.

25.     Mr. Silver was cordial but the content of our communications with him made us feel like we had to beg for something that we deserved. We felt like we were being treated like we were not good enough to receive the loan.

26.     Because of Mr. Silver's discouragement and the way he treated us, we did not complete our application for the USDA loan and so never applied for the loan. Ultimately, we were left with no solutions, no one else to talk to, and no other avenues for options for support for our farm.

4

27.     During the following year, I considered going to the FSA in person to speak with Mr. Silver about my application process for loan funding, but ultimately decided against doing so based on how we were treated by Mr. Silver in the past.

28.     A year later, while I was on a call with a coalition of food systems professionals, I shared my experience in trying to apply for an FSA loan. Rosa Saavedra of Bread for the World responded to the story I shared and explained that my story was common among Black farmers, and that many Black farmers who were plaintiffs in the *Pigford v. Glickman* litigation had also been discouraged from seeking USDA loans and support.

29.     As a result of our experience, we had to start our farm with our own savings, our stimulus checks and my tax return from the previous year.

30.     Upon information and belief, we would have been eligible for debt relief under Section 1005 if we had been able to obtain the FSA loan.

31.     We have still not received any loan funding or debt relief from the USDA.

32.     I also no longer have any interest in applying to any other loans through the USDA because I have my guard up and I no longer trust the USDA. I would also not recommend others to apply for loans through the USDA.

33.     If we had been successful in obtaining, or even applying for, the FSA Microloan we started, I would not feel as vehemently against USDA loans.

34.     I would also never send another Black, Latino or Indigenous farmer to the Orange County FSA office or any FSA office in general.

35.     Looking back, I am frustrated with myself for sharing our racial demographic information with Mr. Silver, but I did so thinking that discrimination at the USDA was in the past.

5

In my opinion, however, things at the USDA have not significantly improved since *Pigford*.

36.     My impression, based on my personal experience and what I have seen in working with other women farmers of color, is that the racially discriminatory culture of the USDA is deeply embedded in the agency and is also perpetuated by the lack of oversight over individual actors within the USDA – individuals who are able to exercise improper power over Black and brown farmers without consequences.

37.     Indeed, I have spoken to other Black, Latino and/or Indigenous farmers who have had a very difficult time even obtaining a farm number.

**I SOLEP NLJ  SWEAR AND AFFIRP  UNDER THE BENALTIES OF BERGURJ  THAT THE   FOREYOINY   IS   TRUE   AND   CORRECT   MASED   ON   P J   BERSONAL KNOWLEDYE.**

_Phoebe K Gooding_                                              07/15/2022
_____                    _____
Declarant's Signature                                              Date

## Phoebe K Gooding
_____
Declarant's Printed Name

FEDERATION MSJ APP. 211

| Document title: | Phoebe Gooding |
| --- | --- |
| Filename: | Phoebe Gooding.pdf |
| Document id: | f0489da5-4fc1-4ed3-bbae-3ea295223ffb |
| Document status: | Completed |

# Document Audit Trail



CREATED AT: **Jul 15, 2022** | 17:20:05 UTC+00:00

Document Created



UPDATED AT: **Jul 15, 2022** | 17:21:16 UTC+00:00

Document updated



SENT AT: **Jul 15, 2022** | 17:21:25 UTC+00:00

Sent for signature to Phoebe Gooding | phoebe@toxicfreenc.org

From IP: 2601:2c2:500:8b40:39b7:22d5:cc81:47e3

# Document Audit Trail

 **VIEWED AT :** Jul 15, 2022 | 20:11:43 UTC+00:00

Viewed by Phoebe Gooding | phoebe@toxicfreenc.org

From IP: 98.26.49.11

 **SIGNED AT :** Jul 15, 2022 | 20:13:35 UTC+00:00

Signed by Phoebe Gooding | phoebe@toxicfreenc.org

From IP: 98.26.49.11

 **COMPLETED AT :** Jul 15, 2022 | 20:13:40 UTC+00:00

Document Completed

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

SID MILLER, et al.,

      *Plaintiffs*,

    *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

      *Defendant*.

No. 4:21-cv-00595-O

---

## DECLARATION OF DEBORAH JONES-HENDRIX

I, Deborah Jones-Hendrix, state that I am more than 18 years of age, and the following is based on my personal experience:

1. I am a Black farmer, currently actively engaged in farming.

2. I am 58 years old.

3. I am also a female farmer.

4. At the age of six, I was planting seeds with my mama and daddy, so I have been farming for about 52 years.

5. My parents, grandparents, great-grandparents, and great-great-grandparents were all farmers in Rankin County, Mississippi.

6. I own a 22-acre farm in the Sandhill area of Rankin County, Mississippi, and one acre of a family farm on the other side of Rankin County.

1

7.      My 22-acre farm is part of a 122-acre farm my siblings and I purchased in 2007. My siblings took 50 acres each and my husband and I took the remaining 22 acres. My 22-acre farm has not changed in size since I purchased it.

8.      I purchased my one acre of my family farm from my parents in 2012 because of the historical significance it has within my past family generations. My one-acre farm has not changed in size since I purchased it.

9.      I raise goats, chickens, and ducks, and grow vegetables, pine trees, chestnuts, pecans, blueberries, and citrus on the 22-acre farm. I am considering silvopasture establishment and starting a beehive for pollination.

10.     Before the COVID-19 pandemic, I sold my chickens' eggs at a farming cooperative, Rainbow, in Jackson, Mississippi selling my brown eggs for $6 a dozen. Rainbow would pay me a premium price due to the quality of my eggs. I was a small-scale producer.

11.     The cooperative shut down, making it impossible for me to sell my eggs at a fair price and process my sales.

12.     Farming is not my primary source of income.

13.     When my siblings and I purchased and split the 122-acre loblolly pine tree farm in 2007, our land was covered with weeds, briars, and shrub trees along with the loblolly pine trees. Consequently, our land could not be used productively until it was cleared.

14.     In the spring of 2016, both my brother and I submitted separate silvopasture applications for our 50-acre and 22-acre farms respectively to the local Rankin County Mississippi USDA National Resources Conservation Service ("NRCS") to obtain the financial assistance for silvopasture practice.

2

15.     While the NRCS immediately approved my brother's silvopasture application, they let my application expire in 2016 on purpose. (Mr. Malcolm Lowe discriminated against me based on my race, gender and disability status) And I have been continuously having reprisals from the local office, area office and state office within Mississippi.

16.     In 2016, the Mississippi NRCS sent Mr. Walter Jackson, the state office agronomist, to evaluate my land to determine what conservation practices were available to me with my land.

17.     After receiving the report, the NRCS refused to grant my land silvopasture status and instead offered to provide me limited funds for "small-dollar" clearing methods such as controlled fires. These "small-dollar" clearing methods would not effectively clear my land.

18.     Throughout this process, 2016 – 2022, I interacted with Malcolm Lowe, the District Conservationist for Rankin County.

19.     Malcolm Lowe is a white man.

20.     In 2017, I asked a white female employee at the local Rankin NRCS office if I could attend a Local Working Group ("LWG") meeting to advocate for more forestry funding. I hoped that some of the new percentages for forestry would be increased for Rankin county.

21.     The white female employee gave me written permission to attend the LWG meeting.

22.     When I got to the meeting, I was allowed to join the meeting however, Mr. Lowe refused to let me speak in the meeting.

3

23.     Upon information and belief, I was refused participation because Mr. Lowe and other white farmers did not want me, as a black woman, to be at the table of the LWG to advocate for my farm interests.

24.     In 2022, Mr. Lowe told me that the NRCS would provide me with a $9,000 conditional grant to plant pecan trees after clearing my land using a tractor and shredder. If my pecan trees eventually failed, however, I would have to pay the $9,000 back.

25.     I told Mr. Lowe that a tractor and shredder would not be able to pass through, let alone clear, the weeds, briars, shrub trees, and other debris on my land. I also told Mr. Lowe that the pecan trees would fail to grow if my land were not properly cleared using heavy machinery.

26.     In response, Mr. Lowe told me to just "go out there with a weedwhacker and clean everything up [your]self."

27.     I raised a complaint with James Tillman, the Senior Regional Conservationist for the Southeast Region, Mr. Curt Reedus, State Conservationist and Mr. David Brundson, Area Conservationist, regarding Mr. Lowe's behavior over the last five years for racial, gender and disability discrimination.

28.     James Tillman is a black man. Curt Reedus is a black man. David Brundson is a white man.

29.     I never heard back from the above NRCS representatives regarding my complaint.

30.     I have completed multiple EQUIP applications with the NRCS over the years and have not been successful in receiving a complete comprehensive conservation plan.

31.     ~~I have never had any loans through the United States Department of Agriculture ("USDA").~~

4

32.     In 2022, I applied for one $50,000 microloan from the USDA to build a barn and buy cows.

33.     I started the microloan application process by reaching out to Roderick Currie, the Farm Loan Manager at the Farm Service Agency's ("FSA's") for Rankin County.

34.     Roderick Currie is a white man.

35.     Farm assessment is part of the loan application process.

36.     When my brother applied for a microloan from the USDA, Mr. Currie drove out to his farm and assisted him with his application for his 50-acre farm.

37.     When I asked Mr. Currie when he would come to assess my farm and help me complete my loan application, Mr. Currie refused. He told me that I would have to come to his office—two hours away—to apply for the microloan because the pandemic "had lifted, he now serves three counties, and he has farmers coming in daily, and they are open for business" and he repeated this to me five times.

38.     My 22-acre farm is adjacent to my brother's farm.

39.     I told Mr. Currie that he was discriminating against me since the agency is supposed to come to my farm to assess it and help me with my loan application.

40.     Mr. Currie told me that he would send me my microloan application in the mail instead.

41.     I never received my microloan application.

42.     I believe Mr. Currie did not come to assess my farm or otherwise assist me with my microloan application because I am a Black female farmer.

43.     I filed a gender discrimination complaint regarding Mr. Currie's actions with the FSA's Mississippi Outreach Coordinator, Jessica Ellington.

5

44.     Jessica Ellington is a black woman.

45.     I have received a copy of my complaint via receipt for service but have not otherwise heard back from the FSA regarding my complaint.

46.     I have high blood pressure, anxiety, depression, neurological disorder diseases and other health conditions.

47.     The long delay to even get a microloan from the FSA is taking a toll on my health.

48.     In my opinion, the NRCS and FSA have been manipulating Black farmers to not get loans, and my experiences with the organizations have been demeaning, discouraging, and exhausting.

49.     With respect to the FSA committees, it seems like they are keeping their buddies close when it comes to voting in committee members.

50.     There is only one black man on the committee, but he was cherry-picked to be on the committee and is basically a body vote with no real authority. There are three white farmers that rule everything in my county.

51.     I am familiar with the *Pigford v. Glickman* settlement, and I received the $50,000 settlement.

52.     However, my own experiences with the USDA since *Pigford* have made me believe that Black and other minority experiences at the USDA have only gotten worse.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

_____*Deborah Hendrix*_____   _____07/17/22_____

6

Declarant's Signature                                         Date


___Deborah Hendrix _____
Declarant's Printed Name

7

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

SID MILLER, et al.,

        *Plaintiffs*,

        *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

        *Defendant.*

No. 4:21-cv-00595-O

## DECLARATION OF HOSEA HENRY

I, Hosea Henry, state that I am more than 18 years of age, and the following is based on my personal experience:

1.      I am a Black farmer, currently actively engaged in farming.

2.      I am 41 years old.

3.      I have been farming since 1992, so I have been farming for about 30 years.

4.      My father and grandfather were farmers, so I am a third-generation farmer.

5.      I work on a farm, but I do not own a farm.

6.      I used to own 300 acres of land, some of which I used to use to raise cattle and grow peanuts and cotton. I have since lost 55.5 acres of that land to satisfy parts of my current loan debt.

7.      The COVID-19 pandemic did not affect my business.

8.      Farming is not my primary source of income. I stopped relying on farming as my primary source of income after I became indebted.

9.      I have one loan through the United States Department of Agriculture ("USDA").

1

10.     My one loan is a direct supervised loan of $164,000 through the Farm Service Agency ("FSA") used as operating capital for my cattle operation.

11.     I currently owe $112,000 on the direct supervised loan.

12.     I obtained the direct supervised loan in 2006.

13.     I was guided through the application process for the direct supervised loan by Clark Gordon, an FSA loan officer.

14.     Clark Gordon is a Black man.

15.     Mr. Gordon advised me to use the remainder of my direct supervised loan to purchase cattle that was smaller in size than what I was usually used to buying.

16.     Despite my inexperience with the smaller cattle, I took a chance on Mr. Gordon's advice and bought the smaller cattle.

17.     The purchase of the cattle for that year cost me $35,000.

18.     In 2007, some of my land became very dry. As a result, some of my cattle began to die.

19.     I asked the FSA for assistance.

20.     In response to my request, the FSA sent an inspector to inspect my cattle operation.

21.     The FSA inspector took photos of the smaller cattle I had bought on Mr. Gordon's advice. The FSA inspector did not take photos of the larger cattle that made up most of my herd.

22.     The FSA inspector gave these photos to Mr. Gordon's direct supervisor.

23.     Mr. Gordon's direct supervisor is a white man.

24.     Mr. Gordon's direct supervisor used these photos of the smaller cattle as evidence that I was abusing my cattle.

25.     I never abused my cattle.

26.     Mr. Gordon's direct supervisor threatened to have me arrested for animal abuse unless I signed paperwork liquidating my entire of herd of cattle and selling them for a much lower price than I would normally sell them at.

2

27.     My farm advisor told me and Mr. Gordon's direct supervisor that my cattle were not all in bad shape, and that many could survive.

28.     Mr. Gordon's direct supervisor ignored my farm advisor's assessment.

29.     Faced with the prospect of criminal prosecution, I felt I had no choice but sign the paperwork.

30.     I do not believe similarly situated white farmers were ever forced to liquidate their cows upon threat of criminal prosecution.

31.     I received less than $15,000 for my entire liquidated herd.

32.     As a result of the loss of my entire herd, I was forced to liquidate 55.5 acres of land to satisfy parts of my direct supervised loan debt.

33.     The federal government continues to garnish my income and tax returns to satisfy my direct supervised loan debt.

34.     The FSA has also placed documentation on my file prohibiting me from applying for loans to purchase cattle because of my alleged "cruelty to animals."

35.     My experience with the FSA has left me feeling frustrated and angry.

36.     I am not familiar with the *Pigford v. Glickman* settlement, but I do not think much has changed in my experiences with the FSA over the past twenty years.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

*Henry D. Hosea*

7-13-2022

_____     _____
Declarant's Signature                                              Date

Henry Hosea
_____
Declarant's Printed Name

3

4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,
       *Plaintiffs*,

    *v.*                         No. 4:21-cv-00595-O

TOM VILSACK, in his official capacity as
Secretary of Agriculture,
       *Defendant*.

## <u>DECLARATION OF WILBURT HOWARD</u>

My name is Wilburt Howard. I am over the age of 18 and fully competent to make this declaration.

1. I am a member of the Kansas Black Farmer Association.

2. I want amicus Rural Coalition and amicus Kansas Black Farmer Association to represent my interests in this lawsuit, *Miller v. Vilsack*, No. 4:21-cv-00595-O (N.D.Tex. Apr. 26, 2021).

3. I agree that this declaration may be shared with the Federation of Southern Cooperatives/Land Assistance Fund to file in support of its case before this Court.

4. I currently live in Gove County in the state of Kansas.

5. I am a legacy Black farmer in western Kansas and part of a farming community that dates back to the early 1900s.

6. In 2004, after my family faced generations of discriminatory practices and undervaluation of assets, I was forced to rush-sell my 2,500 acres of farmland or lose everything through foreclosure.

1

7. My farm came from my grandfather, Harvey Howard, who was among the Black settlers who made their home in southern Logan County.

8. My farming legacy began shortly after the Exodus, a time following the Civil War when free Black Americans moved to Kansas.

9. Many of the Exodusters settled in Graham County, Kansas, where they founded the town of Nicodemus in 1887.

10. Between 1885-1905, nearly 100 Black families moved further west to Logan County, living in dugouts, soddies, and stone houses, while educating their children in schools that doubled as churches.

11. Harvey Howard was among the Black settlers who made a home in southern Logan County.

12. In 1905, my grandfather Harvey Howard acquired a quarter of land (160 acres) under the Kansas Homestead Act, and in 1922 traded that quarter for a 320-acre parcel closer to the smoky hill river.

13. In approximately 1948, my father, David Howard, purchased the land and was able to use it for farming and ranching.

14. By 1975, David Howard had acquired 2,500 acres of farmland.

15. In the early 1970s, I began assisting with farm operations.

16. In 1989, after years of my father enduring systemic racial discrimination through lending institutions, specifically from the Federal Land Bank, I purchased the 2,500 acres from him to avoid foreclosure and continue my family's legacy of farming.

17. I received a 10-year USDA Guaranteed loan at 12.5% interest rate and purchased the property for $260,000.

2

18. The bank required me to enroll 826 acres of land into the Crop Reserve Program (CRP) to pay the loan I used to purchase the land from my father in 1989.

19. I was paid approximately $46,000/year for CRP; however, all income was immediately withdrawn by the bank to pay off my USDA guaranteed loan.

20. The IRS considered monies received from the CRP as income and taxed me, although the payments went directly to the bank for repayment of the loan.

21. The systemic racial discrimination my family continuously faced from local and state entities is documented.

22. In 1999, I was awarded $50,000 in the *Pigford v. Glickman* class action discrimination suit when I was able to prove discrimination by the USDA that took place in the late 1970s during my early farming years.

23. The money that I received from the suit was used to maintain my living expenses.

24. In spite of the *Pigford* settlement, racial discrimination by the USDA continued at the state and local level.

25. I was continuously denied loans by the local and federal USDA.

26. My land was severely undervalued by a local appraisal company, which I believe had ties to The Bank (The Bank, a local bank in Oakley) that funded my USDA loan.

27. This appraisal company's false valuations of my assets created a domino effect of hardship and loss.

28. For another example, the local FSA office denied me a loan because I owed the IRS.

29. The head of the FSA Office in the state of Kansas wrote a letter to the local FSA office explaining that I could get a loan.

3

30. However, the local FSA office failed to follow the steps outlined by the state office to ensure loan approval.

31. In 1998, the local FSA office failed to fulfill the USDA loan guarantee on my $260,000 loan.

32. Instead of applying the loan guarantee to the outstanding balance on my loan, the local FSA office just let it expire.

33. As a result, I received a foreclosure notice in November of 2003.

34. Because of the local FSA office's negligence, in November of 2004, I was finally forced to sell my farm for $600,000, which the bank immediately took to pay off the loan.

35. In February of 2005, just 3 months after my land was severely undervalued, my land was re-listed for $1.2 million through a subsidiary of Bennington State Bank, Whiskey Land, LLC.

36. Like so many Black farmers in America, my family's farming legacy was destroyed due to decades of systemic racism by local banks, appraisal companies, and the USDA.

4

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

_/s/Wilburt Howard_                                   Dated: <u>July 14, 2022</u>
Declarant's Signature


<u>Wilburt Howard</u>
Declarant's Printed Name

5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,

       *Plaintiffs*,

     *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

       *Defendant*.

No. 4:21-cv-00595-O

## DECLARATION OF JORDAN RAE OWENS

I, Jordan Rae Owens, state that I am more than 18 years of age, and the following is based on my personal experience:

1.     I am an Indigenous farmer of the Choctaw Tribe of Oklahoma, currently actively engaged in farming.

2.     I am a member of the Federation.

3.     I am 32 years old woman.

4.     I have been farming since 2011, so I have been farming for about 11 years.

5.     I am a third-generation farmer.

6.     My brother and sister are also farmers and each own one farm in Oregon.

7.     I managed a family ranch from 2011 to 2015.

8.     I purchased a 130-acre farm in 2016, which I use to grow hay and run a commercial cattle operation. The farm has remained the same size throughout my ownership.

9.     Farming is my primary source of income.

10.    I have one loan through the United States Department of Agriculture ("USDA").

1

11.    My one loan is a direct loan of $535,000, split between the Northwest Farm Credit Service and the Farm Service Agency ("FSA"), and used as operating capital for my cattle operation.

12.    I currently owe $500,000 on the direct loan.

13.    I have not applied for refinancing.

14.    I obtained the direct loan in 2016.

15.    I first applied for an FSA direct loan in 2015, when I was still living in Oregon.

16.    I began the loan application process by meeting with an FSA loan officer at the local FSA office.

17.    Every employee at the local FSA office, including the loan officer I spoke with, was white.

18.    I asked the FSA loan officer to tell me what I needed to provide to complete my application. In response, the FSA loan officer gave me a stack of papers and told me to fill them out by myself.

19.    Because I received no assistance from the FSA in filling out my application, I had to ask my sister for assistance.

20.    When I submitted my direct loan application the first time, the FSA did not review my application until the very end of the required 30-day limit.

21.    After reviewing my application at the end of the required 30-day limit, the FSA denied my application for failing to sign a single page. The FSA also requested additional documentation.

22.    The documentation they requested contained redundant information.

2

23.     This cycle of submission, delay in review, and request for additional information repeatedly occurred.

24.     In one such instance, I was asked to provide a 3-year projected document.

25.     30 days after I submitted the 3-year projected document, the FSA office told me that I needed to submit a 3-year current document.

26.     30 days after I submitted the 3-year current document, the FSA office told me that I needed to fill out a form that was not included in the original paperwork they gave me.

27.     30 days after I submitted the requested form, the FSA office sent me a letter denying my direct loan application because I "fell below the zero line."

28.     This constant 30-day cycle was stressful because it aligned with the cancellation period for my planned purchase of the real estate. Therefore, after every request from the FSA office for additional information, I had to go to my real estate agent and ask for an extension in escrow.

29.     In response to the FSA office's letter denying my direct loan application, I scheduled a meeting with the FSA office to discuss my application.

30.     At the meeting, the FSA loan officer told me that I had insufficient cash flow.

31.     I noticed at the meeting that the expenses associated with my farm that the FSA office used in its calculations were different than the expenses I put in my application.

32.     When I pointed out this discrepancy to the FSA loan officer, he directed me to speak with John Mills, another FSA employee.

33.     John Mills is a white man.

34.     When I spoke with Mr. Mills about the discrepancy, Mr. Mills told me, "It doesn't matter what you put, because I can change it."

3

35.     Ultimately, my 2015 direct loan application was denied – seven months after I applied.

36.     After I moved to Idaho in 2016, I was able to obtain the FSA loan from a different FSA office without any issues in the application process.

37.     However, it took an additional three weeks for me to receive my approval letter for the direct loan.

38.     This delay in receiving my approval letter prevented me from being able to ship my cattle on time, forcing me to sustain a loss.

39.     I have also experienced discrimination in the service of my direct loan.

40.     Before the COVID-19 pandemic, many farmers I knew, including me, were already struggling financially due to difficulties in the market.

41.     The COVID-19 pandemic further increased the gap between expenses and income, digging many farmers I knew, including me, deeper into debt.

42.     To mitigate my losses caused by the COVID-19 pandemic, I sought to delay my loan payments by a year. To achieve this, I sought assistance from the district FSA office.

43.     I filed with the FSA as a member of the Choctaw tribe.

44.     The district FSA office refused to help me delay my loan payments and told me, "If you won't [make the loan payment] now you won't make it then [in one year]."

45.     When my sister, who did not file with the FSA as a member of the Choctaw tribe, asked the district FSA office to delay her loan payments, it granted her request.

46.     When I asked the district FSA office whether I would qualify for loan forgiveness, it told me that I did not qualify, and that I should instead apply for COVID-19 assistance or loan servicing.

47.     The COVID-19 assistance I eventually received did not arrive until several months later.

48.     Many other farmers I knew were also unable to receive any financial assistance until several months after they needed it.

49.     Due to the lack of timely financial assistance, many other farmers I knew, including me, were forced to finance our farming operations using a credit card on 15-20% interest rates.

50.     I could not satisfy the payments on my credit card due to the high interest rate, and my credit score is now ruined.

51.     In 2022, I received an approval for my direct loan to be paid off.

52.     Two days later, I received an accelerated foreclosure notice for my 130-acre farm.

53.     I went to the local FSA office to request assistance.

54.     All the FSA employees at the local FSA office are white.

55.     According to the FSA employees I spoke to, I had already missed the primary loan servicing deadline.

56.     I had never received notice of the primary loan servicing deadline, nor was I ever given notice that I had missed the primary loan servicing deadline.

57.     The FSA employees I spoke to told me that the only thing I could do was "pray that the [debt relief] program actually goes through."

58.     If the debt relief program does not go through, I will lose my entire 130-acre farm.

59.     Not only have I experienced discrimination by the USDA, I have also witnessed discrimination by the USDA against my mother and my brother.

5

60.     My mother applied for the National Resource Conservation Service's ("NRCS") Equip program in the same Oregon county where I experienced discrimination during my first direct loan application.

61.     Despite the fact that my mother was the most qualified candidate for the Equip program based on her race, need, and gender, the NRCS agent handling her application withheld her application and ultimately chose a less-qualified candidate.

62.     My mother has since filed suit against the NRCS for discrimination.

63.     My brother, who filed with the FSA as a member of the Choctaw tribe, applied for an FSA loan in Oregon to purchase hay for his cows.

64.     Not only did the FSA office tell him that he did not qualify for a loan, it also informed him that he was delinquent on his existing loans and that it would accelerate foreclosure.

65.     My brother told the FSA office that federal legislation had prohibited the acceleration of foreclosure.

66.     Without an FSA loan, my brother was forced to put a lien on his truck to purchase the necessary hay to feed his cows.

67.     I see in Baker County, Oregon, that generational white farmers are receiving significant financial assistance that farmers of color are not receiving.

68.     I have reported my discrimination to the USDA, and I am planning on filing a lawsuit against those who have discriminated against me and my family.

69.     I did not know of the *Pigford v. Glickman* settlement until I researched it recently.

70.     I believe there are numerous farmers among the *Pigford* plaintiffs who have not yet received the settlement money.

6

71.     Based on my own, my family's, and other Indigenous ranchers' experiences with the USDA, I do not believe things have improved since *Pigford*.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**


*Jordan Rae Owens*
_____
Declarant's Signature

7/13/2022
_____
Date


Jordan Rae Owens
_____
Declarant's Printed Name

7

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,

      *Plaintiffs,*

    *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

      *Defendant.*

No. 4:21-cv-00595-O

## <u>DECLARATION OF AMY KROLL</u>

I, Amy Kroll, state that I am more than 18 years of age, and the following is based on my personal experience:

1.     I am a Caucasian farmer, currently actively engaged in farming.

2.     I am 34 years old and my husband, Martice Scales, is a Black farmer.

3.     I have been farming since 2016. I do not own any farmland, but I rent about 2.5 acres of farmland in Wisconsin with my husband, Martice Scales. We have a natural and bio-intensive farming business that includes producing and selling veggies, produce, herbs, flowers, herbal products, pickled products and eggs    .

4.     Farming is our primary source of income and, luckily, the COVID-19 pandemic did not affect our business.

5.     I have never had any loans through the United States Department of Agriculture ("USDA"), but I communicated with a Farm Service Agency ("FSA") loan officer about how much my family could receive from a USDA loan if we were to apply.

1

6.      I was told by this FSA loan officer that we would not be given a number until we had an accepted offer on a home, and then they would let us know what if they would approve or deny the accepted offer.

7.      We found an organic farm that was about 15 acres for $600,000 with a home attached to it and multiple buildings for animals.

8.      We completed a USDA loan application that was almost 200 pages and included our financials, a five-year business plan, our prior business information, multiple references and the accepted offer and drove it to the Madison, Wisconsin FSA office. We delivered to application an intern who informed us they would give it right away to Ms. Kirsten Hibbard, who informed us that they would review the application within a couple of days.

9.      Ms. Hibbard is a white woman.

10.     One week after we submitted our application, we contacted Ms. Hibbard to check on the status of our application.

11.     Ms. Hibbard informed us that our application was never given to her because her intern did not know they were supposed to hand it to her and told us she now had it in her possession.

12.     Ms. Hibbard then informed us that she never looked at the application because based on the realtor posting online, home was "too nice." Ms. Hibbard did not provide an explanation as to what "too nice" meant.

13.     After pressing the issue multiple times and with multiple employees, we were advised by the USDA that any house built after 1950 would be too new for a loan, and that the total value of the house could not be over $150,000. We were also told that they cared more about what the buildings for the animals were like than the actual home. It was suggested to us that we

FEDERATION MSJ APP. 238

buy raw land and either 1) buy a trailer to put on the land or eventually build a home, 2) buy raw land and stay in our rental and commute to the farm, or 3) find an older farmer who is close to retirement, work for them for free, and maybe we would be gifted the land upon that farmers retirement.

14.     We requested to send possible farms to Ms. Hibbard to look at prior to viewing homes and attempting to obtain an accepted offer. We sent information for approximately eight other potential houses to the USDA in support of our application, but none of the home options were sufficient and we were denied.

15.     During the application process the USDA wants us to show plans for our farm and future projections.

16.     We planned to convert the basement of a house into a commercial kitchen so we could produce products without having to rent a commercial kitchen as we currently do, had plans to add a mother-in-law suite as we would move to being multi-generational home. We also planned to raise livestock on the farm.

17.     Months into the process, the USDA told us that we did not have enough experience for our farm plan and advised us to take business classes despite having shown in our 200-page application that we had a successful farm business already on the land we rent

18.     After being told that our loan application would not be approved, I became discouraged about applying again.

19.     Per Ms. Hibbard's suggestion we rescinded our application, instead of having the USDA formally deny our application.

20.     Since we did not receive a USDA loan, we ended up buying a house near the farmland that we rent in Wisconsin, and have invested over $100,000 land we'll never own.

3

21.     My experience with the FSA has left me feeling frustrated and angry, and I have seen that other Black farmers in the area experience the same thing.

22.     I am familiar with the *Pigford v. Glickman* settlement. I do not think the USDA has changed much since that decision, however, and I believe the USDA continues their racist and discriminatory practices.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Amy Kroll (Jul 17, 2022 13:41 CDT)
_____
Declarant's Signature

07/17/22
_____
Date

Amy kroll
_____
Declarant's Printed Name

4

# Signed Declaration- Amy Kroll (For Review) FINAL

**Final Audit Report**                                                          2022-07-17

| | |
|---|---|
| Created: | 2022-07-17 |
| By: | Anneke Dunbar-Gronke (adunbar-gronke@lawyerscommittee.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAY-fCZaP947uvqp9w4tKpbbv9fXtQHK2V |

## "Signed Declaration- Amy Kroll (For Review) FINAL" History

📄 Document created by Anneke Dunbar-Gronke (adunbar-gronke@lawyerscommittee.org)
  2022-07-17 - 6:17:20 PM GMT

📧 Document emailed to fullcirclehealingmke@gmail.com for signature
  2022-07-17 - 6:18:20 PM GMT

📄 Email viewed by fullcirclehealingmke@gmail.com
  2022-07-17 - 6:40:56 PM GMT

✍️ Document e-signed by Amy Kroll (fullcirclehealingmke@gmail.com)
  Signature Date: 2022-07-17 - 6:41:55 PM GMT - Time Source: server

✅ Agreement completed.
  2022-07-17 - 6:41:55 PM GMT

Adobe Acrobat Sign

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,
        *Plaintiffs*,

    *v.*

TOM VILSACK, in his official capacity as
Secretary of Agriculture,
        *Defendant*.

No. 4:21-cv-00595-O

## DECLARATION OF JONATHAN LAMAR

I, **Jonathan Lamar**, state that I am over the age of 18 and fully competent to make this declaration.

1. I am a generational Black farmer who has farmed his entire life.

2. I also hold advanced degrees in physics and business management.

2. I want amicus Rural Coalition to represent my interests in *Miller v. Vilsack*, No. 4:21-cv-00595-O (N.D. Tex. Apr. 26, 2021).

3. I agree that this declaration may be shared with the Federation of Southern Cooperatives/Land Assistance Fund (the "Federation") to file in support of its case before this Court.

4. I, along with my mom Belinda Lamar, and sister Kendra Lamar, proudly own and operate the Roger Lamar Farm, an active, productive cow-calf operation located in Eatonton, Georgia, Putnam County (hereinafter, "the Farm").

5. The Farm abuts Lake Oconee, which is surrounded by million-dollar homes in the exclusive residential community of Reynolds Lake Oconee Plantation.

6.      The Ritz-Carlton Reynolds, Lake Oconee, is a luxury hotel and golf resort also located along Lake Oconee.

7.      My father, Roger L. Lamar, an African American dairy farmer, passed away on March 19, 2021, at his home in Eatonton, Georgia.

8.      Prior to his passing, my father filed a federal bankruptcy petition for the purpose of preventing the illegal foreclosure efforts of a private farm lender, Peoples Bank, and the U.S. Department of Agriculture (USDA).

9.      The Chapter 11 bankruptcy process prevented foreclosure on our farm and home.

10.     Under the protection and debt restructuring provisions of Chapter 11 of the bankruptcy code, my sister and I purchased the Farm.

11.     In 2018, prior to purchasing the Farm, I made a total of three applications to the FSA for USDA loans. Each time, my loan application was ultimately denied.

12.     My first application to the FSA was for a guaranteed USDA loan for the purpose of purchasing the Farm from my dad.

13.     The FSA loan official declined my loan application basically by manipulating the financial information to appear that the Farm would not be profitable enough to make the monthly payments on the loan.

14.     For example, on my FSA application, I stated that the milk production per cow would meet or even exceed the county average of 70 lbs. per day. I documented this estimate by including paperwork from the seller that included that warranty and a replacement policy for any cow that did not meet that standard.

15.     This production level was also validated based on the cows' dry matter and nutritional intake through a feed ration prepared by a certified ag nutritionist who also prepares the

feed ration for all whites farmers in Eatonton and throughout the state of Georgia.  He is a nutritionist for the Eatonton Corporate Feed Company Inc.

16. This production level is also supported by statistics and records from the UGA Cooperative Extension Office and Agent and the Dairy Herd Improvement Records.

17. Dairy Herd Improvement (DHI) testing was developed and continues to provide convenient, standardized monthly assessments of milk production and milk components (fat, protein, and somatic cell count (SCC)) for individual dairy cows within a herd.

18. When the FSA official saw the 70 lbs. per cow per day on my application, she lowered my milk production estimate to 50 lbs. per cow, which would necessarily reduce the amount of projected revenue for the Farm.

19. She said she did this because she claimed that I lacked farming experience and could not use the county average production of 70 lbs. per cow per day.

20. Meanwhile, I know white farmers with less farming experience than me who purchased cows from the exact same seller that I did, but the FSA approved their loans.

21. The white farmers also purchased feed rations from the same place and prepared by the same person, as I did.

22. After my first USDA loan application was rejected, I applied a second time, also in 2018.

23. An FSA agent advised me that farmers in my area were switching from dairy to beef and that I should do the same with the Farm.

24. I took his advice and worked up a new budget to make that transition.

25. But then, this FSA agent cherry-picked budget information to use in the algorithm (UGA 2018 Cow-Calf Enterprise Budget North Georgia) that determines whether you qualify for a USDA loan.

3

26.     For example, I obtained signed contracts from other farmers to sell them my hay, which would help me offset some of the cost of operating the Farm.

27.     The FSA agent told me that, again, because of my lack of farming experience (never mind me growing up and working on a farm that sold and produced hay my whole life or my advanced degrees), those contracts could not be counted as potential revenue in my budget.

28.     However, I have seen younger, white farmers, with *no* experience farming, who did the exact same thing that I did.

29.     They got signed contracts to sell hay and submitted those contracts as a part of their USDA loan applications.

30.     Their applications were approved.

31.     Mine was not.

32.     Another example of how the FSA has treated me differently than white farmers: Many white farmers in my area use chicken feces to fertilize their fields because it's cheaper than commercial fertilizer.

33.     The FSA agent told me that I had to use commercial fertilizer because I lacked farming experience.

34.     Of course, that drives up costs on my budget, making it harder for me to show that I could make the monthly payment and qualify for the loan.

35.     After my second application for a USDA loan was denied for all of the reasons above, I applied a third time in 2018.

4

36.     Yet again, the FSA agent made changes to my application that inflated my costs and reduced revenue, lowering my overall cash flow, so that on paper, it looked like I couldn't make monthly payments on the loan I was requesting.

37.     One example – the FSA agent told me that I should budget for $20,000.00 in repairs per year for the next 7 years. He said that it was for replacement fencing based on a prediction that a tornado would completely destroy the fencing every year for the next 7 years.

38.     I also work a second job as an insurance agent. So, I know it is completely unreasonable to expect a total loss of fencing every year for 7 years. Not to mention the fact that any disaster would be covered by insurance.

39.     I've also been told by FSA agents that I could only cut grass for hay once per year because there would be a drought every year for the next 7 years.

40.     This projection not only lowered my revenue projections, but it also increased my costs of operation. This is because I would also need to purchase a larger amount feed for my own farm. Lower revenue and higher costs would, again, make it harder for me to qualify for the USDA loan.

41.     I know that the agent's drought information is also unreasonable because it was counter to the information, I was being given by the UGA Cooperative Extension Office and Agent, which tracks that data and had advised that hay could be cut at least 2-3 times per year in the county.

42.     After the FSA denied my USDA loan application for a third time in 2018, I stopped applying.

43.     Fortunately, I eventually was able to get a personal loan from a private lender.

5

44. These are just a few examples of how I feel like I'm being treated differently, on account of my race, by FSA agents, than white farmers in my area with the same or even far less experience in farming.

45. The USDA has a loan handbook online that includes all of the guidelines to qualify for a loan.

46. I have studied this handbook a lot and used it to guide how I put together my USDA loan applications to have a better shot at qualifying.

47. It feels like no matter what I do, these FSA agents bend those guidelines and use them against me to deny my loan applications.

48. I know that, before he passed, my father had similar experiences with the local FSA when he was a dairy farmer.

49. In 2012, he applied for and was granted an FSA loan in the amount of $273,000.00.

50. According to the USDA guidebook, dairy cows are considered loan collateral on a standalone basis.

51. However, FSA insisted on taking a lien out on my dad's equipment and property, as well as the animals. The cows should have been enough collateral.

52. Also, just one piece of my dad's property had a market value of $500,000.00, which, along with the other collateral, was more than twice the value of the loan amount.

53. In my opinion, the FSA wanted my father's property in the event he defaulted on the loan because they knew how valuable it was.

54. I know that USDA doesn't treat white farmers this way. FSA agents aren't asking white farmers to put liens on their property when it's not required.

6

55.     More generally, I have seen how the FSA in my area favors white farmers over Black farmers.

56.     White farmers get direct and guaranteed FSA loans almost every year.

57.     Based on farm profitability, the USDA will write down or completely write off large amounts of these farmers' entire debt.

58.     White-owned farms in my area are far more profitable than Black-owned farms because our farming operations tend to be smaller, due to lack of access to farm loans and farm programs.

59.     As I've described, the FSA makes it very difficult for Black farmers to qualify for USDA loans, which would allow us to expand our operations, increase profitability, and allow us to qualify for other farm assistance programs.

60.     Meanwhile, white farmers pocket the savings from their USDA debt write-offs and write-downs and use that money to continue to grow their operations.

61.     Black farmers just further and further behind.

62.     I know that white farmers sometimes check a box on USDA loan applications, claiming to be minorities, in order to get access to minority funding and programs.

63.     The same white farmers who are complaining about debt relief to minorities also have their white wives apply for and receive USDA minority or social disadvantaged loans as "minorities" because they are women.

64.     By comparison, I can't even get one USDA loan as a Black farmer who really needs it.

65.     The USDA through the local FSA agents continues to discriminate against Black farmers to this day.

7

66.     Based on what I've seen, and experienced, White farmers continue to get the benefit of almost all of the loans and debt forgiveness programs in the form of both debt write-downs and write-offs from the USDA.

67.     If the USDA had been treating Black farmers fairly all along, Section 1005 debt relief wouldn't be necessary to try and level the playing field.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**


*/s/Jonathan Lamar*                                          Date: July 13, 2022

Declarant's Signature


Jonathan Lamar

Declarant's Printed Name

9

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| SID MILLER, et al., | |
| *Plaintiffs*, | |
| *v.* | No. 4:21-cv-00595-O |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, | |
| *Defendant*. | |

**<u>DECLARATION OF RYAN PRESSLEY</u>**

I, Ryan Pressley, state that I am more than 18 years of age, and the following is based on my personal experience:

1.      I am a Black farmer, currently actively engaged in farming.

2.      I am 35 years old.

3.      I have been farming since 2006, so I have been farming for about 16 years.

4.      I am a fifth-generation farmer.

5.      I lease three farms—two in in South Carolina, and one in Georgia.

6.      I also manage a farm in South Carolina for a church organization.

7.      I raise cattle and farm tomatoes, lima beans, peas, watermelon, cantaloupe, okra, and squash.

8.      I used to own a 117-acre family farm used for cattle and hay and a 256-acre farm used for produce. Both farms were in South Carolina.

9.      I began farming on the 117-acre family farm in 1993 and purchased the 256-acre farm in 2008. The farms remained the same size throughout my ownership.

1

10.     I lost the 117-acre family farm and the 256-acre farm in 2014.

11.     Farming is my primary source of income.

12.     Before the COVID-19 pandemic, I had an order from the Charles County School System ("CCSS") for 4,000 bushels of peas from my farm. However, after the schools closed from the pandemic, the CCSS cancelled its order two days before the order was supposed to go through.

13.     I have no current loans.

14.     I once had three loans through the USDA: one guaranteed loan in 2008 through the Farm Credit Administration ("FCA") with AgSouth, one direct loan in 2010 through the Farm Service Agency ("FSA"), and one emergency loan in 2011 through the FSA.

15.     The direct loan I obtained in 2010 was a $300,000 FSA loan used as operating capital and to restructure the guaranteed loan.

16.     I was instructed to complete the application process for the direct loan by Ed Glover, a loan officer at the FSA.

17.     Ed Glover is a Black man and the only Black employee I have encountered in my experience with obtaining USDA loans.

18.     Mr. Glover gave me a loan application and told me to fill it out myself.

19.     Although white farmers filling out loan applications at the same time told me that they received assistance from the FSA loan office, I did not receive any assistance from the FSA loan office.

20.     I spent a day filling out my loan application.

21.     After I submitted my loan application, the FSA loan office requested that I provide additional documents. The FSA loan office claimed it needed the documents because "it needed empirical data to assess the changing market."

FEDERATION MSJ APP. 252

22.     White farmers applying for loans at the same time told me that they were not asked to provide additional documents.

23.     I spent a day collecting and submitting the additional documents.

24.     The FSA loan office did not process my direct loan application until the very end of the required 45-day limit.

25.     By this time, the direct loan was less useful to me because the planting season was already over.

26.     The emergency loan I obtained was a $337,000 FSA loan that I was going to use to plant crops in the fall of 2011 to recoup losses from a qualifying natural disaster that occurred earlier that year.

27.     I was guided through the application process for the emergency loan by Leon Brewer, a loan officer at the FSA.

28.     Leon Brewer is a white man.

29.     Mr. Brewer gave me a loan application and told me to fill it out myself without any assistance despite white farmers receiving assistance from the FSA loan office.

30.     I again spent a day filling out my loan application.

31.     The FSA loan office requested that I provide additional documents on two occasions. On each occasion, I immediately collected and submitted the additional documents.

32.     White farmers applying for loans at the same time told me that they were not asked to provide additional documents.

33.     The FSA loan office did not acknowledge my application as complete until six months after I submitted my application. By this time, the emergency loan was no longer useful to me because the fall planting season was already over.

3

34.     After my loan was approved, Mr. Brewer refused to issue the funds to me until I wrote a check to AgSouth for $195,000.

35.     Mr. Brewer told me, "I don't trust you. I'm not going to [just give you the funds], you're going to write me the check [to AgSouth] first."

36.     Upon information and belief, an FSA loan officer's request for a check in exchange for disbursing loan funds violates FSA policy.

37.     I applied for other loans which the FSA denied.

38.     The FSA claimed that I was ineligible for the loans because I did not have the requisite cash flow.

39.     I also applied for FSA crop insurance for the loss of twenty acres of cantaloupe in 2012.

40.     At the same time, my neighbor, Glen Owens, applied for FSA crop insurance for the loss of five acres of cantaloupe and fifteen acres of other crops.

41.     Glen Owens is a white man.

42.     The FSA crop insurance application process was overseen in part by Randy Lambert, the County Executive Director of the local FSA Office.

43.     Randy Lambert is a white man.

44.     The FSA office requested that I provide additional documents to process my crop insurance claim. The FSA office did not ask Mr. Owens to provide additional documents.

45.     I immediately collected and submitted the additional documents.

46.     I received only a few thousand dollars of crop insurance for the loss of twenty acres of cantaloupe, but Mr. Owens received $95,000 of crop insurance for his loss of twenty acres of cantaloupe and other crop.

4

47.     Because of the dissimilar treatment I received regarding crop insurance, I filed a discrimination complaint with the Office of the Assistant Secretary for Civil Rights. Filing the complaint took two to three weeks because my calls either went unanswered or to the busy dial tone.

48.     The Office of the Assistant Secretary for Civil Rights eventually told me that they "didn't find any signs of discrimination."

49.     I filed other crop insurance claims which the FSA denied.

50.     The FSA claimed that it denied my crop insurance claims because my farming practices, as evidenced by photos of my farm that the FSA kept on file, were unsatisfactory.

51.     The photos of my farm that the FSA kept on file focused on a one-tenth acre of land containing okra crops with a dry spot issue.

52.     None of the photos of my farm that the FSA kept on file showed the other forty-nine and nine-tenths acres of okra which were healthy and highly successful.

53.     Upon information and belief, I had better farm practices than many of my white colleagues.

54.     I was eventually forced to file for bankruptcy: three times under Chapter 12, once under Chapter 13, and once under Chapter 7 with a Chapter 13.

55.     I met with a FSA State Office Loan Employee, Steve Rogers, to discuss my financial situation.

56.     Steve Rogers is a white man.

57.     Mr. Rogers pressured me to transfer my family farm to AgSouth via a deed in lieu of foreclosure to help settle my loans. Mr. Rogers told me that "there's no farmer that can bounce back from this."

5

58.     I lost my 117-acre family farm and my 256-acre farm in 2014 after my Chapter 12 bankruptcy case was dismissed with prejudice.

59.     Not only have I experienced discrimination by the FSA office, but I have witnessed my father go through the same type of discrimination.

60.     My father was denied a loan in 2015 from the same FSA office.

61.     The FSA office claimed that my father was ineligible for a loan because of his credit; however, my father's credit score was 810.

62.     Upon information and belief, the FSA office denied my father a loan because of my own involvement with that FSA office.

63.     My experiences with the FSA have left me feeling aggravated by and distrustful of the FSA.

64.     I was frustrated, disappointed, and angry that I had to tell my grandmother that I had lost the family farm on which she was born.

65.     My credit score is all messed up, and I have had to hire a lawyer to help discharge my bankruptcies.

66.     I am familiar with the *Pigford v. Glickman* settlement, but I do not feel that things have changed since then. My own story and other stories I have heard about Black farmers in similar circumstances make me believe that we are still being mistreated and disadvantaged by the FSA loan process.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

6

_____          7/14/2022
_____
Declarant's Signature                             Date


            Ryan Pressley
_____

7

FEDERATION MSJ APP. 257

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| SID MILLER, et al., | |
| *Plaintiffs*, | |
| *v.* | No. 4:21-cv-00595-O |
| TOM VILSACK, in his official capacity as Secretary of Agriculture, | |
| *Defendant.* | |

## DECLARATION OF MARTICE SCALES

I, Martice Scales, state that I am more than 18 years of age, and the following is based on my personal experience:

1.   I am a Black farmer, currently actively engaged in farming.

2.   I am 35 years old and I have been farming since 2016. I do not own any farmland, but I rent about 2.5 acres of farmland in Wisconsin with my wife, Amy Kroll. Farming is our primary source of income.

3.   I am also an Aldo Leopold Foundation Land Stewardship Fellow.

4.   My grandparents had a farm in Mississippi. However, my grandfather was unfortunately coerced into selling about 60 acres of their farm for three dollars to the government because he was illiterate. My mother also farmed and is now 60 years old.

5.   The COVID-19 pandemic did not affect our business.

6.   I have never had any loans through the United States Department of Agriculture ("USDA").

1

FEDERATION MSJ APP. 258

7.      I communicated with a Farm Service Agency ("FSA") loan officer about how much my family could receive from a USDA loan if we were to apply.

8.      I was told by this FSA loan officer that we would not be given a number until we had an accepted offer on a home, and then they would let us know what we actually qualified for.

9.      We found a farm that was about 15 acres for $600,000 with a home attached to it.

10.     We completed a USDA loan application and drove it to the Madison, Wisconsin FSA office. We delivered to application to Ms. Kirsten Hibbard—a white woman—who informed us that they would review the application within a couple of days.

11.     In addition, the FSA county committee in Madison has no Black farmers. I also have never been asked to join the FSA committee.

12.     Ms. Hibbard was additionally very rude and cold to us.

13.     After one week, we contacted Ms. Hibbard to check on the status of our application.

14.     Ms. Hibbard informed us that our application was lost because an intern took it home and that she never even looked at the application in the first place because the home was "too nice." Ms. Hibbard did not provide an explanation as to what "too nice" meant.

15.     We were advised by the USDA that any house built after 1950 would be too new for a loan, and that the total value of the house could not be over $150,000. This assertion, however, did not make sense to us because if the house cost under $150,000, then it would mean that the land would be valued higher than the home and would necessarily mean that the land was bad or that we would be disqualified for loans.

16.     We sent information for eight other potential houses to the USDA in support of our application.

2

17.     During the application process the USDA wanted us to show plans for our farm and future projections.

18.     We planned to convert the basement of a house into a commercial kitchen so we could produce products without having to rent a commercial kitchen as we currently do. We also planned to raise livestock on the farm.

19.     Despite the fact that we have been farming successfully for three years, the USDA told us that we did not have enough experience for our farm plan and advised us to take business classes and that we needed to have management experience at another farm because managing our own farm did not count.

20.     Despite all of the information we provided to the USDA, at the agency's direction, we were told our loan would not be approved and Ms. Hibbard suggested that we rescind the application instead of having the USDA formally deny our application. We followed Ms. Hibbard's suggestion, trusting that the advice she was giving was in our best interest.

21.     After being informed that our application would likely be denied, I became discouraged about applying again.

22.     Since we did not receive a USDA loan, we ended up buying a house next to the farm land that we rent in Wisconsin, and have invested over $100,000 land we'll never own.

23.     My experience with the FSA has left me feeling frustrated and angry, and I have seen other Black farmers experience the same thing.

24.     I am familiar with the *Pigford v. Glickman* settlement. I do not think the USDA has changed much since that decision, however, and I believe the USDA continues their racist and discriminatory practices.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Martice Scales (Jul 17, 2022 15:24 CDT)
_____
Declarant's Signature

07/16/2022
_____
Date

Martice Scales
_____
Declarant's Printed Name

4

# BIPOC Farmer Declaration - Martice Scales (For Review) FINAL

**Final Audit Report**                                                    2022-07-17

| | |
|---|---|
| Created: | 2022-07-17 |
| By: | Anneke Dunbar-Gronke (adunbar-gronke@lawyerscommittee.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAssDhmGOAvE0qunVhXyy_8ikj8cZjryiT |

## "BIPOC Farmer Declaration - Martice Scales (For Review) FINAL" History

🗎 Document created by Anneke Dunbar-Gronke (adunbar-gronke@lawyerscommittee.org)
2022-07-17 - 6:51:10 PM GMT

✉ Document emailed to fullcirclehealingmke@gmail.com for signature
2022-07-17 - 6:51:39 PM GMT

🗎 Email viewed by fullcirclehealingmke@gmail.com
2022-07-17 - 6:51:46 PM GMT

✍ Document e-signed by Martice Scales (fullcirclehealingmke@gmail.com)
Signature Date: 2022-07-17 - 8:24:44 PM GMT - Time Source: server

✅ Agreement completed.
2022-07-17 - 8:24:44 PM GMT

**Adobe Acrobat Sign**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SID MILLER, et al.,
      *Plaintiffs*,

     *v.*                       No. 4:21-cv-00595-O

TOM VILSACK, in his official capacity as
Secretary of Agriculture,
      *Defendant*.

## DECLARATION OF BARBARA SHIPMAN

My name is Barbara Shipman. I am over the age of 18 and fully competent to make this declaration.

1.     I am a member of Cottage House Inc. in Ariton, Alabama.

2.     I want amicus Rural Coalition to represent my interests in this lawsuit, *Miller v. Vilsack*, No. 4:21-cv-00595-O (N.D. Tex. Apr. 26, 2021).

3.     I agree that this declaration may be shared with the Federation of Southern Cooperatives/Land Assistance Fund (the "Federation") to file in support of its case before this Court.

4.     I live in Barbour County in the state of Alabama.

5.     I am a Black woman generational farmer, and I have been farming my entire life.

6.     I inherited the farm from my family, 110 acres with most of it in timber, where I currently grow, produce, and raise livestock.

7.     This year, I planted my first crop but lost it due to heat and will not be putting anything in the ground again until fall.

8.      I do, however, currently have goats, chickens, ducks, and a few Perani dogs for breeding.

9.      While I have not had any changes in the animals I have raised over the past few years, the drastic increase in input costs, since Covid-19, will dictate what animals I raise, and crops I grow in the future.

10.     Unfortunately, given the increase in these costs – including animal feed, seeds (flowers, beans, etc.), veterinarian costs, fertilizer, lime, and other inputs – I am contemplating not continuing in farming.

11.     We were able to sell our animals during the pandemic, but what has really impacted us financially is the price gouging of everything.

12.     We are small farmers, and we don't have the quantity that a big farmer would have, and we don't get the prices for our products that they would get.

13.     Some Black farmers have decided to stop farming because they are priced out. They cannot compete with larger farms, and we don't get the right amount of cost-share from Natural Resource Conservation Service (NRCS) and FSA.

14.     If agencies have money set aside for minority farmers, it is hard to get it.

15.     Most of the time, the money is part of a program, such as a cost share program, that requires minority farmers to follow a lot of steps before getting the money.

16.     Oftentimes, based on complaints that I have heard from Black farmers, the money that the agencies get for minority farmers does not go to minority farmers.

17.     Instead, the money gets thrown back into the pot and divvied up for white and large farmers to ensure they stay in business, if we as Black people don't get and use it.

2

18.     I was fortunate that I never had to take out any loans from USDA or other lending institutions, and, therefore, the outcome of the court's decision on debt relief payments will not directly impact me.

19.     However, I think it is very important to share my experience dealing with USDA agencies to highlight the fact that discrimination and mistreatment of BIPOC farmers is an ongoing issue and that we are not treated the same as our white counterparts.

20.     I am appalled that USDA and others believe discrimination and mistreatment to BIPOC farmers are a thing of the past, when USDA employees continue to discriminate against and treat minority farmers poorly.

21.     Just because we had the *Pigford* Class Action Settlement, it doesn't mean discrimination has gone away.

22.     I do not believe anything has changed.  If you are who you are, you are who you are, regardless of what happened with that lawsuit.

23.     If you were prejudiced when it happened, you are prejudiced now.  The outcomes of these settlements have no effect on the personalities of individuals.

24.     I would say that instead of these settlements changing discriminatory behaviors, it has given individuals more of a "I will get you now" type of attitude.

25.     I have had multiple mistreatments and poor experiences dealing with my local FSA office.

26.     For example, I have always applied for the Non-insured Crop Disaster Assistance Program (NAP) and continue to do so every year.

27.     One year, I had a loss with my collard greens and had to file a claim.

FEDERATION MSJ APP. 265

28.    An inspector came out to the farm to inspect the loss, and we had a disagreement because he was dismissing my claim on the grounds of not using FSA planting protocol, which I knew nothing about.

29.    FSA did not tell me there was a planting protocol to follow to ensure payment in the event of a loss.

30.    The FSA fails to give Black farmers that information, and without that information, farmers like myself are purchasing seeds and planting their fields according to what we know has worked for us in the past.

31.     However, when you plant based on your own (the farmer's) protocol and you have a loss, the inspector will show up to the farm and start telling you that you didn't follow FSA's protocol.

32.    Other Black farmers have told me that they do not believe they are being treated the same as their white counterparts.

33.    That is unfair, when FSA fails to provide Black farmers with a protocol list and does not educate the farmers before they experience a loss.

34.    Farmers cannot, and will not, know to ask for such a list if this was never discussed with them prior to purchasing NAP.

35.    I was eventually paid, but only after I persisted and told them I would turn it over to my attorney because they failed to give me the protocol list, even after I listed the crops I intended to plant.

36.    FSA waited until after I had a loss before bringing up the protocol requirements.

37.    I believe that this is an alternate method that FSA agents use (not giving you all the information) to not pay out for minority farmers' losses.

4

38.     If they are not paying out the money to minority farmers, they are adding it to the pot for white farmers.

39.     Actions like these by FSA are further crippling BIPOC farmers who are already at a disadvantage and who are spending money they don't have to purchase their insurance.

40.     If you are a small farmer who doesn't push back or persist, you incur a loss and that is a huge setback and financial burden on an already meager or non-existent profit margin.

41.     I have also experienced mistreatment in the local FSA offices and witnessed other Black farmers having similar experiences.

42.     Based on me coming into the FSA office and sitting and listening while waiting to be served, I have heard conversations between FSA agents and white farmers explaining in full detail what white farmers must do to apply for a loan.

43.      However, FSA agents have failed to give me, as a minority female farmer, information about the planting protocol in that much detail.

44.     I believe they should be giving every farmer that goes into the office the same level of service and attention.

45.     I have also had to ask for my receipts of service from FSA local agents and educate other Black farmers to do so as well because the FSA agents serving you do not provide one, even though they are required to do so.

46.     A receipt of service helps farmers follow up on requests with the local FSA office because the receipt states the date and time of service and what the appointment was about.

47.     Also, without a receipt of service, it would be difficult for an FSA agent to locate a farmer in the FSA's computer system because the receipt contains each farmer's farm number and track number.

FEDERATION MSJ APP. 267

48.     In my opinion, FSA agents should be doing their job and routinely providing these very important receipts of service to Black farmers.

49.     Within the last three and a half years, I have also seen where Black farmers submit claims for damages on their properties, for example, holes in their pastureland from water run off after a storm and were denied.

50.     Within the past two years, I have also experienced and witnessed white farmers being called ahead of minority farmers, even when you have an appointment.

51.     Additionally, staff members at the FSA office do not afford me the courtesy of letting me know that the client ahead of me is taking longer and bleeding over into my time. Instead, they tell me nothing, and I have to sit there.

52.     I have also experienced and witnessed other minority farmers having longer wait times than our white counterparts.

53.     I have even had to report mistreatment of, and lack of service to a minority farmer to Mr. Ben Malone, who is over Natural Resources Conservation Service (NRCS) offices in Alabama.  The case was also discussed with a representative from the Geneva office.

54.     This mistreatment is also detrimental to small farmers' businesses because small farmers lack the financial resources to make those repairs on their own. It becomes a huge financial burden.

55.     There is something wrong with this system that we still have in place. It is not a fair system to us as African Americans, Hispanics, Asians, or any other minority farmers.

FEDERATION MSJ APP. 268

**<u>I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.</u>**

*<u>/s/Barbara Shipman</u>*                                     Dated: <u>July 14, 2022</u>
Declarant's Signature


<u>Barbara Shipman</u>
Declarant's Printed Name

7